# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>　　　　Defendant. | : CIVIL ACTION<br>:<br>: NO. 04-CV-325 (ERIE)<br>:<br>: Judge Sean J. McLaughlin<br>:<br>: **JURY TRIAL DEMANDED** |

## PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER

Plaintiff and Counterclaim Defendant Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel, hereby moves the Court for an Order compelling Defendant and Counterclaim Plaintiff Victory Energy Operations, LLC ("VEO") to produce documents that are responsive to IKE's discovery requests and to deny VEO's Motion for Protective Order. In support of its Motion and in opposition to VEO's Motion, IKE states the following:

### Introduction

1.　As set forth in greater detail in IKE's Complaint, this action arises out of VEO's alleged misuse and misappropriation, *inter alia*, of certain software and proprietary and

technical data (collectively, the "Keystone® Technology") that was licensed to VEO pursuant to a written License Agreement dated as of January 7, 2003.

2.  The original licensor under the License Agreement was Erie Power Technologies, Inc. ("EPTI"). EPTI entered bankruptcy proceedings and sold substantially all of its assets to CMI-EPTI, LLC, which almost immediately sold the Keystone® Technology to IKE without ever utilizing that Technology or performing Licensor functions.[1] IKE thus became the successor licensor under the License Agreement, and it acquired all "right, title and interest" in the subject intellectual property and technical data pursuant to a written Asset Purchase Agreement dated as of September 8, 2004. VEO concedes as much in its Amended Counterclaim (at ¶ 17), where it refers to IKE as the "successor-in-interest to EPTI's rights and obligations under the License Agreement." Despite the fact that IKE is the licensor with full rights to the Keystone® Technology and stands in the shoes of EPTI, VEO seeks to limit IKE's discovery to the time period after IKE acquired that Technology.

3.  Moreover, whereas IKE has been forthcoming, reasonable and straightforward in the discovery process in this action, VEO has been dilatory and disputatious.

4.  On March 23, 2005, as part of its Federal Rule 26 initial disclosures, IKE produced to VEO three boxes of documents containing almost 7,400 pages of materials that (among other things) pertain to the dealings between EPTI and VEO prior to IKE's acquisition of the Keystone® Technology. It also gave notice to VEO of subpoenas that were issued prior to receiving any documents from the subpoenaed parties, and IKE agreed to limit the scope of the subpoenas in an effort to facilitate production of documents (especially since VEO had

---

[1] As set forth above, EPTI was the original owner of the Keystone® Technology. On August 27, 2004, the United States Bankruptcy Court for the Western District of Pennsylvania approved the sale, *inter alia*, of the Keystone® Technology to CMI EPTI, LLC ("CMI-EPTI"). On September 8, 2004, CMI-EPTI re-sold the Keystone® Technology to IKE.

2

essentially failed to produce documents and IKE wanted to advance the discovery process). IKE further advised VEO that it could produce documents prior to entry of a protective order and that IKE would preserve confidentiality as though such an order were in place, even holding them back from IKE until the order was entered.

     5.     In contrast, VEO has engaged in delayed, incomplete production of documents that have hindered discovery. VEO initially produced only 345 pages of materials to IKE in its initial disclosures (even though IKE agreed to maintain confidentiality over all documents produced by VEO). VEO then claimed that certain of its documents were so sensitive that only attorneys -- and no IKE employees -- could review those documents. Yet rather than withholding only those allegedly "highly confidential" documents and producing the balance, VEO withheld all of its documents (even those that could be viewed by IKE employees) while it litigated the protective order. IKE challenged the need for an "attorneys' eyes only" designation and, in a further effort to advance discovery, offered to limit disclosure of "highly confidential" information to certain designated IKE employees. Demonstrating that the need for an "attorneys' eyes only" designation was illusory (or an attempt to delay discovery), VEO abandoned its insistence on that designation and accepted the compromise offered by IKE. Then, although the Protective Order was entered on June 7, 2005, VEO still failed to produce documents, and IKE had to threaten a motion to compel. VEO finally (and belatedly) produced certain additional documents on June 24 and 27, but then interposed new objections to making a full production and in furtherance of its apparent strategy to delay discovery, leading to another motion for protective order.

     6.     IKE's attempts to be forthcoming (such as with its document production for the Rule 26 disclosures) and to compromise or accommodate VEO's concerns (such as with

the Protective Order and subpoenas) have been met with delays and new objections, even though there is a Protective Order in place to address any fears (however unfounded) that VEO may have. Even worse, VEO has attempted to mask the hollowness of its objections with accusations of improper motives and business espionage by IKE. For the reasons set forth here, IKE asks the Court to put an end to VEO's stall and delay tactics by striking VEO's objections and ordering VEO to produce all documents that are responsive to IKE's requests.

7. As set forth in VEO's Motion for Protective Order (Doc. No. 21), counsel for the parties have attempted on several occasions to resolve this discovery dispute, but have been unable to do so.

### IKE's Repeated Attempts to Obtain Documents and Information from VEO

8. On March 16, 2005, IKE served upon VEO a Notice of Deposition for VEO representative Mark White. That notice set April 26, 2005 as the date for Mr. White's deposition.

9. IKE served its First Set of Discovery Requests on VEO on March 18, 2005 (the "IKE Discovery"). The IKE Discovery contained interrogatories and document requests. Responses thereto were due on or before April 21, 2005.

10. On March 21, 2005, IKE also served upon VEO a Notice of Deposition, pursuant to Federal Rule 30(b)(6). That notice set April 27, 2005 as the date for the deposition/s of VEO's designee/s. IKE intentionally scheduled the depositions of Mr. White and VEO's designee/s to occur shortly after responses to the IKE Discovery were due.

11. However, on March 23, VEO's counsel advised that Mr. White was not available for deposition on April 26, and requested that it be rescheduled for another time. IKE accommodated VEO's request, but as a result of subsequent positions taken by VEO (set forth in

greater detail below), Mr. White has not yet been deposed. Indeed, no depositions have occurred based on VEO's delays in producing documents and its incomplete production.

12. On April 25, VEO responded to the IKE Discovery. However, VEO did not produce a single document to IKE at that time. Instead, VEO repeatedly objected to the confidential nature of the information and documents requested. No less than ***eighteen times***, VEO promised to produce the requested documents and information, upon the entry of a confidentiality agreement and protective order. A copy of VEO's responses to the IKE Discovery is attached hereto as Exhibit "A".

13. Based on VEO's stated confidentiality concerns, and in an effort to move discovery forward, IKE advised VEO that IKE would maintain confidentiality over VEO's documents pending entry of an appropriate protective order, just as IKE did when it produced confidential documents with its Rule 26 disclosures. VEO still refused to produce any documents.

14. Thereafter, the parties began to draft and negotiate a confidentiality agreement and protective order. So as to not delay the progress of discovery, during the drafting and negotiating process, IKE reiterated its offer to allow VEO to produce documents that had been stamped "Confidential" and promised to treat them as such, subject to the final terms of the confidentiality agreement and IKE's right to later challenge the propriety of VEO's use of that designation. However, VEO still failed and refused to produce any documents or materials at that time.

15. On June 7, the parties executed and this Court approved a final confidentiality agreement and Protective Order for this matter (the "Protective Order").

5

16.   Since that time, IKE repeatedly requested production of all documents and information that VEO expressly represented that it would produce upon the entry of the Protective Order. However, VEO did not produce any additional documents until June 24 and 27, <u>after</u> IKE indicated that it had been left with no choice but to seek to compel production.

17.   Even though VEO finally produced approximately 3,300 pages of additional documents on June 24 and 27 (less than half the production by IKE), VEO arbitrarily and improperly limited the scope of what it recently produced. In particular, VEO now refuses to produce all documents, information and materials that were created or pertain to events prior to IKE's acquisition of the Keystone® Technology on September 8, 2004. As to documents, information and materials that were created or pertain to events occurring after September 8, VEO refuses to produce all documents, information and materials that do not relate expressly and solely to the boilers and equipment that VEO is licensed to market and manufacture under the License Agreement, *i.e.*, the Old-Style Boilers (as that term is defined in the Complaint) -- regardless of whether the Keystone® Technology improperly was or could have been used by VEO to manufacture those other boilers and equipment.

18.   In support of its most recent attempt to forestall discovery, VEO now asserts a myriad of objections and arguments that were not raised or included in its responses to the IKE Discovery or sought to be included in the Protective Order previously negotiated. For the following reasons, those objections should be overruled, and VEO should be compelled to provide all non-privileged materials and information responsive to the IKE Discovery.[2]

---

[2] IKE has not been able to proceed with any depositions of VEO's representatives in this matter because VEO has indicated that it will not permit the deponents to respond to any inquiries that are related to events that occurred prior to September 8, 2004, nor will it permit them to respond to any inquiries that are not directly and solely related to Old-Style Boilers.

### Matters That Occurred Prior to September 8, 2004 Are
### Directly Relevant to the Parties' Claims and Defenses and
### Are Reasonably Calculated to Lead to the Discovery of Admissible Evidence

19. VEO argues that IKE should not be entitled to conduct any discovery into matters that occurred before IKE obtained a "beneficial interest" in the Keystone® Technology on September 8, 2004, because: (i) the Asset Purchase Agreement pursuant to which IKE acquired the Keystone® Technology did not transfer any right or interest in the seller's accounts receivable, and thus, IKE is not entitled to recover for any misconduct by VEO prior to that date; and (ii) under the Asset Purchase Agreement, CMI-EPTI warranted that "no entity was infringing or misappropriating any intellectual property rights, including Keystone technology." *See* VEO's Motion for Protective Order, at ¶ 4.

20. VEO also refuses to produce any materials or information that pertains to events that occurred prior to January 7, 2003, *i.e.*, the effective date of the License Agreement. It claims that such matters are irrelevant because "VEO could not possibly have misappropriated technology before VEO possessed it." *See* VEO's Motion for Protective Order, at ¶ 5.

21. VEO's attempts to hide information from IKE are legally and factually unsupportable. First and foremost, IKE acquired all "right, title and interest" in the Keystone® Technology, and it is now the Licensor that owns the Technology.[3] As such, IKE has an undeniable right and interest in discovering exactly how that property was used by VEO throughout the *entire* term of the License Agreement. In fact, the License Agreement itself expressly grants to the licensor, *i.e.*, IKE, the right to audit all of the records that VEO maintains for all license-related activities conducted during the entire term of the License Agreement:

---

[3] IKE has designated the Asset Purchase Agreement "Confidential", pursuant to the Protective Order. Should the Court wish to review part or all of the Asset Purchase Agreement *in camera*, IKE will be happy to provide the Court with a copy.

7

> Licensee shall, during the term of this Agreement, keep accurate and complete records, books, and files of all Products and orders for Products, including the identifying data required in the Semi-Annual Statement. These records shall be made available for inspection and copying by authorized representatives of Licensor during any normal business day . . .

*See* Clause 7.f of License Agreement, attached hereto as Exhibit "B". Additionally, VEO is obligated under the License Agreement to return all documents and materials "relating to design, manufacture, testing, operation, and repair" of the licensed Keystone® Technology, within thirty (30) days after the expiration of the license. *See* Exhibit "B", at clauses 1.b and 17.a.

      22. Furthermore, VEO misconstrues the language of the Asset Purchase Agreement on which it relies. It is true that CMI-EPTI's accounts receivable were excluded from the assets that IKE acquired, but IKE's claims are not predicated on recovery of accounts receivable (*i.e.*, amounts that EPTI billed to IKE as royalty fees or for services but had not yet collected). That exclusion of a particular asset clearly does <u>not</u> preclude IKE from asserting claims for misappropriation of the Keystone® Technology – an asset in fact purchased by IKE -- in the manufacture of boilers or equipment or from asserting claims for trademark dilution arising out of VEO's misconduct during the term of the License Agreement.

      23. Similarly, VEO mischaracterizes the nature of CMI-EPTI's warranty that "no entity was infringing or misappropriating any intellectual property rights, including Keystone technology." (VEO Motion for Protective Order, at ¶ 4). To the contrary, CMI-EPTI merely warranted that it had no actual knowledge of any infringement or misappropriation:

> To Seller's knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights.

(Asset Purchase Agreement, at § 2.5(c)). Additionally, the Asset Purchase Agreement narrowly defines "knowledge" as "the actual knowledge of [CMI-EPTI's President], after reasonable inquiry." (Asset Purchase Agreement, at § 9.1).

24. Of course, VEO's construction of the aforementioned warranty provision also ignores that: (i) CMI-EPTI owned the Keystone® Technology for *less than two weeks*; (ii) CMI-EPTI never attempted to operate that portion of EPTI's business that relates to the License Agreement, or to otherwise perform as the licensor under the License Agreement; and (iii) there is absolutely no evidence as to what, if any, due diligence CMI-EPTI conducted with respect to the License Agreement.

25. Finally, events that occurred prior to September 8, 2004 are directly relevant to the claims and defenses that have been asserted in this action. In particular, VEO itself has raised the following affirmative defenses that directly involve or implicate pre-September 8, 2004 occurrences:

> (a) "<u>Since January 7, 2003</u>, all of VEO's sales of boilers under the KEYSTONE® trademark have been pursuant to the terms of the license agreement or separate side agreements, and <u>with the express knowledge and consent of EPTI</u>" (First Affirmative Defense, ¶ 4) (emphasis added);
>
> (b) IKE's predecessors in interest, *i.e.*, CMI-EPTI and/or EPTI, approved VEO's design and sale of boilers under the Keystone® trademark (Second Affirmative Defense); and
>
> (c) IKE's predecessors in interest, *i.e.*, CMI-EPTI and/or EPTI, failed to exercise quality control measures over Keystone® boilers that VEO manufactured <u>after it entered into the License Agreement on January 7, 2003</u> (Third Affirmative Defense) (emphasis added).

Put simply, VEO is defending against IKE's claims based on conduct that allegedly occurred prior to IKE's acquisition of the Keystone Technology, but it refuses to produce any documentation pertaining to those defenses that it placed at issue (and has not withdrawn).

26. Likewise, the allegations and claims set forth in VEO's Amended Counterclaim involve or implicate pre-September 8, 2004 occurrences:

9

(a)  VEO claims that it never used the Keystone® mark or the Keystone® Technology, except pursuant to the License Agreement (Amended Counterclaim, at ¶¶ 11-12);

(b)  VEO alleges that IKE and IKE's predecessors, i.e., CMI-EPTI and/or EPTI, sold boilers that infringed on exclusive sales rights that had been granted to VEO under the License Agreement (Amended Counterclaim, at ¶ 19); and

(c)  VEO alleges that it and EPTI entered into an Agreement on Cooperation for Project Outside of License Agreement, which permitted VEO to manufacture and sell certain boilers that were outside the scope of the License Agreement (Amended Counterclaim, at ¶ 49).

27.  Moreover, VEO itself has propounded more than *a dozen* interrogatories and document requests seeking information and materials that pertain to events that occurred prior to September 8, 2004. *See* VEO's First Set of Discovery Requests, attached hereto as Exhibit "C", at Interrogatory Nos. 4, 10, 12 and 15, and Document Request Nos. 5 - 11, and 13 - 15. It is patently unfair and contradictory (among other things) that VEO seeks to avoid production of materials and information relating to pre-September 8, 2004 events, while at the same time conducting its own discovery of events in the same time frame and purporting to rely on those events in its defense.

28.  Discovery into matters that occurred in the one year immediately preceding the effective date of the License Agreement likewise is directly relevant to the claims and defenses in this case. IKE believes that VEO has misappropriated the Keystone® Technology and effectively developed its design and manufacturing capabilities with that Technology without regard to the limitations on use of that Technology. (Not coincidentally, VEO's operations have grown substantially during the pendency of the License Agreement.) VEO's operations in the one-year of time pre-dating the License Agreement are relevant to determining the limitations in VEO's design and manufacture capabilities prior to licensing the

Keystone® Technology and the extent to which VEO improperly expanded its capabilities by misappropriating the Keystone® Technology rather than building on its own (if any) proprietary technology.

29.     Equally as important, VEO has asserted ownership of alleged but undisclosed "improvements" to the Keystone® Technology that it developed at some point during the term of the License Agreement. *See* Exhibit "A", VEO Discovery Responses, at Interrogatory No. 4.[4] Discovery into VEO's activities during the period preceding IKE's acquisition of the Keystone® Technology, including into the one-year period before execution of the Agreement, relates directly to whether VEO can claim to have developed the alleged "Improvements" based on technology it already possessed. In short, the presence or absence of documentation during the one-year period of time prior to the License Agreement showing that it developed or otherwise utilized the alleged "Improvement" supports an inference as to origin the "Improvement".

30.     The one-year prior to the License Agreement is reasonable. In an affidavit given by VEO's President (and attached to VEO's Motion for Protective Order as Exhibit "A"), VEO expressly claims that it had "engineering capabilities" prior to the date on which the License Agreement became effective, which places at issue VEO's technical abilities and whether it had a need to misappropriate the Keystone® Technology, as well as the origin of the technology. Rather than seek discovery dating back to VEO's inception, IKE has limited its discovery to the period immediately prior to the License Agreement in order to obtain a

---

[4] VEO also repeatedly asserted ownership of various undisclosed "improvements" in a letter dated March 30, 2004 from its General Manager, Mark White, to EPTI. VEO has produced a copy of that letter at Bates No. V00121. However, VEO has marked that letter "Confidential", and thus, IKE has not attached a copy hereto. Should the Court wish to review part or all of that letter *in camera*, IKE will be happy to provide the Court with a copy.

11

"snapshot" of what VEO's technological capabilities were and whether it had a pre-existing basis for any claim of ownership over "Improvements" or technology that IKE believes to have been misappropriated.

### Discovery Regarding *Other* Boilers and Equipment Is Relevant Because Keystone® Technology Can be Used and Incorporated Therein

31. Although there is a Protective Order in place, VEO also refuses to produce any materials or information that do not relate expressly and solely to the Old-Style Boilers that VEO is licensed to sell under the License Agreement because such matters allegedly do not involve VEO's use of the Keystone® Technology.[5] *See* VEO's Motion for Protective Order, at ¶ 6.

32. In making that argument, VEO ignores that several components and aspects of the Keystone® Technology can be used and incorporated into <u>any</u> water tube boiler and boiler-related equipment, including water tube Heat Recovery Steam Generators ("HRSGs").[6] *See* Declaration of Terry Pawlowski, attached hereto as Exhibit "D".

33. The following examples illustrate just some of the many ways in which the Keystone® Technology can be used and incorporated into <u>any</u> water tube boiler and HRSG:

---

[5] In support of its position, VEO also claims that the only technology that it received from EPTI pursuant to the License Agreement was technology related to the Old-Style Boilers. However, it is believed, and therefore averred by IKE that proprietary and technical data pertaining to *other* Keystone® boilers was shared by EPTI with VEO to assist VEO in being able to design and manufacture the Old-Style Boilers for specific customers consistent with the confidentiality provisions in the License Agreement. IKE has served discovery upon VEO to confirm the nature and extent of the information that VEO received from EPTI, but VEO has failed and refused to meaningfully respond to that discovery. For obvious reasons, such discovery is relevant, and VEO should be compelled to respond thereto.

[6] IKE is not seeking discovery concerning firetube boilers and HRSGs because it does not believe VEO could have incorporated the Technology into boilers and HRSGs of that kind. Thus, to the extent VEO manufactures firetube boilers and HRSGs, the discovery requests do not encompass that equipment, further demonstrating that IKE is not on a fishing expedition.

  (a)  The steam drum components of an Old-Style Boiler can, and actually have been, adapted for use in an HRSG, by removing the burner or firing equipment from the front of the Old-Style Boiler and attaching a duct that enables the tube bundle to receive flue gas from an external heat source, such as a combustion turbine;

  (b)  The Vortex steam separator, a boiler component often utilized for increased steam purity, can be used in virtually <u>any</u> water tube boiler, steam generator and/or process steam drum; and

  (c)  The Chevron steam separator, another boiler component often utilized for increased steam purity, also can be used in virtually <u>any</u> water tube boiler, steam generator and/or process steam drum.

*See* Pawlowski Declaration, Exhibit "D", *passim.*

  34. Accordingly, discovery pertaining to *other* water tube boilers and equipment manufactured by VEO is relevant and necessary to establish the nature and extent of VEO's misappropriation of the Keystone® Technology, is reasonably limited in scope, and is safeguarded by the terms of the Protective Order entered by the Court.

### VEO's Attempts to Mask Its Discovery Misconduct With Accusations of Improprieties by IKE Are Inappropriate and Baseless.

  35. In an effort to mask its own stall and delay tactics, VEO repeats several of the same accusations of improper motives and business espionage by IKE that it has made in its previous filings and during its appearance before this Honorable Court. *See, e.g.,* VEO's Memorandum of Law in Support of Two-Tiered Protective Order (Doc. No. 15), at p. 2.

  36. In particular, VEO claims that: (i) IKE "has never presented a scintilla of evidence" in support of its misappropriation claims; (ii) "it is obvious IKE is on a 'wild goose chase'"; and (iii) IKE is using "blanketing, broad, irrelevant subpoenas" to "injur[e] VEO's reputation and its ability to compete in the marketplace" (even though its most recent motion

does not seek any relief pertaining to the subpoenas). *See* VEO's Memorandum in Support of Motion for Protective Order, at p. 8.

37. VEO's claims are makeweight bluster intended to support meritless positions. Significantly, the last time these parties (or their respective affiliates) were involved in litigation regarding misappropriation of trade secrets and unfair business competition, it is <u>VEO</u> that paid a substantial settlement to IKE's affiliate. Thus, it is actually VEO, and not IKE, that has a history of misconduct and unfair competition. Of course, as set forth in greater detail above, VEO's colorful allusion to a "wild goose chase" in discovery is belied by the fact that the discovery relates directly to the claims and defenses that VEO itself has asserted.

38. Furthermore, there is a Protective Order in effect in this action, which addresses any fears (however misplaced) that VEO may have concerning misuse of information that is exchanged in the discovery process. Specifically, the Protective Order:

(a) Prohibits the parties from using any information obtained through discovery for any purpose other than "prosecuting or defending this action" (¶ 1);

(b) Prohibits disclosure of "Highly Confidential" materials to all employees and representatives of the parties and their respective affiliates, except for three previously-identified individuals (¶ 8);

(c) Requires those individuals to certify, in writing, that they will comply with the terms and provisions of the Protective Order (¶ 9); and

(d) Renders a violation thereof subject to contempt proceedings with sanctions awardable by this Court.

39. VEO has not cited any authority in support of its argument that a party must produce evidence in support of its misappropriation claims, and in effect, prevail on its causes of action, before being entitled to conduct discovery on those very claims. Indeed, such

an assertion is particular nonsense where much of the evidence of VEO's misconduct is in the exclusive possession of either VEO or its clients and customers.

40. Nevertheless, certain evidence in support of the claims against VEO is presently available to IKE and already in VEO's possession. In particular, IKE's predecessor in interest, EPTI, conducted an evaluation of VEO's performance and transgressions under the License Agreement. Such evaluation was reduced to writing, and a copy thereof is attached hereto as Exhibit "E".[7] As set forth in the attached evaluation, VEO's transgressions under the License Agreement include:

> (a) Consistently pursuing projects that involve the manufacture and sale of boilers that are *outside* or *beyond* the "geometry and characteristics" of the licensed product;
>
> (b) Accepting and/or obtaining "design manuals, internal correspondence and/or drawings" pertaining to Keystone® boilers and equipment that are *outside* or *beyond* "the geometry and characteristics" of the licensed product; and
>
> (c) Failing to appropriately reference EPTI as the licensor of the Keystone® Technology in VEO's sales and marketing materials.

Of course, those assertions were made by EPTI while EPTI owned the Keystone® Technology, were developed during the time period for which VEO seeks to preclude discovery by IKE, and substantiate a belief that VEO has engaged in misconduct (as does VEO's repeated attempts to delay and/or limit discovery).

---

[7] As indicated on the transmittal letter portion of the evaluation, those materials were addressed to Mark White, who is VEO's own General Manager. In fact, the Mark White letter referenced in footnote 4, *supra*, is VEO's response to the above-referenced EPTI evleuation. Accordingly, it is disingenuous for VEO to suggest that it has no knowledge of any specific details regarding VEO's alleged misappropriation and unfair competition.

## CONCLUSION

41. The IKE Discovery is entirely proper, relevant and reasonably calculated to lead to the discovery of admissible evidence. To the extent that any discovery abuses actually exist in this action, it is VEO that has committed them, by engaging in stall and delay tactics and then attempting to mask such misconduct with baseless accusations of improprieties by IKE.

42. Plaintiff Indeck Keystone Energy, LLC respectfully requests that its Motion be granted, that VEO be compelled to provide the materials and information described more fully herein, and that VEO's Motion for Protective Order be denied.

Respectfully submitted,

/s/
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA 15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Alan R. Waskin
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated: July 1, 2005