

3/26/04

5300 KNOWLEDGE PARKWAY, SUITE 200

Mark,

In response to your email back to Stephen, George, Dan and myself regarding the comments to the annex, we agree with you that we may need to restructure the overall document in a better format to address the final concept and will be working simultaneously to get that done.

Let me explain our philosophy in general terms for the approach we have taken which was based on our overall assessment of the past year operating with the current license agreement in place and the desire of VEO to purchase some of the technology. While things in general have gone well over the past year, we do have concerns with regards to the past years performance that needs to be addressed and resolved. Attached is an overview of our concerns for your reference. However, given that these new discussions will address some of the issues, let's hold off on dealing with those issues pending the outcome of the discussion on the extension and/or purchase options.

**EPTI approach recap**
Existing Agreement:
1. Current License → provides VEO the right to market and manufacture the standard M series product within a defined size and capacity range with an extension to permit addition of superheaters to the standard line.

New Agreement:
1. Extended License Option → This is the Annex 1 description. This portion expands availability of the products to the full O boiler line and D boiler line within a defined size and capacity range while preserving the original agreement scope and general conditions. This would give VEO access to a wide range of sizes, pressure and temperature capacity, the use of welded wall construction as well as provide access to steam purity equipment which is not part of the current license agreement scope

2. Purchase Option → This is the Annex 2 description. This would give VEO "ownership" of part of the O boiler product line as well as selected parts of the D boiler line. This would be specifically the standard M series boiler and the executed D boiler project (1959 and 1962/1963)

With that brief explanation of our approach taken, we offer specific response to your comments to the annex contained in the new agreement:

1. Wording as proposed describing the transfer of rights or title can/will be included in the overall sales portion of an agreement, however, it is essential that EPTI maintain rights to the scope of the purchased product line. This could be



IKE 07432

TEL: 814.897.7000 | FAX: 814.897.1090 | EMAIL: INFO@ERIEPOWER.COM



    addressed with a similar reversal of a perpetual, non-transferable, royalty free license back to EPTI for the use of the technology that is purchased.

2. To clarify our position, the 2 annex' in the new agreement are correct as worded and were specifically written to distinguish between the option to extend the product line license and the product line sale. This hopefully eliminates the confusion on terminology of the various products which could have been used interchangeably during earlier discussions. Annex 1 in the new agreement summarizes an option to VEO to extend the scope of the current license agreement and annex 2 is the scope that is for sale. The technology that is available for sale at this time is limited to just the standard M series boilers which is the basis for the current license agreement.

3. We concur that the current license agreement allows for the application of the product up to 1200 psig and this would continue to be an option as long as the license agreement is in place as it relates to the products covered. With regards to the sale of the technology, since the standard product is developed only up to 400 psig, we felt it was appropriate to word it this way so as to not misrepresent the product. Should VEO exercise the option to purchase, VEO would be able to develop that product to the extent they felt necessary/appropriate. In reality, with the proper engineering effort there may be no limit on the design/operating pressure for this boiler product.

4. We concur with the addition of the other 2 D boiler projects. At the time you and I spoke you specifically had mentioned just the Kolon boiler was of interest to VEO. Please note that the Saha (1962) and Rojana (1963) projects are actually identical boiler designs, so in reality this would add 1 additional project specific design to the purchase agreement. We would amend the current wording in all paragraphs to cover this additional D boiler project.

5. The issue of source code is a difficult problem since these programs contain more than just the O boiler technology which can not be separated out. While we can understand your concern on the potential risk, since VEO has been using the program (even in its limited release), you must appreciate the capability and flexibility this program offers, especially to an experienced user. While we would not expect that VEO would distribute the source code, there is no way to control or protect the source code with 100% assurance regardless of the words that may be drafted. After our internal discussions yesterday, we have concluded that we can not in any form offer the source code in the purchase. In the new agreement we attempted to address your concern on software development by offering our services to develop the software and can work out some type of escrow agreement for the source code that would address VEO concern in the event EPTI was no longer in existence or retained control of the source code.

IKE 07433



6. With regards to the technical support, in the case of the extended scope portion, we are only adding access to a couple new features and the D boiler line which we did not feel necessitated an extended support period. In the case of the purchase option, since the product line is the same as currently licensed we did think an extended support period was necessary either. As a compromise, if VEO takes both the extended license option and the purchase option, we can combine the (2) 3 month periods to be a single 6 month period for support of all products.

7. With regards to the use of the Keystone name, as with the software source code, this too is a very difficult matter. Regardless of the course of this agreement EPTI will maintain use/ownership of the O boiler line which as you are well aware the "Keystone" name is a vital part of the heritage and credibility of that product. As such, we can not offer a perpetual license for the name that would survive the license agreement. VEO will have use of the Marks and trademarks within the conditions as outlined for as long as the license agreements remain in effect. In the event that VEO exercises the option for the purchase of the M series, we would be agreeable to including an extension period of the license for the use of the Marks for a fixed period to permit a smooth transition to the name that VEO may choose for the product. This can be added to the overall agreement section that defines the purchase aspects.

As you evaluate your options with respect of the above explanations and response to your comments, we offer the following additional thought that could be included in the overall agreement that may be attractive to VEO. In the event that VEO exercises both of the options in the new agreement (extension of product line and purchase of standard M series), for a period not to exceed 3 years from the effective date, EPTI would waive all royalty fees on new boiler sales during that period.

Once you have had a chance to review, please contact Stephen, Dan or myself and we can discuss further. Once we get to agreement on the basic principle, I am confident we can quickly re-word the formal document wording.

Regards,

Bob Gdaniec

Cc: Stephen Kang, Dan Levstek, VEO-LFile

IKE 07434



EPTI concerns regarding VEO performance under existing agreement.

1. VEO currently licenses only the M series product line which has a very specific geometry and characteristics. In review of some of the VEO recent projects and proposals, it appears that the majority of projects that VEO is pursuing or has completed have been outside the definition of the license agreement. Of particular concern most recently are the Oxy and Dallas Ft Worth Airport projects which are well outside the bounds of the products defined in the agreement. VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex 1 of the current agreement provides a clear definition of the "M"- Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design.)

2. The software tools that were provided to VEO as part of the license agreement are intended to provide flexibility in <u>rating</u> the defined product line and are not to be used to develop derivatives of the product.

3. Of extreme seriousness, during recent discussions with VEO staff it has come to our attention that VEO is in possession of design manuals, internal correspondence and/or drawings that are Erie Power Technologies property which is not part of the current license agreement technology set. At this point, we are not sure how this material was acquired by VEO, however, we request VEO's immediate attention to this matter and assistance with a review of the resources to remove/return back to EPTI any EPTI material that may have been acquired outside of the current license agreement technology set. Of particular concern is reference that has been made to EPTI proprietary and company confidential design manuals.

4. VEO is entitled to develop improvements/modifications to the licensed technology and we encourage VEO to do so for the benefit of both parties. In accordance with the current agreement these improvements/modifications are to be reviewed and approved by EPTI prior to VEO use. This may seem onorous to VEO however this is critical in maintaining the integrity and reputation of the boiler product line. To that end, in order for both VEO and EPTI to keep track of the project progress, we request that VEO utilize either Ted Fuhrman or Bob Gdaniec as outlined in the current agreement for all correspondence to EPTI for issues related to the current design and/or improvements/modificatins. We would expect that these improvements are being proposed in sufficient time in advance of sales/marketing activities to perform an adequate assessment of suitability for the products.

4. We encourage VEO to engage EPTI in some general/specific training on the product line licensed. This was a part of the original agreement which unfortunately for various reasons has not occurred. In light of the recent projects that VEO has been successful

IKE 07435



which are outside of the standard product line series, we have offered at a reduced rate to perform some key critical tasks that may be beyond VEO current experience level and are assuming that VEO is performing all other general engineering design work to confirm the suitability of the boiler to the design conditions to maintain the integrity of the overall boiler system. Since VEO has not participated in the basic training, EPTI is concerned with the success of these new projects.

5. VEO should utilize Keystone Energy resources especially for the supply of specialty items that are an integral part of the Keystone product line series. With regards to in particular the Oxy project as well as other projects, since VEO currently does not have rights to the EPTI steam purifiers, we commit to VEO to work with them on a mutually beneficial arrangment for the supply of these components thru Keystone Energy.

4. With regards to the administrative requirements in the current agreement:
   a. According to our records, VEO is delinquent in payment of the second installment of the base fee, which was due Jan 7, 2004. EPTI has requested a status of the payment on a couple occasions. In that this is overdue, we request that VEO attend to this matter immediately.

   b. VEO is entitled to use the Marks in both literature and on the product, however, it is important that reference be made in all instances to the relationship to EPTI. In reviewing the documents/correspondence to date, it was noted that we have not seen the sales brochures and/or literature that is being proposed by VEO to market the products and would request you submit a copy to EPTI for our review. We realize that some literature is already in use, so for the most part this material would be maintained for record. For future sales/marketing literature, we request that VEO submit to EPTI in sufficient time in advance of printing to permit our review. In addition to that, we request that VEO submit either the drawing or photograph of the nameplate that is being applied to the boilers.

   c. We appreciate the reporting that VEO has provided to date and would ask that VEO continue to keep EPTI informed in a timely manner the status of the projects, in particular the PO date and the shipment date since they relate directly to the tracking of the royalty payment milestones. It is important that we continue to receive the reports of new projects as well as the bi-annual recap report.

   d. In an effort to control costs and maintain a proper workflow, consistency and assure timely responses, we request that VEO go back to utilizing Ted Fuhrman as the single point contact for all inquiries, discussions and/or correspondence. Depending on the issues, final resolution may be redirected to particular individuals, but at least initial contact on a subject must be thru Ted to permit EPTI to best respond to VEO needs/requests.

IKE 07436