1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    INDECK KEYSTONE ENERGY,    : CIVIL DOCKET
     LLC,                       :
4          Plaintiff            :
                                :
5              v.               : Case No. 04-CV-00325-SJM
                                :
6    VICTORY ENERGY OPERATIONS, :
     LLC,                       :
7          Defendant            : Motion for Protective Order

8

9

10            Hearing in the above-captioned matter

11       held on Friday, July 15, 2005, commencing at

12       1:00 p.m., before the Honorable Sean J. McLaughlin,

13       at the Unites States Courthouse, 17 South Park

14       Row, Erie, PA 16501.

15

16   For the Plaintiff:

17        John K. Gisleson, Esquire
          Schnader Harrison Segal & Lewis
18        120 Fifth Avenue
          Suite 2700, Fifth Avenue Place
19        Pittsburgh, PA 15222

20   For the Defendant:

21        Christopher T. Sheean, Esquire
          Kelley Drye & Warren
22        333 W. Wacker Drive, 26th Floor
          Chicago, IL 60606

23

24

25            Reported by Sonya Hoffman
           Ferguson & Holdnack Reporting, Inc.

1:00PM

THE COURT:  Good afternoon.  Please be seated.
All right.  This is the time that we set for argument on the
Victory Energy's motion for protective order from discovery
as well as the flip side of that coin, the Plaintiff's
motion of production in opposition to Defendant's motion for
protective order.

Before we talk about the merits here, under the
group that hope springs eternal, has there been any
discussion or progress made in trying to resolve this?

MR. GISLESON:  No, Your Honor, there hasn't.

THE COURT:  So much for hope.  Who's going to be
pulling Victory's oars at this argument?

MR. SHEEAN:  Good afternoon, Your Honor,
Christopher Sheean on behalf of Victory Energy.  And I have
with me a company representative, Mark White.

THE COURT:  Do you want to come up to the podium,
please.

MR. SHEEAN:  Your Honor, first of all, thank you
for taking the time today to have us in here.  It shows the
seriousness the Court takes with respect to this issue and
we treat it in a similarly serious manner.  I know Your
Honor has had an opportunity to review the briefs and we
spoke about them for a short while 10 days ago, but I wanted
to go back over quickly what we're asking for here and why.

First of all, we understand the Federal Rules of

1:02PM   Civil Procedure allow broad standards for discovery and

2    under Rule 26 it's not only what is relevant, but what could

3    lead to discovery of admissible evidence.

4        THE COURT:  Before we talk about the merits of

1:02PM   your motion, let me ask you a factual question to see if you

6    either agree or make a factual assertion to this -- to put

7    it better, I'm parroting what the Plaintiff has said and

8    that is:  Is it true that vortex steam separators and

9    Chevron steam separators can be placed in any water tube

1:03PM   boiler, old style or not?

11       MR. SHEEAN:  Well, actually, it's not a yes or no

12   question, Your Honor.  First of all, we take great issue

13   with the terminology of old style and new style boiler; that

14   is a term -- not a term of art to the industry, but a loose

1:03PM   handle that Indeck Keystone has come up with for this

16   litigation that we don't think is consistent with the terms

17   of the agreement.

18       But I would agree that vortex and Chevron steam

19   separators can be used in different types of water tube

1:03PM   boilers, and in limited instances they could be used in

21   other types of boilers, but they're only used in high

22   pressure boiler applications.

23       THE COURT:  Now, are vortex steam separators and

24   Chevron steam separators component parts of a broader

1:04PM   universe of Keystone technology?

1:04PM          MR. SHEEAN:  I don't know -- excuse me, I don't

2       know how Your Honor is using the term "Keystone technology"

3       or "broader universe".  Victory Energy has sold -- let me

4       see if I can answer the question as I understand it.

1:04PM          Victory Energy has sold water tube Keystone

6       boilers with vortex steam separators and Chevron steam

7       separators with the full assistance of Erie Power

8       Technology, the licensure, under the original license

9       agreement.  And I see where Your Honor is going if I can

1:04PM  address that point a little more fully.

11              THE COURT:  Go ahead.

12              MR. SHEEAN:  Mr. Poloski makes the assertion that,

13      well, we need to see all of Victory Energy's HRSG sales

14      because they could have --

1:05PM          THE COURT:  Incorporated Keystone Technology into

16      it, that's the claim.

17              MR. SHEEAN:  Right.  Right.  Such as the vortex

18      steam separator or the Chevron steam separator.  The short

19      answer is, Victory has never done that.  They never sold an

1:05PM  HRSG with the vortex steam separator or a Chevron steam

21      separator.  They just haven't, because they haven't sold any

22      high pressure application HRSG boilers.

23              And let me turn the analysis to the way that I'm

24      looking at it so I can share with the Court where we're

1:05PM  coming from.  Is it possible, maybe, could it be in the

1:05PM  realm of all possibility that some component that Victory

2  Energy utilized in Victory -- or in Keystone boilers could

3  have been utilized in another application, yes.  But that

4  gives rise to two questions, one, did that happen, and, two,

1:05PM  was it a proprietary piece of technology or we talking about

6  utilizing a round wheel on an automobile?

7          Now, the reason why we -- and this is a topic

8  that's near and dear to my client's heart and why they said,

9  yes, why we don't go to Erie and fight about this is because

1:06PM  we're not talking about a box of documents here.  We're

11  talking about Victory sold 59 HRSG boilers to date, and it's

12  one of their most proprietary items.  They have come up with

13  some specific design applications that they have patents

14  on --

1:06PM          THE COURT:  Excuse me, in a nutshell, without

16  getting overly technical, what is the difference -- and I

17  know you don't like the phrase "old style boiler", so I'll

18  say Keystone boiler, all right; what is the major difference

19  between the HRSG and the Keystone boiler?

1:06PM          MR. SHEEAN:  To answer Your Honor's question, the

21  major difference is the heat source, in a very broad

22  spectrum of speaking.  HRSG stands for Heat Recovery Steam

23  Generator.  So, for instance, if you've got an application

24  already in place in your factory where you've got heat

1:07PM  exhaust coming off, you want to take advantage of that and

1:07PM  utilize that exhaust in a manner that you can generate more

2  steam or energy, okay?  So HRSG is the application you would

3  use to do that.  Whereas, the Keystone water tube boiler is

4  a direct-fired boiler and I'm going to, just to illustrate,

1:07PM  I believe -- Your Honor, if I may approach?

6          THE COURT:  Yes.

7          MR. SHEEAN:  I am handing up an illustration.  On

8  one side you see a Victory Energy HRSG boiler and on the

9  other side you see a Keystone old style boiler.

1:08PM          THE COURT:  Right.

11          MR. SHEEAN:  And looking at them, they appear

12  pretty dissimilar, obviously, but that doesn't necessarily

13  assist the Court in the difference.  The HRSG does not have

14  a water drum at the bottom, it has headers where the hot

1:08PM  gases pass through and that's how they heat the steam.  It

16  utilizes a completely different type of technology to heat

17  the steam.  So the technology that's in place for an HRSG is

18  understandably different.

19          Let's get to the heart of this case and what this

1:08PM  case is about.  Victory Energy signed a license agreement

21  with Erie.  They were allowed to utilize the name, Keystone,

22  in selling a certain class of boilers that Your Honor will

23  have to determine what that class was.  But they also were

24  given some software, some software to rate the boilers.  And

1:09PM  by that, I mean, to determine if you've got a boiler that's

1:09PM    this long, and this high, with this many rows of tubes

2    (indicating), what can I expect the gas coming out, the

3    exhaust, what's the temperature going to be, how much steam

4    can I make, et cetera, et cetera, you rate the boiler.

1:09PM    That's what the software is for, to rate the old style, the

6    Keystone boilers.

7        Victory Energy got that from Erie and they're

8    still using it today to sell Keystone boilers and they're

9    still paying royalties to the licensure under that

1:09PM    application.  That software cannot be used for HRSG

11    technology, it's a completely different type of technology.

12    You can't take the software that was given to Victory and

13    utilize it for HRSG.  You don't measure the output on an

14    HRSG boiler in the same way, it truly is apples and oranges.

1:09PM        THE COURT:  Do you have any other -- is there any

16    other product which you consider proprietary which you sell

17    besides the Victory style boiler?

18        MR. SHEEAN:  Do you mean the HRSG boiler?

19        THE COURT:  Yes.

1:10PM        MR. SHEEAN:  Judge, I think that's a pretty broad

21    question.  Is there any other proprietary technology that

22    Victory Energy may have attempted to sell --

23        THE COURT:  Do you sell other boilers besides the

24    HRSG boilers?

1:10PM        MR. SHEEAN:  In the Keystone boiler?

1:10PM          THE COURT:  Yes.

2               MR. SHEEAN:  Well, Victory Energy is an authorized

3       distributor of fire tube boilers, as well.  And if I can

4       consult with Mr. White, which is precisely why I brought

1:11PM  him --

6               THE COURT:  Sure.

7               MR. SHEEAN:  I can get a more complete list.

8               THE COURT:  Yes.

9               MR. SHEEAN:  Besides the standard fire tube

1:11PM  boilers, which Victory Energy sells, it also sells heat

11      recovery fire tube boilers.

12              THE COURT:  Okay.

13              MR. SHEEAN:  And what we're talking about there is

14      basically burning garbage, that kind of thing.

1:11PM          THE COURT:  Now, to kind of focus our discussion a

16      little bit, tell me if I have this right, your motion is

17      really premised, at least based upon my reading, on three

18      separate propositions.  One is that any information,

19      documentation, et cetera that they would be requesting,

1:11PM  which predates September 8 --

21              MR. SHEEAN:  2004.

22              THE COURT:  -- 2004 is irrelevant.

23              MR. SHEEAN:  That's correct.

24              THE COURT:  And secondly, any information that

1:12PM  would predate January 7, '03 would most certainly be

1:12PM  irrelevant because that predated the licensure agreement,

2  itself.

3          MR. SHEEAN:  That's correct, Your Honor.

4          THE COURT:  And thirdly, that in any event the

1:12PM  only information, putting aside the time line, that might

6  arguably be relevant is information relative to Keystone

7  boilers, as opposed to any other product of yours; is that

8  right?

9          MR. SHEEAN:  That's correct, Your Honor, and it

1:12PM  goes to two main reasons why.  Sticking with the

11  non-Keystone argument for a minute, because that's where we

12  started, one is the feasibility issue that we talked about,

13  the other one is the reality, Judge.  Victory Energy just

14  hasn't done it and they don't have a scintilla of evidence

1:13PM  to support that Victory Energy has ever utilized one piece

16  of technology to manufacture any type of non-Keystone

17  boiler.  And yet they believe that they should have this

18  discovery on 50 different HRSG boilers in order to ascertain

19  whether or not they can come up with some angle to come

1:13PM  after Victory.  That's truly how we read this.

21          THE COURT:  Let's take each of your positions so

22  that I can make sure I understand you.  You essentially say

23  that with respect to anything that may have occurred prior

24  to September 8, 2004, which is the date that Plaintiff

1:13PM  purchased the assets, anything that would have occurred

9

1:14PM    prior to that time -- I'm not sure you used the phrase, but

2    essentially you argued that there's no standing with respect

3    to that and could claim no damages with respect to whatever

4    may have occurred before, arguably, even if it was

1:14PM    misappropriation.

6         But my question to you is similar to what I asked

7    you on the phone, aren't these ships passing in the night

8    there?  They're not trying to necessarily recover damages

9    for a time frame during which they have no interest, they're

1:14PM    attempting to uncover evidence of conduct.  Isn't that what

11    they're trying to do?

12         MR. SHEEAN:  But if the evidence of conduct is not

13    going to lead to discovery because the conduct predates the

14    date that they had standing, then I don't understand why

1:14PM    they should be entitled to go after it.  You know, I think

16    the asset purchase agreement -- both of them, the one with

17    Erie Power to CMI, and one from CMI to Indeck Keystone make

18    it very clear that one of the excluded assets are the --

19    specifically any type of uncollected debt.  And they're

1:15PM    talking -- it says specifically, not just those on the

21    books.

22         So if they're talking about claims, chosen action.

23    If they don't have a right to a chosen action that predated

24    9/8/04, it's still over in the bankruptcy court.  Why should

1:15PM    the conduct that took place surrounding any of the chosen

1:15PM    actions be relevant?

2              THE COURT:  So to put a finer point on it then, it

3         is the Defendant Victory's position that the only conduct

4         that could arguably be relevant insofar as the Plaintiff's

1:16PM    claims are concerned would be the Defendant's conduct, which

6         was postdated September 8, 2004; is that right?

7              MR. SHEEAN:  I think that's right, Your Honor.

8         And I would carve out a caveat to that and that would be, I

9         guess, if Your Honor believes that the license agreement,

1:16PM    itself, is ambiguous and has to look outside the four

11        corners of the document, the negotiations, things of that

12        nature, conduct of parties --

13             THE COURT:  That's a separate issue, though.

14             MR. SHEEAN:  It is.

1:16PM         THE COURT:  That's more of a parole issue as far

16        as the contract is concerned.  Now, do I have it insofar as

17        there had been -- we're talking about two different types of

18        subpoenas here.  One is the third party's trying to acquire

19        information about your product line, and the other is to

1:16PM    give -- insofar as the third parties are concerned, was

21        there an agreement that that time line would be through

22        January '03?

23             MR. SHEEAN:  Starting January of '03 going forward

24        and would exclude any HRSG technology.  And I think Your

1:17PM    Honor remembers we had a telephone conference following a

1:17PM  motion that we filed and we indicated that -- you know, with

2  respect to the protective order -- and I raised this issue

3  but I said I think we've worked this out with respect to the

4  third party subpoenas.

1:17PM          THE COURT:  But now with respect to you, though,

6  the time frame is January -- back to January 2002; is that

7  right?

8          MR. SHEEAN:  That's my understanding, yeah.

9  Mr. Gisleson and I have never discussed that, that a

1:17PM  separate agreement with respect to the --

11          THE COURT:  And I presume that will be correct

12  when I hear from them.  But unlike your third party folks,

13  the subpoenas that are directed to you include the HRSG

14  technology; is that right?

1:18PM          MR. SHEEAN:  I don't want to speak for

16  Mr. Gisleson.  I mean, that's the way I interpret -- the

17  requests are certainly in there.  And whether or not --

18          THE COURT:  Okay.  Well, we're not arguing about

19  something when I can ask him.  Let me ask you:  Is that

1:18PM  right?

21          MR. GISLESON:  That is correct, Your Honor.  We

22  are interested in discovery concerning the water tube

23  boilers, we are not interested in any discovery dealing with

24  the fire tube boilers whether they are the standard water

1:18PM  tube boiler or the HRSG.  So that is a category of their

1:18PM  operation for which we are not interested in pursuing

2  discovery.

3         THE COURT:  I don't have the foggiest idea of what

4  you just said to me.

1:18PM         MR. SHEEAN:  Judge, can I have a minute?

6         THE COURT:  Sure.  You go do that.

7         MR. GISLESON:  There are two different kinds of

8  boilers, there's the water tube boiler and there's the fire

9  tube boiler.

1:18PM         THE COURT:  Okay.

11         MR. GISLESON:  Victory sells both water tubes, as

12  well as fire tubes.  The fire tube portion of the business,

13  we don't have an interest in, we're not seeking discovery in

14  that area, and that's what we indicated in our response to

1:19PM  the motion.

16         THE COURT:  But you do in the water tube.

17         MR. GISLESON:  That's correct.

18         THE COURT:  And part of the water tube product

19  line is the HRSG; is that right?

1:19PM         MR. GISLESON:  You can use the water tube boiler

21  in the HRSG application.  I mean, they're both boilers, the

22  difference Mr. Sheean indicated is the heat source.  With

23  the water tube boilers and the subject of the license

24  agreement, there's an internal heat source and a burner that

1:19PM  generates the heat.

1:19PM            So with the HRSG, you're still taking your boiler,

2      just like your Keystone boiler, except you're pulling out

3      the burner, the heat source, and you're piping in the

4      external heat source elsewhere.

1:19PM            THE COURT:  You know what occurred to me -- and

6      I'm going to kind of shift gears in the middle of the game

7      here.  Mr. Sheean, what I'm going to do is, and I think we

8      can tee up this argument better, I want to hear from him,

9      and I'm going to let you come up and respond because that

1:20PM    may clear some things up without speculating as to what

11     they're actually looking for.

12            MR. SHEEAN:  Very good, Your Honor.

13            THE COURT:  Okay, fine.

14            MR. GISLESON:  May it please the Court, my name is

1:20PM    John Gisleson, I'm an attorney with Schnader Harrison.  With

16     me today is Bob Williams, my colleague on the case, and Mr.

17     Terry Poloski, who's the chief engineer at Indeck.  Mr.

18     Poloski also is an engineer at Erie Power Technologies, the

19     prior -- the original licensure.

1:20PM            To address, quickly, the Standing issue, I don't

21     think that is an issue.  Standing is simply who owns the

22     technology.

23            THE COURT:  Before we even go farther than that,

24     succinctly tell me precisely what the theory of your case is

1:20PM    and precisely the nature of the technology that you claim

1:20PM  was improperly -- misappropriated.

2  MR. GISLESON:  Yes, Your Honor.  Our theory of the

3  case is this:  January of 2003 there was a license agreement

4  that was entered between Erie Power Technologies and Victory

1:21PM  Energy.  The license encompassed a specific particular kind

6  of boiler, which was a water tube boiler, a

7  standard-packaged boiler, which is known as the M Series.

8  Packaged boiler simply means they can design,

9  manufacture, assemble it at the factory.  At Erie you can

1:21PM  put it on a railcar, put it on a barge, send it out to where

11  the customer is located, pick it up as one piece, and put it

12  into wherever it belongs.  That's why it's a packaged

13  boiler.

14  During the time that Victory was -- strike that.

1:21PM  During the time that Erie Power was the licensure and owned

16  the technology, Erie provided a significant amount of

17  information to Victory to assist it in developing the

18  ability to design and manufacture the Keystone M Series

19  standard-packaged boiler.

1:21PM  THE COURT:  Okay.

21  MR. GISLESON:  The M series is a subset of the

22  O-type boiler that Erie Power was selling.  Basically, the M

23  Series -- when you say "the old style", it's the less

24  sophisticated kind of boiler.  The new style is the more

1:22PM  sophisticated kind of boiler with all the bells and whistles

1:22PM 1    and newer technology.  Victory said, we believe we can

2    exploit the old technology, Erie said, fine.

3           The information that Erie provided to Victory has

4    applications beyond the M Series standard-packaged boiler,

1:22PM 5    but it was provided to assist Victory in developing that

6    standard M Series, because, as I said, the M Series is a

7    subset of the larger quantity of Keystone boilers.

8           THE COURT:  So the M Series is an upgrade to the

9    old style boiler.

1:22PM 10           MR. GISLESON:  Well, no.  The M series is the old

11    style boiler.

12           THE COURT:  The M Series is the old style boiler.

13           MR. GISLESON:  Correct.

14           THE COURT:  Okay.

1:22PM 15           MR. GISLESON:  So basically, you have old style

16    boilers, an active configuration of the tubing.

17           THE COURT:  All right.

18           MR. GISLESON:  And in those type boilers you have

19    O Series and M Series.  The O Series is the more advanced,

1:23PM 20    the M Series is the less advanced, or the old style boilers.

21    With the information that Victory received, it began to

22    design boilers and pursue boilers that were outside the

23    geometry of the boilers that are specified in the licensing

24    agreement.

1:23PM 25           And that Annex one we talked about in the initial

1:23PM    scheduling conference, that sets forth the geometry of

2    boiler that's licensed.  With the information that Victory

3    received, it started to pursue boilers that were beyond that

4    geometry and they were still selling them as Keystone

1:23PM    boilers because they were able to utilize the information

6    received and basically go beyond the kind of boiler that was

7    specified in the license agreement.

8             So the first aspect of the claim is they were

9    selling boilers -- or trying to sell boilers that were not

1:23PM    within the specific confines of the license agreement

11    selling those as Keystone boilers.

12             The other aspect is that we believe that --

13             THE COURT:  Let me stop you on that first point,

14    the theory is that you supplied them with proprietary

1:24PM    information as to how to build this boiler.

16             MR. GISLESON:  Correct.

17             THE COURT:  They then utilized that information,

18    but they -- but the boilers that they built were somewhat

19    different --

1:24PM             MR. GISLESON:  Correct.

21             THE COURT:  -- than what was within the

22    specifications for the boilers that they were licensed to

23    sell; is that right?

24             MR. GISLESON:  Correct.

1:24PM             THE COURT:  And when you say "different", I

17

1:24PM    presume -- do you mean different in size, different in

2    capacity, different in design, different in what ways?

3    MR. GISLESON:  Primarily the features that were

4    included in those boilers -- as I said, the M Series is

1:24PM    basically one of the two O-type boilers, the O Series and

6    the M Series.  O is more advanced.  Erie Power gave certain

7    technical information to Victory that did encompass both the

8    O Series and the M Series boilers.  And then they provided

9    that information to assist Victory with specific

1:25PM    applications without being confronted so they could learn

11    from other boilers that Erie Power had designed,

12    manufactured, and sold.

13    So that while they're still selling what appeared

14    to be an M Series boiler, just based on the basic

1:25PM    configuration, they included elements from the O Series that

16    was beyond the scope of the license agreement so that they

17    still took proprietary Erie information that was provided to

18    them to assist them in understanding how to design and

19    manufacture the M Series.

1:25PM    THE COURT:  It sounds like you gave them too much

21    information.

22    MR. GISLESON:  Yes and no.  I mean, yes, it sounds

23    like that, but, no, we didn't.  And the reason is this --

24    THE COURT:  Aren't you complaining a little?  I

1:25PM    mean -- go ahead.

1:25PM        MR. GISLESON:  The reason is this:  There was a

2    confidentiality provision in the license agreement that said

3    all the information we give you, the technical information,

4    is proprietary and you agree to keep it confidential.  What

1:26PM    that did was it facilitated Victory's ability to learn about

6    the technology as well as for Erie Power to be candid with

7    Victory and to assist them.  Because keeping in mind, this

8    is an older technology, Erie had been focusing on the O

9    Series, which is the more advanced technology, so that the

1:26PM    more recent boilers that Erie Power had been developing were

11    those under the O Series, the new style, which is more

12    advanced.

13        THE COURT:  All right.  So to put a cap on it,

14    what you did is you gave them proprietary information, some

1:26PM    of which was quite specific to the boiler that they were

16    supposed to be building, some of which was proprietary

17    information that really was not specific to the boiler that

18    they were supposed to building, but was given to them anyway

19    to assist them by way of comparison or otherwise in

1:27PM    producing the boiler that they were supposed to be

21    producing; is that right?

22        MR. GISLESON:  That's correct.

23        THE COURT:  And what you say they did is they

24    incorporated into the boiler that they were supposed to be

1:27PM    producing proprietary information from the boiler that they

1:27PM    were not supposed to be producing; is that essentially it?

2              A.    Correct.

3              THE COURT:  So what came out was what looked like

4         an M-style boiler to the technical eye, but it had bells and

1:27PM    whistles that were proprietary to you.

6              MR. GISLESON:  Correct.

7              THE COURT:  All right.  So what's your other

8         claim?

9              MR. GISLESON:  And then the other claim is that

1:27PM    they've been going out -- and this is from what Indeck is

11        hearing in the market, they're still going out to sell other

12        boilers that apparently contain these bells and whistles

13        that aren't part of the license agreement and either they

14        are or they aren't holding them out to be Keystone boilers.

1:27PM         But it sounds as though, from what I can gather

16        from this hearing, they are seeking to include some of the

17        confidential proprietary information they learned from Erie

18        in non-Keystone boilers.

19             So what we're trying to do is get an understanding

1:28PM    both as to the historical relationship between Erie and

21        Victory what information they received, what was the

22        technical advice that was given, so we can understand the

23        Keystone boilers they, in fact, have sold.  And then to

24        focus also on any other water tube boilers that they sold

1:28PM    that were not Keystone boilers.

1:28PM            And then as to the HRSG, the focus is solely on

2       the water tube HRSG, not the fire tube HRSG.  We want to

3       know whether they took this Keystone technology and applied

4       it to the water tube HRSG, if you will.  The focus is

1:28PM  actually very simple for the HRSG discovery that we want.

6       And the focus is on the drum internals because there are

7       drums in the HRSG and it's the same kind of drum that you've

8       got in your basic Keystone water tube boiler and the concern

9       is with the proprietary technology with the pure fire

1:29PM  separators.

11            THE COURT:  What are the unique components of your

12      non-Keystone proprietary product that you are concerned --

13      well, let me ask it this way:  Part of your claim is that

14      they have used proprietary information to improve their own

1:29PM  product, right?

16            MR. GISLESON:  To improve the Keystone product

17      that was licensed to them.

18            THE COURT:  Right.  Are there specific components

19      of the technology that you think -- well, tell me what had

1:29PM  been incorporated.  When I ask the question earlier about

21      the vortex steam separators and the Chevron steam

22      separators, is that two examples of what you think they've

23      done that's inappropriate?

24            MR. GISLESON:  Those are two examples of how they

1:30PM  could have incorporated the Keystone technology into the

1:30PM    HRSG.  And frankly, the focus as to the HRSG on the drum

2    internals, which is the vortex steam separators, Chevron

3    purifiers, as well as the circulation design from that,

4    which was utilized.

1:30PM         THE COURT:  So really there's two distinct things.

6    One is improving the HRSG with your technology, that's one

7    thing over here.

8         MR. GISLESON:  Correct.

9         THE COURT:  And the other one is building a boiler

1:30PM    whose specs went beyond their licensure agreement; is that

11    right?

12         MR. GISLESON:  Correct.  And when you're talking

13    about improvements, there's some improvements they could

14    make to the design that are proper within the scope of the

1:30PM    license agreement.  But there --

16         THE COURT:  Let me ask you this, and I apologize

17    for interrupting you, but I'm trying to get this straight:

18    Just by way of background, in broad brush, how does the

19    license agreement work and what -- and how are you

1:31PM    compensated?

21         MR. GISLESON:  There are royalty payments up front

22    that they had to make in connection with the exchange of the

23    technical information -- the basic technical information.

24    There were two lump-sum payments they had to make.  And then

1:31PM    there are certain royalties and a certain commission

1:31PM    percentage based on each --

2                    THE COURT:  Sale.

3                    MR. GISLESON:  -- yeah, based on each sale of the

4         boilers.  And frankly, what was happening back at the time

1:31PM    when Erie was a licensor was that Erie was experiencing some

6         financial pressures which eventually led them into

7         bankruptcy.

8                    THE COURT:  Right.

9                    MR. GISLESON:  So that Victory would come back to

1:31PM    them and say we have an opportunity to bid this kind of

11        boiler.  We want to use the M Series, but we want to make

12        certain modifications to it, and those modifications,

13        frankly, were outside of the scope of the license agreement.

14                    THE COURT:  Right.

1:32PM                    MR. GISLESON:  And on certain instances,

16        situations, Erie, after disclosure by Victory, said fine,

17        you can go ahead and make those modifications even though it

18        takes you outside of the scope of the license agreement.

19                    THE COURT:  And this may be more of a practical

1:32PM    question than a legal question, but if the licensure

21        agreement was such that you got an up-front royalty payment,

22        or a couple of them, and then periodic percentage payments

23        based upon individual sales, what difference did it make to

24        you whether they were selling a Keystone boiler that was an

1:32PM    exact replica of what they were licensed to sell or a

1:32PM  Keystone boiler that maybe had some, quote, unquote,

2  improvements that wasn't within the four corners of what

3  they're licensed to sell if they were selling the product

4  and you were making money?

1:33PM  MR. GISLESON:  Well, there's two differences.

6  One, I agree with the Court, as to Erie Power Technologies,

7  it was in a situation where it was experiencing financial

8  difficulty, which frankly was precisely why, on certain

9  defined occasions with prior disclosure by Victory, Erie was

1:33PM  willing to say, okay, you can sell this boiler.  Erie did

11  not say, go ahead whenever you want at every opportunity and

12  try to market the improvements that Erie Power developed

13  over decades and decades and decades.  It was a one-off

14  situation on certain instances.

1:33PM  Now, the license and the associated technology

16  that was acquired by Indeck, Indeck now stands in the shoes

17  of Erie Power.

18  THE COURT:  Right.

19  MR. GISLESON:  There's nothing in the license

1:33PM  agreement that says because Erie Power on one or two

21  occasions gave Victory the right to utilize the bells and

22  whistles, the improvements that Erie developed over decades,

23  you can now go out and market whenever you want, however you

24  want, to whomever you want all these improvements that are

1:34PM  our primary --

24

1:34PM          THE COURT:  So basically what you're saying in the

2       long run -- well, you're saying two things:  You're not

3       bound by their, quote, waiver, if you will, and two, that in

4       the long run you're hurt by this because they are competing

1:34PM  in the marketplace with a technology that you developed,

6       which is not licensed.

7               MR. GISLESON:  That's absolutely correct.  In

8       fact, there is no waiver because there's a nonwaiver

9       provision in the license agreement.  And that's the concern.

1:34PM  And that's precisely why we want to go back in time before

11      the date of the acquisition of the technology to figure out

12      exactly what information they received, exactly what design

13      information they utilized in building different Keystones so

14      that we can show, hey, these improvement that they claim are

1:34PM  theirs, they're not, they're ours.

16              THE COURT:  But wouldn't this be true -- we're now

17      talking about the relevance of the pre-January '03 time line

18      before any sharing of information; wouldn't it be true that

19      if you truly have proprietary information, which ultimately

1:35PM  translates itself from the blueprint into a component part,

21      that your engineer should know it when they see it?  In

22      other words, be able to look at it and say, yeah, that's

23      ours.

24              MR. GISLESON:  That's true.  And that's precisely

1:35PM  why we -- was the only provision that Victory sought that

1:35PM    hampered our ability to identify our technology.  But what

2    we've also heard from Counsel for Victory, as well as the

3    correspondence from Mark White over to Erie Power, is that

4    we have these improvements, we developed these improvements

1:35PM    ourselves without any assistance from Erie, we didn't need

6    them.

7         What we want to do is look at that one-year period

8    before license agreement so we can get a snapshot as to what

9    the engineering capabilities were that Victory had at the

1:36PM    time.  And we know from the affidavit that John Gdanetz

11    (phonetic) submitted that he's carving out and protecting

12    himself by saying, hey, we didn't have any pre-existing

13    engineering capabilities.

14         What Indeck doesn't want to be met with in

1:36PM    discovery or at trial is some claim that, hey, we already

16    knew how to do this even before the license agreement was

17    executed and let me show you how, and they pull out a

18    document from 2002 --

19         THE COURT:  In other words, it would really go to

1:36PM    the question as to whether or not -- it really implicates

21    the issue as to whether or not the information was truly

22    proprietary.

23         MR. GISLESON:  Right.  Or was it already in the

24    possession of Victory because there is a carve out for

1:36PM    confidentiality or proprietary information in the license

1:36PM    agreement that says, if you already knew --

2             THE COURT:  It can't be ours, it's not

3    confidential.

4             MR. GISLESON:  Yeah.  If you already knew this

1:36PM    information, then, Erie, you can't consider that to be

6    proprietary because it was already known to me from another

7    source.

8             THE COURT:  Let me stop you right there -- you can

9    stay right there, but it's useful for me to swing back and

1:37PM    forth.  I think that's potentially an important point.

11            If this case is still around and we're at trial

12    someday, would part of Victory's position here be insofar as

13    the confidentiality -- the trade secret, confidential

14    information, proprietary information is concerned that we

1:37PM    didn't learn anything from you that we didn't already know

16    before we ever entered into a licensing agreement; is that

17    your position today?  Are you following the question?

18            MR. SHEEAN:  I think I do, Your Honor.  And I

19    think the answer is, first of all, one piece of information

1:37PM    that was in the affidavit, Victory Energy didn't manufacture

21    any water tube boilers before it entered into the licensing

22    agreement.  It sold two water tube boilers, Erie Power water

23    tube boilers, before January of 2003 because these companies

24    had a pre-existing relationship and, of course, could have

1:38PM    taken those boilers apart and gotten confidential

27

1:38PM    information from those.

2                But my point is, as far as the water tube

3        technology goes, this may be a red herring because they

4        weren't selling them anyway.  The reason why we're

1:38PM    protecting it is because it goes to the HRSG, it has nothing

6        to do with the Keystones.

7                THE COURT:  But to answer my question, because

8        it's an important one, is it your position that among the

9        reasons -- among the reasons that the Plaintiff's claim

1:38PM    fails is that the information or the technology or the

11        expertise that they are accusing you of having stolen, if

12        you will, from them was already within your domain and you

13        already knew how to do it?

14                MR. SHEEAN:  Judge, the answer is no.  And the

1:39PM    reason why is, it was in the public domain.  It was in the

16        public domain.  And the reason why it was in the public

17        domain is these kind of boilers have been manufactured for

18        years.  What we got from -- and I'll repeat myself, what we

19        got from Erie Power was the use of the name Keystone, which

1:39PM    had a lot of cache in the marketplace, and the use of the

21        software program so that we could rate these boilers.

22                Victory Energy did not have the capability in

23        2003, 2004 to write their own rating program.  They didn't

24        have the engineering capability, it needed Erie's help.  And

1:39PM    with respect to certain jobs that Mr. Gisleson has

1:39PM    referenced, there are instances where they were back and

2         forth, the Dallas/Fort Worth job, there were jobs where they

3         went back and forth on engineering to make modifications, to

4         make a given boiler taller and wider, or whatever.

1:39PM             But this case boils down to two things, Judge,

6         about the quote, unquote, modifications, improvements,

7         whatever.  You asked Mr. Gisleson on two different occasions

8         what specific technology do you believe that Victory has

9         misappropriated, and I think he's dodged the issue in both

1:40PM    instances.  But with respect to the Keystone boilers,

11        there's two specific claims that were made in a letter we

12        just got when the motion was filed, we received it from Bob

13        Gadanich back in March of 2004, he was working for Erie

14        Power; and those are, you're utilizing water-cooled front

1:40PM    and rear as opposed to refractory.

16                 What that means is you're running cool water

17        around the boiler in the front and back instead of letting

18        it get hot, and you're using membrane tube instead of

19        tangent tube technology.  What that means is you're welding

1:40PM    those tubes together that are in that drawing so that heat

21        can't escape outside to maximize the efficiency of the

22        boiler and you also reduce the noxious emissions that might

23        go outside.

24                 Those modifications, improvements, whatever have

1:41PM    been utilized in the industry by Nebraska boiler and many

29

1:41PM  other competitors.  So if this case comes down to as to

2  whether or not Victory Energy stole water-cooled front and

3  rear design or membrane wall design, then let's have a

4  hearing on that right now and we can --

1:41PM          THE COURT:  Well, we're not going to do that right

6  now, but we're just going to try one more time back here;

7  it's still not clear to me, and I think the problem is mine,

8  it's not yours, did you have the technology to do prior to

9  January 7, '03 what you were able to do after January 7,

1:41PM  '03?

11          MR. SHEEAN:  And by that you mean, build Keystone

12  boilers?  No.

13          THE COURT:  Then it sounds to me like he has

14  forsworn the argument that they knew how to do it anyways.

1:42PM          MR. GISLESON:  It sounds like it, and part of the

16  concern also, he said that there were two water tube

17  boilers, actually Erie boilers, that they sold before the

18  license agreement, and it's troubling that there's a refusal

19  even to turn over that documentation to us because if those

1:42PM  are the only two water tube boilers that they sold as part

21  of the license agreement and they were sold by Erie Power,

22  the predecessor, then even if those weren't designed or

23  manufactured by Victory to the extent they obtained any

24  detailed drawing for those boilers or otherwise, that's

1:42PM  information that they had in their possession.

1:42PM          THE COURT:  Now, I think I have an affidavit from

2      somebody from that side that -- don't you say -- or your

3      client says, Mr. Sheean, and that Victory has never

4      incorporated into their HRSG product any proprietary

1:43PM  information from the Plaintiff?

6          MR. SHEEAN:  That's correct, Your Honor.  That's

7      Paragraph 4 of it.  "VEO is not designed --"

8          THE COURT:  Whoa, slow down for her.

9          MR. SHEEAN:  "VEO has not designed, manufactured,

1:43PM  or sold any heat-recovered steam-generated boilers that

11     incorporate or utilize any EPTI technology in any way."

12         THE COURT:  Now, that's by way of affidavit,

13     right?

14         MR. SHEEAN:  Yes, Your Honor.

1:43PM          THE COURT:  And you want to peek in the cupboard

16     to make sure that what he's saying it true, right?

17         MR. GISLESON:  Well, that's correct.  I can focus

18     the discover more narrowly if the Court wants, but the

19     Court's aware the defense always denies -- or at least they

1:44PM  deny and then get into the discovery and you find out that

21     the assertions set forth in the answer weren't exactly

22     accurate.

23         THE COURT:  What evidence do you have now as you

24     stand here which supports your suspicion that Victory is

1:44PM  improving its HRSG product at your expense?

1:44PM          MR. GISLESON:  None, other than the fact that they

2     have the ability to do so based on the information they have

3     and our prior knowledge -- or knowledge now, rather, that

4     they, in fact, went beyond the licensing agreement and did

1:44PM   not narrowly -- or did not constrain themselves to comply

6     strictly with the licensing agreement.

7          THE COURT:  And with respect to that matter, not

8     constraining themselves, do I take it that your suspicion of

9     that is more than a suspicion in your view, it is based upon

1:45PM   having seen quote, Keystone boilers that they, in fact,

11    manufactured but which have all the additional bells and

12    whistles?

13          MR. GISLESON:  Correct.

14          THE COURT:  You've seen them out in the

1:45PM   marketplace?

16          MR. GISLESON:  I've seen them from the

17    documentation that we received from Erie that indicates that

18    Victory was selling Keystone boilers that were outside the

19    scope of the licensing agreement and that was unknown to

1:45PM   Erie at the time those boilers were designed.

21          THE COURT:  And notwithstanding the fact that Erie

22    apparently, either because of financial problems or

23    otherwise, aided them in doing some additional tinkering

24    with it, are you saying that this is something beyond that

1:45PM   that even Erie is not aware of?

1:45PM          MR. GISLESON:  For certain of the boilers, that's

2       correct.  And then what happened was -- and there's a

3       letter, the Gadanich letter is an attachment to our motion.

4               In the Gadanich letter, Mr. Gadanich, who's an

1:46PM  engineer with Erie, was identifying specific concerns that

6       Erie had at the time with respect to Victory's activities in

7       the market, and now Victory was not disclosing to Erie that

8       they were doing certain things that were not on the

9       licensing agreement.

1:46PM          At that time Erie and Victory were in discussions

11      that would have Victory acquiring this technology even

12      though they are now saying everything was out in the

13      marketplace.  That Victory wanted to acquire all of this

14      technology, instead of simply license it, and the hope was

1:46PM  that the parties could reach a resolution that would avoid

16      the need for a conflict over Victory's activities, Erie

17      eventually goes bankrupt, and then we end up now with Indeck

18      as the licensor.

19              So, I mean -- I'll be candid about this, do we

1:46PM  have any specific facts showing that they incorporated

21      technology into the HRSG, no, we don't.  But the concern is

22      we know that they've gone beyond the licensing before, and

23      they can do it with the HRSG.  As to the discovery we want,

24      I don't care about pricing information, I don't care about

1:47PM  margin information; as to the HRSG, we would like to get the

33

1:47PM   assembly drawing for the drum internals, which is where the

2   separators and the purifiers are.

3   We also know that they could have used the

4   circulation design program that Erie provided because that

1:47PM   circulation design program for the Keystone boilers could be

6   used in the HRSG.  So if they want to limit it to the drum

7   assembly drawn for HRSG, that's fine, and carve out the rest

8   of it, I'm happy to accept that.

9   THE COURT:  You would settle for only a portion of

1:47PM   the blueprint of the HRSG relevant to that portion of the

11   HRSG -- the only portion of the HRSG where you think your

12   technology could be incorporated.

13   MR. GISLESON:  Correct.

14   THE COURT:  And what, again?

1:47PM   MR. GISLESON:  It's the drum internal, the drum

16   where the purifiers and separators are located.  It's the

17   drum assembly.  Your Honor, may I approach?

18   THE COURT:  What am I looking at?

19   MR. GISLESON:  This is a cutaway of the drum

1:49PM   that's on the boiler.  And it's basically the same drum that

21   you would find both in an M Series boiler such as this,

22   which goes right along the top, as well as in the HRSG.

23   This is another picture of the HRSG.

24   THE COURT:  Hang on one second.

1:49PM   MR. GISLESON:  Sure.

1:49PM           THE COURT:  All right.

2                MR. GISLESON:  The HRSGs can have different

3      designs.  To give you an example, here's the HRSG, here's

4      the M Series, if you look at the basic shape, it's the same,

1:49PM you can see the drum at the top of each boiler.

6                THE COURT:  Yes.

7                MR. GISLESON:  What we're interested in is the

8      drum assembly drawing that would identify the specific

9      components within the drum.  And, obviously, once you get

1:49PM the drum assembly information, it would be easy to determine

11     whether it contains any vortex steam separators or Chevron

12     purifiers.

13               THE COURT:  So as I said in the beginning, it

14     really is the vortex steam separators and Chevron purifiers

1:50PM that you're looking for; isn't it?

16               MR. GISLESON:  Correct, unless there's something

17     else in there.  But those are two best examples that we have

18     of technology that could be imported into the HRSG.

19               THE COURT:  Yes, sir.

1:50PM           MR. WILLIAMS:  Your Honor, the software that was

21     given to Victory by Erie Power, this rating software that

22     we're talking about, it contains a component that allows

23     them to make sure that the water -- to design the water

24     circulation characteristics, and that software can be used

1:50PM in any boiler, any water tube HRSG.  So that's also a

1:50PM  component piece of technology that could have been used to

2  design these HRSGs that we're talking about.  So it's the

3  purifiers, plus the circulation technology.

4          THE COURT:  Let me ask Mr. Sheean a question.

1:51PM  We're making slow but steady progress.

6          Now that the scope of the request, at least

7  apparently, has been narrowed insofar as the HRSG technology

8  is concerned to this distinctive part of the machine, the

9  part that would have the steam separators and the Chevron

1:51PM  purifiers, does that go any distance to quelling your

11  client's concerns about turning over the complete blueprint

12  of this HRSG?

13          MR. SHEEAN:  Judge, I have an alternative

14  proposal.  We'll produce the drum internal drawings for all

1:52PM  HRSGs that Victory Energy has sold that utilize either a

16  vortex purifier or a Chevron steam separator.

17          MR. GISLESON:  Certainly that's good, but then it

18  goes back to, you just have to trust us.

19          THE COURT:  Well, what else were you going to get

1:52PM  besides their blueprints?  They just said they'd turn it

21  over to you.

22          MR. GISLESON:  I'm sorry, maybe I misunderstood.

23  I thought he said that they'll turn over all drawings of

24  drum internals for HRSGs that have the vortex steam

1:52PM  separator and Chevron purifier, but that's not necessarily

1:52PM  all drawings of all the HRSGs as to the drum assemblies.

2            THE COURT:  Maybe the confusion is mine, but I

3  thought that it was the vortex steam separators and the

4  Chevron purifiers which were components of -- which were

1:53PM  your proprietary information.

6            MR. GISLESON:  Correct.

7            THE COURT:  But I thought you -- did you just tell

8  me that you have incorporated into some of your HRSGs vortex

9  steam separators and Chevron purifiers?

1:53PM        MR. SHEEAN:  No.  We have incorporated none.  And

11  that's why I said if we have to turn over all drawings --

12            THE COURT:  I misunderstood then --

13            MR. SHEEAN:  Let me finish --

14            THE COURT:  No.  Sorry, you don't tell me --

1:53PM        MR. SHEEAN:  I apologize.

16            THE COURT:  -- who's finishing, I tell you who's

17  finishing here in this courtroom.

18            MR. SHEEAN:  Yes, sir.

19            THE COURT:  All right.  Now, I think I

1:53PM  misunderstand you.  I thought -- did you misunderstand him

21  as well?

22            MR. GISLESON:  My understanding was we weren't

23  going to get any drawings because he's going to say the

24  vortex steam separator and Chevron purifiers aren't in any

1:53PM  of them.

1:53PM          THE COURT:  No.  I don't think that's what Mr.

2       Sheean -- I don't think that's what he's saying at all.  Say

3       it again.

4               MR. SHEEAN:  Your Honor, to be clear, Victory

1:53PM  Energy has never utilized a vortex steam separator or

6       Chevron purifier in any HRSG boiler, and therefore we'll

7       turn over those drawings because there are none.  There

8       aren't any drawings, Judge.

9               This goes back to the whole -- you know, they want

1:54PM  to see every single boiler that we sold because you may have

11      incorporated some piece of technology.  We don't sell high

12      pressure HRSGs.

13              THE COURT:  Listen carefully now, will you turn

14      over to them -- in other words, what you're saying is you

1:54PM  can't turn over that which you don't have.  Will you, in

16      fact, though turn over to them the blueprints that you do

17      have which show the internal drum assembly as it presently

18      exists?

19              MR. SHEEAN:  On a representative basis or for

1:54PM  every one we've -- every boiler we've ever sold?

21              THE COURT:  Well, for your HRSG -- I don't know if

22      there's different HRSG boilers or not.  Is there more than

23      one type?

24              MR. SHEEAN:  Can we take a break?

1:54PM          THE COURT:  As a matter of fact, why don't you

1:54PM   check.  If we can solve this problem, we'll be a long way to

2   solving a lot of the problems.  We'll take a short recess

3   and then you talk to your client and we'll come back and

4   continue this.

2:01PM          (Recess taken from 1:54 p.m. to 2:02 p.m.)

6          THE COURT:  Okay.  Lets's pick up where we left

7   off on this issue of the HRSG boilers and the extent to

8   which, if at all, the Defendant would be willing to supply

9   the blueprint of the drum area of that boiler.

2:02PM          MR. SHEEAN:  Judge, we still feel like this is a

11   witch hunt and don't feel it's proper to force Victory to

12   produce drawings --

13          THE COURT:  I haven't done that, and I'm not.  I

14   simply was inquiring whether the fact that the blueprint

2:02PM   requested has been reduced from apparently the whole machine

16   to a tiny portion of the machine, if that at all assuages

17   your concern that they're dipping into your proprietary

18   tent.

19          MR. SHEEAN:  It does not assuage us.  It reduces

2:02PM   the volume of documents, but it's still going to require the

21   combing through of some 50-odd job files to find the

22   internal drawings that demonstrate that we never sold an

23   HRSG with Chevron purifier and vortex separator.

24          THE COURT:  All right.  Now, let's go back and

2:02PM   finish up some of these other points and we may be closer to

2:03PM    me putting an order on the record.

2                In response to Mr. Sheean's point that you only

3         jumped on board this license agreement by virtue of you

4         purchasing the assets on September 8, 2004, so anything that

2:03PM    happened before that, at least, insofar as you're concerned,

6         your ox wasn't being gored so you can't get that

7         information; what about that?

8                MR. GISLESON:  Not surprisingly, we disagree.

9         This case involves technology, there's also been an issue to

2:03PM    improvements that were made during the license period.  The

11        reason we need to go back and look at information while Erie

12        was the licensor is to examine exactly what they received

13        and exactly how they manufactured the boilers, including

14        what information they were using from what source in the

2:03PM    development of those boilers.

16                Because even if we only look at the boilers that

17        were produced, designed, and manufactured after they

18        acquired it, they're now turning us off from seeing whether

19        they were relying on information they received prior to the

2:04PM    acquisition to design and sell those boilers.  It goes back

21        to the whole idea of, well, gee, it's public knowledge, it's

22        in the public domain, and that's where it came from, it

23        didn't come from anything we got from Erie; but they're

24        saying that at a time when we're not allowed to look at the

2:04PM    documents that they have from their dealings with Erie, so

2:04PM    we can rely on the fact, it's not a public domain item, it's

2         an Erie Power item that you got on this date, from this

3         individual, and this drawing.

4              And what's really especially frustrating from our

2:04PM    perspective, and this is kind of a standing issue, is I

6         don't think there's any dispute that Indeck is the licensor

7         under the license agreement.  As the licensor, we have all

8         the rights under the license agreement which includes the

9         right to get all this very same information back at the

2:05PM    conclusion of the license agreement.

11             What's interesting is that Victory objected in the

12        Bankruptcy Court to Indeck's attempt to acquire this

13        technology from Erie.  And Victory, through Mr. Sheean, said

14        "Under the license, the licensor, potentially Indeck, has

2:05PM    the right to audit the records of Victory including pricing,

16        performance data, and other proprietary information relating

17        to any sale of products as defined in the license agreement

18        by Victory, such as an audit in order to reveal certain

19        proprietary information, trade secrets of Victory as a

2:05PM    result of the motion," which is the motion for the assets to

21        be sold to CMI and then to Indeck.

22             If the motion is granted, Victory would be

23        required under the license to reveal Victory proprietary

24        information and trade secrets to a direct competitor.  So

2:05PM    this is Victory acknowledging that if Indeck becomes the

2:06PM    licensor, it has the right to all this information.  And

2         then before we had the status conference, it was decided

3         about joint discovery plan.  And in the joint discovery

4         plan, the parties had to work together to identify the

2:06PM    subjects of discovery.  And the parties agreed at Paragraph

6         2 of the joint discovery plan, "Discovery will be needed on

7         a number of topics that include, but are not limited to the

8         following:  Information and documents received by VEO from

9         Erie Power Technologies, Inc. (EPTI, the original licensor),

2:06PM    EPTI, VEO, and Indeck's performance under the license

11        agreement; communications between VEO and EPTI during the

12        term of the license agreement; projects between EPTI and VEO

13        outside of the scope of the license agreement; VEO's

14        marketing and sale of boilers under the Keystone trademark

2:06PM    and the license agreement, whether VEO engaged in conduct

16        exceeding the scope of the licensing agreement, including

17        incorporated technology received from EPTI and boilers

18        outside of the scope of the license agreement; damage

19        experienced by either of the parties."

2:07PM         As part of that process, VEO asserted an

21        objection.  That objection was any discovery involving the

22        negotiation and interpretation of the license agreement.

23        And I think during the conference, VEO decided, well, we'll

24        permit that discovery to occur.  So that when the parties

2:07PM    went over the joint discovery plan, there was no discussion

2:07PM   about limiting discovery to only that period after Indeck

2        acquired the technology.

3               And then we served discovery on Victory and

4        Victory said in its response to our document requests, which

2:07PM   understandably cover the period of time before Indeck

6        acquired the technology, "We will produce all of this

7        documentation to you once an appropriate protective order

8        has been entered."  The protective order has now been

9        entered, it lists the individuals at Indeck, one of them is

2:08PM   Mr. Poloski, to -- who can review highly confidential

11       information.  The documentation will still be stamped

12       confidential.  But there shouldn't be any highly

13       confidential information with respect to any documentation

14       they received from Erie Power because we're the successful

2:08PM   licensor.  So that up to this point Victory was saying,

16       we'll give you the documents, you have a right to the

17       documents under the license agreement, and then we get into

18       discovery and we're met with objections.

19               THE COURT:  Finally, with respect to the

2:08PM   documentation that would predate January of '03, in the face

21       of Mr. Sheean's representation that -- and I may misspeak on

22       this, correct me; in the face of his representation that

23       Victory would not take the position at trial that it already

24       knew how to do what they knew how to do independent of your

2:09PM   information, doesn't that go a long way toward rendering

2:09PM  that earlier documentation irrelevant if they are not

2  defending on the basis that they knew how to do it anyway?

3  MR. GISLESON:  If the stipulation is they had no

4  prior knowledge or engineering capability concerning water

2:09PM  tube boilers prior to the licensing agreement, then I would

6  accept that stipulation.

7  THE COURT:  Is that too broad?

8  MR. SHEEAN:  Just a bit, Judge.

9  THE COURT:  Well, it's not water tube boilers, in

2:09PM  general, it's really -- there's water tube boilers and

11  there's water tube boilers, I'm talking about Keystone

12  technology, that's really the question:  Did you know -- if

13  you change your stipulation and insert Keystone technology,

14  doesn't that get the job done for you as well?

2:10PM  MR. GISLESON:  Yes.  Although, we would like to

16  get the documentation from the two Erie water tube boilers

17  that they sold prior to the license agreement.

18  THE COURT:  I understand your points.  Mr. Sheean,

19  is there anything you want to say, briefly, in response to

2:10PM  what you've heard?

21  MR. SHEEAN:  Yes, Your Honor.  Just to a couple of

22  the key points.  First, I want to apologize for getting a

23  little heated earlier.

24  THE COURT:  No apologies necessary.  I already

2:10PM  dressed you down once, I won't do it again.

2:10PM          MR. SHEEAN:  Victory has been a client of mine for

2          a number of years and they take this situation seriously,

3          and as a result, I do as well.

4              THE COURT:  I used to be over on that side so I

2:10PM         know what it feels like.

6              MR. SHEEAN:  Just a couple of brief points, Judge,

7          and I'll go backwards to frontwards because that's the way I

8          took my notes.

9              Mr. Gisleson listed a number of instances wherein

2:10PM         we said, yeah, fine, we'll produce documents that were dated

11         before September 8, 2004, but one of the first things that

12         came up in our scheduling conference, Your Honor asked me,

13         now, are you really going to push this standing issue.  And

14         I said, I don't know, Judge, I still haven't seen the asset

2:11PM         purchase agreement.  Finally, a couple of weeks thereafter,

16         we did get the purchase agreement and there it is, Indeck

17         Keystone Energy did not get the technology for the HRSGs

18         from Erie Power, or CMI, and Indeck Keystone Energy's assets

19         were limited to accounts receivable after September 8, 2004.

2:11PM          So I think it's a bit of a red herring to wave in

21         your face all the many times when Victory Energy was going

22         to disgorge documents when we didn't know what we were up

23         against at that point.  So I think that's a bit disingenuous

24         to say that we're coming into this lately is something other

2:11PM         than an appropriate response.

2:11PM      With respect to -- we spent a little bit of time

2     talking about the license agreement, itself, and what it is

3     that was licensed and what wasn't.  And I think if you take

4     a took at the license agreement, which is attached to the

2:12PM    motion, it's also attached to, I think, to the pleadings

6     that were filed in this case, the definition of products is

7     clear, it's industrial water tube boilers with a capacity

8     steam range of 29,000 pounds per hour to 150,000 pounds per

9     hour.

2:12PM          THE COURT:  Right.

11              MR. SHEEAN:  Period.  Product shall include, but

12    not be limited to, those items identified that are listed.

13    So I think that's got to be given some weight, not just with

14    respect to the resolution of the merits of this case but --

2:12PM          THE COURT:  Not to interrupt, but what you're

16    really saying is going right back to the contract, itself,

17    that your interpretation of it is that -- contrary to their

18    interpretation, is that you were not necessarily limited to

19    the type of boiler that they claimed you were limited to; is

2:13PM    that right?

21              MR. SHEEAN:  We were permitted to sell industrial

22    water tube boilers utilizing the Keystone name and utilizing

23    the software provided by Erie Power to sell any industrial

24    waterer tube boiler -- natural circulation water tube boiler

2:13PM    within that capacity range.  And if Victory Energy chose to

2:13PM  include membrane wall technology versus tangent tube

2       technology, if they chose to use water cool technology

3       versus the refractory that was the so-called old style, that

4       was their right under the license agreement.

2:13PM          And I think that examining that licensing

6       agreement goes a long way to demonstrate Victory Energy's

7       position here and what we consider to be vastly overbroad

8       requests for documents.

9               THE COURT:  All right.

2:14PM          MR. GISLESON:  Your Honor, just one clarification

11      on the record, Indeck did acquire HRSG technology, so it's a

12      misreading of the asset purchase agreement to say that

13      Indeck did not acquire any HRSG technology.

14              What the agreement talks about is CMI, EPTI

2:14PM  retained reheat recovery steam generator technology applied

16      to combustion turbine exhaust gas heat recovery applications

17      of 18 megawatts and above.  Below 18 megawatts and above,

18      Indeck did acquire the technology.  So there was some HRSG

19      technology acquired along with the Keystone assets.  And, in

2:14PM  fact, if you look at the schedule it shows there's joint

21      ownership of technology to the extent it applied both to

22      HRSGs as well as to the Keystone assets.  So I just wanted

23      to make that one clarification to say that there was HRSG

24      technology acquired.

2:15PM          THE COURT:  Okay.

2:15PM          MR. SHEEAN:  Just to respond to that briefly,

2       Judge, we never got the schedules, number one, and number

3       two, the agreement, itself, says that one of the excluded

4       assets is any assets related to the HRSG business.

2:15PM          MR. GISLESON:  Which is a defined term on the

6       first page of the asset purchase agreement, and it's

7       defined, "Limited to the exhaust gas recovery applications

8       of 18 megawatts and above."

9               THE COURT:  Have you ever heard the expression,

2:15PM  "Losing the forest through the trees?"  We're there right

11      now.

12              This is what -- I'm going to enter an order and

13      really the order is going to be structured around the three

14      major objections; one is the alleged irrelevance of the

2:15PM  January -- anything prior to January of '03, the alleged

16      irrelevance of anything prior to September 8, 2004, and the

17      objection for the reasons that Victory put on the record to

18      being required to divulge information about your HRSG.

19              This is an order:

2:16PM

21                      O R D E R

22

23              Presently pending before the Court is a motion for

24      protective order limiting discovery as well as Plaintiff's

2:16PM  motion to compel production of documents in opposition of

2:16PM Defendant's motion for protective order.  With the

2 understanding in the interest of brevity, I'm simply

3 incorporating here in my reference the substance of the

4 argument that you previously had here today where each party

2:16PM had an opportunity to articulate more fully their respective

6 positions.

7        Essentially, Victory objects to the request of

8 discovery in the nature of subpoenas on three bases:  One,

9 that any information -- that any information from Victory

2:17PM that would predate January 7, '03, which would be the date

11 of the licensing agreement, is irrelevant.  Second, that any

12 information that would predate September 8, 2004 would also

13 be irrelevant in that, in Victory's view, Indeck does not

14 have standing to complain about matters that occurred prior

2:17PM to the time that it purchased the assets.  And three, that

16 Indeck's attempts to acquire allegedly proprietary

17 information concerning Victory's HRSG product is irrelevant

18 given the nature of the claims.

19        First, with respect to any request for

2:18PM documentation prior to January 7, 2003, I find based on the

21 representations made here today as to the nature of the

22 defense or defenses that would be asserted by Victory that

23 pre-January '03 information is irrelevant and not calculated

24 to lead to the discovery of -- and would not be calculated

2:18PM to lead to the discovery of admissible evidence within the

2:19PM    meaning of Rule 26.

2              With respect to the request for documentation that

3        predates -- let me phrase it this way:  With respect to the

4        request for documentation that predates September 8, 2004, I

2:19PM    find that the requested information does involve claims --

6        potentially involve claims for defenses in the case and in

7        my view would be calculated to lead to discovery of

8        admissible evidence.

9              On the subject of the HRSG boiler, as I understand

2:19PM    it, at least at the present time, the Plaintiff has no hard

11        information in its possession to suggest that Keystone

12        technology has, in fact, been injected, if you will, into

13        the HRSG product, unlike, for instance, contrary to the

14        situation where they claim it does have hard information

2:20PM    that the Keystone boilers were allegedly inappropriately

16        modified by Victory.

17              Given the fact that the most that can be said at

18        the present time is that Indeck has a "concern" that that

19        technology might or could be introduced into the HRSG

2:20PM    boiler, and also in view of the fact that I have a sworn

21        affidavit before me that it has not been incorporated, and

22        balancing the equities, considering proprietary nature, and

23        with an eye toward good cause, I do not see at this time in

24        the litigation that notwithstanding the protective order

2:21PM    that that type of discovery is appropriate.