UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company, <br><br> Defendant. | CIVIL ACTION <br><br> NO. 04-CV-325 (ERIE) <br><br> Judge Sean J. McLaughlin |

PLAINTIFF'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION
TO ENFORCE, OR IN THE ALTERNATIVE
TO CLARIFY ORDER LIMITING
DISCOVERY, AND FOR SANCTIONS

Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel, submits this memorandum in opposition to the Motion to Enforce, or in the Alternative to Clarify Order Limiting Discovery, and for Sanctions filed by Defendant Victory Energy Operations LLC ("VEO"). The Motion is wholly without merit and should be denied.

### Introduction

1. As set forth in greater detail in IKE's Complaint, this action arises out of VEO's alleged misuse and misappropriation, *inter alia*, of certain software and proprietary and

PTDATA 290134_3

technical data (collectively, the "Keystone® Technology") that was licensed to VEO pursuant to a written License Agreement dated as of January 7, 2003.[1]

2. On June 24, 2005, VEO filed a Motion for Protective Order seeking to limit the scope of document requests served by IKE on VEO (through document requests) and third parties (through subpoenas). (Docket Entry No. 21) IKE in turn filed a Response to Motion for Protective Order and Motion to Compel Production of Documents on July 1, 2005. No depositions had occurred as of the time those motions had been filed or a hearing held on those motions.

3. The Court held a hearing on July 15, 2005 and entered an Order ("July 15 Order") on the record at the conclusion of the hearing. A copy of the Order is attached hereto as Exhibit A. IKE understood the focus of the hearing to be on the discoverability of certain categories of documentation from VEO and third parties. In that regard, VEO's Motion for Protective Order Limiting Discovery referred to "overly broad discovery through production requests and subpoenas directed to VEO's suppliers and customers" and sought "a protective order limiting IKE's discovery requests to only those subjects that are potentially related to the claims which IKE is entitled to raise ...." (VEO Motion for Protective Order Limiting Discovery at ¶¶ 3, 7) IKE in turn moved to compel production of documents by VEO in addition to opposing that motion. (Docket Entry No. 24) The July 15 Order itself refers to (among other

---

[1] The original licensor under the License Agreement was Erie Power Technologies, Inc. ("EPTI"). EPTI entered bankruptcy proceedings and sold substantially all of its assets to CMI-EPTI, LLC, which almost immediately sold the Keystone® Technology to IKE without ever utilizing that Technology or performing Licensor functions. IKE thus became the successor licensor under the License Agreement, and it acquired all "right, title and interest" in the subject intellectual property and technical data pursuant to a written Asset Purchase Agreement dated as of September 8, 2004.

2

things) the "request for documentation prior to January 7, 2003" (Exhibit A at p.49) and to the "request for documentation that predates September 8, 2004." (*Id.* at p.50)

4. In its current Motion, VEO asserts that Plaintiff has violated the Court's July 15 Order in two ways. First, VEO contends that Plaintiff served two subpoenas that improperly seek documentation concerning Heat Recovery Steam Generators ("HRSGs"). Second, VEO contends that Plaintiff's questions to VEO witnesses concerning whether VEO incorporated the Keystone® Technology into the design of HRSGs and a waste-heat boiler violated the July 15 Order. VEO is wrong on both counts.

### IKE's Subpoenas Comply With The July 15, 2005 Order.

5. VEO's Motion refers to two subpoenas that were issued by IKE: one with respect to ICM and another with respect to Tejas Boiler Services, Inc. (VEO Motion at pp.4-5)

6. IKE has not received any documents from either entity that are outside the scope of the July 15 Order. In fact, no documents have been received from Tejas. (See Affidavit of Keith Whitson, attached hereto as Exhibit B, at ¶¶ 9, 13.) There is no claim to the contrary by VEO.

7. As to the ICM subpoena, it was served *prior* to the July 15 Order, and IKE voluntarily limited the scope of the subpoena after the July 15 Order was entered through direct communications with ICM. (Exhibit B, Whitson Affidavit, ¶¶ 4-10.)

8. As to the Tejas subpoena, VEO's motion ignores that, at VEO's request, IKE agreed in the Protective Order to provide a copy of proposed document subpoenas to VEO for its review *before* they were served. VEO then has an opportunity to alert the subpoenaed party in advance of the subpoena being served and to identify any concerns it has to IKE. IKE in turn can amend the subpoena if appropriate based on any issues raised by VEO. That process

3

occurred with the Tejas subpoena. Through an oversight, counsel for IKE attached the pre-July 15 document request rather than the amended document request. Upon being advised of the oversight, IKE promptly conformed the requests – prior to service of the subpoena -- to comply with the July 15 Order, which is the request ultimately served with the subpoena. (Exhibit B, Whitson Affidavit at ¶¶ 11-12)

9. VEO claims that IKE should be sanctioned because "by blanketing subpoenas on VEO's customers, IKE is injuring VEO's reputation and its ability to compete in the marketplace."[2] (VEO Motion at p.6) IKE has a right to subpoena third parties, and VEO and the third parties may move to quash a subpoena if appropriate. Notably, all of the third parties subpoenaed by IKE were identified in discovery by VEO as having knowledge concerning the claims and defenses at issue here or in documents produced in this lawsuit, which is why they were subpoenaed. Moreover, through those subpoenas, IKE obtained documents that VEO itself failed to produce in discovery that demonstrate that VEO has marketed for sale Keystone® boilers that are admittedly outside the scope of the License Agreement and to which it has no rights.

10. Under the License Agreement, VEO may sell (as specifically defined in more detail in Annex 1 to the Agreement) Keystone® standard watertube boilers from 8M-22M that have a steam flow capacity of 29,000 to 150,000 pounds per hour ("pph"). As a result of its subpoenas, IKE obtained (among other things) sales proposals issued by VEO that utilized Keystone® Technology for the sale of boilers above 150,000 pph and above a 22M – boilers that VEO's current General Manager and former Keystone® National Sales Manager admitted during

---

[2] Because VEO requested that provision in the Protective Order and IKE has followed that procedure, it is misleading for VEO to assert that it "has been forced to police every subpoena sent out." VEO specifically wanted to scrutinize every subpoena.

4

their depositions were outside the scope of the License Agreement. But for the subpoenas, IKE would not have obtained those documents and the associated admissions. IKE's use of the subpoenas has been proper and necessary.

11. Notably, those documents and the associated admissions contradict the Affidavit of John C. Viskup, Jr., which VEO submitted in support of its earlier Motion for Protective Order Limiting Discovery (Docket Entry 22) that VEO used to justify the limitation of HRSG discovery. Viskup stated that "VEO does not utilize any information obtained from EPTI through the License Agreement for the design or manufacture of any non-licensed product." (Exhibit A to VEO's Motion for Protective Order Limiting Discovery at ¶ 3) Yet VEO admittedly utilized the Keystone® technology for the design of the non-licensed boilers described in the proposals referenced above. According to White and Brewer, VEO was unsuccessful in obtaining orders for those boilers, but the simple fact is that the Keystone® technology was utilized for the expected design of non-licensed products, had VEO obtained an order pursuant to the improper proposals.[3]

12. VEO has not supplemented its document production to provide those proposals or any others that were misfiled or otherwise overlooked.

13. IKE will continue to comply with the limitations on document discovery set forth in the July 15 Order, and there is no need to clarify that Order.

---

[3] Through documents subpoenaed from the University of Notre Dame, IKE learned that VEO represented to the University that VEO could "scale up" the technology it received from EPTI under the License Agreement to design and manufacture larger boilers outside the scope of the License Agreement, which apparently is what occurred with the proposals described above in paragraph 10.

## IKE's Deposition Questions Were Proper.

14. On October 13 and 14, 2005, IKE deposed the General Manager of VEO (Mark White) and its former Keystone® National Sales Manager (Shawn Brewer). According to VEO's Motion, at those depositions IKE "inquired regarding the identity of the designer of VEO's HRSG and Waste Heat Boiler products, and the design of HRSG products." (Motion at p.5) As with its argument concerning the subpoenas, VEO's position is incomplete and misleading.

15. As the Court is aware, IKE believes that VEO likely misappropriated the Keystone® Technology by (among other things) incorporating it into other products. In particular, the drum internals for superheated Keystone® boilers can be directly utilized in the HRSG drums, while the rating and design formulas likewise can be utilized in the design of HRSGs.

16. During the White and Brewer depositions, IKE asked questions to determine whether the Keystone® technology could be or was incorporated into non-licensed products. IKE did not ask the witnesses to describe in detail the design of those products.

17. The July 15 Hearing and Order did not address Waste-Heat Boilers, but the Keystone® Technology could be used in that product, which is supported by the Affidavit of Terry S. Pawlowski submitted by IKE in support of its previously filed Motion to Compel Production of Documents and Opposition to VEO's Motion for Protective Order (Docket Entry No. 24): "I understand that in connection with VEO's license, EPTI provided to VEO various drawings, data, and technical information regarding the design, rating, construction, operation and performance of Vortex steam separators and Chevron steam separators. Use of the Vortex steam separators and Chevron steam separators is not limited to Old-Style Boilers. To the

contrary, Vortex steam separators and Chevron steam separators can be used in virtually any water tube boiler, steam generator and/or process steam drum." (Docket Entry 24, at ¶¶ 12-13) Counsel for VEO admitted as much during the July 15, 2005 hearing. (Exhibit A, Excerpts from 7/15/05 Transcript at pp.3-5) Thus, IKE's limited questions concerning the waste-heat boiler were reasonably likely to lead to the discovery of admissible evidence.

18. VEO's assertion of a violation of the July 15 Order is wrong for at least three reasons.

19. First, IKE's questions concerning those products were focused on whether VEO incorporated the Keystone® Technology into those products, which is wholly proper and certainly will lead to the discovery of admissible evidence if the witness provides an affirmative answer. IKE explained this to VEO prior to VEO's filing of this Motion. (Exhibit C, Letter from J. Gisleson to C. Sheean dated October 19, 2005) The questions on these topics from the White and Brewer depositions include the following:

Q: "While you've been employed with VEO, has VEO sold any HRSGs that included a Keystone® watertube boiler?" (M. White Dep., p.10)[4]

\* \* \*

Q: Did you disclose any confidential information of EPTI concerning HRSGs to VEO?" (M. White Dep., p.103)

\* \* \*

Q: "Are there also HRSG designs in the drafting room?"

---

[4] VEO designated the entire transcripts of Mark White and Shawn Brewer confidential. As a result, IKE is identifying only the questions that were asked without including the answers. IKE obtained prior consent to do this from VEO. IKE also obtained consent to identify the admissions concerning proposals outside the scope of the License Agreement referenced in paragraph 10 so long as more detailed information was not disclosed (*e.g.*, the identity of the prospective customer).

Q: "Are those in the same room as the Keystone® drawings in connection with the design or manufacture of HRSGs?" (M. White Dep., p191)

* * *

Q: "While you were with Victory, did Victory ever sell a HRSG that included a Keystone® watertube boiler?" (S. Brewer Dep., p.26)

Q: "Was a Keystone® boiler ever used in an unfired situation?" (S. Brewer Dep., p.28)

* * *

Q: "To your knowledge, was any Keystone® technology ever incorporated into a heat recovery steam generator?" (S. Brewer Dep., pp.28-29)

Q: "Did Victory maintain any literature that addressed both HRSGs and Keystones® in the same brochure?" (S. Brewer Dep., p.113)

Q: "Do you know where at Victory's headquarters the Keystone® drawings were maintained?" (S. Brewer Dep., p.167)

Q: "Where were the HRSG drawings maintained?" (S. Brewer Dep., p.168)

* * *

Q: "Is the Victory boiler in Harrisburg a waste heat boiler?" (M. White Dep., p.12)

Q: "Did VEO incorporate any of the technical information that it received from EPTI into the MSW boiler for the [waste-heat] project?" (M. White Dep., p.13)

Q: "Did VEO incorporate any drum internals that it received from EPTI into the drum of the boiler in [that] project?" (M. White Dep., p.13)

8

Q: "Did VEO provide any design procedures that it received from EPTI to [the designer of the waste heat boiler] in connection with the design of that boiler?" (M. White Dep., p.269)

Q: "Did VEO ever sell a municipal solid waste fuel boiler?" (S. Brewer Dep., p.67)

Q: "Did Victory, to your knowledge, ever include any Keystone® technology in that boiler?" (S. Brewer Dep., p.67)

20. In short, those are precisely the kind of questions that are asked in an infringement and misappropriation case. VEO's objection to such limited and obviously relevant questions has raised red flags for IKE as to what VEO is seeking to hide.

21. Second, asking witnesses to identify the designer of VEO products does not require the disclosure of confidential information, and it can lead to the deposition of those individuals so that they can be asked – under oath and subject to the penalty of perjury – whether they received Keystone® Technology from VEO for use in non-Keystone® products.

22. Third, the July 15 Order expressly contemplated that IKE could pursue broader discovery concerning HRSGs upon the development by IKE of further information concerning VEO's use of the Keystone® Technology in HRSGs, and IKE thus asked questions of White and Brewer designed to develop a basis for pursuing further discovery on that subject. The July 15 Order addresses this discovery as follows:

> On the subject of the HRSG boiler, as I understand it, <u>at least at the present time</u>, the Plaintiff has no hard information in its possession to suggest that Keystone technology <u>has, in fact, been injected if you will into the HRSG product</u>, unlike, for instance, contrary to the situation where they claim it does have hard information that the Keystone boilers were allegedly inappropriately modified by Victory.
>
> Given the fact that the most that can be said <u>at the present time</u> is that Indeck has a 'concern' that that technology might or could be introduced into the HRSG boiler, and also in view of the fact that I have a sworn affidavit before me

that it has not been incorporated, and balancing the equities, considering the proprietary nature, and with an eye toward good cause, <u>I do not see at this time in the litigation</u> that notwithstanding the protective order that that type of discovery is appropriate.

<u>However, with respect to that particular aspect, I'm granting the protective order without prejudice to Indeck to – based upon the potential development of further information, to renew its request if and when it feels it's appropriate during the course of discovery."</u>

(Exhibit A, 7/15/05 Order at pp.50-51) (emphasis added)

23. The Court granted VEO's motion "without prejudice ... based upon the potential development of further information." IKE's narrowly focused questions were intended to "develop" that "further information" about whether "Keystone technology has, in fact, been injected ... into the HRSG product."

24. Furthermore, in granting (in part) VEO's Motion for protective Order, the Court relied on the affirmative representations by VEO that it has not breached the License Agreement. (Exhibit A, excerpts from 7/15/05 Transcript at pp. 31 and 50). As set forth in paragraph 11, *supra*, the credibility of Mr. Viskup's affidavit has been called into question by the testimony of VEO's own General Manager and former Keystone® National Sales Manager about VEO's pursuit of boiler sales outside the scope of the License Agreement.

PTDATA 290134_3

## CONCLUSION

25.     IKE's discovery has complied with the July 15 Order, and there is no basis either for sanctions or for clarification of the July 15 Order. VEO's Motion should be denied.

Respectfully submitted,

___/s/_____
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated:  November 3, 2005

PTDATA 290134_3