```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY,    : CIVIL DOCKET
LLC,                       :
        Plaintiff          :
                           :
        v.                 : Case No. 04-CV-00325-SJM
                           :
VICTORY ENERGY OPERATIONS, :
LLC,                       :
        Defendant          : Motion for Protective Order


            Hearing in the above-captioned matter
        held on Friday, July 15, 2005, commencing at
        1:00 p.m., before the Honorable Sean J. McLaughlin,
        at the Unites States Courthouse, 17 South Park
        Row, Erie, PA 16501.


For the Plaintiff:

        John K. Gisleson, Esquire
        Schnader Harrison Segal & Lewis
        120 Fifth Avenue
        Suite 2700, Fifth Avenue Place
        Pittsburgh, PA 15222

For the Defendant:

        Christopher T. Sheean, Esquire
        Kelley Drye & Warren
        333 W. Wacker Drive, 26th Floor
        Chicago, IL 60606



                Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.
```

1

THE COURT: Good afternoon. Please be seated. All right. This is the time that we set for argument on the Victory Energy's motion for protective order from discovery as well as the flip side of that coin, the Plaintiff's motion of production in opposition to Defendant's motion for protective order.

Before we talk about the merits here, under the group that hope springs eternal, has there been any discussion or progress made in trying to resolve this?

MR. GISLESON: No, Your Honor, there hasn't.

THE COURT: So much for hope. Who's going to be pulling Victory's oars at this argument?

MR. SHEEAN: Good afternoon, Your Honor, Christopher Sheean on behalf of Victory Energy. And I have with me a company representative, Mark White.

THE COURT: Do you want to come up to the podium please.

MR. SHEEAN: Your Honor, first of all, thank you for taking the time today to have us in here. It shows the seriousness the Court takes with respect to this issue and we treat it in a similarly serious manner. I know Your Honor has had an opportunity to review the briefs and we spoke about them for a short while 10 days ago, but I wanted to go back over quickly what we're asking for here and why.

First of all, we understand the Federal Rules of

2

Civil Procedure allow broad standards for discovery and under Rule 26 it's not only what is relevant, but what could lead to discovery of admissible evidence.

THE COURT: Before we talk about the merits of your motion, let me ask you a factual question to see if you either agree or make a factual assertion to this -- to put it better, I'm parroting what the Plaintiff has said and that is: Is it true that vortex steam separators and Chevron steam separators can be placed in any water tube boiler, old style or not?

MR. SHEEAN: Well, actually, it's not a yes or no question, Your Honor. First of all, we take great issue with the terminology of old style and new style boiler; that is a term -- not a term of art to the industry, but a loose handle that Indeck Keystone has come up with for this litigation that we don't think is consistent with the terms of the agreement.

But I would agree that vortex and Chevron steam separators can be used in different types of water tube boilers, and in limited instances they could be used in other types of boilers, but they're only used in high pressure boiler applications.

THE COURT: Now, are vortex steam separators and Chevron steam separators component parts of a broader universe of Keystone technology?

3

MR. SHEEAN: I don't know -- excuse me, I don't know how Your Honor is using the term "Keystone technology" or "broader universe". Victory Energy has sold -- let me see if I can answer the question as I understand it.

Victory Energy has sold water tube Keystone boilers with vortex steam separators and Chevron steam separators with the full assistance of Erie Power Technology, the licensure, under the original license agreement. And I see where Your Honor is going if I can address that point a little more fully.

THE COURT: Go ahead.

MR. SHEEAN: Mr. Poloski makes the assertion that, well, we need to see all of Victory Energy's HRSG sales because they could have --

THE COURT: Incorporated Keystone Technology into it, that's the claim.

MR. SHEEAN: Right. Right. Such as the vortex steam separator or the Chevron steam separator. The short answer is, Victory has never done that. They never sold an HRSG with the vortex steam separator or a Chevron steam separator. They just haven't, because they haven't sold any high pressure application HRSG boilers.

And let me turn the analysis to the way that I'm looking at it so I can share with the Court where we're coming from. Is it possible, maybe, could it be in the

4

Page 5:

1  realm of all possibility that some component that Victory
2  Energy utilized in Victory -- or in Keystone boilers could
3  have been utilized in another application, yes. But that
4  gives rise to two questions, one, did that happen, and, two,
5  was it a proprietary piece of technology or we talking about
6  utilizing a round wheel on an automobile?
7        Now, the reason why we -- and this is a topic
8  that's near and dear to my client's heart and why they said,
9  yes, why we don't go to Erie and fight about this is because
10 we're not talking about a box of documents here. We're
11 talking about Victory sold 59 HRSG boilers to date, and it's
12 one of their most proprietary items. They have come up with
13 some specific design applications that they have patents
14 on --
15        THE COURT: Excuse me, in a nutshell, without
16 getting overly technical, what is the difference -- and I
17 know you don't like the phrase "old style boiler", so I'll
18 say Keystone boiler, all right; what is the major difference
19 between the HRSG and the Keystone boiler?
20        MR. SHEEAN: To answer Your Honor's question, the
21 major difference is the heat source, in a very broad
22 spectrum of speaking. HRSG stands for Heat Recovery Steam
23 Generator. So, for instance, if you've got an application
24 already in place in your factory where you've got heat
25 exhaust coming off, you want to take advantage of that and

Page 6:

1  utilize that exhaust in a manner that you can generate more
2  steam or energy, okay? So HRSG is the application you would
3  use to do that. Whereas, the Keystone water tube boiler is
4  a direct-fired boiler and I'm going to, just to illustrate,
5  I believe -- Your Honor, if I may approach?
6        THE COURT: Yes.
7        MR. SHEEAN: I am handing up an illustration. On
8  one side you see a Victory Energy HRSG boiler and on the
9  other side you see a Keystone old style boiler.
10       THE COURT: Right.
11       MR. SHEEAN: And looking at them, they appear
12 pretty dissimilar, obviously, but that doesn't necessarily
13 assist the Court in the difference. The HRSG does not have
14 a water drum at the bottom, it has headers where the hot
15 gases pass through and that's how they heat the steam. It
16 utilizes a completely different type of technology to heat
17 the steam. So the technology that's in place for an HRSG is
18 understandably different.
19       Let's get to the heart of this case and what this
20 case is about. Victory Energy signed a license agreement
21 with Erie. They were allowed to utilize the name, Keystone,
22 in selling a certain class of boilers that Your Honor will
23 have to determine what that class was. But they also were
24 given some software, some software to rate the boilers. And
25 by that, I mean, to determine if you've got a boiler that's

Page 7:

1  this long, and this high, with this many rows of tubes
2  (indicating), what can I expect the gas coming out, the
3  exhaust, what's the temperature going to be, how much steam
4  can I make, et cetera, et cetera, you rate the boiler.
5  That's what the software is for, to rate the old style, the
6  Keystone boilers.
7        Victory Energy got that from Erie and they're
8  still using it today to sell Keystone boilers and they're
9  still paying royalties to the licensure under that
10 application. That software cannot be used for HRSG
11 technology, it's a completely different type of technology.
12 You can't take the software that was given to Victory and
13 utilize it for HRSG. You don't measure the output on an
14 HRSG boiler in the same way, it truly is apples and oranges.
15       THE COURT: Do you have any other -- is there any
16 other product which you consider proprietary which you sell
17 besides the Victory style boiler?
18       MR. SHEEAN: Do you mean the HRSG boiler?
19       THE COURT: Yes.
20       MR. SHEEAN: Judge, I think that's a pretty broad
21 question. Is there any other proprietary technology that
22 Victory Energy may have attempted to sell --
23       THE COURT: Do you sell other boilers besides the
24 HRSG boilers?
25       MR. SHEEAN: In the Keystone boiler?

Page 8:

1        THE COURT: Yes.
2        MR. SHEEAN: Well, Victory Energy is an authorized
3  distributor of fire tube boilers, as well. And if I can
4  consult with Mr. White, which is precisely why I brought
5  him --
6        THE COURT: Sure.
7        MR. SHEEAN: I can get a more complete list.
8        THE COURT: Yes.
9        MR. SHEEAN: Besides the standard fire tube
10 boilers, which Victory Energy sells, it also sells heat
11 recovery fire tube boilers.
12       THE COURT: Okay.
13       MR. SHEEAN: And what we're talking about there is
14 basically burning garbage, that kind of thing.
15       THE COURT: Now, to kind of focus our discussion a
16 little bit, tell me if I have this right, your motion is
17 really premised, at least based upon my reading, on three
18 separate propositions. One is that any information,
19 documentation, et cetera that they would be requesting,
20 which predates September 8 --
21       MR. SHEEAN: 2004.
22       THE COURT: -- 2004 is irrelevant.
23       MR. SHEEAN: That's correct.
24       THE COURT: And secondly, any information that
25 would predate January 7, '03 would most certainly be

referenced, there are instances where they were back and forth, the Dallas/Fort Worth job, there were jobs where they went back and forth on engineering to make modifications, to make a given boiler taller and wider, or whatever.

But this case boils down to two things, Judge, about the quote, unquote, modifications, improvements, whatever. You asked Mr. Gisleson on two different occasions what specific technology do you believe that Victory has misappropriated, and I think he's dodged the issue in both instances. But with respect to the Keystone boilers, there's two specific claims that were made in a letter we just got when the motion was filed, we received it from Bob Gadanich back in March of 2004, he was working for Erie Power; and those are, you're utilizing water-cooled front and rear as opposed to refractory.

What that means is you're running cool water around the boiler in the front and back instead of letting it get hot, and you're using membrane tube instead of tangent tube technology. What that means is you're welding those tubes together that are in that drawing so that heat can't escape outside to maximize the efficiency of the boiler and you also reduce the noxious emissions that might go outside.

Those modifications, improvements, whatever have been utilized in the industry by Nebraska boiler and many

29

other competitors. So if this case comes down to as to whether or not Victory Energy stole water-cooled front and rear design or membrane wall design, then let's have a hearing on that right now and we can --

THE COURT: Well, we're not going to do that right now, but we're just going to try one more time back here; it's still not clear to me, and I think the problem is mine, it's not yours, did you have the technology to do prior to January 7, '03 what you were able to do after January 7, '03?

MR. SHEEAN: And by that you mean, build Keystone boilers? No.

THE COURT: Then it sounds to me like he has forsworn the argument that they knew how to do it anyways.

MR. GISLESON: It sounds like it, and part of the concern also, he said that there were two water tube boilers, actually Erie boilers, that they sold before the license agreement, and it's troubling that there's a refusal even to turn over that documentation to us because if those are the only two water tube boilers that they sold as part of the license agreement and they were sold by Erie Power, the predecessor, then even if those weren't designed or manufactured by Victory to the extent they obtained any detailed drawing for those boilers or otherwise, that's information that they had in their possession.

30

THE COURT: Now, I think I have an affidavit from somebody from that side that -- don't you say -- or your client says, Mr. Sheean, and that Victory has never incorporated into their HRSG product any proprietary information from the Plaintiff?

MR. SHEEAN: That's correct, Your Honor. That's Paragraph 4 of it. "VEO is not designed --"

THE COURT: Whoa, slow down for her.

MR. SHEEAN: "VEO has not designed, manufactured, or sold any heat-recovered steam-generated boilers that incorporate or utilize any EPTI technology in any way."

THE COURT: Now, that's by way of affidavit, right?

MR. SHEEAN: Yes, Your Honor.

THE COURT: And you want to peek in the cupboard to make sure that what he's saying it true, right?

MR. GISLESON: Well, that's correct. I can focus the discover more narrowly if the Court wants, but the Court's aware the defense always denies -- or at least they deny and then get into the discovery and you find out that the assertions set forth in the answer weren't exactly accurate.

THE COURT: What evidence do you have now as you stand here which supports your suspicion that Victory is improving its HRSG product at your expense?

31

MR. GISLESON: None, other than the fact that they have the ability to do so based on the information they have and our prior knowledge -- or knowledge now, rather, that they, in fact, went beyond the licensing agreement and did not narrowly -- or did not constrain themselves to comply strictly with the licensing agreement.

THE COURT: And with respect to that matter, not constraining themselves, do I take it that your suspicion of that is more than a suspicion in your view, it is based upon having seen quote, Keystone boilers that they, in fact, manufactured but which have all the additional bells and whistles?

MR. GISLESON: Correct.

THE COURT: You've seen them out in the marketplace?

MR. GISLESON: I've seen them from the documentation that we received from Erie that indicates that Victory was selling Keystone boilers that were outside the scope of the licensing agreement and that was unknown to Erie at the time those boilers were designed.

THE COURT: And notwithstanding the fact that Erie apparently, either because of financial problems or otherwise, aided them in doing some additional tinkering with it, are you saying that this is something beyond that that even Erie is not aware of?

32

1    MR. SHEEAN:  Victory has been a client of mine for
2 a number of years and they take this situation seriously,
3 and as a result, I do as well.
4    THE COURT:  I used to be over on that side so I
5 know what it feels like.
6    MR. SHEEAN:  Just a couple of brief points, Judge,
7 and I'll go backwards to frontwards because that's the way I
8 took my notes.
9    Mr. Gisleson listed a number of instances wherein
10 we said, yeah, fine, we'll produce documents that were dated
11 before September 8, 2004, but one of the first things that
12 came up in our scheduling conference, Your Honor asked me,
13 now, are you really going to push this standing issue.  And
14 I said, I don't know, Judge, I still haven't seen the asset
15 purchase agreement.  Finally, a couple of weeks thereafter,
16 we did get the purchase agreement and there it is, Indeck
17 Keystone Energy did not get the technology for the HRSGs
18 from Erie Power, or CMI, and Indeck Keystone Energy's assets
19 were limited to accounts receivable after September 8, 2004.
20    So I think it's a bit of a red herring to wave in
21 your face all the many times when Victory Energy was going
22 to disgorge documents when we didn't know what we were up
23 against at that point.  So I think that's a bit disingenuous
24 to say that we're coming into this lately is something other
25 than an appropriate response.

45

1    With respect to -- we spent a little bit of time
2 talking about the license agreement, itself, and what it is
3 that was licensed and what wasn't.  And I think if you take
4 a took at the license agreement, which is attached to the
5 motion, it's also attached to, I think, to the pleadings
6 that were filed in this case, the definition of products is
7 clear, it's industrial water tube boilers with a capacity
8 steam range of 29,000 pounds per hour to 150,000 pounds per
9 hour.
10    THE COURT:  Right.
11    MR. SHEEAN:  Period.  Product shall include, but
12 not be limited to, those items identified that are listed.
13 So I think that's got to be given some weight, not just with
14 respect to the resolution of the merits of this case but --
15    THE COURT:  Not to interrupt, but what you're
16 really saying is going right back to the contract, itself,
17 that your interpretation of it is that -- contrary to their
18 interpretation, is that you were not necessarily limited to
19 the type of boiler that they claimed you were limited to; is
20 that right?
21    MR. SHEEAN:  We were permitted to sell industrial
22 water tube boilers utilizing the Keystone name and utilizing
23 the software provided by Erie Power to sell any industrial
24 waterer tube boiler -- natural circulation water tube boiler
25 within that capacity range.  And if Victory Energy chose to

46

1 include membrane wall technology versus tangent tube
2 technology, if they chose to use water cool technology
3 versus the refractory that was the so-called old style, that
4 was their right under the license agreement.
5    And I think that examining that licensing
6 agreement goes a long way to demonstrate Victory Energy's
7 position here and what we consider to be vastly overbroad
8 requests for documents.
9    THE COURT:  All right.
10    MR. GISLESON:  Your Honor, just one clarification
11 on the record, Indeck did acquire HRSG technology, so it's a
12 misreading of the asset purchase agreement to say that
13 Indeck did not acquire any HRSG technology.
14    What the agreement talks about is CMI, EPTI
15 retained reheat recovery steam generator technology applied
16 to combustion turbine exhaust gas heat recovery applications
17 of 18 megawatts and above.  Below 18 megawatts and above,
18 Indeck did acquire the technology.  So there was some HRSG
19 technology acquired along with the Keystone assets.  And, in
20 fact, if you look at the schedule it shows there's joint
21 ownership of technology to the extent it applied both to
22 HRSGs as well as to the Keystone assets.  So I just wanted
23 to make that one clarification to say that there was HRSG
24 technology acquired.
25    THE COURT:  Okay.

47

1    MR. SHEEAN:  Just to respond to that briefly,
2 Judge, we never got the schedules, number one, and number
3 two, the agreement, itself, says that one of the excluded
4 assets is any assets related to the HRSG business.
5    MR. GISLESON:  Which is a defined term on the
6 first page of the asset purchase agreement, and it's
7 defined, "Limited to the exhaust gas recovery applications
8 of 18 megawatts and above."
9    THE COURT:  Have you ever heard the expression,
10 "Losing the forest through the trees?"  We're there right
11 now.
12    This is what -- I'm going to enter an order and
13 really the order is going to be structured around the three
14 major objections; one is the alleged irrelevance of the
15 January -- anything prior to January of '03, the alleged
16 irrelevance of anything prior to September 8, 2004, and the
17 objection for the reasons that Victory put on the record to
18 being required to divulge information about your HRSG.
19    This is an order:

ORDER

23    Presently pending before the Court is a motion for
24 protective order limiting discovery as well as Plaintiff's
25 motion to compel production of documents in opposition of

48

```
 1  Defendant's motion for protective order. With the
 2  understanding in the interest of brevity, I'm simply
 3  incorporating here in my reference the substance of the
 4  argument that you previously had here today where each party
 5  had an opportunity to articulate more fully their respective
 6  positions.
 7           Essentially, Victory objects to the request of
 8  discovery in the nature of subpoenas on three bases: One,
 9  that any information -- that any information from Victory
10  that would predate January 7, '03, which would be the date
11  of the licensing agreement, is irrelevant. Second, that any
12  information that would predate September 8, 2004 would also
13  be irrelevant in that, in Victory's view, Indeck does not
14  have standing to complain about matters that occurred prior
15  to the time that it purchased the assets. And three, that
16  Indeck's attempts to acquire allegedly proprietary
17  information concerning Victory's HRSG product is irrelevant
18  given the nature of the claims.
19           First, with respect to any request for
20  documentation prior to January 7, 2003, I find based on the
21  representations made here today as to the nature of the
22  defense or defenses that would be asserted by Victory that
23  pre-January '03 information is irrelevant and not calculated
24  to lead to the discovery of -- and would not be calculated
25  to lead to the discovery of admissible evidence within the
```

49

```
 1  meaning of Rule 26.
 2           With respect to the request for documentation that
 3  predates -- let me phrase it this way: With respect to the
 4  request for documentation that predates September 8, 2004, I
 5  find that the requested information does involve claims --
 6  potentially involve claims for defenses in the case and in
 7  my view would be calculated to lead to discovery of
 8  admissible evidence.
 9           On the subject of the HRSG boiler, as I understand
10  it, at least at the present time, the Plaintiff has no hard
11  information in its possession to suggest that Keystone
12  technology has, in fact, been injected, if you will, into
13  the HRSG product, unlike, for instance, contrary to the
14  situation where they claim it does have hard information
15  that the Keystone boilers were allegedly inappropriately
16  modified by Victory.
17           Given the fact that the most that can be said at
18  the present time is that Indeck has a "concern" that that
19  technology might or could be introduced into the HRSG
20  boiler, and also in view of the fact that I have a sworn
21  affidavit before me that it has not been incorporated, and
22  balancing the equities, considering proprietary nature, and
23  with an eye toward good cause, I do not see at this time in
24  the litigation that notwithstanding the protective order
25  that that type of discovery is appropriate.
```

50

```
 1           However, with respect to that particular aspect,
 2  I'm granting the protective order without prejudice to
 3  Indeck to -- based upon the potential development of further
 4  information, to renew its request if and when it feels it's
 5  appropriate during the course of discovery.
 6           So to clear this motion, the motion for protective
 7  order in limine discovery is granted in part and denied in
 8  part for the reasons set forth on the record. And the
 9  Plaintiff's motion to compel production of documents is
10  granted in part and denied in part for the reasons set forth
11  in the record. Is that all clear?
12           MR. GISLESON: Yes, Your Honor.
13           MR. SHEEAN: Yes, Your Honor.
14           THE COURT: Let's go off the record.
15           (Discussion held off the record.)
16           THE COURT: Let's go back on the record for a
17  second. Incidentally -- there wasn't a request for
18  attorneys' fees, was there?
19           MR. SHEEAN: Not on my end.
20           THE COURT: I didn't think so. You can't it get
21  produced in 14 days, is that it?
22           MR. SHEEAN: That's it, Your Honor. In fact, I'm
23  going to be out the last week of this month.
24           THE COURT: Well, discovery is going to be
25  extended here anyway, it looks like. How much time do you
```

51

```
 1  need?
 2           MR. SHEEAN: Can I get 28 days. I know that
 3  sounds like a lot of time but we're talking about a fair
 4  number of job files.
 5           THE COURT: Yes. You've got four weeks. And I --
 6  then am I going to get a motion -- a joint motion to extend
 7  discovery?
 8           MR. GISLESON: Yes, sir.
 9           MR. SHEEAN: Yes, sir.
10           THE COURT: How much more time do you think you're
11  going to need to wrap it up?
12           MR. GISLESON: The only problem is I'm out in
13  September, I was thinking sometime in October.
14           MR. SHEEAN: I think that's reasonable.
15           THE COURT: We'll make it October 15th and then
16  the other days will fall into place after that. Is that it?
17           MR. GISLESON: Yes, Your Honor.
18           MR. SHEEAN: Yes, Your Honor.
19
20           (Hearing concluded at 2:24 p.m.)
21
22
23
24
25
```

52