UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company, <br><br> Plaintiff <br><br> v. <br><br> VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company, <br><br> Defendant. | CIVIL ACTION <br><br> No. 04-CV-325E <br><br> Judge Sean J. McLaughlin |

**VICTORY ENERGY'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant/Counter-Plaintiff Victory Energy Operations LLC, for its Concise Statement of Material Facts In Support Of Its Motion For Partial Summary Judgment, states as follows:

1. Direct-fired, watertube boilers have been sold to generate steam for heating and other purposes for over 50 years. (Mark J. White Affidavit at ¶ 3, attached as Exhibit A).

2. Prior to approximately 1980, the predominate design of watertube boilers involved furnace and convective walls made up of tubes placed side by side in a row, known as a tangent tube design. (White Aff. at ¶ 4).

3. These boilers also included a significant amount of insulating material, called refractory, that was needed to keep the outside of the boiler from getting too hot. (White Aff. at ¶ 5).

4. By 1980, a new design for watertube boiler walls consisting of furnace and outer wall tubes spaced 3 to 4 or more inches apart, connected by steel bars welded to each

tube, known as finned or welded walls had been developed. (White Aff. at ¶ 6).

5. Welded walls improved the boilers heat retention, and created a seal that prevented flue gas emissions from leaking out of the combustion chamber and boiler, thereby decreasing emissions of noxious gases. (White Aff. at ¶ 7).

6. The industry developed water cooled front and rear walls, further improving the emissions and reducing the amount of refractory needed in the boiler. (White Aff. at ¶ 8).

7. The utilization of welded walls and water cooled front and rear walls is known in the industry as "full membrane" or "100% membrane." (White Aff. at ¶ 9).

8. By 1984, full membrane design became the standard in the boiler industry for watertube package boilers. (White Aff. at ¶ 10).

9. The Keystone Energy Division of Erie Power Technologies, Inc. ("EPTI") was in the business of designing, developing, testing, building, marketing and installing boilers and related equipment for use in the power generation industry. (Plaintiff's Complaint at ¶ 8, attached as Exhibit B).

10. Prior to the execution of the license agreement, VEO purchased two (2) Keystone® boilers from EPTI for the Heinz plant in Muscatine, Iowa. (White Aff. at ¶ 11).

11. The Heinz boilers each had a steam capacity of up to 75,000 pph, and each were 100% membrane wall design. (White Aff. at ¶ 12).

12. EPTI designed and built the Heinz boilers for VEO. (White Aff. at ¶ 13).

13. Following the purchase of the Heinz boilers, VEO began discussions with EPTI regarding the possibility of licensing the technology and trademarks to manufacture and sell O-style Keystone boilers. (White Aff. at ¶ 14).

14. From its inception, EPTI had not actively marketed Keystone® O-Style Boilers below 150,000 pph, choosing instead to focus on larger direct fired and heat recovery steam generators. (Mark White Deposition at p. 21, l. 21-25-p. 22, l. 1-12, attached as Exhibit C).

15. As a result, EPTI decided to explore the possibility of a license agreement with VEO. (White Dep. at p. 39, l. 6-25- p. 40, l. 1-2, Ex. C).

16. EPTI's president, Stephan Kang, authorized Mark White to negotiate the terms of a license agreement with VEO. (Stephan Kang Deposition at p.18, l. 21-24, p. 20 l. 3-7, attached as Exhibit D).

17. As the authorized representative for EPTI, Mark White negotiated and executed the Agreement. (Kang Dep. at p. 21, l. 2-17, Ex. D).

18. Both Mark White and Shawn Brewer, the VEO representative, understood that the Agreement allowed VEO to design, market, manufacture and sell O-Style watertube Keystone® boilers with 100% membrane wall technology. (White Dep. at p. 55, l. 3-20, Ex. C; Shawn Brewer Deposition at p. 178, l. 2-13, attached as Exhibit E).

19. On January 7, 2003, VEO entered into a license agreement with EPTI to license the right to use certain software and related Keystone trademarks to manufacture, market and sell natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph (the "License Agreement"). (License Agreement at p.1, ¶1.a), attached as Exhibit F).

### The License Agreement

20. The Agreement grants VEO the "exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical

3

Information in connection therewith, within the Exclusive Territory." (License Agreement at p. 3, ¶ 2.a) , Ex. F).

    21.    The Agreement provides a clear definition of the term Products as follows:

    1.a)    "Products" shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex 1.

    1.b)    "Technical Information" shall mean all facts, data, know how, formula, procedures, techniques or advice, whether written or oral and regardless of form (including reports, letters, designs, drawings, specifications, training and operational manuals, photographs, tapes, diagrams, patent applications, Software (as defined herein), and any related documentation).

. . . . .

    2.a)    <u>Selling Rights</u>. Licensor hereby grants to Licensee:

(i) the exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory.

(License Agreement at pp. 1,3, Ex. F).

    22.    VEO and EPTI signed a License Agreement Addendum on February 27, 2003 that specifically increased the permissible steam outlet temperature "to superheated steam applications up to and including a final steam temperature of 750°F," and increased the product design pressure "from 399 psig up to and including 1,200 psig (1,125 psig operating)." (License Agreement at Addendum, Ex. F).

    23.    Annex 1 to the Agreement provides:

**Description of Products**
Erie Power Technologies, Inc. "M" Series Keystone® water tube boilers to include the 8M, 9M, 10M, 11M, 12M, 13M, 14M, 15M 16M, 17M, 18M, 19M, 20M, 21M and 22M.

(License Agreement at p. 20, Ex. F).

24. The Annex then provides specific design characteristics for each of the "M" Series models identified above, including the steam generator efficiency, exit gas temperature, flue gas weight flow, release rate, liberation rate, furnace heat absorption, and specific size information. (License Agreement at pp. 20-22, Ex. F).

25. Annex 1 also includes three drawings of a Keystone® M-Series Standard boiler. (License Agreement at pp. 23-25, Ex. F).

26. These drawings show a boiler with tangent tube furnace walls, tangent tube outerwalls, a refractory front wall and a tube and tile water cooled rear wall. (License Agreement at pp. 23-25, Ex. F).

27. Nothing in the Agreement or the Appendices states that "Products" is limited to Standard "M" series boilers. (License Agreement at p.1, ¶ 1.a) , Ex. F).

28. The definition of "Products" states that the term **shall include, but not be limited to** the items set forth in Annex I. (License Agreement at p.1, ¶ 1.a), Ex. F).

29. Clause 8 of the Agreement provides for modifications. (License Agreement at p. 9). Specifically, section 8.a) reads, "Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products. Licensee will submit to Licensor such plans for modifications for prior written approval by Licensor except for the alterations as defined in Clause 3(e)." (License Agreement at p. 9, Ex. F).

30. Clause 13 of the Agreement covers improvements. (License Agreement at p. 13). Specifically, it provides:

> In order to further the mutual interest of both parties, Licensor shall disclose and make available to Licensee and Licensee shall disclose and make available to Licensor, free of any charge, all Improvements developed while this Agreement is in effect. . . . Licensor shall grant to

>   Licensee a royalty-free license to use Improvements developed by
>   Licensor…

(License Agreement at p. 13, ¶ 13.a), Ex. F).

## Transfer of the Licensed Technology

31.  In 2004, EPTI filed for bankruptcy in the Western District of Pennsylvania and eventually sold its assets to CMI EPTI LLC ("CMI") on August 27, 2004. (Plaintiff's Complaint at ¶ 16, Ex. B).

32.  In the Asset Purchase Agreement between CMI and EPTI, a copy of which was filed with the Bankruptcy Court for the Western District of Pennsylvania, the seller represented that "to Seller's Knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights." (EPTI/CMI Asset Purchase Agreement at p. 11, Section 2.10(c), Ex. G).

33.  Stephen Kang, President of EPTI during the relevant time period, acknowledged and affirmed the statements EPTI represented to CMI in the Asset Purchase Agreement that to "Seller's Knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights," and "No license or royalty agreement to which Seller is a party is in breach or default by any party . . ." (Kang Dep. at p. 72, l. 25 – p. 73, l. 16, Ex. D).

34.  IKE purchased certain assets related to EPTI's Keystone Energy Division business from CMI on September 8, 2004, including the assets licensed to VEO pursuant to the Agreement. (Plaintiff's Complaint at ¶ 16, Ex. B).

## The Pleadings

35.  IKE filed a complaint against VEO on October 30, 2004, seeking damages from VEO for trademark infringement, trademark dilution under the federal statute, trademark dilution under the Pennsylvania statute, violation of the Pennsylvania Uniform Trade Secrets

6

Act, Unfair Competition and Unjust Enrichment. IKE asserts in its complaint that VEO has infringed on its Trademarks and Trade Secrets by designing, manufacturing and selling boilers outside the scope permitted by the license. (Plaintiff's Complaint at pp. 7-13).

36. IKE takes the position in its complaint that VEO is only licensed to sell "Standard M-Series boilers" also referred to by IKE in its complaint as so-called "Old-Style Boilers." (Plaintiff's Complaint at ¶ 18, Ex. B).

37. VEO seeks a declaratory judgment in Count I of its Second Amended Counterclaim that VEO's use of IKE's marks and other intellectual property was made under an express grant of right pursuant to the Agreement. (Victory Energy's Second Amended Counterclaim at ¶¶10-13, attached as Exhibit G).

38. In its complaint, IKE attempts to create a distinction between what it purports was licensed under the Agreement, the "Old Style Boilers," and what VEO actually manufactured and sold during the term of the Agreement, the "New Style Boilers." (Plaintiff's Complaint at ¶¶10-11, Ex. B).

39. Specifically, IKE describes the "Old Style Boilers" as the "M" series tangent tube boiler line, and adds in a limitation on steam capacity range identical to the range set forth in the Agreement. (Plaintiff's Complaint at ¶11, Ex. B).

40. IKE describes the "New Style Boilers," as the more modern design of boilers with welded furnace and convective side walls and water cooled front and rear walls. (Plaintiff's Complaint at ¶ 10, Ex. B).

**The Parties Performance Under The Agreement**

41. After the Agreement was signed, EPTI provided, among other things, the following materials to VEO:

7

- drawings of the various Keystone® boilers, depicting boilers with 100% membrane wall construction;

- a draft sales manual, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone M Series boiler;

- a power point presentation, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone M Series boiler;

- the Keystone Design Guide, describing features of the Keystone M Series boilers with welded walls;

- the KPSC computer program, used by EPTI and VEO to rate boilers, that allowed VEO to rate boilers that incorporated 100% membrane technology.

(White Aff. at ¶15, Ex. A).

42. Following the execution of the Agreement, VEO began marketing and selling Keystone® boilers. (Robert Gdaniec Deposition at p. 124, l. 11-16, attached as Exhibit H).

43. As provided for in the Agreement, EPTI provided engineering support to VEO for the first several boilers VEO sold. (Gdaniec Dep. at p. 96, l. 20-25-p. 97, l. 1-5, Ex. H).

44. Mark J. White is the General Manager at Victory Energy Operations, LLC, and from 2002 until August 2003, was the Director of Sales and Marketing at Erie Power Technologies, Inc. (White Aff. at ¶ 1, Ex. A).

45. During the time that IKE was Licensor, VEO only manufactured, sold or installed items under the Agreement that were natural circulation, industrial watertube package boilers between the steam capacity range delineated in the Agreement. (White Aff. at ¶ 18, Ex. A).

46. VEO has not utilized any Technical Information in conjunction with the design, manufacture or sale of any item other than those specifically permitted under the Agreement. (White Aff. at ¶ 19, Ex. A).

47. Every boiler VEO sold, including the boilers designed and rated by EPTI's engineers, utilized 100% membrane technology, the very technology IKE now claims VEO was not authorized to use in designing or selling the Keystone® boilers. (White Aff. at ¶20, Ex. A).

48. VEO requested and obtained assistance from EPTI's engineers in designing and rating the first several such boilers sold under the Agreement. (White Aff. at ¶ 22, Ex. A).

49. VEO has made no modifications to the Products that in any way compromised the reliability or performance of the Products. (White Aff. at ¶ 24, Ex. A).

50. IKE has accepted and cashed each and every check VEO tendered to IKE as a royalty payment under the Agreement. (White Aff. at ¶ 25).

51. On March 17, 2003, Mark White sent an e-mail to Shawn Brewer and John Viskup containing a draft copy of a Keystone "M" Series sales manual. (White Dep. at p. 243, l. 18-21, Ex. C).

52. Mark White created the draft of the sales manual from information at his disposal at EPTI. (White Dep. at p.244, l. 24-p. 245, l. 1, Ex. C)

53. In providing the agreement to VEO, Mark White testified that he specifically advised Shawn Brewer that VEO could utilize the sales manual for sales and marketing as is, without eliminating those boilers that are larger than 150,000 pph. (White Dep. at p. 250, l. 19-p. 251, l. 1, Ex. C).

54. IKE General Manager Chris Petcos testified that he knew of no modifications or improvements made by VEO to the Keystone® Boiler design that resulted in a substandard product being sold. (Chris Petcos Deposition at p. 147, l. 25 – p. 148, l. 4, attached as Exhibit I).

55. Robert Gdaniec, former Director of Engineering at EPTI, testified that he was aware of no instance where VEO made a modification or improvement in the design of a Keystone® boiler that negatively impacted the performance of the product. (Gdaniec Dep. at p. 133, l. 7-12, Ex. H).

56. The undisputed testimony is that VEO built and sold several boilers with membrane wall technology with EPTI's knowledge during the time that EPTI was the licensor, and no EPTI representative ever informed VEO that it was in breach of the Agreement. (Kang Dep. at p. 60, l. 8-10, Ex. D).

57. Stephen Kang, President of EPTI during the relevant time period, acknowledged and affirmed the statements EPTI represented to CMI in the Asset Purchase Agreement that to "Seller's Knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights," and "No license or royalty agreement to which Seller is a party is in breach or default by any party . . ." (Kang Dep. at p. 72, l. 25 – p. 73, l. 16, Ex. D).

58. IKE's predecessors had sold O-Style watertube boilers with membrane walls since the early 1990s, and it has been considered the preferred wall design in the boiler industry since that time. (Deposition of Steve Bernatowicz at p. 13, l. 19-p. 14, l. 22, attached as Exhibit J).

Dated: January 20, 2006                         Respectfully submitted,

                                                /s/Christopher T. Sheean
                                                One of the Attorneys for Defendant,
                                                VICTORY ENERGY OPERATIONS, LLC

Christopher T. Sheean
WILDMAN HARROLD ALLEN & DIXON LLP
225 W. Wacker Drive
28th Floor
Chicago, IL 60606
(312) 201-2000