08/27/2004 13:37 FAX                                                          ☑002

# ASSET PURCHASE AGREEMENT

between

## CMI AMERICA, INC. [or acquisition subsidiary]

and

## ERIE POWER TECHNOLOGIES, INC.

---

**Dated as of August 3, 2004**

---

*Exhibit "A"*

EXHIBIT

G

# TABLE OF CONTENTS

Page

EXHIBITS ................................................................................................................ iv

SCHEDULES ........................................................................................................... v

ARTICLE I. - PURCHASE AND SALE OF PURCHASED ASSETS .......................... 2
    SECTION 1.1.  Purchased Assets ....................................................................... 2
    SECTION 1.2.  Excluded Assets .......................................................................... 3
    SECTION 1.3.  Assumption of Liabilities ............................................................. 4
    SECTION 1.4.  Excluded Liabilities ...................................................................... 4
    SECTION 1.5.  Purchase Price ............................................................................ 5
    SECTION 1.6.  Deposit .......................................................................................... 5
    SECTION 1.7.  Cure Payment Amounts ............................................................... 5
    SECTION 1.8.  Closing ........................................................................................... 5

ARTICLE II. - REPRESENTATIONS AND WARRANTIES OF SELLER ................... 6
    SECTION 2.1  Corporate Existence and Power ................................................... 6
    SECTION 2.2  Authority Relative to this Agreement ........................................... 6
    SECTION 2.3.  No Conflicts; Consents ................................................................ 7
    SECTION 2.4.  Charter Documents and Corporate Records .............................. 7
    SECTION 2.5  Financial Information ...................................................................... 7
    SECTION 2.6.  Liabilities ........................................................................................ 8
    SECTION 2.7.  Absence of Certain Changes ....................................................... 8
    SECTION 2.8.  Properties; Title; Liens ................................................................. 9
    SECTION 2.9.  Contracts ........................................................................................ 9
    SECTION 2.10.  Intangible Property ...................................................................... 11
    SECTION 2.11.  Claims and Proceedings ............................................................. 11
    SECTION 2.12.  Taxes ............................................................................................ 11
    SECTION 2.13.  Employee Benefit Plans; ERISA Matters ................................... 12
    SECTION 2.14.  Employee-Related Matters .......................................................... 13
    SECTION 2.15.  Insurance ...................................................................................... 14
    SECTION 2.16.  Compliance with Laws ................................................................ 14
    SECTION 2.17.  Permits .......................................................................................... 14
    SECTION 2.18.  Environmental Matters ................................................................ 14
    SECTION 2.19.  Customers and Suppliers ........................................................... 14
    SECTION 2.20.  Potential Conflicts of Interest ..................................................... 14
    SECTION 2.21.  Finders' Fees ................................................................................ 15
    SECTION 2.22.  Inventory Assets .......................................................................... 15

SECTION 2.23.  Surety Bonds ..................................................................15
SECTION 2.24.  No Third Party Options ....................................................15
SECTION 2.25.  Location of Purchased Assets .........................................15
SECTION 2.26.  Disclosure ........................................................................15

ARTICLE III. - REPRESENTATIONS AND WARRANTIES OF PURCHASER ...........15
SECTION 3.1.  Corporate Existence ..........................................................15
SECTION 3.2.  Authority Relative to This Agreement ...............................15
SECTION 3.3.  No Conflicts; Consents .....................................................16
SECTION 3.4.  Purchaser's Finders' Fees ................................................16
SECTION 3.5.  Financing ...........................................................................16

ARTICLE IV. - COVENANTS AND AGREEMENTS PRIOR TO CLOSING .............16
SECTION 4.1.  Conduct of Business ..........................................................16
SECTION 4.2.  Corporate Examinations and Investigations ....................18
SECTION 4.3.  Employment Matters ..........................................................19
SECTION 4.4.  Additional Financial Information .......................................20
SECTION 4.5.  Consents, Filings and Authorizations; Efforts to
Consummate        20
SECTION 4.6.  Notices of Certain Events ..................................................20
SECTION 4.7.  Public Announcements ......................................................21
SECTION 4.8.  Confidentiality ....................................................................21
SECTION 4.9.  Expenses ...........................................................................21
SECTION 4.10.  Bankruptcy Actions ..........................................................22
SECTION 4.11.  Prosecution and Modification of the Sale Motion ...........22
SECTION 4.12.  Notice of Bids or Inquiries ...............................................23
SECTION 4.13.  Supplements to Disclosure Schedules ...........................23

ARTICLE V. - CONDITIONS TO CLOSING ........................................................24
SECTION 5.1.  Conditions to the Obligations of Seller and Purchaser ....24
SECTION 5.2.  Conditions to the Obligations of Seller .............................24
SECTION 5.3.  Conditions to the Obligations of Purchaser ......................25

ARTICLE VI. - TERMINATION ...........................................................................27
SECTION 6.1.  Termination .........................................................................27
SECTION 6.2.  Effect of Termination; Termination Payments; Expenses ....28
SECTION 6.3.  Exclusive Remedy ..............................................................28
SECTION 6.4.  Effect of Termination and Abandonment ..........................29

ARTICLE VII. – No Survival ...............................................................................29
SECTION 7.1.  No Survival of Representations and Warranties ...............29

ARTICLE VIII. - MISCELLANEOUS ........................................................................29
    SECTION 8.1.  Notices .................................................................................29
    SECTION 8.2.  Entire Agreement; No Other Representations ...................31
    SECTION 8.3.  Waivers and Amendments; Non-Contractual Remedies;
    Preservation of Remedies .........................................................................31
    SECTION 8.4.  Governing Law ..................................................................31
    SECTION 8.5.  Consent to Jurisdiction and Service of Process ..............31
    SECTION 8.6.  Binding Effect; No Assignment.........................................32
    SECTION 8.7.  Further Assurances.............................................................32
    SECTION 8.8.  Additional Post-Closing Covenants ..................................32
    SECTION 8.9.  Exhibits ..............................................................................33
    SECTION 8.10  Severability; Parties in Interest ........................................33
    SECTION 8.11.  Counterparts.....................................................................33

ARTICLE IX. - DEFINITIONS ..............................................................................33
    SECTION 9.1.  Definitions..........................................................................33
    SECTION 9.2.  Interpretation.......................................................................38

08/27/2004 13:38 FAX                                                                 Ø006

# EXHIBITS

Exhibit A          -     Form of Assumption Agreement

Exhibit B          -     Form of Bill of Sale

## SCHEDULES

Schedule 1.1(a)(i)        Tangible Personal Property, Equipment, Etc.

Schedule 1.1(a)(ii)       Office Equipment and Supplies; Manuals

Schedule 1.1(a)(iv)       Assigned Contracts

Schedule 1.1(a)(v)        Trademarks, Service Marks, Tradenames

Schedule 1.1(a)(vi)       Computers, Software and Proprietary Information

Schedule 1.2(b)           Accounts Receivable

Schedule 1.2(h)           Other Excluded Assets

Schedule 2.1(a)           Jurisdictions

Schedule 2.3              Required Consents

Schedule 2.5              Financial Reporting Materials

Schedule 2.6              Certain Liabilities; Debt

Schedule 2.7              Certain Changes

Schedule 2.7(f)           Changes in Wages, Salaries, Compensation, etc.

Schedule 2.8(a)           Owned Real Property

Schedule 2.8(b)           Leased Real Property

Schedule 2.8(c)           Occupancy Rights of Others

Schedule 2.8(d)           Liens

Schedule 2.9(a)           Contracts

Schedule 2.9(b)           Defaults; Waivers

Schedule 2.10             Intellectual Property Rights

Schedule 2.11             Claims and Proceedings

Schedule 2.12(a)          Tax Disclosures

Schedule 2.13(a)          Employee Benefit Plans

Schedule 2.14(a)          List of Directors and Officers; Compensation

Schedule 2.14(b)          Labor Disclosures

Schedule 2.15             Insurance Policies

Schedule 2.16             Non-Compliance with Laws

Schedule 2.17             Permits

Schedule 2.18(a)          Environmental Disclosures

Schedule 2.18(b)          Hazardous Substance Off-Site Locations

Schedule 2.19             Major Customers and Major Suppliers

Schedule 2.20             Potential Conflicts of Interest

Schedule 2.21             Seller's Finders' Fees

Schedule 2.23             Surety Bonds

Schedule 2.25             Purchased Assets Other than at Facility

Schedule 3.3              Conflicts or Consents of Purchaser

Schedule 4.1(a)           Conduct of Business

Schedule 4.1(a)(xi)       Essential Personnel

08/27/2004 13:38 FAX                                                      ☑009

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of the 3rd day of August, 2004 is between **CMI AMERICA, INC.**, a Delaware corporation, or its designee ("Purchaser") and **ERIE POWER TECHNOLOGIES, INC.**, an Ohio corporation ("Seller"). Capitalized terms used herein have the respective meanings set forth in Article IX.

## RECITALS

1.      Seller is a global supplier of technology solutions and services to the power industry and selected energy-intensive industries, including the development of large-scale heat recovery steam generator (HRSG) projects and the aftermarket service of such projects through its Keystone division (the "Business").

2.      Seller desires to sell, convey, transfer, assign and deliver to Purchaser, and Purchaser desires to purchase and acquire from Seller, all of Seller's right, title and interest in and to certain of Seller's tangible and intangible assets relating to the Business or used or held for use in connection with the Business (other than the Excluded Assets), together with certain specific obligations and Liabilities relating thereto, free and clear of all Liens (collectively, the "Acquisition").

3.      Seller is operating the Business as a debtor in possession in Case No. 03-12126-WWB (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Western District of Pennsylvania (Erie) (the "Bankruptcy Court"). Seller will file a motion pursuant to sections 363 and 365 of the Bankruptcy Code (the "Sale Motion"), seeking, inter alia, the entry of an order in the Bankruptcy Case (the "Procedures Order") that approves the bidding procedures (including the Break-Up Fee and Expense Reimbursement) and minimum bid requirements, and a deadline for the submission of proposed Alternative Offers, that are satisfactory in all material respects to Purchaser (the "Bidding Procedures") and the entry of an order in the Bankruptcy Case that approves and authorizes Seller to enter into and effectuate the sale of certain assets and the assumption and assignment of certain executory contracts pursuant to sections 363 and 365 of the Bankruptcy Code.

4.      In furtherance of the consummation of the Acquisition, the parties hereto desire to enter into this Agreement. The authorization and approval of the Acquisition will be sought as a sale of assets of Seller and an assignment of executory contracts and unexpired leases designated by Purchaser pursuant to sections 363(b) and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties, intending to be legally bound hereby, agree as follows:

# ARTICLE I.
## PURCHASE AND SALE OF PURCHASED ASSETS

**SECTION 1.1.  Purchased Assets.**

(a)    Subject to the terms and conditions of this Agreement and in reliance upon the representations, warranties, covenants and agreements of Seller and Purchaser contained herein, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, free and clear of all Liens, all of Seller's right, title and interest in and to certain of the assets of Seller, real and personal, tangible and intangible, of every kind and wherever situated, which are owned by Seller or in which Seller has any right, title or interest comprising or relating to the Business or used or held for use in connection with the Business, other than the Excluded Assets (collectively, the "Purchased Assets"), as follows:

(i)    all tangible personal property, furniture, machinery and equipment, fixtures, leasehold improvements, equipment under capital leases, if any, and other fixed assets, including, without limitation, the Assets reflected on Schedule 1.1(a)(i) hereto which lists and describes substantially all such Assets;

(ii)    all office equipment and supplies, wherever located, and all manuals and other documentation relating thereto, including, without limitation, all items identified on Schedule 1.1(a)(ii) hereto;

(iii)    all records, files, manuals, blueprints and other documentation relating to the Purchased Assets or the Business including, without limitation (A) project accounting records, including all historical data, (B) maintenance and asset history records, (C) sales promotion materials relating to the Business, (D) all customer and supplier lists, telephone numbers and electronic mail addresses with respect to past, present or prospective customers and suppliers, (E) all sales and credit records relating to the Business, purchasing records and records relating to suppliers, and (F) employee lists and related personnel and employment records of all Persons who immediately prior to the Closing Date were employees (whether part or full time) of Seller, subject to applicable Laws (collectively, the "Business Records");

(iv)    all of Seller's rights under (A) all unexpired leases for tangible personal property including, without limitation, all registrations, licenses, certificates of occupancy and other Permits and approvals relating to the Purchased Assets or the Business, and (B) those Contracts listed on Schedule 2.9 that are designated by Purchaser for assumption and assignment, and will be assigned to Purchaser pursuant to section 365 of the Bankruptcy Code (all such leases and Contracts referred to in this Section 1.1(a)(iv), together with those contracts listed on Schedule 2.9 and designated by Purchaser, are hereinafter collectively referred to as the "Assigned Contracts");

(v)    all methods of operation and manuals, patents, trademarks, service marks, trade names, trade secrets, copyrights, inventions, licensing rights, internet domain names and all other intellectual property of Seller relating to the Business, and all

08/27/2004 13:39 FAX                                                                            ☑011

registrations and applications for the same, owned or used in connection with the Purchased Assets or the Business, including, without limitation, the items listed on Schedule 1.1(a)(v) hereto;

(vi)    all computers, computer programs, computer software, automation systems, accounting systems (except all accounting records of the Business up to the Closing Date which will be retained by Seller), master disks of source codes and other proprietary information, intangible assets, properties and rights, in each such case, relating to and used in connection with the Purchased Assets or the Business, including, without limitation, the items listed and described on Schedule 1.1(a)(vi) hereto;

(vii)    all inventory of the Keystone Business;

(viii)    all goodwill incident to the Business, including, but not limited to, the value of any names associated with the Business which are transferred to Purchaser hereunder and the value of good customer relations.

(b)    The Purchased Assets shall not include the Excluded Assets and any other assets which may have been transferred or disposed of in the ordinary course of the Business prior to the Closing Date.

SECTION 1.2.    **Excluded Assets**.  All Assets not specifically described in the definition of Purchased Assets shall be retained by Seller, including, without limitation, the following (said assets being referred to collectively as the "Excluded Assets"):

(a)    Cash and Cash Equivalents;

(b)    all accounts receivable (whether or not recorded in Seller's books and records) and refunds of any kind (including local, state and federal tax refunds) of Seller with respect to services rendered, royalties earned or products sold by Seller prior to the Closing Date, including, without limitation, those identified on Schedule 1.2(b) hereto;

(c)    avoidance actions and other causes of action arising under sections 544 through 553 of the Bankruptcy Code;

(d)    those Contracts and leases that are not Assigned Contracts ("Excluded Contracts");

(e)    all minute books, stock ledger books and similar records of Seller;

(f)    all accounting and tax books, ledgers and records and other financial records of Seller;

(g)    all prepaid expenses and security deposits;

(h)    all retainage amounts relating to Contracts (other than the Assigned Contracts) entered into prior to the Closing Date;

- 3 -

08/27/2004 13:39 FAX                                                          ✆012

    (i)    amounts received as a result of the settlement of a dispute with Dick Corporation in the Seller's Bankruptcy Case;

    (j)    amounts being held in escrow by Calfee Halter & Griswold; and

    (k)    those Assets set forth on <u>Schedule 1.2(h)</u>.

**SECTION 1.3.** **<u>Assumption of Liabilities</u>.** Upon and subject to the terms, conditions, representations and warranties of Seller contained herein, and subject to Section 1.4, Purchaser hereby assumes and agrees to pay, perform, and discharge when due the following (collectively referred to hereinafter as the "<u>Assumed Liabilities</u>"):

    (a)    the Liabilities of Seller under the Assigned Contracts that, by the terms of such Assigned Contracts, arise after the Closing, relate to periods following the Closing and are to be observed, paid, performed or discharged, as the case may be, in each case at any time after the Closing Date; and

    (b)    all Liabilities (other than the Excluded Liabilities) arising out of the ownership of the Purchased Assets or operation of the Business by Purchaser after the Closing.

    The Assumed Liabilities shall not include any Cure Payment Amounts required by operation of section 365 of the Bankruptcy Code.

**SECTION 1.4.** **<u>Excluded Liabilities</u>.**

    (a)    Except with respect to the Assumed Liabilities, Purchaser shall not assume, and shall have no liability or responsibility for, any Debts, Liabilities, obligations, Claims, expenses, Taxes or Contracts of Seller of any kind, character or description, whether accrued, absolute, contingent or otherwise, arising out of any act or omission occurring or state of facts existing prior to, on or after the Closing Date, it being understood that Purchaser is expressly disclaiming any express or implied assumption of any Liabilities other than the Assumed Liabilities identified expressly in Section 1.3 herein.

    (b)    Notwithstanding Section 1.3 or any other provision contained herein, and regardless of whether any of the following may be disclosed to Purchaser or any of its Representatives or otherwise or whether Purchaser or any of its Representatives may have knowledge of the same, Purchaser shall not assume, and Seller shall remain exclusively liable for the following: (i) any act or omission occurring or state of facts existing prior to the Closing relating to any Liability of Seller under, or directly or indirectly relating to, any Permit; (ii) any Liability of Seller for Taxes, including, without limitation, any income, capital gains or franchise Taxes, any Taxes of Seller arising as a result of the consummation of the Acquisition, or any Taxes on capital; (iii) any Liability whatsoever of Seller or its Affiliates, ERISA Affiliates or Seller Plans, or any fiduciaries, under, or directly or indirectly relating to, any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) or any other plans, programs or arrangements of any kind relating to compensation or employee benefits currently or previously sponsored,

08/27/2004 13:40 FAX                                                                                ☒013

maintained, contributed to or required to be contributed to by Seller or any of its ERISA Affiliates, whether or not identified on Schedule 2.13(a), including all Seller Plans and any change in control or similar agreements, but excluding any such benefits payable under an Assigned Contract and identified on Schedule 1.1(a)(iv); (iv) any Liability of Seller for Claims covered by Seller's Insurance Policies arising out of any act or omission occurring or state of facts existing prior to the Closing, including without limitation, workers' compensation (including claims made in respect of any period during which Seller was a self-insurer), general liability, fire and property insurance policies, and any Liability of Seller for premiums which may be due or are payable under any such Insurance Policy; (v) any Liability of Seller with respect to the Excluded Assets or the Excluded Contracts; or any fee or commission payable by Seller upon consummation of the Acquisition; and (vi) any Liability of Seller with respect to the use, storage or maintenance of any goods and products held by Seller on consignment (other than with respect to Purchased Assets and Assigned Contracts).

**SECTION 1.5. Purchase Price.**

(a)     The consideration for the Purchased Assets shall be as follows (collectively, the "Purchase Price"):

(i)     the cash sum of $1,500,000 (the "Cash Purchase Price"); and

(iv)     the assumption of the Assumed Liabilities.

(b)     At Closing, Purchaser shall pay to Seller, via wire transfer of immediately available funds to an account or accounts specified by Seller in writing not less than three business days prior to the Closing, the Purchase Price less (A) the Deposit and (B) the Cure Payment Amounts (only if the Sale Order provides for payment of such obligations by Purchaser as a credit against the Purchase Price).

**SECTION 1.6. Deposit.** Pursuant to the Procedures Order, Purchaser has delivered to counsel to the Creditors' Committee, as Escrow Agent, the cash sum of $500,000.00 (the "Deposit"). If the Agreement is terminated prior to the Closing pursuant to Section 6.1, the Deposit shall be distributed in accordance with Section 6.2. At the Closing, the Deposit and all accrued interest thereon shall be applied toward payment of the Purchase Price.

**SECTION 1.7. Cure Payment Amounts.** With respect to all leases and Contracts that are designated as Assigned Contracts prior to the Sale Hearing, the Sale Order shall direct either: (a) Seller to pay the cash sum required to fund all cure payments determined as of the Closing Date necessary to assume and assign to Purchaser all Assigned Contracts pursuant to section 365 of the Bankruptcy Code (collectively the "Cure Payment Amounts"); or (b) Purchaser to pay the Cure Payment Amounts, subject to a credit against the Purchase Price equal to the Cure Payment Amounts.

**SECTION 1.8. Closing.** Unless otherwise mutually agreed upon by the parties hereto, the closing (the "Closing") of the Acquisition shall take place at the offices of Piper Rudnick LLP, 1251 Avenue of the Americas, New York, New York at 10:00 a.m.,

local time, on September 3, 2004 provided that the Sale Order shall have become a final order and all of the conditions precedent to Closing hereunder shall have been satisfied or waived, or at such other time and place as the parties hereto shall agree in writing. The date of the Closing is hereinafter called the "Closing Date." The parties hereto hereby agree to deliver at the Closing such documents, certificates of officers and other instruments as are specified in Article V hereof and as reasonably may be required to effect the transfer by Seller of the Purchased Assets pursuant to and as contemplated by this Agreement and to consummate the Acquisition. All events which shall occur at the Closing shall be deemed to occur simultaneously.

## ARTICLE II.

## REPRESENTATIONS AND WARRANTIES
## OF SELLER

Seller represents and warrants to Purchaser as of the date of this Agreement and as of the Closing Date (as if each such representation and warranty was remade on the Closing Date), that:

SECTION 2.1. <u>Corporate Existence and Power</u>.

(a)    Seller is a corporation, duly organized, validly existing and in good standing under the laws of the State of Ohio and, subject to any required approval of the Bankruptcy Court, Seller has all requisite power and authority, and all Permits required to own, lease and operate its properties and to conduct the Business as currently conducted. Seller is duly qualified to do business as a foreign entity and is in good standing in Pennsylvania, and in each other jurisdiction, if any, where the failure to so qualify would have a Material Adverse Effect, which jurisdictions are listed on <u>Schedule 2.1(a)</u>.

(b)    Seller has no subsidiaries and does not directly or indirectly own any interest or investment in any other Person.

SECTION 2.2.  <u>Authority Relative to this Agreement</u>.  Subject to the entry by the Bankruptcy Court of the Procedures Order approving, inter alia, the Bidding Procedures, and the Sale Order approving the remaining terms of this Agreement, and authorizing Seller to consummate the Acquisition, Seller has full power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party and to consummate the Acquisition. Subject to the entry of the Procedures Order and the Sale Order by the Bankruptcy Court, no other proceedings on the part of Seller (or any other Person) are necessary to authorize the execution and delivery by Seller of this Agreement or the Transaction Documents to which it is a party or the consummation of the Acquisition. The execution, delivery and performance by Seller of this Agreement and the Transaction Documents to which it is a party, and the consummation by Seller of the Acquisition, have been duly and validly authorized and approved by Seller's board of directors. Subject to the entry by the Bankruptcy Court of the Procedures Order approving, *inter alia*, the Bidding Procedures, and the Sale Order approving the remaining terms of this Agreement, and authorizing Seller to consummate the

Acquisition, this Agreement and the other Transaction Documents to which Seller is a party have been duly and validly executed and delivered by Seller, and (assuming the valid execution and delivery thereof by the other parties thereto) constitute the legal, valid and binding agreements of Seller, enforceable against Seller in accordance with their respective terms, except as such obligations and their enforceability may be limited by applicable bankruptcy and other similar Laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought (whether at law or in equity) (collectively, the "Enforceability Exceptions").

　　　SECTION 2.3.　No Conflicts; Consents.　Subject to: (a) the qualifications set forth in Section 2.2, and (b) the entry of the Procedures Order and the Sale Order, and (c) as otherwise set forth on Schedule 2.3 (the "Required Consents"), neither the execution, delivery and performance of this Agreement by Seller or any of the Transaction Documents to which it is a party, nor the consummation of the Acquisition: (i) violates any provision of the Charter or By-Laws (or comparable instruments) of Seller; (ii) requires Seller to obtain any consent, approval, Permit or action of or waiver from, or make any filing with, or give any notice to, any Governmental Body or any other Person; (iii) violates, conflicts with or results in a breach or default under (whether before or after the giving of notice or the passage of time or both), or permits the termination or modification of or requires any payment or creates any restriction or obligation under, any Assigned Contract, right, other obligation or restriction relating to or which affects the Purchased Assets or Seller to which Seller is a party or by which Seller or its Assets may be bound or subject, or results in the creation of any Lien upon any of the Purchased Assets pursuant to the terms of any such Assigned Contract or otherwise; (iv) violates any Law or Order of any Governmental Body against, or binding upon, Seller, the Purchased Assets or the Business; or (v) violates or results in the revocation, modification or suspension of any Permit.

　　　SECTION 2.4.　Charter Documents and Corporate Records.

　　　　　(a)　　Seller has heretofore delivered to Purchaser true and complete copies of the Charter and By-Laws (or comparable instruments) of Seller, as in effect on the date hereof.　The stock transfer books (or comparable documents) of Seller have been made available to Purchaser for its inspection and are true and complete.　Seller has heretofore delivered to Purchaser true and complete copies of the minutes of meetings (or written consents in lieu of meetings) of the board of directors (and all committees thereof) and shareholders of Seller.　All actions taken by the board of directors (and all committees thereof) and shareholders of Seller are reflected in such minutes, written consents and other documentation.

　　　SECTION 2.5.　Financial Information.　Seller has previously furnished to Purchaser complete copies of the financial reporting materials identified on Schedule 2.5 (the "Financial Reporting Materials").　The Financial Reporting Materials delivered to Purchaser to date have been maintained in a manner to allow Seller to operate its business

during its Bankruptcy Case. Seller has advised Purchaser that these records may not be fully complete or accurate and may not comply with GAAP, but has granted Purchaser access to all underlying data and Seller's employees so that Purchaser may investigate the completeness and accuracy of these documents.

**SECTION 2.6. Liabilities.** Except as and to the extent reflected in the most recent Financial Reporting Materials, Seller did not have any Liabilities (other than obligations of continued performance under Contracts); and except as described on Schedule 2.6 hereto, Seller has not incurred any Liabilities since March 31, 2004, except (a) current Liabilities for trade or business obligations incurred in connection with the purchase of goods or services in the ordinary course of the Business and consistent with past practice, and (b) Liabilities reflected on any balance sheet included in the Financial Reporting Materials. Schedule 2.6 contains a true and correct list of all Debts as of the date hereof.

**SECTION 2.7. Absence of Certain Changes.** Except as disclosed on Schedule 2.7 or as contemplated by this Agreement, since June 30, 2004, Seller has conducted its Business in the ordinary course consistent with past practice and there has not been:

(a)    Any change in its Business, or any event, occurrence or circumstance that could reasonably be expected to cause a Material Adverse Effect;

(b)    Any transaction with respect to the purchase, acquisition, lease, sale, disposition or transfer of Purchased Assets (in each case, other than in the ordinary course of its Business in accordance with past practice) or creation of any Lien on any Purchased Assets;

(c)    Any declaration, setting aside or payment of any dividend or other distribution with respect to any interest in Seller;

(d)    Any material damage, destruction or other casualty loss (whether or not covered by insurance), condemnation or other taking affecting the Purchased Assets;

(e)    Other than in the ordinary course of its Business with respect to employees of Seller and set forth on Schedule 2.7(e), any increase in the wages, salaries, compensation, bonuses, incentives, pensions or other benefits payable or to become payable by Seller to any officer, shareholder, director, consultant, agent, sales representative or employee of Seller, or any modification to the terms of such compensation or benefits having the effect of materially increasing the cost thereof, other than a modification required under applicable Laws;

(f)    Any failure to maintain the Purchased Assets in accordance with good business practice;

(g)    Any material modification, termination, waiver, amendment or other alteration or change in the terms or provisions of any Assigned Contract;

- 8 -

(h)    Any issuance or sale by Seller of any capital stock, notes, bonds or other securities, or any option, warrant or other right to acquire the same; or

(i)    Any Contract or authorization by Seller to do any of the foregoing.

**SECTION 2.8.  Properties; Title; Liens.**

(a)    Seller owns no real property and all real property leased by Seller is set forth on Schedule 2.8(a) (collectively, the "Real Property").  Schedule 2.8(a) also sets forth the commencement date of any lease of Real Property and any amendments thereto, the term thereof, including any renewal options, options to purchase, rights of first refusal, and the aggregate monthly rental payable thereunder.  Seller enjoys peaceful and undisturbed possession under all such leases.

(b)    To the best of Seller's Knowledge, the Business is not in violation of any building, zoning, anti-pollution, health, occupational safety or other Law or any Order or Permit applicable to the Real Property.  Subject to entry of the Sale order, except as disclosed on Schedule 2.8(b), no Person, other than Seller or its landlord, has any right to occupy or possess any of the Real Property or any such structures or buildings.

(c)    Except as disclosed on Schedule 2.8(c), and subject to entry of the Sale Order, Seller has, and pursuant to this Agreement will convey, assign and deliver to Purchaser, good, valid, marketable, legal and beneficial title to (or a valid leasehold interest in as to any of the leased Purchased Assets) all of the Purchased Assets and is the lawful owner of or holder of a valid leasehold interest in all of the Purchased Assets, free and clear of all Liens.  The equipment and other tangible personal property constituting part of the Purchased Assets (whether owned or leased) have been maintained in accordance with good business practice.  There are no outstanding options, warrants, commitments, agreements or any other rights of any character, entitling any Person other than Purchaser to acquire any interest in all or any part of the Purchased Assets.

**SECTION 2.9.  Contracts.**

(a)    Schedule 2.9(a) lists all Contracts of the following types to which Seller is a party as of the date hereof:

(i)    mortgages, indentures, guarantees, security agreements, installment obligations and other agreements and instruments relating to the borrowing of money or extension of credit;

(ii)    employment, consulting and agency agreements and collective bargaining agreements, and non-competition or other restrictive agreements;

(iii)    sales agency, manufacturer's representative or distributorship agreements;

- 9 -

(iv)    agreements, orders or commitments for the purchase by Seller of raw materials, supplies or finished products exceeding $100,000 in the last six months or $250,000 over the life of any such agreements, orders or commitments;

(v)    agreements, orders or commitments for the sale by Seller of products or services of the Business or Assets exceeding $100,000 in the last six months or $250,000 over the life of any such agreements, orders or commitments, including each Contract relating to a Major Customer;

(vi)    licenses or Intellectual Property rights and other intangible property rights;

(vii)    all capitalized leases and each lease of real or personal property;

(viii)    joint venture agreements, and any agreement between Seller and any of its Affiliates;

(ix)    agreements limiting the freedom of Seller, its sole shareholder or its officers and employees to compete in any line of business similar to the Business; and

(x)    other agreements, contracts and commitments material to the Business, or which in any case involve annual payments or receipts of more than $100,000 or which may not be canceled on no more than 30 days' notice without penalty or premium.

(b)    Each of the Contracts described in Section 2.9(a) has been duly and validly executed and delivered by Seller and (assuming the valid execution and delivery thereof by the other parties thereto) constitutes the legal, valid and binding agreement of Seller, enforceable against Seller and, to Seller's Knowledge, the other parties thereto, in accordance with their respective terms, except as may be limited by the Enforceability Exceptions (and subject to section 365 of the Bankruptcy Code and any other applicable bankruptcy law). Other than any defaults that may have existed as of the date on which Seller filed its Petition for Relief under Chapter 11 of the United States Bankruptcy Code, Seller is not in default (or alleged default), and was not in default (or alleged default) as of the Closing Date, under any such Contract described in Section 2.9(a), except as disclosed on Schedule 2.9(b), and, to Seller's Knowledge, no other party thereto is in default thereunder, and no condition exists that with notice or the lapse of time or both would constitute a default (or give rise to a termination right) thereunder. To Seller's Knowledge, none of the parties to any such Contract described in Section 2.9(a) intends to terminate or alter the provisions thereof by reason of the Acquisition or otherwise. Since March 31, 2004, except as set forth on Schedule 2.9(b), Seller has not waived any right under any such Contract described in Section 2.9(a), amended or extended any such Contract described in Section 2.9(a) or failed to renew (or received notice of termination or failure to renew with respect to) any such Contract described in Section 2.9(a). Seller has not received written or oral notice of cancellation, modification or termination of any

08/27/2004 13:42 FAX                                                          ☒019

Contract. Seller has made available to Purchaser true, correct and complete copies of all of the written Contracts with respect to the Business and summaries of the material provisions of all oral Contracts.

**SECTION 2.10. Intangible Property.** Schedule 2.10 sets forth a true, correct and complete list of all patents, trademarks, registered copyrights, internet domain names, service marks or trade names (and all applications for any of the foregoing), Permits, grants and licenses and all other intangible assets, properties and rights running to or from, or used by, Seller in the conduct of the Business (the "Intellectual Property Rights"). Except as disclosed on Schedule 2.10:

(a) Seller owns all right, title and interest, or possesses adequate rights, in and to the Intellectual Property Rights necessary to conduct its Business and there are no agreements, arrangements, Claims or any other rights of any character entitling any Person other than Purchaser to any interest in any of the Intellectual Property Rights;

(b) To Seller's Knowledge, the Intellectual Property Rights do not infringe on or conflict with the rights or intellectual property of third parties, and Seller has not received any notice contesting its right to use any such Intellectual Property Rights;

(c) To Seller's Knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights;

(d) The Intellectual Property Rights have not been and are not the subject of any pending or, to Seller's Knowledge, threatened litigation or Claim of infringement;

(e) No license or royalty agreement to which Seller is a party is in breach or default by any party thereto or the subject of any notice of termination given or, to Seller's Knowledge, threatened;

(f) Seller has not granted any license or agreed to pay or receive any royalty in respect of any Intellectual Property Rights; and

(g) The Acquisition will not adversely affect or violate the right, title and interest of Seller in and to any of the Intellectual Property Rights.

**SECTION 2.11. Claims and Proceedings.** Except as set forth on Schedule 2.11, and except for the Bankruptcy Case there are no outstanding Orders of any Governmental Body against or involving Seller, the Purchased Assets or the Business. Except as set forth on Schedule 2.11, there are no actions, suits, or legal, administrative or arbitral proceedings or investigations (collectively, "Claims") (whether or not the defense thereof or Liabilities in respect thereof are covered by insurance), pending or, to Seller's Knowledge, threatened against or involving Seller, the Purchased Assets or the Business.

**SECTION 2.12. Taxes.**

- 11 -

(a)    Except as set forth on Schedule 2.12(a):

(i)    Copies of all Tax Returns for periods ending on or after December 31, 2003 have been or will be delivered to Purchaser;

(b)    there are no Tax Liens on or pending against Seller or any of the Purchased Assets that arose in connection with any failure to pay any Tax or otherwise;

**SECTION 2.13. Employee Benefit Plans; ERISA Matters.**

(a)    Schedule 2.13(a) contains a true and complete list of each "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is sponsored, maintained or contributed to or required to be contributed to by Seller or any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Seller would be deemed a "single employer" within the meaning of Section 414(b) or (c) of the Code, or to which Seller or an ERISA Affiliate is a party, for the benefit of any current or former employee or consultant of Seller engaged in the Business (individually, a "Seller Plan," and collectively, the "Seller Plans"). Purchaser is not assuming and shall have no liability in connection with any Seller Plan.

(b)    To the best of Seller's Knowledge and other than as set forth in Schedule 2.13(a), Seller and each ERISA Affiliate are in material compliance with, and each Seller Plan has been operated in accordance with, the provisions of such Seller Plan and all applicable Laws with respect to such Seller Plan, including but not limited to rules and regulations promulgated by the Department of Labor, the Pension Benefit Guaranty Corporation and the Department of the Treasury pursuant to the provisions of ERISA and the Code.

(d)    Neither Seller nor any ERISA Affiliate is a party to any collective bargaining agreements and there are no labor unions or other organizations representing, purporting to represent, or attempting to represent, any employee of Seller.

(e)    To the best of Seller's Knowledge, Seller has not, with respect to employees engaged in the Business, violated any provision of federal or state law or any governmental rule or regulation, or any order, decree, judgment arbitration award of any court, arbitrator or government agency, or other Laws, regarding the terms and conditions of employment of employees, former employees or prospective employees or other labor related matters, including, without limitation, laws, rules, regulations, orders, rulings, decrees, judgments and awards relating to discrimination, fair labor standards and occupational health and safety, wrongful discharge or violation of the rights of employees, former employees or prospective employees.

(f)    There are no pending claims or lawsuits by, against, or relating to any Seller Plan that would, if successful, result in liability of Seller, any ERISA Affiliate or Purchaser, and no claims or lawsuits have been asserted, instituted or, to the Knowledge of Seller, threatened in writing by, against, or relating to any Seller Plan, by or against Seller with respect to any Seller Plan, or by or against the plan administrator or any fiduciary of any Seller Plan, and Seller does not have Knowledge of any fact that could form the basis for any such

- 12 -

claim or lawsuit. The Seller Plans are not presently under audit or examination (nor has notice been received of a potential audit or examination) by the IRS, the Department of Labor, or any other governmental agency or entity, and no matters are pending with respect to any Seller Plan under the IRS's Voluntary Compliance Resolution program, its Closing Agreement Program, or other similar programs.

(g)    With respect to each Seller Plan, there has been made available to Purchaser complete copies of the following documents: (i) all plan documents, including trust agreements, insurance policies and service agreements, and amendments thereto, (ii) the most recent Forms 5500 and any financial statements attached thereto and those for the prior three years, (iii) the last IRS determination letter and evidence of timely adoption of any amendments requested by the IRS upon which reliance on such determination letter is contingent (if applicable), (iv) summary plan descriptions, (v) the most recent actuarial report and those for the prior three years (if applicable), and (vi) written descriptions of all non-written agreements relating to any such plan.

(i)    To Seller's Knowledge, neither Seller nor any Affiliate thereof has made any oral or written statement regarding any Seller Plan that was not in accordance with the terms thereof and that could have a Material Adverse Effect.

**SECTION 2.14. Employee-Related Matters.**

(a)    _Schedule 2.14(a)_ contains a true and correct list of all directors, officers, employees (listed by job classification), independent contractors and consultants of Seller and a description of the rate and nature of all compensation payable by Seller to each such Person. Except as set forth on such _Schedule 2.14(a)_, the employment, independent contracting, or consulting arrangements or other agreements of all such Persons is terminable at will by Seller or its assignee without payment, charge, penalty or Liability.

(b)    Except as set forth on _Schedule 2.14(b)_, (i) Seller is not a party to any Contract with any labor organization or other representative of its employees; (ii) there is no unfair labor practice charge or complaint pending or, to Seller's Knowledge, threatened against Seller; (iii) Seller has not experienced any labor strike, slowdown, work stoppage or similar labor controversy; (iv) no representation question has been raised respecting Seller's employees, nor are there any campaigns being conducted to solicit authorization from Seller's employees to be represented by any labor organization; (v) no Claim before any Governmental Body brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of Seller's employees is pending or, to Seller's Knowledge, threatened against Seller; (vi) Seller is not a party to, or otherwise bound by, any Order relating to its employees or employment practices; and (vii) except for any unused vacation that may be due and except as set forth on Schedule 2.14(b), Seller has paid in full to all of its employees all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees.

- 13 -

**SECTION 2.15.** **Insurance.** Schedule 2.15 sets forth a list of all insurance policies, fidelity bonds and fiduciary liability policies (the "Insurance Policies") covering any of the Purchased Assets, the Business, the Contracts, or operations, employees, officers and directors of Seller in effect in the date of this Agreement and true and complete copies of all such Insurance Policies have been delivered by Seller to Purchaser. There is no Claim by Seller pending under any of such Insurance Policies as to which coverage has been questioned, denied or disputed by the underwriters of such Insurance Policies or requirement by any insurer to perform work which has not been satisfied. All premiums due under all Insurance Policies have been paid and Seller is in compliance with the terms and conditions of all such Insurance Policies. All such Insurance Policies are in full force and effect. All Assets and the Business of Seller are insured under such Insurance Policies in amounts and against risks usually insured against by persons operating businesses similar to the Business.

**SECTION 2.16.** **Compliance with Laws.** Except as set forth on Schedule 2.16, to Seller's Knowledge, Seller is not in violation of any order, judgment, preliminary or permanent injunction, temporary restraining order, award, citation, decree, consent decree or writ (collectively, "Orders"), or any law, statute, code, ordinance, rule, regulation, policy or other requirement (each a "Law" and, collectively, "Laws"), of any government or political subdivision thereof, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision, or any court or arbitrator (collectively, "Governmental Bodies") affecting or relating to the Purchased Assets or the Business.

**SECTION 2.17.** **Permits.** Seller has obtained all licenses, permits, certificates, certificates of occupancy, orders, authorizations and approvals (collectively, "Permits") required for the conduct of the Business and all Permits issued by, and has made all required registrations and filings with, any Governmental Body that are required for the conduct of the Business. All Permits that are required for the conduct of the Business are listed on Schedule 2.17 and are in full force and effect; other than as disclosed on Schedule 2.17, to Seller's Knowledge no violations are or have been recorded in respect of any Permit and no proceeding is pending or, to Seller's Knowledge, threatened to revoke or limit any Permit or Environmental Permit and no Permit will terminate by reason of the Acquisition.

**SECTION 2.18.** **Intentionally omitted.**

**SECTION 2.19.** **Customers and Suppliers.** Schedule 2.19 lists, by dollar volume paid for the year ended December 31, 2003, the 10 largest customers of Seller (collectively, the "Major Customers") and the 10 largest suppliers of Seller (collectively, the "Major Suppliers").

**SECTION 2.20** **Potential Conflicts of Interest.** To the best of Seller's Knowledge, except as set forth on Schedule 2.20, no Representative of Seller, no spouse of any such Representative, and no entity Controlled by a Representative of Seller owns, directly or indirectly, in whole or in part, any Asset that Seller uses in the conduct of its Business.

**SECTION 2.21  Finders' Fees.**  Except as set forth on Schedule 2.21, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller and which might be entitled to a fee or commission from Seller upon consummation of the Acquisition.

**SECTION 2.22  Intentionally omitted.**

**SECTION 2.23  Surety Bonds .**  Schedule 2.23 sets forth a list of all surety bonds relating to the Business or any Contract.

**SECTION 2.24  No Third Party Options**  There are no existing agreements, options or commitments granting to any Person the right to acquire Seller's right, title and interest in or to any of the Purchased Assets or any interest therein.

**SECTION 2.25  Location of Purchased Assets**  Except as disclosed on Schedule 2.25, the Purchased Assets are located at the Seller's offices at 5300 Knowledge Parkway, Suite 200, Erie, Pennsylvania 16510.

**SECTION 2.26  Disclosure.**  Neither this Agreement, the Schedules hereto, nor any documents or certificates furnished or to be furnished to Purchaser or any of its Representatives by or on behalf of Seller pursuant to this Agreement or in connection with the Acquisition contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading. To Seller's knowledge, there are no facts not disclosed herein or on the Schedules hereto, which might reasonably be expected to directly and materially adversely affect the value of the Purchased Assets or the Business. All representations and warranties made by Seller in this Agreement will be deemed to have been relied on by Purchaser (notwithstanding any independent investigation by Purchaser).

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller, as of the date of this Agreement and as of the Closing Date (as if each such representation and warranty was remade on the Closing Date), that:

**SECTION 3.1.  Corporate Existence.**  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

**SECTION 3.2.  Authority Relative to This Agreement.**  Except as otherwise provided herein, Purchaser has full power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party and to consummate the Acquisition. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Documents to which it is a party and the consummation by it of the Acquisition have been duly and validly authorized and approved by Purchaser's board of directors, and no other corporate proceedings on the

- 15 -

part of Purchaser are necessary to authorize the execution and delivery by Purchaser of this Agreement or the other Transaction Documents to which Purchaser is a party or the consummation of the Acquisition. This Agreement has been duly and validly executed and delivered by Purchaser and (assuming the valid execution and delivery of this Agreement by the other parties hereto) constitutes the legal, valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

SECTION 3.3. <u>No Conflicts; Consents</u>. Except as set forth on <u>Schedule 3.3</u>, neither the execution, delivery and performance by Purchaser of this Agreement and each other Transaction Document to which it is a party nor the consummation of the Acquisition (i) violates any provision of the Charter or By-laws of Purchaser; (ii) requires Purchaser to obtain any consent, approval or action of or waiver from, or make any filing with, or give any notice to, any Governmental Body or any other Person; (iii) violates, conflicts with or results in the breach or default under (after the giving of notice or the passage of time), or permits the termination of, any material Contract to which Purchaser is a party or by which it or any of its assets may be bound or subject; or (iv) violates any Law or Order of any Governmental Body against, or binding upon, Purchaser or upon its assets or business.

SECTION 3.4. <u>Purchaser's Finders' Fees</u>. There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Purchaser and which might be entitled to a fee or commission from Purchaser upon consummation of the Acquisition.

SECTION 3.5. <u>Financing</u>. Purchaser has access to sufficient funds to pay the Purchase Price at Closing, to operate the Business, and perform the Assigned Contracts.

## ARTICLE IV.
## COVENANTS AND AGREEMENTS PRIOR TO CLOSING

SECTION 4.1. <u>Conduct of Business</u>.

(a)    From the date hereof through the Closing Date, except as contemplated by this Agreement or disclosed on <u>Schedule 4.1(a)</u>, Seller agrees:

(i)    Not to undertake (nor permit to be undertaken) any of the actions specified in <u>Section 2.7</u>;

(ii)    Subject to any change or effect resulting directly from the commencement of the Bankruptcy Case or this Agreement, to operate the Business in a reasonable and prudent manner, to conduct its operations according to the ordinary and usual course of its Business consistent with its operations during the pendency of the Bankruptcy Case, to preserve intact its present business organization and structure, to use its best efforts to keep available the services of its present officers, agents and full-time employees, to use best efforts to preserve and maintain its Assets and the goodwill of the

Business, to preserve its rights to be assigned to Purchaser hereunder, and to use best efforts to preserve its relationships with customers, suppliers, independent contractors, employees and other Persons having business dealings with it or otherwise material to the operation of the Business;

      (iii)    To maintain in the ordinary course of Business, consistent with past practice and in accordance with all Contracts, the Business and all of its material equipment and other tangible property;

      (iv)    To maintain the books and records relating to the Business in the usual and ordinary manner;

      (v)    Subject to any change or effect resulting directly from the commencement of the Bankruptcy Case or this Agreement, to pay all post-petition non-disputed account and trade payables on a current basis;

      (vi)    Not to incur any Liability (other than Liabilities incurred in the ordinary course of its Business, consistent with past practice, which are not in the aggregate material to the Business);

      (vii)    Not to sell, transfer, convey, assign or otherwise dispose of any Purchased Assets, except in the ordinary course of its Business consistent with past practices, or create, incur, assume or suffer to exist any Lien on any Purchased Assets;

      (viii)    Not to authorize for issuance, issue, sell, deliver or agree or commit to issue, sell or deliver (whether through the issuance or granting of options, warrants, convertible or exchangeable securities, commitments, subscriptions, rights to purchase or otherwise) any shares of Seller's capital stock or any other securities, or amend any of the terms of any such securities;

      (ix)    Not to terminate, modify, amend, waive or otherwise alter or change any of the material terms or provisions of any Assigned Contract or create any default under the terms of any Assigned Contract or pay any amount under any Assigned Contract not required by Law or by the terms of the Assigned Contract;

      (x)    Not to increase the compensation or other remuneration payable or to become payable to any Representative of Seller, or any alteration in the benefits payable to any thereof, or pay any bonuses or compensation to any such Person other than in respect of salaries in effect on the date hereof;

      (xi)    To exercise all commercially reasonable efforts to retain its essential personnel as identified on Schedule 4.1(a)(xi);

      (xii)    Not to engage in any practice, take any action, fail to take any action or enter into any transaction which could cause any representation or warranty of Seller in this Agreement or any of the Transaction Documents to be untrue or result in a breach of any covenant made by Seller;

(xiii)  To continue its pricing, procurement and purchasing policies, in accordance with past practice.

(b)    From the date hereof through the Closing Date, Seller agrees to use best efforts (i) to conduct its affairs in such a manner that the representations and warranties of Seller contained herein shall continue to be true and correct on and as of the Closing Date as if made on and as of the Closing Date and (ii) to obtain and deliver to Purchaser at the Closing the fully executed documents and other items identified in Section 5.3.

(c)    From the date hereof through the Closing Date, Seller shall consult with Purchaser prior to any renewal, amendment, extension or termination of, waiver of any material right under, or any failure to renew, any Contract and will not take any such action if Purchaser objects thereto in writing.

(d)    From the date hereof through the Closing Date, Seller shall keep in full force and effect all its Insurance Policies and shall not allow any breach, default, termination or cancellation of such Insurance Policies to occur or exist.

SECTION 4.2.  Corporate Examinations and Investigations.  Commencing on the date hereof through the earlier of the Closing Date or the termination of this Agreement as provided herein, Seller agrees that Purchaser shall be entitled, through its directors, officers, Affiliates, employees, attorneys, accountants, representatives, lenders, consultants, independent contractors and other agents (collectively, "Representatives"), to make such investigation of the Purchased Assets, the Business and operations of Seller, and such examination of the books, records and financial condition of Seller, as Purchaser deems necessary or advisable.  Any such investigation and examination shall be conducted upon reasonable notice with Seller's reasonable cooperation.  Commencing on the date hereof through the earlier of the Closing Date or the termination of this Agreement as provided herein, Seller agrees to: (a) make available to the Representatives of Purchaser all such information and copies of such documents and records concerning the affairs of Seller as such Representatives may reasonably request; (b) permit access by the Representatives of Purchaser to the Purchased Assets and all parts thereof and to Seller's Representatives and its employees, customers, suppliers and others; and (c) cause its Representatives to cooperate reasonably in connection with such review and examination. No investigation by Purchaser shall diminish or obviate or otherwise affect any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.  Purchaser shall have a right to designate certain of its Representatives as a transition team which may work from Seller's premises in order to facilitate the orderly transfer of the Business to Purchaser in accordance with the terms of this Agreement. Such transition team shall be given reasonable access to Seller's management and other employees, including through attendance by such management and employees at meetings with the transition team. Commencing on the date hereof through the earlier of the Closing Date or the termination of this Agreement as provided herein, Purchaser shall be permitted to discuss the potential modification of existing contractual arrangements or alternative contractual arrangements with material customers, vendors and suppliers of

Seller in connection with the Acquisition, and contingent on the consummation of the Acquisition.

      **SECTION 4.3.  Employment Matters.**  (a) Purchaser may, at its election, enter into employment or consulting contracts with the existing management of Seller prior to the Closing Date but effective after the Closing Date to ensure an orderly transition of the Business after the Closing.  Seller shall cooperate with Purchaser with respect to Purchaser's evaluation of employees engaged in the Business who may be offered employment by Purchaser.  Seller will terminate all employees who are hired by Purchaser effective on the Closing Date.  It is the intention of Purchaser to hire some of the persons employed by Seller in the Business as of the Closing Date, and accordingly, it is anticipated that for said employees, employment will not be interrupted.  Seller agrees that Purchaser retains sole and complete discretion with respect to which employees of Seller Purchaser will offer employment. From the date hereof through the Closing, Seller shall cooperate with and permit Purchaser to communicate in writing with Seller's employees, at reasonable times and upon reasonable notice, concerning Purchaser's plans, operations and general personnel matters and to interview Seller's employees and review the personnel records and such other information concerning Seller's employees as Purchaser may reasonably request (subject to obtaining any legally required permission and to other applicable Laws).  Seller shall be solely responsible for any notification and liability under the Worker Adjustment and Restraining Notification Act ("WARN") relating to any termination of any of Seller's employees from employment with Seller occurring prior to or after the date of this Agreement, whether or not in connection with the Acquisition. Seller does not anticipate that an "employment loss" (as that term is defined in WARN) will occur such that notification will be required under WARN.  In any event, given the total number of employees, it does not appear that any obligations will arise under WARN.  Seller shall be responsible for all liabilities for employee or independent contractor compensation and benefits accrued or otherwise arising out of services rendered by its employees, directors and independent contractors prior to the Closing or arising by reason of actual, constructive or deemed termination of their service relationship with Seller at Closing, including all costs relating to the continuation of health benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, with respect to employees not hired by Purchaser after the Closing Date.  Without limitation of the preceding sentence, on the Closing Date Seller shall pay the employees hired by Purchaser the full amount, if any, to which they may be entitled for any compensation or accrued benefits.  On or before the Closing Date, Seller shall amend each Seller Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA to provide for full vesting of the accrued benefits of all employees whose employment with Seller is terminated in connection with the Acquisition.

      (b)  No provision of this Section 4.3 shall create any third party beneficiary or other rights in any employee or former employee of Seller in respect of continued or resumed employment in the Business, or with Purchaser, and no provision of this section 4.3 shall create any rights in any such persons in respect of any benefits that may be provided under any plan or arrangement which may be established by Purchaser.

08/27/2004 13:46 FAX                                                                    ☑028

**SECTION 4.4  Additional Financial Information.**  Prior to the Closing Date, as soon as available, Seller shall furnish Purchaser with Monthly Operating Reports as filed with Bankruptcy Court for each fiscal month ended after the date of this Agreement, in form and substance comparable to such other financial information routinely prepared by Seller.

**SECTION 4.5  Consents, Filings and Authorizations; Efforts to Consummate.**  As promptly as practicable after the entry of the Procedures Order, Purchaser and Seller shall make all filings and submissions under such Laws as are applicable to them or to their respective Affiliates, and as may otherwise be required for them to consummate the Acquisition in accordance with the terms of this Agreement and shall consult with each other prior to such filing and shall not make any such filing or submission to which Seller or Purchaser, as the case may be, reasonably objects in writing.  All such filings shall comply in form and content in all material respects with applicable Laws.  Subject to the terms and conditions herein, each party hereto, without payment or further consideration, shall use its best efforts to take or cause to be taken all action and to do or cause to be done all things necessary, proper or advisable under applicable Laws, Permits and Orders, to consummate and make effective, as soon as reasonably practicable, the Acquisition, including, but not limited to, obtaining all of the Required Consents and Permits or consents of any third party, whether private or governmental, required in connection with such party's performance of such transactions and each party hereto shall cooperate with the other in all of the foregoing.

**SECTION 4.6  Notices of Certain Events.**  Prior to the Closing Date, Seller, on the one hand, and Purchaser, on the other hand, shall promptly notify the other of:

(a)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Acquisition;

(b)    any notice or other communication from any Governmental Body in connection with the Acquisition;

(c)    the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty contained in this Agreement to be materially untrue or inaccurate (without given effect to any limitation as to "materiality" set forth therein);

(d)    any failure of Seller or Purchaser, as the case may be, to comply materially with or satisfy materially any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(e)    any material developments affecting the Assets, Liabilities, business, business prospects, financial condition, operations, results of operations or customer, supplier or employee relations of Seller or the Business; and

(f)    any notice or other oral or written communication from a Governmental Body relating to the Business, any of the Purchased Assets or any Assigned Contracts.

SECTION 4.7  **Public Announcements.**

(a)    Prior to the Closing Date, Purchaser or Seller will consult with each other before issuing any press release or otherwise making any public statement with respect to the Acquisition, and will not issue any such press release or make any such public statement without the prior approval of the other party, except as may be required by applicable Law in which event the other party shall have the right to review and comment upon any such press release or public statement prior to its issuance.

(b)    Seller will provide Purchaser and its counsel with copies of all proposed pleadings and orders in the Bankruptcy Case pertaining to the Acquisition with a reasonable amount of time to permit review and comment by Purchaser. Except as may be required by applicable Law, neither Purchaser nor Seller will make any public disclosure or issue any press release in which the Acquisition is mentioned without the prior review and approval of the Other Party.

SECTION 4.8  **Confidentiality.**

(a)    Prior to the Closing Date, Purchaser shall hold in strict confidence, and shall use commercially reasonable efforts to cause all its Representatives to hold in strict confidence, unless compelled to disclose by judicial or administrative process (in which event Purchaser shall give Seller prompt notice of the demand for such disclosure do that Seller may seek an appropriate protective order), or by other requirements of Law, all non-public, proprietary or confidential information concerning Seller or the Assets obtained from Seller or its Representatives, and Purchaser shall not use or disclose to others, or permit the use of or disclosure of, any such information so obtained, and will not release or disclose such information to any other Person, except its Representatives who need to know such information in connection with this Agreement and any potential joint venture participant disclosed in writing to Seller (and who shall be advised of the provisions of this Section 4.8(a) and agree to be bound hereby). The foregoing provision shall not apply to any such information to the extent: (i) known by Purchaser prior to the date such information was provided to Purchaser by Seller or its Representatives in connection with the Acquisition; (ii) made known to Purchaser from a third party not in breach of any confidentiality requirement; or (iii) made public through no fault of Purchaser or any of its Representatives.

(b)    If this Agreement is terminated as provided herein and the Acquisition is not consummated, Purchaser shall return to Seller all tangible evidence of such information regarding Seller if requested by Seller. Any analyses, compilations, studies or other documents prepared by Purchaser or its Representatives containing or based in whole or in part, on any such information and all copies thereof, will be held by Purchaser and kept confidential and subject to the terms of this Agreement, or destroyed at the request of Seller.

SECTION 4.9  **Expenses.**  Except as provided in Section 6.2 or as otherwise specifically provided in this Agreement, the parties hereto shall bear their respective expenses incurred in connection with the preparation, execution and performance of this

Agreement and the Acquisition, including, without limitation, all fees and expenses of their respective Representatives. Payment of all Taxes associated with the Acquisition shall be borne by Seller.

### SECTION 4.10. Bankruptcy Actions.

(a)    Seller will seek approval of the Acquisition in the most expeditious manner permitted under the Bankruptcy Code and the rules promulgated thereunder. Seller shall file with the Bankruptcy Court as soon as practicable after the date hereof the Sale Motion, in form reasonably satisfactory to Purchaser, seeking entry of the Procedures Order and the Sale Order, which shall include a request pursuant to Bankruptcy Rule 6004(g) to shorten the ten day stay of the Sale Order.

(b)    With respect to the motion identified in this Section 4.10, Seller shall serve timely and adequate written notice to all creditors, parties asserting an interest in any of the Purchased Assets, parties to all Assigned Contracts, the IRS and all Tax Authorities, and environmental agencies with jurisdiction over the Purchased Assets and/or the Business, and all other parties in interest entitled to or requesting notice in accordance with the Federal Rules of Bankruptcy Procedure or any Local Rules of the Bankruptcy Court, and shall certify such service in form satisfactory to Purchaser.

### SECTION 4.11. Prosecution and Modification of the Sale Motion.

(a)    Seller and Purchaser shall each use their reasonable best efforts and cooperate, assist and consult with each other, to secure (i) the entry of the Procedures Order on or before July 26, 2004, or such other date mutually agreed to by Seller and Purchaser, in form and substance satisfactory to Purchaser and its counsel and (ii) the entry of the Sale Order on or before August 23, 2004, or such other date mutually agreed to by Seller and Purchaser, each in form and substance satisfactory to Purchaser and its counsel. The Procedures Order shall include the approval of the Break-Up Fee and Expense Reimbursement and the Bidding Procedures. The Sale Order shall include (i) approval of this Agreement, (ii) the sale of the Purchased Assets free and clear of all Liens, (iii) the assumption and assignment of Assigned Contracts, (iv) a finding that Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, (v) authorization to take all action necessary or appropriate to consummate the transactions contemplated by the Sale Motion and this Agreement, and (vi) such other terms as Purchaser may reasonably require (the "Sale Order"). Seller and Purchaser shall consult with, and seek the advice of, one another regarding pleadings which each of them might file, or positions either of them might take, with the Bankruptcy Court in connection with or which might reasonably affect, the approval of the Procedures Order and the Sale Order and consummation of the transactions contemplated by the Sale Motion and this Agreement. Neither Seller nor Purchaser shall file any pleadings or take any position in the Bankruptcy Court contrary to the approval of the Procedures Order, the approval of the Sale Order and the consummation of the transactions contemplated by the Sale Motion and this Agreement unless the other shall approve such pleading or position.

☑031

(b)    Neither the Sale Motion nor any other pleading relating to the transactions contemplated hereby shall be materially amended, modified, supplemented, withdrawn or revoked without the mutual consent of Seller and Purchaser.

(c)    If the Procedures Order, the Sale Order, or any other Orders of the Bankruptcy Court relating to this Agreement or the Sale Motion shall be appealed by any party (or a petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Purchaser will cooperate in taking such steps diligently to prosecute such appeal, petition or motion and Seller and Purchaser shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

Section 4.12  **Notice of Bids or Inquiries.**

Seller shall not provide any non-public information with respect to Seller to any third party that expresses an unsolicited bona fide interest in making a potential offer to acquire substantially all of the Purchased Assets ("Alternative Offer") unless: (i) such non-public information is provided pursuant to a customary confidentiality agreement (with terms regarding the protection of confidential information at least as restrictive as such terms in any confidentiality agreement between Seller and Purchaser) and (ii) such non-public information has been delivered or previously made available to Purchaser. Seller shall not release any Person from, or waive any provisions of, any such confidentiality agreement to which Seller is a party. Seller agrees to provide notice to CMI of any bid, inquiry or request for due diligence materials received by Seller in connection with the proposed sale under 11 U.S.C. 363, and copies of any documents produced in response to such requests.

SECTION 4.13   **Supplements to Disclosure Schedules.**   It is understood and agreed that Seller has a continuing obligation until the Closing Date to amend or supplement promptly the Schedules attached to this Agreement with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth or described in such Schedules or that is necessary to complete or correct any information in any representation or warranty of Seller contained in this Agreement.   The disclosure provided by Seller in any such amended, supplemented or revised Schedule shall in no way affect or be deemed to limit Purchaser's right, exercisable at any time prior to the Closing, to provide written notice to Seller that Purchaser has elected to terminate this Agreement pursuant to Article VI of this Agreement.   If Purchaser does not elect to terminate this Agreement as provided above, this Agreement shall remain in full force and effect subject to the express provisions hereof.

## ARTICLE V.
## CONDITIONS TO CLOSING

**SECTION 5.1.** <u>Conditions to the Obligations of Seller and Purchaser</u>. The respective obligations of Seller and Purchaser to consummate the Acquisition are subject to the satisfaction of the following conditions on or prior to the Closing Date:

(a) <u>No Injunction</u>. No provision of any applicable Law will be in effect and no interlocutory, appealable or final Order will have been issued that prohibits or restricts the consummation of the Acquisition.

(b) <u>No Proceeding or Litigation</u>. No Claim instituted by any Person shall have been commenced or pending against Seller or Purchaser or any of their respective Affiliates or Representatives, which Claim seeks to restrain, prevent, change or delay in any material respect the Acquisition or seeks to challenge any of the material terms or provisions of this Agreement or seeks damages in connection with any of such transactions.

(c) <u>Bankruptcy Condition</u>. The Bankruptcy Court shall have entered the Sale Order, in form and substance satisfactory to Purchaser, with such changes as Purchaser shall agree to in writing, and the Sale Order shall become a final order which shall not be vacated, modified, stayed or appealed.

**SECTION 5.2.** <u>Conditions to the Obligations of Seller</u>. All obligations of Seller to consummate the Acquisition hereunder are subject to the fulfillment (or written waiver by Seller) on or prior to the Closing of each of the following further conditions:

(a) <u>Performance</u>. Purchaser shall have performed and complied in all material respects with its obligations and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing.

(b) <u>Representations and Warranties</u>. The representations and warranties of Purchaser contained in this Agreement, in any other Transaction Documents, and in any certificate or other writing delivered by Purchaser pursuant hereto shall be true in all material respects at and as of the Closing Date as if made at and as of such time.

(c) <u>Purchase Price</u>. The Cash Purchase Price shall have been paid in accordance with Section 1.5.

(d) <u>Documentation</u>. There shall have been delivered to Seller the following:

(i) A certificate, dated the Closing Date, of an executive officer of Purchaser confirming the matters set forth in Section 5.2(a) and (b) hereof.

(ii) A certificate, dated the Closing Date, of the Secretary or Assistant Secretary of Purchaser certifying, among other things, that attached or appended to such certificate: (A) is a true copy of all corporate actions taken by it,

☑033

including resolutions of its board of directors authorizing the consummation of the Acquisition and the execution, delivery and performance of this Agreement and each of the Transaction Documents to be delivered by Purchaser pursuant hereto; and (B) are the names and signatures of its duly elected or appointed officers who are authorized to execute and deliver this Agreement, the Transaction Documents to which Purchaser is a party and any certificate, document or other instrument in connection herewith.

　　　　　　(iii)　An executed Assumption Agreement by Purchaser, a form of which is attached hereto as <u>Exhibit A</u>, evidencing the assumption by Purchaser of the Assumed Liabilities described in Section 1.3.

　　　　　　(iv)　A good standing certificate for Purchaser from the Secretary of State of the State of Delaware.

　　**SECTION 5.3.**　<u>Conditions to the Obligations of Purchaser</u>.　All obligations of Purchaser to consummate the Acquisition hereunder are subject to the fulfillment (or written waiver by Purchaser) on or prior to the Closing of each of the following further conditions:

　　　　　　(a)　<u>Performance</u>.　Seller shall have performed and complied in all material respects with all agreements, obligations and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing. Seller shall be in compliance in all material respects with the provisions of Section 4.1.

　　　　　　(b)　<u>Representations and Warranties</u>.　The representations and warranties of Seller contained in this Agreement, any other Transaction Documents, and in any certificate or other writing delivered by Seller pursuant hereto shall be true at and as of the Closing Date as if made at and as of such time.

　　　　　　(c)　<u>No Material Adverse Change</u>.　During the period from the date hereof to the Closing Date, there shall not have occurred any of the actions described in Section 2.7 except as contemplated by this Agreement or disclosed on <u>Schedule 4.1(a)</u> (excluding any change or effect resulting from the Bankruptcy Case and any proceedings with respect thereto).

　　　　　　(d)　<u>Documentation</u>.　There shall have been delivered to Purchaser the following:

　　　　　　(i)　A certificate, dated the Closing Date, of an executive officer of Seller confirming the matters set forth in Section 5.3(a) and (b).

　　　　　　(ii)　A certificate, dated the Closing Date, of the Secretary or Assistant Secretary of Seller certifying, among other things, that attached or appended to such certificate (A) is a true and correct copy of the Charter and By-Laws of Seller, and all amendments if any thereto as of the date thereof; (B) is a true copy of all actions taken by the board of directors of Seller authorizing the consummation of the Acquisition and the execution, delivery and performance of this Agreement and each other Transaction Document to be delivered by Seller pursuant hereto; and (C) are the names and signatures

of the duly elected or appointed representatives of Seller who are authorized to execute and deliver the Transaction Documents to which Seller is a party and any certificate, document or other instrument in connection herewith;

(iii)    True, correct and complete copies of all Required Consents and Permits.

(iv)    The executed Form 8594 mutually agreed upon by Seller and Purchaser in accordance with Section 8.8(e).

(v)    Possession and control of the Purchased Assets.

(vi)    A bill of sale, executed by Seller, in the form attached hereto as Exhibit B.

(vii)    Good standing or comparable certificates for Seller from the Secretary of State of the jurisdiction of formation of Seller and each of the jurisdictions identified on Schedule 2.1(a) in which Seller is qualified to do business as a foreign entity.

(viii)    Seller represents that to the best of its Knowledge, there is no security interest in any of the Purchased Assets. The Sale Order, by its express terms, shall provide that it can be recorded as conclusive evidence of the termination of any Lien of record encumbering all or any of the Purchased Assets.

(ix)    The Business Records.

(x)    A certified copy of the Sale Order.

(e)    An executed agreement by and among Seller, Purchaser and the Creditors' Committee and any successor thereto, in form and substance satisfactory to Purchaser, with respect to the completion of the Bechtel Contract and Exxon Sarnia Contract, including, without limitation, receivable sharing arrangements;

(f)    An executed agreement by and among Seller, Purchaser and the Creditors' Committee and any successor thereto, in form and substance satisfactory to all parties, with respect to the performance of certain delineated tasks ("Wind Down Tasks"). Wind Down Tasks shall include the provision to the Creditors' Committee, the Seller or its successor, personnel to perform Seller's now existing and outstanding warranty obligations, as well as support the Estate's marshalling of assets and defense of claims against the Estate at a flat rate of $70,00 per hour as is reasonably required by the Debtor (in its sole discretion) or its successor to carryout such tasks.

(g)    Executed non-competition agreement by SGK Holdings, Inc. in favor of Purchaser on terms and conditions mutually acceptable to such parties;

- 26 -

(h)    The Bankruptcy Court shall have entered an order (the "Customer Assumption Order") authorizing the Seller to assume the Bechtel Contract and the Exxon Sarnia Contract, in form and substance satisfactory to Purchaser, with such changes as Purchaser shall agree to in writing, and the Customer Assumption Order shall become a final order which shall not be vacated, modified, stayed or appealed.

(i)    Due Diligence.    Purchaser and its Representatives shall have completed their due diligence investigation of the Purchased Assets and the Business and related matters, and the results of such due diligence investigation shall be satisfactory to Purchaser in its sole and absolute discretion, which condition shall be deemed to have been waived by Purchaser upon expiration of the Due Diligence Period if Purchaser has not provided written notice to Seller of the termination of its efforts to complete the Acquisition.

(j)    Executed employment agreements by and between Purchaser and the following individuals: [Purchaser to designate individuals].

**ARTICLE VI.
TERMINATION**

**SECTION 6.1.    Termination.**    This Agreement may be terminated and the Acquisition may be abandoned at any time prior to the Closing upon the occurrence of any of the following:

(a)    Mutual written consent of the parties hereto;

(b)    By Purchaser, if it provides written notice to Seller of termination of its efforts to complete the Acquisition prior to the expiration of the Due Diligence Period;

(c)    By Purchaser, if the Bankruptcy Court does not enter the Procedures Order in form and substance satisfactory to Purchaser and its counsel on or before August 1, 2004, or such other date agreed to by Purchaser in writing;

(d)    By Purchaser or Seller, if the Closing has not occurred by September 3, 2004, and if failure to close is not the result of a breach of this Agreement by the party electing to terminate;

(e)    By Seller, if: (i) there has been a material misrepresentation or breach by Purchaser of a representation or warranty contained herein and such material misrepresentation or breach, if curable, is not cured within ten days after written notice thereof from Seller; (ii) Purchaser has committed a material breach of any covenant imposed upon it hereunder and, if curable, fails to cure such breach within ten days after written notice thereof from Seller; or (iii) any condition to Seller's obligations hereunder becomes incapable of fulfillment through no fault of Seller or its Affiliates or Representatives and is not waived by Seller;

(f)     By Purchaser, on the one hand, or Seller, on the other hand, if there shall be any Law that makes consummation of the Acquisition illegal or otherwise prohibited, or if any Order enjoining Purchaser, on the one hand, or Seller, on the other hand, from consummating the Acquisition is entered and such Order shall have become final and nonappealable, provided that the Party seeking to terminate this Agreement pursuant to this provision shall have used all reasonable efforts to remove or vacate such Order;

(g)     By Purchaser, if: (i) there has been a material misrepresentation or breach by Seller of a representation or warranty contained herein and such material misrepresentation or breach, if curable, is not cured within ten days after written notice thereof from Purchaser; (ii) Seller has committed a material breach of any covenant imposed upon it hereunder and, if curable, fails to cure such breach within ten days after written notice thereof from Purchaser; or (iii) any condition to Purchaser's obligations hereunder becomes incapable of fulfillment through no fault of Purchaser or its Affiliates or Representatives and is not waived by Purchaser;

(h)     By Purchaser or Seller, if an Alternative Offer is accepted by Seller;

(i)     By Purchaser, if the Bankruptcy Court does not enter the Sale Order in form and substance satisfactory to Purchaser and its counsel on or before August 23, 2004 or such other date agreed to by Purchaser in writing;

(j)     By Purchaser or Seller, if Seller becomes a proponent or co-proponent of any plan of reorganization under the Bankruptcy Code filed with the Bankruptcy Court which does not contemplate the Acquisition by Purchaser or any of its Affiliates; or

(k)     By Purchaser, if the Bankruptcy Case is converted to a liquidation case under Chapter 7 of the Bankruptcy Code.

**SECTION 6.2.  Effect of Termination; Termination Payments; Expenses.**

(a)     Except as otherwise provided in this Section 6.2 or in Section 4.9, in the event that this Agreement shall be terminated in accordance with Section 6.1, all obligations of the parties under this Agreement shall terminate without further liability of any party hereunder.  Upon termination (other than a Seller termination under Section 6.1(e)(i) and (ii)), the Deposit shall be immediately released by the Escrow Agent to Purchaser via wire transfer in immediately available funds to the account specified by Purchaser.   The Break-Up Fee and Expense Reimbursement shall be payable in accordance with the terms specified in the Procedures Order.   In the event Seller terminates this Agreement in accordance with section 6.1(e)(i) and (ii), Seller shall be entitled to retain the Deposit, but in no event shall the Purchaser be liable to reimburse Seller in excess of the amount of the Deposit.

**SECTION 6.3.  Exclusive Remedy.**  The provisions of Section 6.2 shall be the exclusive remedy of the non-breaching party in the event that this Agreement is

- 28 -

terminated pursuant to Section 6.1. The parties agree that the amounts payable pursuant to Section 6.2 shall be in the nature of liquidated damages.

SECTION 6.4.   **Effect of Termination and Abandonment.**  In the event of termination of this Agreement pursuant to this Article VI, written notice thereof shall as promptly as practicable be given to the other party to this Agreement and this Agreement shall terminate and the Acquisition shall be abandoned without further action by any of the parties hereto.  If this Agreement is terminated as provided herein (a) there shall be no liability or obligation on the part of Seller, Purchaser, or their respective Representatives, and (b) all obligations of the parties shall terminate, except for the obligation of the parties pursuant to Sections 4.7, 4.8 and 4.9, this Article VI, and Sections 8.1, 8.4, and 8.5, which shall survive the termination hereof.  For the avoidance of doubt, in the event that a condition precedent to the obligation of any party is not satisfied, nothing contained herein shall be deemed to require such party to terminate this Agreement, rather than to waive such condition precedent and proceed with the Acquisition.

# ARTICLE VII.
## NO SURVIVAL

**SECTION 7.1.  No Survival of Representations and Warranties.**

(a)    Notwithstanding any right of Purchaser to investigate the affairs of Seller and any Knowledge of facts determined or determinable by Purchaser pursuant to such investigation or right of investigation, Purchaser has the right to rely fully upon the representations, warranties, covenants and agreements of Seller contained in this Agreement or any other Transaction Document, or listed or disclosed on any Schedule hereto or thereto or in any document or instrument delivered in connection with or pursuant to any of the foregoing.

(b)    Except as otherwise provided in this Agreement, all representations and warranties and obligations of the parties hereto in respect thereof shall terminate as of the Closing Date, or upon the termination of this Agreement, as the case may be.

# ARTICLE VIII.

## MISCELLANEOUS

**SECTION 8.1.  Notices.**

(a)    Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally by hand or by recognized overnight courier, telecopied or mailed (by registered or certified mail, postage prepaid) as follows:

(i)      If to Purchaser, one copy to:

CMI America, Inc.
521 Fifth Avenue
20th Floor
New York, New York 10175
Attention:  Mr. Pierre Melin, President
Telecopier: (212) 949-2015

with a simultaneous copy to:

Piper Rudnick LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Attention:  Eric B. Miller, Esquire
                Heather A. Klink, Esquire
Telecopier: (410) 580-3216

(ii)     If to Seller, one copy to:

Erie Power Technologies, Inc.
5300 Knowledge Parkway
Suite 200
Erie, Pennsylvania 16510
Attention:   Mr. Stephen Kang, President
Telecopier:   (814) 897-7166

with a simultaneous copies to:

Schnader Harrison Segal & Lewis LLP
2700 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15219
Attention:     Eric T. Smith, Esquire
Telecopier:    (412) 577-5190

and

Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc.
222 West Grandview Boulevard
Erie, Pennsylvania 16506-4508
Attention:    Lawrence C. Bolla, Esquire
Telecopier:    (814) 833-6753

(b)     Each such notice or other communication shall be effective: (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in Section 8.1(a) (with confirmation of transmission); or (ii) if given by any other means,

when delivered at the address specified in <u>Section 8.1(a)</u>. Any party by notice given in accordance with this <u>Section 8.1</u> to the other party may designate another address (or telecopier number) or person for receipt of notices hereunder. Notices by a party may be given by counsel to such party.

SECTION 8.2. **Entire Agreement; No Other Representations**. This Agreement (including the Schedules and Exhibits hereto) and the Transaction Documents executed in connection with the consummation of the Acquisition contain the entire agreement between the parties with respect to the subject matter hereof and related transactions and supersede all prior agreements, written or oral, with respect thereto. It is the explicit intent of the parties that Seller is making no representation or warranty whatsoever, express or implied, except those representations and warranties contained in this Agreement. Without limiting any representation of Seller contained herein, IT IS UNDERSTOOD THAT PURCHASER TAKES THE PURCHASED ASSETS "AS IS" AND "WHERE IS."

SECTION 8.3. **Waivers and Amendments; Non-Contractual Remedies; Preservation of Remedies**. This Agreement may be amended, superseded, canceled, renewed or extended only by a written instrument signed by the parties hereto. The provisions hereof may be waived only in writing signed by the parties hereto. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege. Except as otherwise provided herein, the rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at Law or in equity.

SECTION 8.4. **Governing Law**. This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania applicable to agreements made and to be performed entirely within such state, without regard to the conflict of laws rules thereof, except that, to the extent applicable, the Bankruptcy Code shall govern.

SECTION 8.5. **Consent to Jurisdiction and Service of Process**. The parties hereto irrevocably: (a) agree that any Claim arising out of this Agreement or related to the performance thereof shall be brought in the Bankruptcy Court, and in the event the Bankruptcy Court declines to exercise jurisdiction, in the state courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania; (b) consent to the jurisdiction of each court in any such Claim; (c) waive any objection which they, or any of them, may have to the laying of venue of any such Claim in any of such courts, and (d) waive the right to a trial by jury in any such Claim. Once a party has filed a Claim in a particular court, the adverse party shall be required to file in such court any Claims arising out of the same facts and circumstances, including all counterclaims.

**SECTION 8.6.  Binding Effect; No Assignment.**  This Agreement and all of its provisions, rights and obligations shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, including any trustee subsequently appointed in the Bankruptcy Case.  This Agreement may not be assigned (including by operation of Law) by either party without the express written consent of Purchaser, in the case of an assignment by Seller, or Seller, in the case of assignment by Purchaser other than to an Affiliate of Purchaser or to a joint venture entity in which Purchaser or an Affiliate of Purchaser owns at least 40% of the equity interests in such joint venture entity, any purported assignment, unless so consented to, shall be void and without effect.  Nothing herein express or implied is intended or shall be construed to confer upon or to give anyone other than the parties hereto and their respective successors and permitted assigns any rights or benefits under or by reason of this Agreement and no other party shall have any right to enforce any of the provisions of this Agreement.

**SECTION 8.7  Further Assurances.**  Seller hereby agrees, without further consideration, and the Sale Order shall expressly authorize Seller, to execute and deliver following the Closing such other instruments of transfer and take such other action as Purchaser may reasonably request in order to put Purchaser in possession of, and to vest in Purchaser, good, valid, and unencumbered title to the Purchased Assets in accordance with this Agreement and to consummate the Acquisition.  Purchaser hereby agrees, without further consideration, to take such other action following the Closing and execute and deliver such other documents as Seller may reasonably request in order to consummate the Acquisition in accordance with this Agreement.

**SECTION 8.8  Additional Post-Closing Covenants.**

(a)    Retention of Books and Records.  For a period ending on the fifth (5th) anniversary of the Closing Date, Purchaser shall not dispose of or destroy any of the Business Records and files of the Business other than in connection with a sale or other disposition of the Business.  If Purchaser wishes to dispose of or destroy any of the business records or files of the Business for any reason, it shall first give sixty (60) days' prior written notice to Seller and Seller shall have the right, at its option and expense, upon prior written notice to Purchaser within such sixty (60) day period, to take possession of the Business Records and files within ninety (90) days after the date of the notice from Seller.

(b)    Access.  Purchaser shall allow Seller's Representatives access to all Business Records and files of Seller or the Business that are transferred to Purchaser in connection herewith, that are reasonably required in the administration of the Bankruptcy Case, preparation for any existing legal proceeding involving Seller or any of Seller's Contracts, an Excluded Liability or an Excluded Asset, or Taxes of Seller, during regular business hours and upon reasonable notice, and Seller's Representatives shall have the right to make copies of any such records and files: provided, however, that any such access or copying shall be had or done in such a manner so as not to interfere with the normal conduct of Purchaser's business operations.

☑041

(c)     Continued Cooperation.    If the Closing occurs at a time when not all Permits have been transferred to Purchaser, the parties shall (i) continue to abide by their obligations hereunder to obtain all such transfers, as soon as practicable, and Seller authorizes Purchaser to use any such Permits in its business operations after the Closing Date.

(d)     Confidentiality.   After the Closing, Seller shall hold in strict confidence, and shall use its best efforts to cause all of its Representatives to hold in strict confidence, all confidential information concerning the Purchased Assets and the Business.

(e)     Allocation of Purchase Price. The Parties agree that the value of the Purchased Assets shall be as set forth on the attachment to IRS Form 8594: Asset Acquisition Statement under Section 1060, including any required amendments or supplements thereto ("Form 8594"). Form 8594 shall be prepared jointly by Purchaser, on the one hand, and Seller, on the other hand, and signed by the Parties on the Closing Date.   The Parties further agree that: (a) the Cash Purchase Price shall be allocated among the Purchased Assets based on the values set forth on such Form 8594; (b) such allocation shall be binding on the Parties for federal, state and local Tax purposes; and (c) Purchaser and Seller shall file Form 8594 with their respective federal income Tax Returns reflecting such allocation.

SECTION 8.9  Exhibits. All Exhibits and Schedules attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

SECTION 8.10  Severability; Parties in Interest. If any provision of this Agreement for any reason shall be held to be illegal, invalid or unenforceable, such illegality shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such illegal, invalid or unenforceable provision had never been included herein. Nothing in this Agreement, express or implied, is intended to confer upon any person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

SECTION 8.11  Counterparts. The Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

## ARTICLE IX.

## DEFINITIONS

SECTION 9.1.  Definitions.  The following terms, as used herein, have the following meanings:

08/27/2004 13:51 FAX                                                                        ☒042

"Acquisition" as defined in the Recitals.

"Affiliate" of any Person means any other Person directly or indirectly through one or more intermediary persons, Controlling, Controlled by or under common Control with such Person and shall include in each case all of such Persons' officers, directors, agents, employees, and subsidiaries.

"Agreement" or "this Agreement" means, and the words "herein", "hereof" and "hereunder" and words of similar import refers to, this agreement as it from time to time may be amended.

"Alternative Offer" as defined in Section 4.12(a) of this Agreement.

"Assets" means properties, rights, interests and assets of every kind, real, personal or mixed, tangible and intangible, used or usable by Seller in the Business.

"Assigned Contracts" as defined in Section 1.1(a)(iv) of this Agreement.

"Assumed Liabilities" as defined in Section 1.3 of this Agreement.

"Bankruptcy Case" as defined in the Recitals.

"Bankruptcy Code" means Chapter 11 of title 11 of the United States Code, 11 U.S.C. Section 101-1330, as amended.

"Bankruptcy Court" as defined in the Recitals.

"Bechtel Contract" means that certain agreement between Bechtel International, Inc. and Aalborg Industries, Inc. as Purchase Order No.: 24507-410-POA-MBPR-00001 dated 12 June 00.

"Bidding Procedures" as defined in the Recitals.

"Break-Up Fee and Expense Reimbursement" as defined in the Procedures Order.

"Business" as defined in the Recitals.

"Business Records" as defined in Section 1.1(a)(iii) of this Agreement.

"Cash and Cash Equivalents" has the meaning ascribed to such terms under GAAP.

"Cash Purchase Price" as defined in Section 1.5(a)(i) of this Agreement.

"Charter" means, in the case of any corporation, the certificate of incorporation, articles of incorporation or charter of a corporation, howsoever denominated under the laws of the jurisdiction of its incorporation as amended or supplemented and as currently in effect.

"Claims" as defined in Section 2.11 of this Agreement.

"Closing" as defined in Section 1.8 of this Agreement.

"Closing Date" as defined in Section 1.8 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, indenture, note, bond, lease, conditional sale contract, mortgage, license, franchise, instrument, commitment or other binding arrangement or obligation, whether written or oral.

"Control," with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, by or through stock ownership, agency or otherwise, or pursuant to or in connection with an agreement, arrangement or understanding (written or oral) with one or more other Persons by or through stock ownership, agency or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case by the Office of the United States Trustee.

"Cure Payment Amounts" as defined in Section 1.7 of this Agreement.

"Customer Assumption Order" as defined in Section 5.3(h) of this Agreement.

"Debts" means (i) money borrowed by Seller from any Person; (ii) any indebtedness of Seller arising under leases required to be capitalized under GAAP or evidenced by a note, bond, debenture or similar instrument; (iii) any indebtedness of Seller arising under purchase money obligations or representing the deferred purchase price of property and services (other than accounts payable and current trade payables incurred in the ordinary course of the Business); and (iv) any Liability of Seller under any guaranty, letter of credit, performance credit or other agreement having the effect of assuring a creditor against loss.

"Deposit" as defined in Section 1.6 of this Agreement.

"Due Diligence Period" means the period commencing on the date hereof through the earlier of August 16, 2004 or the date of the termination of this Agreement as provided herein.

"Enforceability Exceptions" as defined in Section 2.2 of this Agreement.

"ERISA" as defined in Section 2.13(a) of this Agreement.

"ERISA Affiliate" as defined in Section 2.13(a) of this Agreement.

"Escrow Agent" means Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc.

- 35 -

"Estate" means property of the Seller as defined in Section 541 of the Bankruptcy Code.

"Excluded Assets" as defined in Section 1.2 of this Agreement.

"Excluded Claims" as defined in Section 1.2(e) of this Agreement.

"Excluded Contracts" as defined in Section 1.2(d) of this Agreement.

"Exxon Sarnia Contract" means that certain agreement between Imperial Oil and Aalborg Industries, as Contract Number: 46011579, dated April 30, 2002. "Financial Reporting Materials" as defined in Section 2.5 of this Agreement.

"Form 8594" as defined in Section 8.8(e) of this Agreement.

"GAAP" means generally accepted accounting principles applied on a consistent basis in effect on the date hereof as set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States.

"Governmental Bodies" as defined in Section 2.16 of this Agreement.

"Insurance Policies" as defined in Section 2.15 of this Agreement.

"Intellectual Property Rights" as defined in Section 2.10 of this Agreement.

"IRS" means the Internal Revenue Service.

"Knowledge" means the actual knowledge of Stephen Kang, Daniel Levstek and Tracey Peterson, in each case after reasonable inquiry; and "Know," "Knows," and "Known" shall have meanings correlative to the foregoing.

"Laws" as defined in Section 2.16 of this Agreement.

"Liability" means any direct or indirect indebtedness, liability, assessment, claim, loss, damage, deficiency, obligation or responsibility, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, actual or potential, contingent or otherwise (including any liability under any guaranties, letters of credit, performance credits or with respect to insurance loss accruals).

"Lien" means, with respect to any Asset, any mortgage, lien (including mechanics, warehousemen, laborers and landlords liens), claim, pledge, charge, security interest, preemptive right, right of first refusal, option, judgment, title defect or encumbrance of any kind in respect of or affecting such Asset.

"Major Customers" as defined in Section 2.19 of this Agreement.

"Major Suppliers" as defined in Section 2.19 of this Agreement.

"Material Adverse Effect" means, with respect to Seller, any change or effect that is materially adverse to the Business, results of operation, properties, financial condition or Purchased Assets, taken as a whole; other than (a) general changes in the U.S. economy, (b) general changes in the U.S. power industry or (c) any change or effect resulting directly or indirectly from: (i) the Bankruptcy Case; or (ii) this Agreement or the transactions contemplated hereby or the announcement thereof.

"Orders" as defined in Section 2.16 of this Agreement.

"Permits" as defined in Section 2.17 of this Agreement.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Procedures Order" as defined in the Recitals.

"Purchased Assets" as defined in Section 1.1(a) of this Agreement.

"Purchase Price" as defined in Section 1.5(a) of this Agreement.

"Purchaser" as defined in the first paragraph of this Agreement.

"Real Property" as defined in Section 2.8(a) of this Agreement.

"Representatives" as defined in Section 4.2 of this Agreement.

"Required Consents" as defined in Section 2.3 of this Agreement.

"Sale Motion" as defined in the Recitals.

"Sale Order" as defined in Section 4.11(a) of this Agreement.

"Seller" as defined in the first paragraph of this Agreement.

"Seller Plans" as defined in Section 2.13(a) of this Agreement.

"Tax" (including, with correlative meaning, the terms "Taxes" and "Taxable") means (i) any net income, gross income, gross receipts, sales, use, ad valorem, transfer, transfer gains, franchise, profits, license, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, rent, recording, registration, occupation, premium, real or personal property, escheat, intangibles, environmental (including taxes under Code § 59A) or windfall profits tax, alternative or add-on minimum tax, capital stock, customs duty or other tax, fee, duty, levy, impost, assessment or charge of any kind whatsoever (including but not limited to taxes assessed to real property and water and sewer rents relating thereto), together with any interest and any fine, penalty, addition to tax or additional amount or deductions imposed by any

Governmental Body (domestic or foreign) (a "Tax Authority") responsible for the imposition of any such tax, whether disputed or not, including any liability arising under any tax sharing agreement, with respect to Seller, the Business or the Assets (or the transfer thereof); (ii) any liability for the payment of any amount of the type described in the immediately preceding clause (i) as a result of Seller being a member of an affiliated or combined group with any other corporation at any time on or prior to the Closing Date; and (iii) any liability of Seller for the payment of any amounts of the type described in the immediately preceding clause (i) as a result of a contractual obligation to indemnify any other Person.

"Tax Authority" as defined in the definition of "Tax."

"Tax Return" means any return or report (including elections, declarations, disclosures, schedules, attachments, estimates and information returns) relating to Taxes required to be supplied to any Tax Authority, and including any amendment thereof.

"Transaction Documents" means, collectively, this Agreement, and each of the other agreements, certificates, schedules, and instruments to be executed and/or delivered by all or some of the parties hereto in connection with the consummation of the Acquisition.

"Wind Down Tasks" as defined in Section 5.3(f) of this Agreement.

**SECTION 9.2.  Interpretation.**  Unless the context otherwise requires, the terms defined in Section 9.1 shall have the meanings herein specified for all purposes of this Agreement, applicable to both the singular and plural forms of any of the terms defined herein. All accounting terms defined in Section 9.1, and those accounting terms used in this Agreement not defined in Section 9.1, except as otherwise expressly provided herein, shall have the meanings customarily given thereto in accordance with GAAP. When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement unless otherwise indicated. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

*[Signatures appear on next page]*

- 38 -

08/27/2004 13:53 FAX                                        ☒047
Tuesday, August 03, 2004 11:24 AM         949-492-2993              p.02

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date first above written.

SELLER:

ERIE POWER TECHNOLOGIES, INC.

By:        *Stephen King*
Name:      Stephen King
Title:          President

PURCHASER:

CMI AMERICA, INC.

By:        _____
Name:      _____
Title:     _____

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER:

ERIE POWER TECHNOLOGIES, INC.

By: _____
Name: _____
Title: _____

PURCHASER:

CMI AMERICA, INC.

By: _____
Name: _____
Title: _____

*Pierre Melin*
*President & CEO*
*august 3rd 2004*

- 39 -