## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>        Plaintiff<br><br>v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>        Defendant. | CIVIL ACTION<br><br>No. 04-CV-325E<br><br>Judge Sean J. McLaughlin<br><br>JURY TRIAL DEMANDED |

## DEFENDANT/COUNTER-PLAINTIFF VICTORY ENERGY OPERATIONS' SECOND AMENDED COUNTERCLAIM

Defendant, Victory Energy Operations, LLC, ("VEO") by and through its attorneys Christopher T. Sheean of Wildman Harrold Allen & Dixon LLP, and G. Jay Habas of Marshall, Dennehey, Warner Coleman & Goggin, for its Second Amended Counterclaim against Plaintiff/Counter-Defendant Indeck Keystone Energy, LLC's ("IKE") states as follows:

## AMENDED COUNTERCLAIM

Defendant/Counter-Plaintiff Victory Energy Operations, LLC ("VEO"), for its Second Amended Counterclaim against Plaintiff/Counter-Defendant Indeck Keystone Energy LLC ("IKE"), states as follows:

### Parties

1.      VEO is a Delaware Limited Liability Corporation with its principal place of business at 10701 East 126th Street, North Collinsville, Oklahoma 74021.

2.      IKE is a Delaware limited liability company with an office and principal place of business located at 5300 Knowledge Parkway, Suite 200, Erie, Pennsylvania 16510-4660.

EXHIBIT

H

## The License Agreement

3.      On or about January 7, 2003, VEO and Erie Power Technologies, Inc.

("EPTI") entered into a contract to license to VEO the right to use certain software and related

trademarks to enable VEO to manufacture, market and sell boilers in North America (the

"License Agreement").  (A copy of the License Agreement is attached hereto as Exhibit A).

4.      Specifically, the License Agreement provides:

Licensor hereby grants to Licensee:
(i)      The exclusive license to manufacture the Products and to offer, sell, and
install the Products so manufactured, and to use Technical Information in
connection therewith, within the Exclusive Territory.  Licensee understands and
agrees, however that Licensor reserves the right to itself to offer, sell,
manufacture, and install the Products in the Exclusive Territory in the following
cases:
1.  if explicitly requested by the client(s), or
2.  Licensee's capabilities to meet the requirements by any client are significantly
    diminished as determined by mutual agreement of the parties.
In these cases, the Parties will also agree on the best practical cooperation and
support to be provided by Licensee and Licensee's most reasonable offer/order
share

(License Agreement, Ex. A, at ¶ 2a).

5.      The License Agreement defines "Products" as "natural circulation,

industrial watertube package steam generators with a steam capacity range beginning at 29,000

pph up to and including 150,000 pph.  Products shall include but not be limited to the items set

forth in Annex. 1.  If Licensee receives inquires which are not in Licensor's range of Products,

subject to and prior notice to Licensor, Licensee will be free to enter into separate alternative

agreements."  (License Agreement, Ex. A, at ¶ 1a).

6.      Moreover, pursuant to the terms of the License Agreement, "Exclusive

Territory" means United States, Canada and Mexico.  (License Agreement, Ex. A, at ¶1d).

7.    Under the requirements of the License Agreement, EPTI provided to VEO a set of software programs and related drawings and information, defined in the License Agreement as "Technical Information."

8.    The License Agreement also grants VEO the right to use EPTI's marks in conjunction with the manufacturing, marketing and sales of the Products. Accordingly, the License Agreement provides:

> Trademarks
>
> 15.a)    Grant of License. For the duration of this Agreement, Licensee shall be permitted to use the Mark royalty-free on the Products manufactured by Licensee. The Mark shall be affixed to a plate appearing on each Product supplied by Licensee upon which there shall be an indication that the Products were supplied by Licensee under license from Licensor. For the duration of this Agreement, Licensee also shall be permitted to use the Mark in marketing, advertising, and sales activities related to the Product manufactured by Licensee

9.    The License Agreement grants VEO the limited right to use the trademark KEYSTONE® in connection with the manufacture, marketing and sales of the Products.

## COUNT I

### (Declaratory Judgment)

10.    Pursuant to the terms of the License Agreement, VEO has manufactured, marketed and sold natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph, under the trademark KEYSTONE® since January 7, 2003.

11.    VEO has never manufactured or sold any products under the trademark KEYSTONE® or any other mark owned by EPTI or its successors-in-interest, other than pursuant to a license granted by EPTI.

12.    Moreover, VEO has never manufactured or sold any products using the Technical Information, other than pursuant to a license granted by EPTI.

13.    There is an actual controversy between the parties as to whether VEO has sold any products using the intellectual property and/or trade secrets of EPTI or IKE outside the rights granted under the License Agreement, and this Court may enter a declaratory judgment pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Counter-Plaintiff Victory Energy Operations, LLC respectfully demands judgment in its favor and against Indeck Keystone Energy, LLC.

## COUNT II

### (Breach of Contract)

14.    VEO incorporates by reference and realleges the preceding paragraphs of this Counterclaim, as though the same were set forth fully herein

15.    Pursuant to the License Agreement, EPTI granted to VEO "an **exclusive license** to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory." (License Agreement, Ex. A, at ¶2a).

16.    IKE has represented to VEO that, effective September 8, 2004, it is the Licensor under the License Agreement.

17.    As the successor-in-interest to EPTI's rights and obligations under the License Agreement, IKE is bound by the terms of the License Agreement.

18.    Among its rights and obligations, IKE is precluded, except in two narrow exceptions, from manufacturing, marketing or selling in North America, any natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph until the expiration of the License Agreement.  (License Agreement, Ex. A, at ¶ 2a).

19.    On information and belief, IKE, directly and through its predecessors-in-interest, has marketed and attempted to sell items that fall within the definition of "Products" under the License Agreement that VEO was granted an exclusive license to manufacture, market and sell.

20.    IKE's attempts to market and sell Products is in direct violation of the License Agreement, has damaged VEO's reputation, and has caused damage to VEO.

**WHEREFORE**, Counter-Plaintiff Victory Energy Operations, LLC respectfully demands judgment in its favor and against Indeck Keystone Energy, LLC.

## COUNT III

(Intentional Interference With Contractual Relations)

21.    VEO incorporates and realleges Paragraphs 1-19 of this Counterclaim, as though the same were set forth fully herein.

22.    VEO and IKE are competitors in the design, manufacturing and sale of steam generating equipment, including industrial boilers.

23.    In July 2003, VEO and Christian Power Equipment ("CPE"), located in Walnut Creek, California, entered into an agreement for CPE to provide sales representation to VEO for certain steam generating equipment and related services (the "CPE Agreement"). A true and correct copy of the CPE Agreement is attached hereto as Exhibit B.

24.    Under the terms of the CPE Agreement, CPE, among other things, solicited orders and provided limited support services to customers on behalf of VEO within a defined territory.

25.    The CPE Agreement defined "Territory" to include counties North of San Luis Obispo, Fresno, and Inyo in California, and the entire states of Alaska, Idaho, Nevada,

Oregon, and Washington. CPE Agreement ¶ 1. CPE was a unique representative of VEO with

extensive experience within the various industrial boiler markets in the Territory. CPE's

longstanding relationships with the customers within such markets provided a competitive

advantage to VEO.

26.    VEO and CPE had been performing under the Representative Agreement

since its execution in July 2003.

27.    On information and belief, IKE was aware of the CPE Agreement between

VEO and CPE.

28.    On information and belief, CPE also represented IKE in the sale of after

market parts related to steam generating equipment, for which CPE received commissions for

such sales.

29.    In January 2005, IKE, through its agents, stated to Alan Christian, the

owner of CPE, that if CPE did not cancel the Representative Agreement, IKE would terminate

CPE's representation of IKE in the sale of after market parts relating to steam generating

equipment, which was worth $100,000 annually to CPE.

30.    As a result of IKE's statements to Alan Christian, CPE notified VEO of its

intent to terminate the Representative Agreement on March 9, 2005, based on its fear that IKE

would cease to do business with CPE.

31.    IKE's conduct was intentional and designed to interfere with VEO's

Representative Agreement with CPE and ultimately caused VEO to lose the ability to market its

steam generating equipment and related services in the Territory.

32.    As a direct and proximate result of IKE's conduct, VEO has lost the ability to market or sell steam generating equipment and related services within the Territory, and has suffered damages through loss of profits and loss of market share.

33.    In March 2003, VEO entered into a similar Representative Agreement with Power Systems, Inc. of Farmington Hills, Michigan, (the "PSI Agreement") pursuant to which Power Systems provided sales representation to VEO for certain steam generating equipment and related services in the state of Michigan.  A true and correct copy of the PSI Agreement is attached hereto as Exhibit C.

34.    Under the terms of the PSI Agreement, PSI, among other things, solicited orders and provided limited support services to customers on behalf of VEO within the defined territory of Michigan.

35.    VEO and PSI had been performing under the PSI Representative Agreement since its execution in March 2003.

36.    On information and belief, IKE was aware of the Representative Agreement between VEO and PSI.

37.    On information and belief, PSI also represented IKE in the sale of after market parts related to steam generating equipment, for which PSI received commissions for such sales.

38.    In February 2005, IKE, through its agents, stated to Ed Eidt, President of PSI, that if PSI did not cancel the Representative Agreement, IKE would terminate PSI's representation of IKE in the sale of after market parts relating to steam generating equipment.

39.    As a result of IKE's statements to Ed Eidt, Mr. Eidt notified VEO on February 25, 2005, of its intent to terminate the Representative Agreement, based on its fear that IKE would cease to do business with PSI.

40.    IKE's conduct was intentional and designed to interfere with VEO's Representative Agreement with PSI and ultimately caused VEO to lose the ability to market its steam generating equipment and related services in the Territory.

41.    As a direct and proximate result of IKE's conduct, VEO has lost the ability to market or sell steam generating equipment and related services within the Territory, and has suffered damages through loss of profits and loss of market share.

42.    VEO has a similar representative agreement with Thermal & Hydraulic Equipment in Toronto, Canada ("THE"), pursuant to which THE, among other things, solicits orders and provides limited support services to customers on behalf of VEO within a defined territory.

43.    On information and belief, IKE is aware of the existence of a contractual relationship between VEO and THE.

44.    On or about February 1, 2005, Chris Petcos of IKE contacted Ian Milligan at THE and pressured Milligan to drop VEO as a supplier or lose the rights and abilities to sell Indeck after market parts of any kind. Milligan refused to succumb. Petcos then said in substance, "Indeck is in a lawsuit with Victory right now that Indeck is going to win. When it is over, Victory will not be able to sell boilers at all."

WHEREFORE, Counter-Plaintiff Victory Energy Operations, LLC respectfully demands judgment in its favor and against Indeck Keystone Energy, LLC.

## COUNT IV

(Violation of California Business & Professional Code § 17200 *et seq.*)

45.    VEO incorporates and realleges Paragraphs 1-19 and 23-32 of this Amended Counterclaim, as though the same were set forth fully herein

46.    VEO and IKE are "persons" as defined under California Bus & Prof. Code § 17201.

47.    IKE's conduct in inducing CPE's termination of the Representative Agreement constitutes an unlawful business practice under California Business & Profession Code § 17200.

**WHEREFORE**, Counter-Plaintiff Victory Energy Operations, LLC respectfully demands judgment in its favor and against Indeck Keystone Energy, LLC.

## COUNT V

(Intentional Interference With Prospective Economic Advantage)

48.    VEO incorporates and realleges Paragraphs 1-24 of this Amended Counterclaim, as though the same were set forth fully herein.

49.    On May 17, 2004, VEO and EPTI entered into an agreement titled an "Agreement on Cooperation for Project Outside of License Agreement" ("Variance Agreement") to grant VEO a variance to the scope definition of the EPTI/VEO license agreement, dated December 31, 2003. The Variance Agreement allowed VEO to sell an O type boiler under the Keystone name to the University of Notre Dame, located in South Bend, Indiana.

50.    After the Variance Agreement was signed, VEO submitted a bid to the University of Notre Dame for the sale of an O type boiler. By October 2004, VEO became one of two suppliers who were under final consideration by the University of Notre Dame for the

award of a contract to build an O type boiler ("Notre Dame Contract"). The Notre Dame

Contract represented a lucrative opportunity for VEO.

51.    VEO was reasonably likely to be awarded the Notre Dame Contract

because of the success and reputation of the Keystone boiler. VEO's lone competitor had

significantly less experience and offered a product with an inferior history and service record.

52.    IKE was aware that VEO had submitted a bid to the University of Notre

Dame to build an O type boiler.

53.    On information and belief, IKE was aware of the Variance Agreement

between VEO and EPTI, which specifically gave VEO the right to sell an O type boiler to the

University of Notre Dame.

54.    On information and belief, in October 2004, IKE knowingly made

statements to a University of Notre Dame official in order to prevent VEO from being awarded

the Notre Dame Contract. Specifically, IKE, through one of its representatives, Jeff Coale,

stated to Paul Kempf, the Director of Utilities at the University of Notre Dame, that VEO lacked

authority to sell an O type boiler to the University of Notre Dame. Mr. Coale also stated to Mr.

Kempf that VEO lacked the engineering capability to complete the Notre Dame contract.

55.    Mr. Coale's statements to Mr. Kempf were false, and were known to be

false by IKE and Mr. Coale at the time they were made.

56.    As a result of IKE's statements to Mr. Kempf, shortly thereafter, VEO was

eliminated from further consideration, and the Notre Dame Contract was awarded to the other

company under final consideration by the University of Notre Dame.

57.    IKE's conduct was intentional and designed to prevent the University of

Notre Dame from awarding the Notre Dame Contract to VEO. IKE's conduct was unjustified

because IKE was not under consideration to be awarded the Notre Dame contract and had no direct pecuniary interest in the outcome of the Notre Dame Contract. IKE's conduct was motivated to deprive VEO of potential new business and ultimately to eliminate VEO as a competitor in the design, manufacturing and sale of steam generating equipment, including industrial boilers.

58.    As a result of IKE's wrongful conduct, VEO lost the opportunity to enter into the Notre Dame Contract and the profits that would have been generated thereunder.

**WHEREFORE,** Counter-Plaintiff Victory Energy Operations, LLC respectfully demands judgment in its favor and against Indeck Keystone Energy, LLC.

## COUNT VI

### (Defamation)

59.    VEO incorporates and realleges Paragraphs 1-19 and 49-58 of this Amended Counterclaim, as though the same were set forth fully herein.

60.    Mr. Coale's statements to Mr. Kempf were defamatory *per se* in that they assailed VEO's business methods by falsely asserting that VEO did not have the engineering capabilities to complete a job within the scope of the Notre Dame Contract.

61.    As a result of IKE's conduct VEO has also suffered damage to its business reputation.

**WHEREFORE,** Counter-Plaintiff Victory Energy Operations, LLC respectfully demands judgment in its favor and against Indeck Keystone Energy, LLC.

## COUNT VII

(Declaratory Judgment)

62.     VEO incorporates and realleges Paragraphs 1-10 of this Second Amended Counterclaim, as though the same were set forth fully herein.

63.     In Clause 16(b) of the License Agreement, it provides that "after the expiration of the initial three (3) year term, this Agreement will be continued from year to year, in accordance with the terms and conditions of this Agreement unless notice is given in writing by one party to the other at least sixty (60) days before the expiration of the original or extended period that the notifying party does not intend to renew or extend this Agreement." (License Agreement, Ex. A, at Clause 16(b)).

64.     On October 28, 2005, IKE notified VEO for the first time of its intention not to renew the License Agreement.

65.     In its notice of non-renewal, IKE stated that "VEO must comply with all of its obligations after termination described in Clause 17 and elsewhere in the Agreement. In particular, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement, or to use the Mark." (License Agreement, Ex. A, at Clause 17).

66.     In fact, section 17(a) states "after any termination of this Agreement by Licensor in accordance with the provisions of Clause 16(c) hereof, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement . . . or to use the Mark."

67.     IKE did not effectuate a termination of the License Agreement in accordance with the provisions of Clause 16(c). Clause 16(c) reads "in the event Licensee has

not received during the first two (2) years a minimum of 5 orders for the Products, Licensor has

the right to terminate the Agreement." IKE clearly effectuated a non-renewal under the terms of

Clause 16(b).

68.     Following the expiration of the License Agreement, VEO is entitled to

compete fairly and openly with Indeck Keystone Energy by designing, manufacturing, marketing

and selling natural circulation, industrial watertube package steam generators utilizing

technology obtained from the public domain, or developed by VEO employees and independent

contractors.

69.     Given the language in IKE's letter of non-renewal, VEO has a legitimate

concern that as of January 8, 2006, IKE will attempt to foreclose VEO from manufacturing,

marketing and selling natural circulation, industrial watertube package steam generators utilizing

technology obtained from the public domain, or developed by VEO employees and independent

contractors.

70.     There is an actual controversy between the parties as to whether the

License Agreement precludes VEO from manufacturing natural circulation, industrial watertube

package steam generators utilizing technology obtained from the public domain, or developed by

VEO employees and independent contractors, and this Court may enter a declaratory judgment

pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Counter-Plaintiff Victory Energy Operations, LLC respectfully

demands judgment in its favor and against Indeck Keystone Energy, LLC, and more specifically

demands the following relief:

(a)     Declaring that VEO's sales of boilers using the KEYSTONE ® trademark were
        authorized pursuant to the License Agreement;

(b)     Declaring that following the expiration of the License Agreement, VEO is entitled
        to manufacture, market and sell natural circulation, industrial watertube package

steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors.

(c)    Preliminarily and permanently enjoining IKE from further acts in violation of the License Agreement, including, without limitation, ordering IKE to cease all efforts to market or sell the Licensed Boilers until expiration or termination of the License Agreement;

(d)    Preliminarily and permanently enjoining IKE from inducing any of VEO's sales representatives to terminate their representation of VEO;

(e)    Preliminarily and permanently enjoining IKE from making any statement to any actual or potential VEO customer regarding VEO's authority to build any steam generated equipment or VEO's capabilities or ability to build such equipment;

(f)    Ordering an accounting of all sales and profits which IKE has realized or will hereafter realize as a result of marketing for sale or selling the Licensed Boilers during the License Period.

(g)    Awarding VEO its actual damages in an amount to be proven at trial, including, but not limited to actual damages and lost sales suffered by VEO as a result of IKE's misconduct, as well as any profits of IKE that are attributable to the above-described misconduct and not otherwise taken into account in computing the aforementioned actual damages, plus interest;

(h)    Awarding VEO any additional amounts IKE received as an unjust enrichment for its unlawful acts;

(i)    Awarding VEO its attorneys' fees, expenses and costs of suit incurred in this action; and

(j)    Awarding VEO such other and further relief as the Court deems just, equitable and appropriate under the facts and circumstances of this matter.

Dated: November 4, 2005

Christopher T. Sheean
WILDMAN HARROLD ALLEN & DIXON LLP
225 West Wacker Drive, Suite 2800
Chicago, IL 60606
T: (312) 201-2000
F: (312) 201-2555

Counsel for Victory Energy Operations, LLC

Respectfully Submitted,

/s/ Christopher T. Sheean
G. Jay Habas, Esquire
Marshall, Dennehey, Warner
Coleman & Goggin
1001 State Street, Suite 1400
Erie, PA  16506
(814) 461-7800
PA  ID No. 55581

LOCAL COUNSEL

00001

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   INDECK KEYSTONE ENERGY, LLC,      :
 3      Plaintiff                    :
                                     :
 4      v.                 : Case No. 04-325 Erie
                                     :
 5 VICTORY ENERGY OPERATIONS, LLC,   :
        Defendant                    :
 6

 7

 8        Deposition of ROBERT JOHN GDANIEC, taken before

 9   and by Sondra A. Black, Notary Public in and for the

10   Commonwealth of Pennsylvania, on Tuesday, November 8,

11   2005, commencing at 9:06 a.m., at the offices of

12   Marshall Dennehey Warner Coleman & Goggin, 1001 State

13   Street, Erie, Pennsylvania 16501.

14

15

16 For the Plaintiff:

17    John K. Gisleson, Esquire
      Schnader Harrison Segal & Lewis, LLP
18    Fifth Avenue Place
      120 Fifth Avenue, Suite 2700
19    Pittsburgh, PA 15222

20 For the Defendant:

21    Christopher T. Sheean, Esquire
      Wildman Harrold Allen & Dixon, LLP
22    225 West Wacker Drive
      Chicago, IL 60606
23

24
          Reported by Sondra A. Black
25        Ferguson & Holdnack Reporting, Inc.
```

**EXHIBIT**

I

**Gdaniec, Steven (11-08-05)**          **Page 1**

00096

1    (Gdaniec Deposition Exhibit No. 17 marked for

2    identification.)

3    A.  Yes, I do.

4    Q.  And then, above it says, "Bob, Attached is a drawing

5    list for saturated refractory front and rear wall unit.  Also

6    attached is a drawing list of a superheated wall unit with

7    all welded wall construction.  Hours and requirements are

8    included in the list as well.  Thanks, Dave."  Do you see

9    that?

10   A.  Yes, I do.

11   Q.  Why were you asking for the drawing list from Dave

12   Briggs?

13   A.  In response to a question probably from Victory with

14   regards to how many drawings does it take to do these

15   boilers, what's typical there for a saturated versus a

16   superheated so they could understand and start to lay out

17   their course of engineering work.

18   Q.  Did you provide these lists to Victory Energy?

19   A.  I don't recall.

20   Q.  Did you think it was a good idea to help Victory

21   Energy to develop their engineering capacity so that they

22   could build their own boilers and not have to come back to

23   Erie Power with every engineering question?

24   A.  Yes.  That was an expectation under the license

25   agreement, that they had to be a qualified company to do this

**Gdaniec, Steven (11-08-05)**                    **Page 96**

00097

1  on their on.

2  Q.  And you wanted to do whatever you could to make sure

3  that Victory Energy's engineering capabilities met that

4  expectation, correct?

5  A.  Yes.  Correct.

6  Q.  Mr. Gdaniec, you've been handed Exhibit 18, VEO1049

7  and 1050.  It's a series of e-mails, the first one and second

8  one -- both of which dated February 12, 2004.  And the first

9  part is a forward back to you from Mark.  It says, "Bob, Any

10  progress to date?  Mark."  With respect to the Keystone D

11  boiler opportunity that we previously discussed in Exhibit

12  16.  Do you see that?

13      (Gdaniec Deposition Exhibit No. 18 marked for

14      identification.)

15  A.  Yes, I do.

16  Q.  And you write back to Mark, I'm interested in the

17  fifth paragraph down, "The mechanical design does not meet

18  the 1-inch maximum bar width between tubes, and please note

19  the original Kolon boiler had refractory front with tube and

20  tile rear walls, but we could relatively easily change the

21  design to a welded front and rear wall for this design."  Do

22  you see that?

23  A.  Yes, I do.

24  Q.  Did Mark ask you whether or not this could be a

25  welded wall boiler?

00124

1    identification.)

2    A.  Okay.

3    MR. GISLESON:  I apologize, the handwriting with

4    the date on the top is mine.

5    A.  Okay.

6    Q.  Mr. Gdaniec, did you prepare this document?

7    A.  Yes, I did.

8    Q.  Did you forward it to Mark White on or about March

9  26, 2004?

10    A.  Yes, I did.

11    Q.  Do you see that under the term "Current License" it

12  says, "Provides VEO the right to market and manufacture the

13  standard M series product within a defined size and capacity

14  range with an extension to permit addition of superheaters to

15  the standard line."?

16    A.  Yes.

17    Q.  Below that it says, "Extended License Option:  This

18  is the Annex 1 description.  This portion expands

19  availability of the products to the full O boiler line and D

20  boiler line within a defined size and capacity range while

21  preserving the original agreement scope and general

22  conditions.  This would give VEO access to a wide range of

23  sizes, pressure, and temperature capacity, the use of welded

24  wall, as well as provide access to steam purity equipment

25  which is not part of the current license scope."  Do you see

00133

1   you guys to catch up. And we're saying, regardless of the

2   burden on you, we still want to be part of that to look at

3   it. Because the bigger concern was, because of the name of

4   the Keystone boiler, to end up getting something out there

5   that was negative to the product line that we could have

6   stopped or maybe enhanced better or done something further.

7       Q. Are you aware of any instance where Victory Energy

8   sold a boiler that had any modifications, improvements,

9   whatever you want to call it, that negatively impacted the

10  performance of the boiler?

11      A. Not that negatively impacted the performance of the

12  boiler, no. However, we were aware of some quality issues

13  that had been in boilers they fabricated.

14      Q. What quality issues were you aware of?

15      A. There was a project I think they did for the cancer

16  institute -- Rockwell Cancer Institute, I believe, that one

17  of our subcontractors was called in on site to try to make

18  some corrections. Nickelson and Hall was the contractor.

19  And it was reported back to us of things that were improperly

20  assembled or fabricated in the boiler parts that needed to be

21  corrected. Nickelson and Hall was a company we'd used in the

22  past to fabricate our boilers when we sold them.

23      Q. Where was the Rockwell Cancer Institute located?

24      A. I don't remember the site.

25      Q. When did you first hear about this?

**Gdaniec, Steven (11-08-05)**          **Page 133**

00001

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

  INDECK KEYSTONE ENERGY, LLC,    :

3    Plaintiff        :

                    :

4    v.           : Case No. 04-325 Erie

                    :

5  VICTORY ENERGY OPERATIONS, LLC,   :
      Defendant        :

6

7

8     Videotape deposition of CHRISTOS PETCOS, taken

9  before and by Sondra A. Black, Notary Public in

10  and for the Commonwealth of Pennsylvania, on Wednesday,

11  November 9, 2005, commencing at 8:08 a.m., at the

12  offices of Marshall Dennehey Warner Coleman & Goggin,

13  1001 State Street, Erie, Pennsylvania 16501.

14

15

16 For the Plaintiff:

17    John K. Gisleson, Esquire
    Schnader Harrison Segal & Lewis, LLP
18    Fifth Avenue Place
    120 Fifth Avenue, Suite 2700
19    Pittsburgh, PA 15222

20 For the Defendant:

21    Christopher T. Sheean, Esquire
    Wildman Harrold Allen & Dixon, LLP
22    225 West Wacker Drive
    Chicago, IL 60606
23

24
        Reported by Sondra A. Black
25       Ferguson & Holdnack Reporting, Inc.



EXHIBIT

J

**Petcos, Christos (11-09-05)**        **Page 1**

00147

1    A.  I believe so.  I --

2    Q.  Okay.  And as someone involved in the management of

3  the company, you would expect the company to want to make

4  sure that any changes to boilers licensed under the license

5  agreement would not in any way negatively impact the -- the

6  value of the trademark, correct?

7    A.  Correct.

8    Q.  You want to make sure that any design changes that

9  were made to the boilers would -- would meet with code

10  requirements and satisfy the customers' needs as much as

11  possible, correct?

12    A.  I don't know.  I mean, I don't know what code -- I

13  don't know what customer requirements there are.  That's not

14  up my -- that wasn't my --

15    Q.  Well, as -- as someone involved in the management of

16  the company, you wanted to make sure that the Keystone mark

17  remained a good, strong, and well-respected product mark,

18  correct?

19    A.  Yes.

20    Q.  And if Victory Energy were out there selling

21  substandard products, that would not be in the best interests

22  of Erie Power, would it?

23    A.  If they made modifications from the Annex 1 that

24  would make it substandard, yeah, that would be a problem.

25    Q.  Are you aware of any instance where Victory Energy

00148

1  made modifications to the design of the products as

2  identified in the license agreement that created a

3  substandard product?

4   A.  No.

5   Q.  Mr. Petcos, I've handed you what we've marked as

6  Petcos Exhibit 4, which, for the record, is a series of

7  e-mails, first one dated September 10, 2004, second one

8  September 24, 2004.  And the e-mail on the 10th is from Mark

9  White to you, and it says, "Chris, Good to hear from you

10  regarding the letter.  We ask that you provide us with a copy

11  of the assignment letter.  Your cooperation is appreciated."

12  Do you see that?

13      (Petcos Deposition Exhibit No. 4 marked for

14       identification.)

15   A.  Yes.

16   Q.  Do you recall receiving this e-mail from Mark White?

17   A.  Yes.

18   Q.  Did you have any objection to providing Victory

19  Energy with a copy of the assignment agreement?

20   A.  I think -- I think initially we did not want to

21  provide a copy of the complete sales asset agreement, which

22  was confidential, yes.

23   Q.  Did you think that Victory Energy was entitled to

24  know, on an objective basis, the document that transferred

25  the ownership of the license to a third party?

00001
1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
  INDECK KEYSTONE ENERGY, LLC,   :
3    Plaintiff           :
                       :
4    v.            : Case No. 04-325 Erie
                       :
5  VICTORY ENERGY OPERATIONS, LLC,   :
      Defendant       :
6

7

8        Deposition of STEVEN P. BERNATOWICZ, taken

9    before and by Sondra A. Black, Notary Public in

10    and for the Commonwealth of Pennsylvania, on Monday,

11    November 8, 2005, commencing at 3:17 p.m., at the

12    offices of Marshall Dennehey Warner Coleman & Goggin,

13    1001 State Street, Erie, Pennsylvania 16501.

14

15

16  For the Plaintiff:

17    John K. Gisleson, Esquire
    Schnader Harrison Segal & Lewis, LLP
18    Fifth Avenue Place
    120 Fifth Avenue, Suite 2700
19    Pittsburgh, PA 15222

20  For the Defendant:

21    Christopher T. Sheean, Esquire
    Wildman Harrold Allen & Dixon, LLP
22    225 West Wacker Drive
    Chicago, IL 60606
23

24
        Reported by Sondra A. Black
25    Ferguson & Holdnack Reporting, Inc.

EXHIBIT

K

**Bernatowicz, Steven (11-08-05)**        **Page 1**

00013

1    A.  Everything they would ask.  It would include fuel

2  type, we would have to meet the steam conditions that they

3  asked for, meet any guarantees the company would have sold at

4  the time, or any velocity requirements, pressure

5  requirements -- whatever the customer had.  Sometimes the

6  specs were very large, and sometimes they were a sheet of

7  paper.

8    Q.  I don't want to go off on detours, but I have to

9  know, what are philosophy requirements?

10    A.  I didn't --

11    Q.  Did you say philosophy requirements?

12    A.  No.

13        MR. GISLESON:  Velocity.

14    A.  Velocity.

15    Q.  Velocity.  Okay.

16    A.  Gas and steam.

17    Q.  Not nearly as exciting.

18    A.  Sorry.

19    Q.  Now, at that time, in 1990, 1991, when you started

20  working on the Keystone package boiler line, were those M

21  series boilers?

22    A.  No.

23    Q.  What type of boilers were they?

24    A.  They were O style Keystone boilers, but they were

25  not the M style design.  As I said, the M style was outdated

**Bernatowicz, Steven (11-08-05)**                **Page 13**

00014

1  by then.

2  Q.  What about the M style was out dated?

3  A.  One of the things is that the M style was developed

4  when there weren't economizer systems.  So the boiler would

5  be very large, and they'd have a low gas temperature, which

6  would make it expensive, because it had more surface than

7  you'd need.  When the development of the economizer came

8  around, people started making the boilers smaller to be

9  competitive, and then they'd throw an economizer on the back

10  end, and it would help lower the gas temperature even more

11  without spending a lot of boiler surface.  So just part of

12  upgrading the system as we went over the years.

13  Q.  What else?

14  A.  We were probably, about that time, getting out of

15  the refractory style boilers, trying to get away from them as

16  much as possible; although, not always.  But the larger

17  boilers we would try to get away from the refractory and get

18  into more of a welded style.  Welded wall.

19  Q.  Do you know why Erie Power -- I'm sorry, strike

20  that.  Do you know why Zurn Energy was interested in getting

21  away from a refractory and tangent tube design?

22  A.  The welded wall is a better design.

23  Q.  What makes the welded wall a better design?

24  A.  Well, it's -- I think it's superior in strength.

25  Obviously, if you're welding up the furnace, then you don't

**Bernatowicz, Steven (11-08-05)**                    **Page 14**