## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

        Plaintiff

   v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

        Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

### APPENDIX OF EXHIBITS TO VICTORY ENERGY'S

### MOTION FOR PARTIAL SUMMARY JUDGMENT

A.    Affidavit of Mark J. White, dated January 10, 2006.

B.    Plaintiff's Complaint, dated November 8, 2004.

C.    White Deposition Transcript, dated October 14, 2005.

D.    Kang Deposition Transcript, dated December 13, 2005.

E.    Brewer Deposition Transcript, dated October 13, 2005.

F.    License Agreement between Erie Power Technologies, Inc. and Victory Energy
Operations, LLC, dated January 7, 2003. *(Sealed per order 3-29-06)*

G.    EPTI/CMI Asset Purchase Agreement, dated August 3, 2004.

H.    Victory Energy's Second Amended Counterclaim, dated November 11, 2005.

I.    Gdaniec Deposition Transcript, dated November 8, 2005.

J.    Petcos Deposition Transcript, dated November 9-10, 2005.

K.    Bernatowicz Deposition Transcript, dated November 8, 2005.

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

      Plaintiff

    v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

      Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

**AFFIDAVIT OF MARK J. WHITE**

I, Mark J. White, being duly sworn on oath, depose and state:

1.      I am the General Manager at Victory Energy Operations, LLC ("VEO"), and from 2002 until August 2003, I was the Director of Sales and Marketing at Erie Power Technologies, Inc ("EPTI").

2.      I have personal knowledge of the matters contained in this affidavit.

3.      Direct-fired, watertube boilers have been sold to generate steam for heating and other purposes for over 50 years.

4.      Prior to approximately 1980, the predominate design of watertube boilers involved furnace and convective walls made up of tubes placed side by side in a row, known as a tangent tube design.

5.      These boilers also included a significant amount of insulating material, called refractory, that was needed to keep the outside of the boiler from getting too hot.

6.      By 1980, a new design for watertube boiler walls consisting of furnace and outer wall tubes spaced 3 to 4 or more inches apart, connected by steel bars welded to each tube, known as fined or welded walls had been developed.

EXHIBIT

A

7.    Welded walls improved the boilers' heat retention, and created a seal that prevented flue gas emissions from leaking out of the combustion chamber and boiler, thereby decreasing emissions of noxious gases.

8.    The industry developed water cooled front and rear walls, further improving the emissions and reducing the amount of refractory needed in the boiler.

9.    The utilization of welded walls and water cooled front and rear walls is known in the industry as "full membrane" or "100% membrane."

10.    By 1984, full membrane design became the standard in the boiler industry for watertube package boilers.

11.    Prior to the execution of the license agreement, VEO purchased two (2) Keystone® boilers from EPTI for the Heinz plant in Muscatine, Iowa.

12.    The Heinz boilers each had a steam capacity of up to 75,000 pph, and each had 100% membrane wall design.

13.    EPTI designed and built the Heinz boilers for VEO.

14.    Following the purchase of the Heinz boilers, VEO began discussions with EPTI regarding the possibility of licensing the technology and trademarks to manufacture and sell Keystone® O-style boilers.

15.    After the Agreement was signed, EPTI provided, among other things, the following materials to VEO:

- drawings of the various Keystone® boilers, depicting boilers with 100% membrane wall construction;

- a draft sales manual, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone® M Series boiler;

- a power point presentation, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone® M Series boiler;

2

- the Keystone Design Guide, describing features of the Keystone® M Series boilers with welded walls;

- the KPSC computer program, used by EPTI and VEO to rate boilers, that allowed VEO to rate boilers that incorporated 100% membrane technology.

16.     During the time that IKE was the Licensor, VEO only manufactured, sold or installed items under the Agreement that were natural circulation, industrial watertube package boilers between, but not exceeding, 150,000 lbs. of steam per hour, as delineated in the Agreement.

17.     During the time that IKE was the Licensor, VEO only manufactured, sold, or installed items under the Agreement that were natural circulation, industrial watertube package boilers with steam temperatures up to and including, but not exceeding, 750° Fahrenheit, as delineated in the Agreement.

18.     During the time that IKE was the Licensor, VEO only manufactured, sold, or installed items under the Agreement that were natural circulation, industrial watertube package boilers with design pressures up to and including, but not exceeding, 1,200 lbs. of steam per square inch.

19.     VEO did not utilize any Technical Information in conjunction with the design, manufacture or sale of any item other than those specifically permitted under the Agreement.

20.     Every boiler VEO sold, including the boilers designed and rated by EPTI's engineers, utilized 100% membrane technology, the very technology IKE now claims VEO was not authorized to use in designing or selling the Keystone® boilers.

22.     VEO requested and obtained assistance from EPTI's engineers in designing and rating the first several boilers sold under the Agreement.

3

24.    VEO has made no modifications to the Products that in any way compromised the reliability or performance of the Products.

25.    IKE has accepted and cashed each and every check that VEO tendered to IKE as a royalty payment under the Agreement.

Further affiant sayeth not.  I affirm, under the penalties for perjury, that the foregoing representations are true.

_____
Mark J. White

SUBSCRIBED AND SWORN TO
before me this 20th day of January, 2006.

_____
Notary Public

4

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE  
ENERGY, LLC, a Delaware limited liability  
company,

        Plaintiff,

        v.

VICTORY ENERGY  
OPERATIONS, LLC, a Delaware limited  
liability company,

        Defendant.

CIVIL ACTION

NO. _04-cv-325_ (ERIE)

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel,

hereby files the following Complaint against Defendant, Victory Energy Operations, LLC

("VEO"):

### Nature of Action

1.     This is an action against VEO for trademark infringement, misappropriation of

trade secrets, unfair competition and unjust enrichment, all of which have caused irreparable

harm and substantial damages to IKE, and which will continue to cause irreparable harm and

substantial damages to IKE, unless and until enjoined by this Honorable Court.

**EXHIBIT**

**B**

PTDATA 276364_4

### Parties

2.       IKE is a Delaware limited liability company with an office and principal place of business located at 5300 Knowledge Parkway, Suite 200, Erie, Pennsylvania 16510-4660.

3.       Upon information and belief, VEO is a Delaware limited liability company with an office and place of business located at 302 East 5th Avenue, Owasso, Oklahoma 74055. VEO also maintains in the Commonwealth of Pennsylvania certain resident agents and representatives, whose offices are located at 741 First Avenue, King of Prussia, Pennsylvania 19406, and 4024 Mt. Royal Boulevard, Allison Park, Pennsylvania 15101.

### Jurisdiction and Venue

4.       This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, as well as 15 U.S.C. § 1121, because this action involves federal questions under the Lanham Act, 15 U.S.C. §§ 1114, *et seq*.

5.       This Court has supplemental jurisdiction over all additional claims set forth herein pursuant to 28 U.S.C. § 1367.

6.       Upon information and belief, VEO resides in the Commonwealth of Pennsylvania and in this judicial district. Furthermore, VEO regularly solicits and transacts business in the Commonwealth of Pennsylvania and in this judicial district. Finally, the claims and causes of action set forth herein arise out of acts and/or omissions that were undertaken by VEO in this judicial district and/or directly affect property and entities in this judicial district. Accordingly, this Court has personal jurisdiction over VEO.

7.       Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(a).

PTDATA 276364_4

**Facts**

8.    The Keystone Energy Division of Erie Power Technologies, Inc. ("EPTI") was in the business of designing, developing, testing, building, marketing, and installing water tube and fire tube boilers and related equipment for use in the electricity and power generation industries, as well as industries and entities involved in the co-generation of electricity.

9.    EPTI marketed the aforementioned boilers and related equipment under the trade name and trademark "Keystone®". The Keystone® trademark is registered with the United States Patent and Trademark Office at No. 554,723, and has been in use by EPTI (and its predecessors) since at least February 12, 1952.

10.    In particular, EPTI designed, developed, tested, built, marketed and installed certain specific lines of boilers and related equipment, including aftermarket parts and service, with the following qualities and characteristics (collectively, the "New-Style Boilers"):

(a)    Welded or membrane front, rear and side furnace walls;

(b)    Welded or membrane outer boiler convective walls;

(c)    "O", "D" and "A" style package boilers with rated capacity limits of up to at least 500,000 lbs. of steam per hour, steam temperatures of up to at least 1,000° Fahrenheit, and design pressures of up to at least 1,000 lbs. of steam per square inch;

(d)    Waste Heat Steam Generators with a rated capacity of up to at least 600,000 lbs. of steam per hour; and

(e)    Solid-fuel (coal and lignite, wood and bark, bagasse, municipal solid waste, refuse derived fuel, tires and agricultural waste) Water Tube Steam

3

Generators with a rated capacity of up to at least 600,000 lbs. of steam per hour.

11.    EPTI also designed, developed, tested, built, marketed and installed the so-called "M" series standard package boiler line and related equipment, including aftermarket parts and service, that included the following qualities and characteristics (collectively, the "Old-Style Boilers"):

(a)    Rated capacity limits of between 29,000 and 150,000 lbs. of steam per hour;

(b)    Steam temperatures up to an including 750° Fahrenheit; and

(c)    Design pressures up to and including 1,200 lbs. of steam per square inch.

The New-Style Boilers and the Old-Style Boilers hereinafter are referred to collectively as the "Keystone® Boilers".

12.    In connection with its aforementioned business activities, EPTI developed certain information and data relating to product design, manufacturing processes, product performance, and installation processes for the Keystone® Boilers (the "Keystone® Trade Secrets"). The Keystone® Trade Secrets are confidential, privileged, proprietary, not available to the public, and constitute recognizable trade secrets, which confer substantial benefits and competitive advantages upon the owner thereof.

13.    EPTI also developed its own computer software to aid and otherwise facilitate the marketing, design, alteration, modification, customization, modeling, fabrication, installation, testing, and operation of its products, including the Keystone® Boilers (the "Keystone® Software"). The Keystone® Trade Secrets are an integrated part of the Keystone® Software, are

4

contained within the source code for the Keystone® Software, and otherwise are accessible to any person in possession of or with access to the Keystone® Software.

14.     The Keystone® Software, *inter alia*, also contains a compilation of certain mathematic operations and formulae, which are essential for the use, interpretation, application, and manipulation of the Keystone® Trade Secrets contained therein.  The Keystone® Software has been in use by EPTI for several years, and its accuracy and operation have been verified, all at great expense and effort by EPTI.

15.     The Keystone® Software is confidential, privileged, proprietary, not available to the public, and constitutes a recognizable trade secret, which confers substantial benefits and competitive advantages upon the owner thereof.

16.     On or about September 8, 2004, IKE acquired all of the intellectual property at issue in this action (including, but not limited to the Keystone® Trade Secrets, the Keystone® Software, and the exclusive ownership and right to use the Keystone® trademark) from CMI EPTI LLC.  CMI EPTI LLC previously had acquired all of the assets of the then bankrupt EPTI through an auction that was supervised by the United States Bankruptcy Court for the Western District of Pennsylvania and approved by the Honorable Warren W. Bentz on or about August 27, 2004.

17.     At all times relevant hereto, EPTI and IKE took all reasonable measures and precautions necessary for the protection of the Keystone® Trade Secrets, the Keystone® Software and the Keystone® trademark, and for the prevention of dissemination and use of the same by the public.

18.     On or about January 7, 2003, EPTI and VEO entered into a License Agreement, pursuant to which EPTI granted to VEO a limited right to market, sell and manufacture the Old-

5

Style Boilers (as described in the License Agreement and attachments thereto), as well as the limited rights to use the Keystone® trademark and the Keystone® Software solely for the marketing, sale and manufacture of the Old-Style Boilers.

19.    None of the misconduct set forth in this Complaint involves or pertains to VEO's marketing, sale and/or manufacture of the Old-Style Boilers or its use of the Keystone® trademark or Keystone® Software in connection with the marketing, sale and/or manufacture of the Old-Style Boilers. The Old-Style Boilers are a distinct line of boilers that are different from the New-Style Boilers, and this action is based upon acts and conduct by VEO that are wholly outside of, and unrelated to any rights that VEO may have, under the foregoing License Agreement.

20.    VEO is a competitor of IKE with respect to IKE's manufacture, marketing, sale and service of New-Style Boilers. Upon information and belief, VEO has misappropriated the Keystone® Trade Secrets and the Keystone® Software, and, without the consent of IKE, improperly has been and continues to use the same to design, market, manufacture, and install boilers and related equipment that competes with, or otherwise is substantially the same as and/or similar to, the New-Style Boilers.

21.    Upon information and belief, VEO also has misappropriated the Keystone® trademark and, without the consent of IKE, improperly has been and continues to use the same to confuse and mislead consumers as to the true identity of the designer and/or manufacturer of various boilers and related equipment and accessories that are being marketed, fabricated, and sold by VEO.

22.    Furthermore, upon information and belief, VEO, without the consent of IKE, has been using and continues to use photographs, graphical images and depictions of New-Style

6

Boilers and related equipment (the "Keystone® Images") in VEO's sales and marketing materials, in such a way that improperly suggests to consumers that such products and related equipment are owned, designed, and/or manufactured by VEO, and/or that VEO otherwise was involved in certain jobs and construction projects utilizing New-Style Boilers when, in fact, it was not.

23.     Neither EPTI nor IKE has permitted or consented to VEO's use of the Keystone® Trade Secrets, the Keystone® Software, the Keystone® trademark or the Keystone® Images in the manner set forth in this Complaint, and VEO's use of the same is not otherwise justified or privileged.

24.     As a result of the misconduct by VEO, which is described more fully throughout this Complaint, IKE has suffered irreparable harm and substantial damages, including, but not limited to lost profits and revenue on the design, manufacture and sale of New-Style Boilers, loss of competitive advantage and market share, and loss of consumer good-will and reputation.

### COUNT I
### Trademark Infringement

25.     IKE incorporates by reference and realleges the preceding paragraphs of this Complaint, as though the same were set forth fully herein.

26.     VEO has, without IKE's (or EPTI's) permission or consent, used the Keystone® name and trademark in interstate commerce to market, sell, distribute, and/or advertise for sale certain boilers and related equipment that competes with, or otherwise is substantially the same and/or similar to the New-Style Boilers.

27.     The aforementioned use by VEO of the Keystone® name and trademark has caused and is likely to continue to cause confusion, mistake and the deception of consumers as to

7

the affiliation, connection and/or association of VEO with IKE with respect to the New-Style
Boilers and as to the origin, sponsorship, or approval of VEO's goods, services and/or
commercial activities by IKE.

28.     VEO's unauthorized and unprivileged acts directly infringe upon IKE's rights in
the Keystone® trademark in violation of the Lanham Act, 15 U.S.C. § 1114.

29.     VEO intentionally engaged in the aforementioned misconduct, with full
knowledge that EPTI, and now IKE, owns and has the exclusive right to use the Keystone® name
and trademark with respect to New-Style Boilers.

30.     As a direct and proximate result of the foregoing misconduct by VEO, IKE has
suffered, and continues to suffer, substantial damages – the full amount and extent of which is
not yet determinable, including irreparable harm for which there is no adequate remedy at law.

**COUNT II**
**<u>Trademark Dilution</u>**

31.     IKE incorporates by reference and realleges the preceding paragraphs of this
Complaint, as though the same were set forth fully herein.

32.     The Keystone® name and trademark is distinctive and has become famous.

33.     VEO has, without IKE's (or EPTI's) consent, used the Keystone® name and
trademark in interstate commerce to market, sell, distribute, and/or advertise certain boilers and
related equipment that competes with, or otherwise is substantially the same as and/or similar to,
the New-Style Boilers.

34.     VEO's improper and unauthorized use of the Keystone® name and trademark has
diluted and will continue to dilute the Keystone® trademark, in violation of the Lanham Act, 15
U.S.C. § 1125.

8

35.    VEO intentionally engaged in the aforementioned misconduct, with full knowledge that EPTI, and now IKE, owns and has the exclusive right to use the name and trademark Keystone® with respect to New-Style Boilers, and with the willful intention of trading on the reputation of the Keystone® name and New-Style Boiler product line(s), thereby causing dilution of the Keystone® trademark.

36.    As a direct and proximate result of the foregoing misconduct by VEO, IKE has suffered, and continues to suffer, substantial damages – the full amount and extent of which is not yet determinable, including irreparable harm for which there is no adequate remedy at law.

### COUNT III
### Trademark Dilution (54 Pa.C.S.A. § 1124)

37.    IKE incorporates by reference and realleges the preceding paragraphs of this Complaint, as though the same were set forth fully herein.

38.    VEO's improper and unauthorized use of the Keystone® name and trademark have diluted and will continue to dilute the Keystone® trademark, in violation of the Pennsylvania Trademark Act, 54 Pa.C.S.A. § 1124.

39.    VEO willfully intended to trade on the reputation of the Keystone® name and trademark and the New-Style Boiler product line(s), thereby causing dilution of the Keystone® trademark.

40.    As a direct and proximate result of the foregoing misconduct by VEO, IKE has suffered, and continues to suffer, substantial damages – the full amount and extent of which is not yet determinable, including irreparable harm for which there is no adequate remedy at law.

9

## COUNT IV
### Pennsylvania Uniform Trade Secrets Act (12 Pa.C.S.A. § 5301, et seq.)

41.     IKE incorporates by reference and realleges the preceding paragraphs of this Complaint, as though the same were set forth fully herein.

42.     As set forth above, the Keystone® Trade Secrets and the Keystone® Software were developed at great expense and effort by EPTI, and the ownership rights and interests in the same were transferred to IKE.

43.     The Keystone® Trade Secrets and the Keystone® Software enable IKE to compete effectively and profitably in the relevant commercial market, and confer upon IKE distinct and substantial commercial advantages.   Accordingly, the Keystone® Trade Secrets and the Keystone® Software are of great economic value to IKE's competitors in the commercial market for New-Style Boilers (and boilers with the same or similar capacities and capabilities), including VEO.

44.     The Keystone® Trade Secrets and the Keystone® Software are not known by or available to the public, and are not otherwise discoverable by public means.  IKE (and EPTI) has taken all reasonable measures and precautions necessary for the protection of the Keystone® Trade Secrets, the Keystone® Software and the Keystone® trademark, and for the prevention of dissemination and use of the same by the public.

45.     At all times relevant hereto, VEO knew that the Keystone® Trade Secrets and the Keystone® Software were, in fact, trade secrets and proprietary information.  Upon information and belief, VEO knowingly acquired the Keystone® Trade Secrets and the Keystone® Software: (i) by improper means; and/or (ii) under circumstances that gave rise to a duty to maintain their secrecy and to limit their use; and/or (iii) from or through a person or persons who owed a duty to IKE (and EPTI) to maintain their secrecy and to limit their use.

10

PTDATA 276364_4

46.    Upon information and belief, VEO improperly has used and continues to use the Keystone® Trade Secrets and the Keystone® Software to design, market, manufacture, and install boilers and related equipment that competes with, or otherwise is substantially the same as and/or similar to, the New-Style Boilers.

47.    As a direct and proximate result of the foregoing intentional and malicious misconduct by VEO, IKE has suffered, and continues to suffer, substantial damages – the full amount and extent of which is not yet determinable, including irreparable harm for which there is no adequate remedy at law.

## COUNT V
## Unfair Competition

48.    IKE incorporates by reference and realleges the preceding paragraphs of this Complaint, as though the same were set forth fully herein.

49.    VEO's misuse and misappropriation of the Keystone® Trade Secrets, the Keystone® Software, the Keystone® trademark, and the Keystone® Images, as described more fully above, constitute unfair competition.

50.    As a direct and proximate result of the foregoing misconduct by VEO, IKE has suffered, and continues to suffer, substantial damages – the full amount and extent of which is not yet determinable, including irreparable harm for which there is no adequate remedy at law.

## COUNT VI
## Unjust Enrichment

51.    IKE incorporates by reference and realleges the preceding paragraphs of this Complaint, as though the same were set forth fully herein.

52.    Through its misappropriation and unauthorized use of the Keystone® Trade Secrets, the Keystone® Software, the Keystone® trademark, and the Keystone® Images, VEO has

11

reaped substantial benefits, including, but not limited to revenue and profits, increased and/or improved market position, increased production efficiency, and other competitive advantages.

53.    At the same time, and as a direct and proximate result of these circumstances, IKE has suffered corresponding injury and harm, including, but not limited to lost revenue and profits, loss of competitive advantage and market share, and loss of consumer good-will and reputation.

54.    VEO would be unjustly enriched, if it were permitted to retain all of the aforementioned benefits and advantages without compensating IKE for its corresponding loss. Accordingly, VEO is liable to IKE for unjust enrichment.

WHEREFORE, as to all Counts of this Complaint, Plaintiff Indeck Keystone Energy, LLC respectfully demands judgment in its favor and against Defendant Victory Energy Operations, LLC:

(a)    Preliminarily and permanently enjoining VEO from further acts of trade secret misappropriation and misuse, unfair competition and violations of the Lanham Act, the Pennsylvania Trademark Act, the Pennsylvania Uniform Trade Secrets Act, and the common law, including, without limitation, ordering VEO:

(i)    to cease all use of the Keystone® Trade Secrets, the Keystone® Software, the Keystone® trademark and the Keystone® Images with respect to the New-Style Boilers, including any and all derivatives thereof and improvements thereon;

(ii)    to return all information and materials constituting, referring and/or relating to the Keystone® Trade Secrets, the Keystone® Software, the Keystone® trademark and the Keystone® Images in its custody and control, and any and all derivatives thereof and improvements thereon, to IKE;

(iii)    to otherwise cease any and all deceptive practices and acts of unfair competition;

(b)    Ordering an accounting of all sales and profits which VEO has realized or will hereafter realize as a result of using the Keystone® Trade Secrets, the Keystone® Software, the Keystone® trademark and the Keystone® Images to market, sell, distribute, and/or advertise certain boilers and related equipment that competes

12

PTDATA 276364_4

with, or otherwise is substantially the same as and/or similar to, the New-Style Boilers;

(c)    Awarding IKE its actual damages in an amount to be proven at trial, including, but not limited to actual damages and lost sales suffered by IKE as a result of VEO's misconduct, as well as any profits of VEO that are attributable to the above-described misconduct and not otherwise taken into account in computing the aforementioned actual damages, plus interest;

(d)    Awarding IKE any additional amounts the VEO received as an unjust enrichment for its unlawful acts;

(e)    Awarding IKE punitive and/or exemplary damages for VEO's intentional, willful and wanton misconduct;

(f)    Awarding IKE its attorneys' fees, expenses and costs of suit incurred in this action; and

(g)    Awarding IKE such other and further relief as the Court deems just, equitable and appropriate under the facts and circumstances of this matter.


Respectfully submitted,

_____

John K. Gisleson (Pa. ID. No. 62511)
Keith E. Whitson (Pa. ID. No. 69656)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA 15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858


Attorneys for Plaintiff,
Indeck Keystone Energy, LLC

Dated: November ___8___, 2004


13

PTDATA 276364_4

00001
```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3
   INDECK KEYSTONE ENERGY,   )
 4 LLC, a Delaware limited    )
   liability company,        )
 5                  )
        Plaintiff,  ) CIVIL ACTION
 6                  )
   vs.              ) No. 04-CV-325E
 7                  )
   VICTORY ENERGY OPERATIONS, ) Judge Sean J. McLaughlin
 8 LLC, a Delaware limited   )
   liability company,        )
 9                  )
        Defendant.   )
10

11

12

13      The videotape deposition of MARK WHITE taken on

14 behalf of the Plaintiff before Pamela B. Stinchcomb,

15 Certified Shorthand Reporter in and for the State of

16 Oklahoma, on the 14th day of October, 2005, in the

17 City of Tulsa, State of Oklahoma, pursuant to the

18 stipulations of the parties.

19

20

21
        PAMELA B. STINCHCOMB, CSR #1544
22       DAVIDSON REPORTING SERVICE
        5508 South Lewis Avenue
23       Tulsa, Oklahoma  74105
           (918) 745-9959
24

25
```

**EXHIBIT**

**C**

**White, Mark (10/14/2005)**                    **Page 1**

00021

1    A.  It would have been most likely from

2  probably the last four years I was with the company,

3  approximately.  I don't know the exact date that I

4  became responsible for that particular group.

5    Q.  During that four-year period,

6  approximately, what were the sales of Keystone

7  boilers?

8    A.  In the four-year -- I don't know.  I don't

9  recall.

10    Q.  Can you approximate in any way?

11    A.  Keystone watertube boilers?

12    Q.  Yes.

13    A.  It was very small.  In our peak, we

14  probably sold somewhere between seven and ten million

15  dollars worth of Keystone watertube boilers, which I

16  don't --

17    Q.  Annually?

18    A.  Yes, sir.  That would have been the peak.

19  The low end would probably be closer to three or four

20  million or none at all.

21    Q.  What was the range of sizes in terms of

22  steam flow for the Keystone boilers that were being

23  sold during that time?

24    A.  Our primary focus was in the larger units.

25  When I say larger, 175,000 and up.  Occasionally we

**White, Mark (10/14/2005)**                    **Page 21**

00022

1  would run across an application where we might sell a

2  couple of smaller units.  We generally found that we

3  weren't really competitive in that market.

4    Q.  Why not?

5    A.  Well, you have to understand the Zurn

6  Energy Division wasn't set up to compete with low

7  overhead, small companies that were providing small

8  watertube package boilers for industrial steam

9  markets.  It's difficult to compete when you have

10  much larger and higher overheads and you have a

11  sophisticated engineering system to compete with

12  somebody who's much more simplified.

13    Q.  Did you develop an understanding as to the

14  Keystone watertube technology?

15    A.  Generally.  I wouldn't call myself an

16  expert.

17    Q.  What did you do to educate yourself as to

18  the Keystone technology?

19        MR. SHEEAN:  Objection, vague.

20        MR. GISLESON:  What -- how is that

21  vague?

22        MR. SHEEAN:  The term "Keystone

23  watertube technology" I think is a vague term.

24    Q.  (By Mr. Gisleson) What did you do to

25  educate yourself about the Keystone watertube

**White, Mark (10/14/2005)**                **Page 22**

00039

1    A.  It might go into a steam turbine to produce

2    steam.  It's drier steam, higher temperature, more

3    energy involved, you know.  So -- and it's used in

4    different aspects.  It can be used through steam

5    turbines to generate power, so forth.

6    Q.  So what happened next with VEO in terms of

7    the potential license agreement?

8    A.  Well, John met independently with Chairman

9    Kim with DKME Machinery, John Viskup.  I'm sorry, met

10   with Chairman Kim of DKME Machinery, DKME, and

11   Stephen Kang, as well.  And they discussed the

12   potential of a license agreement.  I wasn't involved

13   really in those discussions.

14   Q.  Were you present?

15   A.  I was in the booth.

16   Q.  So the meeting between Viskup, Kim and Kang

17   occurred in the booth --

18   A.  Yes, sir.

19   Q.  -- at Power Gen?

20   A.  Yes, sir.

21   Q.  How long was that meeting, approximately?

22   A.  Maybe an hour, if that.

23   Q.  What was discussed that you heard?

24   A.  They just assessed the license agreement,

25   the benefits, you know, potential revenue that could

**White, Mark (10/14/2005)**                              **Page 39**

00040

1  be generated as part of the license.  Beyond that, I

2  don't know the specifics.

3     Q.  Was there any discussion as to the specific

4  design parameters for the boiler that was to the

5  licensed?

6     A.  I don't know.  I wasn't that involved in

7  that discussion.

8     Q.  Are you aware of any notes that anyone

9  maintained at that meeting?

10    A.  No.

11    Q.  Did you have any notes?

12    A.  No.

13    Q.  Was there any memorandum prepared

14 summarizing the meeting?

15    A.  No.

16    Q.  Did you, after that meeting, have any

17 conversations with Chairman Kim or Stephen Kang

18 concerning the discussion with John Viskup?

19    A.  Yes.

20    Q.  When did that occur?

21    A.  It occurred in the booth, and it also

22 occurred when we were arrived back, when Stephen Kang

23 and myself arrived back in Erie.

24    Q.  Starting with the discussion in the booth,

25 what were you told?

**White, Mark (10/14/2005)**                              **Page 40**

00243

1    Q.  Did you expect VEO to provide samples of

2   its marketing materials to you for approval?

3    A.  Not necessarily.  I mean, if it fell within

4   the boundaries of what was provided, I didn't have

5   that concern if -- the agreement, again, was -- the

6   spirit of the agreement was not to be so limiting

7   that it became so onerous that nothing could get done

8   because you were so tied up in providing information

9   back and forth on a daily and hourly basis.

10       (Plaintiff's Exhibit Number 39 was marked

11   for identification.)

12    Q.  (By Mr. Gisleson) I show you what's been

13   marked as White Exhibit 39.  It's a document stamped

14   VEO830 to VEO890.  Is this an e-mail with enclosures

15   that you sent to Shawn Brewer and John Viskup on

16   March 17, 2003?

17    A.  Yes.

18    Q.  You write:  "Shawn and John, as per our

19   discussion of March 6, 2003, I have forwarded by

20   express mail a draft copy of the Keystone "M" series

21   Sale Manual for your review.  The manual requires

22   completion of the introduction section, contact

23   information, et cetera.  The manual includes all of

24   the following information."  Where was the discussion

25   held on March 6, 2003?

**White, Mark (10/14/2005)**          **Page 243**

00055

1  mischaracterizes the evidence.  You can answer.

2      A.  I was not aware of that, no.

3      Q.  (By Mr. Gisleson) When was the first time

4  you had a discussion with someone from VEO about the

5  use of membrane wall technology and the Keystone

6  boilers that were licensed?

7      A.  Oh, Shawn Brewer and I -- it was discussed

8  through the license agreement.

9      Q.  Pardon me?

10     A.  It was discussed through the license

11  agreement as being part of the technology that would

12  be provided.

13     Q.  When was the first time you had that

14  discussion?

15     A.  I don't recall.

16     Q.  It was after the license agreement was

17  executed?

18     A.  No, it was before the license.  It's during

19  the period of which the license agreement was being

20  negotiated.

21     Q.  You had that conversation with Shawn

22  Brewer?

23     A.  With Shawn, yes.

24     Q.  By phone?

25     A.  Yes, I believe it was by phone.

**White, Mark (10/14/2005)**                              **Page 55**

00244

1    A.  I don't recall.

2    Q.  Do you know whether it was by phone or in

3 person?

4    A.  No, I don't.

5    Q.  Did VEO ask you to prepare a sales manual

6 for the "M" series?

7    A.  They -- we had discussed it.  They had

8 mentioned that they'd known that other -- I believe

9 other competitors in the industry had a -- had a nice

10 sales manual.  They were interested in having

11 something similar and would ask -- and asked if I

12 would be -- would assist in helping them generate

13 one.  And I -- as I had mentioned prior, it was

14 always better for me to provide the information than

15 to have them trying to create it themselves.  So the

16 information that's in here was definitely provided by

17 me.

18    Q.  What was the source of the information that

19 you provided here?

20    A.  Information that was at my disposal within

21 Erie.

22    Q.  Did you simply copy the sales manual that

23 EPTI had for Keystone?

24    A.  No, there was no such sales manual that

25 EPTI had.  I had to create -- I had to structure the

**White, Mark (10/14/2005)**                    **Page 244**

00245

1  information and create this document.

2      Q.  On Page VEO832 under background license,

3  you wrote:  "Victory Energy Operations is the

4  exclusive licensee of Erie Power Technologies, Inc.,

5  formally Aalborg, for the sale, execution,

6  fabrication and delivery of Keystone watertube

7  package boilers with steam capacities of 29,000 pph

8  up to and including 150,000 pph."  Why didn't you

9  refer to design in that sentence?

10     A.  Well, execution and design, in my opinion,

11  are synonymous.

12     Q.  Has VEO sold any watertube boilers outside

13  of the United States, Mexico and Canada?

14     A.  Keystone watertube boilers, no.

15     Q.  From where did you obtain the drawings for

16  the "M" series standard models?

17     A.  Within Erie Power.

18     Q.  Did you show this proposed sales manual to

19  anyone at EPTI before sending it to VEO?

20     A.  I don't recall.

21     Q.  If you look at Page VEO841, do you see how

22  this is a drawing of a furnace wall construction for

23  welded tube and membrane?

24     A.  Yes.

25     Q.  And that there's a date apparently on here

**White, Mark (10/14/2005)**                     **Page 245**

00250

1    A.  No, no.

2    Q.  What does that refer to?

3    A.  Just a select list to assist Victory Energy

4  to have at least a reference list to present to their

5  clients or prospective clients to show that there are

6  -- there is experience.  There is experience within

7  given range of application so they wouldn't have such

8  a difficult time in trying to convince a customer

9  even though as Victory -- as Victory Energy, they

10  didn't have any experience.  It was supporting the

11  agreement, supporting the spirit of the agreement,

12  trying to get the revenues moving.

13    Q.  Did you have any discussions with Shawn

14  Brewer or anyone else at VEO as to whether this list

15  of selected references should be modified to

16  eliminate those boilers that were outside the scope

17  of the license agreement?

18    A.  No, I don't recall.

19    Q.  Did you advise specifically Shawn Brewer

20  that VEO could use this list as is without

21  eliminating those boilers that are larger than

22  150,000 pph?

23    A.  Yeah.  When I provided the agreement, it

24  was to be utilized for sales and marketing.

25    Q.  Without alteration?

**White, Mark (10/14/2005)**                    **Page 250**

00251

1    A.  Correct.

2        MR. GISLESON:  Let's take a break.

3        (Break was taken)

4    Q.  (By Mr. Gisleson) In connection with

5  preparing a license agreement, what was your

6  understanding as how the transfer of technical

7  information back from VEO to EPTI was to occur at

8  conclusion of the license.

9    A.  At the conclusion of the license

10  agreement?  I guess in a general sense, and I have to

11  be honest, I -- without reading -- rereading the

12  agreement, I would have to get an exact definition of

13  what the requirements are.  I would have to review

14  the agreement.  But in a general sense, all of the

15  information that was transferred at the initial stage

16  and throughout the agreement from EPTI or, in this

17  case, IKE would have to be returned, any proprietary

18  information, the mark and so on and so forth.  And

19  then at the time frame, there would be no -- VEO

20  could not continue to use the mark, couldn't use the

21  sales literature and so on and so forth.  So at that

22  point, it basically would be terminated.

23    Q.  VEO also couldn't use any of the technical

24  information to design or manufacture "O" type

25  boilers?

**White, Mark (10/14/2005)**                    **Page 251**

00001
1                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF PENNSYLVANIA
2

3

4  INDECK KEYSTONE ENERGY LLC, )
                              )
5          Plaintiff,     )
                              )
6  VS                     )Civil Action No. 04-325 Erie
                              )
7  VICTORY ENERGY OPERATIONS,  )Judge Sean J. McLaughlin
   LLC,                   )
8                         )
           Defendant      )JURY TRIAL DEMANDED
9

10

11

12          ORAL AND VIDEOTAPED DEPOSITION OF

13          STEPHEN YOUNG KANG

14              December 13, 2005

15              Volume 1 of 1

16

17  Oral Deposition of STEPHEN YOUNG KANG, produced as a
    witness at the instance of MR. CHRISTOPHER T. SHEEAN,
18  ATTORNEY FOR DEFENDENT VICTORY ENERGY OPERATIONS, LLC,
    and duly sworn, was taken in the above-styled and
19  numbered cause on December 13, 2005, from 1:50 p.m.
    to 5:03 p.m., before Lydia P. Battle, CSR, RPR, in and
20  for the State of Texas, reported by stenographic means,
    at the offices of Jones & Young, P.C., 2700 Post Oak
21  Blvd., Suite 1350, Houston, Harris County, Texas,
    pursuant to the Federal Rules of Civil Procedure and the
22  provisions stated on the record attached hereto.

23

24

25

EXHIBIT
D

**Kang, Stephen 12/13/05**                    **Page 1**

Case 1:04-cv-00325-SJM     Document 48     Filed 01/20/2006     Page 31 of 73

00018

1   A   And -- and Mark said that -- that he felt like

2   it would be in good interest of the company to sell

3   certain boiler lines or technology to that -- not sell --

4   I'm sorry.  License the certain boiler line to Victory

5   Energy which Erie Power would not sell; hence, we will

6   get royalties from a product line that we may never sell.

7   Q   Was Mr. Kim at the Power-Gen Conference?

8   A   Yes.  He was at the Orlando Power-Gen Conference

9  as well.

10   Q   Did Mr. Kim have any conversations with anyone

11  at Victory Energy during that conference?

12   A   Not regarding the license agreement.  Mr. Kim

13  did meet Victory Energy and its CEO John Viskup.

14   Q   But they did not discuss the license agreement,

15  to the best of your knowledge?

16   A   No.  No.  To the best of my knowledge, there was

17  no discussion of the license agreement.

18   Q   Okay.  So, what did you say back to Mr. White

19  when he described to you this license agreement

20  opportunity?

21   A   I told Mark White, since you're in charge of

22  sales and marketing, if you feel like that that would

23  help Erie Power to have additional revenue that we would

24  otherwise not, then that he should look into it.

25   Q   And what did -- and what happened next?

**Kang, Stephen 12/13/05**              **Page 18**

00019

1    A    I was introduced to Victory's CEO John Viskup

2    and he and I had typical chitchat of cordial hellos

3    and -- and John Viskup did mention to me that Victory was

4    interested in licensing certain boiler lines from Erie

5    Power.

6    Q    Did he tell you what type of boiler lines he was

7    interested in licensing?

8    A    He -- he did, but then I wasn't very aware of

9    the boiler technology or the company at the time, so that

10    I had asked John Viskup if he would contact our engineers,

11    Erie Power's engineers, and discuss those technical

12    specifications.

13    Q    To the best of your knowledge or recollection,

14    as you sit here today, what types of boiler lines did

15    Mr. Viskup indicate he was interested in licensing?

16    A    It sounded to me like what Victory was

17    interested in was certain size of boiler lines for

18    certain types.

19    Q    Can you recall anything else about the types of

20    boilers that Victory was interested in licensing at that

21    meeting that you had at the Power-Gen Conference in

22    December 2002?

23    A    The main number that -- that John Viskup, or

24    Victory, told me that I recall is 150 pound per pressure

25    was a term they used a lot.

00020

1    Q    Okay.  What happened next in terms of pursuing a

2    license agreement, to the best of your knowledge?

3    A    Victory and Erie Power then started having

4    communication regarding potentially setting up a license

5    agreement.  I had delegated that task, or project, to

6    Mark White.  I put him in charge of drafting or -- or

7    reviewing the license agreement.

8    Q    Let me go back for a minute.  Were you ever

9    aware of -- strike that.  Had Victory Energy ever

10   purchased any boilers from Erie Power, to the best of

11   your knowledge, prior to the entry of the license

12   agreement?

13   A    I had been told that Victory wanted or -- or did

14   work on a project previously one time with Erie, but

15   that's -- that's basically what I recall at that --

16   before we had entered into license agreement.

17   Q    Did you know any of the specifics about the

18   types of boilers that Victory had purchased?

19   A    No.

20   Q    Excuse me.  Was there any -- strike that.  Did

21   either Mr. Viskup or Mr. White mention Keystone as the

22   type of boiler that would be licensed at that Power-Gen

23   Conference?

24   A    Yeah, basically Keystone boiler is the boiler

25   line for Erie Power.  That is the name for the boiler

**Kang, Stephen 12/13/05**                    **Page 20**

00021

1  line.

2  Q   And you authorized Mr. White to draft and

3  negotiate the license agreement on behalf of Erie Power?

4  A   Yes.

5  Q   Did you review any drafts of the license

6  agreement?

7  A   Yes.

8  Q   Did you have any changes to the license agreement

9  that you can recall?

10  A   No.

11  Q   Do you know who signed the license agreement on

12  behalf of Erie Power?

13  A   I believe it was originally signed by Mark White

14  on behalf of Erie Power.

15  Q   Did you authorize Mr. White to sign that license

16  agreement on behalf of Erie Power?

17  A   Yes.

18  Q   What was Erie Power's financial situation at the

19  end of 2002 when you came onboard?

20  A   Erie Power had been in financial difficulty for

21  almost a year at that time, so it was financially already

22  in a fairly bad shape at -- at the end of 2002.

23  Q   Did you have an understanding as to whether or

24  not the license agreement with Victory Energy would

25  provide a positive revenue stream to Erie Power that it

**Kang, Stephen 12/13/05**                    **Page 21**

Case 1:04-cv-00325-SJM      Document 48      Filed 01/20/2006      Page 35 of 73

00060

1  that Victory Energy is in breach of the agreement, does he?

2          MR. GISLESON:  Objection.  Mischaracterizing

3  the document.

4          MR. SHEEAN:  I'm asking what Mr. Kang's

5  understanding of the document is.

6    Q   (BY MR. SHEEAN)  You can answer, sir.

7    A   No, he did not have a conclusion on that issue.

8    Q   Did you ever reach a conclusion as to whether or

9  not Victory Energy was in breach of the agreement?

10    A   No.

11    Q   What is your understanding of the "M" series

12  boiler?

13    A   My understanding of the "M" series is more of

14  a -- it was designed before the "O" series, so, therefore,

15  the term "outdated" or "antiquated" were used by our

16  people.

17    Q   Do you have an understanding of why Victory

18  Energy would want to license outdated and antiquated

19  technology?

20    A   I believe Victory wanted to sell those lines

21  because they had a niche market that was different from

22  Erie Power perhaps to certain industries that fit those

23  certain types of boilers that we would not sell or have

24  an access to in the market.

25    Q   How did you develop that understanding?

**Kang, Stephen 12/13/05**                    **Page 60**

00072
1  the Asset Purchase Agreement between CMI America

2  Incorporated and Erie Power Technologies Incorporated,

3  dated as of August 3, 2004.  Do you see that?

4    A    Yes.

5    Q    Were you involved in the negotiation of this --

6  of this contract?

7    A    Yes.

8    Q    Were you involved in any of the due diligence

9  relative to the representations and warranties set forth

10  in this agreement?

11    A    Yes.

12    Q    And if you'll turn to page 39, which is not the

13  last page, it's about four pages, five pages from the

14  back.  Is that your signature on that page, "Stephen Kang

15  President of Erie Power Technologies Incorporated"?

16    A    Yes.

17    Q    You signed this agreement on behalf of Erie Power,

18  correct?

19    A    That's correct.

20    Q    Turn back to page 11 of the agreement.

21    A    Okay.

22    Q    Section 2.10, "Intangible Property;" do you see

23  that?

24    A    Yes.

25    Q    Under subsection (e), it says, "No license or

**Kang, Stephen 12/13/05**                    **Page 72**

00073
1   royalty agreement to which Seller is a party is in breach

2   or default by any party thereto or the subject of any

3   notice of termination given or, to the Seller's Knowledge,

4   threatened;" do you see that?

5      A   Yes.

6      Q   And you acknowledged that to be the case when

7   you signed this agreement, correct?

8      A   Yes.

9      Q   And subset (c) says, "To the --" "To Seller's

10  Knowledge, no third party is infringing or has

11  misappropriated any of --" "-- any of the Intellectual

12  Property Rights." Do you see that?

13     A   Yes.

14     Q   And, again, you acknowledged that to be the case

15  when you signed this agreement, correct?

16     A   Yes. That's correct.

17     Q   Have you ever heard the term "Old style boilers"

18  used in the boiler industry?

19     A   No.

20     Q   Are you aware of any instance where Victory

21  Energy utilized Erie Power's trademarks without its

22  authorization?

23     A   No, I'm not aware.

24     Q   Are you aware any instance where Victory Energy

25  utilized the trademarks now owned by Indeck Keystone

**Kang, Stephen 12/13/05**                    **Page 73**

```
00001
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3
   INDECK KEYSTONE ENERGY,   )
 4 LLC, a Delaware limited   )
   liability company,        )
 5                           )
         Plaintiff,     ) CIVIL ACTION
 6                           )
   vs.                 ) No. 04-CV-325E
 7                           )
   VICTORY ENERGY OPERATIONS, ) Judge Sean J. McLaughlin
 8 LLC, a Delaware limited   )
   liability company,        )
 9                           )
         Defendant.     )
10

11

12

13      The videotape deposition of SHAWN BREWER taken

14 on behalf of the Plaintiff before Pamela B.

15 Stinchcomb, Certified Shorthand Reporter in and for

16 the State of Oklahoma, on the 13th day of October,

17 2005, in the City of Tulsa, State of Oklahoma,

18 pursuant to the stipulations of the parties.

19

20

21

22
          PAMELA B. STINCHCOMB, CSR #1544
23        DAVIDSON REPORTING SERVICE
            5508 South Lewis Avenue
24         Tulsa, Oklahoma  74105
              (918) 745-9959
25
```

**Brewer, Shawn (10/13/2005)**                    **Page 1**

EXHIBIT
E

00178

1  wall in addition to refractory wall?

2      A.  I don't remember making a specific e-mail

3  to that effect because it was assumed that it was an

4  option.

5      Q.  Assumed by whom?

6      A.  Well, not assumed.  It was stated as an

7  option in all of the literature and all of the

8  manuals that we received.  It said optional membrane

9  walls, as well.  Because it -- like we stated before,

10  in the '50s when this was developed, they were all

11  tangent tubes.  But as time went on and progressed in

12  the '90s and now, there is no market for tangent tube

13  boilers.

14      Q.  You thought that membrane wall construction

15  in the Keystone "M" series boiler was an option

16  because of the sales and marketing materials you

17  received from Mark White?

18          MR. SHEEAN:  Objection,

19  mischaracterizes the prior testimony.  You can

20  answer.

21      A.  Well, I knew they were options because of

22  that.

23      Q.  (By Mr. Gisleson) Were you aware that the

24  marketing materials that Mr. White sent you covered

25  the full range of Keystone boilers that would include

**Brewer, Shawn (10/13/2005)**          **Page 178**