## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

        Plaintiff

        v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

        Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

## VICTORY ENERGY'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### Introduction

The January 7, 2003 license agreement (the "Agreement") with Erie Power Technologies, Inc. ("EPTI") clearly and unambiguously granted to Victory Energy Operations LLC ("VEO") the right to utilize EPTI's technical information and marks to design, manufacture, market and sell natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pounds per hour of steam ("pph"), up to 150,000 pph (defined in the Agreement as the "Products"). Plaintiff takes the position that VEO was only authorized to manufacture and sell a line of older, outmoded boilers within that same capacity range. The language of the Agreement, however, contains no such limitation and clearly grants VEO the right to manufacture and sell a broad class of items, and to improve and modify said Products to the financial benefit of both the licensor and licensee. VEO has only used the technical information to design, manufacture and sell the Products, based on the clear definition of that term in the Agreement, and IKE can identify no relevant evidence to the contrary. Therefore, VEO is entitled to summary judgment on Plaintiff's Complaint and Count I of VEO's Second Amended Counterclaim.

# BACKGROUND

## The Technology

Direct-fired, watertube boilers have been sold to generate steam for heating and other purposes for over 50 years.  (Mark White Affidavit at ¶ 3; attached as Exhibit A in the Appendix; VEO's Concise Statement of Material Facts "Statement of Facts," ¶ 1 ) (all references hereafter to exhibits shall refer to the exhibits in the Appendix).  Up until approximately 1980, the predominate design of watertube boilers involved furnace and convective walls made up of tubes placed side by side in a row, known as a tangent tube design.  (White Aff. at ¶ 4; Ex. A; Statement of Facts, ¶ 2).  These boilers also included a significant amount of insulating material, called refractory, that was needed to keep the outside of the boiler from getting too hot.  (White Aff. at ¶ 5; Ex. A; Statement of Facts, ¶ 3).  By 1980, a new design for watertube boiler walls consisting of furnace and outer wall tubes spaced 3 to 4 or more inches apart, connected by steel bars welded to each tube, known as finned or welded walls had been developed.  (White Aff. at ¶ 6; Ex. A; Statement of Facts, ¶ 4).  Welded walls improved the boilers heat retention, and created a seal that prevented flue gas emissions from leaking out of the combustion chamber and boiler, thereby  decreasing emissions of noxious gases.  (White Aff. at ¶ 7; Ex. A; Statement of Facts, ¶ 5).

The industry developed water cooled front and rear walls, further improving the emissions and reducing the amount of refractory needed in the boiler.  (White Aff. at ¶ 8; Ex. A; Statement of Facts, ¶ 6).  The utilization of welded walls and water cooled front and rear walls is known in the industry as "full membrane" or "100% membrane."  (White Aff. at ¶ 9; Ex. A; Statement of Facts, ¶ 7).  By 1984, full membrane design became the standard in the boiler industry for watertube package boilers. (White Aff. at ¶ 10; Ex. A; Statement of Facts, ¶ 8).

2

The Keystone Energy Division of Erie Power Technologies, Inc. ("EPTI") was in the business of designing, developing, testing, building, marketing and installing boilers and related equipment for use in the power generation industry. (Plaintiff's Complaint at ¶ 8; attached as Exhibit B; Statement of Facts, ¶ 9). VEO purchased two (2) Keystone® boilers from EPTI prior to the execution of the license agreement for the Heinz plant in Muscatine, Iowa. (White Aff. at ¶ 11; Ex. A; Statement of Facts, ¶ 10). The boilers each had a steam capacity of up to 75,000 pph, and each were 100% membrane wall design. (White Aff. at ¶ 12; Ex. A; Statement of Facts, ¶ 11). EPTI designed and built these boilers for VEO. (White Aff. at ¶ 13; Ex. A; Statement of Facts, ¶ 12). Following the purchase of the Heinz boilers, VEO began discussions with EPTI regarding the possibility of licensing the technology and trademarks to manufacture and sell O-style Keystone boilers. (White Aff. at ¶ 14; Ex. A; Statement of Facts, ¶ 13).

From its inception, EPTI had not actively marketed Keystone® O-Style Boilers below 150,000 pph, choosing instead to focus on larger direct fired and heat recovery steam generators. (Mark White Deposition at p. 21, l. 21-25-p. 22, l. 1-12; attached as Exhibit C; Statement of Facts, ¶ 14). As a result, EPTI decided to explore the possibility of a license agreement with VEO. (White Dep. at p. 39, l. 6-25- p. 40, l. 1-2; Ex. C; Statement of Facts, ¶ 15). EPTI's president, Stephan Kang, authorized Mark White to negotiate the terms of a license agreement with VEO. (Stephan Kang Deposition at p.18, l. 21-24, p. 20 l. 3-7; attached as Exhibit D; Statement of Facts, ¶ 16). As the authorized representative for EPTI, Mark White negotiated and executed the Agreement. (Kang Dep. at p. 21, l. 2-17; Ex. D; Statement of Facts, ¶ 17). Both Mark White and Shawn Brewer, the VEO representative, understood that the Agreement allowed VEO to design, market, manufacture and sell O-Style watertube Keystone®

3

boilers with 100% membrane wall technology. (White Dep. at p. 55, l. 3-20; Ex. C; Statement of Facts, ¶ 18; Shawn Brewer Deposition at p. 178, l. 2-13; attached as Exhibit E; Statement of Facts, ¶ 18).

On January 7, 2003, VEO entered into a license agreement with EPTI to license the right to use certain software and related Keystone trademarks to manufacture, market and sell natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph (the "License Agreement"). (License Agreement at p.1, ¶1.a); attached as Exhibit F; Statement of Facts, ¶ 19).

### The License Agreement

The Agreement provides a clear definition of the term Products as follows:

1.a)   "Products" shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex 1.

The Agreement further provides:

1.b)   "Technical Information" shall mean all facts, data, know how, formula, procedures, techniques or advice, whether written or oral and regardless of form (including reports, letters, designs, drawings, specifications, training and operational manuals, photographs, tapes, diagrams, patent applications, Software (as defined herein), and any related documentation).

. . . . .

2.a)   Selling Rights. Licensor hereby grants to Licensee:

(i) the exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory.

(License Agreement at pp. 1, 3; Ex. F; Statement of Facts, ¶ 21).

VEO and EPTI signed a License Agreement Addendum on February 27,

4

2003 that specifically increased the permissible steam outlet temperature "to superheated steam applications up to and including a final steam temperature of 750°F," and increased the product design pressure "from 399 psig up to and including 1,200 psig (1,125 psig operating)." (License Agreement at Addendum; Ex. F; Statement of Facts, ¶ 22).

Annex 1 to the Agreement provides:

**Description of Products**
Erie Power Technologies, Inc. "M" Series Keystone® water tube boilers to include the 8M, 9M, 10M, 11M, 12M, 13M, 14M, 15M 16M, 17M, 18M, 19M, 20M, 21M and 22M.

(License Agreement at p. 20; Ex. F; Statement of Facts, ¶ 23).

The Annex then provides specific design characteristics for each of the "M" Series models identified above, including the steam generator efficiency, exit gas temperature, flue gas weight flow, release rate, liberation rate, furnace heat absorption, and specific size information. (License Agreement at pp. 20-22; Ex. F; Statement of Facts, ¶ 24). Annex 1 also includes three drawings of a Keystone® M-Series Standard boiler. (License Agreement at pp. 23-25; Ex. F; Statement of Facts, ¶ 25). These drawings show a boiler with tangent tube furnace walls, tangent tube outerwalls, a refractory front wall and a tube and tile water cooled rear wall. (License Agreement at pp. 23-25; Ex. F; Statement of Facts, ¶ 26). However, nothing in the Agreement or the Appendices states that "Products" is limited to Standard "M" series boilers. (License Agreement at p. 1, ¶ 1.a); Ex. F; Statement of Facts, ¶ 27). In fact, the definition of "Products" states that the term **shall include, but not be limited to** the items set forth in Annex I. (License Agreement at p.1, ¶ 1.a); Ex. F; Statement of Facts, ¶ 28).

Clause 8 of the Agreement provides for modifications. (License Agreement at p. 9; Ex. F; Statement of Facts, ¶ 29). Specifically, section 8.a) reads, "Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the

reliability and the performance of the said Products. Licensee will submit to Licensor such plans

for modifications for prior written approval by Licensor except for the alterations as defined in

Clause 3(e)." (License Agreement at p. 9; Ex. F; Statement of Facts, ¶ 29).

> Clause 13 of the Agreement covers improvements. Specifically, it provides:
>
> In order to further the mutual interest of both parties, Licensor shall disclose and make available to Licensee and Licensee shall disclose and make available to Licensor, free of any charge, all Improvements developed while this Agreement is in effect. . . . Licensor shall grant to Licensee a royalty-free license to use Improvements developed by Licensor…

(License Agreement p. 13, ¶ 13.a) ; Ex. F; Statement of Facts, ¶ 30).

**Transfer of the Licensed Technology**

In 2004, EPTI filed for bankruptcy in the Western District of Pennsylvania and

eventually sold its assets to CMI EPTI LLC ("CMI") on August 27, 2004. (Plaintiff's Complaint

at ¶ 16; Ex. B; Statement of Facts, ¶ 31). In the Asset Purchase Agreement between CMI and

EPTI, a copy of which was filed with the Bankruptcy Court for the Western District of

Pennsylvania, the seller represented that "to Seller's Knowledge, no third party is infringing or

has misappropriated any of the Intellectual Property Rights." (EPTI/CMI Asset Purchase

Agreement at p. 11, Section 2.10(c); Ex. G, Statement of Facts, ¶ 32). Moreover, Stephen Kang,

President of EPTI during the relevant time period, acknowledged and affirmed the statements

EPTI represented to CMI in the Asset Purchase Agreement that to "Seller's Knowledge, no third

party is infringing or has misappropriated any of the Intellectual Property Rights," and "No

license or royalty agreement to which Seller is a party is in breach or default by any party . . ."

(Kang Dep. at p. 72, l. 25 – p. 73, l. 16; Ex. G, Statement of Facts ¶ 33).

IKE purchased certain assets related to EPTI's Keystone Energy Division

business from CMI on September 8, 2004, including the assets licensed to VEO pursuant to the

6

Agreement. (Plaintiff's Complaint at ¶ 16; Ex. B; Statement of Facts, ¶ 34). In the Asset Purchase Agreement between IKE and CMI, the Seller made an identical representation that "to Seller's Knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights," and "No license or royalty agreement to which Seller is a party is in breach or default by any party thereto . . ." (The Asset Purchase Agreement between IKE and CMI was designated as "Confidential" under the terms of the Court's June 7, 2005 protective order. A copy will be tendered to the Court's chambers at the Court's request). In both Asset Purchase Agreements, the Intellectual Property Rights were defined to include the rights licensed to VEO, under the terms of the Agreement.

### The Pleadings

IKE filed a complaint against VEO on October 30, 2004, seeking damages from VEO for trademark infringement, trademark dilution under the federal statute, trademark dilution under the Pennsylvania statute, violation of the Pennsylvania Uniform Trade Secrets Act, Unfair Competition and Unjust Enrichment. (Plaintiff's Complaint at pp. 7-13; Ex. B; Statement of Facts, ¶ 35). A complete defense to each and every claim IKE asserts is that VEO utilized IKE's marks and trade secrets, if any, under the authority granted by the Agreement. Similarly, VEO seeks a declaratory judgment in Count I of its Second Amended Counterclaim that VEO's use of IKE's marks and other intellectual property was made under an express grant of right pursuant to the Agreement. (Victory Energy's Second Amended Counterclaim at ¶¶10-13; attached as Exhibit H; Statement of Facts, ¶ 37).

In its complaint, IKE attempts to create a distinction between what it purports was licensed under the Agreement, the "Old Style Boilers," and what VEO actually manufactured and sold during the term of the Agreement, the "New Style Boilers." (Plaintiff's Complaint at ¶¶10-11; Ex. B; Statement of Facts, ¶ 38). Specifically, IKE describes the "Old Style Boilers" as

7

the outdated tangent tube boilers, and adds in a limitation on steam capacity range identical to the range set forth in the Agreement.  (Plaintiff's Complaint at ¶11; Statement of Facts, ¶ 39). IKE describes the "New Style Boilers," as the more modern design of boilers with welded furnace and convective side walls and water cooled front and rear walls.  (Plaintiff's Complaint at ¶ 10; Ex. B; Statement of Facts, ¶ 40).

<h3 align="center">The Parties Performance Under The Agreement</h3>

After the Agreement was signed, EPTI provided, among other things, the following materials to VEO:

- drawings of the various Keystone® boilers, depicting boilers with 100% membrane wall construction;

- a draft sales manual, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone M Series boiler;

- a power point presentation, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone M Series boiler;

- the Keystone Design Guide, describing features of the Keystone M Series boilers with welded walls;

- the KPSC computer program, used by EPTI and VEO to rate boilers, that allowed VEO to rate boilers that incorporated 100% membrane technology.

(White Aff. at ¶ 15; Ex. A; Statement of Facts, ¶ 41).

Following the execution of the Agreement, VEO began marketing and selling Keystone® boilers.  (Robert Gdaniec Deposition at p. 124, l. 11-16; attached as Exhibit I; Statement of Facts, ¶ 42).  As provided for in the Agreement, EPTI provided engineering support to VEO for the first several boilers VEO sold.  (Gdaniec Dep. at p. 96, l. 20-25-p. 97, l. 1-5; Ex. I; Statement of Facts, ¶ 43).  Every boiler VEO sold, including the boilers designed and rated by EPTI's engineers, utilized 100% membrane technology, the very technology IKE now claims VEO was not authorized to use in designing or selling the Keystone® boilers.  (White Aff. at ¶

8

20; Ex. A; Statement of Facts, ¶ 47). No EPTI representative ever informed VEO that it was in breach of the Agreement. (Kang Dep., p. 60, l. 8-10; Ex. D; Statement of Facts ¶ 56).

## ARGUMENT

### A.   Standards for Motion for Summary Judgment.

It is well-settled in the Third Circuit that "a grant of summary judgment is appropriate where the moving party has established that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. As the United States Supreme Court has stated, the requirement is that there be no genuine issue of material fact, that is, facts that might affect the outcome of the suit under the governing law. *Palm Bay Imports, Inc. v. Miron*, 55 Fed. Appx. 52, 56 (3rd Cir. 2002) (internal citations omitted).

On a motion for summary judgment, the movant has the initial burden of showing an absence of a genuine issue of material fact, but does not have to supply affidavits or other materials negating an adversary's claim. *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1061 (3rd Cir. 1991) (internal citations omitted). To survive a motion for summary judgment, the non-moving party cannot solely rest upon her allegations in the pleadings but rather must set forth specific facts such that a reasonable jury could find in the non-moving party's favor, thereby establishing a genuine issue of fact for trial. While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Bradley v. Kemper Insurance Company*, 121 Fed. Appx. 468, 470 (3rd Cir. 2005) (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Contini v. Cranmer*, 117 Fed. Appx. 186, 188 (3rd Cir. 2004) (internal citations omitted).

**B.    The License Agreement Clearly And Unambiguously Grants VEO The Right To Design, Manufacture, Market and Sell Industrial, Natural Circulation Watertube Package Steam Generators With A Capacity From 29,000 to 150,000 PPH of Steam.**

"It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (Pa. Sup. Ct. 1982)(holding that the contract at issue was unambiguous and refusing to consider extrinsic evidence to create an ambiguity). *See also Thomas Rigging & Construction Co., Inc. v. Contraves, Inc.*, 798 A.2d 753, (Pa. Sup. Ct. 2002)(reversing trial court's finding that licensee was liable to licensor under agreement, and finding the agreement unambiguous). The words the parties used in the contract must be accorded their ordinary meaning. *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 394 Pa. 124 145 A.2d 672 (1958).

The Agreement grants VEO the "exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory." (License Agreement at p. 3, ¶ 2.a); Ex. F; Statement of Facts, ¶ 20). The Agreement defines "Products" as "natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,0000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex I." (License Agreement at p. 1, ¶ 1.a); Ex. F; Statement of Facts, ¶ 21). Only one interpretation follows from the plain meaning of these provisions. VEO was authorized to use the Technical Information to design, manufacture, market and sell industrial watertube package boilers, such as those identified in Annex I, during the term of the Agreement. Nothing in the Agreement precludes VEO from incorporating welded walls, increasing the length of the unit, or the size of the drum.

10

There has been no evidence adduced in this litigation, and IKE cannot point to a single piece of evidence, that shows VEO has manufactured, sold or installed any item under the Agreement other than natural circulation, industrial watertube package boilers between the steam capacity range delineated in the Agreement. Moreover, not a single document or witness in this matter has been demonstrated to support the theory that VEO utilized any Technical Information in conjunction with the design, manufacture or sale of any item other than those specifically permitted under the Agreement.

IKE takes the position in its complaint that VEO is only licensed to sell "Standard M-Series boilers" also referred to by IKE in its complaint as so-called "Old-Style Boilers." (Plaintiffs' Complaint at ¶ 18; Ex. B; Statement of Facts, ¶ 36). IKE defines these boilers as steam generators that incorporate only tangent tube furnace and convection wall construction, with refractory front and tube and tile rear walls. (License Agreement at pp. 23-25; Statement of Facts, ¶ 26). IKE takes this position despite the fact that the clear and unambiguous definition of Products fails to make mention of these alleged limitations on the scope of the license. "In holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one." *Steuart*, 444 A. 2d at 663, 498 Pa. at 53. IKE is relying on a strained contrivancy in an effort to assert an ambiguity in the definition of Products that simple does not exist. IKE does not take the position, nor can it, that VEO has sold anything under the Agreement other than natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,0000 pph up to and including 150,000 pph.

Rather, IKE has taken the untenable position that, unless a boiler VEO sold is identical in size, steam capacity range and all other characteristics to one of the M series boilers listed in Annex I to the Agreement, VEO lacked the authority to sell the boiler and was outside

11

the scope of the Agreement. "Determining the intentions of the parties is one of the paramount considerations in the interpretation of any contract." *Thomas Rigging,* 798 A.2d at 755. Clearly the parties entered into the Agreement to allow VEO the ability to market and sell Keystone boilers under 150,000 pph, to the mutual financial benefit of both parties. The language of the Agreement also shows that the parties intended to allow VEO sufficient flexibility to modify and improve the products. IKE's narrow and strained interpretation of the Agreement simply ignores this plain aspect of the Agreement. Moreover, IKE's position asks the Court to ignore the plain language of the Agreement in the definition of the term "Products."

## C.    VEO Had The Right To Make Modifications.

Even if the Court were to adopt IKE's unsupported interpretation of the term "Products" under the Agreement, VEO had the absolute right to modify the Products, so long as said modification did not diminish the reliability and performance of the Product. (License Agreement at p.9, ¶ 8.a); Ex. F; Statement of Facts, ¶ 29). In addition, VEO had the right to improve the design of the Products, and following the expiration of the License, VEO would retain the rights to the improvement under the terms of the Agreement. (License Agreement at p.13, ¶ 13.a); Ex. F; Statement of Facts, ¶ 30).

Therefore, even if the Agreement limited the definition of Products to only the so-called "Old-Style Boilers," VEO was free to change the product in order to make it more marketable, so long as the modification or improvement did not diminish the quality or functionality of the Product. It is important to note that IKE is not alleging VEO made any modifications to the Products that in any way compromised the reliability or performance of the Products. In fact, several of IKE's fact witnesses, including Chris T. Petocs, General Manager of IKE, testified that they know of no instance where a product sold by VEO failed to perform properly for a customer. (Chris Petcos Deposition at  p. 147, l. 25 – p. 148, l. 4, attached as

Exhibit J; Statement of Facts, ¶ 54; Gdaniec Dep. at p. 133, l. 7-12; Ex. I; Statement of Facts, ¶ 55). Accordingly, even if the Court ignores the plain language of the Agreement and accepts IKE's proposed definition of Products, IKE cannot demonstrate that VEO was in breach for selling boilers with design alterations, because VEO had the right to make said modifications under the Agreement.

**D.      Under The Agreement, The Licensor Was Compelled To Disclose And Grant VEO A Royalty-Free License To Use Any Improvements To The Products.**

IKE takes the position that it was the intention of the parties to license to VEO only the "Old Style Boilers," so that the licensor could continue to market and sell the "New Style Boilers." The terms of Clause 13, however, belie IKE's assertion. Clause 13 specifically required the Licensor to disclose to VEO any improvements to the Products. (License Agreement at p. 13, ¶ 13.a); Ex. F; Statement of Facts, ¶ 30). It would be nonsensical to argue that the parties sought to share information regarding improvements, while at the same time, understanding that VEO was licensed only to sell older-model boilers that do not include renovations such as welded walls that were developed and incorporated into the technology over twenty years before the parties entered into the Agreement. This clause further demonstrates that the parties intended for VEO to utilize the most modern technology available to design and sell boilers to the financial benefit of both parties.

**E.      The Parties Conduct Demonstrates That Both Sides Understood VEO Was Authorized To Manufacture And Sell Keystone Boilers With Full Membrane Technology.**

As noted above, the role of the Court is to ascertain the intent of the parties from the plain meaning of the contract. *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (Pa. Sup. Ct. 1982). The Agreement clearly and unambiguously granted to VEO the authority to utilize Plaintiff's marks and Technical Information to design, manufacture and sell the Products.

13

Therefore, the Court should not look to extrinsic evidence to ascertain the intent of the parties to the agreement.

However, were this Court forced to examine the extrinsic evidence here, it would find a definite pattern of understanding by both parties that the Agreement permitted VEO to manufacture and sell much more than the narrow class of boilers described in IKE's complaint. VEO purchased two (2) Keystone® boilers from EPTI prior to the execution of the license agreement for the Heinz plant in Muscatine, Iowa. (White Aff. at ¶ 11; Ex. A; Statement of Facts, ¶ 10). Both of the Heinz boilers were 100% membrane wall design. (White Aff. at ¶ 12; Ex. A; Statement of Facts, ¶ 11). EPTI designed and built these boilers for VEO. (White Aff. at ¶ 13; Ex. A; Statement of Facts, ¶ 12). Following the purchase of the Heinz boilers, VEO began discussions with EPTI regarding the possibility of licensing the technology and trademarks to manufacture and sell O-style Keystone boilers. (White Aff. at ¶ 14; Ex. A; Statement of Facts, ¶ 13).

After the Agreement was signed, EPTI provided, among other things, the following materials to VEO:

- drawings of the various Keystone® boilers, depicting boilers with 100% membrane wall construction;

- a draft sales manual, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone M Series boiler;

- a power point presentation, showing welded walls and water cooled front and rear walls as an optional feature to the Keystone M Series boiler;

- the Keystone Design Guide, describing features of the Keystone M Series boilers with welded walls;

- the KPSC computer program, used by EPTI and VEO to rate boilers, that allowed VEO to rate boilers that incorporated 100% membrane technology.

(White Aff. at ¶15; Ex. A; Statement of Facts, ¶ 41).

Following the execution of the Agreement, VEO began marketing and selling Keystone® boilers. (Gdaniec Dep. at p. 124, l. 11-16; Ex. I; Statement of Facts, ¶ 42). As provided for in the Agreement, EPTI provided engineering support to VEO for the first several boilers VEO sold. (White Aff. at ¶ 22; Ex. A; Statement of Facts, ¶ 43). Every boiler VEO sold, including the boilers designed and rated by EPTI's engineers, utilized 100% membrane technology, the very technology IKE now claims VEO was not authorized to utilize in designing or selling the Keystone® boilers. (White Aff. at ¶ 20; Ex. A; Statement of Facts, ¶ 47).

IKE describes the boilers as "Old Style" and "New Style," in an effort to create a false distinction between certain outmoded models, and the types of boilers sold in North America today. (Plaintiff's Complaint at ¶¶10-11; Ex. B; Statement of Facts, ¶ 38). The critical distinction IKE makes in describing the "New Style" boilers, is to designate boilers that include, among other things, welded furnace and convective side walls and water cooled front and rear walls. (Plaintiff's Complaint at ¶ 10; Ex. B; Statement of Facts, ¶ 40). However, IKE's own witnesses noted that IKE's predecessors had sold O-Style watertube boilers with welded walls since the early 1990s, and it has been considered the preferred wall design in the boiler industry since that time. (Deposition of Steve Bernatowicz at p.13, l. 19-p.14, l. 22; attached as Exhibit K; Statement of Facts, ¶ 58).

IKE has taken the position that VEO was not authorized to sell boilers with membrane wall design. However, the undisputed testimony is that VEO built and sold several boilers with membrane wall technology with EPTI's knowledge during the time that EPTI was the licensor, and no EPTI representative ever informed VEO that it was in breach of the Agreement. (Kang Dep. at p. 60, l. 8-10; Ex. D, Statement of Facts ¶ 56). Moreover, Stephen Kang, President of EPTI during the relevant time period, acknowledged and affirmed the

statements EPTI represented to CMI in the Asset Purchase Agreement that to "Seller's Knowledge, no third party is infringing or has misappropriated any of the Intellectual Property Rights," and "No license or royalty agreement to which Seller is a party is in breach or default by any party . . ." (Kang Dep. at p. 72, l. 25 – p. 73, l. 16; Ex. D, Statement of Facts ¶ 57).

IKE asserts in its complaint that VEO has infringed on its Trademarks and Trade Secrets by designing, manufacturing and selling boilers outside the scope permitted by the license. (Plaintiff's Complaint at pp. 7-13; Ex. B; Statement of Facts, ¶ 35). However, IKE has accepted and cashed each and every check VEO tendered to IKE as a royalty payment under the Agreement. (White Aff. at ¶ 25; Ex. A; Statement of Facts, ¶ 50). IKE's behavior during the course of the relationship is further evidence that not only the Agreement, but the parties themselves clearly understood the Agreement and its broad flexibility. As such, IKE should not be permitted to take an inconsistent position in this litigation.

## CONCLUSION

VEO requests that this Court grant it Summary Judgment on IKE's Complaint and on Count I of VEO's Second Amended Counterclaim and declare:

1)    that VEO did not breach the License Agreement by designing, manufacturing, marketing and selling boilers that incorporated membrane furnace and convection side walls and water-cooled front and rear walls;

2)    that VEO did not breach the License Agreement by designing, manufacturing and selling boilers that differed from the specific parameters set forth in Annex I of the License Agreement.

Dated: January 20, 2006

Respectfully submitted,


/s/Christopher T. Sheean
One of the Attorneys for Defendant,
VICTORY ENERGY OPERATIONS, LLC


LOCAL COUNSEL:

Christopher T. Sheean
WILDMAN HARROLD ALLEN & DIXON LLP
225 W. Wacker Drive, 28th Floor
Chicago, IL 60606
(312) 201-2000

G. Jay Habas, Esquire
Marshall, Dennehey, Warner
Coleman & Goggin
1001 State Street, Suite 1400
Erie, PA 16506
(814) 461-7800
PA ID No. 55581