## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company, | : : : : | |
| | : | CIVIL ACTION |
| Plaintiff, | : : | NO. 04-CV-325 (ERIE) |
| v. | : : | Judge Sean J. McLaughlin |
| VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company, | : : : : | |
| Defendant. | : : | |

---

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS

---

Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel, submits this Memorandum of Law in support of its Motion for Partial Summary Judgment on Counts II through V of the Second Amended Counterclaim filed by Defendant, Victory Energy Operations, LLC ("VEO").

## I.    BACKGROUND

IKE commenced this action against VEO for trademark infringement, misappropriation of trade secrets, unfair competition and unjust enrichment. As set forth in greater detail in IKE's Statement of Undisputed Facts in Opposition to VEO's Motion for Partial Summary Judgment and in Support of IKE's Motion for Partial Summary Judgment on its Complaint, Memorandum

of Law in Support of Motion for Partial Summary Judgment on its Complaint and Memorandum of Law in Opposition to VEO's Motion for Partial Summary Judgment (which are being filed contemporaneously herewith, and which are incorporated herein by reference), the crux of IKE's claim is that VEO misappropriated trade secrets pertaining to Keystone® water tube industrial package boilers, which were communicated to VEO in confidence and pursuant to the confidentiality provision of the parties' License Agreement, by marketing and selling Keystone® boilers that were *outside* the scope of the License Agreement. VEO's latest response to IKE's Complaint purports to set forth Counterclaims, *inter alia*, for alleged breach of the exclusivity provision of the License Agreement (Count II), intentional interference with contractual relationships with third-parties (Count III), violation of the California Business and Professional Code (Count IV), and intentional interference with prospective economic advantage (Count V). However, despite extensive discovery, VEO does not have any evidence necessary to establish several of the elements of the foregoing counterclaims. To the extent that discovery has yielded evidence that is germane to VEO's counterclaims, such evidence affirmatively demonstrates that VEO is <u>not</u> entitled to any relief thereupon. Accordingly, IKE is entitled to summary judgment on Counts II through V of VEO's Second Amended Counterclaim.

In its counterclaim for alleged intentional interference with prospective economic advantage, VEO avers that it had submitted a bid to the University of Notre Dame ("Notre Dame") for the sale of a Keystone® O-type boiler. VEO claims that it was "reasonably likely" to be awarded a contract for the sale of that boiler, but that an IKE representative (Jeff Coale) made disparaging comments to Notre Dame officials, which caused VEO to be eliminated from consideration for that contract. *See* VEO's Second Amended Counterclaim, at ¶¶ 50-58. However, the Director of Utilities for Notre Dame (Paul A. Kempf, P.E.) told a much different

2

story. In particular, Mr. Kempf testified that Notre Dame awarded the subject boiler contract to

VEO's competitor (English Boiler) on the merits of English's proposal, specifically including:

(i) English's bid price, which was lower than VEO's, (ii) the fact that English's proposal

guaranteed lower emissions than the proposal submitted by VEO, and (iii) the fact that English's

proposed boiler was more efficient than the package proposed by VEO.  (Exhibit A, Kempf

Dep., pp. 68, 76-77, 84-85 and 89).  Significantly, the alleged statements about VEO by Mr.

Coale were not considered by Notre Dame and had no impact on its decision to award the boiler

contract to English, instead of VEO.  (*Id.*, at pp. 66-67 and 91-94).  Because IKE's alleged

statements were not a factor in Notre Dame's decision to award the boiler contract to English, as

a matter of law, IKE did not "interfere" with VEO's prospective economic advantage or

otherwise cause VEO to sustain any damages.

In support of its counterclaim for alleged interference with contractual relations, VEO

alleges that it was a party to separate Sales Representative Agreements with Christian Power

Equipment ("CPE"), Power Systems, Inc. ("PSI") and Thermal & Hydraulic Equipment

("THE"), and that IKE improperly caused those representatives to terminate their respective

representative agreements with VEO, by threatening to discontinue IKE's business with each of

them.  *See* VEO's Second Amended Counterclaim, at ¶¶ 22-44.  Once again, however, VEO

cannot recover on that counterclaim, as a matter of law.  First and foremost, each of the subject

representative agreements was terminable ***at-will*** and without cause by either party.  *See* Exhibits

B and C to VEO's Second Amended Counterclaim, at ¶ 8(a).  Secondly, VEO has admitted in its

Second Amended Counterclaim (at ¶¶ 22, 28, and37) that IKE and VEO are "competitors in the

design, manufacturing and sale of steam generating equipment, including industrial boilers" and

that at least two of the identified sales representatives also represented IKE for the sale of boilers

3

and equipment. Because IKE's alleged conduct related to its competition with VEO for boiler and equipment sales, and it would have been a conflict of interest for those sales agents to represent both IKE and VEO for competing products and services simultaneously, IKE's requests that the sales agents represent either IKE or VEO exclusively was not improper or actionable.

Furthermore, there is no evidence that IKE's actions actually caused VEO to sustain any damages from the alleged terminations of the sales representative agreements. With respect to CPE, for example, VEO's President and corporate designee could not identify any lost sales in the territory in which CPE had represented VEO. (Exhibit B, Viskup Dep., pp 40-42). Additionally, the undisputed evidence is that there are no less than eight other boiler sales representatives who are active in the same territory, most of whom are competent, and whose reputations range from "good" to "excellent". (Exhibit C, Christian Dep., pp. 130-35). Similarly, with respect to THE, there was no termination of the sales representative agreement with VEO, nor did THE alter or modify its promotional activities for VEO's products and services as a result of any actions or statements by IKE. (See Second Amended Counterclaim, at ¶ 44 and Exhibit B, Viskup Dep., pp 40-42).

The basis for VEO's counterclaim under the California Business and Professional Code is the same alleged interference with the sales representative agreement between VEO and CPE that was the basis for VEO's intentional interference claim, above. VEO is not entitled to judgment in its favor on that statutory claim, for the same reasons that VEO is not entitled to any recovery on its intentional interference claim. Furthermore, the relief that VEO seeks for its statutory claim is monetary damages. (Id., at pp. 40-42). However, it is well established that

PTDATA 294554_1

private parties cannot recover monetary damages under the California Business and Professional Code. Accordingly, VEO's statutory counterclaim fails as a matter of law.

Finally, VEO contends that IKE has breached the exclusivity provision of the parties' License Agreement, by marketing and selling boilers that VEO had been granted an exclusive license to sell. *See* VEO's Second Amended Counterclaim, at ¶¶ 15-20. However, VEO's President and corporate designee could not identify one boiler that IKE actually sold in violation of the exclusivity provision of the License Agreement. Similarly, Mr. Viskup could not identify any damages that were actually sustained by VEO as a result of IKE's alleged conduct. (Exhibit B, Viskup Dep., pp. 7, 28, 34 and 36). Accordingly, IKE is entitled to summary judgment in its favor on Count II, as well as Counts III, IV and V of VEO's Second Amended Counterclaim.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a party is entitled to summary judgment in its favor, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a summary judgment motion, the Court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the [counterclaimant] proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Anderson v. Conrail*, 297 F.3d 242, 247 (3d Cir. 2002)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). Where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial", summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

PTDATA 294554_1

### III.    ARGUMENT

**(A)    IKE is Entitled to Summary Judgment on VEO's Claim for Intentional Interference With Prospective Economic Advantage, Because There is No Evidence That IKE Interfered or Caused Actual Damages**

In order to recover for intentional interference with prospective economic advantage, a plaintiff must establish the following:

      (1)    a prospective contractual relationship;

      (2)    the purpose or intent to harm  plaintiff by preventing the relationship from occurring;

      (3)    the absence of privilege or justification on the part of the defendant; and

      (4)    occurrence of actual damage.

*Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir. 1991)(applying Pennsylvania law).[1]  A plaintiff also must establish there was a reasonable likelihood that the prospective transaction would have been completed, but for the alleged interference. *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466, 471 (Pa. 1979); *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 898 (3d Cir. 1981)(*cert. denied* at 454 U.S. 893); *Posner v. Lankenau Hospital*, 645 F.Supp. 1102, 1111 (E.D. Pa. 1986).

In the instant matter, VEO claims that IKE's Jeff Coale made statements to Notre Dame, which caused VEO to be eliminated from consideration for a contract to provide a Keystone® O-type boiler to the University, and which VEO further alleges was "reasonably likely" to be awarded to VEO. *See* VEO's Second Amended Counterclaim, at ¶¶ 50-58. Accordingly, the

---

[1] The elements of intentional interference with prospective economic advantage are substantially identical under Pennsylvania law, Oklahoma law (i.e., VEO's principal place of business) and Indiana law (the place of the alleged interference). *See Boyle Services, Inc. v. Dewberry Design Group, Inc.,* 24 P.3d 878, 880 (Okla. Ct. App. 2001); *Butts v. OCE-USA, Inc.,* 9 F.Supp. 2d 1007, 1012 (S.D. Ind. 1998).

parties deposed Paul A. Kempf, P.E., the Director of Utilities at Notre Dame and person in

charge of evaluating bids and selecting the contractor to provide a custom manufactured water

tube boiler for the University. (Exhibit A, Kempf Dep., pp. 12, 75-76). Mr. Kempf's testimony

made it abundantly clear that IKE did not actually interfere with any prospective economic

advantage anticipated by VEO.

First and foremost, Mr. Kempf testified that Notre Dame awarded the subject boiler

contract to VEO's competitor (English Boiler) on the merits of English's proposal, specifically

including: (i) English's bid price, which was lower than VEO's, (ii) the fact that English's

proposal guaranteed lower emissions than the proposal submitted by VEO, and (iii) the fact that

English's proposed boiler was more efficient than the package proposed by VEO. (*Id.*, at pp. 68,

76-77, 84-85 and 89). Significantly, the alleged statements about VEO by Mr. Coale were <u>not</u>

considered by Notre Dame and had <u>no</u> impact on its decision to award the boiler contract to

English, instead of VEO. In fact, Mr. Kempf specifically testified that:

- At the point in time when Jeff Coale allegedly made remarks about VEO, Notre Dame was "leaning towards [purchasing a boiler from] English and NATCOM, and so if that was going to be the end decision, [Coale's comments] really didn't matter" to him;

- If Notre Dame had decided to purchase a boiler from VEO, it would have discussed Coale's statements with VEO, "but [Notre Dame] never got to that point... we didn't get to a point where we were seriously looking at [VEO]. . ."; and

- Coale's alleged statements weren't "part of [Kempf's] decision process."

(*Id.*, at pp. 66-67, 73 and 91-94).

Furthermore, VEO had no "right" to a contract with Notre Dame for the proposed boiler.

To the contrary, Notre Dame reserved the right to reject any proposal, including the proposal

submitted by the lowest bidder. (*Id.*, at p. 76). Under the foregoing circumstances, Mr. Kempf

indicated that the English boiler was and is in the best interest of Notre Dame. (*Id.*, at p. 77).

Thus, as a matter of both fact and law, IKE's alleged statements to Notre Dame did not

cause the University to refrain from awarding any contract to VEO. Because IKE's alleged

statements had no impact whatsoever on the University's decision, IKE did not actually cause

VEO to sustain any damages. There is no genuine issue as to the foregoing material facts, and

IKE is entitled to judgment as a matter of law on Count V of VEO's Seconded Amended

Counterclaim.

**(B)    IKE is Entitled to Summary Judgment on VEO's Claim for Intentional Interference With Contractual Relations, Because There is No Evidence That IKE's Alleged Interference Was Improper or Unjustified**

It is generally accepted jurisprudence that, "One who intentionally and improperly

interferes with the performance of a contract (except a contract to marry) between another and a

third person by inducing or otherwise causing the third person not to perform the contract, is

subject to liability to the other for the pecuniary loss resulting to the other from the failure of the

third person to perform the contract." *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393

A.2d 1175, 1182 (Pa. 1978)(citing RESTATEMENT OF TORTS (Second) §766 (1977)).

Accordingly, in order to prevail on a claim for intentional interference with contractual relations,

a plaintiff must establish the following elements:

> (1)    an existing contract;
>
> (2)    the purpose or intent to harm the plaintiff by preventing the relation from occurring;
>
> (3)    the absence of privilege or justification on the part of the defendant; and
>
> (4)    the occasioning of actual damage resulting from the defendant's conduct.

PTDATA 294554_1

*Thompson Coal Co.,* 412 A.2d at 417 (citing *Glenn v. Point Park College,* 272 A.2d 895, 898 (Pa. 1971)).[2]

Whether a defendant's conduct is proper or justified depends upon the circumstances of each individual case. The Courts have explained, "The issue in each case is whether the interference is improper or not under the circumstances; whether upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." *Adler,* 393 A.2d at 1184 (*citing* RESTATEMENT OF TORTS (Second) §767, cmt. b. (1977)). *See also* Harper & James, THE LAW OF TORTS §§ 6.12 and 6.13 (whether interference is improper or not depends upon the "rules of the game" in place in the context of the alleged tort). In fact, under the following circumstances, a business that induces a third-party to terminate an *at-will* contract with its competitor will <u>not</u> be liable to the competitor therefor:

(1) the relation concerns a matter involved in the competition between the actor and the other and

(2) the actor does not employ wrongful means and

(3) the action does not create or continue an unlawful restraint of trade and

(4) his purpose is at least in part to advance his interest in competing with the other.

RESTATEMENT OF TORTS (Second) §768 (1979). *See also Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 203 A.2d 469, 471 (Pa. 1964); *Republic Systems and Programming, Inc. v.*

---

[2] The elements of intentional interference with contractual relations are substantially identical under Pennsylvania law, Oklahoma law (i.e., VEO's principal place of business), Michigan law (the place of the alleged interference with the PSI Agreement) and California law (the place of the alleged interference with the CPE Agreement). *See Gabler v. Holder and Smith, Inc.,* 11 P.3d 1269, 1278 (Okla. Ct. App. 2000)(*citing Navistar Int'l. Transp. Corp. v. Vernon Klein Truck & Equipment,* 919 P.2d 443, 446 (Okla. Ct. App. 1994) and RESTATEMENT OF TORTS (Second) §766); *DeCoe v. General Motors Corp.,* 32 F.3d 212, 218 (6th Cir. 1994)(applying Michigan law); *Quelimane Co. Inc. v. Stewart Title Guaranty Co.,* 960 P.2d 513, 530 (Cal. 1998).

PTDATA 294554_1

*Computer Assistance, Inc.*, 440 F.2d 996, 1000-01 (2d Cir. 1971); *Motorola, Inc. v. Fairchild Camera and Instrument Corp.*, 366 F.Supp. 1173, 1180-81 (D. Ariz. 1973).

1.    **IKE's Requests for Exclusive Representation from Its Independent Sales Agents is Not Actionable As a Matter of Law**

In the instant matter, IKE's requests that the identified sales agents represent either IKE or VEO exclusively was <u>not</u> improper or actionable.  First, VEO has admitted that IKE and VEO are business competitors.  *See* VEO's Second Amended Counterclaim, at ¶ 22.  Accordingly, IKE's alleged communications with the sales agents clearly concerned the business competition between IKE and VEO.  Secondly, IKE did not "employ wrongful means" in asking the sales representatives to make such a decision, especially where it would have been a conflict of interest for those sales agents to represent both IKE and VEO for competing products and services simultaneously.[3]  Thirdly, there is no evidence that IKE's requests to the sales representatives created or continued any restraint of trade.  To the contrary, for example, at least eight other boiler sales representatives are active in the same territories in which CPE provided representation for VEO -- most of whom are competent, and whose reputations range from good to excellent.  (Exhibit C, Christian Dep., pp. 130-35).  Finally, it is undisputed that IKE's alleged actions were intended to advance its interest in competing with VEO, namely, by securing sales representatives with undivided loyalty to IKE.  Thus, the termination of at-will sales

---

[3] VEO allegedly designed and recently launched the "Voyager" boiler series, a line of industrial water tube package boilers that competes directly with the Keystone® boilers that VEO had licensed from IKE, and thus, presently competes with IKE on all major or primary product lines. *See* VEO web page announcement, Exhibit D hereto, and deposition transcript of VEO General Manager Mark White, attached hereto as Exhibit E, at pp. 100-02

PTDATA 294554_1

representative contracts[4] set forth in Count III of VEO's counterclaim is not actionable, and IKE

is entitled to judgment as a matter of law.

### 2. IKE's Requests for Exclusive Representation from Its Independent Sales Agents Were Sanctioned by the "Rules of the Game" in the Boiler Industry

Even if IKE's alleged actions were not permissible simply as legitimate competition, the

applicable "rules of the game" in the boiler industry establish the propriety of IKE's conduct. In

particular, the subject sales representative agreements each included a non-compete clause,

which specifically provided that the "Representative shall not handle, sell, distribute or otherwise

associate itself with any equipment that is *similar to* or competes *in any way* with the [subject]

Products." *See* Exhibits B and C to VEO's Second Amended Counterclaim, at paragraph 8(a).

(emphasis added). CPE's principal, Alan Christian, testified that such non-compete provisions

are contained in written sales representative contracts more than half of the time in the boiler

sales industry. (Exhibit C, Christian Dep., p. 107). Even where a non-compete clause is not

contained in a written representative agreement, it is nevertheless implied -- "the intent of that

clause is common in the industry." *Id.*, at pp. 103-106. In fact, CPE has never represented two

competing manufacturers for the same product line simultaneously – except where it received

express consent from Erie Power to CPE's representation of VEO for the licensed Keystone®

boilers. *Id.*, at pp. 107-109.

Furthermore, the Sales Representative Agreement (at paragraph 8(c)) requires the sales

agent to identify all companies it is representing and all equipment that it is attempting to sell, so

---

[4] Paragraph 12(a) of the Sales Representative Agreement provides that "This contract is subject to cancellation upon thirty (30) days written notice by either party." *See* VEO's Second Amended Counterclaim, at Exhibits B and C.

PTDATA 294554_1

that the manufacturer may determine whether a conflict of interest exists. *Id.*, at pp. 109-110. Here, IKE considered it to be a conflict of interest for CPE to represent both VEO and IKE. IKE legitimately desired sales representatives who would be able to represent its entire product lines with undivided loyalty. *Id.*, at pp. 37-38 and 43-50. CPE simply decided that it would be more profitable and was "the best business decision" for CPE to represent IKE's products exclusively. *Id.*, at pp. 56, 119-20.

Finally, the Sales Representative Agreements are terminable at-will by either party. *See* VEO's Second Amended Counterclaim, at paragraph 12(a) of Exhibits B and C. Mr. Christian testified that such at-will termination provisions are common in the industry, appearing in over 80% of the contracts to which CPE is a party. *Id.*, at p. 118.

The existence of widely-accepted and standard non-compete provisions, the practice of allowing the manufacturer to determine what constitutes a conflict of interest for outside sales agents, and the regular existence of bilateral at-will termination provisions clearly demonstrate that any boiler manufacturer is well within its right to request its sales representatives to refrain from representing competitors -- even if it requires those representatives to exercise their termination rights with a competitor. As such, there is no evidence that IKE acted improperly.

### 3. Even If VEO Could Prove That IKE Acted Improperly, VEO Nevertheless Cannot Prove That It Sustained Any Harm

Even if VEO could establish a cause of action based upon IKE's requests that its sales representatives choose between IKE and VEO, VEO nevertheless has failed to produce any evidence of actual harm. Specifically, VEO is unable to quantify any sales opportunities that it actually lost as a result of the termination of its Sales Representative Agreements with CPE or

PSI.[5] (Exhibit B, Viskup Dep., at pp. 38-42).  Likewise, THE never terminated its Sales

Representative Agreement with VEO, nor did it alter its sales efforts on VEO's behalf as a result

of any alleged pressure or request from IKE.  *Id.*, at p. 24.  Accordingly, IKE is entitled to

judgment in its favor as a matter of law on VEO's claim for intentional interference with

contractual relations.

### (C)    VEO Similarly is Without Evidence Sufficient to Permit It To Proceed on Its Claim Under the California Business and Professional Code

VEO has attempted to state a cause of action under the California Business and

Professional Code, section 17200, *et seq* (the "Code").  However, the sole basis for that statutory

claim is the exact same set of factual allegations upon which VEO's claim for intentional

interference with its Sales Representative Agreement with CPE is based.  *See* VEO's Second

Amended Counterclaim, at ¶ 47.  For the reasons set forth above, there is no evidence that IKE

acted improperly with respect to CPE or its Sales Representative Agreement with VEO, and thus,

VEO's statutory claim must fail.[6]

Furthermore, the relief that VEO seeks for its statutory claim is monetary damages.

(Exhibit B, Viskup Dep., pp. 40-42).  However, it is well established that private parties cannot

recover monetary damages under the California Business and Professional Code.  *Korea Supply*

---

[5] VEO's claim that it was harmed by the termination of its Sales Representative Contract with CPE is further refuted by the uncontroverted facts that: (i) there are several other competent sales representatives who provide representation in the same geographic territories as CPE, (ii) VEO did nothing to persuade CPE to refrain from terminating its agreement with VEO, and (iii) prior to IKE's request that CPE choose between IKE and VEO, VEO unilaterally modified its agreement with CPE, by *reducing* the size of the territory in which CPE represented VEO. (Exhibit C, Christian Dep., at pp. 57, 121-24, 130-35

[6] Even if the undisputed facts and circumstances did not establish that there was nothing improper about IKE's alleged request to CPE, VEO has not, and can not identify any provision of the Code that IKE violated.

PTDATA 294554_1

*Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003)("A[n action under the Code] is equitable in nature; damages cannot be recovered.")(citations omitted).  Accordingly, VEO's counterclaim for monetary damages under the Code fails as a matter of law.

### (D)    VEO Has No Evidence That IKE Actually Breached the Exclusivity Provision of The License Agreement, Or That It Sustained Any Damages

Finally, VEO contends that IKE has breached the exclusivity provision of the parties' License Agreement, by marketing and selling boilers that VEO had been granted an exclusive license to sell.  *See* VEO's Second Amended Counterclaim, at ¶¶ 15-20.  It is axiomatic that, in order to recover for breach of contract, a party must prove the existence of a contract, the breach of a duty imposed by that contract, and damages.  *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269 (Pa.Super. 2002).

However, VEO's President and corporate designee could not identify one boiler that IKE actually sold in violation of the exclusivity provision of the License Agreement.  (Exhibit B, Viskup Dep., at pp. 7, 28 and 34).  Accordingly, VEO has no evidence of an actual breach of the exclusivity provision of the License Agreement.  Similarly, Mr. Viskup could not identify any damages that were actually sustained by VEO as a result of IKE's alleged conduct.  (*Id.*, at pp. 7 and 36).  Accordingly, VEO has no evidence to support two of the three elements of its breach of contract claim, and IKE is entitled to summary judgment in its favor on Count II of VEO's Second Amended Counterclaim as a matter of law.

PTDATA 294554_1

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff Indeck Keystone Energy LLC asks the Court to enter judgment in its favor and against Defendant Victory Energy Operations, LLC, on Counts II through V of VEO's Second Amended Counterclaim.

Respectfully submitted,

_/s/    Robert J. Williams_
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated:  March 6, 2006

PTDATA 294554_1