```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   INDECK KEYSTONE ENERGY,     )
 4   LLC, a Delaware limited     )
     liability company,          )   CONFIDENTIAL
 5                               )
            Plaintiff,           )   CIVIL ACTION
 6                               )
     vs.                         )   No. 04-CV-325E
 7                               )
     VICTORY ENERGY OPERATIONS,  )   Judge Sean J.
     McLaughlin
 8   LLC, a Delaware limited     )
     liability company,          )
 9                               )
            Defendant.           )
10
11
12
13      The videotape deposition of JOHN VISKUP taken
     on
14   behalf of the Plaintiff before Pamela B. Stinchcomb,
15   Certified Shorthand Reporter in and for the State of
16   Oklahoma, on the 1st day of February, 2006, in the
17   City of Tulsa, State of Oklahoma, pursuant to the
18   stipulations of the parties.
19
20
21
            PAMELA B. STINCHCOMB, CSR #1544
22          DAVIDSON REPORTING SERVICE
              5508 South Lewis Avenue
23            Tulsa, Oklahoma  74105
                 (918) 745-9959
24
25
```

```
                                                           2
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF:    MR. JOHN K. GISLESON
                           Attorney at Law
 3                         Fifth Avenue Place
                           120 Fifth Avenue
 4                         Suite 2700
                           Pittsburgh, Pennsylvania
 5                                               15222
 6   FOR THE DEFENDANT:    MR. CHRISTOPHER T. SHEEAN
                           Attorney at Law
 7                         225 West Wacker Drive
                           Chicago, Illinois  60606
 8
     Also appearing:       Chris Petcos
 9                         Mark White
                           Martin Swabb
10
11
12
13            S T I P U L A T I O N S
14      It is hereby stipulated and agreed by and
15   between the parties hereto that this deposition is
16   being taken pursuant to notice and that the same may
17   be taken at this time and place.
18      It is further stipulated and agreed that this
19   deposition may be taken pursuant to the Federal
     Rules
20   of Civil Procedure and that the same may be taken at
21   this time and place.
22
23
24
25
```

```
                                                           3
 1                    I N D E X
 2   DIRECT EXAMINATION
           by Mr. Gisleson..................... Page 4
 3
     REPORTER'S CERTIFICATE.................... Page 50
 4

 5              INDEX OF EXHIBITS
 6   EXHIBIT                               PAGE
 7   NUMBER                                IDENTIFIED
 8   PLAINTIFF'S EXHIBITS
 9   Number 1............................. 4
10   Number 2............................. 25
11   Number 3............................. 26
12   Number 4............................. 45
13   Number 5............................. 47
14
15
...
25
```

```
                                                           4
 1              JOHN VISKUP,
 2   being first duly sworn to tell the truth, the whole
 3   truth, and nothing but the truth, testified as
 4   follows:
 5              DIRECT EXAMINATION
 6   BY MR. GISLESON:
 7     Q. Would you state your name, please.
 8     A. John Viskup.
 9     Q. Do you understand you're appearing here
10   today as the authorized representative of Defendant
11   Victory Energy Operations, LLC, in this lawsuit?
12     A. Yes.
13       (Plaintiff's Exhibit Number 1 was marked
14   for identification.)
15     Q. (By Mr. Gisleson) I'd like to show you
16   what's been marked as Plaintiff's Exhibit 1, which is
17   a copy of a Notice of Rule 30(b)(6) Deposition Of
18   Corporate Designee Of Defendant. If you can look at
19   that, let me know whether you've seen it before.
20     A. Yes.
21     Q. Are you here today to testify to any of
22   these items listed 1 through 23?
23     A. Yes.
24     Q. Which ones?
25     A. I believe specifically 21, 22, 23.
```

5

1  Q. Any others?
2  A. No.
3  Q. Item Number 21 is, "The factual basis for
4  VEO's claim that IKE has violated exclusivity under
5  the license agreement," correct?
6  A. Yes.
7  Q. What is VEO's understanding as to any
8  exclusivity obligation under the license agreement
9  that applies to Indeck Keystone Energy?
10 A. We believe under the license agreement, we
11 had exclusive rights to the marketing and the sales
12 thereof of the Keystone boilers within the United
13 States, Canada and Mexico.
14 Q. Which Keystone boilers?
15 A. The ones that have been licensed.
16 Q. Which were the ones that were licensed?
17 A. The ones identified in the license
18 agreement.
19 Q. In Clause 1 as well as in Annex 1?
20 A. Clause 1.
21 Q. Are the license products for which VEO
22 claim as exclusivity those included in Annex 1, as
23 well?
24            MR. SHEEAN:  John, I think we're
25 getting into sort of blending back over to topic

6

1  Number 2, which is the interpretation of the license
2  agreement for which we're going to offer Mark White.
3             MR. GISLESON:  I understand that.  I
4  just want to make sure I understand the scope of the
5  exclusivity claim and the specific boilers that are
6  the subject of the exclusivity claim.
7             MR. SHEEAN:  And I think the answer to
8  that is what Mr. Viskup has already testified to and
9  that is the -- those items licensed under the license
10 agreement.  If you want to delve into what VEO's
11 interpretation of the license agreement is, you're
12 free to ask Mr. White all about that.
13            MR. GISLESON:  Thank you.
14 Q. (By Mr. Gisleson) So what are the boilers
15 for which -- well, strike.  That does VEO believe
16 that IKE violated exclusivity under the license
17 agreement?
18 A. Yes.
19 Q. How did IKE violate exclusivity under the
20 license agreement?
21 A. There were several announcements made about
22 their ability to sell Keystone boilers in the same
23 marketplace that we had been selling Keystone boilers
24 in, with no mention of Victory Energy, no mention of
25 capacity ranges to which they could sell -- sell the

7

1  units. We -- to my understanding there was a
2  brochure that was developed and sent out in the
3  marketplace also identifying the same items with no
4  mention of our company and in a sense creating a
5  false understanding of who the person is that could
6  supply the Keystone boilers in the marketplace.
7  Q. Anything else?
8  A. I can't think of anything else right now.
9  Q. Did IKE, in fact, sell any Keystone boilers
10 in alleged violation of exclusivity provision of the
11 license agreement?
12 A. I don't know.
13 Q. Has VEO, in fact, experienced any financial
14 damages associated with the alleged violation of
15 exclusivity by IKE?
16 A. None that we know of right at the moment.
17 Q. Is VEO in possession of any documents as
18 you identified that support the claim of a breach of
19 exclusivity?
20 A. Yes.
21 Q. What are the documents?
22 A. I believe there's a brochure developed by
23 IKE and there is some public announcements that were
24 made by Marsha Fornyeah. I think there's a couple of
25 those documents.

8

1  Q. Anything else?
2  A. Not that I can think of right now.
3  Q. What was the date of the brochure?
4  A. I don't know.
5  Q. What did the brochure look like?
6  A. I don't know.
7  Q. Can you describe the brochure in any way?
8  A. No.
9  Q. When was the last time you saw the
10 brochure?
11 A. I haven't seen it.
12 Q. How did VEO become aware of this brochure?
13 A. I believe it was through document
14 production from IKE.
15 Q. Was VEO in possession of a copy of the
16 brochure prior to production by IKE?
17 A. I don't know.
18 Q. Did the brochure address Keystone boilers
19 above 150,000 pounds per hour?
20 A. I don't know.
21 Q. Does VEO contend that IKE violated or
22 breached exclusivity if it was offering for sale a
23 Keystone boiler above 150,000 pounds per hour?
24            MR. SHEEAN:  Objection, vague.  Can
25 you rephrase that?  Who violated the agreement?

21

1   A.  I'm not sure.
2   Q.  VEO believes that its own sales brochure
3   identified that its exclusive license was only up to
4   150,000 pounds per hour steam flow?
5   A.  Yes.
6   Q.  What was the name of the trade publication
7   that you referenced?
8   A.  I don't remember.
9   Q.  Who were the customers who expressed
10  confusion to VEO?
11  A.  I don't recall right now.
12  Q.  Can VEO identify any sales that it lost as
13  a result of any alleged actions by IKE in violation
14  of the exclusivity provision in the license
15  agreement?
16  A.  Well, I know we lost opportunities, so
17  don't know of any sales were lost yet, but we lost
18  opportunities to bid.
19  Q.  Can you identify any specific opportunities
20  to bid that VEO loss?
21  A.  Yes, the one I mentioned in Michigan about
22  the 150,000 pound per hour boiler application.
23  Q.  Any others?
24  A.  No.
25  Q.  As of Michigan boiler, was that Indeck

22

1   Keystone Energy or Indeck Power Equipment?
2   A.  Indeck Keystone Energy.
3   Q.  Are there any other public announcements
4   you can identify, other than the Marsha Fornyeah
5   e-mail and the trade publication?
6   A.  Other than just Chris Petcos, his own
7   announcements at the sales meeting in front of
8   several sales reps and several phone calls that he
9   made to a lot of our existing reps.
10  Q.  When was the sales conference that you
11  referenced?
12  A.  It was in December, Power Gen.
13  Q.  December of 2005?
14  A.  No, it was a year before that.
15  Q.  December of 2004?
16  A.  Right.
17  Q.  What exactly did Mr. Petcos say that causes
18  concern to VEO?
19           MR. SHEEAN:  Objection, asked and
20  answered.
21  A.  He had said that Victory Energy was
22  licensed to sell Keystone boilers of the tangent tube
23  refractory front and rear wall design, that IKE could
24  sell Keystone boilers that differ from that.  As an
25  example, "O" series or -- or the new series, whatever

23

1   he was characterizing at that time.
2   Q.  (By Mr. Gisleson) Was that the same
3   statement that Mr. Petcos made to VEO in writing
4   prior to the time of Power Gen?
5   A.  No.
6   Q.  Did IKE through Chris Petcos, at any time
7   prior to December 2004, notify VEO that its license
8   only permitted VEO to sell tangent tube boilers?
9   A.  What time frame?
10  Q.  Prior to December 2004.
11  A.  I don't know.
12  Q.  What were the several calls that Chris
13  Petcos allegedly made?
14  A.  To our sales reps.
15  Q.  To which sales reps?
16  A.  Ian Milligan being one of them.
17  Q.  What did he say?
18  A.  What I had said before about what our
19  limitations were as far as what we could sell.  He
20  was trying to get Ian Milligan to cancel our sales
21  agreement with Victory Energy, represent IKE.  And
22  one of his lasting comments was, you know, you might
23  as well just cancel your contract with them.  We're
24  suing them anyways and they're not going to be able
25  to sell Keystone boilers.

24

1   Q.  Did Ian Milligan cancel his contract with
2   VEO?
3   A.  No.
4   Q.  Is Ian Milligan currently a VEO sales rep?
5   A.  Yes, he is.
6   Q.  Did Ian Milligan in any way change his
7   sales approach based on the conversation with Chris
8   Petcos, to the best of VEO's knowledge?
9   A.  I don't know.
10  Q.  What customers expressed concerns to you in
11  phone calls?
12  A.  I don't know.
13  Q.  Can you remember the specific concerns that
14  were raised?
15  A.  I think just the consistent campaign that
16  he was on, trying to make a difference that we were
17  not able to sell Keystone boilers in the marketplace.
18  Q.  But what were the concerns raised by the
19  customers with whom VEO spoke?
20  A.  Whether or not we were going to be able to
21  sell boilers, you know, again, the mention of the
22  litigation created some serious doubt in people's
23  minds and just caused a stress for us for a period of
24  time there.
25  Q.  So the only public announcements that VEO

25

1  can identify are the Marsha Fornyeah e-mail, the
2  article in the trade publication, the comments by
3  Chris Petcos at Power Gen and then phone calls that
4  Chris Petcos allegedly had with certain VEO sales
5  representatives; is that correct?
6     A. No.
7     Q. What else is there?
8     A. I don't believe I ever testified to an
9  e-mail by Marsha. I believe it was a publication by
10 her, okay? Also you forgot the brochure that they
11 submitted.
12    Q. Brochure?
13    A. Color brochure.
14    Q. Anything else?
15    A. No.
16       (Plaintiff's Exhibit Number 2 was marked
17 for identification.)
18    Q. (By Mr. Gisleson) I'd like to show you
19 what's been marked as Exhibit 2, and if you could
20 just confirm that there is a copy of VEO's amended
21 counterclaim that's included within this document.
22    A. What would you like me to do?
23    Q. There's a copy VEO's amended counterclaim
24 in that document. If you could identify for me the
25 count of the counterclaim that contains the claim for

26

1  breach of the alleged exclusivity provision?
2     A. Number 44.
3     Q. Paragraph 44?
4     A. Is one of them up there. Number 19, Number
5  20, Number 29, Number 30, Number 31, Number 32.
6  There might be others but, I mean, that's -- spend
7  all morning here so --
8              MR. GISLESON: Mark that please.
9       (Plaintiff's Exhibit Number 3 was marked
10 for identification.)
11             THE WITNESS: Before we get started,
12 can I take a bathroom break?
13             MR. GISLESON: Sure.
14      (break was taken)
15    Q. (By Mr. Gisleson) I'd like to show you
16 what's been marked as Exhibit 3, which is a document
17 stamped VEO 1170 to 1190. Is that a copy of the
18 license agreement that was executed by EPTI and VEO
19 without Annex 1?
20    A. Yes.
21    Q. Can you identify this specific provision
22 involving exclusivity that was in VEO's view breached
23 by IKE?
24    A. 1.d, 2.a.1, 2.b, 5.a, 5.e. That's about
25 it.

27

1     Q. How did IKE violate section 5.e of the
2  license agreement?
3     A. I guess it doesn't, no.
4     Q. IKE did not violate section 5.e?
5     A. No, I shouldn't have said that one, so --
6     Q. How did IKE violate section 5.a?
7     A. Where -- where I mean by there is the --
8  all the technical information that was supplied was
9  for the exclusive use for us during the license
10 agreement and they were using the information for
11 benefit of themselves.
12    Q. How did IKE use any technical information
13 supplied by licensor under the agreement in violation
14 of the exclusivity provision?
15    A. Because they were using the information to
16 explain to the industry that they were allowed to
17 sell "O" type watertube boilers, Keystone boilers.
18    Q. What specific technical information did IKE
19 use?
20    A. I believe there was proposals that they
21 generated for that 150,000 pound per hour boiler.
22    Q. Michigan boiler?
23    A. Uh-huh.
24    Q. Anything -- yes?
25    A. Yes.

28

1     Q. Anything else?
2     A. I can't think of right now.
3     Q. Did VEO ever see a copy of the Michigan
4  boiler proposal?
5     A. No.
6     Q. In VEO's view then, the only technical
7  information that was used in violation of the
8  exclusivity provision would be contained in the
9  proposal or other documents submitted in connection
10 with the Michigan boiler proposal?
11    A. And also, I mean, I'm sure there's been
12 document production back and forth in this litigation
13 and I haven't read them all, but, you know, if I was
14 given the opportunity to look through some of those
15 documents, we might be able to point out some more
16 items.
17    Q. Can you identify any sitting here today as
18 VEO's authorized representative to testify in this
19 issue?
20    A. Not at this time.
21    Q. Section 2.b refers to the exclusive license
22 to manufacture the licensed products. Can you
23 identify any boiler in fact manufactured by IKE in
24 violation of section 2.b?
25    A. No.

33

1 Q. Can you identify that amount sitting here
2 today?
3 A. I would say it would be somewhere above
4 250,000 to $400,000.
5 Q. As profit?
6 A. Yes.
7 Q. Did VEO contact GE after learning of the
8 proposal by EPTI?
9 A. I believe we did.
10 Q. Who contacted GE?
11 A. I believe Shawn Brewer did.
12 Q. What did VEO say to GE?
13 A. I don't know.
14 Q. Do you know what GE's response was to the
15 contact by VEO?
16 A. I do not.
17 Q. Did VEO submit a proposal to GE?
18 A. I believe we did.
19 Q. Did GE award a contract to VEO?
20 A. No.
21 Q. Why not?
22 A. I don't know. I think they were confused
23 as what was going on. They didn't understand the
24 whole relationship. I believe they were just
25 confused on what the issues were.

34

1 Q. What basis does VEO have to believe that GE
2 was confused as to the relationship?
3 A. I believe that there is a conversation
4 between Shawn Brewer and somebody from the -- the GE
5 site.
6 Q. What were the details of the conversation?
7 A. How I recall it, that the client was
8 concerned why he had two proposals for a Keystone
9 boiler. He didn't understand why we were -- or why
10 they were offering the unit for sale if we were the
11 exclusive licensee. So there was concerns.
12 Q. Any other concerns that you can identify?
13 A. Not right now, no.
14 Q. Had GE made a decision as to the sale of
15 the boiler as of the time of that contact by VEO?
16 A. I don't know.
17 Q. Did VEO correct any concerns or confusion
18 that GE had?
19 A. I think we tried to verbally, yeah.
20 Q. Any other potential breaches by EPTI that
21 you can identify?
22 A. Not at this time.
23 Q. Are there any other alleged breaches of
24 exclusivity that VEO can identify?
25 A. No.

35

1 Q. Turning to Item 22 of the deposition
2 notice, that reads, "The damages allegedly sustained
3 by VEO with respect to each its of counterclaims."
4 VEO is not seeking any money damages with respect to
5 Count 1 declaratory judgment; is that correct?
6 A. No.
7 Q. Say it differently, is VEO seeking money
8 damages under Count 1 for declaratory judgement?
9 A. No.
10 Q. Under Count 2 is VEO seeking money damages
11 for breach of contract?
12 A. No.
13         MR. SHEEAN: Let's take a break.
14     (break was taken)
15 A. I'd like to correct my answer for Count 2.
16 Q. (By Mr. Gisleson) Okay.
17 A. There's two items there, that one being
18 there's a missed opportunity for the Michigan boiler
19 project that we were not able to pursue, and,
20 secondly, written and oral -- or representations by
21 Chris Petcos and IKE in the industry of their ability
22 to sell Keystone boilers below 150,000 pounds per
23 hour.
24 Q. Anything else?
25 A. No.

36

1 Q. Sitting here today, are you able to
2 quantify any financial damages associated with the
3 missed opportunity for the Michigan boiler?
4 A. Not right now, but I'm sure we could review
5 past project and then determine what that amount is
6 for past opportunities.
7 Q. If the Michigan boiler was a D boiler, that
8 would not violate the license agreement exclusivity
9 provision, would it?
10 A. Yes.
11 Q. A D boiler would violate --
12 A. Yes.
13 Q. -- the agreement? How so?
14 A. Because it's below 150,000 pounds her hour
15 and they're offering it "O" type.
16 Q. Who was offering an "O" type?
17 A. IKE.
18 Q. But if the customer wanted "D" type and IKE
19 offered a "D" type boiler, would that violate the
20 exclusivity provision?
21 A. I don't know.
22 Q. Can you identify the amount of any
23 financial damages associated with any statements by
24 Chris Petcos?
25 A. Not at this time.

37

1   Q. And Count 2 was for breach of contract
2   based on alleged violations of the exclusivity
3   provision, correct?
4   A. Correct.
5   Q. Is VEO seeking any money damages associated
6   with its claim in Count 3 for intentional
7   interference with contractual relations?
8   A. Yes.
9   Q. What is the amount of financial damages?
10  A. It's undetermined right now.
11  Q. Can VEO identify any specific sales that
12  were lost as a result of the alleged interference
13  with contracts set forth in Count 3?
14  A. We do know that there was a missed
15  opportunity for a -- an alternative fuel boiler that
16  Christian Power put together and missed opportunity
17  by ways of them not representing our company any
18  more, we weren't given that opportunity. It was for
19  a large project that we -- we consider to be in that
20  marketplace in a very competitive way and we weren't
21  given that opportunity that he developed.
22  Q. What was the alternative fuel?
23  A. It was a project and I believe it was for
24  Hereford [sic] ethanol.
25  Q. Was that an HRSG?

38

1   A. Yes.
2   Q. That project did not involve a Keystone
3   boiler, did it?
4   A. I don't know.
5   Q. Can you identify any other potential
6   damages experienced by VEO?
7   A. I know that we sold -- we have an
8   aftermarket parts and sales group at Victory Energy
9   and, of course, since Christian Power is not our rep
10  any longer, we don't have the ability to sell parts
11  in that territory and had he still been the rep, we
12  definitely would have.
13  Q. Can you quantify in any way the lost sales
14  associated with the alleged inability to sell parts
15  in the territory?
16  A. I can't at this point.
17  Q. Can you identify any other alleged
18  financial damages experienced by VEO under Count 3?
19  A. The only other one would be -- give me one
20  second. The only other missed opportunities were
21  through a company called PSI Power Systems in
22  Michigan and the termination of their representative
23  agreement with us did not provide us the ability to
24  offer proposals for a period of time.
25  Q. Can you identify any specific sales that

39

1   were lost as a result of PSI no longer being a sales
2   rep?
3   A. The Michigan project we know.
4   Q. Anything else?
5   A. I believe the Notre Dame project through
6   interference with -- with Indeck and IKE.
7   Q. Anything else?
8   A. No, not right now.
9   Q. As VEO's authorized representative, can you
10  identify a specific amount of money damages
11  associated with Count 3?
12  A. I believe we're going to leave that to
13  expert testimony.
14  Q. Has VEO retained an expert to quantify
15  damages under Count 3?
16  A. I don't believe we have at this point.
17  Q. Has VEO undertaken any attempt at
18  quantifying its money damages under Count 3?
19  A. I think it's an ongoing process right now.
20  Q. Has it undertaken any attempt to the
21  present to quantify money damages under Count 3?
22          MR. SHEEAN: Objection, asked
23  answered.
24  A. I don't have anything else to add to that.
25  Q. (By Mr. Gisleson) Pardon me?

40

1   A. I don't have anything else to add.
2   Q. Can you identify anything that VEO has done
3   in an effort to quantify damages under Count 3?
4           MR. SHEEAN: Objection, asked and
5   answered.
6   A. Other than with our attorney, no.
7   Q. (By Mr. Gisleson) Is VEO seeking any
8   damages under Count 4 of its counterclaim?
9   A. No.
10          MR. SHEEAN: Let's take a break.
11  (break was taken)
12  A. I need to correct one of my last
13  statements. I was looking at Count 5 when you were
14  talking about Count 4. The pages kind of came
15  together but -- so we do, yes.
16  Q. (By Mr. Gisleson) What is the claim in
17  Count 4?
18  A. Count 4 is violation of California business
19  and professional code.
20  Q. What are the money damages that VEO seeks?
21  A. Money damages are anything that's been sold
22  from Christian Power for the termination of his
23  representative agreement with us to present day time.
24  Q. Can you quantify that in any way as you sit
25  here today as VEO's authorized representative?

41

1    A.  I know Alan had mentioned to us that it was
2  worth well north of 150, $150,000 a year to them.
3    Q.  That Alan Christian's business?
4    A.  That would he profited from that, and so
5  profits brought to the company would be in excess of
6  that.
7    Q.  Alan Christian told VEO that his profits
8  exceeded $100,000 from his aftermarket parts
9  business?
10    A.  Yes.  And also during the period of time
11  Alan hasn't been a rep of ours, we have not had
12  opportunities to sell projects in his territory.  He
13  was successful for a project with us through, you
14  know, several hours and days of preparation and
15  bidding on the King County project.  So there were
16  several projects that probably didn't get opportunity
17  to bid on.
18    Q.  Can you identify the projects for which VEO
19  did not have an opportunity to bid?
20    A.  There was I know a couple of projects that
21  he was working on with a large engineering firm.  His
22  territory name escapes me right now.  I can't think
23  of the name of him at the moment.  SNC Lavalin,
24  sorry.
25    Q.  Any others?

42

1    A.  Not that I know of right now.
2    Q.  VEO, in fact, submitted a bid to SNC
3  Lavalin, didn't it?
4    A.  We had in the past.
5    Q.  Was this a new project for SNC Lavalin?
6    A.  I'm not sure.  I don't remember.
7    Q.  Had VEO ever obtained a contract from any
8  of its prior proposals to SNC Lavalin?
9    A.  No.
10    Q.  So that VEO had no prior experience getting
11  a contract from SNC Lavalin; is that correct?
12    A.  Correct.
13    Q.  Can VEO quantify its money damages
14  associated with Count 4?
15    A.  Not at this time.
16    Q.  Alan Christian of CPI had a sales rep
17  agreement that permitted him to terminate at any time
18  for any reason; is that correct?
19    A.  CPE?
20    Q.  CPE?
21    A.  Yes.
22    Q.  Are there any other bases for damages that
23  VEO can identify under Count 4?
24    A.  Not that I can recall right now.
25    Q.  Is VEO seeking damages under Count 5?

43

1    A.  I don't believe so at this time.
2    Q.  Are there any other damages under any claim
3  that VEO is seeking from IKE?
4    A.  I'm not aware of any more at this
5  particular time.
6    Q.  Under Item 23, that is VEO's use and/or
7  attempted acquisition and/or use of the Iron [sic]
8  City Ironworks name or mark.  Do you see that?
9    A.  Erie City Ironworks?
10    Q.  Yes.
11    A.  Is that what you mean?  Yes.
12    Q.  Has VEO ever utilized the name Erie City
13  Ironworks?
14    A.  No.
15    Q.  Does VEO claim ownership in any way to the
16  name Erie City Ironworks?
17    A.  No.
18    Q.  Has VEO ever attempted to register the name
19  Erie City Ironworks?
20    A.  I believe we were, yes.
21    Q.  When?
22    A.  I don't want to speculate.  I'm not sure.
23  It was probably a year or two ago.
24    Q.  April 2004?
25    A.  I don't know.

44

1    Q.  Why did VEO seek to register the Erie City
2  Ironworks name?
3    A.  As I said yesterday, this was during the
4  time when as we moved forward in the attempt to
5  purchase the Keystone technology, we just thought
6  that this would be a good -- a good name to use
7  possibly.  It was abandoned and -- but we decided --
8  decided against it.  We've never used it since then.
9    Q.  Why did VEO believe that Erie City
10  Ironworks was a good name to use?
11    A.  It was along with the same lines of
12  bringing a boiler back off the shelf, the old retro,
13  if you will, concept of the boiler being an old
14  boiler and just keeping along with that.
15    Q.  Did Erie City Ironworks have an established
16  reputation in the marketplace?
17    A.  I don't know.
18    Q.  Did you believe that people who were
19  knowledgeable concerning boilers knew the Erie City
20  Ironworks name?
21    A.  Some people may have, yes.
22    Q.  How did you learn of the name?
23    A.  I learned of the name when I worked at
24  Indeck and I heard, you know, through several -- I
25  believe even in the Keystone brochure it leads on to