Page 771

```
 1         UNITED STATES DISTRICT COURT
 2         WESTERN DISTRICT OF PENNSYLVANIA
 3
 4   INDECK KEYSTONE ENERGY LLC  )
                                 )
 5        Plaintiff,             )
                                 )
 6   vs.                         ) Civil No. 04-325 Erie
                                 ) Judge Sean J. McLaughlin
 7   VICTORY ENERGY OPERATIONS   )
     LLC,                        )
 8                               )
          Defendant.             )
 9   _____)
10
11
12
13
14   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
15         DEPOSITION OF ALAN W. CHRISTIAN
16
        Taken on Monday, December 5, 2005
17              at 10:08 a.m.
18       At Hall Prangle & Schoonveld, LLC
         300 South Fourth Street, Suite 1001
19              Las Vegas, Nevada
20
21
22
23
24
25   Reported by: MICHELLE C. JOHNSON
```

Page 3

```
 1              I N D E X
 2   WITNESS                        PAGE
     ALAN W. CHRISTIAN
 3
        Examination by Mr. Sheean      5
 4
        Examination by Mr. Williams    96
 5
        Further Examination by Mr. Sheean  171
 6
 7              E X H I B I T S
 8   NUMBER                         PAGE
     Christian Deposition
 9
10   1   "Amended Notice of Videotaped Deposition  68
         of Alan Christian"
11
     2   CONFIDENTIAL - Printout of e-mail,   69
12       8/8/03 (VEO0936)
13   3   CONFIDENTIAL - Printout of e-mail,   69
         9/5/03 (VEO0941)
14
     4   CONFIDENTIAL - Printout of e-mail,   69
15       6/24/03 (IKE 000154)
16   5   HIGHLY CONFIDENTIAL - Printout of e-mail,  76
         10/4/04 (IKE 07971)
17
     6   Printout of e-mail, 3/14/05 (IKE 07749)  76
18
     7   HIGHLY CONFIDENTIAL - Printout of e-mail  76
19       with attachments, 3/17/05 (IKE 07931-65)
20   8   3/24/05 letter to Christian from West  76
21   9   HIGHLY CONFIDENTIAL - Printout of e-mail  76
         with attachments, 5/18/04 (IKE 07980-82)
22
     10  Indeck Keystone Energy, LLC "Boiler  76
23       Design and Manufacturing" brochure
         (IKE 07437-42)
24
     11  CONFIDENTIAL - Various documents  87
25       beginning with 11/29/05 "Memorandum" to
         Williams from Christian
```

Page 4

```
 1   PROCEEDINGS                    10:08 A.M.
 2        THE VIDEOGRAPHER: We are now on the record.
 3   Today is Monday, December 5th, 2005, and the time is
 4   approximately 10:08 a.m.
 5        This begins Tape No. 1 in the videotaped
 6   deposition of Alan Christian. We're at the Law
 7   Offices of Hall Prangle & Schoonveld, LLC, 300 South
 8   Fourth Street, Las Vegas, Nevada.
 9        This deposition has been ordered by
10   Christopher Sheean, representing the defendant. We
11   are here in the matter of "Indeck Keystone Energy,
12   LLC, Plaintiff, versus Victory Energy Operations,
13   Defendant." This case is in the United States
14   District Court, Western District of Pennsylvania.
15   Civil Action No. 04-325 Erie.
16        My name is Tim Hartmanszerbiec, Court Video
17   Specialist, for Certified Legal Videography, Las
18   Vegas, Nevada. The court reporter is Michelle
19   Johnson, for Cameo Kayser & Associates.
20        Will counsel please identify yourselves and
21   whom you represent for the record, starting with the
22   plaintiff's counsel.
23        MR. WILLIAMS: My name is Robert Williams. I
24   represent the plaintiff, Indeck Keystone Energy, LLC.
25        MR. SHEEAN: My name is Christopher Sheean.
```

Page 5

```
 1   I'm with Wildman, Harrold, Allen & Dixon in Chicago.
 2   And I represent the defendant, Victory Energy
 3   Operations, LLC.
 4        THE VIDEOGRAPHER: The reporter will
 5   administer the oath.
 6   Whereupon --
 7             ALAN W. CHRISTIAN,
 8   being first duly sworn to tell the truth, the whole
 9   truth, and nothing but the truth, was examined and
10   testified as follows:
11             EXAMINATION
12   BY MR. SHEEAN:
13      Q. Sir, would you please state your full name
14   for the record.
15      A. Alan Wayne Christian.
16      Q. Mr. Christian, where do you reside?
17      A. In Danville, California.
18      Q. Can you please give your current address.
19      A. 593 Old Orchard Drive, Danville, California,
20   94526.
21      Q. Let the record reflect that this is the
22   deposition of Alan Wayne Christian taken pursuant to
23   subpoena and notice, pursuant to the Federal Rules of
24   Civil Procedure and all applicable local rules.
25        Mr. Christian, have you ever had your
```

Page 34

1  those types of boilers that you are referring to?
2      A. Well, the ones that I was interested in burn
3  primarily ag waste, which is prevalent on the West
4  Coast, and particularly in California. And we've been
5  very successful selling those, so there were a lot of
6  those types of boilers that formed a key base for a
7  segment of my market.
8      Q. And just, again, so the record is clear, can
9  you define for me what your understanding of
10 aftermarket parts is?
11     A. Well, these were parts for those boilers that
12 were manufactured by the division, the company, that
13 had now become known as Indeck Keystone.
14     Q. Why did you say that that was an important
15 point that you and Mr. Petcos reached this handshake
16 over-the-phone deal for your company to continue to
17 offer those parts?
18     A. A significant portion of the products that I
19 represent service that market. They're not all boiler
20 company manufactured parts, but they all fit together
21 as a package. And that formed a significant portion
22 of my revenue, and if I lost the boiler portion of
23 that, the boiler parts manufacturing portion, it would
24 force me to reevaluate how I was going to service the
25 long-term existing customers as well as replace that

Page 35

1  business with some other manufacturer's parts.
2      Q. Did you and Mr. Petcos have any other
3  conversation during this initial discussion regarding
4  what types of products Christian Power would continue
5  to represent?
6      A. Um, my interest focused on this aftermarket
7  solid fuel market. And that's really the primary
8  focus of our conversation.
9      Q. At any point during that initial
10 conversation, did Mr. Petcos say anything to the
11 effect that Christian Power would need to represent
12 all of the products of Indeck if it wanted to continue
13 to represent the aftermarket parts sector?
14         MR. WILLIAMS: Objection to the form.
15         THE WITNESS: No.
16 BY MR. SHEEAN:
17     Q. Was there any mention about the
18 representative relationship between Christian Power
19 and Victory Energy during that initial conversation?
20     A. No.
21     Q. And in the fall of 2004, when this initial
22 conversation took place, was Christian Power still a
23 representative for Victory Energy?
24     A. Yes.
25     Q. And did Christian Power continue to sell

Page 36

1  aftermarket parts in the fall of 2004 after the
2  transition of the assets from EPTI to IKE?
3      A. Yes, we did.
4      Q. And did you close on any sales during that
5  time for IKE?
6      A. Yes, uh-huh. Some fairly significant orders.
7      Q. And during that same time period, the fall of
8  2004, were you able to obtain any contracts with
9  Victory Energy?
10     A. Sometime in the second half of '04, I got the
11 one and only Victory order, which was for HRSGs. The
12 one and only Victory order that I was involved with.
13     Q. Had you -- strike that.
14        During the time that you were a
15 representative for Victory Energy, had you submitted
16 other proposals from Victory to potential customers?
17     A. Yes. Yes, we had.
18     Q. Do you know approximately how many, off the
19 top of your head?
20     A. No, I don't. But it was probably in excess
21 of 20.
22     Q. Is there any specific reason in your mind --
23 strike that.
24        Did you believe that you could be successful
25 if you continued as a representative for Victory

Page 37

1  Energy?
2      A. Yes, I could have survived representing
3  Victory. Yes, I could have been successful.
4      Q. During the time that you were a
5  representative for Victory Energy, did you offer any
6  proposals for water-tube package boilers?
7      A. Yes.
8      Q. From Victory Energy?
9      A. From Victory.
10     Q. Were you in any way dissatisfied with the
11 products that Victory Energy offered for sale?
12     A. In general, no, I was not dissatisfied.
13 Every job has a lot of details, and it's impossible
14 for every job to be proposed exactly the way you would
15 envision it. So I can't say it was always my opinion
16 that it was the best way to propose, but in general I
17 was happy with the way Victory responded.
18     Q. Why did Christian -- Why did Christian Power
19 terminate its rep agreement with Victory Energy?
20     A. Well, ultimately I had to make a decision
21 between Victory and Indeck Keystone. So the primary
22 reason was to be able to maintain my after market with
23 the solid fuel boilers.
24     Q. Why did Christian Power have to make a
25 decision between Victory Energy and Indeck Keystone

Page 38

1  Energy?
2      A. Because Indeck Keystone considered it -- in
3  my opinion, Indeck Keystone considered it a conflict
4  to represent both Victory and Indeck Keystone.
5      Q. Whom from -- strike that.
6         Did anyone from Indeck Keystone Energy tell
7  you that it was a conflict of interest for Christian
8  Power to represent both Victory Energy and Indeck
9  Keystone Energy?
10     A. Yes.
11     Q. Who?
12     A. Chris Petcos.
13     Q. Anyone else?
14     A. Well, I'm pretty sure just about anybody at
15 Indeck Keystone would have said that.
16     Q. I don't want you to guess or speculate; I
17 just want you to tell me what you recall. Do you
18 recall any conversations with anyone, other than Chris
19 Petcos, at Indeck Keystone Energy wherein they stated
20 that it would be a conflict of interest for Christian
21 Power to continue to represent Victory Energy and
22 Indeck Keystone Energy?
23     A. Well, Chris was my primary contact, so he was
24 the one carrying the message, I think.
25     Q. Did anyone within Indeck, but outside of

Page 39

1  Indeck Keystone Energy, ever discuss with you the
2  belief that it was a conflict of interest for
3  Christian Power to continue to represent both Victory
4  Energy and Indeck Keystone Energy?
5      A. Well, there were meetings, even at PowerGen,
6  where I'd say a number of Indeck individuals were
7  present when the topic was being discussed.
8      Q. Well, I want to go through --
9         THE VIDEOGRAPHER: Four minutes.
10        MR. SHEEAN: We'll start this process.
11     Q. I want to go through with you the
12 conversations you had leading up to that decision.
13 You told about the first conversation you had with
14 Mr. Petcos over the phone wherein he said you could
15 continue to represent the aftermarket parts, correct?
16     A. Yes, uh-huh.
17     Q. When was the next time you had any
18 conversation with anyone associated with Indeck
19 relating to your continuation of -- as a
20 representative for Victory Energy?
21     A. Well, those conversations went on, I'd say,
22 pretty regularly through the fall and winter of '04,
23 even into early '05.
24     Q. To the best of your recollection, when was
25 the next specific meeting or conversation that you can

Page 40

1  recall with anyone relating to whether or not
2  Christian Power would be allowed to continue to
3  represent both Indeck Keystone Energy and Victory
4  Energy?
5      A. I don't think that position was clearly
6  stated until probably November of '04. And I don't
7  think it was a firm statement even then. But by
8  December of '04, it was.
9         MR. SHEEAN: Okay, I don't want to get cut
10 off, so let's take our break now.
11        THE VIDEOGRAPHER: This is the end of Tape
12 No. 1. We're off the record at 11:05 a.m.
13        (Recess taken.)
14        THE VIDEOGRAPHER: This is the beginning of
15 Tape No. 2. We're on the record at 11:12 a.m.
16        You may proceed.
17 BY MR. SHEEAN:
18     Q. Mr. Christian, before we went off the record,
19 you had mentioned a couple of conversations in the
20 fall of 2004. I believe you testified that in
21 November of 2004, the prospect that it would be a
22 conflict of interest to represent both Victory Energy
23 and Indeck Keystone Energy was first raised, but it
24 wasn't set as a definitive position; is that correct?
25     A. That's correct.

Page 41

1      Q. And then in December of 2004, it was stated
2  as an affirmative position by Indeck Keystone Energy,
3  correct?
4      A. As I recall, I think the first -- we'll call
5  it absolute statement -- happened at PowerGen in a
6  meeting there.
7      Q. The meeting in November of 2004, was that
8  another telephone conference with Chris Petcos?
9      A. Yes, uh-huh.
10     Q. Anyone else on the line in that conversation?
11     A. I don't recall ever having a conference call
12 when there was more than just myself and one other
13 person.
14     Q. And then in December, the meeting that you
15 referenced at PowerGen, that was in person, correct?
16     A. That's correct.
17     Q. And that was in Orlando?
18     A. Yes.
19     Q. Do you recall where the conversation --
20 strike that.
21        You said there were a series of conversations
22 at PowerGen. Is that right?
23     A. Yes, that's correct.
24     Q. Do you recall where the first conversation
25 took place?

Page 42

1   A. Probably just in the booth, the Indeck
2   Keystone booth.
3   Q. And who was present?
4   A. A number of Indeck Keystone employees. The
5   person I was primarily talking with would have been
6   Chris Petcos.
7   Q. Do you recall the names of any of the other
8   individuals who were there?
9   A. No, I don't. I know Jeff was probably there.
10  But other than -- the individuals they brought to the
11  show were all standing in the booth.
12  Q. When you say "Jeff," are you referring to
13  Jeff Coale?
14  A. Yes.
15  Q. Do you know who Jeff Coale works for?
16  A. I believe he works for Marsha Forsythe.
17  Q. And the company that he works for?
18  A. Indeck, I think.
19  Q. Anyone other than Mr. Petcos and Mr. Coale
20  that you can recall who were present during this first
21  conversation?
22  A. I can't recall who was there.
23  Q. Who primarily did the talking on behalf of
24  Indeck at that time?
25  A. Um, well, since I knew Chris the best and the

Page 43

1   longest, he is the one I preferred to hear from,
2   honestly. And Chris was -- for me, at least, Chris
3   was my primary contact.
4   Q. To the best of your recollection, what did
5   Mr. Petcos say relative to your continuing to
6   represent both Victory Energy and Indeck Keystone
7   Energy?
8   A. My primary interest was to investigate the
9   possibility of representing Indeck Keystone for
10  aftermarket parts sales and to continue with Victory.
11  Chris's response ultimately became, "You can't do
12  that."
13  Q. Did he say why?
14  A. Well, they wanted -- Indeck Keystone wanted
15  representation that would -- individuals and companies
16  that would represent all of their products, not just a
17  portion of the product line.
18  Q. To the best of your knowledge, does Indeck
19  Keystone Energy currently offer any water-tube package
20  boilers for sale?
21  A. Yes, they do.
22  Q. Is there any limitation, to the best of your
23  knowledge, on the size capacity for the water-tube
24  package boiler that Indeck Keystone Energy is offering
25  for sale currently?

Page 44

1   A. Um, I believe there is a restriction on what
2   they can offer, yes.
3   Q. What is your understanding of the restriction
4   on what they can offer?
5   A. I believe that, for package boilers, it has
6   to do -- boilers have to be over 150,000 pounds an
7   hour.
8   Q. What is the basis for your understanding that
9   the boilers have to be over 150,000 pounds per hour?
10  A. Well, I believe that's what they've told us.
11  And I am not sure if the contract states that or not,
12  but that's what I've been told.
13  Q. Did you have an understanding of the range of
14  products that Victory Energy was licensed to sell
15  Keystone boilers for as a licensee for Erie Power?
16  A. I am not aware that it's a license from Erie
17  Power that Indeck Keystone has.
18  Q. I asked a bad question. Let me clean it up
19  for you, okay?
20  A. Okay.
21  Q. Did you ever have an understanding of whether
22  or not there was a limitation on the size capacity
23  range for the boilers that Victory Energy was
24  authorized to manufacture and sell from either Erie
25  Power or Indeck Keystone Energy?

Page 45

1   A. Yes, I think there is a specific range in
2   size and description of those boilers.
3   Q. Do you know the upper limit of that size
4   capacity?
5   A. Well, I think it's, for Victory, for their
6   license, is 150,000 pounds an hour nominally.
7   Q. So to the best of your understanding, would
8   it have been a conflict of interest for Christian
9   Power to continue to represent Victory Energy for
10  boilers below 150,000 pounds per hour of steam and
11  Indeck Keystone Energy for boilers above 150,000
12  pounds of power of steam?
13       MR. WILLIAMS: Objection to the form.
14  BY MR. SHEEAN:
15  Q. You can answer.
16  A. Well, my opinion usually doesn't count for
17  much when manufacturers' principals are making
18  decisions. I think it probably would be possible to
19  do that.
20  Q. Did you make that proposal to anyone at
21  Indeck Keystone Energy during your discussions
22  relative to continuing on as a rep for Victory Energy?
23  A. No, I did not make that proposal.
24  Q. Any reason why you didn't make that proposal?
25  A. For me, I didn't think that would be where

Page 46

1  the cleanest split of product lines would lie. My
2  feeling was that the cleanest split would be for me to
3  represent the aftermarket existing boiler servicing
4  for Indeck Keystone, balance of boilers for Victory.
5    Q. Did anyone at Victory Energy ever tell you if
6  they would consider it to be a conflict of interest
7  for you to represent Indeck Keystone Energy on the
8  aftermarket parts and continue to represent Victory
9  for the boilers?
10    A. To the best of my knowledge, nobody ever said
11  that.
12    Q. What was your reaction when Mr. Petcos told
13  you at PowerGen that it would not be possible for you
14  to continue representing both Indeck Keystone Energy
15  and Victory Energy?
16    A. It was a personal reaction. I was
17  disappointed because it -- it -- it was going to
18  result in me making a pretty tough decision that would
19  affect, possibly affect, the balance of my product
20  lines.
21    Q. Did you convey to Chris Petcos or anyone at
22  Indeck that you considered this to be a tough
23  decision?
24    A. Yes, I did.
25    Q. Do you recall any response to your voicing

Page 47

1  that -- strike that.
2    Did anyone from Indeck Keystone Energy
3  respond when you told them this was a tough decision?
4    A. Yeah, they acknowledged it. They knew that
5  some reps would have a difficult time making a
6  decision.
7    Q. How did you leave it with Mr. Petcos and
8  Mr. Coale in this first meeting on the floor of the
9  PowerGen conference in Orlando in 2005 -- in 2004?
10    A. Well, it was an exchange of views, but not a
11  decision, a meeting where any decisions were going to
12  be made. I don't think at that point they were asking
13  for a deadline for a decision. I don't recall that.
14    Q. When was the next -- strike that.
15    You said there were a series of conversations
16  at PowerGen. When was the next conversation at
17  PowerGen relative to whether or not you could continue
18  as a representative for both Victory Energy and Indeck
19  Keystone Energy?
20    A. Well, I went by the booth a number of times,
21  but not for a meeting, just to say hello. But before
22  the PowerGen was over, we did have a group of reps
23  meet with Chris and Jeff off of the floor in a private
24  room. Off of the display floor, not in a booth.
25    Q. Was this a preset meeting?

Page 48

1    A. What do you mean, "preset"?
2    Q. When did you first learn that there would be
3  a meeting with Chris Petcos and Jeff Coale off the
4  display floor with a group of representatives?
5    A. Oh, it was during the show. It had not been
6  arranged for prior to that.
7    Q. How many other reps were in this meeting?
8    A. There were either three or four, including
9  myself.
10    Q. Do you recall the names of any of those
11  individuals?
12    A. Tom Patten, Gene Lockaby, Chuck Thacher. And
13  I'm not sure who the other person was. It could have
14  been Tommy Bronson, but I don't remember. I -- I
15  don't remember.
16    Q. Do you know whether or not any of the other
17  four individuals that you believe may have been at
18  this meeting were at that time Victory Energy
19  representatives?
20    A. To the best of my knowledge, I think they all
21  were Victory representatives.
22    Q. And who primarily did the talking at this
23  meeting? Was it Mr. Petcos?
24    A. I'd say it was about 50/50 between Chris and
25  Jeff. I wouldn't say that one or the other conducted

Page 49

1  the meeting.
2    Q. How long did the meeting last?
3    A. Probably an hour.
4    Q. To the best of your recollection, what did
5  Chris Petcos and Jeff Coale say, and what did the
6  other representatives say who were there, including
7  yourself?
8    A. Well, I think that was the first point in
9  time where it was obvious that there wasn't going to
10  be any negotiation with Indeck. We had to decide; we
11  weren't going to be able to carve up portions of the
12  lines from two different companies. It was pretty
13  clearly stated that we had to make a decision.
14    Q. What did the reps say, to the best of your
15  knowledge, if you recall?
16    A. Well, I guess one of the things that we
17  needed to understand was what Indeck Keystone was
18  going to be as a company, what products they were
19  going to pursue, and just who they were going to be.
20  And it's my opinion that nobody really knew at that
21  point. I think Indeck Keystone was still trying to
22  decide what they were going to do, but that's just my
23  opinion; that wasn't stated.
24    Q. Anything else that you can recall from that
25  meeting?

Page 50

1  A. Um, well, we did talk about details in the
2  proposed Representative Agreement. So there were some
3  discussions on the language in the proposed contract.
4  Q. What discussions relative to the language in
5  the proposed contract do you recall?
6  A. Um, I don't recall all of the issues, but
7  some pertain to what the commission schedule was going
8  to be, what the treatment of commissions on rental
9  boilers was going to be, and indemnification.
10  Q. Why was indemnification discussed, if you
11  know?
12  A. Well, it's a -- it's an important point for
13  me, but for most reps. It's frequently a discussion,
14  a topic of discussion. It's frequently excluded, if
15  possible, by manufacturers, and included, if possible,
16  by reps. So it's not unusual that that be discussed.
17  Q. Did you have any concerns, going into the
18  meeting, regarding what you perceived Indeck's
19  position would be regarding the commission schedule?
20  A. Um, yes, I had a concern with the level of
21  commissions and the method for crediting effort, and
22  whether a portion of the commission could be
23  attributed to the home office for their perceived
24  contribution to the sales task.
25  Q. To the best of your knowledge at the time

Page 51

1  that you went into this meeting with Mr. Coale and
2  Mr. Petcos, did Indeck have any type of a reputation
3  in the industry relative to its treatment of
4  representatives on commissions?
5  A. I don't know if I -- yeah, I think they
6  did -- did have a reputation.
7  Q. What was that reputation, to the best of your
8  knowledge?
9  A. I think, right or wrong, reps had the
10  perception that -- that you had to fight for any
11  commission on a sale. And you needed to be pretty
12  cautious about dealing with Indeck. And I'm not
13  saying that pertained to Indeck of today, but
14  certainly was a reputation from the past.
15  Q. Was Marsha Forsythe at PowerGen in '04?
16  A. I don't recall seeing her. I don't know if
17  she was there.
18  Q. You certainly didn't meet with her?
19  A. I didn't meet with her.
20  Q. Other than the conversation you had the first
21  time you stopped by the booth, with Chris Petcos and
22  Jeff Coale, and this subsequent one-hour meeting
23  between Mr. Petcos, Mr. Coale, yourself, and three
24  other reps, do you recall any other specific meetings
25  during the PowerGen conference relative to whether or

Page 52

1  not Christian Power Equipment would be allowed to
2  continue as a representative for both Indeck Keystone
3  Energy and Victory Energy?
4  A. These are meetings between myself and an
5  Indeck person, is that what you're saying?
6  Q. Well, let's -- no, I'm not limiting it in
7  that way. Any other meetings whatsoever.
8  A. Well, the reps talked among themselves. But
9  there were no meetings.
10  Q. What other reps did you talk to about that?
11  A. Um, I don't remember specifically all of the
12  reps, but many of them go back at least 20 years, and
13  so I've known quite a number. We were all uncertain
14  where these companies were going, and so we were all
15  talking about it. But we didn't have any specific
16  meetings about it.
17  Q. Anything else that you can recall regarding
18  your discussions with other representatives relative
19  to this topic?
20  A. No, I wouldn't say so.
21  Q. To the best of your knowledge, did all four
22  of the reps besides yourself who were at the meeting
23  with Mr. Coale and Mr. Petcos at PowerGen in 2004
24  terminate their rep agreement with Victory Energy and
25  go over to Indeck Keystone Energy?

Page 53

1  MR. WILLIAMS: Objection to form, basis.
2  THE WITNESS: You know what, I don't know
3  what all of the reps have done. I know at least one
4  did not go back to Indeck Keystone.
5  BY MR. SHEEAN:
6  Q. Which one was that?
7  A. Tom Patten.
8  Q. Do you know if he's still a Victory Energy
9  rep?
10  A. To my knowledge, he is.
11  Q. How about Gene Lockaby?
12  A. I don't know.
13  Q. How about Chuck Thacher?
14  A. I don't know what any of them did.
15  Q. Okay.
16  A. I should, but I don't know.
17  Q. When was the next time after the PowerGen
18  conference in December 2005 (sic) that you had any
19  conversation with anyone at Indeck relative to your
20  ability to continue on as a rep for Victory Energy?
21  A. I don't recall specific conversations during
22  the balance of December.
23  Q. When was the next date that you do recall?
24  A. I don't recall a specific date, but there
25  were conversations in January. I think there might

Page 54

1  have been a revision of the proposed contract that was
2  sent out in -- sometime in the early part of '05.
3     Q. Had you already seen a version of the
4  proposed Representative Agreement prior to this first
5  one going out in early 2005?
6     A. Yes, I had.
7     Q. When did you see that first version?
8     A. You know, I don't remember. I believe that I
9  had it -- I may have had it -- before PowerGen. I
10 don't remember for sure.
11    Q. Did the revisions in the proposed rep
12 agreement that you received from Indeck Keystone take
13 into account any of the concerns that were raised by
14 you or any of the other reps during that meeting at
15 PowerGen?
16    A. Yes, it did. There were modifications.
17    Q. Other than receiving this revised proposed
18 Representative Agreement from Indeck Keystone Energy,
19 when was the next conversation or communication of any
20 kind that you had with anyone at Indeck Keystone
21 Energy regarding your ability to continue as a rep for
22 Victory Energy?
23    A. I don't recall a specific phone call. I know
24 specifically it was a phone call, but I don't remember
25 when that was. I'm going to say in January.

Page 55

1     Q. And who initiated the call that you're
2  referring to?
3     A. I don't remember if I did or Chris Petcos
4  did.
5     Q. It was between you and Mr. Petcos?
6     A. Yeah. Yes.
7     Q. And to the best of your recollection, what
8  did you say and what did he say in this phone
9  conversation?
10    A. Well, in early January, I was still undecided
11 what I was going to do. I told him that.
12    Q. Anything that you can recall from that
13 conversation?
14    A. Nothing specific, no.
15    Q. When was the next conversation, to the best
16 of your recollection, with anyone at Indeck regarding
17 whether you would continue on as a rep for Victory
18 Energy?
19    A. Could you state that again?
20    Q. When was the next conversation, after the one
21 you just identified sometime in 2005 where you
22 indicated you were still undecided, with anyone at
23 Indeck regarding whether you would continue on as a
24 rep for Victory Energy?
25    A. In late January -- and I don't remember the

Page 56

1  specific call. But in late January, I notified, I
2  think both Chris and Jeff, that I was going to cancel
3  my representation with Victory and sign the Indeck
4  Keystone contract.
5     Q. Was there any single -- strike that.
6     Did anything occur in January 2005 that
7  caused you to sway your decision one way or the other?
8     A. Probably the contract modification and an
9  internal evaluation. Having no contact with Victory
10 or with Indeck, but my internal evaluation of the best
11 business decision for Christian Power Equipment, Inc.
12    Q. What, if anything, did Mr. Petcos say when
13 you communicated your decision to him?
14    A. Well, there had been such a long relationship
15 with myself and -- we'll call it the Zurn product
16 line -- all these different company names, he was
17 happy I made that decision.
18    Q. Anything else that you can recall from that
19 conversation?
20    A. No.
21    Q. And what did Mr. Coale say, if anything, that
22 you can recall from that conversation where you
23 informed him that you were going to sign the rep
24 agreement with Indeck Keystone Energy?
25    A. I don't recall anything substantial. I'm

Page 57

1  sure he was pleased that I had chosen to switch to
2  Indeck.
3     Q. Anything else that you can recall from either
4  of those conversations?
5     A. No.
6     Q. When did you actually sign the rep agreement
7  with Indeck Keystone Energy?
8     A. Well, I informed Mark White verbally on
9  January 31. At least that's my -- best I can
10 determine. And the contract was actually executed the
11 11th of March. I don't remember the date that I
12 signed it, but I think that's the date that's on the
13 contract. I sent a letter, an official letter, on
14 March 9th to Victory.
15    Q. What did Mr. White say when you told him that
16 you were going to be cancelling?
17    A. He was disappointed. And it was -- he
18 actually initiated the call -- I remember it
19 distinctly -- because he was calling me to tell me
20 they were cancelling my portion -- a portion of the
21 territory I was going to cover. The Oregon-Washington
22 territory was being taken away and given to a
23 different agency. And in that same phone
24 conversation, I informed him I'd made a decision to
25 cancel the Victory contract.

Page 102

1 package boilers?
2     MR. SHEEAN: Objection, foundation.
3     THE WITNESS: I don't remember if the
4 literature talked about that.
5 BY MR. WILLIAMS:
6     Q. To the best of your recollection, do you
7 recall whether any of those brochures indicated any
8 limitation on Victory's capacity to design or
9 manufacture Keystone water-tube package boilers?
10     A. I don't remember for sure, but I believe
11 that, at least for the Keystone product line, it
12 defined a size range.
13     Q. Do you remember what that size range was?
14     A. Um, you mean what the literature said it was?
15     Q. Yes, yes, exactly.
16     A. I don't remember what the literature said.
17     Q. Mr. Christian, if you would turn to paragraph
18 8(a) of the Representative Agreement. If you would
19 read that into the record, please.
20     A. "8(a). Representative shall not handle,
21 sell, distribute, or otherwise associate itself with
22 any equipment that is similar to or competes in any
23 way with the products."
24     Q. I know you're not a lawyer, so I'm not going
25 to try to ask you for any type of legal conclusion,

Page 103

1 but I -- and I'm sure that Mr. Sheean will interpose
2 an objection nonetheless. But I want to tell you that
3 my next question is based upon simply your
4 understanding as a principal of Christian Power
5 Equipment and your experience in the industry. Is
6 that fair?
7     A. That's fair.
8     Q. The question is, at the time that you signed
9 the Representative Agreement, did you have any
10 understanding as to what paragraph 8(a) meant?
11     MR. SHEEAN: Objection, calls for a legal
12 conclusion.
13     You can answer.
14     THE WITNESS: Well, in my business, you sell
15 lots of allied and associated equipment. And
16 manufacturers have a primary product that they
17 manufacture that they're known for, but then they have
18 a lot of associated equipment that may not be primary,
19 but may be associated with what they sell.
20     This statement, in my mind, pertains to the
21 primary products that are being offered more than the
22 associated equipment that occasionally is offered.
23 And the statement states that you are not to represent
24 another company that manufactures or offers equipment
25 that compete directly with the primary products.

Page 104

1 BY MR. WILLIAMS:
2     Q. And when you say primary product, can you
3 give me an example of what's in your head when you use
4 that term.
5     A. Well --
6     MR. SHEEAN: Objection, form.
7     THE WITNESS: -- primary product in the case
8 that we're talking about might be package boilers.
9 That's an example of a primary product.
10 BY MR. WILLIAMS:
11     Q. And to compare or contrast that, when you use
12 the term "associated equipment," what types of things
13 are you referring to?
14     A. Well, boilers come with a lot of other parts,
15 such as trim. That's valves and sensors and other
16 equipment. In some cases, boilers might come with
17 fuel-feeding devices, burners; back-end equipment:
18 fans, stacks, pollution-control equipment, all of
19 which might be offered, but it would probably be a
20 buyout item not manufactured by the boiler OEM.
21     Q. From the point in time when you executed the
22 Representative Agreement up until the present, has
23 your understanding of the meaning of paragraph 8(a)
24 changed in any way from what you've just testified to?
25     A. Um, the meaning can change over time as

Page 105

1 companies add or drop product lines. I don't believe
2 the meaning has changed, but I am -- I might be wrong
3 about that. I don't know if the meaning has changed.
4     Let me add something to that. For the period
5 of time that I represented Victory, I don't think the
6 meaning changed of the products.
7     Q. Fair enough.
8     Based upon your experience as a sales
9 representative, is that type of -- when I say "that
10 type," I mean the clause paragraph 8(a) of the Victory
11 Representative Agreement -- is that common in the
12 industry?
13     A. Whether the clause is in there, the intent of
14 that clause is common in the industry.
15     Q. All right, let's break it down.
16     Would you say that the intent is present 100
17 percent of the time?
18     MR. SHEEAN: Objection, calls for
19 speculation, lack of foundation.
20     THE WITNESS: Could you expand on the
21 question? I don't understand the question.
22 BY MR. WILLIAMS:
23     Q. Sure. You said that your answer -- if we
24 need to, we can have it read back. But I believe that
25 your answer was that whether or not the clause appears

Page 106

1  in writing, the intent is there.
2      My question is, how often is the intent there
3  in representative agreements?
4      MR. SHEEAN: Objection, lack of foundation,
5  calls for speculation.
6      THE WITNESS: Well, I believe it's there. I
7  could give you examples where it's not enforced. Not
8  with the product lines that I handle, but with some
9  product lines, and for some types of agencies.
10 Generally, though, it doesn't apply in my case.
11 BY MR. WILLIAMS:
12     Q. Okay. I'll try to ask it in a more specific
13 way, then. For all of the sales representative
14 agreements that you have entered into for the boiler
15 industry, has the intent been present for all of those
16 agreements?
17     A. I can't say that it's in there in writing. I
18 don't know.
19     Q. Okay. My question is still based upon the
20 spirit or the intent that you first spoke of.
21     A. Yeah, I believe that the companies that I've
22 associated with expect me to exclusively represent
23 them for their primary products.
24     Q. And as to written contracts that you have
25 entered into in your career and experience for boilers

Page 107

1  and in the boiler industry, how often would you say
2  that a noncompete provision actually appears in
3  writing in the agreement?
4      MR. SHEEAN: Objection, calls for
5  speculation.
6      THE WITNESS: I don't know. More than half
7  of the time.
8  BY MR. WILLIAMS:
9      Q. Has Christian Power Equipment, Inc. ever
10 represented two competing designers or manufacturers
11 for the same primary product line at the same time?
12     A. Not to my knowledge.
13     Q. And before it was Christian Power Equipment,
14 Inc., when it was just Christian Power Equipment, did
15 that company ever represent two competing
16 manufacturers or designers for boilers for their
17 primary products simultaneously?
18     A. Probably not, but let me give you an example.
19 When this license was signed with Victory, when the
20 license agreement occurred, I might have been one of
21 the last reps to sign an agreement with Victory
22 because I was very uncomfortable about the definition
23 of product. And there was a definition based on size
24 range more than anything, but it was a very un-Zurn
25 like, we'll say -- this is a long line of companies,

Page 108

1  but some primary employees that stayed with the
2  company. This was very unlike that company to license
3  a product. So I was cautious about this potential
4  conflict that you're talking about.
5      Q. Okay. My question was the predecessor to
6  Christian Power Equipment, Inc., Christian -- that is,
7  Christian Power Equipment --
8      A. Yeah.
9      Q. -- did that company ever represent two
10 competing designers or manufacturers of boilers for
11 their primary product line simultaneously?
12     MR. SHEEAN: Objection, asked and answered.
13     You can answer again.
14     THE WITNESS: I think I did. When I signed
15 the licensing agreement with Victory and continued
16 with an Erie Power Technologies agreement. The
17 difference there was what Erie Power Technologies,
18 Inc. was willing to do, but at some time in their
19 past, they were willing to build package boilers. The
20 way the agreement was written, the employees of Erie
21 Power encouraged me and the other reps to sign that
22 agreement.
23 BY MR. WILLIAMS:
24     Q. Do you have any understanding as to why the
25 folks at Erie Power encouraged you to sign that

Page 109

1  agreement?
2      A. Well, they either -- they weren't successful
3  in selling package boilers. And so even though they
4  had a pretty successful design, it was pretty much on
5  the shelf. And so they felt like there was some
6  value, but not in their hands, in someone else's
7  hands. So they licensed that to a company who was
8  willing to try to capitalize on the value of the
9  product design.
10     Q. And other than what we were just talking
11 about where Christian Power Equipment was representing
12 Victory and had the Erie Power agreement in place, did
13 Christian Power Equipment ever simultaneously
14 represent any other competing boiler designer or
15 manufacturers at the same time?
16     MR. SHEEAN: Objection, vague.
17     You can answer.
18     THE WITNESS: Not to my knowledge.
19 BY MR. WILLIAMS:
20     Q. Would you read paragraph 8(c)?
21     A. "Representative shall furnish VEO with a
22 complete list of companies and equipment it presently
23 represents, and agrees to continually notify VEO of
24 any changes in that representation."
25     Q. Did Christian Power Equipment ever furnish

## Page 110

1 Victory with such a list?
2     A. I believe I did.
3     Q. Do you have any understanding as to the
4 purpose of paragraph 8(c)?
5     A. Well, 8(c) puts the -- in my mind -- a
6 portion, if not all, of the responsibility in
7 determining these conflicts into the hands of the OEM.
8 At least they have the opportunity to assess
9 representation that the rep has and at least question
10 those potential conflicts, I suppose.
11     Q. In your experience in this industry, is it
12 common for the responsibility of determining a
13 conflict to be on the OEM?
14     A. I think it's a joint responsibility. I don't
15 think everybody believes that, but I think it's joint.
16 This is a partnership we enter into, and if you don't
17 have a very open relationship with that partnership,
18 it won't be long term.
19     Q. Proceeding on to paragraph 10(d). I'll tell
20 you what, I will give you a break from reading that
21 into the record, and you can just read it to yourself.
22     A. (Witness complies.)
23         Okay.
24     Q. Did Victory ever do anything to comply with
25 paragraph 10(d) of the Representative Agreement?

## Page 111

1     A. Um, I believe they did. I never issued a
2 proposal on my own; Victory prepared those. They
3 occasionally asked me what the status of projects
4 were, or I reported the status of projects. In terms
5 of accepting orders, I didn't take orders in the name
6 of my company; I instructed any customer that they
7 were going to enter an order not with Christian Power,
8 but with Victory. That's a few examples of, you know,
9 the internal paperwork that Victory expected us to do
10 and we conformed with.
11     Q. What about sales meetings; did Victory have
12 sales meetings that someone from Christian Power
13 attended during the term of the Representative
14 Agreement?
15     A. Yes.
16         MR. SHEEAN: I'm going to object to the
17 extent that it's already been asked and answered.
18 Sorry.
19         THE WITNESS: Yes, yes, we did attend. They
20 had meetings, and we attended.
21 BY MR. WILLIAMS:
22     Q. Okay. Were there any meetings that Victory
23 had that you or anyone else from Christian Power
24 attended that Mr. Sheean did not ask about or you did
25 not testify about earlier this morning?

## Page 112

1     A. Not to my knowledge.
2     Q. How about teleconferences among sales
3 representatives; did Victory hold any of those while
4 you were a representative of the company? Or while
5 Christian Power was a representative of the company.
6     A. Not to my knowledge.
7     Q. Paragraph 12(a) of the Representative
8 Agreement, if you would read that to yourself and let
9 me know when you're finished.
10     A. (Witness complies.)
11         Okay.
12     Q. Do you have an understanding as to the
13 meaning of that paragraph?
14     A. I may have a different understanding today
15 than I did three weeks ago.
16     Q. Okay, well, then let's take it in order.
17 What was your understanding of that paragraph at the
18 time that you executed the Representative Agreement?
19     A. Historically, when a cancellation or a
20 ceasing of a relationship has occurred, we've offered
21 to return literature. That's generally what
22 manufacturers expect, and we've done so.
23     Q. I take it from your prior answer, that
24 understanding changed at some point?
25     A. Well, I'm not sure it's changed, but I've

## Page 113

1 certainly got a new perspective on this. More as a
2 service to my customers, I keep files for a long time.
3 And frequently jobs come back to life, and so we -- we
4 keep these files that are generally correspondence or
5 proposals written by principals. And after a certain
6 period of time, we destroy the file, if it's not an
7 order. If it is an order, I keep it. So far, since
8 '79 I've got every order I ever received. And this --
9 this clause might bring into question whether I could
10 do that.
11         I don't think I've ever had a principal
12 question me as far as whether I keep files or not
13 after the representation period ended. Certainly my
14 commitment to that principal, whether I'm representing
15 them or I just ended the representation, is to never
16 share any of that information, even if I go to a
17 competitor. Something I wouldn't do.
18         MR. WILLIAMS: Okay, Mr. Christian, I believe
19 we're out of tape, so we'll take a break.
20         THE VIDEOGRAPHER: This is the end of Tape
21 No. 3. We're off the record at 1:25 p.m.
22         (Recess taken.)
23         THE VIDEOGRAPHER: This is the beginning of
24 Tape No. 4. We're on the record at 1:38 p.m. You may
25 proceed.

Page 118

1 understanding that paragraph 12(a) allows either party
2 to the Representative Agreement to terminate the
3 agreement without cause?
4     A. Yes, either party can do that without cause.
5     Q. Based upon your experience and years in the
6 industry, is that a common clause that appears in
7 representative agreements?
8         MR. SHEEAN: Objection, foundation, vague.
9         THE WITNESS: I believe it is common.
10 BY MR. WILLIAMS:
11     Q. And I'll ask it more specifically. With
12 respect to Christian Power, is that a clause that
13 appears in all of the representative agreements to
14 which Christian Power has been a party over the last
15 ten years?
16     A. No, it's not been in all of those contracts.
17     Q. Can you estimate the percentage or tell me
18 the percentage of contracts to which Christian Power
19 was a party and there was an at-will termination
20 clause included?
21     A. Over 80 percent.
22     Q. When Mr. Sheean was asking you why Christian
23 Power decided to terminate the Representative
24 Agreement with Victory, you said two things. And feel
25 free to correct me if I mischaracterize you or if I'm

Page 119

1 just flat-out wrong.
2         You said, number one, the contract
3 modifications swayed you. And number two, the
4 internal evaluation that you had done at Christian
5 Power led you to believe that it was the best decision
6 for the company.
7         MR. SHEEAN: I object. Mischaracterizes his
8 prior testimony.
9         But you can answer.
10 BY MR. WILLIAMS:
11     Q. Well, the first question is, does that fairly
12 characterize what you said earlier this morning?
13         MR. SHEEAN: Same objection.
14         THE WITNESS: That is a characterization,
15 similar characterization, to what I stated. I made a
16 business decision, and Indeck convinced me that I
17 could probably trust them.
18 BY MR. WILLIAMS:
19     Q. Just so you know, I'm not trying to play any
20 games. What I'm trying to do is avoid asking you
21 questions that you've already been asked and that
22 you've answered.
23         So with respect to the business decision that
24 you made, what were the factors or conclusions that
25 you analyzed in making that business decision?

Page 120

1     A. Well, the biggest factor is the percent of my
2 business year in and year out that's constituted in
3 the solid fuel aftermarket business, and those
4 customers who rely on not just the products
5 manufactured but my advice for a lot of other plant
6 operating issues that are sales opportunities for me.
7     Q. Was revenue a factor that you considered in
8 making that decision?
9     A. Well, it all boils down to revenue. But
10 there's a big synergism between product lines. I
11 would have lost that synergism, the anchor for that
12 synergism, if I gave up my solid fuel aftermarket
13 business.
14     Q. When you say "it all boils down to revenue,"
15 is that to say that your expectation is that Christian
16 Power would generate more revenue as a representative
17 of Indeck and Indeck Keystone Energy than it would
18 representing Victory?
19         MR. SHEEAN: Objection, incomplete
20 hypothetical.
21         THE WITNESS: It's all speculation on what
22 the long-term income was. But certainly the structure
23 of my business and the short-term income was probably
24 higher with Indeck. Not certainly, but probably.
25 BY MR. WILLIAMS:

Page 121

1     Q. Am I at least correct that you did say that
2 the revisions to Indeck's proposed Representative
3 Agreement swayed you or had some impact on you? Did I
4 hear that right earlier this morning?
5     A. Yes.
6         MR. SHEEAN: Same objection.
7         THE WITNESS: I'm sorry.
8         Yes, that's true.
9 BY MR. WILLIAMS:
10     Q. Can you please tell me, though -- there were
11 no questions about the details or the specifics. How
12 was the proposed Representative Agreement from Indeck
13 changed from the original to these revisions?
14     A. This is my recollection. I don't remember
15 for sure, but I believe the Commission Schedule was
16 changed. I'm certain that the wording for credit on a
17 sale was changed. And there could have been a couple
18 of other items that were changed in that contract.
19     Q. When you said the Commission Schedule was
20 changed, are you referring to the percentages of
21 commission paid out?
22     A. Yes, and for what type of work and for what
23 products.
24     Q. And it may be obvious, but I have to ask.
25 How was it changed? Was it increased, decreased?

Page 122

1  A. It was increased.
2  Q. You said wording for credit on sale was
3  changed. Can you explain what you mean by that?
4  A. Well, some companies and some individuals
5  involved in both of these companies have presided over
6  contract administration where a portion of the sales
7  credit was attributed to the home office, and with
8  no -- with no possibility of influence from the rep,
9  and thereby reducing the commissions paid. And all of
10 the reps were very concerned about that issue.
11 Q. And so how was the wording for credit on the
12 sale changed in the revision of the proposed Indeck
13 Representative Agreement?
14 A. You know, I can't answer specifically. It
15 took a form that I felt like represented good intent.
16 Q. Did it provide for more liberal application
17 of commissions?
18 A. What it did was state that -- I believe it
19 states that 100 percent of the possible commission
20 would be awarded on every job. If it doesn't state
21 that, we had a verbal commitment to it.
22 Q. Okay. And as we sit here today, can you
23 recall any other details about the changes or
24 revisions to the proposed Indeck Representative
25 Agreement?

Page 123

1  A. I really can't.
2  Q. Mr. Christian, if you would turn, in
3  Exhibit 11, to the page toward the end. I think you
4  marked it with a 2 in the upper right-hand corner, the
5  March 9 letter to Mark White.
6  A. (Witness complies.)
7  Q. Prior to your conversation with Mr. White on
8  February 2nd where he told you that Victory was taking
9  away part of your territory, had you had any other
10 conversations with anyone at Victory regarding an
11 assessment of Christian Power's performance under the
12 Representative Agreement?
13 A. No.
14 Q. Were there ever any talks or discussions
15 prior to February 2 of 2005 about performance of
16 Christian Power under the agreement?
17 A. You mean lack of performance or any kind of
18 performance?
19 Q. Any kind of performance: good, bad.
20 A. There were discussions and compliments given
21 to the quality of representation I was providing.
22 Meaning that it was good quality.
23 Q. How about bad?
24 A. No, I don't remember any bad. Could be
25 selective memory, but, no, I don't think so.

Page 124

1  Q. During the February 2, 2005 conversation that
2  had you with Mr. White, did he do anything to try and
3  persuade Christian Power to reconsider its decision to
4  terminate the Representative Agreement?
5  A. Um, I don't believe that he did. It was a
6  fairly brief conversation. I don't remember that
7  there was much give and take at all about the decision
8  I'd made or why or an attempt to try to persuade me
9  not to do that.
10 Q. Other than Mr. White, did anyone from
11 Victory -- anyone else from Victory -- try to persuade
12 Christian Power to stay on as a representative?
13 A. No, I don't believe so.
14 Q. At any time, did anyone from Victory ever
15 tell Christian Power that it should not do business
16 with Indeck or any of its affiliates?
17 A. No.
18 Q. At any time, has anyone from Victory ever
19 told Christian Power anything negative or disparaging
20 about Indeck or any of its affiliates?
21     MR. SHEEAN: Objection, vague.
22     THE WITNESS: Um, I don't believe so. I
23 don't remember anybody ever saying negative -- making
24 negative comments about Indeck.
25 BY MR. WILLIAMS:

Page 125

1  Q. Did anyone at Victory ever say anything
2  negative or disparaging about any of Indeck's
3  employees or employees of any affiliate of Indeck to
4  you?
5  A. No, no.
6  Q. Again, just to try and streamline this, I'm
7  going to characterize your earlier testimony. You
8  tell me if I'm right or wrong, and we'll use that as a
9  springboard to go from there.
10     You said earlier this morning that you don't
11 think Indeck initially -- Indeck Keystone Energy --
12 initially knew what kind of company it wanted to be or
13 what kind of products it wanted to design or
14 manufacture.
15     Is that an accurate characterization?
16 A. Yes, it is.
17 Q. What's your basis for that?
18 A. Well, I'll point to this most recent order
19 that we gave back. There was a lot of effort put out
20 to put together a proposal, revise it, work with the
21 customer. This wasn't a case of a customer calling or
22 me stumbling over someone and getting a very quick,
23 no, we don't want to pursue this. We went all the way
24 through design and detail pricing and receiving a
25 purchase order, and then changed our mind. That's an

CAMEO KAYSER & ASSOCIATES (702) 655-5092

Page 130

1  place. And those comments go way back. It must be
2  the early days of Erie Power. But that wasn't
3  pertaining to the details; it was just the concept of
4  licensing a boiler.
5  BY MR. WILLIAMS:
6      Q. Are you referring to a conversation that you
7  had with Mr. Petcos while Erie Power was in existence?
8      A. Yeah, that would go back to the Erie Power
9  days. And I don't know that there was a specific
10 conversation; I just heard it said.
11     Q. Skipping forward to after the formation of
12 Indeck Keystone Energy, LLC, did Mr. Petcos ever make
13 any representations to Christian Power one way or the
14 other regarding whether IKE would honor the license
15 agreement that was in place with Victory?
16     A. No.
17     Q. Are there other boiler sales representatives
18 that are active in the same territories in which
19 Christian Power is active?
20     A. Yes.
21        MR. SHEEAN: Objection, vague.
22        THE WITNESS: I'm sorry.
23        Yes, there are. I have competitors.
24 BY MR. WILLIAMS:
25     Q. Who are they?

Page 131

1      A. Um, A.H. Merrill & Associates. They've
2  changed their name to AHM now. R.F. McDonald.
3      I'm assuming you're asking this in terms of
4  package boilers. Are you asking about package boilers
5  or all types of boilers?
6      Q. I'm asking about all types of boilers; let's
7  include everyone.
8      A. Um, Nationwide Boiler, B&W. Let's see. Ted
9  Pullen. That's not the name of his company, that's
10 the name of the individual, the name of a person.
11 Brad Thompson. Cole Industrial, C-o-l-e, Cole
12 Industrial. Floyd Welch & Associates. I'm sure there
13 are others. That's a pretty representative example
14 sample.
15     Q. In your opinion from your years and
16 experience in the industry, are the representatives
17 that you've listed for us here competent
18 representatives?
19     A. Um, I think most of them are competent. They
20 all have their strengths and their weaknesses, but
21 they're competent.
22     Q. With respect to the eight sales
23 representatives that you listed that compete in your
24 territory, are any of those limited to water-tube
25 package boilers?

Page 132

1      A. I don't know if any sales company would say
2  they were limited to anything. I mean, we're pretty
3  independent. Some people would say roguelike. But
4  one of those companies is really focused on package
5  boilers.
6      Q. Which one is that?
7      A. That's R.F. McDonald.
8      Q. I take it none of those eight companies or
9  representatives that you've listed also represent
10 Indeck currently.
11     A. I don't know who -- oh, no, none of those
12 companies represent Indeck.
13     Q. Of the eight companies that we were just
14 talking about, do you know the reputation of any of
15 them?
16        MR. SHEEAN: Objection, asked and answered.
17        THE WITNESS: Well, reputation is a
18 subjective thing. My opinion of their reputation is
19 different than the next person's. But I do know the
20 reputation of some of those companies.
21 BY MR. WILLIAMS:
22     Q. Which ones do you know?
23     A. Probably all of them. I have a reputation
24 opinion on all of them.
25     Q. Is it the same, or do we need to go through

Page 133

1  it individually? You tell me.
2      A. It's widely varying.
3      Q. Why don't we then go through them.
4      Your understanding of AHM's reputation, what
5  is that?
6      A. It's excellent. They are the Coen
7  representative, Coen Burner, C-o-e-n, the Coen Burner
8  representative. And their company is structured like
9  mine, and they function mostly as a rep as opposed to
10 a distributor or buy/resell service company.
11     Q. What about R.F. McDonald's reputation?
12     A. They are far and away the largest boiler,
13 package boiler, service company in California. And
14 because they're large, they have a reputation for
15 being available and, in many cases, competent.
16 They've grown rapidly, and in some cases they also
17 have a reputation of not having consistent quality.
18 Sometimes -- and it may be because of their size, but
19 sometimes they have not satisfied their customers.
20     They are a case of a company that will sign
21 these kind of agreements with two or three competing
22 companies and represent three, maybe four companies
23 producing the same product, and choose for themselves
24 who gets the inquiry. Because of their size, they get
25 away with that.

**Page 134**

Q. Is that an anomaly in the industry?
A. You know, I don't know. It's certainly an anomaly in the rep business. But in the service company and distributor business, it may be more the norm.
Q. How about Nationwide Boiler's reputation?
A. Nationwide's got a good reputation. They're very similar to Indeck in that they're a rental boiler company, and they will sell new boilers. They pretty much had the West Coast rental market to themselves because they don't have very many competitors that carry a fleet located in the West. They've been successful selling package boilers.
Q. How about B&W's reputation as a sales representative in your area?
A. Well, B&W is representing their own products. They have a very excellent reputation for boiler knowledge. And they are a company that people who run large utility-sized boilers turn to for service. They'll quote large package boilers directly, but under a certain size -- and I don't know -- under 200,000 pounds an hour, they hope that Nationwide will sell for them.
Q. What about Ted Pullen's reputation?
A. He's got a good reputation. He's strictly a

**Page 135**

manufacturer's representative, and he handles large boilers and turbines and is well regarded in the industry.
Q. And Brad Thompson's reputation?
A. Brad is also a rep who handles similar product lines, large capital equipment. He's known to be technically competent but maybe not quite as trustworthy as some of the other reps. But he's done a very good job with some accounts.
Q. How about Cole Industrial's reputation?
A. That's sort of changing. They've grown from a small, regional service company to a much larger full service supplier of services and products. And they are considered to be a good, very good, supplier.
Q. And Floyd Welch's reputation?
A. They were probably the No. 1 power rep in Northern California. They've shrunk to one retiring individual, so their reputation is really at a low, low point now. But they'd be thought of as a boiler supplier at least up until the last year.
Q. Going back to the Representative Agreement with Victory Energy. Would you turn to -- I think it's one of the last pages -- it is the last page of the Representative Agreement. It's titled Product Schedule.

**Page 136**

A. (Witness complies.)
Q. It states, "Product Schedule.
    "The following products are included within this agreement."
    "Keystone water-tube boilers: 8M - 22M (29,000 pph - 157,000 pph);
    "VEO HRSG's (heat recovery steam generator) systems - all sizes."
    Did I read that correctly?
A. That's what I have on my contract. I think you did.
Q. Good. Had you read that at the time that you executed the Representative Agreement?
A. Yes.
Q. Other than -- strike that.
    Mr. Christian, I believe you testified that you had never seen a copy of the license agreement between Victory and Erie Power or any successor that purchased that technology. Is that correct?
A. That's correct.
Q. Did you or anyone from Christian Power ever request to see a copy of that license agreement?
A. No.
Q. Did anyone from Victory Energy ever offer to provide you with a copy of the license agreement?

**Page 137**

A. No.
Q. Did Victory ever give Christian Power any instructions regarding which size boilers to target in its sales efforts?
    MR. SHEEAN: Objection. Other --
    Go ahead.
    I'm going to object because I think it mischaracterizes the document in front of us.
    But go ahead; you can answer.
    THE WITNESS: This contract language here in writing states what size of boilers that we were to pursue that were the Keystone water-tube type.
BY MR. WILLIAMS:
Q. Okay. And that's fair. I'll rephrase the question.
    Other than what is set forth on the Product Schedule, did Christian Power receive any instructions from anyone at Victory regarding which size Keystone package water-tube boilers Christian Power should pursue on its behalf?
A. No, I never received any document, other than this document.
Q. And my question applies not just to documents, but verbally, on the telephone, by e-mail, in any mode of communication.