# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE                            :
ENERGY, LLC, a Delaware limited liability  :
company,                                   :
                                          :  CIVIL ACTION
               Plaintiff,                :
                                            :  NO. 04-CV-325 (ERIE)
       v.                           :
                                            :  Judge Sean J. McLaughlin
VICTORY ENERGY                             :
OPERATIONS, LLC, a Delaware limited        :
liability company,                         :
                                            :
               Defendant.                :

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned

counsel, submits this memorandum of law in opposition to the Motion of Defendant Victory

Energy Operations LLC ("VEO") for Partial Summary Judgment.

### Introduction

VEO's motion, as well as IKE's own Motion for Partial Summary Judgment,

ultimately depends on this Court's interpretation of the License Agreement entered by VEO with

IKE's predecessor-in-interest Erie Power Technologies, Inc. ("EPTI"). If, as IKE contends, the

Agreement conferred a right on VEO to sell only the Standard M-Series Keystone® boiler as

defined in Annex I to the Agreement, then the Court must deny VEO's motion and enter

judgment on IKE's claims for trademark infringement, misappropriation of trade secrets, unfair competition, and unjust enrichment because VEO admittedly sold boilers that did not conform to the description of the licensed product in Annex I. Conversely, if VEO had the unfettered right to deviate from the product defined in Annex I, then VEO is entitled to judgment on its claim for declaratory judgment, but not on all of Plaintiff's claims.[1]

In moving for partial summary judgment, VEO relies on a selective, incomplete and misleading factual record that ignores (1) an interpretation of the Agreement as a whole; (2) an integration clause in the Agreement that bars the self-serving, pre-contractual "understanding" that VEO now claims to have had; and (3) the parties' course of performance showing that EPTI and IKE repeatedly advised VEO that its sale of boilers with (among other features) membrane/welded walls was outside the scope of the Agreement – without any contrary assertion by VEO. When all of the undisputed evidence is considered – even in the light most favorable to VEO – it is clear that VEO's motion must be denied and IKE's must be granted.

<u>Facts</u>

EPTI and VEO (jointly "the Parties") negotiated a License Agreement for the Keystone® M-Series boiler, which Agreement IKE acquired when it purchased the Keystone® technology and trademark.[2] The Agreement includes an Annex I, which the Parties intended to specifically define the licensed "Product" described in Clause 1(a) of the Agreement, which

---

[1]     Plaintiff's claims for trademark infringement and misappropriation would still exist inasmuch as VEO offered for sale boilers that were admittedly beyond the capacity range of the License Agreement (above 150,000 pph steam capacity) in reliance on IKE's technology and its Keystone® trademark. (Plaintiff's Undisputed Facts, ¶¶ 129-58)

[2]     Plaintiff incorporates by reference its Undisputed Statement of Facts in Opposition to VEO's Motion for Partial Summary Judgment and in Support of Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Undisputed Facts").

2

expressly incorporated Annex I. (Plaintiff's Undisputed Facts, ¶¶ 15-60) Mark White, who negotiated the Agreement for EPTI and later became an employee of VEO, identified Annex I as the "Product description of the License Agreement," and he consulted with EPTI's Engineering Department to develop that description. The Engineering Department advised him to identify (among other features) tangent tube furnace and outer walls and refractory front and rear walls, which represent the design of the Standard M-Series Keystone® boiler. White incorporated those changes, which are shown on drawings in Annex I, and they were accepted by VEO. (Plaintiff's Undisputed Facts at ¶¶ 1-6, 39-62)

VEO knew that Annex I had to be completed when it signed the License Agreement and that Annex I was part of the Agreement. VEO read and understood Annex I and knew that it identified a tangent tube rather than membrane wall boiler. VEO initialed Annex I, "expressing our agreement that ... this document would become part of the agreement. [VEO] also initialed it from the standpoint that we understood that it included data." Annex I "provides model numbers, it provides the designs, it provides the basis of which the thermal performance was generated, ... it has capacity data." Annex I includes a cross-section of the Standard M-Series boiler; the purpose of the cross-section is to "see basically ... the mechanical design features in the unit." The drawings in Annex I are "part of the original M-Series boiler." (Plaintiff's Undisputed Facts, ¶¶ 18, 32, 54-56, 61-62) Annex I identifies a tangent tube boiler with refractory front and rear walls; neither Annex I nor the text of the License Agreement identify or refer to a boiler with membrane walls. (*Id.* at ¶¶ 59, 65, 5-8)

When the Parties wanted to prospectively amend the Agreement, they executed a written addendum as required by Clauses 21 and 24. (Plaintiff's Undisputed Facts at ¶¶ 67-77) They in fact executed a License Agreement Addendum on February 27, 2003 – less than one

3

month after finalizing the Agreement and Annex I – that EPTI "agrees to modify the Products as described in Annex I of the License Agreement in exchange for compensation from Licensee as stated herein." (*Id*. at ¶ 68)

For the first 14 months of the Agreement, EPTI permitted VEO to sell boilers that included membrane walls and that otherwise deviated from Annex I. VEO was disclosing its activities to EPTI, and EPTI expressly gave consent because it was experiencing financial difficulty. Throughout that time, though, EPTI reiterated the scope of the Agreement to VEO, advising (among other things) that the licensed product was the Standard M-Series with tangent tube walls. (Plaintiff's Undisputed Facts, ¶¶ 71-74, 96-108)

On March 26, 2004, EPTI sent a letter to VEO advising VEO of concerns that EPTI had with VEO's prior performance. (Plaintiff's Undisputed Facts, ¶¶ 86-95) EPTI stated that

> "VEO currently licenses only the M series product line which has a very specific geometry and characteristics. In review of some of the VEO recent projects and proposals, it appears that the majority of projects that VEO is pursuing or has completed have been outside the definition of the license agreement. … VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex 1 of the current agreement provides a clear definition of the M-Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design.)"

(Plaintiff's Undisputed Facts at ¶ 86) In response, VEO acknowledged that the Agreement "does provide specific geometry and characteristics" and that "membrane furnace and outer walls, watercooled front and rear" walls and a change to the physical dimension of the boiler "are outside the geometry and characteristics of the License." (*Id*. at ¶¶ 90-91) EPTI did not thereafter consent to VEO selling boilers outside the scope identified in the March 26, 2004 letter. (*Id*. at ¶¶ 87, 122-24)

4

In Spring 2004, VEO initiated negotiations to purchase the Keystone® technology from EPTI through a steam capacity of 165,000 pph and to obtain a perpetual license for the Keystone®, offering $500,000. EPTI was willing to sell the Standard M-Series technology that was the subject of the License Agreement, but VEO refused, wanting the full range of O-type technology that extended beyond the M-Series and permitted customization of the M-Series to include such features as membrane wall technology. EPTI refused, but offered an extension of the License Agreement that would permit membrane walls and other customized features. The negotiations ended because EPTI would not sell more than the M-Series and would not provide the perpetual license. (Plaintiff's Undisputed Facts at ¶¶ 109-121)

## Argument

VEO's Motion is predicated on contract interpretation principles, arguing that "nothing in the Agreement or the Appendices states that 'Products' is limited to Standard 'M' series boilers." (VEO Memorandum at p.5) VEO makes the following unequivocal arguments:

> "Plaintiff takes the position that VEO was only authorized to manufacture and sell a line of older, outmoded boilers within that same capacity range [of 29,000 to 150,000 pph of steam flow]. The language of the Agreement, however, contains no such limitation and clearly grants VEO the right to manufacture and sell a broad class of items, and to improve and modify said Products to the financial benefit of both the licensor and licensee. VEO has only used the technical information to design, manufacture and sell the Products, based on the clear definition of that term in the Agreement, and IKE can identify no relevant evidence to the contrary." (VEO Memorandum at p.1)

* * *

> "Only one interpretation follows from the plain meaning of these provisions [in Clause 1(a) and 2(a) of the Agreement]. VEO was authorized to use the Technical Information to design, manufacture, market and sell industrial watertube package boilers, such as those identified in Annex I, during the term of the Agreement. Nothing in the Agreement precludes VEO from incorporating welded walls, increasing the length of the unit, or the size of the drum." (VEO Memorandum at p.10)

5

VEO's assertions fail to interpret the contract as a whole, ignore the terms of Annex 1, ignore the parties' communications concerning the meaning of the Agreement, and ultimately disregards the law.

## A.    The Contract Must Be Interpreted As A Whole.

License agreements (including trademark licensing agreements) are interpreted according to standard principles of contract law. *See, e.g., Regscan, Inc. v. Con-Way Transp. Servs.*, 875 A.2d 332, 336-37 (Pa. Super. 2005); *Thomas Rigging & Constr. Co. v. Contraves, Inc.*, 798 A.2d 753, 755-56 (Pa. Super. 2002), *appeal denied*, 575 Pa. 688, 834 A.2d 1143 (2003); *see also Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 472 n.8 (3d Cir. 1986). Determining the intention of the parties is the paramount consideration in the interpretation of any contract. *Foulke v. Miller*, 112 A.2d 124, 127 (Pa. 1955). In construing a contract, the "intention of the parties must be ascertained from the entire instrument, and each and every part of it must be taken into consideration and given effect if reasonably possible." *Id.* (*citing Neal D. Ivey Co. v. Franklin Associates, Inc.*, 87 A.2d 236 (Pa. 1952)). When a written agreement is clear and unequivocal, its meaning must be determined by its content and, thus, extrinsic evidence is not permitted. *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982); *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973).

## 1.    VEO Has Misinterpreted The Contract.

In analyzing the Agreement, VEO fails to give effect to Annex I and focuses solely on the text definition in Clause 1(a) of the Agreement. According to VEO, "IKE defines these boilers as steam generators that incorporate only tangent tube furnace

6

and convection wall construction, with refractory front and tube and tile rear walls. IKE takes this position despite the fact that the clear and unambiguous definition of Products fails to make mention of these alleged limitations on the scope of the license." (VEO Memorandum at p.11) Yet Clause 1(a) expressly incorporates Annex I, and that Clause cannot be interpreted in isolation from the Annex. In that regard, both Viskup and White admit that the Annex is part of the Agreement and that they knew at the time they signed the Agreement that they still had to agree on Annex I, which made sense because Clauses 1(a) and 2 did not refer to the type of technology being licensed. (Plaintiff's Undisputed Facts, ¶¶ 26, 29-33, 39, 53-54, 61-62)   VEO also admits that Annex I in fact shows "tangent tube furnace walls, tangent tube outer walls, a refractory front wall and a tube and tile water cooled rear wall" (VEO Memorandum at p.5) and that the License Agreement does not contain any reference to membrane wall (Plaintiff's Undisputed Facts, ¶¶ 55, 59, 65). IKE's interpretation thus comports with the Agreement and gives effect to all of the Agreement's terms, whereas VEO's interpretation nullifies Annex I.

VEO fixates on the clause "includes but not limited to" in Clause 1(a), but there was no negotiation or discussion concerning that clause, and the evidence is that it was copied from a prior license agreement for a different product (HRSGs). As a result, there is no independent significance to that phrase. (Plaintiff's Undisputed Facts, ¶¶ 15, 18, 25, 29-33)  Importantly, Clause 1(a) does not identify Keystone® boilers, M-Series boilers, or even O-type boilers, despite the fact that EPTI had D-type boiler technology that admittedly is outside the scope of the Agreement and that EPTI had O-type

7

technology beyond the M-Series (the purchase of which also was the subject of the parties sale discussions in Spring 2004). (*Id.* at ¶¶ 1, 5, 7-8, 11, 100, 109-21)  Yet in giving effect to that phrase, the logical meaning is that the Agreement could be amended to include additional products, such as Keystone® boilers below 29,000 pph or above 150,000 pph or D-type boilers – which in fact was discussed by the Parties in connection with a possible expansion of the Agreement when VEO attempted to purchase the Keystone technology in the Spring 2004. (*Id.* at ¶¶ 109-21)  If VEO's current interpretation were correct that that VEO could sell any kind of boiler it wanted so long as it was in the capacity range, then there would be no need for any drawings in the Annex and, indeed, no need for the Annex at all.  However, both White and Viskup knew it was necessary to complete Annex I and that it is a part of the Agreement.

That VEO is grossly misinterpreting the Agreement as a whole is readily apparent from three facts omitted from VEO's Memorandum and Statement of Facts and one that is admitted.

First, on February 27, 2003 – less than a month after the Agreement was finalized – the parties executed a License Agreement Addendum to include superheated applications.  Mark White (then of EPTI) was responsible for preparing the Addendum, which was signed by both him and John Viskup (VEO) – the very same individuals who signed the Agreement and initialed the Annexes.  The Addendum provides that EPTI **"agrees to modify the Products as described in Annex I of the License Agreement in**

8

exchange for compensation from Licensee as stated herein." (Plaintiff's Undisputed Facts at ¶¶ 67-68) (Emphasis added)  There was no reference to Clause 1(a).

Second, when White was developing Annex I (and before he became a VEO employee), he told the engineers at EPTI, in writing, that "Annex 1 … is the Product description of the License Agreement" (Plaintiff's Undisputed Facts at ¶ 49), which is fully consistent with the February 27 Addendum.

Third, Annex I itself specifically uses the word "Products" twice, identifying the Products as the different models of the M-Series.  The drawings in Annex I, particularly the cross-section, in turn identify the "Standard M-Series," which corresponds to the Products identified in the beginning of Annex I, the title of the heading for the table that begins on the first page, and is consistent with the parties' pre-contract discussions about licensing the M-Series. The Annex thus identifies the specific Products that were licensed, whereas the text of the Agreement merely provides a general description that relies on Annex I for the actual description.  (Plaintiff's Undisputed Facts at ¶¶ 49-62, 65)

Finally, VEO obviously understands Annex I, as evidenced by the fact that it admits the drawings "show a boiler with tangent tube furnace walls, tangent tube outerwalls, a refractory front wall and a tube and tile watercooled rear wall."  (VEO Memorandum at p.5); (Plaintiff's Undisputed Facts at ¶ 62)  VEO also concedes that Annex I does not identify membrane walls.  (Plaintiff's Undisputed Facts, ¶¶ 59, 65)  Annex I is clear, and it defines the licensed Products.

### 2.    VEO Is Relying On Parol Evidence For Its Interpretation In Order To Vary The Plain Terms Of The Agreement.

Despite emphasizing that the Agreement is unambiguous and that intent should be determined from the plain meaning of the Agreement (VEO Memorandum at p.10), VEO deviates from the language of the Agreement and injects an "understanding" that is contrary to the terms of the Agreement.  VEO argues that it had the right to design and sell boilers "*such as* those in Annex 1" (*Id.*) (rather than those in Annex I) and that "[b]oth Mark White and Shawn Brewer [of VEO] understood that the Agreement allowed VEO to design, manufacture and sell O-Style watertube Keystone® boilers with 100% membrane wall technology (VEO Statement of Facts at ¶ 18)  However, Annex I refers only to tangent tube walls, and there is <u>nothing</u> in the negotiations leading to execution of Annex I, in the text of the Agreement, or in Annex I that identifying membrane wall technology.  (Plaintiff's Undisputed Facts at ¶¶ 39-65)

Parol evidence may be introduced to aid in the interpretation of the Agreement. *West Conshohocken Restaurant Associates, Inc. v. Flanigan*, 737 A.2d 1245, 1248 (Pa. 1999). However, "[w]here the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.  All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence." *Yocca v. Pittsburgh Steelers Sports, Inc.,* 854 A.2d 425, 436 (Pa. 2004), citing *Gianni v. Russell & Co.*, 126 A. 791,

792 (Pa. 1924) (citations omitted) and *Scott v. Bryn Mawr Arms, Inc.*, 312 A.2d 592, 594 (Pa. 1973). Clause 24(a) of the Agreement is an integration clause, and VEO is improperly seeking to add terms to the Agreement. In contrast, the evidence identified by IKE is fully consistent with all terms of the Agreement.

That VEO is seeking to introduce parol evidence to vary or add to the terms of the Agreement is clear from the testimony of VEO's President (John Viskup) that the Product in Annex I "is not what [VEO] licensed." (Exhibit 6, J. Viskup Dep., p.73) Of course, that position is directly contrary to the Agreement, including the February 27 Addendum, and precisely why integration clauses and the parol evidence rule exist.[3] VEO received the drawings in the revised draft of Annex I, understood the information in Annex I, and initialed Annex I, including the drawing that shows tangent tube walls. If Annex I did not contain what VEO was licensing (which is denied), VEO should have made changes to the Annex or refused to sign it. (Plaintiff's Undisputed Facts at ¶¶ 54, 61-62) Of course, both Viskup and White testified that they knew the difference between membrane and tangent tube technology when they initialed Annex I. (*Id.* at ¶¶ 17-18)

---

[3]    The only Keystone® boiler referenced in the Agreement is the Standard M-Series as set forth in Annex I. There is no reference to "O-style watertube Keystone® boilers" (VEO Statement of Facts at ¶ 18), which phrase represents the full scope of the Keystone® product line beyond what was licensed to VEO. Nor is there any reference in Clause 2 of the Agreement to VEO having the right to "design" Keystone® boilers. Rather, the grant of selling rights is to "manufacture the Products," which makes sense because the Standard M-Series has standard designs. (Plaintiff's Undisputed Facts at ¶¶ 1, 3, 5-6)

11

Further, the parties negotiated two amendments to the Agreement and never modified the Agreement to include membrane technology, even though EPTI advised VEO on multiple occasions that the scope of the Agreement was limited to the Standard M-Series and that membrane/welded walls were outside the scope of the Agreement. (Plaintiff's Undisputed Facts at ¶¶ 67-70, 86-108)  The February 27 Addendum specifically identifies that the "Products" in Annex I were "modified" to include increased temperature and pressure, which resulted in an increased royalty.  If the parties intended to change the licensed Products to deviate from tangent tube technology, they would have entered a modification and increased the royalty, and EPTI would not have been repeatedly reiterating the scope of the Agreement to VEO.  (*Id*. at ¶¶ 67-70)

**B.**     **VEO Did Not Make Improvements Or Modifications.**

VEO makes the grand assertion that "VEO had the absolute right to modify the Products, so long as said modification did not diminish the reliability and performance of the Product.  In addition, VEO had the right to improve the design of the Products, and following expiration of the License, VEO would retain the rights to the improvement under the terms of the Agreement."[4]  (VEO Memorandum at pp.12-13)  VEO has again ignored evidence and mischaracterized the Agreement.

---

[4]     Like the phrase "Products shall include but not be limited to" in Clause 1, Clauses 8 and 13 were simply copied from the Rosetti Agreement and were not the subject of discussion or negotiation.  (Plaintiff's Undisputed Facts at ¶¶ 20, 25, 93-94)

12

As to the evidence, VEO has admitted that it did not make any improvements <u>or</u> modifications during the term of the License Agreement. In fact, White of VEO specifically admitted that membrane walls are <u>not</u> improvements. (Plaintiff's Undisputed Facts at ¶¶ 93-94) As a result, the modification and improvement provisions are irrelevant to whether VEO had the right to sell boilers with membrane technology.

Nor do those provisions in the Agreement assist VEO. Under Clause 8(a) (Modifications), VEO ignores that any modification was subject to "prior written approval" of the Licensor, which EPTI never prospectively provided. At most, the Parties agreed that any approval for modifications would be on a "per job" basis. EPTI never gave written approval for VEO to use membrane walls in all boilers, and it retracted consent in March 2004. And IKE never gave written approval. (Plaintiff's Undisputed Facts at ¶¶ 71, 72, 74 98, 125-27) Under Clause 13 (Improvements) of the Agreement, "Licensor shall disclose and make available to Licensee and Licensee shall disclose and make available to Licensor, free of charge, all improvements **developed while this Agreement is in effect.**" (Emphasis added) EPTI developed its membrane wall technology long before the Parties entered the Agreement, as confirmed by VEO. (VEO Memorandum at pp.13, 15) Because the technology was not "developed while this Agreement is in effect," it was not to be shared as a matter of right between the parties. Clause 13 is equally irrelevant.

## C.    The Course Of Performance Evidence Demonstrates That Membrane Technology Was Outside The Scope Of The License Agreement.

The Pennsylvania Supreme Court has made clear that "course of performance is *always* relevant in interpreting a writing." *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 376 n.6, 390 A.2d 736, 741 n.6 (1978) (emphasis added); *see also Regscan, Inc. v. Con-Way Transp.*

13

*Servs.*, 875 A.2d 332, 339 (Pa. Super. 2005) ("any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement"). Thus, a contract, including a license agreement, need not be ambiguous "in order to justify consideration of the parties' post-agreement conduct." *Pennsylvania Eng'g Corp. v. McGraw-Edison Co.*, 500 Pa. 605, 612, 459 A.2d 329, 332 (1983); *cf. Langer v. Monarch Life Ins. Co.*, 879 F.2d 75, 81 & n.8 (3d Cir. 1989) (same, applying Pennsylvania law); Restatement (Second) of Contracts, § 202 of the Restatement ("[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given *great weight* in the interpretation of the agreement.") (emphasis added). In addition, "[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with . . . any relevant course of performance . . . ."[5] RESTATEMENT (SECOND) OF CONTRACTS § 202(5).

Importantly, course of performance alone will not constitute evidence of a modification of the agreement. "'Course of dealing' may supplement or qualify terms of an agreement, whereas 'course of performance' may be used only to interpret a contract." *J.W.S.*

---

[5]     Section 203 of the Restatement provides that a contract's "express terms are given greater weight than course of performance." RESTATEMENT (SECOND) OF CONTRACTS § 203(b); *Giampolo v. Somerset Hosp. Ctr. for Health*, No. Civ.-95-133J, 1998 U.S. Dist. LEXIS 14388, at *41 (W.D. Pa. May 29, 1998) (Smith, J.) (while course of performance is relevant even when contract language is not ambiguous, such course of performance evidence "must still be weighed in the light of the terms of the agreement itself."), *aff'd*, 189 F.3d 464 (3d Cir. 1999); *Intermetal Mexicana, S.A. v. Insurance Co. of N. Am.*, No. Civ.-84-6179, 1986 U.S. Dist. LEXIS 20369, at *8 (E.D. Pa. Sept. 16, 1986) (Pollak, J.) ("The approach of the Restatement (Second) of Contracts does not require that the unambiguous language of a contract be set aside whenever one party produces evidence of a contradictory course of performance.").

PTDATA 293735_2

*Delavau, Inc. v. Eastern Am. Transport & Warehousing, Inc.*, 810 A.2d 672, 684 (Pa. Super. 2002) (citation omitted), *appeal denied*, 573 Pa. 704, 827 A.2d 430 (2003).[6]

As set forth in detail in Plaintiff's Undisputed Facts (¶¶ 71-81, 86-121), the course of performance evidence shows that EPTI complied with the License Agreement and that EPTI/IKE's interpretation of the Agreement is correct, whereas VEO's alleged evidence is irrelevant and/or ignores the terms of the License Agreement and the Parties' course of performance.

### 1.    VEO's Evidence Does Not Support The Interpretation It Seeks.

First, as to the Heinz boilers (VEO Memorandum at p.14), VEO purchased those in 2001, more than 18 months before the Parties began to negotiate the License Agreement. (Plaintiff's Undisputed Facts at ¶ 11)  As a result, VEO is simply wrong (and misleading) in its assertion that "following the purchase of the Heinz boilers, VEO began discussions with EPTI regarding the possibility of license the technology." (VEO's Facts at ¶ 15)  In any case, Viskup (VEO) testified that he did not review any drawings for the Heinz boilers in connection with negotiating the license agreement, but he did know that the Heinz boiler was a "Special", not a Standard, and that it had membrane walls.  (*Id*. at ¶¶ 11, 54)  Of course, if VEO intended to license the same technology as the Heinz boilers, VEO would not have agreed to Annex I, which refers to Standard boilers and tangent tube walls.  Because the purchase of the Heinz boilers significantly predates the negotiation and interpretation of the License Agreement, was not

---

[6]    Course of dealing refers to the parties' transactional relationship prior to entry of the contract in question, whereas course of performance refers to the parties' conduct under the contract in question. *See J.W.S. Delavau*, 810 A.2d at 683-84.

PTDATA 293735_2

referenced in any of the communications during the negotiations, and is not identified in the Agreement, VEO's purchase of the Heinz boilers does not inform the intent of the Parties in a way that favors VEO. To the contrary, that evidence supports IKE's interpretation.

Second, the drawings, marketing materials and software provided by EPTI to VEO do not show that the Agreement permitted VEO to deviate from the product definition in Annex I. (VEO Memorandum at pp.13-16) As an initial matter, Clauses 21 and 24 provided that the Agreement would be modified only by a written amendment. The Parties never entered an amendment to permit VEO to sell O-style (as opposed to M-Series) boilers even though they in fact entered two amendments and therefore knew the procedure to follow.[7] (Plaintiff's Undisputed Facts at ¶¶ 67, 70, 76-77, 122-27) As to the drawings showing boilers with 100% membrane construction, EPTI provided those drawings at the request of VEO for a specific project after VEO disclosed that the project required membrane walls. EPTI thus provided consent to use the technology on that and subsequent projects prior to March 26, 2004, when EPTI sent the EPTI Breach Letter notifying VEO that it could no longer sell boilers with membrane walls and other features beyond the scope of Annex I. (EPTI had the absolute right to revoke its consent as described below.) (Plaintiff's Undisputed Facts at ¶¶ 71-72, 101) As to the Keystone® Design Guide and KPSC computer program, EPTI did not have a separate Design Guide or program for the M-Series. Rather, the M-Series was a subpart of the Keystone® technology, and EPTI's Design Guide and Program encompassed the Keystone® technology as a whole. The same is true for the sales manual and the power point presentation – EPTI did not have separate materials for the M-Series because it was a subset of the Keystone®

---

[7]    VEO is referring to "O-style" Keystone boilers, which is broader than the M-Series and includes the newer features that are excluded from the License Agreement.

PTDATA 293735_2

product line. In any case, Annex II expressly required EPTI to provide VEO with "sales promotion material *as used* by Licensor" and "typical sales proposal information to include unpriced technical proposal and drawing package to include typical arrangement GA and Plan drawings and typical P& ID." (Annex II, p.26) (emphasis added)  It also is telling the VEO refused to provide its marketing materials to EPTI when EPTI requested them in March 2004. (Plaintiff's Undisputed Facts at ¶¶ 9-10, 131-33, 136-38)

Third, even when EPTI gave consent for VEO to sell non-conforming boilers, EPTI continued to reiterate to VEO that the scope of the Agreement was limited to the Standard M-Series with tangent tube walls.  VEO's employees never disputed those statements, even though White himself managed the License Agreement for VEO. (Plaintiff's Undisputed Facts at ¶¶ 71-72, 82-108)

Fourth, the fact that EPTI and its predecessors – as owners of the complete Keystone® product line -- sold Keystone® boilers with membrane walls is irrelevant to whether VEO had the *contractual* right to sell such boilers under the terms of the License Agreement. (VEO Memorandum at p.15)  EPTI also sold Keystone® boilers above 150,000 pph and D-type boilers, but that did not give VEO the right to do so.  If VEO licensed old technology believing it could sell that technology, VEO is bound by the terms of its written agreement.  In that regard, White (while with EPTI) specifically told Stephen Kang of EPTI that VEO was licensing "outdated and antiquated" technology and similarly told Gdaniec that the M-Series was "somewhat outdated." (Plaintiff's Undisputed Facts at ¶¶ 16, 27)

Fifth, VEO again is engaging in semantic games when it says that "no EPTI representative ever informed VEO that it was in breach of the Agreement." (VEO Memorandum

17

at p.15) EPTI, both during the time White worked there and after he joined VEO, reiterated to

VEO – without any disagreement from VEO -- that the scope of the Agreement was the Standard

M-Series with tangent tube technology.  (Plaintiff's Undisputed Facts at ¶¶ 42-48, 51-52, 86-

94, 96-108)  Perhaps most importantly, the EPTI Breach Letter, specifically advised VEO that it

was pursuing projects outside the scope of the Agreement, which by definition is a breach.  (*Id.*

at ¶¶ 86-87)  Counsel for EPTI likewise sent letters to VEO in August and September 2004

advising that VEO had violated the Agreement.  (*Id.* at ¶¶ 122-24)

Sixth, VEO's reliance on representations by EPTI or CMI-EPTI in sale

agreements that do not involve VEO is misplaced because VEO is not a third-party beneficiary

under those agreements and because the communications between VEO and EPTI demonstrate

that VEO was advised that it acted outside the scope of the License Agreement.  (VEO

Memorandum at pp.6-7, 15-16); (Plaintiff's Undisputed Facts at ¶¶ 86-108)  Stephen Kang of

EPTI also testified that he did not go back to review the EPTI file with VEO to inform himself in

connection with those representations being given and that the EPTI Breach Letter did reflect the

consensus of the engineers at EPTI.  (Plaintiff's Undisputed Facts at ¶ 87)

Finally, the fact that IKE cashed royalty checks from VEO is of no legal

significance because: (1) VEO failed to disclose (unlike with EPTI) that VEO was selling boilers

with membrane wall technology (Plaintiff's Undisputed Facts at ¶ 81); (2) the payments were

neither offered nor accepted in satisfaction of a dispute between VEO and IKE concerning

monies owed to IKE; and (3) VEO identifies no law to support this argument.

2.    **EPTI and IKE Advised VEO Of The Scope
      Of The Agreement Without Objection By VEO.**

As set forth in IKE's Statement of Facts (¶¶ 86, 96-108, 122-27), EPTI and IKE

repeatedly advised VEO of the scope of the Agreement without any objection or contradiction

from VEO.  Notably, White and the other VEO employees never disputed EPTI's and IKE's

reiteration of the scope of the Agreement.  In addition to the facts identified above, there are

three key facts that demonstrate VEO knew the scope of the Agreement excluded membrane

technology.

First, VEO agreed with EPTI's description of the scope of the Agreement when

the Parties exchanged correspondence in March 2004.  According to EPTI,

> **VEO currently licenses only the M series product line which has a very
> specific geometry and characteristics**. …. In review of some of the VEO recent
> projects and proposals, **it appears that the majority of projects that VEO is
> pursuing or has completed have been outside the definition of the license
> agreement.** …  **VEO will need to redirect their attention on the
> sales/marketing and execution of the products that are defined in the license
> agreement.  (Annex 1 of the current agreement provides a clear definition of
> the M-Series design with product size, dimensional data for the different size
> ranges, typical cross-section of the boiler and overall boiler construction
> which includes refractory front and rear walls, tangent furnace and outer
> wall tubes and pressure casing design**.)"

VEO – through Mark White in consultation with John Viskup and after two drafts of the letter

over six days -- then responded as follows:

> "**The Agreement does provide specific geometry and characteristics** but also
> allows for improvements, refer to Clause 13.  **As such, VEO has made
> improvements** which are necessary to offer/provide a Keystone® boiler that is
> technically compliant with our customers requirements, is inline with that of our
> competitors offerings and as we deem necessary to enhance our overall success.
>
> The Oxyvinyls Project includes two (2) 15M Series Keystone® boilers **each of
> which include membrane furnace and outer walls, watercooled front and
> rear and an upper drum size of 60" ID.  <u>These features are outside the</u>

19

**geometry and characteristics of the License but are clearly improvements**.
…. (All emphasis added)

White's statement that the Agreement "does provide specific geometry and characteristics" referred to Annex 1. (Plaintiff's Undisputed Facts at ¶¶ 86-94)  VEO thus admitted that Annex I contained "specific geometry and characteristics" and that "membrane furnace and outer walls, watercooled front and rear are "outside the geometry and characteristics of the License." Moreover, it admitted that a change in the size of the upper drum also was "outside the geometry and characteristics," further confirming that the intent of the Agreement was to sell boilers with the configuration in Annex I.

Second, VEO sought to purchase the Keystone technology in Spring 2004, but it refused to purchase only the Standard M-Series technology, which was the only technology EPTI was willing to sell.  VEO admitted that EPTI's "'O' boiler technology … includes the 'M' Series boilers," confirming that it knew during the term of the Agreement that there was a distinction between the M-Series and the balance of the Keystone® technology such that the M-Series did not include all of the O-boiler technology (*i.e.*, all M-Series are Keystones®, but not all Keystones® are M-Series).  During that process, EPTI specifically offered to extend the License Agreement, which EPTI described as follows: the "extended license option … [would] expand[] availability of the products **to the full O boiler line** and D boiler line within a defined size and capacity range  while preserving the original agreement scope and general conditions.  This would give VEO access to a wide range of sizes, pressure and temperature capacity, **the use of welded wall construction** as well as provide access to steam purity equipment **which is not part of the current license agreement scope**."  EPTI reiterated that the "technology that is available for sale at this time is limited to just the standard M series boilers which is the basis for

20

the current license agreement." VEO did not dispute that characterization, and it refused to purchase the technology because it did not want just the M-Series. (*Id.* at ¶¶ 109-21)

Third, VEO hid from IKE the fact that it was selling boilers with membrane walls. When IKE became licensor, IKE immediately notified VEO that it could not sell boilers that deviated from Annex I. Unlike with EPTI, VEO stopped disclosing the sale of boilers with membrane walls in the USNs it sent to IKE. (Plaintiff's Undisputed Facts at ¶¶ 81,125-28)

## II.    EPTI And IKE Revoked VEO's Permission To Exceed The Scope Of The License Agreement.

During the time that EPTI was the licensor, EPTI gave consent for VEO to sell boilers with membrane wall technology in order for EPTI to increase its cash flow during a time that EPTI experienced financial difficulty. (Plaintiff's Undisputed Facts, ¶ 71) The parties did not, however, enter a written modification that expanded the scope of the License Agreement. Then, in March 2004, EPTI advised VEO that VEO must confine its activities under the License Agreement to the scope of Annex 1. When IKE acquired the Keystone technology less than six months later and became Licensor, IKE similarly required VEO to confine its activities to the scope of the License Agreement. (*Id.* at ¶¶ 71-78, 122-27) As a matter of law, EPTI and IKE had the right to instruct VEO to discontinue its sale of boilers with membrane walls and other features outside the scope of the Agreement.

A waiver of a contract provision — such as the provision in Annex 1 limiting the License Agreement's scope to Standard M-Series boilers with tangent tube walls — may be revoked as to executory portions of the contract "by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be

unjust in view of a material change of position in reliance on the waiver."[8] 13 Pa. C.S.

§ 2209(e); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 150, cmt. c (same); *Cassidy*

*Podell Lynch, Inc. v. Snyder General Corp.*, 944 F.2d 1131, 1147 (3d Cir. 1991) (applying New

Jersey's UCC and noting that while the defendant "could have retracted its waiver with respect

to future shipments, it could not demand compliance with respect to past shipments"); *cf.*

RESTATEMENT (SECOND) OF CONTRACTS § 150, cmt. e (explaining that, unlike a new

interpretation of the contract based on course of performance, contract rights waived through

course of performance are "subject to the possibility of reinstatement"). The executory portion

of the Agreement was future boiler sales, and both EPTI and IKE gave such notification – in

writing – to VEO.

EPTI's ability to rescind its limited, case-by-case waiver is supported by the

License Agreement. Clause 24(b) provides that no waiver of a past breach by either party "shall

operate or be considered as a waiver of any other subsequent breach." VEO thus had no right to

expect that past permission to sell boilers beyond the scope would extend to future boiler sales.

Similarly, Clause 24(a) provided that "no subsequent modification of this Agreement shall be

binding upon the parties unless negotiated upon the terms contained herein provided and

executed with the same formalities as this Agreement." Yet, there was no written modification

(other than the 2/27/03 Addendum) permitting VEO to sell membrane wall boilers or otherwise

deviate from Annex 1. If the Agreement is governed by the UCC, this is fatal to any

---

[8]     There was nothing unjust about the retraction for several reasons, including that the
Agreement contained nonwaiver and no oral modification provisions in Clause 24; VEO
disclosed its proposed sales and received EPTI's consent; and EPTI consistently
informed VEO of the scope of the Agreement without giving any unqualified approval
for prospective sales.

modification claim as a result of the requirement in the Agreement that any modification be in writing. A "signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded." 13 Pa. C.S. § 2209(b).

Furthermore, there is no evidence that the parties agreed to waive the requirement of a written modification. When, as here, a contract contains a provision requiring any modifications to be in writing, the parties can modify the contract absent such a writing only if the facts demonstrate that the parties agreed to waive the requirement of written modifications. *See, e.g., Somerset Community Hosp. v. Allan B. Mitchell & Assocs.*, 454 Pa. Super. 188, 197, 685 A.2d 141, 146 (1996). The Parties, though, entered a written addendum when they wanted to modify the Agreement prospectively for all purposes, and EPTI consistently advised VEO of the scope of the Agreement and then retracted consent to exceed that scope. IKE immediately prohibited the sale of such boilers. (Plaintiff's Undisputed Facts, ¶¶ 67-78, 86-87, 96-108 ) VEO cannot show an intent to waive the requirement of a written modification.[9]

---

[9]    "[T]he party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence." *Nicolella v. Palmer*, 432 Pa. 502, 508, 248 A.2d 20, 23 (Pa. 1968); *see also Somerset*, 454 Pa. Super. at 197, 685 A.2d at 146. There is a two-step analysis: First, "the parties' conduct [must] clearly show[] the intent to waive the requirement that the amendments be made in writing." *Somerset*, 454 Pa. Super. at 197, 685 A.2d at 146; *Sonfast Corp. v. York Int'l Corp.*, 875 F. Supp. 1099, 1103 (M.D. Pa. 1995). Second, there must be proof that, after waiving the written modification requirement, the parties agreed to modify the contract; in other words, the same requirements for executing an original contract apply when modifying a contract: "[O]nce a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration." *J.W.S. Delavau*, 810 A.2d at 681. Neither requirement is met here.

PTDATA 293735_2

### III.    VEO Infringed The Trademark and Misappropriated Trade Secrets.

VEO contends that it has a "complete defense to each and every claim IKE asserts" due to its allegedly acting "under the authority granted by the Agreement." (VEO Memorandum at p.7)  VEO's memorandum does not explain or offer any legal authority for that position.  Nor does VEO address the fact that it used the Trademark and technology to offer for sale boilers above 150,000 pph steam capacity, which VEO admits are outside the scope of the Agreement, and misused the EPTI brochures.  (Plaintiff's Undisputed Facts at ¶¶ 131-58)  As a result, even if VEO were to prevail on the issue of its right to deviate from Annex I as to boilers with a steam capacity between 29,000 and 150,000 pph, that does not permit VEO to use the Trademark and technology to offer for sale boilers above that capacity or in the manner that VEO marketed the boilers.

24

**Conclusion**

For the foregoing reasons, Plaintiff Indeck Keystone Energy LLC asks the Court to deny VEO's Motion for Partial Summary Judgment on Count One of Defendant's Counterclaim.

Respectfully submitted,

/s/    John K. Gisleson

John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated:  March 6, 2006

PTDATA 293735_2