# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE
ENERGY, LLC, a Delaware limited liability
company,

   Plaintiff,

  v.

VICTORY ENERGY
OPERATIONS, LLC, a Delaware limited
liability company,

   Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

NO. 04-CV-325 (ERIE)

Judge Sean J. McLaughlin

---

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel, submits this Statement of Undisputed Facts both in opposition to the Motion of Defendant Victory Energy Operations LLC ("VEO") for Partial Summary Judgment and in support of IKE's own Motion for Partial Summary Judgment on its affirmative claims.

## Keystone® Watertube Boilers

1. Erie Power Technologies and its predecessors Aalborg Industries and Zurn Energy (among others) (collectively "EPTI") developed the technology to design and

PTDATA 293745_3

manufacture a line of industrial O-type watertube steam generators ("boilers") known as the Keystone®, which ranged from a steam flow capacity of 8,000 to 500,000 pounds per hour. O-type refers to the shape of the tubes in the boiler. For example, there also are "D" and "A"-type boilers.

2. The Keystone® boiler has been in the marketplace since the 1940s. (Exhibit 2, B. Gdaniec Dep., p.177) The boiler is "well-respected, extremely conservative, very robust design. Expensive product, but you got what you paid for." (Exhibit 2, B. Gdaniec Dep., pp.177-78) The Keystone® name is well-known in the watertube boiler industry and was valuable to EPTI. (Exhibit 7, M. White Dep., pp.30, 76) The Keystone® boiler has a reputation "of being a quality piece of equipment." (Exhibit 1, S. Brewer Dep., pp.23-25)

3. "The uniquely designed Keystone® is very compact and has minimal space requirements." "All basic components of the Keystone® are the same – only the physical dimensions vary to meet the required operating conditions." (Exhibit 57, VEO Sales Brochure, at PTC 488) "The unique design … offers uniform gas distribution, equal expansion and vertical flue gas outlet. The symmetrical arrangement and short furnace tubes offer lower heat absorption and higher circulation ratios than other package steam generator designs." (*Id*. at PTC 490)

4. The Keystone® trademark is registered with the United States Patent and Trademark Office at No. 554,723, and has been continuously in use by EPTI (and its predecessors) since at least February 12, 1952.

5. The M-Series Standard Package Watertube Boiler ("M-Series") is a subset of the broader line of Keystone® O-type boilers and essentially is the baseline design for the full Keystone® line. (Exhibit 2, B. Gdaniec Dep., pp.56-57); (Exhibit 48) (VEO 499-500)

2

(M-Series is part of O-boiler line) "The M Series [is] a specific geometry construction type and style of boiler ... and did not include welded waterwall construction." (Exhibit 2, B. Gdaniec Dep., pp.29-31) The M-Series has a tangent tube furnace, outer wall refractory front and rear, and a particular size range. (Exhibit 58, T. Pawlowski Dep., p.46) Thus, all M-Series boilers are Keystone® boilers, but not all Keystone® boilers are M-Series.

6.  "Standard" means the boiler has developed design standards. (Exhibit 2, B. Gdaniec Dep., p.177); (Exhibit 59, VEO 30(b)(6) Dep. (White), at p.46) There was a standard set of drawings for the M-Series. (Exhibit 43) (IKE 1560) (VEO email advising that it was "in the process of setting up standard design files for all of the Standard "M" Series boilers."); (Exhibit 4, T. Miller Dep., p.35) It had standard geometry (length, width and height) and characteristics (such as tangent tube walls) and is essentially an off-the-shelf, one-size-fits-all item. There are multiple sizes, steam flows and pressures depending on the model (e.g., 8M, 9M, 10M, etc.), so a customer would select the series that corresponds to its steam and size needs. (Exhibit 60, C. Petcos Dep., p.200); (Exhibit 9, Annex I) It was not necessary to do any further design work with respect to the Keystone® boilers beyond what was shown on the standard drawings. (Exhibit 4, T. Miller Dep., pp.35-37) In particular, it was not necessary to update the Keystone® design to comply with applicable boiler and pressure vessel code issued by the American Society of Mechanical Engineers. (Id. at p.38)

7.  EPTI also developed state of the art design features to customize O-type Keystone® boilers to the specific needs of a customer. Those features include (among other things) membrane or welded walls and watercooled burner throats. (For ease of reference, those

3

boilers are sometimes called "0-Series" boilers.)   (Exhibit 8, Zurn Sales Brochure)

Membrane or welded walls refer to metal between adjacent tubes to form a gas-tight seal,

whereas tangent tubes touch each other without any metal between the tubes.  (Exhibit 4,

T. Miller Dep., p.50)

8.    From time to time prior to commencement of the License Agreement at issue here, an M-

Series boiler was modified by EPTI to include customized features such as

membrane/welded walls or a watercooled burner throat.  When that occurred, the boiler

no longer was a Standard M-Series and instead became a "special" (such as 10M Special)

due to the customization.  Any such change took the boiler outside the scope of the

Standard M-Series.  (Exhibit 2, B. Gdaniec Dep., p.179); (Exhibit 58, T. Pawlowski Dep.,

pp.47-48)  In the 1990s, EPTI sold boilers with and without membrane walls.  (Exhibit

58, T. Pawlowski Dep., p.18)

9.    Because EPTI owned the Keystone® technology, it developed software and design

guidelines that applied to the full-range of Keystone® boilers.  The software is known as

the "KPSC Software," and it permitted EPTI to "rate" a boiler by showing what the

boiler's thermal performance would be under certain operating conditions (e.g., altitude).

The KPSC Software is not used for designing the components of the boiler or any of its

features. The KPSC Software is used for all Keystone® boilers, and there was not a

separate software created for just the M-Series.  (Exhibit 60, C. Petcos Dep., pp.215-16);

(Exhibit 58, T. Pawlowski Dep., p.50)  The EPTI Design Guide similarly applied to the

full Keystone® boiler line, and there was not a separate design guide for the M-Series.

(Exhibit 58, T. Pawlowski Dep., pp.53-54); (Exhibit 60, C. Petcos Dep., p.200) (Exhibit

4

5, J. McConnaughy Dep., p.110)  The Design Guide included designs for the M-Series, which show tangent tube boilers.  (Exhibit 58, T. Pawlowski Dep., pp.109-112)

10. EPTI also developed marketing materials for the entire Keystone® boiler line that addressed the full range of boilers.  EPTI did not create or maintain any marketing materials specific to the M-Series.  (Exhibit 8, Zurn Sales Brochure); (Exhibit 61, T. Fuhrman Dep., p.120); (Exhibit 60, C. Petcos Dep., pp.168-71, 197-98);

11. In 2001, VEO purchased two Keystone® boilers from EPTI for use in a Heinz plant in Muscatine, Iowa.  Those boilers were not Standard M-Series boilers because they included (among other features) membrane walls.  (Exhibit 7, M. White Dep., p.36); (Exhibit 5, J. McConnaughy Dep., pp.164-67)  VEO knew that they were "special" Keystone® boilers.  (Exhibit 6, J. Viskup Dep., p.106)

12. Prior to entering the License Agreement with EPTI that is the subject of this lawsuit, VEO did not have any experience designing or manufacturing Keystone® watertube boilers.  (7/15/05 Hearing Transcript at pp.43-55)  The License Agreement with EPTI was the first time VEO had licensed technology.  (Exhibit 6, J. Viskup Dep., p.66)

13. IKE acquired the Keystone® technology and Keystone® trademark as of September 8, 2004.  IKE considers the unique design of the Keystone® boiler and the associated technology (including the KPSC software and the detail designs of the Keystone®) to be trade secrets, for which IKE utilizes reasonable means to preserve secrecy.  IKE continues to utilize the Keystone® trademark.  (Deposition of IKE 30(b)(6) Witness, transcript pending)

14. VEO and IKE are competitors for the sale of watertube boilers. (Exhibit 6, J. Viskup Dep., p.191)

## Preparation of the Text of the License Agreement

15. In December 2002, VEO contacted EPTI about licensing technology for Keystone® watertube boilers. (Exhibit 7, M. White Dep., pp.34-35); (Exhibit 6, J. Viskup Dep., pp.42-43) VEO was first interested in licensing the Keystone® M-Series watertube package boiler as early as 1999. (Exhibit 6, J. Viskup Dep., pp.34-36)

16. Stephen Kang was the President of EPTI, and he authorized Mark White to negotiate a license agreement with VEO. (Exhibit 7, M. White Dep., p.33, 35, 40-41) Mark White had told Kang that the technology to be licensed was "outdated and antiquated." (Exhibit 3, S. Kang Dep., p.81)

17. Mark White was the director of sales and marketing manager for EPTI and its predecessor Zurn. (Exhibit 7, M. White Dep., p.20) White had a "broad understanding" of the Keystone® technology but "wouldn't call [himself] an expert." He does not recall reviewing any Keystone® drawings other than a cross-section showing the "inner workings" of the boiler that was included in Annex 1 of the License Agreement. His "main focus" at EPTI was on heat recovery steam generators ("HRSGs"). (Exhibit 7, M. White Dep., p.22-23; 47-49) White knew the difference between a tangent tube boilers (boiler tubes touching each other) and a membrane or welded wall boiler (metal bar between the tubes so they do not touch). (Exhibit 7, M. White Dep., p.25-26) White is not an engineer. (Exhibit 7, M. White Dep., pp.11-12)

6

18. John Viskup was president of VEO. (Exhibit 7, M. White Dep., p.10) Viskup had heard

of the Standard M-Series Keystone® package boiler before signing the License

Agreement with EPTI because his prior employer owned several of them. (Exhibit 6, J.

Viskup Dep., pp.14-15, 104-05) Viskup knew the difference between a tangent tube

boiler and a membrane/welded wall boiler. (Exhibit 6, J. Viskup Dep., p.13)

19. From in or about December 22, 2002 until February 3, 2003, VEO (through John Viskup)

and EPTI (through Mark White) negotiated the License Agreement. They exchanged

drafts by email and never met personally to discuss the Agreement. (Exhibit 7, M. White

Dep., p.50); (Exhibit 6, J. Viskup Dep., p.70)

20. Mark White (EPTI) used a prior license agreement entered by EPTI with Rosetti Moreni

for heat recovery steam generators (a different product sold by EPTI) as the basis for the

proposed agreement with VEO. (Exhibit 7, M. White Dep., pp.43-44)

21. In describing the negotiations, Mark White testified as follows:

"I sent an agreement. We probably iterated a very minor issue two or three times. John
had mentioned that they had a legal review done of the agreement but felt very
comfortable that he wanted an agreement that Erie felt very comfortable with. Wasn't
going to impose any changes. Did not impose any of these changes. I believe my
comment was we wouldn't have accepted them regardless or the discussions would have
been over."

22. On December 20, 2002 at 11:03 am, Mark White (EPTI) sent a draft of the License

Agreement to Shawn Brewer. (Exhibit 10) (IKE 00224)

23. On December 20, 2002 at 11:35 am, Mark White (EPTI) sent a data table concerning a

subset of Keystone® boilers to Shawn Brewer (VEO) that "provides the details of the

capacity range and Models that the License Agreement will cover." (Exhibit 11) (VEO

7

683-85)  The data table was the first draft of what was to become Annex 1 to the License Agreement.

24.  On January 7, 2003, John Viskup (VEO) sent a revised, blacklined draft of the License Agreement to Mark White (EPTI).  (Exhibit 12) (VEO710-30)  VEO "made some minor changes" that "focused primarily towards the initial costs of the license." (Exhibit 12) (VEO 710)  The subjects that were negotiated were "the terms of the payments, the initial fees and so forth, when they would be paid, the royalty percentages, capacity" range. (Exhibit 7, M. White Dep., p.52)

25.  There were no changes to, nor any negotiation or discussion of, the following provisions in the License Agreement: Clause 1(a) (Definition of Productions) except as to capacity range, which increased from 100,000 to 150,000 pph; Clause 1(h) and 13 ("Improvements" to Products); Clause 8 ("Modifications" to Products); Clause 9 (Workmanship); Clause 14 (Copyrights); Clause 15 (Trademarks); Clause 24 (Integration, Merger, and Waiver).

26.  On January 8, 2003, Mark White (EPTI) sent to Viskup (VEO) a "conformed License Agreement for signature.  I have not yet completed the Annexes. I suggest that we sign the Agreement and when completed, initial off each Annex." (Exhibit 14) (VEO 731-50)  White incorporated the changes requested by VEO in its January 7 draft.

27.  On January 8, 2003, Mark White sent Bob Gdaniec an email explaining why EPTI was not seeking to market the M-Series itself. (Exhibit 62, IKE 336)  In that email, White stated that "[e]ven though the M Series is somewhat outdated, it has monetary value." (*Id.*)  He referred to the M Series as "a small commodity product line" and believed VEO

8

could market the M Series because it is "accustomed to executing highly standardized products." He then sent Gdaniec a copy of the License Agreement for his review. (*Id.*)

28. On January 9, 2003, Mark White (EPTI) also sent the Agreement to the EPTI engineering department (Bob Gdaniec, Ted Fuhrman, and Dave Briggs, among others) "for review." (Exhibit 15) (IKE 4410-29)

29. Viskup signed the License Agreement on January 10, 2003. The Agreement defines "Products" as follows:

> "'Products' shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex 1. If Licensee receives inquiries which are not in Licensor's range of Products, subject to and prior notice to Licensor, Licensee will be free to enter into separate agreements."

(License Agreement, Clause 1(a))

30. As to the definition of Products in Clause 1(a), John Viskup and Mark White discussed during the negotiations the specific model numbers of the M-Series. (Exhibit 6, J. Viskup Dep., pp.73-74)

31. The sentence "Products shall include but not be limited to the items set forth in Annex 1" was copied directly from the Rosetti Agreement. (Exhibit 16, Rosetti Agreement)

32. As of January 10, 2003, the Parties still had not completed Annex I. VEO understood it was still necessary to complete and approve the annexes to the License Agreement. (Exhibit 6, J. Viskup Dep., p.97)

33. The text of the EPTI-VEO License Agreement signed by the parties does not reference Keystone® or the type of boiler being licensed (e.g., "O" or "D").

9

34. EPTI did not provide any drawings to Viskup pertaining to Keystone® boilers prior to execution of the License Agreement. (Exhibit 7, M. White Dep., pp.49-50)

35. There is a secrecy provision in Clause 5 of the License Agreement. The "understanding and the intent of the agreement was to limit design details, such as separation devices, ... that type of equipment, what we would consider proprietary, but not to limit proposal-type information." (Exhibit 7, M. White Dep., pp.71-72)

36. EPTI's expectation was that at the conclusion of the License Agreement, the technical information provided by EPTI to VEO "would have to be returned .... It was not to be given away." (Exhibit 7, M. White Dep., pp.71-72) "In a general sense, all of the information that was transferred at the initial stage and throughout the agreement from EPTI or, in this case IKE would have to be returned, any proprietary information, the mark and so on and so forth. And then ... VEO could not continue to use the mark, couldn't use the sales literature and so on and so forth." (Exhibit 7, M. White Dep., pp.251-52)

37. VEO cannot use the technical information to design an O-type boiler after the conclusion of the License Agreement. (Exhibit 7, M. White Dep., p.252); (Exhibit 6, J. Viskup Dep., p.61)

38. All use of the Keystone® trademark and any goodwill arising out of that use was to benefit EPTI. (Exhibit 15, License Agreement, Clause 15(b)(2)); (Exhibit 7, M. White Dep., pp.76-77)

## Preparation of the Annexes to the License Agreement

39. Mark White and John Viskup each agree that Annex 1 is part of the License Agreement. (Exhibit 7, M. White Dep., p.104); (Exhibit 6, J. Viskup Dep., p.73)

40. Mark White of EPTI was responsible for preparing Annex 1 of the License Agreement that is referenced in the definition of "Product" in Clause 1(a) of the text of the License Agreement. (Exhibit 7, M. White Dep., pp.113-140)

41. The December 20, 2002 data table sent by Mark White to VEO was the first draft of Annex I. (Exhibit 59, VEO 30(b)(6) Dep., p.48)

42. Mark White of EPTI included Bob Gdaniec "in the generation of the annex to a certain degree." (Exhibit 7, M. White Dep., p.118) Gdaniec was the "chief engineer, and had role and responsibility for the care and custody of [EPTI's] technology." (Exhibit 2, B. Gdaniec Dep., p.163)

43. Stephen Kang (EPTI President) expected Gdaniec to develop an understanding of the scope of the License Agreement, and he relied on Mark White and the EPTI engineers "to look into the technical scope definition for the license agreement." (Exhibit 3, S. Kang Dep., p.81) Even though Kang "trust[ed] Mark White as our employee, I wanted other engineers to make sure and check on or cross-reference each other on what the license agreement would be, because I would not know what the annexes or technical[] definition would mean." (Exhibit 3, S. Kang Dep., p.89)

44. Stephen Kang instructed Mark White to consult with the engineers in the preparation of Annex I to the License Agreement. (Exhibit 3, S. Kang Dep., p.97) Kang "expected [Mark White] would have discussion … with Bob Gdaniec and … everybody [in the

11

Engineering Department] to come up with this such annex … so that the final version of Annex I for the product in the license agreement would be a joint product … of both sales and marketing and engineering." (Exhibit 3, S. Kang Dep., p.94)  White told Kang that he in fact consulted with the engineers in the preparation of Annex I.  (Exhibit 3, S. Kang Dep., p.97)

45.    On January 14, 2003, EPTI's Chief Engineer (Bob Gdaniec) sent an email to Mark White (EPTI) on the subject of "Keystone Product Line License Agreement" that stated as follows: "At this point as a recap of where we are going with this … the scope will be the **standard package boiler line** that is rated at steam flows from 29,000 to 150,000 which for us is the 8M thru the 22M.  … The general arrangement of the boilers will be defined by the KDB sheets with all tubes rolled into radially drilled tube holes.  **Any deviation from the above definition would be outside of the Product License Agreement**." (Exhibit 17) (IKE 340) (emphasis added)  The KDB sheets were the engineering standard numbers for the M-Series drawings.  (Exhibit 58, T. Pawlowski Dep., pp.111-12)  Mark White did not respond to the January 14, 2003 Gdaniec email or state to Bob Gdaniec that he was mistaken as to the scope of the License Agreement.

46.    On January 21, 2003, Mark White advised Bob Gdaniec that VEO had a possible new order for "a standard M-Series Keystone."  (Exhibit 18) (IKE 341)

47.    On January 22, 2003, Bob Gdaniec responded to the January 21, 2003 White email, stating "be careful on this one for free … Dan [Levstek, EPTI VP] spoke on it today and he believes that if this is outside of the license agreement (which it is) then we better get paid for it.  I think you need to get together with Dan and Stephen [Kang] and Simon [Kassas] and resolve this matter pretty quickly.  From what I understand … **this is way**

**out of the license agreement ... welded walls** and higher design pressure ...." (Exhibit

19) (IKE 342-43) (emphasis added)

48.    On January 22, 2003, Mark White responded to Bob Gdaniec's email of earlier that day,

stating

> "[T]hank you for your email message. The welded wall design will be handled by
> Victory and they will take responsibility and liability for the change. We will not be
> required to make such changes. ... In general we need to be practical about the
> agreement. We need to assist Victory in a positive way to ensure sales are generated
> and a diversified revenue stream is created for EPTI. We seem to be going in the
> same direction without any concern for diversification. If this is the case let me know
> so that I will only focus on HRSG [heat recovery steam generator] work."[1]

(Exhibit 19) (IKE 342-43)

49.    On January 29, 2003, Mark White sent an email to Bob Gdaniec on the subject "License

Product Description" that stated: "Bob, please review **the enclosed Annex 1 which is the**

**Product description of the License Agreement** and provide your comments." (Exhibit

20) (IKE 4876-79) (emphasis added)  Annex 1 included a "Description of Products" that

identified the "M Series Keystone water tube boilers to include the 8M, 9M, 10M, 11M,

12M, 13M, 14M, 15M, 16M, 17M, 18M, 19M, 20M, 21M and 22M."  Under "Design,"

White included "for the purpose of this agreement, the thermal performance of the above

'M' Series Keystone® boilers (Products) are based on the following design parameters

...."  There then is a table, generally corresponding to the data table sent on December

20, 2002, with the heading "Standard 'M' Series Keystone® Summary."  After the data

table, there are "standard fuels" that are identified.

---

[1]    VEO in fact needed EPTI's design, and EPTI ultimately provided the welded wall design,
which was utilized by VEO.  (Exhibit 19) (IKE 342-343)

PTDATA 293745_3

50. On January 30, 2003, Mark White sent Bob Gdaniec an email on the subject "Annex 1 of the License Agreement" that stated: "Bob, please review and provide your comments. **The document is complete with all Annex data.**" (Exhibit 21) (IKE 5003-09) (emphasis added)  In addition to Annex 1 that was forwarded with the January 29 email, White included drafts of Annex II (Technology Fee & Transfer of Information) and III (Contract Rates for Technical Assistance).  (Exhibit 21) (IKE 5003-09)

51. On January 30, 2003, Dave Briggs (EPTI) sent an email to White in response to White's January 30 email.  (Exhibit 22) (IKE 4240)  Briggs had been copied on White's January 29 and 30 emails.  Briggs wrote: "I have looked at the annex as well and the following are my comments as to **what should be added: There is no mention of the following: (a) tangent furnace wall tubes; (b) Tangent outer side wall tubes**; (c) The units are only saturated (no superheater); … (f) **That the front and rear wall construction is that of refractory (no front wall tubes at all)**."  Mark White responded "thanks." (Exhibit 22) (IKE 4240) (emphasis added)

52. On February 3, 2003 at 4:57 pm, Mark White sent by email a revised Annex 1, along with Annexes II and III, to VEO that incorporated all of the changes identified by Dave Briggs identified above.  (Exhibit 23, VEO 786-796); (Exhibit 7, M. White Dep., pp.125-29); (Exhibit 2, B. Gdaniec Dep., pp.165-69)

53. The revised Annex 1 included drawings that were not included in the data table sent on December 20 to VEO or in the draft Annex 1 that White sent to Bob Gdaniec on January 29 and 30.  (Exhibit 23) (VEO 790, 791, 792)  White intentionally included those drawings in Annex 1, and he reviewed them before including them in the annex.  White

cannot identify any change to Annex 1 that was requested by VEO. (Exhibit 7, M. White Dep., pp.130, 133-34)

54. VEO understood Annex 1 and did not raise any questions concerning it with EPTI. (Exhibit 59, VEO 30(b)(6) Dep. (White), p.43) John Viskup of VEO read Annex I and understood that VEO had a right to negotiate changes to Annex 1. (Exhibit 6, J. Viskup Dep., pp.74, 101-02) He cannot identify any drawings he received concerning the License Agreement prior to those in Annex I. (Exhibit 6, J. Viskup Dep., pp.103-04)

55. The drawings in Annex I "specifically define construction details" of the licensed M-Series boilers. (Exhibit 2, B. Gdaniec Dep., pp.166-67) The drawing on page VEO 790 is a cross-section of a Keystone® M-Series boiler. The purpose of the cross-section is to "[s]ee the tubes, see basically any of the mechanical design features in the unit." (Exhibit 59, VEO 30(b)(6) Dep., pp.46-47) The cross-section shows that the furnace and side walls are constructed of tangent tube furnace and outer walls, refractory front wall, and tube and tile watercooled rear wall.

56. The drawings in Annex 1 "were part of the original 'M' series boiler." (Exhibit 7, M. White Dep., p.132)

57. VEO in received drawings for tangent tube walls from EPTI. (Exhibit 4, T. Miller Dep., p.51)

58. According to Bob Gdaniec (EPTI), "Annex I defined exactly what the product lines and ranges and type of construction of the boiler [are] …. The license agreement text itself was very generic as to what it was trying to accomplish, and Annex I was the specifics of what the products were." (Exhibit 2, B. Gdaniec Dep., pp.41, 173-74)

59. There is no reference to membrane/welded wall technology in Annex 1. (Exhibit 59, VEO 30(b)(6) (White), pp.14-15); (Exhibit 23, VEO 790); (Exhibit 7, M. White Dep., pp.130-31); (Exhibit 6, J. Viskup Dep., pp.110-12); (Exhibit 1, S. Brewer Dep., pp.169-71); (Exhibit 2, B. Gdaniec Dep., p.168); (Exhibit 5, J. McConnaughy Dep., pp.72-74, 80).

60. According to Bob Gdaniec, the License Agreement did not authorize VEO to design, manufacture and sell O-style boilers with membrane technology. (Exhibit 2, B. Gdaniec Dep., p.43)

61. On February 3, 2001, Mark White sent a letter to John Viskup of VEO regarding "Annex 1-3 of License Agreement" by United Parcel Service that enclosed "two sets of originals duly initialed by Mark White of Annex I, II, and III of the EPTI License Agreement between our two companies." Viskup also initialed each of the pages of Annex 1 without making any changes. (Exhibit 13, VEO 1191-1201); (Exhibit 7, M. White Dep., pp.135-36)

62. Annex I initialed by Viskup included the drawings of the Keystone® M-Series Standard showing tangent tube furnace and outer walls and a refractory front wall. (Exhibit 13) (VEO 1191-1201) By initialing Annex 1, VEO was "expressing our agreement that … this document would become part of the agreement. We also initialed it from the standpoint that we understood that it included data." Annex I "provides model numbers, it provides the designs, it provides the basis of which the thermal performance was generated, … it has capacity data." (Exhibit 59, VEO 30(b)(6) Dep. (White), p.44)

63. There are many tangent tube boilers currently in operation in the United States. (Exhibit 5, J. McConnaughy Dep., pp.76-77) ("There's a lot out there.") Tangent tube boilers are

16

sometimes referenced as "old style" boilers because it is an older technology. (Exhibit 5, J. McConnaughy Dep., p.179)

64. VEO offered for sale tangent tube boilers during the term of the License Agreement, and it had the ability to manufacture those boilers. (Exhibit 5, J. McConnaughy Dep., pp.197-99); (Exhibit 57, VEO Sales Brochure, PTC 485-500)

65. There is no reference to membrane/welded walls in the License Agreement. (Exhibit 7, M. White Dep., p.58)

66. During the term of the Agreement, VEO marked the design drawings for the Keystone® boilers confidential, and entered confidentiality agreements with its subcontractors. (Exhibit 59, VEO 30(b)(6) Dep. (White), p.215)

## Amendment of the License Agreement

67. Clause 21 of the License Agreement provides that "[t]his Agreement shall not be modified except by a supplemental written agreement executed by an authorized representative of both of the parties hereto." (Exhibit 15, License Agreement) (IKE04410-04429)

68. On February 27, 2003, EPTI (through Mark White) and VEO (through John Viskup) entered a License Agreement Addendum on EPTI letterhead. (Exhibit 24) (IKE 1093-95) The Addendum provides that EPTI "**agrees to modify the Products as described in Annex I of the License Agreement** in exchange for compensation from Licensee as stated herein." (Emphasis added)  The compensation was an increase in the royalty rate. The addendum, under the heading "Modifications," provides that the "Product final steam outlet temperature shall be increased from saturated steam temperature applications

17

to superheated applications up to and including a final steam temperature of 750°." In addition, "Product design pressure shall be increased from 399 psig up to and including 1,200 psig (1,125 psig operating)." Mark White of EPTI wrote the final version of the February 27 Addendum. (Exhibit 7, M. White Dep., pp.141-42)

69. On July 3, 2003, EPTI and VEO entered a License Agreement Addendum providing that EPTI "agrees to modify Clause 3 Delivery of Technical Information, clause 3(a) relative to method of access to Licensor computer systems" by supplying VEO with a "complete Unix workstation system with software installed to permit the rating of the Product independently from the Licensor." (Exhibit 25) (IKE 1534-35)

70. The parties did not enter any other Addenda for the License Agreement. (Exhibit 7, M. White Dep., pp.81-82) In particular, the Agreement was never amended to included welded/membrane walls. (Exhibit 2, B. Gdaniec Dep., p.169)

### Licensor's Authorization To Sell Boilers Outside The Scope Of Annex I

71. Prior to March 26, 2004, EPTI expressly gave consent to VEO to sell boilers outside the scope of Annex I that, among other things, included welded/membrane walls, in order for EPTI to generate a revenue stream at a time it was experiencing financial distress. (Exhibit 2, B. Gdaniec Dep., pp.44, 60-63, 87-88); (Exhibit 7, M. White Dep., p.224)

72. EPTI provided drawings for welded/membrane wall design to VEO at VEO's request that it utilized in the design of Keystone® boilers. (Exhibit 59, VEO 30(b)(6) Dep. (White), pp.199, 201); (Exhibit 1, S. Brewer Dep., pp.176-81)

73. Welded/membrane walls are not necessary to comply with applicable code. (Exhibit 2, B. Gdaniec Dep., p.193); (Exhibit 4, T. Miller Dep., p.38)

18

74. When VEO disclosed its boiler sales to EPTI in Unit Sale Notifications ("USN"), VEO advised EPTI that it was selling boilers with "100% full membrane" walls. (Exhibit 26, VEO USNs to EPTI) (IKE 4568-76, 5202-5205)

75. EPTI did not permit VEO sell boilers with welded/membrane walls after March 26, 2004. (Exhibit 2, B. Gdaniec Dep., p.170); (Exhibit 29) (VEO 527-31)  Neither Gdaniec, Stephen Kang, nor anyone else at EPTI authorized VEO to sell boilers that were outside the scope of Annex 1 after March 26, 2004.  (Exhibit 3, S. Kang Dep., pp.103-04)

76. Clause 24(a) of the License Agreement provides that "no subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms herein provided and executed with the same formalities."  (Exhibit 15, License Agreement Clause 24(b)) (IKE004410-00429, at 4428)

77. Clause 24(b) of the License Agreement provides that "[n]o waiver, express or implied, by either party of a breach of obligation by the other party shall operate as a waiver of any other or subsequent breach."  (Exhibit 15, License Agreement Clause 24(b)) (IKE004410-00429, at 4428)

78. IKE never authorized VEO to sell a boiler outside the scope of the License Agreement or to modify the Keystone® design.  (Exhibit 7, M. White Dep., p.162); (Exhibit 59, VEO 30(b)(6) Dep. (White), p.61); (Exhibit 60, C. Petcos Dep., pp.202-03)

79. VEO sold eleven boilers while IKE was licensor.  (Exhibit 59, VEO 30(b)(6) Dep. (White), pp.69-70)  None of the boilers sold by VEO while IKE was licensor conformed to the Description in Annex 1.  For example, and without limitation, the boilers included

PTDATA 293745_3

membrane walls rather than tangent tube walls and water-cooled burner throats. (*Id.*; *see also id.* at pp.65-66); (Exhibit 28, VEO Responses to First Set of Discovery)

80. VEO used the Keystone® trademark (at a minimum) in the sales proposals for the eleven boilers it sold while IKE was licensor without receiving permission from IKE. (Exhibit 59, VEO 30(b)(6) Dep. (White), pp.209-10); (Exhibit 60, C. Petcos Dep., pp.202-03)

81. Although VEO disclosed to EPTI in USNs that it was selling boilers with "100% full membrane" walls, VEO did not make that disclosure to IKE. (Exhibit 31, VEO USNs to EPTI); (Exhibit 7, M. White Dep., pp.66-67); (Exhibit 30, VEO USNs to IKE)

### EPTI's Discharge Of Mark White And His Hiring By VEO

82. On July 14, 2003, Mark White was laid off by EPTI. (Exhibit 7, M. White Dep., p.33) EPTI was in "dire financial straits" from 2002 until he was laid off, and he had suspicions his job was at risk throughout that time. (Exhibit 7, M. White Dep., p.33-34)

83. During the time that Mark White worked with EPTI, he did not say anything to Bob Gdaniec to dispute that welded/membrane walls were outside the scope of the License Agreement. (Exhibit 2, B. Gdaniec Dep., p.209-10)

84. In August 2003, Mark White joined VEO as General Manager. (Exhibit 7, M. White Dep., p.10)

85. As General Manager of VEO, White had responsibility for (among other things) VEO's "management of the License Agreement." (Exhibit 6, J. Viskup Dep., p.50)

### The Parties' Exchange of Correspondence Pertaining to VEO's Sale Of Boilers Outside the Scope of the Agreement

86. On March 26, 2004, Bob Gdaniec of EPTI sent a letter to Mark White of VEO stating that "[w]hile things in general have gone well in the past year, we do have concerns with

20

regards to the past year's performance that needs to be addressed and resolved." (Exhibit 29, VEO 527-31) ("EPTI Breach Letter")  He then wrote:

> "**VEO currently licenses only the M series product line which has a very specific geometry and characteristics**.  In review of some of the VEO recent projects and proposals, **it appears that the majority of projects that VEO is pursuing or has completed have been outside the definition of the license agreement.**  Of particular concern most recently are the OXY and Dallas Ft. Worth Airport projects which are well outside the bounds of the products defined in the agreement.  **VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex 1 of the current agreement provides a clear definition of the M-Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design.**)"  (Exhibit 29 at VEO 530) (emphasis added)

87.    Stephen Kang (President of EPTI) discussed the EPTI Breach Letter with the EPTI engineers.  The Letter represented a consensus view internally at EPTI among the engineers.  (Exhibit 3, S. Kang Dep., p.102)  EPTI was advising VEO that it had to comply with the definition of the product set forth in Annex I.  (Exhibit 2, B. Gdaniec Dep., p.189)  While Kang gave a representation in the sale agreement between EPTI and CMI EPTI for the sale of the Keystone® assets (which in turn were sold to IKE) that he did not have actual knowledge of infringement or a breach of the License Agreement, he did not review the correspondence between the parties.  (Exhibit 3, S. Kang Dep., p.100-03)

88.    Mark White prepared two drafts of a response to the EPTI Breach Letter on March 26 and 27, 2004, which he provided to John Viskup for review.  (Exhibit 33, VEO 1013-16); (Exhibit 32, VEO 1017-20)  Viskup and White had "several discussions" concerning the proposed response to the EPTI Breach Letter.  (Exhibit 6, J. Viskup Dep., pp.165-66)  As

set forth above, Viskup and White were the two individuals engaged in the negotiation of the License Agreement.

89. On March 29, 2004, Jay McConnaughy sent an email to Mark White referring to the subject of "non-standard units being built" that White had mentioned to him. (Exhibit 5, J. McConnaughy Dep., p.143)

90. Mark White, on behalf of VEO, sent a response to the EPTI Breach Letter on March 30, 2004, copying Viskup on the letter. (Exhibit 34) (VEO 632-635) White's letter responded to the quoted section above of the Gdaniec Breach Letter as follows:

> **"The Agreement does provide specific geometry and characteristics** but also allows for improvements, refer to Clause 13. **As such, VEO has made improvements** which are necessary to offer/provide a Keystone® boiler that is technically compliant with our customers requirements, is inline with that of our competitors offerings and as we deem necessary to enhance our overall success.
>
> The Oxyvinyls Project includes two (2) 15M Series Keystone® boilers each of **which include membrane furnace and outer walls, watercooled front and rear** and an upper drum size of 60" ID.  <u>**These features are outside the geometry and characteristics of the License but are clearly improvements.**</u>
> …. (All emphasis added)

91. VEO's statement that the "Agreement does provide specific geometry and characteristics" referred to Annex 1. (Exhibit 7, M. White Dep., p.211)

92. The March 30 letter was the first time VEO stated to EPTI that membrane/welded walls were an improvement under the terms of the License Agreement. (Exhibit 7, White Dep., p.212)

93. "Improvements" are defined in the License Agreement as "all modifications, variations, revisions, and enhancements of the Products … which either Licensor or Licensee **may develop, acquire, or acquire control of and commercially exploit during the term of**

22

**this Agreement** and which Licensor determines, in its reasonable judgment" meet certain criteria. (LA, Clause 1.h, p.2) (emphasis added)  Membrane wall technology was not developed or acquired "during the term of" the Agreement, and EPTI had that technology before the Agreement commenced. (Exhibit 2, B. Gdaniec Dep., p.201); (Exhibit 5, J. McConnaughy Dep., p.75); (VEO Memorandum of Law in Support of Motion for Partial Summary Judgment at p.5)

94.  Membrane walls are not improvements. (Exhibit 7, M. White Dep., p.213)  VEO has taken the evidentiary position in this lawsuit that it did not make any "Improvements" or "Modifications" under the License Agreement.[2] (Exhibit 59, VEO 30(b)(6) Dep., pp. 54, 63); (Exhibit 28, VEO Discovery Responses); (Exhibit 7, M. White Dep., p.100)

95.  EPTI did not pursue a lawsuit against VEO because of its financial difficulties, it was in bankruptcy, and because the assets eventually were sold to IKE. (Exhibit 3, S. Kang Dep., p.106)

**EPTI's Communications With VEO Prior To the EPTI Breach Letter
Concerning The Scope of The Agreement**

96.  On February 3, 2003, Mark White forwarded an email to Shawn Brewer and Trent Miller of VEO prepared by Dave Briggs of EPTI stating that **"The agreement is for the saturated standard 8M through 22M refractory wall design Keystone package boiler**. You asked what drawings would be affected if the order in question would be a welded wall design for the furnace and outer side walls." (Exhibit 35) (VEO 784) (emphasis added)  White forwarded the Briggs email to VEO with the statement "[p]lease

---

[2]   During his deposition, Mark White testified his March 30 Letter was inaccurate. "In my haste to get this letter out, I failed to look at the technical information, which clearly transferred membrane wall technology." (Exhibit 7, White Dep., p.212)  White did not notify EPTI of any errors in his March 30 letter prior to this lawsuit.

PTDATA 293745_3

refer to the following **in regard to M Series Keystone changes**." (Exhibit 35) (VEO 784) (emphasis added) In response, VEO stated in an internal email "[h]opefully this sounds scarier than it actually is!!" (Exhibit 35) (VEO 784)

97. VEO did not send a response disputing EPTI's characterization of the scope of the Agreement as described in the February 3, 2003 email ("saturated standard 8M through 22M refractory wall design" and that the welded wall design represented "M Series Keystone® changes).

98. On February 6, 2003, there was a telephone conference between EPTI and VEO. (Exhibit 37) (VEO 797-98) A written "re-cap" of the agreements reached during the conference provides, as to "modifications of standard unit", that modifications will be "highlighted by Erie, changed by VEO, double checked by Erie (per job)." (Exhibit 37) (VEO 797) As to the "exchange of information," the parties agreed that there would be a "continuous stream of info focusing on actual projects." (Exhibit 37) (VEO 797)

99. On February 10, 2003, Mark White of EPTI sent an email to Shawn Brewer and John Viskup of VEO stating that "[a]s you are aware, at present, the Atofina boiler is sized as a 14M Special (w/watercooled walls) …") (IKE 1274) A "special" Keystone® boiler was outside the scope of the License Agreement. (Exhibit 2, Gdaniec Dep., p.179)

100. On February 10, 2003, VEO requested access to EPTI's D-type boiler line, which was initially declined by Mark White. (Exhibit 39) (IKE 295)

101. On February 19, 2003, Dave Briggs of EPTI sent Mark White a list of "marked-up" drawings that White wanted to send to VEO for a specific project. Those drawings included drawings for welded walls (*i.e.*, membrane walls). Dan Levstek of EPTI wrote

24

to White, stating that "[a]s these drawings are outside of the basic license agreement, we should put a disclaimer in the transmittal to Victory that they are for use on this specific project only." (Exhibit 40) (IKE 4306)  White did not respond to Levstek's statement that the drawings were "outside of the basic license agreement."

102.  On February 21, 2003, Dave Briggs sent an internal email to Dan Levstek and Bob Gdaniec on the subject of the License Agreement stating that "Mark White had asked over the phone for the following list of drawings that would be required if the agreement were to include superheated units.  I am unsure if I should be supporting this request of his.  This would clearly be beyond the agreement as was the all welded wall design we just provided him." (Exhibit 41) (IKE04315)

103.  On July 10, 2003, Dave Briggs sent an email to Trent Miller of VEO advising him to
    **"please remember that the license agreement was for our standard "M" series Keystone Package Boilers.  These boilers are all saturated, refractory rear and front wall with a tangent furnace wall.** Our order G.O. 2023 [about which Miller was asking questions] was a 'special' Keystone®, not a 14M, not a 15M but a 'special'. **This order was an all welded wall design.  You cannot compare apples to oranges, they are just not the same**. So to answer your question as to what model size was G.O. 2023; the answer is that it is not a 'model size'." (Exhibit 42) (IKE 04962)"

104.  VEO did not send a response to Dave Briggs' July 10, 2003 email to dispute EPTI's characterization of the scope of the Agreement.

105.  On October 22, 2003, Trent Miller of VEO sent an email to Mark White (then of VEO) and Ted Fuhrman of EPTI  stating that his "biggest frustration is when I'm told 'That's not a standard 'M' series." It may not be a 'standard' but it is the way that they have been built." (Exhibit 44) (IKE 1546)  Miller never read or received a copy of the License Agreement. (Exhibit 4, T. Miller Dep., p.6)

25

106. Trent Miller, VEO's Chief Engineer, experienced frustrated in dealing with EPTI because on "numerous" occasions EPTI told him that VEO was requesting information that was not part of the Standard M-Series design. (Exhibit 4, T. Miller Dep., pp.52-53)  VEO never provided Miller with a copy of the License Agreement (id. at p.6), so he did not know what was licensed.  He is not aware of VEO creating a new design for any aspect of the Keystone® boiler.  (Exhibit 4, T. Miller Dep., pp.68-69)

107. On March 23, 2004, Bob Gdaniec of EPTI sent an email to Jay McConnaughy concerning the Dallas Fort Worth Airport project ("DFW") being pursued by VEO, stating that "[t]his boiler clearly is well beyond the standard M series boiler …. By no stretch of the imagination can this boiler be considered standard." (Exhibit 45) (V116)

108. Shawn Brewer (Sales Manager for VEO) had conversations with EPTI in which he was told that particular sales were outside the scope of the License Agreement and that EPTI had to approve the sales.  (Exhibit 1, S. Brewer Dep., pp.45-46)  There was at least one instance when Bob Gdaniec was involved in a project because it was outside the scope of the Agreement.  (Exhibit 1, S. Brewer Dep., pp.49-50)

### VEO's Attempt To Purchase The Keystone® Line

109. In January 2004, VEO contacted Stephen Kang of EPTI about purchasing the Keystone® technology.  (Exhibit 3, S. Kang Dep., pp.106-07)  VEO thought it "would be a good opportunity for our company to own the technology."  If VEO did not purchase the technology, it would not be able to use the technology after the Agreement expired unless there was an extension of the Agreement.  (Exhibit 6, J. Viskup Dep., p.134)

26

110. VEO reviewed the License Agreement in connection with its effort to purchase the technology. (Exhibit 6, J. Viskup Dep., p.116)

111. VEO "wanted to acquire at that time the Keystone® technology, the 'O' type series to basically where the license covered, around the 150,000 pound power range or somewhere thereabouts." VEO also wanted to acquire the Keystone® name. (Exhibit 7, M. White Dep., pp.200-02); (Exhibit 3, S. Kang Dep., p.111, 121) In a written communication to EPTI during the negotiations, VEO described the technology it sought to purchase as follows: "All associated Keystone® "O" and "D" type drawings and information required for the design, fabrication and assembly **to include those of the "M" Series and any other drawings and information developed for products executed within the capacity range stated above**," which was 250,000 pph of steam flow. (Exhibit 46, VEO 957) (Emphasis added); (Exhibit 2, B. Gdaniec Dep., pp.189-91) ("They had no desire for just [the M-Series] subset.")

112. In its March 3, 2004 draft of the description of products it wished to acquire (Exhibit 47) (VEO 976-78), VEO stated that it wanted to purchase the customized designs pertaining to the M-Series. "Drawings and information shall be provided for all 'M' ('O' type) & 'D' Series boilers for projects executed within the Capacity Range as stated above [165,000 pph] **that may be of custom design**." (Exhibit 47) (VEO 977) (emphasis added) It also reaffirmed that it wanted "a perpetual and exclusive license … for use of the name 'Keystone.'" (Exhibit 47) (VEO 978)

113. In a March 24, 2004 email, Mark White of VEO stated that "[i]t has always been the intention of VEO **to purchase the 'O' boiler technology which includes the 'M' Series boilers**. The purchase of the 'O' Series would enable VEO to be the sole and exclusive

PTDATA 293745_3

owner of the technology up to the capacity range." (Exhibit 48) (VEO 499-500)  VEO

insisted on a "perpetual license for use of the name 'Keystone.'" (Exhibit 48) (VEO 500)

114. Although VEO wanted to acquire the entire O-type technology, EPTI was only willing to

sell the M-Series technology.  (Exhibit 2, B. Gdaniec Dep., pp.116-22)  "The discussion

was all-around relative to our distinction of what the M-Series was versus what the O-

boiler line could be, and Victory wanted the full flexibility of what the O boiler could be

and not be limited to what the M series was."  EPTI was not "interested in selling the

entire O boiler line.  We were only interested to sell the subset called the M series

technologies." (Exhibit 2, B. Gdaniec Dep., p.122); (Exhibit 3, S. Kang Dep., p.111,

114-15) (sale of "all associated 'O' ... type drawings and information required for the

design, fabrication, assembly and maintenance of the Boiler Technology" was not

acceptable to EPTI)

115. EPTI also refused to give a perpetual license for the Keystone® name "because, in the

boiler industry, the Keystone® boiler has always been attributed back to our product line,

and that really is 80 percent of the nature of the business, having reputation and

identifiability in the industry." (Exhibit 2, B. Gdaniec Dep., p.127)

116. VEO was willing to pay $500,000 for the technology it wanted to purchase. (Exhibit 3,

S. Kang Dep., pp.111-12); (Exhibit 6, Viskup Dep, pp.139-40)  EPTI would accept

$500,000 for the M-Series but not the entire O-type technology. (Exhibit 3, S. Kang

Dep., p.112); (*id*. at 115) (price "would be too low a price" to give VEO perpetual right

to use Keystone® name)

117. As an alternative, or in conjunction with the exercise of a right to purchase the Standard

Keystone® M-Series technology, EPTI proposed to extend the License Agreement to

PTDATA 293745_3

include features that EPTI considered to be beyond the scope of the Agreement.  In his March 26, 2004 Letter (Exhibit 29) (VEO 527-31), Bob Gdaniec of EPTI described the "existing agreement" and the proposed "new agreement."  (Exhibit 29) (VEO 527)  As to the "current license," it "provides VEO the right to market and manufacture **the standard M series product** within a defined size and capacity range with an extension to permit addition of superheaters to the standard line."  As to the "new agreement," the "extended license option … [would] expand[] availability of the products **to the full O boiler line** and D boiler line within a defined size and capacity range  while preserving the original agreement scope and general conditions.   This would give VEO access to a wide range of sizes, pressure and temperature capacity, **the use of welded wall construction** as well as provide access to steam purity equipment **which is not part of the current license agreement scope**."   The "purchase option … would give VEO 'ownership' of part of the O boiler product line as well as selected parts of the D boiler line.  This would be specifically the standard M series boiler and the executed D boiler project …."  (Exhibit 29) (VEO 527) (emphasis added).  Gdaniec expressly stated that the "technology that is available for sale at this time is limited to just the standard M series boilers which is the basis for the current license agreement."  (*Id*.)

118.   On February 26, 2004, Bob Gdaniec (EPTI) sent an email to Jay McConnaughy of VEO (formerly of EPTI) advising him to "please keep in mind that Victory has licensed the STANDARD M series Keystone with the addition of superheat and increase in design pressure.  EPTI and Victory (Mark/John) are now working on a new dealt that may result in increasing the scope of the License Agreement, however, at this point it is not finalized."  McConnaughy, who was unaware that VEO had licensed only the Standard

M-Series, then raised that issue with Mark White. White said that "they're working on it." (Exhibit 5, J. McConnaughy Dep., pp.111, 116-17)

119. There was a discussion concerning extension of the License Agreement as part of the sale negotiations. (Exhibit 6, J. Viskup Dep., p.141) VEO did not send a written response to EPTI disputing EPTI's statement that "the use of welded wall construction … is not part of the current license agreement scope."

120. EPTI refused to sell technology other than the Standard M-Series and refused to give a perpetual license to use the Keystone® name. (Exhibit 3, S. Kang Dep., pp.114-15, 125-26) Because EPTI would not sell full rights to the Keystone® technology nor provide a perpetual license, the parties' negotiations ended. (Exhibit 2, B. Gdaniec Dep., p.191)

121. During the negotiations, VEO never expressed the belief that the Keystone® technology was in the public realm. (Exhibit 3, S. Kang Dep., p.113)

**Licensor's Instructions to VEO To Comply With The License Agreement**

122. The EPTI Breach Letter dated March 26, 2004 instructed VEO that "VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex 1 of the current agreement provides a clear definition of the M-Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design.)" (Exhibit 29, VEO 527-31)

123. On August 31, 2004, outside counsel for EPTI (Keith Whitson of Schnader Harrison Segal & Lewis LLP) sent a letter to VEO's outside counsel stating that "VEO has

PTDATA 293745_3

violated the terms of the License Agreement on several occasions, and EPTI has been attempting to work with VEO to ensure that such violations do not continue." (Exhibit 49) (VEO 1159-60)  VEO received and reviewed the letter.  (Exhibit 7, M. White Dep., p.231)

124. On September 9, 2004, EPTI's outside counsel sent another letter to VEO's outside counsel stating that "EPTI personnel first discussed these violations with Mr. White and Mr. Viskup six months ago .... EPTI had hoped that these discussions would cause VEO to conform its conduct to the License Agreement.  We trust that, if it has not already done so, VEO will immediately conform its conduct to the terms of the License Agreement." (Exhibit 50) (VEO 1161-62)  The discussions "six months ago" referred to the Gdaniec Breach Letter.

125. On September 10, 2004, after IKE purchased the Keystone® assets effective September 9, 2004 and thereby replaced EPTI as licensor, Chris Petcos of IKE sent a letter to Mark White of VEO stating that IKE "has become aware of a dispute with respect to VEO's failure to strictly adhere and comply with the scope of the License Agreement. ... [W]e request that VEO restrict its boiler activities to that which is contemplated under the License Agreement ..." (Exhibit 51) (VEO 585)  VEO received and reviewed the letter. (Exhibit 7, M. White Dep., p.232); (Exhibit 6, J. Viskup Dep., p.171) (he personally "saw some of" the correspondence with IKE concerning the scope of the License Agreement)

126. On September 24, 2004, Chris Petcos of IKE sent an email to Mark White of VEO stating that "we are still awaiting a response and confirmation that Victory Energy will comply with all of the terms and conditions of the license agreement by marketing the specific 'M' Series product line.  Specifically, following the product size, dimensional data for the

different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer tubes and pressure casing design." (Exhibit 52) (IKE 1098)  Mark White received and reviewed this email but did not respond to it.  (Exhibit 7, M. White Dep., pp.233-35)  He discussed the email with John Viskup.  (Exhibit 6, J. Viskup Dep., pp.173-74)

127.  On October 29, 2004, Chris Petcos sent another letter to Mark White of VEO insisting on performance by VEO within the scope of the License Agreement.  (V229-230) (Exhibit 53)

128.  VEO did not limit the boilers it sold to the description in the 9/24/04 email after receiving that communication from IKE and continued selling boilers of the same kind and configuration as were sold while EPTI was the licensor.  (Exhibit 6, J. Viskup Dep., pp.175, 179-80)

### VEO's Failure To Use The Keystone® Name On Boilers

129.  Clause 15(a) of the License Agreement provides that the Keystone® name "shall be affixed to a plate appearing on each Product supplied by Licensee upon which there shall be an indication that the Products were supplied by Licensee under license from Licensor."  (Exhibit 15, License Agreement) (IKE 04410-04429)  EPTI provided several Keystone® nameplates to VEO for use on the boilers.  (Exhibit 56) (VEO 893); (Exhibit 7, M. White Dep., pp.145-46)

130.  VEO never included the Keystone name on the boilers it sold.  VEO should have placed the nameplates on the boilers.  (Exhibit 7, M. White Dep., pp.145-47, 49)  Instead, VEO

32

painted the "Victory" name in large letters on the boilers.  (Exhibit 5, J. McConnaughy Dep., pp.50-53)

## VEO's Sales And Marketing Literature

131.  Pursuant to Annex 2 (Technology Fee & Transfer of Information) of the License Agreement, EPTI was to provide VEO with "sales promotion material as used by Licensor" and "typical sales proposal information to include unpriced technical proposal and drawing package to include typical arrangement GA and Plan drawings and typical P& ID."  (Annex II, p.26)

132.  Under Clause 14 (Copyrights) of the License Agreement, "Licensee may not copy, reproduce, distribute, perform, display, or prepare derivative works based upon any copyrightable materials provided to Licensee by Licensor without prior written consent of Licensor."  (Exhibit 15, License Agreement) (IKE 04410-04429)

133.  Under Clause 15 (Trademarks) of the License Agreement, Licensee "agrees to use the Mark only in the form approved by Licensor. … Upon request by Licensor, Licensee shall promptly provide representative samples of any and all uses by Licensee of the Mark."  In addition, "all use of the Mark by Licensee, including any good will arising out of such use, shall be solely to the benefit of Licensor.  (Exhibit 15, License Agreement) (IKE 04410-04429)

134.  VEO used the Keystone® trademark in sales proposals, brochures, and on its website.  (Exhibit 59, VEO 30(b)(6) Dep. (White), pp.209-11)

135.  VEO never requested permission from IKE to use the Keystone® trademark on particular documents after IKE became licensor.  (Exhibit 59, VEO 30(b)(6) Dep. (White), p.210)

PTDATA 293745_3

136.  EPTI did not maintain separate promotional material for the Keystone® M-Series that was licensed to VEO; rather, its promotion materials addressed the entire Keystone® line. (Exhibit 60, C. Petcos Dep., pp.168-71, 197-98); (Exhibit 61, T. Fuhrman Dep., p.120)

137.  In the March 26, 2004 EPTI Breach Letter (Exhibit 29, VEO 527-31), EPTI advised VEO that it was "entitled to use the Marks in both literature and on the product, however, it is important that reference be made in all instances to the relationship to EPTI. In reviewing the documents/correspondence to date, it was noted that we have not seen the sales brochures and/or literature that is being proposed by VEO to market the products and would request you submit a copy to EPTI for our review. ... For future sales/marketing literature, we request that VEO submit to EPTI in sufficient time in advance of printing to permit our review." (Exhibit 29 at VEO 531)

138.  In its March 30, 2004 response (Exhibit 36) (V120-24), VEO refused to provide any sales brochures and/or literature to EPTI. "The brochure and sales information of VEO is the sole property of VEO and disclosure is not required by the Agreement." (Exhibit 36) (V122) VEO refused to provide those materials. (Exhibit 7, M. White Dep., p.225); (Exhibit 2, B. Gdaniec Dep., pp.187-88)

139.  VEO copied a Zurn brochure (EPTI predecessor) that it used as VEO's brochure for Keystone® boilers. (Exhibit 1, S. Brewer Dep., pp.98-103); (Exhibit 8, Zurn Brochure) (VEO 09248-09280) VEO "took the language from the Zurn brochure and simply tried to add the Victory name whenever possible," substantially copying what VEO received. (*Id*. at p.103, 217); (Exhibits 54) (VEO Keystone® brochures)

34

140. VEO's brochures state that VEO "acquired the license to manufacture KEYSTONE steam generating systems." The brochure addresses the sale of the full Keystone® boiler line up to 500,000 pph and models 3M-26M without any reference to the fact that VEO may sell only the M-Series up to 22M and 150,000 pph. (Exhibit 57 at PTC 486, 488; Exhibit 54, ND277, 297) The same brochures refer to "Victory Energy's design, engineering and manufacturing advances." (*Id*. at PTC 492; ND283)

141. The Zurn Brochure states that "tangent tube construction" is "standard" for furnace and convection (outer) walls and that refractory construction is "standard" for front walls on "smaller capacity units." Water-cooled tube and tile "is standard on smaller capacity units" for the rear wall. "Welded wall construction" is "recommended only for special applications" or "high capacity units." (Exhibit 8, Zurn Brochure, p.VEO 9255)

142. The VEO brochure changed the Zurn brochure by stating that "membrane or tangent tube construction is standard on all Keystones®" and that "Membrane or Tangent Tube Construction [of convection side walls] is standard on all Keystones®." (Exhibit 57, at PTC 492) Like the Zurn brochure, VEO stated that "refractory [front-wall] construction is standard on smaller capacity units," that "water-cooled Tube and Tile [rear wall] is standard on smaller capacity units," that "Water-cooled and Welded construction for additional heating surface and minimum refractory on high capacity units," and that "Water-cooled and Welded Walls are a cost-saving option [for the front wall] available for high-capacity units." (*Id*.)

143. VEO then changed its brochure to eliminate references to "tangent tube" for furnace and convection wall and to water-cooled and welded walls as an option for the front wall. (Exhibit 54, VEO Keystone® Brochure, ND 276-99)

144. VEO did not provide a draft of the sales brochure to EPTI before it was finalized, and EPTI did not provide VEO with written authorization to copy the marketing brochures prepared by EPTI or its predecessors. (Exhibit 7, M. White Dep., pp.258-59)

145. Shawn Brewer (VEO), who prepared VEO's sales brochures, relied on John Viskup to determine whether his use of EPTI's brochures complied with the License Agreement. He doe not know whether Viskup made such a determination. (Exhibit 1, S. Brewer Dep., p.217)

146. VEO distributed its Keystone® brochures to the public, including several instances in 2005. (Exhibit 6, J. Viskup Dep., p.203)

147. VEO did not sign an addendum or agreement that permitted unqualified use of EPTI or its predecessors sales literature. (Exhibit 1, S. Brewer Dep., p.105) VEO believed it could use the marketing materials received from EPTI in VEO's own materials by virtue of the fact that EPTI provided those materials to VEO. (Exhibit 1, S. Brewer Dep., pp.160-63)

148. The VEO brochures did not disclose that VEO may only sell boilers below 150,000 pph steam capacity or that the sales are limited to the Standard M-Series as defined in the License Agreement.

149. Mark White did not advise EPTI that he had approved the marketing materials while White was employed with EPTI. (Exhibit 2, B. Gdaniec Dep., pp.187-88)

### VEO's Sales Proposals To Prospective Customers

150. VEO's sales proposals used the Keystone® Trademark. (Exhibit 59, VEO 30(b)(6) Dep. (White), pp.209-10)

PTDATA 293745_3

151. VEO's proposals initially (but not always) identified itself as "the exclusive licensee of Eire Power Technologies". (*See,e.g.,* 1/21/03 Proposal to Tejas Boiler Services, Inc. for Atofina Petrochemicals, Inc. Project, VEO 3793-3807; 5/28/03 Proposal Tejas Boiler Services, Inc. for OxyVinyl Project, VEO4811-4835)[3] After May 28, 2003, VEO stopped identifying itself as the licensee of the technology and stopped referring to EPTI. VEO never identified IKE as the licensor in any of its proposals or marketing materials.

152. VEO's proposals after March 30, 2004 used the Keystone® trademark in connection with offering for sale boilers that included membrane walls and other features not identified in Annex I. (*See, e.g.,* 5/12/04 Proposal for Worcester Poly Tech, VEO 3710-30; 4/18/05 Proposal to Protherm, PTC 197-217 6/16/05 Proposal for Public Service Electric & Gas Company, VEO 7571-93; 7/8/05 Proposal for Orchids Paper Products, VEO 6887-99)

153. VEO could not sell boilers above 150,000 pph steam capacity, which was above the capacity range in the License Agreement, without the licensor's consent. (Exhibit 1, S. Brewer Dep., p.42); (Exhibit 7, M. White Dep., pp.168-69, 240) VEO submitted proposals using the Keystone® trademark for boilers that exceeded 150,000 pph steam capacity. (*See, e.g.,* 2/18/04 Proposal for Escalon Packers for 170,000 pph boiler for a 23M, CPE 395-426; VEO Proposal VE-1858 for 200,000 O-type boiler, PTC 23-39; 11/24/04 Proposal to SNC-Lavalin for 200,000 pph boiler, CPE 31-98); (Exhibit 7, M. White Dep., pp.161-69); (Exhibit 55, Proposal Chart) The 11/24/04 SNC-Lavalin Proposal referred to a "Victory Energy Model 26M" and used Keystone® schematics

---

[3]    VEO designated its proposals "confidential," so they are being identified by bates number rather than included as exhibits. When there is a bates number other than VEO, the documents were obtained from a third party and not produced directly by VEO.

utilized in proposals below 150,000 pph, but VEO whited out the "Keystone®" name. (CPE 37, 40)

154. VEO also used the Keystone® trademark in connection with offering for sale a 23M boiler even though the Agreement is only for 8M to 22M. VEO referred to the boiler as a "VEO model 23M". (*See, e.g.*, 3/28/05 Proposal for Ware, Inc., BHE 260-72; 6/10/05 Proposal to Indiantown Cogeneration, L.P., VEO 8665-96; 12/5/05 Proposal to Protherm Corporation, PTC 42-65; Proposal for Ware, Inc., BHE 111-16)

155. In VEO's March 30, 2004 response to the EPTI Breach Letter, VEO stated that its "marketing efforts remain focused on the Keystone® M series. ... VEO is not marketing custom designed Keystone® boilers. ...." (Exhibit 36) (V121) After March 30, 2004, VEO sent sales proposals using the Keystone® trademark to prospective customers expressly offering a "custom steam generating system." (*See, e.g.*, 8/27/04 Proposal to Broin & Associates, VEO 2417-35; 9/12/05 Proposal to Vamco Sheet Metal, VEO 7861-91; 12/5/05 Proposal to Protherm Corporation, PTC 42-65, at 47) In a 7/13/05 Proposal to Ware, BHE 178-99, VEO referred to the boiler as the "Victory Energy O-Series" boiler while using M-Series drawings. (BHE 191)

156. VEO transmitted proposals for Keystone® boilers that used the Keystone® trademark but referred to the boiler as a "VEO O-type watertube boiler" and/or to the "VEO design." (*See, e.g.*, 6/13/05 Proposal to Protherm Corporation, PTC 364-77; Proposal No. 54155201, PTC 405-24)

157. After IKE became licensor, VEO sent proposals that referred to "Victory boilers" or a particular M-Series model boiler (*e.g.*, 15M) that did not reference the Keystone® trademark in any way in the proposal, referring instead to the "Victory Energy design"

38

and the "Victory Energy Model" even though the boiler was a Keystone® boiler, thereby

portraying the boiler as a "Victory boiler" rather than a Keystone® boiler. (*See, e.g.*,

12/23/04 Proposal for ACCO Engineered Systems, CPE 11-23; 1/18/05 Proposal for

Ware, Inc., BHE 292-304; 3/29/05 Proposal for Ware, Inc., BHE 250-59; 4/28/05

Proposal for Ware, Inc., BHE 167-739 (non-consecutive bates numbers); 6/21/05 Budget

Proposal to Dick Engineering for 25,000 pph Boiler); (Exhibit 7, M. White Dep., pp. 174,

177-78); (Exhibit 55, Proposal Chart)  EPTI expected VEO in its proposals to identify the

boiler as a Keystone boiler.  (Exhibit 7, M. White Dep., p.158)

158.    The only watertube boiler technology that VEO had during the term of the License

Agreement was the Keystone® technology.  (Exhibit 7, M. White Dep., p.166)

Respectfully submitted,


     /s/    John K. Gisleson___

John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated:  March 6, 2006

PTDATA 293745_3