## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE
ENERGY, LLC, a Delaware limited liability
company,

        Plaintiff,

    v.

VICTORY ENERGY
OPERATIONS, LLC, a Delaware limited
liability company,

        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

NO. 04-CV-325 (ERIE)

Judge Sean J. McLaughlin

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

---

       Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel, submits this memorandum of law in support of its Motion for Partial Summary Judgment.

### Introduction

       This case ultimately involves whether Defendant Victory Energy Operations LLC ("VEO") sold boilers outside the scope of a License Agreement that VEO entered with IKE's predecessor-in-interest Erie Power Technologies, Inc. ("EPTI"). Based on the express terms of the Agreement, VEO was permitted to market and sell tangent tube, refractory wall boilers as expressly described in Annex I of the Agreement, as well as to use the Keystone® trademark in connection therewith. For a limited period of time at the beginning of the Agreement, EPTI

expressly consented to the sale of boilers outside the scope of the Agreement, but EPTI retracted

that consent, in writing, on March 26, 2004. Both EPTI and IKE then reiterated to VEO, on

multiple occasions in writing, that VEO must confine its activities to the scope of the Agreement.

VEO, however, ignored those instructions and instead marketed and sold boilers that exceeded

the scope of the license while continuing to use the Keystone® trademark.

IKE is entitled to judgment as matter of law on Counts I (Trademark

Infringement), IV (Violation of Uniform Trade Secrets Act), V (Unfair Competition), and VI

(Unjust Enrichment) because the undisputed facts demonstrate that VEO's sales and marketing,

as well as its use of the Keystone® trademark, exceeded the scope of the License Agreement

without authorization while IKE was licensor, thereby infringing on IKE's Keystone trademark,

misappropriating trade secrets, unfairly competing, and resulting in an unjust enrichment to

VEO. The Court should enter partial summary judgment as to liability on those claims, leaving

only the issue of damages to be decided.

**Facts**

VEO contacted EPTI (jointly "the Parties") in December 2002 about VEO's

interest in licensing EPTI's Keystone® M-Series line of boilers. The M-Series is a subset of the

overall "O-type" or "O-Series" Keystone® boiler line, utilizes older technology, and has

standard geometry (*e.g.,* height, width, and length) and characteristics (*e.g.,* steam flow, gas

temperatures, tangent tube furnace and outer walls, refractory front walls, etc.). There are

different models of the M-Series, each of which has a different "M" designation, such as 9M or

15M. In seeking authority from EPTI's President (Stephen Kang) to negotiate a license

agreement, Mark White (EPTI's Director of Sales and Marketing) advised Kang that the

technology to be licensed was "outdated and antiquated." Kang authorized White to negotiate a

2

license agreement with VEO but to include the Engineering Department in defining the scope of the technology to be licensed. Neither Kang nor White was an engineer. (Plaintiff's Statement of Undisputed Facts in Opposition to Defendant's Motion for Partial Summary Judgment and in Support of Plaintiff's Motion for Partial Summary Judgment at ¶¶ 15-17, 5-6, 43-44) (hereafter "Plaintiff's Undisputed Facts", which is incorporated by reference in its entirety)

### Negotiation of the License Agreement

John Viskup (President of VEO) and Mark White exchanged drafts of the License Agreement between December 20, 2002 and January 8, 2003. (Plaintiff's Undisputed Facts, ¶¶ 15-38) White prepared the initial draft and used a prior EPTI license agreement for a different product line (heat recovery steam generators) and licensee as the basis for the agreement. VEO's changes focused on financial rather than technical terms, and EPTI accepted those changes. The Agreement was signed by the parties on or about January 8, 2003. The text of the Agreement defined the licensed "Products" as follows:

> "'Products' shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex 1. If Licensee receives inquiries which are not in Licensor's range of Products, subject to and prior notice to Licensor, Licensee will be free to enter into separate agreements."

(*Id.* at ¶ 29, License Agreement, Clause 1(a)) There was no negotiation of that definition other than the capacity range, and it does not reference "Keystone®" or "M-Series". At the time, EPTI also had "D-type" boiler technology within the capacity range identified in the definition of "Products" but that was not discussed by the Parties. (*See generally id.* at ¶¶ 15-38)

At the time the Parties signed the Agreement, they understood it was still necessary to prepare and agree to the terms of the Annex I referenced in the definition of

PTDATA 294482_2

"Products." (*See generally* Plaintiff's Undisputed Facts at ¶¶ 39-66)  White had sent a "data table" on December 20, 2002 that identified the different sizes of boiler from 3M (9,500 pph steam flow) through 23M (165,000 pph steam flow) and certain operating characteristics (*e.g.*, heat release rate) associated therewith, that showed a proposed "range" of potentially licensed boilers as 8M (29,000) to 17M (100,000).  (Plaintiff's Undisputed Facts at ¶¶ 23, 41)  On January 29, 2003, White sent a draft of Annex I, which incorporated information from the data table, to EPTI's chief engineer (Bob Gdaniec) and others in the Engineering Department, advising that "**Annex I is the Product description for the License Agreement**."  (Plaintiff's Undisputed Facts at ¶ 49) (Emphasis added)  White's draft Annex I identified the "Description of Products" as EPTI's "M-Series Keystone® water tube boilers to include the 8M, 9M, 10M, 11M, 12M, 13M, 14M, 15M, 16M, 17M, 18M, 19M, 20M, 21M, and 22M," which extended the range to 150,000 pph from the 100,000 pph in the December 20 draft.  White also added to the data in the December 20 draft to include two tables under the heading "Standard M-Series Keystone Summary." (*Id.*)

On January 30, White re-sent his draft Annex I, along with drafts of Annex II (Technology Fee & Transfer of Information) and III (Contract Rates for Technical Assistance), to the Engineering Department, again asking for comments and advising that the "document is complete with all Annex data." (Plaintiff's Undisputed Facts at ¶ 50)

EPTI's Engineering Department advised White, in writing, that Annex I needed to identify the licensed boiler as having (among other features) tangent tube furnace and outer walls (tubes touching each other) and refractory front and rear walls.  The Engineering Department prepared drawings showing those features for inclusion in Annex I.  White incorporated all of the information from the Engineering Department – including the drawings -- into a revised Annex I,

PTDATA 294482_2

which he sent to VEO on February 3, 2003. EPTI (through Mark White) and VEO (through John Viskup) thereafter initialed each of the pages in Annexes I and II that White had prepared. White and Viskup agree that Annex I is part of the License Agreement. (Plaintiff's Undisputed Facts at ¶¶ 51-62)

On February 27, 2003, less than one month after the Agreement was finalized, the Parties entered an "Addendum" that permits VEO to sell boilers with a higher steam outlet temperature and design pressure. The Addendum, signed by both White and Viskup, states that "Licensor agrees to **modify the Products described in Annex I of the License Agreement**" for additional compensation. (Plaintiff's Undisputed Facts at ¶¶ 67-68) (Emphasis added)

The Parties did not negotiate another written addendum or amendment to the Agreement that further modified the Products described in Annex I of the License Agreement. (*Id.* at ¶ 70)

### VEO's Performance While EPTI Was Licensor

The Parties agreed that EPTI would provide technical assistance to VEO with its manufacturing of boilers at the inception of the Agreement. During that process, VEO advised EPTI of proposals it submitted that included membrane/welded furnace and outer walls, as well as welded front and rear walls ("full membrane"). "Membrane" or "welded" wall means that there is a metal bar between the tubes such that the tubes are no longer touching. Membrane walls are a newer technology that was developed after tangent tube technology, although tangent tube boilers remain widely in use. At VEO's request, EPTI provided the designs for membrane technology and the other deviations from Annex I to VEO ("non-conforming designs"). However, EPTI's engineers advised White, as well as VEO, on multiple occasions that the non-conforming designs were outside the scope of the Agreement. EPTI, though, was in financial

PTDATA 294482_2

distress, so it consented to VEO selling boilers that deviated from Annex I by having (among other features) full membrane walls. (*See generally* Plaintiff's Undisputed Facts at ¶¶ 71-77, 86-108)

VEO understood that EPTI was giving express consent on each occasion when it utilized the non-conforming designs received from EPTI. (Plaintiff's Undisputed Facts at ¶ 71) In particular, in a March 30, 2004 letter to EPTI, VEO stated that "[t]o date no changes have been made without EPTIs knowledge."(*Id.* at ¶ 90, Exhibit 34, VEO 634) In that regard, when notifying EPTI of sales, VEO disclosed in writing that it was selling 100% full membrane boilers. The Parties did not execute a written document that prospectively gave VEO the right to include membrane technology or otherwise deviate from Annex I without the licensor's consent. (Plaintiff's Undisputed Facts at ¶¶ 70-75)

In the Summer 2003, White's position with EPTI was eliminated. He then joined VEO as General Manager, and his responsibilities included managing the License Agreement with VEO. (Plaintiff's Undisputed Facts at ¶¶ 82-85)

On March 26, 2004, EPTI notified VEO of concerns that it had with VEO's performance under the License Agreement. (*See generally* Plaintiff's Undisputed Facts at ¶¶ 86-95) In particular, EPTI stated the following:

> **VEO currently licenses only the M series product line which has a very specific geometry and characteristics.** …. In review of some of the VEO recent projects and proposals, **it appears that the majority of projects that VEO is pursuing or has completed have been outside the definition of the license agreement.** Of particular concern most recently are the OXY and Dallas Ft. Worth Airport projects which are well outside the bounds of the products defined in the agreement. **VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex 1 of the current agreement provides a clear definition of the M-Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction**

> **which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design**.)" (IKE Uncontested Facts at ¶¶___) (emphasis added)

VEO – through Mark White in consultation with John Viskup and after two drafts of the letter over six days -- responded as follows:

> **"The Agreement does provide specific geometry and characteristics** but also allows for improvements, refer to Clause 13. **As such, VEO has made improvements** which are necessary to offer/provide a Keystone® boiler that is technically compliant with our customers requirements, is inline with that of our competitors offerings and as we deem necessary to enhance our overall success.
>
> The Oxyvinyls Project includes two (2) 15M Series Keystone® boilers **each of which include membrane furnace and outer walls, watercooled front and rear and an upper drum size of 60" ID. <u>These features are outside the geometry and characteristics of the License but are clearly improvements</u>**. …. (IKE Uncontested Facts at ¶ 90) (all emphasis added)

White's statement that the Agreement "does provide specific geometry and characteristics" referred to Annex 1. VEO thus admitted that Annex I contained "specific geometry and characteristics" and that "membrane furnace and outer walls, watercooled front and rear walls (which are not identified in Annex I) are "outside the geometry and characteristics of the License." VEO also admitted that a change in the size of a component (e.g., the upper drum) also was "outside the geometry and characteristics" of Annex I. VEO did not advise EPTI of any error in its March 30 letter while EPTI was licensor, although in this lawsuit VEO has admitted that it did not make any "improvements" or "modifications" to the boilers under the License Agreement. (Plaintiff's Undisputed Facts, ¶¶ 88-94)

At that time, EPTI also requested copies of VEO's sales and marketing materials so that EPTI could review VEO's use of the Keystone® trademark and description of the licensed product. VEO refused to provide that documentation to EPTI. VEO in fact copied the sales brochure of an EPTI predecessor (Zurn Industries), stating or implying that it owned the entire Keystone® line and had

PTDATA 294482_2

complete right to all design features associated with Keystone® boilers. (Plaintiff's Undisputed Facts, ¶¶ 131-49)

EPTI at the time contacted counsel about its concerns, but EPTI did not pursue litigation because of its bankruptcy and its efforts to sell the assets. EPTI had its outside counsel send correspondence to VEO advising that VEO must comply with the Agreement. EPTI did not give consent to VEO to sell boilers that deviated from Annex I after sending the March 26, 2004 letter. (Plaintiff's Undisputed Facts, ¶¶ 75, 95-108, 122-24)

### VEO's Attempt to Purchase The Keystone® Technology from EPTI

In Spring 2004, VEO contacted EPTI about purchasing the Keystone® technology and trademark (or at least obtaining a perpetual license). White of VEO negotiated with Bob Gdaniec of EPTI. VEO offered to pay EPTI $500,000 for the technology it wished to purchase and the right to the Keystone® name. The Parties could not, however, reach an agreement. (Plaintiff's Undisputed Facts, ¶¶ 109-21)

VEO advised EPTI that it would not purchase just the Standard M-Series and that it wanted the complete "O" technology, including customized designs beyond the M-Series. In a March 24, 2004 email, Mark White of VEO stated that "[i]t has always been the intention of VEO to purchase the 'O' boiler technology **which includes the 'M' Series boilers**. The purchase of the 'O' Series would enable VEO to be the sole and exclusive owner of the technology up to the capacity range." (emphasis added) VEO thus confirmed its recognition that the M-Series was a subset of the overall Keystone® technology. VEO also insisted on a "perpetual license for use of the name 'Keystone.'" (Plaintiff's Undisputed Facts, ¶¶ 111-13)

PTDATA 294482_2

EPTI, through Gdaniec, refused to sell the O boiler technology sought by VEO. The "technology that is available for sale at this time is limited to **just the standard M series boilers which is the basis for the current license agreement**." (Plaintiff's Undisputed Facts, ¶¶ 114-15) (emphasis added)  As an alternative (or in conjunction with a sale of the Standard M-Series), EPTI offered to enter an expansion of the License Agreement that would include features such as membrane walls.  Gdaniec described the "current license" and the proposed "new agreement."  As to the "current license," it "provides VEO the right to market and manufacture the standard M series product within a defined size and capacity range with an extension to permit addition of superheaters to the standard line."  As to the "new agreement," the

> "extended license option … [would] expand[] availability of the products **to the full O boiler line** and D boiler line within a defined size and capacity range while preserving the original agreement scope and general conditions.  This would give VEO access to a wide range of sizes, pressure and temperature capacity, **the use of welded wall construction** as well as provide access to steam purity equipment **which is not part of the current license agreement scope**. … "[The] purchase option … would give VEO 'ownership' of part of the O boiler product line as well as selected parts of the D boiler line.  This would be specifically the standard M series boiler and the executed D boiler project …."

(Plaintiff's Undisputed Facts, ¶¶ 117-19) Because VEO could not acquire the full O boiler line, the negotiations ended.  VEO did not dispute EPTI's description of the scope of the Agreement during the negotiation of the proposed sale and/or extension of the Agreement.  (Plaintiff's Undisputed Facts, ¶¶ 117-21)

### VEO's Performance While IKE Was Licensor

IKE became licensor on September 8, 2004 when it acquired the Keystone® technology and the trademark.  IKE immediately notified VEO that it must comply with the

terms of the Agreement, including that its sales efforts must be limited to tangent tube boilers. (Plaintiff's Undisputed Facts, ¶¶ 13, 125-28)

VEO sold 11 boilers while IKE was licensor. All of those boilers deviated from Annex I and included, among other features, membrane walls – the very features that EPTI and IKE notified VEO that it could not include. Unlike with EPTI, VEO's Unit Sales Notifications did not disclose that VEO was selling boilers with membrane walls. VEO used the Keystone® trademark in connection with making those sales. (Plaintiff's Undisputed Facts, ¶¶ 78-81)

VEO's website, sales proposals, and marketing materials utilized the Keystone® trademark throughout the time IKE was licensor. VEO's proposals and brochures included features (such as membrane walls) that were not included in Annex 1 and were the subject of letters from EPTI and IKE advising VEO of limitations on what VEO could sell. IKE did not authorize VEO to use the Keystone® name on products outside the scope of the Agreement. (Plaintiff's Undisputed Facts, ¶¶ 129-58)

## Argument

### I.    VEO Sold Boilers Outside The Scope Of the License Agreement.

License agreements (including trademark licensing agreements) are interpreted according to standard principles of contract law. *See, e.g.*, *Regscan, Inc. v. Con-Way Transp. Servs.*, 875 A.2d 332, 336-37 (Pa. Super. 2005); *see also Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 472 n.8 (3d Cir. 1986). Determining the intention of the parties is the paramount consideration in the interpretation of any contract. *Foulke v. Miller*, 112 A.2d 124, 127 (Pa. 1955). In construing a contract, the "intention of the parties must be ascertained from the entire instrument, and each and every part of it must be taken into consideration and given effect if reasonably possible." *Id.* (*citing Neal D. Ivey Co. v. Franklin Associates, Inc.*, 87 A.2d

236 (Pa. 1952)).  When a written agreement is clear and unequivocal, its meaning must be

determined by its content and, thus, extrinsic evidence is not permitted.  *Steuart v. McChesney*,

444 A.2d 659, 661 (Pa. 1982); *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973).

   Clause 1(a) of the Agreement expressly incorporates Annex I, and that Clause

cannot be interpreted in isolation from the Annex.  In that regard, both Viskup and White admit

that the Annex is part of the Agreement and that they knew at the time they signed the

Agreement that they still had to agree on Annex I.  (Plaintiff's Undisputed Facts, ¶¶ 32, 39, 61-

62)  In that regard, Clause 1(a) does not identify Keystone® boilers, M-Series boilers, or O-type

boilers (which is relevant because EPTI had D-type boiler technology that admittedly is outside

the scope of the Agreement); instead, it simply shows the capacity range (29,000 to 150,000 pph)

and general type (water tube as opposed to fire tube) of an unspecified boiler technology that was

to be licensed.  To determine the specific boiler that was licensed, it is necessary to refer to

Annex I, which is consistent with John Viskup's testimony that he and Mark White of EPTI

discussed M-Series boilers before the Agreement was executed.  Put simply, if the parties

intended for VEO to have full use of the O-type technology beyond the M-Series, they would

have included that language in the Agreement and would not have included specific geometry

(e.g., height, width, and length) and characteristics (*e.g.,* the drawings and temperatures) in

Annex I.

   There also is no claim by VEO that Annex I is vague or unclear.  To the contrary,

VEO states unequivocally that Annex I shows "tangent tube furnace walls, tangent tube outer

walls, a refractory front wall and a tube and tile water cooled rear wall."  (VEO Memorandum at

p.5)  According to VEO's corporate representative, Annex I "provides model numbers, it

provides the designs, it provides the basis of which the thermal performance was generated, … it

PTDATA 294482_2

has capacity data." (Plaintiff's Undisputed Facts, ¶ 62)  Both White and Viskup testified that

they knew the difference between tangent tube and membrane walls, but they did not make any

change to Annex I.  (*Id*. at ¶¶ 17-18)  The reason is obvious – they knew the licensed product

was limited to the tangent tube boiler.  In that regard, VEO in fact marketed boilers with tangent

tube design, and at least one version of VEO's sales brochures for Keystone® boilers identified

"tangent tube" walls as being standard in the Keystone®, which information was copied from a

Zurn brochure provided by EPTI for Keystone® boilers.  (*Id*. at ¶ 64)  IKE's interpretation

comports with the Agreement and gives effect to all of the Agreement's terms, whereas VEO's

interpretation – that it can deviate from Annex I through the use of membrane walls and other

features so long as it stays within the capacity range – fails to give effect to Annex I.

If VEO's interpretation were correct that it could sell any kind of boiler it wanted

between 29,000 and 150,000 pph, then there would be no need for Annex I at all, which

obviously is not true.  Although VEO has placed great reliance on the phrase in Clause 1(a) that

the licensed products "include but are not limited to" those in Annex I, there is no independent

significance to that phrase.  The Parties did not discuss or negotiate Clause 1(a), and the evidence

is that it was simply copied from a prior license agreement for a different product (HRSGs) and

licensee. (Plaintiff's Undisputed Facts, ¶¶ 20, 31)  Yet in giving effect to that phrase, the logical

meaning is that the Agreement could be amended to include additional products, such as

Keystone® boilers below 29,000 pph or above 150,000 pph or D-type boilers, or to modify the

existing "Products" as occurred with the superheated application that was the subject of the

February 27 Addendum.  Indeed, the Parties in fact discussed doing just that during the purchase

negotiations in the Spring 2004 when they considered an expansion to the current License

Agreement while keeping the other terms of the Agreement in place.  (*Id*. at ¶¶ 117-19)  Given

PTDATA 294482_2

the plain terms of Annex I, the care that went into creating it, and the obvious need to clearly define what technology is being licensed, the phrase "include but are not limited to" cannot give VEO carte blanche to sell any kind of boiler it wanted so long as it was in the capacity range, which would effectively nullify Annex I by making the tables and the drawings meaningless.

That the licensed "Products" are the Standard M-Series from 8M to 22M with tangent tube walls is readily apparent from the face of Annex I and from the following four facts.

First, when White was developing Annex I, he told the engineers at EPTI (in writing) that "Annex 1 … is the Product description of the License Agreement." (Plaintiff's Undisputed Facts, ¶ 49)

Second, Annex I itself specifically uses the word "Products" twice and identifies the Products as the different models of the M-Series. The drawings in Annex I, particularly the cross-section, similarly identify the "Standard M-Series," which corresponds to the Products identified in the beginning of Annex I, the title of the heading for the table that begins on the first page, and is consistent with the parties' pre-contract discussions about licensing "the M-Series." The Annex thus identifies the specific Products that were licensed, whereas the text of the Agreement merely provides a general description that requires Annex I for the actual description. (Plaintiff's Undisputed Facts, ¶¶ 51-55)

Third, on February 27, 2003 – less than a month after the Agreement was finalized – the parties executed a License Agreement Addendum to include superheated applications. Mark White (then of EPTI) was responsible for preparing the Addendum, which was signed by both him and John Viskup (VEO) – the very same individuals who signed the

Agreement and initialed the Annexes.  The Addendum provides that EPTI **"agrees to modify the Products as described in Annex I of the License Agreement** in exchange for compensation from Licensee as stated herein." (Emphasis added)  There was no reference to Clause 1(a).  (Plaintiff's Undisputed Facts, ¶ 68)

Fourth, VEO specifically refused to purchase just the Standard M-Series during the sale negotiations, insisted on acquiring customized drawings that are not part of the Standard M-Series, and discussed an expansion of the License Agreement that included membrane walls. At no point during those discussions – which occurred before the lawsuit and were principally in writing -- did VEO state that the Agreement included boilers with membrane walls.  (Plaintiff's Undisputed Facts, ¶¶ 109-21)

In sum, the Parties knew exactly what was licensed, and what the limitations were of those products.  It was fortunate for VEO that EPTI permitted it to deviate from the Agreement for a limited time, but EPTI exercised its right under Pennsylvania law to rescind that consent.  (*See* IKE's Memorandum of Law in Opposition to VEO's Motion for Partial Summary Judgment at pp.19-22, which is incorporated herein by reference)

## II.     VEO Has Infringed Plaintiff's Trademark By Using The Keystone® Name In Connection With The Sale Of Boilers Outside The Scope Of The License Agreement.

Trademark infringement occurs when the defendant employed a trademark so similar to that of the plaintiff that the public will mistake the defendant's products for those of the plaintiff. *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980). Similarly, "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement." *Professional Golfers Ass'n of*

14                                         PTDATA 294482_2

*America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir.1975). The unauthorized use of a trademark which has the effect of misleading the public to believe that the "user is sponsored or approved by the registrant" may constitute infringement. *Id.*

   In this case, VEO used the same Keystone® Mark on products and in a manner for which it had no right, falsely suggesting that VEO owned the entire Keystone® technology and the right to sell Keystone® boilers of any kind rather than the limited right to sell the M-Series Keystone® boiler. (Plaintiff's Undisputed Facts, ¶¶ 131-58) Of course, if a boiler was outside the scope of the Agreement, IKE or EPTI could have sold that boiler and itself earned the profit. Under the License Agreement, VEO had the right "to use the Mark in marketing, advertising, and sales activities **related to the Product** manufactured by Licensee." (*Id.* at ¶ 133) (emphasis added) As shown above, the "Product" was a tangent tube, refractory wall boiler. During the time that IKE was licensor, VEO submitted sales proposals and in fact made sales of boilers that were outside the scope of the License Agreement. In connection with those activities, VEO used the Keystone® Mark. By using the "Keystone®" trademark when it had no right to do so, VEO infringed IKE's "Keystone®" trademark.

   To prove trademark infringement, IKE must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by IKE; and (3) VEO's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (*citing Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir. 1990)).

   The first two requirements, validity and legal protectability, are proven where, as here, the mark is federally registered and has become "incontestable" under the Lanham Act, 15

PTDATA 294482_2

U.S.C. §§ 1058 and 1065. *Id.* at 194. A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration. *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d at 438; *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 n.7 (3d Cir. 1994). IKE owns the Keystone® trademark, which has been registered with the United States Patent and Trademark Office at No. 554,723, and has been continually in use by IKE, EPTI and its predecessors since at least February 12, 1952.

As to the third requirement, likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co. v. Summit Motor Products, Inc.*, 30 F.3d 466, 472 (3d Cir. 1991); 15 U.S.C. § 1114(1)(a) (liable for using in commerce a trademark in connection with goods or services if the use is "likely to cause confusion, or to cause mistake, or to deceive.") The statutory requirement of "confusion" refers to confusion as to the source, origin, or sponsorship of the goods or services associated with the mark. 15 U.S.C. § 1125. Although proof of actual confusion is not necessary, IKE has the burden of proving the likelihood of confusion and not the mere possibility of confusion. *A&H Sportswear v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 201 (3d Cir. 1999). When the trademark owner and the "alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). If the infringing party uses an identical or nearly identical mark on directly competing goods, there is ordinarily a likelihood of confusion. *Id.* at 463 (*citing American Plan Corp. v.*

*State Loan & Finance Corp.*, 365 F.2d 635, 639 (3d Cir. 1966), *cert. denied*, 385 U.S. 1011,

(1967)). Likelihood of confusion can be found as a matter of law in trademark infringement

action if the defendant intended to derive a benefit from the trademark. *Amstar v. Domino's*

*Pizza*, 615 F.2d 252, 263 (5th Cir. 1980), *cert. denied*, 449 U.S. 889 (1980).

Because VEO sought to derive profits through the use of IKE's Mark in

connection with the sale of Keystone® boilers outside the scope of the License Agreement --

after EPTI retracted its consent and IKE refused to consent -- there was a likelihood of confusion

as a matter of law because VEO used the identical mark on a competing product. *See United*

*States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) ("We perceive that

there is great likelihood of confusion when an infringer uses the exact trademark [of its former

licensor]."); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997)

("proof of continued, unauthorized use of an original trademark by one whose license to use the

mark has been terminated is sufficient to establish 'likelihood of confusion'"); *Villanova*

*University v. Villanova Alumni Educ. Found.*, 123 F. Supp.2d 293, 309 (E.D. Pa. 2000) (The

unauthorized use of a registered mark by a former licensee has been described as "a fraud of the

public, since they are led to think that the ex-licensee is still connected with the licensor.")

(quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:31 (4th

ed. 1992) ("[T]he law is simple.  If, as a matter of contract law, a service mark or trademark

license has ended, the licensee has no right to continue use of the mark.  Any such use is without

the trademark licensor's consent and constitutes infringement.").  In this regard, the likelihood of

confusion exists as a *matter of law* if a licensee continues to use marks owned by the licensor

after termination of the license." *Burger King Corp. v. Mason*, 710 F.2d at 1492-93 (emphasis

added).

As explained above and in IKE's Uncontested Statement of Facts, VEO received permission to sell out-of-scope boilers until March 26, 2004. Thereafter, both EPTI and IKE expressly prohibited VEO from selling such boilers. VEO has admitted, though, that every boiler it sold throughout the time that IKE was the licensor deviated from Annex I because it had membrane/welded walls (among other non-conforming designs) and that VEO used the Keystone® Mark in connection with those sales without IKE's permission. (Plaintiff's Undisputed Facts, ¶¶ 78-81, 128) VEO therefore used the Keystone® Mark in connection with the sale, and offer for sale, of boilers for which it had no license or other right to sell, infringing the Mark.

VEO also distributed sales brochures and proposals to prospective customers that exceeded the scope of the License Agreement and represented both an infringement on the Keystone® mark and misappropriation of technology. First, VEO used the Mark in connection with proposals for boilers that were objectively outside the scope of the License Agreement inasmuch as the steamflow exceeded the maximum of 150,000 pph. Second, all of the proposals issued by VEO included membrane/welded walls and other features that took the boilers outside the scope of the Agreement, and it used the Mark in those proposals. (Plaintiff's Undisputed Facts, ¶¶ 129-58) Third, VEO's sales brochures and proposals amounted to express reverse passing off to the extent they referred to "Victory boilers" and VEO designs in violation of 15 U.S.C. § 1125(a), which prohibits false designations of the origin of goods. McCarthy on Trademarks § 25:6 ("'Express reverse passing off' occurs when defendant falsely takes credit for another's goods or services. It can occur, for example, if the defendant removes or obliterates the original trademark without permission and re-brands the item with defendant's own mark.").

Finally, VEO's infringement was willful because both EPTI and IKE expressly instructed VEO that it must comply with the terms of Annex I of the License Agreement by selling only tangent tube boilers. VEO intentionally disregarded those instructions, which it admittedly received. The willfulness is especially clear because Mark White – the former EPTI employee who negotiated the Agreement and communicated with the EPTI engineers concerning its scope – joined VEO and became responsible for VEO's management of the Agreement. VEO's intent further is clear from the fact that VEO never disclosed to IKE that it continued to deviate from Annex I. Whereas Unit Sale Notifications ("USNs") to EPTI disclosed "100% full membrane" because EPTI gave consent, VEO failed to include that information in its USNs to IKE. Of course, VEO attempted to purchase the technology and refused to enter an expanded agreement that would have permitted it to sell boilers with membrane walls and other features outside the scope of the license, choosing instead to do what it wanted without consent. (Plaintiff's Undisputed Facts, ¶¶ 109-28)

## III.    VEO Misappropriated IKE's Trade Secrets.

The Pennsylvania Trade Secret Act prohibits the misappropriation of trade secrets by improper means. 12 Pa.C.S.A. §§ 5301-5308. Although EPTI initially consented to VEO's sale and manufacture of non-conforming boilers and provided VEO with technology to do so on a project-by-project basis, EPTI retracted that consent with the EPTI Breach Letter dated March 26, 2004. By continuing to use that technology to sell boilers outside the scope of the License Agreement after EPTI expressly retracted its consent in writing, VEO misappropriated IKE's trade secrets in violation of the Pennsylvania Trade Secret Act. 12 Pa.C.S.A. §§ 5301-5308.

The Trade Secret Act defines a "trade secret" as follows:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S.A. § 5302. Here, the design of the Keystone® boilers is a trade secret that has independent economic value and that has been the subject of reasonable efforts to maintain secrecy. VEO's own brochures and proposals stated that the Keystone® has a unique design and competitive advantages based on the decades of refinements to the Keystone® boilers. VEO licensed the technology for a fee and sought to purchase the technology from EPTI for $500,000 in Spring 2004, confirming that there is economic value and that the technology is not generally known. (Plaintiff's Undisputed Facts, ¶¶ 2-3, 7, 9, 13, 109-21)

VEO misappropriated the Keystone® trade secrets under § 5302(2)(ii)(B), which addresses "use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." VEO initially received EPTI's express consent to use the technology, and VEO knew at all times that it could not disclose the technology received from EPTI to third parties. It also stamped the drawings confidential. (Plaintiff's Undisputed Facts, ¶¶ 35-37, 66) Although EPTI's consent was retracted on March 26, 2004 without ever being reinstated by EPTI or IKE, VEO continued using the non-conforming designs when it knew had no right to do so.

Finally, "improper means" includes breach of a breach of a duty to maintain secrecy, 12 Pa.C.S.A. § 5302, which VEO had under Clause 5 of the the License Agreement.

PTDATA 294482_2

VEO agrees that it at all times had to maintain secrecy (*i.e.*, confidentiality) over all of the Keystone® technology. (Plaintiff's Undisputed Facts, ¶¶ 35-37, 66)

## V. VEO's USE OF THE TECHNOLOGY REPRESENTED UNFAIR COMPETITION.

For the same reasons, VEO's use of the Keystone® technology to sell non-conforming boilers represented unfair competition. Any conduct, the "natural and probable effect of which is to deceive the public, so as to pass off the goods of one person as and for that of another," constitutes unfair competition. *Gamlen Chemical Co. v. Gamlen*, 79 F.Supp. 622, 635 (W.D. Pa. 1948). A business entity entering into a field already occupied by a competitor of established reputation must do nothing which will unnecessarily create or increase confusion between his goods or business and the goods or business of the competitor. *Id.* at 636. Moreover, the trading on another's business reputation by use of deceptive selling practices or other means which is reasonably likely to produce confusion in the public mind, is enjoinable on the grounds of unfair competition. *Id.* This is because the plaintiff may be damaged in ways other than the diversion of business; his reputation and goodwill may be tarnished by the use of a trademark in connection with inferior goods or services over which he has no quality control. *Atlantic and Pacific Tea Co. v. A & P Radio Stores*, 20 F.Supp. 703 (E.D. Pa. 1937). Thus, if a plaintiff's established business practices, processes, methods, and, ultimately, his capital investment are usurped by a defendant without a license or consent, this is, essentially, unfair competition. *Pottstown Daily News Publishing Co. v. Pottstown Broadcasting Co.*, 411 Pa. 383, 394 (1963).

The elements for trademark infringement and unfair competition are identical. *Scott Felzer Co. v. Gehring*, 288 F.Supp.2d 696, 703 (E.D. Pa. 2003); *Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp.2d 567, 580 (E.D. Pa. 2002). The Third Circuit has

PTDATA 294482_2

previously held that the elements of federal unfair competition and Pennsylvania unfair competition are similar as well. *Browning King Co. v. Browning King Co.*, 176 F.2d 105 (3d Cir. 1949). However, an action for unfair competition "exists today separate and apart from any statutory rights which the owner of a trademark possesses." *House of Westmore, Inc. v. Denney*, 151 F.2d 261, 265 (3d Cir. 1945). Moreover, a claim of unfair competition inherently encompasses trademark infringement, but also includes a broader ranger of unfair practices which may include the misappropriation of the skill, expenditures and labor of another. *Murphy Door Bed Co. v. Interior Sleep Systems*, 874 F.2d 95, 102 (2d Cir. 1989).

For the reasons set forth above and in Plaintiff's Undisputed Facts, the Court should enter judgment against VEO for unfair competition.

## VI.  VEO Was Unjustly Enriched By Its Use Of The Technology.

"Unjust enrichment" is an equitable doctrine. *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. 1995), citing *Styler v. Hugo*, 619 A.2d 347 (Pa. Super. 1993). Pennsylvania courts have described the elements of unjust enrichment as (1) benefits conferred on defendant by plaintiff, (2) appreciation of such benefits by defendant, and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Id.*, citing *Wolf v. Wolf*, 514 A.2d 901 (Pa. Super. 1986), overruled on other grounds, and *Van Buskirk v. Van Buskirk*, 590 A.2d 4 (Pa. 1991); *See also Burgettstown-Smith v. Langeloth*, 588 A.2d 43 (Pa. Super. 1991). "Where unjust enrichment is found, the law implies a contract, referred to as either a *quasi contract* or a contract implied in law, which requires that the defendant pay to plaintiff the value of the benefit conferred. In short, the defendant makes restitution to the plaintiff in *quantum meruit*." *Id.* at

328-329, citing *Chesney v. Stevens,* 644 A.2d 1240 (Pa. Super. 1994) and *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 449 (Pa. 1969).

"The application of the doctrine depends on the particular factual circumstances of the case at issue.  In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Schenck,* 666 A.2d at 328, citing *State Farm Mut. Auto. Ins. Co. v. Jim Bowe & Sons, Inc.*, 539 A.2d 391, 393 (Pa. Super. 1988) (citing *Myers-Macomber Engineers v. M.L.W. Construction Corp. & HNC Mortgage and Realty Investors,* 414 A.2d 357 (Pa. Super. 1979).  "The most important factor to be considered in applying the doctrine is whether the enrichment of the defendant is *unjust.*" *Id.* (emphasis in original), citing *Styler, supra*, 619 A.2d at 350 and *State Farm Mut. Auto Ins. Co., supra.*

VEO was unjustly enriched when it used the technology received from EPTI for selling boilers outside the scope of the License Agreement after it was advised by EPTI that it could no longer use that technology.  EPTI also offered to sell the technology and/or extend the license to include non-conforming designs such as membrane walls during the sale negotiations, but VEO declined to do so.  VEO ignored instructions from both EPTI and VEO that it must confine its sale marketing activities to the boiler defined in Annex I, and VEO failed to disclose to IKE in the USNs that it was selling boilers outside the scope of the Agreement, which confirms that VEO knew it had no right to do so.  VEO also benefited by holding itself out as having the ability to sell, and in fact selling, boilers more sophisticated than the ones it licensed.

PTDATA 294482_2

## Conclusion

For the foregoing reasons, Plaintiff Indeck Keystone Energy LLC asks the Court to grant its Motion for Partial Summary Judgment on Counts I, IV, V, and VI of Plaintiff's Complaint.

Respectfully submitted,

_____/s/_____ John K. Gisleson_____

John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA 15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant, Indeck Keystone Energy, LLC

Dated: March 6, 2006

24

PTDATA 294482_2