**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

        Plaintiff

    v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

        Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

**VEO'S MEMORANDUM OF LAW IN OPPOSITION TO IKE'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT ON VEO'S COUNTERCLAIMS**

**Introduction**

        IKE seeks summary judgment on four of VEO's seven counterclaims,

Counts II-V.  As set forth below, VEO is voluntarily dismissing Counts IV and V.  IKE is

not entitled to summary judgment on the other two claims.  Specifically, IKE has failed

to demonstrate the absence of a genuine issue of material fact regarding either claim.

Count II is a claim for Breach of Contract involving IKE's breach of the exclusivity

provision in the January 7, 2003 License Agreement by offering for sale Keystone boilers

below 150,000 pph, and its related activities in misrepresenting the scope of the

Agreement to VEO's sales representatives to entice them to terminate their representative

agreements with VEO and enter agreements with IKE.

        Count III is a claim for Tortious Interference with Contractual Relations

arising out of IKE's improper conduct in inducing several of VEO's sales representatives

to terminate their sales agreements with VEO.  IKE asserts that its interferences with

VEO's contracts with its sales representatives were permissible and justified as

competition.  However, the evidence adduced in discovery demonstrates that VEO and

IKE were not competitors for the Keystone boilers, and shows that IKE employed wrongful means in coercing VEO's representatives to terminate their contracts with VEO and sign on with IKE.  VEO has been damaged as a result of IKE's interference.  At a minimum, IKE has failed to show an absence of any genuine issue of material fact that would entitle IKE to summary judgment.

Count IV is a claim under the California Business & Professional Code which VEO hereby voluntarily withdraws.  Count V is a claim for Tortious Interference With Prospective Economic Advantage, which claim VEO hereby voluntarily withdraws.[1]  VEO's counsel sought IKE's concurrence with VEO's dismissal of these claims, and IKE has no objection.

## Facts

## IKE's Breach Of The License Agreement's Exclusivity Provision

VEO and IKE entered into a License Agreement dated January 7, 2003 (the "Agreement").  Pursuant to the Agreement, VEO was granted an exclusive license to build, market and sell natural circulation industrial water tube package steam generators under the Keystone trademark within a given a steam capacity range in the U.S., Mexico and Canada.  (Ex. 1 to VEO's Appendix in Opposition to IKE's Motion for Partial Summary Judgment on VEO's Counterclaims (excluding the Annexes); hereinafter, all references to exhibits shall be to VEO's Opposition Appendix; License Agreement, Clause 2a).  The Agreement provides, "'Products' shall mean natural circulation, industrial water tube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph.  Products shall include but not be limited to

---

[1]  In seeking withdrawal of Count V, VEO does not wish to imply that Count VI for defamation is similarly withdrawn.  Rather, the factual allegations from Count V shall remain incorporated into Count VI.

the items set forth in Annex 1".  (Ex. 1, License Agreement, Clause 1a)).  Because VEO was the exclusive seller of Keystone O-style water tube package boilers below 150,000 pph, IKE was precluded from marketing or selling them.

IKE marketed to sell Keystone O-style water tube package boilers below 150,000 pph in two relevant ways.  First, its sales and marketing brochure states, "the Keystone 'O' Series water tube steam generator is capable of producing steam up to 500,000 lbs steam/hr . . ."  (Ex. 2, A. Christian Dep., pp. 92-94, citing to IKE 07437-7442, Ex. 3, C. Petcos Dep., p. 58).  Second, IKE's General Manager Chris T. Petcos testified that he told several of VEO's sales representatives that VEO was only licensed to sell outdated boilers with tangent tubes and similar features, while IKE could sell any other type of Keystone boiler without running afoul of the Agreement.  (Ex. 3, C. Petcos Dep., p. 28).

### IKE's Tortious Interference With VEO's Contracts With Sales Representatives

At the Power Gen Conference in Orlando Florida in December 2004, Chris Petcos met with at least four of VEO's sales representatives, Alan Christian of Christian Power Equipment, Inc., Gene Lockaby of Spectrum Engineering, Inc., Tom Patton of M.C. Patton & Associates and Chuck Thatcher of Gulf Coast Thermal.  (Ex. 3, C. Petcos Dep., pp. 31-20; Ex. 2, A. Christian Dep., pp. 38, 48-9).  At the time, each of the above-referenced entities was under contract with VEO as a sales representative.  At that meeting, Mr. Petcos made it clear that any representatives wishing to be able to sell IKE's aftermarket parts would have to terminate their agreement with VEO.  (*Id.*)

At the same meeting, Mr. Petcos also misrepresented that VEO was only entitled under the parties' license agreement to market or sell refractory front wall, tube

and tile rear wall, tangent tube boilers.  (Ex. 3, C. Petcos Dep., pp. 40, 43-44; Ex. 4, J.

Viskup Dep., pp. 23-25).  Mr. Christian stated that it was clear after IKE's meeting with

the sales representatives at the Power Gen conference in December 2004, that "there

wasn't going to be any negotiation with Indeck.  We had to decide; we weren't going to

be able to carve up portions of the lines from two different companies.  It was pretty

clearly stated that we had to make a decision [regarding who we were going to

represent]."  (Ex. 2, A. Christian Dep., p. 43).  In addition, at various times in December

2004 and January 2005, Mr. Petcos approached known VEO sales representatives and

misrepresented the scope of VEO's exclusive license.  (*Id.* at 53-4)

## <u>Argument</u>

Under the Federal Rules of Civil Procedure, summary judgment may be

granted when "there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  *Williams v. West Chester*,

891 F.2d 458, 463-64 (3d Cir.1989).  This procedural rule enables the court to resolve a

pending controversy without the expense and delay of conducting a trial when the critical

facts of a case are not in dispute.  *Peterson v. Lehigh Valley Dist. Council, United

Brotherhood of Carpenters and Joiners*, 676 F.2d 81, 84 (3d Cir.1982).  For a dispute to

be "genuine," the evidence must be such that a reasonable jury could return a verdict for

the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the court must consider the

evidence presented in a light most favorable to the non-moving party.  *United States v.

Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Baker v. Lukens Steel Co.*, 793 F.2d 509, 511

(3d Cir.1986).  The court must give that party the benefit of all reasonable inferences

arising from that evidence, *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir.1987); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), cert. denied, 474 U.S. 1010 (1985), and must accept as true all allegations of the non-moving party that conflict with those of the movant. *Id.*; *Anderson*, 477 U.S. at 255.

The burden of demonstrating the absence of genuine issues of material fact is initially on the moving party regardless of which party would have the burden of persuasion at trial. *First Nat. Bank v. Lincoln Nat. Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir.1987). Following such a showing in a case where the non-moving party is the plaintiff and thus bears the burden of proof, plaintiff must present evidence through affidavits or depositions and admissions on file which comprise a showing sufficient to establish the existence of every element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To establish a genuine issue of material fact, the non-moving party must introduce evidence beyond the mere pleadings to create an issue of fact on "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## I.    IKE IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF VEO'S COUNTERCLAIM FOR BREACH OF CONTRACT.

IKE claims that VEO has no evidence that IKE breached the exclusivity provision of the Agreement by marketing or selling boilers that VEO had been granted an exclusive license to sell. IKE's contention ignores the clear evidence adduced in discovery. As IKE notes, in order to recover for a breach of contract, VEO must prove the existence of a contract, the breach of a duty imposed by that contract, and damages. *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269 (Pa. Super. 2002).

It is undisputed that VEO and Erie Power Technologies, Inc., ("EPTI"), IKE's predecessor in interest, entered into the Agreement on January 7, 2003, and that the Agreement was in force for three years. (Ex. 1, License Agreement). It is also undisputed that, pursuant to the terms of that Agreement, VEO was granted the exclusive license to manufacture, market and sell the Products in the United States, Canada and Mexico, with limited exceptions that IKE does not argue are applicable here. (*Id.*) As discussed in great detail in VEO's Memorandum of Law in Support of Its Motion for Partial Summary Judgment and VEO's Response to IKE's Motion for Partial Summary Judgment/Reply to VEO's Motion for Partial Summary Judgment, the parties intended the term "Products" to be broad and understood that they would include natural circulation industrial water tube package boilers from 29,000 to 150,000 pph, including but not limited to the M Series boilers listed in Annex I.

IKE breached the Agreement and marketed to sell Keystone O-style water tube package boilers below 150,000 pph in two relevant ways. First, its sales and marketing brochure states, "the Keystone 'O' Series water tube steam generator is capable of producing steam up to 500,000 lbs steam/hr . . ." (Ex. 3, C. Petcos Dep., p. 58; Ex. 2, A. Christian Dep., pp. 92-94, citing to IKE 07437-7442). Second, IKE's General Manager Chris T. Petcos testified that he told several of VEO's sales representatives that VEO was only licensed to sell outdated boilers with tangent tubes and similar features, while IKE could sell any other type of Keystone boiler without running afoul of the Agreement. (Ex. 3, C. Petcos Dep., p. 28).

VEO was damaged by IKE's breach of the exclusivity provisions of the Agreement. For one thing, VEO lost sales opportunities as a result of IKE's improper

marketing activities.  (Ex. 4, J. Viskup Dep., pp. 159-61, Ex. 5, VEO 30(b)(6) Dep.

(Viskup), pp. 37-8).  In addition, VEO lost sales representatives due to IKE's improper

comments made to VEO's representatives regarding the scope of what IKE was permitted

to sell under the Agreement.  VEO will discuss this aspect of its damages more fully

below.  VEO submits that it is unable at this time to quantify the amount of its damages,

but it intends to engage an expert to opine on the adverse financial impact IKE's conduct

has had on VEO's sales.

## II.    IKE IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF VEO'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

IKE asserts that its interference with VEO's contractual relations with its

sales representatives was permissible as competition.  However, IKE has cannot establish

with an absence of any genuine issue of material fact that IKE's interference was justified

as competition.  In addition, VEO has properly established that it was harmed as a result

of IKE's improper conduct.

Pennsylvania courts have adopted § 766 of the RESTATEMENT

(SECOND) OF TORTS, which sets out the elements of a claim for intentional

interference with existing contractual relations.  *Adler, Barish, Daniels, Levin and*

*Creskoff v. Epstein,* 393 A.2d 1175, 1181-83 (Pa. 1978) (citing RESTATEMENT

(SECOND) OF TORTS § 766 (1977)).  Section 766 of the RESTATEMENT provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 (1979).

Thus, in order for VEO to establish that IKE wrongfully interfered with VEO's sales representative agreements, it must prove that:

(1)    IKE intended to harm VEO's contractual relations with its sales representatives;
(2)    IKE acted improperly, i.e. was not privileged to act the way it acted;
(3)    IKE induced or otherwise caused VEO's sales representatives to not perform the contracts; and
(4)    VEO suffered pecuniary loss resulting from the sales representative's failure to perform their contracts.

In its motion for summary judgment on VEO's claim for Intentional Interference with Contractual Relations, IKE claims that VEO has failed to produce sufficient evidence to raise a genuine issue of material fact as to the second and fourth elements of its claim for intentional interference of contractual relations. Specifically, IKE claims that VEO has failed to produce any evidence to prove that its interferences with VEO's separate Sales Representative Agreements ("Representative Agreements") with Christian Power Equipment ("CPE"), Power Systems, Inc. ("PSI"), and Thermal & Hydraulic Equipment ("THE") were improper. (See IKE's Memorandum of Law in Support of its Motion for Partial Summary Judgment on VEO's Counterclaims, pp. 10-12). IKE also argues that even if VEO could prove that IKE's interference with the Representative Agreements were improper, VEO has failed to produce any evidence to prove that it sustained any harm as a result of their interference. (See IKE's Memorandum of Law in Support of its Motion for Partial Summary Judgment on VEO's Counterclaims, pp. 12-13).

VEO has provided sufficient evidence to prove that IKE's interferences were both improper, and that these improper acts caused VEO substantial harm. At the

very least, VEO has provided enough evidence to demonstrate that there are genuine issues of material fact on both of these issues which preclude granting IKE's motion for summary judgment.

**1.    IKE Intended To Harm VEO's Contractual Relations With Its Sales Representatives.**

IKE does not dispute, that it intended to harm VEO's contractual relations with its sales representatives.  It is clear from the evidence that at the time of IKE's interferences with VEO's sales representatives, IKE knew that VEO had entered into sales representative agreements with CPE, PSI and THE, as well as Gene Lockaby of Spectrum Engineering, Inc., Tom Patton of M.C. Patton & Associates and Chuck Thatcher of Gulf Coast Thermal.   (Ex. 3, C. Petcos Dep., pp. 33, 36, 45-48, and 51-53; Ex. 2, A. Christian Dep., p. 43).  There is also evidence that, in late 2004 and early 2005, IKE met with representatives for CPE, PSI, THE, Spectrum Engineering, Inc., M.C. Patton & Associates and Gulf Coast Thermal, notwithstanding the fact that they were current VEO sales representatives, in an attempt to lure them into entering into exclusive sales representative agreements with IKE.   There is no question that IKE's actions would undeniably "harm" VEO's contractual relationships with its sales representatives.  (Ex. 3, C. Petcos Dep., pp. 31-33, and 45-46).  In fact, Chris Petcos told four of VEO's sales representatives that IKE would not sign or continue with any representatives that represented VEO.  (Ex. 2, A. Christian Dep., pp. 38, 48-9).

**2.    IKE's Interference With VEO's Sales Representative Agreements Was Improper.**

IKE argues that its interferences with VEO's sales representative agreements were privileged as IKE was trying to legitimately compete with VEO.  (See IKE's Memorandum of Law in Support of its Motion for Partial Summary Judgment on

VEO's Counterclaims, pp. 3-4, 10).  In its motion for summary judgment, IKE contends

that VEO's sales representative agreements are terminable at will contracts which can be

terminated at any time by either of the parties.  (*Id.* at p.12).  As a result, IKE directed the

court to § 768 of the RESTATEMENT, which has been recognized by Pennsylvania

courts.  *Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa. 1988).  That section provides:

> (1)  One who intentionally causes a third person not to enter into a
> prospective contractual relation with another who is his competitor
> or not to continue an existing contract terminable at will does not
> interfere improperly with the other's relation if:
>   (a)  the relation concerns a matter involved in the competition
>        between the actor and the other; and
>   (b)  the actor does not employ wrongful means; and
>   (c)  his action does not create or continue an unlawful restraint
>        of trade; and
>   (d)  his purpose is at least in part to advance his interest in
>        competing with the other.
>
> (2)  The fact that one is a competitor of another for the business of a
> third person does not prevent his causing a breach of an existing
> contract with the other from being an improper interference if the
> contract is not terminable at will.

RESTATEMENT (SECOND) OF TORTS § 768 (1979).  This section of the

RESTATEMENT provides a rule for the special application of the factors provided in §

767 of the RESTATEMENT, which are used for determining whether any given

interference is improper or not.  *Gilbert,* 550 A.2d at 554.

Contrary to IKE's argument, the facts in this case support a finding that

IKE has failed to meet at least three of the requirements of § 767 of the

RESTATEMENT.  As a result, its interferences with VEO's sales representations cannot

be determined under the law to be justifiable as competition.  Specifically, IKE is not a

true competitor of VEO, the relation did not concern a matter involved in competition,

and IKE employed wrongful means in forcing the representatives to terminate their agreement.

### a.    VEO Was Not a Competitor of IKE.

IKE's argument under § 768 RESTATEMENT relies entirely on its mistaken belief that the parties were in fact competitors.[2]  (See IKE's Memorandum of Law in Support of its Motion for Partial Summary Judgment on VEO's Counterclaims, pp. 3-4, 10-12).  However, an examination of the facts reveals IKE failed to show that it and VEO are in fact competitors in the relevant segment of the market – the water tube package boiler market.  Although, it is true that IKE was acting as a competitor during the term of the Agreement as alleged by VEO in its counterclaim (VEO's Second Amended Counterclaim, at ¶¶ 22, 28, and 37), it was IKE choosing to breach the Agreement and compete with VEO, and not vice versa.

Under the Agreement, VEO was a licensee of IKE, and as a licensee VEO paid royalties for each of its sales to IKE.  In fact, IKE accepted each and every one of those payments.  (Ex. 6, VEO's 30(b)(6) Dep. (White) p. 72).  During the term of the agreement, VEO and IKE were not competitors for the sale of water tube package boilers because of the parties' license agreement which allowed VEO to exclusively market and sell industrial, natural circulation water tube steam generators with a steam capacity of between 29,000 up to and including 150,000 pounds per hour of steam.  IKE also retained the legal right to sell industrial, natural circulation water tube steam generators with a steam capacity of above 150,000 pounds per hour.  Accordingly, the parties were not

---

[2] In a footnote, IKE states that VEO recently launched the "Voyager" boiler series, which it concludes is evidence that VEO and IKE are competitors.  (See IKE's Memorandum, p. 10).  However, Mr. Viskup testified that VEO did not begin marketing or selling the "Voyager" boiler series until the expiration of the parties' license agreement in January of 2006.  (Ex. 4, J. Viskup Dep., pp. 181, 183).

competitors of one another under the license agreement. Mr. White, VEO's General Manager, stated that the parties' "products weren't competing with each other, IKE doesn't have products that compete with Victory's products in terms of the Keystone because we were the licensee." (Ex. 7, M. White Dep., p. 176).

If IKE was lawfully abiding by the Agreement, it would have honored VEO's exclusive right to market and sell steam generators with a steam capacity of between 29,000 up to and including 150,000 pounds per hour of steam. At the same time, IKE could have marketed and sold its steam generators with a steam capacity above 150,000 pounds per hour that it had the right to sell. It is clear that the purpose of the parties' license agreement was for VEO and its licensor to be partners, not competitors, as IKE suggests.

Comment *c* of § 768 of the RESTATEMENT makes it clear that in order for IKE's interferences to be deemed to be lawful competition, the parties must be true competitors. In addition, Comment *d* of § 768 of the RESTATEMENT, provides that in order for the interference to be justified, the interfering party must show that the business diverted by the interfering party was legitimately related to the competition between the parties. Here, IKE's interference with VEO's sales representatives could not have been legitimately related to the competition between the parties, because IKE was precluded from competing with VEO to sell boilers below 150,000 pph. Therefore, under the terms of Comments *c* and *d*, IKE and VEO were not "competitors" for purposes of determining if IKE's interference with VEO's sales representatives' agreements was justified.

It is clear that VEO was IKE's licensee and not a competitor. See generally *Techno Corp. v. Dahl Assoc. Inc.*, 535 F. Supp. 303, 307 (W.D. Pa. 1982). At

the very least, there is a genuine issue of material fact as to whether IKE and VEO were direct competitors which a jury must resolve before determining that IKE's interferences were privileged as lawful competition. *Data Based Systems, International, Inc. v. Hewlett-Packard Company*, 2001 U.S. Dist. Lexis 17402, p. 43 (E.D. Pa. 2001) (Court found that there was a genuine issue of fact as to whether a reseller of defendant's used products was a competitor of defendant).

> **b.    IKE Employed Wrongful Means In Inducing the Termination of VEO's Representation Agreements.**

Even if this Court finds that IKE was a true competitor of VEO, IKE's decision to use wrongful means to interfere with VEO's representative agreements precludes a finding that IKE's interference was justified as competition. Comment *e* of § 768 of the RESTATEMENT states that if an actor employs improper means, his interference will not be justified as lawful competition. The facts in this case show that IKE employed wrongful means to induce CPE, PSI, and others to terminate their agreements with VEO. First, IKE instituted a campaign to opportunistically interfere with VEO's contractual relationship with its established representatives by strong-arming them to terminate their agreements with VEO. (Ex. 2, A. Christian Dep., pp. 38, 48-9). IKE's representatives threatened that if VEO's sales representatives did not terminate their agreements with VEO, that IKE would no longer allow them to sell any of its aftermarket parts or other product lines. (Ex. 2, A. Christian Dep., pp. 40-44; Ex. 3, C. Petcos Dep., pp. 32-36; Ex. 7, M. White Dep., p174-175; Ex. 4, J. Viskup Dep., pp.152-153, 156-158). Mr. Christian, the owner of CPE, testified that when he asked Mr. Petcos whether CPE could continue to represent both VEO and IKE, Mr. Petcos's response was "You can't do that." (Ex. 2, A. Christian Dep., p. 40-44). In addition, Mr. Petcos also

informed some of VEO's sales representatives that IKE was involved in a lawsuit with

VEO over sales it made outside of its licensing agreement.  (Ex. 3, C. Petcos Dep., pp.

46-48).

        IKE also breached its license agreement with VEO by telling VEO's

representatives that VEO was only authorized to sell outdated Keystone water tube

boilers with tangent tubes and that IKE could sell any other Keystone water tube boiler

other than the tangent tube boilers.  (Ex. 3, C. Petcos Dep., pp. 40, 43-44).  In doing so,

IKE misrepresented to VEO's sales representatives the terms of the License Agreement

in an effort to convince them that VEO would only be permitted to build and sell

outdated boilers with no market appeal, and therefore, opportunities to sell Keystone

boilers built by Victory would be virtually non-existent.

        The evidence in this case demonstrates that IKE used unjustifiable,

coercive conduct in an attempt to interfere with VEO's sales representative agreements

and its conduct precludes a finding that its interferences were proper.  At the very least,

there is a genuine issue of material fact as to whether IKE's interferences were justified

that a jury must resolve.  In summary, IKE has failed to meet at least three of the

requirements of § 767 of the RESTATEMENT, and as a result its interferences with

VEO's sales representatives cannot be determined under the law to be justified as

competition.

        **3.    IKE Induced Several of VEO's Sales Representatives to
                Terminate Their Representative Agreements With VEO.**

        IKE does not dispute that its interferences induced several of VEO's sales

representatives to terminate their representative agreements with VEO.  The record in this

case provides sufficient evidence that IKE identified and approached several of the

VEO's sales representatives and unlawfully induced them through misrepresentation, intimidation, and threats to terminate their contractual relations with VEO. (Ex. 3, C. Petcos Dep., pp. 26-32; Ex. 4, J. Viskup Dep., pp. 151-159; Ex. 5, VEO's 30(b)(6) Dep. (Viskup), pp. 23-24; Ex. 2, A. Christian Dep., pp. 46-48, 61). The evidence also reveals that CPE, PSI, and several other sales representatives terminated their representative agreements with VEO following their meetings with IKE. (Ex. 2, A. Christian Dep., pp. 38, 48-9; M. White Dep., pp. 255-256; C. Petcos Dep., pp. 31-32). Mr. Viskup, VEO's president, also testified that VEO lost several of its sales representatives because of IKE's misrepresentations. (Ex. 4, J. Viskup Dep., pp. 151-158).

### 4.    VEO Has Suffered Damages Resulting From The Terminations Of Its Representative Agreements.

IKE contends that there is no evidence that its actions actually caused VEO to sustain damages from the termination of several of VEO's sales representative agreements. (See IKE's Memorandum of Law in Support of its Motion for Partial Summary Judgment on VEO's Counterclaims, p. 4). Moreover, IKE argues that VEO is unable to quantify any sales opportunities that it actually lost as a result of the termination of its agreements with CPE or PSI. (*Id.* at p. 12-13). In support of its statements, IKE cites Mr. Viskup's deposition. However, Mr. Viskup testified that damages being were still being determined for specific missed opportunities that are directly attributed to IKE's improper and unlawful interference of VEO's sales representation agreements. (Ex. 5, VEO 30(b)(6)(Viskup) Dep., pp. 37-42). In addition, Mr. Viskup testified that VEO intends to retain an expert to calculate the amount of the damages VEO has suffered due to lost opportunities.

VEO incurred the following damages as a result of CPE and PSI's termination of their agreements with VEO, which were caused in part by IKE's breach of the License Agreement: VEO lost out on the Herford project , the Michigan boiler opportunity and the Michigan Correctional facility opportunity; (Ex. 5, VEO 30(b)(6)(Viskup); pp. 37-38)(Ex. 6, J. Viskup Dep., pp. 159-161); VEO lost out on sales through CPE and PSI for opportunities that IKE realized. (Ex. 5, VEO 30(b)(6) Dep. (Viskup) at 40-41; Ex. 4, J. Viskup Dep., p. 159); VEO has requested from IKE the amounts IKE has received for orders from PSI and CPE, and despite promises to furnish the information, VEO has received none from IKE at this time. In addition, VEO suffered lost business and damage to its reputation caused by IKE's marketing Keystone water tube package boilers below 150,000 pph.

While, it is true that VEO has not yet determined the exact amount of damages based on lost profits, damages to its business reputation, or the costs incurred in locating and replacing its terminated sales representatives, expert discovery remains open and was stayed pending the Court's ruling on the pending motions for partial summary judgment. "Although the plaintiffs must prove loss, causation and specific damages, at the summary judgment stage, the court's main concern should be with determining loss and causation in general, rather than proof of specific amounts of damages." *Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999). VEO has demonstrated beyond a doubt that it has been damaged and that the damage was wrongfully caused by IKE. Therefore, at a minimum, a genuine issue of material fact regarding VEO's damages exists.[3]

---

[3] IKE asserts in fn. 5 on p. 13 of its Brief that VEO's damages claim is "refuted," and lists three allegations that IKE submits undercut the likelihood VEO will prevail on its damages claim at trial. VEO disputes the allegations, but need not refute them here, as they are immaterial, and at best, demonstrate an additional issue of fact for the jury.

Dated:  April 10, 2005                          Respectfully submitted,

                                                /s/ Christopher T. Sheean
                                                One of the Attorneys for Plaintiff,
                                                VICTORY ENERGY OPERATIONS,
                                                LLC

Christopher T. Sheean
Wildman, Harrold, Allen & Dixon LLP
225 W. Wacker Drive
28th Floor
Chicago, IL 60606
(312) 201-2997

LOCAL COUNSEL:
G. Jay Habas
Marshall, Dennehey, Warner
Coleman & Goggin
1001 State Street, Suite 1400
Erie, PA  16506
(814) 461-7800
PA  ID No. 55581

Counsel for Victory Energy Operations, LLC