## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>       Plaintiff<br><br>  v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>       Defendant. | CIVIL ACTION<br><br>No. 04-CV-325E<br><br>Judge Sean J. McLaughlin |

### VEO'S RESPONSE TO IKE'S STATEMENT OF FACTS FILED BY IKE IN OPPOSITION TO VEO'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF IKE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant/Counter-Plaintiff Victory Energy Operations LLC, ("VEO"), for its Response to Plaintiff Indeck Keystone Energy LLC's ("IKE") Statement of Facts Filed In Support of Its Motion for Partial Summary Judgment on its Affirmative Claims, states as follows. VEO objects on a general basis to IKE's citation to and reliance upon documents produced in discovery that lack the requisite foundation and authentication to be used as evidence at trial. Only matters of the evidentiary record may be cited as support for a party's undisputed facts in support for a motion for summary judgment. *See Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 763 (W.D. Pa. 2004). IKE has failed to attempt to lay a proper foundation for several such documents. VEO submits that the Court may not rely upon such evidence in ruling on the parties' cross-motions for summary judgment.

Furthermore, VEO submits that the terms and conditions of the License Agreement between the parties speak for themselves, and that the Agreement itself is the best

evidence of the understanding and intent of the parties. For that reason, IKE's proposed facts regarding purported "admissions" regarding the meaning of the Agreement are improper and should not be considered by the Court.

1.      VEO admits that EPTI's predecessors-in-interest, including Zurn Energy and Aalborg Industries, manufactured a line of industrial O-type water tube steam generators known as the Keystone® which ranged in capacity from 8,000 to 500,000 pounds per hour of steam, and that other manufacturers sell A-type and D-type boilers. VEO denies the remaining allegations of paragraph 1. VEO cites to no supporting evidence, as none was cited by IKE.

2.      VEO admits that at one time years ago, the Keystone® boiler was well known and well respected as being a quality piece of equipment. VEO also submits that, as of the time VEO entered into the market, the Keystone® name was no longer well-known in the industry. In speaking about Erie Power Technologies, Inc. and its predecessors, Mark White testified, "unfortunately, it was a company that had left many markets and very, very little, if any, market share in most of those markets." (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., p. 27).

3.      The "facts" set forth in paragraph 3 are immaterial, and are unsupported by competent evidence. IKE's citation to a sales brochure is improper, as the statements referenced from the brochure are hearsay, and IKE has failed to lay a proper foundation for the document.

4.      VEO lacks knowledge or information sufficient to admit or deny the allegation, but submits that it should be rejected, as IKE has failed to proffer any evidence, competent or otherwise, to support its contention.

5.      VEO disputes these contentions. Shawn Brewer testified that it was his understanding that M-Series boilers were the same as O-style Keystone boilers. (Ex. 2 to VEO's

Supplemental Appendix, S. Brewer Dep., p. 210). Bob Gdaniec admits that the term "Standard

M Series" had no meaning in the boiler industry at large, and was only a term understood within

EPTI. (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 207). Mr. Gdaniec also

testified that the term "M-Series" was used internally at EPTI and its predecessors to provide

reference to a specific model number, such as a 23 M, but that to the customer, EPTI was selling

the boilers as simply "O-type boilers." Gdaniec admitted that EPTI and its predecessors would

sell M-Series boilers with membrane walls. (Ex. 3 to VEO's Supplemental Appendix, R.

Gdaniec Dep., pp. 33-34). Chris Petcos did not know whether individuals outside of EPTI were

familiar with the name "Standard M Series." (Ex. 4 to VEO's Supplemental Appendix, C.

Petcos Dep., p. 40). Jay McConaughy, an engineer with Zurn, Aalborg and EPTI, testified that

in his mind, there was no such thing as a "standard M-series boiler." (Ex. 5 to VEO's

Supplemental Appendix, J. McConaughy Dep., p. 118).

IKE alleges that M-Series Keystone boilers did not include membrane walls. VEO also

disputes this contention. Several witnesses testified that M-Series boilers can incorporate

membrane walls. For instance, on February 5, 2003, immediately following the execution of

Annex I, Jere Nieminski of EPTI forwarded an email to Mark White, then of EPTI, with carbon

copies to Steve Bernatowicz and Ted Fuhrman, both of EPTI. In the email, Nieminski stated

"the proposed boiler would be a 15M Keystone with welded wall front, side, and rear

construction and an extended furnace length." (Ex. 6 to VEO's Supplemental Appendix, S.

Bernatowicz Dep., p. 29). Bernatowicz stated, "that is a 15M, that's the M series boiler right

there. So it is an M series boiler." (*Id.* at p. 30). In addition, Ted Fuhrman, a former EPTI

engineer, testified that he had designed an M-Series boiler with membrane walls. (Ex. 7 to

VEO's Supplemental Appendix, T. Fuhrman Dep., p. 40). Moreover, IKE's predecessor's

offered M-Series Keystone boilers with membrane wall construction.  VEO had purchased two

Keystone 15M boilers from EPTI's predecessor, Aalborg Industries, in 2001, both of which

included membrane walls.  (Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 8-9;

Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., p. 36).

It is undisputed that Mark White, as the authorized EPTI representative, supplied the

Keystone Sales Manual and a related power point presentation to VEO in March 2003, which

shows membrane walls as an available option on Keystone M Series Boilers.  (Ex. C to VEO's

Motion for Partial Summary Judgment, M. White Dep., p. 244).  Similarly, the Keystone Design

Guide provided to VEO shows welded front and rear walls as an option for M-Series Keystone

boilers.  (Ex. 9 to VEO's Supplemental Appendix, T. Pawlowski Dep., pp. 113-114).

6.    VEO denies the contentions alleged in paragraph 6, and objects to IKE's citation

to documents produced in discovery without offering any foundation or authentication.  See

response to paragraph 5, above.

VEO disputes that there was a standard set of drawings for the Keystone M-Series.  Mark

White testified that VEO had to create drawings for the various boiler models because the

drawings provided by EPTI were incomplete and hand drawn.  (Ex. 1 to VEO's Supplemental

Appendix, M. White Dep., pp. 179-180).  VEO further denies IKE's unsupported contention that

M Series boilers are "essentially an off-the-shelf, one-size-fits-all item."  (Plaintiff's Statement

of Facts, ¶ 7).  Steve Bernatowicz, an engineer who worked at EPTI throughout the period EPTI

was the licensor, testified that:

> [W]e never, fortunately, sell anything standard, but they were almost a standard
> product.  They had the same pressure and temperature.  So it was -- made it a little
> bit easier to do the work, and did a lot of it.
> Q.    You just said you never sell anything standard.  What do you mean by that?
> A.    They're always designed per the customer specifications.  So we never have a
> product you can just pull off the shelf.  They're always a custom design.

> Q.  In your experience, is that typical in the package boiler industry?
> A.  Yes.  I think it's typical in the entire industry.

(Ex. 6 to VEO's Supplemental Appendix, S. Bernatowicz Dep., pp. 12.)  Similarly, Jay

McConaughy, an engineer formerly with EPTI and its predecessors, testified that in is

experience, Keystone M Series boilers were always customized to meet customer specifications.

(Ex. 5 to VEO's Supplemental Appendix, J. McConaughy Dep., p. 64).

VEO disputes IKE's contention that it was not necessary to do design work beyond what

was shown on the standard drawings.  Mark White testified that it was always the intention of the

parties that VEO would take over making any design changes to the drawings after the first few

projects were completed.  (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 179-

180).

VEO disputes IKE's contention that "it was not necessary to update the Keystone®

design to comply with applicable boiler and pressure vessel code issued by the American Society

of Mechanical Engineers."  A boiler manufacturer is required to increase the drum and tube

thickness for applications utilizing increased pressure and steam, and it is undisputed that VEO

was authorized to sell Keystone boilers with higher pressure and temperature steam outputs.

(Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 140-141).

7.      VEO objects to IKE's reference to the Zurn brochure without providing any

foundation or authentication.  VEO disputes that the term "O-Series" was a defined phrase at

Zurn or in the industry.  VEO refers to response to paragraphs 5 and 6 for support for VEO's

denial of IKE's contention that M-Series boilers were only sold with a tangent tube furnace or

outer wall, or a refractory front or rear wall.  VEO admits that not all Keystone boilers are M-

Series boilers, as evidenced by the fact that EPTI's predecessors had developed and sold

Keystone D Style boilers.  VEO denies the remaining allegations of paragraph 7.

8.      VEO admits that EPTI and its predecessors sold M-Series boilers with membrane walls and water-cooled front walls.  VEO disputes that when an M-Series boiler was sold with a membrane wall or water-cooled front wall, it was always called a "special" or that any such change would take a boiler outside the scope of the Standard M-Series.  Robert Gdaniec testified that the term "special" when used to designate a Keystone M-Series boiler, had no independent significance to persons outside of EPTI.  Moreover, Mark White testified that he was not aware of any procedure at Zurn that indicated an M-Series boiler would be designated as "special" when it was customized to differentiate the boiler from a standard boiler.  (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., p. 207).

9.      VEO admits that EPTI developed software known as the "KPSC Software" to permit EPTI to rate a boiler by showing what the boiler's thermal performance would be under certain operating conditions, but denies that the software was not used to design the components or features of a boiler.  In fact, EPTI would frequently modify the design or components of a boiler in order to improve the thermal performance of a boiler based on the information provided by the KPSC software.  (Ex. 10 to VEO's Supplemental Appendix, M. White Supplemental Affidavit, ¶ 1).

VEO admits that EPTI did not develop a separate program for M-Series boilers, but affirmatively states that EPTI engineers did endeavor to limit the scope of the KPSC program provided to VEO under the License Agreement.  (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 155, 200-201).  VEO admits that the Keystone Design Guide shows tangent tube boilers, and also shows that M-Series boilers can include a welded front and rear wall.  (Ex. 9 to VEO's Supplemental Appendix, T. Pawlowski Dep., pp. 63-64).

10.     VEO admits that EPTI had marketing materials for the Keystone boiler and did

not create or maintain any marketing material specific to the M-Series.  VEO also submits that EPTI created a Keystone sales manual specifically for VEO that showed Keystone boilers with optional membrane furnace and outer walls, water-cooled front and rear walls.  (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 246-247).  VEO objects to the citation to the Zurn brochure without offering any foundation or authentication.

11.  VEO admits that in 2001 it purchased two Keystone® 15 M boilers from Aalborg Industries for use at a Heinz plant in Muscatine, Iowa, and that the boilers contained membrane walls.  VEO admits that certain Aalborg personnel designated the boilers as 15 M Special, but denies that a boiler cannot be a Standard M boiler with the inclusion of membrane walls or other features.  John Viskup testified simply that he recalled the drawings for the 15M boilers included a designation "sp," but did not testify that he know or understood what that meant at the time.  (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., p. 106).  VEO denies the remaining allegations in Paragraph 11.

12.     VEO admits the allegations set forth in paragraph 12, but submits that they are immaterial.

13.     Admit.

14.     Admit.

15.     Admit.

16.     VEO admits that Mark White was authorized to negotiate a license agreement with VEO, but denies that he told Mr. Kang the technology to be licensed was "outdated and antiquated."  Mark White testified that he and Mr. Kang only discussed the steam capacity of the boilers to be licensed."  (Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., pp. 40-41).

17.    Admit.

18.    VEO admits that John Viskup was the president of VEO, and that he had heard of the Standard M-Series Keystone package boiler.  However, VEO denies the implication that, by having heard of the "Standard M-Series Keystone package boiler," Viskup understood the term to mean what IKE purports it to mean.  Viskup testified that his understanding of the Keystone standard M-series boiler was that it was a package boiler and that it was rail shippable.  (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 14-15).  VEO admits Viskup knew the difference between a tangent tube boiler and a membrane/welded wall boiler.

19.    Admit

20.    VEO admits that Mark White testified he used the Rosetti Moreni agreement as a "model" for the proposed License Agreement with VEO, but denies this fact is material to the pending motions.

21.    VEO admits that Mark White testified as stated in paragraph 21.

22.    VEO submits that the facts set forth in paragraph 22 are immaterial and lack any competent support.

23.    VEO submits that the facts set forth in paragraph 23 are immaterial and lack any competent support.

24.    VEO admits that a draft was sent to Mark White on January 7, 2003, and that Mark White described the subjects negotiated as described in paragraph 24.  VEO submits that these facts are immaterial.

25.    VEO submits that the facts set forth in paragraph 25 are immaterial and lack any competent support.

26.    VEO submits that the facts set forth in paragraph 22 are immaterial and lack any

8

competent support.

27.    VEO submits that the facts set forth in paragraph 27 are immaterial and lack any competent support.

28.    VEO submits that the facts set forth in paragraph 28 are immaterial and lack any competent support.

29.    VEO denies that Viskup signed the Agreement on January 10, 2003, but admits the definition of Products is properly set forth in the Agreement.

30.    VEO denies the statements in paragraph 30. John Viskup testified that he and Mark White "just talked about the boiler products under the M-Series there is specific model numbers, but it wasn't set up, I mean to my understanding, the Attachment 1 or Annex 1 wasn't set up as having any boundaries to it. It was a guideline." (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep. pp. 73-74).

31.    VEO denies the allegation of paragraph 31, and submits that IKE has proffered no competent evidence to support its assertion. Moreover, the allegations set forth in paragraph 31 are immaterial.

32.    Admit.

33.    Admit.

34.    VEO denies that EPTI, as defined by IKE, did not provide any drawings to Viskup pertaining to Keystone boilers prior to the execution of the Agreement. Viskup testified that Aalborg provided drawings of the 15M boilers VEO purchased for the Heinz plant in Muscatine Iowa in 2001. (Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 9-11).

35.    VEO submits that the Agreement speaks for itself, and that Clause 5 of the Agreement is entitled "Secrecy." VEO does not believe this allegation is material to the issues

raised in the parties' pending motions.

36.    VEO denies that Mark White testified on pp. 71-72 of his deposition that it was EPTI's expectation that at the conclusion of the License Agreement, the technical information provided by EPTI to VEO would have to be returned . . . It was not to be given away."

VEO disputes IKE's contention that the Agreement required the return of all of the information that was transferred at the initial stage and throughout the Agreement from EPTI or IKE, as it is inconsistent with the terms of the Agreement.  The Agreement provides in Clause 17 a) that "After any termination of this Agreement by Licensor in accordance with the provisions of Clause 16(c) hereof, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement . . . Licensee shall return all of the design, drawings, and other physical materials comprising the Technical Information within thirty (30) days after such termination."  It is undisputed that the Agreement was not terminated under Clause 16(c), which limits termination to those instances where VEO failed to receive a minimum of five (5) orders during the first two (2) years of the license term.  Accordingly, there is nothing in the Agreement that requires the return of any information, let alone Technical Information.

The parties' post-termination obligations are immaterial to the issues raised in the pending motions.

37.    VEO denies the allegations of paragraph 37.  The License Agreement is the best evidence of the understanding and intent of the parties, and the Agreement does not preclude VEO from utilizing the Technical Information following termination.  The parties' post-termination obligations are immaterial to the issues raised in the pending motions.

38.    VEO admits that Clause 15(b)(2) provides that the goodwill of the Keystone mark

was to benefit the Licensor, and submits that the Agreement is the best evidence of the understanding and intent of the parties. This provision is immaterial to the issues raised in the pending motions.

39.    VEO admits that both Mark White and John Viskup testified that Annex I acted as a guideline for the parties as to the scope of the items covered by the Agreement, and as such, was part of the Agreement. (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 73-74; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., p. 64). VEO denies the remaining allegations of paragraph 39.

40.    Admit.

41.    VEO admits that, when asked if the December 20, 2002 table was the first draft of Annex I, Mark White testified, "I believe so, but I can't be sure." VEO disputes the materiality of this fact, as it is undisputed that Mark White negotiated on behalf of EPTI, and the internal discussions at EPTI during that time bear no relevance to what VEO and EPTI discussed regarding the Agreement or the parties' understanding of the Agreement.

42.    VEO admits that Mark White agreed and understood he was to keep Bob Gdaniec and the engineering department involved while negotiating the terms of the Agreement, so that the engineers would know and understand that their assistance would be needed to support the Agreement. (Ex. 1 to IKE's Statement of Undisputed Facts, M. White Dep., p. 122). VEO further admits that Bob Gdaniec testified he was chief engineer and had a role and responsibility for the care and custody of EPTI's technology. VEO disputes the materiality of these facts as it is undisputed that Mark White negotiated on behalf of EPTI, and the internal discussions at EPTI during that time bear no relevance to what VEO and EPTI discussed regarding the Agreement or the parties' understanding of the Agreement.

43.    VEO admits that Stephen Kang testified he expected Gdaniec to develop an understanding of the scope of the License Agreement, and he relied upon Mark White and the EPTI engineers to look into the technical scope of the agreement.  VEO further admits that he had Mark White and the engineers look into the technical definitions for the license agreement because he himself is not an engineer and, therefore, not equipped to do it.  VEO denies the remaining allegations of Paragraph 43 and disputes the paragraph is material to the issues raised in the pending motions.

44.    VEO admits that Stephen Kang testified essentially as set forth in paragraph 44 of the Plaintiffs' Statement of Facts, but denies these statements are material to the pending motions as it is undisputed that Mark White negotiated on behalf of EPTI, and the internal discussions at EPTI during that time bear no relevance to what VEO and EPTI discussed regarding the Agreement or the parties' understanding of the Agreement.

45.    VEO objects to the facts and quotations taken from incompetent evidence without any effort to authenticate or lay a proper foundation.  VEO also disputes the materiality of these facts as it is undisputed that Mark White negotiated on behalf of EPTI, and the internal discussions at EPTI during that time bear no relevance to what VEO and EPTI discussed regarding the Agreement or the parties' understanding of the Agreement.  Mark White affirmatively testified that the two parties had prior conversations about membrane wall technology, and consequently, felt they had an understanding so there was no need to amend Annex I to reflect the membrane wall technology.  (Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., p. 49).

46.    Admit.

47.    See response to paragraph 45.

48.    See response to paragraph 45.

49.    See response to paragraph 45.  VEO also states that the terms of the Agreement and Annex I speak for themselves and are the best evidence of the parties' intention and understanding.

50    See response to paragraph 45.

51.    See response to paragraph 45.

52.    See response to paragraph 45.  In addition, Mark White did not testify that he made the changes as requested by Dave Briggs.  Accordingly, VEO denies that allegation.

53.    Admit.

54.    VEO admits that it understood Annex I to be a guideline, as Mark White and John Viskup testified.  (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 73-74; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., pp. 64), and as such, John Viskup did not ask any questions about Annex I with EPTI.  VEO admits it had a right to negotiate changes to Annex I.  John Viskup identified the Heinz boiler drawings as drawings VEO received prior to those in Annex I.  (Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 12-14).

55.    Admit.

56.    Admit.

57.    VEO admits it received drawings for tangent tube walls from EPTI, and at the same time, received drawings for membrane walls.  (Ex. 4 to IKE's Statement of Undisputed Facts, T. Miller Dep., p. 52).

58.    VEO admits that Bob Gdaniec testified in part as stated in paragraph 58, but VEO denies that Annex I provides "the specifics of what the products were."  Rather, Annex I was

meant to be a guideline.  (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 73-74; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., p. 64).

59.     VEO states that Annex I speaks for itself as to whether it included a reference to membrane or welded walls.  VEO admits that Annex I does not reference membrane walls, but also fails to reference economizers, lower heating drum coils, fuel skids or burners, despite the fact that Mr. Gdaniec testified that he believes VEO was authorized under the Agreement to sell boilers with those features.  (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., pp. 51-52).  Specifically, Mr. Gdaniec testified, "Annex I was specifically written around the boiler itself, and *the products include but not limited to would be such things as if they added an economizer to it*, which is not the boiler itself but an add-on piece, or a fuel skid or a burner or additional equipment around the boiler is what I would say is what that was intended to— *because we didn't address every technical part and piece that could be included with a boiler itself*.  Like auxiliary equipment, valves, instruments, and devices such as that."  (*Id.,* emphasis added.)

60.     VEO admits that Bob Gdaniec testified that the Agreement did not authorize VEO to design, manufacture and sell O-style boilers with membrane technology.  Mr. Gdaniec also says that Victory should have known that membrane wall technology was not included in the products being licensed because it was not identified specifically in Annex 1, although he agreed that Annex 1 is not a complete list of the products.  (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec, pp. 58-59).  He also admitted that Erie Power never refused to support Victory Energy in the engineering of a boiler that included membrane wall technology.  (*Id.* at p. 125).

61.     Admit.

62.     VEO admits the facts as set forth in paragraph 62, and affirmatively states that

both John Viskup and Mark White testified that Annex I was meant to be a guideline. (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 73-74; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., p. 64).

63.    VEO admits that there are many tangent tube boilers in operation in the United States, and affirmatively states that the tangent tube boilers are allowed to operate because municipalities and governing bodies will grant boiler operators an exception from complying with emissions requirements for older equipment. (Ex. 5 to VEO's Supplemental Appendix, J. McConaughy Dep., p. 191). However, it would be very difficult, if not impossible, for a boiler operator to obtain a permit to operate a new boiler with a tangent tube construction, because a burner manufacturer would not be willing to issue a combustion guarantee for a tangent tube boiler. (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 213-214).

64.    VEO admits that its sales brochure identified tangent tube construction as a type of Keystone boiler. However, VEO denies the remaining allegations of paragraph 64 and affirmatively states that it never submitted a proposal to a potential customer for a tangent tube Keystone Boiler. (Ex. 10 to VEO's Supplemental Appendix, M. White Supp. Affidavit, ¶ 2).

65.    See VEO's response to paragraph 59.

66.    Admit, but VEO denies this paragraph is material to the issues raised in the pending motions.

67.    VEO admits that the License Agreement contains the words set forth as Clause 21, but affirmatively states that the Agreement must be read as a whole.

68.    VEO admits that the License Agreement was amended on February 27, 2003, pursuant to an addendum agreed to by the parties, and that the words set forth in the Addendum are the best evidence, but affirmatively states that the Agreement must be read as a whole. That

Mark White drafted the Addendum is immaterial to the issues of the pending motions.

69.    VEO admits that the parties entered into an addendum on July 3, 2003 and affirmatively states that the terms of the addendum are the best evidence.  VEO affirmatively states that the Agreement must be read as a whole.  The July 3, 2003 addendum is immaterial to the issues of the pending motions.

70.    Admit.

71.    VEO denies that EPTI "expressly" gave consent to VEO to sell boilers outside the scope of Annex I that included membrane/welded walls, because VEO was authorized under the terms of the Agreement to sell boilers with membrane walls for the reasons cited above.

72.    VEO admits that EPTI provided drawings for welded/membrane wall design at the inception of the Agreement, but denies that either Shawn Brewer or Mark White testified that VEO requested the drawings.  (Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., pp. 199-201; Ex. 1 to IKE's Statement of Undisputed Facts, S. Brewer Dep., 176-181).

73.    VEO denies that, as an absolute principle, membrane walls are not necessary to comply with applicable code.  In the U.S., a water tube package boiler operator is required to obtain a permit to operate a new boiler.  The primary means of obtaining a permit is to obtain a guarantee of emissions from the burner manufacturer that the boiler will combust all of the fuels.  Shawn Brewer, an employee of Peabody, a burner manufacturer, testified that he knew of no burner manufacturer that would guarantee a tangent tube water tube package boiler.  (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., p. 214).

74.    VEO admits that in certain of its Unit Sale Notifications, VEO made reference to the fact that the boiler being sold was 100% membrane wall.  VEO objects to the documents cited in support of paragraph as the are incompetent and IKE has made no effort to lay a

16

foundation or to authenticate the documents.

75.    VEO denies that EPTI did not permit VEO to sell boilers with welded/membrane

walls after March 26, 2004.  VEO provided IKE with Unit Sale Notifications on April 23, 2004

for three boilers with 100% membrane walls, without objection.  (Ex. 7 to VEO's Supplemental

Appendix, T. Fuhrman Dep., pp. 96-98).  Moreover, Steve Bernatowicz testified that he assisted

VEO in the design of a membrane wall boiler in August 2004.  (Ex. 6 to VEO's Supplemental

Appendix, S. Bernatowicz Dep., pp. 36-37).  In addition, Bob Gdaniec testified that, given the

financial difficulties EPTI was having, they "let it go."  (Ex. 2 to IKE's Statement of Undisputed

Facts, R. Gdaniec Dep., pp. 43-44 ).

76.    Admit.

77.    Admit.

78.    Admit.

79.    VEO admits that each of the eleven boilers it sold while IKE was licensor

included membrane furnace and outer walls and welded front and rear walls.  VEO denies Annex

I provides the Description of Products that governs the Agreement.  That interpretation ignores

the plain language of Clause 1a) and the testimony of Mark White and John Viskup, who

testified that the Annex was a guide for the parties to use, and not an absolute description of the

items VEO was licensed to build and sell.  (Ex. 6 to IKE's Statement of Undisputed Facts, J.

Viskup Dep., at pp. 73-74; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., at

p. 64).

80.    VEO admits that it did not request permission to use the Keystone mark after IKE

became the licensor.  However, VEO did receive authorization under the terms of the Agreement

to use the Keystone mark in its proposals relating to efforts to sell the Products pursuant to

Clause 15a), which states, "[f]or the duration of this Agreement, Licensee also shall be permitted to use the Mark in marketing, advertising, and sales activities related to the Product manufactured by Licensee" (Ex. F to VEO's Motion for Partial Summary Judgment, License Agreement, Clause 15a), p. 14). VEO denies that it was required under the terms of the Agreement to seek or obtain permission from IKE to use the Keystone mark for the sales proposals related to the boilers it while IKE was licensor.

81.    VEO denies that it failed to disclose to IKE that it was selling boilers with 100% membrane walls. IKE became the licensor on September 8, 2004, but failed to provide VEO with a copy of the purchase and sale agreement between IKE and CMI/EPTI until April 2005, when IKE finally produced a copy in response to VEO's discovery requests. Following confirmation, VEO provided IKE with extensive information regarding the boilers it has sold since September 8, 2004, including detailed design drawings, sales proposals, and correspondence with the customer for every project VEO sold under the Agreement. (Ex. 10, White Supp. Aff., ¶ 4). In addition, VEO described in its Responses to IKE's interrogatories its sales of boilers, including a detailed description of the design of the boilers. (VEO's Supplemental Answers to Plaintiff's First Set of Discovery Requests, pp. 3-10).

82.    VEO admits that Mark White testified he was advised he was being laid off on 7/14/03, and that, because EPTI was in "dire financial straits," he had suspicions his job was at risk from 2002 until he was laid off. VEO disputes that these facts are material to the issues raised by the parties in their pending motions.

83.    VEO admits that Bob Gdaniec testified that during the time Mark White worked at EPTI, he did not dispute that welded/membrane walls were outside the scope of the License Agreement. However, VEO objects to this fact as inherently misleading and ambiguous, as it

18

implies Mr. White had a duty or obligation to advise Mr. Gdaniec of the terms of the Agreement.
VEO affirmatively states that Mark White had no reason to inform Bob Gdaniec that
membrane/welded walls were outside the scope of the License, as Mark White was the License
Administrator at EPTI, and was not directed by anyone at EPTI during that time that EPTI
should not support or assist VEO in designing, building and selling boilers with membrane walls.
(Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 182-183). Finally, VEO disputes
that the allegations asserted in paragraph 83 are material to the issues raised in the parties'
pending motions as internal discussions at EPTI are not evidence of the parties' understanding of
the Agreement.

84.    Admit.

85.    Admit.

86.    VEO admits that VEO received a letter from Mr. Gdaniec dated March 26, 2004,
and that it contained, in part, the excerpt set forth in paragraph 86. VEO disputes however, the
characterization of the letter as the EPTI "Breach" Letter. No where in the letter does the word
breach appear. Moreover, Stephen Kang testified that neither he nor Bob Gdaniec ever
concluded that VEO had breached the License Agreement. (Ex. 12 to VEO's Supplemental
Appendix, S. Kang Dep., p. 60).

87.    VEO admits that S. Kang testified he discussed the March 26, 2004 letter from
Bob Gdaniec to Mark White with EPTI's engineers, and that the letter represented a consensus
view internally at EPTI among the engineers.

VEO disputes that EPTI was advising VEO that it had to comply with the definition of
the product set forth in Annex I. Bob Gdaniec testified that EPTI did not pursue any effort to
preclude VEO from selling membrane wall boilers after March 26, 2004. (Ex. 3 to VEO's

19

Supplemental Appendix, Gdaniec Dep., pp. 125-126).  Moreover, the letter was sent in conjunction with a longer letter setting forth EPTI's offer to sell rights to manufacture and sell a portion of the Keystone boiler line, which strongly suggests EPTI was attempting to gain leverage against VEO to exact a higher price.  (Ex. 11 to VEO's Supplemental Appendix, M. White Supp. Aff., ¶ 3).

VEO admits that Kang testified that he was aware of no breaches of the License Agreement, and that he signed the purchase and sale agreement attesting to the fact that he knew of no infringement of EPTI's technology and no breaches of the License Agreement on August 3, 2004, five months after the March 26, 2004 letter was sent.  (Ex. 12 to VEO's Supplemental Appendix, S. Kang Dep., pp. 72-73).  VEO disputes the materiality of the statement that Mr. Kang did not review the correspondence between EPTI and VEO just before signing the document attesting to no known infringements or breach of the License Agreement.

88.     Admit, but deny the facts of paragraph 88 are material to the issues raised in the parties' pending motions.

89.     VEO denies that Jay McConaughy testified that Mark White mentioned to him anything about "non-standard units being built."  (Ex. 5 to IKE's Statement of Undisputed Facts, J. McConaughy Dep., p. 143).  Moreover, VEO denies this allegation has any materiality to the issues raised in the parties' pending motions.

90.     VEO admits that on March 30, 2004, Mark White sent a letter to Bob Gdaniec, and that the letter includes the excerpt set forth in paragraph 90, without the "emphasis added." VEO further submits that the Agreement is the best evidence of the parties' intent and understanding, and asserts that, therefore, the language quoted in paragraph 90 is immaterial. Moreover, Mark White explained at his deposition that VEO does not believe membrane furnace

and outer walls, water-cooled front and rear walls are outside the scope of the license, and therefore, recanted his statement that they constitute improvements. (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 210-212). However, if boilers with membrane walls were outside the scope of the definition of Products, VEO submits that VEO was permitted to add membrane walls as an improvement to the boilers under Clause 13 of the Agreement.

91.    VEO admits Mark White made the statement, but asserts the same denials and objections as those set forth in paragraph 90 above.

92.    VEO admits Mark White testified as stated, in part. However, he also testified that he had erred in indicating that membrane/welded walls were an improvement under the Agreement, as the Agreement granted VEO the right to build boilers with membrane walls, so they would not be considered an improvement. (See also, response to paragraph 90.)

93.    VEO admits that paragraph 93 sets forth an incomplete recitation of the definition of Improvements from the Agreement. VEO admits that EPTI had the membrane wall technology prior to the inception of the Agreement. However, VEO disputes the contention that "membrane wall technology was not acquired "during the term of" the Agreement. EPTI provided VEO with drawings of membrane furnace and outer walls, water-cooled rear walls and water-cooled burner throats just after the inception of the Agreement. (Ex. 1 to IKE's Statement of Undisputed Facts, S. Brewer Dep., pp. 176-81). Therefore, VEO did "acquire" the technology during the term of the Agreement. Accordingly, even if the term Products did not include membrane wall boilers, which VEO denies, VEO was free to incorporate the "improvement" of membrane walls which it acquired during the term of the Agreement from EPTI.

94.    VEO admits that it has taken the position it did not make any improvements to the boilers during the term of the Agreement, but disputes that membrane walls are not

"improvements." Bob Gdaniec specifically testified that they were "enhancements or improvements." (Ex. 2 to IKE's Statement of Undisputed Facts, R. Gdaniec Dep., pp. 56-57 ). As noted in paragraph 93, VEO asserts the Agreement defines Products broadly and the term Products includes Keystone M Series boilers with membrane walls. However, if the Court determines membrane wall boilers were outside the definition of Products, VEO was authorized to utilize them as improvements.

95.    VEO denies that any EPTI witness testified that they had even considered a lawsuit against VEO. Stephen Kang testified that he never even concluded that VEO had breached the Agreement. (Ex. 3 to IKE's Statement of Undisputed Facts, S. Kang Dep., p. 106).

96.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. VEO further submits that the allegations set forth in paragraph 96 are not material to the issues raised in the parties' pending motions.

97.    IKE has failed to provide any evidentiary support for paragraph 97, rendering it invalid. VEO further submits that the allegations set forth in paragraph 97 are not material to the issues raised in the parties' pending motions.

98.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. VEO further submits that the allegations set forth in paragraph 98 are not material to the issues raised in the parties' pending motions.

99.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. VEO further submits that the allegations set forth in paragraph 96 are not material to the issues raised in the parties' pending

motions. VEO denies that a "special" Keystone boiler was outside the scope of the License Agreement and submits that the Agreement is the best evidence of its terms and conditions. Annex I's "Description of Products" lists Erie Power Technologies, Inc. 'M' Series Keystone® water tube boilers to include the 8M, 9M, 10M, 11M, 12M, 13M, 14M, 15M, 16M, 17M, 18M, 19M, 20M, 21M and 22M. Neither the Annex nor the body of the Agreement states that "Special" Keystone boilers are excepted from the Products VEO was authorized to sell. (*See* Ex. F to VEO's Motion for Partial Summary Judgment, License Agreement).

100.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. Notwithstanding the foregoing objection, VEO admits that Mark White rejected VEO's request to add D-type boilers to the products VEO could build and sell under the License.

101.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. VEO further submits that the allegations set forth in paragraph 101 are not material to the issues raised in the parties' pending motions, particularly given that the alleged communication was between employees of EPTI, and there is no evidence that the communications were forwarded to VEO.

102.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. VEO further submits that the allegations set forth in paragraph 102 are not material to the issues raised in the parties' pending motions, particularly given that the alleged communication was between employees of EPTI, and there is no evidence that the communications were forwarded to VEO.

103.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents. VEO further submits that the

allegations set forth in paragraph 103 are not material to the issues raised in the parties' pending

motions, as Dave Briggs was not the authorized representative for EPTI, and Briggs does not

contend that a boiler with "an all welded wall design" was outside the scope of the Agreement or

that VEO was precluded from selling such a boiler.

104.     IKE has failed to provide any evidentiary support for paragraph 104, rendering it

invalid.  VEO further submits that the allegations set forth in paragraph 104 are not material to

the issues raised in the parties' pending motions.

105.     VEO admits that Trent Miller never read or received the License Agreement.

VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a

foundation or authenticate the documents.  VEO further submits that the allegations set forth in

paragraph 103 are not material to the issues raised in the parties' pending motions.

106.     VEO admits that Trent Miller testified consistent with the statements set forth in

paragraph 106, but denies that the statements are material to the issues raised in the parties'

pending motions.

107.     IKE has failed to provide any evidentiary support for paragraph 106, rendering it

invalid.  VEO further submits that the allegations set forth in paragraph 106 are not material to

the issues raised in the parties' pending motions.

108.     VEO admits that Shawn Brewer had conversations with EPTI relating to boilers

that were above the stated steam capacity of 150,000 pph.  (Ex. 1 to IKE's Statement of

Undisputed Facts, S. Brewer Dep., p. 46).  VEO specifically denies that Brewer had

conversations with EPTI engineers regarding boilers that were "outside the scope of the

Agreement" other than those above 150,000 pph.  VEO admits that Brewer testified Gdaniec was

involved in at least one project because it was outside the scope of the Agreement, but he

clarified that "Bob actually would normally be involved if it was a more complicated system or if it was one that was outside. So usually he was involved because we were going forward with a project that they wanted to pursue with us." (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., p. 48). VEO disputes that the allegations set forth in paragraph 108 are material to the issues raised in the parties' pending motions.

109. VEO admits that in January 2004, VEO contacted Stephen Kang about purchasing the rights to build and sell Keystone boilers below 165,000 pph of steam capacity, and that "VEO thought it would be a good opportunity to own the technology." However, VEO denies that if VEO did not purchase the technology, VEO would not be able to use the technology. When asked whether he thought it was necessary to purchase the Keystone technology if Victory wanted to use it after the license agreement expired, Viskup said "I mean, not necessarily." (Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., p. 134).

VEO further affirmatively states that the Agreement is the best evidence of the terms and conditions of the Agreement. VEO denies that VEO would be precluded under the Agreement from using the Keystone technology after the expiration of the Agreement. The Agreement provides in Clause 17 a) that "After any termination of this Agreement by Licensor in accordance with the provisions of Clause 16(c) hereof, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement." (Ex. F to VEO's Motion for Partial Summary Judgment, License Agreement, p. 15). It is undisputed that the Agreement was not terminated under Clause 16(c), which limits termination to those instances where VEO failed to receive a minimum of five (5) orders during the first two (2) years of the license term. Accordingly, there is nothing in the Agreement that states VEO would be precluded from using the Keystone technology following

the expiration of the Agreement.  The parties' post-termination obligations are immaterial to the issues raised in the pending motions.

110.    Admit.

111.    VEO admits that it wanted to purchase the Keystone technology for the O-type and D-type boilers up to approximately 150,000 pph, and the rights to the Keystone name.  VEO denies that the statements asserted in paragraph 111 are material to the issues raised in the parties' pending motions.

112.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents.  VEO further submits that the allegations set forth in paragraph 112 are not material to the issues raised in the parties' pending motions.  Moreover, VEO disputes that it drafted the document.  For those reasons, VEO denies the allegations of paragraph 112.

113.    VEO objects to IKE's citation to incompetent evidence without making any attempt to lay a foundation or authenticate the documents.  VEO further submits that the allegations set forth in paragraph 113 are not material to the issues raised in the parties' pending motions.  For those reasons, VEO denies the allegations of paragraph 113.

114.    VEO admits that Bob Gdaniec and Stephen Kang testified as set forth in paragraph 114, and that VEO and IKE could not come to an agreement on the sale of the rights to build and sell the O-Style and D-Style Keystone boiler line, or a perpetual license to use the Keystone trademark to sell such boilers.  VEO disputes the materiality of the facts set forth in paragraph 114.

115.    VEO admits the statements in paragraph 115, but denies they are material to the issues raised in the parties' pending motions.

116.    VEO admits that VEO was willing to pay $500,000 for the O and D type boiler

lines up to 165,000 pph, and a perpetual license to use the Keystone Mark to sell those boilers.

VEO further admits that Stephen Kang testified EPTI believed $500,000 was too low of a price

for the perpetual right to use the Keystone name.  VEO denies that any EPTI representative ever

stated or testified that $500,000 would be too low of a price to pay for the O type technology.

(Ex. 3 to IKE's Statement of Undisputed Facts, S. Kang Dep., p. 115)  VEO denies the

remaining allegations of paragraph 116, and states that the allegations are immaterial to the

issues raised by the parties' pending motions.

117.    VEO objects to IKE's citation to incompetent evidence without making any

attempt to lay a foundation or authenticate the documents.  VEO further submits that the

allegations set forth in paragraph 117 are not material to the issues raised in the parties' pending

motions.  For those reasons, VEO denies the allegations of paragraph 117.

118.    VEO admits that Jay McConaughy testified that he received the email from Bob

Gdaniec and showed it to Mark White, and that Mark White said that there should not be an

issue with it.  Jay McConaughy also testified that he does not believe that there is such a thing as

a Standard M-Series boiler.  (Ex. 5 to VEO's Supplemental Appendix, J. McConaughy Dep., p.

118).  VEO denies the remaining allegations of paragraph 118.

119.    VEO objects to IKE's citation to incompetent evidence without making any

attempt to lay a foundation or authenticate the documents.  VEO further submits that the

allegations set forth in paragraph 119 are not material to the issues raised in the parties' pending

motions.  For those reasons, VEO denies the allegations of paragraph 119.

120.    VEO admits that negotiations regarding VEO's potential purchase of the

Keystone O-style and D-style boilers broke off, and that VEO decided not to go forward due to

27

issues surrounding EPTI's bankruptcy. (Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., p. 136). VEO denies that "Standard M-Series" is a defined or understood term. (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., p. 210; J. McConaughy Dep., p. 118; (Ex. 2 to IKE's Statement of Undisputed Facts, R. Gdaniec Dep., p. 61). VEO denies the remaining allegations of paragraph 120.

121.    VEO does not dispute the accuracy of the fact stated in paragraph 21, but submits that it is not material to the issues presented in the parties' pending motions.

122.    VEO objects to IKE's characterization of the letter Bob Gdaniec sent to VEO on March 26, 2004 as the "EPTI Breach Letter" for the reasons stated in paragraph 86. VEO denies that it violated or otherwise failed to perform its obligations under the Agreement for the reasons cited above. VEO objects to IKE's reference to incompetent evidence in the form of a document without any effort to lay a foundation or authenticate the document.

123.    VEO admits that its outside counsel received the letter.

124.    VEO objects to IKE's reference to incompetent evidence in the form of a document without any effort to lay a foundation or authenticate the document.

125.    VEO admits it received the September 10, 2004 letter, and that Mark White responded to Mr. Petcos' letter the same day via email, requesting that IKE provide a written copy of the agreement IKE relied upon in asserting it was the new licensor under the Agreement. (Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., pp. 233-4; IKE 1101).

126.    VEO admits that it received the September 24, 2004 email from Chris Petcos, and submits further that Mark White responded by email the same day, reiterating VEO's request for a copy of the purchase and sale agreement between IKE and CMI/EPTI, in order to confirm IKE's assertion that it was the licensor under the Agreement. VEO did not receive a copy of the

purchase and sale agreement between IKE and CMI/EPTI until April 2005, six months after IKE

filed the instant lawsuit.  VEO denies that the September 24, 2004 email from Chris Petcos

accurately described the scope of the term "Products" under the Agreement for the reasons cited

above.

127.    VEO admits it received an October 29, 2004 letter, and that, as of October 29,

2004, it had still not received verification of IKE's claim that it was licensor under the

Agreement.

128.    VEO admits it continued to sell boilers with membrane walls, as permitted under

the terms of the Agreement.

129.    VEO admits that Clause 15a) provides, in part, as stated in paragraph 129, and

that EPTI provided VEO with Keystone nameplates.  VEO asserts, however that because IKE

has no claim for breach of contract, allegations that VEO failed to comply with Clause 15a) are

not material.

130.    VEO denies that it "never" placed the Keystone nameplates on the Keystone

boilers it sold, and submits that IKE has failed to provide any support for the allegation.  VEO

admits that Jay McConaughy testified VEO painted Victory on the sides of some of the boilers

he saw.  VEO submits that these facts are immaterial to the issues raised in the parties' pending

motions, given that IKE has no claim for breach of contract.

131.    VEO admits that paragraph 131 sets forth a portion of the language from Annex II

of the Agreement.

132.    VEO admits that paragraph 132 sets forth a portion of the language from Clause

15 of the Agreement.

133.    Admit.

134.    Admit.

135.    VEO admits it did not seek renewed or additional permission from IKE to continue using the Keystone Mark in sales and promotional materials because those materials had previously been expressly approved by EPTI when it was Licensor.  (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp.  210-211).

136.    VEO denies this fact.  Mark White specifically testified that while with EPTI in January 2003, he had the Keystone Sales Manual prepared specifically for VEO.  (Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., p. 211).

137.    VEO objects to the characterization of the March 26, 2004 letter as the "EPTI Breach Letter."  VEO objects to IKE's reference to incompetent evidence without citing to appropriate testimony to lay a foundation and authenticate the document.  Answering further, VEO rejects the notion that EPTI was permitted to add new or different requirements on VEO's use of the Keystone mark 15 months into the Agreement, after it had previously provided VEO with authorization to use the Mark.  The Agreement is the best evidence of the parties' rights and obligations under the Agreement.

138.    VEO admits the facts alleged in paragraph 138, but disputes that they are material to the issues raised in the parties' pending motions, or to the litigation as a whole.  IKE has not asserted a claim for breach of contract.

139.    VEO admits that EPTI provided VEO with copies of existing marketing materials, authorized VEO to use the marketing materials, including the Zurn brochure, and ultimately, approved the form and substance of VEO's sales manual and brochure.  (Ex. 1 to IKE's Statement of Undisputed Facts, S. Brewer Dep., pp. 161, 217).  VEO disputes that Shawn Brewer testified VEO simply copied the Zurn brochure.  Brewer stated that VEO changed a lot

of verbiage and the layout in the beginning of the brochure. (Ex. 1 to IKE's Statement of Undisputed Facts, S. Brewer Dep., pp. 99). VEO disputes that this issue is material to the parties' pending motions, as IKE has not asserted a claim for breach of contract.

140.    VEO denies the allegations asserted in paragraph 140 and objects to the IKE's reference to documents without any attempt to lay a proper foundation or authenticate the document.

141.    VEO objects to IKE's reference to this document without any attempt to lay a proper foundation or authenticate the document. VEO admits that the Zurn brochure has a copyright of 1978, and provides that welded walls are available on Keystone boilers

142.    VEO objects to IKE's reference to this document without any attempt to lay a proper foundation or authenticate the document. VEO also disputes the inference that VEO prepared and distributed sales and marketing materials without the knowledge and consent of the licensor. Mark White assisted VEO in preparing the sales and marketing material, and reviewed and approved the material before it was finalized. (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 242-43).

143.    See VEO's response to paragraph 142.

144.    VEO denies it did not provide EPTI with a draft of the sales brochure before it was finalized, and denies that EPTI did not provide VEO with written authorization to use information from existing Zurn brochures. (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 103-104; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., p. 95).

145.    VEO admits that Shawn Brewer testified that he relied upon John Viskup and Mark White (then with EPTI) in determining if VEO's use of EPTI's brochures complied with the terms of the Agreement. (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 103-

104 *)*.

146.    Admit.

147.    VEO admits that it did not sign an addendum to permit unqualified use of EPTI or its predecessors' sales literature, but denies the implication that such an addendum was presented to VEO or that such an addendum was needed.  VEO further denies that it made "unqualified use" of EPTI's or its predecessors' sales literature.  (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 103-104; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., p. 95). VEO disputes IKE's assertion that VEO thought it could use the marketing materials received from EPTI in VEO's materials with no further approval from EPTI.  (*Id.*)  VEO affirmatively states that Victory was provided the material in question from Erie and they were told they could use it.  VEO would use the information, and then send it to EPTI for review and approval.  (*Id.*)

148.    VEO objects to the characterization IKE makes in paragraph 148, and objects to IKE's failure to provide any evidentiary support for the allegation.  VEO disputes the materiality of the allegation, given the undisputed fact that the sales materials were reviewed and approved by the Licensor prior to use.

149.    VEO disputes that Bob Gdaniec testified that Mark White did not advise EPTI that he had approved the marketing materials while employed with EPTI.  The testimony cited in support of this contention deals with a period after Mr. White left EPTI.  (Ex. 2 to IKE's Statement of Undisputed Facts, R. Gdaniec Dep., pp. 187-188).  VEO also asserts that this allegation is not material to the issues raised in the parties' pending motions.

150.    VEO admits that the Keystone trademark was used in sales proposals, and that VEO was authorized to "use the Mark in marketing, advertising, and sales activities related to the Products manufactured by Licensee."  (Ex. F to VEO's Motion for Partial Summary

Judgment, License Agreement, Clause 15a)).

151.    VEO admits that from time to time it identified itself as the licensee under the Agreement on its sales proposals, but denies that it stopped doing so after May 28, 2003, and denies the inference that VEO was required to identify itself as the licensee for the Products under the Agreement.

152.    VEO admits that throughout the license period, VEO submitted proposals to prospective customers for boilers that included membrane walls.  VEO denies the remaining allegations asserted in paragraph 152 and objects to the reference to documents without any effort to lay a proper foundation or demonstrate authentication.

153.    Regarding the upper steam capacity, VEO submits that the Agreement is the best evidence of the parties' rights and obligations, and VEO admits that the Agreement provides VEO was authorized to design, manufacture, market and sell boilers up to 150,000 pph of steam. VEO objects to IKE's reference to proposals dated before the date IKE became Licensor under the Agreement, as those proposals are not material to the issues presented in the parties' pending motions.  VEO also objects to IKE's reference to all of the documents cited in paragraph 153, as IKE has failed to cite to the testimony to lay the foundation or authenticate the documents.  VEO also disputes the statement that VEO used Keystone® schematics and whited out the Keystone name.  IKE cites to no competent evidence that VEO used the Keystone mark or any Technical Information to prepare proposals for boilers above 150,000 pph.  Moreover, it is undisputed that VEO did not sell any water tube package boilers above 150,000 pph.  (Ex. 1 to VEO's Supplemental Appendix, M. White Dep., p. 160, 164, 169; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., p. 75).

154.    VEO disputes the statements set forth in paragraph 154.  As IKE is well aware,

the "23M" for Indiantown Cogeneration was a typographical error, as evidenced by the statement

on the same page to the boiler being a 136,000 pph steam capacity unit. (VEO 8665-96).

Similarly, the proposal to Protherm indicated on its face it is for a boiler with a steam capacity of

150,000 pph). Moreover, many of the proposals cited in paragraph 154 were made before IKE

became the licensor, and are therefore irrelevant to IKE's claims. VEO objects to IKE's

reference to these documents without any testimony laying foundation or authenticating the

documents.

155.    VEO objects to IKE's reference to documents with no citation to any testimony

that lays the foundation or authenticates these documents. Moreover, the documents are taken

out of context, and are immaterial to the issues set forth in the parties' pending motions, as there

is no prohibition in the Agreement on VEO marketing custom steam generating systems.

156.    VEO objects to IKE's reference to documents with no citation to any testimony

that lays the foundation or authenticates these documents. Moreover, VEO submits that the

allegations listed in paragraph 156 are immaterial to the issues set forth in the parties' pending

motions, as there is nothing in the Agreement that mandates VEO refer to the boilers as

"Keystone" boilers, and VEO was expressly authorized to use the Keystone mark in conjunction

with the sale and marketing of the Products. (Ex. F to VEO's Motion for Partial Summary

Judgment, License Agreement, Clause 15a)).

157.    See VEO's response to paragraph 156, above.

158.    VEO admits that it did not design, market, manufacture or sell any boiler other

than the Keystone O-style water tube boiler during the term of the Agreement.

## ADDITIONAL AFFIRMATIVE MATTER IN RESPONSE TO IKE'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

1.    Mark White never stated to any VEO representative that VEO could not design,

manufacture, market or sell Keystone Boilers with membrane walls. (Ex. 1 to VEO's
Supplemental Appendix, M. White Dep., pp. 58-59; Ex. 2 to VEO's Supplemental Appendix, S.
Brewer Dep., p. 63; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 148-150).

2.      VEO sold three (3) 15M boilers to Broin Industries for the Iowa Ethanol plant.
(Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 182-183).

3.      EPTI refused to assist VEO when VEO requested the opportunity to market D-
Style Keystone boilers (Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 172-173).

4.      The parties entered into a separate agreement, as contemplated in Clause 1a),
when VEO sought projects involving boilers above 150,000 pph for the University of Notre
Dame and the University of Massachusetts.  (Ex. 1 to VEO's Supplemental Appendix, M. White
Dep., p. 199).

5.      Viskup and Gdaniec both testified that VEO was authorized to manufacture and
sell boilers with membrane walls pursuant to the terms of the Agreement.  (Ex. 8 to VEO's
Supplemental Appendix, J. Viskup Dep. at pp 176-178; Ex. 11 to VEO's Supplemental
Appendix, M. White Dep., pp. 11-12).

6.      Mr. Gdaniec believed VEO could lengthen the boiler, and needed to update things
on the boilers, such as floor tile.  (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p.
141).

7.      EPTI's Vice President of Engineering, Bob Gdaniec, confirmed that Annex I
should not be read to limit VEO's authorization to build and sell boilers to customers who would
operate them at 80ºF, 1000' elevation, etc.  Specifically, he testified as follows:

> Q:  So it was not your understanding, was it, that Victory Energy was only
> allowed to sell boilers at 80 degree Fahrenheit ambient air temperature?
> A.  Correct.  We would have expected they sold at the prevailing site conditions
> within the range of certain pound-per-hour capacity to another pound per-hour

capacity in the --

Q.  And you didn't believe that Victory Energy could only sell boilers that would be installed at locations where it was exactly at 1,000 feet above sea level, did you?

A.  No.

Q.  Or that there would be exactly 10 percent excess air for natural gas, correct?

A.  Correct.

Q.  Or 15 percent excess air for No. 2 oil and No. 6 field oils?

A.  Correct.  And that's the reason we gave them -- and in the license that we had an obligation to provide them rating capability so they could adjust the parameters for site specific for customers.

Q.  Where does it say that the design capability provided is only to adjust the design parameters to meet with changes in temperature or changes in elevation?

A.  Nothing specific in the license agreement that I recall.  We did it via the software.

(Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., pp. 54-55).

8.      Steve Bernatowicz testified that he did not believe VEO could sell M-Series Keystone boilers without revising the design to meet customer specifications.  The boilers would be too large, would waste fuel, and would not be economical.  (Ex. 6 to VEO's Supplemental Appendix, S. Bernatowicz Dep., p. 56-57).

9.      Shawn Brewer, a former VEO employee who now works for a burner manufacturer, provided a clear explanation of why tangent tube boilers are no longer purchased in the United States:

> Q:  In your opinion, could Victory Energy have successfully marketed boilers that incorporated solely tangent tube technology?
> A:  Absolutely not.
> Q:  And why not?
> A:  Because tangent tube technology is not an acceptable design for boilers in any . . . sales campaign that I've seen in the engineering spec that's been provided, any customer preference or customer design requested of us, in no fashion were tangent tube boilers acceptable.
> Q:  Do customers in their specifications typically require that they obtain a permit from the burner manufacturer regarding the emissions on a boiler?
> A:  Normally they . . . get the permit from whatever governing body it is.  They have to get a guarantee from the burner manufacturer that they'll meet emissions.
> Q:  And in order to meet emissions, do burner manufacturers have any express requirements with respect to the design of the boiler?

A: Yes.
Q: And with respect to "O" type water tube boilers, do you know of any burner manufacturer that would render a guarantee regarding emissions of a tangent tube "O" style boiler?
A: No, I don't know that.
Q: And why is it that . . . in your opinion, would a burner manufacturer not guarantee the emissions on a boiler that incorporated tangent tube technology.
A: Because there's . . . flexing that takes place inside the boiler which could cause an air gap, which would allow gases to escape prior to being fully combusted. And it's not possible to control your emissions if you're not fully combusting the gases that are injected.
Q: And with a welded wall design, does that take care of the issues with respect to gas bypassing without being fully combusted?
A: It should to the point where the manufacturers are willing to guarantee under those conditions.

(Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 212-214).

10.    Mr. Gdaniec testified that he had no knowledge or evidence of any instance where VEO had modified a Keystone Boiler without EPTI's knowledge or consent. (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 139).

11.    Robert Gdaniec's March 26, 2004 letter accompanied EPTI's counter-offer regarding the proposed sale to VEO of some or all of the assets licensed to VEO under the Agreement. (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 129).

12.    When asked why he never responded to Mark White's March 30, 2004 letter that stated VE was authorized to build and sell Keystone boilers with membrane walls, Bob Gdaniec stated, "most of these issues, we just said we'd just let them go by the wayside, and probably didn't follow up after that." (Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 145).

13.    The engineers who drafted those emails asserting that the Agreement only extended to Keystone M-Series boilers were clearly opposed to EPTI licensing the Keystone boiler to VEO. (Ex.7 to VEO's Supplemental Appendix, T. Fuhrman Dep., p. 33-35).

14.    EPTI's management decided enter into the license agreement despite the

opposition to the Agreement expressed by EPTI's engineers.  (Ex.12 to VEO's Supplemental

Appendix, S. Kang Dep., pp. 28-29).

16.    Lower level engineers such as Dave Briggs and Ted Furman did not speak for

EPTI, as evidenced by the fact that despite their displeasure, EPTI continued to support VEO in

its efforts to design, manufacture and build Keystone boilers with membrane walls, etc.  (Ex. 12

to VEO's Supplemental Appendix, S. Kang Dep., pp. 28-29).

16.    The designs for the Keystone boiler are available in the public domain.  (Ex. 11 to

VEO's Supplemental Appendix, M. White 30(b)(6) Dep., pp. 204-205).

Respectfully submitted,

                              /s/Christopher T. Sheean
                              One of the Attorneys for Defendant,
                              VICTORY ENERGY OPERATIONS, LLC


                              LOCAL COUNSEL:
Christopher T. Sheean          G. Jay Habas, Esquire
WILDMAN HARROLD ALLEN & DIXON LLP          Marshall, Dennehey, Warner
225 W. Wacker Drive, 28th Floor          Coleman & Goggin
Chicago, IL 60606              1001 State Street, Suite 1400
(312) 201-2000                Erie, PA 16506
                              (814) 461-7800
                              PA ID No. 55581