# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INDECK KEYSTONE ENERGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-325 Erie |
| | ) | |
| VICTORY ENERGY OPERATIONS LLC, | ) | Judge Sean J. McLaughlin |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

## VEO'S RESPONSE BRIEF IN OPPOSITION TO IKE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY BRIEF IN SUPPORT OF VEO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### Introduction

The briefs filed by the parties to date on their cross-motions for summary judgment on Indeck Keystone Energy LLC's ("IKE") Complaint and Count I of Victory Energy Operations LLC's ("VEO") Second Amended Counterclaim show that the central issue can be summed up concisely: Whether the License Agreement dated January 7, 2003 between VEO and EPTI (the "Agreement") granted VEO the right to build, market and sell Keystone boilers with membrane walls, or not.

As VEO demonstrated in its Memorandum of Law in Support of Its Motion for Partial Summary Judgment, the Agreement clearly and unambiguously granted to VEO a license to design, manufacture, market and sell industrial, natural circulation water tube steam generators with a steam capacity of between 29,000 up to and including 150,000 pounds per hour of steam. The boilers VEO was authorized to design, build and sell included, but were not limited to the M Series Keystone boilers generally described in Annex I. VEO has asked this Court to find that the Agreement is

unambiguous, and as such, granted to VEO the authorization to sell Keystone boilers

from 29,000 to 150,000 pph, including boilers with membrane walls. The definition of

Products in the Agreement is sufficiently broad to allow VEO to sell membrane wall

boilers. Moreover, even if this Court were to agree with IKE's impossibly narrow

interpretation of the Agreement, VEO was authorized to make modifications and

improvements to the boilers. Although VEO takes the position that membrane walls

were not an improvement because they were part of the technology transferred to VEO

under the Agreement, clearly membrane walls constitute an enhancement or

improvement over the antiquated tangent tube design that IKE claims was the only design

permitted under the Agreement. Therefore, VEO is entitled to partial summary judgment

on Count I of its Second Amended Counterclaim.[1]

In addition to being contrary to the plain language of the Agreement,

IKE's interpretation is the classic "bait and switch" scenario. VEO justifiably believed

and understood that it was entering into an agreement to allow it to design, build and sell

Keystone boilers so that it could compete effectively in the marketplace. It is undisputed

that boilers with membrane walls are the standard in the industry. VEO marketed, built

and sold boilers with membrane walls for the first 18 months of the license with the

knowledge and consent of the Licensor. IKE came in 18 months after the inception of

the agreement and tried to rewrite the agreement to lock VEO out of the marketplace. If

VEO were not permitted under the Agreement to sell boilers with membrane walls, VEO

would be unable to sell them at all, given the Agreement's provision precluding VEO

---

[1]  IKE alleges in footnote 1 of its Brief in Opposition to VEO's Motion for Partial Summary Judgment, that even if this Court finds VEO was authorized under the Agreement to build and sell boilers with membrane walls, IKE's claims for trademark infringement and misappropriation would still exist. VEO disputes this contention for the reasons set forth in Section IIIA on pp. 21-22.

from offering for sale any competing products. Accordingly, if this Court were to accept IKE's version of the facts, it would be grossly unfair and would work an extreme hardship on VEO.

The Court should grant VEO's Motion for Partial Summary Judgment on IKE's complaint for the same reasons VEO is entitled to summary judgment on Count I of its Counterclaim. In addition, even if the Agreement did not grant VEO the right to build and sell Keystone boilers with membrane walls and similar attributes, the Court should deny IKE's motion for summary judgment. IKE's trademark infringement claim fails because EPTI acquiesced in VEO's building and selling such boilers, and relied upon that acquiescence to its detriment. IKE's attempt to save its infringement and unfair competition claims by asserting that VEO is liable for reverse passing off fails, as VEO did not re-label IKE's products as its own. IKE cannot prevail on its trade secrets misappropriation claim because IKE has failed to even identify what it believes constitutes a trade secret, and testimony obtained in this case shows that issues of fact exist as to whether IKE has any trade secrets at all related to the Keystone boiler. IKE's unjust enrichment claim fails because the parties had a contract that governed the conduct between the parties, and VEO was authorized by the Agreement to use the mark and technology.

## Argument

IKE never actually indicates whether it believes the Agreement is ambiguous, but references both pre- and post-execution correspondence and communications, claiming that they support IKE's narrow interpretation. VEO submits that the Agreement is not ambiguous, and that a plain reading of the Agreement

demonstrates that it granted to VEO the authorization to build and sell Keystone boilers with membrane walls.

**I.    THE LICENSE AGREEMENT CLEARLY AND UNAMBIGUOUSLY GRANTED TO VEO A LICENSE TO BUILD AND SELL KEYSTONE BOILERS UP TO 150,000 PPH WITH MEMBRANE WALLS.**

It is evident from the definition of "Products" that the parties clearly intended for the License Agreement to provide a framework, but not for that framework to be rigid. The definition of "Products" demonstrates that the parties' primary concern was to delineate the steam capacity range for VEO. The Agreement provides that, "Products shall mean natural circulation, industrial water tube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include, but not be limited to the items set forth in Annex I." Beyond that, the parties understood that the term "Products" encompassed items of the same general class or type as those described in Annex I. In other words, Annex I was a guideline. (VEO's Response to IKE's Statement of Facts, ¶ 39; Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 73-74; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., p. 64).

IKE incorrectly argues that Annex I must be the exclusive definition of the term Products. Such an interpretation, however, would ignore the plain language of the Agreement, including the clause, "Products shall include but not be limited to the items set forth in Annex I." In apparent recognition that this provision vitiates its argument, IKE asserts that the phrase, "include but not be limited to" must be ignored by the Court because a similar provision was found in an earlier license EPTI had signed with a third party. EPTI cites no legal basis to support its claim that the language should be ignored. Moreover, Pennsylvania courts recognize that each provision of a contract must be

4

enforced, absent ambiguity. *TIG Specialty Insurance Co. v. Koken*, 855 A. 2d 900, 909 (Pa. Cmwlth. 2004).

IKE argues that VEO's interpretation of the License Agreement is inconsistent with the fact that the parties executed the February 27, 2003 Addendum to extend VEO's license to boilers with higher design pressures and allowable steam output. The February 27, 2003 Addendum, however, actually supports VEO's interpretation of the Agreement, and not IKE's. The addendum demonstrates that the parties understood and agreed that higher design pressure and steam output temperatures were above and beyond the scope of what the parties intended in the Agreement, necessitating an amendment. By contrast, although EPTI assisted VEO in designing Keystone boilers with membrane walls from January 2003 until at least March 26, 2004, no such amendment to the Agreement was ever signed or even discussed between the parties. It is undisputed that VEO manufactured and built boilers with EPTI's knowledge and assistance from January 2003 until at least March 26, 2004. (IKE's Statement of Facts, ¶ 72). If the parties truly believed the 100% full membrane Keystone boilers were outside the scope of the Agreement, they would have executed another addendum to the Agreement. In the alternative, the parties would have entered into a "separate alternative agreement" as called for in Clause 1a), for inquiries outside the range of Products. As the undisputed facts demonstrate, the parties did not enter into either type of Agreement.

As IKE correctly notes, the terms of a contract must be read as a whole. *Foulke v. Miller*, 112 A.2d 124, 127 (Pa. 1955) (*citing Neal D. Ivey Co. v. Franklin Associates, Inc.*, 87 A.2d 236 (Pa. 1952)). Accordingly, the provisions relating to Modifications and Improvements must be considered when attempting to ascertain the

intent of the parties from the Agreement.  IKE incorrectly argues that Clause 8 in the

Agreement dealing with Modifications is irrelevant because, among other things, VEO

has taken the position that it made no modifications to the Products during the time of the

Agreement.  In point of fact, VEO believes that the definition of Products was

sufficiently broad to encompass membrane walls and similar enhancements.  However, to

the extent this Court finds the definition of Products does not encompass enhancements,

VEO was entitled to make modifications, including the addition of membrane walls.

> Clause 8a) provides in part:
>
> Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products.  Licensee will submit to Licensor such plans for modifications for prior written approval by Licensor except for the alterations as defined in Clause 3 (e).  Upon reasonable request by Licensee, Licensor will give special engineering advice regarding planning, design, manufacturing, installation or operation of Products by Licensee at licensor's applicable service rate in effect at the time service is rendered.

It is undisputed that "EPTI provided VEO with drawings for welded/membrane walls at

VEO's request that VEO utilized in the design of Keystone® boilers."  (IKE's Statement

of Facts, ¶ 72).  It is similarly undisputed that EPTI and VEO never entered into any

separate agreement to allow VEO to manufacture or sell membrane wall Keystone boilers

below 150,000 pph steam capacity.  (IKE's Statement of Facts, ¶ 153).

EPTI's assistance in providing the membrane wall drawings and support

fall clearly within the confines of Clause 3e), providing VEO with whatever authorization

it then needed to modify the Products.  It is also undisputed that VEO made no

modifications to any Keystone boilers that affected the boilers' reliability or performance.

(VEO's Concise Statement of Facts, ¶ 49; Ex. A to VEO's Motion for Partial Summary

Judgment, M. White Aff., ¶ 24; Ex. I to VEO's Motion for Partial Summary Judgment,

R. Gdaniec Dep., p. 133). Having provided VEO with the authorization to modify the boilers to include 100% membrane walls, EPTI clearly approved of the reliability and performance of that enhancement. IKE has failed to demonstrate or even allege that VEO's inclusion of membrane walls negatively impacted the boilers' reliability or performance. As such, IKE has no basis to claim that VEO failed to obtain consent for the alleged modifications it made to the design of the Products. Therefore, even if the term Products did not encompass Keystone boilers with membrane walls, VEO was authorized to make modifications, such as the addition of membrane walls, increasing the length of the boiler, or increasing the diameter of the steam drum.

Similar to Modifications, IKE takes the position that Clause 13 regarding "Improvements" is irrelevant to the current dispute because VEO has stated it made no Improvements to the Keystone boiler during the term of the Agreement. (IKE's Memorandum of Law in Opposition to VEO's Motion for Partial Summary Judgment, p. 13). VEO does not consider membrane walls to be an Improvement because that information was provided to VEO by EPTI pursuant to the license, and the term "improvement" is defined as "all modifications, variations, revisions and enhancements of the Products, or methods or processes for manufacturing the Products, and all Technical Information relating thereto …" However, if, as IKE argues, membrane walls were not part of the technology transferred to VEO under the Agreement, VEO was free to use membrane walls as an improvement under the agreement, as VEO was entitled to utilize any "modifications, variations, revisions and enhancements of the Products . . . which either Licensor or Licensee may develop, acquire, or acquire control of and

commercially exploit during the term of this Agreement . . ." (Ex. F to VEO's Motion for Partial Summary Judgment, License Agreement, Clause 1.h).

The only proscription in the Agreement on VEO's use of an improvement is that VEO is required to disclose and make available to Licensee . . . all Improvements developed while this Agreement is in effect.  Such disclosure shall be made not earlier than six (6) months after such Improvement have (sic) been introduced into commercial production." (Ex. F to VEO's Motion for Partial Summary Judgment, License Agreement, Clause 13.a).  As such, VEO was free to add membrane walls or any other improvement it acquired during the time of the Agreement, so long as said improvement is disclosed to Licensor at some point thereafter.  It is undisputed that VEO has disclosed to EPTI and IKE that it has sold boilers with 100% membrane walls, even if VEO did not designate membrane walls as an improvement.  (IKE's Statement of Facts, ¶ 79).

These provisions make clear that VEO must be granted summary judgment as a matter of law on Count I of its Second Amended Counterclaim for Declaratory Judgment and IKE's claims for trademark infringement, trademark dilution, trade secret misappropriation, unfair competition and unjust enrichment.  The Agreement clearly and unambiguously granted to VEO the right to manufacture, market and sell natural circulation, industrial water tube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph, including but not limited to those boilers identified in Annex I.  VEO also had the right to modify and improve the boilers, so long as the modifications or improvements did not adversely affect the performance or reliability of the boilers.  It is undisputed that VEO was given authorization to manufacture and sell Keystone boilers with membrane walls for the first

15 months of the agreement.  Accordingly, even if the enhancements VEO made to the boilers rendered the boilers outside of the scope of the term "Products" under the Agreement, VEO was authorized to make such enhancements as Modifications and/or Improvements.

II.    **IF THE COURT FINDS THE AGREEMENT AMBIGUOUS AS TO THE MEANING OF THE TERM "PRODUCTS," THE PAROL EVIDENCE CLEARLY DEMONSTRATES VEO WAS LICENSED TO DESIGN, MANUFACTURE, MARKET AND SELL KEYSTONE BOILERS WITH MEMBRANE WALLS.**

If the Court finds the Agreement is ambiguous, parole evidence clearly demonstrates that the parties intended to include membrane walls and other modern enhancements.  Moreover, if the Agreement is ambiguous, the ambiguity must be construed against its drafter, in this case the Licensor.  *Uniontown Hospital v. Chauffeurs, Teamsters & Helpers, Local Union No. 491,* 2006 U.S. App. LEXIS 7572 at *4 (3rd Cir. 2006).  It is undisputed that the Agreement and Annexes were drafted by EPTI's Mark White, with the assistance of EPTI's engineers.  (IKE's Statement of Facts, ¶¶ 24-25, 53)

A.    **The Pre-Execution Negotiations Between EPTI and VEO Reveal That Both Parties Understood And Agreed VEO Would Build And Sell Keystone Boilers With Membrane Walls And Similar Modern Attributes.**

The negotiations between EPTI and VEO reveal that the clear intent of the parties was to allow VEO to build and sell Keystone boilers with membrane walls and other modern attributes needed to sell boilers in a competitive market.  IKE asserts that "VEO agreed and understood that Annex I set forth the definition of 'Products.'"  That statement is utterly false and ignores the testimony of John Viskup and Mark White.  Mark White, Shawn Brewer and John Viskup, the only individuals identified by either

party as having participated in negotiations, testified that it was their understanding that Annex I was merely a guideline, a starting point for the parties to use. (VEO's Response to IKE's Statement of Facts, ¶ 39; Ex. 1 to VEO's Supplemental Appendix, M. White, pp. 104-105, 119-120; Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., p. 40; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp.71-72). In addition, Mark White testified he and Shawn Brewer discussed the fact that the Agreement would include membrane wall boilers during the negotiations, and John Viskup recalled discussing membrane wall boilers with Mark White during the time the parties were discussing the terms of the Agreement. (VEO's Response to IKE's Statement of Facts, ¶ 45; Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 55-56; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 148-150). Mark White also testified that he agreed and understood that the definition of Products included membrane wall technology. (VEO's Response to IKE's Statement of Facts, ¶ 92; Ex. 1 to VEO's Supplemental Appendix, M. White Dep., p. 57).

IKE spends much of its facts and argument citing internal EPTI correspondence between Mark White and various engineers, attempting to show that certain EPTI engineers had the understanding that membrane walls were outside the scope of the License Agreement. IKE's citations to internal correspondence are wholly irrelevant to the parties' mutual understanding of the scope of the Agreement. It is undisputed that Mark White was the authorized EPTI representative who negotiated the Agreement, and was the designated contact person at EPTI regarding the Agreement with VEO until August 2003. (VEO's Response to IKE's Statement of Facts, ¶ 16; Ex. 1 to VEO's Supplemental Appendix, M. White Dep., p. 51; Ex. 12 to VEO's Supplemental

Appendix, S. Kang Dep., p. 79). It is undisputed that Mark White **never** stated to any VEO representative that VEO could not design, manufacture, market or sell Keystone Boilers with membrane walls. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 1; Ex. 1 to VEO's Supplemental Appendix, M. White Dep., pp. 58-59; Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., p. 63; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 148-150). Moreover, the only instance where an authorized representative of EPTI actually expressed in correspondence that EPTI believed membrane walls were outside the scope of the products licensed under the Agreement, Mark White responded on behalf of VEO and explicitly rejected that position.

### B.   The Parties' Course Of Performance Reveals They Understood The Agreement Allowed VEO To Sell Membrane Wall Boilers.

IKE correctly notes that course of conduct can be considered by the Court in interpreting the terms of an Agreement. *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 376 n. 6, 390 A. 2d 736, 741 n. 6 (1978) and *Regscan, Inc. v. Con-Way Transp. Servs.*, 875 A.2d 332, 339 (Pa. Super. 2005). The clearest of course of performance evidence that demonstrates the parties' understanding of the Agreement would logically be that conduct that occurred closest in time to the execution of the Agreement, when the parties' understanding of the Agreement was foremost in the parties' decision making.

### 1.   EPTI Assisted VEO In Building Boilers With Membrane Walls Under The Agreement, Without Objection.

The transactions that occurred almost immediately following the execution of the License Agreement provide a clear record of the parties' understanding of the scope of the Agreement. VEO sold three (3) 15M boilers to Broin Industries for the Iowa Ethanol plant. (VEO's Additional Affirmative Matter in Response to IKE's Motion for

Partial Summary Judgment, ¶ 2; Ex. 1 to VEO's Supplemental Appendix, M. White Dep.,

pp. 182-183). Each of those boilers were designed and rated with the help and assistance

of EPTI and included membrane walls. (*Id.*) EPTI invoiced VEO for the three Broin

boilers pursuant to the License Agreement, and VEO paid EPTI the royalty set forth in

the License Agreement. (VEO's Response to IKE's Statement of Facts, ¶ 74; Ex. 7 to

VEO's Supplemental Appendix, T. Fuhrman Dep., pp. 96-98). If these transactions were

truly outside the scope of the Agreement, as IKE argues, EPTI would have refused to

assist VEO, as EPTI did when VEO requested the opportunity to market D-Style

Keystone boilers (VEO's Additional Affirmative Matter in Response to IKE's Motion for

Partial Summary Judgment, ¶ 3; Ex. 2 to VEO's Supplemental Appendix, S. Brewer

Dep., pp. 172-173), or the parties would have entered into a separate agreement, as

contemplated in Clause 1a), and as the parties did when VEO sought projects involving

boilers above 150,000 pph for the University of Notre Dame and the University of

Massachusetts. (VEO's Additional Affirmative Matter in Response to IKE's Motion for

Partial Summary Judgment, ¶ 4; Ex. 1 to VEO's Supplemental Appendix, M. White Dep.,

p. 199). The absence of a separate agreement or addendum, coupled with the fact that

VEO was invoiced and paid for the boilers pursuant to the terms of the Agreement,

confirms that EPTI knew and understood VEO was authorized to build membrane wall

boilers under the Agreement.

> **2.    Annex I's Reference To "M-Series Boilers" Fails To Demonstrate The Parties Understood VEO Could Only Sell Tangent Tube Boilers.**

IKE argues that because Annex I refers to M-Series Keystone boilers, the

parties must have understood that membrane wall boilers were outside the scope of the

Agreement. (IKE's Memorandum in Support of Its Motion for Partial Summary

Judgment, p. 13).  Annex I has a heading Description of Products that identified the "M Series Keystone water tube boilers to include the 8M . . .22M."  IKE fails to establish that anyone at VEO understood the Agreement was limited to "Standard M-Series Keystone Boilers" merely because the data table and drawings in Annex I reference that term. More importantly, no VEO representative testified that he understood that M-Series Keystone Boilers cannot include membrane walls.  (VEO's Concise Statement of Facts, ¶ 18; Ex. C to VEO's Motion for Partial Summary Judgment, M. White Dep., p. 55; Ex. E to VEO's Motion for Partial Summary Judgment, S. Brewer Dep., p. 178).  Shawn Brewer also testified that it was his understanding that M-Series boilers were the same as O-style Keystone boilers.  (VEO's Response to IKE's Statement of Facts, ¶ 120; Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., p. 210).

In fact, EPTI engineers did not believe the term "Standard M-Series Keystone Boiler" had any clear meaning.  Bob Gdaniec admits that the term "Standard M Series" had no meaning in the boiler industry at large, and was only a term understood within EPTI.  (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 207).  Chris Petcos did not know whether individuals outside of EPTI were familiar with the name "Standard M Series."  (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 4 to VEO's Supplemental Appendix, C. Petcos Dep., p. 40).  Jay McConaughy, an engineer with Zurn, Aalborg and EPTI, testified that in his mind, there was no such thing as a "standard M-series boiler." (VEO's Response to IKE's Statement of Facts, ¶ 118; Ex. 5 to VEO's Supplemental Appendix, J. McConaughy Dep., p. 118).

IKE argues that VEO was only authorized to sell M-Series Keystone boilers, and that such boilers did not include membrane walls. (IKE's Memorandum in Support of Its Motion for Partial Summary Judgment, p. 13). However, several witnesses testified that M-Series boilers can incorporate membrane walls. For instance, on February 5, 2003, immediately following the execution of Annex I, Jere Nieminski of EPTI forwarded an email to Mark White, then of EPTI, with carbon copies to Steve Bernatowicz and Ted Fuhrman, both EPTI engineers. In the email, Nieminski stated "the proposed boiler would be a 15M Keystone with welded wall front, side, and rear construction and an extended furnace length." (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 6 to VEO's Supplemental Appendix, S. Bernatowicz Dep., p. 29). Mr. Bernatowicz testified regarding the email, "that is a 15M, that's the M series boiler right there. So it is an M series boiler." (*Id.* at p. 30). In addition, Ted Fuhrman, a former EPTI engineer, testified that he had designed an M-Series boiler with membrane walls. (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 7 to VEO's Supplemental Appendix, T. Fuhrman Dep., p. 40). IKE's predecessor's offered M-Series Keystone boilers with membrane wall construction. For instance, VEO had purchased two Keystone 15M boilers from EPTI's predecessor, Aalborg Industries, in 2001, both of which included membrane walls. (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep., pp. 8-9; Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., p. 36).

It is undisputed that Mark White, as the authorized EPTI representative, supplied the Keystone Sales Manual and a related power point presentation to VEO in March 2003, which shows 100% membrane wall construction (i.e. membrane furnace and

14

convection walls, a water-cooled membrane rear wall, and a water-cooled burner throat front wall) as an available option on Keystone M Series Boilers. (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 1 to VEO's Supplemental Appendix, M. White Dep., p. 244). Similarly, the Keystone Design Guide provided to VEO shows welded front and rear walls as an option for M-Series Keystone boilers. (VEO's Response to IKE's Statement of Facts, ¶ 5; Ex. 9 to VEO's Supplemental Appendix, T. Pawlowski Dep., pp. 113-114). IKE does not deny these facts, but argues without support that the materials provided were developed by EPTI for a broader class of boilers. (IKE's Brief In Opposition to VEO's Motion for Partial Summary Judgment, pp. 16-17). However, Mark White testified that he put the sales manual together specifically for VEO, and did not simply provide an existing copy of an EPTI manual. (VEO's Response to IKE's Statement of Facts, ¶ 136; Ex. 7 to IKE's Statement of Undisputed Facts, M. White Dep., p. 211).

IKE misrepresents the testimony of Viskup and White in stating "VEO admitted that EPTI expressly authorized VEO to manufacture and sell membrane wall boilers." Viskup and White both testified that VEO was authorized to manufacture and sell boilers with membrane walls pursuant to the terms of the Agreement. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 5; Ex. 8 to VEO's Supplemental Appendix, J. Viskup Dep. at pp. 176-178; Ex. 11 to VEO's Supplemental Appendix, M. White Dep., pp. 11-12).

### 3.    The Parties Agreed And Understood That VEO Could Make Improvements And Modifications to the Design of the Boilers.

As noted above, VEO was authorized under the Agreement to make modifications and incorporate improvements to the Keystone boilers it manufactured and

sold. As such, even if the boilers VEO built and sold were outside the scope of the term "Products," because they included membrane walls, which VEO denies, VEO had the right to incorporate such changes. Bob Gdaniec agreed that VEO was not prohibited from making any modifications to the design of the Keystone M Series boiler. In fact, Mr. Gdaniec believed VEO could lengthen the boiler, and needed to update aspects of the boilers, such as the floor tile. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 6; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 141). He further stated that EPTI was aware that VEO was selling membrane wall boilers and considered that to be an enhancement. (VEO's Response to IKE's Statement of Facts, ¶ 60; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 59).

> **4.    EPTI And IKE Engineers Confirm That IKE's Attempt To Limit The Products To The Items Listed In Annex I Is Unworkable.**

IKE asserts it was the parties' understanding and intention to treat Annex I as the clear and unequivocal outer boundary of what VEO was licensed to sell under the Agreement. That argument falls under its own weight, however, as a plain reading of the exact design parameters shows such a literal construction would render the Agreement unworkable. The first page of Annex I provides, under the heading "Design" that:

> For the purpose of this agreement, the thermal performance of the "M" Series Keystone® boilers (Products) are based on the following design parameters:
> 1) The rated capacity of Erie Power Technologies, Inc. Standard Fuels analysis.
> 2) 150 psig operating pressure
> 3) Steam temperature leaving boiler: Saturated
> 4) Boiler entrance water temperature of 212°F
> 5) 80°F ambient air temperature
> 6) 1,000' above sea level elevation
> 7) 10% excess air for natural gas

16

8) 15% excess air for #2 oil and #6 fuel oils

. . .

(Ex. F to VEO's Motion for Partial Summary Judgment, License Agreement, Annex I).

EPTI's Vice President of Engineering, Bob Gdaniec, confirmed that

Annex I should not be read to limit VEO's authorization to build and sell boilers to

customers who would operate them at 80ºF, 1000' elevation, etc.  Specifically, he

testified as follows:

> Q:  So it was not your understanding, was it, that Victory Energy was only
> allowed to sell boilers at 80 degree Fahrenheit ambient air temperature?
> A.  Correct.  We would have expected they sold at the prevailing site
> conditions within the range of certain pound-per-hour capacity to another
> pound per-hour capacity in the --
> Q.  And you didn't believe that Victory Energy could only sell boilers that
> would be installed at locations where it was exactly at 1,000 feet above sea
> level, did you?
> A.  No.
> Q.  Or that there would be exactly 10 percent excess air for natural gas,
> correct?
> A.  Correct.
> Q.  Or 15 percent excess air for No. 2 oil and No. 6 field oils?
> A.  Correct.  And that's the reason we gave them -- and in the license that
> we had an obligation to provide them rating capability so they could adjust
> the parameters for site specific for customers.
> Q.  Where does it say that the design capability provided is only to adjust
> the design parameters to meet with changes in temperature or changes in
> elevation?
> A.  Nothing specific in the license agreement that I recall.  We did it via
> the software.

(VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary

Judgment, ¶ 7; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., pp. 54-55).

Mr. Gdaniec also testified that he understood "included but not limited to"

from the Agreement to refer to auxiliary equipment, such as economizers.  (VEO's

Response to IKE's Statement of Facts, ¶ 59; Ex. 3 to VEO's Supplemental Appendix, R.

Gdaniec Dep., pp. 51-52).  Again, Annex I does not mention the possibility that an

economizer could be included, but neither IKE nor EPTI has ever objected to VEO's

sales of boilers with economizers under the terms of the Agreement. Mr. Gdaniec could

not explain how VEO was to ascertain, from the terms of the Agreement, which

limitations were to be taken literally, and which were meant to be illustrative. Mr.

Gdaniec's admission shows the mere fact that EPTI included an illustrative drawing of a

boiler with tangent tube construction falls far short of establishing the definitive meaning

of "Products". The only plausible interpretation of the term "Products," is that Annex I

was meant to be a guideline to provide a starting point for the parties to understand what

VEO was authorized to build, but was in no way meant to be a definitive list, as stated by

the individuals who negotiated the Agreement. (VEO's Response to IKE's Statement of

Facts, ¶ 39; Ex. 6 to IKE's Statement of Undisputed Facts, J. Viskup Dep., pp. 73-74; Ex.

11 to VEO's Supplemental Appendix, M. White Dep. 30(b)(6), pp. 64).

       IKE attempts to mischaracterize the nature of the boiler business by

making the unsupported statement that M Series boilers are "essentially an off-the-shelf,

one-size-fits-all item." (IKE's Statement of Facts, ¶6). However, former EPTI engineer

Steve Bernatowicz testified that:

> [W]e never, fortunately, sell anything standard, but they were almost a
> standard product. They had the same pressure and temperature. So it was
> -- made it a little bit easier to do the work, and did a lot of it.
> Q. You just said you never sell anything standard. What do you mean by
> that?
> A. They're always designed per the customer specifications. So we never
> have a product you can just pull off the shelf. They're always a custom
> design.
> Q. In your experience, is that typical in the package boiler industry?
> A. Yes. I think it's typical in the entire industry.

(VEO's Response to IKE's Statement of Facts, ¶ 6; Ex. 6 to VEO's Supplemental

Appendix, S. Bernatowicz Dep., p. 12).

IKE's interpretation of the Agreement is also contradicted by the simple reality of the state of the art in the boiler industry. IKE has grossly mischaracterized the marketability of tangent tube boilers to U.S. customers. Steve Bernatowicz, an engineer at EPTI charged with assisting VEO in designing Keystone boilers, testified that by 1990-1991, EPTI's predecessor, Zurn, had stopped selling tangent tube boilers, added economizers and added membrane walls to improve emissions and reduce refractory. (VEO's Concise Statement of Facts, ¶ 58; Ex. K to VEO's Motion for Partial Summary Judgment, S. Bernatowicz Dep., pp. 13-14). Steve Bernatowicz testified that he did not believe VEO could sell M-Series Keystone boilers without revising the design to meet customer specifications. The boilers would be too large, would waste fuel, and would not be economical. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 8; Ex. 6 to VEO's Supplemental Appendix, S. Bernatowicz Dep., p. 56-57).

Similarly, Jay McConaughy, an engineer formerly with EPTI and its predecessors, testified that in his experience, Keystone M Series boilers were always customized to meet customer specifications. (VEO's Response to IKE's Statement of Facts, ¶ 6; Ex. 5 to VEO's Supplemental Appendix, J. McConaughy Dep., p. 64). The testimony of these former EPTI engineers demonstrates the practical reality – what IKE is claiming VEO purchased is not feasible in today's industrial world.

Shawn Brewer, a former VEO employee who now works for a burner manufacturer provided a clear explanation of why tangent tube boilers are no longer purchased in the United States:

> Q: In your opinion, could Victory Energy have successfully marketed boilers that incorporated solely tangent tube technology?

A:  Absolutely not.

Q:  And why not?

A:  Because tangent tube technology is not an acceptable design for boilers in any . . . sales campaign that I've seen in the engineering spec that's been provided, any customer preference or customer design requested of us, in no fashion were tangent tube boilers acceptable.

Q:  Do customers in their specifications typically require that they obtain a permit from the burner manufacturer regarding the emissions on a boiler?

A:  Normally they . . . get the permit from whatever governing body it is. They have to get a guarantee from the burner manufacturer that they'll meet emissions.

Q:  And in order to meet emissions, do burner manufacturers have any express requirements with respect to the design of the boiler?

A:  Yes.

Q:  And with respect to "O" type water tube boilers, do you know of any burner manufacturer that would render a guarantee regarding emissions of a tangent tube "O" style boiler?

A:  No, I don't know that.

Q:  And why is it that . . . in your opinion, would a burner manufacturer not guarantee the emissions on a boiler that incorporated tangent tube technology.

A:  Because there's . . . flexing that takes place inside the boiler which could cause an air gap, which would allow gases to escape prior to being fully combusted.  And it's not possible to control your emissions if you're not fully combusting the gases that are injected.

Q:  And with a welded wall design, does that take care of the issues with respect to gas bypassing without being fully combusted?

A:  It should to the point where the manufacturers are willing to guarantee under those conditions.

(VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary

Judgment, ¶ 9; Ex. 2 to VEO's Supplemental Appendix, S. Brewer Dep., pp. 212-214).

### 5.    The March 26, 2004 Letter From Robert Gdaniec to Mark White Fails to Support IKE's Claim That VEO Was Put On Notice That Was In Breach of The License Agreement.

IKE points to the March 26, 2004 letter from Robert Gdaniec to Mark

White at VEO as evidence of the parties course of conduct showing that EPTI interpreted

the Agreement consistent with IKE's current position.  However, a review of the letter

shows IKE has misstated the content of the letter and the circumstances surrounding that

letter significantly undercut its probative value.  First, it was sent out 15 months after the

parties entered into the Agreement. Given the fact that EPTI allowed 15 months to pass without objection, and as noted above, assisted VEO in the design and rating of several membrane wall boilers during that time, EPTI's motivation in sending the letter is highly suspect. Mr. Gdaniec testified that he had no knowledge or evidence of any instance where VEO had modified a Keystone Boiler without EPTI's knowledge or consent. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 10; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 139).

Second, the letter accompanied EPTI's counter-offer regarding the proposed sale to VEO of some or all of the assets licensed to VEO under the Agreement. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 11; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep., p. 129). Third, EPTI was in bankruptcy and desperately trying to drive up the value of its remaining assets in the hopes of staving off liquidation. Finally, Stephen Kang testified that he reviewed the License Agreement and could not determine whether membrane wall boilers were included in the definition of Products, but authorized the letter to be sent anyway. (Ex. 12 to VEO's Supplemental Appendix, S. Kang Dep., p. 61). Finally, VEO responded to Mr. Gdaniec's letter on March 30, 2004, specifically rejecting EPTI's position that VEO was authorized to build and sell only tangent tube Keystone boilers. EPTI never responded to Mr. White's letter.

When asked why he never responded, Bob Gdaniec stated, "most of these issues, we just said we'd just let them go by the wayside, and probably didn't follow up after that." (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 12; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec

Dep., p. 145). Gdaniec testified that EPTI never refused to provide VEO with engineering support on boilers with membrane walls, either before or after he sent the 3/26 letter. (VEO's Response to IKE's Statement of Facts, ¶ 60; Ex. 3 to VEO's Supplemental Appendix, R. Gdaniec Dep. p. 126). Given these facts, it is difficult to comprehend how IKE can argue that EPTI issued an unequivocal pronouncement that VEO had breached the Agreement. In addition, EPTI knew and understood that VEO continued to sell boilers with membrane walls after 3/26/04. For instance, on 4/23/04, Mark White sent to EPTI three Unit Sale Notices, each specifically noting that VEO had sold a 100% membrane wall boiler. VEO received no objection to those sales from EPTI. (VEO's Response to IKE's Statement of Facts, ¶ 75; Ex.7 to VEO's Supplemental Appendix, T. Fuhrman Dep., p. 97). Similarly, Steve Bernatowicz testified that he assisted VEO in designing a membrane wall boiler in August 2004. (Ex. 6 to VEO's Supplemental Appendix, S. Bernatowicz Dep., p. 37).

IKE attempts to rely upon a few emails from lower level engineers to support its position that IKE "repeatedly informed VEO that selling boilers with membrane walls was outside the scope of the license." However, the evidence adduced to date shows that the engineers who drafted those emails were clearly opposed to EPTI licensing the Keystone boiler to VEO at the inception of the negotiations. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 13; Ex.7 to VEO's Supplemental Appendix, T. Fuhrman Dep., p. 33-35). Despite the engineers' opposition, EPTI's management decided to go ahead with the license agreement. *Id.* (*See also* VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 14; Ex.12 to VEO's Supplemental

Appendix, S. Kang Dep. at pp. 28-29). Lower level engineers such as Dave Briggs and Ted Furman did not speak for EPTI, as evidenced by the fact that despite their apparent displeasure, EPTI continued to support VEO in its efforts to design, manufacture and build Keystone boilers with membrane walls, etc. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 15; Ex. 12 to VEO's Supplemental Appendix, S. Kang Dep., pp. 28-29). Most significantly, Stephen Kang, president of EPTI, testified that neither he nor Bob Gdaniec were able to conclude that VEO had breached the Agreement. (Ex.12 to VEO's Supplemental Appendix, S. Kang Dep. at p. 60). Similarly, Mr. Kang reaffirmed his acknowledgement in the purchase and sale agreement between EPTI and CMI EPTI, that he knew of no breaches of any EPTI license agreement, and no infringements of EPTI's intellectual property. (*Id.* at p. 73).

The parties' performance during the course of the Agreement unequivocally demonstrates that EPTI and VEO agreed and understood VEO was authorized to sell Keystone water tube boilers with membrane walls from 29,000 to 150,000 pph.

## III. IKE HAS FAILED TO DEMONSTRATE IT IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS COMPLAINT.

### A. VEO Did Not Infringe IKE's Marks Because It Manufactured, Marketed and Sold The Boilers Under Grant of License.

IKE's claim of trademark infringement hinges on the Court finding that VEO sold boilers outside the scope of the license granted in the Agreement. It is uncontested that if the Court holds the Agreement authorized VEO to sell boilers with membrane walls, VEO's activities related to those sales could not constitute trademark infringement. As stated above, the Agreement granted to VEO the right to build and sell

water tube package boilers with membrane walls, either under a plain reading of the term

Products, or by virtue of VEO's rights to modify and improve the Products.

IKE alleges that although EPTI granted VEO permission to exceed the

scope of the License Agreement, EPTI and IKE revoked that permission. VEO submits

that it did not exceed the scope of the Agreement. However, if this Court were to hold

otherwise, VEO disputes IKE's contention that the permission granted by EPTI was

revocable. It is undisputed that ETPI authorized VEO to manufacture and sell water tube

boilers with membrane walls and similar enhancements until at least March 26, 2004.

(IKE's Statement of Facts, ¶ 71). Moreover, the testimony of EPTI's Vice President of

Engineering, Robert Gdaniec, establishes that EPTI knew VEO continued to build

membrane wall boilers, and continued to assist VEO with those boilers. (VEO's

Response to IKE's Statement of Facts, ¶ 75; Ex. 2 to IKE's Statement of Undisputed

Facts, R. Gdaniec Dep., pp. 43-44 ("We let it go.")). At the direction and with the

express permission of EPTI, VEO developed a nationwide force of representatives, sales

brochures and a sales manual that featured the Keystone, O-Style water tube boiler with

100% membrane walls as an available feature. It would be highly inequitable and work

and undue hardship on VEO to now rule that IKE was entitled to revoke VEO's right to

build and sell membrane wall boilers halfway through the term of the Agreement.

Pennsylvania's statutory version of the Uniform Commercial Code recognizes that a

party cannot seek to revoke a past permission where doing so would be unjust due to a

material change in reliance on the past permission. 13 Pa. C.S. §2209(e).

For the same reasons that IKE cannot revoke under Section 2209, IKE

cannot seek to revoke EPTI's acquiescence of VEO's use of the Keystone mark on

boilers with membrane walls. Where a trademark holder acquiesces in a party's use of a trademark, the trademark holder may not subsequently seek to revoke that acquiescence if the permitted user relied upon the acquiescence to its detriment. *Analytic Recruiting, Inc. v. Analytic Resources, LLC*, 156 F. Supp. 2s 499 (E.D. Pa. 2001); *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3d Cir. 1998). Here, it is undisputed that EPTI knew VEO was using the Keystone mark on Keystone boilers with membrane walls. (IKE's Statement of Facts, ¶ 82). As noted above, VEO developed a representative force, marketing materials, and the manufacturing ability to build and sell modern water tube package boilers, and VEO would have been severely prejudiced if IKE were permitted to revoke EPTI's acquiescence half way through the license period.

VEO disputes IKE's contention that EPTI's authorization to VEO to market, build and sell boilers with membrane walls under the Agreement constituted a "waiver." As discussed above, even if the Court finds the term Products is limited to the exact specifications set forth in Annex I, which VEO disputes, VEO was permitted to modify and improve the boilers. EPTI approved those modifications pursuant to clause 3e) by providing assistance in designing and rating those boilers. The stated purpose for seeking approval of modifications was to insure no adverse impact on performance or reliability. Once approved, it is inconceivable how a subsequent modification of the same type could be deemed a risk to the reliability or performance of a boiler. Accordingly, there was no "waiver" that either IKE or EPTI could revoke. Rather, EPTI approved VEO's modification of the boilers, and nothing in the Agreement provides that the licensor can withdraw approval of a modification.

IKE cites three cases in an effort to demonstrate a likelihood of confusion to support its trademark infringement claim. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.2d 1183, 1190 (6th Cir. 1997); *Villanova University v. Villanova Alumni Educ. Found.*, 123 F. Supp. 2d 293 (E.D. Pa. 2000). However, none of the cases is applicable to the facts here. In each of the cases cited, the license had expired and the former licensee had continued to use the licensed mark. The court in *Villanova University* described the continued use of a mark after expiration as a fraud on the public, as they are mislead to believe an affiliation still exists. 123 F. Supp. 2d 293, 309. Here, VEO remained a licensee throughout the period of time IKE alleges infringement. Moreover, EPTI authorized VEO to use the mark for the purpose IKE now claims was outside the scope of the Agreement.

IKE asserts that VEO engaged in "express reverse passing off" when VEO referred to "Victory" boilers and "VEO designs" in its sales proposals and brochures. In order to prevail on a claim of reverse passing off under §43(a) of the Lanham Act, a claimant must show: (1) that the alleged infringer misbranded claimant's goods or services; (2) that the goods or services entered interstate commerce; and (3) that the misbranding caused a likelihood of confusion such that consumers believe the claimant's product is actually the infringer's. *Daley v. Firetree, Ltd.*, 2006 U.S. Lexis 4061 (M.D. Pa. 2006). IKE falls woefully short, however, of demonstrating in any way that it can even state a claim for reverse passing off, let alone that it is entitled to partial summary judgment on its claim. As an initial matter, it is undisputed that VEO was authorized to use the information provided by EPTI under the Agreement to market and sell the

Products. (License Agreement, Clause 2.a)(i), <u>Selling Rights</u>). As set forth above, the Agreement authorized VEO to sell boilers with membrane walls and similar features. Accordingly, VEO's use of designs and other material in sales proposals was absolutely permitted under the Agreement, and forecloses any claim for reverse passing off. *See, Westcode, Inc. v. Daimler Chrysler Rail Systems (North America) Inc.*, 123 F. Supp. 2d 819 (E.D. Pa. 2000)(holding that plaintiff had failed to demonstrate a likelihood of success on the merits where a contract existed and the plaintiff failed to show that the terms of the contract did not foreclose the reverse passing off claim).

IKE argues that even if VEO was permitted to sell membrane wall boilers under the Agreement, VEO is still liable for reverse passing off. IKE has misapprehended the applicability of this doctrine, and attempts to create a claim for trademark infringement where none exists. Beyond the fact that VEO was authorized to use the Technical Information under the Agreement to market and sell the Products, reverse passing off is inapplicable here. Reverse passing off applies where the infringer has misapplied its own mark to the claimant's goods. *Daley*, 2006 U.S. Lexis 4062, at 5. Here, IKE does not allege that VEO applied its own mark to IKE's goods or services. Rather, it alleges that VEO applied the "Victory" name to boilers VEO manufactured. Assuming these facts are true, they do not support a claim for reverse passing off. *See, Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)(holding that a claim for reverse passing off did not lie where the "goods" in question were created by the alleged wrongdoer).

In some instances, IKE does not allege that any goods or services were involved. Rather, IKE alleges that VEO utilized IKE's drawings or designs, but removed

the reference to "Keystone." IKE has no competent evidence to support that claim. Moreover, the drawings at issue are not protected by reverse passing off under the Lanham Act, as they are not goods or services. *Id.* at 32-36.

IKE alleges that even if VEO was authorized under the Agreement to sell Keystone boilers with membrane walls, VEO is liable for trademark infringement and/or "reverse passing off" for submitting proposals to customers for boilers above 150,000 pph. There are three significant problems with IKE's argument, however. First, IKE has failed to provide any competent evidence to show that VEO in fact submitted any proposals above 150,000 pph. Second, even taking into account the unauthenticated proposals IKE has identified in its Statement of Facts, IKE has failed to identify any proposals VEO submitted to prospective customers, using the Keystone mark, for boilers above 150,000 pph, during the time IKE has been the licensor. As such, IKE cannot prevail on its claim for partial summary judgment for trademark infringement associated with any alleged proposals. Finally, the lone document identified by IKE for a boiler above 150,000 pph that VEO allegedly submitted during the period that IKE was the licensor was a November 24, 2004 proposal to SNC Lavalin Constructors for a 200,000 pph boiler. However, IKE admits that nowhere on the proposal did VEO utilize the Keystone mark. Accordingly, VEO could not have infringed upon IKE's mark. In addition, for the reasons stated above, IKE cannot assert a claim for reverse passing off.

**B.     IKE Has Failed To Demonstrate The Existence Of A Valid Trade Secret To Support Its Claim of Trade Secret Misappropriation.**

In order to prevail on a claim for Trade Secret Misappropriation, a party must show the existence of a valid trade secret, that the trade secret was misappropriated by the alleged wrongdoer, and that the use of the trade secret was by improper means. 12

Pa.C.S.A. §§ 5301-5308.  VEO disputes IKE's claim that its designs for O-style water tube boilers constitute a trade secret.  IKE has failed to even sufficiently define what it is that IKE considers in its O-style water tube boiler design to be a trade secret.  As the movant, IKE has the burden of establishing that there is no genuine issue of material fact that the claimed technology constitutes a trade secret.  *Doebler's Pennsylvania Hybrids, Inc. v. Doebler*, 2006 U.S. App. LEXIS 7197 at *18, and *44 (3rd Cir. 2006) ("We have held repeatedly that the party moving for summary judgment under Fed. R. Civ. P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact …Under Pennsylvania law, a plaintiff must show that the information constitutes a trade secret…") (internal citations omitted).

The designs for the Keystone boiler are available in the public domain. (VEO's Additional Affirmative Matter in Response to IKE's Motion for Partial Summary Judgment, ¶ 16; Ex. 11 to VEO's Supplemental Appendix, M. White 30(b)(6) Dep., pp. 204-205).  Jay McConaughy worked at Zurn Energy and its successor, Aalborg Industries, EPTI and now, CMI EPTI.  Jay McConaughy testified that the information contained in the Keystone designs are available in the public domain.  (Ex. 5 to VEO's Supplemental Appendix, J. McConaughy Dep., p. 185).  As such, at a minimum, a genuine issue of material fact exists that defeats IKE's claim for partial summary judgment on its misappropriation of trade secrets claim.

**C.**     **IKE's Motion for Partial Summary Judgment On Its Claim For Unfair Competition Fails For The Same Reasons As Its Claims For Trademark Infringement.**

As IKE points out, the elements for trademark infringement are identical to those for unfair competition.  *Scott Felzer Co. v. Gehring*, 288 F. Supp. 2d 696,703 (E.D. Pa. 2003); *Louis Vitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 580

(E.D. Pa. 2002).  Accordingly, IKE's claims for unfair competition are barred for the same reasons.  Namely, VEO had authorization to use the mark under the terms of the Agreement, EPTI acquiesced in VEO's use of the Keystone mark on boilers with membrane walls, and VEO relied upon that acquiescence to its detriment.

**D.  IKE Is Not Entitled To Partial Summary Judgment On Its Claim For Unjust Enrichment.**

Unjust enrichment, also known as quasi contract, is an equitable doctrine that courts employ in the absence of a contract.  *See Aceros Recicilables de Mexico v. ELG Haniel Metals Corp*, 2006 U.S. Dist. LEXIS 10827 at * 2 (W.D. Pa.  2006).  Unjust enrichment will only lie where the court finds that the defendant received and enjoyed benefits under circumstances where it would be unjust to allow the defendant to retain the benefit without payment of the value of the benefit.  *See Allegheny General Hospital v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3rd Cir. 2000).   Pennsylvania courts recognize, however, that where a contract exists between the parties, the equitable remedy of unjust enrichment is not available.  *Alstom Power, Inc. v. RMF Industrial Contracting, Inc.*, 2006 U.S. Dist. LEXIS 8019  at *36 (W.D. Pa. 2006).  Courts will defer to the will of the parties to a contract to determine whether just consideration was paid by the party receiving a benefit.  *See Channel Home Centers, Division of Grace Retail Corp. v. Grossman*, 795 F.2d 291  298-299 (3rd Cir. 1986).

In the instant case, it is undisputed that a contract existed between the parties that governed VEO's rights and obligations regarding the use of the Keystone mark and related technology.  As such, this Court should respect the will of the parties and enforce the terms of the contract as written, which enabled VEO to use the Keystone mark and technology to build and sell Keystone boilers.

30

In addition, VEO submits that IKE's claims are barred by the doctrine of equitable estoppel.  IKE's predecessor in interest, EPTI, allowed VEO to use the Keystone mark and technology to build and sell O style water tube package boilers with membrane walls and similar features.  VEO reasonable relied upon EPTI's acquiescence in building membrane wall boilers using the Keystone mark and technology.  As such, IKE must be equitably estopped from arguing VEO lacked the right to use the mark and technology to build and sell membrane wall boilers.

## Conclusion

For the foregoing reasons, Defendant VEO asks the Court to grant its Motion for Partial Summary Judgment on Count I of its Second Amended Counterclaim and IKE's Complaint, and to deny IKE's motion for Partial Summary Judgment on Counts I, IV, V and VI of Plaintiffs' complaint.

Dated:  April 10, 2005                              Respectfully submitted,

/s/ Christopher T. Sheean
One of the Attorneys for Plaintiff,
VICTORY ENERGY OPERATIONS,
LLC

Christopher T. Sheean
Wildman, Harrold, Allen & Dixon LLP
225 W. Wacker Drive, 28th Floor
Chicago, IL 60606
(312) 201-2997

LOCAL COUNSEL:
G. Jay Habas
Marshall, Dennehey, Warner
Coleman & Goggin
1001 State Street, Suite 1400
Erie, PA  16506
(814) 461-7800
PA  ID No. 55581

Counsel for Victory Energy Operations, LLC