UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>   Plaintiff,<br><br>v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>   Defendant. | CIVIL ACTION<br><br>NO. 04-CV-325 (ERIE)<br><br>Judge Sean J. McLaughlin |

**PLAINTIFF'S RESPONSE TO ADDITIONAL
AFFIRMATIVE MATTER IN RESPONSE TO IKE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

  Plaintiff Indeck Keystone Energy, LLC ("IKE") submits this response to the Additional Affirmative Matter Asserted by Victory Energy Operations LLC's ("VEO") in its Response to IKE's Motion for Motion for Partial Summary Judgment.

  1. Denied. For the reasons stated in IKE's Statement of Facts, there is no reference anywhere in the License Agreement to membrane walls, and the drawing included in Annex I specifically identifies tangent tube walls. EPTI therefore advised VEO that it could manufacture boilers only with tangent tube walls, and it was unnecessary for anyone at EPTI to advise VEO that it could not design, manufacture, market or sell Keystone® Boilers with membrane walls. Further, IKE disputes that EPTI ever advised VEO prior to the time Annex 1 was finalized that VEO could sell boilers with membrane walls. Shawn Brewer testified that his recollection of

PTDATA 296457_1

1

discussions with anyone from EPTI about licensing the technology was "[n]othing more than it sounds like a good idea and something that we need to look into." (Exhibit 1, S. Brewer Dep., p.34) In addition, when asked whether he ever had any discussions with anyone from EPTI about the use of membrane walls ". . . and whether membrane walls were outside the scope of the License Agreement," he testified only that it "was never even considered an issue." (VEO Supplemental Appendix, Exhibit 2, page 63) Had such a conversation in fact occurred, one would expect Annex 1 to show membrane rather than tangent tube walls because both White and Viskup knew the difference between those technologies.

      2.     Denied. The cited testimony does not support this assertion.

      3.     Admitted.

      4.     Admitted in part, denied in part. The parties entered separate agreements for the University of Notre Dame, which was an O-type boiler and for the University of Massachusetts, which was a D-type boiler. VEO submitted proposals for boilers above 150,000 PPH and/or for a 23M without authorization from EPTI or IKE as shown in Plaintiff's Undisputed Facts at ¶¶ 153-54.

      5.     Admitted in part, denied in part. IKE admits that Viskup took the position, during his deposition, that the License Agreement permitted VEO to manufacture boilers with membrane walls. IKE denies that Viskup's interpretation complies with the Agreement for the reasons set forth in IKE's Statement of Facts and denies that Gdaniec testified that the Agreement permitted VEO to sell boilers with membrane walls, which is unsupported by VEO's citations and his testimony. EPTI specifically authorized VEO on a case-by-case basis to sell boilers with membrane walls prior to March 26, 2004. Gdaniec confirmed that EPTI did not

provide consent after March 26, 2004. (¶¶ 29-32, 39, 52-62, 64-65, 68, 71, 74, 75, 86-91, 96-98, 103-108, 109-120).

6. Admitted in part, denied in part. Mr. Gdaniec testified that "in the strictest, hardest, firm sense" of the Agreement, VEO had to exactly comply with the Agreement. In his personal view, VEO may be able to make certain changes "in the spirit of the agreement," but he was not testifying to a specific change in fact requested by VEO. In particular, he was not testifying concerning the alterations at issue in this lawsuit.

7. Admitted in part, denied in part. IKE admits that Mr. Gdaniec gave the testimony but denies that VEO is properly explaining that testimony. The design parameters identify operating conditions, not changes to the design in the event those operating conditions change. The design parameters in Annex I identify the operating conditions used to determine the predicted boiler performance; they do not signify that the boiler could only be operated at a certain operating pressure, temperature, or elevation or that VEO could alter the design whenever it wished. As Bob Gdaniec explained, if the operating/site conditions change (*e.g.*, the site elevation is higher or lower), then the <u>performance</u> (such as steam flow or quality) will change. The <u>design</u> of the boiler, however, does <u>not</u> change. (VEO Supplemental Appendix, Exhibit 3, R. Gdaniec Dep., pp.53-54) ("not modification of the products but modifications to the conditions at which the boilers run under. ... if the boiler is at a different elevation, it performs differently."); (*See also* Exhibit 63, IKE 30(b)(6), pp.21-23)

8. Denied. The out-of-context testimony quoted by VEO from Steve Bernatowicz that EPTI would "never, fortunately, sell anything standard" referred to "O-style Keystone boilers, but they were not the M-style design. As I said, the M-style was outdated ..." (VEO Supplemental Appendix, Exhibit 6, p.13) The fact that EPTI could make changes to the design

as owner of the technology is different than whether the licensee could make changes under the contract. Similarly, even if customers may prefer membrane wall over tangent tube boilers, that circumstance cannot expand VEO's contractual rights, which are defined solely by the written Agreement. IKE objects to this testimony as immaterial because the issue is whether VEO had the contractual right to sell the M-Series Keystone Boiler with modifications at issue in this lawsuit. As a further answer, there was no foundation for that testimony.

9. Admitted in part, denied in part. IKE admits that Shawn Brewer gave that testimony, but denies that it is either material or relevant for the reasons in response to paragraph 8. Brewer also was not an engineer, and he never reviewed the License Agreement. Brewer has no recollection of ever reading or receiving the final version of the License Agreement, so his understanding as to what an M-Series boiler was has no relevance to what was licensed. (Exhibit 1, S. Brewer Dep., pp.36-37)

10. Admitted to the extent the consent was provided prior to March 26, 2004. That testimony also contradicts VEO's assertion in paragraph 5 concerning Mr. Gdaniec. He also confirmed that IKE did not provide consent or otherwise permit VEO to sell non-conforming boilers after March 26, 2004. (IKE Statement of Facts, ¶ 75)

11. Admitted in part, denied in part. IKE admits that the March 26, 2004 letter was provided in connection with the parties' negotiations concerning the sale of certain technology. EPTI only offered to sell the standard M-Series technology. (IKE Statement of Facts, ¶¶ 109-21)

12. Admitted in part, denied in part. VEO mischaracterized Mr. Gdaniec's testimony, although the quoted portion is correct. He testified that he "responded to each one of these items, it was in the discussion of the extension of the license agreement, sales, purchase – whole discussion of trying to move it forward. When the issue kept moving forward and fell

apart of VEO continuing the purchase option, most of these issues we just said we'd let them go by the wayside and probably didn't follow up after that." As a further answer, EPTI's President explained that EPTI was in financial distress and therefore did not pursue a lawsuit. (IKE Statement of Facts, ¶ 95)

13. Admitted. As a further answer, those engineers also participated in developing Annex 1 in cooperation with Mark White and therefore knew what the scope of the License Agreement was. They also were authorized to communicate with VEO, and VEO has offered no evidence to the contrary. Those communications were fully consistent with the March 26, 2004 letter sent by Bob Gdaniec, EPTI's Chief Engineer. (IKE Statement of Facts, ¶¶ 40-60, 96-106)

14. Admitted. However, Stephen Kang instructed Mark White to work with the Engineering Department to define the technology being licensed, which in fact occurred, such that only the standard M-Series technology was licensed. (IKE Statement of Facts, ¶¶ 43-44)

15. Denied. See response to paragraph 13.

16. Denied. VEO failed to identify where in the public domain the designs for the Keystone® boilers allegedly are located, and the designs in fact are not public. (Exhibit 65, Martin R. Swabb Declaration); (IKE Statement of Facts, ¶ 13, 36-37, 66, 121) If the designs truly are in the public domain, then VEO should identify the source where they can be found. Of

course, VEO sought to purchase the technology and offered $500,000 for it, which it would not have done if the technology truly were public. (IKE Statement of Facts, ¶¶ 109-21)

Respectfully submitted,

/s/   John K. Gisleson

John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant, Indeck Keystone Energy, LLC

Dated:  May 2, 2006.