# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE<br>ENERGY, LLC, a Delaware limited liability<br>company, | :<br>:<br>:<br>: |
| Plaintiff, | : CIVIL ACTION<br>:<br>: NO. 04-CV-325 (ERIE)<br>: |
| v. | : Judge Sean J. McLaughlin |
| VICTORY ENERGY<br>OPERATIONS, LLC, a Delaware limited<br>liability company, | :<br>:<br>:<br>: |
| Defendant. | :<br>: |

## PLAINTIFF'S REPLY MEMORANDUM OF
## LAW IN SUPPORT OF ITS MOTION FOR
## PARTIAL SUMMARY JUDGMENT

Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned

counsel, submits this reply memorandum of law in support of its Motion for Partial Summary

Judgment on Counts I, IV, V, and VI.

### INTRODUCTION

The parties agree that the issue at the heart of their competing motions for partial

summary judgment is whether Defendant Victory Energy Operations LLC ("VEO") had the

contractual right to sell boilers with features, such as membrane walls, that were not identified in

the License Agreement. (VEO Response Brief at p.1) The parties offer competing

interpretations of the Agreement, although there ultimately is no dispute about the material facts

pertaining to the negotiation of the Agreement or the parties' performance under it. In particular,

VEO admits or does not dispute the following facts:

- The License Agreement identifies only boilers with tangent tube walls, and there was never an amendment of the Agreement to permit VEO to prospectively sell boilers with membrane walls. (VEO Response to IKE Factual Statement at ¶¶ 55, 59, 70)

- The License Agreement Addendum, which was prepared by Mark White (EPTI) and signed by both Mark White and John Viskup (VEO) less than one month after Annex I was finalized, amended the Agreement to "modify the Products as described in Annex I." (*Id*. at ¶ 68)

- VEO disclosed to IKE's predecessor-in-interest, Erie Power Technologies, Inc., ("EPTI") that it wished to sell boilers with membrane walls and other features not included in Annex I, and EPTI initially provided consent to sell boilers with those features in connection with the disclosure of specific boiler sales. (VEO Response Brief at p.2); (IKE Factual Statement at ¶ 71) (no opposing evidence)

- EPTI on multiple occasions advised VEO that membrane walls were outside the scope of the Agreement, including during the parties' negotiation for the potential sale of Keystone® technology in the Spring 2004, without any dispute by VEO. (VEO Response to IKE Factual Statement at ¶¶ 86, 103, 117) EPTI also repeatedly advised VEO that the Agreement encompassed only standard M-Series boilers and/or that boilers were outside the scope. (*Id*. at ¶¶ 96, 98, 105-08)

- EPTI's March 26, 2004 Letter to VEO stated that the "majority of projects that VEO is pursuing or has completed have been outside the definition of the License Agreement" and that VEO "will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex I ... provides a clear definition of the M-Series design ..., which includes ... tangent furnace and outer wall tubes ....)" (*Id*. at ¶ 86)

- VEO's March 30, 2004 Letter to EPTI, which was reviewed by both White and Viskup over a few days, stated that the "Agreement does provide specific geometry and characteristics .... [M]embrane furnace and outer walls, watercooled front and rear walls ... features are outside the geometry and characteristics of the License ...." VEO's reference to "geometry and characteristics" referred to Annex I. (*Id*. at ¶¶ 88, 90-91)

- IKE never gave consent to VEO to sell boilers with membrane walls or other features that deviated from Annex I. (*Id*. at ¶¶ 70, 78-81)

- During the time IKE was the licensor, VEO marketed boilers with membrane

PTDATA 296353_2

walls and other features not included in Annex I using the Keystone® trademark, and it sold 11 boilers with those features. (*Id.* at ¶¶ 79-80)

As explained below, IKE provides the logical interpretation to the Agreement that gives effect to the Agreement as a whole and that comports with the parties' pre- and post-contract conduct. Because VEO did not have the right to sell boilers that deviated from the Agreement without express consent, its admitted sale of Keystone® boilers with non-conforming features during the period that IKE was licensor requires entry of judgment as matter of law on Counts I (Trademark Infringement), IV (Violation of Uniform Trade Secrets Act), V (Unfair Competition), and VI (Unjust Enrichment). The Court should enter partial summary judgment as to liability on those claims, leaving only the issue of damages to be decided.

## Argument

### I.    VEO's Interpretation Of The License Agreement Is Legally And Factual Wrong.

VEO does not dispute the contract interpretation principles applicable here. "[E]ach provision of a contract must be enforced," and the "terms of the contract must be read as a whole." (VEO Response Brief at pp.4-5) When a written agreement is clear and unequivocal, its meaning must be determined by its content and, thus, extrinsic evidence is not permitted. *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982); *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973). IKE believes that, when properly interpreted, the Agreement is not ambiguous (VEO Response Brief at p.3); however, if this Court believes it appropriate to consider extrinsic evidence, that evidence supports IKE's interpretation.

VEO has failed to give effect to the Agreement as a whole by relying solely on the definition of "Products" in Clause 1(a) of the Agreement and effectively ignoring Annex I by introducing parole evidence to describe it as a "guide" or "framework." There is nothing in the License Agreement to suggest that Annex I was only a "guide" or a "framework," and VEO's

3

assertion that that was the purpose of Annex I demonstrates quite convincingly why parole evidence is inadmissible to vary the terms of a contract – especially since the pre-contract documentary evidence fails to support the conversations that supposedly occurred. Yet VEO cannot dispute that both Viskup and White admit that Annex I is part of the Agreement and that they knew at the time they signed the text of the License Agreement that they still had to agree on Annex I. (VEO Response to IKE Factual Statement, ¶¶ 32, 61-62)

Importantly, less than one month after Annex I was finalized, thereby rendering the License Agreement "complete" (IKE Undisputed Facts at ¶ 50), Viskup and White entered the License Agreement Addendum -- drafted by White -- providing that the licensed Products "as described in Annex I" were modified as set forth in the Addendum. (VEO Response to IKE Factual Statement, ¶ 68) That is fully consistent with White's written description of Annex I on January 29, 2003 – after both parties had signed the Agreement -- as the "Product description of the License Agreement." (Plaintiff's Undisputed Facts at ¶ 49) If Annex I were truly a "framework" or "guide", White and Viskup would not have identified it as the description for the licensed products. Although VEO calls this evidence "immaterial" in its Response to the IKE Factual Statement, those documents were created _after_ the parties signed the Agreement, making them extremely probative of what the parties intended.

Indeed, despite arguing that the "clearest course of performance evidence that demonstrates the parties' understanding of the Agreement would logically be that conduct that occurred closest in time to the execution of the Agreement" (VEO Response Brief at p.11), VEO completely ignores the text of the Addendum (_id_. at p.5). Instead, VEO argues that the Addendum supports its position by claiming that the absence of an addendum for membrane walls shows that such a feature was within the scope of the Agreement. (_Id_.) That argument

4

fails because the product description identified by the parties – Annex I – admittedly includes only tangent tube walls; EPTI repeatedly reiterated to VEO (and EPTI's engineers reiterated to White without objection while he was its employee) that the scope of the Agreement was the Standard M-Series with tangent tube walls throughout the time EPTI gave consent; and EPTI revoked that consent on March 26, 2004. (VEO Response to IKE Factual Statement, ¶¶ 59, 68, 71, 96, 103-06, 113-14, 117-119) Had the parties entered an Addendum permitting membrane walls, consent could not have been revoked.

VEO also seeks to add terms to the Agreement by asserting that the licensed boilers "included, but were not limited to the M Series Keystone® boilers generally described in Annex I" and that the "term 'Products' encompassed items of the same general class or type as those described in Annex I." (VEO Response Brief at p.1, 4) That interpretation is mystifying because VEO wanted to license the M-Series since 1999; Annex I specifically identifies only Keystone® Standard M-Series boilers, including the cross-section of a Standard M-Series boiler; and because Viskup of VEO confirmed that he discussed M-Series boilers with Mark White before the Agreement was entered. (VEO Response to IKE Factual Statement, ¶¶ 15, 18, 30, 33, 54, 56, 62) According to VEO's corporate designee, by initialing Annex 1, VEO was "expressing our agreement that ... this document would become part of the agreement. We also initialed it from the standpoint that we understood that it included data." In particular, Annex I "provides model numbers, it provides the designs, it provides the basis of which the thermal performance was generated, ... it has capacity data." (*Id*. at ¶ 62) The cross-section schematic of the boiler in Annex I shows "the mechanical design features in the unit," and that schematic was for the original M-Series boiler. (*Id*. at ¶¶ 55-56) If VEO was not limited to the M-Series with the cross-section identified in Annex I and could deviate whenever and however it wanted

PTDATA 296353_2

from that design, then Annex I was meaningless, with only the text definition in Clause 1 of "Products" being necessary. VEO's interpretation violates established contract interpretation principles and contradicts the factual record here.[1]

VEO adds yet another term to the Agreement by stating that the Agreement allows VEO to "design" Keystone® boilers. (VEO Response Brief at pp.1, 2) However, under Clause 2(a), VEO's "Selling Rights" were the "the exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured." Under Clause 2(b), VEO's "Manufacturing Rights" were to "manufacture or have manufactured the Products." The fact that VEO had "manufacturing rights" rather than unlimited "design" rights confirms that the Products were defined as shown by Annex I in order to specify what was to be manufactured. In that regard, on January 8, 2003 – the same day he sent the Agreement to VEO for signature after the parties had agreed on terms – White described the M-Series as a "small commodity product line" and stated that VEO was "accustomed to executing highly standardized products," further demonstrating that the manufacturing rights were for the product defined in Annex I. (Plaintiff's Undisputed Facts at ¶ 27)

VEO's reliance on the modification and improvements clauses of the Agreement is misplaced because those clauses do not address what was licensed to VEO at the inception of the Agreement, which is what is at issue here. (VEO Response Brief at pp. 6-8) In any case, VEO admittedly did not develop modifications or improvements for membrane walls or

---

[1]     VEO is wrong in asserting that IKE "ignores the plain language of the Agreement" and seeks to ignore the phrase "include but not limited to" in Clause 1 of the Agreement. (VEO Response Brief at p.4) IKE specifically addressed the meaning of the phrase in its opening brief at pages 12-13.

PTDATA 296353_2

watercooled burner throats; EPTI created those designs and provided them to VEO for a specific project and then gave consent on a case-by-case basis. (VEO Reponse to IKE Factual Statement, ¶¶ 12, 71-72, 93, 94, 158) As to modifications, VEO was to "submit ... to Licensor such plans for prior written approval," which was not what occurred. As to improvements, they were to be acquired or developed "during the term of this Agreement," which did not occur here because EPTI's membrane wall technology was developed before the inception of the Agreement, and EPTI did not give VEO unlimited the right to use the membrane technology prospectively or otherwise to make unlimited changes to the design without consent, which is confirmed by the internal communications at EPTI and by EPTI's communications with VEO. (*Id*. at ¶¶ 86-91, 96-108, 109-120)

VEO's reliance on Clause 3(e) is similarly misplaced as that provision cannot serve as the basis for "providing VEO with whatever authorization it [then] needed to modify the Products." (VEO Response Brief, p.6) Rather, Clause 3(e) simply provides that "Upon Licensee's reasonable request, Licensor shall provide, without any additional payment to Licensor, reasonable <u>technical assistance</u> to Licensee by written or telephonic response relating to the <u>application and interpretation</u> of the Technical Information furnished by Licensor under this Agreement." (Emphasis added) Stated differently, if VEO had a question about the Technical Information, EPTI would answer it; that clause does not mean that because EPTI answered questions, VEO could prospectively deviate from the Agreement whenever it wished. In any case, Clause 24 required any modification of the Agreement to be in writing and further provided that "no waiver, express or implied, by either party of any breach of obligation by the other party shall operate or be considered as a waiver of any other or subsequent breach." In that regard, EPTI's repeated, unrefuted reminders to VEO about the specific scope of the Agreement

PTDATA 296353_2

refute this contention, as does the fact that VEO (through White) in its March 30, 2004 Letter to EPTI agreed that membrane walls are outside the scope of the Agreement.

Next, VEO improperly seeks to interpret the Agreement based on its characterization of tangent tube technology, charactering that design as "antiquated" and claiming that IKE's interpretation represents a "classic bait and switch scenario." (VEO Response Brief at p.2) Those rhetorical arguments are irrelevant to the contract interpretation issue. If VEO wanted to contract for older technology that it believed it could sell, and the contract by its terms encompassed only that older technology, then VEO is bound by that contract even if its sales efforts would not be as successful as VEO might have with different technology.[2] IKE thus did not try "to rewrite" the Agreement (VEO Response Brief at p.2); it simply sought to ensure VEO complied with the Agreement as written. In that regard, VEO admittedly received tangent tube drawings and offered tangent tube boilers for sale. (VEO Response to IKE Factual Statement at ¶¶ 57, 64) If VEO was unable to sell any boilers without membrane technology (VEO Response Brief at pp.2-3), that was an inherent risk of the Agreement as contemplated by Clause 16(c), which provided for termination of the Agreement if VEO failed to sell a certain number of boilers within the first two years.

Finally, VEO's attempt to use parole evidence to re-cast history and re-write the Agreement is perhaps best evidenced by the parties' communications in the Spring 2004 and the positions taken by VEO in this lawsuit. When EPTI sent its March 26 Letter, VEO agreed that

---

[2]     The record demonstrates that Mark White (at least while employed by EPTI) recognized VEO was licensing only the older technology. White specifically stated to EPTI's President that the technology being licensed was "outdated and antiquated," which is also what he stated in writing to EPTI's engineers on the very same day he sent the final version of the License Agreement to VEO for signature. "Even though the M Series is somewhat outdated, it has monetary value." (Plaintiff's Undisputed Facts at ¶¶ 16, 26)

membrane walls were outside the scope of the Agreement but claimed they were
"improvements". VEO now takes the position that membrane walls were not improvements but
were within the scope of the Agreement. During the negotiations for the potential sale of the
technology – which subject VEO ignores in its brief even though raised by IKE in its brief
(p.14) -- the parties clearly differentiated between the M-Series technology licensed to VEO that
EPTI was willing to sell and the broader O-style technology owned by EPTI that VEO wanted to
purchase and that included technology in addition to the M-Series for the same capacity range.
According to White (VEO), "[i]t has always been the intention of VEO to purchase the 'O'
boiler technology which includes the 'M' Series boilers. The purchase of the 'O' Series would
enable VEO to be the sole and exclusive owner of the technology up to the capacity range."
(Emphasis added) EPTI, however, would sell only the M-Series technology, which was
unacceptable to VEO, thereby confirming that VEO knew the limited scope of that technology
and that it could not be expanded with membrane walls or other features at VEO's election
(otherwise it would have purchased just the M-Series technology). EPTI offered to expand the
License Agreement to make available to VEO "the full O boiler line," which would "give VEO
access to a wide range of sizes, pressure and temperature, **the use of welded wall construction**
as well as to provide access to steam purity equipment **which is not part of the current license**
**agreement scope**." (IKE Undisputed Facts, ¶¶ 109-120) (emphasis added) Yet now in this
litigation, VEO essentially claims there was no Standard M-Series distinct from EPTI's O-style
technology, that VEO did not appreciate any difference between the M-Series and other boiler
technology, and that VEO already had full rights to the O boiler line within the capacity range of
the Agreement. (VEO Response to IKE Factual Statement, ¶¶ 5-8, 18)

PTDATA 296353_2

**B.    VEO's Interpretation Of The Parole Evidence Is Erroneous.**

**1.    VEO's Parole Evidence Contradicts The Agreement And Is Unsupported By The Documentary Record.**

VEO describes as "utterly false" IKE's factual statement that "VEO agreed and understood that Annex I set forth the definition of 'Products.'" (VEO Response Brief at p.9) IKE's statement was based on what the parties stated in writing at the time the Agreement and Annex were being prepared and thereafter, including the License Agreement Addendum modifying the products "described in Annex I", and on the deposition testimony. There is no documentary evidence – and VEO cites none – that Mark White, John Viskup, or Shawn Brewer discussed membrane walls prior to the time that the Agreement and Annex were executed. Of course, had they done so, one would expect Annex I to reflect membrane walls rather than tangent tube walls, especially since both White and Viskup knew the difference between those technologies, or to refer to the fact that the Annex was merely a "guideline" or "framework," which would contradict the characterization of Annex I by the Addendum signed by Viskup and White less than one month after Annex I was approved. Moreover, one would expect Mark White to have advised EPTI's engineers that membrane wall technology was part of the Agreement after they told him otherwise and that he would not have included the drawing of the cross-section showing tangent tube walls in the Annex. (*See* VEO Response to IKE Factual Statement at ¶¶ 45, 47, 48, 51, 52, 53, 83) EPTI's internal communications, which frequently included Mark White while he was employed there, show that White and EPTI were always consistent concerning membrane wall technology – it was always outside the scope of the Agreement. Those communications are also fully consistent with Viskup and White's admission in their March 30, 2004 letter to EPTI that membrane wall technology was outside the scope of the Agreement.

    PTDATA 296353_2

Without a citation to the record, VEO asserts that "the only instance where an authorized representative of EPTI actually expressed in correspondence that EPTI believed membrane walls were outside the scope of the products licensed under the Agreement, Mark White responded on behalf of VEO and explicitly rejected that position." (VEO Response Brief at p.11) First, while White was with EPTI, EPTI's engineers reminded him that the technology was clearly defined under the Agreement, that the licensed product was the Standard M-Series, and/or that membrane walls were outside the scope, and White never disputed them. (IKE's Undisputed Facts at ¶¶ 45, 47-48, 51-52, 101; *see also* ¶ 46) Second, representatives, including Bob Gdaniec, from EPTI's engineering department properly advised VEO that the Agreement involved standard units and/or that membrane walls were outside the scope of the Agreement, again without any dispute by VEO. (*Id*. at ¶¶ 96-99, 103-08, 111-14, 117-19) Third, White did not "explicitly reject[]" IKE's position that membrane walls were outside the scope of the Agreement in their response to the Breach Letter. Both White and Viskup reviewed that VEO letter, which was revised and discussed over a period of a few days prior to being sent by White to EPTI, and VEO in fact agreed that "membrane furnace and outer walls, watercooled front and rear … are outside the geometry and characteristics of the License." (*Id*. at ¶ 90) (emphasis added) As White confirmed in his deposition, his reference to the "geometry and characteristics" pertained to Annex I, which contains the tables and the drawing showing the cross-section of the Standard M-Series. At the time White called those features "improvements," which connotes that they are not part of the technology licensed by EPTI to VEO and that they were developed by VEO during the term of the Agreement. White, though, confirmed in this litigation that membrane walls are not improvements (*id*. at ¶ 94), leaving only the admission in the March 30 letter that membrane walls are in fact outside the scope of the Agreement.

## 2.    VEO's Course Of Performance Evidence Fails To Create A Material Issue Of Fact.

VEO's course of performance evidence neither disputes IKE's evidence nor creates a dispute of material fact. (VEO Response Brief at pp.11-22)  First, EPTI consented to VEO's sale of non-conforming boilers prior to March 26, 2004, but it consistently advised VEO that the Agreement was limited to the Standard M-Series and/or that membrane walls and other features were outside the scope.  (IKE Undisputed Facts at ¶¶ 96-97, 98, 106-08, 114, 117-19)  Those reminders were so frequent that VEO's Chief Engineer stated that his "biggest frustration is when I'm told 'That's not a standard 'M' series." (*Id*. at ¶¶ 103-05)  Second, despite VEO's contention that VEO did not understand Annex I to limit the boilers to the "Standard M-Series" and that the term did not have meaning in the industry, Viskup was aware of the "Standard M-Series" prior to entering the Agreement because a prior employer owned several.  He had been interested in licensing the Keystone® M-Series as early as 1999.[3]  (*Id*. at ¶¶ 15, 18)  Third, the Standard M-Series had its owns design drawings, and the cross-section in Annex I showing membrane walls was a Standard M-Series drawing.  (*Id*. at ¶¶ 5-6, 56)  Fourth, the fact that the Standard M-Series could be altered to include membrane walls and had been altered <u>by EPTI as owner</u> of the technology to include such features prior to the Agreement does not mean that <u>VEO as licensee</u> had the contractual right to make that alteration under the terms of the Agreement. (VEO Response Brief at pp.13-15)  Fifth, EPTI provided a design guide and sales and marketing materials to VEO showing membrane walls and other features not included in Annex I (*id*. at

---

[3]    VEO states that Shawn Brewer of VEO understood that "M-Series boilers were the same as O-style Keystone boilers." (VEO Brief at p.13)  Brewer has no recollection of ever reading or receiving the final version of the License Agreement, so his understanding as to what an M-Series boiler was has no relevance to what was licensed. (Exhibit 1, S. Brewer Dep., pp.36-37)  In addition, his recollection of discussions with anyone from EPTI about licensing the technology  was "[n]othing more than it sounds like a good idea and something that we need to look into." (*Id*. at p.34)

PTDATA 296353_2

pp.14-15) because, as VEO admits, EPTI did not have separate materials for the M-Series and because the contract required EPTI to provide "sales promotion materials as used by" EPTI. (VEO Response to IKE Factual Statement, ¶¶ 9, 10, 131, 136, 139)

Next, VEO grossly mischaracterizes Annex I in arguing that it is "unworkable" based on the "design parameters". (VEO Response Brief at pp.16-20) First, the design parameters in Annex I identify the operating conditions used to determine the predicted boiler performance; they do not signify that the boiler could only be operated at a certain operating pressure, temperature, or elevation or that VEO could alter the design whenever it wished. (*Id*. at pp.16-17) As Bob Gdaniec explained, if the operating/site conditions change (*e.g.*, the site elevation is higher or lower), then the performance (such as steam flow or quality) will change. The design of the boiler, however, does not change. (VEO Supplemental Appendix, Exhibit 3, R. Gdaniec Dep., pp.53-54) ("not modification of the products but modifications to the conditions at which the boilers run under. ... if the boiler is at a different elevation, it performs differently."); (Exhibit 63, IKE 30(b)(6), pp.21-23) Second, it is irrelevant that VEO may use auxiliary equipment with the M-Series because that equipment does not change the design of the boiler. (VEO Response Brief at pp.17-18) Third, VEO's claim that the cross-section drawing in Annex I is merely "illustrative" fails for the reasons set forth above. Fourth, IKE did not mischaracterize the boiler business by identifying the Standard M-Series as "essentially an off-the-shelf, one-size-fits-all item." (*Id*. at p.18) The out-of-context testimony quoted by VEO from Steve Bernatowicz that EPTI would "never, fortunately, sell anything standard" referred to "O-style Keystone boilers, but they were not the M-style design. As I said, the M-style was outdated ..." (VEO Supplemental Appendix, Exhibit 6, p.13) Not surprisingly, the Standard M-Series had standard designs. In any case, the fact that EPTI could make changes to the design as owner

of the technology is different than whether the licensee could make changes under the contract. Similarly, even if customers may prefer membrane wall over tangent tube boilers, that circumstance cannot expand VEO's contractual rights, which are defined solely by the written Agreement. (VEO Response Brief at pp.16-20)  The License does not automatically change with the technology; it must be amended or superseded by written agreement.  That did not occur.

### 3.    The EPTI Breach Letter Revoked Consent.

VEO attempts strenuously to undermine the significance of the March 26, 2004 Letter in which EPTI identified its concerns over VEO's performance during the initial 15 months of the License Agreement and in which EPTI expressly stated that VEO "will need to redirect their attention pm the sales/marketing and execution of the products that are defined in the license agreement." (VEO Response Brief at pp.20-23)  VEO's multiple challenges fail for multiple reasons.

First, the Letter is clear and unequivocal in identifying how VEO had sold boilers outside the scope of the Agreement and in stating that VEO's future activities must be confined to the scope of Annex I.  "VEO currently licenses only the M series product line which has a very specific geometry and characteristics.  In review of some of the VEO recent projects and proposals, it appears that the majority of projects that VEO is pursuing or has completed have been outside the definition of the license agreement." (VEO Response to IKE Factual Statement at ¶ 86); (*Cf.* VEO Response Brief at p.22) ("it is difficult to comprehend how IKE can argue that EPTI issued an unequivocal pronouncement that VEO had breached the Agreement.")  VEO's March 30 response did not raise questions about the letter's meaning and specifically responded

to the assertion that membrane walls were outside the scope of the Agreement. VEO's desperate attempt to minimize the importance of the letter does not create a factual issue.

Second, VEO's questioning of the timing of the letter is immaterial because it ignores both that the letter represented a consensus view of EPTI's Engineering Department and that EPTI repeatedly reminded VEO throughout the first 15 months of the scope of the Agreement such that the March 26 Letter was not the first time EPTI raised concerns with VEO. Indeed, those concerns were raised so frequently that the "biggest frustration" of VEO's chief engineer was being told "that's not a standard 'M' series." VEO also ignores that EPTI was in financial duress throughout that time, including being in bankruptcy, which explains why EPTI permitted VEO to make sales even though the boilers were outside the scope and why EPTI did not bring a lawsuit.[4]

Third, VEO attempts to dismiss the multiple emails sent by EPTI to VEO informing VEO that membrane walls are outside the scope of the Agreement by characterizing the senders as "lower level engineers." (VEO Response Brief at p.22) The engineers obviously dealt with VEO in the ordinary course of business, and the same engineers either participated in development of Annex I (*e.g.*, David Briggs) or were the contractual contact person under the Agreement (Ted Fuhrman, who replaced Mark White). In any case, their views were consistent with the position EPTI took internally and externally from day one and corresponded to the substance of the March 26 Breach Letter.

---

[4]    IKE's claims are based on boilers sold after IKE became licensor and does not include any boilers sold while EPTI was licensor given the consent provided by EPTI. To the extent VEO contacted EPTI about non-conforming boilers after March 26, 2004, the orders likely were placed prior to the date of the Breach Letter.

15

Finally, the Engineering Department – which assisted in the development of Annex I – believed that VEO was selling boilers outside the scope and reached consensus on that view, as VEO admits. (VEO Response to IKE Factual Statement, ¶ 87) Stephen Kang, IKE's President, may not have concluded there was a breach, but he approved the sending of the EPTI Breach Letter based on the unanimous conclusion of the Department. (*Id.*)

## II.    VEO Has Infringed Plaintiff's Trademark By Using The Keystone® Name In Connection With The Sale Of Boilers Outside The Scope Of The License Agreement.

VEO agrees that if IKE's interpretation is correct that membrane walls are outside the scope of the Agreement, then IKE is entitled to prevail (at a minimum) on its trademark infringement claim with respect to each of the 11 boilers sold while IKE was licensor.[5] (VEO Response Brief at p.23) VEO's arguments seeking to avoid IKE's infringement claim fail under the facts and the law.[6]

First, the License Agreement did not permit VEO to sell boilers with membrane walls and other non-conforming features for the reasons set forth in IKE's briefing on the parties' respective dispositive motions, which is incorporated herein. VEO cannot dispute that it obtained the right to use the trademark under the Agreement only for licensed products. VEO in

---

[5]    Even if the Court finds that membrane walls are within the scope of the Agreement, IKE would still have trademark infringement claims based on VEO's offering for sale boilers above 150,000 pph and for reverse passing off (described below).

[6]    VEO takes the surprising position that it "lacks knowledge or information sufficient to admit or deny" the factual statement that the Keystone trademark is registered and has been in use continuously since 1952, despite the fact that VEO has used the trademark in sales brochures and proposals and on its website and sought to purchase the Keystone® name from EPTI. (VEO Reponse to IKE Factual Statement, ¶¶ 4, 111, 134, 150, 152) IKE has supplemented its Statement of Undisputed Facts to include the registration and Trademark Assignment Abstract of Title showing both registration and continuous use (¶ 4, Exhibit 64), which also is confirmed by VEO's Response to IKE's Factual Statement at ¶¶ 2, 80, 111, 115, 116, 120)

PTDATA 296353_2

fact used the trademark in connection with the sale of 11 boilers and in marketing materials that deviated from Annex I and failed to confine its sales as demanded by IKE. (VEO Response to IKE Factual Statement, ¶¶ 78-80, 128, 134, 135, 150-52) VEO admits that it refused to provide its sales and marketing materials to EPTI and that IKE did not authorize it to sell any products that deviated from Annex I., confirming its willful intent to infringe the trademark. (*Id.* at ¶¶ 78-80, 138)

Second, VEO disputes that the consent given by EPTI "was revocable" (VEO Response Brief at p.24), but it fails to cite any law contradicting that identified by IKE showing the consent was, in fact, revocable. (IKE Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment at pp.21-23) At most, VEO claims it would be "unjust" for EPTI and IKE to revoke consent based on an alleged "material change in reliance on the past permission." (*Id.*) As shown by IKE's Undisputed Statement of Facts, that defense fails because VEO at all times knew that Annex I defined the licensed product, that membrane walls were outside the scope of the Agreement, and that EPTI had consented to the sale of non-conforming boilers on a boiler-by-boiler basis. VEO obtained a benefit from EPTI's consent in the form of profits from those boiler sales. While VEO developed a sales force, sales brochure, and sales manual, those were necessary both for the sale of the licensed boiler as well as for the other products (HRSGs and firetube boilers) sold by VEO. And as shown by the factual record concerning IKE's Motion for Partial Summary on VEO's Counterclaims, VEO's contracts with the sales representatives cover all VEO products and are terminable at will such that there was no financial harm if VEO had to terminate representatives (which it did not do). Of course, IKE never gave consent to VEO. There is nothing unjust about EPTI revoking consent when VEO at all times knew the scope of the Agreement.

For the same reasons, VEO did not rely to its detriment based on EPTI's acquiescence on the use of the trademark for the non-conforming boilers. (VEO Response Brief at p.25) As an initial matter, VEO has the burden of proving this defense, *Analytic Recruiting, Inc. v. Analytic Resources,* LLC, 156 F. Supp. 2d 499, 516 (E.D. Pa. 2001), and neither of the cases cited by VEO found that the defense was proven. EPTI consistently notified VEO of the scope of the Agreement, and VEO chose to continue marketing boilers exceeding that scope. EPTI acquiesced in the use of the trademark prior to March 26, 2004 for non-conforming boilers, but it did not do so thereafter. IKE, of course, never did. Although VEO adds that it developed "manufacturing ability to build and sell modern water tube package boilers" (*id.*), it does not explain or offer facts as to what that means. If anything, developing that ability was a benefit, not a detriment. Of course, VEO also manufactured firetube boilers, waste-heat boilers, and HRSGs, with VEO apparently manufacturing more HRSGs than Keystone® boilers. (Exhibit 5, J. McConnaughy Dep., pp. 46-48, 88, 133) There simply was no prejudice.

Third, VEO incorrectly asserts, without any supporting case law, that EPTI's permission to VEO was not a waiver of the limited scope of the License based on VEO's alleged right to modify the licensed product. (VEO Response Brief at p.25) As set forth above, membrane walls were not a modification under the terms of the Agreement, and EPTI never gave a prospective right to VEO to sell boilers with membrane walls. Moreover, VEO ignores Clause 24(b) of the Agreement that "no waiver, express or implied, by either party of any breach of obligation by the other party shall be considered as a waiver of any other or subsequent breach." As a result, IKE can withdraw prior consent.

Next, VEO seeks without success to distinguish the cases cited by IKE holding that the use of a trademark after expiration of a license demonstrates a likelihood of confusion by

PTDATA 296353_2

arguing that VEO was a licensee throughout the time of the improper usage and that EPTI authorized that usage. (VEO Response Brief at p.26) Those cases directly apply here because EPTI's consent conferred a limited right to use the trademark on non-conforming products for a limited time, namely on a case-by-case basis. Just as the right to use a trademark ends when the license agreement expires, so too does the right end as to a non-conforming product when consent is revoked. In both cases, there is no contractual right to use the trademark under the terms of the agreement between the parties.[7] *Villanova University v. Villanova Alumni Educ. Found.*, 123 F. Supp.2d 293, 309 (E.D. Pa. 2000) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:31 (4th ed. 1992) ("If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the mark. Any such use is without the trademark licensor's consent and constitutes infringement.")).

Despite the fact that VEO used the "Victory" name on the boilers it sold without placing the Keystone® name on those boilers (Exhibit 5, McConnaughy Dep., pp.49-54) and marketed the boilers as having "VEO designs," VEO claims that it can escape a finding of reverse passing off, under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), because it rather than IKE physically manufactured the boilers. (VEO Response Brief at pp.27-28) VEO's argument ignores the differences between the present dispute and the one in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), as well as the plain terms of §43(a)(1)(B) of the Lanham Act.

In *Dastar*, the Supreme Court held that the phrase "origin of goods" in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the

---

[7]    VEO does not dispute that its use of the trademark was willful. (IKE Opening Memorandum at p.19)

author of any idea, concept, or communication embodied in those goods." *Dastar*, 539 U.S. at 32. The defendant/petitioner Dastar took a public domain television series, obtained it independently of plaintiff/respondent Fox, re-edited it, and sold it, without proper credit to the original series. Unlike the present case, the parties in *Dastar* did not have a pre-existing contractual relationship governing the use of the tangible goods. The Supreme Court held that no credit was required under the Lanham Act. In contrast, Clause 15(a) of the License Agreement required VEO to place the Keystone® name on all boilers and to state on a "plate appearing on each Product supplied by Licensee … that the Products were supplied by Licensee under license from Licensor," thereby designating that the origin of the licensed product was Licensor. That makes sense because the licensor supplied the proprietary technology to manufacture the boilers and because one of the purposes of the License was to promote the Keystone boiler. (*See, e.g.*, Clause 15(b)(ii)) ("All use of the Mark by Licensee, including any good will arising out of such use, shall be solely to the benefit of Licensor.")

In short, VEO used the technology provided under the License to manufacture and sell the boilers as its own product without disclosing the licensor, confirming that it sought to deceive the public as to the origin of the boilers. VEO simply cannot be said to be the "origin" of the goods, despite its having physically manufactured them, when the licensor provided the technology and the know-how -- effectively everything up to the physical manufacture -- and the boilers were to be sold under the Keystone® trademark with disclosure of the licensor. Clearly, the licensor was – and was to be identified as -- the source or origin of the goods, with VEO supplying them only as the designated licensee. Had VEO wanted the right to hold the goods out as its own, it should have negotiated for that in the Agreement. For VEO to

PTDATA 296353_2

put its own name on the boilers without any reference to Keystone® and/or the licensor – despite a contractual obligation to do so -- is to falsely designate their origin.

Finally, VEO's description of the boilers as "VEO Designs" is a deliberately false or misleading statement as to the "nature, characteristics, [or] qualities" of the goods, because the goods admittedly were not designed by VEO. *See* 15 U.S.C. § 1125(a)(1)(B). "The only watertube boiler technology that VEO had during the term of the License Agreement was the Keystone® technology." (VEO Response to IKE Factual Statement, ¶ 158; *see also* ¶¶12-13) When VEO marketed the boilers as "VEO Designs," it knew that the boilers were not VEO designs, but were, in fact, designed by IKE's predecessors in interest. *Cf. Do It Best Corp. v. Passport Software, Inc.*, No. 01 7674, 2005 U.S. Dist. LEXIS 19959 (N.D. Ill. Sept. 12, 2005) (removing copyright and re-packaging software as one's own stated Lanham Act violation). The Supreme Court in *Dastar* explicitly left open the possibility that, by falsely describing the goods in marketing materials, Dastar could be liable under § 43(a)(1)(B), despite the Court's holding that Dastar was not liable under § 43(a)(1)(A). *Dastar*, 539 U.S. at 32. Where, as here, a seller of goods knowingly uses a term that misrepresents the "nature, characteristics, [or] qualities" of the goods, the seller is liable under § 43(a)(1)(B).

## III.    **VEO Misappropriated IKE's Trade Secrets.**

VEO disputes that IKE's "designs for O-style water tube boilers constitute a trade secret" (VEO Response Brief at p.29) but fails to identify evidence refuting IKE's evidence – derived from the License Agreement, VEO's own documents, and deposition testimony – that the design of the Keystone® represents a trade secret and that VEO continued to utilize the licensor's proprietary technology after EPTI and IKE instructed VEO that it could no longer

deviate from Annex I. (Plaintiff's Undisputed Facts, ¶¶ 2-3, 5, 7, 9, 13, 15, 35, 36, 64, 66, 78, 79, 109-21, 121, 123, 125, 126-28, 139, 141, 158); (Exhibit 63, IKE 30(b)(6) Dep., pp.148-59) VEO did not have its own technology prior to entering the Agreement (*id*. at ¶¶ 12, 158), and after VEO had sold Keystone® boilers for slightly more than a year, VEO thought it "would be a good opportunity to purchase the technology," offering $500,000 for the technology and the Keystone® name. (*Id*. at ¶¶ 109, 116) VEO itself marketed the design as unique. (*Id*. at ¶¶ 3, 64, 139, 141)

Given those facts, VEO's only argument is the conclusory assertion that "the designs for the Keystone boiler are available in the public domain." (VEO Response Brief at p.29) (citing testimony from its 30(b)(6) designee and from Jay McConnaughy) Despite that this litigation has been ongoing for more than 16 months, VEO, however, does not identify where in the public domain those designs are or what the specific design is that is publicly available. The 30(b)(6) designee testified only that VEO "believe[s]" the designs are available without citing any facts to support that belief, while McConnaughy testified only that there are "reference materials out there in the public domain that someone could use in order to design an O style boiler." McConnaughy's testimony actually was that he has not seen the detailed drawings of the Keystone® in reference materials in the marketplace. (Exhibit 5, J. McConnaughy Dep., p.192) Of course, if there was nothing special about the technology and the technology was publicly available, why would VEO offer $500,000 to acquire it?

In sum, VEO has failed to identify any evidence contradicting that the boiler has a unique design, competitive advantages, and economic value and that it was the subject of reasonable efforts to preserve secrecy. 12 Pa.C.S.A. § 5302. VEO admits that it continued to sell boilers with membrane walls – using technology received from licensor -- during the time

PTDATA 296353_2

that IKE was licensor after both EPTI and IKE advised that it may not do so. VEO's superficial response confirms that the Keystone® designs are trade secrets that were misappropriated.

## V.    IKE IS ENTITLED TO JUDGMENT ON ITS CLAIM FOR UNFAIR COMPETITION.

VEO agrees that the "elements for trademark infringement are identical to those for unfair competition." (VEO Response Brief at p.29) Thus, because IKE is entitled to judgment on its trademark infringement claim, it is entitled to judgment on its unfair competition claim. However, IKE also explained that "a claim of unfair competition inherently encompasses trademark infringement, but also includes a broader range of unfair practices which may include the misappropriation of the skill, expenditures and labor of another." (IKE Memorandum at pp.20-21). Thus, regardless of whether IKE prevails on the trademark infringement claim, it still prevails under its unfair competition claim because: (1) regardless of use of the trademark, VEO used the technology without permission when it sold non-conforming boilers after EPTI and IKE revoked consent; (2) at all times held itself out to the public as owning the Keystone® technology, developing the designs, and having the capability of selling the full range of Keystone® boilers with all features up to 500,000 pph; and (3) placed the Victory name on boilers without identifying Keystone® or the licensor as it was required to do. VEO thus passed off the technology as its own, thereby engaging in deceptive practices and trading on another's reputation and obtaining the benefit of the skill, expenditures, and labor inuring to IKE as EPTI's successor. That was important because, immediately after the License Agreement expired, VEO introduced -- without interruption -- its own line of O-type, industrial water tube boilers,

supposedly designed by Mark White beginning when IKE became licensor, that compete with Keystone® boilers. (Exhibit 59, VEO 30(b)(6) (M. White) Dep., pp.100-01, 113)

## VI.  VEO Was Unjustly Enriched By Its Use Of The Technology.

VEO seeks to avoid IKE's unjust enrichment claim by arguing (1) that the parties had a contract, rendering unjust enrichment inapplicable and (2) that EPTI's limited consent should equitably estop any claim of unjust enrichment. (VEO Response Brief at pp.30-31) Both arguments fail.

Although an unjust enrichment claim fails when the parties have a contract, the parties here did not have a contract that permitted VEO to sell boilers with membrane wall technology. Because there was no such contract, IKE does not have a contract right to recover damages. As a result, an unjust enrichment claim exists. VEO did not identify any evidence showing that IKE failed to meet its evidentiary burden if, as demonstrated by IKE, the License Agreement did not permit VEO to sell boilers outside the scope of Annex I.

Second, VEO has not identified any case law or facts to support its equitable estoppel claim. Instead, VEO claims that it "reasonably relied upon EPTI's acquiescence in building membrane wall boilers using the Keystone mark and technology." (VEO Response Brief at p.31) While that is a defense to its boiler sales prior to its receipt of the EPTI Breach Letter on March 26, 2004, that is no defense after EPTI and IKE revoked consent and thus refused to acquiesce in the sale of non-conforming boilers.

In sum, VEO obtained the technology for the membrane walls and other non-conforming features from EPTI, used that technology after EPTI and IKE instructed it not to do so, and derived revenues from its sale of the non-conforming boilers. It is inequitable for VEO to retain the profits for those boilers.

## Conclusion

For the foregoing reasons, Plaintiff Indeck Keystone Energy LLC asks the Court to grant its Motion for Partial Summary Judgment on Counts I, IV, V, and VI of Plaintiff's Complaint.

Respectfully submitted,

___/s/___John K. Gisleson_____

John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated:  May 2, 2006.

PTDATA 296353_2