1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3

INDECK KEYSTONE ENERGY,        )
4  LLC, a Delaware limited      )
   liability company,           )
5                               )
             Plaintiff,         )  CIVIL ACTION
6                               )
   vs.                          )  No. 04-CV-325E
7                               )
   VICTORY ENERGY OPERATIONS,   )  Judge Sean J. McLaughlin
8  LLC, a Delaware limited      )
   liability company,           )
9                               )
             Defendant.         )
10

11

12

13       The videotape deposition of SHAWN BREWER taken

14  on behalf of the Plaintiff before Pamela B.

15  Stinchcomb, Certified Shorthand Reporter in and for

16  the State of Oklahoma, on the 13th day of October,

17  2005, in the City of Tulsa, State of Oklahoma,

18  pursuant to the stipulations of the parties.

19

20

21

22          PAMELA B. STINCHCOMB, CSR #1544
23          DAVIDSON REPORTING SERVICE
              5508 South Lewis Avenue
24          Tulsa, Oklahoma  74105
                (918) 745-9959
25



EXHIBIT
1

23

1      A.    Armstrong Services was our customer at

2    Combustion Equipment Sales in Miami, and we referred

3    them to John at Victory Energy.

4      Q.    What was the Keystone boiler that was sold?

5      A.    I don't understand the question.  What do

6    you mean?

7      Q.    Do you know what the size of the boiler was

8    that was sold?

9      A.    It was the boilers that we were talking

10    about earlier, the 75,000-pound boilers with two

11    units.

12      Q.    What was your personal involvement in the

13    transaction?

14      A.    Strictly as a liaison between Victory and

15    Armstrong Services.

16      Q.    Did you do any analysis of any kind of the

17    boiler?

18      A.    No.

19      Q.    As of the time that you joined Victory in

20    February of 2002, did you have any understanding as

21    to the reputation that Keystone watertube boilers had

22    in the marketplace?

23      A.    I did have an understanding of it, yes.

24      Q.    And what was that understanding?

25      A.    Just that it had been a long living company

24

1    in the boiler business and that they had a reputation

2    of being a quality piece of equipment.

3        Q.    And that was true for the Keystone

4    watertube package boilers?

5        A.    To my understanding -- well, it was -- Zurn

6    is actually who we knew it as.  Aalborg was a new

7    name for me, but I did know Zurn Boiler, which is who

8    owned the Keystone for 50 years before Aalborg,

9    somewhere around there.

10       Q.    How did you develop an understanding as to

11   Keystone's reputation?

12       A.    Being in the sales, and we were a BNW

13   representative at one time, and just being able to

14   know who some of your competition is and just by

15   being in the business, gaining knowledge that way.

16   Word of mouth I guess would be the best represent.

17       Q.    During 2002, did you ever have any

18   discussions with John Viskup about Keystone watertube

19   package boilers?

20            MR. SHEEAN:  Objection, vague.

21       A.    Yes, I'm sure we did.

22       Q.    (By Mr. Gisleson) Did John Viskup ever

23   describe to you his view as to the quality of the

24   Keystone watertube package boilers?

25       A.    He indicated that he felt it was a quality

25

1  boiler.

2      Q.    What else did he say?

3          MR. SHEEAN:   Objection, calls for

4  speculation.

5      A.    I don't recall any details other than that.

6      Q.    (By Mr. Gisleson) Describe Victory's

7  facility in 2002 when you joined the company.

8      A.    It was a fairly small office.  Mainly a

9  sales office with some bays that were being used to

10 recondition the firetube boilers that I described and

11 then some additional bays where the manufacturing of

12 the piping and also some duct work, I should throw in

13 there.  And there was another bay of parts.

14     Q.    The bay of parts, was that storage?

15     A.    Yes.

16     Q.    What was the manufacturing of duct work?

17     A.    It was similar to the piping.  It was just

18 that, it was duct work that was being manufactured by

19 us for field installation.

20     Q.    When you joined Victory, did it have any

21 design engineers on staff?

22     A.    Not when I joined.  Not on staff, no.

23     Q.    Is John Viskup an engineer?

24     A.    Not to my knowledge.

25     Q.    Were there any engineers working for

42

1    scope of a Keystone.  And we had Erie involved

2    intimately designing a very high pressure boiler well

3    over 1,000 psi and large, and also a big steam

4    receiving tank that they were designing for that

5    project, as well.

6        Q.   You understood, as the Keystone national

7    sales manager for VEO, that any watertube boiler

8    above 150,000 pounds per hour steam flow was outside

9    of the scope of the license agreement, correct?

10           MR. SHEEAN:  I'm going to object to

11   the extent that you're referring to Mr. Brewer as the

12   national Keystone sales manager for Victory Energy.

13   Mr. Brewer has already testified that that was a

14   self-ordained title and not necessarily something

15   that the company assigned to him.

16           Go ahead.  With that objection you can

17   answer.

18       A.   Oh, yeah, we understood that.

19       Q.   (By Mr. Gisleson) You also understood that

20   in order to submit a proposal for a watertube boiler

21   above 150,000 pounds per hour, it was necessary to

22   obtain the licensor's consent, correct?

23       A.   Yes.

24       Q.   And for each of the three instances that

25   you identified, the University of Notre Dame, McGee

45

1   the details of the quote just to get a quote out to

2   the customer.

3       Q.   And in many instances, those existing

4   quotes had already been sized or performance rated by

5   EPTI?

6       A.   Oftentimes.  Or some were just close

7   enough, and then what -- you wouldn't include that

8   part of that to the proposal.  But at least you could

9   get your price to them and try to cultivate the

10  customer a little bit.

11      Q.   Was it your belief while you worked with

12  VEO that EPTI approved of the sale of each of the

13  boilers?

14      A.   It was my feeling while I was employed that

15  it was a real team effort, and they were very happy

16  with what we were doing with them.

17      Q.   Why did you have that belief?

18      A.   Because they told us.  Many of the people I

19  spoke to were thrilled that the unit was being sold

20  again.  It was, to many of them, like a lost love had

21  resurfaced.

22      Q.   To what extent were you speaking with the

23  engineers at EPTI?

24      A.   Well, I'm not sure who were engineers, but

25  Steve Bernatowicz was my main contact.  And he would

46

1    do the sizing.  I spoke to him very often.  And then

2    when it got a little more complicated, Bob Gdaniec

3    would be involved.  At the beginning, I spoke to Gary

4    Blasick a few times and also Chris Petcos a couple of

5    times.  Those were mainly, you know, the people that

6    I dealt with.  But almost I would say 90 -- you know,

7    I won't give an estimation on percentage, but Steve

8    Bernatowicz was my main contact.

9        Q.    What subjects did you speak with Steve

10   Bernatowicz?

11       A.    Sizing and performance requirements.

12       Q.    Anything else?

13       A.    No, that was mainly it.

14       Q.    Did you ever have any conversations with

15   Steve Bernatowicz in which he told you that a

16   particular boiler was outside the scope of the

17   license agreement?

18       A.    Yeah, I recall where he had said that.  And

19   he said he needed to go talk to someone else to -- to

20   make sure it's okay to pursue and to also help him

21   sometimes in figuring out how to size it properly.

22       Q.    Did you ask Mr. Bernatowicz how a

23   particular boiler was outside the scope of the

24   license agreement?

25       A.    Oh, usually I would know if it was

49

1    the license agreement?

2        A.    Not necessarily outside the scope, but

3    possibly a more complicated system.  Bob's an

4    excellent engineer and definitely a guy -- you know,

5    we used Erie as our tool for guidance and he was a

6    great guy to refer to.  Had tremendous experience.

7        Q.    Was it your understanding that there were

8    instances in which Bob Gdaniec was involved with the

9    design of a particular watertube boiler because it

10   was outside of the scope of the licensing agreement?

11       A.    Yes.

12       Q.    On how many occasions did that happen?

13       A.    I wouldn't be able to say how many.  I know

14   he was involved with the Wyoming project that I

15   mentioned, intimately involved in that job.

16       Q.    More than five projects?

17             MR. SHEEAN:  Objection, calls for

18   speculation.

19       A.    I don't know.

20       Q.    (By Mr. Gisleson) Is it your belief that

21   there was more than one boiler with which Bob Gdaniec

22   was involved that was outside the scope of the

23   license agreement?

24       A.    Not to my knowledge.  I don't recall that.

25       Q.    Could it have happened, you're just not

50

1   sure?

2       A.    Sure, it could have happened.  You know,

3   Bob would have been an engineer, so he would have

4   been dealing with engineering more than with us.

5       Q.    At any time while you were employed at VEO,

6   did you have a conversation with John Viskup

7   concerning the sale by VEO of boilers outside the

8   scope of the license agreement?

9       A.    Only on a -- on a job-by-job basis.

10      Q.    John Viskup ever tell you that it was his

11  plan to go big and sell boilers that were larger than

12  150,000 pounds per hour?

13      A.    On a job-by-job basis.

14      Q.    Did he ever telling you that his goal after

15  the license agreement ended was to sell boilers above

16  150,000 pounds per hour?

17      A.    Not specifically.

18      Q.    Generally?

19      A.    No.  We often talked to Erie about the

20  larger ones, you know, on projects.

21      Q.    Did Victory, while you worked for them,

22  ever develop any proprietary technology for the

23  design and manufacture of boilers above 150,000

24  pounds per hour?

25      A.    Not to my knowledge.  Not to my knowledge.

1     Q.   Did you have an understanding that to the

2   extent Mark White provided any sales and marketing

3   materials with you, you had and obligation to tailor

4   those materials to comply with the license agreement?

5     A.   Well, in the sales and marketing, I may

6   have taken some liberties with some of that

7   information because it was public -- it was old

8   brochures, things that had already been disclosed.

9   So anything technical I would have definitely made

10  sure that Mark was involved in.  If it was just, you

11  know, something along the lines of a description or

12  something that was in a brochure that was printed,

13  I'm not sure if I understood that everything that we

14  ever put to the public had to go through him first,

15  for example, proposals.

16    Q.   Did you ever receive -- strike that.

17         Did you ever seek prior authorization from

18  Mark White before disseminating any brochures

19  pertaining to Keystone boilers?

20    A.   Sure.  We -- well, yeah, absolutely.  We

21  sent -- all of our printed material before we would

22  allow it to be released, from what I recall, were

23  always sent to them for comment.

24    Q.   Did you ever receive any written

25  authorization from EPTI?

89

1      A.    I can't remember specifically receiving

2  other than what you've shown me where Mark would come

3  back with a change or perhaps an e-mail.

4      Q.    As to the request for catalogs/brochures --

5      A.    Uh-huh.

6      Q.    -- in your March 11, 2003, e-mail, were

7  there any "M" series catalogs or brochures already in

8  existence?

9      A.    See, there was never anything that

10  stipulated "M" series as far as sales literature.  It

11  was a Keystone, and we never saw anything that

12  stipulated that there was another type of Keystone

13  other than the "M" series.  So I can't tell you that

14  we ever received an "M" series catalog.  We received

15  Keystone equipment information.

16      Q.    When you say in the first line of your

17  e-mail that:  I feel these are realistic expectations

18  as to what you wanted --

19      A.    Uh-huh.

20      Q.    -- you're referring to the license

21  agreement and the provision of sales and marketing

22  materials under the license agreement?

23      A.    See, I didn't think in terms of the

24  stipulation of the license.  Everything was more,

25  hey, this is what I'd like to have in order to sell

98

1  those references that are outside the scope of the

2  license agreement?

3                    MR. SHEEAN:  Objection, asked and

4  answered.

5       A.   I would say that this was our

6  authorization.

7       Q.   (By Mr. Gisleson) Can you point to anything

8  else?

9       A.   If, in fact, we continued to leave it,

10  which I don't recall if we took those out or not, but

11  I don't think we did, I know that we did send them a

12  copy of our final draft, as well.  And I -- I'm sure

13  we had sign-off on that.  I know I did verbally.  I

14  don't recall if we received something in writing.

15  But I know that they were well aware that we had

16  provided this in our sales literature.  Matter of

17  fact, because they thought it was so neat that we

18  brought it out, some of the guys in the office at

19  Erie asked us to send additional catalogs up there so

20  they could have them, as well.

21                    MR. GISLESON:  Mark that, please.

22              (Plaintiff's Exhibit Number 6 was marked

23  for identification.)

24       Q.   (By Mr. Gisleson) I'd like to show you

25  what's been marked as Brewer Exhibit 6.  It's a

99

1   document that's stamped ND 276 through ND 299.  Have

2   you seen a copy of this before?

3       A.   Yes.

4       Q.   And this is a Victory Energy Keystone Steam

5   Generating Systems brochure; is that correct?

6       A.   Yes.

7       Q.   Were you involved in preparing this?

8       A.   Yes.

9       Q.   What was the source document that you --

10  strike that.

11          Was anyone else involved in preparing

12  this --

13      A.   Yes.

14      Q.   -- brochure?

15          Who?

16      A.   John Viskup, Lee West and Mark White at

17  Erie, and I don't know who else.

18      Q.   What was the source document that was used

19  to prepare this Victory brochure?

20      A.   There was an old Zurn brochure, Zurn

21  Energy, three owners before that we -- we used as a

22  basis for this.

23      Q.   What changes did Victory make to the old

24  Zurn brochure that was used to create this Victory

25  brochure?

100

1       A.    A lot of verbiage.  This was actually a

2   rough draft.  We changed the second page here, the

3   whole introduction.  I know that we -- you'll notice

4   it mentions Zurn in there.  Obviously we didn't -- we

5   didn't -- we changed the -- the way this was laid out

6   at the beginning.  A lot of semantics were changed.

7   We -- and there were different revisions at the time,

8   you know, over the course of 18 months that I was

9   there working with that.  A lot of it was changing --

10  just getting our name in there.  Again, you know, we

11  were trying to come to market as quickly as possible

12  with some material that we could give to somebody.

13  So oftentimes we found that the first thing we put

14  out may not have been the clearest or necessarily the

15  cleanest looking piece of literature, but we had to

16  get our name out there.

17      Q.    Did Victory maintain any of the drafts of

18  the brochures?

19      A.    I don't know if our drafting department did

20  or if the printing company that we used did.

21      Q.    On the second page of this exhibit, ND 277,

22  on the left column, last sentence, it says:  "Victory

23  Energy has acquired the license to manufacture

24  Keystone Steam Generating Systems."  Do you see that?

25      A.    Yes.

101

1          Q.   Who included that sentence from Victory?

2          A.   I don't recall.

3          Q.   Victory did not acquire a license, it

4     entered into a license agreement, correct?

5               MR. SHEEAN:  Objection, calls for a

6     legal conclusion.

7          A.   I don't know what the -- what the legal

8     terminology would be to give you a fair, intelligent

9     answer to that.

10         Q.   (By Mr. Gisleson) Where in this brochure

11    does it say that Victory is limited to designing and

12    supplying watertube package boilers under the

13    Keystone name up to 150,000 pounds per hour?

14         A.   I don't know if we put a limitation in

15    writing to the public because, again, in a -- from a

16    marketing perspective, that has -- that provides your

17    competition with a real hole to be able to say, see,

18    they're very limited in what they can do.  Are you

19    sure you want to work with a company that can't do

20    anything more than this?  And again, we were taking

21    the team approach.  So we knew that if it was

22    something outside of the license agreement, that even

23    if we couldn't do it, Erie would be able to do it,

24    and we were more than happy to give them the work.

25         Q.   Did you personally have any discussions

102

1    with Mark White about whether the brochure should

2    disclose the fact that Victory's rights under the

3    license agreement were limited to boilers below

4    150,000 pounds per hour?

5        A.    I don't recall having that type of a

6    specific conversation.

7        Q.    It's correct, isn't it, that many of the

8    photographs of boilers in this brochure are beyond

9    the scope of the license agreement?

10       A.    It's really hard to say from looking at the

11   pictures, but, again, they're just old pictures that

12   we ran through.  But we didn't try to dimensionalize

13   the picture to determine, oh, this would have been a

14   larger unit.  So I can't answer that.  And again,

15   this would have been Draft Number 1.  I know that it

16   changed considerably from this.

17       Q.    How do you know this is Draft Number 1?

18       A.    Okay, I shouldn't have said Number 1.  This

19   was one of the earlier drafts.  I know this isn't

20   what the final brochure when I was there looked like.

21       Q.    How does the final brochure differ from

22   this brochure?

23       A.    We changed photographs.  We changed the

24   number of pages.  We -- it was considerable changes.

25   This isn't the most current brochure available.

103

1      Q.    Do you know how widely disseminated this
2  brochure was that's marked as Exhibit 6?
3      A.    I don't know.
4      Q.    Turn to Page ND 283.  Do you know whether
5  those are Victory drawings or Erie Power drawings?
6      A.    Those are Erie Power drawings.  Well,
7  actually let me correct that.  Those were Zurn Energy
8  drawings.
9      Q.    Those were drawings supplied by EPTI to
10 Victory?
11     A.    They were part of the brochure.  We took an
12 old brochure and they remanufactured that, the
13 printing company did.  So we didn't get this in
14 editing format.  We got this in a hard copy that we
15 duplicated from there.
16     Q.    And the only specific changes that you can
17 identify are that Victory took the language from the
18 Zurn brochure and simply tried to add the Victory
19 name whenever possible?
20     A.    That was our initial intention, yeah.
21     Q.    And otherwise it was mostly plagiarized
22 from the Zurn brochure?
23              MR. SHEEAN:  Object to use of the term
24 "plagiarized".
25     Q.    (By Mr. Gisleson) To use the word you used

105

        Q.    (By Mr. Gisleson) To your knowledge, did

Victory ever sign an addendum or amendment in writing

to the license agreement that permitted Victory to

have unfettered or unqualified use of marketing and

sales material it received from Erie Power?

        A.    Not to my knowledge.

                MR. GISLESON:  Mark that, please.

        (Plaintiff's Exhibit Number 7 was marked for

identification.)

        Q.    (By Mr. Gisleson) I'd like to show you

what's been marked as Brewer Exhibit 7.  It's a

document stamped VEO646 to 658.  Have you seen this

before?

        A.    Yes.

        Q.    Can you describe what this is.

        A.    It's a Power Point presentation provided to

us by Erie Power.

        Q.    Did you use this Power Point presentation?

        A.    Yes.

        Q.    How?

        A.    In sales meetings, clients where you do a

sales presentation.

        Q.    How many presentations did you give using

this Power Point?

        A.    I don't know.

160

1      Q.    Turn to Page VE0676.  Under Clause 14-B in

2    the section for copyrights, it says:  "Except as

3    provided above in Clauses 3(a), 3(d), 3(e) and 14(a),

4    Licensee may not copy, reproduce, distribute

5    (including sale, lease or rental), perform, display

6    or prepare derivative works based upon any

7    copyrightable materials provided to Licensee by

8    Licensor without prior written consent of Licensor."

9    Were you aware of that provisional license agreement

10   during the time that you were utilizing Erie Power

11   provided sales and marketing materials?

12     A.    Yes.

13     Q.    Did you ever, to your knowledge, receive

14   prior written consent of the licensor in connection

15   with your using sales and marketing materials

16   provided by Erie Power?

17     A.    I can't think of anything specific, but I

18   know that most of the material that I received was

19   e-mailed to me, and I accepted that as written

20   consent.

21     Q.    Did you receive any document giving you

22   written consent to incorporate the Erie sales and

23   marketing materials into what you prepared?

24             MR. SHEEAN:   I'm going to object to

25   the extent he just answered that question.

161

1           But you can answer it again.

2      A.    I believe their earlier displays where Mark

3   had sent information, I consider that written

4   consent.

5      Q.    (By Mr. Gisleson) So it's clear, in your

6   mind written consent was satisfied simply by his

7   transmitting Erie Power marketing and sales materials

8   to you?

9      A.    For the purpose of marketing the unit, yes.

10     Q.    And beyond that, you cannot identify any

11  documentation that, in your mind, represents written

12  consent from Erie Power to copy, reproduce,

13  distribute, perform, display or prepare derivative

14  works based upon copyrightable materials provided to

15  you by Erie Power?

16     A.    Well, again, you know, the relationship

17  that we had indicate -- the kind of information

18  feeding back and forth that we did where I would send

19  them what we were doing, especially at the beginning

20  stages, which is when most of that was developed, it

21  was seen, it was approved, if not in writing, at

22  least verbally.  And just by sending it to us, it was

23  like, here, I'm going to send you stuff for you to

24  use.  So, to my knowledge, that was the type of

25  authorization I needed.

162

1      Q.    That is the only authorization you can

2  identify?

3      A.    Yes.

4      Q.    Under Paragraph 15-B, "Use of Trademarks,"

5  it says:  "Licensee agrees to use the mark only in

6  the form approved by Licensor."  Were you aware that

7  that provision is in the final version of the license

8  agreement?

9      A.    I don't remember seeing the final version,

10 but I do know that we were -- that I was told that.

11 And that was part of our discussions in his reviewing

12 what we sent them.

13     Q.    Did you receive any written approvals of

14 the materials that you sent?

15            MR. SHEEAN:  Well, I'm going to object

16 to the extent that your question contradicts the

17 terms of the contract.

18            But you can answer.

19     A.    Only in by our sending him copies of what

20 we had developed and he telling us it was right.

21     Q.    (By Mr. Gisleson) Anything in writing?

22            MR. SHEEAN:  Same objection.

23     A.    Just through e-mails.

24     Q.    (By Mr. Gisleson) Are you saying that there

25 was a -- an e-mail that you received from Erie Power

163

1    in which someone from Erie Power specifically

2    approved the form of the trademark for Keystone that

3    was being used by Victory?

4        A.    I don't believe there is anything

5    specifically stating that.

6        Q.    Turn to the next page.  Subpart 2 says:

7    Licensee acknowledges that the mark, the property

8    solely of Licensor, is of great commercial value to

9    Licensor and represents the good will and wide

10   recognition obtained by Licensor's high quality

11   products.  All use of the mark by Licensee, including

12   any good will arising out of such use, shall be

13   solely to the benefit of the Licensor.  Do you see

14   that?

15       A.    Uh-huh.

16       Q.    Yes?

17       A.    Yes.

18       Q.    Were you aware of that provision in the

19   final version of the license agreement?

20            MR. SHEEAN:  I'm going to object to

21   the extent this calls for him to make a legal

22   interpretation of the agreement.

23            But you can answer.

24       A.    I didn't understand this to mean anything

25   different than what was stated in the last two

169

1        Q.    Did you have any discussions with
2    Mr. Viskup about the revisions to Annex.1?
3        A.    I don't remember a specific discussion
4    regarding it.  I think it was just a follow-up to the
5    contract.
6        Q.    Did you have any role with respect to the
7    preparation of Annex.1 other than forwarding drafts
8    to John Viskup?
9        A.    No.
10       Q.    Did you ever consult Annex.1 to the license
11   agreement in connection with any of the proposals you
12   prepared?
13       A.    No, because when we did receive sizing
14   information, it duplicated a lot of this.  So there
15   was no need to get an official document like this in
16   order to do that, so I never did.
17       Q.    Looking at Pages VEO790 through 792, do you
18   see any reference in those pages to either welded
19   walls or membrane walls?
20              MR. SHEEAN:  I'm going to object to
21   the extent the document speaks for itself, but you
22   can answer.
23       A.    I don't see that.
24       Q.    (By Mr. Gisleson) Pardon me?
25       A.    I don't see that.

170

1    Q.   Did you have any discussions with John
2  Viskup in which one or both of you discussed whether
3  Annex.1 should be modified to refer to either welded
4  walls or membrane walls?
5    A.   I don't remember having a specific
6  conversation to that effect.
7    Q.   Did you have such a conversation with Mark
8  White?
9    A.   I don't specifically remember ever talking
10  about revising any of the contract or any of the
11  attachments.
12    Q.   Did you review this Annex.1 when you
13  received it on February 3rd, 2003?
14    A.   I've seen it, but I don't know if I took
15  the time to review it in depth.
16    Q.   At the time you received it in February
17  2003?
18    A.   Right.
19    Q.   Do you know how to read the drawings that
20  are on Pages 790, 792?
21    A.   Yes.  Yes, I.
22    Q.   So that you had the technical ability in
23  February of 2003 to determine whether the walls were
24  tangent tube or whether they were welded wall or
25  membrane walls?

171

1      A.    I could read it to see that it said that.

2      Q.    According to Page 790, what are the furnace

3   walls -- strike that.

4           According to Page VEO790, how were the

5   furnace walls constructed?

6              MR. SHEEAN:  Objection.  The document

7   speaks for itself.  You can answer.

8      A.    Tangent tube.

9      Q.    Which is different than membrane or welded

10  wall?

11     A.    Yes.

12     Q.    What was the material of which the front

13  wall was constructed?

14             MR. SHEEAN:  Same objection.

15     Q.    (By Mr. Gisleson) As you understood it from

16  reading Annex.1?

17     A.    From reading it now, refractory and fire

18  brick, block insulation.

19     Q.    What was the construction of the outer

20  walls, as you understood it from reading Annex.1?

21             MR. SHEEAN:  Same objection.

22     A.    Tangent tube.

23             MR. GISLESON:  Mark that, please.

24             (Plaintiff's Exhibit Number 21 was marked

25  for identification.)

176

1   for identification.)

2       Q.   (By Mr. Gisleson) I'd like to show you

3   what's been marked as Brewer Exhibit 23.  It's a

4   document stamped IKE273.  If you could review this

5   and let me know when you're finished.

6       A.   Okay.

7       Q.   You see that the lower e-mail is a February

8   3, 2003, e-mail from Dave Briggs to Mark White on the

9   subject of license agreement response.  Mr. Briggs

10  writes:  "Mark, the agreement is for the saturated

11  standard 8M through 22M refractory wall design

12  Keystone package boilers.  You asked what drawings

13  would be affected if the order in question would be a

14  welded wall design for the furnace and outer side

15  wall."  Did you understand in February of 2003 that

16  there was a difference between a refractory wall

17  design for a Keystone and a welded wall design?

18      A.   I knew the welded wall design was an

19  option.

20      Q.   You understood it was different than a

21  refractory wall?

22      A.   Yes.

23      Q.   Did you make a request of Mark White that

24  he determine what drawings would be affected if there

25  was an order for a welded wall instead of a

177

1    refractory wall design?

2        A.    Well, again, this was less than a month

3    after we started with it, and we had some projects

4    that looked like they were going to go through.    So

5    we needed to be ready for that in the event that we

6    were awarded it, because there's, of course,

7    deadlines to meet.    So I don't remember if I

8    requested it or if I was just in the loop because it

9    was my project.

10       Q.    And then Mark White, in turn, forwarded to

11   you the Dave Briggs mail and said:    "Please refer to

12   the following in regard to "M" series Keystone

13   changes"; is that right?

14       A.    Yes.

15       Q.    Now, did you read the fact that Dave Briggs

16   was stating to Mark White that the agreement is for

17   the saturated standard 8M through 22M refractory wall

18   design Keystone package boilers?

19                 MR. SHEEAN:    Objection, vague.

20       A.    I see that now.    I don't remember it as

21   something that stood out at the time.

22       Q.    (By Mr. Gisleson) Did you send an e-mail

23   back to Mark White when he forwarded to you the

24   Briggs e-mail to say, hey, wait a minute, the

25   agreement also encompasses welded wall or membrane

178

1   wall in addition to refractory wall?

2       A.    I don't remember making a specific e-mail

3   to that effect because it was assumed that it was an

4   option.

5       Q.    Assumed by whom?

6       A.    Well, not assumed.  It was stated as an

7   option in all of the literature and all of the

8   manuals that we received.  It said optional membrane

9   walls, as well.  Because it -- like we stated before,

10  in the '50s when this was developed, they were all

11  tangent tubes.  But as time went on and progressed in

12  the '90s and now, there is no market for tangent tube

13  boilers.

14      Q.    You thought that membrane wall construction

15  in the Keystone "M" series boiler was an option

16  because of the sales and marketing materials you

17  received from Mark White?

18              MR. SHEEAN:  Objection,

19  mischaracterizes the prior testimony.  You can

20  answer.

21      A.    Well, I knew they were options because of

22  that.

23      Q.    (By Mr. Gisleson) Were you aware that the

24  marketing materials that Mr. White sent you covered

25  the full range of Keystone boilers that would include

179

1  Keystone boilers above 150,000 pounds per hour?

2  Strike that.

3          Were you aware that the marketing materials

4  for the Keystone boiler that Mr. White sent you

5  included or addressed Keystone boilers above 150,000

6  pounds per hour?

7      A.    I knew that some stated some materials

8  about those, yeah.

9          (Plaintiff's Exhibit Number 24 was marked

10 for identification.)

11     Q.    (By Mr. Gisleson) I'd like to show you

12 what's been marked as Brewer Exhibit 24, which is

13 stamped VEO784 to 785.  Do you see how this

14 incorporates the February 3 e-mails from the prior

15 exhibit but that it adds your forwarding of that --

16 of those e-mails to John Viskup also on February 3

17 with your comments?

18     A.    Yes.

19     Q.    And you write:  "John, hopefully this

20 sounds scarier than it actually is" with respect to

21 changing the drawings to include welding wall design?

22              MR. SHEEAN:  Objection.  That's not

23 what the document states.  Mischaracterizes the

24 document.

25     Q.    (By Mr. Gisleson) Do you see how you

180

1    wrote:   "Hopefully this sounds scarier than it

2    actually is"?

3         A.    Yes.

4         Q.    What did you mean by that?

5         A.    What I meant was we are on the verge of

6    closing some orders, and Dave Briggs is telling me

7    that he's going to have to send a bunch of drawings

8    that we're going to need that are not in our

9    possession in order to build them.  And in order to

10   meet deadlines, that sounded scarier than I hoped it

11   really was.

12        Q.    Because of the extent of changes that

13   appeared necessary based on the Briggs e-mail?

14        A.    Because of the amount of information that

15   we were sitting around waiting for.

16        Q.    Did you understand that information

17   concerning the changes to the drawings for a welded

18   wall design was to come from EPTI?

19             MR. SHEEAN:   I'm going to object.

20   Lack of foundation.

21        A.    All the drawings were going to come from

22   EPTI, and I don't think we had received any at this

23   point.

24        Q.    (By Mr. Gisleson) Did you expect EPTI to

25   provide the drawings for the welded wall design?

181

1      A.    Yes.

2      Q.    Did EPTI, in fact, provide the drawings for

3    the welded wall design?

4      A.    From what I recall, yes.

5            (Plaintiff's Exhibit Number 25 was marked

6    for identification.)

7      Q.    (By Mr. Gisleson) I'd like to show you

8    what's been marked as Brewer Exhibit 25.  It's a

9    document stamped IKE289 through 292.  Is this an

10   e-mail and memorandum that you prepared that was

11   recapping a telephone conference between VEO and EPTI

12   on February 6th, 2003?

13     A.    Yes.

14     Q.    What was the purpose of the call?

15     A.    Again, this was so quickly after the

16   license was put into place and we had projects that

17   were pending that it looked as though they were going

18   to go our way so quickly.  I think the purpose of

19   this was so that we could be sure that we were

20   streamlining that transfer of information and so we

21   would be able to meet our customers' needs.

22     Q.    If you'll look at the last page, which is

23   IKE292, it shows "Tele-Con Agenda".  Do you see that?

24     A.    Yes.

25     Q.    Do you know who prepared the agenda for the

217

1          MR. SHEEAN:  Objection, foundation,

2    speculation.

3          A.    I don't know if he reviewed it under that

4    guise.

5          Q.    (By Mr. Gisleson) Is it correct that to the

6    extent you received marketing materials from EPTI

7    that pertained to Keystone boilers, you substantially

8    copied what you received and made it VEO's own sales

9    material?

10         A.    A lot of it, sure, yes.

11         Q.    Did you ever ask anyone whether there was a

12    difference between an "O" series and an "M" series

13    Keystone boiler?

14         A.    I've never heard of an "O" series.  I

15    believe that that one page where I had said "O"

16    series I meant "O" type.  In the same sentence I

17    would have referred to our competition as providing

18    "D" series.  As a matter of fact, I recall that and

19    realizing after the fact that I have to say "O" type,

20    because nobody calls them series.  They were types.

21         Q.    Do you know what the name or series was for

22    Keystone boilers above 150,000 pph that were sold?

23         A.    Never heard any designation.

24         Q.    Are you aware of any documentation showing

25    that had Escalon awarded a contract to VEO he would

32

1    the price is why.  So in marketing, you would often

2    get a comment like, oh, they're still in business,

3    or, oh, that's still being built.  So that made it a

4    little difficult.

5                MR. SHEEAN:  Shawn, you have to keep

6    your voice up.

7                THE WITNESS:  Oh, I'm sorry.

8        Q.    (By Mr. Gisleson) Have you heard of an

9    O-series Keystone boiler?

10       A.    That's the only type of Keystone that there

11   is, an "O" type boiler.

12       Q.    Have you heard of an O-series Keystone

13   boiler?

14       A.    I don't remember hearing it, no, not --

15       Q.    Are you aware of any differences between an

16   M-series and an O-series Keystone boiler?

17       A.    No.

18       Q.    Do you know whether any Keystone boilers

19   above a steam flow of 150,000 pounds per hour were

20   being sold?

21                MR. SHEEAN:  Objection, vague.

22       A.    By whom?

23       Q.    (By Mr. Gisleson) By anyone.

24                MR. SHEEAN:  Objection, vague.

25       A.    I don't know of any.

1  before in the deposition.

2      A.   Yeah.  Well, I apologize for using that.  I

3  guess plagiarized wouldn't be a good word to use.  It

4  would be -- because we were given the material to

5  use.  So I just utilized that information, modified

6  it to be more appropriate for what we were using it

7  for.  Yes, that's what we did with it.

8      Q.   Did you go back to the license agreement to

9  see what it says about the use of Erie Power and its

10  predecessors' literature by Victory?

11     A.   I didn't -- I never did that.  I relied on

12  Mark.  And I knew that I had to send it to them first

13  before I could send something right out, and I just

14  did what John told me to do and I did what Mark told

15  me to do.  And I made sure -- I assumed that they

16  were dealing with license issues.

17     Q.   Did you ever sign or aware of having signed

18  a written modification or addendum to the license

19  agreement that permitted Victory the unqualified use

20  of promotional materials that were created by Erie

21  Power or one of its predecessors?

22         MR. SHEEAN:  Objection, lack of

23  foundation.

24     A.   We were provided that material from Erie to

25  use.  We were told that we could use it.

1       Q.   (By Mr. Gisleson) I want to show you what's
2   been marked as Brewer Exhibit 21.  It's a document
3   stamped IKE295.  Does this show an e-mail exchange
4   between you and Mark White in February of 2003 on the
5   subject of "D" type boilers?

6       A.   Yes.

7       Q.   The lower e-mail message from February 4,
8   2003, from you to Mark White on subject "D" type
9   boilers says:  "Mark, see attached.  Can we have
10  access to this line of products, too?"  Was this the
11  first time that VEO, to your knowledge, requested
12  access to the technology for "D" type boilers?

13      A.   That's the first time I'd asked for it that
14  I can remember.

15      Q.   In response on February 10, Mark White
16  writes to you:  "Let's discuss in a few months.  It
17  that same time we can include small HRSGs".

18      A.   Right.

19      Q.   Did you, in fact, discuss the inclusion of
20  small HRSGs, as well as "D" type boilers at some
21  point thereafter?

22      A.   Maybe, but nothing detailed with me anyway.

23      Q.   Did Mark White ever refuse to license "D"
24  type boiler technology to VEO during a conversation
25  he had with you?

1  conference?

2      A.   I think I did this.

3      Q.   Did you prepare the recap of the
4  teleconference?

5      A.   Yes.

6      Q.   Under Item 1, status of exchange of
7  information, the outcome of the call was:  Continuous
8  stream of information focusing on actual projects.
9  Information will be sent via structured and organized
10 schedule.  What did you mean by that?

11     A.   We had actual projects pending, as I
12 explained, and that we needed to be more specific in
13 getting information for those projects so that we
14 could stick to our schedule as opposed to the general
15 receiving of information that we were supposed to
16 get.

17     Q.   Did you prepare a schedule that you
18 provided to EPTI for it to submit information?

19     A.   I -- I did not prepare anything like that.

20     Q.   Did anyone prepare such a schedule?

21     A.   I don't -- I don't recall a schedule
22 specific to that effect.

23     Q.   Who at VEO is responsible for receiving the
24 information from EPTI?

25     A.   Our engineering department, but I don't

183

1    know who specifically was taking over that.

2        Q.    Did you participate in any meetings at VEO

3    that discussed how to organize the EPTI technical

4    information that was provided?

5        A.    No, no more than what this states to this

6    effect.

7        Q.    Under Item 4, modifications of standard

8    unit, it says:  "What needs to be done -- what needs

9    to be done to update?"  And under outcome, it says:

10   "Highlighted by Erie, changed by VEO, double-checked

11   by Erie (per job)."  What did you mean by that entry?

12       A.    If there were -- if there was anything that

13   needed to be updated to the drawings that we were

14   provided, in order to meet a standard code or current

15   code or a customer specific code -- because, again,

16   these are engineered products.  No two jobs are the

17   same.  We were hoping that in these initial stages,

18   Erie would help us in the review of what we had to

19   provide, help highlight that.  We were going to do as

20   much of the work as we could, but Erie had -- was

21   also going to make sure that they agreed with what we

22   did.

23       Q.    Did that process, in fact, occur for

24   modifications as described there?

25       A.    To be honest, I was out of it by that time