1
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3   INDECK KEYSTONE ENERGY, LLC,           :
         Plaintiff                         :
                                           :
4            v.                            : Case No. 04-325 Erie
                                           :
5   VICTORY ENERGY OPERATIONS, LLC,        :
         Defendant                         :
6                                          :

7

8          Deposition of ROBERT JOHN GDANIEC, taken before

9     and by Sondra A. Black, Notary Public in and for the

10    Commonwealth of Pennsylvania, on Tuesday, November 8,

11    2005, commencing at 9:06 a.m., at the offices of

12    Marshall Dennehey Warner Coleman & Goggin, 1001 State

13    Street, Erie, Pennsylvania 16501.

14

15

16   For the Plaintiff:

17      John K. Gisleson, Esquire
        Schnader Harrison Segal & Lewis, LLP
18      Fifth Avenue Place
        120 Fifth Avenue, Suite 2700
19      Pittsburgh, PA 15222

20   For the Defendant:

21      Christopher T. Sheean, Esquire
        Wildman Harrold Allen & Dixon, LLP
22      225 West Wacker Drive
        Chicago, IL 60606

23

24
                  Reported by Sondra A. Black
25              Ferguson & Holdnack Reporting, Inc.

CONFIDENTIAL

**EXHIBIT**

2

1    R O B E R T   J O H N   G D A N I E C, first having

2    been duly sworn, testified as follows:

3

4    DIRECT EXAMINATION

5    BY MR. SHEEAN:

6

7    Q.    Sir, would you please state your name for the

8    record.

9    A.    Robert John Gdaniec.

10   Q.    Let the record reflect this is the deposition of

11   Robert John Gdaniec pursuant to subpoena and notice and

12   pursuant to the Federal Rules of Civil Procedure.

13   Mr. Gdaniec, can you please provide your home

14   address.

15   A.    4084 Zimmerman Road, Erie, Pennsylvania 16510.

16   Q.    How long have you resided there?

17   A.    Five years.

18   Q.    And your business address?

19   A.    Is 5300 Knowledge Parkway, Suite 200, Erie,

20   Pennsylvania 16510-4660.

21   Q.    The name of your employer?

22   A.    CMI EPTI, LLC.

23   Q.    Have you ever had your deposition taken before?

24   A.    No.

25   Q.    I'm going to go over a couple quick ground rules

1  it was more appropriate that Heather then be directly

2  involved to understand what potential CMI EPTI liabilities

3  there could be involved with this.  So at that point I

4  believe we just identified to Mr. Woodson that Heather would

5  be in contact with him.

6      Q.   Anything else you can recall specifically from your

7  conversations with Mr. Woodson, other than what you've

8  already told me?

9      A.   No.  Nothing specific.

10     Q.   I want to go into a little bit of your background

11 just so I can get an understanding.  Did you attend high

12 school?

13     A.   Yes, I did.

14     Q.   Where did you attend high school?

15     A.   Cathedral Prep in Erie, Pennsylvania.

16     Q.   Did you graduate?

17     A.   Yes, I did.

18     Q.   What year?

19     A.   Class of '83.

20     Q.   Did you attend college or University after that?

21     A.   Yes, I did.

22     Q.   Where did you go to college?

23     A.   Gannon University in Erie, Pennsylvania.

24     Q.   What did you study at Gannon University?

25     A.   Mechanical engineering.

1    Q.    Did you obtain a degree in mechanical engineering?

2    A.    Yes, I did.

3    Q.    What year?

4    A.    1987.

5    Q.    Did you have any minors or subspecialties?

6    A.    No.

7    Q.    Did you attend any postgraduate studies?

8    A.    No, I did not.

9    Q.    What was your first job after graduating from Gannon

10   University?

11   A.    At Electric Boat in Groton, Connecticut.

12   Q.    What did you do at Electric Boat?

13   A.    I was a nonengineered -- or I was an engineered

14   components designer for a nonnuclear pump service.

15   Q.    What were your job responsibilities?

16   A.    Reviewing technical specifications, troubleshooting

17   in the shipyard, Naval support for Trident and 688 class

18   submarines.

19   Q.    Anything else?

20   A.    No.

21   Q.    How long did you work for Electric Boat in Groton?

22   A.    Two years.

23   Q.    Till 1989?

24   A.    Correct.

25   Q.    What did you -- strike that.  Where did you go in

1    1989?

2        A.    I came back to Erie to work for Zurn Industry's

3    energy division.

4        Q.    I'm sorry, what division?

5        A.    Energy division.

6        Q.    What was your first position at Zurn in 1989?

7        A.    Design engineer in the engineering group.

8        Q.    What were your responsibilities as design engineer?

9        A.    Thermal performance, basic boiler design, boiler

10   circulation, basic calculations, piping sizing, pressure drop

11   calculations.

12       Q.    Anything else?

13       A.    Nothing in particular, no.

14       Q.    How long were you a design engineer at Zurn?

15       A.    Probably a year, maybe a year-and-a-half period.

16       Q.    So sometime in 1990 you got a new position?

17       A.    Yes.

18       Q.    What was that?

19       A.    Moved into -- at that time the company created a

20   group for specializing on HRSG product lines, and I was moved

21   into that group as an engineer in that group.

22       Q.    What were your responsibilities as an engineer in

23   the HRSG group?

24       A.    Similar to previous except specific to just the HRSG

25   product line.  Basic boiler calculations, boiler sizing,

1    thermal performance, boiler circulation.  Took on the

2    responsibility of software development for the group.

3        Q.    What sort of software did you develop for the HRSGs?

4        A.    The thermal performance rating program, the boiler

5    circulation program, routine engineering calculations, ASME

6    pressure vessel programs.  Anything related to the design of

7    the boilers.

8        Q.    Were you actually writing the software?

9        A.    In part, with the gentlemen from the computer group,

10   yes.  Some specifically to me, and others in conjunction with

11   the computer department.

12       Q.    What language were those drafted in?

13       A.    FORTRAN 77.

14       Q.    Where'd you learn to write programs in FORTRAN?

15       A.    At Gannon University.

16       Q.    Anything else that you were responsible for as an

17   engineer for the HRSG group, other than what you've already

18   told me?

19       A.    Over the period of time of probably five or six

20   years it was various responsibilities.  Product engineering

21   became under my responsibility, took in charge of the

22   graphics and drafting area under my responsibility.  It was

23   quite a number of positions.

24       Q.    Anything else?

25       A.    No.  I can't recall.

1    Q.    Before I forget, did you talk to Ted Fuhrman since

2    last night?

3    A.    No, I have not.

4    Q.    Did you talk to him last night?

5    A.    No.  I -- since yesterday morning when he was in the

6    office.

7    Q.    What was the next position you had after engineer in

8    the HRSG group?

9    A.    I don't recall the exact year, but at one point the

10   company decided to merge everything back into one function, I

11   would guess it was probably maybe 1992 time frame, and I

12   moved back into the main body of engineering and took over a

13   position that was specific to pressure vessel engineering.

14   Q.    Are these the drum internals?

15   A.    The drums -- the pressure parts themselves, the

16   drums, the tubes, anything ASME boiler code related, sizing

17   of safety valves, interpretation of the boiler code.

18   Q.    Now, were you responsible for the pressure vessels

19   for all types of boilers or were you still working primarily

20   on the HRSGs?

21   A.    No.  This was all types of boilers.  The company

22   made a decision that the HRSG product line was carrying the

23   business, so they merged everybody back into one function and

24   we then handled everything.  The business was 90 percent

25   HRSG; however, it could be any product line at that point.

1    Q.   Was it still Zurn at that point?

2    A.   Yes.

3    Q.   Was Zurn a privately held company at that time?  If

4    you know.

5    A.   I honestly don't know.  I would say, yes, but I'm

6    not sure.

7    Q.   How long were you in the main engineering department

8    operating -- what was your title at that time, when you were

9    moved back and you were taking over pressure vessel

10   engineering?

11   A.   I think the title was pressure vessel engineer.

12   Again, I don't recall all the -- there's been a number of

13   moves in different positions and responsibilities, and I

14   don't recall.

15   Q.   To the best of your recollection, what was the next

16   position that you took on?

17   A.   Manager of technical software development.

18   Q.   Do you recall what year that was?

19   A.   No, I don't.

20   Q.   It was still with Zurn?

21   A.   Yes.

22   Q.   What were your responsibilities as the manager of

23   technical software development?

24   A.   I was responsible for all software that the company

25   wrote for the engineering group.

1    Q.    Anything else?

2    A.    No.  That was -- it was a full-time job.

3    Q.    How long were you the manager of software

4    development?

5    A.    It was about a one-year period.

6    Q.    What was the next position that you took?

7    A.    Manager of engineering.

8    Q.    And this is still Zurn?

9    A.    Yes.  Still under the Zurn Company, yes.

10   Q.    Did you replace someone as manager of engineering at

11   that time?

12   A.    Yes.  At that time Frank Vona was the -- would have

13   been the chief engineer/manager of engineering.  He had left

14   on leave of absence, and I replaced him in that position.

15   Q.    What were your responsibilities as manager of

16   engineering?

17   A.    Had full responsibility for coordinating the

18   day-to-day activities of the entire engineering group.

19   Q.    Anything else?

20   A.    It was everything under -- anything that was under

21   engineering was my responsibility at that period.

22   Q.    So that was all products company-wide?

23   A.    Everything, yes.

24   Q.    Do you know what time frame that was when you became

25   manager of engineering?

1      A.   Just prior to 1997 because it was just prior to the

2    time that the company was sold to Aalborg Industries.

3      Q.   So, late 1996?

4      A.   Yeah.

5      Q.   You had testified before that the company was

6    relying -- strike that.  You testified before that the

7    company sales were 90 percent HRSGs.

8      A.   Yes.  That's correct.

9      Q.   Was that still true in '96?

10     A.   Yes.

11     Q.   What other boilers made up the 10 percent?

12     A.   Package boilers and what we would have called

13   conventional boilers, two-drum type --

14     Q.   Field erected?

15     A.   Field erected, coal fired, wood fired, waste-heat

16   type boilers.

17     Q.   What percentage of the company's business did the

18   package boilers represent?

19     A.   At that period of time, probably 8 percent of the 10

20   percent that was remaining.

21     Q.   8 to 10 percent of that 10 percent?

22     A.   Yes.

23     Q.   So being an engineer, you'd agree it was about .8

24   percent of the overall sales for the company?

25     A.   No.  It was 8 percent of the total sales.  90

1    percent was HRSGs; the remaining 10 percent, 8 of that 10

2    percent was probably package boilers.

3        Q.    What was the size range for the package boilers at

4    that time?

5        A.    I don't recall.  The majority of what the business

6    was pursuing, what we felt was competitive, was over about

7    100,000 pounds per hour capacity.  So I would guess 125,

8    150s, 175, in that range probably.

9        Q.    You said in 1997 the company was sold to Aalborg

10   Industries?

11       A.    Yes.  Correct.

12       Q.    And that's A-A-L-B-O-R-G?

13       A.    Correct.

14       Q.    Did your title change when the company changed hands

15   to Aalborg Industries?

16       A.    Yes.  It became -- at that time we moved out of the

17   office on 1422 and moved up to the new office where we are

18   today, and when I moved up there, I became director of

19   technology.

20       Q.    Was that a promotion from manager of engineering,

21   the director of technology?

22       A.    Organizational, yes.  It was fully responsible for

23   all of engineering and drafting and was a member of the staff

24   at that point.

25       Q.    What does "a member of the staff" mean?

1     A.   Reported directly to the president of the company

2  and was responsible for helping to make decisions and steer

3  the direction of the company.

4     Q.   Who was the president of the company at that time?

5     A.   Jim Davis.

6     Q.   How long were you director of technology for Aalborg

7  Industries?

8     A.   I would guess two years.

9     Q.   Till about '99?

10    A.   Correct.

11    Q.   What happened in 1999?

12    A.   I chose to step out of that position and took over

13  the role of chief engineer, and we brought in a manager-type

14  personality for the position.

15    Q.   Who was that?

16    A.   Mike Davidson.

17    Q.   Did you report to Mr. Davidson?

18    A.   Yes, I did.

19    Q.   Why did you decide to step out of your position as

20  director of technology?

21    A.   I felt my skills and what I could contribute to the

22  company were more beneficial in a pure technical role instead

23  of the administrative managerial role.

24    Q.   During that two-year period, from '97 to '99, was

25  the percentage makeup of the company sales similar to what

1    you testified previously?

2    A.    No.    It had changed.    There was less HRSG business.

3    Just guessing percentage, probably 70 percent of the business

4    was HRSG business.    We had more in the other product lines,

5    probably a smaller -- higher percentage in the package

6    boilers and some traditional conventional-type boilers at

7    that period of time.

8    Q.    Why did the HRSG market drop?

9    A.    I couldn't tell you.

10    Q.    How long were you chief engineer?

11    A.    I was chief engineer up until 2004.    So probably

12    four-year time period.

13    Q.    Do you know who owned Aalborg Industries?

14    A.    No, I don't.

15    Q.    At some point did DKME become the owner of Aalborg

16    Industries?

17    A.    No.    It became the owner of the company.    Aalborg

18    sold the company to DKME.

19    Q.    What year was that?

20    A.    I'm going to guess it was 2002.    It was either 2002

21    or 2003.

22    Q.    Do you recall what DKME stands for?

23    A.    Dae Kang Machinery and Engineering Company.

24    Something like that.    It was always known as DKME.

25    Q.    Did your position change when Aalborg sold the

1    company to DKME?

2        A.   No, it did not.

3        Q.   You remained as chief engineer?

4        A.   Yes.   Correct.

5        Q.   You identified Jim Davis as the president of the

6    company when it was Aalborg Industries, correct?

7        A.   Yes.   Correct.

8        Q.   Did Mr. Davis stay on when the company was sold to

9    DKME?

10       A.   No, he did not.

11       Q.   Who took over as president?

12       A.   Stephen Kang -- when it was DKME, Stephen Kang was

13   president of the company.

14       Q.   Is it K-A-N-G?

15       A.   Yes.   Correct.

16       Q.   Did you report to Mr. Kang?

17       A.   Yes.

18       Q.   What happened in 2004 that changed your position?

19       A.   Mr. Kang had moved the company into bankruptcy, and

20   we were working very hard to take it out of bankruptcy, and

21   we were beginning to restructure the company, make some

22   administrative and position moves, at which time I was

23   promoted to vice president.

24       Q.   Vice president of anything in particular or --

25       A.   Just vice president.

1    Q.    Who was the president at that time?

2    A.    Stephen Kang.

3    Q.    At some point the assets of the company were sold to

4    CMI EPTI?

5    A.    Yes.  Correct.

6    Q.    That was in late August 2004?

7    A.    September 8, 2004 was the hearing date for the sale

8    and closing.

9    Q.    And after the assets were purchased by CMI, did you

10   change jobs?

11   A.    I stayed vice president.

12   Q.    Is that your position today?

13   A.    Yes.

14   Q.    Jumping back for a minute.  When you were vice

15   president of the company in 2004, what were your

16   responsibilities?

17   A.    It was -- there was three vice presidents at that

18   time, we shared responsibility for running the day-to-day

19   operations of the company.

20   Q.    Who were the three vice presidents?

21   A.    Dan Levstek and, at the beginning, Simon Kassas.

22   Q.    When did Mr. Kassas leave?

23   A.    It was almost at the same time I was promoted to

24   vice president.  So it was probably March -- March --

25   February, March time frame of 2004, I believe.  And then,

1    after that, it was just Mr. Levstek and I as vice presidents

2    in the company.

3        Q.    Is Mr. Levstek with CMI EPTI?

4        A.    Yes.

5        Q.    Is he still a vice president?

6        A.    Yes, he is.

7        Q.    Who's the president of CMI EPTI?

8        A.    Today it's Tino Vinkestyn.  He's CEO, there is no

9    president.

10       Q.    How do you spell Vinkestyn?

11       A.    V-I-N-K-E-S-T-Y-N.

12       Q.    Are there any other vice presidents besides you?

13       A.    Yes.  There's one other.  Xavier D'Hubert,

14   D-H-U-B-E-R-T.

15       Q.    D'?

16       A.    H-U-B-E-R-T.

17       Q.    And is Xavier working in Erie?

18       A.    Yes, he is.

19       Q.    Mr. Vinkestyn as well?

20       A.    Yes.

21       Q.    Were you ever offered a position with Indeck

22   Keystone Energy?

23       A.    No, I was not.

24       Q.    Do you have any knowledge of how it was that certain

25   individuals who had been working for EPTI were offered

1   did you utilize in developing the new processes?

2       A.   95 percent of it is the same.  The decision was made

3   that, even though we're a new company, we couldn't start from

4   scratch.  You know, it's best to try to continually move the

5   company forward and not throw everything out and say start

6   over.  It's not efficient.

7       Q.   Do you have any engineering responsibilities

8   currently for CMI EPTI?

9       A.   Yes.  I'm responsible for all of the technical

10  aspects of the company.  So engineering, drafting, and the

11  computer department, organization would report to me.

12      Q.   Did you develop the KPSC design rating program for

13  the Keystone boilers?

14      A.   Not directly myself, no, I did not.

15      Q.   Who did?

16      A.   Computer department people, and then a gentleman by

17  the name of Neil Bradwell.

18      Q.   Were you involved in the design or rating of any

19  Keystone direct-fired watertube boilers during the time that

20  you worked at Zurn and Aalborg?

21      A.   Yes.

22      Q.   Let's start with Zurn.  While you were employed by

23  Zurn, did Zurn sell any Keystone M series boilers with 100

24  percent welded wall construction?

25      A.   No.

1      Q.    Did Zurn sell any direct-fired O style watertube

2   boilers with welded wall construction?

3      A.    Yes.

4      Q.    Is it your testimony that the mere addition of

5   welded wall construction takes the boiler out of the realm of

6   the M series boiler?

7      A.    Yes.   The M series was a specific geometry

8   construction type and style of boiler for the company, and

9   that did not include welded waterwall panels.

10     Q.    When was the last Keystone M series boiler sold by

11  Zurn Energy?

12     A.    I have no idea.  I'd have to look at records to see

13  that.

14     Q.    When was the last Keystone M series boiler sold by

15  Aalborg Industries?

16     A.    I'd have to look at the records.  I don't know.

17     Q.    When was the last Keystone M series boiler sold by

18  EPTI?

19     A.    Last one I would guess is -- our order 2023 is the

20  last O-type boiler, and the drawings show it probably as an M

21  size.  If you look at the title box, it's probably called an

22  M size.  But that was the last O-type boiler that I recall

23  that we did.

24     Q.    My question was the last M series boiler.

25     A.    I don't know without looking.

1    Q.   Was 2023 an M series boiler?

2    A.   2023 was an O-type boiler.  I'd have to look at the

3    records to see exactly what it's called.

4    Q.   Do you know who the customer was on that project?

5    A.   It was Victory Energy.

6    Q.   Was that the Heinz Plant?

7    A.   Yes.

8    Q.   Muscatine, Iowa?

9    A.   I believe that's what it was, yes.

10   Q.   And that was sold to Victory prior to the date of

11   the license agreement?

12   A.   Yes.  Correct.

13   Q.   You just don't recall, as you sit here today --

14   strike that.  Do you recall whether or not 2023 had 100

15   percent membrane construction?

16   A.   I don't recall if it was 100 percent membrane

17   construction, but the furnace and side walls were membrane

18   construction, yes.

19   Q.   Well, if the furnace and side walls were membrane

20   construction, could it be considered an M series boiler?

21   A.   No.  Because -- on the drawing it was probably shown

22   as an M series; however, internally to the company -- the

23   term M series boiler was used loosely in the company.  The

24   style of boiler was an O-type boiler, and in the past, the M

25   series was standardized based on capacity, and certain

1      A.    I don't know for sure.

2      Q.    Now, you indicated that you were involved in the

3   company in reviewing the license agreement specific to Annex

4   1?

5      A.    The entire license agreement, and -- in addition to

6   helping to develop and write Annex 1, yes.

7      Q.    What was your understanding of how Annex 1 operated

8   in conjunction with the license agreement?

9      A.    The license agreement spelled out a certain

10  technology was licensed per the description in Annex 1, and

11  the Annex 1 defined exactly what the product lines and ranges

12  and type of construction of the boiler that -- the license

13  agreement text itself was very generic to what it was trying

14  to accomplish, and Annex 1 was the specifics of what the

15  products were.

16     Q.    Do you have any legal training?

17     A.    No, I do not.

18     Q.    But you did take the time to aide the agreement and

19  draft or revise Annex 1?

20         MR. GISLESON:  Objection.  Implication that legal

21         training is necessary to do so.

22     A.    From my perspective of protecting the company's

23  interests, yes.  I reviewed the documents and highlighted

24  areas which I felt were inconsistent with what the company

25  may want to do, yes.  Absolutely.

1    that annex as to exactly what the license agreement entailed

2    for the period of time which it was effective.

3        Q.   Now, you say there was an understanding in that

4    annex.  Whose understanding?

5        A.   Certainly, internally to the people that wrote it, a

6    clear understanding of the products.  Outside of the office,

7    I'm not sure if there was a clear understanding.

8        Q.   Prior to the signing of Annex 1 did you have any

9    conversation with anyone at Victory Energy so that you could

10   convey that clear understanding to anyone at Victory Energy?

11       A.   No.

12          MR. GISLESON:  Objection to the implication that it

13          was necessary to convey the understanding based on

14          what was in Annex 1.

15          MR. SHEEAN:  You're coaching the witness now, John.

16          MR. GISLESON:  I'm objecting to unclear questions.

17       A.   No.  At that time there was no need for discussion

18   from my perspective because Mr. White was put in full

19   responsibility, in control, of doing what was best for the

20   company.  So, no, there was not.

21       Q.   Did the license agreement authorize Victory Energy

22   to design, manufacture, and sell O style boilers with

23   membrane technology?

24       A.   No, it did not.

25       Q.   Did Victory Energy sell any Keystone boilers with

1    membrane technology under the license agreement?

2        A.    Yes, they did.

3        Q.    Do you know approximately how many of the boilers or

4    what percentage of the boilers that Victory sold included

5    membrane wall technology?

6        A.    I would guess probably 70 percent of them did.

7        Q.    In fact, all of the six -- first six sales that

8    Victory had under the license agreement included membrane

9    wall technology, didn't they?

10       A.    I honestly don't know.  At the time period we

11   weren't concerned about the specifics of what they were

12   selling.  Again, given the timing of the company, it was more

13   important to watch the revenue stream.  So we were encouraged

14   by the fact that they were able to sell boilers, and we were

15   not strictly enforcing any -- any degree of what was in the

16   license agreement.

17       Q.    You said you weren't strictly enforcing it?

18       A.    Correct.  So from the perspective, if they had

19   welded walls, we never sent anything to them and said, please

20   stop selling welded wall style boilers.  Because at that time

21   period it was more important to see that there was a revenue

22   stream and we were re-establishing the name in the industry

23   for the package boiler line.

24            MR. SHEEAN:  Why don't we take a short break.

25            (Pause in the proceedings.)

44

1    identify everything because there were things that we would

2    not have known.  But the intention was predominantly the

3    auxiliary equipment.

4        Q.   So it was your understanding that Victory Energy was

5    permitted to make modifications to the line?

6            MR. GISLESON:  Objection.  Vague, mischaracterizes

7            the prior testimony.

8        Q.   You can answer.

9        A.   Yes.  We knew there was a clause in there that

10   allowed them to make enhancements or improvements to the

11   product line that was licensed.

12       Q.   And Mark White said as much in that first e-mail to

13   you, right?

14       A.   Yes.  He identified that there would need to be

15   improvements made, yes.

16       Q.   Are you aware of any improvements that Victory

17   Energy made to the Keystone Energy boiler line?

18           MR. GISLESON:  Objection.  Vague, foundation.

19       A.   No.  That's one of -- I believe one of the

20   complaints we had with regards to identifying issues in the

21   license agreement that Victory was not notifying us if, in

22   fact, they were making improvements or enhancements to the

23   boiler.

24       Q.   The inclusion of 100 percent membrane wall

25   technology, would that have been an improvement in the mind

1    of Erie Power, to the best of your knowledge?

2        MR. GISLESON:  Objection.  Vague, foundation.

3    A.    No.  Because what we licensed was the M series

4    product.  We had another product line that included that,

5    which was the entire O boiler set of products.  So in the

6    context of the M series boiler that was already established

7    and it was already an enhancement.  It was not part of the

8    license agreement.  And it became apparent when we were

9    working with Victory to try to sell the product line or what

10   Victory was looking to purchase under the product line got

11   into the nomenclature of, all M series are O-type, but not

12   all O-type are M series.

13   Q.    Before the time you were discussing the sale of the

14   product line to Victory Energy, did you have any

15   conversations with anyone at Victory Energy relative to

16   whether or not M series boilers included membrane wall

17   technology?

18   A.    We did not, I would say.  We were not concerned

19   about that from the perspective of we were selling product

20   and receiving income cash flow to the company.

21   Q.    How was Victory Energy supposed to know that M

22   series boilers did not include membrane wall technology?

23   A.    In Annex 1 there's a description of what the product

24   line specifically is, right down to the detail of type of

25   construction and arrangement of side walls, front walls, rear

1    that.

2        Q.    Was Erie Power paid on those jobs for that

3    engineering support?

4        A.    On the case of the one that was the taller, narrower

5    boiler, yes, we were paid as an engineering study to do that

6    engineering work.

7        Q.    And that was above and beyond any remuneration that

8    Erie Power would receive under the license agreement,

9    correct?

10        A.    Yes.    Correct.

11        Q.    Mr. Gdaniec, I have handed you what's been marked as

12    Exhibit 6 in your deposition.    This is a series of e-mails

13    between you and Mark White, Bates labeled IKE000342 and 343.

14    Do you recall receiving and sending these e-mails?

15            (Gdaniec Deposition Exhibit No. 6 marked for

16            identification.)

17        A.    Yes, I do recall this, yes.

18        Q.    As a general matter, do you believe Mark White

19    understood -- strike that.    As a general matter, in January

20    2003, do you believe Mark White had the same understanding of

21    the definition of the term "standard M series boiler" that

22    you have attributed to that term?

23        A.    Yes.

24        Q.    How do you have that -- strike that.    On what do you

25    base that understanding?

1    A.    The period of time that he was in the company and in

2    discussions on the product line and aware of what the market

3    was asking for versus what the company had to offer as

4    standard products.

5    Q.    Did Mark White ever say to you specifically that he

6    had the same understanding of the M series boiler phrase that

7    you have attributed today?

8    A.    No.    I can say we've never had that discussion.

9    Q.    Okay.    In your response to Mark on January 22, 2003,

10   at 8:36 a.m., which is in the middle of the first page of

11   this exhibit, it says, "Mark, Be careful on this one for

12   free.    Dan and I spoke on it today and he believes that if

13   this is outside of the license agreement (which it is) then

14   we better get paid for it.    I think you need to get together

15   with Dan and Stephen and Simon and resolve this matter pretty

16   quickly.    From what I understand, this is way out of the

17   license agreement, welded walls and higher design pressure."

18   Do you see that?

19   A.    Yes, I do.

20   Q.    Do you recall writing that to Mark White?

21   A.    No.    But seeing it here I'm sure I did in the

22   e-mail, yes.

23   Q.    Did you speak with Dan Levstek or Stephen Kang or

24   Simon Kassas relative to this e-mail?

25   A.    No, I did not.    Basically, in my opinion, it was

1    Mark White's responsibility, as the person that was managing

2    the license agreement at that time, to make sure that he had

3    concurrence with the executive management of the company.

4         Q.   To the best of your knowledge, did Mark White have

5    concurrence with the executive management of the company?

6         A.   I honestly don't know.

7         Q.   Did you ever come to learn that Mark White was

8    operating without authority?

9         A.   Not directly, no.

10        Q.   Mark's response back is, "Thank you for your e-mail

11   message.  The welded wall design will be handled by Victory,

12   and they will take responsibility and liability of the

13   change."  Do you see that?

14        A.   Yes, I do.

15        Q.   This is with respect to the Atofina project in La

16   Porte, Texas.  Do you see that at the bottom of the page?

17        A.   Yes.  I do.

18        Q.   Do you recall the Atofina project?

19        A.   I know that's one of the names of the boilers, but I

20   don't recall details on it in particular.

21        Q.   Are you aware of whether or not Victory Energy

22   actually sold the boiler to Atofina?

23        A.   Without looking at the records I could not tell you.

24        Q.   Are you aware of the fact that Erie Power received a

25   4 percent royalty on that boiler sale?

1    A.    I would assume that, if, in fact, they sold it,

2    under the license agreement we did receive a royalty.    I

3    would assume so, yes.

4    Q.    Did Erie Power support the Atofina project?

5    A.    If there were questions specifically asked on it, I

6    would say, yes, we probably did, yes.

7    Q.    Now, did you respond back to Mark in any way after

8    receiving his e-mail?  The one that's at the top of the first

9    page, wherein he says, "Welded wall design will be handled by

10   Victory."

11   A.    I do not recall if I responded specifically to this

12   or not.

13   Q.    Did you believe that it was permissible under the

14   license agreement for Victory to sell the welded wall design

15   on that boiler as long as they handled it?

16   A.    I would say given the timing in the company, were we

17   going to make an issue of a welded wall -- as you can see in

18   my concern back to him, "This is way out of the license

19   agreement, welded walls and higher design pressure."  So from

20   my perspective -- I expressed my concern it was beyond the

21   agreement; however, given the context of where we were in the

22   company, it was revenue, and if the company chose to pursue

23   it and allow it to happen, then I didn't raise any further

24   concern.

25   Q.    Did you voice any concern regarding your belief that

1    the assets.

2        Q.    Did Mr. Coale ask you what was licensed under the

3    license agreement?

4        A.    Yes.

5        Q.    What did you tell him?

6        A.    The products, and we went through the pages of the

7    license agreement, explained the product lines and the subset

8    of the O boiler that was licensed to Victory.  And the

9    projects -- we went through the projects that they had been

10   successful to sell and the types of boilers they were

11   pursuing, yes.

12       Q.    So you explained to Mr. Coale that Victory Energy

13   had sold predominantly boilers with welded wall technology?

14           MR. GISLESON:  Objection.  Mischaracterizes his

15           testimony.

16       A.    No.  We did not get into specifics like that.

17       Q.    Did you discuss with Mr. Coale any perceived

18   breaches by Victory Energy of the license agreement?

19       A.    Yes, we did.

20       Q.    This is, again, in that same due diligence time

21   frame?

22       A.    The only discussions with Mr. Coale were during due

23   diligence period, yes.

24       Q.    What breaches did you describe to Mr. Coale during

25   those meetings?

1    A.    I believe we identified 10 or 11.  I don't recall

2   exactly what the 10 or 11 were, but they were conveyed to

3   Victory in writing, and that was part of the discussion.

4    Q.    To the best of your recollection, did Victory Energy

5   approach Erie Power for permission to pursue other projects

6   outside the scope of the license agreement?

7    A.    Yes.

8    Q.    Do you recall the names of any of those projects?

9    A.    Not specifically.  I think there was a total of five

10  that they came back and specifically asked, and two of the

11  five we actually had written cooperation agreements, and at

12  that time it was getting very near the -- the sale in the

13  bankruptcy courts.  So the other three projects were never

14  formalized into a cooperation agreement.  However, Victory

15  understood that we would write those, and, you know, that

16  that was part of the -- the five was agreed to by EPTI that

17  we would support them and pursue it in joint.

18   Q.    To the best of your knowledge, did Victory Energy

19  ever sell a boiler above 150,000 pounds per hour of steam

20  without the permission of Erie Power?

21   A.    To the best of any knowledge, they never sold

22  anything beyond 150 period.

23   Q.    Either with permission or otherwise?

24   A.    With or without, yes.  From my understanding of what

25  was sold, yes.

1    Q.    Did you and Mr. Kang have discussions regarding his

2    negotiations with Victory Energy relative to the sale of the

3    O style boilers?

4    A.    I had discussions with regards to this entire issue,

5    yes.  Whether it was O series, M series, what dollar amounts

6    we were going to try to achieve from that, what it meant to

7    the ongoing business if we did this, lengthy discussions to

8    that.

9    Q.    We've been throwing a lot of terms around, and I

10    want to get some clarification on -- you've already defined

11    for me what the M series boiler is.  Was there such a thing

12    as an O series boiler at Erie Power?

13    A.    No.  O series was never in existence.  O is the type

14    of boiler we build, versus a D type or an A type or --

15    characterizes the style of boiler.

16    Q.    As you've already said, in your mind all Ms are O

17    style boilers, but not all O style boilers are M series

18    boilers?

19    A.    That's correct.

20    Q.    The draft purchase agreement that you first

21    received, was it a license agreement and option to purchase,

22    or was it simply a purchase agreement?

23    A.    I believe it was just a purchase agreement.  And in

24    our first initial draft or revision of it, we created a

25    license agreement document with option to purchase.  And then

1   there was also an extension to the license agreement which

2   then clearly, in writing, broke out the M series boiler,

3   which is what the company was willing to sell, and then an

4   option to extend the license agreement to include all of the

5   O series products within that range.

6       Q.   Why did you -- strike that.  Do you have an

7   understanding of why Erie Power went from a purchase

8   agreement to a license with option to purchase?

9       A.   It was all with regards to the bankruptcy issues.

10  Could -- and this is part of the discussions with the

11  lawyers.  Was it even an alternative for EPTI to sell the

12  products out under the bankruptcy or -- could it be done,

13  could it not be done.  I believe the discussions, which I was

14  not part of, that we could do the license agreement because

15  it was demonstrating we were trying to bring in revenue as

16  part of the reorganization, but potentially could not agree

17  to sell it, along those lines.

18      Q.   Do you recall that after your revisions to the

19  license agreement and option to purchase that you had some

20  correspondence back and forth with Mark White?

21      A.   Yes.  Some very heated discussions as well.

22      Q.   I'm handing you what we've marked as Gdaniec Exhibit

23  24, but before I get into that document, you just said you

24  had some heated discussions with Mark White?

25          (Gdaniec Deposition Exhibit No. 24 marked for

1          identification.)

2     A.    Yes.

3     Q.    Without looking at the document, can you give me a

4     synopsis of what those discussions entailed?

5     A.    Yes.    The negotiations between Victory and EPTI were

6     being handled by Mr. Kang and Victory.    I'm not sure who in

7     Victory, but I'd say Mr. Kang and at that time Mr. Kang's

8     assistant, George Doremus.    And there was nobody else in the

9     company involved.    At one point is when it got turned over to

10    me and I began to modify, change, alter, expand, clarify the

11    documents at which -- which at that point -- then it was

12    discussions with Mr. White with regards to what I was doing,

13    and I was being negative towards the whole process, and, you

14    know, confusing Stephen with new terminology and new

15    subtleties of the equipment.

16          You know, they were -- they had moved so far along,

17    and this was going to save EPTI with cash coming into the

18    company.    So it was a good thing and why can't I just, you

19    know, leave it be and move forward.    Apparently it had gotten

20    pretty far along with regards to negotiations or discussions

21    between, at that time, Stephen Kang and Victory with moving

22    forward with some kind of arrangement.    That, I would assume,

23    probably prompted someone to write the draft saying, okay,

24    we've gotten over the initial discussion, let's draft a

25    document and get this thing moving forward.

1       Q.   For the record, Exhibit 24 is VEO1009 through 1012,

2   and this is a series of e-mails.  The first e-mail is dated

3   March 3rd, and it's from Mark White to Stephen Kang and Dan

4   Levstek.  It says, "Stephen and Dan, A draft of the annex is

5   enclosed for your comment.  Regards, Mark White."  Do you see

6   that?

7       A.   Yes, I do.

8       Q.   Do you know which annex Mr. White is referring to

9   there?

10      A.   No, I do not.

11      Q.   And then, a couple up from that, Dan Levstek writes

12  back and says, "Attached is the marked-up agreement with our

13  comments.  We would propose it to be an amendment to the

14  existing license agreement with the option to purchase

15  included.  This would allow the portions of the license that

16  are not changed to remain in place if the option is not

17  exercised."  Do you see that?

18      A.   Yes, I do.

19      Q.   At this point you're still not carbon copied on this

20  e-mail --

21      A.   Correct.

22      Q.   -- it's to Mark White, with carbon copies to John

23  Viskup, George Doremus, and Stephen Kang from Dan Levstek.

24  And the next e-mail is from Mark, and it's to Dan, Stephen,

25  George, and yourself with a carbon to John Viskup.  Do you

1    see that?

2        A.    Yes, I do.

3        Q.    The subject is "Completed Annex," and Mark says,

4    "Gentlemen, based on our recent discussions relative to a

5    technology purchase through Rule 363, the amendment as

6    provided would not be appropriate for this purpose.  The

7    document outlining the sale of the technology requires

8    development.  However, the Annex 2 could be utilized to

9    define the technology purchase.  In regards we have the

10   following comments to the annex," and then it identifies a

11   number of statements, and one of those is, "Boiler

12   technology.  Paragraph No. 1.  This paragraph requires

13   modification as it limits the purchase to that of the M

14   series and is to be expanded to include O type boilers.  It

15   has always been the intention of VEO to purchase the O boiler

16   technology which includes the M series boilers."  Do you see

17   that?

18       A.    Yes, I do.

19       Q.    So you understood that Victory Energy was looking to

20   purchase the entire O series line?

21       A.    Yes.

22       Q.    Or O style?

23       A.    Yes.  And they identify here that they understood

24   the difference between what the M series and O boilers were,

25   clearly by his comment.

1     Q.   In March of 2004?

2     A.   Yes.

3         MR. SHEEAN:  I'd like to move to strike the last

4         answer as nonresponsive.

5         MR. GISLESON:  Disagree.

6     Q.   Above that is an e-mail from you to Mark saying, "We

7 met internally yesterday and this morning with Stephen and

8 George in the loop by conference call and discussed the

9 agreement and your comments and offer the attached for your

10 consideration.  I have a version of the full agreement, but

11 did not include because I need to proofread the Annex 1 one

12 more time with the changes that are addressed in this

13 attachment."  Do you see that?

14    A.   Yes, I do.

15    Q.   And Mark writes back to you, "Bob, My first pass is

16 that of extreme disappointment.  We are interested in

17 purchasing the O line up to 165,000 PPH.  EPTI needs to

18 determine if you are interested in selling the line.  I will

19 discuss with John Viskup and develop a formal response."  Do

20 you see that?

21    A.   Yes, I do.

22    Q.   You said a minute ago that you believe that

23 Paragraph No. 1 under boiler technology demonstrates Victory

24 Energy understood the difference between M series and O type;

25 is that right?

1    A.    Yes.   Correct.

2    Q.    Isn't it possible that Mark White was referring to

3  the increase in the steam capacity above 150,000 pounds per

4  hour to designate the difference between the M series and the

5  O?

6    A.    No.

7         MR. GISLESON:   Objection.

8    Q.    Had you ever had a conversation with Mark White

9  where you specifically were able to confirm that?

10   A.    Yes.  Because the discussion was all-around relative

11 to our distinction of what the M series was versus what the O

12 boiler line could be, and Victory wanted the full flexibility

13 of what the O boiler could be and not be limited to what the

14 M series was.

15   Q.    And that was based on what Erie Power was defining

16 the M series to be, correct?

17   A.    And what -- yes.  And what Erie Power was willing to

18 sell under this discussion that we're having here in the

19 e-mails.  That we weren't interested in selling the entire O

20 boiler line.  We were only interested to sell the subset

21 called the M series technologies.

22   Q.    To the best of your knowledge, there were no similar

23 discussions before the execution of the original license

24 agreement regarding the Erie Power understanding of the M

25 series boiler line, correct?

1    provide Victory Energy with a perpetual license for the use

2    of the Keystone name?

3        A.    Because, in the boiler industry, the Keystone boiler

4    has always been attributed back to our product line, and that

5    really is 80 percent of the nature of the business, having

6    reputation and identifiability in the industry.  People see a

7    Keystone boiler, and they know it was our product and always

8    was our product.

9        Q.    Is that still true today?

10       A.    From the perspective of CMI's business, I'm -- it

11   has no meaning to CMI's business.  In the industrial boiler

12   business, yes, the Keystone name has a very solid and

13   long-lived reputation, yes.

14       Q.    Is it still attributed back to Erie Power and its

15   predecessors, to the best of your knowledge?

16       A.    I would say, yes, to the best of my knowledge.

17       Q.    Do you know if Indeck Keystone Energy is currently

18   marketing any Keystone boilers?

19       A.    I'm not aware of their day-to-day business.

20       Q.    Page 7435 through 7436 sets forth EPTI concerns

21   regarding VEO performance.  Do you see that?

22       A.    Yes, I do.

23       Q.    Did you draft this document as well?

24       A.    Yes, I did.

25       Q.    Was this attached to your March 26th letter to Mark

127

1    White?

2        A.    Yes.  It was part of this entire document.

3        Q.    Here you set forth a number of problems or --

4    concerns, as you identify it, regarding VEO performance under

5    the existing agreement?

6        A.    Yes.

7        Q.    Why did you wait 15 months into the agreement to set

8    forth Erie Power's concerns regarding the license agreement?

9            MR. GISLESON:   Objection.  Misleading,

10           mischaracterizes the evidence.

11       A.    I would say EPTI as a whole did not wait until this

12   period of time to put forth the concerns.  There had been

13   concerns that had been raised throughout the course of the

14   agreement.  This was the first document that formalized them

15   all together in one document to say we'd also like to

16   address -- we were in the discussion with Victory to move

17   forward with business, either amend license, extend license,

18   purchase it, and we looked at it also as the opportunity to

19   now, in the timing of the company -- the bankruptcy was

20   moving positively, there was belief we were moving forward.

21   It was time to get back to start looking at all of the open

22   issues in the business.  So we accumulated the issues in this

23   one document.  Committed the issues we discussed previously.

24       Q.    Can you identify a single document where Erie Power

25   specifically identified to Victory Energy performance

1     Q.    Strike that.  Did someone from EPTI ask you to

2     become involved in the process leading up to a finalization

3     of the license agreement with Victory Energy Operations?

4     A.    No.  Not specifically.

5     Q.    How about generally?

6     A.    I was company chief engineer, and had role and

7     responsibility for the care and custody of the technology,

8     so I didn't need to be asked to be involved in that

9     discussion.

10    Q.    Did you believe it was appropriate for you to

11    participate in that discussion?

12    A.    Yes.

13    Q.    What did you see your role as being?

14    A.    Protector and maintainer of the intellectual

15    property and technology of the company.

16    Q.    Did you fulfill that goal in connection with this

17    license agreement?

18    A.    I would say, in hindsight, no.  Looking at the time

19    we did it, we did the best that we thought we could do, yes.

20    Q.    Now, specifically with respect to Annex 1, how did

21    you seek to protect and maintain the technology?

22    A.    In Annex 1 of the license agreement, we tried to be

23    as specific to the construction features and geometry of what

24    the boiler mind was -- in our mind was intended to be.  From

25    the perspective of types of detail of drawing or construction

1    January 2003?

2        A.    Functionally he was a graphics group leader.  I'm

3    not sure the title he had.  He managed and coordinated

4    activities of the drafting area.

5        MR. SHEEAN:  And that was asked and answered.

6        Q.    To your knowledge, did he have any responsibilities

7    with respect to the Keystone?

8        A.    That was -- his primary historical experience was in

9    the package boiler line.

10       Q.    So you understood that Mr. Briggs had an

11   understanding as to the features associated with the Keystone

12   M series?

13       A.    Yes.

14       Q.    I'd like to show you what's been marked as Gdaniec

15   Exhibit 33.  It's a two-page document stamped IKE354 to 355.

16   Looking at the first page, do you see how at the bottom of

17   this is a copy of the January 30, 2003 e-mail from Mark White

18   to you asking you to review and provide your comments?

19           (Gdaniec Deposition Exhibit 33 marked for

20            identification.)

21       A.    Yes.

22       Q.    Above that is an e-mail that Dave Briggs drafted on

23   January 30th, shortly after Mr. White sent the January 30th

24   e-mail in which he is stating that he looked at the annex as

25   well and had the following comments to what should be added.

1      Do you see that?

2          A.    Yes, I do.

3          Q.    And Mr. Briggs wrote, "There is no mention of the

4      following:  Tangent furnace wall tubes, tangent outer side

5      wall tubes; the units are only saturated, no superheater; the

6      feedwater connection is in the lower drum."  And he has a

7      question, "Is the outer side casing flat or ribbed?"  Then he

8      writes, "The front and rear wall construction is that of

9      refractory, no front wall tubes at all."  As to his comments,

10     A, B A C, D, and F, which are the ones without a question

11     involved, did he accurately describe the standard M series

12     Keystone watertube package boiler?

13         A.    Those were -- what he's identified are significant

14     issues in the M series that were not identified.

15         Q.    Did you agree that those were significant issues

16     that should be identified in the annex of the license

17     agreement?

18         A.    Yes.

19         Q.    Now, when we looked at the draft of the annex that

20     was provided by Mark White to you on January 30, 2003, were

21     there any drawings associated with that draft for Annex 1?

22         A.    No.  In the original draft, no.

23         Q.    Do you agree that in his original draft Mr. White

24     did not have any mention of tangent furnace wall tubes,

25     tangent outer side wall tubes, that the units are only

166

1    saturated, and that the front and rear wall construction's

2    that of refractory?

3        A.   Yes.   There's no mention of construction detail in

4    the original annex.

5        Q.   Did you have a discussion with Mr. Briggs about the

6    need to incorporate those features into Annex 1 that were

7    identified in Mr. Briggs' January 30, 2003 e-mail?

8        A.   Not that I recall directly with Mr. Briggs.

9        Q.   Did you have any conversations with Mark White

10   concerning whether those features should be incorporated into

11   Annex 1 of the license agreement?

12       A.   Not directly as I recall.

13       Q.   Indirectly?

14       A.   Don't recall.

15       Q.   Do you know whether those features, in fact, were

16   included in Annex 1?

17       A.   In the final version of the annex we added drawings

18   and sketches that specifically define construction details.

19       Q.   If we could look at Exhibit 5, which contains a copy

20   of the final annex, do you see how that is initialed in the

21   lower right-hand corner?

22       A.   Yes.

23       Q.   Would you recognize the initials to be those of John

24   Viskup and Mark White?

25           MR. SHEEAN:   I'm going to object.   Lack of

1          foundation.

2     A.    Mark White, MJW, I recognize.  I've never seen -- I

3     assume that's John Viskup, but I've never seen his --

4     Q.    Now, in looking at Annex 1, the version that was

5     executed by the parties, does Annex 1 have any mention to

6     tangent furnace wall tubes?

7     A.    There's a section that was added in the sketches

8     that shows, specific to the details, type of construction of

9     the side walls being tangent tubes, the front wall being

10    refractory, and the rear wall being tube and tile.

11    Q.    What page is that?

12    A.    Page 23 in the -- what's marked here as Page 23 of

13    the annex.

14    Q.    Of Exhibit 5?

15    A.    That's marked as Fuhrman 24.  Yep.  Gdaniec 5.

16    Q.    And that shows, on that page, both tangent furnace

17    wall tubes as well as tangent outer side wall tubes?

18    A.    Yeah.  There's a specific note on the drawing that

19    the furnace wall is tangent tube and the outer wall is

20    tangent tube.  The front wall is shown as castable refractory

21    and insulating fire brick.  The rear wall is shown as tube

22    and tile -- tubes with tile insulation.  And there's a note

23    on the drawing itself that says, "Front wall refractory, rear

24    wall tube and tile, outer wall tangent, furnace walls

25    tangent."

1    Q.   Based on your review of the final version of Annex

2    1, does it appear to you that the specific comments raised by

3    Dave Briggs to Mark White were incorporated in that final

4    version of Annex 1?

5    A.   Yes.

6    Q.   After the date of the Annex 1 finalized set, which

7    is on or about February 2, 2003, did Mark White ever come

8    back to you and say that it was necessary to amend Annex 1 so

9    that membrane walls would become within the scope of the

10   license agreement?

11   A.   No.   There's no specific discussion with me.

12   Q.   Did you ever see any written document in which the

13   license agreement was amended to incorporate membrane wall

14   technologies being within the scope of the agreement?

15   A.   No.

16   Q.   Now, you were asked some questions about sales by

17   VEO that included membrane wall technology during the time

18   that EPTI was a licensor.   Do you recall that?

19   A.   Yes.

20   Q.   Were there certain sales that VEO was making in

21   which you didn't learn about the membrane walls being in the

22   design until after the sale had already been accomplished?

23   A.   In general, we weren't watching and monitoring

24   exactly what the configuration of the boiler they were

25   selling was.   Just being aware of steam capacity probably as

1    being the significant one.

2         Q.    Was VEO not disclosing, in each of the instances, at

3    the time of the sale or before the time of sale that it was

4    including membrane walls?

5              MR. SHEEAN:   Objection.  Asked and answered.

6         A.    I would say, not every instance, but we also weren't

7    asking for it to follow up.

8         Q.    Did you, in fact, become aware that VEO was

9    incorporating membrane technology in its boilers that were

10   sold under the license agreement?

11        A.    Yes.

12        Q.    Was it your belief that EPTI, with respect to each

13   of those specific boilers, permitted VEO to sell those

14   boilers with that feature?

15        A.    Yes.

16        Q.    Did you ever send anything in writing to VEO in

17   which you authorized them, after March 26, 2004, which was

18   the date of your letter expressing or identifying concerns

19   with respect to VEO's performance, that they could sell M

20   series boilers with membrane walls whenever they wanted?

21        A.    No.  I never sent anything like that.

22        Q.    I'd like to show you what's been marked as Gdaniec

23   Exhibit 34, which is a document stamped IKE4410 to IKE4429.

24   Do you recognize this to be an e-mail from Marie Fisk, on

25   behalf of Mark White, to John Viskup on the subject of

1    Q.   Did Mark White ever tell you that Annex 1 was in any

2    way inconsistent with the license agreement that was signed

3    by Victory and EPTI?

4    A.   No.

5    Q.   In your view, does Annex 1 clearly define the

6    standard package watertube boiler that was licensed to VEO?

7    A.   As clearly as can be described, yes.

8    Q.   Did Mark White at any time come up to you and say he

9    had questions about the interpretation of Annex 1?

10   A.   No.

11   Q.   Did you believe it was necessary for you to provide

12   any further comments to Mark White after you saw Dave Briggs'

13   e-mail to Mark White?

14   A.   Dave Briggs' comments were probably a separate

15   avenue of it.  Engineering created those drawings to be put

16   in there, so that was in parallel to or shortly thereafter.

17   Q.   If we look at Annex 1, specifically Page 23, which

18   is stamped VEO1195, can you identify a date on there for when

19   those drawings were created?

20   A.   Well, the reference on the drawing is a KD sheet

21   dated 1/14 -- can't read the numbers.  It's too hard to read.

22   Q.   I thought it was 2003.  If we look at VEO1196, can

23   you read the date on that drawing?

24   A.   Yeah.  That's 1/14/03.

25   Q.   And then, if we go to the next page, which is

173

1    VEO1197, can you read the date on that drawing?

2    A.   Yeah.  1/14/03.

3    Q.   Now, who asked engineering to prepare the drawings

4    that became part of Annex 1?

5    A.   I'm not sure anyone specifically asked the drawings

6    be created, but in the discussion of how do we capture the

7    definition of the product line, the decision was made to

8    create drawings or take standard sheets and put them together

9    as -- to form part of the annex.

10    Q.   Who made that decision?

11    A.   It was probably collective.  I can't recall that it

12    was me in particular, but around the discussion of, how do we

13    go ahead and protect ourselves, what's the best way to do it,

14    it was proposed, I assume, that drawings be put in, but I

15    can't tell you for sure.

16    Q.   Collectively who do you believe was involved in that

17    process?

18    A.   Ted Fuhrman; myself; Dave Briggs, might have been

19    Mark White in the discussion; Neil Bradwell, who was a design

20    engineer in the group --

21         MR. SHEEAN:  I'm going to object to this as

22         speculation.

23    Q.   You can finish.

24    A.   That's it.

25    Q.   Do you know who was responsible for providing the

1     Q.   Now, when the drawing has the words, "Keystone M

2  series standard" on it, what is meant by the word "standard"?

3     A.   It has a lot of connotation within the company.  In

4  this case, the Keystone M series boiler had the most

5  developed standards that were just copy/paste to use for the

6  future.  So this drawing is what we call an RTI, refractory

7  tile and insulation, drawing standard was used.  So that

8  never changed boiler to boiler.

9     Q.   When the word "standard" was used in the license

10  agreement, what was meant by the word "standard" there?

11     A.   The grouping of the well-defined and well -- well

12  matured product line.  The boilers.

13     Q.   As of January 2003, did you have an understanding as

14  to the reputation of Keystone in the marketplace?

15     A.   The Keystone boiler, yes.

16     Q.   How long had the Keystone boiler been in the

17  marketplace?

18     A.   I'm guessing 40, 50 years probably.  1940s, 1950s

19  time frame.

20     Q.   How did you become familiar with the reputation of

21  Keystone?

22     A.   When I started with the company in 1985, '86 time

23  frame.  That was just the trademark name and the product was

24  the Keystone -- was the cornerstone of the company.

25     Q.   Have you had conversations with individuals outside