1    of the company, outside of your employer, to learn their view
2    as to the quality of the Keystone boiler?
3        A.   Over the years of being there, yes.
4        Q.   Based on the various conversations that you've had,
5    what was your understanding as to the reputation of Keystone
6    in the marketplace?
7        A.   Well respected, extremely conservative, very robust
8    design.  Expensive product, but you paid for what you got.
9        Q.   Among those who were in the boiler industry, was the
10   Keystone name well known?
11       A.   In the watertube boiler industry, yes.
12       Q.   I'd like to show you what's been marked as Gdaniec
13   Exhibit 36.  It's a document stamped IKE1274.  Do you see how
14   this appears to be a copy of a February 10, 2003 e-mail from
15   Mark White to Shawn Brewer on the subject of Atofina,
16   utilization of the Heinz broiler?
17           (Gdaniec Deposition Exhibit No. 36 marked for
18              identification.)
19       A.   Yes.  I see that.
20       Q.   In February 2003, Mark White was still working for
21   EPTI, correct?
22       A.   I believe so, yes.
23       Q.   Mr. White writes, "Shawn, As you are aware, at
24   present the Atofina boiler is sized as a 14M special (with
25   watercooled walls)."  Do you see that?

1    A.    Yes.

2    Q.    His reference to a 14M special, within EPTI, in or
3 before February, 2003, did the reference of a Keystone boiler
4 to being a special have significance?

5    A.    Yes.

6    Q.    What was meant when someone at EPTI referred to a
7 Keystone boiler as being special?

8    A.    It was nonstandard. It was 14M, but had changes to
9 it. And here he highlights with watercooled walls. Could
10 be one change, there was a lot of changes that made it
11 special.

12   Q.    But watercooled walls would be something that took
13 the boiler outside the scope of the standard Keystone
14 watertube boiler?

15   A.    Yes.

16         (Pause in the proceedings.)

17   Q.    I'd like to show you a two-page document stamped
18 IKE6233 to 6234, which has been marked Gdaniec 37. Do you
19 see how the lower e-mail on the first page is dated February
20 19, 2003 from Dave Briggs to Mark White and you're copied on
21 it, and the subject is listed, "Remaining marked-up drawings
22 for Victory Energy license agreement?"

23         (Gdaniec Deposition Exhibit No. 37 marked for
24          identification.)

25   A.    Yes.

1    Q.   Did you review this e-mail and the one on top of it
2 from February 19, 2003 at or about the time it was sent?
3    A.   I don't recall, no.
4    Q.   The top e-mail from Dan Levstek to Dave Briggs and
5 Mark White, on which you're copied on the same subject, reads
6 in part, "Mark, As these drawings are outside of the basic
7 license agreement, we should put a disclaimer in the
8 transmittal to Victory that they are for use on this specific
9 project only." What was Dan Levstek's position in February
10 2003?
11   A.   It would have been vice president. I don't believe
12 there was a caveat, it was just vice president of the
13 company, I think.
14   Q.   Did Mr. White come to you to have a discussion about
15 the e-mail that Mr. Levstek sent to him and Mr. Briggs,
16 copied to you, in which he said the drawings are outside the
17 basic license agreement and that there should be a disclaimer
18 in the transmittal to Victory that they are for use on this
19 specific project only?
20   A.   Not that I recall.
21   Q.   Did you expect Mr. White to work with Mr. Levstek
22 given that he was vice president of the company?
23   A.   Yes.
24        MR. SHEEAN:  Objection, lack of foundation.
25        MR. GISLESON:  I'm going show you a document that

1  your letter, which was Exhibit 27. Did you understand that
2  Mr. White was doing a, basically, point-by-point response to
3  your letter?
4      A.   Yes.
5      Q.   He writes in his first and second paragraphs that
6  certain of the changes -- well, strike that. He writes in
7  the first paragraph, "The agreement does provide specific
8  geometry and characteristics." And that's what the point of
9  Annex 1 is; is that right?
10     A.   Yes.
11     Q.   He then says, "But also allows for improvements,
12 refer to Clause 13. As such, VEO has made improvements which
13 are necessary to offer/provide a Keystone boiler that is
14 technically compliant with our customers' requirements, is in
15 line with that of our competitors' offerings, and as we deem
16 necessary to enhance our overall success." I think you said
17 VEO never notified EPTI of any improvements that it had made;
18 is that correct?
19     A.   Correct.
20     Q.   After you received a copy of this March 30, 2004
21 letter, did Mr. White tell you that he was mistaken in
22 describing membrane walls as being an improvement, as shown
23 in Paragraph 2 on the second page of his letter?
24     A.   No. We had very little discussion after this.
25     Q.   If we look down to Paragraph 4B of the March 30,

```
 1    2004 letter that Mark White sent to EPTI, do you see how he
 2    writes, "The brochure and sales information of VEO is the
 3    sole property of VEO, and disclosure is not required by the
 4    agreement."  Did he, at some point after March 30, 2004,
 5    provide you or anyone else at EPTI, to your knowledge, with a
 6    copy of the brochure and sales information that VEO utilized
 7    for the Keystone standard M series?
 8         A.   No.  Not -- we did not get it from Mark White.
 9         Q.   Did Mark tell you words to the effect that you don't
10    need to see the brochure and sales information for VEO
11    because I approved it back when I was working for EPTI?
12         A.   There was no discussion with me.
13         Q.   He also writes, in Paragraph 4B, "Photographs of the
14    mark will be provided for the various boilers provided."  Did
15    you ever receive photographs of the mark from VEO?
16         A.   We received photographs of the S stamp, but that was
17    not the mark that we were looking for.  We were looking for
18    the use of the Keystone name and the mark as defined by the
19    license agreement.
20         Q.   Did anyone from VEO, after March 26, 2004, provide
21    you with photographs of the mark showing the Keystone name on
22    boilers that had been sold by VEO?
23         A.   No.
24         Q.   I'd like to ask you about the attempted sale of the
25    Keystone technology to VEO.  I think you said you're not
```

certain whose idea it was to purchase the technology, whether it was VEO's idea or EPTI's idea.

A. Yes. Correct.

Q. Based on your involvement in that process, what was it that VEO wanted to purchase?

A. Their expectation was to purchase everything. The entire O boiler technology line.

Q. Based on what VEO said to you, was it willing to purchase just the M series line of boilers that it had licensed?

A. No. They had no desire for just that subset.

Q. Who told you VEO had no desire to purchase just that subset?

A. It was obvious in the phone call discussions with Mark White and in the ceasing of discussions on the concept of trying to move it forward that there was no intention.

Q. Did Mark White tell you why VEO was not satisfied with just purchasing the standard M series technology?

A. Not directly, no. Or indirectly, no.

Q. Now, in the draft purchase agreement that we saw, there was a proposed sale price of $250,000. Do you recall that?

A. I recall that there was something like that, yes. 250.

Q. That's in Exhibit 23, on Page 3, which is VEO964.

```
 1    Did VEO at some point agree to pay $250,000 for the
 2    technology, assuming that you could reach agreement on the
 3    other terms?
 4         A.   No.  We never got -- once we stopped the discussion
 5    and tried to rewrite the agreement, we never got back to a
 6    discussion on, at least that I was directly involved with,
 7    purchase price or what's the value of it.  The discussions
 8    ceased when we made the clear distinction between M series
 9    and O series and O boiler technologies.
10         Q.   Did VEO also insist during that process that it
11    obtain rights to the Keystone name?
12         A.   That was part of the original draft of the agreement
13    was that he got full rights to the --
14         Q.   For how long did VEO want full rights to the
15    Keystone name?
16         A.   I'm not sure of the terminology that was used, but
17    it was basically indefinite.
18         Q.   Was EPTI willing to give indefinite rights to the
19    Keystone name to VEO?
20         A.   No.
21         Q.   Why not?
22         A.   The original intention was, if we were to sell
23    something, we would sell a subset of the product, but not
24    give up the complete product line in its entirety.  And the
25    identity in the market was to maintain the Keystone boiler as
```

a product line.

Q. Can you identify, in order of priority, what the obstacles were to reaching agreement with VEO on the sale of the technology?

A. I think the biggest obstacle was when we separated M series and made it distinct relative to the entire O boiler line. That all the company was interested to sell was truly the M series standard product.

Q. That was a deal breaker for VEO?

A. Yeah. The rest of the discussion -- we ceased the discussion at that point. The minor issues of name and licensing that Keystone name became secondary to it.

Q. To go back to January 2003 when you were talking about seeing the license agreement and the drafts of Annex 1 -- or the draft of Annex 1. You refer to there being a flurry of activity before the license agreement was executed. What was the reason for the flurry of activity?

A. Up until the time that it was published in the company it wasn't evident that everybody in the company knew what was happening. That it was an -- that a deal was being made, but it certainly wasn't in concert with what the collective opinions of the company was. So it was engineering and sales and service, and the flurry of activity was all the people finding out what was happening and discussions initiating after that as what exactly is

1    A.    Not that I recall.

2    Q.    Was it important to you that any updates or
3    improvements would be owned by EPTI?

4    A.    Yes.

5    Q.    Now, there were questions about updating the
6    Keystone for customer requirements and code requirements.  Do
7    you recall that?

8    A.    Yes.

9    Q.    In updating the Keystone for customer requirements
10   and code requirements, in your view was it still necessary
11   for VEO to comply with the license agreement?

12   A.    Yes.

13   Q.    By "customer requirements," did you understand that
14   to mean having the Keystone comply with prevailing site
15   conditions at a customer's location?

16   A.    Yes.

17   Q.    When you're talking about "prevailing site
18   conditions," what does that mean?

19   A.    It could be anything.  Wind, seismic, fuel
20   conditions, steam conditions, whatever the conditions
21   surrounding the site needs.

22   Q.    And in terms of complying with code requirements, is
23   it necessary for a boiler to have membrane walls in order to
24   comply with affable code?

25   A.    No.

```
 1      Q.   Does that include, for example, the drum internals
 2   for a superheated unit could be used for the drum internals
 3   in an HRSG?
 4      A.   Yes.  Drum internals are generic to the product.
 5   They could fit in any boiler.
 6      Q.   So the technology could also be used with other
 7   fired boilers, such as heated solid waste field-erected
 8   boilers?
 9      A.   Could be, yes.
10      Q.   In terms of the membrane walls that were designed
11   and tested by EPTI or its predecessors, were those all
12   engineers employed by EPTI or under other predecessors
13   involved in that design and testing?
14      A.   I can't speak for all in the past.  The majority I
15   would say, yes, were Zurn or EPTI employees.
16      Q.   To go back to the question about having a boiler
17   meet code, was it necessary to increase the drum size or
18   lengthen the boiler in order to meet code?
19      A.   Not the boiler and pressure vessel code, no.
20      Q.   Did you have conversations with Stephen Kang about
21   your participation in the preparation of the license
22   agreement and the annex back in January 2003?
23      A.   Not --
24           MR. SHEEAN:  Objection.  Mischaracterizes his prior
25               testimony.
```

1       MR. SHEEAN: Calls for speculation, lack of
2       speculation.
3    A.  In my opinion, they were taking advantage of the
4    situation.
5    Q.  For example, one of the disagreements involved
6    whether membrane walls were within the scope of the license
7    agreement, correct?
8    A.  Yes.
9    Q.  That was an issue that was addressed while Mark
10   White was at EPTI, correct?
11      MR. SHEEAN: Objection. Vague.
12   Q.  Based on the documents that we reviewed today in
13   your deposition.
14      MR. SHEEAN: Objection. Vague, lack of foundation,
15      mischaracterizes prior testimony.
16   Q.  You can answer.
17   A.  There was discussions early on in the license
18   agreement of what defined the boiler geometry and the
19   annexes, yes.
20   Q.  During the time Mark White was involved in the
21   drafting of Annex 1, and the administration of the license
22   agreement while employed by EPTI, he did not dispute the
23   geometry and characteristics of the Keystone boiler that was
24   licensed, as set forth in Annex 1; is that correct?
25      MR. SHEEAN: Objection. Asked and answered.

A. I don't know if he did or not.

2 Q. Did he say anything to you to dispute that membrane walls were not included within the scope of the license agreement while he was employed with EPTI?

MR. SHEEAN: I'm going to object to the extent it mischaracterizes documents that we've seen and testimony we've already heard. But you can answer.

A. No.

MR. GISLESON: Could you read back my question and answer.

(Record read back.)

MR. GISLESON: Those are all the questions I have.

MR. SHEEAN: Thanks, Mr. Gdaniec.

MR. GISLESON: You have the right to read and sign the transcript, or you can waive that right. Generally speaking, I'm sure Chris will say the same thing, it's your decision to make, witnesses generally reserve the right. Maybe they read the transcript; maybe you don't. But it gives you a chance to go back through and read it to make any changes, whether substantive or, in the unlikely event, typographical that may have occurred.

THE WITNESS: I'd like to do that.

(Deposition concluded at 2:55 p.m.)

```
 1            doesn't have a Bates stamp.  It was produced --
 2            it's the same issue we had back in Tulsa.
 3            MR. SHEEAN:  For the record, I'm going to object to
 4            the use of documents that don't have Bates stamps
 5            on them to the extent that I can't confirm that
 6            they were produced in this litigation, and
 7            therefore, I think it constitutes unfair surprise.
 8            But to the extent they were produced and the Bates
 9            label can be identified subsequently, I withdraw my
10            objection.
11       Q.   I want to show you what's been marked as Gdaniec
12  Exhibit 38.  It's a two-page document.  Do you see in the
13  lower part of the first page, there's an e-mail from Trent
14  Miller to Dave Briggs on the subject of a couple of questions
15  in which he writes, "We have a new project that we're going
16  to make a 14M, but I've been looking at the boiler that you
17  built for us, your Project 2023, and am getting confused."
18  Was Project 2023 the project you referenced earlier today?
19            (Gdaniec Deposition Exhibit No. 38 marked for
20            identification.)
21       A.   Yes.  That was Heinz.
22       Q.   Above that Mr. Briggs writes, and copied you on the
23  e-mail, also on July 10th, "Trent, In response to your
24  questions, please remember that the license agreement was for
25  our standard M series Keystone package boilers.  These
```

1  boilers are all saturated refractory rear and front wall with
2  a tangent furnace wall. Our order G.O. 2023 was a special
3  Keystone, not a 14M, not a 15M, but a special. This order
4  was an all welded wall design. You cannot compare apples to
5  oranges. They're just not the same. So to answer your
6  question as to what model size was G.O. 2023, the answer is
7  that it is not a model size." Was Mr. Briggs accurate in his
8  characterization?
9      A.  Yes.
10     Q.  Did you understand that Trent Miller was an engineer
11 with Victory in July 2003?
12     A.  Yes.
13     Q.  I'd like to show you what's been marked as Gdaniec
14 Exhibit 39. It's a document stamped V116 to V117. Do you
15 see how this is an e-mail from you to Jay McConaughy in --
16 March 23, 2004 on the subject of Dallas-Fort Worth additional
17 analysis?
18         (Gdaniec Deposition Exhibit No. 39 marked for
19          identification.)
20     A.  Yes.
21     Q.  You copied Mark White on this, right?
22     A.  Yes. Correct.
23     Q.  And as of this time Mark White worked at VEO; is
24 that correct?
25     A.  I believe so, yes.

```
 1        Q.   And the Dallas-Forth Worth, or DFW, project was one
 2   you identified before as being outside the scope of the
 3   license agreement; is that right?
 4        A.   Yes.
 5        Q.   But it was pursued by VEO with EPTI's knowledge and
 6   consent; is that correct?
 7        A.   Yes.
 8        Q.   And then you write, in the first paragraph, "Jay,
 9   This is getting tougher to break out individual costs for
10   these items.  This boiler is clearly well beyond the standard
11   M series boiler and should have completed detail design
12   analysis conducted on it.  By no stretch of the imagination
13   can this boiler be considered a standard."  Did I read that
14   correctly?
15        A.   Yes.  That's correct.
16        Q.   That's what you wrote at the time, right?
17        A.   Yes.
18        Q.   So were you clearly telling VEO that this was a
19   boiler outside the scope of the license agreement?
20        A.   I was trying to emphasize to them that by no means
21   was this a standard boiler.
22        Q.   Now, did you get a response from Jay McConaughy
23   disputing your characterization of the license agreement?
24        A.   No.
25        Q.   Did Mark White contact you on or after March 23,
```

183

1   A.   Yes.  Correct.
2   Q.   Isn't it possible that Mark White was referring to
3   the increase in the steam capacity above 150,000 pounds per
4   hour to designate the difference between the M series and the
5   O?
6   A.   No.
7        MR. GISLESON:  Objection.
8   Q.   Had you ever had a conversation with Mark White
9   where you specifically were able to confirm that?
10  A.   Yes.  Because the discussion was all-around relative
11  to our distinction of what the M series was versus what the O
12  boiler line could be, and Victory wanted the full flexibility
13  of what the O boiler could be and not be limited to what the
14  M series was.
15  Q.   And that was based on what Erie Power was defining
16  the M series to be, correct?
17  A.   And what -- yes.  And what Erie Power was willing to
18  sell under this discussion that we're having here in the
19  e-mails.  That we weren't interested in selling the entire O
20  boiler line.  We were only interested to sell the subset
21  called the M series technologies.
22  Q.   To the best of your knowledge, there were no similar
23  discussions before the execution of the original license
24  agreement regarding the Erie Power understanding of the M
25  series boiler line, correct?

1       A.   Only to the -- with respect to that issue, only to
2  the fact that Mark White says Victory understands they're
3  going to have to do a lot of work and update and do a lot of
4  re-engineering work.  There was no specific discussion of
5  explaining to you the difference between the products.
6       Q.   There was no discussion with Victory Energy?
7       A.   Not by myself, but I would assume that, based on
8  Mr. White's response, everyone understood that there was a
9  lot of work to do to update the product line and make it more
10 sellable.
11      Q.   You didn't answer my question, Mr. Gdaniec.  My
12 question was, to the best of your knowledge, no one from Erie
13 Power had a similar discussion with Victory Energy where they
14 laid out Erie Power's definition of the M series boiler line
15 prior to the execution of the original license agreement;
16 isn't that true?
17           MR. GISLESON:  Objection.  Assuming such a
18           conversation --
19      A.   I would have to say I'm not aware of if there was or
20 was not a discussion of that level.
21      Q.   You've been handed what's been marked as Gdaniec
22 Exhibit 25, which, for the record, is Bates labeled IKE7432
23 through IKE7436.  Take a look at this document, and let me
24 know when you've had a chance to review it.
25           (Gdaniec Deposition Exhibit No. 25 marked for

123

```
 1              identification.)
 2      A.    Okay.
 3            MR. GISLESON:  I apologize, the handwriting with
 4      the date on the top is mine.
 5      A.    Okay.
 6      Q.    Mr. Gdaniec, did you prepare this document?
 7      A.    Yes, I did.
 8      Q.    Did you forward it to Mark White on or about March
 9   26, 2004?
10      A.    Yes, I did.
11      Q.    Do you see that under the term "Current License" it
12   says, "Provides VEO the right to market and manufacture the
13   standard M series product within a defined size and capacity
14   range with an extension to permit addition of superheaters to
15   the standard line."?
16      A.    Yes.
17      Q.    Below that it says, "Extended License Option:  This
18   is the Annex 1 description.  This portion expands
19   availability of the products to the full O boiler line and D
20   boiler line within a defined size and capacity range while
21   preserving the original agreement scope and general
22   conditions.  This would give VEO access to a wide range of
23   sizes, pressure, and temperature capacity, the use of welded
24   wall, as well as provide access to steam purity equipment
25   which is not part of the current license scope."  Do you see
```

124

```
 1   that?
 2       A.   Yes, I do.
 3       Q.   Did you understand at that time that Victory Energy
 4   took the position that the license agreement took the right
 5   of Victory Energy to sell membrane wall boilers?
 6           MR. GISLESON:  Objection.  Mischaracterizes the
 7           evidence.
 8       A.   I don't know if Victory felt that of the license
 9   agreement or not.  I don't know.  I was not aware of that.
10       Q.   The -- strike that.  The license agreement that had
11   been in place for almost 15 months at this point, correct?
12       A.   Yes.
13       Q.   To your knowledge, had Erie Power ever refused to
14   allow Victory Energy the right to sell a membrane wall boiler
15   prior to March 26, 2004?
16       A.   We never specifically prohibited it, no.
17       Q.   To your knowledge, did Erie Power ever refuse to
18   support Victory Energy in the engineering of a boiler that
19   included membrane wall technology?
20       A.   No.  Not to my knowledge.
21       Q.   And that was true before March 26th and after March
22   26th, correct?
23       A.   It was true definitely before March 26th.
24       Q.   Can you identify a single project after March 26th
25   where Erie Power refused to provide Victory Energy
```

```
 1   engineering support on a membrane wall boiler?
 2       A.   There was less discussion after the -- the failure
 3   of the sales and the extension of the license agreement,
 4   there was less and less discussion with regard to EPTI and
 5   Victory with regards to any project work they were pursuing,
 6   and more focus was being focussed on the bankruptcy and
 7   moving the company forward.
 8       Q.   Can you identify a single instance after March 26,
 9   2004 where Erie Power refused to provide support to Victory
10   Energy on a membrane wall boiler?
11       A.   No, I cannot.
12       Q.   On Page 7434, which is the third page of the letter,
13   "Item No. 7.  With regards to the use of the Keystone name,
14   as with the software source code, this too is a difficult
15   matter.  Regardless of the course of this agreement, EPTI
16   will maintain use and ownership of the O boiler line, which
17   as you are well aware the Keystone name is a vital part of
18   the heritage and credibility of that project."  Do you see
19   that?
20       A.   Yes, I do.
21       Q.   "As such, we cannot offer a perpetual license for
22   the name that would survive the license agreement."  Do you
23   see that?
24       A.   Yes, I do.
25       Q.   Why was it Erie Power's position that it would not
```