1

2

       UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF PENNSYLVANIA

3

4  INDECK KEYSTONE ENERGY LLC, )
                               )
5          Plaintiff,          )
                               )
6  VS                          )
                               )Civil Action No. 04-325 Erie
7  VICTORY ENERGY OPERATIONS,  )
   LLC,                        )Judge Sean J. McLaughlin
8                              )
                               ).
9          Defendant           )JURY TRIAL DEMANDED

10

11

12

        ORAL AND VIDEOTAPED DEPOSITION OF

13

           STEPHEN YOUNG KANG

14

           December 13, 2005

15

            Volume 1 of 1

16

17   Oral Deposition of STEPHEN YOUNG KANG, produced as a
     witness at the instance of MR. CHRISTOPHER T. SHEEAN,
18   ATTORNEY FOR DEFENDENT VICTORY ENERGY OPERATIONS, LLC,
     and duly sworn, was taken in the above-styled and
19   numbered cause on December 13, 2005, from 1:50 p.m.
     to 5:03 p.m., before Lydia P. Battle, CSR, RPR, in and
20   for the State of Texas, reported by stenographic means,
     at the offices of Jones & Young, P.C., 2700 Post Oak
21   Blvd., Suite 1350, Houston, Harris County, Texas,
     pursuant to the Federal Rules of Civil Procedure and the
22   provisions stated on the record attached hereto.

23

24

25

**EXHIBIT**

**3**

1           MR. SHEEAN:   Those are all the questions I

2    have at this time.

3                        EXAMINATION

4       Q    (BY MR. GISLESON, 3:42 p.m.)   Good afternoon.

5       A    Hi.

6       Q    So your undergraduate and major from Carnegie

7    Mellon, you got a bachelor of science in?

8       A    Economics, industrial management.

9       Q    Oh, in industrial management?

10      A    Yes.

11      Q    Do you have any education or training in

12   engineering?

13      A    No.

14      Q    Throughout the time that you were, first, chief

15   financial officer and then president of Erie Power

16   Technologies, were you relying on the engineers with

17   respect to their knowledge and experience with the

18   technology underlying the license agreement with Victory

19   Energy Operations?

20      A    Yes.

21      Q    I want to ask you some questions about your

22   discussions with Mark White prior to the time that the

23   license agreement between Erie Power and VEO was executed.

24   How did Mark White describe to you the technology that

25   was to be licensed to VEO?

1    A    He said it was 150 pounds per hour pressure

2  or -- or less size or these were outdated, antiquated

3  models to Erie Power.

4              MR. SHEEAN:   I'm going object to the extent

5  it mischaracterizes prior testimony.

6    Q    (BY MR. GISLESON)  When you're referring to 50

7  (SIC) pounds, is it -- do you mean 150,000 pounds per hour?

8    A    Yes.  I'm sorry.  150 -- 150,000, yes, yes.

9    Q    And Mark White told you that the technology was

10  outdated and antiquated?

11    A    Yes.

12    Q    And that's what Mark White told you prior to the

13  time the license agreement was executed, correct?

14    A    Yes.

15    Q    Did you rely on his description as to the

16  technology in authorizing him to proceed with the

17  negotiations and execution of a license agreement?

18              MR. SHEEAN:   Objection.  Vague.

19    A    I relied on him and others, other engineers, to

20  look into the technical scope definition for the license

21  agreement.

22    Q    (BY MR. GISLESON)  Now, in terms of the

23  technical scope definition for the license agreement, you

24  said that you wanted to have Mark check with the

25  engineers about what those specifications were; is that

1    would be outside of the Product License Agreement."  Do

2    you see that?

3        A    Yes.

4        Q    And you read this January 14, 2003, e-mail at or

5    about the time that you received it from Bob Gdaniec; is

6    that correct?

7        A    Yes.

8        Q    Now, on or after January 14, 2003, and prior to

9    the time that the license agreement was signed by Mark

10   White, did Mark White ever go to you to express any

11   concerns he had about Bob Gdaniec's involvement with the

12   negotiation and preparation of the license agreement?

13       A    No.

14       Q    Did Mark White come to you to advise that Bob

15   Gdaniec did not understand the scope of the license

16   agreement?

17       A    No.

18       Q    Was it your expectation that Bob Gdaniec develop

19   an understanding of the scope of the license agreement?

20       A    Right.  Yes.

21       Q    Why did you want Bob Gdaniec to have an

22   understanding as to the scope of the license agreement?

23       A    Because it would be silly for me to try to

24   understand technically what these terms or scopes or

25   boilers would mean.  So I expected that the existing

1    Q    And did you, in turn, expect Mark White to rely

2  on the information he was being provided by the engineers?

3    A    I expected he would have discussion, yeah, with

4  Bob Gdaniec and Dan Levstek and everybody to come up with

5  this such annex or...

6    Q    So that the final version of Annex I for the

7  product in the license agreement would be a joint product,

8  if you will, of both sales and marketing and engineering?

9    A    Yes.

10              MR. GISLESON:  Mark that, please.

11              (Exhibit No. 16 was marked.)

12    Q    (BY MR. GISLESON)  I'd like to show you what's

13  been marked as Kang Exhibit 16, which is a document

14  stamped IKE 354 to 355.  Would you take a look at that,

15  please.

16    A    (Nods head.)

17    Q    Looking at the first page of this, do you

18  recognize this as an e-mail from Dave Briggs dated

19  January 30, 2003, to Mark White that he copied to Bob

20  Gdaniec and Dan Levstek on the subject of "Annex of

21  License Agreement"?

22    A    Yes.

23    Q    And he writes:  "Mark, I have looked at the

24  annex as well and the following are my comments as to

25  what should be added."  And he identifies, among other

1    received from Dave Briggs in the Engineering Department?

2              MR. SHEEAN:  Objection.  Lack of foundation.

3    Calls for speculation.

4      A    It -- it appears that way, yes.  Yes.  Excuse me.

5      Q    (BY MR. GISLESON)  When you instructed Mark White

6    to check with the engineers concerning the preparation of

7    Annex I --

8      A    Excuse me.  Excuse me.  Yes.

9      Q    -- did he tell you that he would do that?

10      A    I'm sorry.  Can you repeat the question.

11      Q    Sure.  You told Mark -- strike that.  You

12    instructed Mark White to consult with the engineers in

13    the preparation of Annex I to the license agreement,

14    correct?

15      A    Yes, that's correct.

16      Q    Did Mark White, in turn, respond to you that he

17    would follow that instruction?

18      A    Yes.

19      Q    Did Mark White thereafter tell you that he, in

20    fact, had consulted with the engineers?

21      A    Yes.

22      Q    Did he give you any details as to the feedback

23    he received from the engineers?

24      A    No.

25      Q    Did he discuss in any way the information he had

1    agreement?

2          MR. SHEEAN:  Objection.  Vague.

3      A    Yeah, I -- I -- I pretty much said, "Okay,

4    that's fine, John.  Let's move on to the topic of asset

5    sale discussion."

6      Q    (BY MR. GISLESON)  You were shown a copy of the

7    Asset Purchase Agreement between CMI America, Inc., and

8    Erie Power Technologies --

9      A    Yes.

10     Q    -- which was marked as Exhibit Kang 11, in which

11   you were shown Section 2.10, on page 11, that includes,

12   among other things, the disclosures that "To Seller's

13   knowledge no third party is infringing or has

14   misappropriated any of the Intellectual Property Rights;"

15   and that "no license or royalty agreement to which Seller

16   is a party is in breach or default by any party thereto,

17   or the subject of any notice of termination given or, to

18   Seller's Knowledge, threatened."  Do you see that?

19     A    Yes.

20     Q    Were you relying on the representation by John

21   Viskup in your meeting with him that VEO was not

22   infringing the license agreement when you gave those

23   representations?

24          MR. SHEEAN:  Objection.  Foundation.

25     A    No, I didn't rely based on John's statement.  I

1    relied on basically overall feedback or information I had

2    up to that point.

3        Q    (BY MR. GISLESON)   And if we look at page 36,

4    which is the definition of "Knowledge".

5        A    Yes.

6        Q    It says, "Knowledge means the actual knowledge

7    of Stephen Kang, Daniel Levstek and Tracey Peterson, in

8    each case after reasonable inquiry; and "Know," "Knows,"

9    and "Known" shall have meanings correlative to the

10   foregoing."  Do you see that?

11       A    Yes.

12       Q    In connection with giving the representations in

13   this Asset Purchase Agreement, did you go back and look

14   at all the correspondence between EPTI on the one hand

15   and VEO on the other hand --

16       A    No.

17       Q    -- to determine what EPTI was saying to VEO

18   about VEO's performance on the license agreement?

19       A    No, we did not go back and look at every

20   correspondence, no.

21       Q    Did you look at the internal correspondence

22   within EPTI to determine what information Mark White had

23   concerning the interpretation and scope of the license

24   agreement?

25       A    No.

1     Q     You were shown a copy of Exhibit Kang 10, which

2     is the letter that Bob Gdaniec sent to Mark White that

3     concerned both the proposed Asset Sale Agreement with

4     VEO, as well as EPTI's concerns regarding VEO's performance

5     under the existing license agreement, correct?

6     A     Correct.  Yes.

7     Q     And this letter, both the main portion of the

8     letter written by Bob Gdaniec, as well as the last two

9     pages concerning EPTI concerns regarding VEO performance

10    under the existing agreement, was discussed internally at

11    EPTI prior to the time that it was sent; is that right?

12    A     Yes.

13    Q     And the letter represented the consensus, if you

14    will, among those at EPTI who discussed these issues; is

15    that correct?

16    A     Consensus among the engineers, yes.

17    Q     Who participated in the discussion?

18    A     Myself, Bob Gdaniec, Chris Petcos, Dan Levstek,

19    as well as Bob Gdaniec also went to Ted Fuhrman and --

20    and consulted.

21    Q     And looking at the second to the last page,

22    under paragraph No. 1, it says, "VEO currently licenses

23    only the M series product line which has a very specific

24    geometry and characteristics.  In review of some of the

25    VEO recent projects and proposals, it appears that the

1    majority of projects that VEO is pursuing or has

2    completed have been outside the definition of the license

3    agreement."  Does that also mean outside the scope of the

4    license agreement?

5        A    That is what I assume when I read it.

6        Q    It says, "Of particular concern most recently

7    are the Oxy and Dallas Ft Worth Airport projects which

8    are well outside the bounds of the products defined in

9    the agreement.  VEO will need to redirect their attention

10   on the sales," slash, "marketing and execution of the

11   products that are defined in the license agreement.

12   (Annex 1 of the current agreement provides a clear

13   definition of the "M"-Series design with product size,

14   dimensional data for the different size ranges, typical

15   cross-section of the boiler and overall boiler

16   construction which includes refractory front and rear

17   walls, tangent furnace and outer wall tubes and pressure

18   casing design."  Do you see that?

19       A    Yes.

20       Q    After EPTI sent this letter to VEO, did you, in

21   your capacity as president of EPTI, advise VEO that it

22   could sell products outside the scope of Annex I, as

23   defined in that paragraph?

24       A    No, I did not notify.

25       Q    Did you instruct anyone from EPTI to advise VEO

1   that VEO was permitted to sell products outside the scope

2   of the license agreement as defined in that paragraph 1?

3       A    No.

4       Q    Did you receive a copy of VEO's response to the

5   concerns that EPTI raised about VEO's performance?

6       A    I don't -- I do not recall pursuing anything.

7   Of course, they might have responded, but I do not recall

8   right now.

9              (Exhibit No. 18 was marked.)

10      Q    (BY MR. GISLESON)  I'd like to show you what's

11   been marked as Kang Exhibit 18.  It's a document stamped

12   VEO 632 to 635.

13      A    Uh-huh.

14      Q    Looking at the first page of this, do you see

15   how it's a March 30, 2004, e-mail from Mark White to Bob

16   Gdaniec in which you are cc'd on the subject of "EPTI

17   License Concerns"?

18      A    Yes.

19      Q    Did you, in fact, read this e-mail with the

20   EPTI -- with the VEO response?

21      A    It looks familiar.

22      Q    Looking at the second page, Mark White writes to

23   Bob Gdaniec:  "We have reviewed your license of March

24   26th, 2004, which details your concerns regarding VEO's

25   compliance with the license agreement dated January 7th,

1    point that...

2       Q     You said that you contacted EPTI's lawyers,

3    MacDonald Illig, and EPTI, about the issue of VEO's

4    performance under the license agreement; is that right?

5       A     Yes.

6       Q     Did you not pursue the issue of a potential

7    breach with -- strike -- strike that.  Is it correct that

8    you did not pursue the issue of whether VEO is in breach

9    of the license agreement with MacDonald Illig because the

10   bankruptcy was underway?

11      A     Yes.  Our focus was more on the bankruptcy

12   issue, so we put this issue on the back burner.

13      Q     And, then, before the issue could move to the

14   front burner, the assets were sold?

15      A     Yes.  That's correct.

16      Q     You were asked some questions about the potential

17   sale of the technology from EPTI to VEO.  Who was involved

18   in those discussions internally at EPTI?

19      A     Myself, Dan Levstek, Bob Gdaniec, and Chris

20   Petcos were four key members.

21      Q     Who first raised the idea of VEO purchasing the

22   technology?

23      A     It was actually really sort of a phone call from

24   Mark White to me.

25      Q     When did that call occur?

1      A      Sometime like I think January -- like very early

2  part of 2003 or -- I'm sorry.  2004.  January 2004.  And

3  he just called me on my cell phone and -- and asked how I

4  was doing, and then -- and then -- and brought that issue

5  up.

6      Q      At the time of Mark White's phone call, had EPTI

7  already entered bankruptcy?

8      A      Yes.

9      Q      What did Mark White tell you that VEO had an

10  interest in acquiring?

11     A      He was very vague.  He said, basically, "I --

12  we're interested in purchasing your Keystone boiler," is

13  how he put it.

14     Q      Did he give it any more detail than that?

15     A      No, no.

16     Q      And then what was the next thing that happened?

17     A      He kind of tried to feel out whether or not I

18  was interested or not.  I explained to him that actually

19  EPTI might be interested because we're in bankruptcy and

20  we may sell certain parts of our assets, and that -- that

21  I would get back to him on that.

22     Q      Did you get back to him?

23     A      Yes, I went back and talked to our people and we

24  did discuss -- that's when we discussed selling of the

25  "M" line.

1       Q     The people with whom you spoke, were those in

2    the Engineering Department?

3       A     Yeah.   They're Dan Levstek, Bob Gdaniec and

4    Chris Petcos.

5       Q     Was it EPTI that first prepared a draft of the

6    proposed sale agreement?

7       A     I believe we actually received that draft.   I

8    don't know if we actually initiated that draft.

9            MR. JONES:   What sale agreement exactly?

10            MR. GISLESON:   Of the potential -- drafts of

11    the potential sale agreement between EPTI and VEO.

12            MR. JONES:   Oh, okay.

13            MR. GISLESON:   For technology.

14       A     Later on, there was some draft that might have

15    been done by a Schnader law firm that was representing

16    EPTI in bankruptcy.   So, that might have been the draft

17    too.   I mean the -- I don't know which draft.

18            MR. GISLESON:   Would you mark that, please.

19            (Exhibit No. 19 was marked.)

20       Q     (BY MR. GISLESON)   I'd like to show you what's

21    been marked as Exhibit 19.   It's a document stamped VEO

22    961 to 978.

23       A     Uh-huh.

24            MR. JONES:   Agreement to own.

25       Q     (BY MR. GISLESON)   Looking at the first page, I

1    think this is an e-mail that we saw in a prior exhibit.

2    That's from you to Mark White, copy to Dan Levstek, dated

3    February 24, 2004, in which you write:  "Dan, please

4    review the attached agreement and also distribute to

5    others like Bob Gdaniec and so forth for review.  Mark,

6    this is our first attempt at setting up expanded and rent

7    to own type agreement draft whereby Victory has full

8    unilateral right to exercise the option to continue and

9    keep the technology."  And, then, skipping a couple of

10   sentences, you write:  "We need Annex I from you also to

11   add all the lines and languages as to what specific items

12   are being sold eventually.  We shall discuss how to make

13   this work."  Do you see that?

14        A    Yes.

15        Q    And you were responding to a February 20, 2004,

16   e-mail that Mark White had sent to you in which he wrote:

17   "Stephen, pursuant with our meeting, what is the status

18   of the Keystone Sell Agreement?"  Do you see that?

19        A    Yes.

20        Q    When was the meeting that was referenced by Mark

21   White?

22        A    This is probably the meeting that we had down in

23   Oklahoma, where my days may not be clear, I mean, as to

24   whether that was April or February, but it was that

25   springtime of 2004.

1    Q    And, then, turning to the next page, which is

2    stamped VEO 962 and then going through page 968, is that

3    the draft of the License Agreement and Option to Purchase

4    that was sent to VEO?

5    A    Yes.

6    Q    And, if you look, there's a date in the lower

7    right-hand corner, February 13, 2004, do you see that?

8    A    Yes.

9    Q    Now, on page 3, paragraph 6 refers to

10   "Compensation," and it says, "In consideration of the

11   rights granted herein, Licensee shall pay to licensor

12   $250,000 payable upon the execution hereof."  And, then,

13   under paragraph 7, "Option to Purchase," it says, "At the

14   conclusion of the one-year term of the licensing

15   provisions of this Agreement, at Licensee's sole

16   discretion, Licensee shall have the option to purchase an

17   assignment of the rights and Technical Information

18   licensed hereunder for the price of $250,000 (US) payable

19   on or before the termination date of this Agreement."  Do

20   you see that?

21   A    Yes.

22   Q    Where did the compensation amounts of $250,000

23   under paragraph 6 and $250,000 under paragraph 7, Option

24   to Purchase, come from?

25   A    That was sort of the number that was negotiated

1    in Oklahoma between John Viskup and myself.

2         Q    But there would be $250,000, in paragraph 6, for

3    the extended license, and then, if VEO were to purchase

4    the technology, another $250,000 payment?

5         A    Right.  Yes.

6         Q    And what was the sequence of events leading to

7    an agreement as to the amount of compensation?

8         A    You mean to these amounts?

9         Q    Correct.

10        A    We had a discussion down in Oklahoma about

11   selling the -- potentially the "M" line to Victory and --

12   and initially we wanted a price of one million dollars

13   and then Victory said, no, that was too high, that they

14   would pay $250,000, and then we sort of got to $500,000

15   during that negotiation.

16        Q    In terms of discussing compensation, was the

17   subject of discussion the Standard "M" Series line of

18   boilers?

19             MR. SHEEAN:  Objection.  Calls for

20   speculation.

21        A    Yes, we -- well, they wanted the "O" line and we

22   said, "No, 'O' line is not for sale.  We're selling 'M'

23   line," and then we never made the Annex I.  That's the

24   reason why I was asking for Mark White to clarify what

25   their understanding of Annex I would be, you know, such a

1   draft of sales agreement.

2       Q    (BY MR. GISLESON)  When the parties arrived at

3   the $250,000, under paragraph 7, if VEO were to purchase

4   the technology, that $250,000 contemplated purchase of

5   the "O" type technology or the "M" Series?

6       A    From our side, it was the understanding that it

7   was -- that would be an "M" line for that price.

8       Q    Did John Viskup tell you what VEO was willing to

9   pay if they could acquire the entire "O" type technology?

10      A    Yes.  $500,000.

11      Q    If he could acquire the whole "O" type technology?

12      A    Right, right.

13      Q    Paragraph 5 is a confidentiality provision that

14  says, "All of the Technical Information supplied by

15  Licensor under this Agreement shall be deemed to be part

16  of Licensor Confidential Information and shall be for the

17  exclusive use of Licensee," and there's some additional

18  phrases there.

19      A    Yes.

20      Q    During your discussions with Mark White or John

21  Viskup concerning the proposed sale agreement, did they

22  ever dispute any of the confidentiality assertions that

23  EPTI made in the draft sales agreements?

24      A    No.

25      Q    Did they ever say to you:  "We don't believe

1    this is confidential"?

2        A    No.

3        Q    Did they ever say to you that they believed the

4    Keystone technology that you were negotiating was already

5    in the public realm?

6        A    No.

7        Q    And if we look at page VEO 969, there's a

8    heading for "Annex I" and it's blank.  Is that because

9    you expected VEO to provide Annex I?

10        A    Yeah, we both jointly agreed to come up with

11    Annex I and we hadn't come up with it.

12        Q    And then, looking at page VEO 970, this is a

13    February 25, 2004, e-mail from Mark White to you on the

14    subject of "License Agreement and Option to Purchase," in

15    which he writes:  "In general, the document is not what

16    we expected.  It is not our desire to enter into an

17    agreement where we would continue to be subject to

18    royalty payments (except for those units above the

19    purchased range), have no guarantee of acquiring the

20    technology and possibly lose our investment should EPTI

21    be forced to liquidate.  However, we are willing to enter

22    into an agreement that would allow VEO to purchase the

23    Keystone technology outright for the given range

24    discussed.  This type of agreement would include two

25    payments, the first of which would be put into an escrow

1    account to protect VEO should EPTI be forced into

2    liquidation.  The second payment would be due within six

3    months thereafter.  Once we enter into a purchase

4    agreement, the current license agreement would be

5    terminated.  The range of boilers would include the

6    smallest available (3M) or a steam flow of 9,500 pph up

7    to 165,000 pph."

8                The reference there to the two payments, is

9    that one of 250,000 and then a second of 250,000?

10                MR. SHEEAN:  Objection.  Calls for

11    speculation.  Lack of foundation.

12        A    That was my understanding, yes.

13        Q    (BY MR. GISLESON)  Well, after the draft of

14    February 13, 2004, of the License Agreement and Option to

15    Purchase was sent to VEO, was there any further negotiation

16    of the purchase price?

17        A    No.

18        Q    And if we turn to page VEO 973, this is a March

19    3, 2004, e-mail from Mark White to you and Dan Levstek,

20    on the subject of "Completed Annex," and he writes:

21    "Stephen & Dan, a draft of the annex is enclosed for your

22    review and comment."  Then on pages 974 and 975 is the

23    proposed annex; is that right?

24        A    Yes.

25        Q    And under "Drawings and Information," he writes:

1    "All associated Keystone® "O" and "D" type drawings and

2    information required for the design, fabrication, assembly

3    and maintenance of the Boiler Technology."  Did you

4    understand that he wanted all the "O" drawings?

5         A    Yes.

6         Q    Was that acceptable to EPTI?

7         A    No.

8         Q    And then turn to the next page, under "License

9    to Use the Keystone Name," he writes:  "As a part of this

10   agreement, VEO shall be granted a perpetual license for

11   use of the trade name 'Keystone'."  Was that acceptable

12   to EPTI?

13        A    No.

14        Q    Why not?

15        A    That just was not what we offered.

16        Q    Why wasn't EPTI willing to give a perpetual

17   license for use of the "Keystone" name?

18        A    Because then, in essence, we will be giving away

19   Keystone boiler brand, I mean, then they could just put

20   "Keystone" on the boilers.

21        Q    Why didn't EPTI want to sell or provide the

22   right to use the Keystone name perpetually to VEO?

23        A    Because the price at the -- that it was being

24   negotiated would not -- that would be too low a price to

25   give that up.

1        Q      Did EPTI consider the Keystone name to be the

2    available asset?

3        A      Yes.

4        Q      And then turning to page VEO 976, this is a

5    March 3rd e-mail from Mark White to you and Dan Levstek,

6    again on the subject of "Completed Annex," in which he

7    writes:  "In my haste to submit the annex, I failed to

8    incorporate several of my comments.  I have made the

9    necessary changes to the annex, a copy of which is

10   enclosed.  We apologize for this inconvenience."  And you

11   read this e-mail and the attached annex, right?

12       A      Right.

13       Q      Just as you read his prior e-mail and the

14   attached annex, correct?

15       A      Yes.

16       Q      Looking at the revised annex, under "Drawings

17   and Information," he writes:  "All associated Keystone®

18   'O' and 'D' type drawings and information required for

19   the design, fabrication, assembly and maintenance of the

20   Boiler Technology.  Drawings and information shall be

21   provided for all 'M,' ('O' Type) and 'D' Series boilers

22   for projects executed within the Capacity Range as stated

23   above that may be of custom design."

24              Did you have any discussions with Mark White

25   about his interest in obtaining drawings for custom

Page 117

1  designed boilers?

2      A    No, I didn't have a direct discussion.

3      Q    In looking under "Computer Software & Hardware,"

4  VEO also wanted, among other things, the Keystone &

5  Shared Component Program (KPSC), including the source

6  code for that software?

7      A    Right.

8      Q    Do you see that?

9      A    Yes.

10     Q    Was EPTI willing to provide the source code for

11 that software?

12     A    No.

13     Q    Why not?

14     A    Once again, this is sort of their wish list --

15 Victory's wish list, and so we didn't agree to all of

16 these terms.

17     Q    Under the next page, for "License to Use the

18 Keystone Name," they have:  "As part of this agreement,

19 VEO shall be granted a perpetual and exclusive license

20 (at least with respect to the assets being transferred

21 hereunder) for use of the trade name 'Keystone'."  Did

22 EPTI, at this time, plan to use in the future the

23 Keystone name in its own business?

24     A    Yes.

25              (Exhibit No. 20 was marked.)

1    on page VEO 991, this is for "Sale of Keystone Watertube

2    Boiler Technology, Description of Technology;" is that

3    correct?

4        A    Yes.

5        Q    And the boiler technology identified by EPTI

6    that would be sold was "Keystone® Standard M Series

7    industrial watertube boiler technology in a capacity

8    range up to and including 165,000 pph of saturated steam

9    at design pressures no greater than 400 psig;" is that

10   correct?

11       A    Yes.

12       Q    And then, if we turn to page VEO 995, do you see

13   how that page and the one that follows is a Mark White

14   e-mail dated March 24, 2004, to you, Bob Gdaniec and Dan

15   Levstek on the subject of the "Completed Annex," in which

16   he is making changes or proposed changes to the agreement?

17       A    Yes.

18       Q    He writes:  "Based on our recent discussions

19   relative to a technology purchase through Rule 363, the

20   Amendment as provided would not be appropriate for this

21   purpose.  A document outlining the sale of the technology

22   requires development.  However, the Annex #2 could be

23   utilized to define the technology purchase."  Do you see

24   that?

25       A    Yes.

1      Q     (BY MR. GISLESON)  I'd like to show you what's

2   been marked as Kang Exhibit 20.  It's a document stamped

3   VEO 981 to VEO 996.

4           MR. JONES:  Sounds like they're having a

5   party.

6      Q     (BY MR. GISLESON)  Looking -- looking at the top

7   of the first page, do you see how that's an e-mail from

8   Dan Levstek, dated March 24th, 2004, to Mark White,

9   copied to you on the subject of the "Completed Annex"?

10     A     Yes.

11     Q     And he's responding to Mark White's e-mail of

12  March 3rd that transmitted his Annex I; is that correct?

13     A     Yes.

14     Q     And Dan Levstek writes:  "Attached is the

15  marked-up Agreement with our comments.  We would propose

16  it to be an amendment to the existing license agreement

17  with the option to purchase included.  This would allow

18  the portions of the license that are not changed to

19  remain in place if the purchase option is not exercised."

20  Do you see that?

21     A     Yes.

22     Q     And you reviewed this e-mail as well as the

23  attached Amendment to License Agreement and Option to

24  Purchase; is that right?

25     A     Yes.

1     Q     In preparing this e-mail and the Amended License

2   Agreement and Option to Purchase, did Dan Levstek discuss

3   that document with you?

4     A     Yes.

5     Q     And you agreed to the substance of his e-mail,

6   as well as the changes to the proposed License Agreement

7   and Option to Purchase?

8     A     Yes.

9     Q     If you look at page VEO 984, paragraph 6 and 7,

10   the amount of compensation remained the same, correct?

11     A     Let's see here, 984.  Yes.

12     Q     And then, on page VEO 989, Annex I is now

13   "Extension of License Agreement and Description of

14   Technology;" is that correct?

15     A     Yes.

16     Q     And under "Drawings and Information," in the

17   second sentence, it reads:  "Drawings and information

18   shall be provided for standard M series boilers;" is that

19   correct?

20     A     Yes.

21     Q     And then turning to --

22           MR. SHEEAN:  Which page is that on, John?

23           MR. GISLESON:  VEO 989, second sentence.

24           MR. SHEEAN:  Okay.

25     Q     (BY MR. GISLESON)  And then, turning to Annex II

Page 121

1    Q    So was -- strike that.  Did you understand that

2    VEO only wanted to focus on purchasing the technology at

3    this point?

4    A    That -- yeah, that basically that's what VEO

5    wanted to do at this time, rather than trying to do a

6    license agreement.  In the long term, they really wanted

7    to purchase the technology.

8    Q    And under "Boiler Technology," paragraph #1, on

9    page VEO 995, Mr. White wrote:  "This paragraph requires

10   modification as it limits the purchase to that of the 'M'

11   Series and is to be expanded to include all 'O' type

12   boilers.  It has always been the intention of VEO to

13   purchase the 'O' boiler technology which includes the

14   'M' Series boilers.  The purchase of the 'O' Series would

15   enable VEO to be the sole and exclusive owner of the

16   technology up to the capacity range."  Do you see that?

17   A    Yes.

18   Q    What's the difference between "O" series and the

19   "M" series, as you understand it, at the time of this

20   exchange?

21   A    My understanding was the "O" series is the --

22   sort of the main line or -- or the main product line of

23   Keystone boiler, and "M" series sort of complements or is

24   another line that we kept using the word "antiquated,

25   old".  I don't know it's because of years actually older

1    of the design or they were just older designs, but

2    basically "O" line was the main line for Keystone boiler.

3        Q    The old line was the "M" line?

4        A    No.  The main line is the "O" line.  And the

5    older line is the "M" line was my understanding.

6            MR. JONES:  You mean the primary line.

7            THE WITNESS:  Primary line.  I'm sorry.

8    Yeah, primary line.  The main line, you know, of the

9    Keystone boilers.

10       Q    (BY MR. GISLESON)  So, what happened at this

11   point?

12       A    This sort of negotiation died and we never

13   entered into any kind of sales agreement with Victory.

14           MR. GISLESON:  Would you mark that, please.

15           (Exhibit No. 21 was marked.)

16       Q    (BY MR. GISLESON)  I'd like to show you what's

17   been marked as Kang Exhibit 21, which is a document

18   stamped VEO 1009 to 1011 -- I'm sorry -- to 1012.  Do you

19   see how the -- on the first page, there's an e-mail from

20   Bob Gdaniec dated March 26th, 2004, to Mark White on

21   which you were copied, on the subject of the "Completed

22   Annex - EPTI Response"?

23       A    Yes.

24       Q    And he is responding to Mark White's e-mail on

25   the same page, from the same date, in which he wrote:

1    the proposed License Agreement and Option to Purchase

2    between the parties?

3        A    No, I don't know all the detailed comments on

4    this side, because there's so many comments going back

5    and forth, but I'm sure this is one of the latter, yeah

6    or -- sort of the final drafts that went back and forth.

7        Q    This is basically the last and final offer from

8    EPTI?

9        A    Yes.

10       Q    Was this accepted by VEO?

11       A    No.

12       Q    Was this the end of the discussions?

13       A    Yes.  We never further went down on this

14   discussion of the sales agreement.  I should really call

15   that "License Agreement and Option to Purchase," the way

16   it says at the top, just to clarify that.

17       Q    What did you understand the deal breaker was

18   that prevented EPTI from selling technology to VEO?

19       A    Basically, for the price that -- that Victory

20   wanted to buy, the things that Victory wanted were not to

21   be included from our end, so we had a, basically,

22   disagreement on too much of major items to ever reach

23   a -- a fruitful agreement on this topic.

24       Q    Were the engineers also telling you that EPTI

25   should not sell the "O" type, or "O" series, technology?

Page 126

1      A    Yes, but, then, as the president, I said

2   everything is for sale for right price; it just wasn't

3   the right price.

4      Q    After those discussions fell apart, did Mark

5   White or anyone else from VEO contact you or someone else

6   from EPTI again to discuss the possibility of VEO

7   acquiring technology from EPTI?

8      A    No.

9           MR. SHEEAN:  John, do you want to take a

10  two-minute break while you're reviewing those?

11          MR. GISLESON:  That's fine.  I think I'm --

12          VIDEOGRAPHER:  4:49, we're off the record.

13          (Break taken, 4:49 p.m.)

14          VIDEOGRAPHER:  4:54, we're back on the

15  record.

16              FURTHER EXAMINATION

17     Q    (BY MR. SHEEAN, 4:54 p.m.)  Mr. Kang, I just

18  have a few follow-up questions.  Mr. Gisleson's indicated

19  he's done --

20     A    Okay.

21     Q    -- with his direct examination of you, and I

22  just have a few follow-up questions.  Looking, first, at

23  what we had marked as Kang Deposition Exhibit No. 13.

24     A    Okay.

25     Q    This was the July -- or I'm sorry -- January 14,