1
## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

2

3  INDECK KEYSTONE ENERGY, LLC,  )
   a Delaware limited liability  )
4  company,                      )
                                 )        CIVIL ACTION
5              Plaintiff,         )
                                 )
6  vs.                           )        Case No. 04-CIV-325E
                                 )        Judge Sean J. McLaughlin
7  VICTORY ENERGY OPERATIONS, LLC)
   a Delaware limited liability  )
8  company,                      )        **CONFIDENTIAL TESTIMONY**
                                 )
9              Defendant.        )

10

11          <u>DEPOSITION OF JOHN VISKUP,</u>

12  a witness called on behalf of the Plaintiff, on the 31st
    day of January, 2006, at 320 South Boston, Suite 400, in
13  the City of Tulsa, County of Tulsa and State of Oklahoma,
    commencing at 9:30 A.M., before the undersigned, Joni
14  Humphries, a Certified Shorthand Reporter in and for the
    State of Oklahoma.

15  Fee for Original:    $_____
    Paid by Plaintiff.

16

17                    _Joni Humphries_

18              JONI HUMPHRIES, CSR #1236

19

20                  DAVIDSON REPORTING
            CERTIFIED SHORTHAND REPORTERS
21             5508 South Lewis Avenue
                Tulsa, Oklahoma 74105
22              Phone: (918) 745-9959

23                                      COPY

24        EXHIBIT
               6
25

1    A    Just reviewed them.  That was it.

2    Q    When you reviewed them, what were you looking for?

3    A    I really didn't spend a lot of time on those at that

4    time, but we looked to confirm the size of the furnace to

5    make sure what was proposed was depicted on the drawings as

6    well.

7    Q    As of the time that you received the drawings for the

8    Heinz boilers, did you know what a drawing for a membrane

9    wall looked like?

10    A    Yes.

11    Q    Did you also know at the time that you received the

12    drawings for the Heinz boilers what a tangent tube design

13    was for a watertube boiler?

14    A    Yes.

15    Q    What was a tangent tube design?

16    A    It's a design where you have a tube essentially

17    touching another tube.

18    Q    And what was the design for a membrane wall?

19    A    It's a tube where you have a bar of carbon steel

20    construction welded to the tube and when both tubes are

21    joined together it forms a common membrane between the two

22    tubes.

23    Q    Now had you seen drawings for tangent tube furnaces

24    prior to the time that you received the drawings for the

25    Heinz boilers?

| | | |
|---|---|---|
| 1 | A | I may have. |
| 2 | Q | Were the Heinz boilers Keystone boilers? |
| 3 | A | Yes. |
| 4 | Q | Do you recall the steam capacity of the boilers? |
| 5 | A | I believe they're 75,000 pounds per hour. |
| 6 | Q | What was the series number for the boilers? |
| 7 | A | I don't know. |
| 8 | Q | 14M, 15M? |
| 9 | A | It's possible, yeah. |

10  Q    Do you know whether the Heinz boilers were standard
11  Keystone boilers?
12        MR. SHEEAN:  Objection, vague.
13  A    What do you mean by standard?
14  Q    (By Mr. Gisleson)  Have you ever heard of a standard
15  Keystone boiler?
16  A    I've heard of a standard M-Series.
17  Q    When did you first hear of the standard M-Series
18  Keystone boiler?
19  A    When I was employed by Indeck Power.
20  Q    When were you employed by Indeck Power?
21  A    Early nineties.
22  Q    What were the years?
23  A    I believe it was '92 or '93 until '99.
24  Q    What was your understanding of the standard M-Series
25  Keystone boiler at that time?

1    A    It was a package boiler.

2    Q    Anything else?

3    A    It was truck shippable, rail shippable.  No, that's

4    about it.

5    Q    Did Indeck own any standard M-Series Keystone boilers

6    during the time that you worked at Indeck?

7    A    Yes, I believe so.

8    Q    How many?

9    A    I don't know.

10    Q    Approximately?

11        MR. SHEEAN:  Objection, calls for speculation.

12    A    I don't know, several.

13    Q    (By Mr. Gisleson)  What was the extent of your

14    contact with the standard M-Series Keystone boilers while

15    you were with Indeck?

16    A    I don't understand your question.

17    Q    What position did you have with Indeck at the time?

18    A    At what time?

19    Q    When you worked for Indeck?

20    A    What time?

21    Q    What was your starting position with Indeck?

22    A    Sales Engineer.

23    Q    For what years were you a Sales Engineer?

24    A    '92 or '93 to '96 or '97.

25    Q    What were your responsibilities as Sales Engineer?

1    Heinz boilers at the time that you were discussing a

2    license agreement with EPTI?

3    A      What drawings?

4    Q      Any of the design drawings for the Heinz boilers?

5    A      I don't believe so, no.

6    Q      Did you, at any point during the negotiation of the

7    license agreement with EPTI, review design drawings for the

8    Heinz boilers?

9    A      No.

10   Q      Did you, at any point during the negotiation of the

11   license agreement with EPTI, review any documentation of

12   any kind pertaining to the Heinz boilers?

13   A      I don't remember.

14   Q      When did you first have contact with someone from

15   EPTI concerning a potential license of a watertube Keystone

16   boiler?

17   A      Probably late 1999.

18   Q      With whom did you have contact?

19   A      With Ron Pancari started out with, and then the next

20   conversation with was with John Barnes.

21   Q      How do you spell Ron's last name?

22   A      P-a-n-c-a-r-i I believe.

23   Q      What position did Ron have?

24   A      I think he was in project management.

25   Q      With Aalborg or with Erie Power?

1    A    Back then I think it was would have been Aalborg.

2    Q    What did you discuss with Ron Pancari?

3    A    We had some opportunities at that time to quote some

4    larger boilers, and I had contacted Ron, I had a

5    relationship with him during the time I worked at Indeck,

6    and was inquiring whether or not they were still interested

7    in building the Keystone boilers, because they had put it

8    on the shelf.

9    Q    What did he tell you?

10   A    He directed me to speak with John Barnes.  It was a

11   product line that they weren't pursuing any longer, and he

12   directed me to speak with him.

13   Q    When did you speak with John Barnes?

14   A    It was shortly around the same time frame, shortly

15   thereafter.

16   Q    What did John Barnes tell you about the M-Series?

17   A    He didn't say a whole lot about it.  He didn't give

18   me a whole lot of time on the phone at that particular

19   time, but he asked me to put something down, you know, what

20   I was asking for, you know, what my ideas were so to speak.

21   Q    What were your ideas at that time?

22   A    We were open to, you know, a multitude of ideas,

23   either manufacturing and/or representation.

24   Q    What was the specific product in which Victory had an

25   interest at that time?

1    A    The "M" Series.

2    Q    At what steam capacity?

3    A    At that time it was unlimited.

4    Q    Had VEO explored the possibility of entering a

5    license agreement with any other manufacturer or owner of

6    boiler technology?

7    A    No.

8    Q    EPTI was the only owner of boiler technology that

9    Victory had contacted for licensing?

10          MR. SHEEAN:  Well, objection, mischaracterization

11    of prior testimony.  It's EPTI, Aalborg.

12    A    No.

13    Q    (By Mr. Gisleson)  Who else was contacted?

14    A    Superior Boiler Works.

15    Q    With whom at Superior did you speak?

16    A    At the time it would have been Warren Hardesty, Al

17    Wasinger, W-a-s-i-n-g-e-r.  That's it.

18    Q    When did that contact occur?

19    A    I think it was around the same time frame, 2000.

20    Q    What was the technology that Superior had in which

21    Victory had an interest?

22    A    Representation of their fire tube boiler product

23    line.

24    Q    Did VEO, in fact, become a representative for fire

25    tube boilers for Superior?

42

1    Q    Anything else?

2    A    That's about it.

3    Q    What did you and Shawn Brewer discuss about how to

4    market the Keystone boilers?

5    A    That we would do it through manufacturers' reps.

6    Q    Anything else?

7    A    I'm sure we did.  I just don't remember right now.

8    Q    Now as of that time had VEO set up a network of

9    manufacturers' reps?

10   A    We did.  We had several that we were working with and

11   with our heat recovery steam generator product line.

12   Q    Then what was the next step in the process?

13   A    What process?

14   Q    Of seeking to license the technology from EPTI?

15   A    We met with Mark White and Stephen Kang.

16   Q    Where?

17   A    Powergen.

18   Q    When?

19   A    December I guess of probably 2002.

20   Q    How many meetings were there at Powergen to discuss

21   the potential license?

22   A    I think there was two.

23   Q    Who was at the first meeting?

24   A    I was, Mark White, Stephen Kang, Shawn Brewer was

25   there.

1    Q    How long was that meeting?

2    A    A half hour maybe, maybe longer.

3    Q    Where was it?

4    A    Powergen.

5    Q    But was it at a booth, in a conference room?

6    A    Trade show booth, yeah.

7    Q    Whose booth?

8    A    Erie Power.

9    Q    Was anyone there other than White and Cain on behalf

10   of EPTI?

11   A    At the trade show or at the meeting?

12   Q    During that meeting?

13   A    Okay.  I think Dan Levstek was there.  I don't know

14   if he participated.  I don't remember or not.

15   Q    What did you discuss?

16   A    We were expressing our interest at that time to

17   Stephen Kang regarding the license, you know, the

18   opportunity to license the product line.

19   Q    Was there any discussion about the design of the

20   boilers that would be licensed?

21   A    I don't recall.

22   Q    Was there any discussion about the technology, other

23   than that VEO wanted to license Keystone boilers?

24   A    I don't recall.

25   Q    Was there any discussion about the scope of the

1    respect to VEO's compliance with the license agreement?

2    A    No.

3    Q    Did he have any involvement with respect to VEO's

4    reporting of sales under the license agreement to EPTI?

5    A    No.

6    Q    Or the successor licensor, Indeck Keystone Energy?

7    A    No.

8    Q    When did you first make an offer to Mark White to

9    come work for VEO?

10   A    I would say probably within about 30 to 45 days of

11   him leaving Erie Power.

12   Q    For what position?

13   A    General Manager.

14   Q    Who was serving that function as of the time, or just

15   prior to the time that he was hired?

16   A    Nobody.

17   Q    What were Mark White's responsibilities as General

18   Manager once he accepted the position?

19   A    He had multiple responsibilities, one being the

20   management of the license agreement, the other being he

21   managed project managers and the engineers.

22   Q    Anything else?

23   A    I'm sure we did other things.

24   Q    When you said that he had responsibility for

25   management of the license agreement, was it his

1    A      Will you restate your question?

2    Q    (By Mr. Gisleson)  In your view, may VEO use any of

3    the designs it received from EPTI for watertube boilers now

4    that the license agreement has terminated?

5              MR. SHEEAN:  Same objection.

6    A    No.

7    Q    (By Mr. Gisleson)  Has VEO provided any of the

8    designs it received from EPTI to any third parties?

9    A    No.

10   Q    Specifically, did VEO provide any information it

11   received from EPTI to E-Tech?

12   A    No.

13   Q    How do you know?

14   A    I know Mark and I, we talked about -- I mean that

15   information was not ours to give to anybody else.  So I

16   mean we talked about it and we didn't do it.

17   Q    Did you understand that all the information that EPTI

18   provided to VEO was proprietary and confidential?

19             MR. SHEEAN:  Objection, calls for a legal

20   conclusion and mischaracterizes the document.

21   Q    (By Mr. Gisleson)  You can answer.

22             MR. SHEEAN:  And it's vague.

23   A    Yeah, I don't know how to answer that question.

24   Q    (By Mr. Gisleson)  Did anyone from VEO -- strike

25   that.  EPTI provided certain software for rating boilers to

1    A    We talked about the length of time I believe.

2    Q    Anything else?

3    A    Not that I can recall.

4    Q    So the only item of the license agreement that you

5    can recall discussing with Shawn Brewer was the length of

6    the agreement, prior to the time that the agreement was

7    executed?

8    A    I'm sure there were other things discussed.  I just

9    can't remember them all at this point.

10    Q    Had VEO entered any license agreements prior to the

11    one with EPTI?

12    A    Well the one I mentioned before with Superior, but it

13    was a representative agreement, a license to sell their

14    product.

15    Q    Had VEO licensed technology from anyone prior to

16    entering a license agreement with EPTI?

17    A    No.

18    Q    So that the license with EPTI was the very first time

19    that VEO had been involved in licensing technology that it

20    would use to design and manufacture products?

21    A    Yes.

22    Q    I would like to show you what's been marked as Viskup

23    Exhibit 1.  It's a document stamped VEO663 to 685.  If you

24    would look at that and let me know when you're done.  You

25    see this is two separate e-mails with attachments.  The

1    A    Yes.

2    Q    Did Mark White of EPTI ever tell you that any of the

3    provisions in the license agreement were non-negotiable?

4    A    I would say he wasn't open to changes in it at that

5    time.

6    Q    What made you believe that?

7    A    Just conversation with him.

8    Q    Did he tell you what changes EPTI would not accept in

9    the license agreement?

10   A    No.

11   Q    Was Mark White the only individual with whom you

12   dealt with at EPTI concerning the license agreement?

13   A    The negotiation of it?

14   Q    During the negotiation of it?

15   A    I believe so, yes.

16   Q    Turning to page VEO664, which is the first page of

17   the December 20, 2002 draft license agreement, under Clause

18   1, definitions, there's a definition for products, do you

19   see that?

20   A    Yes.

21   Q    It says product shall mean natural circulation,

22   industrial watertube package steam generators with a steam

23   capacity range beginning at 29,000 PPH, up to and including

24   100,000 PPH.  Products shall include, but not be limited to

25   the items set forth in Annex 1.  If licensee receives

1    referred to Annex 1 as a guideline?

2    A    Well in the draft, I mean there was -- at that

3    particular time.

4    Q    Where did it say that Annex 1 was a guideline?

5    A    Well if you look at Annex 1, I mean the information

6    is not what we licensed, so it would be a guideline.

7    Q    How is the information in Annex 1 not what VEO

8    licensed?

9    A    Do you want to look at it?

10   Q    Sure.  You're referring to the last two pages?

11   A    No.  I mean this is -- I need Annex 1.

12   Q    The final version of Annex 1?

13   A    Yeah.

14   Q    Okay.  We'll get to that.  Did you understand that

15   Annex 1 was to be part of the license agreement itself?

16   A    Yes.

17   Q    Was there ever any negotiation as to the definition

18   of products in the proposed license agreement?

19         MR. SHEEAN:  Objection, vague.

20   A    I'm sure there was, yes.

21   Q    (By Mr. Gisleson)  Do you know for a fact whether you

22   and Mark White discussed what the specific wording of the

23   definition of products was to be?

24   A    Not necessarily.

25   Q    Do you recall specifically having a conversation with

1    Mark White concerning the definition of products in

2    paragraph 1A?

3            MR. SHEEAN:  Objection, vague.

4    A    We just talked about the boiler products and under

5    the M-Series there is specific model numbers, but it wasn't

6    set up, I mean to my understanding, the Attachment 1 or

7    Annex 1 wasn't set up as having any boundaries to it.  It

8    was a guideline.

9    Q    (By Mr. Gisleson)  Did you understand that VEO had

10   the right to negotiate changes to Annex 1?

11           MR. SHEEAN:  Objection, vague.

12   A    I believe so.

13   Q    (By Mr. Gisleson)  Did VEO, in fact, negotiate any

14   changes to Annex 1 prior to the time it was finalized?

15   A    I don't know.

16   Q    In Clause 1A, the steam capacity range is 29,000 PPH

17   up to and including 100,000 PPH, and that eventually was

18   changed in the final agreement to 150,000, correct?

19   A    Yes.

20   Q    Why was that increased?

21   A    I believe at that time we were just trying to get

22   access to other models or other I guess -- yeah, other

23   models, larger spectrum of range, a larger spectrum we

24   could offer in the market place.

25   Q    Is there more profit associated with a larger boiler?

1    Q    Did you use any information provided by EPTI to

2    develop the Keystone brochure?

3    A    Yes.

4    Q    What did you use?

5    A    The brochure, the Keystone brochure.

6    Q    You simply copied the Keystone brochure that you

7    received?

8        MR. SHEEAN:  Objection to the term copied.  That

9    mischaracterizes his prior testimony.

10   A    We received the brochure from Mark.  I'm trying to

11   think who else was there.  Anyways, we received the

12   brochure and we utilized it in our marketing, yeah.

13   Q    (By Mr. Gisleson)  Did you make any changes to the

14   brochure?

15   A    Yes, we did.

16   Q    Who made the changes to the brochure?

17   A    What do you mean who?

18   Q    Who at VEO made the changes to the brochure before it

19   was finalized?

20   A    I think there was a couple of us that did.  Shawn

21   being one, myself, and I think Lee West.

22   Q    What position did Lee West have at VEO?

23   A    He worked with marketing and computers and graphics

24   and those kind of things.

25   Q    Were there portions of the Keystone brochure that VEO

1    simply copied to include in its brochure for Keystone

2    boilers?

3    A    Some of it.

4    Q    Did VEO provide a final version of the brochure it

5    created for Keystone boilers to EPTI for EPTI's approval?

6    A    Yes.

7    Q    To whom did you provide it?

8    A    I believe it was provided to Mark.

9    Q    Did VEO receive written approval that VEO could use

10   that Keystone brochure in that format?

11   A    I believe we have.

12   Q    Who gave the written approval?

13   A    I don't remember right now who it was.

14   Q    Can you identify the form that the written approval

15   took?

16   A    It would have been possibly an e-mail, but again, the

17   approval came when the information was given to us as well.

18   I mean they handed it to us to use.

19   Q    Who sent the e-mail?

20   A    It probably would have been from Mark or maybe a

21   secretary or somebody.

22   Q    Are you guessing or do you have a specific

23   recollection?

24   A    I don't know.

25   Q    You don't know whether such an e-mail, in fact,

1    Q    You don't know.  Did you have any conversations with

2    Mark White after receiving this e-mail asking him about

3    whether you should sign the agreement before the annex was

4    finalized?

5    A    I don't recall.

6    Q    Did you understand in connection with receiving this

7    e-mail it was still necessary to complete and approve the

8    annex of the license agreement?

9    A    Well it says here I suggest that we sign the

10   agreement and when completed, initial off each annex.  So I

11   would say yes.

12   Q    What was the status of Annex 1 as of January 8, 2003

13   when you received this draft license agreement?

14   A    I don't know.

15   Q    Did VEO want any additional changes to be made to the

16   license agreement after you received this January 8th

17   version?

18              MR. SHEEAN:  Object to the foundation.

19   A    I believe there was another change which was relative

20   to adding super heat -- super heated opportunities.

21   Q    (By Mr. Gisleson)  And that came at some point later

22   on after the annexes were finalized?

23   A    I don't remember the time frame.

24   Q    Incidently, based on the changes that were included

25   in your January 7, 2003 e-mail with attached license

1        MR. SHEEAN:  Objection, mischaracterizes the

2    document.

3    A    Yeah.  It doesn't say that.  Mark doesn't say that.

4    Q    (By Mr. Gisleson)  Strike that.  I apologize.  Did

5    either Shawn Brewer or Trent Miller ever tell you that EPTI

6    was taking the position that the agreement is for the

7    saturated standard 8M through 22M refractory wall design

8    Keystone package boilers?

9        MR. SHEEAN:  Objection, misrepresents the

10   document.  There's been no demonstration that Dave Briggs

11   speaks for all of EPTI and Mr. Viskup has already testified

12   he hasn't seen the document.  You can answer.

13   A    Can you restate your question please?

14   Q    (By Mr. Gisleson)  Sure.  Did either Shawn Brewer or

15   Trent Miller have any conversations with you about concerns

16   they had as to EPTI's understanding as to the scope of the

17   license agreement?

18   A    No.

19   Q    I would like to show you what's been marked as Viskup

20   Exhibit 6.  It's a document stamped VEO786 through VEO796.

21   Can you take a look at that and let me know if you've seen

22   it before?

23   A    There's two of them here.  I believe so, yes.

24   Q    On the first page of this there's an e-mail from Mark

25   White to Shawn Brewer dated February 3, 2003 from 4:10 P.M.

1    that then was forwarded to you by Shawn Brewer at 4:57 P.M.

2    the same day?

3    A    Yes.

4    Q    And it's enclosing revised Annex 1, based on the

5    description of the icon?

6    A    I see that, yes.

7    Q    And then attached to this there's a copy of Annex 1

8    as well as Annex 2 and 3, is that correct?

9    A    Yes.

10    Q    As to Annex 1, did you receive any drafts of that

11    annex after the initial data table and then prior to

12    receiving this draft on February 3?

13    A    I don't recall if I did or not.

14    Q    What did you do after you received this annex on

15    February 3, 2003?

16    A    I don't know.

17    Q    Did you read it?

18    A    I'm sure I did.

19    Q    Do you have a specific recollection of reading it?

20    A    No.

21    Q    Did you discuss Annex 1 with anyone else at VEO?

22    A    I'm sure we did.

23    Q    Can you identify anyone with whom you, in fact,

24    discussed it?

25    A    I would assume Shawn.

1    Q    Do you have a specific recollection of discussing it

2    with Shawn?

3    A    No.

4    Q    Did you discuss Annex 1 with outside Counsel?

5    A    I don't recall if I did or not.

6    Q    Focusing on Annex 1, did you understand the

7    information that was included in Annex 1?

8    A    You mean the guidelines?

9    Q    I'm not referring to them as a guideline.  Did you

10   understand the information that's included in Annex 1?

11   A    What do you mean understand?

12   Q    Is there any information in Annex 1 that you did not

13   understand?

14   A    I don't know if I did or not.  It was just used as a

15   guideline, so.

16   Q    Did you discuss Annex 1 with Mark White after you

17   received this copy of the annex on February 3, 2003?

18   A    I don't recall.

19   Q    Do you see how there are drawings on pages VEO790,

20   791 and 792?

21   A    Yes.

22   Q    Did you receive any drawings from anyone at EPTI

23   during the negotiation of the license agreement prior to

24   the time that you received those three drawings on February

25   3, 2003?

104

1    A    Any drawings?

2    Q    Yes?

3    A    I don't remember.  I mean it was awhile ago.

4    Q    Can you identify any drawings that you received

5    during the negotiation process prior to the time that you

6    received those three drawings that are included in Annex 1?

7    A    As I sit here today I can't recall any.

8    Q    On page 20, which is the first page of Annex 1, do

9    you see the data table there?

10            MR. SHEEAN:  Are you referring to the box at the

11   bottom of the page?

12   Q    (By Mr. Gisleson)  Right, under the heading standard

13   M-Series Keystone summary?

14   A    Yes.

15   Q    And that's the same data table that you received in

16   December, correct?  Feel free to look back at the exhibit.

17   A    Well, I call it a guideline, but you call it a data

18   table.  I mean there's some differences to it.

19   Q    Overall though the data table follows the same format

20   and contains the same information?

21   A    Not necessarily, but it's similar.

22   Q    Now do you see the heading for standard M-Series

23   Keystone summary?

24   A    Yes.

25   Q    Did you have an understanding as to what was meant by

105

1      the word standard in that heading?

2      A      No.  I mean it's just been -- I mean I hear -- I have

3      heard standard M-Series for several years.  So I just

4      didn't put much thought into it.

5      Q      You had heard the phrase standard M-Series for

6      several years prior to receiving this annex?

7      A      Oh yeah.  I mean it refers to a package boiler.

8      Q      Did you understand that the Keystone M-Series had a

9      standardized design?

10            MR. SHEEAN:  Objection, vague.

11     A      I don't know if I would characterize it as standard.

12     Q      (By Mr. Gisleson)  How did you characterize it?

13     A      Well, I mean within the models, the ratings or

14     capacity efficiencies will change based on operating

15     conditions, so I don't know.

16     Q      In terms of the physical design of the boiler itself

17     stayed constant, correct?

18     A      No, not necessarily.  I know on the -- I just have

19     one example, on the Heinz project, I believe they

20     characterized it as a 15 MSP, which was termed a special.

21     So I think it was a pretty common practice.  Again, I mean

22     this was a guideline just to show, you know, capacities,

23     but I mean they would interchange based on field

24     requirements or customer requirements.  So you couldn't

25     really go by those.

1    Q    And you're aware that the Heinz 15M Special was

2    referred to as a special prior to the time that you signed

3    the license agreement, correct?

4    A    What do you mean?

5    Q    When did you first hear the Heinz boiler referred to

6    as a 15M Special?

7    A    Well I'm using the word special. It was the SP. But

8    it was on the drawings I believe.

9    Q    On the drawings for the Heinz boiler that you

10   reviewed before the time you signed the license agreement?

11   A    Probably so, yes.

12   Q    For Annex 1 there is also a footer showing the drive

13   where this annex was located. Does that show that you, in

14   fact, copied Annex 1 onto your computer?

15       MR. SHEEAN:  Objection, lack of foundation.

16   A    I don't know if I copied it or not. I don't know if

17   I copied it or not. I don't know if that's what that

18   means. I know a lot of times when you download files to

19   review them, it temporarily sets a file up I think. I

20   don't know if it stayed there.

21   Q    (By Mr. Gisleson)  Under design on that first page of

22   the annex it says, for the purpose of this agreement the

23   thermal performance of the above M-Series Keystone boilers

24   (product) are based on the following design parameters, and

25   then it lists nine parameters. Do you see that?

1    A    Yes.

2    Q    What did you understand the purpose of the design

3    parameters to be?

4    A    Starting point.

5    Q    Starting point for what?

6    A    To try to come up with the guidelines below.

7    Q    How is it a starting point to come up with the

8    information in the data table?

9    A    Well, in this particular case, number 2 here, it is

10   arbitrarily picked as 150 PSIG.  So if there's correlation

11   between the table and that number, I mean that number

12   changes all the time.  So, I mean, you have to have

13   somewhere to start.  I mean it's a guideline.  You can't go

14   by this because there's so many variables that change.

15   Q    What were the fuels that could be used with the

16   Keystone factory boiler as licensed to VEO?

17            MR. SHEEAN:  I'm going to object to the extent it

18   calls for a legal conclusion.

19            MR. GISLESON:  I disagree that it does.

20   A    I don't know.  I mean if I had to go by the annex, it

21   calls out three fuels in this particular case.

22   Q    (By Mr. Gisleson)  What are the three fuels that are

23   called out by the annex for the Keystone boilers that were

24   licensed by VEO?

25            MR. SHEEAN:  Objection to the extent that you're

1    permissible fuel is that could be used in the Keystone

2    boilers licensed by VEO?

3            MR. SHEEAN:  Can you read that question back

4    please?  Why don't you just read it -- are you able to

5    repeat it?

6    Q    (By Mr. Gisleson)  Are you able to tell from reading

7    the executed copy of the license agreement what the

8    permissible fuel oils were for the licensed Keystone

9    boilers?

10    A    No.

11    Q    Does the executed copy of the license agreement

12    contain any information on the geometry of the boilers that

13    were being licensed?

14            MR. SHEEAN:  I'm going to object.  It calls for a

15    legal conclusion.

16    A    Without reading the entire agreement, I don't know.

17    Q    (By Mr. Gisleson)  Turning to page VEO790 of the

18    February 3, 2003 e-mail with attached annexes, do you see

19    how that page shows a Keystone M-Series standard drawing?

20    A    Yes.

21    Q    What the design of the walls on this drawing?

22    A    Refractory insulating fire brick and block

23    insulation.

24    Q    What's the design of the outer walls?

25    A    I can't tell -- oh, okay.  It says here tangent tube.

1  Q    What is the design of the furnace wall?

2  A    It says tangent tube.

3  Q    Were you able to read this drawing back in February

4  3, 2003 to determine whether the drawing showed tangent

5  tube versus membrane wall construction?

6  A    I'm sure I did, but again, this is a guideline, so it

7  wasn't -- I mean this is not setting forth what we

8  licensed.

9  Q    Is there anything in Annex 1 showing a membrane wall

10 construction for the boilers that were licensed to VEO?

11 A    Well, if you blew the drawing up, I mean, there could

12 be a membrane between the tubes.

13 Q    Can you identify anything in Annex 1 showing that a

14 membrane wall technology was part of the standard M-Series

15 boiler that was licensed to VEO?

16 A    Sure.  I mean it's laid out the same way.

17 Q    Is there any reference to membrane wall technology in

18 Annex 1?

19 A    The way the tubes are aligned, yes.

20 Q    Where?

21 A    On the drawing.

22 Q    Where does it show membrane wall technology as a part

23 of this design?

24 A    It shows it tube to tube, but again, I mean I haven't

25 seen a larger size of this drawing, but it could be on

112

1    there.

2    Q    From what you can tell on this drawing, do you see

3    any reference to membrane walls anywhere?

4    A    I would say no.

5    Q    What is the construction of the burner throat as

6    shown on this drawing?

7    A    What do you mean?

8    Q    Does it show a section of the boiler for the burner

9    throat?

10    A    What do you mean by section?

11    Q    Do you see the reference to castable refractory

12    burner throat support ring and a standard cone throat?

13    A    Yes.

14    Q    Can you tell whether this boiler includes a water

15    cooled burner throat?

16    A    No, it doesn't show it and you wouldn't be able to

17    see it.  I mean I don't think that this drawing has all the

18    details as far as the design of the boiler.

19    Q    Did you ask Mark White why drawings were included in

20    Annex 1?

21    A    No.  It was used as a guideline, so I didn't really

22    --

23    Q    Did you object to the inclusion of drawings in Annex

24    1?

25    A    No reason to.

116

1    licensee under the license agreement?

2    A    I looked at proposals from time to time.

3    Q    Was there any policy or practice in place as to when

4    you were to review a particular sales proposal?

5    A    The only time necessarily is if the salesman felt

6    maybe uncomfortable with the customer specifications or

7    what have you, I would review it.

8    Q    During the time that the license agreement was in

9    place, did you ever go back to look at the license

10   agreement to determine whether a proposed sale was within

11   or without the scope of the license agreement?

12   A    I don't know if I would have or not.

13   Q    After signing the final version of the license

14   agreement and then initialing the annexes to the license

15   agreement on February 3, 2003, did you at any point

16   thereafter read the license agreement again?

17   A    We read it. We reviewed it again at the time that we

18   were looking at the possibility of purchasing the

19   technology.

20   Q    That was in the spring of 2004?

21   A    I don't remember the time. It could be.

22   Q    Any other time when you read the license agreement

23   again after it was finalized?

24   A    No.

25   Q    Does VEO still have in its possession copies of sales

1    show that it was a Keystone boiler?

2    A    Sure.

3    Q    Was there any prohibition under any ASME guideline

4    about having a separate plate identifying that this was a

5    Keystone boiler?

6    A    I don't know.

7    Q    On those occasions when VEO only included a name

8    plate that identified VEO, did it ever include a separate

9    plate identifying that it was a Keystone boiler?

10    A    I believe in the beginning we did a few, yes.

11    Q    Why did VEO stop having a separate plate identifying

12    Keystone as being the brand name of the boiler?

13    A    I don't think we necessarily stopped.  Our proposals

14    identified it that way.  We just didn't tag it.  There

15    really wasn't any tags on it.

16    Q    Your proposals identified the boilers as a Keystone?

17    A    Yes.

18    Q    Did you ever have any discussions with Mark White

19    while you were negotiating the agreement as to whether

20    Victory had to identify on the boiler itself that it was a

21    Keystone boiler?

22    A    No.

23    Q    What was a Keystone custom steam generating system?

24    A    What do you mean?

25    Q    Have you ever seen the phrase used in any VEO sales

1    proposals that it was offering for sale a Keystone custom

2    steam generator?

3    A    It's possible.  We would at times, if a customer had

4    a specific operating pressure or temperature or size, we

5    would build it specifically to their specs, so more as a

6    sales tool.

7    Q    What made a Keystone boiler custom as opposed to

8    standard?

9    A    What I just said.

10   Q    Anything else?

11   A    I can't think of anything else right now.

12   Q    Were there certain standard drawings for the Keystone

13   that VEO received from EPTI?

14        MR. SHEEAN:  Objection, vague.  It's vague and

15   ambiguous.

16   A    What do you mean by standard?

17   Q    (By Mr. Gisleson)  Was there a standard set of

18   drawings for each of the different series, 8M through 22M?

19   A    There was a roll of drawings that we received, but I

20   don't know if they were all standard or whether it was

21   complete or not.

22   Q    Did VEO ever computerize their roll of drawings it

23   received?

24   A    I don't believe we ever computerized that roll of

25   drawings.  We computerized boilers that were sold in an

122

1    effort to manufacture them.

2    Q    I would like to show you what's been marked as Viskup

3    8.  It's a document stamped VEO3783 to 3791.  Do you

4    recognize this as a copy of a Keystone "O" type watertube

5    package boiler proposal for Broin & Associates dated

6    January 25, 2003?

7    A    Yes.

8    Q    Did you review this proposal before it was sent out

9    from Victory?

10   A    I believe so, yes.

11   Q    On the first page of the proposal, which is stamped

12   VEO3784, under general information it says, Victory Energy

13   Operations, LLC proposes to furnish a Keystone custom steam

14   generating system to be utilized by Broin & Associates as a

15   back up boiler to the primary HRSG system.  Can you tell

16   what it was that made this boiler custom from looking at

17   the proposal?

18   A    No.

19   Q    The following paragraph says that the Keystone design

20   offers the least amount of furnace refractory compared to

21   other designs.  The tube and membrane seal welded front and

22   rear walls virtually eliminates all refractory in the

23   furnace other than localized seals and refractory coverage

24   of the water cooled burner throats.  This design greatly

25   reduces maintenance costs and offers increased unit

1    you've seen it before?

2    A    I don't think I have.

3    Q    You see on the first page this is a March 20, 2004

4    e-mail from Shawn Brewer to C.P. Equipment, re: boiler

5    specification for Escalon, and then he's attaching an

6    Escalon proposal?

7    A    I don't seen where he attached anything.

8    Q    Rita, attached is the Escalon proposal?

9    A    It doesn't show any attachment line on there.

10    Q    Have you heard of Escalon before?

11    A    No.

12    Q    Do you see how in the proposal it refers to a

13    Keystone Model 23M, 170,000 PPH package boiler?

14    A    Yes, I do.

15    Q    Do you have an explanation as to why Shawn Brewer was

16    selling a boiler that was a model 23M, or offering for sale

17    a boiler that was a model 23M, 170,000 PPH package boiler?

18            MR. SHEEAN:  I'm objecting to the

19    characterization of this document.  It overstates what the

20    document says and it's inconsistent with the testimony of

21    both Mr. Brewer and Mr. Christian.  He tesitifed this was a

22    request for pricing and nothing more than that.

23    Q    (By Mr. Gisleson)  You can answer the question?

24    A    The only thing I can think he was thinking of there

25    was that the boiler -- the net conditions may have been

1    150,000 pounds per hour.  The balance used for steam.  You

2    know, I don't know.  I don't know what he was thinking.

3    Q    A model 23M Keystone boiler at 170,000 PPH is outside

4    the scope of the license agreement, correct?

5    A    I don't know.  I need to determine whether or not --

6    no, I don't know.

7    Q    Pardon me?

8    A    I don't know.

9    Q    Did VEO ever license from EPTI the right to use

10   Chevrons and Vortexes as steam purifiers in the Keystone

11   drums?

12        MR. SHEEAN:  Objection to the extent it calls for

13   a legal conclusion.

14   A    Yes.

15   Q    (By Mr. Gisleson)  Were you involved in those

16   negotiations?

17   A    No.

18   Q    Who was?

19   A    Mark White.

20   Q    I would like to show you what's been marked as Viskup

21   Exhibit 10.  Let me know if you've seen that before please?

22   A    No.

23   Q    Do you see how this appears to be a proposal that was

24   sent by Lee Cole to SNC-Lavalin Constructors, Inc. for a

25   200,000 pound per hour watertube steam boiler?

1    A    Yes.

2    Q    And that boiler is outside the scope of the license

3    agreement, correct?

4    A    I guess so, yes.

5    Q    Turn to section 3.1 of the proposal. Do you see how

6    there's a photograph there of -- strike that. Do you see

7    how there's a drawing on that page of a furnace wall

8    construction welded to the membrane, but there's no name on

9    the top line?

10    A    Yes.

11    Q    Do you recognize that as a Keystone drawing?

12         MR. SHEEAN:  Objection, vague.

13    A    I've seen other ones like it before, but yeah, I

14    guess so.

15    Q    (By Mr. Gisleson)  Were you aware of Victory Energy

16    using Keystone drawings and yet removing the name Keystone

17    from the drawing?

18    A    Not necessarily.

19    Q    Under section 3.1, general, it says the Victory

20    Energy design offers the least amount of furnace refractory

21    compared to other designs. The tube and membrane seal

22    welded front and rear walls virtually eliminates all

23    refractory in the furnace other than localized seals and

24    refractory coverage of the water cooled burner throats.

25    Do you see that?

1    A    Yes.

2    Q    Why is Victory now referring to this as a Victory

3    Energy design instead of a Keystone design?

4         MR. SHEEAN:  Objection, foundation.  He's already

5    testified that he hasn't seen the document yet, so I think

6    it's unfair to ask him why language in this document is

7    referred to as such, but if you can answer, go ahead.

8    A    I can't answer it.

9    Q    (By Mr. Gisleson)  Did you ever have any discussions

10   with the sales staff at VEO about removing references to

11   Keystone and inserting in its place references to Victory

12   Energy?

13   A    No.

14        MR. GISLESON:  Chris, I want to use this, but I

15   don't understand why it's marked as highly confidential.

16        MR. SHEEAN:  Let's go off the record.

17        (Whereupon, an off the record discussion was had.)

18   Q    (By Mr. Gisleson)  I would like to show you what's

19   been marked Viskup Exhibit 11.  It's a document stamped

20   VEO2417 to 2435.  If you'll let me know whether this is a

21   copy of a proposal that you submitted on behalf of VEO to

22   Broin & Associates dated August 27, 2004?

23   A    Yes.

24   Q    Turning to the second page, which is VEO2418, under

25   item number 1 it shows that the system is a Victory Energy

1   85,000 PPH auxiliary package boiler.  Do you see that?

2   A    Yes.

3   Q    Why are you referring to it as a Victory Energy

4   boiler rather than a Keystone boiler?

5   A    We would -- I mean this template here is a standard

6   template that we use and we insert and remove items as

7   needed to develop the proposals.  The same format could be

8   used for an HRSG.

9   Q    Well I'll tell you that initially Victory was

10   referring to Keystone in that location proposal and now

11   it's switching to Victory Energy.  What was the reason for

12   the change?

13          MR. SHEEAN:  Objection, asked and answered.

14   A    What was your question?

15   Q    (By Mr. Gisleson)  Why change from referencing the

16   boiler as a Keystone boiler to a Victory boiler?

17          MR. SHEEAN:  Objection, lack of foundation.  If

18   you know.

19   A    No reason.  Like I said, we just -- these proposals

20   were changed from time to time and we inserted -- I mean

21   this is a new format as relates to warranting equipment --

22   excuse me, start up and equipment warranty, so new formats,

23   that's all.

24   Q    (By Mr. Gisleson)  Turn to page VEO2420 under general

25   information.  It says Victory Energy Operations, LLC

1    proposes to furnish a VEO custom steam generating system to

2    be utilized by Broin & Associates.  What made this proposed

3    boiler a custom steam generating system?

4    A    We were just building it specifically for the

5    application.

6    Q    By custom that means it's no longer a standard

7    M-Series Keystone boiler?

8         MR. SHEEAN:  Objection, mischaracterizes his

9    prior testimony, vague as to standard and M-Series.  If you

10   understand you can answer.

11   A    No.

12   Q    (By Mr. Gisleson)  No what?

13   A    No, it doesn't, not necessarily.

14   Q    What were the changes that made this custom rather

15   than standard?

16   A    Well we built it specifically for the application.

17   Q    What was it about this application that made this a

18   custom boiler?

19   A    The pressure, just the operating parameters in this

20   particular project.  It was also operating with an HRSG.

21   Q    Anything else?

22   A    Could have been some control design changes.

23   I'm not sure.  I don't remember.

24   Q    Who did the design on this boiler?

25   A    I don't know.  I don't remember.

1  Q    Now was this a Keystone boiler or a VEO design --

2  strike that.  Was this a Keystone design or a VEO design?

3  A    Which one?

4  Q    For this Broin boiler in the August 27th --

5  A    The package boiler was a Keystone boiler.

6  Q    And VEO used the Keystone design that it obtained

7  from EPTI for this boiler?

8  A    Yes.

9  Q    The reason I ask is in the second paragraph under

10 general information it refers to the VEO design.  Why are

11 you referring to this as the VEO design if this was based

12 on a Keystone design?

13 A    No particular reason.

14 Q    I would like to show you what's been marked as Viskup

15 Exhibit 12.  If you would look at that and let me know if

16 you've seen it before?

17 A    I believe so, yes.

18 Q    Is this a proposal that you submitted to Ware, Inc.

19 on July 13, 2005?

20 A    Yes.

21 Q    What was the business of Ware, Inc.?

22 A    What do you mean?

23 Q    What was their business?

24 A    They sell boilers, they rent package boilers, repair

25 after market I believe.

1    Q    On page number 3 of the proposal, under section 2.0,

2    scope and supply, the first line item is VEO Model 15M "O"

3    type steam boiler saturated steam.  Why are you referring

4    to the boiler as a VEO Model 15M rather than a Keystone

5    Model 15M?

6    A    No particular reason.

7    Q    On page 5, under section 3.0, general information,

8    you refer to the boiler as a custom steam generating

9    system.  What made this boiler a custom steam generating

10   system?

11   A    I think pretty much what I've been telling you all

12   day about it.  I mean this is standard text.  We just have

13   it in our proposals.  We don't change them.  So it's just

14   specific to the application.  This one has an off capacity

15   range of 57,000 pounds an hour.  So it's being built

16   specifically for the application.  That's it.

17   Q    And this one also had membrane walls, is that

18   correct?

19   A    Yes.

20   Q    If you would turn to page number 12 of the proposal.

21   A    Okay.

22   Q    Why is the reference to Victory Energy "O" Series

23   standard models?

24   A    What was the question?

25   Q    Why did you refer to the boilers on that page as

132

1    Victory Energy "O" Series standard models?

2                MR. SHEEAN:  Lack of foundation.

3    A    No particular reason.

4    Q    (By Mr. Gisleson)  Who prepared this page?

5    A    I don't know.

6    Q    Was Victory Energy offering for sale an "O" Series

7    watertube package boiler?

8    A    Yes.

9    Q    That was separate from the Keystone boiler?

10   A    No.

11   Q    Have you seen other documents where Victory is

12   referring to an "O" Series boiler?

13   A    I'm sure we do.  It also references Keystone, page 6.

14   Q    Why didn't you identify this proposal that Victory

15   was offering the Keystone boiler for sale pursuant to a

16   license agreement with EPTI?

17               MR. SHEEAN:  Objection, foundation.  He's already

18   testified he doesn't know who prepared this entire

19   document.

20   A    Well, I mean we offer a Keystone boiler.  Whose to

21   say that we're not.

22   Q    (By Mr. Gisleson)  But why doesn't the proposal refer

23   to the fact that VEO has a license agreement pertaining to

24   the Keystone?

25   A    I didn't know it had to have it in there.

1    A      I would say it was probably, you know, somewhere

2    north of three months of when they filed for bankruptcy.

3    Q      Why did you want Victory to purchase the technology?

4    A      I thought it would be a good opportunity for our

5    company to own the technology, and we already had -- we

6    already had spent a lot of time and money developing --

7    bringing back Keystone into the market and it's just a

8    little easier to continue doing what we were doing.

9    Q      Did you understand that it was necessary to purchase

10   the Keystone technology if you wanted to use it after the

11   license agreement expired?

12   A      I mean not necessarily.

13   Q      How not?

14   A      The license could have been extended.  I mean there's

15   several things that could have taken place I guess.

16   Q      Anything else?

17   A      No.

18   Q      Did Victory at some point make an offer to purchase

19   the Keystone technology?

20   A      I don't know if it was ever formalized, but there was

21   discussions about it, yes.

22   Q      Who was involved in the discussions?

23   A      Mark White was, my partner Jim Sponder.  I'm sure we

24   were speaking to our attorneys at the time.  I think that's

25   it.

1    A    I don't know.  I'm sure that would have been part of

2    it.

3    Q    Who took the lead in the negotiations for VEO as to

4    the purchase of the technology, you or Mark White?

5    A    I think it was half and half.  I think Mark probably

6    had more conversations than I did, but we were both

7    involved at the same time.

8    Q    I would like to show you what's been marked as

9    Plaintiff's Exhibit 14.  It's a document stamped VEO961 to

10   978.  This is a collection of e-mails for a draft license

11   to -- license agreement and option to purchase.  If you

12   could flip through this and let me know whether you've seen

13   these pages before?

14   A    Okay.  Yeah, I'm sure I've seen it.

15   Q    The second page of this is a draft license agreement

16   and option to purchase from February of 2004, do you see

17   that?

18   A    What page?

19   Q    The second page of this, which is VEO962?

20   A    Yes.

21   Q    And the products would include a boiler from 29,000

22   PPH up to and including 165,000 PPH as more fully disclosed

23   in Annex 1, do you see that?

24   A    Yes.

25   Q    And then going to page VEO964 under paragraph 6,

1   compensation, it says in consideration of the rights

2   granted herein, licensee shall pay to licensor $250,000

3   U.S. payable upon the execution hereof.  Do you know what

4   the source of the $250,000 was in that paragraph?

5   A    What do you mean?

6   Q    Who arrived at the value or amount $250,000?

7   A    I'm sure Mark and I did collectively.

8   Q    And then under paragraph 7, option to purchase.  It

9   says at the conclusion of the one year term of the

10  licensing provisions of this agreement, at licensee's sole

11  discretion, licensee shall have the option to purchase an

12  assignment of the rights and technical information licensed

13  hereunder for the price of $250,000 payable U.S., payable

14  on or before the termination date of this agreement.

15  Is that also an amount that you and Mark White developed?

16          MR. SHEEAN:  Objection, lack of foundation.

17  A    I'm sure it was.

18  Q    (By Mr. Gisleson)  Going back VEO970, do you see how

19  that is an e-mail from Mark White to Stephen Kang copied to

20  you on February 25, 2004 on the subject of the license

21  agreement and option to purchase?

22  A    Yes.

23  Q    And it reads in the second paragraph, in general the

24  document is not what we had expected.  It is not our desire

25  to enter into an agreement where we will continue to be

1    subject to royalty payments, except for those units above

2    the purchased range, have no guarantee of acquiring the

3    technology and possibly lose our investment should EPTI be

4    forced to liquidate.  However, we are willing to enter into

5    an agreement that would allow VEO to purchase the Keystone

6    technology outright for the given range discussed.

7    Is it correct that throughout the time VEO was negotiating

8    with EPTI, it's goal wasn't to extend the license

9    agreement, and instead was to purchase the technology?

10   A    I don't know.  I wouldn't say that necessarily.  I

11   mean after all, they were the ones that came to us and we

12   were trying to work through a relationship with them of

13   some sort.  They needed money.

14   Q    What was the discussion about extending the scope of

15   the license agreement?

16   A    What do you mean?

17   Q    Was there a discussion about expanding the license

18   agreement?

19   A    I think there was, yes.

20   Q    How was the license agreement to be expanded?

21   A    Capacity ranges.  I know we were asking to go up to

22   larger capacity since we were -- and this might have been

23   pursued to the Notre Dame project and some others.  We were

24   going after larger boilers, and also it would be another

25   revenue generator for them.

1    Gdaniec identified concerns that EPTI had?

2    A    I think I already said yes, yes.

3    Q    Did you have any conversations with Mark White as to

4    whether welded wall or membrane technology was an

5    improvement under the license agreement?

6    A    No.  It was never viewed that way.

7    Q    Did Mark White send any drafts of a response to Mr.

8    Gdaniec's letter?

9    A    He may have.

10   Q    I would like to show you what's been marked as Viskup

11   Exhibit 17.  It's a document stamped VEO1013 to 1016.  Is

12   this an e-mail with attachment that you received from Mark

13   White on or about March 26, 2004?

14   A    Yes.

15   Q    Did you review his proposed response to Bob Gdaniec's

16   letter identifying concerns that EPTI had?

17   A    I don't know if I did or not.

18   Q    Did you authorize Mark White to send a response to

19   the letter in which EPTI identified concerns it had with

20   VEO's performance?

21   A    I don't recall if I did or not.

22   Q    I would like to show you what's been marked as Viskup

23   Exhibit 18.  It's a document stamped VEO632 through 635.

24   If you will, take a look at that and let me know whether

25   you've seen it before?

1    A    This is the same letter I think, isn't it?  I don't

2    know, I mean, if I've seen it or not.

3    Q    Do you see how you're shown as a CC on Mr. White's

4    March 30, 2004 e-mail to Bob Gdaniec?

5    A    Yes.

6    Q    It says Bob, the enclosed is in response to your

7    letter dated March 26, 2004.  Please feel free to call me

8    should you have any questions or comment.  Did you have any

9    discussions with Mark White concerning his March 30, 2004

10   letter before he sent it to EPTI?

11   A    I think my comments are the same as I said before.  I

12   think it's the same letter.  It has different dates on it.

13   Q    Do you specifically recall having any conversations

14   with Mark White concerning the substance of his response to

15   EPTI about his concerns with VEO's performance under the

16   license agreement?

17   A    I know we talked about it.  So, I mean, we had

18   several discussions I'm sure.  I just can't recall anything

19   specific right now.

20   Q    On how many occasions did you and Mark White discuss

21   the response that VEO would provide Mr. Gdaniec's March

22   26th letter?

23   A    I don't know if we ever discussed that in particular,

24   the response.  I know we discussed the issues.

25   Q    So you don't know one way or the other then whether

1    questioning because I think it lacks foundation and because

2    I think there were documents that you're referring to and I

3    don't think it's fair to ask him about them without showing

4    him the document.  You can answer.

5    A    I don't know.

6    Q    (By Mr. Gisleson)  Did you personally review the

7    correspondence that IKE sent to VEO concerning the scope of

8    the license agreement?

9    A    I did see some of it, yes.

10    Q    Did VEO refuse to comply with IKE's instructions

11    about the scope of the license agreement?

12    A    I don't know.  I don't think there's any reason to

13    refuse.  We did comply.

14    Q    You complied with what -- strike that.  VEO complied

15    with what IKE asked it to do?

16    A    We operated under the terms of the license agreement

17    the way we were suppose to.  So that's my answer.

18            MR. SHEEAN:  Let's take a break.

19            MR. GISLESON:  Sure.

20        (Whereupon, a brief recess was had.)

21    Q    (By Mr. Gisleson)  I want to show you what's been

22    marked as Viskup Exhibit 19.  It's a document stamped

23    VEO1159 to 1160.

24    A    Okay.

25    Q    Did you receive a copy of this letter on or about

1    August 31, 2004 that was sent by Keith Whitson to Todd

2    Vinson of Kelley, Drye?

3    A    I don't know if I did or not.

4    Q    Did anyone report to you that VEO, through its

5    outside counsel, had received a letter from IKE stating

6    that VEO had violated the terms of the license agreement?

7    A    Can you repeat your question?

8    Q    Sure.  Did anyone advise you that VEO had received a

9    letter through its outside counsel at Kelley, Drye

10   asserting that VEO had violated the terms of the license

11   agreement?

12   A    I don't believe so, no.

13   Q    I would like to show you what's been marked as Viskup

14   Exhibit 20.  It's a document stamped VEO1161 to 1162.  Did

15   you receive a copy of that letter?

16   A    I don't think so.

17   Q    Do you see how this is a September 9, 2004 letter

18   from Keith Whitson of Schnader to Todd Vinson of Kelley,

19   Drye?

20   A    Can you repeat your question?

21   Q    Sure.  Do you see how this is a letter dated

22   September 9, 2004 from Keith Whitson of Schnader, Harrison

23   to Todd Vinson of Kelley, Drye?

24   A    Yes.

25   Q    Was Todd Vinson an attorney for VEO in September of