1          IN THE UNITED STATES DISTRICT COURT
2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

INDECK KEYSTONE ENERGY,     )
4   LLC, a Delaware limited    )
    liability company,         )
5                              )
              Plaintiff,       ) CIVIL ACTION
6                              )
    vs.                        ) No. 04-CV-325E
7                              )
    VICTORY ENERGY OPERATIONS, ) Judge Sean J. McLaughlin
8   LLC, a Delaware limited    )
    liability company,         )
9                              )
              Defendant.       )
10

11

12

13      The videotape deposition of MARK WHITE taken on

14   behalf of the Plaintiff before Pamela B. Stinchcomb,

15   Certified Shorthand Reporter in and for the State of

16   Oklahoma, on the 14th day of October, 2005, in the

17   City of Tulsa, State of Oklahoma, pursuant to the

18   stipulations of the parties.

19

20

21

22          PAMELA B. STINCHCOMB, CSR #1544
            DAVIDSON REPORTING SERVICE
23             5508 South Lewis Avenue
              Tulsa, Oklahoma  74105
24               (918) 745-9959

25



EXHIBIT
7

10

1       A.    Yes, sir.

2       Q.    When did you join Victory?

3       A.    I joined Victory in 2003, August of 2003.

4       Q.    Have you been general manager of Victory,

5  which I'll sometimes refer to as VEO, continuously

6  from August of 2003 to the present?

7       A.    Yes, sir.

8       Q.    To whom do you report?

9       A.    John Viskup and Jim Sponder.

10      Q.    What is John Viskup's title with VEO?

11      A.    President.

12      Q.    What is Jim Sponder's title with VEO?

13      A.    Service manager.

14      Q.    Do you have an ownership interest in VEO?

15      A.    I do not.

16      Q.    Is any aspect of your compensation based on

17  commissions?

18      A.    I was on a bonus program for the previous

19  calendar year, which has expired.

20      Q.    Was that bonus in any way related to the

21  sale of Keystone watertube boilers?

22      A.    It was based on the overall sales of the

23  company.

24      Q.    Which would include the Keystone boilers?

25      A.    Yes, sir.

11

1        Q.    Did you receive a bonus?

2        A.    Yes, sir.

3        Q.    Can you allocate any of the bonus to the

4    sales of Keystone boilers?

5        A.    Not directly.

6        Q.    Indirectly?

7        A.    Indirectly they would have been part of the

8    overall sales of the company.

9        Q.    What was the amount of the bonus?

10        A.    It was based on my salary at the time, and

11    I believe it was in the neighborhood of about

12    $20,000, approximately.

13        Q.    Are John Viskup and Jim Sponder the only

14    two owners of VEO?

15        A.    To my knowledge.

16        Q.    Do you know what their respective ownership

17    interests are?

18        A.    I don't.

19        Q.    What's your educational background?

20        A.    I graduated with a Bachelor of Science in

21    1984 from Wayne State College in Wayne, Nebraska.

22        Q.    I'm sorry, what was the name of the

23    college?

24        A.    Wayne State College in Wayne, Nebraska.

25        Q.    Are you an engineer?

12

1    A.    No, I'm not.

2    Q.    Have you ever taken any engineering

3 courses?

4    A.    In college, you know, industrial-type

5 classes.  How would you define engineering courses?

6    Q.    Any courses that an engineering major would

7 take.

8    A.    No.

9    Q.    When you say Bachelor of Science, was there

10 a particular area in which you received your degree?

11    A.    Industrial education, non-teaching.

12    Q.    What does industrial education mean?

13    A.    A variety of industrial courses and also

14 business courses that one would take so you have a --

15 a background in industrial project management and

16 manufacturing-type applications, process law

17 environment, as well as business law, accounting,

18 statistics, et cetera.

19    Q.    Did you pursue any further education after

20 college?

21    A.    Just seminars and so forth.

22    Q.    Did you ever attend any seminars on

23 watertube boilers?

24    A.    No.

25    Q.    What did you do after college?

20

1   Division?

2        A.   The Zurn Energy Division, yes.

3        Q.   Why did you leave Vogt?

4        A.   Well, Vogt was for sale at the time.  I

5   wasn't really interested.  There was some degree of

6   uncertainty.  My superior, Jim Davis, had left.  I

7   liked working for Jim.  Jim actually went to work for

8   the energy division at Zurn and asked if I'd like to

9   come up there.  And I enjoyed working for Jim, so I

10  accepted that offer and went to work for Zurn.

11       Q.   How long did you work for Zurn?

12       A.   Approximately ten years.

13       Q.   What was your title at Zurn?

14       A.   I had various titles.  I believe the title

15  when I arrived was account manager, then sales

16  manager and director of sales and marketing.

17       Q.   Was director of sales and marketing the

18  highest position you attained?

19       A.   Yes, sir.

20       Q.   What were the products that you sold for

21  Zurn?

22       A.   I was responsible for HRSGs, solid fuel

23  systems, to some degree, Keystone watertube boilers.

24       Q.   What period of time were you responsible

25  for Keystone watertube boilers?

22

1    would run across an application where we might sell a

2    couple of smaller units.  We generally found that we

3    weren't really competitive in that market.

4        Q.    Why not?

5        A.    Well, you have to understand the Zurn

6    Energy Division wasn't set up to compete with low

7    overhead, small companies that were providing small

8    watertube package boilers for industrial steam

9    markets.  It's difficult to compete when you have

10   much larger and higher overheads and you have a

11   sophisticated engineering system to compete with

12   somebody who's much more simplified.

13       Q.    Did you develop an understanding as to the

14   Keystone watertube technology?

15       A.    Generally.  I wouldn't call myself an

16   expert.

17       Q.    What did you do to educate yourself as to

18   the Keystone technology?

19                 MR. SHEEAN:  Objection, vague.

20                 MR. GISLESON:  What -- how is that

21   vague?

22                 MR. SHEEAN:  The term "Keystone

23   watertube technology" I think is a vague term.

24       Q.    (By Mr. Gisleson) What did you do to

25   educate yourself about the Keystone watertube

23

1    product?

2        A.    I had a broad understanding of the

3    product.  I relied on my sales engineers that worked

4    for me, my account managers, depending upon title at

5    the time.  And I relied on them to properly present

6    the equipment to the client.  In terms of educating

7    myself, my main focus was on heat recovery steam

8    generator systems.  I did most of my -- my educating

9    was generally focused in that area.  And there were

10   times that, I guess, to further my education, I might

11   prepare myself to go with one of my sales engineers

12   to present a proposal to a client so I understood,

13   you know, in a general sense, what we were offering

14   and so forth.

15       Q.    Did you ever review any of the design

16   drawings for the Keystone boiler?

17       A.    I don't recall.

18       Q.    Can you identify any technical information

19   concerning Keystone boilers that you reviewed to

20   assist yourself in learning about the characteristics

21   and features of Keystone watertube boilers?

22       A.    I looked at the -- there was a -- there's a

23   cross-section.  It's a cutaway section that shows the

24   inner workings of a Keystone boiler, shows the drum

25   internals.  The drum internals for Keystone boilers

25

1  back while you worked with Zurn?

2      A.   Sure.

3      Q.   Describe what your understanding was of

4  tangent tube walls.

5      A.   Tangent tube walls are just simply tubes in

6  the furnace inner -- which the tubes that form the

7  furnace in lieu of a membrane wall, the tubes

8  actually just touch each other.  They do not have a

9  gas tight seal either on the inner furnace wall or

10  the outer wall.  Typically provided in military

11  specs, and that's generally where they were

12  developed.

13      Q.   Can those tangent tubes be seal welded to

14  prevent gas from passing through the tubes?

15      A.   I would suppose that could happen.

16      Q.   Were you aware of that technology back when

17  you were working for Zurn?

18      A.   Yes, sir.

19      Q.   Were you aware of membrane wall technology

20  while you were working with Zurn?

21      A.   I was -- yes, sir.  I was actually aware of

22  membrane wall technology when I worked for Nebraska

23  Boiler in 1984.

24      Q.   So that during the time you worked at Zurn,

25  you knew about the difference between tangent tube

26

1   technology and membrane wall technology?

2       A.    Yes, sir.

3       Q.    Similarly, when you worked with Erie Power

4   Technologies in 2003, you knew the difference between

5   tangent tube technology and membrane wall technology?

6       A.    Yes, sir.

7       Q.    How much of your time while you were with

8   Zurn did you spend working on Keystone watertube

9   boilers or working with respect to Keystone watertube

10  boilers?

11      A.    It varied.  You know, if we had projects

12  that we looked like they were going to -- likely to

13  win to secure these projects, I would have spent more

14  of my time.  But, as I said before, my time -- my

15  time was being directed by my superiors, John Barnes

16  Jim Davis and others that I had reported to, to focus

17  my time specifically on HRSGs that brought in the

18  biggest bulk of revenue into the company.

19      Q.    While with Zurn, were you involved in the

20  preparation of any sales and marketing materials with

21  respect to Keystone boilers?

22      A.    Other than for presentations, Power Point

23  presentations and so forth, you know, yeah, yes.

24      Q.    Were there any brochures that were prepared

25  for watertube boilers at that time?

30

1    required alteration, in your view?

2        A.    Membrane wall construction.

3        Q.    Anything else?

4        A.    The adaptation, flue gas recirculation, I

5    think a --

6        Q.    What did you -- I'm sorry, what you did say

7    before flue gas recirculation?

8        A.    Adaptation of flue gas recirculation.  I

9    think there are given benefits.  Emission standards

10   were becoming more restrictive.  Furnace volumes were

11   becoming more sensitive.  The units were not

12   originally sized to accommodate flue gas

13   recirculation, which would lower the overall emission

14   values to a unit.  But it's a variety of issues.  One

15   needs to change the product to continue with the

16   market and to continue with the client demand and so

17   forth.  And from what I could see, it would appear --

18   and, granted, I didn't work at Zurn in the 1980s and

19   so forth.  But what it would appear to me is that

20   there was some resistance to make those changes.

21       Q.    While you worked at Zurn, was the Keystone

22   name still well known in the industry?

23       A.    It was well known.

24       Q.    Did you leave Zurn at some point?

25       A.    Yes, sir.

33

1   marketing I believe was his title.

2       Q.   VP sales and marketing for Zurn?

3       A.   Well, at that time, it was Aalborg and then

4   Erie Power.

5       Q.   What position did Simon Kassas have?

6       A.   Originally Simon was a -- I believe a

7   director of purchasing and then eventually was

8   promoted to vice president.  I'm not sure if that was

9   purchasing or just a general title.

10      Q.   What position did Stephen Kang have?

11      A.   President and CEO.

12      Q.   Of what company?

13      A.   Erie Power Technology.

14      Q.   When did you first learn that your position

15  with Zurn was to be eliminated?

16      A.   When I was -- when the separation agreement

17  was presented to me on the 14th of July, 2003.

18      Q.   Did you have any suspicions prior to that

19  time that your position was to be eliminated?

20      A.   Well, sure.  We -- we were in dire

21  financial straits.  We had prior layoffs.  We weren't

22  able to bond or provide any kind of financial

23  security to our clients.  And which the HRSG markets

24  that we provided and even the Keystone watertube --

25  or industrial watertube package boiler markets we

34

1    provided, you can't bond, you're not going to be a

2    player.  So, yeah, I had -- I had suspicions.

3        Q.    When did those suspicions begin?

4        A.    When Aalborg sold the company to Erie

5    Power, Erie Power Technology or DKME Machinery.

6        Q.    When was that?

7        A.    About 2002 time frame.

8        Q.    When in 2002?

9        A.    I don't know.

10       Q.    And from the time that DKME acquired

11   Aalborg until you were discharged in July 2003, you

12   had those suspicions that your job was at risk?

13       A.    Sure.

14       Q.    Yes?

15       A.    Yes.

16       Q.    Were there any prior layoffs of people who

17   had been associated with Keystone watertube boilers?

18       A.    Yes.

19       Q.    Who?

20       A.    Joe Duranty.  Joe Duranty.

21       Q.    Anyone else?

22       A.    Various people.  I don't recall.

23       Q.    When did you first meet John Viskup?

24       A.    I believe I met John at Power Gen in 2002.

25   I think it was December time frame of 2002.

35

1      Q.    What were the circumstances of your meeting
2   John Viskup at Power Gen?
3      A.    John Viskup and Shawn Brewer had attended
4   Power Gen, had told me they were going to be there.
5   Shawn had mentioned that.  And Stephen Kang -- we had
6   a booth there, "we" as in Erie Power Technologies.
7   And Victory, also.  They didn't have a booth, but I
8   believe they were just walking the floor.  And they
9   wanted to meet Stephen Kang, Chairman Kim.  They
10  wanted to talk about a license agreement.  They
11  wanted to talk about the benefits of a license
12  agreement and I was facilitating to make that happen.
13     Q.    What was Power Gen?
14     A.    Power Gen is a large industrial turbine
15  expo.  It -- it deals with utility, whether it be
16  public, private, power generation.  And all of the
17  industrial companies, such as General Electric,
18  Westinghouse, Siemens Westinghouse, Olsten, they
19  provide equipment into that arena, if you will.  And
20  it's a -- it's a gathering.  There are trade booths
21  for each company.  There are seminars and
22  discussions.  And it's a -- basically a meeting for
23  all these people to convene to talk, discuss, present
24  their newest technology and sell their potential
25  clients and so forth.

36

1       Q.    Did EPTI have literature on Keystone
2   package watertube boilers at its booth?
3       A.    I believe so.
4       Q.    How did you know Shawn Brewer?
5       A.    Shawn had called me, introduced himself,
6   told me he was with Victory Energy.  I don't recall
7   when.  And, you know, it just -- introduced himself,
8   said they were, you know, interested.  He had gone on
9   board.  He understood that Victory had had some prior
10  experience with Aalborg at the time where they had
11  purchased a couple of watertube package boilers and
12  understood that he'd like to take maybe that a little
13  further either through a license agreement or some
14  other way to try to generate some business
15  collectively between the two companies.
16      Q.    At the time that you met John Viskup, were
17  you aware that VEO had purchased two Keystone
18  boilers?
19      A.    Yes.
20      Q.    Did you review the specifications for those
21  two VEO boilers?
22      A.    I don't believe so.
23      Q.    Did John Viskup describe to you what his
24  assessment was of the Keystone boilers that he had
25  purchased through Aalborg?

40

1  be generated as part of the license.  Beyond that, I

2  don't know the specifics.

3      Q.   Was there any discussion as to the specific

4  design parameters for the boiler that was to the

5  licensed?

6      A.   I don't know.  I wasn't that involved in

7  that discussion.

8      Q.   Are you aware of any notes that anyone

9  maintained at that meeting?

10     A.   No.

11     Q.   Did you have any notes?

12     A.   No.

13     Q.   Was there any memorandum prepared

14  summarizing the meeting?

15     A.   No.

16     Q.   Did you, after that meeting, have any

17  conversations with Chairman Kim or Stephen Kang

18  concerning the discussion with John Viskup?

19     A.   Yes.

20     Q.   When did that occur?

21     A.   It occurred in the booth, and it also

22  occurred when we were arrived back, when Stephen Kang

23  and myself arrived back in Erie.

24     Q.   Starting with the discussion in the booth,

25  what were you told?

41

1       A.    Proceed.  Proceed with the generation of a

2  license agreement, the drafting of an agreement

3  between Victory Energy and Erie Power Technology.

4       Q.    Anything more definite?

5       A.    No.  They said, "Mark, you have the

6  authority to proceed with this agreement."

7       Q.    Was there any description as to the design

8  parameters of the boiler that was to be licensed?

9       A.    No.

10      Q.    Was there any discussion as to the steam

11  flow of the boiler that was to be licensed?

12      A.    The discussions -- the discussions, as I

13  recall, focused in the smaller range.  The range of

14  where Erie Power Technology was not interested and I

15  believe I had previously stated approximately 150 to

16  187,000 pounds per hour steam.  So it would have

17  fallen below 150 -- 100 -- well, at that range, 180

18  to 150,000 pounds per hour.

19      Q.    Was there any discussion as to the license

20  fee that EPTI would pay?  Strike that.

21            Was there any discussion as to the license

22  fees that VEO would pay under the license agreement?

23      A.    Not at that time.

24      Q.    When you went back to Erie and spoke with

25  Stephen Kang, what did you discuss concerning the

1    Q.   Had you ever previously drafted a license
2    agreement?

3    A.   No.

4    Q.   This is the very first license agreement
5    you ever drafted?

6    A.   Yes, sir.

7    Q.   You said you were going to use another
8    agreement?

9    A.   Yes, sir.

10   Q.   What other -- did you, in fact -- strike
11   that.

12        Did you, in fact, use another agreement as
13   a model for the license agreement you were going to
14   draft with VEO?

15   A.   Yes, sir.

16   Q.   What agreement was that?

17   A.   Rosetti Moreno.

18   Q.   What was Rosetti Moran [sic]?

19   A.   They were the Italian licensee of Aalborg,
20   Erie.

21   Q.   For what technology?

22   A.   Heat recovery steam generators.

23   Q.   Did Rosetti Moran license Keystone
24   watertube boilers?

25   A.   Excuse me, Rosetti Moreno.  I'm sorry,

44

1   would you repeat your question.

2       Q.   Did Rosetti Moreno license any Keystone

3   watertube boilers?

4       A.   No, sir.

5       Q.   Did Stephen Kang tell you to use the

6   Rosetti agreement?

7       A.   No, sir.

8       Q.   That was your decision alone?

9       A.   Yes, sir.

10      Q.   Did you make any changes to the Rosetti

11  agreement?

12      A.   Yes, sir.

13      Q.   What change did you make?

14      A.   Well, specifically I don't recall.  But the

15  agreement would have had to have been modified.  It

16  was for HRSGs.  Now we're going into watertube

17  package boilers, specifically Keystone boilers.  It

18  was an Italian licensee, which made it an

19  international agreement, so, of course, international

20  provisions really wouldn't apply.  So there was a

21  variety of changes that would need to be made, too

22  extensive for me to remember all of them.

23      Q.   Did you at any time provide a draft copy of

24  the license agreement to Stephen Kang?

25      A.   I don't recall.

1    Q.    During that meeting with Stephen Kang to

2    talk through the license agreement, did you review

3    any design drawings for Keystone boilers?

4    A.    No.

5    Q.    Did you personally, in connection with

6    preparing the license agreement, at any time review

7    any of the design drawings for Keystone package

8    boilers?

9    A.    I would have reviewed "M" series drawings.

10   I would have reviewed other drawings just to

11   familiarize myself.

12   Q.    Did you, in fact, review the drawings for

13   Keystone --

14   A.    Which drawings are you referring to

15   specifically?

16   Q.    Any -- any design drawings for Keystone

17   package boilers in connection with preparing of the

18   license agreement.

19              MR. SHEEAN:  Objection, asked and

20   answered.

21              MR. GISLESON:  No, he said what he

22   would have done.

23   Q.    (By Mr. Gisleson) I'm asking what you, in

24   fact, did.

25   A.    Well, define -- let's define design

48

1   drawings.

2       Q.   Any of the standard drawings that show the

3   design configuration for the package boilers that

4   were to be licensed.

5       A.   The package boilers being what?

6       Q.   Being the ones that were the subject of the

7   license agreement, 8M to 22M.

8       A.   No.

9       Q.   Do you have a specific recollection of

10  reviewing any drawings with respect to Keystone

11  package boilers prior to execution of the license

12  agreement?

13      A.   The information that's in Annex.1, Annex.2

14  of the agreement would have been the drawings.  That

15  information I had reviewed.

16      Q.   Any other drawings?

17      A.   Drawings that would have been provided as

18  part of the agreement, most likely.

19      Q.   The only drawings with respect to Keystone

20  package boilers that you reviewed are those that are

21  included in the annex to the license agreement?

22      A.   There may have been others.  That was a

23  long period of time ago and I don't recall.

24      Q.   Can you identify any drawing that you

25  reviewed other than the drawings attached to the

49

1   Annex.1 of the license agreement --

2                    MR. SHEEAN:  Objection, asked and --

3       Q.   (By Mr. Gisleson) -- prior to execution of

4   the license agreement?

5                    MR. SHEEAN:  Sorry.  I object.  It's

6   been asked and answered.  You can answer again.

7       A.   I've answered your question.

8       Q.   (By Mr. Gisleson) You haven't.  Did you

9   review -- or can you identify -- strike that.

10          Can you identify any drawings that you

11  reviewed prior to execution of the license agreement

12  other than those that are contained within Annex.1 of

13  the license agreement?

14                   MR. SHEEAN:  Same objection.

15      A.   I believe I've answered your question.

16      Q.   (By Mr. Gisleson) Can you identify any?

17      A.   Would you repeat your question one more

18  time.

19                   MR. GISLESON:  Can you read it back,

20  please.

21  (The record, as requested, was read by the reporter.)

22      A.   No.

23      Q.   (By Mr. Gisleson) Did you ever provide any

24  drawings pertaining to the Keystone boilers that were

25  to be licensed to John Viskup prior to execution of

50

1    the license agreement?

2        A.    Me personally?

3        Q.    Yes.

4        A.    No.

5        Q.    Did you direct anyone to send drawings to

6    John Viskup pertaining to the Keystone watertube

7    boilers that were to be licensed?

8        A.    No.

9        Q.    Did you have any in-person meetings with

10   John Viskup or anyone else from VEO to discuss the

11   license agreement?

12       A.    Other than what I'd mentioned, Power Gen,

13   no.

14       Q.    You and John Viskup exchanged drafts of the

15   agreement through e-mail, correct?

16       A.    Yes, sir.

17       Q.    Did you consult with anyone at EPTI or Zurn

18   other than Stephen Kang and Chairman Kim in

19   connection with preparing and -- strike that.

20            Did you consult with anyone other than

21   Stephen Kang, Chairman Kim and Maureen Fiske in

22   connection with preparing the license agreement?

23       A.    Marie Fiske.

24       Q.    Pardon me?

25       A.    Marie Fiske.

52

1      Q.   Describe generally the sequence of events
2   from the time that you first sent a draft of the
3   license agreement to John Viskup until the license
4   agreement was executed.

5      A.   Well, to the best of my recollection, I
6   sent an agreement.  We probably iterated a very minor
7   issue two or three times.  John had mentioned that
8   they had a legal review done of the agreement but
9   felt that he wanted an agreement that Erie felt very
10  comfortable with.  Wasn't going to impose any of
11  these changes.  Did not impose any of these changes.
12  I believe my comment was we wouldn't have accepted
13  them regardless or the discussions would have been
14  over.  And, you know, we got to a point we had a
15  reasonably, you know, agreeable document and we moved
16  that forward.

17     Q.   Can you identify any specific subjects of
18  negotiation with John Viskup?

19     A.   I think just, you know, the terms of the
20  payments, the initial fees and so forth, when they
21  would be paid, the royalty percentages, capacity
22  arranged.  Shawn Brewer was also involved to a
23  certain extent.

24     Q.   Any other specific subjects of negotiations
25  with John Viskup?

58

1  welded wall technology?

2           MR. SHEEAN:  Objection, calls for a

3  legal conclusion.

4      A.   Once again, I'm not an attorney, but the

5  agreement does talk about alterations, does talk

6  about changes.

7      Q.   (By Mr. Gisleson) Is there a specific

8  reference anywhere in the agreement to welded wall

9  technology?

10     A.   I don't believe --

11          MR. SHEEAN:  Same objection.  Sorry.

12     A.   I don't believe so.

13     Q.   (By Mr. Gisleson) Other than taking your

14 word for it and that of Shawn Brewer, is there any

15 way to prove that that discussion, in fact, occurred?

16          MR. SHEEAN:  Objection, badgering the

17 witness.  You can answer.

18     A.   I don't know.

19     Q.   (By Mr. Gisleson) Were there any other

20 conversations you had with someone from VEO about the

21 use of membrane walls or welded wall technology under

22 the license agreement prior to the time the license

23 agreement was executed?

24     A.   I don't recall.

25     Q.   Is it correct that you never discussed

66

1      A.   No.  But no permission would be necessary

2   because it was part of the license agreement.

3      Q.   Has VEO provided copies of any of the

4   proposals that it submitted for Keystone boilers to

5   Indeck Keystone Energy?

6      A.   Other than through discovery, I don't -- I

7   don't -- I don't believe so.

8      Q.   VEO has an obligation to sell -- strike

9   that.

10          VEO has an obligation to send unit sale

11   notifications to the licensor in connection with the

12   sales of watertube boiler it's making, correct?

13               MR. SHEEAN:  I'm going to object to

14   the extent it calls for a legal conclusion.  You can

15   answer.

16      A.   I believe so.

17      Q.   (By Mr. Gisleson) In any of the unit sale

18   notifications that you sent to Indeck Keystone

19   Energy, did you disclose the fact that VEO was

20   selling Keystone boilers with membrane wall

21   technology?

22      A.   Well, once again, the membrane wall

23   technology was part of the license agreement, so it

24   wouldn't have been necessary.

25      Q.   Did you send any unit sale notifications to

67

1   Indeck Keystone Energy that disclosed the fact that
2   VEO was selling Keystone boilers with membrane wall
3   technology?

4               MR. SHEEAN:  Objection, asked and
5   answered because you just asked him the question.

6               MR. GISLESON:  He didn't answer it.

7       A.    Yes, I said.  I said it was part --
8   membrane wall construction was part of the license
9   agreement.  Therefore, it wouldn't have been
10  required.  So the answer, in terms of within the
11  announcements, would be no.

12              (Off-the-record discussion)

13              (Plaintiff's Exhibit Number 1 was marked
14  for identification.)

15      Q.    (By Mr. Gisleson) I'd like to show you
16  what's been marked as White Exhibit 1.  It's a
17  document stamped VEO663 through 685.  Have you seen
18  this document before?

19      A.    I believe so.

20      Q.    On the first page, the lower e-mail appears
21  to be one from you to Shawn Brewer --

22      A.    Uh-huh.

23      Q.    -- dated December 20, 2002, on the subject
24  draft license agreement.  You write: "Shawn, as
25  discussed, the draft license is enclosed for your

68

1  review.  Regards, Mike -- Mark White"; is that

2  correct?

3       A.   Yes.

4       Q.   Why did you send this to Shawn White [sic]

5  rather than to John Viskup?

6                 MR. SHEEAN:   Objection.

7       Q.   (By Mr. Gisleson) I'm sorry.  Why did you

8  send this to Shawn Brewer instead of to John Viskup?

9       A.   When I sent it to Shawn, Shawn and I were

10  talking daily.  And Shawn was in contact with John,

11  so it got to John and they would discuss it.  It's

12  just a central point of communication.

13       Q.   Why were you speaking with Shawn Brewer

14  daily?

15       A.   Just on the license agreement.

16       Q.   On what subjects were you having

17  discussions with Shawn Brewer?

18       A.   Questions, answers.  It may not have been

19  daily, but it was often.

20       Q.   Then attached to this is a draft license

21  agreement, correct?

22       A.   It would appear so.

23       Q.   Then if you look at Page VEO683, the VEO

24  numbers in the lower right-hand corner --

25       A.   Which number are you referring?

1     Q.    VEO683.

2     A.    Six-eight-three?

3     Q.    Correct.

4     A.    Okay.

5     Q.    This is another e-mail dated December 20,

6  2002, that you sent to Shawn Brewer on the subject of

7  license agreement in which you write:  "Shawn,

8  enclosed is a data table which provides the details

9  of the capacity range and models that the license

10  agreement will cover"; is that correct?

11     A.    Yes.

12     Q.    And you read the data table before you sent

13  it to Shawn Brewer, correct?

14     A.    I would have looked at it, yes.

15     Q.    From where did you obtain this data table?

16     A.    I don't recall.

17     Q.    Is that your handwriting on Page VEO684?

18     A.    It would appear so.  I can't be sure.

19     Q.    Was the selection of 100,000 as the steam

20  capacity simply an arbitrary cutoff that you

21  personally selected?

22           MR. SHEEAN:  Object to the term

23  "arbitrary".  You can answer.

24     A.    It was discussed prior with both Shawn and

25  John as a -- as a range, 29,000 to 100,000 pounds per

70

1   hour as a starting point for discussions.  The draft

2   reflects that.

3       Q.    (By Mr. Gisleson) Why use that as a

4   starting point rather than simply identify whatever

5   the full range of products was that EPTI was willing

6   to license?

7       A.    Well, capacity ranges is easily definable.

8   We all knew that going into this agreement, "we" as

9   in Shawn -- or Victory Energy and Erie Power

10  Technologies, that this technology was dated.  It was

11  going to require enhancements, change and so forth.

12  And it was easier to define a capacity range knowing

13  that the models were going to require alterations and

14  so forth.  And the capacity ranges is simply

15  dictating the markets in which they are going to

16  pursue.  Industrial steam markets can be defined

17  through capacity much easier that it can through

18  boiler models.

19      Q.    And the draft license agreement from VE0664

20  through 682 was based on the Rosetti license; is that

21  correct?

22      A.    Yes, sir.

23      Q.    Looking at Page VE0665, there's a

24  definition of improvements.  Do you see that?

25      A.    Yes, sir.

71

1      Q.   Did you make any changes to the definition
2  of improvements that was in the Rosetti license?
3      A.   I don't recall.
4      Q.   Did you make any handwritten markups to the
5  license agreement as you were drafting it?
6      A.   You know, I may have, but I wouldn't know
7  unless I looked at it.
8      Q.   Were there any negotiations with John
9  Viskup, Shawn Brewer or anyone at VEO concerning the
10 wording of Paragraph 1-H involving improvements?
11     A.   I don't recall.
12     Q.   Under 1-K there's a definition of mark.  Do
13 you see that?
14     A.   Yes, sir.
15     Q.   And you understood that one of the marks
16 that was being licensed was Keystone, correct?
17     A.   Yes, sir.
18     Q.   On Page VEO669, Clause 5 involves secrecy.
19 Do you see that?
20     A.   Clause 5?
21     Q.   Yes.
22     A.   Yes, I see it.
23     Q.   Was it important to you that if this
24 license agreement was entered with VEO, that VEO
25 maintain secrecy over the technical information it

72

1    received from EPTI?

2        A.    In terms of the secrecy, the understanding

3    and the intent of the agreement was to limit design

4    details, such as separation devices, those type of --

5    that type of information, what we would consider

6    proprietary, but not to limit proposal-type

7    information.  And when selling anything, it would

8    have been entirely impossible for Victory to limit

9    technical information to the extent not providing it

10   to their clients.  You couldn't even provide a

11   proposal.  It wouldn't have been a practical

12   agreement.

13       Q.    Is there any carve out that you're aware of

14   in the license agreement for that kind of proposal

15   information you just described?

16              MR. SHEEAN:  I'm going to object to

17   the extent it calls for a legal conclusion.

18       A.    I'm not an attorney, but under 2.A, under

19   selling rights:  The exclusive license to manufacture

20   the products and to sell -- or to offer, sell and

21   install the products so manufactured, and use the

22   technical information connected therewith.  I'm not

23   an attorney, but to me that implies that you use the

24   information to provide -- to sell and market these

25   boilers.

1      Q.    (By Mr. Gisleson) Anything else?

2      A.    Without doing a thorough review of the

3   document, I couldn't say.

4      Q.    On Page VE0670 under Clause 6 for

5   compensation, it refers to a technology disclosure

6   fee of $75,000.  How did you arrive at the $75,000

7   figure?

8      A.    It was discussed with Stephen.  There may

9   have been others in the discussion.  It was a

10  starting point for the negotiations.  I recall it was

11  later reduced to somewhere around $20,000.

12     Q.    Turning to Page VE0671, Clause 8 refers to

13  modifications to products by licensee.  Are you aware

14  of any changes to Clause 8 from this draft based on

15  discussions that you had with John Viskup, Shawn

16  Brewer or anyone else from VEO?

17     A.    No.

18     Q.    Turning to Page VE0672, Clause 9 for

19  workmanship, are you aware of any changes that were

20  made to the language in that clause based on

21  discussions you had with John Viskup, Shawn Brewer or

22  anyone else from VEO?

23     A.    I don't recall.

24     Q.    Turn to Page VE0675, Clause 13,

25  improvements.  Are you aware of any changes to the

74

1    language in that clause based on conversations you

2    had with John Viskup, Shawn Brewer or anyone else

3    from VEO?

4         A.    I'm not aware of any.

5         Q.    Turn to Page VEO676.  Clauses 14 and 15

6    refer to copyrights and trademarks respectively.  Are

7    you aware of any changes that were made to the

8    language in those clauses based on conversations you

9    had with John Viskup, Shawn Brewer or anyone else

10   from VEO?

11        A.    I don't recall.

12        Q.    Was it always your expectation that VEO

13   preserve and protect the copyright and trademark

14   rights that EPTI had?

15        A.    Yes.

16        Q.    As of the time that the license agreement

17   was executed with VEO, did you care whether VEO

18   complied with the license agreement?

19        A.    Absolutely.

20        Q.    Why?

21        A.    Why did I care?

22        Q.    Yes.

23        A.    Well, I was an employee of Erie Power

24   Technology, and as such, it was my responsibility to

25   administrate this document and implement this

1   document, execute this document in the best interest

2   of Erie Power Technology.  In addition to that, you

3   know, this document was drafted in a broad sense to

4   understand that both parties, Erie Power Technology

5   and Victory Energy, would enter into an agreement

6   where we would be successful, where both parties

7   could be successful.  You know, limiting

8   documentation, trying to make this very difficult

9   would have defeated the entire point of putting this

10  together.

11      Q.   Do you know who drafted the original

12  Rosetti license agreement?

13      A.   I believe it's Jim Davis.

14      Q.   Did you speak with Jim Davis about what he

15  intended by the different provisions in the Rosetti

16  license?

17      A.   No.

18      Q.   So you don't have any personal knowledge,

19  one way or the other, as to what Jim Davis intended

20  by certain provisions in the license agreement,

21  correct?

22      A.   In the Rosetti agreement?

23      Q.   Yes.

24      A.   No.

25               THE WITNESS:  I'd like to take a

76

1    break.

2                    MR. GISLESON:  Yeah, let's take a

3    break.

4                    (Break was taken)

5        Q.    (By Mr. Gisleson) Under Clause 15-B-2 of

6    the December 20, 2002, draft license agreement, it

7    says:  "Licensee acknowledges that the mark, the

8    property solely of Licensor, is of great commercial

9    value to Licensor and represents the good will and

10   wide recognition attained by Licensor's high quality

11   of products.  All use of the mark by Licensee,

12   including any good will arising out of such use,

13   shall be solely to the benefit of Licensor."

14              It was your belief, wasn't it, as of the

15   time the license agreement was executed, that the

16   mark owned by Erie Power Technologies, particularly

17   the Keystone trademark, was of great commercial value

18   to EPTI and represented the good will and wide

19   recognition attained by EPTI's high quality products?

20       A.    In terms of the definition, yeah.  You

21   know, it was valuable to Erie Power Technologies.

22       Q.    And it was your expectation, wasn't it,

23   that all use of the Keystone mark by VEO, including

24   any good will arising out of such use, shall be

25   solely to the benefit of EPTI, correct?

77

1    A.    Yes.

2    Q.    Was there any negotiation or change to that

3    language at any time by VEO?

4    A.    Not that I recall.

5    Q.    Under Clause 16, duration of agreement,

6    Subparagraph C, it's in bold highlighting and it

7    says:  "In the event Licensee has not received during

8    the first two years a minimum of five orders for the

9    products, Licensor has the right to terminate the

10   agreement."  Do you see that?

11   A.    Yes, sir.

12   Q.    Whose language was that?

13   A.    I don't recall.

14   Q.    Was this the first draft of the license

15   agreement?

16   A.    You know, I don't know without looking at

17   all of the information.  It may have been, it may not

18   have been.

19   Q.    Was this a document that you maintained on

20   the hard drive of your computer at EPTI?

21   A.    You know, I don't know.  It could have been

22   maintained on the company directory or it could have

23   been maintained on the hard drive.  Once again,

24   without having the document and having the directory,

25   I wouldn't know.

81

1      Q.    Do both of those individuals still work for

2  VEO?

3      A.    McConaughy has tendered his resignation.

4  As of today, he is no longer working for us.

5      Q.    Did he tell you why he's no longer working

6  for VEO?

7      A.    Yeah, he's going to work for Erie Power

8  Technology -- or EPTI CMI as a project manager.  And

9  the reason being is he lives in Pennsylvania and he's

10  tired of traveling back and forth.

11      Q.    Any other reasons he provided to you?

12      A.    No.

13      Q.    On Page VEO679, Clause 21 of the December

14  20, 2002, draft license agreement, it says:  "This

15  agreement shall not be modified except by a

16  supplemental written agreement executed by an

17  authorized representative of both of the parties

18  hereto."  Were you the authorized individual from

19  EPTI while you were employed there to sign

20  supplemental written agreements that modified the

21  final executed license agreement?

22      A.    I was given full authority to execute and

23  administrate this agreement by Stephen Kang and

24  Chairman Kim.

25      Q.    Did you, in fact, enter certain

82

1   supplemental written agreements to modify the license
2   agreement?

3        A.    Other than the addendums or the additional
4   annexes that came later, such as the increased
5   pressure and temperature and superheat and so forth.

6        Q.    Was that the only supplemental written
7   agreement that you executed on behalf of EPTI to
8   modify the license agreement?

9        A.    I believe so.

10       Q.    Turning to Page VEO681, Clause 24,
11  integration, merger and waiver, Subpart A reads:  The
12  terms and provisions contained in this agreement are
13  the full agreement of the parties pertaining to the
14  subject matter of this agreement and are fully set
15  forth herein, and no prior understanding or
16  obligation not expressly set forth herein shall be
17  binding upon the parties to this agreement, and no
18  subsequent modification of this agreement shall be
19  binding upon the parties unless negotiated upon the
20  terms herein provided and executed with the same
21  formalities as this agreement.

22           Are you aware of any changes to the
23  language of that paragraph in connection with your
24  discussions with either John Viskup, Shawn Brewer or
25  anyone else on behalf of VEO?

1    for identification.)

2        Q.    (By Mr. Gisleson) I'd like to show you

3    what's been marked as White Exhibit 4.  It's a

4    document stamped IKE336 to 337.  Does this include an

5    e-mail exchange that you had with Bob Gdaniec on

6    January 8, 2003, concerning the license agreement?

7        A.    It would appear so.

8        Q.    In Mr. Gdaniec's e-mail to you at the

9    bottom of the first page, he writes in the third

10   sentence:  "If Victory Energy thinks they can be

11   successful at selling the Keystone, why aren't we

12   taking the same/similar approach and selling it

13   here?"  Did you, in your capacity as having

14   responsibility for sales, at any time analyze the

15   market prior to entering the license agreement to

16   determine whether it was an opportunity for EPTI to

17   pursue?

18       A.    Absolutely.  I worked in the market.  I

19   discussed this with Stephen Kang.  We were not

20   successful.  "We," as in Erie Power, Zurn, Aalborg

21   and Aalborg Keystone were not successful in selling

22   the Keystone.  The ABMA information in sales and

23   sales -- sales reporting information would dictate

24   that.  When you have literally less than five to

25   maybe a fraction of the percent of the market, you

100

1    as we see fit."  Is that an accurate statement based
2    on your understanding of the license agreement?
3              MR. SHEEAN:  Objection, calls for a
4    legal conclusion.
5         A.   I'm not an attorney, but my understanding
6    of the license agreement, it -- the improvements will
7    be owned by the party that develops those
8    improvements.
9         Q.   (By Mr. Gisleson) But in your e-mail to Bob
10   Gdaniec, you say:  "Any updates or improvements will
11   be owned by EPTI for possible use as we see fit."
12        A.   Yeah, that's an inaccurate statement.
13        Q.   Did you ever correct the statement you made
14   to Bob Gdaniec in this e-mail?
15        A.   I don't recall.
16        Q.   Can you identify any improvements for
17   Keystone watertube boilers that were made by VEO that
18   it intends to keep for itself after the conclusion of
19   the license agreement?
20        A.   No.
21        Q.   Has anyone at VEO ever told you that they
22   developed an improvement that, in their view, VEO can
23   keep at the conclusion of the license agreement?
24        A.   No.
25        Q.   How did you get along with Bob Gdaniec?

1   boilers.

2       Q.   Did you trust Dave's judgment?

3       A.   Sometimes.

4       Q.   Did you believe he was knowledgeable

5   concerning the design of the Keystone boilers?

6       A.   He had some knowledge in the design, but it

7   wasn't to the extent that I had a great faith in his

8   background.

9           (Plaintiff's Exhibit Number 5 was marked

10  for identification.)

11      Q.   (By Mr. Gisleson) I'd like to show you

12  what's been marked as White Exhibit 5.  It's a

13  document stamped VEO731 to 750.  Do you see how this

14  is a January 8th, 2003, e-mail with enclosure from

15  Marie Fiske to John Viskup, cc to you, transmitting a

16  conformed license agreement for signature?

17      A.   Yes, I see that.

18      Q.   Did you have an understanding as to what

19  Marie Fiske meant by a conformed license agreement

20  for signature?

21      A.   No, I do not.

22      Q.   She then writes:  "I have not --" oh, are

23  you the one who wrote this?  The e-mail says:  "John,

24  the following message and attachment are being

25  forwarded to you at the request of Mark White."  And

1   then there's a paragraph that says:  "Enclosed is the

2   conformed license agreement for signature.  I have

3   not yet completed the annexes.  I suggest that we

4   sign the agreement, and when completed, initial off

5   each annex.  Please sign two copies of the document

6   and forward to me for signature.  We will return one

7   for your files."

8        A.   It would appear that -- yeah, that I had

9   had Marie forward this over to John.

10       Q.   Do you have any understanding what she did

11  to conform the license agreement?

12                 MR. SHEEAN:  Objection, asked and

13  answered.

14       A.   I don't recall.

15       Q.   (By Mr. Gisleson) Or did you conform the

16  agreement?

17       A.   I don't recall.

18       Q.   As of January 8th, 2003, the draft annex

19  that you transmitted on December 20, 2002, to VEO had

20  not been finalized yet, correct?

21       A.   That would be appear to be the case.

22       Q.   Why didn't you finalize Annex.1 to the

23  license agreement prior to having the license

24  agreement signed by VEO?

25       A.   I don't recall.

104

1      Q.    Do you have any explanation for that?

2      A.    I don't recall.  I mean, if I had my notes,

3   it might be -- be a little easier.

4      Q.    You agree, don't you, that Annex.1 is part

5   of the license agreement?

6      A.    Yeah, it's part of the agreement.

7      Q.    What was the purpose of Annex.1?

8            MR. SHEEAN:   Objection, calls for a

9   legal conclusion.

10     Q.    (By Mr. Gisleson) What did you understand

11   to be the purpose of Annex.1?

12     A.    I gave a -- basically Annex.1 is -- would

13   set some geometry, but the agreement was not to be

14   limited to that geometry.  Basically what it was was

15   a road map for Victory Energy to use these models in

16   combination with the agreement.

17     Q.    What do you mean by the fact that Annex.1

18   set some geometry?

19     A.    Well, there's geometry that's defined in

20   Annex.1 that when the agreement -- the intent of the

21   agreement was never to limit the -- the geometry of

22   the units within that annex.

23     Q.    What do you mean by geometry?

24     A.    Dimensions.

25     Q.    Are you saying that VEO, in your view, had

1  discussed more the HRSG side of the business.  Again,

2  my background is HRSGs predominantly, not Keystone

3  boilers, so we discussed that.  We also discussed my

4  commercial knowledge, different things like that,

5  operations and so forth.

6      Q.    What was discussed concerning Keystone

7  boilers?

8      A.    Just the license agreement, and John had

9  some concerns that if I came on board, would there be

10  problems, you know, from the Erie side, the fact that

11  I had -- I was the author of the license agreement.

12  And if I came to work for Victory, it may be

13  cancelled.  So there was some definite concerns from

14  John's side if I was employed with Victory Energy

15  they could lose the license agreement.

16      Q.    Did you disclose any confidential

17  information of EPTI concerning HRSGs to VEO?

18      A.    No.

19          (Plaintiff's Exhibit Number 6 was marked

20  for identification.)

21      Q.    (By Mr. Gisleson) I'd like to show you

22  what's been marked as White Exhibit 6.  It's a

23  document stamped IKE4410 through 4429.  Do you see

24  how this is another copy of your January 8, 2003,

25  e-mail to John Viskup with the enclosed license

1  agreement for signature?

2       A.   Yes, sir.

3       Q.   Whose handwriting is on the first page of

4  this exhibit?

5       A.   That's my handwriting.

6       Q.   And you wrote:  "To Bob, Dan, Jim, Dave,

7  Neil.  Conformed version for review.  Regards, Mark

8  White."  Who is Bob?

9       A.   That would have been Bob Gdaniec.

10      Q.   Dan?

11      A.   Levstek.

12      Q.   Jim?

13      A.   I don't recall his last name.

14      Q.   Dave?

15      A.   Briggs.

16      Q.   Neil?

17      A.   Bradwell.

18      Q.   Why were you sending the conformed version

19 for review to those individuals?

20      A.   I don't recall.

21      Q.   What did you mean by review?

22      A.   How do you define review?  Just read

23 through the document, let me know if you have any

24 questions.

25      Q.   Were you giving them an opportunity to make

112

1  watertube boilers while you worked with EPTI?

2      A.    They may have.

3      Q.    Do you recall specifically whether you

4  received any?

5      A.    No.

6      Q.    Did you ever at any time while you worked

7  with EPTI after the license agreement was executed

8  review the license agreement to determine whether a

9  particular boiler that was sold by VEO was outside of

10 the scope of the license agreement?

11     A.    No.

12     Q.    Were there instances while you were

13 employed with EPTI that engineers or others at EPTI

14 advised you of their belief that VEO was selling

15 watertube boilers outside of the scope of the license

16 agreement?

17     A.    They may have.  I don't recall.

18          (Plaintiff's Exhibit Number 8 was marked

19 for identification.)

20     Q.    (By Mr. Gisleson) I'd like to show you

21 what's been marked as White Exhibit 8.  Is this a

22 true and correct copy of an e-mail that you received

23 from Bob Gdaniec on John 14, 2003, on the subject of

24 Keystone product line license agreement?

25     A.    It would appear so.

113

1      Q.   Bob Gdaniec writes to you that:  "I have

2  started to put together both my estimate on hours and

3  scope for the license agreement for the package

4  boiler line with Victory and, unfortunately, have not

5  got it completed yet."  Was that information that you

6  requested Mr. Gdaniec to provide to you?

7      A.   I don't recall.

8      Q.   He then requests a draft of the annex that

9  you were writing; is that right?

10      A.   I haven't finished reading it.  May I read

11  this?

12      Q.   Sure.

13      A.   Would you -- would you please repeat your

14  question.

15      Q.   Sure.  At the end of the first paragraph,

16  Mr. Gdaniec writes:  "If you get the draft of the

17  annex written, please e-mail me a copy."  Do you see

18  that?

19      A.   Yes.

20      Q.   Did you, in fact, send a draft of the annex

21  to Bob Gdaniec?

22      A.   I don't recall.

23      Q.   You were the individual at EPTI responsible

24  for writing the Annex.1 to the license agreement,

25  correct?

114

1       A.    I believe so.

2       Q.    Mr. Gdaniec then writes:  "At this point,

3   as a recap of where we believe we are going with

4   this, the scope will be the standard package boiler

5   line that is rated at steam flows from 29,000 to

6   150,000, which for us is the 8M through the 22M

7   Keystone.  This is a boiler that is limited to a 250

8   psig MAWP and is based on no economizer and no flue

9   gas recirculation, with performance rating based on

10  15 percent excess air.  The general arrangement of

11  the boilers will be defined by the KDB sheets with

12  all tubes rolled into radially drilled tube holes.

13  Any deviation from the above definition would be

14  outside of the product license agreement."

15          Based on your understanding in negotiating

16  and executing the license agreement with VEO, did Bob

17  Gdaniec accurately describe the scope of the license

18  agreement?

19      A.    No.

20      Q.    Did you tell him that he did not properly

21  define the scope of the license agreement?

22      A.    I don't recall.

23      Q.    Are you aware of any documentation that

24  exists in which you advised Mr. Gdaniec that his

25  understanding as to the scope of the license

115

1   agreement is incorrect?

2       A.   I don't know.  I don't recall unless you

3   have -- you can produce something through discovery.

4       Q.   Who had a better understanding as to what

5   the design of the standard Keystone package boiler

6   is, you or Bob Gdaniec?

7               MR. SHEEAN:  Objection, vague.

8       A.   I don't know.

9       Q.   (By Mr. Gisleson) Who do you think has a

10  better understanding as to the design of the Keystone

11  package watertube boilers, you or Dave Briggs?

12              MR. SHEEAN:  Objection, vague.

13      A.   In terms of the overall design?

14      Q.   (By Mr. Gisleson) Yes.

15      A.   Me.

16              (Plaintiff's Exhibit Number 9 was marked

17  for identification.)

18      Q.   (By Mr. Gisleson) I'd like to show you

19  what's been marked as White Exhibit 9.  Is this a

20  true and correct copy of an e-mail that you sent to

21  Bob Gdaniec, Ted Fuhrman and Dave Briggs on the

22  subject of license product description?

23              MR. SHEEAN:  Well, I'm going to object

24  to the use of this document because it does not

25  appear on its face as though it's been produced in