116

1    discovery at this point. And it's got the name of

2    attorney for Indeck Keystone Energy, John Gisleson,

3    at the top. If there's a copy of this document that

4    has been produced so that we can confirm that we've

5    got that in front of us, I'd prefer that that be

6    used. Otherwise, I'm going to object to the use of

7    this document at this point.

8                    MR. GISLESON:  It was produced.  I ran

9    out of time in finding the copy of the document that

10   was produced to you.

11                   THE WITNESS:  Well, while you're

12   looking, can I take a bathroom break?

13                   MR. GISLESON:  Sure.

14                      (Break was taken)

15      Q.   (By Mr. Gisleson) Going back to Exhibit 8

16   for a moment, which is the January 14, 2003, Bob

17   Gdaniec e-mail to you in which he describes his

18   understanding as to the scope of the license

19   agreement, how is Mr. Gdaniec incorrect in his

20   description?

21      A.   Well, in terms of the operating pressure,

22   he lists 250 psig maximum allowable working

23   pressure. That's inaccurate.

24      Q.   Anything else?

25      A.   Just think in the general sense what he's

117

1  stating, there's some possible inaccuracy.  You know,

2  it's broad.  It's not very definitive.  But, you

3  know, just -- it would just go to show that Bob is,

4  you know, trying to find his way through the

5  agreement.

6      Q.    Can you identify any other specific

7  inaccuracies in his description as to the scope of

8  the license agreement?

9      A.    Not within that paragraph.

10      Q.    Looking at Exhibit 9, which is the January

11  29 e-mail exchange between you and Bob Gdaniec, you

12  sent to Bob Gdaniec a copy of Annex 1, which you

13  described as the product description of the license

14  agreement.  And you ask him to provide Mr. Gdaniec's

15  comments, correct?

16      A.    This document has still got your title on

17  it.

18      Q.    Right.

19      A.    Has it been produced as part of discovery?

20      Q.    Yes, it has.

21      A.    And where is that document at?

22      Q.    It's in a box at Christian's office, as

23  well as in a box at my office.

24          MR. SHEEAN:  Well, John, I'm just

25  going to object to this document being used in this

1   deposition at this time because it's not clear that

2   this document has been produced.  I don't have a

3   catalog memory of every document you produced, nor do

4   you, I would imagine.  And, therefore, I think it's

5   inappropriate for you to use a document that's not

6   properly labeled as having been produced.

7        Q.   (By Mr. Gisleson) Okay.  Looking at White

8   Exhibit 9, which is a January 29 e-mail exchange, you

9   write -- first, would you deny -- strike that.

10            Do you deny sending this e-mail to Bob

11  Gdaniec?

12       A.   It would appear that I sent it to Bob.

13       Q.   And you referred to Annex.1 as the product

14  description of the license agreement, correct?

15       A.   That's what it says, yes.

16       Q.   Were you asking Bob Gdaniec to comment on

17  Annex.1?

18       A.   No, not necessarily.  It was just a

19  review.  You know, Bob and I would have talked about

20  it, any questions.  I was involving Bob, I guess, in

21  the -- I guess in the generation of the annex to a

22  certain degree.

23       Q.   Referring to the next page for Annex 1,

24  it's got a header for Erie Power Technologies,

25  Incorporated; is that right?

119

1        A.    Yes.

2        Q.    And then for a description of products it

3   says:  "Erie Power Technologies, Inc., "M" series

4   Keystone watertube boilers to include the 8M, 9M,

5   10M, 11M, 12M, 13M, 14M, 15M, 16M, 17M, 18M, 19M,

6   20M, 21M and 22M"; is that correct?

7        A.    That's what it says.

8        Q.    And what you were licensing were these

9   specific series of boilers, correct?

10                  MR. SHEEAN:   Objection, calls for a

11   legal conclusion.

12        Q.    (By Mr. Gisleson) Was it your understanding

13   that you were licensing this specific series of

14   Keystone boilers?

15        A.    We were -- what was being licensed from the

16   Erie Power Technology was this series of boilers in

17   the capacity range from 29,000 pounds to 150,000

18   pounds, as I mentioned prior, which would require

19   changes and alterations, including membrane wall.

20        Q.    Then under the section for design, you

21   identified certain design parameters; is that

22   correct?

23        A.    It would appear so.

24        Q.    What did you mean by -- strike that.

25                  Is all the language under description of

120

1    products and design your language?

2        A.    It may have been, I don't recall.

3        Q.    You aware of anyone else writing this,

4    other than you?

5        A.    I do not recall.

6        Q.    What did you mean by design parameters?

7                    MR. SHEEAN:  I'm going to object.  He

8    just said he doesn't recall if he wrote this or not,

9    so your referring to it as his is misleading and

10   mischaracterizes prior testimony.  You can answer.

11       Q.    (By Mr. Gisleson) Do you have an

12   understanding as to what is meant by design

13   parameters in this Annex.1?

14       A.    Can I read it, please?

15       Q.    Sure.

16       A.    Yes, I understand what it refers to.

17       Q.    What?

18       A.    It refers to -- the information in the

19   table is based on Items 1 through 7.  If you were to

20   -- if you were to run thermal performance of an 8M

21   through a 22M, it was based on the following:  150

22   psi operating pressure and so on and so forth through

23   this diagram.  It's just simply a rating.  You have

24   to establish a basis for the design at some point.

25   You pick a point and that gives you a benchmark, if

121

1  you will.

2          (Plaintiff's Exhibit Number 10 was marked

3  for identification.)

4      Q.   (By Mr. Gisleson) Handing you what's been

5  marked as White Exhibit 10.  It's a document stamped

6  IKE5003 through IKE5009.  Do you recognize this as a

7  January 30, 2003, e-mail with enclosure that you sent

8  to Bob Gdaniec, Marie Fiske, Ted Fuhrman, Dave

9  Briggs, Steve Bernatowicz and Neil Bradwell on the

10 subject of annex of license agreement?

11     A.   Yes.

12     Q.   On January 30, you're sending this again to

13 Bob, which is Bob Gdaniec, is that right, in the text

14 of your e-mail?

15     A.   It states -- well, yes, it's to Bob.

16     Q.   Says:  "Please review and provide your

17 comments.  The document is complete with all annex

18 data."  When you refer to the document, are you

19 referring to the license agreement?

20     A.   I don't recall.

21     Q.   Why did you want Bob Gdaniec to review and

22 provide his comments on the annex?

23     A.   I don't recall.  It may have been to the

24 extent just a cursory review.  We were getting ready

25 to initiate this agreement to begin the execution of

123

1  would be pre-engineered models.  Again, we go back to

2  the road map I talked about previously that sets a

3  capacity range, general capacity range for each

4  boiler for use as part of the license agreement.

5      Q.    Is standard different than custom?

6      A.    Standard and custom can be one and the

7  same.

8      Q.    Can you identify any differences between

9  standard and custom?

10     A.    You can use a standard boiler and if it

11 operates at a given pressure, you're still going to

12 have run co-calculations, which makes it custom.

13     Q.    Anything else?

14     A.    Without going into more detail, there are

15 certainly other issues that will involve that.  Those

16 co-calculations can fall into two -- two wall

17 thicknesses, which can change all different types of

18 parameter, rolling designs and so forth, in the

19 manufacturability of the product.  So there is -- by

20 simply stating it's standard, it can very much be a

21 customized product.

22     Q.    In your view, was VEO permitted to sell

23 custom watertube boilers under this license

24 agreement?

25     A.    There's custom --

124

1              MR. SHEEAN:  Object as vague.

2        A.    There's customizing that goes into the

3    standard units.  There's customizing that goes into

4    every boiler.

5              (Plaintiff's Exhibit Number 11 was marked

6    for identification.)

7        Q.    (By Mr. Gisleson) I'd like to show you

8    what's been marked as White Exhibit 11.  It's a

9    document stamped IKE4435 to 4437.  Looking at the

10   first page of this at the upper right-hand corner, in

11   handwriting, it says:  Comments by D. Briggs January

12   30, 2003.  Do you see that?

13       A.    Yes, I see that.

14       Q.    Did you receive a copy of this document

15   from Mr. Briggs?

16       A.    Not to my knowledge, no.

17       Q.    Or from anyone else?

18       A.    Not to my knowledge.

19       Q.    Mr. Briggs writes on here:  "Design

20   pressure stated on Sheet 2 and 3 states 200 psig.

21   The KD PERF sheets were based on 200 psig, but the

22   "M" series is supposed to be good up to and

23   including 399 psig."  Is that an accurate statement

24   by Mr. Briggs?

25              MR. SHEEAN:  I'm going to object to

1   foundation.  He says he doesn't recall seeing the
2   document.

3              But you can answer.
4       A.    In terms of the overall maximum allowable
5   working pressure of 399 psig, that is an accurate
6   statement.
7       Q.    (By Mr. Gisleson) Then is written in
8   handwriting below that:  "No mention of tangent
9   furnace tubes."  Is that an accurate statement?
10      A.    No.
11      Q.    How is that not an accurate statement?
12      A.    I don't understand his intent to -- in
13  terms of furnace tubes, I don't know what he's
14  implying.
15      Q.    Based on your having written this version
16  of Annex.1, is there anything in this Annex.1 to
17  indicate that the Keystone boilers were to have
18  tangent furnace tubes?
19      A.    Not that I recall.
20            (Plaintiff's Exhibit Number 12 was marked
21  for identification.)
22      Q.    (By Mr. Gisleson) I'd like to show you
23  what's been marked as White Exhibit 12.  It's a
24  document stamped IKE4240.  Does that appear to be a
25  true and correct copy of an e-mail exchange between

126

1   you, Dave Briggs and others on January the 30th,
2   2003?

3       A.      Let me read the document, please.
4               Yes.

5       Q.      In his e-mail to you on January 30 at
6   4:10 p.m., Dave Briggs wrote:  Mark, I have looked at
7   the Annex, as well, and the following are my comments
8   as to what should be added.  Number 1:  There is no
9   mention of the following:  Tangent furnace wall
10  tubes; tangent outer side wall tubes; the units are
11  only saturated (no superheater); the feed water
12  connection is in the lower drum; is the outer casing
13  -- is the outer side casing flat or ribbed?  That
14  the front and rear wall construction is that of
15  refractory (no front wall tubes at all).

16              Is his description of the draft annex that
17  you provided to him accurate as to what it does not
18  contain?

19              MR. SHEEAN:  Objection, lack of
20  foundation.

21      A.      No, David didn't have an understanding of
22  the agreement, so he's speculating in terms of what
23  should be added in terms of his opinion.

24      Q.      (By Mr. Gisleson) So what did you do once
25  you received this information from Dave Briggs?  Did

127

1    you do anything with it?

2        A.    I don't recall.

3        Q.    You then wrote in response:  "Thanks."  Why

4    didn't you write back to Mr. Briggs that he didn't

5    understand the intent of the license agreement or its

6    purpose?

7        A.    I chose just to thank him and take it under

8    advisement and move on.

9                (Plaintiff's Exhibit Number 13 was marked

10   for identification.)

11       Q.    (By Mr. Gisleson) I'm handing you what's

12   been marked -- I'm handing you what's been marked as

13   White Exhibit 13.  It's a document stamped IKE344

14   through IKE353.  Do you recognize the handwriting on

15   any of these pages?

16       A.    No, I do not.

17       Q.    It's not your handwriting?

18       A.    That's not my handwriting.

19       Q.    Looking at Page 23 of White Exhibit 13,

20   which is stamped IKE347 --

21       A.    I'm sorry, which page?

22       Q.    Page Number 23, which is stamped IKE347.

23              In connection with the preparation of the

24   annex, did you review this document, which is

25   described as Keystone "M" series standard with a plan

128

1   section?

2       A.    I may have, but I don't know where these

3   documents came from.  Since that's not my

4   handwriting, I can't be sure that I had reviewed this

5   specific document.

6       Q.    Did you ask anyone to obtain drawings for

7   you for use in the annex?

8       A.    Yes, I may have.

9       Q.    Do you know whether you, in fact, did so?

10      A.    I'm sure I did.  I mean, they're in the

11  annex.

12      Q.    To whom did you make that request?

13      A.    I don't recall.

14      Q.    Someone in engineering?

15      A.    It may have been one of my draftsmen.

16      Q.    Including Dave Briggs?

17      A.    No.  I had two proposal draftsmen.

18      Q.    Who were they?

19      A.    Tom Markowitz and Ron Zimmer.

20              MR. SHEEAN:  What's the second name?

21              THE WITNESS:  Ron Zimmer.

22          (Off-the-record discussion)

23      Q.    (By Mr. Gisleson) I'd like to show you

24  what's been marked as Plaintiff's Exhibit 20.  It's a

25  document stamped VE0786 to 795.  It was marked

129

1   yesterday during Shawn Brewer's deposition.  Ask you

2   to take a look at that and let me know when you're

3   finished.

4          A.    Okay.

5          Q.    Is this exhibit a true and correct copy of

6   an e-mail with attached annex that you sent to Shawn

7   Brewer on February 3rd, 2003?

8          A.    It would appear so.

9          Q.    Did you, in fact, revise the annex?

10         A.    From the information you provided me, it

11  would look like it had been revised to reflect some

12  of the changes in Exhibit 12, 13 and others.

13         Q.    Who made the decision to revise Annex.1?

14         A.    I don't recall.

15         Q.    Can you identify anyone other than you at

16  EPTI who made the decision to revise Annex.1 to the

17  license agreement?

18         A.    No.

19         Q.    Was this the first time that you sent to

20  VEO the drawings that are included at Page VEO790,

21  791 and 792?

22              MR. SHEEAN:  I'm sorry, can you read

23  that back, please.

24  (The record, as requested, was read by the reporter.)

25         A.    I don't recall.

130

1    Q.    (By Mr. Gisleson) You intentionally

2  included the drawings at these three pages in Annex

3  1, correct?

4    A.    It would appear so.

5    Q.    You certainly could have chosen not to

6  include the drawings if that is what you wished,

7  right?

8    A.    Possibly.

9    Q.    On Page 790, can you describe what the

10  purpose of this drawing is.

11              MR. SHEEAN:  I'm going to object to

12  the extent it calls for a legal conclusion.

13              MR. GISLESON:  I'll rephrase the

14  question.

15    Q.    (By Mr. Gisleson) What does the drawing on

16  Page VEO790 show?

17    A.    Is there something specific that you're

18  looking for?  It shows a lot of details.

19    Q.    Details of what?

20    A.    A cross-section of the boiler, an "M"

21  series boiler.

22    Q.    Is there any reference in this drawing to

23  welded wall or membrane technology?

24    A.    I don't see one.

25    Q.    Is there a reference to tangent tube

131

1    technology?

2        A.    It would appear so.

3        Q.    For both the furnace wall, as well as the

4    outer walls?

5        A.    Yes.

6        Q.    The front wall's refractory, correct?

7        A.    Yes.

8        Q.    The rear wall is tube and tile water

9    pooled, correct?

10       A.    That's correct.

11       Q.    The conversation that you claim to have had

12   with Shawn Brewer concerning welded wall construction

13   occurred sometime prior to February 3, 2003, correct?

14       A.    I believe so.

15       Q.    Was it EPTI's practice in January 2003 to

16   date drawings to show when they were created?

17       A.    Could you rephrase your question, please.

18       Q.    Did EPTI have a practice in January 2003 of

19   dating drawings that it created in order to show when

20   the drawing was created?

21            MR. SHEEAN:   Objection, lack of

22   foundation.

23       A.    I don't know what the standard was at that

24   time.

25       Q.    (By Mr. Gisleson) Turning to the next page,

132

1  VE0791, what is depicted on that page?

2              MR. SHEEAN:  I'm going to object to

3  the extent it calls for a legal conclusion.  You can

4  answer.

5      A.   It's the front wall of the -- would appear

6  to be an "M" series boiler.

7      Q.   (By Mr. Gisleson) The fact that the word

8  "refractory" is shown there after front wall, does

9  that show that the material for the front wall was to

10 be refractory?

11             MR. SHEEAN:  Objection, calls for a

12 legal conclusion.

13     A.   In this particular sketch, it would -- it

14 would infer that.

15     Q.   (By Mr. Gisleson) And then the next page,

16 what does that show?

17             MR. SHEEAN:  Same objection.

18     A.   Page 792?

19     Q.   (By Mr. Gisleson) Correct.

20     A.   It shows a tube and tile rear wall.

21     Q.   Do you have any understanding as to why

22 EPTI included those drawings in Annex.1?

23     A.   They were part of the original "M" series

24 boiler.

25     Q.   Now, you sent this e-mail with Annex.1 to

133

1    Shawn Brewer, correct?

2        A.   Yeah, that's what it states.

3        Q.   After -- on or after February 3, 2003, did

4    you receive a phone call from Shawn Brewer saying,

5    "Hey, Mark, we discussed welded wall design for the

6    watertube boiler.  You need to change Annex.1"?

7        A.   I may have.  I don't recall.

8        Q.   Certainly had you received such a call, you

9    would have revised Annex.1, correct?

10       A.   Not necessarily.

11       Q.   Did you receive a phone call from John

12   Viskup saying words to the affect of, hey, Mark the

13   boiler will include welded wall or membrane

14   technology.  You need to change Annex.1?

15       A.   I don't recall.

16       Q.   Was there any negotiation of Annex.1 by

17   VEO?

18       A.   I don't recall.

19       Q.   Can you identify any questions you received

20   from VEO concerning Annex.1?

21       A.   Not specifically.

22       Q.   Generally?

23       A.   No.

24       Q.   Did VEO accept Annex.1 as written?

25                   MR. SHEEAN:  Objection, asked and

134

1   answered.

2       A.    They -- "they" as in, excuse me, Victory

3   Energy, accepted the agreement with the understanding

4   no membrane wall was included in the agreement as

5   part of the technology that was transferred.

6       Q.    (By Mr. Gisleson) Can you identify any

7   change requested by VEO to this revision of Annex.1

8   that you sent on February 3, 2003?

9       A.    No.

10      Q.    You read each of these drawings before you

11  transmitted this version of Annex.1 to VEO, didn't

12  you?

13      A.    I would have --

14            MR. SHEEAN:   Objection, asked and

15  answered.

16      A.    I would have reviewed the drawings.

17      Q.    (By Mr. Gisleson) And you had enough

18  experience as of February 3, 2003, to determine

19  whether these drawings called for a membrane or

20  welded wall versus a tangent tube wall, correct?

21      A.    Yes.

22      Q.    Did you make a mistake in not changing them

23  to welded wall, a membrane wall instead of leaving it

24  as tangent tube?

25      A.    No.   The -- it was being handled through

135

1   the agreement in other areas.  As I previously

2   answered, it was handled through the transfer of

3   technology.

4               MR. SHEEAN:  John, are you done with

5   this exhibit?

6               MR. GISLESON:  Yes.

7               MR. SHEEAN:  Can we put it back with

8   yours so they don't get goofed up?

9               MR. GISLESON:  And what we'll do, if

10  you don't mind, is we will mark this -- also make a

11  copy at the break, but mark this as White Exhibit 14.

12              MR. SHEEAN:  That's fine.

13              MR. GISLESON:  And why don't you just

14  put a White Exhibit 14 on this one, too.  We'll make

15  a copy.

16              MR. SHEEAN:  That's fine.

17          (Plaintiff's Exhibit Number 15 was marked

18  for identification.)

19      Q.    (By Mr. Gisleson) I'd like to show you

20  what's been marked as White Exhibit 15.  It's a

21  document stamped VE01191 to 1201.  Is this a true and

22  correct copy of a letter with enclosure that you sent

23  to John Viskup on February 3, 2003, regarding Annex.1

24  to 3 of the license agreement?

25      A.    It would appear so.

136

1      Q.    You write:  "Dear John, enclosed please
2   find two sets of originals duly initialed by Mark
3   White of Annex.1, 2 and 3 of the EPTI license
4   agreement between our two companies.  Please initial
5   both originals, returning one to us and retaining one
6   for your file."

7          And then going through Annex.1 through 3,
8   did you, in fact, receive back from John Viskup
9   initialed pages from those annexes as shown by this
10  exhibit?

11     A.    As shown in this exhibit, it would appear
12  so.

13     Q.    What's your understanding as to -- well,
14  strike that.

15          Why did you have John Viskup initial each
16  of the pages in Annex.1, 2 and 3?

17     A.    Just as marked as receipt so he understood
18  that it was part of the agreement.

19     Q.    There's no doubt in your mind, is there,
20  that Annex.1 is a part of the license agreement?

21          MR. SHEEAN:  Objection, calls for a
22  legal conclusion.  You can answer.

23     A.    Yes, it's part of the agreement.

24     Q.    (By Mr. Gisleson) Do you agree that in
25  assessing whether VEO marketed or sold a boiler

137

1   outside the scope of the license agreement, it's
2   necessary to look at both the text of the license, as
3   well as at Annex.1?
4            MR. SHEEAN:  Objection to the extent
5   it calls for a legal conclusion.
6       A.   You didn't state the technical
7   information.  You also have to look at technical
8   information, as well, that was transferred.
9       Q.   (By Mr. Gisleson) Technical information
10  transferred from whom to whom?
11      A.   From Erie Power to Victory Energy.
12      Q.   Why is it necessary to look at that?
13      A.   Because it includes the membrane
14  construction.
15      Q.   Did you specifically authorize VEO after
16  the license agreement was executed to use membrane
17  wall technology that it received from EPTI?
18      A.   Membrane wall construction was part of the
19  agreement from the beginning, from the onset.  It was
20  discussed with, as I had mentioned, Shawn Brewer.  In
21  prior discussions, it was the intent of the agreement
22  to include it.  It was included through the technical
23  transferred information.
24           MR. GISLESON:  Move to strike as
25  nonresponsive.

138

1    Q.    (By Mr. Gisleson) After the license

2    agreement was executed, did you specifically

3    authorize VEO that it could utilize EPTI's membrane

4    wall technology and Keystone watertube boilers it was

5    selling?

6    A.    It was authorized by Erie Power Technology,

7    not specifically Mark White.

8    Q.    If not by you, then who?

9    A.    By anyone and everyone who sent information

10   on the first few units that were design engineered by

11   Erie Power as part of the license agreement, which

12   included front wall -- front and rear wall

13   construction, membrane side and furnace wall

14   construction.

15   Q.    Did you specifically instruct EPTI

16   personnel to send documents to VEO?

17   A.    I did not.

18   Q.    Not at any time?

19   A.    Which documents are you referring to?

20   Q.    Any documents.

21          MR. SHEEAN:  Objection, vague.

22   Q.    (By Mr. Gisleson) Any technical -- strike

23   that.

24          Did you at any time instruct anyone at EPTI

25   to transmit technical information in the form of

139

1   drawings and otherwise to VEO?

2       A.   I may have.

3       Q.   Did you place any limitation on others at

4   EPTI as to the technical information it was to

5   provide to VEO --

6               MR. SHEEAN:   Objection --

7       Q.   (By Mr. Gisleson) -- under the license

8   agreement?

9               MR. SHEEAN:   Objection, vague.

10      A.   I may have.   I don't recall.

11      Q.   (By Mr. Gisleson) Did you advise -- strike

12  that.

13          Did you advise EPTI personnel of any

14  protections they need to take to ensure the

15  confidentiality of the technical information being

16  provided to VEO?

17      A.   I don't recall.

18      Q.   At some point in time, there was an

19  addendum to the license agreement to include

20  superheat, correct?

21      A.   Yes.

22      Q.   Why?

23      A.   I believe Shawn Brewer had given me a call

24  -- I don't recall exactly the date and time -- from

25  Victory Energy requesting to pursue superheated units

140

1   within the range of products.

2       Q.   What was your response?

3       A.   I said we would take it under consideration

4   and that we'd get back to him.

5       Q.   How did you consider the request?

6       A.   I considered it a reasonable request.

7       Q.   Did you consult with anyone else at EPTI

8   before agreeing to this?

9       A.   Yes.

10      Q.   With whom?

11      A.   I believe Bob Gdaniec, Dan Levstek.  There

12  may have been others.

13      Q.   What did Gdaniec and Levstek tell you?

14      A.   I don't recall exactly, but we determined

15  to generate the annex and -- to proceed with it, to

16  generate an annex to the agreement, at which I

17  believe Bob Gdaniec had some involvement, and then

18  issue the annex for review, for Victory's review and

19  then move ahead next -- move ahead with the execution

20  of the annex.

21          (Plaintiff's Exhibit Number 16 was marked

22  for identification.)

23      Q.   (By Mr. Gisleson) I'd like to show you

24  what's been marked as White Exhibit 16.  It's a

25  document stamped IKE1093 to 1095.  Is this a true and

141

1    correct copy of the -- strike that.

2           Is this a true and correct copy of a

3    February 27, 2003, e-mail that you received from John

4    Viskup that encloses an executed copy of a license

5    agreement addendum dated February 27, 2003?

6        A.   It would appear so.

7        Q.   Under modifications, it says:  "Product

8    final steam outlet temperature shall be increased

9    from saturated steam temperature applications to

10   superheated applications up to and including a final

11   steam temperature of 750 degrees Fahrenheit.  Product

12   design pressure shall be increased from 399 psig up

13   to and including 1,200 psig (1,125 psig operating)."

14   Those are the modifications to which you agreed on

15   behalf of EPTI?

16       A.   Yes.

17       Q.   Under modification B concerning product

18   design pressure, does that -- strike that.

19           Does that increase in product design

20   pressure apply only with respect to superheated

21   boilers?

22       A.   No.

23       Q.   So that even if there is no superheated

24   application, the boiler can still exceed 399 psig?

25       A.   Yes.

142

1          Q.   Is there any reference, to your knowledge

2     -- well, strike that.

3               Who wrote License Agreement Addendum?

4          A.   I probably -- I don't recall.  But, to my

5     -- to the best of my knowledge, I would have drafted

6     the final version after I had received comments from

7     others.

8          Q.   Has VEO, to your knowledge, pursued any

9     projects that had a final steam temperature that

10    exceeds 750 degrees Fahrenheit?

11         A.   Repeat the question, please.

12         Q.   Has VEO, since you joined the company,

13    pursued a project that had a final steam temperature

14    above 750 degrees Fahrenheit?

15         A.   Not to my knowledge.

16         Q.   Is it correct that a boiler that requires a

17    final steam temperature of 750 degrees Fahrenheit is

18    of -- outside the scope of the license agreement?

19         A.   Yes.

20         Q.   For a boiler that required a final steam

21    temperature above 750 degrees Fahrenheit that's

22    outside of the license agreement, at that point, EPTI

23    or whoever the licensor is can pursue the project?

24         A.   I would have --

25               MR. SHEEAN:  Objection, calls for a

1    dated plate, if that's what you're referring to,

2    which is required by ASME Section 1.

3        Q.    The code dated plate shows that EPTI is the

4    manufacturer of the boiler?

5        A.    It shows that Victory Energy is the

6    manufacturer of the boiler, and it has stamped it off

7    with its code stamp.  And it has to provide this per

8    ASME Section 1.

9        Q.    Is there any reference to EPTI on the code

10   stamp?

11       A.    On that nameplate?  No.  It's not required

12   by ABMA -- or, excuse me, ASME.

13           (Plaintiff's Exhibit Number 18 was marked

14   for identification.)

15       Q.    (By Mr. Gisleson) I'd like to show you

16   what's been marked as White 18.  It's a document

17   stamped VEO893 to 894.  Have you seen this document

18   before?

19       A.    Yes, I have.

20       Q.    What does it show?

21       A.    It shows a -- it's a -- it's a drawing that

22   shows the Keystone nameplate if it had to be

23   manufactured, a cast.

24       Q.    Did VEO ever use this nameplate on any of

25   boilers that -- Keystone boilers that it sold?

146

1        A.    While I was working at Erie Power
2    Technologies, we purchased and supplied several of
3    these nameplate to Erie Power Technologies -- or,
4    excuse me, to Victory Energy.  Victory Energy did not
5    apply these to any of the units that were sold, to my
6    knowledge.
7        Q.    Did you ask why not?
8        A.    Yeah, I did.
9        Q.    What were you told?
10        A.    They said they just preferred not to put
11    them on the unit.
12        Q.    Pardon me?
13        A.    They preferred not to put them on the unit.
14        Q.    Did you object to that?
15        A.    No.  The license agreement allows for if
16    you display them -- display the mark, you have to
17    follow the conditions of the agreement.  If you do
18    not display the mark, there is no such provisions.
19        Q.    Looking back at White Exhibit 7, which is
20    the executed copy of the license agreement, on Page
21    VE01185 under Clause 15, trademarks, Paragraph A,
22    grant of license, it reads:  "For the duration of
23    this agreement, Licensee shall be permitted to use
24    the mark royalty free on the products manufactured by
25    Licensee.  The mark shall be affixed to a plate

147

1  appearing on each product supplied by Licensee upon
2  which there shall be an indication that the products
3  were supplied by Licensee under license from
4  Licensor."
5          Was it your understanding that under that
6  clause, VEO did not have an obligation to include a
7  reference to the licensor and to put the mark on a
8  plate appearing on each product?
9      A.    Let me look through the document for a
10 moment.   Repeat your question.
11     Q.    I forgot.
12          MR. GISLESON:   Could you read it
13 back.
14 (The record, as requested, was read by the reporter.)
15     A.    Well, according to the license agreement,
16 15-A, it would appear that it should have been put on
17 the -- on the product.
18     Q.    (By Mr. Gisleson) Does VEO currently take a
19 photograph of the boiler before it gets sent to the
20 customer?
21          MR. SHEEAN:   Objection, lack of
22 foundation.
23     A.    You know, I don't -- I don't know if we do
24 that on a -- on a standard basis to do that.
25     Q.    (By Mr. Gisleson) Is there any reference to

149

1    includes several -- several different issues.  The

2    mark doesn't include just the Keystone name.  The

3    mark talks about Erie Power Technologies, as well.

4    So could you be more specific?

5        Q.   (By Mr. Gisleson) To break it down, did any

6    of the boilers sold by VEO pursuant to the license

7    agreement contain on the exterior the word

8    "Keystone"?

9               MR. SHEEAN:  Objection, lack of

10   foundation.

11       A.   Without going to each unit individually and

12   reviewing them, I -- I can't be sure.

13       Q.   (By Mr. Gisleson) To your knowledge, were

14   there boilers sold by VEO while you've been general

15   manager of the company that failed to include a

16   reference to Keystone on the exterior of the boiler?

17       A.   Yes.

18       Q.   Were there boilers sold by VEO while you've

19   been general manager of the company that failed to

20   have on the exterior a reference to Erie Power

21   Technologies?

22       A.   Yes.

23       Q.   Wasn't part of the reason you entered the

24   license agreement on behalf of EPTI to publicize the

25   Keystone boiler?

1      A.    I didn't really think about that.  You

2  know, my issue was, you know, representing the

3  products and providing, you know, quotations that

4  were suitable.

5      Q.    Part of your goal in pursuing this license

6  agreement was to publicize the Keystone boiler,

7  correct?

8      A.    Yeah, and that -- but that could have been

9  done through the product announcements and, you know,

10  when they made a sale -- "they" as in Victory, made a

11  sale, you know, Erie could take credit, as well, for

12  the -- you know, the sale, as well.  So it did have

13  reference regardless of whether there was the name in

14  the proposal or on the boiler.  So there was a method

15  to take advantage of that through sales and

16  marketing.

17      Q.    Is it correct that you always expected VEO,

18  at least while you were employed with EPTI, to

19  identify the boiler as a Keystone boiler rather than

20  as a Victory boiler?

21              MR. SHEEAN:  Objection, asked and

22  answered.

23      A.    I would say yes.

24      Q.    (By Mr. Gisleson) Since you've joined VEO,

25  has it ever marketed for sale a Keystone boiler by

161

1        A.    I may have.

2        Q.    Did you ever become aware of your salesmen

3   submitting proposals that were outside the scope of

4   the license agreement?

5        A.    No, I'm not aware of it.

6        Q.    Did VEO ever sell a boiler to SNC-Lavalin

7   Constructors?

8        A.    No.

9        Q.    Have you heard of SNC-Lavalin Constructors?

10       A.    Yes.

11       Q.    What are they?

12       A.    Well, it depends.  They're --

13       Q.    Well, what is it?

14       A.    There's a -- SNC-Lavalin is a company up in

15   Canada, but they're also -- they have other offices.

16   There's subsidiary offices.  So, I mean, they're a

17   very large global company.  But I think their primary

18   offices are in Canada.

19       Q.    Have you heard of the Thorold,

20   T-H-O-R-O-L-D, Cogen Project?

21       A.    I don't recall.  I may have.

22       Q.    Has VEO sold any boilers to SNC-Lavalin

23   Constructors?

24       A.    No.

25       Q.    Indeck Keystone Energy became the licensor

162

1  for the Keystone technology in September of 2004,
2  correct?

3      A.   Would you please repeat that question.

4      Q.   Indeck Keystone Energy become the licensor
5  for the Keystone technology in September 2004?

6           MR. SHEEAN:   I'll object to the extent
7  it calls for a legal conclusion.

8      A.   I believe that to be correct.

9      Q.   (By Mr. Gisleson) At or shortly after the
10  time that Indeck Keystone Energy became the licensor,
11  you had correspondence by mail, as well as e-mail,
12  with Chris Petcos, the general manager of Indeck
13  Keystone Energy, in which he advised you that IKE
14  expected VEO to comply with the scope of the license
15  agreement, correct?

16     A.   I would have to see that correspondence,
17  but it sounds correct.

18     Q.   Neither Chris Petcos nor any other
19  representative of IKE ever authorized VEO to sell a
20  Keystone watertube boiler outside of the scope of the
21  license agreement, correct?

22     A.   That's correct.

23     Q.   Nor did Chris Petcos or any other
24  representative of IKE ever authorize VEO to submit
25  proposals for watertube boilers outside of the scope

163

1    of the license agreement, correct?

2         A.    That's -- I can't be sure.  I don't know.

3    I don't have all the dialogue between all the

4    parties, but that would be my understanding.

5              (Plaintiff's Exhibit Number 20 was marked

6    for identification.)

7              MR. GISLESON:  What number is this?

8              THE WITNESS:  Twenty.

9         Q.    (By Mr. Gisleson) I'd like to show you

10   what's been marked as White Exhibit 20.  It's a

11   multipage document.  Looking at the first page, do

12   you see how this includes an e-mail from Lee Cole to

13   John Davies, who appears to be with Christian Power

14   Equipment?

15        A.    I don't know John Davies, so, I mean, I'll

16   take your word for it.

17        Q.    Well, take that back.  I'm looking at the

18   wrong --

19        A.    I think that's something thermal.

20        Q.    You're right.

21        A.    I don't know who that is.

22        Q.    In November 2004, was Lee Cole an employee

23   of VEO?

24        A.    Yes.

25        Q.    Did he have a sales function?

164

1        A.    Yeah, he was an -- I believe he was a sales
2    engineer at that time.
3        Q.    Did his responsibilities include the sale
4    of Keystone watertube boilers?
5        A.    Yes.
6        Q.    Lee Cole writes:  "Mr. Davies, please see
7    the attached proposal for the Thorold Cogen Project.
8    If you have any questions or need any additional
9    information, please contact myself or our
10   representative in your area, Christian Power
11   Equipment.  Regards, Lee Cole."
12           Turning to the next page, do you recognize
13   that as the front page of a proposal from Victory for
14   SNC-Lavalin Constructors, Inc., Thorold Cogen Project
15   for a 200,000 pph watertube steam boiler?
16       A.    Yes.
17       Q.    Were you aware of VEO submitting proposals
18   for watertube boiler above 150,000 while you've been
19   general manager?
20       A.    No.
21       Q.    Does this proposal follow the format of
22   proposals used by VEO with respect to Keystone
23   watertube boilers?
24       A.    It may.  I would have to compare it with
25   others.

165

1      Q.   Based on your review, does it appear to

2  follow the format generally used for Keystone

3  proposals?

4      A.   Generally.

5      Q.   Turning to the third page of the exhibit,

6  which is Summary Proposal and Terms, Section 1.0,

7  equipment description and pricing, it says:  "Victory

8  Energy Operations is pleased to offer two Victory

9  Energy 2,000 pph steam boilers for the Thorold Cogen

10  Project in Thorold, Ontario.  A detailed description

11  of the boiler and accessories is provided in the

12  following sections.  The boiler systems will be

13  complete and includes the following:"  Number 1 is:

14  "Two Victory Energy Model 26M, 200,000 pph packaged

15  watertube steam boilers."  VEO did not license a 26M

16  Keystone from EPTI, did it?

17      A.   No.

18      Q.   If you go to the page for scope of supply,

19  Section 2.0, the first line is a reference to Victory

20  Energy Model 26M, "O" type steam boilers.  Have you

21  seen other proposals where Victory refers to a boiler

22  as a Victory Energy boiler without reference to

23  Keystone?

24      A.   I don't think so.  I don't know.

25      Q.   Based on your understanding as to the

166

1    technical information provided by EPTI to VEO, could
2    it scale up the Keystone package watertube boiler for
3    which it has rights under the license agreement to
4    include a 200,000 pound per hour capacity?
5         A.    No.
6         Q.    If not, did you have any understanding then
7    as to how Lee Cole could submit a proposal for a
8    200,000 pound per hour watertube boiler?
9         A.    No.
10        Q.    Because there was no other watertube
11   technology, other than the Keystone technology,
12   correct?
13        A.    That's correct.
14        Q.    If you go to the page for Section 3.0, "O"
15   type boiler specifications, it reads:   "The Victory
16   Energy design offers the least amount of furnace
17   refractory compared to other designs.   The tube and
18   membrane seal welded front and rear walls virtually
19   eliminates all refractory in the furnace, other than
20   the localized seals and refractory coverage of the
21   water cooled burner throats.   This design greatly
22   reduces maintenance costs and offers increased unit
23   availability."   And there are some more descriptions
24   there.   The reference -- well, strike that.
25             Have you seen that language before?

167

1      A.    No.

2      Q.    Would it surprise you --

3      A.    It would -- the reference to Victory Energy

4    design, no, I have not seen that language.

5      Q.    Have you seen that language to describe

6    Keystone boilers?

7      A.    I believe so.

8      Q.    In fact, it's identical to the language for

9    Keystone boilers that Victory submits in its

10   proposals for Keystone boilers, right?

11     A.    I can't be sure.

12     Q.    Looking at the -- strike that.

13           Looking at the diagram on that page, do you

14   recognize that as a Keystone diagram or drawing?

15     A.    Figure 3?

16     Q.    Yes.

17     A.    Yes.

18     Q.    And do you see how it appears that someone

19   whited out the reference to Keystone at the top of

20   the drawing?

21           MR. SHEEAN:  Objection, calls for

22   speculation.

23     A.    I can't be sure.

24     Q.    (By Mr. Gisleson) And then turning to the

25   page following Section 3.5, there are four drawings

168

1   on that page.  Do you recognize each of those as

2   being Keystone drawings?

3       A.   Oh, I'm sorry.  Yes.

4       Q.   Can you explain why Lee Cole was utilizing

5   Keystone drawings for a proposal for a 200,000 pound

6   per hour boiler that is outside the scope of the

7   license agreement?

8       A.   No.

9       Q.   Turning to the next page, Section 3.8,

10  steam purification, it reads:  "The upper (steam)

11  drum includes steam purifiers.  The steam purifiers

12  include chevrons and vortexes."  Did you ever receive

13  authorization from EPTI after you joined VEO to

14  license and otherwise utilize steam purifiers,

15  including chevrons and vortexes, for watertube

16  boilers outside the scope of the license agreement?

17      A.   Not outside the scope of the license

18  agreement.

19      Q.   Have you heard of the Escalon project?

20      A.   No.

21      Q.   Did Shawn Brewer have authority to submit

22  proposals for VEO projects?

23      A.   Yes.

24      Q.   Did you ever advise Shawn Brewer not to

25  submit proposals or sell watertube boilers that are

169

1   outside of the scope of the license agreement?

2       A.   Yes.

3       Q.   Did you tell him he can't sell boilers

4   above 150,000 pounds per hour?

5       A.   Yes.

6       Q.   I'd like to show you what we've marked as

7   Exhibit 17, and we'll mark it here as Exhibit White

8   21, at Mr. Brewer's deposition yesterday.  If you

9   would take a look at that.  Let me know when you're

10  done, please.

11           Shawn Brewer was a salesman for VEO in

12  March 2004, correct?

13      A.   Yes, I believe that to be true.

14      Q.   Do you see on the second page of the cover

15  sheet for Escalon Packers Keystone watertube steam

16  boiler?

17      A.   Yes.

18      Q.   And turning to the third page, do you see

19  that Mr. Brewer has submitted a proposal for a

20  Keystone Model 23M, 170,000 pound per hour package

21  boiler?

22      A.   Yes.

23      Q.   Such a boiler is outside the scope of the

24  license agreement, correct?

25      A.   Yes.

1      Q.   Can you explain why Mr. Brewer submitted a
2  proposal for a watertube boiler outside the scope of
3  the license agreement?
4             MR. SHEEAN:   Objection, calls for
5  speculation, lack of foundation.
6      A.   No.
7      Q.   (By Mr. Gisleson) Does VEO in any way
8  maintain copies of the proposals that its salesmen
9  send to prospects and customers?
10      A.   Generally, yes.
11      Q.   How?
12      A.   They would be either on the sales
13  engineer's hard drive or in the mainframe of the
14  computer.
15      Q.   Is there a central filing system that VEO
16  uses so it can keep track of what proposals are being
17  disseminated?
18      A.   I believe so.
19      Q.   Who maintains hard copies of the proposals
20  that are distributed?
21      A.   It's up to each sales engineer to make sure
22  the file is maintained.
23      Q.   Is there a master file at VEO so it can
24  keep track of what its salesmen are doing?
25      A.   It's -- yes and no.  I mean, there is a

1   master file.  But as I said prior, it's up to each
2   sales engineer to keep the master file updated.  If
3   they do not, it's only as good as, you know, the
4   people that are keeping it updated.

5       Q.   Does anyone at VEO have responsibility for
6   going back to review proposals to make sure that VEO
7   is complying with its contracts, including its
8   contract for the Keystone technology?

9       A.   Before any sale is made, I will go through
10  the boiler model and to make sure that it does comply
11  with the license agreement.  Clearly these two were
12  -- proposals were not sold because I would never
13  have let that happen.

14      Q.   Can you explain why it was that these two
15  proposals that are outside the scope of the license
16  agreement weren't produced in discovery?

17              MR. SHEEAN:  Objection, lack of
18  foundation.

19      A.   No, other than I know Shawn Brewer had had
20  computer problems.  He had the same computer I had,
21  so at times we had -- we had documents that were just
22  destroyed.  There was nothing we could do about it.
23  As far as Lee Cole, no, I don't -- I don't know why.

24              Were these documents produced by Christian
25  Power?

 1      Q.   (By Mr. Gisleson)  Correct.

 2      A.   Well, it would have been simple.  If they

 3  were returning them under the provisions of the

 4  representation agreement, we could have provided

 5  these to you even if they were destroyed within --

 6  you know, inadvertently destroyed within the

 7  company.  And without pricing information --

 8               MR. SHEEAN:   There's no question

 9  pending, Mark.

10      Q.   (By Mr. Gisleson)  Who's Bill Crutchfield?

11      A.   Bill worked for Victory Energy as a sales

12  engineer.

13      Q.   Did he work for VEO as a sales engineer in

14  December 2004?

15      A.   I believe so.

16      Q.   Was he involved in sending out proposals

17  for Keystone watertube boilers?

18      A.   He may have been.

19      Q.   Who did Bill Crutchfield, Lee Cole and

20  Shawn Brewer report to?

21      A.   They report to John, John Viskup and

22  myself.

23      Q.   Is it dual reporting?  You're each

24  accountable for those salesmen?

25      A.   There's some overlap there.

1    Q.    Did you ever instruct the salesmen that
2    they must always refer to the Keystone boiler as a
3    Keystone in their sales proposals?
4    A.    I think that was discussed in sales
5    meetings.
6    Q.    On multiple indications?
7    A.    I can't say on multiple indications, but I
8    know it was discussed.
9    Q.    And the instruction was to always use the
10   Keystone name?
11   A.    You'd refer to it as a Keystone boiler.
12   Q.    And you knew that because when you were
13   involved with the license agreement, you wanted to
14   make sure Keystone got publicized and got the benefit
15   of the Keystone being back on the market with more
16   fanfare and marketing, right?
17             MR. SHEEAN:  Objection,
18   mischaracterizes his prior testimony.
19   A.    There was value in the Keystone name.
20   Q.    (By Mr. Gisleson) And you wanted it
21   publicized as much as possible, as least while you
22   were with EPTI, right?
23             MR. SHEEAN:  Objection, asked and
24   answered and mischaracterizes his prior testimony.
25   A.    While I was with EPI [sic], we wanted to

174

1    take the benefit of the marketing -- marketing side.

2            (Plaintiff's Exhibit Number 22 was marked

3    for identification.)

4        Q.    (By Mr. Gisleson) I'd like to show you

5    what's been marked as White Exhibit 22.  See on the

6    first page of this exhibit is a December 23rd, 2004,

7    e-mail from Bill Crutchfield to Alan C. on the

8    subject of ACCO engineered systems?

9        A.    Yes.

10       Q.    He writes:  "Alan, attached is our proposal

11   for the Central Valley, CA, project and our terms and

12   conditions of sale.  Please feel free to contact me

13   if you have any questions."  In December of 2004, was

14   Christian Power Equipment a sales representative for

15   VEO?

16       A.    I believe so.

17       Q.    Is Christian Power Equipment still a sales

18   representative?

19       A.    No.

20       Q.    Why not?

21       A.    They elected to terminate the agreement.

22       Q.    Did they tell you why?

23       A.    I don't recall.  Oh, well, yeah.  They were

24   given the option to either continue with Victory or

25   continue with IKE.  And my understanding was Indeck

1  Keystone Energy made the demand of them to one or the
2  other, but not both.

3      Q.   Was it reasonable, in your view, that IKE
4  require Christian to either work for it or work for
5  VEO, but that it couldn't work for both?

6      A.   No.

7      Q.   Do you have any sales representatives who
8  work both for Victory and one of Victory's
9  competitors?

10             MR. SHEEAN:   Objection.

11     A.   No.  It goes against -- if they're doing
12  it, they're doing it, you know, against the terms of
13  the agreement, because specifically in our agreement
14  that Victory Energy, they cannot compete with our
15  products.

16     Q.   (By Mr. Gisleson) Is it also correct that
17  under the sales representative agreements in force at
18  VEO that the sales representatives can terminate
19  those agreements for any reason they want so long as
20  they give appropriate notice?

21     A.   They can terminate if they desire.

22     Q.   Similarly, VEO can terminate the sales
23  representatives if it chooses to do so for any reason
24  it wants so long as it gives appropriate notice,
25  right?

1      A.    That's correct.

2      Q.    Do you know how the commissions that

3   Christian Power received from IKE compare to the

4   commissions that it received from VEO?

5      A.    No.

6      Q.    Would it make sense to you -- strike that.

7            Is it reasonable to you that a sales

8   representative would prefer to work for a

9   manufacturer for whom it can earn more commissions

10  rather than less commissions?

11               MR. SHEEAN:   Objection, calls for

12  speculation, incomplete hypothetical, lack of

13  foundation.

14     A.    The -- the products weren't competing with

15  each other.  IKE doesn't have products that competes

16  with Victory's products in terms of the Keystone

17  because we were the licensee.  Therefore, they had

18  more opportunity to make additional commission money

19  in addition to what they had for IKE by representing

20  both companies.  To me it would make sense to

21  represent both companies, not one or the other.

22     Q.    (By Mr. Gisleson) Did Christian Power go to

23  work for IKE or for a different Indeck entity?

24     A.    I don't know.

25     Q.    Turning to the fourth page, a cover sheet

177

1   for ACCO Engineered Systems for a 60,000 pound per

2   hour watertube steam boiler dated December 23rd,

3   2004?

4       A.   Yes.

5       Q.   Then turning to the next page, under

6   summary proposal and terms, that's a standard format

7   for a VEO proposal, correct?

8       A.   There is no standard format.  There is a --

9   maybe a typical format that might be used.

10      Q.   Is this the typical format for proposals?

11      A.   Without looking at other proposals, I

12  couldn't be sure.

13      Q.   Looking under Section 1.1, equipment

14  description and pricings, it reads:  "Victory Energy

15  is pleased to offer a 60,000 pph "O" type watertube

16  steam boiler for the ACCO Engineered Systems project

17  in Central Valley, California.  A detailed

18  description of the boiler and trim is provided in the

19  following sections.  The boiler will be complete and

20  includes the following."  Number 1 identifies:  "One

21  Victory Energy Operations, LLC, Model 14M, 60,000 pph

22  packaged watertube steam boiler."  Did VEO maintain

23  its own line of boilers separate from Keystone

24  boilers?

25      A.   No, that's referring to a Keystone.

178

1        Q.   Do you have any understanding as to why

2   there's no reference to Keystone?

3        A.   No.

4        Q.   Turning to Section 3.0, under boiler

5   specifications, general, do you have any

6   understanding as to why there's no reference to this

7   being a Keystone design?

8        A.   No.

9        Q.   In looking through this proposal, do you

10  see a reference anywhere to Keystone?

11       A.   Without reading the entire document, I

12  can't be sure.  But on the -- on a cursory review, I

13  would say no.

14                 MR. GISLESON:  Let's take a break.

15                    (Break was taken)

16            (Plaintiff's Exhibit Number 23 was marked

17  for identification.)

18       Q.   (By Mr. Gisleson) I'd like to show you

19  what's been marked as White Exhibit 23.  It's a

20  two-page document stamped IKE342 to 343.  If you'll

21  take a look at that and let me know when you're

22  finished, please.

23       A.   Okay.

24       Q.   This is an e-mail exchange from January 21

25  and 22 between you and Bob Gdaniec, correct?