1   Technology was involved.  Steve Bernatowicz was

2   involved in the thermal design of the unit.  There

3   were changes, if I recall, in the fact that the unit

4   was -- included a membrane wall, which I'd talked

5   about previously was part of the license agreement.

6   And so, therefore, the membrane wall in front and

7   rear would have to have been changed, and those

8   drawings would be changed by Erie Power under the

9   guidance of EPTI.

10      Q.   You mean changed by Victory under the

11  guidance of EPTI?

12      A.   I'm sorry, yes, by Victory under the

13  guidance of EPTI, correct.

14      Q.   Did that, in fact, occur, that Victory

15  modified the drawings under the guidance of EPTI?

16      A.   I believe so.  I don't recall entirely.  I

17  believe that was the case.

18      Q.   Bob Gdaniec then writes back to you:

19  "Mark, be careful on this one for free.  Dan and I

20  spoke on it today, and he believes that if this is

21  outside of the license agreement (which it is), then

22  we better get paid for it.  I think you need to get

23  together with Dan and Stephen and Simon and resolve

24  this matter pretty quickly.  From what I understand,

25  this is way out of the license agreement, welded

1   walls and higher design pressure.

2            At this point, until Dan gives the okay, we

3   are not going to support this one for free.  Bob."

4   Is that correct?

5        A.    That's what he wrote, yes.

6        Q.    And then you write in response:  "Bob,

7   thank you for your e-mail message.  The welded wall

8   design will be handled by Victory and they will take

9   the responsibility and the liability of the change."

10  What do you mean by Victory taking responsibility and

11  liability of the change?

12       A.    In terms of pulling in the welded wall in

13  the membrane, that Victory would be responsible for

14  changing the drawings, doing the manufacturing and so

15  forth.  And if there's liability that was associated

16  with that, they would be -- as in Victory, would be

17  liable for those changes.

18       Q.    You then say:  "We will not be required to

19  make such changes.  In regard to the design pressure,

20  the operating pressure of the boiler outlet is 110

21  psig.  I am not sure where you are getting a pressure

22  outside the "M" series.  In general, we need to be

23  practical about the agreement.  We need to assist

24  Victory in a positive way to ensure sales are

25  generated and a diversified revenue stream is created

1   for EPTI."  Did I read that correctly?

2       A.   Yes.

3       Q.   So you didn't tell Bob Gdaniec you're

4   wrong, welded walls are within the scope of the

5   license agreement.  You simply said we need to be

6   practical about the agreement, correct?

7                MR. SHEEAN:  Objection,

8   mischaracterizes the document.  You can answer.

9       A.   No.  Bob was wrong.  Bob's interpretation

10  of the agreement was wrong.  Erie designed and

11  engineered this unit and included welded front and

12  rear walls, as they did on the prior job, which was

13  for Broin Corporation, three units, membrane front

14  and rear, membrane inner, membrane outer.  There was

15  no confusion within the corporation.

16      Q.   (By Mr. Gisleson) You did not, in

17  responding to Mr. Gdaniec, advise him that he was

18  wrong in describing welded walls as being outside of

19  the license agreement, did you?

20               MR. SHEEAN:  Objection,

21  mischaracterizes the document and it's been asked and

22  answered.  You can answer it again.

23      A.   The welded wall construction was included

24  prior to the license.  There are times internally to

25  a corporation that you try to be politically

1    correct.  What I was trying to do was be politically

2    correct in getting Bob to understand that this

3    agreement did include this equipment.  And if you

4    wanted to argue and fight about it, you could take it

5    to Stephen Kang, you could take it to others in the

6    superiors, which he did.

7        Q.   (By Mr. Gisleson) This e-mail exchange

8    occurred before you finalized Annex.1 of the license

9    agreement, correct?

10       A.   What was the date of the annex agreement

11   that was executed?

12       Q.   February the 3rd.

13       A.   Then it would have -- yes, then it would

14   have -- exchange would have occurred then.

15           (Plaintiff's Exhibit Number 24 was marked

16   for identification.)

17       Q.   (By Mr. Gisleson) I'd like to show you

18   White Exhibit 24, which is a document stamped

19   IKE273.  Do you recognize this as an e-mail exchange

20   in which you participated on February 3, 2003?

21       A.   Yes.

22       Q.   The lower message from Dave Briggs to you,

23   copied to Dan Levstek and Bob Gdaniec, subject

24   license agreement response reads:  "Mark, the

25   agreement is for the saturated standard 8M through

1  22M refractory wall design Keystone package
2  boilers."  Did you thereafter write back to Dave
3  Briggs and tell him he's wrong in his interpretation
4  of the license agreement?

5      A.    Shawn Brewer had asked what would change in
6  terms of the "M" series Keystone line if -- with a
7  membrane wall, which, again, was part of the license
8  agreement.  I was referring back to Shawn:  Ask Dave
9  Briggs for some assistance to see -- Dave with these
10  drawings that were provided to Victory Energy, what
11  would change?  That information was then transmitted
12  back.

13      Q.    Did you write back to Dave Briggs to advise
14  him that he's wrong as his interpretation of the
15  license agreement as being the saturated standard 8M
16  through 22M refractory wall design Keystone package
17  boilers?

18      A.    I don't recall, but I wasn't Dave's
19  supervisor.

20      Q.    You were being politically correct again?
21      A.    I think it was up to David's supervisor to
22  inform him and, also, Bob Gdaniec to be informed by
23  Stephen Kang and Dan Levstek of the intention, so --
24            (Plaintiff's Exhibit Number 25 was marked
25  for identification.)

1      Q.    (By Mr. Gisleson) I'd like to show you

2    what's been marked as White Exhibit 25.  Do you

3    recognize this as a true and correct copy of an

4    e-mail that you sent to Shawn Brewer on February 10,

5    2003, on the subject of Atofina, utilization of the

6    Heinz boiler?

7      A.    Yes.

8      Q.    You write:  "Shawn, as you are aware, at

9    present, the Atofina boiler is sized as a 14M special

10   (with water cooled walls)."  What did you mean by 14M

11   special?

12     A.    Well, 14M Keystone that would -- the

13   drawings that were provided to Victory included a

14   different wall configuration.  This was my attempt to

15   try to just -- to show they were different, that they

16   show that the water cooled walls included in this as

17   part of the license agreement would make some

18   change.  It would be an alteration.  There is no 14M

19   special.  It's just my interpretation.

20     Q.    So what that means is that it's not a

21   standard model?

22             MR. SHEEAN:  Objection to the extent

23   it calls for a legal conclusion.

24     A.    When you say what's not a standard model?

25     Q.    (By Mr. Gisleson) In referring to a 14M

1    another document for which I couldn't find the Bates

2    stamped copy in my files, but we have produced a copy

3    of this to VEO.

4              MR. SHEEAN:  Based on those grounds,

5    I'm going to object to the use of this document.

6         Q.   (By Mr. Gisleson) Do you see how this is an

7    e-mail exchange in which you're involved from

8    February 19, 2003, on the subject of list of

9    remaining marked up drawings for Victory Energy

10   license agreement?

11        A.   Yes.

12        Q.   The lower e-mail from Dave Briggs to you

13   provides:  "Mark, the following is a list of the

14   remaining marked up drawings that are to support the

15   license agreement with Victory Energy.  I have made

16   you two prints each for your distribution."

17             And then Dan Levstek, the director of

18   engineering at EPTI, writes to you and says:  "Mark,

19   as these drawings are outside of the basic license

20   agreement, we should put a disclaimer in the

21   transmittal to Victory that they are for use on this

22   specific project only."

23             Did you follow his recommendation?

24        A.   I don't recall.

25        Q.   Did you write back to him to say, hey, Dan,

189

1  all these drawings are within the scope of the basic

2  license agreement?

3      A.   I don't recall.

4      Q.   Was VEO disclosing to you the designs of

5  all of the proposed Keystone boilers that it was

6  seeking to sell?

7      A.   He's already asked --

8              MR. GISLESON:  Could you read that

9  back.

10  (The record, as requested, was read by the reporter.)

11             MR. SHEEAN:  Objection, vague.

12     A.   Please repeat the question.

13             MR. GISLESON:  Would you read it back.

14  (The record, as requested, was read by the reporter.)

15             MR. SHEEAN:  Same objection.

16     Q.   (By Mr. Gisleson) This is while you were

17  working with EPTI.

18     A.   I understand that.  I don't recall.

19             (Plaintiff's Exhibit Number 27 was marked

20  for identification.)

21     Q.   (By Mr. Gisleson) I'd like to show you

22  what's been marked -- it's another where I don't have

23  the Bates number handle on it.

24             MR. SHEEAN:  Same objection as to

25  use.

200

1    A.    I don't know.

2    Q.    At some point, VEO was interested in

3 acquiring the Keystone technology from EPTI, correct?

4    A.    Yes.

5    Q.    When did those discussions begin?

6    A.    I don't -- I don't recall.

7    Q.    Approximately?

8    A.    I don't recall.

9    Q.    When did you first have a conversation with

10 John Viskup about his interest in acquiring the

11 Keystone technology?

12    A.    While I worked with Victory Energy?   I

13 don't recall.  If you can show me a document, that

14 would refresh my memory.

15    Q.    Did you have any conversations with John

16 Viskup prior to your joining VEO in which he

17 expressed an interest in acquiring the Keystone

18 technology?

19    A.    No.

20            MR. SHEEAN:   I'm going to object to

21 this entire line of questions as vague with respect

22 to the term "Keystone technology".

23    Q.    (By Mr. Gisleson) Is it your understanding

24 that Victory wanted to acquire ownership over the

25 right to design and manufacture the "M" series

201

1    Keystone standard package watertube boiler?

2        A.    From Erie Power Technology?

3        Q.    Correct.

4        A.    While I was employed at Victory Energy?

5    Yes, we pursued that with Stephen Kang, Bob Gdaniec,

6    Dan Levstek -- I don't think it was Dan Levstek.

7        Q.    Over what period of time did those

8    discussions occur?

9        A.    I don't recall.

10       Q.    Can you estimate it in terms of weeks?

11              MR. SHEEAN:   Objection, calls for

12   speculation.

13       A.    No.

14       Q.    (By Mr. Gisleson) Were you personally

15   involved in those discussions?

16       A.    Yes.

17       Q.    So do you have personal knowledge as to how

18   the discussions progressed?

19       A.    Yeah.

20       Q.    Who else from Victory was involved in those

21   discussions, if anyone?

22       A.    John Viskup.

23       Q.    Just the two of you?

24       A.    I believe so.

25       Q.    Who from EPTI was involved in those

202

1  discussions?

2      A.   Bob Gdaniec, Stephen Kang, and they had a

3  consultant -- or an employee at the time.  I believe

4  he was a consultant, George -- I don't recall his

5  last name.

6      Q.   What was it that Victory wanted to acquire,

7  in your own words?

8      A.   We wanted to acquire at the time the

9  Keystone technology, the "O" type series up to

10 basically where the license covered, around the

11 150,000 pound power range or somewhere thereabouts.

12 You know, the discussions were somewhat fluid trying

13 to understand what it was Erie was wanting to sell,

14 what it was we would acquire.

15     Q.   Did VEO also want to acquire the Keystone

16 name?

17     A.   I believe so.

18     Q.   Were drafts of a proposed acquisition

19 agreement exchanged?

20     A.   Yes.

21     Q.   Was an agreement reached?

22     A.   No.

23     Q.   What's your understanding as to why an

24 agreement was not reached?

25     A.   Well, I think initially we came fairly

209

1   7.

2       A.   Okay.

3       Q.   (By Mr. Gisleson) Had VEO offered to pay

4   EPTI $250,000 to purchase the Keystone technology,

5   including the use of the name Keystone?

6       A.   I don't recall.

7       Q.   Was there a specific purchase price that

8   had been advanced by VEO?

9       A.   No.

10           (Plaintiff's Exhibit Number 30 was marked

11   for identification.)

12      Q.   (By Mr. Gisleson) I'd like to show you

13   what's been marked as White Exhibit 29 [sic].  It's a

14   document stamped V120 through V124.  Do you recognize

15   this as an e-mail with attachment in which you are

16   responding to the March 26, 2004, letter of EPTI,

17   Mr. Gdaniec, advising of concerns of VEO's license

18   agreement performance?

19      A.   Yes.

20      Q.   Now, in the first numbered paragraph of

21   Mr. Gdaniec's March 26th letter, he writes that:  VEO

22   currently licenses only the "M" series product line,

23   which has a very specific geometry and

24   characteristics.

25           MR. SHEEAN:  John, can you hold on

1  till we get to that page?

2              MR. GISLESON:  Sure.

3       Q.    (By Mr. Gisleson) In review of some of the

4  VEO recent projects and proposals, it appears that

5  the majority of projects that VEO is pursuing or has

6  completed have been outside the definition of the

7  license agreement.  Of particular concern most

8  recently are the Oxy and Dallas/Ft. Worth airport

9  projects, which are well outside the bounds of the

10  products defined in the agreement.  VEO will need to

11  redirect their attention on the sales/marketing and

12  execution of the products that are defined in the

13  license agreement.  Annex.1 of the current agreement

14  provides a clear definition of the "M" series design

15  with product size, dimensional data from different

16  size ranges, typical cross-section of the boiler and

17  overall boiler construction, which includes

18  refractory front and rear walls, tangent furnace and

19  outer wall tubes and pressure casing design.  Do you

20  see that?

21       A.    Uh-huh.

22       Q.    Yes?

23       A.    Yes.

24       Q.    And as to his description of Annex.1,

25  that's literally correct, right?

211

1       A.    That's your interpretation.

2       Q.    As to what's contained within Annex.1, can

3   you identify any inaccuracies in how Mr. Gdaniec

4   described Annex.1?

5       A.    Well, in Annex.1, I think it -- as -- what

6   I said before and this morning, the -- it wasn't the

7   intent of the agreement to limit the geometry, as is

8   stated with Annex.1.  If you want to refer

9   specifically and only to Annex.1 and not to the

10  technical information, that's your -- that's to your

11  choosing, but I disagree.

12      Q.    You write in response:  The agreement does

13  provide a specific geometry and characteristics.

14  When you're referring there to the agreement, are you

15  referring to the annex?

16      A.    Referring to the annex.

17      Q.    The agreement does provide specific

18  geometry and characteristics, but also allows for

19  improvements.  Refer to Clause 13.  As such, VEO has

20  made improvements which are necessary to

21  offer/provide a Keystone boiler that is technically

22  compliant with our customers' requirements.  It is in

23  line with that of our competitor's offerings and as

24  we deem necessary to enhance our overall success.  Is

25  that right?

212

1      A.    That's what I wrote.

2      Q.    This is the very first time you've ever

3   advised EPTI in writing that the membrane wall and

4   other modifications that VEO was making were

5   improvements under the license agreement, correct?

6      A.    Yes.   But as I stated this morning, there

7   are no such improvements.   In my haste to get this

8   letter out, I failed to look at the technical

9   information, which clearly transferred membrane wall

10  technology.   So this is an inaccurate statement that

11  I made.

12     Q.    You then write:   "The Oxyvinyls project

13  includes two 15M series Keystone boilers, each of

14  which include membrane furnace and outer walls, water

15  cooled front and rear end, an upper drum size from 60

16  ID.   These features are outside the geometry and

17  characteristics of the license.   They are clearly

18  improvements."   Was that an inaccurate statement, as

19  well?

20     A.    Outside of the 60-inch drum, yes, they were

21  inaccurate statements by me.

22     Q.    Whose idea was it at VEO to describe those

23  changes to the boilers as being improvements?

24     A.    I just didn't look at the technical

25  information.   I didn't do my homework.   I should have

213

1    looked at all of the information before I responded
2    and, as a result, there was inaccuracies in the
3    letter.

4        Q.   Were you the one who decided to try and fit
5    the changes to the Keystones within the improvements
6    definition of the license agreement?

7                MR. SHEEAN:   Objection to use of the
8    term "fit".  Mischaracterizes prior testimony.

9        A.   No, there was no such trying to fit
10   anything, as you referred it to.

11       Q.   (By Mr. Gisleson) Did you and John Viskup
12   sit down and decide how to respond to the concerns
13   raised in Paragraph 1?

14       A.   No.  I think I generally wrote -- I wrote
15   this -- this agreement.  And, as I said, I wrote it
16   in haste and I didn't review all of the information,
17   the technical information that was transferred.  And,
18   you know, in hindsight, I should have.

19       Q.   So it's clear, in your view, the use of
20   membrane furnace and outer walls, as well as a water
21   cooled front and rear, are not improvements under the
22   agreement, correct?

23       A.   They're not improvements.

24       Q.   Next paragraph says:  "The Dallas/Ft. Worth
25   project includes a single 15 "M" series Keystone

224

1    should not have.

2        Q.    In Paragraph 4, you state that:  "To date

3    no changes have been made without EPTI's knowledge."

4    Is that an accurate statement?

5        A.    Yes, I believe that to be an accurate

6    statement.

7        Q.    And you're referring to changes to the

8    design of the standard Keystone package watertube

9    boiler?

10        A.    I'm referring to changes outside the

11    boundaries of the agreement.

12        Q.    And when you say that -- strike that.

13            When you say that the changes were made

14    with EPTI's knowledge, did you believe that EPTI

15    expressly gave its consent to those changes being

16    made?

17        A.    Yes, I do.

18        Q.    Turning to the next page under 4-B,

19    Mr. Gdaniec wrote:  "VEO is entitled to use the marks

20    in both literature and on the product.  However, it

21    is important that reference be made in all instances

22    to the relationship to EPTI.  In reviewing the

23    documents/correspondence to date, it was noted that

24    we have not seen the sales brochure and/or literature

25    that is being proposed by VEO to market the products

225

1    and would request you submit a copy to EPTI for our

2    review.  We realize that some literature is already

3    in use, so, for the most part, this material would be

4    maintained for record.  For future sales/marketing

5    literature we request that VEO submit to EPTI in

6    sufficient time in advance of printing to permit our

7    review.  In addition to that, we request that VEO

8    submit either the drawing or photograph of the

9    nameplate that is being applied to the boilers."

10           And your response was:  "The brochure and

11   sales information of VEO is the sole property of VEO

12   and disclosure is not required by the agreement"; is

13   that correct?

14        A.    That's the way I answered it, yes.

15        Q.    So you were refusing to provide any of the

16   sales and marketing materials to EPTI, your licensor,

17   right?

18        A.    At that point.

19        Q.    Did you thereafter provide sales and

20   marketing literature to EPTI for it to see?

21        A.    No.  It was never requested after that

22   point.

23        Q.    You also say:  "Photographs of the mark

24   will be provided for the various boilers provided."

25   Did you ever provide EPTI with those photographs?

231

1          A.    May I read the document, please?

2                I'm sorry, go ahead.

3          Q.    Did you receive and review a copy of this

4    August 31, 2004, letter?

5          A.    I believe so.

6          Q.    And you read the statements in the third

7    and fourth paragraphs that:  "VEO has violated the

8    terms of the license agreement on several occasions,

9    and EPTI has been attempting to work with VEO to

10   ensure that such violations do not continue.

11               EPTI and its successors and assigns will

12   continue to comply with the terms of the license

13   agreement, but we also expect VEO to conform its

14   conduct immediately to the terms of that agreement."

15               You're aware of that expectation by EPTI,

16   correct?

17         A.    As it's stated in this letter.

18         Q.    Yes.

19         A.    Yes.

20               MR. SHEEAN:  Objection, asked and

21   answered.

22               (Plaintiff's Exhibit Number 33 was marked

23   for identification.)

24         Q.    (By Mr. Gisleson) I'd like to show you

25   what's been marked as White Exhibit 33, which is a

232

1    document stamped VEO1161 to 62.  Did you receive a

2    copy of Exhibit 33 in or about September 2004?

3         A.    This letter?

4         Q.    Yes.

5         A.    I don't recall seeing this.

6              (Plaintiff's Exhibit Number 34 was marked

7    for identification.)

8         Q.    (By Mr. Gisleson) I'd like to show you

9    what's been marked as White Exhibit 34.  It's a

10   document stamped VEO585.  Please take a look at

11   that.  Let me know when you're finished, please.

12             Do you recognize this as copy of a

13   September 10, 2004, letter that Chris Petcos, general

14   manager of Indeck Keystone Energy, sent to you?

15        A.    Yes.

16        Q.    Did you review the letter in or about

17   September 10, 2004?

18        A.    In or about that time.

19        Q.    So that you understood what IKE's position

20   was with respect to VEO's compliance with the license

21   agreement?

22        A.    In a general sense but not fully.

23             (Plaintiff's Exhibit Number 35 was marked

24   for identification.)

25        Q.    (By Mr. Gisleson) I'd like to show you

233

1   what's been marked as White Exhibit 35, which is a

2   document stamped IKE1098.  If you'd review the

3   document.  Let me know when you're finished.

4       A.    Okay.

5       Q.    Do you recognize this to be a September 24,

6   2004, e-mail exchange between you and Chris Petcos of

7   Indeck Keystone Energy?

8       A.    Yes.

9       Q.    Mr. Petcos wrote to you on September 24,

10  2004, in the second paragraph:  "In regard to my

11  previous letter, we are still awaiting a response and

12  confirmation that Victory Energy will comply with all

13  the terms and conditions of the license agreement by

14  marketing the specific "M" series product line.

15  Specifically, following the product size, dimensional

16  data for the different size ranges, typical

17  cross-section of the boiler and overall boiler

18  construction, which includes refractory front and

19  rear walls, tangent furnace and outer wall tubes and

20  pressure casing design."  Did I read that correctly?

21      A.    Yeah, you read --

22      Q.    Did that provide the detail that you were

23  looking for in terms of how IKE expected VEO to

24  comply with the license agreement?

25      A.    Well, --

234

1          MR. SHEEAN:  I'm going to object as

2    vague.  You can answer.

3      A.    There's two issues.  One, at this time, I

4    don't believe we had sufficient information on the

5    assignment.  Two, although Mr. Petcos wrote this, it

6    doesn't reflect our understanding of the agreement.

7      Q.    (By Mr. Gisleson) This conveyed clearly to

8    VEO what IKE's expectations as licensor were for the

9    license agreement, correct?

10          MR. SHEEAN:  Objection, calls for

11    speculation, lack of foundation.

12      A.    I won't speculate then.

13      Q.    (By Mr. Gisleson) Did you understand from

14    reading this how IKE expected VEO to perform under

15    the license agreement?

16      A.    Not fully.

17      Q.    Did you follow up with Mr. Petcos to

18    request clarification as to what he meant by his

19    statements in that paragraph?

20      A.    As I said, I didn't have the assignment

21    letter, so I probably did not respond until that came

22    in.  And it may have just got overlooked by me.

23      Q.    Did you receive the assignment information

24    that you requested or needed from Mr. Petcos?

25      A.    I believe we eventually received that.

235

1        Q.    And it was satisfactory to you?

2        A.    I believe so.

3        Q.    Do you know whether you ever sent a

4   response to Mr. Petcos?

5        A.    No, I didn't -- I didn't send a response.

6        Q.    Did you ever refuse to comply in writing to

7   Mr. Petcos advising him that you would not follow his

8   understanding of the license agreement?

9        A.    I didn't refuse, but I didn't agree on it

10  in writing.

11       Q.    During the -- strike that.

12             You're aware that EPTI was in bankruptcy,

13  correct?

14       A.    At that time, I was.

15       Q.    Did you, on behalf of VEO, ever cause an

16  objection to be filed in the EPTI bankruptcy to IKE

17  acquiring the license agreement?

18       A.    I -- I don't have any knowledge of that.

19       Q.    How did Chris Sheean come to represent VEO?

20             MR. SHEEAN:   I'm going to object to

21  the extent this calls for the disclosure of any

22  attorney-client communication you may have had.  If

23  you can answer the question without disclosing any

24  attorney-client information, then go ahead and

25  answer.

240

1      A.    While I was still at EPTI?

2      Q.    Yes.

3      A.    I don't recall.  We may have.

4      Q.    Keystone boilers above 150,000 pounds per

5  hour were still products available for sale through

6  EPTI, correct?

7      A.    That's correct.

8      Q.    And then following that is a January 10,

9  2003, letter that you appeared to have written.  Did

10  you, in fact, write that letter?

11      A.    Bear with me, please.

12      Q.    Sure.

13      A.    Yes, I did.

14      Q.    And is that letter true and correct, to the

15  best of your knowledge, as to the time it was

16  written?

17      A.    Best of my knowledge.

18            (Plaintiff's Exhibit Number 37 was marked

19  for identification.)

20      Q.    (By Mr. Gisleson) I'd like to show you

21  what's been marked as White Exhibit 37.  It's a

22  document stamped VEO774 to 775.  If you'll review

23  that.  Let me know whether you've seen it before.

24      A.    Yeah, it looks familiar.

25      Q.    Is this an e-mail that you sent to Shawn

251

1      A.    Correct.

2                  MR. GISLESON:  Let's take a break.

3                      (Break was taken)

4      Q.    (By Mr. Gisleson) In connection with

5  preparing a license agreement, what was your

6  understanding as how the transfer of technical

7  information back from VEO to EPTI was to occur at

8  conclusion of the license.

9      A.    At the conclusion of the license

10  agreement?  I guess in a general sense, and I have to

11  be honest, I -- without reading -- rereading the

12  agreement, I would have to get an exact definition of

13  what the requirements are.  I would have to review

14  the agreement.  But in a general sense, all of the

15  information that was transferred at the initial stage

16  and throughout the agreement from EPTI or, in this

17  case, IKE would have to be returned, any proprietary

18  information, the mark and so on and so forth.  And

19  then at the time frame, there would be no -- VEO

20  could not continue to use the mark, couldn't use the

21  sales literature and so on and so forth.  So at that

22  point, it basically would be terminated.

23      Q.    VEO also couldn't use any of the technical

24  information to design or manufacture "O" type

25  boilers?

252

1       A.    Well, there is no patent to an "O" type

2   boiler.   The "O" type boiler has been on the market

3   for some time.   So I think in terms of using the

4   information that was specifically provided as part of

5   the license agreement, the answer would be no.   But

6   if they would -- if Victory and -- would pursue the

7   design and manufacturer of an "O" type boiler, there

8   would be nothing to prohibit that.

9       Q.    Could VEO utilize the technical information

10  received from EPTI for the design and manufacture of

11  Keystone boilers in designing "O" type boilers?

12              MR. SHEEAN:   Well, I'm going to object

13  to the extent it calls for a legal conclusion, but

14  you can answer.

15      A.    Could one use it and adapt it?   It's an "O"

16  type boiler, so the answer would be yes.

17      Q.    (By Mr. Gisleson) No, but the question,

18  though, is whether, as you understood the license

19  agreement, VEO would be permitted to utilize any of

20  the technical information it received from EPTI with

21  respect to Keystone boilers to design and manufacture

22  "O" type boilers after the license agreement ends?

23      A.    No, not using the technical information.

24      Q.    You aware of efforts by VEO to obtain

25  rights to use the name Erie City Ironworks?

1  by Mr. Petcos to Mr. Milligan?

2       A.    He may have, but I don't recall the

3  details.

4             (Plaintiff's Exhibit Number 40 was marked

5  for identification.)

6       Q.    (By Mr. Gisleson) I'd like to show you

7  what's been marked as White Exhibit 39 [sic], which

8  is a document stamped ND276 --

9                  MR. SHEEAN:   Forty.

10                 MR. GISLESON:   Forty.

11      Q.    (By Mr. Gisleson) I'd like to show you

12  what's been marked as White Exhibit 40, which is a

13  document stamped ND276 through 299.   Have you seen

14  this document before?

15      A.    Yes.

16      Q.    Do you have an understanding as to when it

17  was prepared?

18      A.    Not -- not exactly.

19      Q.    This is a Keystone Steam Generating Systems

20  sales brochure; is that right?

21      A.    Yes.

22      Q.    Do you know approximately when it was

23  created?

24      A.    I don't recall, to be honest.

25      Q.    Do you know whether it was created before

258

1    or after you joined VEO?

2        A.    It was before I joined VEO.

3        Q.    Did you provide a Keystone sales brochure

4    to Shawn Brewer or someone else at VEO?

5        A.    I believe I provided a brochure to Shawn.

6        Q.    Did Shawn Brewer show you a draft of the

7    Victory brochure for the Keystone "M" series before

8    it was finalized?

9        A.    This particular brochure?

10       Q.    Yes.

11       A.    Yes, I've seen it.

12       Q.    But did he show you a draft of it before it

13   was finalized?

14       A.    No, I saw a final version.

15       Q.    It had already gone to printing?

16       A.    It appeared it had, yes.

17       Q.    Did you send anything in writing to Shawn

18   Brewer advising him that he could copy wholesale the

19   sales manual for Keystone that Erie or one of its

20   predecessors had prepared?

21            MR. SHEEAN:   Object to the terms "copy

22   wholesale".  You can answer.

23       A.    Would you repeat the question.

24       Q.    (By Mr. Gisleson) Sure.  Did you give

25   written authorization to Shawn Brewer to copy, in

1  material respect, a Keystone sales brochure that was
2  created by EPTI or one of its predecessors?
3       A.   I did not give him written authorization,
4  no.
5       Q.   Is it correct that a number of the boilers
6  depicted in photographs in this brochure are outside
7  of the scope of the license agreement?
8       A.   Without really knowing the specific steam
9  capacity, pressure and temperature range, I couldn't
10 be certain, to be honest.  I think it's the intent of
11 this document to show pictures, not to relate to
12 steam capacities, per se, as it relates to the
13 pictures.
14      Q.   Is this brochure still in use at VEO?
15      A.   I don't believe so.
16      Q.   Has it been replaced by another brochure?
17      A.   I don't think so.
18      Q.   Are there any brochures that are being
19 distributed by VEO?
20      A.   I think at this time, no.  I don't think
21 we're actually utilizing really any brochures that
22 would depict the Keystone.
23      Q.   When did VEO stop issuing brochures for the
24 Keystone?
25      A.   I don't recall.