**John Viskup**

---

**From:** Fiske, Marie [mfiske@eriepower.com]
**Sent:** Wednesday, January 08, 2003 3:16 PM
**To:** John Viskup
**Cc:** White, Mark
**Subject:** Conformed License Agreement
**Importance:** High

John:

The following message and attachment are being forwarded to you at the request of Mark White.

Enclosed is the conformed License Agreement for signature. I have not yet completed the Annexes. I suggest that we sign the Agreement and when completed, initial off each Annex. Please sign two copies of the document and forward to me for signature. We will return one for your files.

We are please to have Victory Energy as a EPTI Licensee!

Marie Fiske for Mark White

Erie Power Technologies, Inc.
814/897-7264 (Phone)
814/897-1090 (Fax)
mfiske@eriepower.com (e-mail)

<<License Agreement Jan 08.doc>>

EXHIBIT
tabbies
14



**LICENSE AGREEMENT**

This agreement is made in Erie, Pennsylvania, USA this 7th day of, January 2003 by and between Erie Power Technologies, Inc., 5300 Knowledge Pkwy. Ste. 200, Erie, PA, 16510 a corporation established under the laws of Ohio, U.S.A., (hereinafter, "Licensor") and Victory Energy Operations, LLC, 302 East 5th Avenue, Unite "D", Owasso, OK, 74055, a corporation established under the laws of Delaware, U.S.A. (hereinafter "Licensee") hereinafter referred to as "Party/Parties".

**WITNESSETH**

WHEREAS, Licensor has for many years been engaged in researching, designing, engineering and manufacturing certain Products (as defined hereinafter) and has acquired considerable experience therein; and

WHEREAS, Licensee intends to manufacture and sell said Products and wishes to secure access to and use of Licensor Technical Information (as defined herein) for said purpose to the extent permitted herein; and

NOW, THEREFORE, in consideration of the mutual premises set forth herein, IT IS AGREED AS FOLLOWS:

**CLAUSE 1**
**Definitions**

1.a) "Products" shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex. 1. If Licensee receives inquires which are not in Licensor's range of Products, subject to and prior notice to Licensor, Licensee will be free to enter into separate alternative agreements.

1.b) "Technical Information" shall mean any facts, data, know how, formula, procedures, techniques or advice, whether written or oral and regardless of form (including reports, letters, designs, drawings, specifications, training and operational manuals, photographs, tapes, diagrams, patent applications, Software (as defined herein), and any related documentation). Whether owned by Licensor, used by Licensor under license with the right to sublicense, or in the public domain, relating to design, manufacture, testing, operation, and repair of the Products, including but not limited to information set forth in Annex II of this Agreement. "Technical Information" may be patentable or unpatentable, and if patentable, need not be patented. Improvements may also be protected under the copyright, trade secret, or other applicable legal principles.

1.c) "Technology Disclosure Fee" shall mean payment due to Licensor for the disclosure of the Technical Information and for the supply of the technical assistance under Clause 3 and Clause 4 hereof.



1.d) "Exclusive Territory" shall mean United States, Canada and Mexico.

1.e) "Net Selling Price" shall mean the actual selling price of Products, ex-works, excluding field supervision prices, taxes (directly applied to the selling price) and equipment including water treatment systems and associated equipment (i.e. pumps deaerators etc.) continuous blowdown heat recovery systems, spare parts (directly applied to the selling price) freight and insurance charges to destination, FOB charges or costs of parts supplied by Licensor, if any.

1.f) "Effective Date" shall mean the date identified in the first sentence of this Agreement.

1.g) "Contract Year" as used herein shall mean each one year period commencing with the Effective Date of this Agreement or anniversary dates.

1.h) "Improvements" shall mean all modifications, variations, revisions, and enhancements of the Products, or methods or processes for manufacturing the Products, and all Technical Information relating thereto, which either Licensor or Licensee may develop, acquire, or acquire control of and commercially exploit during the term of this Agreement and which Licensor determines, in its reasonable judgment: (1) improve Product Performance and/or manufacturing costs of Products; (2) expand commercial applications of the Products or provide a superior substitute for any Product; or (3) increase marketability and/or commercial acceptance of the Products. "Improvements" may be patentable or unpatentable, and if patentable, need not be patented. Improvements may also be protected under copyright, trade secret, or other applicable legal principles.

1.i) "Software" shall mean computer programs, in whatever form and including related documentation, owned or licensed by Licensor and used in connection with the design, manufacture, testing operation or repair of Products.

1.j) "Standard Parts" shall mean parts which are made for other products as well as for the Products covered by this Agreement, and which require no change in design or specification to become parts for the products covered by this Agreement.

1.k) "Mark" shall mean the trademarks " Erie Power Technologies, Inc. or EPTI" and shall include any related designs, logos, or other descriptive devices customarily used by Licensor in connection with the Mark.

1.l) "Licensor Confidential Information" shall mean any data or information disclosed hereunder (whether written, oral or graphical) that relates to Licensor's products, technology, research, development, customers or business activities, and which is confidential or proprietary to or a trade secret of Licensor. Licensor Confidential Information shall not include any information, data or material which:



(a) Licensor expressly agrees in writing is free of any non-disclosure obligations; (b) at the time of disclosure to Licensee was known to Licensee (as evidenced by documentation in Licensee's possession) free of any non-disclosure obligations; (c) is independently developed by Licensee (as evidenced by documentation in Licensee's possession); (d) is lawfully received by Licensee, free of any non-disclosure obligations, from a third party having the right to so furnish such Licensor Confidential Information; or (e) is or becomes generally available to the public without any breach of this Agreement or unauthorized disclosure of such Licensor Confidential Information by Licensor

**CLAUSE 2**
**<u>Grant of Selling, Manufacturing and Related Rights</u>**

2.a) <u>Selling Rights</u>. Licensor hereby grants to Licensee:

(i) The exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory. Licensee understands and agrees, however that Licensor reserves the right to itself to offer, sell, manufacture, and install the Products in the Exclusive Territory in the following cases:

1. if explicitly requested by the client(s), or
2. Licensee's capabilities to meet the requirements by any client are significantly diminished as determined by mutual agreement of the parties.

Formatted

In these cases, the Parties will also agree on the best practical cooperation and support to be provided by Licensee and Licensee's most reasonable offer/order share.

2.b) <u>Manufacturing Rights</u>. Licensor hereby grants to Licensee an exclusive license to manufacture or have manufactured the Products using the Technical Information for installation in the Territory except for what provided in Clause 2.a.i. Licensee may not manufacture or have manufactured, the Products or any component part thereof, anywhere outside of Territory without the prior written consent of Licensor.

2.c) <u>Conditions of Grant of Rights.</u>

(i) Licensee expressly agrees that it will not sell, transfer, sublicense or disclose the Technical Information to any third party except as expressly provided in this Agreement and subject to the prior written consent of Licensor. The grant of rights pursuant to this Agreement shall not extend to technology (patented or unpatented), manufacturing information, or know-how possessed by Licensor regarding the Products.



(ii) As a condition of the licenses granted herein, Licensee agrees that it will exercise its best efforts to promote the offer, sale, and installation of Products manufactured under the Agreement in the Territory. Whenever Licensee receives any inquiry regarding the purchase of installation of Products outside of Territory, Licensee will promptly notify Licensor, and the parties shall thereafter mutually agree which one of them shall submit a bid in response to such inquiry.

(iii) During the term of this Agreement, Licensee shall not engage in the manufacture of products that are in competition or may compete with the Products licensed under this Agreement without the advance written consent of Licensor except as follows; firetube boilers with a steam capacity up to and including 75,000 pph at various pressures and steam temperatures.

(iv) Nothing in this Agreement shall be construed to establish by expression or implication that either Party to this Agreement is acting as, or is deemed to be, the agent for the other Party.

**CLAUSE 3**
**Delivery of Technical Information/Technical Assistance**

3.a) Licensor shall furnish Licensee with the Technical Information indicated within Annex II at Licensor's office in Erie, Pennsylvania within sixty (60) days of receipt of the initial payment of the Technical Disclosure Fee. Licensor will provide Licensee access via remote connection to Licensor's computer system so that Licensee may properly rate the Product. The rating system is a Fortran based program, designed to run on UNIX workstations. If Licensee elects to run the program on a Windows based system, an X-Windows emulator is required on Licensee's computer system to properly display the user interface for the program. It is the responsibility of the Licensee to provide the X-Windows emulator.

3.b) Each item of Technical Information furnished by Licensor shall be furnished in a form utilized by Licensor and such information shall be as detailed as Licensor would furnish to its own personnel for use in connection with the Products.

3.c) With the aid of the Licensor-provided Technical Information, Licensee will, in case of an order, make its own workshop drawings of Products, as well as calculations of performance of Products, except for information and output from the Licensor's natural circulation computer program. (Licensor will provide the foregoing assistance as outlined in the Annexes until a reasonable period of training and Software transfer is complete. This assistance will include



reasonable thermal design support, other mechanical and general proposal support from Licensor's offices sufficient for preparation of proposals by Licensee for the Licensee's clients).

3.d) At the request of Licensee, Licensor will review Licensee's workshop drawings and calculations for compliance with Licensor's design at Licensee's applicable service rate in effect at the time such service is rendered. This support will be modified by Licensor free of charge to Licensee for the first two orders to review for general compliance with Licensor's standard. Licensee will be responsible for making and implementing any alterations of the design of the Products required by codes, rules, or other requirements of the country of manufacture or the country of delivery or because of shop practices within the Licensee's plant(s).

3.e) Upon Licensee's reasonable request, Licensor shall provide, without any additional payment to Licensor, reasonable technical assistance to Licensee by written or telephone response relating to the application and interpretation of the Technical Information furnished by Licensor under this Agreement.

3.f) On reasonable request by Licensee, Licensor will give special engineering advice regarding planning, design, manufacturing, installation or operation of Products by Licensee at Licensor's applicable service rate in effect a the time service is rendered.

3.g) All amounts payable to Licensor under this Clause shall be due in United States Dollars (USDLR) within thirty (30) day after receipt by Licensee of Licensor's invoice. Payments will be by wire transfer or issued by company check.

Formatted

3.h) Annex III here to set forth Licensor's contract rates for technical assistance as of the Effective Date, provided however, that rates for technical assistance are subject to prior agreement between the Parties on reasonable escalation throughout the term of this Agreement.

**CLAUSE 4**
**Personnel Support, Training, and Technical Assistance**

4.a) During the life of this Agreement, at the reasonable requests of Licensee, Licensor will admit to that portion of its facility a reasonable number of Licensee's employees to inspect and become acquainted with Licensor's engineering discipline, working methods, and manufacturing processes relating to the Products. Such visits shall be free of charge to Licensee for up to, one (1) month of training during the first year of this Agreement. Licensor will conduct periodic Licensee meetings during the term of this Agreement to provide additional training and exchange of information. Licensor will provide Licensee with any other Technical Information in respect of the manufacture of Products, in



connection with such visits, on the condition that the regular course of business of Licensor is not interfered with thereby, and provided that all expenses of such employees of Licensee will be borne and paid for by Licensee. All employees of Licensee who participate in on-site training at Licensor will execute acknowledgements that they are aware of a bond by the secrecy provisions of this Agreement and that all information disclosed during on-site training constitutes Technical Information hereunder. Licensee assumes all responsibility for any health, accident, or other liability insurance coverage for all employees and other representatives of Licensee who participate in such on-site visits to Licensor's premises.

4.b) Licensor will provide personnel support to Licensee by sending a Licensor representative to Licensee's project team as technical presentations of the Products and joint technical meetings between Licensee and its clients as required by Licensee, free of charge to Licensee, for the first two (2) projects, limited to, two (2) day trip and one trip per project. For subsequent Licensor's personnel support, Licensee will pay to Licensor standard per diem rate set forth in Annex III or as may be in effect at the time the support is provided.

4.c) All amounts payable under this Clause shall be due and payable (USDLR) within thirty (30) days after receipt by Licensee of Licensor invoice.

**CLAUSE 5**
**Secrecy**

5.a) All of the Technical Information supplied by Licensor under this Agreement shall be for the exclusive use of Licensee (and its employees on a need to know basis) and Licensee agrees that Technical Information shall not be given, sold, disclosed, or otherwise made available in any fashion to any other firm, company, or person (including customers and prospective customers of Licensee) except with the prior written consent of Licensor. Licensee shall not use any of the Technical Information supplied by Licensor under this Agreement for any purpose except as set forth in Clause 2 of this Agreement. In the event that Licensee becomes legally obligated or compelled to disclose any Technical Information, it will provide Licensor with prompt written notice of same and cooperate with Licensor in its efforts to obtain a protective order or other confidential treatment.

Formatted

5.b) Notwithstanding the foregoing, no secrecy obligation herein shall apply to Technical Information which:

(i) At the time of disclosure is generally available to the public;
(ii) After disclosure by Licensor becomes generally available to the public by publication or otherwise through no fault of Licensee;



    (iii) Was in Licensee's possession prior to the disclosure hereunder and which was not acquired directly or indirectly from Licensor and which was acquired without being subject to any restriction as to disclosure or use;

(iv) Was received by Licensee from a third party imposing no obligation of confidentiality and who did not acquire any such information directly or indirectly from Licensor under an obligation of confidentiality.

5.c) Licensee requires all of its subcontractors to agree in writing to be bound by the provisions of this Clause 5.

5.d) The provisions of this Clause 5 shall apply with equal force with respect to improvements with Licensor supplies to Licensee.

Formatted

5.e) Licensee may, from time to time, furnish the Licensor with certain Licensee Confidential Information. Licensor will use the same care, but at a minimum reasonable care, to avoid disclosure, publication or dissemination of Licensee Confidential Information as it uses with its own similar confidential information which it does not wish to disclose, publish or disseminate. Licensee Confidential Information shall not be used except as expressly permitted under this Agreement nor disclosed to any persons other than the employees and authorized consultants of Licensor (if any) who have a need to know and who have been informed of the their obligation to maintain its confidentiality prior to such disclosure, and who have entered into written confidentiality agreements restricting their use and disclosure of such information, except for the uses expressly permitted in this Agreement. The disclosure of Licensee Confidential Information does not grant to Licensor any license or rights to any trade secrets or under any patents or copyrights. In the event that Licensor becomes legally obligated or compelled to disclose any Licensee Confidential Information, it will provide Licensee with prompt written notice of same and cooperate with Licensee in its efforts to obtain a protective order or other confidential treatment. Licensor will under no circumstances furnish any portion of the Licensee Confidential Information that it is not legally required to produce and, to the extent that Licensor is required to produce any Licensee Confidential Information, it will use its best efforts to obtain reliable assurances that confidential treatment will be accorded to the Licensee Confidential Information that is disclosed.

**CLAUSE 6**
**<u>Compensation</u>**

In consideration of Licensee rights granted herein, supply of Technical Information, and the supply of technical assistance, Licensee shall pay to Licensor:

6.a) <u>Technology Disclosure Fee:</u> A lump sum of $50,000 (US) payable per the schedule defined in paragraph 6 (b) below.

Formatted


6.b) Payment Schedule: Payment for the Technology Disclosure Fee will be payable as follows:

(i) $10,000 within thirty (30) days from the Effective Date of this Agreement.

(ii) $20,000 within twelve (12) months from the Effective Date of this Agreement.

(iii) A final payment of $20,000 within eighteen (18) months from the Effective Date of this Agreement.

6.c) Royalties: On the schedule set forth in Clause 7, Licensee will pay to Licensor, in addition to the Technology Disclosure Fee, a continuing royalty, which shall be computed at 4% of the Net Selling Price, as defined in Clause 1.e hereof, of each Product manufactured and sold by Licensee.

6.d) The compensation rates herein provided for shall continue for the duration of this Agreement, unless altered in accordance with the terms of Clause 19 hereof.

**CLAUSE 7**
**Payments and Accounting**

7.a) The Royalties defined in Clause 6 will be paid in accordance with the following schedule:

1. Sixty percent (60%) within three (3) months after the receipt of the purchase order or upon initiation of manufacture of the Product by Licensee for this purchase order, whichever occurs sooner.
2. Forty percent (40%) upon materially complete shipment of the Product under the specific purchase order.

7.b) A "Semi-Annual" Statement" (as hereafter defined) shall be submitted by Licensee to Licensor for period ending with the end of each half Contract Year for the duration this Agreement, listing Products upon which manufacturing by Licensee has been completed in such period and an addendum listing Products upon which manufacturing is not complete. The Semi-Annual Statement shall identify for each completed or incomplete Product:

(i) Date of Order
(ii) Name of Client
(iii) Destination
(iv) Performance Data to include steam capacity and conditions and the number of industrial watertube package steam generators
(v) Date of completion or scheduled completion of the Products
(vi) Purchase order price and portion relevant Net Selling Price



        (vii) The royalty amount payable thereon

7.c) All amounts, which Licensee owes Licensor under this Clauses 6 and 7, will be paid by Licensee to Licensor in U.S. Dollars.

7.d) Licensee will advise Licensor of each sale of a Product by Licensee by forwarding to Licensor a copy of each order immediately after said order has been placed with Licensee.

7.f) Licensee shall, during the term of this Agreement, keep accurate and complete records, books, and files of all Products and orders for Products, including the identifying data required in the Semi-Annual Statement. These records shall be made available for inspection and copying by authorized representatives of Licensor during any normal business day; provided however, that an inspection of Licensee's records shall be made by Licensor only upon and after giving to Licensee at least ten (10) days written notice by Licensor of Licensor's intention to inspect such records.

7.g) If an audit by Licensor reveals a shortfall in Royalty payments exceeding five (5) percent of Royalties owing then Licensee shall pay any such shortfall, plus interest thereon at the US Federal Reserve Prime Rate plus three percent (3%) and the reasonable cost of the audit.

**CLAUSE 8**
**Modifications to Products by Licensee**

8.a) Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products. Licensee will submit to Licensor such plans for modifications for prior written approval by Licensor except for the alterations as defined in Clause 3 (e).

8.b) Licensee shall assume the entire responsibility for any changes in design or material specifications made by Licensee, and shall hold Licensor harmless from any liability thereafter, regardless of any approvals made by Licensor.

8.c) All technical questions related to proposed modifications of the Products shall be directed to the Licensor's Chief Mechanical Engineer with a copy provided to the Licensor contact identified in Clause 23 – Notices.

8.d) Any modification by Licensee shall be deemed an Improvement under this Agreement.



**CLAUSE 9**
**Workmanship**

9.a) Licensee will at all times use its best efforts to attain high class workmanship in all activities performed by Licensee or its subcontractors relating to Products, so as to protect the reputation of Licensor and the good will of the Mark (as hereinafter defined) regarding such Products.

9.b) Licensee shall maintain Licensor's standards of materials and workmanship and shall conform, insofar as possible, to Licensor's engineering standards in manufacture of Products, and will regularly consult with Licensor in matters of application or problems relating to the design, manufacture, quotation, sale, installation and operation of Products, and will abide by the recommendations and instructions received from Licensor. The responsibility for the exercise of final judgment in making recommendations to Licensee's customers for proper application of Products shall, however, rest solely with Licensee.

9.c) Licensor shall have the right, upon reasonable notice to Licensee, to conduct inspections of Licensee's manufacturing facilities and procedures during normal business hours and to inspect randomly-selected Products, manufacturing equipment and processes for Products, and installations of Products. Deficiencies in Products, to the extent these are the result of Licensee's manufacture, use, modification or installation of Products, shall be remedied by Licensee within 30 days of written notice from Licensor of the deficiencies.

**CLAUSE 10**
**Warranty & Representations**

10.a) Licensor will provide to Licensee Technical Information available to Licensor. Licensor represents that such Technical Information provided by Licensor is accurate and complete.

10.b) OTHER THAN AS SET FORTH HEREIN, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, AND ASSUMES NO RESPONSIBLITIES WHATEVER WITH RESPECT TO THE MANUFACTURE, USE, SALE, OR OTHER DISPOSITION BY LICENSEE OF PRODUCTS.

**CLAUSE 11**
**Indemnity/Insurance/Limitation of Liability**

11.a) Indemnity. Licensee and Licensor will indemnify and hold harmless each other from, for, and against all liabilities asserted against, resulting to, imposed on, or


ERIE POWER
TECHNOLOGIES, INC.

incurred by either Party at any time arising out of claims or allegations that injury to either Party or any third party resulted from the manufacture, marketing, sale, installation, and operation of Products and any Improvements thereto pursuant to this Agreement. If it should be shown that the cause of any liability for any injury resulting from the manufacture, marketing, sale, and installation of Products, then Licensor will use its best efforts to correct any errors or deficiencies in the Technical Information and will contribute to satisfying any liability arising from such defect in the Technical Information in an amount up to but not exceeding the limit set forth in Clause 11 (b) herein. As used in this Agreement, "Indemnify" means to indemnify, reimburse, defend and hold harmless the indemnitee (including its parents, subsidiaries, successors, affiliates, officers, directors, employees, agents, and representatives) from any and all liabilities and injuries; "liabilities" means all demands, claims, actions, causes of action, assessments, losses, damages, obligations, judgments, fines, and costs and expenses (including without limitation settlements, penalties, interest, reasonable attorneys fees, disbursements and expenses, and reasonable consultant fees, disbursements and expenses); and "injury" means bodily injury, death, property damage or economic loss.

11.b) Limitation of Liability. Licensor's responsibility for any liabilities for any injury to Licensee or any third party arising from the design, manufacture, marketing, sale, and installation of any Product pursuant to this Agreement shall be limited to the amount of the relevant Royalty for the particular Product, as provided in Clause 6(c). In no event shall Licensor's liability exceed the amount of such royalty for he particular Product. Licensee understands and agrees, however, that in no event shall it be entitled to any indemnity from Licensor with respect to liabilities for injuries arising from the operation by purchasers of installed Products, inasmuch as Licensor and its agents will not be permitted or authorized to operate, service, or repair Products manufactured and sold by Licensee pursuant to this Agreement.

11.c) Insurance. Licensee, pursuant to this Agreement, will carry general public liability insurance to include products and completed operations coverage on a claims-made or occurrence basis. This insurance coverage shall be in an amount not less than Two Million U.S. Dollars. Each such insurance policy will name Licensor as additional insured by no later than the date of the first Licensee purchase order. Licensee will furnish a certificate of insurance, or a copy of the policy upon request, evidencing such overage within thirty (30) days of the Licensee's first purchase order and annually thereafter.

11.d) Licensee may satisfy the requirement in the above paragraph by adding Licensor to its Builders All-Risk insurance policy as an additional insured "for the interests as specified" if such insurance policy meets the identified insurance limits specified above.

CONFIDENTIAL VEO0742

11.e) Licensee may be allowed to self-insure for the required insurance coverage, provided Licensee demonstrates to the satisfaction of Licensor sufficient financial capability to self-insure.

**CLAUSE 12**
**Patents**

12.a) To the best of Licensor's knowledge, it has not infringed any patent possessed by any third party. Accordingly, Licensor makes no warranty or representation, and none implied, that the manufacture, use or sale of Products, by Licensee under this Agreement will be free from infringement of any third party patents.

12.b) In the event of any legal action for patent infringement by or against Licensee based on the manufacture, use or sale of any Products under this Agreement, Licensor shall, upon request of Licensee, furnish Licensee any information and evidence which is readily available to Licensor and which Licensor deems material to the prosecution or defense of such patent actions.

12.c) If Licensee desires that a patent be obtained in the Territory for an invention made by Licensor during the term of this Agreement, then Licensor will cooperate with Licensee in obtaining such patent on behalf of Licensor if Licensor desires the patent and if the invention is patentable under applicable patent laws. The payment of all fees incurred in investigating or obtaining such patents shall be equally shared by Licensor and Licensee; provided however, that any such patent obtained by Licensee for Licensor will be subject to this Agreement.

12.d) In case a patent of Licensor which is covered by this Agreement shall have lost its importance to Licensor in the Territory, Licensor will consult with its other Licensees not later than 6 months before the date upon which any patent fees or other required patent maintenance action shall fall due. If all other Licensees agree, Licensor will cease to maintain such patent, whereby Licensee will cease to maintain such patent, whereby Licensee may maintain such patents for its own account in Licensor's name.

12.e) Licensee will use due diligence to police and enforce any patents obtained by Licensor in the Territory, and will notify Licensor when third parties commit such acts as may infringe such patents. It will be left to Licensor to decide whether or not such infringements are to be prosecuted and the Parties will mutually agree how to share in the costs of prosecution.



**CLAUSE 13**
**Improvements**

13.a) In order to further the mutual interest of both parties, Licensor shall disclose and make available to Licensee and Licensee shall disclose and make available to Licensor, free of any charge, all Improvements developed while this Agreement is in effect. Such disclosure shall be made not earlier than six (6) months after such Improvement have been introduced into commercial production, whether or not such Improvements are patented or subject to patent applications; provided, however, that an Improvements, including new designs and inventions, which are developed by any of Licensor's other Licensees shall not be made available to Licensee and, similarly, any such improvements and developments made by Licensee shall not be made available to any other Licensee of Licensor. However, best efforts will be made to make all improvements available to Licensee unless this is prevented by other license agreement (s) and related legal regulation.

13.b) Improvements disclosed by either party pursuant to this paragraph shall be subject to the secrecy provisions of Clause 5 herein.

13.c) Any Improvement shall be owned by the party, which has discovered or made the Improvement. Licensor shall grant to Licensee a royalty-free license to use Improvements developed by Licensor and disclosed pursuant to Clause 13(a) above. Any Improvement licensed from Licensee to Licensor, however, shall be non-exclusive as to Licensor's use or modification of such Improvement, subject only to rights retained by Licensee.

**CLAUSE 14**
**Copyrights**

14.a) Licensee understands and agrees that certain items to be provided within the Technical Information, including but not limited to software, drawings, manuals, and promotional and sales materials, are protected under U.S. Copyright law whether or not such items bear copyright notice. Licensee further agrees that Licensor owns all right, title, and interest to any copyrightable materials contained in the Technical Information. Nothing in this Agreement shall constitute or be deemed to be a transfer to Licensee of any ownership rights in any such copyrightable material, and title to all copyrights shall remain exclusively with Licensor. Pursuant to the license granted in Clause 2 of this Agreement, however Licensee shall have the limited right to use internally and copy any program in conjunction with a machine or for archival or backup purposes. Any archival copies made under this paragraph shall be destroyed upon termination of this Agreement for any reason. Licensee may maintain archival copies as required by national or local laws, regulations, and codes.



14b.) Except as provided above in Clauses 3 (a), 3(d), 3(e) and 14 (a), Licensee may not copy, reproduce, distribute (including sale, lease, or rental), perform, display, or prepare derivative works based upon any copyrightable materials provided to Licensee by Licensor without prior written consent of Licensor.

CLAUSE 15
Trademarks

15.a) Grant of License. For the duration of this Agreement, Licensee shall be permitted to use the Mark royalty-free on the Products manufactured by Licensee. The Mark shall be affixed to a plate appearing on each Product supplied by Licensee upon which there shall be an indication that the Products were supplied by Licensee under license from Licensor. For the duration of this Agreement, Licensee also shall be permitted to use the Mark in marketing, advertising, and sales activities related to the Product manufactured by Licensee.

15.b) Use of Trademarks.
Licensee agrees to use the Mark only in the form approved by Licensor. The design, appearance, placement, application of statutory notice and other uses by Licensee of the mark shall conform to the existing usage and specifications to be provided to Licensee by Licensor. Upon request by Licensor, Licensee shall promptly provide representative samples of any and all uses by Licensee of the Mark.

(i) Licensee acknowledges that the Mark, the property solely of Licensor, is of great commercial value to Licensor, and represents the good will and wide recognition attained by Licensor's high quality Products. All use of the Mark by Licensee, including any good will arising out of such use, shall be solely to the benefit of Licensor. Licensee further acknowledges that any misuse or infringement of the Mark, including breach of Licensee's obligations under Clauses 8 and 9 of this Agreement would cause Licensor irreparable harm for which it would have no adequate remedy at law.

(ii) All rights to the use of the Mark by Licensee shall terminate immediately with the termination of this Agreement. Licensee understands and agrees that it will use no mark confusingly similar to the Mark in any way following the termination of this Agreement. Licensee's obligations under this paragraph shall survive any termination of this Agreement.

15.c) Registered User Status. This license to use the Mark on Products and in marketing and sales activities shall be conditioned, where required by applicable law or custom, upon the entry of Licensee into a Registered User Agreement in a form appropriate under the applicable law within the Territory. The use of the



Mark pursuant to this license shall in no way imply that Licensee is acting as an agent for Licensor or vice versa.

**CLAUSE 16**
**Duration of Agreement**

16.a) This Agreement will be in effect for the term of three (3) years from the Effective Date hereof, unless terminated earlier under the terms provided for herein.

16.b) After the expiration of the initial three (3) year term, this Agreement will be continued from year to year, in accordance with the terms and conditions of this Agreement unless notice is given in writing by one party to the other at least sixty (60) days before the expiration of the original or extended period that the notifying party does not intend to renew or extend this Agreement.

16.c) In the event Licensee has not received during the first two (2) years a minimum of 5 orders for the Products, Licensor has the right to terminate the Agreement.

16.d) Any orders resulting from bids submitted by the Parties though a consortium or joint venture or equivalent cooperation agreement will be part of the orders received in the time period as per above Clause 16.c.

**CLAUSE 17**
**Obligations After Termination of Agreement**

17.a) After any termination of this Agreement by Licensor in accordance with the provisions of Clause 16 (c) hereof, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement (to the extent that said Technical Information has not meanwhile become publicly known through no fault of Licensee), or to use the Mark. Licensee shall return to Licensor all of the design, drawings, and other physical materials comprising the Technical Information within thirty (30) days after such termination.

17.b) Any notice of termination, or any termination, of this will not prevent Licensee from completing manufacture and delivering Products which were ordered before the date said notice or to confirm the validity of bids submitted to Clients before the notice of Termination, if so agreed in writing with Licensor in order to prevent any damage to Licensor's Trademark and Licensor's/Licensee's reputation in the Territory; provided, however, that Licensee will have the duty to make the Royalty payment required under Clause 6 of this Agreement, provided further, that Licensee will have the duty to maintain the secrecy of all Technical Information as herein above provided in Clause 5. If the Agreement termination



is for a reason other than breach, Licensor shall provide reasonable support to Licensee required in execution of this work.

**CLAUSE 18**
**Assignment**

The rights and obligations arising out of this Agreement shall not be assignable by Licensee without the written consent of Licensor.

**CLAUSE 19**
**Arbitration**

In the event of any dispute, controversy or claim between the parties arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, the parties shall attempt in the first instance to resolve such dispute through friendly consultations between the parties. If such consultations do not result in a resolution of the dispute within thirty (30) days, then the dispute may be referred to the President of each Company and the two of them shall personally confer in an effort to resolve the matter. If the presidents can not resolve the matter, then the dispute may be submitted by either party to binding Arbitration, irrespective of the magnitude thereof, the amount in dispute or whether such dispute would otherwise be considered justifiable for resolution by any court, by giving written notice thereof to the other party. The parties agree to attempt to resolve all dispute arising hereunder promptly equitably and in a good faith manner.

Arbitration shall be conducted in accordance with the American Arbitration Association and interpreted under the laws of the State of Pennsylvania. The place of Arbitration shall be Erie, PA.

**CLAUSE 20**
**Law Applicable**

This Agreement shall be deemed to have been made in the Commonwealth of Pennsylvania, United States of America, and the parties intend to be governed in the operation, effect, validity, interpretation, performance and discharge of this Agreement by the laws of the Commonwealth of Pennsylvania.

**CLAUSE 21**
**Modification**

This Agreement shall not be modified except by a supplemental written agreement executed by an authorized representative of both of the parties hereto.



**CLAUSE 22**
**Force Majeure**

22.a) In the event that either party gives notice that it is delayed in the performance of its obligations under this Agreement by Force Majeure, this Agreement shall be suspended until such party gives notice that the cause of such delay has ceased, and neither Licensor nor Licensee shall have any liability for loss or injury suffered by the other party by reason of said Force Majeure. Upon cessation of the cause of said delay, this Agreement shall become fully operative under the terms hereinabove set forth.

22.b) For the purpose of this Agreement, Force Majeure shall include, without limitation, strikes, lockouts, riots, sabotage, acts of war, civil disorder or piracy, retroactive application of laws and regulations in any country covered by this Agreement, destruction of essential equipment by fire, explosion, storm, flood, earthquake and the like, and delay caused by failure of power supplies to either Licensor's or Licensee's facilities and delay caused by transportation facilities and any similar cause of delay beyond the reasonable control of the party liable to perform.

**CLAUSE 23**
**Notices**

23.a) Any notices, reports, or information required to be given under the terms of this Agreement, by Licensee to Licensor shall, unless otherwise expressly provided for, be addressed to:

Mark J. White
Erie Power Technologies, Inc.
5300 Knowledge Pkwy., Suite 200
Erie, PA 16510
Fax: 814/897-1092

23.b) Any notices, reports or information required under the terms of this Agreement to be given by Licensor to Licensee shall, unless otherwise expressly provide for, be addressed to:

John C. Viskup, Jr.
Victory Energy Operations, LLC
302 East 5th Avenue – Unit "D"
Owasso, OK 74055
Fax: 918-274-0059

Formatted



Notice shall be deemed to have been given as of the date postmarked, when in writing and mailed, registered mail herein above specified, but such method of giving notice shall not exclude the use of any other method of giving notice, which does in fact give notice.

**CLAUSE 24**
**Integration, Merger and Waiver**

24.a) The terms and provisions contained in this Agreement, are the full Agreement of the parties pertaining to the subject matter of this Agreement, and are fully set forth herein, and no prior understanding or obligation not expressly set forth herein shall be binding upon the parties to this Agreement, and no subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms herein provided and executed with the same formalities as this Agreement.

24.b) No waiver, expressed or implied, by either party of any breach of obligation by the other party shall operate or be considered as a waiver of any other or subsequent breach.

24.c) Section headings appearing in this Agreement are inserted for convenience of reference only and shall in no way be construed to be interpretation of the text.

**CLAUSE 25**
**No Agency**

Nothing in this Agreement shall be construed to establish by expression or implication that either party to this Agreement is acting as, or is deemed to be, the agent for the other party.

**CLAUSE 26**
**Severability**

In the event that any provision of this Agreement shall be held to be invalid, illegal, or unenforceable in any respect, as a whole or in part, by a court or administrative body of competent jurisdiction, then unless otherwise agreed, this Agreement shall continue in full force and effect except for such provision, which shall be deemed to be excised here from but only with regard to the part held invalid, illegal, or unenforceable. In such event, the parties hereby agree to use their best efforts to agree on substitute provision, which while valid, will achieve as closely as possible the same economic effects as invalid provision(s).



**CLAUSE 27**
**Further Assurances**

Formatted

Formatted

Each Party hereto covenants, without the need for additional consideration, that it and its affiliates will take such further actions and execute any further documents as may be reasonably required to fully effectuate the terms, ownership and licenses, conditions and intent hereunder.

**CLAUSE 28**
**Counterparts**

Formatted

This Agreement may be executed in two or more counterparts, each of which will be considered an original, and all of which together will constitute one and the same instrument.

IN TESTIMONY WHEREOF, witness the signatures of the parties hereto:

**ERIE POWER TECHNOLOGIES, INC.**

By: ______________________

Title: ______________________

Date: ______________________

Witnessed By: ______________________

**VICTORY ENERGY OPERATIONS, LLC**

By: ______________________

Title: ______________________

Date: ______________________

Witnessed By: ______________________