HIGHLY
CONFIDENTIAL



# LICENSE AGREEMENT

( IN ERIE, PENNSYLVANIA (U.S.A.) )

This Agreement is made this 31ST day of OCTOBER , 1996 by and between Zurn Industries, Inc., Energy Division, 1422 East Avenue, Erie, PA, 16503, U.S.A., a corporation established under the laws of the Commonwealth of Pennsylvania, U.S.A., (hereinafter, "LICENSOR"), and Rosetti Marino S.p.A., 230 V. Trieste, 48100 Ravenna, Italy, a corporation established under the laws of Italy (hereinafter "LICENSEE") hereinafter referred to as "Party/Parties".

## WITNESSETH

WHEREAS, LICENSOR has for many years been engaged in researching, designing, engineering and manufacturing certain Products (as defined hereinafter) and has acquired considerable experience therein; and

WHEREAS, LICENSEE intends to manufacture and sell said Products and wishes to secure access to and use of LICENSOR Technical Information (as defined herein) for said purpose to the extent permitted herein; and

WHEREAS, LICENSOR is willing to grant the right to use this know-how to LICENSEE on the conditions set forth herein, and

NOW, THEREFORE, in consideration of the mutual premises setforth herein, IT IS AGREED AS FOLLOWS:

EXHIBIT
tabbies
16

CONFIDENTIAL

## CLAUSE 1

### Definitions

1.a) "Products" shall mean natural circulation, water tube waste heat steam generators for combustion turbine exhaust heat recovery with combustion turbine exhaust flow rates in excess of 300,000 pounds/hour (136,000 kg/hour), including those once-through waste heat steam generators designed for use in the thermal enhanced oil recovery applications, which incorporate or are based upon the Technical Information or which are covered by any copyright or patent owned or controlled by LICENSOR.  Products shall include but not be limited to the items set forth in Annex 1.  LICENSOR shall make available to LICENSEE forced or assisted circulation HRSGs, subject to the provisions of Clause 21 hereof, if LICENSOR develops this technology.  Nevertheless, if LICENSEE receives inquiries which explicitly require forced or assisted circulation HRSGs which are not in LICENSOR's range of Products, subject to prior notice to LICENSOR, LICENSEE will be free to enter into separate alternative agreements.

1.b) "Technical Information" shall mean any facts, data, know how, formulae, procedures, techniques or advice, whether written or oral and regardless of form (including reports, letters, designs, drawings, specifications, training and operational manuals, photographs, tapes, diagrams, patent applications, Software (as defined herein), and any related documentation), whether owned by LICENSOR, used by LICENSOR under license with the right to sublicense, or in the public domain, relating to design, manufacture, testing, operation, and repair of the



CONFIDENTIAL

Products, including but not limited to the information set forth in Annex II of this Agreement. "Technical Information" may be patentable or unpatentable, and if patentable, need not be patented. Improvements may also be protected under the copyright, trade secret, or other applicable legal principles.

1.c)   "Technology Disclosure Fee" shall mean payment due to LICENSOR for the disclosure of the Technical Information and for the supply of technical assistance under Clause 3 and Clause 4 hereof.

1.d)   "Exclusive Territory" shall mean Italy.

1.e)   "Nonexclusive Territory" shall mean:

- The European countries
- Any other country in the remainder of the whole world (other than United States of America and its protectorates, Canada, Mexico, Japan, Brazil, Korea, United Kingdom, and India) whenever principally Italian financing is a requirement by the customer or the Product is incorporated into a plant which will be supplied by an Italian company, or otherwise on a case-by-case basis (with a "case-by-case basis" meaning LICENSEE's prior receipt of permission in writing from LICENSOR.)

1.f)   "Net Selling Price" shall mean the actual selling price of Products, ex-works, after deducting from the invoice price to a customer the field erection or field installation prices, field supervision prices, taxes (directly applied to the selling price, such as, but not limited to, Value Added Tax), financing charges, sales commission, freight and insurance charges to destination, FOB charges or costs or parts

CONFIDENTIAL

supplied by LICENSOR, if any.

1.g) "Effective Date" shall mean the date identified in the first sentence of this Agreement.

1.h) "Contract Year" as used herein shall mean each one year period commencing with the Effective Date of this Agreement or anniversary dates. For the purpose of Clause 7 hereof, the First-Half Contract Year shall consist of the six month period beginning with the Effective Date of this Agreement or its anniversary dates, and the Second-half Contract Year shall comprise the remaining six months of each Contract Year.

1.i) "Improvements" shall mean all modifications, variations, revisions, and enhancements of the Products, or methods or processes for manufacturing the Products, and all Technical Information relating thereto, which either LICENSOR or LICENSEE may develop, acquire, or acquire control of and commercially exploit during the term of this Agreement and which LICENSOR determines, in its reasonable judgement: (1) improve Product performance and/or durability; (2) reduce materials and/or manufacturing costs of Products; (3) expand commercial applications of the Products or provide a superior substitute for any Product; or (4) increase marketability and/or commercial acceptance of the Products. "Improvements" may be patentable or unpatentable, and if patentable, need not be patented. Improvements may also be protected under copyright, trade secret, or other applicable legal principles.

1.j) "Software" shall mean computer programs, in whatever form and

CONFIDENTIAL

including related documentation, owned or licensed by LICENSOR and used in connection with the design, manufacture, testing, operation or repair of Products.

1.k) "Standard Parts" shall mean parts which are made for other products as well as for the Products covered by this Agreement, and which require no change in design or specification to become parts for the Products covered by this Agreement.

1.l) "Mark" shall mean the trademarks "ŻURN, ZURN INDUSTRIES, or ZURN ENERGY DIVISION" and shall include any related designs, logos, or other descriptive devices customarily used by LICENSOR in connection with the Mark.

## CLAUSE 2

### Grant of Selling, Manufacturing and Related Rights

2.a) **Selling Rights.** LICENSOR hereby grants to LICENSEE:

(i) The exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory. LICENSEE understands and agrees, however, that LICENSOR reserves the right to itself to offer, sell, manufacture, and install the Products in the Exclusive Territory in the following cases:

1. if explicitly requested by the client(s), or

2. LICENSEE's capabilities to meet the requirements by client are significantly diminished.

In these cases, the Parties will also agree on the

CONFIDENTIAL

best practical cooperation and support to be provided by LICENSEE and LICENSEE's most reasonable offer/order share.

(ii)    A non-exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith in the Non-Exclusive Territory.

(iii)   For the sole purpose of exercising the rights granted in this Clause 2 (a), the grant by LICENSOR shall extend to any majority-owned subsidiaries of LICENSEE for use of the Technical Information as required in connection with the sale and installation of Products, subject to their prior written agreement to be bound by the secrecy restriction set forth in Clause 5 herein. Such subsidiaries, however, shall not be deemed to be sublicensees under this Agreement.

2.b)    <u>Manufacturing Rights</u>. LICENSOR hereby grants to LICENSEE an exclusive license to manufacture or have manufactured the Products using the Technical Information for installation in the Exclusive Territory except for what provided in Clause 2.a.i. LICENSEE may not manufacture or have manufactured, the Products or any component part thereof, anywhere outside of Exclusive Territory without the prior written consent of LICENSOR.

2.c)    <u>Sublicensing Rights</u>.

Subject to LICENSOR's prior written consent to any proposed manufacturing subcontractor, which consent shall not be



CONFIDENTIAL

reasonably withheld, LICENSEE shall have the right to have component parts of the Products manufactured for it by subcontractors located in the Non-Exclusive Territory. Should LICENSOR consent to the appointment of any such manufacturing subcontractors, LICENSEE undertakes to insert a clause in writing in the subcontracting agreements (and LICENSEE shall promptly provide LICENSOR with a copy of such agreements) to the purpose of binding the subcontractors to the same provisions regarding secrecy and the protection of LICENSOR's proprietary rights in the Products and Technical Information as those set forth in this Agreement. The provisions set forth in the subcontracting agreements with respect to secrecy and protection of LICENSOR's proprietary rights in the Products and Technical Information shall be enforceable by either LICENSOR or LICENSEE. Subcontractors shall waive in writing in the subcontracting agreements any right to subcontract.

2.d) <u>Conditions of Grant of Rights</u>.

(i)     LICENSEE expressly agrees that it will not sell, transfer, sublicense or disclose the Technical Information to any third party except as expressly provided in this Agreement and subject to the prior written consent of LICENSOR. The grant of rights pursuant to this Agreement shall not extend to technology (patented or unpatented), manufacturing information, or know-how possessed by LICENSOR



CONFIDENTIAL

regarding other products.

(ii)   As a condition of the licenses granted herein, LICENSEE agrees that it will exercise its best efforts to promote the offer, sale, and installation of Products manufactured under the Agreement in the Exclusive Territory and Non-Exclusive Territory. Whenever LICENSEE receives any inquiry regarding the purchase or installation of Products outside of Exclusive Territory, LICENSEE will promptly notify LICENSOR, and the parties shall thereafter mutually agree which one of them shall submit a bid in response to such inquiry.

(iii)   During the term of this Agreement, LICENSEE shall not engage in the manufacture of any products that are in competition or may compete with the Products licensed under this Agreement without the advance written consent of LICENSOR. To the extent of the foregoing provision is not enforceable in certain jurisdictions included within the territory covered by this Agreement, then LICENSOR reserves the right to (1) terminate LICENSEE's exclusivity as granted herein or (2) withhold Improvements from LICENSEE. Notwithstanding the above, LICENSEE shall have the right to sell and manufacture Forced/Assisted Circulation Heat Recovery Steam Generators if specifically stipulated by the customer.

(iv)   Nothing in this Agreement shall be construed to establish by expression or implication that either

CONFIDENTIAL

Party to this Agreement is acting as, or is deemed to be, the agent for the other party.

~~2.e) Cooperation. Should any inquiry for the supply of the~~ Products in the Exclusive Territory include the following requirements:

(i)     reference for HRSG supply in excess of LICENSEE's acquired experience;

(ii)    technical requirements which cannot be solely met by LICENSEE.

LICENSOR and LICENSEE shall settle a specific consortium (or equivalent) agreement subject to LICENSEE's adequate guarantees to LICENSOR, for above case "i" or will agree on the best possible way to cooperate up to client's satisfaction in above case "ii".

SEE ADDENDUM TO THIS AGREEMENT (SH. 47.1) FOR REVISED SUB-CLAUSE "2.e).

## CLAUSE 3

### Delivery of Technical Information/Technical Assistance

3.a)    LICENSOR shall furnish LICENSEE with the Technical Information specified in Items 1 through 8, and 13 of Annex II at LICENSOR's office in Erie, Pennsylvania within thirty (30) days of receipt of the ⟨INITIAL PAYMENT OF THE⟩ Technology Disclosure Fee⟨AS PER SUB-CLAUSE 6.2 HERE⟩. LICENSOR will make reasonable efforts to provide LICENSEE a version of the Software suitable for execution on Sun Unix Workstations based upon Fortran Programs. LICENSEE will be responsible for any conversion requirements required for use of the software on the LICENSEE's computer system.

3.b)    LICENSOR shall furnish LICENSEE with the Technical Information as specified in the remaining items of Annex II

CONFIDENTIAL

as requested by LICENSEE in response to orders received by LICENSEE for Products or in response to inquiries if so agreed by the Parties.

3.c) Each item of Technical Information furnished by LICENSOR shall be furnished in a form utilized by LICENSOR, and shall contain either metric or American dimensions and measurements and legends as LICENSOR may deem appropriate and such information shall be as detailed as LICENSOR would furnish to its own personnel for use in connection with the Products.

3.d) With the aid of the LICENSOR-provided Technical Information, LICENSEE will, in case of an order, make its own workshop drawings of drawings of Products, as well as calculations of performance of the Products, except for specific heat transfer design information and output from the LICENSOR's natural circulation computer program, which LICENSOR will furnish to LICENSEE as part of the Software. (The foregoing assistance will be provided by LICENSOR as outlined in the ANNEXES ~~Appendices~~ until a reasonable period of training and Software transfer is complete. This assistance will include reasonable thermal design support, other mechanical and general proposal support from LICENSOR's offices sufficient for preparation of proposals by LICENSEE for the LICENSEE's clients).

3.e) At the request of LICENSEE, LICENSOR will review LICENSEE's workshop drawings and calculations for compliance with LICENSOR's design at LICENSOR's applicable service rate in effect at the time such service is rendered. This support will be provided by LICENSOR free of charge to LICENSEE for




CONFIDENTIAL

the first two orders to review for general compliance with LICENSOR's standard. All drawings will be provided in English. LICENSEE will be responsible for making and implementing any alterations of the design of the Products required by codes, rules, or other requirements of the country of manufacture or the country of delivery or because of shop practices within the LICENSEE's plant(s).

3.f) Upon LICENSEE's reasonable request, LICENSOR shall provide, without any additional payment to LICENSOR, reasonable technical assistance to LICENSEE by written or telephone response relating to the application and interpretation of the Technical Information furnished by LICENSOR under this Agreement.

3.g) On reasonable request by LICENSEE, LICENSOR will give special engineering advice regarding planning, design, manufacturing, installation, or operation of Products by LICENSEE at LICENSOR's applicable service rate in effect at the time service is rendered.

3.h) All amounts payable to LICENSOR under this Clause shall be due in United States Dollars (USDLR) within sixty (60) days after receipt by LICENSEE of LICENSOR's invoice. Payments will be by wire transfer.

3.i) Annex III and Annex IV hereto set forth LICENSOR's contract rates for technical assistance as of the Effective Date, provided however, that rates for technical assistance are subject to prior agreement between the Parties on reasonable escalation throughout the term of this Agreement.



CONFIDENTIAL

## CLAUSE 4

### Personnel Support, Training, and Technical Assistance

4.a) During the life of this Agreement, at the reasonable requests of LICENSEE, LICENSOR will admit to that portion of its facility a reasonable number of LICENSEE's employees to inspect and become acquainted with LICENSOR's engineering discipline, working methods, and manufacturing processes relating to the Products. Such visits shall be free of charge to LICENSEE for up to four (4) man-months of training during the first year of this Agreement. LICENSOR will conduct periodic LICENSEE meetings during the term of this Agreement to provide additional training and exchange of information. LICENSOR will provide LICENSEE with any other Technical Information in respect of the manufacture of Products, in connection with such visits, on the condition that the regular course of business of LICENSOR is not interfered with thereby, and provided that all expenses of such employees of LICENSEE will be borne and paid for by LICENSEE. All employees of LICENSEE who participate in on-site training at LICENSOR will execute acknowledgments that they are aware of and bound by the secrecy provisions of this Agreement and that all information disclosed during on-site training constitutes Technical Information hereunder. LICENSEE assumes all responsibility for any health, accident, or other liability insurance coverage for all employees and other representatives of LICENSEE who participate in such on-site visits to LICENSOR's premises.

4.b) LICENSOR will provide personnel support to LICENSEE by sending



CONFIDENTIAL

a LICENSOR representative to LICENSEE's project team at technical presentations of the Products and join technical meetings between LICENSEE and its clients as required by LICENSEE, free of charge to LICENSEE, for the first two (2) projects, limited to one week trip and one trip per project. For subsequent LICENSOR's personnel support, LICENSEE will pay to LICENSOR standard per diem rate set forth in Annex III or as may be in effect at the time the support is provided.

4.c) All amounts payable under this Clause shall be due and payable (USDLS) within sixty (60) days after receipt by LICENSEE of LICENSOR invoice. Payments will be by wire transfer.

## CLAUSE 5

### Secrecy

5.a) All of the Technical Information supplied by LICENSOR under this Agreement shall be for the exclusive use of LICENSEE (and its employees on a need to know basis) and LICENSEE agrees that Technical Information shall not be given, sold, disclosed, or otherwise made available in any fashion to any other firm, company, or person (including customers and prospective customers of LICENSEE) except with the prior written consent of LICENSOR. LICENSEE shall not use any of the Technical Information supplied by LICENSOR under this Agreement for any purpose except as set forth in Clause 2 of this Agreement.

5.b) Notwithstanding the foregoing, no secrecy obligation herein shall apply to Technical Information which:

(i)    At time of disclosure is generally available to the



CONFIDENTIAL

public;

(ii) After disclosure by LICENSOR becomes generally available to the public by publication or otherwise through no fault of LICENSEE;

(iii) Was in LICENSEE's possession prior to the disclosure hereunder and which was not acquired directly or indirectly from LICENSOR and which was acquired without being subject to any restriction as to disclosure or use;

(iv) Was received by LICENSEE from a third party imposing no obligation of confidentiality and who did not acquire any such information directly or indirectly from LICENSOR under an obligation of confidentiality; or

(v) Which is independently generated by an affiliated company of LICENSEE without any disclosure from LICENSEE to such affiliated company, and in the event of a dispute LICENSEE shall have the burden of proving by clear and convincing evidence that the information was independently generated by such affiliated company without any such disclosure.

5.c) Notwithstanding the above, and without prejudice to LICENSEE'S rights of disclosure as stated heretofore, LICENSEE may disclose Technical Information to appropriate governmental authorities when reasonably deemed necessary by LICENSEE in furtherance of the purpose for which the Technical Information is licensed hereunder; provided, however, that prior to making any such disclosure, LICENSEE shall (i) provide LICENSOR with timely written notification of the information requested by the governmental authority



CONFIDENTIAL

and its intent to so disclose; (ii) minimize the amount of information to be provided consonant with the interests of LICENSOR and the requirements of the governmental authority involved; and (iii) make every reasonable effort (which shall include participation by LICENSOR in discussions with the governmental authority involved) to secure confidential treatment of the information to be provided.  In the event the efforts to secure confidential treatment are not successful, LICENSOR shall have the prior right to revise such informational in a manner consonant with its interests and the requirements of the governmental authority involved.

5.d)  LICENSEE shall require all of its subcontractors to agree in writing to be bound by the provisions of this Clause 5.

5.e)  The provisions of the Clause 5 shall apply with equal force with respect to improvements which LICENSOR supplies to LICENSEE.

5.f)  All obligations under this Clause 5 shall survive the termination of this Agreement.

### CLAUSE 6

### Compensation

In consideration of licensee rights granted herein, supply of Technical Information, and the supply of technical assistance, LICENSEE shall pay to LICENSOR:

6.a)  Technology Disclosure Fee: A lump sum of REDACTED payable per the schedule REDACTED defined in paragraph 6 (b) below.

6.b)  Payment Schedule: Payment for the Technology Disclosure Fee



CONFIDENTIAL

will be payable as follows:

(i)          within sixty (60) days from the Effective Date of this Agreement.

**REDACTED**

(ii)          within twelve (12) months from the Effective Date of this Agreement.

(iii)          within eighteen (18) months from the Effective Date of this Agreement.

6.c) <u>Royalties:</u> On the schedule set forth in Clause 7, LICENSEE will pay to LICENSOR, in addition to the Technology Disclosure Fee, a continuing royalty, which shall be computed at percent          of the Net Selling Price, as defined in Clause 1.f hereof, of each Product manufactured and sold by LICENSEE

**REDACTED** or by an authorized sublicensee of LICENSEE.  The royalty rate for the LICENSEE's first contract will be reduced to percent          The royalty due LICENSOR will be converted to U.S. dollars at the prevailing currency exchange rate quoted in the Wall Street Journal on the nearest business date to date of LICENSEE's Purchase order or contract from its customer.

6.d) The compensation rates herein provided for shall continue for the duration of this Agreement, unless altered in accordance with the terms of Clause 19 hereof.

6.e) ALL PAYMENTS HEREIN PROVIDED FOR SHALL BE PERFORMED BY LICENSEE AGAINST CORRESPONDING INVOICES ISSUED BY LICENSOR



CONFIDENTIAL

## CLAUSE 7

### Payments and Accounting

7.a) The Royalties defined in Clause 6 will be paid in accordance with the following schedule:

1.    within six (6) months after the receipt of the Purchase order or upon initiation of **REDACTED** manufacture of the Product by LICENSEE for this Purchase order, whichever occurs sooner.

2.    upon materially complete shipment of the Product under the specific Purchase order.

7.b) A "Semi-Annual Statement" (as hereafter defined) shall be submitted by LICENSEE to LICENSOR for period ending with the end of each half Contract Year for the duration of this Agreement, listing Products upon which manufacturing by LICENSEE (or its authorized sublicensees) has been completed in such period and an addendum listing Products upon which manufacturing is not complete. The Semi-Annual Statement shall identify for each completed or incomplete Product:

(i)     Date of Order

(ii)    Name of Client

(iii)   Destination

(iv)    Performance Data to include steam capacity and conditions, type of gas turbine, number of Heat Recovery Steam Generators

(v)     Date of completion or scheduled completion of the Products

(vi)    Purchase order price and portion relevant Net Selling Price

LICENSE.ITALY/ROSETTI
FINAL 9/30/96



CONFIDENTIAL

(vii)  The royalty amount payable thereon

This report shall be sent to LICENSOR within 30 days following the end of specified semi-annual period.

7.c) All amounts which LICENSEE owes LICENSOR under this Clause 7 will be paid by LICENSEE to LICENSOR in U.S. Dollars and remitted by telegraphic transfer free from bank or other charges, which charges, if any, are to be paid by LICENSEE at the prevailing currency exchange rate quoted in the Wall Street Journal on the nearest business date to date of LICENSEE's specific Purchase order or contract from its customer.

7.d) Any tax imposed in Italy on compensation payments to LICENSOR as referenced in Clause 6 shall be borne by LICENSOR.  In the event LICENSEE is required to withhold such taxes from the amount payable to LICENSOR hereunder, and to pay said taxes on behalf of LICENSOR, LICENSEE shall furnish LICENSOR with a certificate of such tax payment duly executed by the proper Italian authority and attached to the Semi-Annual Statement. LICENSOR will file a tax form called "Application Form for Income Tax Convention (Form 3)" stating that it is a U.S. resident company and does not have a permanent establishment in Italy.  The filing shall be made through LICENSEE with a tax office prior to payment. Any other taxes, including any value-added tax, shall be paid and borne by LICENSEE without any deduction from the amounts owing hereunder to LICENSOR, unless otherwise required by law.

7.e) LICENSEE will advise LICENSOR of each sale of a Product by LICENSEE or an authorized sublicensee by forwarding to



CONFIDENTIAL

LICENSOR a copy of each order immediately after said order has been placed with LICENSEE.

7.f) LICENSEE shall, during the term of this Agreement, keep accurate and complete records, books, and files of all Products and orders for Products, including the identifying data required in the Semi-Annual Statement. These records shall be made available for inspection and copying by authorized representatives of LICENSOR during any normal business day; provided however, that an inspection of LICENSEE's records shall be made by LICENSOR only upon and after giving to LICENSEE of at least ten (10) days written notice by LICENSOR of LICENSOR's intention to inspect such records. This paragraph also shall apply to and be made part of any agreement between LICENSEE and any authorized sublicensees of LICENSOR.

7.g) If an audit by LICENSOR reveals a shortfall in Royalty payments exceeding five (5) percent of Royalties owing then LICENSEE shall pay any such shortfall, plus interest thereon at the LIBOR rate plus three percent (3%) and the reasonably documented cost of the audit.

## CLAUSE 8

### Modifications to Products by LICENSEE

8.a) LICENSEE will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products. LICENSEE will submit to LICENSOR such plans for modifications for prior written approval by LICENSOR except for the



CONFIDENTIAL

alterations as defined in Clause 3(e).

8.b) LICENSEE shall assume the entire responsibility for any changes in design or material specifications made by LICENSEE, and shall hold LICENSOR harmless from any liability therefor, regardless of any approvals made by LICENSOR.

8.c) All technical questions related to proposed modifications of the Products shall be directed to the LICENSOR'S Chief Mechanical Engineer with a copy provided to the LICENSOR contact identified in Section 23 - Notices.

8.d) Any modification by LICENSEE shall be deemed an Improvement under this Agreement.

## CLAUSE 9

### Workmanship

9.a) LICENSEE will at all times use its best efforts to attain high class workmanship in all activities performed by LICENSEE or its subcontractors relating to Products, so as to protect the reputation of LICENSOR and the good will of the Mark (as hereinafter defined) regarding such Products.

9.b) LICENSEE shall maintain LICENSOR's standards of materials and workmanship and shall conform, insofar as possible, to LICENSOR's engineering standards in manufacture of Products, and will regularly consult with LICENSOR in matters of application or problems relating to the design, manufacture, quotation, sale, installation and operation of Products, and will abide by the recommendations and instructions received from LICENSOR. The responsibility for the exercise of final judgment in making recommendations to LICENSEE's customers for

CONFIDENTIAL

proper application of Products shall, however, rest solely with LICENSEE.

9.c) LICENSOR shall have the right, upon reasonable notice to LICENSEE, to conduct inspections of LICENSEE's manufacturing facilities and procedures during normal business hours and to inspect randomly-selected Products, manufacturing equipment and processes for Products, and installations of Products. Deficiencies in Products, to the extent these are the result of LICENSEE's manufacture, use, modification or installation of Products, shall be remedied by LICENSEE within 30 days of written notice from LICENSOR of the deficiencies.

## CLAUSE 10

### Warranty & Representations

10.a) LICENSOR will provide to LICENSEE the most advanced Technical Information available to LICENSOR. LICENSOR represents that such Technical Information provided by LICENSOR will be in the English language and of the same kind and as accurate and complete as the Technical Information currently used by LICENSOR in manufacturing the Products.

10.b) OTHER THAN AS SET FORTH HEREIN, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, AND ASSUMES NO RESPONSIBILITIES WHATEVER WITH RESPECT TO THE MANUFACTURE, USE, SALE, OR OTHER DISPOSITION BY LICENSEE OR ITS SUBLICENSEES OF PRODUCTS.



CONFIDENTIAL

## CLAUSE 11

### Indemnity/Insurance/Limitation of Liability

11.a) <u>Indemnity</u>. LICENSEE and LICENSOR will indemnify and hold harmless each other from, for, and against all liabilities asserted against, resulting to, imposed on, or incurred by either Party at any time arising out of claims or allegations that injury to either Party or any third party resulted from the manufacture, marketing, sale, installation, and operation of Products and any Improvements thereto pursuant to this Agreement; provided that the foregoing indemnity shall not apply with respect to parts of Products which were purchased from LICENSOR pursuant to this Agreement and which were incorporated in Products in accordance with all relevant specifications and guidelines provided by LICENSOR and that any errors or defects in such parts found to give rise to a liability are not attributable to modifications or alterations made by LICENSEE or any of its sublicensees or subcontractors. If it should be shown that the cause of any liability for any injury resulting from the manufacture, marketing, sale, and installation of Products is the Technical Information provided by LICENSOR and properly implemented and applied by LICENSEE in the Products, then LICENSOR will use its best efforts to correct any errors or deficiencies in the Technical Information and will contribute to satisfying any liability arising from such defect in the Technical Information in an amount up to but not exceeding the limit set forth in Clause 11(b) herein.



CONFIDENTIAL

As used in this Agreement, "Indemnify" means to indemnify, reimburse, defend and hold harmless the indemnitee (including its parents, subsidiaries, successors, affiliates, officers, directors, employees, agents, and representatives) from any and all liabilities and injuries; "liabilities" means all demands, claims, actions, causes of action, assessments, losses, damages, obligations, judgments, fines, and costs and expenses (including without limitation settlements, penalties, interest, reasonable attorneys' fees, disbursements and expenses, and reasonable consultant fees, disbursements and expenses); and "injury" means bodily injury, death, property damage or economic loss.

11.b) <u>Limitation of Liability</u>.  LICENSOR's responsibility for any liabilities for any injury to LICENSEE or any third party arising from the design, manufacture, marketing, sale, and installation of any Product pursuant to this Agreement shall be limited to the amount of the relevant Royalty for the particular Product, as provided in Clause 6(c).  In no event shall LICENSOR's liability exceed the amount of such royalty for the particular Product.  LICENSEE understands and agrees, however, that in no event shall it be entitled to any indemnity from LICENSOR with respect to liabilities for injuries arising from the operation by purchasers of installed Products, inasmuch as LICENSOR and its agents will not be permitted or authorized to operate, service, or repair Products manufactured and sold by LICENSEE pursuant to this Agreement.



CONFIDENTIAL

11.c) <u>Insurance</u>.     LICENSEE, and any sublicensee of LICENSEE pursuant to this Agreement, will carry general public liability (in Italy RCT = Responsabilita Civile Terzi = Third Party Liability) insurance available in the European Market, to include products and completed operations coverage on a claims-made or occurrence basis.     This insurance coverage shall be in an amount not less than Five Million U.S. Dollars.     Each such insurance policy will name LICENSOR an additional insured by no later than the date of the first LICENSEE purchase order.     LICENSEE (and, where applicable, sublicensee) will furnish a certificate of insurance, or a copy of the policy upon request, evidencing such coverage within thirty (30) days of the LICENSEE's first purchase order and annually thereafter.

11.d) LICENSEE may satisfy the requirement in the above paragraph by adding LICENSOR to its Builders All-Risk insurance policy as an additional insured "for the interests as specified" if such insurance policy meets the identified insurance limits specified above.

11.e) LICENSEE may be allowed to self-insure for the required insurance coverage, provided LICENSEE demonstrates to the satisfaction of LICENSOR sufficient financial capability to self-insure.



CONFIDENTIAL

## CLAUSE 12

### Patents

12.a) To the best of LICENSOR's knowledge, it has not infringed any patent possessed by any third party. LICENSOR has not investigated patents in the Territory where LICENSEE intends to manufacture and sell Products covered under this Agreement. Accordingly, LICENSOR makes no warranty or representation, and none is implied, that the manufacture, use or sale of Products, by LICENSEE under this Agreement will be free from infringement of any third party patents.

12.b) In the event of any legal action for patent infringement by or against LICENSEE based on the manufacture, use or sale of any Products under this Agreement, LICENSOR shall, upon request of LICENSEE, furnish LICENSEE any information and evidence which is readily available to LICENSOR and which LICENSOR deems material to the prosecution or defense of such patent actions.

12.c) If LICENSEE desires that a patent be obtained in the Territory for an invention made by LICENSOR during the term of this Agreement, then LICENSOR will cooperate with LICENSEE in obtaining such patent on behalf of LICENSOR if LICENSOR desires the patent and if the invention is patentable under applicable patent laws. The payment of all fees incurred in investigating or obtaining such patents shall be equally shared by LICENSOR and LICENSEE; provided however, that any such patent obtained by LICENSEE for LICENSOR will be subject to this Agreement.

12.d) In case a patent of LICENSOR which is covered by this



CONFIDENTIAL

Agreement shall have lost its importance to LICENSOR in the Territory, LICENSOR will consult with its other licensees not later than 6 months before the date upon which any patent fees or other required patent maintenance action shall fall due.  If all other licensees agree, LICENSOR will cease to maintain such patent, whereby LICENSEE may maintain such patents for its own account in LICENSOR's name.

12.e)  LICENSEE will use due diligence to police and enforce any patents obtained by LICENSOR in the Territory, and will notify LICENSOR when third parties commit such acts as may infringe such patents.  It will be left to LICENSOR to decide whether or not such infringements are to be prosecuted and it will be mutually agreed by the Parties how to share in the costs of prosecution.

## CLAUSE 13

### Improvements

13.a)  In order to further the mutual interest of both parties, LICENSOR shall disclose and make available to LICENSEE and LICENSEE shall disclose and make available to LICENSOR, free of any charge, all Improvements developed while this Agreement is in effect.  Such disclosure shall be made not earlier than six (6) months after such Improvement have been introduced into commercial production, whether or not such Improvements are patented or subject to patent applications; provided, however, that any Improvements, including new designs and inventions, which are developed by any of LICENSOR's other licensees shall not be made available to



CONFIDENTIAL

LICENSEE and, similarly, any such improvements and developments made by LICENSEE shall not be made available to any other licensee of LICENSOR. However, best efforts will be made to make all improvements available to LICENSEE unless this is prevented by other license agreement(s) and related legal regulation.

13.b)  Improvements disclosed by either party pursuant to this paragraph shall be subject to the secrecy provisions of Clause 5 herein.

13.c)  Any Improvement shall be owned by the party which has discovered or made the Improvement. LICENSOR shall grant to LICENSEE a royalty-free license to use Improvements developed by LICENSOR and disclosed pursuant to Clause 13(a) above, such license being equal in scope to the license granted to LICENSEE with respect to Technical Information in Clause 2 of this Agreement. Any Improvement licensed from LICENSEE to LICENSOR, however, shall be non-exclusive as to LICENSOR's use or modifications of such Improvement, subject only to rights retained by LICENSEE.

## CLAUSE 14

### Copyrights

14.a)  LICENSEE understands and agrees that certain items to be provided within the Technical Information, including but not limited to software, drawings, manuals, and promotional and sales materials, are protected under U.S. Copyright law whether or not such items bear copyright notice. LICENSEE further agrees that LICENSOR owns all right, title, and



CONFIDENTIAL

interest to any copyrightable materials contained in the Technical Information. Nothing in this Agreement shall constitute or be deemed to be a transfer to LICENSEE of any ownership rights in any such copyrightable material, and title to all copyrights shall remain exclusively with LICENSOR. Pursuant to the license granted in Clause 2 of this Agreement, however, LICENSEE shall have the limited right to use internally and copy any program included in the Software to the extent such copying is an essential step in the utilization of a program in conjunction with a machine or for archival or backup purposes. Any archival copies made under this paragraph shall be destroyed upon termination of this Agreement for any reason. LICENSEE may maintain archival copies as required by national or local laws, regulations, and codes.

14.b) Except as provided above in Clauses 3 (a) , (d), (e), and 14 (a), LICENSEE may not copy, reproduce, distribute (including sale, lease, or rental), perform, display, or prepare derivative works based upon any copyrightable materials provided to LICENSEE by LICENSOR without the prior written consent of LICENSOR.


## CLAUSE 15

### Trademarks

15.a) <u>Grant of License</u>. For the duration of this Agreement, LICENSEE shall be permitted to use the Mark royalty-free on the Products manufactured by LICENSEE. The Mark shall be affixed to a plate appearing on each Product supplied by



CONFIDENTIAL

LICENSEE upon which there shall be an indication that the Product was supplied by LICENSEE under license from LICENSOR. For the duration of this Agreement, LICENSEE also shall be permitted to use the Mark in marketing, advertising, and sales activities related to the Product manufactured by LICENSEE.

15.b) <u>Use of Trademarks</u>.

(i)  LICENSEE agrees to use the Mark only in the form approved by LICENSOR. The design, appearance, placement, application of statutory notice and other uses by LICENSEE of the mark shall conform to the existing usage and specifications to be provided to LICENSEE by LICENSOR. Upon request by LICENSOR, LICENSEE shall promptly provide representative samples of any and all uses by LICENSEE of the Mark.

(ii)  LICENSEE acknowledges that the Mark, the property solely of LICENSOR, is of great commercial value to LICENSOR, and represents the good will and wide recognition attained by LICENSOR's high quality Products. All use of the Mark by LICENSEE, including any good will arising out of such use, shall be solely to the benefit of LICENSOR. LICENSEE further acknowledges that any misuse or infringement of the Mark, including breach of LICENSEE's obligations under Clauses 8 and 9 of this Agreement would cause LICENSOR irreparable harm for which it would have no adequate remedy at law.

(iii) All rights to the use of the Mark by LICENSEE shall



CONFIDENTIAL

terminate immediately with the termination of this Agreement.   LICENSEE understands and agrees that it will use no mark confusingly similar to the Mark in any way following the termination of this Agreement. LICENSEE's obligations under this paragraph shall survive any termination of this Agreement.

15.c)   <u>Registered User Status</u>.   This license to use the Mark on Products and in marketing and sales activities shall be conditioned, where required by applicable law or custom, upon the entry of LICENSEE into a Registered User Agreement in a form appropriate under the applicable law within the Territory.   The use of the Mark pursuant to this license shall in no way imply that LICENSEE is acting as an agent for LICENSOR or vice versa.


## CLAUSE 16

### Duration of Agreement

16.a)   This Agreement will be in effect for the term of ten (10) years from the Effective Date hereof, unless terminated earlier under the terms provided for.

16.b)   After the expiration of the initial ten (10) year term, this Agreement will be continued from year to year, in accordance with the terms and conditions of this Agreement unless notice is given in writing by one party to the other at least sixty (60) days before the expiration of the original or extended period that the notifying party does not intend to renew or extend this Agreement.

16.c)   ~~In the event that either of the parties hereto, at anytime~~
SEE ADDENDUM TO THIS AGREEMENT (SH. 47.1) FOR MODIFICATIONS
TO SUB-CLAUSE "16.C"

CONFIDENTIAL

during ~~the term of this Agreement, commits the breach of any~~ material provision hereunder, and fails to rectify such breach within ninety (90) days from the receipt of written notice thereof from the other party hereto, such other party may, at its sole option, and in addition to any other remedies that it may be entitled to, terminate this Agreement forthwith by notice in writing to the breaching party to such effect.   This Agreement may be terminated forthwith at any time by either party if there should occur a substantial change in the management, operation or control of the other party which is demonstrated to affect either Party's performance, reliability and operations.

The LICENSOR will be entitled to terminate the Agreement with immediate effect by serving the LICENSEE written notice to this purpose, in case the LICENSEE, at any time during the term of this Agreement, breaches one of the following provisions of this Agreement:

- Clause 2(c)   Sublicensing Rights
- Clause 2(d)   Conditions of Grant of Rights
- Clause 3(h)
- Clause 5       Secrecy
- Clause 6       Compensation
- Clause 7       Payments and Accounting
- Clause 8       Modifications to Products by LICENSEE
- Clause 9       Workmanship
- Clause 11      Indemnity/Insurance/Limitation of Liability
- Clause 12      Patents
- Clause 13      Improvements
- Clause 14      Copyrights
- Clause 15      Trademarks
- ~~Clause 25      U.S. Export Regulations~~

16.d)  In the event LICENSEE has not received during the first three (3) years a minimum of two (2) HRSG orders for GE



CONFIDENTIAL

Frame 6 equivalent or larger application, provided that no changes in laws and regulations in the Territory affect the market potential available at the time of the Effective Date hereof, LICENSOR has the right to convert LICENSEE's Exclusive Territory to Non-Exclusive Territory without affecting any other terms of this Agreement. This conversion to Non-Exclusive Territory would be effective within thirty (30) days after written notice to LICENSEE.

16.e) Any HRSG orders resulting from bids submitted by the Parties through a consortium or joint venture or equivalent cooperation agreement will be part of the orders received in the time period as per above Clause "16.d".

### CLAUSE 17

### Obligations After Termination of Agreement

17.a) After any termination of this Agreement by LICENSOR in accordance with the provisions of Clause 16 (c) hereof, LICENSEE shall no longer have the right to manufacture the Products, to use the Technical Information supplied to LICENSEE by LICENSOR under this Agreement (to the extent that said Technical Information has not meanwhile become publicly known through no fault of LICENSEE), or to use the Mark. LICENSEE shall return to LICENSOR all of the design, drawings, and other physical materials comprising the Technical Information within thirty (30) days after such termination.

17.b) Any notice of termination, or any termination, of this will not prevent LICENSEE from completing manufacture and



delivering Products which were ordered before the date of said notice or to confirm the validity of bids submitted to Clients before the notice of termination, if so agreed in writing with LICENSOR in order to prevent any damage to LICENSOR's Trademark and LICENSOR's/LICENSEE's reputation in the Exclusive Territory; provided, however, that LICENSEE will have the duty to make the Royalty payment required under Clause 6 of this Agreement, provided further, that LICENSEE will have the duty to maintain the secrecy of all Technical Information as herein above provided in Clause 5. If the Agreement termination is for a reason other than breach, LICENSOR shall provide reasonable support to LICENSEE required in execution of this work.

17.c)   Upon any termination of this Agreement, LICENSEE shall, upon receipt of notice from LICENSOR, terminate any or all sublicenses approved hereunder and/or assign its rights under any remaining sublicenses to LICENSOR.


## CLAUSE 18

### Assignment

The rights and obligations arising out of this Agreement shall not be assignable by LICENSEE without the written consent of LICENSOR.



CONFIDENTIAL

## CLAUSE 19

### Arbitration

Any controversy between the parties to this Agreement arising out of and in connection with this Agreement shall be settled definitely by three arbitrators in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce by which each party hereto is bound. The place where arbitration is to be held shall be London, England. The arbitrator's award shall be enforceable in any court and the parties hereby consent to the jurisdiction thereof. The arbitration shall be in the English language.

## CLAUSE 20

### Law Applicable

This Agreement shall be deemed to have been made in the Commonwealth of Pennsylvania, United States of America, and the parties intend to be governed in the operation, effect, validity, interpretation, performance and discharge of this Agreement by the laws of the Commonwealth of Pennsylvania, United States of America, with the exclusion of the provisions of the Convention on Contracts for the International Sale of Goods. However, in case of conflict with any provisions imposed to LICENSEE by law in the Exclusive Territory, such latter provisions shall prevail and be subject to provisions of Clause 27.



CONFIDENTIAL

## CLAUSE 21

### Modification

This Agreement shall not be modified except by a supplemental written agreement executed by an authorized representative of both of the parties hereto.

## CLAUSE 22

### Force Majeure

22.a)    In the event that either party gives notice that it is delayed in the performance of its obligations under this Agreement by Force Majeure, this Agreement shall be suspended until such party gives notice that the cause of such delay has ceased, and neither LICENSOR nor LICENSEE shall have any liability for loss or injury suffered by the other party by reason of said Force Majeure. Upon cessation of the cause of said delay, this Agreement shall become fully operative under the terms hereinabove set forth.

22.b)    For the purpose of this Agreement, Force Majeure shall include, without limitation, strikes, lockouts, riots, sabotage, acts of war, civil disorder or piracy, retroactive application of laws and regulations in any country covered by this Agreement, destruction of essential equipment by fire, explosion, storm, flood, earthquake and the like, and delay caused by failure of power supplies to either LICENSOR's or LICENSEE's facilities, and delay caused by transportation facilities and any similar cause of delay beyond the reasonable control of the party liable to perform.



CONFIDENTIAL

## CLAUSE 23

### Notices

23.a)  Any notices, reports, or information required to be given under the terms of this Agreement, by LICENSEE to LICENSOR shall, unless otherwise expressly provided for, be addressed to:

> Vice President, Customer Development
>
> Zurn Energy Division
>
> 1422 East Avenue
>
> Erie, PA  U.S.A.   16503

23.b)  Any notices, reports, or information required under the terms of this Agreement to be given by LICENSOR to LICENSEE shall, unless otherwise expressly provided for, be addressed to:

> Marketing Manager
>
> Rosetti Marino S.p.A.
>
> Via Trieste, 230
>
> 48100 Ravenna, Italy

Notice shall be deemed to have been given as of the date postmarked, when in writing and mailed, registered mail or international courier service, postage prepaid, addressed as herein above specified, but such method of giving notice shall not exclude the use of any other method of giving notice which does in fact give notice.



CONFIDENTIAL

## CLAUSE 24

## Integration, Merger and Waiver

24.a)   The terms and provisions contained in this Agreement, are the full agreement of the parties pertaining to the subject matter of this Agreement, and are fully set forth herein, and no prior understanding or obligation not expressly set forth herein shall be binding upon the parties to this Agreement, and no subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms herein provided and executed with the same formalities as this Agreement.

24.b)   No waiver, expressed or implied, by either party of any breach of obligation by the other party shall operate or be considered as a waiver of any other or subsequent breach.

24.c)   Section headings appearing in this Agreement are inserted for convenience of reference only and shall in no way be construed to be interpretation of the text.

## CLAUSE 25

## U.S. Export Regulations

25.a)   LICENSEE acknowledges that the technical data to be provided by LICENSOR is subject to United States export controls pursuant to the Export Administration Regulations, 15 C.F.R. parts 768-799.   LICENSEE will comply strictly with the requirements of the Export Administration Regulations with respect to all such LICENSOR technical data, and, without limiting the generality of the foregoing undertaking, LICENSEE specifically agrees that neither the LICENSOR




CONFIDENTIAL

technical data, nor the direct product thereof, will be exported, reexported, diverted or otherwise transferred to any country listed in Appendix A hereto, or to any country that may be hereafter proscribed under the Export Administration Regulations, without the prior written authorization of the United States Commerce Department and LICENSOR. LICENSOR will provide reasonable support to LICENSEE in obtaining these authorizations when required.

25.b) LICENSEE further acknowledges that the disclosure of United States origin technical data to nationals of another country may constitute a reexport of such technical data. Accordingly, all disclosures by LICENSEE of LICENSOR technical data to nationals of countries specified in Appendix A hereto shall be subject to the prior authorization of requirements set forth above.

24.c) LICENSEE will make records available to LICENSOR, at LICENSOR's reasonable request, in order to permit LICENSOR to confirm LICENSOR's compliance with its obligations as set forth herein.

25.d) The obligations set forth in this Clause 25 shall survive expiration or termination of this Agreement.

## CLAUSE 26

### No Agency

Nothing in this Agreement shall be construed to establish by expression or implication that either party to this Agreement is acting as, or is deemed to be, the agent for the other party.



CONFIDENTIAL

## CLAUSE 27

### Severability

In the event that any provision of this Agreement shall be held to be invalid, illegal, or unenforceable in any respect, as a whole or in part, by a court or administrative body of competent jurisdiction, then, unless otherwise agreed, this Agreement shall continue in full force and effect except for such provision, which shall be deemed to be excised here from but only with regard to the part held invalid, illegal, or unenforceable. In such event, the parties hereby agree to use their best efforts to agree on substitute provisions, which while valid, will achieve as closely as possible the same economic effects as the invalid provision(s).

IN TESTIMONY WHEREOF, witness the signatures of the parties hereto:

ZURN INDUSTRIES, INC./ENERGY DIVISION

By: _James S Davis_

Title: _President_

Date: __OCTOBER 31ST, 1996__

Witnessed By: _Terri L. Jackson_ 11/14/96

ROSETTI MARINO SPA

By _____ GIANFRANCO MAGNANI

Title: __MANAGING DIRECTOR__

Date: __OCTOBER 31ST, 1996__

Witnessed By: __BRUNO DALLEDONNE__

HARK J. WHITE

LICENSE.ITALY/ROSETTI
FINAL 9/30/96