IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company, | ) ) ) **CONFIDENTIAL** |
| Plaintiff, | ) ) CIVIL ACTION |
| vs. | ) ) No. 04-CV-325E |
| VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company, | ) ) Judge Sean J. McLaughlin ) ) |
| Defendant. | ) |

The videotape deposition of MARK WHITE taken on behalf of the Plaintiff before Pamela B. Stinchcomb, Certified Shorthand Reporter in and for the State of Oklahoma, on the 1st day of February, 2006, in the City of Tulsa, State of Oklahoma, pursuant to the stipulations of the parties.

COPY

PAMELA B. STINCHCOMB, CSR #1544
DAVIDSON REPORTING SERVICE
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
(918) 745-9959

EXHIBIT 59

```
 1       A.    Well, let me look at Annex 1.
 2             MR. SHEEAN:  It's not there.
 3       A.    There is no Annex 1.
 4             MR. GISLESON:  Go ahead and mark
 5  that.
 6             (Plaintiff's Exhibit Number 6 was marked
 7  for identification.)
 8       Q.    (By Mr. Gisleson) I'd like to show you
 9  what's been marked as Exhibit 6.  It is documents
10  stamped V 39 to 45.  Does Exhibit 6 contain the fist
11  page of the license agreement and then a copy of the
12  annexes to the license agreement?  I'm sorry.  A copy
13  of Annex 1 to the license agreement?
14       A.    It would appear so.
15       Q.    Where in Annex 1 does it refer to the
16  license product including membrane wall technology?
17       A.    The word membrane is not -- I don't see the
18  word membrane here.
19       Q.    Where in Annex 1 does it show that VEO has
20  the right to include membrane technology in a
21  licensed boiler?
22       A.    What do you mean by the right to include?
23       Q.    Is there anything in Annex 1 to the license
24  agreement providing that VEO has the right to include
25  membrane technology in the licensed boiler?
```

1      MR. SHEEAN: I object to the question
2  as mischaracterizing Annex 1 as a separate agreement
3  that provides rights or otherwise bestows or even
4  limits the rights, limits set forth in the license
5  agreement. I think you're misrepresenting the
6  document, but you can answer.
7      A.   Could you repeat your question, please?
8          MR. GISLESON: Could you read it
9  back.
10     (The record was read back by the court reporter
11 as requested.)
12     A.   It's not shown in Annex 1.
13     Q.   (By Mr. Gisleson) On how many occasions
14 prior to Annex 1 being finalized did Shawn Brewer
15 discuss membrane wall technology?
16     A.   On how many occasions?
17     Q.   Yes.
18     A.   I don't know specifically the number.
19     Q.   Approximately?
20     A.   I'm -- I don't want to speculate but there
21 were several, several times throughout the
22 conversations.
23     Q.   You understood the difference at the time
24 of those conversations between tangent tube --
25 tangent tube technology and membrane wall technology,

1        Q.    Was there any aspect of Annex 1 that VEO
2   did not understand?
3        A.    Not that I'm aware of.
4        Q.    Did VEO raise any questions with EPTI
5   concerning the substance of anything in Annex 1?
6        A.    I don't believe so.  Once again, we were
7   reviewing this as a guide and not as a -- you know,
8   complying with all the data in the table and even on
9   that subject, even the first several designs that
10  were completed by Erie Power Technologies didn't use
11  any of these data in these tables either, which would
12  go further, to my extent, that it was a guide.
13             MR. GISLESON:  Move to strike as
14  nonresponsive.
15             MR. SHEEAN:  Disagree.
16       Q.    (By Mr. Gisleson) Did VEO have any
17  conversations with Mark White or anyone else at EPTI
18  concerning the version of Annex 1 that was attached
19  to the February 3, 2003, e-mail?
20             MR. SHEEAN:  Objection, asked and
21  answered.
22       A.    I don't recall.
23       Q.    (By Mr. Gisleson) Did VEO accept the terms
24  of Annex 1 as written?
25       A.    We initialed and sent back the agreement.

1  Q. By initialing and sending back Annex 1, was
2  VEO expressing its agreement to the information that
3  was included in Annex 1?
4  A. We were expressing our agreement that it's
5  part of the -- or that this document would become
6  part of the agreement. We also initialed it from the
7  standpoint that we understood that it included data.
8  Q. What is the data that it included?
9  A. Well, you go through it, and it provides
10 model numbers, it provides the designs, it provides
11 the basis of which the thermal performance was
12 generated, which we all know varies. It has capacity
13 rated -- the capacity data in here. I mean,
14 throughout the entire agreement I -- you know, it's
15 got various texts and various information that would
16 go in this considered as data.
17 Q. Was the fuel that was -- strike that. What
18 fuel did VEO understand could be used with the
19 Keystone "O" type boiler that it licensed?
20 A. The fuels outlined within the design manual
21 or really any fuels. It really wasn't defined.
22 Q. Was there any limitation on the fuels that
23 VEO could use with the Keystone?
24 A. Well, there's some common sense that plays
25 into the fact here. You're not going to fire any

1  understand relative to a commercial definition.  We
2  assumed it was packaged -- packaged units where the
3  drawings were all completed and the units could be
4  fairly readily and quickly drawn and developed for
5  particular applications.  In other words, it was like
6  a pre-engineered model, if you will.
7       Q.   Was there a standard set of drawings for
8  the Keystone boilers?
9       A.   Yeah, we found out later that they were
10 incomplete.
11      Q.   Did VEO ask why there were drawings
12 included within Annex 1 as shown on Pages 23, 24 and
13 25?
14      A.   I don't believe so.
15      Q.   What is shown on page -- strike that.  What
16 did VEO understand to be shown on Page 23?
17      A.   That just appears to be a cross-section of
18 a boiler.
19      Q.   What do you mean by cross-section of a
20 boiler?
21      A.   If you were to take a plan view of a boiler
22 and cut the boiler in half and look through it,
23 that's most likely what you would see.
24      Q.   How is a cross-section of a boiler used?
25      A.   How is it used?

1    Q.    What's the purpose of creating a drawing
2  for a cross-section of the boiler?
3    A.    See the tubes, see basically any of the
4  mechanical design features in the unit.
5    Q.    Any other reason?
6    A.    I'm sure there could be, I mean.
7            MR. GISLESON:  Mark that please.
8            (Plaintiff's Exhibit Number 12 was marked
9  for identification.)
10    Q.    (By Mr. Gisleson) I'd like to show you
11 what's been marked as Exhibit 12.  It's a document
12 stamped VEO 1191 to 1201.  Do you see how that's a
13 February 3, 2003, letter from Mark White to John
14 Viskup, re:  Annex 1-3 of the license agreement?
15    A.    Yes.
16    Q.    Was this the final version of Annex 1, 2
17 and 3?
18    A.    I believe so.
19    Q.    Are these the versions of Annex 1, 2 and 3
20 that are a part of the license agreement?
21    A.    I believe so, but I would have to compare
22 the two to be absolutely certain, excuse me.
23    Q.    Compare what two?
24    A.    The current license agreement as it states
25 today versus this document.  I don't take on face

1   value whether a document is accurate unless I compare
2   the two.
3       Q.   So what would you compare the annexes that
4   are in this exhibit?
5       A.   You'd have to check everything.
6       Q.   Is the annex attached to the Mark White
7   February 3, 2003, a revision to the data table that
8   was transmitted by EPTI to VEO on December 20, 2002?
9            MR. SHEEAN:  Objection, vague.
10      A.   I don't know.
11      Q.   (By Mr. Gisleson) I wonder if you could
12  look at the data table that was transmitted on
13  December 20, 2002.  It was at the back of the
14  December 20 draft of the license agreement.
15           MR. SHEEAN:  It's three pages.
16      A.   You're asking is it a revision to this
17  document?
18      Q.   (By Mr. Gisleson) Yes.
19      A.   I don't know if it's a revision, but the
20  two appear to be different.
21      Q.   Did VEO understand that the final version
22  of Annex 1 -- well, strike that.  Did VEO understand
23  that the December 20, 2002, data table was the first
24  iteration of Annex 1?
25      A.   I believe so but I can't be sure.

1  to the definition of products or what was licensed or
2  our interpretation of what was licensed, it included
3  Keystone watertube "O" type package boilers between
4  29,000 and 150,000 pounds per hour that if they did
5  require, as you -- I'll use your term "changes",
6  which I still don't quite understand, to apply to a
7  particular application, for example, changes in
8  thermal performance, absolutely.
9       Q.   Was there any limitation in VEO's view to
10 the modifications that it could make to a Keystone
11 boiler within 29,000 and 150,000?
12      A.   We didn't make any modifications.
13      Q.   Was VEO in its view permitted to sell a
14 watertube package boiler under the Keystone name that
15 exceeded 150,000 pounds per hour?
16           MR. SHEEAN:  I'm sorry.  Can you --
17 can you reread that for me, please?
18           (The record was read back by the court
19 reporter as requested.)
20      A.   Well, you bring up an interesting
21 question.  But Victory's position is simply it could
22 be over 150,000 pounds per hour above, but that would
23 be the total gross steam rather than the net steam
24 flow.  And there's -- you know, it's substantiated
25 simply by the program allows such and even -- when

1      A.     The agreement hasn't changed.
2      Q.     Did IKE ever provide consent to VEO to make
3  a modification to the design of the Keystone?
4      A.     No, because no modification was sent to IKE
5  by VEO.
6      Q.     Let's skip ahead for a moment to Item
7  Number 5 since we're to the subject.  Item Number 5
8  is the nature and extent of any modifications made by
9  VEO to Keystone boilers.  Did VEO make my
10 modifications to the Keystone boiler?
11     A.     On two projects.  On the Dallas/Ft. Worth
12 airport project and Occidental Petroleum project with
13 Tejas.
14     Q.     Did VEO receive EPTI's consent with respect
15 to those modifications?
16     A.     Yes.
17     Q.     Were there any other projects for which VEO
18 received consent to make modifications?
19     A.     Not that I'm aware of.
20     Q.     What were the modifications in the DFW
21 project?
22     A.     The height of the unit changed and actually
23 Erie Power was -- even a purchase order by Victory
24 Energy to make the modifications.  The modifications
25 were primarily made by Erie Power to include a

1  said -- I retracted my answer and I said there were
2  no modifications.
3      Q.   What were the ways in which the DFW boiler
4  deviated from the standard design of the Keystone
5  boiler?
6      A.   It didn't.
7      Q.   Did VEO create any modifications to the
8  design of the Keystone that it did not disclose to
9  the licensor?
10     A.   No.
11     Q.   Under Item Number 6, the nature and extent
12 of any improvements made my VEO to Keystone boilers,
13 did VEO make any improvements to the Keystone boiler
14 design?
15     A.   No.
16     Q.   Did VEO ever request approval to make
17 improvements to a Keystone boiler?
18     A.   No.
19     Q.   Has VEO made any improvements to a Keystone
20 boiler that it has not disclosed to the licensor?
21     A.   No.
22     Q.   Under Item 7, the identification of
23 Keystone boilers sold by VEO during the time that IKE
24 has been the licensor that had designed
25 characteristics that are depicted or referenced in

1   A.   Which projects?
2   Q.   Yes.
3   A.   I would have to go through each and every
4  one of them to determine that.
5   Q.   Can you identify any projects for which the
6  boiler had a cross-section as shown on Page 23 of
7  Annex 1?
8           MR. SHEEAN:  Objection, vague.
9   A.   Define cross-section.
10  Q.   (By Mr. Gisleson) Did you identify Page 23
11 as showing is a cross-section of the Keystone boiler?
12  A.   Yes.
13  Q.   Did any of the boilers that were sold by
14 VEO during the time that IKE was a licensor have a
15 cross-section as shown on Page 23 of Annex 1?
16          MR. SHEEAN:  Objection, vague.  Are
17 you -- are you asking whether or not a boiler matched
18 at every physical detail the drawing on Page 23?
19          MR. GISLESON:  Yes.
20  A.   It's impossible to tell.  There are no
21 transverse pitch, no longitudinal pitch, no tube
22 diameter.  The drawing is incomplete so I can't
23 answer your question.
24  Q.   (By Mr. Gisleson) Did VEO sell any boilers
25 during the time that IKE has been the licensor that

1  had tangent tube furnace and outer walls?
2       A.   No.
3       Q.   Did VEO sell any boilers during the time
4  that IKE has been the licensor that had a refractory
5  front wall?
6       A.   No.
7       Q.   Did VEO sell any boilers during the time
8  that IKE was the licensor that did not have a water
9  cooled burner throat?
10      A.   I don't believe so.
11      Q.   Did all the boilers sold by VEO have water
12 cooled burner throats while IKE was the licensor?
13      A.   Yes.
14      Q.   I understand that it's VEO's position that
15 Annex 1 is just a guide.  Did VEO sell any boilers
16 during the time that IKE was a licensor that followed
17 the guide in Annex 1?
18           MR. SHEEAN:  Objection, vague as to
19 the term "followed" and as to the term "guide".
20      A.   I don't know.  I would have to go back
21 and -- and look through all of the information in the
22 guide and compare it to everything else so -- so I
23 don't know.
24      Q.   (By Mr. Gisleson) Going back to Item Number
25 2, which was VEO's interpretation of the license

Case 1:04-cv-00325-SJM    Document 86-56    Filed 05/03/2006    Page 14 of 19

69

1  licensor in September 2004, can I determine what
2  boilers were sold during the time IKE was a licensor
3  by looking at the purchase order date?
4      A.   Provided the -- provided those projects
5  were -- didn't stay with the estate and they -- out
6  of EPTI and didn't -- and were transferred to IKE.
7           MR. SHEEAN:  Let's take a break.
8                (break was taken)
9      A.   I'm sorry, you want to read the last
10 question back to me?
11          (The record was read back by the court
12 reporter as requested.)
13     A.   Yeah, I believe so.
14     Q.   (By Mr. Gisleson) Based on the purchase
15 order date?
16     A.   Yes.
17     Q.   So that for all of the projects after DFW
18 airport on this exhibit, IKE was the licensor; is
19 that correct?
20     A.   I believe so, yes.
21     Q.   And each of those projects WPTI; Idaho
22 State University; Ware Inc. Toyo, T-O-Y-O; Michigan
23 Ethanol; Ware Inc. Mobile; Tejas, T-E-J-A-S, NASA;
24 Frank Lill-PSEG; Orchids Paper; City of Perham,
25 P-E-R-H-A-M; Sing Sing-Vamco, V-A-M-C-O; and

```
 1  Indiantown Cogeneration were projects that included
 2  membrane wall technology?
 3       A.   Yes.  Well, let me rephrase that.  Membrane
 4  where specifically?
 5       Q.   Furnace and outer wall?
 6       A.   That's correct.
 7       Q.   Was there also a front and rear wall
 8  membrane technology used?
 9       A.   Yeah, that's what I just said, yeah,
10  furnace outer wall, front and rear wall.
11       Q.   And that was true for each of those
12  boilers?
13       A.   Yes.
14       Q.   Item Number 9 is the basis for VEO's
15  calculation and/or allocation of boiler value among
16  other components of each Keystone package boiler
17  contract, such as burner control panel, emission
18  control/reduction components, etcetera, in connection
19  with allocating the price to the Keystone technology
20  and determining the royalty payable to EPTI and to
21  IKE.  Does this Exhibit Number 14 identify the
22  royalties that VEO owes to IKE as the licensor?
23       A.   I believe so.  There may be some -- this is
24  an internal Victory document, so there may be some
25  inconsistencies.  This a document that I used to
```

1      A.    It doesn't need to.  It shows the diameters
2  so one can extract it.
3      Q.    In the balance of the documents in the
4  range 8822 to 9244, are documents in VEO's view that
5  are in the public domain that address different
6  aspects of an "O" boiler design?
7      A.    A boiler design.
8      Q.    Boiler design generally?
9      A.    Yeah.  Doesn't have to be an "O" type
10 boiler to be incorporated into an "O" type boiler.  A
11 feature of benefit could be from a "D", "A" coal fire
12 or otherwise.  I know as a fact that when I worked
13 for Zurn and Erie Power Technologies and Alburg
14 Keystone and EPTI, they utilize their steam
15 separators across a range of boilers.
16     Q.    Item Number 10 is VEO's use of the Keystone
17 trademark.  In what documents did VEO utilize the
18 Keystone trademark?  I'm doing it by category.
19     A.    The trademark was used in a -- in brochures
20 and proposals.  Was used, I believe, on several units
21 in marketing the units as with the -- the units
22 included -- the manufactured units included the
23 Victory code nameplate with a Keystone metal label,
24 if you will.  I'm not sure how to define that.
25     Q.    Any other way in which VEO used the

1  Keystone trademark?
2     A.   It may have been used in the web site in
3  the inception of the license agreement through
4  announcements.  There was a joint announcement done
5  between EPTI and Victory.  I believe it was used
6  within that so it would have been referenced in
7  the -- the web site.
8     Q.   Any other way that VEO used the trademark?
9     A.   Not to my knowledge.
10    Q.   Did VEO ever request permission to use the
11 trademark on particular documents after IKE became
12 the licensor?
13    A.   Not after IKE became the licensor I don't
14 believe, no.
15    Q.   What were the marketing materials -- strike
16 that.  Item Number 11 is marketing materials
17 distributed by VEO to third party concerning Keystone
18 boilers.  What were the marketing materials that VEO
19 distributed concerning Keystone boilers?
20    A.   Well, I talked about a brochure in my prior
21 question, so we the brochure.  Marketing materials
22 could include proposals.  I mean, that -- to me
23 that's a marketing material.  Not having a definition
24 of marketing material, I'm assuming that that would
25 fall under that category.  You know, I guess, you

know, when you have marketing material, just by simply advertising the Keystone on the web site, that would be -- third parties could obviously click into that web site and review that. A joint sales manual was developed between Erie Power Technologies and Victory Energy for use by Victory Energy which included the Keystone name and Keystone information. I think that's about it.

Q. Was a sales manual given to sales representatives?

A. Yes, it was.

Q. Did the sales representatives to VEO's knowledge ever provide the sales manual to customers?

A. Yes.

Q. Did VEO give any guidance to its sales representatives about whether it could provide the sales manuals to customers?

A. Well, the sales manuals weren't to be given to clients to keep, to keep in their possession. The sales manual was used with the representatives to educate them relative to what it was that Victory was marketing and selling at the time frame.

Q. Has VEO made any attempt to recover documents pertaining to Keystone boilers from its sales representatives?

1  in that essence, yes, information was provided as
2  part of the sale but that is allowed by the license
3  agreement.  So under the provisions of the license
4  agreement, the answer is yes.
5        Q.   (By Mr. Gisleson) Was there anything --
6  strike that.  Was there any technology, other than as
7  may be contained in the sales proposal, that VEO
8  provided to third parties?
9        A.   Not that I'm aware of.
10       Q.   Are there any subcontractors at VEO
11 currently in possession of any documentation
12 pertaining to Keystone boilers?
13       A.   There might be but each drawing is marked
14 as a confidentiality agreement and in some cases, our
15 subsuppliers are more -- we call major subsuppliers
16 that we do our bulk of business with have signed
17 confidentiality agreements with us.
18       Q.   Has VEO attempted to recover any Keystone
19 documents from subsuppliers?
20       A.   Not at this time but, again, some of this
21 work is ongoing.
22       Q.   Did VEO ever copy the drum internals that
23 it purchased from EPTI and had it manufactured by
24 another vendor?
25            MR. SHEEAN:  Objection, vague.