CONFIDENTIAL

1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY LLC,

        Plaintiff,    Civil Action

vs.    No. 04-325 Erie

VICTORY ENERGY OPERATIONS, LLC,

        Defendant.


DEPOSITION OF CHRISTOS TRIFON PETCOS
WEDNESDAY, FEBRUARY 15, 2006

Deposition of CHRISTOS TRIFON PETCOS, taken pursuant to Notice and the Federal Rules of Civil Procedure, by and before Cathy R. Mull, Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Schnader Harrison Segal & Lewis LLP, Fifth Avenue Place, Suite 2700, 120 Fifth Avenue, Pittsburgh, Pennsylvania 15222-3001 commencing at 10:07 o'clock a.m., on the day and date above set forth.

EXHIBIT 63

COPY

CONFIDENTIAL

4

```
 1                P R O C E E D I N G S
 2              CHRISTOS TRIFON PETCOS,
 3   having been duly cautioned and sworn, as hereinafter
 4   certified, was examined and testified as follows:
 5                     EXAMINATION
 6   BY MR. SHEEAN:
 7   Q     Sir, would you please state your full name for the
 8   Record.
 9   A     Sure.  Christos Trifon Petcos.  C-h-r-i-s-t-o-s,
10   middle name T-r-i-f-o-n, P-e-t-c-o-s for the last name.
11   Q     Mr. Petcos, do you recall that approximately four
12   months ago we got together and you gave your Deposition in
13   this case as an individual?
14   A     Yes.
15   Q     The rules that we went over during that Deposition
16   are going to apply again here today.  Okay?
17   A     Okay.
18   Q     Do you also understand that as opposed to your last
19   Deposition where you were testifying as an individual, you
20   have been designated here today to testify on behalf of
21   Indeck Keystone Energy?
22   A     Yes.
23              MR. SHEEAN:  Let's go ahead and mark as
```

1   the testimony.
2   Q      Topic No. 12, trade secrets.
3          MR. GISLESON:  One second.  I forgot
4   something in my office on this subject.
5          (Thereupon, a recess was taken).
6          MR. SHEEAN:  Let's go back on the Record.
7   BY MR. SHEEAN:
8   Q      Can you identify for me every trade second that IKE
9   believes was provided to Victory Energy pursuant to the
10  terms of the License Agreement.
11  A      The overall design of the Keystone boiler by itself
12  as well as in combination with the KPSC software based on
13  its proven performance and enhancements, over time VEO's
14  marketing materials reference the advantages that the
15  Keystone has over other boilers.
16         Our KPSC software, all tube layouts, M series
17  custom and O series, design of our welded walls, design of
18  our water cooled burner throat, steam purity designs,
19  assembly sequences, design performance sheets, all
20  printouts of thermal performance sheets, and engineering
21  methodologies and design standards, structural based
22  design allows for thermal expansion from front to rear,
23  front and rear water wall designs, refractory design, tube

clearances, drum internals, the vortex designs, the chevron designs, the internal baffling of the drums, structural size, the structural jacking points, pads, rings on all four corners of the boiler, the load moves from the pad up through the casing design and onto the upper drum, water cooled front wall and burner throat refractory tile and insulation design allows provisions for expansion sales upper and lower drum.

Inner outer casing seal system allows for expansion, the stiffener design, the chemical feed, internal piping arrangement, the blow down piping internal arrangement, dry can on incline baffle design, dry can on the information in our operations and maintenance manuals how EPTI and IKE recommend startup and operation and shut down of our units, superheater design and sizing criteria and operation criteria, superheater supports both our lug support design and our steam cooled support design and our wall attachment designs, superheater penetration design through the rear wall, the welding of the superheater, the platen loops.

The Keystone tile furnace floor design to control superheat temperature, the water wash drain design, steam outlet location on steam drums, feedwater heating coil

150

1  designs, mud drum steel coil designs, flue gas outlet duct
2  arrangements, furnace aspect ratios, widths, height of
3  tube layouts for M series and special O series, furnace
4  tube slopes, the buckstay designs, the tube and membrane
5  designs.
6      Also separate steam drum internals to isolate flow
7  in the front wall design, the anti vibration bar design
8  that mitigates and minimizes flow induced vibration, steam
9  diameter drum sizing criteria for various steam flows,
10 drum water level criteria for operation, normal low, high
11 water logs, the heat transfer coefficients throughout the
12 unit, the furnace, the boiler superheater, the economizer,
13 furnace exit gas temperature sizing criteria, flue gas
14 draft loss calculation methodologies, the pinch and
15 approach points, limitations on feedwater flue gas
16 temperature, saturation temperatures.
17     Various manufacturing specifications and
18 requirements, those of which are also beyond code
19 requirements, limits on minimum shell and tube
20 thicknesses, these are not on the limited list.
21     Overall everything related to the design of the
22 Keystone package boiler is a trade secret.
23 Q    First, let me ask you, for those items, those

151

1  aspects that you identified as trade secrets, were those
2  created by IKE's predecessors?  I mean, they would have
3  had to have been; right?
4  A    Yes.
5  Q    What I asked you was were they provided to VEO
6  under the License Agreement and IKE hasn't provided any
7  information to VEO that I know of.
8  A    Yes.  The answer is yes.
9  Q    What efforts did IKE's predecessors make to
10 maintain the confidentiality of those trade secrets?
11 A    Trade secrets remain confidential even if certain
12 general design features are known.  For example, O type
13 are known from sales literature.  That information cannot
14 be used to design and manufacture the boilers or to make
15 them operate safely to meet performance requirement.
16 There is no distribution of detailed design drawings
17 unless confidentiality agreements, control of drawings
18 including limited disclosure of drawings internally and
19 externally.
20      Engineers have confidentiality agreements, access
21 to computer systems are password protected, access to UNIX
22 system was password protected, limited distribution of
23 technical information within the company and control of

152

1   drawings, drawings stamped proprietary and confidential,
2   confidentiality agreements with manufacturers or
3   construction contractors.
4   Q      Anything else?
5   A      Not at this time.
6   Q      Did Mark White sign a Confidentiality Agreement
7   with EPTI?
8          MR. GISLESON:  I think, just so its clear,
9   your topic No. 12 is efforts by IKE to maintain the
10  confidentiality.
11         MR. SHEEAN:  Why is that relevant to whether
12  or not these trade secrets are -- --
13         MR. GISLESON:  We'll object as outside the
14  scope.
15         MR. SHEEAN:  Okay.  You can answer.
16  A      I don't know if he did, but we will look into it
17  from our predecessor's files.
18  Q      Okay.  Did Mark White have access to the various
19  aspects of the Keystone technology that you described as
20  trade secrets?
21         MR. GISLESON:  Same objection.
22  A      Not everything.
23  Q      What do you believe he didn't have access to?

1  A    While he was --

2  Q    While he was at Erie Power.

3  A    While he was at Erie Power?

4  Q    Or Aalborg, A-a-l-b-o-r-g, Zurn.

5          MR. GISLESON: Same objection. He is

6  testifying here as IKE's designee and you're talking about

7  what was happening at EPTI. So to the extent you have

8  knowledge as IKE's representative on that subject --

9  A    As IKE's representative, we don't have knowledge on

10 that.

11 Q    Okay. Do the trade secrets that you identified

12 remain confidential today, to the best of your knowledge?

13 A    Yes.

14 Q    Would that be true even if various aspects of the

15 Keystone design are in the public domain?

16         MR. GISLESON: Objection. Assumes facts not

17 in evidence. No foundation. Calls for a legal

18 conclusion.

19         MR. SHEEAN: You can answer.

20         MR. GISLESON: Argumentative as well.

21 A    Yes, whether its individually or all grouped

22 together to operate as an overall Keystone package boiler.

23 Q    I'm not talking about any aspect that you have

1  identified. Would you agree if its in the public domain

2  its no longer a trade secret?

3  A    No.

4  Q    You wouldn't agree with that?

5         MR. GISLESON: Same objections.

6  A    IKE's interpretation is that, as stated earlier,

7  even if there is reference to one or more of those items

8  in the public domain, the public cannot design those

9  aspects just from referencing them in the public domain.

10 Q    You agree with me, wouldn't you, that the License

11 Agreement specifically excludes from the secrecy

12 requirements for technical information any information

13 that is in the public domain under Clause 5 of the License

14 Agreement; correct?

15        MR. GISLESON: Objection. The License

16 Agreement speaks for itself.

17 BY MR. SHEEAN:

18 Q    Specifically, on page 6 of the License Agreement,

19 VEO 1177 5.b) reads, Notwithstanding the foregoing, no

20 secrecy obligation herein shall apply to technical

21 information which: At the time of disclosure is generally

22 available to the public;

23      ii: After disclosure by licensor becomes generally

1  available to the public by publication or otherwise
2  through no fault of licensee;
3        iii: Was in licensee's possession prior to the
4  disclosure hereunder and which was not acquired directly
5  or indirectly from licensor and
6        iv: Was received by licensee from a third party
7  imposing no obligation of confidentiality and who did not
8  acquire any such information directly or indirectly from
9  licensee.
10       Do you see that?
11 A    I see that.
12 Q    Do you believe if the License Agreement is within
13 the public domain there is no secrecy obligation pursuant
14 to the License Agreement?
15       MR. GISLESON: Objection.
16 A    No. IKE's interpretation is that all the items
17 listed, the detailed trade secret and the design
18 information on how to actually design each and every one
19 of those, is not in the public domain and its not --
20 that's it.
21 Q    Are you confident that each trade secret that you
22 identified for me in that laundry list of trade secrets
23 was provided to Victory Energy pursuant to the terms of

156

1  the License Agreement, because that was my question?
2  A    All those trade secrets were not pursuant to the
3  License Agreement. Those trade secrets were provided to
4  Victory, not all of which were pursuant to the License
5  Agreement. Some were provided on a case by case agreement
6  to allow VEO to pursue the License Agreement.
7  Q    Do you mean a reference to --
8        MR. GISLESON:  One second.
9        (Discussion off the Record).
10 A    IKE's belief is that EPTI permitted VEO to sell
11 products outside of the License Agreement as defined in
12 Annex 1 on a case by case basis. However, all the other
13 provisions as far as secrecy and that of the License
14 Agreement remain intact.
15 Q    If the information that Victory Energy obtained
16 from EPTI was outside the scope of the License Agreement,
17 how is it that the rest of the terms of the License
18 Agreement apply?
19 A    As far as the secrecy and the royalty payments.
20 Q    That's just your interpretation of the License
21 Agreement?
22 A    Correct.
23 Q    Are you confident that --

1  A    As well as the parties performance under the
2  License Agreement, because they both agreed to operate
3  under the License Agreement.
4  Q    Are you confident that Victory Energy received
5  technical information relating to the buckstays?
6  A    I don't know exactly if the buckstay design
7  information was provided to VEO without going through the
8  documents.  I was providing trade secrets.
9  Q    Okay.
10 A    Of the Keystone product line.
11 Q    So you don't know specifically whether each and
12 every one of those was part of what was provided to
13 Victory Energy; is that a fair statement?
14 A    I believe they were and I would like to refer again
15 to what's in the documents behind Item 5 of what you will
16 be getting a copy of, as far as our understanding of what
17 EPTI was to provide, the broad categories of documentation
18 described in Clause 1.
19 Q    Are there any aspects of the design and
20 manufacturing process of the Keystone boiler that IKE
21 asserts are proprietary above and beyond the trade secrets
22 that you have just identified?  This is topic No. 13.
23 A    IKE considers the overall design and its components

1  proprietary, consistent with the prior description of the
2  trade secrets.
3  Q      Okay.  I think the -- is it fair to say that the
4  trade secrets you identified in response to topic 12
5  include trade secrets relative to design and manufacturing
6  processes?  I don't want to cover ground we have already
7  covered.
8  A      Yes.
9  Q      Because 13 I was breaking out, you know, the
10 feature of the Keystone boiler itself and the design and
11 engineering process and I understand you basically put
12 those things together, which is fine.  Like I said, I
13 don't want to cover the same thing again.
14        Are the efforts that IKE identifies as confidential
15 the same as what you previously testified?
16 A      That's correct.
17 Q      And to the best of your knowledge, none of the
18 design information that you deem to be a trade secret are
19 within the public domain; is that right?
20 A      Yes.
21 Q      Can you identify for me each and every trade secret
22 you allege that Victory Energy misappropriated from either
23 Erie Power or IKE?

1  A      IKE believes that VEO misappropriated the design
2  for the Keystone M series boiler as well as part of the
3  features that are not part of the standard series such as
4  membrane walls and water cooled throats.  Under the
5  agreement, i.e., the products defined in Annex 1, VEO
6  utilized technology it received from EPTI on a project
7  specific basis that was out of the scope of the agreement
8  after EPTI notified VEO on March 26, 2004, that it must
9  confine itself to the scope of the agreement.
10         IKE is investigating whether VEO incorporated the
11 license technology.  Discovery is continuing on that
12 issue.
13         In addition, I would refer to my comments on item
14 12 previously, as well as the documents that are behind
15 tab 5.
16 Q      Are the damages that IKE is seeking for
17 misappropriating the design as you described in any way
18 different from the damages its seeking generally for
19 trademark infringement and unauthorized modification and
20 sale of Keystone boilers?
21 A      No.
22 Q      Topic No. 15 is all instances that IKE is aware of
23 where VEO sold a product outside the scope of the License