UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

        Plaintiff

    v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

        Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

DEFENDANT VICTORY ENERGY OPERATIONS, LLC'S
SUPPLEMENTAL APPENDIX OF EXHIBITS
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF INDECK KEYSTONE ENERGY, LLC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 1:     Mark White Deposition dated October 14, 2005

Exhibit 2:     Shawn Brewer Deposition dated October 13, 2005

Exhibit 3:     Robert Gdaniec Deposition dated November 8, 2005

Exhibit 4:     Christos Petcos Deposition dated November 9, 2005

Exhibit 5:     Jay McConaughy Deposition dated February 16, 2006

Exhibit 6:     Steve Bernatowicz Deposition dated November 8, 2005

Exhibit 7:     Ted Fuhrman Deposition dated November 7, 2005

Exhibit 8:     John Viskup Deposition dated January 31, 2006

Exhibit 9:     Terry Pawlowski Deposition dated November 10, 2005

Exhibit 10:    Supplemental Affidavit of Mark White

Exhibit 11:    Mark White 30(b)(6) Deposition dated February 1, 2006

Exhibit 12:    Stephen Kang Deposition dated December 13, 2005

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

INDECK KEYSTONE ENERGY,        )
4  LLC, a Delaware limited      )
   liability company,          )
5                               )
                Plaintiff,      )  CIVIL ACTION
6                               )
   vs.                          )  No. 04-CV-325E
7                               )
   VICTORY ENERGY OPERATIONS,   )  Judge Sean J. McLaughlin
8  LLC, a Delaware limited      )
   liability company,          )
9                               )
                Defendant.      )
10

11

12

13        The videotape deposition of MARK WHITE taken on

14  behalf of the Plaintiff before Pamela B. Stinchcomb,

15  Certified Shorthand Reporter in and for the State of

16  Oklahoma, on the 14th day of October, 2005, in the

17  City of Tulsa, State of Oklahoma, pursuant to the

18  stipulations of the parties.

19

20

21        PAMELA B. STINCHCOMB, CSR #1544
22        DAVIDSON REPORTING SERVICE
             5508 South Lewis Avenue
23           Tulsa, Oklahoma  74105
                (918) 745-9959
24

25                                            COPY


EXHIBIT
1

Scrunch® www.Scrunchit.com  GC Software,  Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 7

1 A No, I'm not.
2 Q. Have you ever taken any engineering
3    courses?
4 A In college, you know, industrial-type
5    classes. How would you define engineering courses?
6 Q. Any courses that an engineering major would
7    take.
8 A No.
9 Q. When you say Bachelor of Science, was there
10   a particular area in which you received your degree?
11 A Industrial education, non-teaching.
12 Q. What does industrial education mean?
13 A A variety of industrial courses and also
14   business courses that one would take so you have a a
15   background in industrial project management and
16   manufacturing-type applications, process law
17   environment, as well as business law, accounting,
18   statistics, et cetera.
19 Q. Did you pursue any further education after
20   college?
21 A Just seminars and so forth.
22 Q. Did you ever attend any seminars on
23   watertube boilers?
24 A No.
25 Q. What did you do after college?

Page 8

1 A Went to work for Nebraska Boiler.
2 Q. What was the time period when you worked at
3    Nebraska Boiler?
4 A From 1984 to 2001.
5 Q. What were the positions that you held at
6    Nebraska from the beginning moving forward?
7 A I worked in the engineering department.
8    And from that -- from that time frame, I worked in
9    the engineering department for about three years
10   working in drafting, working on project management
11   functions. After three, three and a half years, I
12   moved into their sister division, which was Energy
13   Recovery International. And for the remainder of my
14   tenure, I was employed there as a sales engineer.
15 Q. What was the business of Energy Recovery
16   International?
17 A Waste heat recovery boilers.
18 Q. When you say you were involved with
19   drafting in the engineering department, what did you
20   do?
21 A Well, the training involves any time a new
22   employee comes in, regardless if they end up sales
23   and marketing or if they end up in project
24   engineering or project management, they start as a
25   draftsman so they can learn the product from the

Page 9

1    beginning all the way through so they have a
2    technical background of the product.
3 Q. What was the product for which you were
4    developing drafting experience?
5 A It was for two different types of product.
6    One was watertube package boilers. The other would
7    have been heat recovery steam generators. They were
8    also involved in economizer assemblies and burners,
9    burner management systems.
10 Q. What's your understanding as to the
11   difference between a watertube package boiler and a
12   heat recovery steam generator or an HRSG?
13 A In terms of the differences, a watertube
14   package boiler could be an actual HRSG. It could be
15   many different types of boilers. It simply states
16   that there's tube in which water and steam generate
17   through the tubes and through the circuitry. So a
18   watertube boiler could be an HRSG, it could be a
19   waste heat boiler, which could, you know, be buying a
20   gas turbine or some sort of a waste process. It
21   could also include a package boiler, which has a
22   direct ^*^*^*.
23 Q. How does a watertube boiler become an HRSG?
24 A It's just -- it's basically -- an HRSG does
25   not have a self-contained burner. It requires

Page 10

1    another heat source via gas turbine, incineration,
2    various different types of waste heat traveling
3    through the boiler to provide its heat source whereas
4    a package boiler has a direct fire burner on it. So
5    it's a self-contained unit.
6 Q. While you've been employed with VEO, has
7    VEO sold any HRSGs that included a Keystone watertube
8    boiler?
9 A No.
10 Q. When I say that, I'm including a Keystone
11   watertube boiler that's obviously also on fire
12   without the burners.
13 A I understand your question. The answer is
14   no.
15 Q. While you were in the engineering
16   department in Nebraska Boiler, was Nebraska Boiler
17   competing against Keystone watertube boilers?
18 A Well, I wasn't in the sales and marketing
19   side at Nebraska Boiler, so it would be difficult for
20   me to ascertain that. So you had asked me not to
21   speculate and I won't speculate.
22 Q. Thank you. When did you first learn or
23   hear of Keystone watertube boilers?
24 A I believe I heard the term "Keystone"
25   approximately the time I came to work for Zurn

Page 11

1    Energy.
2 Q. When did you go to work for Zurn Energy?
3 A I became employed at Zurn Energy in -- let
4    me step back a moment here.
5    I worked for Nebraska Boiler. I then
6    worked for Henry Vogt Machine Company in 2003.
7 Q. I'm sorry, what was it called?
8 A Henry Vogt Machine Company. Henry
9    Vogt Machine Company. I worked there from 2001 to
10   2003, and then I left and went to -- and I was
11   employed for the Zurn Energy Division in 2003. So my
12   tenure would have started at that time.
13     MR. SHEEAN: Mark, you said 2003. Are
14   you sure you meant 2003 and not 1993?
15     THE WITNESS: Oh, I'm sorry, 1993.
16   I'm sorry. Correct.
17     MR. SHEEAN: It's a decade here or
18   there.
19 Q. (By Mr. Gisleson) I must have misheard
20   you. I thought you said you worked for Nebraska
21   Boiler from 1984 till 2001?
22 A Approximately. I meant 1991.
23 Q. Oh.
24 A Sorry about that.
25 Q. After Nebraska Boiler, you went to work for

Page 12

1    Henry Vogt Machine?
2 A Vogt, V-O-G-T, Machine Company, Louisville,
3    Kentucky.
4 Q. And what was the time period that you
5    worked at Vogt?
6 A 1991 to 1993.
7 Q. What position did you have at Vogt?
8 A Sales engineer.
9 Q. Why did you leave Nebraska Boiler?
10 A I had a better opportunity to work for
11   Henry Vogt Machine Company. At the time, Henry Vogt
12   Machine Company was the world's largest supplier of
13   watertube boilers. It's a good opportunity.
14 Q. Is the Victory boiler in Harrisburg a waste
15   heat boiler?
16 A No. I don't know.
17 Q. Are you aware of an MSW boiler project in
18   Harrisburg?
19 A If you're referring to the Barlow ^* 
20   project?
21 Q. Yes.
22 A It's not a -- could you please ask the
23   question again.
24 Q. What does the Barlow project in Harrisburg
25   involve?

Pages 49 - 54

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 49

```
1    discuss welded wall technology for the boilers that
2    were to be licensed?
3  A  I don't recall.
4  Q  Did you maintain any notes of your
5    conversations with John Viskup?
6  A  Sure.
7  Q  Be more specific.
8  A  Yes.
9  Q  Did you maintain any notes of your
10   discussions with John Viskup leading up to execution
11   of the license agreement?
12 A  Yeah, I always -- I always took very good
13   and detailed note when I was at Erie Power, so I
14   would have had an entire file on the subject.
15 Q  Do you still have a copy of those notes?
16 A  No. Those notes were left with Erie Power.
17 Q  Did you maintain a binder concerning the
18   license agreement?
19 A  I may have. I don't recall.
20 Q  When did you first authorize VEO to start
21   marketing for sale of Keystone package boilers?
22 A  After the execution of the license
23   agreement.
24 Q  Were you aware that prior to execution of
25   the license agreement, VEO had started to market
```

Page 50

```
1    Keystone boilers for sale?
2      MR. SHEEAN: Objection,
3    mischaracterizes the evidence. You can answer.
4  A  I was not aware of that, no.
5  Q  (By Mr. Gisleson) When was the first time
6    you had a discussion with someone from VEO about the
7    use of membrane wall technology and the Keystone
8    boilers that were licensed?
9  A  Oh, Shawn Brewer and I -- it was discussed
10   through the license agreement.
11 Q  Pardon me?
12 A  It was discussed through the license
13   agreement as being part of the technology that would
14   be provided.
15 Q  When was the first time you had that
16   discussion?
17 A  I don't recall.
18 Q  It was after the license agreement was
19   executed?
20 A  No, it was before the license. It's during
21   the period of which the license agreement was being
22   negotiated.
23 Q  You had a conversation with Shawn Brewer?
24 A  With Shawn, yes.
25 Q  By phone?
```

Page 51

```
1  A  Yes, I believe it was by phone.
2  Q  Do you recall the date?
3  A  No.
4  Q  Did you keep notes of the conversation?
5  A  I may have.
6  Q  What was discussed?
7  A  The understanding that the Keystone would
8    need to be -- there would be -- need to be changes to
9    bring it up to standards which were acceptable in the
10   industry. The tangent tube was not an acceptable
11   design that would be provided and marketable and that
12   the welded wall construction would be part of the
13   license agreement.
14 Q  Anything else?
15 A  There may have been. I don't recall.
16 Q  Who first raised the issue of welded wall
17   being part of the license agreement?
18 A  I don't recall.
19 Q  That was a conversation that occurred prior
20   to execution of the license agreement; is that right?
21     MR. SHEEAN: Objection, asked and
22   answered.
23 A  Yes.
24 Q  (By Mr. Gisleson) And when Shawn Brewer
25   told you that, in his view, the package boiler would
```

Page 52

```
1    need to be updated to include welded wall, what was
2    your response?
3      MR. SHEEAN: Objection,
4    mischaracterizes prior testimony. You can answer.
5  A  Would you please repeat the question.
6  Q  (By Mr. Gisleson) Did you make any
7    representations to Shawn Brewer during that phone
8    conversation as to whether the license would include
9    welded wall design?
10 A  I mean, it was the intent of the license
11   agreement to include welded wall technology.
12 Q  So did you, in fact, include a reference
13   anywhere in either the license agreement or in
14   Annex.1 to the fact that the license would include
15   welded wall technology?
16     MR. SHEEAN: I'm going to object.
17   Calls for a legal conclusion. You can answer.
18 A  As counsel said, I'm not a lawyer. But I
19   can tell part of the license agreement, the
20   technology supplied definitely includes membrane wall
21   construction.
22 Q  (By Mr. Gisleson) That wasn't my question.
23   Did you specifically reference welded wall technology
24   either in the text of the license agreement or in
25   Annex.1 based on the conversation that you had with
```

Page 53

```
1    Shawn Brewer that he wanted the license to include
2    welded wall technology?
3      MR. SHEEAN: Objection, calls for a
4    legal conclusion.
5  A  Once again, I'm not an attorney, but the
6    agreement does talk about alterations, does talk
7    about changes.
8  Q  (By Mr. Gisleson) Is there a specific
9    reference anywhere in the agreement to welded wall
10   technology?
11 A  I don't believe --
12     MR. SHEEAN: Same objection. Sorry.
13 A  I don't believe so.
14 Q  (By Mr. Gisleson) Other than taking your
15   word for it and that of Shawn Brewer, is there any
16   way to prove that discussion, in fact, occurred?
17     MR. SHEEAN: Objection, badgering the
18   witness. You can answer.
19 A  I don't know.
20 Q  (By Mr. Gisleson) Were there any other
21   conversations with someone from VEO about the
22   use of membrane walls or welded wall technology under
23   the license agreement prior to the time the license
24   agreement was executed?
25 A  I don't recall.
```

Page 54

```
1  Q  Is it correct that you never discussed
2    welded wall or membrane technology with John Viskup
3    prior to the time the license agreement was executed?
4      MR. SHEEAN: I object to the extent it
5    mischaracterizes prior testimony. You can answer.
6  A  Repeat the question again.
7  Q  (By Mr. Gisleson) Did it correct that you
8    did not discuss either welded wall technology or
9    membrane technology with John Viskup prior to the
10   time that the license agreement was executed?
11     MR. SHEEAN: Same objection.
12 A  I don't recall.
13 Q  (By Mr. Gisleson) Are you aware of any
14   standard applicable to package watertube boilers that
15   prevents the use of tangent tube technology?
16 A  Please repeat your question.
17 Q  Are you aware of any standard that applies
18   to watertube boilers that prohibits the use of
19   tangent tube technology?
20 A  What standard are you referring to?
21 Q  Well, you said that during your
22   conversation with Shawn Brewer --
23 A  Uh-huh.
24 Q  -- he discussed changes to bring the
25   boilers up to standards.
```

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 55

1  A  Industry standards.
2  Q  Are you aware of any industry standards
3     that prohibit the use of tangent tube technologies in
4     watertube boilers?
5  A  They would have -- the industry standards I
6     would have been referring to would have been customer
7     specifications. And most, if not all, customer
8     specifications do require a membrane wall
9     construction for domestic use.
10 Q  Are you aware of any permitting authorities
11    anywhere in the country that prohibited the use of
12    tangent tube technology in watertube boilers?
13 A  When you say "permitting authorities," be
14    more specific.
15 Q  Any authority that would assess the
16    emissions coming from a watertube boiler to determine
17    whether those emissions comply with local regulations
18    or state or federal regulations.
19 A  Well, if you're referring to EPA standards,
20    EPA doesn't determine the design of any equipment.
21    They determine the emissions allowable for a given
22    region or area.
23 Q  Are there, in fact, tangent tube watertube
24    boilers in use today?
25 A  Possibly.

Page 56

1  Q  Did you have any other discussions with
2     Shawn Brewer about the substance of the license
3     agreement other than that one conversation in which
4     he raised the issue of welded wall design?
5        MR. SHEEAN: Objection,
6     mischaracterizes prior testimony.
7  A  I don't recall.
8  Q  (By Mr. Gisleson) After you spoke with
9     Shawn Brewer, did you thereafter speak with any of
10    the engineers at Erie Power Technologies concerning
11    the licensing of welded wall or membrane technology?
12       MR. SHEEAN: Objection, vague as to
13    time.
14 Q  (By Mr. Gisleson) Prior to the time the
15    license agreement was executed?
16 A  I don't recall.
17 Q  It's true, isn't it, that you did consult
18    with engineers at EPTI concerning the definition of
19    products in Annex.1?
20 A  Please repeat the question.
21 Q  Isn't it correct that you consulted with
22    the engineers at EPTI concerning the preparation of
23    Annex.1 to the license agreement?
24 A  I may have.
25 Q  Do you know whether Zurn sold any tangent

Page 57

1     tube watertube boilers in the four-year period
2     preceding the license agreement?
3  A  Without going back and researching the
4     information, I couldn't answer that question.
5  Q  Did you have any discussions with John
6     Viskup or Shawn Brewer concerning VEO's maintaining
7     secrecy, confidentiality of the information that was
8     being provided?
9        MR. SHEEAN: Objection, vague, time.
10 A  You know, I don't recall other than maybe
11    what's in the agreement.
12 Q  (By Mr. Gisleson) How many Keystone boilers
13    has VEO sold since you joined the company?
14 A  I would have to look and see what the
15    information is. I don't -- I don't know off the top
16    of my head.
17 Q  Approximately?
18       MR. SHEEAN: Objection, calls for
19    speculation.
20 A  You asked me not to speculate. I'm not
21    going to speculate.
22 Q  (By Mr. Gisleson) Isn't the sale of
23    Keystone boilers within the scope of your
24    responsibilities as general manager?
25 A  There's a lot of things within the scope of

Page 58

1     my responsibility. And I don't -- and I keep fairly
2     accurate records, but I refer to those records when
3     questions such as this are asked.
4  Q  Can you approximate in any way the number
5     of Keystone boilers that have been sold?
6        MR. SHEEAN: Objection, calls for
7     speculation.
8  A  Not without looking at the information.
9  Q  (By Mr. Gisleson) Are Keystone boilers the
10    only watertube boilers that are sold by VEO?
11 A  No.
12 Q  What other watertube boilers are sold by
13    VEO?
14 A  We sell waste heat recovery boilers.
15 Q  Any others?
16 A  Coal fire.
17 Q  Any others?
18 A  Possibly.
19 Q  Does VEO currently have any technology to
20    design and manufacture a watertube boiler that uses
21    natural gas or fuel oil other than the technology it
22    received from EPTI?
23 A  Could you be more specific.
24 Q  Once the license agreement expires, does
25    VEO plan to sell watertube boilers?

Page 59

1  A  We are selling watertube boilers currently
2     and we will continue to sell watertube boilers.
3  Q  Are those other two watertube boilers, are
4     they "O" type boilers?
5  A  We're talking -- I'm talking about specific
6     HRSGs. There's been no determination made whether we
7     will continue with a watertube package boiler.
8  Q  Does VEO have any technology currently that
9     would replace the technology it received from EPTI?
10 A  No.
11 Q  Who at VEO is responsible for sending
12    semiannual statements to the current licensor of the
13    Keystone technology?
14 A  I am.
15 Q  Have you sent a semiannual statement --
16    strike that.
17    The current licensor is Indeck Keystone
18    Energy, correct?
19 A  Yes.
20 Q  Have you sent a semiannual statement yet to
21    Indeck Keystone Energy with respect to Keystone
22    sales?
23 A  I've sent project announcements, which
24    includes the include the information in the
25    semiannual report.

Page 60

1  Q  Have you sent a semiannual report?
2  A  No, sir.
3  Q  Why not?
4  A  I believe that they have sufficient
5     information within these project announcements. It's
6     just repetitive and redundant information.
7  Q  Aren't you the one who was involved with
8     drafting the license agreement?
9  A  You have to understand the license
10    agreement was a very broad agreement between two
11    parties. It wasn't meant to be tedious for either
12    party in terms of the transfer of daily information,
13    even semiannual reports. If it's that important to
14    Indeck Keystone Energy, it should request such an
15    information. I haven't seen such a request that I
16    recall.
17 Q  Has VEO sold any Keystone boilers since
18    Indeck Keystone Energy became the licensor that
19    included membrane wall technology?
20 A  Yes.
21 Q  At any time since Indeck Keystone Energy
22    became the licensor, has VEO requested permission to
23    sell Keystone boilers with membrane wall technology?
24 A  Repeat your question, please.
25 Q  Sure. Has VEO requested permission from

Page 103

```
1    Viskup leading up to your joining VEO, was the
2    subject of Keystone boilers ever discussed?
3 A  Yeah, we discussed Keystone boilers, but we
4    discussed more the HRSG side of the business.  Again,
5    my background is HRSG predominantly, not Keystone
6    boilers, so we discussed that.  We also discussed my
7    commercial knowledge, different things like that,
8    operations and so forth.
9 Q. What was discussed concerning Keystone
10   boilers?
11 A  Just the license agreement, and John had
12   some concerns that if I came on board, would there be
13   problems, you know, from the Erie side, the fact that
14   I had -- I was the author of the license agreement.
15   And if I came to work for Victory, it may be
16   canceled.  So there was some definite concerns from
17   John's side if I was employed with Victory in that
18   they could lose the license agreement.
19 Q. Did you disclose any confidential
20   information of EPTI concerning HRSGs to VEO.
21 A  No.
22   (Plaintiff's Exhibit Number 6 was marked for
23   identification.)
24 Q. (By Mr. Gisleson)  I'd like to show you
25   what's been marked as White Exhibit 6.  It's a
```

Page 104

```
1    document stamped IKE4410 through 4429.  Do you see
2    how this is another copy of your January 8, 2003
3    e-mail to John Viskup with the enclosed license
4    agreement for signature?
5 A  Yes, sir.
6 Q. Whose handwriting is on the first page of
7    this exhibit?
8 A  That's my handwriting.
9 Q. And you wrote:  "To Bob, Dan, Jim, Dave,
10   Neil.  Conformed version for review.  Regards, Mark
11   White."  Who is Bob.
12 Q. That would have been Bob Gdaniec?
13 A  Dan?
14 A  Lovatek.
15 Q. Jim?
16 A  I don't recall his last name.
17 Q. Dave?
18 A  Briggs.
19 Q. Neil?
20 A  Bradwell.
21 Q. Why were you sending the conformed version
22   for review to those individuals?
23 A  I don't recall.
24 Q. What did you mean by review?  Just read
25 A  How do you define review?  Just read
```

Page 105

```
1    through the document, let me know if you have any
2    questions.
3 Q. Were you giving them an opportunity to make
4    changes to the license agreement?
5 A  Not necessarily.
6 Q. Had you already sent the license agreement
7    to VEO for execution prior to the time you sent it to
8    engineers and others --
9 A  I think it was sent on --
10 Q. -- on January 9th?
11 A  I think it was sent on the same day.
12 Q. What's the date of your note?
13 A  Oh, I'm sorry 1/9/02.
14 Q. And what's the date of your e-mail?
15 A  You're correct.  Yeah, I was sending it
16   thereafter.
17 Q. Did you receive feedback from any of the
18   engineers or others at EPTI concerning the terms of
19   the license agreement?
20 A  I'm sure I did.
21 Q. Who's Terri A * Jackson?
22 A  She was the administrative assistant to
23   Stephen Kang.
24   (Plaintiff's Exhibit Number 7 was marked for
25   identification.)
```

Page 106

```
1 Q. (By Mr. Gisleson) Showing you what's been
2    marked as White Exhibit 7.  It's a document stamped
3    VEO1170 to 1190.  Do you see how the first page is --
4    strike that.
5    Is this a true and correct copy of the
6    January 10, 2003 letter with enclosure that you sent
7    to John Viskup enclosing an executed copy of the
8    license agreement?
9 A  It would appear so.
10 Q. How far were you from -- strike that.
11   Was Steve Kang's office located in the same
12   building as your office?
13 A  Yes, sir.
14 Q. How far was it in distance?
15 A  I don't -- I don't know.
16 Q. Was it the same floor?
17 A  Same floor.
18 Q. During the term of the license agreement,
19   did you ever -- strike that.
20   Did VEO provide copies of all of the
21   proposals it was submitting for watertube boilers to
22   you?
23 A  During the terms of the license -- well,
24   during my tenure at Erie Power Technology?
25 Q. Yes.
```

Page 107

```
1 A  No, it wasn't necessary.
2 Q. Did VEO provide with you copies of any of
3    the proposals that it submitted for Keystone
4    watertube boilers while you worked for EPTI?
5 A  They may have.
6 Q. Do you recall specifically whether you
7    received any?
8 A  No.
9 Q. Did you ever at any time while you worked
10   with EPTI after the license agreement was executed
11   review the license agreement to determine whether a
12   particular boiler that was sold by VEO was outside
13   the scope of the license agreement?
14 A  No.
15 Q. Were there instances while you were
16   employed with EPTI that engineers or others at EPTI
17   advised you of their belief that VEO was selling
18   watertube boilers outside of the scope of the license
19   agreement?
20 A  They may have.  I don't recall.
21   (Plaintiff's Exhibit Number 8 was marked for
22   identification.)
23 Q. (By Mr. Gisleson) I'd like to show you
24   what's been marked as White Exhibit 8.  Is this a
25   true and correct copy of an e-mail that you received
```

Page 108

```
1    from Bob Gdaniec on John 14, 2003, on the subject of
2    Keystone product line license agreement?
3 A  It would appear so.
4 Q. Bob Gdaniec writes to you that:  "I have
5    started to put together both my estimate on hours and
6    scope for the license agreement for the package
7    boiler line with Victory and, unfortunately, have not
8    got it completed yet."  Was that information that you
9    requested Mr. Gdaniec to provide to you?
10 A  I don't recall.
11 Q. He then requests a draft of the annex that
12   you were writing; is that right?
13 A  I haven't finished reading it.  May I read
14   this?
15 Q. Sure.
16 A  Would you -- would you please repeat your
17   question.
18 Q. Sure.  At the end of the first paragraph,
19   Mr. Gdaniec writes:  "If you get the draft of the
20   annex written, please e-mail me a copy."  Do you see
21   that?
22 A  Yes.
23 Q. Did you, in fact, send a draft of the annex
24   to Bob Gdaniec?
25 A  I don't recall.
```

Scrunch® www.Scrunchit.com  GC Software,  Seattle, Washington

EVALUATION COPY: Use of the software after 3/30/06 prohibited

**Page 115**

1 A  It would appear so.
2 Q. What did you mean by -- strike that.
3 Is all the language under description of
4 products and design your language?
5 A  It may have been, I don't recall.
6 Q. You aware of anyone else writing this,
7 other than you?
8 A  I do not recall.
9 Q. What did you mean by design parameters?
10 MR. SHEEAN: I'm going to object. He
11 just said he don't recall if he wrote this or not,
12 so your referring to it as his is misleading and
13 mischaracterizes prior testimony ^*^*.
14 Q. (By Mr. Gisleson) Do you have an
15 understanding as to what is meant by design
16 parameters in this Annex.1?
17 A  Can I read it, please?
18 Q. Sure.
19 A  Yes, I understand what it refers to.
20 Q. What?
21 A  It refers to -- the information in the
22 table is based on Items 1 through 7. If you were to
23 -- if you were to run thermal performance of an 8M
24 through a 22M, it was based on the following: 150
25 psi operating pressure and so on and so forth through

**Page 116**

1 this diagram. It's just simply a rating. You have
2 to establish a basis for the design at some point.
3 You pick a point and that gives you a parameter, if
4 you will.
5 (Plaintiff's Exhibit Number 10 was marked for
6 identification.)
7 Q. (By Mr. Gisleson) Handing you what's been
8 marked as White Exhibit 10. It's a document stamped
9 IKE5003 through IKE5009. Do you recognize this as a
10 January 30, 2003 e-mail with enclosure that you sent
11 to Bob Gdaniec, Marie Fiske, Ted Fuhrman, Dave
12 Briggs, Steve Bernatowicz and Neil Bradwell on the
13 subject of annex of license agreement?
14 A  Yes.
15 Q. On January 30, you're sending this again to
16 Bob, which is Bob Gdaniec, is that right, in the text
17 of your e-mail?
18 A  It states -- well, yes, it's to Bob.
19 Q. Says: "Please review and provide your
20 comments. The document is complete with all annex
21 data." When you refer to the document, are you
22 referring to the license agreement?
23 A  I don't recall.
24 Q. Why did you want Bob Gdaniec to review and
25 provide his comments on the annex?

**Page 117**

1 A  I don't recall. It may have been to the
2 extent just a cursory review. We were getting ready
3 to initiate this agreement to begin the execution of
4 the agreement. I wanted these people -- I wanted
5 Bob, Dan and others familiar with what we were doing.
6 Q. Why did you want them familiar with what
7 EPTI was doing?
8 A  They were going to provide technical
9 support as part of the license agreement, so it would
10 have been -- would have been wise to have included
11 them.
12 Q. You then write: "Marie, please ensure the
13 document is written to agree with the main
14 document." What did you mean by that?
15 A  Probably semantics. I don't recall
16 exactly.
17 Q. In Annex.1 immediately above the table, it
18 reads: "Standard "M" series Keystone Summary". Do
19 you see that?
20 A  Yes, sir.
21 Q. What is meant by standard?
22 MR. SHEEAN: Objection, calls for a
23 legal conclusion.
24 Q. (By Mr. Gisleson) Do you have an
25 understanding as to what is meant by the word

**Page 118**

1 "standard" in the phraseology "standard "M" series
2 Keystone summary" that you included in your Annex.1?
3 A  In terms of standard, my interpretation
4 would be pre-engineered models. Again, we go back to
5 the road map I talked about previously that sets a
6 capacity range, general capacity range for each
7 boiler for use as part of the license agreement.
8 Q. Is standard different than custom?
9 A  Standard and custom can be one and the
10 same.
11 Q. Can you identify any differences between
12 standard and custom?
13 A  You can use a standard boiler and if it
14 operates at a given pressure, you're still going to
15 have make co-calculations ^*^*, which makes it
16 custom.
17 Q. Anything else?
18 A  Without going into more detail, there are
19 certainly other issues that will involve that. Those
20 co-calculations can fall into two wall thicknesses,
21 which can change all different types of parameter,
22 rolling designs and so forth, in the
23 manufacturability of the product. So there is -- by
24 simply stating it's standard, it can very much be a
25 customized product.

**Page 119**

1 Q. In your view, was VEO permitted to sell
2 custom watertube boilers under this license
3 agreement?
4 A  There's custom --
5 MR. SHEEAN: Object as vague.
6 A  There's customizing that goes into the
7 standard units. There's customizing that goes into
8 every boiler.
9 (Plaintiff's Exhibit Number 11 was marked for
10 identification.)
11 Q. (By Mr. Gisleson) I'd like to show you
12 what's been marked as White Exhibit 11. It's a
13 document stamped IKE4435 to 4437. Looking at the
14 first page of this at the upper right-hand corner, in
15 handwriting, it says: Comments by D. Briggs January
16 30, 2003. Do you see that?
17 A  Yes, I see that.
18 Q. Did you receive a copy of this document
19 from Mr. Briggs?
20 A  Not to my knowledge, no.
21 Q. Or from anyone else?
22 A  Not to my knowledge.
23 Q. Mr. Briggs writes on here: Design pressure
24 stated on Sheet 2 and 3 states 200 psig. The KD PERF
25 sheets were based on 200 psig, but the "M" series is

**Page 120**

1 supposed to be good up to and including 399 psig. Is
2 that an accurate statement by Mr. Briggs?
3 MR. SHEEAN: I'm going to object to
4 foundation. He says he doesn't recall seeing the
5 document.
6 But you can answer.
7 A  In terms of the overall maximum allowable
8 working pressure of 399 psig, that is an accurate
9 statement.
10 Q. (By Mr. Gisleson) Then is written in
11 handwriting below that: "No mention of tangent
12 furnace tubes". Is that an accurate statement?
13 A  No.
14 Q. How is that not an accurate statement?
15 A  I don't understand his intent to -- in
16 terms of furnace tubes, I don't know what he's
17 implying.
18 Q. Based on your having written this version
19 of Annex.1, is there anything in this Annex.1 to
20 indicate that the Keystone boilers were to have
21 tangent furnace tubes?
22 A  No, that I recall.
23 (Plaintiff's Exhibit Number 12 was marked for
24 identification.)
25 Q. (By Mr. Gisleson) I'd like to show you

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Scruncn® www.Scruncht.com or GG Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 181

1  it calls for a legal conclusion.
2 A.  When you say what's not a standard model?
3 Q.  (By Mr. Gisleson) In referring to a 14M
4     special, are you distinguishing from a 14M standard
5     package Keystone boiler?
6        MR. SHEEAN: Well, I'm going to
7     object. He just said special doesn't have any
8     specific meaning, so it mischaracterizes prior
9     testimony.
10       You can answer.
11 A.  Well, you say the 14M standard. What --
12     when you say standard, what do you mean?
13 Q.  (By Mr. Gisleson) Standard as used in
14     Annex.1 to the license agreement that you drafted
15     that described the Keystone as being a standard
16     package watertube boiler.
17 A.  Is there a definition of the word
18     "standard" in the license agreement?
19 Q.  Not that I saw.
20       MR. SHEEAN: I'm going to object.
21     Obviously this is calling for a legal conclusion.
22     You're asking the interpretation of the agreement.
23 Q.  (By Mr. Gisleson) Why did you use the word
24     "special"?
25       MR. SHEEAN: Objection, asked and

Page 182

1     answered.
2 A.  I don't recall.
3 Q.  (By Mr. Gisleson) Isn't it true that
4     whenever Zurn customized a Keystone package boiler,
5     it referred to it as a special to distinguish it from
6     the standard model?
7 A.  I'm not aware of that.
8 Q.  Did you respect Dan Levstek's judgment?
9 A.  At times.
10       MR. SHEEAN: Objection, vague.
11 A.  At times.
12 Q.  (By Mr. Gisleson) Did you believe that he
13     was a competent engineer?
14 A.  I didn't really have enough experience with
15     Dan to make that assessment.
16 Q.  Did you feel like you were getting some
17     push back from the engineering department at EPTI
18     concerning the license agreement that you had
19     negotiated?
20 A.  I think there's a certain amount of push
21     back salesmen get in any organization, whether it be a
22     license agreement or an HRSG proposal. I wouldn't
23     say any more than I -- then it was normal, would
24     consider at any company.
25     (Plaintiff's Exhibit Number 26 was marked for

Page 183

1     identification.)
2 Q.  (By Mr. Gisleson) I'd like to show you
3     what's been marked as White Exhibit 26. This is
4     another document for which I couldn't find the Bates
5     stamped copy in my files, but we have produced a copy
6     of this to VEO.
7        MR. SHEEAN: Based on those grounds,
8     I'm going to object to the use of this document.
9 Q.  (By Mr. Gisleson) Do you see how this is an
10     e-mail exchange in which you're involved from
11     February 19, 2003, on the subject of list of
12     remaining marked up drawings for Victory Energy
13     license agreement?
14 A.  Yes.
15 Q.  The lower e-mail from Dave Briggs to you
16     provides: "Mark, the following is a list of the
17     remaining marked up drawings that are to support the
18     license agreement with Victory Energy. I have made
19     you two prints each for your distribution."
20     And then Dan Levstek, the director of
21     engineering at EPTI, writes to you and says: "Mark,
22     as these drawings are outside of the basic license
23     agreement, we should put a disclaimer in the
24     transmittal to Victory that they are for use on this
25     specific project only."

Page 184

1 Q.  Did you follow his recommendation?
2 A.  I don't recall.
3 Q.  Did you write back to him to say, hey, Dan,
4     all these drawings are within the scope of the basic
5     license agreement?
6 A.  I don't recall.
7 Q.  Was VEO disclosing to you the designs of
8     all of the proposed Keystone boilers that it was
9     seeking to sell?
10 A.  He's already asked --
11       MR. GISLESON: Could you read that
12     back.
13     (The record, as requested, was read by the reporter.)
14       MR. SHEEAN: Objection, vague.
15 A.  Please repeat the question.
16       MR. GISLESON: Would you read it back.
17     (The record, as requested, was read by the reporter.)
18       MR. SHEEAN: Same objection.
19 Q.  (By Mr. Gisleson) This is while you were
20     working with EPTI.
21 A.  I understand that. I don't recall.
22     (Plaintiff's Exhibit Number 27 was marked for
23     identification.)
24 Q.  (By Mr. Gisleson) I'd like to show you
25     what's been marked -- It's another where I don't have

Page 185

1     the Bates number ^ * ^ * on it.
2       MR. SHEEAN: Same objection as to use
3     --
4 Q.  (By Mr. Gisleson) I'll show you what's
5     marked as White Exhibit 27, which is a July 10, 2003
6     e-mail exchange in which you were involved in the top
7     e-mail. Do you see that?
8       MR. SHEEAN: I object to the use of
9     this document because it doesn't bear a Bates label.
10     It's unclear where the document came from, whether or
11     not it was, in fact, produced in discovery and,
12     therefore, I think it's unfair to use at this time.
13 A.  Repeat the question, please.
14 Q.  (By Mr. Gisleson) Do you recognize this as
15     a copy of e-mail correspondence in which you were
16     copied on July 10, 2003?
17 A.  Yes.
18 Q.  The lower e-mail from Trent Miller to Dave
19     Briggs is on the subject of a couple of questions.
20     Do you understand that Trent Miller was an engineer
21     with VEO in July of 2003?
22 A.  I believe so.
23 Q.  He writes: "Dave, we have a new project
24     that we are going to make a 14M, but I've been
25     looking at the boiler that you built for us, your

Page 186

1     Project 2023, and I'm getting confused. My
2     understanding was that 2023 was a 15M, but the base
3     dimensions are only one inch longer than a 14M." Then
4     adds more information below that.
5     In response, Dave Briggs writes to Trent
6     Miller and copies you on an e-mail that says: "Trent,
7     in response to your questions, please remember that
8     the license agreement was for our standard "M" series
9     Keystone package boilers. These boilers are all
10     saturated, refractory rear and front wall with a
11     tangent furnace wall. Our order, G.O.2023, was a
12     special Keystone, not a 14M, not a 15M, but a
13     special. This order was an all welded wall design.
14     You cannot compare apples to oranges. They are just
15     not the same. So to answer your question as to what
16     model size was G.O.2023, the answer is that is not a
17     model size."
18     Did you send a response to Dave Briggs to
19     disagree with his assertions there?
20 A.  I don't believe so, but I can't recall.
21 Q.  "Special" is the same word that you used in
22     the prior e-mail to describe a Keystone boiler with
23     water cooled walls, correct?
24 A.  Yes.
25 Q.  Is it just a coincidence that he used the

Scrunch® www.Scrunchit.com  GC Software,  Seattle, Washington

EVALUATION COPY: Use of the software after 3/2/06 prohibited

Page 199

1   Keystone technology if CMI, in the first instance,
2   were able to acquire certain assets from EPTI?
3 A  No.  I had conversations with Xavier Devair
4   ^*^* regarding the just desire to continue the
5   license should CMI acquire EPTI.  And our answer was
6   certainly we'd like to continue the license
7   agreement.
8 Q.  You didn't have any discussions personally
9   with anyone from CMI about acquiring the technology?
10 A  Did I?
11 Q.  Yes.
12 A  No, not a purchase, just a continuation of
13   the license agreement.
14 Q.  As part of the discussions with Bob Gdaniec
15   and others at EPTI concerning your proposed
16   acquisition of the Keystone name and "O" type
17   technology up to 150,000 or so, did EPTI at that time
18   advise VEO of its belief that VEO had been pursuing
19   projects outside the scope of the license agreement?
20 A  I believe there was a letter drafted by Bob
21   Gdaniec that would address those issues.
22 Q.  Did you read the letter?
23 A  Yes.
24 Q.  Were you surprised by the letter?
25 A  Yes.

Page 200

1 Q.  Why?
2 A  It was the first – it was a first real
3   acknowledgment that we'd received that we were
4   violating the agreement, or their belief that we were
5   violating the agreement.  We had many day-to-day
6   conversations with the Erie engineers and it was
7   disappointing.
8 Q.  While you were employed with EPTI, did you
9   ever advise any of the engineers at EPTI that
10   Victory's use of either welded walls or membrane
11   walls was an improvement under the terms of the
12   license agreement?
13 A  While I was at EPTI?
14 Q.  Yes.
15 A  Please repeat the question.
16 Q.  While you were an employee of EPTI, did you
17   ever state in writing to any employee or
18   representative of EPTI that VEO's use of welded wall
19   or membrane technology in Keystone boilers was a,
20   quote, "improvement," closed quote, under the terms
21   of the license agreement?
22 A  I don't believe so.
23 Q.  Did you ever verbally advise any
24   representative of EPTI that VEO's use of welded wall
25   or membrane technology in Keystone boilers was a,

Page 201

1   quote, "improvement," closed quote, under the terms
2   of the license agreement?
3 A  I don't believe so.
4   MR. GISLESON:  Mark that.
5   (Plaintiff's Exhibit Number 29 was marked for
6   identification.)
7 Q.  (By Mr. Gisleson) I'd like to show you
8   what's been marked as White Exhibit 28.  It's a
9   document stamped VEO514 to 544.  It's actually a
10   collection of documents that pertain to VEO's
11   proposed acquisition of the Keystone technology.  Is
12   it correct that in connection with those discussions
13   you were communicating by e-mail with EPTI and
14   sending drafts back and forth that way?
15 A  Yes.
16 Q.  Looking at the first page, this is an
17   e-mail that you sent to Stephen Kang in which you are
18   expressing your comments concerning the proposed
19   agreement; is that right?
20 A  Yes.
21 Q.  And a draft of the license agreement is
22   attached to the next page, and it's a draft of March
23   26, 2004; is that right?
24 A  Yes.
25 Q.  And then if we turn to Page 527, this is a

Page 202

1   letter that you received from EPTI and Mr. Gdaniec
2   addressing the current version of the proposed
3   acquisition agreement for the Keystone technology; is
4   that right?
5 A  Repeat the question, please.
6 Q.  Do you recognize this as a letter that Mr.
7   Gdaniec sent to you addressing the current status of
8   the draft acquisition agreement for the Keystone
9   technology?
10 A  Yes.
11 Q.  And I'll represent to you, based on a
12   letter we're going to look at after this one, that
13   the date of this letter is March 26, 2004.  And in
14   the letter, Mr. Gdaniec writes in the second
15   paragraph:  "Let me explain our philosophy in general
16   terms for the approach we have taken which was based
17   on our overall assessment of the past year operating
18   with the current license agreement in place and the
19   desire of VEO to purchase some of the technology.
20   While things, in general, have gone well over the
21   past year, we do have concerns with regard to the
22   past year's performance that needs to be addressed
23   and resolved.  Attached is an overview of our
24   concerns for your reference."
25   And you reviewed the attachment to this

Page 203

1   letter that itemizes these specific concerns that
2   EPTI had, correct?
3 A  Yes.
4 Q.  And then if we could look at VEO530, those
5   are the specific concerns that Bob Gdaniec, on behalf
6   of EPTI, raised to VEO, correct?
7 A  I believe so.
8 Q.  You read the attachment to Mr. Gdaniec's
9   letter and were involved along with Mr. Viskup in
10   preparing a response to the letter; is that right?
11 A  I believe so.
12 Q.  Why did you feel it was necessary to
13   prepare a written response to the statements in Mr.
14   Gdaniec's letter of March 26, 2004?
15 A  Addressing the inaccuracies.
16 Q.  And to some extent, you also agreed with
17   certain of his contentions, right?
18 A  I don't know.  I'd have to read through the
19   document.
20 Q.  Before getting to that document, if you'll
21   look at Page VEO532, there is a draft of the
22   amendment to the license agreement and option to
23   purchase.  Do you see that?
24 A  Yes.
25 Q.  On the third page of that draft, it shows a

Page 204

1   purchase price of $250,000?
2   MR. SHEEAN:  I'm sorry, what – where
3   are you referring, John?
4   MR. GISLESON:  Its VEO534, Paragraph
5   7.
6 A  Okay.
7 Q.  (By Mr. Gisleson) Had VEO offered to pay
8   EPTI $250,000 to purchase the Keystone technology,
9   including the use of the name Keystone?
10 A  I don't recall.
11 Q.  Was there a specific purchase price that
12   had been advanced by VEO?
13 A  No.
14   (Plaintiff's Exhibit Number 30 was marked for
15   identification.)
16 Q.  (By Mr. Gisleson) I'd like to show you
17   what's been marked as White Exhibit 29 [sic].  It's a
18   document stamped V120 through V124.  Do you recognize
19   this as an e-mail with attachment in which you are
20   responding to the March 26, 2004 letter of EPTI, Mr.
21   Gdaniec, advising of concerns of VEO's license
22   agreement performance?
23 A  Yes.
24 Q.  Now, in the first numbered paragraph of Mr.
25   Gdaniec's March 26th letter, he writes that:  VEO

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 241

1    it is drawing of a furnace wall construction for
2    welded tube and membrane?
3 A  Yes.
4 Q. And that there's a date apparently on here
5    of 03/03, do you see in the lower right-hand corner?
6 A  3/03, yes, I see that.
7 Q. Did you ask someone to prepare that drawing
8    for you?
9 A  I may have, I don't recall.
10 Q. Now, the drawings on Pages 839 and 840 are
11   included in Annex.1, right, to the license agreement?
12 A  They appear to be.
13 Q. Drawing 841 is not in the license
14   agreement, correct?
15       MR. SHEEHAN: I'm going to object to
16   the extent it calls for a legal conclusion. You can
17   answer.
18 A  This -- the document or this 0841 is part
19   of the license agreement.
20 Q. But it's not specifically included in the
21   license agreement as a drawing in Annex.1 as with the
22   priority two drawings?
23 A  Within Annex.1, no, but is included as
24   part of the agreement.
25 Q. And on Page 842, that's the drawing from

Page 242

1    Annex.1 except you changed tangent tube walls to
2    membrane walls, correct?
3 A  I didn't change it.
4 Q. Who made the changes?
5 A  I didn't create this drawing. As I told
6    you prior, I don't recall who had drawn these --
7    created these drawings.
8 Q. Do you know what department these drawings
9    were in?
10 A  No.
11 Q. On Page 843 under optional features and
12   benefits, you identified: "Membrane watercooled
13   front wall assembly and membrane watercooled rear
14   wall assembly," among others, right?
15 A  Yes.
16 Q. Because those are optional features and
17   benefits, does that mean they're not part of the
18   standard Keystone watertube boiler?
19       MR. SHEEHAN: Objection, calls for a
20   legal conclusion.
21 A  No, not necessarily.
22 Q. (By Mr. Gisleson) When these drawings have
23   stamps on them for Erie Power that say:  This drawing
24   and design shown herein is the property of Erie Power
25   Technologies and must be not be used or reproduced

Page 243

1    for third party, that obviously indicates that the
2    drawing was created by EPTI, right?
3 A  Yes.
4 Q. Did you expect VEO to provide copies of
5    these drawings to third parties?
6 A  In terms of the sales and marketing
7    materials provided as part of the license agreement,
8    yes, I expected them to provide those to customers.
9    It's very difficult to sell without having proper
10   information to do so.
11 Q. Is it correct that you don't know the
12   source of any of the drawings in the sales manual?
13 A  I don't recall the source of these
14   drawings.
15 Q. As to the text that's in here, did you copy
16   any of the text on Pages 843 or 849 from the Keystone
17   sales manual that was in use at Zurn or an old manual
18   from Zurn?
19 A  Well, we talked about a Keystone sales
20   manual, and I'm not -- I'm not -- I don't understand
21   what you're referring to. And in terms of an old
22   sales manual, I again, don't know what you're
23   referring to, so the answer would be no.
24 Q. Is the text on these pages then original
25   and solely your own?

Page 244

1 A  I don't recall.
2 Q. I'm just trying to figure out whether you
3    wrote this freehand yourself or whether you copied it
4    from some other documents.
5       MR. SHEEHAN: And I think he's answered
6    the question. You can answer it again.
7 A  As I said, I don't recall what I used or
8    didn't use.
9 Q. (By Mr. Gisleson) Turning to Page VEO855,
10   Package Steam Generator Sample Specification, what
11   was the source of that sample specification?
12 A  I believe that was a sample specification
13   we had when I was -- when I worked at Erie Power, the
14   disposal of the sales and marketing group.
15 Q. Was that the sample specification for
16   Keystone boilers?
17 A  Yes.
18 Q. Including for Keystone boilers above
19   150,000 pounds per hour?
20 A  You could use it for anything from 10
21   pounds -- or 10,000 pound per hour all the way up to
22   a million pounds per hour.
23 Q. And then beginning on Page VEO858 through
24   890, there is Erie Power Packaged Boilers Selected
25   References?

Page 245

1 A  Right.
2 Q. Does that refer to all boilers that were
3    sold by Erie Power Technologies or its predecessors
4    for Keystone?
5 A  No, no.
6 Q. What does that refer to?
7 A  Just a select list to assist Victory Energy
8    to have at least a reference list to present to their
9    clients or prospective clients to show that there are
10   -- there is experience. There is experience within
11   given range of application so they wouldn't have such
12   a difficult time in trying to convince a customer
13   even though as Victory -- as Victory Energy, they
14   didn't have any experience. It was supporting the
15   agreement, supporting the spirit of the agreement,
16   trying to get the revenues moving.
17 Q. Did you have any discussions with Shawn
18   Brewer or anyone at VEO as to whether this list of
19   selected references should be modified to eliminate
20   those boilers that were outside the scope of the
21   license agreement?
22 A  No, I don't recall.
23 Q. Did you advise specifically Shawn Brewer
24   that VEO could use this list as is without
25   eliminating those boilers that are larger than

Page 246

1    150,000 pph?
2 A  Yeah. When I provided the agreement, it
3    was to be utilized for sales and marketing.
4 Q. Without alteration?
5 A  Correct.
6       MR. GISLESON: Let's take a break.
7    (Break was taken.)
8 Q. (By Mr. Gisleson) In connection with
9    preparing a license agreement, what was your
10   understanding as how the transfer of technical
11   information back from VEO to EPTI was to occur at
12   conclusion of the license.
13 A  At the conclusion of the license
14   agreement? I guess in a general sense, and I have to
15   be honest, I -- without reading -- rereading the
16   agreement, I would have to get an exact definition of
17   what the requirements are. I would have to review
18   the agreement. But in a general sense, all of the
19   information that was transferred at the initial stage
20   and throughout the agreement from EPTI or, in this
21   case, IKE would have to be returned, any proprietary
22   information, the mark and so on and so forth. And
23   then at the time frame, there would be no -- VEO
24   could not continue to use the mark, couldn't use the
25   sales literature and so so and so forth. So at that

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3

INDECK KEYSTONE ENERGY,      )
4 LLC, a Delaware limited     )
liability company,           )
5                            )
              Plaintiff,      ) CIVIL ACTION
6                            )
     vs.                      ) No. 04-CV-325E
7                            )
VICTORY ENERGY OPERATIONS,   ) Judge Sean J. McLaughlin
8 LLC, a Delaware limited     )
liability company,           )
9                            )
              Defendant.      )
10

11

12

13        The videotape deposition of SHAWN BREWER taken

14 on behalf of the Plaintiff before Pamela B.

15 Stinchcomb, Certified Shorthand Reporter in and for

16 the State of Oklahoma, on the 13th day of October,

17 2005, in the City of Tulsa, State of Oklahoma,

18 pursuant to the stipulations of the parties.

19

20

21

22

23        PAMELA B. STINCHCOMB, CSR #1544
          DAVIDSON REPORTING SERVICE
              5508 South Lewis Avenue
24            Tulsa, Oklahoma  74105
                (918) 745-9959
25

EXHIBIT

2

PENGAD 800-631-6989

40

1    A.   I could, yes.

2    Q.   Was there ever an instance in which you

3 reviewed the license agreement between EPTI and VEO

4 in order to determine whether a proposal that VEO

5 wanted to submit was outside of the scope of the

6 license agreement?

7    A.   Not that I used the contract.  That I read

8 the contract to make that determination, no.

9    Q.   Are you aware of anyone, while you worked

10 at VEO, ever reviewing the license agreement to

11 determine whether a particular proposal that VEO

12 wished to make was within the scope of the license

13 agreement or outside of the scope of the license

14 agreement?

15    A.   I don't remember the license agreement

16 being referred to often enough where it would be used

17 on a -- on a job-by-job type basis.  It was a -- it

18 was a guideline for us that had some specifics that

19 we worked with.  But the majority of our quotes were

20 sent to EPTI for performance and sizing.  We worked

21 within the capacity range, is mainly what we did.

22    Q.   What was the capacity range, do you recall?

23    A.   Yeah, I believe -- and I haven't looked at

24 that document for several years.  But it was 29,000

25 pounds up to 150,000.  And there was also a break on

1    A.   Again, it was nothing -- no, nothing in

2  particular.  Just on a job-by-job basis.  If there

3  was something that came up that was out of the scope,

4  we would discuss it.

5    Q.   Did you ever have any discussions with

6  anyone from EPTI about the use of membrane walls in

7  Keystone boilers and whether membrane walls were

8  outside the scope of the license agreement?

9    A.   It was never even considered an issue.  It

10  was a -- an option that the Keystones provided that.

11    Q.   You understood throughout the time you

12  worked at VEO that membrane walls were not a standard

13  feature of the Keystone watertube M-series boiler,

14  correct?

15    A.   You know, I wouldn't convey it as such.  It

16  was presented years before as an option.  But it was

17  no longer an option in the marketplace not to be a

18  membrane wall.  So as we were getting into the

19  license, it was an obvious item that -- matter of

20  fact, we dropped the tangent [sic] tube design from

21  the offers completely because it's no longer

22  acceptable in the market.  It's an unmarketable

23  product.

24    Q.   Membrane walls were first offered or always

25  offered by whom?

172

1    Q.    (By Mr. Gisleson) I want to show you what's

2    been marked as Brewer Exhibit 21.  It's a document

3    stamped IKE295.  Does this show an e-mail exchange

4    between you and Mark White in February of 2003 on the

5    subject of "D" type boilers?

6    A.    Yes.

7    Q.    The lower e-mail message from February 4,

8    2003, from you to Mark White on subject "D" type

9    boilers says:  "Mark, see attached.  Can we have

10   access to this line of products, too?"  Was this the

11   first time that VEO, to your knowledge, requested

12   access to the technology for "D" type boilers?

13   A.    That's the first time I'd asked for it that

14   I can remember.

15   Q.    In response on February 10, Mark White

16   writes to you:  "Let's discuss in a few months.  It

17   that same time we can include small HRSGs".

18   A.    Right.

19   Q.    Did you, in fact, discuss the inclusion of

20   small HRSGs, as well as "D" type boilers at some

21   point thereafter?

22   A.    Maybe, but nothing detailed with me anyway.

23   Q.    Did Mark White ever refuse to license "D"

24   type boiler technology to VEO during a conversation

25   he had with you?

1      A.    Just to this extent.

2      Q.    Did you have any conversations with John

3  Viskup concerning the technology for the "D" type

4  boilers that was owned by EPTI?

5      A.    Yes, we -- I mean, it was a line I would

6  liked to have been able to provide, as well.

7      Q.    Was it Viskup who in the first instance

8  asked you to make the request of EPTI to obtain the

9  "D" type technology?

10      A.    Not to my knowledge.

11      Q.    Did you have any involvement with respect

12  to a license agreement addendum at the end of

13  February 2003 to modify the license agreement to

14  include superheated applications?

15      A.    I just know that we had discussed it.  I

16  don't -- again, I had nothing to do with negotiation

17  of the actual contract, though.

18      Q.    Who's "we"?

19      A.    John and I had discussed it.

20      Q.    What were the discussions about superheated

21  applications that you had with John Viskup?

22      A.    He'd agreed to go superheaters, too.

23      Q.    Anything beyond that?

24      A.    Yeah, it would be great.  We needed to be

25  able to do that.  It was to that generality.  Again,

210

1          Earlier you used the term "plagiarized"

2    with respect to your preparation of some sales and

3    marketing materials.  Did you mean to imply that you

4    were utilizing information provided by Erie Power

5    without their express consent?

6          A.   No.

7          Q.   Did you ever, to the best of your

8    knowledge, utilize any Erie Power marketing materials

9    without the consent of Erie Power?

10         A.   No.

11              MR. GISLESON:  Objection.

12         Q.   (By Mr. Sheean) You talked earlier about a

13   -- an "O" series boiler, and you also mentioned an

14   "M" series boiler.  Do you have a clear distinction

15   in your mind between the term ""O" series" and ""M"

16   series" with respect to Keystone boilers?

17         A.   No, I don't.

18         Q.   Has it always been your understanding that

19   an "O" series boiler is an "M" series boiler and vice

20   versa?

21              MR. GISLESON:  Objection, leading,

22   foundation.

23         A.   No.  And actually "O" series, I believe in

24   the one document I saw was supposed to say "type,"

25   "O" type boiler.

212

```
 1      A.   It was sales information provided.   I

 2   believe it came from a Power Point presentation

 3   provided to us from -- by Erie specifically.

 4      Q.   And when you obtained those marketing

 5   materials from Erie, were you told that you'd be

 6   entitled to utilize that information for marketing

 7   Keystone boilers?

 8      A.   Yes.

 9           MR. GISLESON:  Objection, leading.

10      Q.   (By Mr. Sheean) Did you ever have the

11   understanding that Victory Energy agreed to license

12   only tangent tube Keystone boilers?

13      A.   No.

14      Q.   In your opinion, would Victory Energy have

15   ever entered into an agreement where it was allowed

16   to sell only tangent tube technology Keystone

17   boilers?

18      A.   No.

19           MR. GISLESON:  Objection, foundation,

20   lack of personal knowledge.

21      Q.   (By Mr. Sheean) In your opinion, could

22   Victory Energy have successfully marketed Keystone

23   boilers that incorporated solely tangent tube

24   technology?

25           MR. GISLESON:  Objection, foundation.
```

213

1       A.    Absolutely not.

2       Q.    (By Mr. Sheean) And why not?

3       A.    Because tangent tube technology is not an

4   acceptable design for boilers in any -- in any

5   campaign -- sales campaign that I've seen in the

6   engineering spec that's been provided, any customer

7   preference or customer design requested of us, in no

8   fashion were tangent tube boilers acceptable.

9       Q.    Do customers in their specifications

10  typically require that they obtain a -- a permit from

11  the burner manufacturer regarding the emissions on

12  the boiler?

13      A.    Normally they -- they make -- they get the

14  permit from whatever governing body it is.  They have

15  to get a guarantee from the burner manufacturers that

16  they'll meet the emissions.

17      Q.    And in order to meet the emissions, do

18  burner manufacturers have any express requirements

19  with respect to the design of the boiler?

20      A.    Yes.

21      Q.    And with respect to "O" type watertube

22  boilers, do you know of any burner manufacturer that

23  would render a guarantee regarding emissions of a

24  tangent tube "O" style boiler?

25      A.    No, I don't -- I don't know that.

214

1    Q.    And why is it that a -- in your opinion,

2  would a burner manufacturer not guarantee the

3  emissions on a boiler that incorporated tangent tube

4  technology?

5              MR. GISLESON:  Objection, foundation.

6    A.    Because there's -- there's flexing that

7  takes place inside the boiler which could cause an

8  air gap, which would allow gases to escape prior to

9  being fully combusted.  And it's not possible to

10  control your emissions if you're not fully combusting

11  the gases that are interjected.

12    Q.    (By Mr. Sheean) And with a welded wall

13  design, does that take care of the issues with

14  respect to gas bypassing without being fully

15  combusted?

16              MR. GISLESON:  Objection.

17    A.    It should to the point where the burner

18  manufacturers are willing to guarantee under those

19  conditions.

20              MR. SHEEAN:  Those are all the

21  questions I have.  Thank you, sir.

22              MR. GISLESON:  Why don't we take a

23  short break so I can go through my notes.

24              (Break was taken)

25              REDIRECT EXAMINATION

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

    INDECK KEYSTONE ENERGY, LLC,         :
 3                    Plaintiff          :
                                         :
 4          v.                           :  Case No. 04-325 Erie
                                         :
 5   VICTORY ENERGY OPERATIONS, LLC,     :
                      Defendant          :
 6
 7
 8          Deposition of ROBERT JOHN GDANIEC, taken before
 9   and by Sondra A. Black, Notary Public in and for the
10   Commonwealth of Pennsylvania, on Tuesday, November 8,
11   2005, commencing at 9:06 a.m., at the offices of
12   Marshall Dennehey Warner Coleman & Goggin, 1001 State
13   Street, Erie, Pennsylvania 16501.
14
15
16   For the Plaintiff:
17        John K. Gisleson, Esquire
          Schnader Harrison Segal & Lewis, LLP
18        Fifth Avenue Place
          120 Fifth Avenue, Suite 2700
19        Pittsburgh, PA 15222
20   For the Defendant:
21        Christopher T. Sheean, Esquire
          Wildman Harrold Allen & Dixon, LLP
22        225 West Wacker Drive
          Chicago, IL 60606
23
24             Reported by Sondra A. Black
               Ferguson & Holdnack Reporting, Inc.
25
                                                          1
```

*CONFIDENTIAL* (stamp)

```
 1                     I N D E X
 2
 3   ROBERT JOHN GDANIEC
 4   Direct Examination by Mr. Sheean.......................5
 5   Cross-Examination by Mr. Gisleson...................161
 6   Redirect Examination by Mr. Sheean..................204
 7   Recross-Examination by Mr. Gisleson.................208
 8
...
25                                                        2
```

```
 2   Gdaniec Deposition Exhibit No. 1.....................45
 3   Gdaniec Deposition Exhibit No. 2.....................45
 4   Gdaniec Deposition Exhibit No. 3.....................46
 5   Gdaniec Deposition Exhibit No. 4.....................50
 6   Gdaniec Deposition Exhibit No. 5.....................50
 7   Gdaniec Deposition Exhibit No. 6.....................60
 8   Gdaniec Deposition Exhibit No. 7.....................65
 9   Gdaniec Deposition Exhibit No. 8.....................70
10   Gdaniec Deposition Exhibit No. 9.....................73
11   Gdaniec Deposition Exhibit No. 10....................74
12   Gdaniec Deposition Exhibit No. 11....................76
13   Gdaniec Deposition Exhibit No. 12....................78
14   Gdaniec Deposition Exhibit No. 13....................79
15   Gdaniec Deposition Exhibit No. 14....................84
16   Gdaniec Deposition Exhibit No. 15....................90
17   Gdaniec Deposition Exhibit No. 16....................93
18   Gdaniec Deposition Exhibit No. 17....................95
19   Gdaniec Deposition Exhibit No. 18....................97
20   Gdaniec Deposition Exhibit No. 19....................98
21   Gdaniec Deposition Exhibit No. 20...................101
22   Gdaniec Deposition Exhibit No. 21...................104
23   Gdaniec Deposition Exhibit No. 22...................109
24   Gdaniec Deposition Exhibit No. 23...................111
25   Gdaniec Deposition Exhibit No. 24...................117
                                                          3
```

```
 1   Gdaniec Deposition Exhibit No. 25...................123
 2   Gdaniec Deposition Exhibit No. 26...................138
 3   Gdaniec Deposition Exhibit No. 27...................144
 4   Gdaniec Deposition Exhibit No. 28...................146
 5   Gdaniec Deposition Exhibit No. 29...................148
 6   Gdaniec Deposition Exhibit No. 30...................150
 7   Gdaniec Deposition Exhibit No. 31...................152
 8   Gdaniec Deposition Exhibit No. 32...................164
 9   Gdaniec Deposition Exhibit No. 33...................165
10   Gdaniec Deposition Exhibit No. 34...................171
11   Gdaniec Deposition Exhibit No. 35...................175
12   Gdaniec Deposition Exhibit No. 36...................178
13   Gdaniec Deposition Exhibit No. 37...................179
14   Gdaniec Deposition Exhibit No. 38...................181
15   Gdaniec Deposition Exhibit No. 39...................182
16   Gdaniec Deposition Exhibit No. 40...................203
                                                          4
```

EXHIBIT
3

**Page 49**

```
 1   aligned with the manufacturers that fabricated the equipment for
 2   us within the US, yes.
 3        Q.  Did you ever tell Mark that you disagreed with his
 4   analysis of the ability of the company to sell M series
 5   boilers competitively?
 6        A.  I don't recall if I ever, after this discussion,
 7   went back to Mark White at all on it.  I believe at that
 8   point I discussed it with Mr. Kang directly.  Again, as I
 9   said before, from the perspective of the lesser of two evils
10   we needed the opportunity to have revenue.  So to continue to
11   fight it, seeing how far it had moved along, was not seen as
12   being reasonable in my mind.
13        Q.  Back to the first e-mail from Mark White in the
14   morning of January 8th.  The sentence I read before, "Victory
15   understands that the series is somewhat dated and will
16   require modifications to comply with current customer and
17   code requirements."  Do you see that?
18        A.  Yes, I do.
19        Q.  Did you understand that Victory Energy, under the
20   license agreement, would be allowed to make changes in the
21   design of the boiler in order to meet customer needs?
22        A.  Yes, I do.
23        Q.  And code requirements?
24        A.  In general, design requirements in their entirety,
25   yes.  Because the original M series was designed under an
```

49

**Page 50**

```
 1   older edition of the boiler codes.  We were not doing that
 2   engineering for Victory, we were expecting that they would
 3   have to do that re-engineering work for -- to meet current
 4   additions of the code and standards.
 5        Q.  Who was your supervisor in January of 2003?
 6        A.  I would say Mr. Kang was.
 7        Q.  Was Dan Levstek?
 8        A.  I never reported to Mr. Levstek, no.
 9        Q.  Mr. Gdaniec, I've handed you what we've marked as
10   Gdaniec Deposition Exhibits 4 and 5, which were Fuhrman
11   Exhibits 24 and 23.
12             (Gdaniec Deposition Exhibit Nos. 4 and 5 marked for
13             identification.)
14        A.  Yes.  That's -- I have those.
15        Q.  Make sure that they're different.
16        A.  Yeah.  They're two separate documents.
17        Q.  Do you recognize what we've marked as Gdaniec
18   Exhibit 4 as a letter from Mark White to John Viskup, second
19   page being a letter from Mr. Viskup to Mr. White, and the
20   third page of that agreement, which is VEO1172 through
21   VEO1190, as being the body of the license agreement between
22   Erie Power and Victory Energy?
23        A.  Yes.  I recognize the document.
24        Q.  The document is signed by Mark White for Erie Power
25   and John Viskup for Victory Energy, correct?
```

50

**Page 51**

```
 1        Q.  I want to direct your attention to Page 1172 --
 2   VEO1172.  That's the Bates number on the bottom right corner.
 3        A.  Yes.  Okay.
 4        Q.  Do you see under Clause 1, Definitions, it says,
 5   "'Products' shall mean natural circulation, industrial
 6   watertube package steam generators with a steam capacity rate
 7   between 29,000 PPH up to and including 159,000 PPH."  Do you
 8   see that?
 9        A.  Yes, I do.
10        Q.  Is that what you were referring to previously when
11   you said the description in the body of the agreement itself
12   was relatively broad?
13        A.  Yes.  Correct.  Because that generically covers all
14   industrial watertube package-type boilers that are out there
15   with no specific limitation on type or style or
16   configuration.
17        Q.  The second sentence reads, "Products shall include
18   but not be limited to the items set forth in Annex 1."  Do
19   you see that?
20        A.  Yes, I do.
21        Q.  What did you understand the term, "include but not
22   be limited to" to mean there?
23        A.  I don't have Annex 1 to fresh my memory on what is
24   exactly in Annex 1, but Annex 1 was specifically written
25
```

51

**Page 52**

```
 1   around the boiler itself, and the products include but not
 2   limited to would be such things as if they added an
 3   economizer to it, which is not the boiler itself but an
 4   add-on piece, or a fuel skid or a burner or additional
 5   equipment around the boiler is what I would say is what that
 6   was intended to -- because we didn't address every technical
 7   part and piece that could be included with a boiler itself.
 8   Like auxiliary equipment, valves, instruments, and devices
 9   such as that.
10        Q.  Did you ever share that understanding that you had
11   with anyone at Victory Energy?
12        A.  No.  I can say I did not, no.
13        Q.  Just so that you don't think I'm hiding the ball on
14   you, Exhibit 5 is a letter, we'll go ahead and, for the
15   record, identify it as VEO1191 through VEO1201, and the
16   letter is to John Viskup from Mark White.  It says, "Please
17   find two sets of originals duly initialed by Mark White of
18   Annex 1, 2, and 3 of the Erie Power license agreement between
19   our two companies."  Do you see that?
20        A.  Yes, I do.
21        Q.  Do you recognize this document?
22        A.  Yes, I do.
23        Q.  Now, it was your testimony -- strike that.  Is it
24   your understanding that Annex 1 sets the outer limits of the
25   possible products that Victory Energy would be permitted to
```

52

**Page 53**

```
 1   sell under the license agreement.
 2       A.  Within -- yes.  Within the understanding that the
 3   performance rating of the boiler would be adjusted within the
 4   bounds of the rating program and the information we provide
 5   in the license agreement.
 6       Q.  Where does it say that the rating program would be
 7   adjusted within the bounds of the program to be provided?
 8       A.  There's clause in here that says that we would
 9   provide the capability to rate the boiler itself, and without
10   reading this again, there's reference that the performance
11   data is referenced only in the -- in this annex.
12       Q.  Where does it say that?
13       A.  I'd have to reread the document.  If you give me a
14   second.
15       Q.  Take your time.
16       A.  I would say reference -- come back to what's marked
17   as VE01175, it's Page 4 of the agreement.  The first
18   reference to it is that the obligation of the agreement, on
19   Clause 3, that we would provide licensee with technical
20   information, et cetera, et cetera, and it says, "Licensor
21   will provide licensee access via remote connection so that
22   licensee might properly rate the product."  And it explains
23   what the program was and how it worked.  So the expectation
24   was that they would have to rate the actual performance of
25   the boiler under customer specific criteria.  That the
                                                              53
```

**Page 54**

```
 1   information provided in the annex was reference for what the
 2   product could actually do or could achieve.
 3       Q.  So there would have to be modifications made in
 4   order to rate the boiler in order to meet the customer needs?
 5           MR. GISLESON:  Objection.
 6       A.  Not modification of the products but modifications
 7   to the conditions at which the boilers run under.  For
 8   example, the annex is based -- performance based on a certain
 9   elevation of the boiler, and if the boiler is at a different
10   elevation, it performs differently.  It's based on a certain
11   particular type of fuel analysis.  So if they had a different
12   fuel analysis, you'd need to rerate the performance of the
13   boiler.
14       Q.  So it was not your understanding, was it, that
15   Victory Energy was only allowed to sell boilers at 80 degree
16   Fahrenheit ambient air temperature?
17       A.  Correct.  We would have expected they sold at the
18   prevailing site conditions within the range of certain
19   pound-per-hour capacity to another pound per-hour capacity in
20   the --
21       Q.  And you didn't believe that Victory Energy could
22   only sell boilers that would be installed at locations where
23   it was exactly at 1,000 feet above sea level, did you?
24       A.  No.
25       Q.  Or that there would be exactly 10 percent excess air
                                                              54
```

**Page 55**

```
 1   for natural gas, correct?
 2       A.  Correct.
 3       Q.  Or 15 percent excess air for No. 2 oil and No. 6
 4   field oils?
 5       A.  Correct.  And that's the reason we gave them -- and
 6   it's in the license that we had an obligation to provide them
 7   rating capability so they could adjust the parameters for
 8   site specific for customers.
 9       Q.  Where does it say that the design capability
10   provided is only to adjust the design parameters to meet with
11   changes in temperature or changes in elevation?
12       A.  Nothing specific in the license agreement that I
13   recall.  We did it via the software.  The software only had
14   the ability to rate the standard boilers, and we only gave
15   them the capability in that program to adjust certain
16   parameters of that, which were ambient fuel conditions, steam
17   conditions, steam pressures.  So it was via the software we
18   controlled that.
19       Q.  I want to go back for a minute.  You told me in the
20   definition of products that the including but not limited to
21   was, in your understanding, meant to refer only to ancillary
22   equipment such as economizers and things of that nature.
23       A.  I would say predominantly to ancillary equipment.
24   But there's a clause in there that allows enhancements and
25   improvements to the product line.  So we weren't trying to
                                                              55
```

**Page 56**

```
 1   identify everything because there were things that we would
 2   not have known.  But the intention was predominantly the
 3   auxiliary equipment.
 4       Q.  So it was your understanding that Victory Energy was
 5   permitted to make modifications to the line?
 6           MR. GISLESON:  Objection.  Vague, mischaracterizes
 7           the prior testimony.
 8       Q.  You can answer.
 9       A.  Yes.  We knew there was a clause in there that
10   allowed them to make enhancements or improvements to the
11   product line that was licensed.
12       Q.  And Mark White said as much in that first e-mail to
13   you, right?
14       A.  Yes.  He identified that there would need to be
15   improvements made, yes.
16       Q.  Are you aware of any improvements that Victory
17   Energy made to the Keystone Energy boiler line?
18           MR. GISLESON:  Objection.  Vague, foundation.
19       A.  No.  That's one of -- I believe one of the
20   complaints we had with regards to identifying issues in the
21   license agreement that Victory was not notifying us if, in
22   fact, they were making improvements or enhancements to the
23   boiler.
24       Q.  The inclusion of 100 percent membrane wall
25   technology, would that have been an improvement in the mind
                                                              56
```

**Page 57**

```
 1   of Erie Power, to the best of your knowledge?
 2         MR. GISLESON:  Objection.  Vague, foundation.
 3      A.  No.  Because what we licensed was the M series
 4   product.  We had another product line that included that,
 5   which was the entire O boiler set of products.  So in the
 6   context of the M series boiler that was already established
 7   and it was already an enhancement.  It was not part of the
 8   license agreement.  And it became apparent when we were
 9   working with Victory to try to sell the product line or what
10   Victory was looking to purchase under the product line got
11   into the nomenclature of, all M series are O-type, but not
12   all O-type are M series.
13      Q.  Before the time you were discussing the sale of the
14   product line to Victory Energy, did you have any
15   conversations with anyone at Victory Energy relative to
16   whether or not M series boilers included membrane wall
17   technology?
18      A.  We did not, I would say.  We were not concerned
19   about that from the perspective of we were selling product
20   and receiving income cash flow to the company.
21      Q.  How was Victory Energy supposed to know that M
22   series boilers did not include membrane wall technology?
23      A.  In Annex 1 there's a description of what the product
24   line specifically is, right down to the detail of type of
25   construction and arrangement of side walls, front walls, rear
                                                              57
```

**Page 58**

```
 1   walls, that defines it without any doubt.
 2      Q.  But the definition of products itself includes the
 3   statement that the product shall include but not be limited
 4   to the items identified in Annex 1, doesn't it?
 5         MR. GISLESON:  Objection.  You're arguing with the
 6         witness.  It was asked and answered.
 7         MR. SHEEAN:  It's a different question, John.
 8         MR. GISLESON:  It's the same question you asked
 9         before.
10      Q.  Does that clause appear in that definition of
11   products?
12      A.  I don't understand your question.  Ask again.
13      Q.  You indicated just a minute ago that Victory Energy
14   should have known that the membrane wall technology was not
15   included in the products being licensed to Victory because
16   it's not identified specifically in Annex 1; have I
17   accurately summarized your testimony?
18      A.  Yes.  That is correct.
19      Q.  My question back to you is, doesn't the agreement
20   also provide that Annex 1 is not the complete list of the
21   products?  It's included but not limited to those products?
22         MR. GISLESON:  Objection.  Mischaracterizes the
23         document and his testimony.
24      A.  Yes, it does say that.  But I don't believe that was
25   the intention, and that's specifically why, when we wrote
                                                              58
```

**Page 59**

```
 1   Annex 1 for the picture of the M series boiler that
 2   gives specifics on the type of construction and arrangement
 3   of the pressure parts and the types of wall construction.
 4      Q.  To the best of your knowledge, did anyone on behalf
 5   of Erie Power, prior to the execution of the license
 6   agreement or the annexes, tell Victory Energy explicitly that
 7   welded wall technology was not being licensed?
 8      A.  No.  Not to the best of my knowledge.  And nor did
 9   Victory ever ask for a clarification of what Annex 1 was, and
10   what Annex 1 did or did not include at that time.
11      Q.  Are you aware of any -- strike that.  Did you become
12   aware at any time of any modifications that Victory Energy
13   made to the M series boiler line under the license agreement?
14      A.  To the specific M series they were selling boilers
15   that included welded wall construction.  So if you want to
16   classify that as an alteration or enhancement or improvement
17   to the M series, then, yes, we were aware of that.
18      Q.  There were also instances, were there not, where
19   Victory Energy requested a change in the drum size?
20      A.  Yes.  And we --
21      Q.  You remember the Dallas-Fort Worth job?
22      A.  We supported that, and I believe there was one other
23   that was twice as tall, half as wide, and half as long, which
24   CMI provided engineering -- at that time Erie Power provided
25   engineering services on a paid basis to support Victory to do
                                                              59
```

**Page 60**

```
 1   that.
 2      Q.  Was Erie Power paid on those jobs for that
 3   engineering support?
 4      A.  On the case of the one that was the taller, narrower
 5   boiler, yes, we were paid as an engineering study to do that
 6   engineering work.
 7      Q.  And that was above and beyond any remuneration that
 8   Erie Power would receive under the license agreement,
 9   correct?
10      A.  Yes.  Correct.
11      Q.  Mr. Gdaniec, I have handed you what's been marked as
12   Exhibit 6 in your deposition.  This is a series of e-mails
13   between you and Mark White, Bates labeled IKE000342 and 343.
14   Do you recall receiving and sending these e-mails?
15         (Gdaniec Deposition Exhibit No. 6 marked for
16         identification.)
17      A.  Yes, I do recall this, yes.
18      Q.  As a general matter, do you believe Mark White
19   understood -- strike that.  As a general matter, in January
20   2003, do you believe Mark White had the same understanding of
21   the definition of the term "standard M series boiler" that
22   you have attributed to that term?
23      A.  Yes.
24      Q.  How do you have that -- strike that.  On what do you
25   base that understanding?
                                                              60
```

**Page 125**

1  that?
2     A.  Yes, I do.
3     Q.  Did you understand at that time that Victory Energy
4  took the position that the license agreement took the right
5  of Victory Energy to sell membrane wall boilers?
6         MR. GISLESON:  Objection.  Mischaracterizes the
7  evidence.
8     A.  I don't know if Victory felt that of the license
9  agreement or not.  I don't know.  I was not aware of that.
10     Q.  The -- strike that.  The license agreement that had
11  been in place for almost 15 months at this point, correct?
12     A.  Yes.
13     Q.  To your knowledge, had Erie Power ever refused to
14  allow Victory Energy the right to sell a membrane wall boiler
15  prior to March 26, 2004?
16     A.  We never specifically prohibited it, no.
17     Q.  To your knowledge, did Erie Power ever refuse to
18  support Victory Energy in the engineering of a boiler that
19  included membrane wall technology?
20     A.  No.  Not to my knowledge.
21     Q.  And that was true before March 26th and after March
22  26th, correct?
23     A.  It was true definitely before March 26th.
24     Q.  Can you identify a single project after March 26th
25  where Erie Power refused to provide Victory Energy

**Page 126**

1  engineering support on a membrane wall boiler?
2     A.  There was less discussion after the -- the failure
3  of the sales and the extension of the license agreement,
4  there was less and less discussion with regard to EPTI and
5  Victory with regards to any project work they were pursuing,
6  and more focus was being focussed on the bankruptcy and
7  moving the company forward.
8     Q.  Can you identify a single instance after March 26,
9  2004 where Erie Power refused to provide support to Victory
10  Energy on a membrane wall boiler?
11     A.  No, I cannot.
12     Q.  On Page 7434, which is the third page of the letter,
13  "Item No. 7.  With regards to the use of the Keystone name,
14  as with the software source code, this too is a difficult
15  matter.  Regardless of the course of this agreement, EPTI
16  will maintain use and ownership of the O boiler line, which
17  as you are well aware the Keystone name is a vital part of
18  the heritage and credibility of that project."  Do you see
19  that?
20     A.  Yes, I do.
21     Q.  "As such, we cannot offer a perpetual license for
22  the name that would survive the license agreement."  Do you
23  see that?
24     A.  Yes, I do.
25     Q.  Why was it Erie Power's position that it would not

**Page 127**

1  provide Victory Energy with a perpetual license for the use
2  of the Keystone name?
3     A.  Because, in the boiler industry, the Keystone boiler
4  has always been attributed back to our product line, and that
5  really is 80 percent of the nature of the business, having
6  reputation and identifiability in the industry.  People see a
7  Keystone boiler, and they know it was our product and always
8  was our product.
9     Q.  Is that still true today?
10     A.  From the perspective of CMI's business, I'm -- it
11  has no meaning to CMI's business.  In the industrial boiler
12  business, yes, the Keystone name has a very solid and
13  long-lived reputation, yes.
14     Q.  Is it still attributed back to Erie Power and its
15  predecessors, to the best of your knowledge?
16     A.  I would say, yes, to the best of my knowledge.
17     Q.  Do you know if Indeck Keystone Energy is currently
18  marketing any Keystone boilers?
19     A.  I'm not aware of their day-to-day business.
20     Q.  Page 7435 through 7436 sets forth EPTI concerns
21  regarding VEO performance.  Do you see that?
22     A.  Yes, I do.
23     Q.  Did you draft this document as well?
24     A.  Yes, I did.
25     Q.  Was this attached to your March 26th letter to Mark

**Page 128**

1  White?
2     A.  Yes.  It was part of this entire document.
3     Q.  Here you set forth a number of problems or --
4  concerns, as you identify it, regarding VEO performance under
5  the existing agreement?
6     A.  Yes.
7     Q.  Why did you wait 15 months into the agreement to set
8  forth Erie Power's concerns regarding the license agreement?
9         MR. GISLESON:  Objection.  Misleading,
10  mischaracterizes the evidence.
11     A.  I would say EPTI as a whole did not wait until this
12  period of time to put forth the concerns.  There had been
13  concerns that had been raised throughout the course of the
14  agreement.  This was the first document that formalized them
15  all together in one document to say we'd also like to
16  address -- we were in the discussion with Victory to move
17  forward with business, either amend license, extend license,
18  purchase it, and we looked at it also as the opportunity to
19  now, in the timing of the company -- the bankruptcy was
20  moving positively, there was belief we were moving forward.
21  It was time to get back to start looking at all of the open
22  issues in the business.  So we accumulated the issues in this
23  one document.  Committed the issues we discussed previously.
24     Q.  Can you identify a single document where Erie Power
25  specifically identified to Victory Energy performance

**129**

1  concerns under the existing agreement prior to March 26,
2  2004?
3      A.  I don't have -- offhand I can't tell you.  But
4  Mr. Fuhrman had issues on the administrative issues with
5  regards to documentation and identifying sales, and quarterly
6  reporting had been discussed in the past; and the use of the
7  mark had been discussed in the past with regards to the under
8  licensee to EPTI had to be on every boiler that was shipped,
9  in separate correspondence, but I don't know dates and times
10  of those.
11      Q.  Was this the first time that you had conveyed a
12  written document to Victory Energy or you indicated that
13  membrane wall technology was not permissible under the
14  license agreement?
15      A.  Yes.  Formally in a document that it was
16  specifically not a part of the license agreement was in this,
17  yes, from me.
18      Q.  Can you identify any conversations with any Victory
19  Energy personnel prior to March 26, 2004 where you made that
20  statement?
21      A.  Not me directly, no.
22      Q.  And the concerns regarding the license agreement
23  were sent as an attachment to your letter explaining Erie
24  Power's approach toward a license agreement with an option to
25  purchase, correct?

**130**

1      A.  Yes.  Correct.
2      Q.  In Item No. 2 on Page 7435, "The software tools that
3  were provided to VEO as part of the license agreement are
4  intended to provide flexibility and rating the defined
5  product line and are not meant to be used to develop
6  derivatives of the product."  Do you see that?
7      A.  Yes, I do.
8      Q.  What do you mean by "derivatives"?
9      A.  When we wrote the program, it was intended to rate
10  the M series.  If you knew how to manipulate the program, you
11  could actually design any other boiler.  It's a basic heat
12  transfer program customized around the M series or the O
13  boiler.  And the more experienced you are with the program,
14  there's ways to fake the program out and manipulate it to get
15  it to do other than what the program could do.  You could
16  adjust heating surfaces or effectiveness factors and
17  basically start to rate anything that had heat transfer.
18      Q.  What type of derivatives -- strike that.  Did you
19  have any evidence that Victory Energy was using the rating
20  program to develop derivatives?
21      A.  Not specific evidence that they were doing that, no.
22      Q.  No. 3 says, "Of extreme seriousness, during recent
23  discussions with VEO staff, it has come to our attention that
24  VEO is in possession of design manuals, internal
25  correspondence, and/or drawings that are Erie Power

**131**

1  technologies' property, which is not part of the current
2  license agreement technology set."  Do you see that?
3      A.  Yes, I do.
4      Q.  Does this relate to your e-mail to Jay McConaughy
5  that we reviewed earlier in an exhibit regarding drum
6  internals?
7      A.  Yes.  It was related to that discussion, yes.
8      Q.  Other than that specific document that
9  Mr. McConaughy cited to you that indicated you did not
10  believe was provided to Victory Energy under the license
11  agreement, can you identify any other specific documents that
12  you were aware of that Victory Energy had that you did not
13  believe they were entitled to?
14      A.  No specific documents, no.
15      Q.  Item No. 4 on Page 7435 says, "VEO is entitled to
16  develop improvements/modifications to the license technology,
17  and we encourage VEO to do so for the benefit of both
18  parties.  In accordance with the current agreement, these
19  improvements/modifications are to be reviewed and approved by
20  EPTI prior to use."  Do you see that?
21      A.  Yes, I do.
22      Q.  "This may seem onerous to VEO, however, this is
23  critical in maintaining the integrity and reputation of the
24  boiler product line."  Do you see that?
25      A.  Yes, I do.

**132**

1      Q.  You wrote that?
2      A.  Yes, I did.
3      Q.  Were you aware, when you wrote this, of any instance
4  where Victory Energy had made any improvements or
5  modifications to a Keystone boiler without Erie Power's prior
6  consent?
7      A.  None that actually physically got built, we weren't
8  aware of, but there were discussions prior of things Victory
9  was looking at doing or enhancements being made, and we
10  wanted to be part of that discussion prior to it being
11  fabricated and built in the market.
12      Q.  But, again, you knew of no instance where Victory
13  Energy had made any improvements or modifications to a
14  fabricated or built boiler without prior authorization from
15  Erie Power, correct?
16      A.  None that I was aware of, yes.  Correct.
17      Q.  Now, I want to focus on the sentence, "This may seem
18  onerous to VEO, however, this is critical to maintaining the
19  integrity and reputation of the boiler product line."  Can
20  you expand on that for me.
21      A.  Yes.  When we -- when we had the discussions with
22  Victory, we wanted it to be submitted in advance so that we
23  had time to review it, determine if it was appropriate, give
24  feedback, and Victory was pushing the time to get it to the
25  market, we need to be on the cutting edge, we can't wait for

**Page 137**

1  Q. And that was a draft document, wasn't it?

2  A. Yes.

3  Q. Did you ever see a final version of that?

4  A. No, I did not.

5  Q. Do you know whether or not Mark White approved the

6  final version of the sales manual that was put together for

7  Victory Energy?

8  A. I have no idea. I don't know.

9  Q. Do you know whether or not Mark White approved the

10  brochures that Victory Energy put together to market the

11  Keystone boilers?

12  A. I don't know.

13  Q. Mark was in charge of administering the license

14  agreement while he was employed at Erie Power, correct?

15  A. Yes. Correct.

16  Q. Would you have expected Mark to oversee approval of

17  the use of the trademarks?

18  A. Yes. I would assume it would be his responsibility.

19  Q. Can you identify for me any instance where Erie

20  Power was damaged as a result of Victory Energy's use of the

21  Keystone trademark?

22  A. No. None that I'm aware of.

23  Q. Did you have anyone put together a performance

24  review of Victory Energy's actions under the license

25  agreement to assist you in preparing that document?

**Page 138**

1  A. Yes. Mr. Fuhrman did.

2  Q. Did you give him any instructions on what to look

3  for?

4  A. Not specifically.

5  Q. Did you review what he provided to you?

6  A. Yes.

7  Q. I've handed you what's been marked as Gdaniec

8  Deposition Exhibit 26, Bates labeled IKE005038 through 5046,

9  titled "Victory Energy Operations, LLC, M Series Keystone

10  License Agreement Performance Review." Do you see that?

11      (Gdaniec Deposition Exhibit No. 26 marked for

12      identification.)

13  A. Yes, I do.

14  Q. Is this the document that Mr. Fuhrman prepared for

15  you?

16  A. It appears to be, yes.

17  Q. You see that it's nine pages long?

18  A. Yes. Correct.

19  Q. Did you use each and every portion of the

20  performance review prepared by Mr. Fuhrman in preparing your

21  document for Victory Energy?

22  A. No, I did not.

23  Q. You edited it down a little bit?

24  A. Yes. Correct.

25  Q. Why didn't you just send what Mr. Fuhrman had put

**Page 139**

1  together on to Victory Energy as an attachment to your

2  agreement?

3  A. Because, at the time, some of the items that were

4  being raised and brought up were more of nuisance items, not

5  significant in the nature of the relationship with Victory.

6  They were items that Mr. Fuhrman was upset about, but from

7  changing how we behave with Victory, I didn't think was

8  significant.

9  Q. Turn to the second page. It says, under No. 4,

10  second paragraph regarding improvements, "This section is

11  intended to allow VEO the opportunity to enhance the standard

12  M series boiler design. It is not intended to provide carte

13  blanche modification capability." Do you see that?

14  A. Yes.

15  Q. And then it says, "VEO has and continues to modify

16  the standard M series boiler design without obtaining EPTI's

17  review and confirmation of acceptance. VEO must use the M

18  series design without modification." Do you see that?

19  A. Yes, I do.

20  Q. A minute ago you told me you could not identify a

21  single instance, prior to your letter of March 26, 2004,

22  where Victory Energy had made a modification without first

23  obtaining consent from Erie Power, correct?

24  A. Correct.

25  Q. So do you agree with what Mr. Fuhrman wrote there?

**Page 140**

1  A. Most of this notice came after the fact. After the

2  boiler was sold and the modification had been done. Like

3  Dallas-Forth Worth, we were notified by Victory that the

4  boiler had to be twice as high and half as short, and we

5  weren't notified up front that they needed to do that. So

6  that's the difference.

7  Q. You could have said no, right?

8  A. It was already sold to a customer. From the

9  perspective of what we were looking at with the business, it

10  was sold to the customer or it was very near closing with the

11  customer, is there an opportunity to put a boiler out in the

12  market, and what do we need to do to protect EPTI and Victory

13  and make this a successful project. The business was to sell

14  boilers and to get boilers and equipment out into the

15  industry.

16  Q. But you could have told Victory Energy, upon

17  learning that the Dallas-Forth Worth boiler had a 60-inch

18  drum instead of a 42-inch drum, we will not support this and

19  you are not authorized to sell it, couldn't you?

20  A. We could have possibly done that. We took the other

21  tact of selling them engineering services to try to make sure

22  it was a successful project.

23  Q. And you did that because you were trying to maximize

24  the revenue stream to Erie Power, correct?

25  A. Yes.

MR. GISLESON: Objection. Asked and answered.

Q. Now, do you agree with his statement here that VEO must use the M series design without modification?

A. That's -- 100 percent, no. That's in the strictest, hardest, firm sense of, it says, blue, so therefore they have to paint it blue. That's why I say a lot of this was edited from the perspective of, in the spirit of the agreement, if they painted it green, okay, we like blue, but it was green. If it needed to be 2 feet longer, they could make it 2 feet longer and do that. That was possible. There was a lot of things in the boiler design that needed to be adjusted. Tile on the floor that had to be adjusted based on the performance of the boiler. So there were things that need to be -- Mr. Fuhrman took the hard line of, it must be per exactly the letter of every sentence that's in there, which I didn't 100 percent agree with.

Q. On the first page in the bolded paragraph at the bottom it says, "In discussions with VEO personnel and their contract personnel, we have become aware that VEO has pirated copies of our Keystone design manual." Do you see that?

A. Yes, I do.

Q. You didn't use the word "pirated" in your letter, did you?

A. I didn't believe it was appropriate to use that term.

141

Q. Did you have evidence at that time that Victory Energy had pirated copies of the Keystone design manual?

A. I didn't personally, no. Hence the reason for not using that term.

Q. On Page 4 of 9, under "Payment and Accounting," you see the chart that Mr. Fuhrman put together?

A. Yes.

Q. And it says, under "Invoicing, payment," and it shows that for the six boilers that had been built to date for Victory under the Victory Energy license, five of those had been paid?

A. Yes. I see that.

Q. And the sixth one had not shipped yet?

A. Yes.

Q. On Page 6 of 9 it says, "VEO continually attempts to place the risk of design changes on EPTI," and then he identifies Dallas-Forth Worth. Do you see that?

A. Yes.

Q. Is that true?

A. I wouldn't have said the work "continually," but, again, with Dallas-Forth Worth the boiler was 98 percent sold, and now we had a situation to try to deal with. But I wouldn't say it was continually doing that.

Q. Nothing in the license mandated that Erie Power accept liability for design changes, correct?

142

A. Correct.

Q. So if Victory Energy came to you and requested that Erie Power assume liability for design changes, you absolutely could have said no, correct?

A. Yeah. We wouldn't have taken that liability.

Q. On Page 8 of 9, the second to the last section, which is X in the bold, Mr. Fuhrman writes, "EPTI has not granted any waivers to VEO despite VEO's clear breach of many agreement requirements." Do you see that?

A. Yes.

Q. Erie Power had never sent Victory a notice of any breach prior to March 26, 2004, correct?

A. I'm not sure of that.

Q. Are you aware of any document wherein Erie Power claimed that Victory Energy had breached the agreement prior to March 26, 2004?

A. Not that I'm aware of.

Q. To the best of your knowledge, no one from Erie Power ever threatened to terminate the agreement; is that right?

A. No. Correct. No one from EPTI ever threatened that.

MR. SHEEAN: We can take a break.

(Pause in the proceedings.)

Q. Mr. Gdaniec, you've been handed what was marked as

143

Gdaniec Exhibit 27, which was a March 30, 2004 letter to you from Mark White. Do you recall receiving this letter?

(Gdaniec Deposition Exhibit No. 27 marked for identification.)

A. Yes, I do.

Q. Did you receive it on or about March 30, 2004?

A. Yes, we did.

Q. He identifies in here two specific projects in response to your letter, the Oxy Vinyl project and the Dallas-Forth Worth project. Do you see that?

A. Yes, I do.

Q. And would you agree with his statement here that VEO has issued an order to EPTI to provide a circulation study for Dallas-Forth Worth at the bottom of that section?

A. Yes.

Q. Were you aware prior to receiving this letter that the Oxy Vinyl project, which was two 15M Keystone boilers, and the Dallas-Forth Worth project, which was a single 15M Keystone boiler, both were membrane furnace and outer walls watercooled front and rear?

A. Yes.

Q. So you knew those were watercooled full membrane boilers prior to March 30, 2004?

A. Yes.

Q. Prior to you writing a letter on March 26th?

144

**Page 145**

    1   A.  Yes.

    2   Q.  But you didn't say anything about the fact that they

    3 were membrane furnace watercooled front and rear until March

    4 26, 2004?

    5   A.  Correct.

    6   Q.  Did you respond to Mr. White in any way from his

    7 March 30th letter?

    8   A.  I believe I responded to each one of these items,

    9 and it was in the discussion of the extension of the license

  10 agreement, sales, purchase -- whole discussion of trying to

  11 resolve it and move it forward.  When the issue kept moving

  12 forward and fell apart of VEO continuing the purchase option,

  13 most of these issues we just said we'd let them go by the

  14 wayside and probably didn't follow up after that.

  15   Q.  Did you provide a written response to Mr. White on

  16 each one of these topics?

  17   A.  I don't recall.

  18   Q.  Do you recall a project in Erie, Pennsylvania

  19 involving GE Transportation?

  20   A.  Yes.

  21   Q.  Did EPTI solicit an offer for the supply of a

  22 Keystone boiler for the GE Transportation facility?

  23   A.  Yes, we did.

  24   Q.  Was that during the term of the license agreement?

  25   A.  Yes, it was.

**Page 146**

    1   Q.  What was the range of that boiler?

    2   A.  I don't recall exactly.  80,000 pounds per hour is

    3 my guess.

    4   Q.  You've been handed what's been marked as Gdaniec

    5 Exhibit 28, which is V00147.  It's a Tuesday, April 27, 2004

    6 e-mail from Mark White to you, "Subject:  License Agreement,

    7 GE Transportation, Erie, PA."  Do you see that?

    8     (Gdaniec Deposition Exhibit No. 28 marked for

    9     identification.)

  10   A.  Yes, I do.

  11   Q.  Do you recall receiving this e-mail?

  12   A.  Yes, I do.

  13   Q.  And was Mark -- let's read this for a second.  "It

  14 is our understanding the steam capacity of the boiler is

  15 within that of the license agreement."  Do you see that?

  16   A.  Yes, I do.

  17   Q.  Was Mark White correct?

  18   A.  I would say, yes, he was.

  19   Q.  "We are aware that the license agreement provides

  20 EPTI with the opportunity to pursue projects 'if explicitly

  21 requested by the client'."  Did the client explicitly request

  22 that EPTI bid on this project?

  23   A.  Not explicitly, no.

  24   Q.  Did you respond to Mr. White?

  25   A.  I don't recall if we responded in writing or not.

**Page 147**

    1   Q.  Did you pursue the project from GE Transportation

    2 after receiving this e-mail from Mark White?

    3   A.  Yes, we did.  Because we didn't believe this was

    4 relative to the license agreement scope.  It was a full --

    5 full welded construction package boiler.  It was not an M

    6 series.

    7   Q.  Did you obtain a contract to sell that boiler to GE

    8 Transportation?

    9   A.  No, we did not.

  10   Q.  During the time of the license agreement, had Erie

  11 Power bid on any other projects that were within 29,000 to

  12 150,000 pounds per hour of steam involving O style watertube

  13 package boilers?

  14   A.  Not to my recollection.

  15   Q.  Were you aware that Victory Energy had submitted a

  16 proposal for that project?

  17   A.  No, we were not.

  18   Q.  Did you inform Victory Energy prior to soliciting an

  19 offer for the supply of a Keystone boiler that you would be

  20 doing so?

  21     MR. GISLESON:  Objection.  Assuming it was

  22     solicited.

  23     MR. SHEEAN:  I'm using the terms in the agreement

  24     that he's already agreed to.

  25   A.  I do not know because I was not in the sales

**Page 148**

    1 department.

    2   Q.  Did you discuss with the sales department the

    3 pursuit of this project before it was bid?

    4   A.  Yes.

    5   Q.  Did you approve the pursuit of the project?

    6   A.  It wasn't my decision to approve or to reject what

    7 sales pursued.

    8   Q.  Do you know whose decision that was?

    9   A.  Probably at that time Dan Levstek or Stephen Kang

  10 directly.

  11   Q.  You've been handed Exhibit 29, which is VEO0553,

  12 dated Thursday, May 13, 2004 from Mark -- I'm sorry, Bob

  13 Gdaniec to Mark White and Jay McConaughy, and it says, "Mark,

  14 in follow-up of your question, we want to clarify the design

  15 requirements for the drum internals in the package boilers as

  16 follows:  1, There are no vortex units required for a

  17 Keystone due to the steam purity requirements, but the unit

  18 has a welded front wall, there should be a separate chamber

  19 with two additional cans for the front wall tubes only.  The

  20 cans are there to control and assist in the circulation flow

  21 within the front wall tubes.  There is nothing required for

  22 the rear wall tubes whether they are part of a tube and tile

  23 wall or a welded wall."  Do you see that?

  24     (Gdaniec Deposition Exhibit No. 29 marked for

  25     identification.)

**Page 205**

```
1    Q.  Certainly, would you say that the license
2  agreement, including Annex 1, is ambiguous?
3         MR. GISLESON:  Objection.  Foundation, vague.
4    A.  No.  I don't believe it's ambiguous.
5    Q.  Now, you told me earlier that you had sort of dual
6  goals in looking at the license agreement.  One was to
7  maximize the revenue stream; the other was to protect the
8  company's assets.  Do you recall that?
9    A.  Yes.
10   Q.  One of the ways that you attempted to protect the
11 company's assets was to, in your mind, limit what was
12 licensed under Annex 1; is that correct?
13   A.  Yes.  Correct.
14   Q.  Was Victory Energy successful, in your estimation,
15 in selling Keystone boilers under the license agreement?
16        MR. GISLESON:  Objection.  Beyond the scope.
17   A.  They were very successful in selling boilers, yes.
18   Q.  Do you believe Victory Energy would have been able
19 to successfully market and sell the Keystone boilers if it
20 were only allowed to sell tangent tube boilers?
21   A.  I'm not sure.  It's a different market, different
22 industry they would have to pursue.
23   Q.  Do you review a lot of customer specifications as
24 they come in relating to bids?
25   A.  Yes.
                                                    205
```

**Page 206**

```
1    Q.  Are there a lot of customer specifications that
2  you've seen in the last five years seeking tangent tube
3  boilers?
4         MR. GISLESON:  Objection.
5    Q.  Or direct-fired watertube boilers?
6    A.  No.
7    Q.  Is it much more common to see specifications from
8  customers for watertube boilers that are membrane wall?
9         MR. GISLESON:  Objection.  Vague.
10   A.  Yes.
11   Q.  Is it fair to say that if Erie Power had limited
12 what Victory Energy sold under the license agreement to only
13 tangent tube, front and rear refractory, that Victory Energy
14 would not have been able to sell as many boilers?
15        MR. GISLESON:  Objection.  Vague, foundation,
16 speculation.
17   A.  I have no way to know that.  I couldn't determine
18 it.
19   Q.  One of the reasons why you allowed Victory Energy to
20 sell boilers with welded wall construction, bigger tubes --
21 I'm sorry, bigger boiler drums, and other variations from
22 what you defined as the standard M series was because you
23 wanted to maximize that revenue stream, correct?
24   A.  In the context of the time period in the company,
25 that was the most important thing that we could try to do.
                                                    206
```

**Page 207**

```
1    we've talked a lot today about the term standard M
2  series, and you've told us what the term meant within Erie
3  Power Technologies, correct?
4    A.  Um-hum.
5    Q.  Yes?
6    A.  Yes.  That's correct.
7    Q.  Does the term "standard M series" have any meaning
8  in the boiler industry at large?
9    A.  I don't believe so, no.
10   Q.  How about the term "M series special," does that
11 have any meaning in the boiler industry at large?
12   A.  No.
13   Q.  You told Mr. Gisleson about the Kolon boiler that
14 Victory Energy purchased.
15   A.  Yes.
16   Q.  What year did that purchase take place in?
17   A.  I'm guessing 2002.  I don't know for sure.
18   Q.  It was before the license agreement was signed,
19 wasn't it?
20   A.  No.  It was after the license agreement was signed.
21 Mr. White was at Victory Energy at that time.
22   Q.  He was?
23   A.  I'm almost 100 percent sure of that, yes.
24   Q.  We were just talking a little bit about customer
25 specifications and bids, and you told me before that you were
                                                    207
```

**Page 208**

```
1  involved in the preparation of bids, correct?
2    A.  Yes.
3    Q.  Typically, in preparing a bid, would you include in
4  the materials some general sketches of the boiler that you're
5  going to be providing?
6    A.  Yes.
7    Q.  In order to allow Victory Energy to sell Keystone
8  boilers, you would have expected Victory Energy to utilize
9  the drawings that it had been provided relative to the
10 Keystone design to market those boilers, correct?
11   A.  Either use -- yes.  Correct.  Either use ours or
12 have recreated in their own format or CADed the drawings
13 instead manual drawings.
14        MR. SHEEAN:  Those are all the questions I have.
15
16             RECROSS-EXAMINATION
17 BY MR. GISLESON:
18
19   Q.  Just quickly, you were asked about disagreements
20 between EPTI and VEO concerning the interpretation of the
21 license agreement.  Do you remember that?
22   A.  Yes.
23   Q.  Do you know whether VEO was acting in good faith
24 when it was asserting a different interpretation of the
25 license agreement than was EPTI?
                                                    208
```

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC,
                    Plaintiff,
          v.                          : Case No. 04-325 Erie
VICTORY ENERGY OPERATIONS, LLC,
                    Defendant.

          Videotape deposition of CHRISTOS PETCOS, taken

before and by Sondra A. Black, Notary Public in

and for the Commonwealth of Pennsylvania, on Wednesday,

November 9, 2005, commencing at 8:08 a.m., at the

offices of Marshall Dennehey Warner Coleman & Goggin,

1001 State Street, Erie, Pennsylvania 16501.

CONFIDENTIAL

For the Plaintiff:

     John K. Gisleson, Esquire
     Schnader Harrison Segal & Lewis, LLP
     Fifth Avenue Place
     120 Fifth Avenue, Suite 2700
     Pittsburgh, PA 15222

For the Defendant:

     Christopher T. Sheean, Esquire
     Wildman Harrold Allen & Dixon, LLP
     225 West Wacker Drive
     Chicago, IL 60606

          Reported by Sondra A. Black
          Ferguson & Holdnack Reporting, Inc.

                                                    1

---

                    I N D E X

CHRISTOS PETCOS

     Direct Examination by Mr. Sheean.....................3

     Cross-Examination by Mr. Gisleson.................196

     Redirect Examination by Mr. Sheean...............208

     Recross-Examination by Mr. Gisleson..............215

EXHIBITS

     Petcos Deposition Exhibit No. 1....................139

     Petcos Deposition Exhibit No. 2....................141

     Petcos Deposition Exhibit No. 3....................143

     Petcos Deposition Exhibit No. 4....................148

     Petcos Deposition Exhibit No. 5....................150

     Petcos Deposition Exhibit No. 6....................150

     Petcos Deposition Exhibit No. 7....................158

     Petcos Deposition Exhibit No. 8....................168

     Petcos Deposition Exhibit No. 9....................183

     Petcos Deposition Exhibit No. 10...................188

EXHIBIT

4

PENGAD 800-631-6989

                                                    2

---

          MR. EVANOFF:  My name is Dale Evanoff.  We are in

Erie, Pennsylvania to videotape the deposition of

Chris Petcos.  This is for Indeck Energy versus

Victory Energy Operations.

          Would the attorneys present state their names.

          MR. GISLESON:  John Gisleson from Schnader Harrison

Segal & Lewis on behalf of Plaintiff.

          MR. SHEEAN:  Christopher Sheean, Wildman Harrold

Allen & Dixon on behalf of Defendant, Victory

Energy Operations.

          MR. EVANOFF:  Would the court reporter introduce

herself and then swear the witness.

          COURT REPORTER:  Sondra Black, court reporter.


          C H R I S T O S   P E T C O S, first having

          been duly sworn, testified as follows:


                    DIRECT EXAMINATION

BY MR. SHEEAN:


     Q.  Sir, could you please state your full name for the

record.

     A.  Yes.  Christos Trofan Petcos.

     Q.  Mr. Petcos, where do you reside?

     A.  816 West Eighth Street, Apartment 2E, Erie,

                                                    3

---

Pennsylvania.

     Q.  Let the record reflect that this is the deposition

of Chris Petcos taken pursuant to notice pursuant to the

Federal Rules of Civil Procedure.

          Mr. Petcos, have you had your deposition taken

before?

     A.  No.

     Q.  I know you've been present for a number of the

depositions in this case, but just so that we get a clear

record, I'll run down the rules.  As you know, my name is

Christopher Sheean.  I represent Victory Energy Operations in

the lawsuit that was brought by your company, Indeck Keystone

Energy, in the Federal Court here in Erie, Pennsylvania.  I'm

going to be asking you a series of questions, they're going

to be out loud and verbal.  I need you to respond in the same

way, out loud and verbal, which means please don't respond

with nods of the head, shakes of the head, uh-huh or huh-uh.

Okay?

     A.  Okay.

     Q.  If you don't understand any of my questions, just

let me know and I'll try and rephrase them for you.  But if

you answer one of my questions, I'll assume you understood

it.  Fair enough?

     A.  Fair.

     Q.  If you need to take a break at any time, just let me

                                                    4

**Page 37**

```
 1      Q. Did you tell Mr. Lockaby that he would have to pass up
 2   representation of any other package boilers if he wanted to
 3   represent Indeck Keystone Energy?
 4      A. I -- again, we didn't say that specifically.  We --
 5   we told all our reps that we were looking at representing
 6   that they were not to represent -- we weren't going to accept
 7   any representatives that represented competing product lines
 8   with the Indeck organization.
 9      Q. Did you explain what you considered a competing
10   product line?
11      A. No.  That was for our decision.
12      Q. What, in your mind, would compete with the products
13   that Indeck Keystone Energy is currently authorized to sell,
14   to the best of your knowledge?
15      A. The same product lines.
16      Q. How about for package boilers?
17      A. The same product lines that we -- we have.
18      Q. Does a D style boiler compete with an O style
19   boiler, generally speaking, if the size parameters are the
20   same?
21      A. It can.
22      Q. So would you -- strike that.  Would, in your mind,
23   Indeck refuse to sign a representative that sold a -- or
24   represented a company that -- that manufactured D style
25   boilers between 50,000 and 200,000 pounds per hour of steam?
```

**Page 38**

```
 1      A. Would we what?
 2      Q. Would you refuse to sign a rep who was already
 3   representing another company that manufactured that size
 4   boiler?
 5      A. Possibly.
 6      Q. What factors would go into your consideration of
 7   whether or not to allow that to occur?
 8      A. I don't know.  A lot.  Whether the rep's a good rep,
 9   the exact product line -- I don't know the specifics of what
10   you're referring to.
11      Q. Does Indeck Keystone Energy currently have a
12   representative relationship with any company that also
13   represents Nebraska Boiler?
14      A. Does Indeck Keystone Energy have a rep that also
15   reps Nebraska?
16      Q. Yes.
17      A. I don't think so.
18      Q. Does Indeck Keystone Energy have a representative
19   relationship with any company that also represents Babcock &
20   Wilcox?
21      A. I don't think so.
22      Q. How about Rentech?
23      A. I don't think so.
24      Q. How about English?
25      A. I don't think so.
```

**Page 39**

```
 1   or after -- strike that.  When you met with Tom
 2   Patton at the Power Gen conference in December 2004, was
 3   Patton & Associates a representative for Victory Energy?
 4      A. To the best of my knowledge, I think so.
 5      Q. Were you ultimately successful in getting Gene
 6   Lockaby to sign a rep agreement with Indeck?
 7      MR. GISLESON:  Objection to the characterization of
 8      getting.
 9      A. I think Gene signed a rep agreement with us.
10      Q. Following your meeting with Tom Patton at the Power
11   Gen conference in December 2004, did Patton & Associates sign
12   a rep agreement with Indeck?
13      A. No.
14      Q. Following your meeting with Chuck Thatcher, did Gulf
15   Coast Thermal sign a rep agreement with Indeck?
16      A. Yes.
17      Q. And was Gulf Coast Thermal -- strike that.  At the
18   time that you met with Mr. Thatcher at the Power Gen
19   conference in December 2004, was Gulf Cost Thermal a
20   representative for Victory Energy?
21      A. I -- to be honest, I don't know.
22      Q. Can you recall any other prospective representatives
23   that you spoke to at the Power Gen conference, other than
24   those you've already identified?
25      A. No.  As I mentioned earlier, I couldn't think of
```

**Page 40**

```
 1   any, but I'm sure I talked to maybe a couple.  I can't
 2   remember.  There were a lot of people that I just met for the
 3   first time that I didn't know their names.
 4      Q. Did you tell anyone at the Power Gen conference in
 5   December 2004 that Victory Energy is only licensed to sell
 6   old style boilers?
 7      A. I don't recall my exact description.  I -- my -- my
 8   description was that Victory was allowed to sell the M series
 9   boiler, which was a refractory front wall, tube and tile rear
10   wall, tangent furnace.
11      Q. Did you ever refer to that type of boiler that you
12   believe Victory Energy was authorized to sell as an old style
13   boiler?
14      A. I don't recall.
15      Q. Are the terms "standard M series boiler" well known
16   and understood in the boiler industry, to your knowledge?
17      A. The standard M series, there are certain clients
18   that recognize that, yes.
19      Q. Would you say that the term "standard M series" is a
20   well-known term in the industry?
21      A. I don't know what you mean by well -- well-known.
22      Q. Would more than half of the prospective customers in
23   the industry understand the term "standard M series boiler"
24   with no further elaboration?
25      MR. GISLESON:  Objection.  Foundation.
```



```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   INDECK KEYSTONE ENERGY LLC,

 4            Plaintiff,        Civil Action

 5   vs.                       No. 04-325 Erie

 6   VICTORY ENERGY OPERATIONS,
     LLC.
 7            Defendant.

 8

 9            DEPOSITION OF JAY McCONAUGHY
              TUESDAY, FEBRUARY 16, 2006
10

11        Deposition of JAY McCONAUGHY, taken pursuant to

12   Notice and the Federal Rules of Civil Procedure, by and

13   before Cathy R. Mull, Notary Public in and for the

14   Commonwealth of Pennsylvania, at the offices of Schnader

15   Harrison Segal & Lewis LLP, Fifth Avenue Place, Suite

16   2700, 120 Fifth Avenue, Pittsburgh, Pennsylvania

17   15222-3001 commencing at 8:30 o'clock a.m., on the day and

18   date above set forth.

19

20

21

22

23
```

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3            Schnader Harrison Segal & Lewis LLP
              John K. Gisleson, Esquire
 4            Fifth Avenue Place, Suite 2700
              120 Fifth Avenue
 5            Pittsburgh, Pennsylvania  15222-3001

 6        On behalf of the Defendant:

 7            Wildman, Harrold, Allen & Dixon LLP
              Christopher T. Sheean, Esquire
 8            225 West Wacker Drive, Suite 2800
              Chicago, Illinois  60606-1229
 9
          Also Present:
10
              Mark White
11

12                    I N D E X

13   WITNESS:                              PAGE:

14   JAY McCONAUGHY

15        By Mr. Gisleson                  4, 192

16        By Mr. Sheean                    185

17

18

19

20

21

22

23
```

```
 1                E X H I B I T S

 2   JM Exhibit No. 1                      50
     JM Exhibit No. 2                      59
 3   JM Exhibit No. 3                      66
     JM Exhibit No. 4                      111
 4   JM Exhibit No. 5                      119
     JM Exhibit No. 6                      120
 5   JM Exhibit No. 7                      125
     JM Exhibit No. 8                      127
 6   JM Exhibit No. 9                      134
     JM Exhibit No. 10                     141
 7   JM Exhibit No. 11                     143
     JM Exhibit No. 12                     146
 8   JM Exhibit No. 13                     155
     JM Exhibit No. 14                     158
 9   JM Exhibit No. 15                     164
     JM Exhibit No. 16                     168
10   JM Exhibit No. 17                     173
     JM Exhibit No. 18                     195
11

12

13

14

15

16

17

18

19

20

21                    EXHIBIT
22                      5
23
```

PENGAD 800-631-6989

```
 1                P R O C E E D I N G S

 2                JAY McCONAUGHY,

 3   having been duly cautioned and sworn, as hereinafter

 4   certified, was examined and testified as follows:

 5                    EXAMINATION

 6   BY MR. GISLESON:

 7   Q    Would you state your name, please.

 8   A    Jay McConaughy, M-c cap C-o-n-a-u-g-h-y.

 9   Q    And are you appearing here today pursuant to a

10   subpoena?

11   A    No.

12   Q    Are you appearing voluntarily?

13   A    Yeah.

14   Q    How are you currently employed?

15   A    I work for CMI.

16   Q    What do you do for CMI?

17   A    I'm a Senior Project Manager -- Engineer, excuse

18   me.

19   Q    Senior Engineer?

20   A    Senior Project Engineer.

21   Q    Senior Project Engineer.  And as a Senior Project

22   Engineer what do you do?

23   A    Pretty much order equipment to specifications from
```

61

1 Q    Was this copied from any other documents?

2 A    No.

3 Q    In the second paragraph you write, The idea is to

4 utilize these specifications so the supplier knows what he

5 is quoting on and we all have a standard of design for our

6 equipment.  The ones I have completed are on the Z drive

7 under Victory General Tech Specifications.

8      Were there any other documents under Victory

9 General Tech Specifications beyond this one?

10 A    These that are listed?

11 Q    Right.

12 A    No.

13 Q    I just wanted to know whether there was a separate

14 folder, if you will, that VEO maintained for tech

15 specifications?

16 A    No.  This is — that was it.

17 Q    The last sentence says, in that paragraph, They

18 will be considered controlled documents and will be

19 revised by one assigned person.  At the moment its me.

20      What did you mean by controlled documents?

21 A    Well, it doesn't do any good to have a standard if

22 anybody can go in and revise it and not have a consortium

23 agreement that, yeah, we need to do that.  That's just

62

1 going to cause more confusion.  Essentially you would end

2 up with this one document and someone went to change it.

3 I used this reference and he has presenting it to the same

4 vendor and they say what is this?  It causes confusion and

5 you end up buying the wrong stuff and you spend more money

6 fixing it.

7 Q    Were any of the drawings for the Keystone boilers

8 controlled documents?

9      MR. SHEEAN:  Objection.  Foundation.

10      MR. GISLESON:  I'll strike the question.

11 BY MR. GISLESON:

12 Q    You said from time to time you worked with drawings

13 associated with Keystone boilers.

14 A    Right.

15 Q    Were any of the drawings for the Keystone boilers

16 maintained by Victory controlled documents?

17      MR. SHEEAN:  Same objection.

18 A    In the sense of this, I would say yes, since nobody

19 could make revisions or anything to them because you

20 didn't — all you had was paper.

21 Q    What do you mean all you had was paper?

22 A    I mean the drawings you had was hard copy.  I'm not

23 sure we had it in electronic form or not.

63

1 Q    I was going to ask, did VEO have electronic copies

2 of any of the Keystone drawings?

3      MR. SHEEAN:  Objection.  Vague, and

4 foundation.

5 A    Not that I know of.

6 Q    Did you ever consult the computer network at

7 Victory to obtain a copy of the Keystone drawings?

8      MR. SHEEAN:  Same objections.

9 A    No.

10 Q    Where were the physical drawings for Keystone

11 boilers located that you consulted?

12 A    They're in a drawer in the Graphics area.

13 Q    Did you ever have a set of your own Keystone

14 drawings for any boiler?

15 A    No.

16 Q    Why not?

17 A    Didn't really need it.

18 Q    Why not?

19 A    Built enough of them.

20 Q    Beginning when?

21 A    Let's see, let's say early 1980s, maybe I got

22 involved with the O type, somewhere in there.

23 Q    Approximately how many Keystone boilers were you

64

1 involved with building prior to the time that you joined

2 VEO?

3 A    Prior?

4 Q    Yes.

5 A    I'm sure I built well over 100 and some.

6 Q    Have you heard of the phrase Keystone O series?

7 A    Keystone O?  No.

8 Q    You're familiar with the phrase Keystone M series?

9 A    Yes.

10 Q    And prior to the time you joined VEO you were

11 familiar with the phrase standard Keystone M series?

12 A    Yes.

13 Q    And the standard Keystone M series could be

14 customized?

15 A    They almost always were.

16 Q    You said that the standard Keystone M series almost

17 always was customized, so that there were times when the

18 standard M series was not customized?

19 A    I don't ever remember building one that wasn't.

20 Q    You said almost always, which is why I'm following

21 up.

22 A    Okay.  I'm sorry.

23 Q    While you were with EPTI or a predecessor when the

117

1  Q     Prior to receiving that E mail on February 27,
2  2004, had anyone else ever told you that Victory had
3  licensed only the standard M series Keystone with addition
4  of superheat and increase in design pressure?
5  A     No.
6  Q     Was this the first time anyone ever told you that
7  Victory had licensed only the standard M series Keystone?
8  A     I think this is the first time it was brought up,
9  yeah.
10 Q     After you received this E mail from Bob Gdaniec did
11 you then go to Mark White and say, hey, Mark, Bob Gdaniec
12 is telling me that Victory only licensed the standard M
13 series Keystone with the addition of superheat and
14 increase in design pressure?
15 A     Yeah.  I brought it up to him and he said they're
16 working on it.  I proceeded on.
17 Q     When did you bring it up with Mark White?
18 A     Probably around the time when this was sent to me.
19 Q     What did you say to Mark White?
20 A     I think I just went in -- I don't remember.  I just
21 went in and said, is there an issue with this.  He said,
22 no, there shouldn't be and I said fine.
23 Q     What else did Mark White tell you?

118

1             MR. SHEEAN:  I'm going to caution you not to
2  speculate.  If you don't remember, you don't remember.
3  A     I don't remember.
4  Q     Did you specifically tell him that according to Bob
5  Gdaniec VBO licensed only the standard M series Keystone
6  with addition of superheat and increase in design
7  pressure?
8  A     I'm going to say that I just showed him this, so --
9  Q     Did you understand what Mr. Gdaniec meant when he
10 said that VBO licensed the standard -- which is in all
11 caps in his E mail -- M series Keystone?
12            MR. SHEEAN:  Objection.  Calls for
13 speculation.  You may answer.
14 A     No.
15 Q     You knew what the standard M series Keystone was an
16 of February 27, 2004?
17            MR. SHEEAN:  Same objection.
18 A     I know what it was, but there is really, in my
19 mind, no standard M.  There is no such beast.
20 Q     Did you ever go back and look at the design
21 drawings that VBO received from EPTI?
22 A     No.
23 Q     Pardon me?

119

1  A     No.
2  Q     Did you ever go back to see whether there's a set
3  of standard drawings for the standard M series?
4  A     No.
5  Q     Did Mark White discuss with you the new deal on
6  which he was working with EPTI?
7  A     No.
8  Q     Did Mark White ever tell you that the scope of the
9  license had been increased based on any discussions he was
10 having with EPTI?
11            MR. SHEEAN:  Objection.  Vague.
12 A     Not that I remember, no.
13            (Thereupon, JM Exhibit No. 5 was marked for
14 identification).
15 BY MR. GISLESON:
16 Q     I would like to show you what has been marked JM
17 Exhibit 5.  Its a document stamped IKE 1560.  Have you
18 seen this E mail before?
19            MR. SHEEAN:  I'm going to object to the
20 extent you're showing him a document that nowhere on it
21 indicates he was a recipient, but go ahead, you can
22 answer.
23 A     No.

120

1  Q     This is an E mail dated October 9, 2003, from Mark
2  White to Bob Gdaniec and Ted Fuhrman on the subject of
3  standard M series summary question and its Bates stamped
4  IKE 1450.  Mr. White wrote, Bob and Ted, we are in the
5  process of setting up standard design files for all of the
6  standard M series boilers.  Do you see that?
7  A     Uh-huh.
8  Q     Yes?
9  A     Yes.
10 Q     Did you ever see any standard design files for all
11 of the standard M series boilers at VBO while you worked
12 there?
13            MR. SHEEAN:  Objection.  Asked and answered.
14 A     No.
15            (Thereupon, JM Exhibit No. 6 was marked for
16 identification).
17 BY MR. GISLESON:
18 Q     I would like show how what has been marked JM
19 Exhibit 6.  Its a document stamped 116 and 117.  Do you
20 recognize this as a copy of an E mail you received from
21 Bob Gdaniec on March 23, 2004, on the subject of Dallas
22 Fort Worth Additional Analysis?
23 A     Yes.

185

1  product that was sold by VEO?

2  A    No.

3        MR. GISLESON:  That's all the questions I

4  have.

5        MR. SHEEAN:  I just have a few questions for

6  you, Mr. McConaughy.

7              EXAMINATION

8  BY MR. SHEEAN:

9  Q    In the -- in your earlier testimony you referenced

10  a B and W steam book as a reference material that you

11  referred to from time to time during your time working

12  with boilers; correct?

13  A    Yes.  Correct.

14  Q    Are there other similar reference materials out

15  there in the public domain that someone could use in order

16  to design an O style water tube package boiler?

17  A    Yes.

18  Q    Can you identify for me just some examples?

19  A    One is -- the military has one, Mil Specs.  You can

20  go out on their Web site and find amazing stuff that's in

21  there.

22        There's groups out there, if you just go scan, you

23  come up with design, show the fin tube.  A lot of

186

1  engineers, you want to talk about fin tubing, they tell

2  you about how they do it, what it looks like, so its out

3  there.

4  Q    Do you believe that Victory Energy could design and

5  manufacture an O type water tube boiler without referring

6  to any of the information supplied by Erie Power under the

7  License Agreement?

8        MR. GISLESON:  Objection.  Foundation.

9  Calls for speculation.

10        MR. SHEEAN:  You can answer.

11  A    Yes.

12  Q    That's based on your understanding of the

13  experience and knowledge that Trent Miller and Mark White

14  have in designing O style water tube package boilers?

15        MR. GISLESON:  Same objections.

16  Q    (Continuing) And on what's available in the public

17  domain?

18        MR. GISLESON:  Same objections.

19  A    Yes.

20  Q    Now, you had been shown a copy of a drawing of a

21  tangent tube refractory boiler, do you recall that?

22  A    Correct.

23  Q    And you had indicated that such boilers had been

187

1  manufactured and sold in your early days at Zurn; is that

2  correct?

3  A    Right.

4  Q    To the best of your recollection, when was the last

5  time that you're aware of that Zurn sold a boiler that was

6  tangent tube?

7  A    I can't tell you.

8  Q    Okay.

9  A    I don't remember.

10  Q    I don't want you to guess.  Was it before 1985?

11  A    I'm sure that -- I can't tell you.  I don't think

12  there's a clear-cut off date or if today they could build

13  it.

14  Q    Mr. Gisleson asked you about whether or not there

15  are any tangent tube boilers used in the United States and

16  you said, yes, there are many; correct?

17  A    Correct.

18  Q    Are you aware of any tangent tube boilers being

19  sold in the United States in the last five years as new

20  boilers?

21  A    I'm not aware.

22  Q    You talked about the difference between seal

23  welding and the membrane wall construction; correct?

188

1  A    Right.

2  Q    Do you know whether or not standard M series

3  boilers, as those drawings showed in the materials you

4  were shown earlier, whether or not a standard M series

5  boiler would be seal welded?

6  A    It could be.

7  Q    Would it still be considered a standard M series

8  boiler?

9  A    They would still call it an M series.

10  Q    Would it still be an M series if it had a membrane

11  wall?

12        MR. GISLESON:  Objection.

13  A    I mean, yes.  I mean, we already saw it in the

14  documents.

15  Q    Okay.  So it was not uncommon during the time that

16  you worked at Aalborg, Zurn and EPTI for Keystone boilers

17  with membrane walls to be referred to as M series boilers;

18  is that correct?

19        MR. GISLESON:  Objection.

20  A    M special.

21  Q    Would they always be called special if there was a

22  membrane wall, to the best of your knowledge?

23  A    I think they might be.