Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC,          :
     Plaintiff                       :
                                     :
     v.                              : Case No. 04-325 Erie
                                     :
VICTORY ENERGY OPERATIONS, LLC,       :
     Defendant                       :


     Deposition of STEVEN P. BERNATOWICZ, taken

before and by Sondra A. Black, Notary Public in

and for the Commonwealth of Pennsylvania, on Monday,

November 8, 2005, commencing at 3:17 p.m., at the

offices of Marshall Dennehey Warner Coleman & Goggin,

1001 State Street, Erie, Pennsylvania 16501.




For the Plaintiff:

    John K. Gisleson, Esquire
    Schnader Harrison Segal & Lewis, LLP
    Fifth Avenue Place
    120 Fifth Avenue, Suite 2700
    Pittsburgh, PA 15222

For the Defendant:

    Christopher T. Sheean, Esquire
    Wildman Harrold Allen & Dixon, LLP
    225 West Wacker Drive
    Chicago, IL 60606


       Reported by Sondra A. Black
       Ferguson & Holdnack Reporting, Inc.



EXHIBIT

6

21f595de-3e80-4047-8020-e293fc19e468

Page 10

1 year, 1984.
2  Q.  What was your first title at Zurn Energy?
3  A.  It was engineer, but I think it was -- I don't know
4 if there was any specific title, but just engineer.
5  Q.  What were your responsibilities as engineer?
6  A.  I worked in the stoker department.
7  Q.  Stoke?
8  A.  Stoker, S-T-O-K-E-R, department.  At that time the
9 company had a coal-burning and wood-burning system, and I
10 worked on the two-drum units.  So both design of the stoker
11 equipment, which is the burning equipment, and the -- I did a
12 lot of travelling, troubleshooting in the fields, travelling
13 to work on the boilers.
14  Q.  How long did you hold that position?
15  A.  Five years.
16  Q.  Till about 1989?
17  A.  Yeah.  1989, right.
18  Q.  What position did you take in '89?
19  A.  Well, then I left the company and went to Riley
20 Stoker in Wooster, Mass, and I worked there for a year and a
21 half.
22  Q.  What was your position at Riley Stoker?
23  A.  I was a process engineer there.  We designed the
24 two-drum units, wood-fired mostly.
25  Q.  Now you said you were a process engineer for a year

Page 11

1 and a half at Riley Stoker.
2  A.  Yes.
3  Q.  Did you take another job at Riley Stoker at after
4 that?
5  A.  Yes.
6  Q.  What did you do?
7  A.  I came back to Zurn in 1990.  December '90.  My
8 start date was maybe January '91.  And in the same position,
9 process engineer.
10  Q.  You wanted to get back in time for the winter?
11  A.  Yeah.
12  Q.  Were your responsibilities as process engineer at
13 Zurn Energy any different than they were before you left
14 Zurn?
15  A.  Yeah.  Now I started working in the package systems,
16 and had full responsibility for the design of a complete
17 boiler.  At Riley we were only doing portions of each unit,
18 you know, maybe an economizer section or an evaporator
19 section.  But now, at Zurn, I was doing a full package unit
20 design.
21  Q.  What type of package boilers were you working on in
22 1990, 1991 when you became a process engineer?
23  A.  They were the Keystone package boiler.
24  Q.  Was that your first opportunity to work on the
25 Keystone package boilers?

Page 12

1  A.  Yes.
2  Q.  What size boiler typically were you working on at
3 that time?
4  A.  They really vary quite a bit.  I would say that most
5 of them were in the range of 100,000 pounds of steam per hour
6 to 250,000 pounds of steam per hour.  The 250 pound-per-hour
7 unit particularly was very popular.  We sold a lot of those
8 units at that time.  In fact, they got to be almost a
9 standard -- we never, fortunately, sell anything standard,
10 but they were almost a standard product.  They had the same
11 pressure and temperature.  So it was -- made it a little bit
12 easier to do the work, and did a lot of it.
13  Q.  You just said you never sell anything standard.
14 What do you mean by that?
15  A.  They're always designed per the customer
16 specifications.  So we never have a product you can just pull
17 off the shelf.  They're always a custom design.
18  Q.  In your experience, is that typical in the package
19 boiler industry?
20  A.  Yes.
21   MR. GISLESON:  Objection.
22  A.  I think it's typical in the entire industry.
23  Q.  What sort of customer specifications would you have
24 to meet in order to, you know, design the boiler?
25   MR. GISLESON:  Objection.

Page 13

1  A.  Everything they would ask.  It would include fuel
2 type, we would have to meet the steam conditions that they
3 asked for, meet any guarantees the company would have sold at
4 the time, or any velocity requirements, pressure
5 requirements -- whatever the customer had.  Sometimes the
6 specs were very large, and sometimes they were a sheet of
7 paper.
8  Q.  I don't want to go off on detours, but I have to
9 know, what are philosophy requirements?
10  A.  I didn't --
11  Q.  Did you say philosophy requirements?
12  A.  No.
13   MR. GISLESON:  Velocity.
14  A.  Velocity.
15  Q.  Velocity.  Okay.
16  A.  Gas and steam.
17  Q.  Not nearly as exciting.
18  A.  Sorry.
19  Q.  Now, at that time, in 1990, 1991, when you started
20 working on the Keystone package boiler line, were those M
21 series boilers?
22  A.  No.
23  Q.  What type of boilers were they?
24  A.  They were O style Keystone boilers, but they were
25 not the M style design.  As I said, the M style was outdated

Ferguson & Holdnack Reporting, Inc.
814-452-4556

21f595de-3e80-4047-8020-e293fc19e468

Page 26

1  before a contract was sold, if you know, or after?
2      A.  Yes.  It was always before the contract was sold.
3  It was in the proposal stage.
4      Q.  So essentially what you were doing, to paraphrase,
5  was you would help Victory Energy put their proposal
6  together?
7      A.  That's correct, yes.
8      Q.  And you understood that the material that you were
9  sending to Victory Energy was going to be included in the
10  proposal to the customer, correct?
11      A.  They just asked me for the information.  What they
12  did with it -- you can assume that, but I don't know what
13  they did with it.
14      Q.  Was the information that you provided to Victory
15  information that you, as a proposal designer, would typically
16  send to a customer?
17      A.  Yes.  It's the same information that we send out to
18  a customer.
19      Q.  Have you had any conversations with anyone in the
20  last year and a half regarding the status of the license
21  agreement between Victory Energy and Indeck Keystone Energy?
22      A.  No.  I never discussed the license agreement with
23  anyone.
24      Q.  Have you ever had an opportunity to review any of
25  the sales literature for Indeck Keystone Energy?

Page 27

1      A.  I don't recall any sales literature.
2      Q.  Now, CMI EPTI shares office space with IKE, correct?
3      A.  That's correct.
4      Q.  But you just haven't seen any sales material or
5  anything like that laying around the office?
6      A.  Not really, no.
7          MR. GISLESON:  Please make sure you keep your voice
8          up.  Sometimes you have a tendency to drift and
9          it's difficult for the court reporter.
10         THE WITNESS:  Okay.  Sorry.
11      Q.  Do you know whether or not Indeck Keystone Energy
12  has sold or marketed any Keystone boilers?
13      A.  Keystone Energy?  You mean Indeck?
14      Q.  Yes, sir.
15      A.  I believe Indeck has marketed some boilers, but --
16      Q.  Do you know if they've made any sales of those
17  boilers?
18      A.  No, they haven't.  That I know of.
19      Q.  Have you had any discussions with anyone at Indeck
20  Keystone Energy regarding Victory Energy?
21      A.  Not recently, no.  I worked with people from
22  Indeck -- when they were with our company, I'm sure that we
23  talked about items with -- about Victory.  I don't remember
24  any specifics.
25      Q.  But since you went to CMI EPTI, that's what I'm

Page 28

1  interested in, have you had any conversations with IKE
2  employees?
3      A.  I don't recall any conversations about Victory.
4  Pretty much everybody is close-lipped.
5      Q.  Have you become aware of any conversations between
6  IKE employees and third parties relating in any way to
7  Victory Energy?
8      A.  No.
9      Q.  Do you recall a conversation you had with Dave
10  Briggs in January of 2003 relative to the first boiler sold
11  by Victory Energy?
12      A.  I believe it was a similar boiler to one we had sold
13  in the past, if that's the same one or not, I'm not 100
14  percent sure, but, yeah, maybe we talked about maybe where
15  drawings were for it, that type of thing.  I know that -- I
16  believe that's the one that was similar to a boiler that Zurn
17  had sold or maybe Aalborg had sold in the past.
18      Q.  Is that the Heinz boiler?
19      A.  I don't know.
20      Q.  Can you recall anything else from that conversation
21  with Dave Briggs?
22      A.  It was so long ago I really don't remember anything
23  specific.
24      Q.  Mr. Bernatowicz, you've been handed what we've
25  marked as Bernatowicz Exhibit 1, which, for the record, is a

Page 29

1  subpoena in a civil case to Steve Bernatowicz at CMI IPTI
2  (sic), interesting.  Do you recall receiving that subpoena?
3          (Bernatowicz Deposition Exhibit No. 1 marked for
4          identification.)
5      A.  Yes, I do.
6      Q.  Have you appeared here today in order to satisfy
7  your obligations under that subpoena?
8      A.  Yes, I did.
9      Q.  Mr. Bernatowicz, you've been handed what we've
10  marked as Bernatowicz Exhibit 2, which is Bates labeled
11  IKE006257, 6258 in the bottom right-hand corner, and it is,
12  for the record, from Jere Nieminski to Mark White with carbon
13  copies to Ted Fuhrman and Steve Bernatowicz, dated February
14  5, 2003.  Do you see that?
15         (Bernatowicz Deposition Exhibit No. 2 marked for
16         identification.)
17      A.  Yes, I do.
18      Q.  Do you recall receiving this e-mail in or around
19  February 2003?
20      A.  I must have, but I don't remember it, no.
21      Q.  Do you see, down under memo, in the body of the
22  e-mail it says, "The proposed boiler would be a 15M Keystone
23  with welded wall front, side, and rear construction and an
24  extended furnace length."?
25      A.  Yes.

Ferguson & Holdnack Reporting, Inc.
814-452-4556

21f595de-3e80-4047-8020-e293fc19e468

Page 34

1  furnace wall assembly, and welded front wall assembly.  Do
2  you see that?
3      A.  Yes, I do.
4      Q.  To the best of your knowledge, did anyone object to
5  Dave Briggs forwarding to Victory Energy drawings --
6      A.  I don't know of anyone objecting.  Sorry to
7  interrupt.
8      Q.  Do you recall receiving this e-mail?
9      A.  I don't recall it, but I did.  I wouldn't have
10  gotten involved in anything that were drawings going to a
11  customer.  I mean, I may have looked at it, but what they
12  sent them wasn't my responsibility or my -- part of my work
13  description.
14      Q.  We've handed you what's been marked Bernatowicz
15  Exhibit 5, which is marked V00105 and 106, and it is a series
16  of e-mails, the most recent being Monday, December 22, 2003,
17  from Steve Bernatowicz to Mark White, and it's in response to
18  an e-mail from Mark White to Bob Gdaniec and yourself dated
19  December 19, 2003.  Do you see that?
20      (Bernatowicz Deposition Exhibit No. 5 marked for
21      identification.)
22      A.  Yes, I do.
23      Q.  And it relates to the Dallas-Fort Worth Airport
24  project?
25      A.  Yes.

Page 35

1      Q.  And in note No. 2, which is highlighted, it says,
2  "Note that all of the surface shown above would need to be
3  adjusted for a membrane wall furnace and/or a membrane outer
4  wall."  Do you see that?
5      A.  Yes, I do.
6      Q.  And that relates to the circulation study that you
7  did?
8      A.  I believe it could.  It appears that maybe they
9  didn't take the proper surface, because on the welded
10  membrane, there would be less surface because there's less
11  tubes.
12      Q.  Did you understand at this time that the Dallas-Fort
13  Worth Airport boiler project included membrane wall furnace
14  and membrane outer wall?
15      A.  Yes.
16      Q.  Did Bob Gdaniec ever tell you that you should stop
17  working on the Dallas-Forth Worth Airport project because it
18  included membrane wall furnace and/or membrane outer wall?
19      A.  No.  I'm sure Bob asked me to do the work on it.
20      Q.  You completed the circulation study for the
21  Dallas-Fort Worth project?
22      A.  Yes, I did.
23      Q.  Mr. Bernatowicz, you've been handed Bernatowicz
24  Exhibit 6, which, for the record, is a string of e-mails
25  Bates stamped IKE006415, 6416.  And the first e-mail is from

Page 36

1  John Viskup to you, it says -- and that's on the second page.
2  By first, I mean oldest.
3      A.  Yes, I follow you.
4      Q.  Sorry about that.  "Steve, Can you please re-run the
5  attached performance by adding an additional 3 feet to the
6  weld line to weld line dimension.  We are up against Rentech
7  on this project and need to lower our heat release rate as
8  much as possible and still be able to ship a package boiler.
9  We notice that the superheater outlet extends past the boiler
10  taking up valuable space on the rail car that we could use to
11  increase the boiler length."  Do you see that?
12      A.  Yes.
13      Q.  Did you get approval from anyone at Erie Power to
14  assist Victory Energy in this project?
15      A.  I believe I -- I would have had someone tell me that
16  this is what they'd like me to work on, yes.
17      Q.  You understood that you were authorized to work on
18  this for Victory Energy as part of the license agreement?
19      MR. GISLESON:  Objection.  Foundation.
20      A.  Authorized by?
21      Q.  By Erie Power.
22      A.  Yes.
23      Q.  Would adding an additional 3 feet to the weld line
24  to weld line dimension take a boiler out of the standard M
25  series design?

Page 37

1      A.  It could.  I don't know what the overall length of
2  this one is.
3      Q.  Well, if you keep reading, you write back, "John,
4  Attached is the performance for the 80M Peoria with 3 foot
5  added to the weld line to weld line dimension as you
6  requested."
7      A.  Yes.
8      Q.  "The new weld line dimension is 47 feet, 3 inches.
9  Please note that this dimension exceeds the maximum rail
10  shipped overall length of 46, 8 based on a weld line to weld
11  line using a depressed rail car."  Do you see that?
12      A.  Yes.
13      Q.  Would that take it outside the standard M series?
14      A.  Yes, it would.
15      Q.  And this was in August of 2004, correct?
16      A.  That's what this says.
17      Q.  Is that correct?
18      A.  That's correct.
19      Q.  Do you have any reason to doubt that these e-mails
20  were sent back and forth between you and Mr. Viskup in August
21  of 2004?
22      A.  No, I don't.
23      Q.  And you got another e-mail from Mr. Viskup saying,
24  "What are the new heating surfaces associated with the new
25  boiler, furnace convected, et cetera?".  And you write back,

10  (Pages 34 to 37)

21f595de-3e80-4047-8020-e293fc19e468

Page 54

1      MR. SHEEAN: Objection. Language of foundation.
2      Q. You can answer.
3      A. It was developed when we were doing all tangent tube
4  designs, and it was never updated to provide surface for
5  membrane wall. So it was just outdated.
6      Q. Did you ever provide a copy of the Keystone design
7  manual to anyone at VEO?
8      A. No, I did not.
9      Q. Did Mark White ever tell you that he hoped at some
10  point to go to work for VEO?
11      A. No. I found out when he was already announcing he
12  was leaving.
13      Q. Did Mark White give you any instructions about what
14  you're to do if VEO calls you on the phone with design
15  questions?
16      A. Yes. He told me that I would be doing designs with
17  them, yes.
18      Q. And all of the design work that you did was in
19  conjunction with proposals; is that right?
20      A. With the exception of the Dallas-Forth Worth where I
21  did a circulation study. I understand that was a contract
22  design. From what I remember, it was all proposal design
23  work, and I didn't really do any sizing of the equipment when
24  it was in the contract phase. I may have done some review of
25  what was designed, but I don't believe I did any design for

Page 55

1  contract work.
2      Q. When you're talking proposal design work, what does
3  that involve?
4      A. It's the design before the boiler has been sold. So
5  it's sizing of the boiler, providing all the information that
6  the customer may require, if we provided a specification, so
7  we could tell them that we met whatever the specification
8  was.
9      Q. Does that include any detailed designs in terms of
10  the specific features or characteristics of the boiler?
11      A. It would say the surface area, probably drum sizes,
12  tube sizes. So, yes, it has specific details in it, yes.
13      Q. Are you actually preparing drawings, though, of the
14  boiler?
15      A. Typically I would provide sketches depending on if
16  it was a firm or budget proposal. I mean, a firm would be it
17  was more likely to become a job. We might be able to provide
18  more information than would be sometimes -- a proposal
19  design, I don't remember if we did any at the time, I don't
20  know. But -- I wouldn't have done them, but our graphics
21  screwed me up and provided some drawings.
22      Q. You didn't provide the drawings, did you?
23      A. No.
24      MR. GISLESON: Those are all the questions.
25

Page 56

1              REDIRECT EXAMINATION
2  BY MR. SHEEAN:
3
4      Q. Just a couple quick follow-up questions.
5      Mr. Bernatowicz, you testified before that nothing
6  that Erie Power Technologies sold was standard or stocked,
7  that everything had to be somewhat customized to fit customer
8  needs, correct?
9      A. That's correct.
10      Q. Could M series boilers be sold without customizing
11  to fit customer needs?
12      MR. GISLESON: Objection. Foundation.
13      A. They could be sold that way. It'd be unlikely that
14  any customer would buy one because the surface would be so
15  over -- it would be so large that the expense would be too
16  great, I would guess. It's possible that someone would want
17  one.
18      Q. Why would the expense be so great?
19      A. You have so much additional surface in one of those.
20  An M series, as we talked about before, was developed before
21  economizers. So typically it was a lot of boiler surface
22  trying to get the gas temp down to a reasonable number.
23      Q. Did Victory Energy sell any Keystone boilers during
24  the time of the license agreement with Erie Power that
25  included economizers?

Page 57

1      A. I'm not aware of any of the boilers they sold, with
2  the exception of Dallas, I guess. They had some that were
3  getting pretty close, and they probably all had economizers,
4  I would say.
5      Q. Anyone object to the inclusion of an economizer with
6  the boilers that Victory sold that you know of?
7      A. No. I'm sure we would recommend it, and I'm sure
8  every customer out there would want one also.
9      Q. Why would Erie Power recommend that Victory Energy
10  include an economizer?
11      MR. GISLESON: Objection. It's hypothetical, no
12  foundation.
13      A. If we're helping with the design, we would recommend
14  the best design possible for a boiler.
15      Q. Why would you recommend the best design possible for
16  a boiler?
17      A. Because we're trying to provide a quality product.
18  It's something that we would -- we've always tried to provide
19  the best product we could. That's part of the design
20  engineering. We'd probably try to provide what we could that
21  would be the best model, something that the customer would
22  want, something that would be efficient so it wouldn't waste
23  money on fuel.
24      Q. Generally speaking, would an M series -- strike
25  that. Generally speaking, would a standard M series boiler

Ferguson & Holdnack Reporting, Inc.
814-452-4556

21f595de-3e80-4047-8020-e293fc19e468

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3   INDECK KEYSTONE ENERGY, LLC,    :
               Plaintiff             :
 4                                   :
          v.                         :  Case No. 04-325 Erie
 5                                   :
     VICTORY ENERGY OPERATIONS, LLC, :
               Defendant             :
 6
 7
 8          Deposition of THEODORE CHARLES FUHRMAN, JR.,
 9   taken before and by Sondra A. Black, Notary Public
10   in and for the Commonwealth of Pennsylvania, on Monday,
11   November 7, 2005, commencing at 2:09 p.m., at the offices
12   of Marshall Dennehey Warner Coleman & Goggin, 1001 State
13   Street, Erie, Pennsylvania 16501.
14
15
16   For the Plaintiff:
17      John K. Gisleson, Esquire
        Schnader Harrison Segal & Lewis, LLP
18      Fifth Avenue Place
        120 Fifth Avenue, Suite 2700
19      Pittsburgh, PA 15222
20   For the Defendant:
21      Christopher T. Sheean, Esquire
        Wildman Harrold Allen & Dixon, LLP
22      225 West Wacker Drive
        Chicago, IL 60606
23
24          Reported by Sondra A. Black
25          Ferguson & Holdnack Reporting, Inc.
                                                      1
```

CONFIDENTIAL

**Page 3**

```
 2   Fuhrman Deposition Exhibit No. 1.....................54
 3   Fuhrman Deposition Exhibit No. 2.....................54
 4   Fuhrman Deposition Exhibit No. 3.....................58
 5   Fuhrman Deposition Exhibit No. 4.....................60
 6   Fuhrman Deposition Exhibit No. 5.....................62
 7   Fuhrman Deposition Exhibit No. 6.....................63
 8   Fuhrman Deposition Exhibit No. 7.....................65
 9   Fuhrman Deposition Exhibit No. 8.....................67
10   Fuhrman Deposition Exhibit No. 9.....................67
11   Fuhrman Deposition Exhibit No. 10....................69
12   Fuhrman Deposition Exhibit No. 11....................71
13   Fuhrman Deposition Exhibit No. 12....................73
14   Fuhrman Deposition Exhibit No. 13....................76
15   Fuhrman Deposition Exhibit No. 14....................79
16   Fuhrman Deposition Exhibit No. 15....................81
17   Fuhrman Deposition Exhibit No. 16....................84
18   Fuhrman Deposition Exhibit No. 17....................85
19   Fuhrman Deposition Exhibit No. 18....................87
20   Fuhrman Deposition Exhibit No. 19....................96
21   Fuhrman Deposition Exhibit No. 20....................96
22   Fuhrman Deposition Exhibit No. 21....................96
23   Fuhrman Deposition Exhibit No. 22....................96
24   Fuhrman Deposition Exhibit No. 23...................104
25   Fuhrman Deposition Exhibit No. 24...................104
                                                      3
```

**Page 2**

```
 1                    I N D E X
 2
 3   THEODORE CHARLES FUHRMAN, JR.
 4      Direct Examination by Mr. Sheean...................4
 5      Cross-Examination by Mr. Gisleson...............100
 6      Redirect Examination by Mr. Sheean..............126
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22           EXHIBIT
23           ___7___
24
25
                                                      2
```

PENGAD 800-631-6989

**Page 4**

```
 1          T H E O D O R E   C H A R L E S   F U H R M A N, J R.,
 2               first having been duly sworn, testified as follows:
 3
 4                    DIRECT EXAMINATION
 5   BY MR. SHEEAN:
 6
 7      Q.  Sir, could you please state your full name for the
 8   record.
 9      A.  Theodore Charles Fuhrman, Jr.
10      Q.  Let the record reflect that this is the deposition
11   taken of Theodore Charles Fuhrman, Jr., taken pursuant to
12   subpoena and notice and pursuant to the Federal Rules of
13   Civil Procedure.
14          Mr. Fuhrman, have you ever had your deposition taken
15   before?
16      A.  Yes.
17      Q.  How many times?
18      A.  12 to 15.
19      Q.  Well, you know the drill pretty well then so I won't
20   belabor the point too much.  But just so that I say it for
21   the record, my name is Christopher Sheean.  I represent
22   Victory Energy Operations, LLC in a lawsuit that was filed by
23   Indeck Keystone Energy here in Erie, Pennsylvania.  I'm going
24   to be asking you a series of questions, and my questions will
25   be verbal and out loud, and I need you to answer the same
```

signed --

A. No, I do not.

Q. Beginning of 2003, to the best of your recollection?

A. I don't recall.

Q. What was being said with regard to the license agreement between Victory Energy and Erie Power when you first heard about it?

A. That it was an agreement where Victory Energy was given the license to market and build M series boilers.

Q. Were the people at Erie Power excited about the license agreement with Victory Energy?

MR. GISLESON: Objection. Vague, foundation.

Q. You can answer.

A. No.

Q. Specifically, to the best of your recollection, who was unhappy about the license agreement when you first heard about it?

A. Most everyone in the organization.

Q. To the best of your recollection, why was most everyone in the organization unhappy about the license agreement with Victory Energy?

MR. GISLESON: Objection. Vague, no foundation.

Q. You can answer.

A. They're unhappy because the M series had always been a mainstay for our company, and the management at that time

33

---

didn't -- didn't have time for that -- that product line. They spent most of their time going after the HRSG market. And in the past, when we had one type of boiler sales go down, the M series boiler always seemed to level things out as far as income to the company. And we thought it was a mistake to sell that -- or license that away to somebody.

Q. Where were the M series boilers manufactured when Zurn Energy was manufacturing them?

A. In our shops in Erie.

Q. Did that change at some point?

A. They closed down our shops.

Q. What year were those shops closed down?

A. I don't recall offhand.

Q. Was it before 2000?

A. Yes.

Q. Where were Zurn Energy boilers being manufactured after the Erie shops were closed down?

A. Depended on the type of boiler.

Q. Where were M series boilers being manufactured after the shops closed down in Erie?

A. Depended on where they were going to be shipped to.

Q. What were the options available in terms of where the M series boilers could be manufactured for Zurn Energy after the shops were closed down in Erie?

A. North American units were built in various -- by

34

---

various companies within the United States. We also had -- I don't know if those were M series or not. I don't think Korea built an M series. They built the O style boilers for us.

Q. What size capacity range O style boilers were built in Korea?

A. 150 to 250,000 pounds an hour.

Q. Can you recall any specific individuals within Erie Power who were unhappy about management's decision to license the Keystone boilers to Victory Energy?

A. Myself.

Q. Anyone else?

A. Dave Briggs.

Q. Anyone else?

A. Bob Gdaniec. Like I said, a lot of people were disappointed.

Q. Now, earlier today you testified, I believe, that you told Mr. Gisleson you were not involved in the negotiations for the license agreement itself; is that correct?

A. Correct.

Q. You were involved in negotiating one appendix, correct?

A. Correct.

Q. That was the appendix dealing with who was

35

---

authorized on behalf of the company after Mr. White left?

A. Correct.

Q. Are you aware of who was authorized to negotiate and exercise the license agreement for Erie Power?

A. No.

Q. Were you ever aware of who it was?

A. I knew that it was -- that Mark White did the negotiations. I'm not aware of his being authorized to.

Q. Did you believe that he was not authorized to negotiate the license agreement?

A. I don't know.

Q. Did you ever raise that with anyone in management at Erie Power?

A. Not that I recall.

Q. Do you know if anyone at Erie Power ever raised with management a question as to whether or not Mark White was authorized to negotiate the license agreement with Victory Energy?

A. I don't know.

Q. Are you aware of who executed the license agreement on behalf of Erie Power?

A. Mark White.

Q. Now, you said before that -- strike that. I'll just ask you a new question. What was your understanding of what was licensed to Victory Energy under the license agreement

36

**Page 37**

1  A. They licensed the M series boiler.

2  Q. How did you come to that understanding?

3  A. Looking at the license agreement.

4  Q. Anything else?

5  A. No.

6  Q. Are you an attorney, sir?

7  A. No.

8  Q. Did you ever ask Mark White what was licensed under

9  the license agreement?

10  A. We had discussions.

11  Q. When was your first discussion with Mark White

12  regarding what was licensed under the license agreement?

13  A. After I was made head of the license agreement.

14  Right before Mark left.

15  Q. To the best of your recollection, what did Mr. White

16  say in response to your inquiry?

17  A. They license solely the M series boilers.

18  Q. Was anyone else present when he told you that?

19  A. I don't recall.

20  Q. How did you ask Mr. White what was licensed?  I

21  mean, how did you phrase the question to the best of your

22  recollection?

23  A. I asked him what was -- we went in and sat down and

24  discussed the license agreement and went over the different

37

**Page 38**

1  appendices so that I would know what exactly Victory was to

2  market and to build.  And I -- in that was all the documents

3  that -- relative to the M series that he had put together.

4  Q. And this is just before Mr. White left, correct?

5  A. Yes.

6  Q. Had you been involved in the design or rating of any

7  of the Keystone boilers prior to Mr. White's departure?

8  A. The rating or design?

9  Q. Yes, sir.

10  A. No.

11  Q. Did you become aware of any of the design

12  characteristics of any of the Keystone boilers that were

13  rated and designed for Victory Energy prior to Mr. White's

14  departure?

15  A. There was a project that we did the engineering on

16  for Victory Energy.

17  Q. Do you recall the name of that project?

18  A. No.

19  Q. Does Atofina ring a bell?

20  A. No.

21  Q. How about Iowa Ethanol?

22  A. Those -- those jobs were afterwards.  I don't recall

23  the first job that we worked on.  That's the one I was

24  talking about.

25  MR. GISLESON:  We've been going for more than an

38

**Page 39**

1  MR. SHEEAN:  That's fine.

2  (Pause in the proceedings.)

3  Q. Mr. Fuhrman, we were talking a little bit before

4  about your discussions with Mr. White with respect to the

5  scope of the products included under the license agreement.

6  Do you recall that?

7  A. Yes.

8  Q. Did either you or he say anything more than the fact

9  that M series boilers were licensed under the license

10  agreement?  I mean, was there any elaboration as to what that

11  would include?

12  A. Elaboration was strictly up -- from a 3M up to a 21M

13  I believe it was.

14  Q. Now, you'd been involved in designing M series

15  boilers prior to the Victory Energy license agreement,

16  correct?

17  A. Yes.

18  Q. Were those boilers that were involved in

19  designing -- was there any requirement by you, as the

20  engineer, to make changes in the design to accommodate

21  customer needs?

22  A. We would go and utilize possibly a different size

23  boiler due to having to utilize a superheater or different

24  fuels being fired.  But we always just kept up or down

39

**Page 40**

1  depending upon what we needed.

2  Q. During the time that you were rating and designing

3  these M series boilers, would you typically receive an

4  invitation for bid or a specification from a customer?

5  A. Yes.

6  Q. During that time, when you were rating and designing

7  boilers for Zurn or Aalborg or one of the predecessors of

8  Erie Power, did you ever receive a specification or

9  invitation to bid that included a requirement that the boiler

10  have membrane wall technology?

11  A. Yes.

12  Q. Did you ever design an M series boiler with membrane

13  wall technology?

14  A. Yes.

15  Q. What else did you and Mr. White discuss during that

16  meeting just before he left Erie Power with respect to the

17  license agreement?

18  A. The payment schedules, the royalties.

19  Q. Anything else?

20  A. Scheduling.

21  Q. When you say "scheduling," are you referring to

22  current projects that were in the works for Victory Energy?

23  A. No.

24  Q. What do you mean by "scheduling"?

25  A. Scheduling meaning notification by Victory of a

40

```
 1     A.  There was discussion from Jay McDonaughy and Mark
 2  White relative to information that was included in the design
 3  manual that the only way that they would be able to know what
 4  page and section the stuff was on is if they had the manual
 5  in front of them.
 6     Q.  Other than the fact that Victory Energy had a copy
 7  of the design manual, did you have any evidence that Victory
 8  Energy had pirated a copy of the design manual?
 9         MR. GISLESON:  Objection.  Asked and answered.  He
10     said it was a controlled document.
11     Q.  Go ahead.  You can answer.
12     A.  It's a controlled document, and according to what
13  Mark White advised me in the initial phase of the license
14  agreement, he stated that he did not go and provide that to
15  them.  So how they got those is subject to conjecture, and
16  that's why I put "pirated".
17     Q.  But you had no other evidence, other than what
18  you've just testified to, correct?
19     A.  Correct.
20     Q.  At the top of Page 3 of 9, which is IKE5299, bolded
21  section says, "VEO continually demands design capability and
22  exercises EPTI personnel to obtain information so that they
23  can use the rating program for their nonstandard M series
24  boiler designs."  Do you see that?
25     A.  Yes.
                                                            93
```

```
 1     Q.  Erie Power could have refused Victory Energy's
 2  request, could they not?
 3     A.  Yep.
 4     Q.  On Page 4 of 9, which is IKE5300, you identify six
 5  boiler sales to date.  Do you see that?  Under payment and
 6  accounting?
 7     A.  Yes.
 8     Q.  And those six boilers are 20281, 20282, and 20283,
 9  and 2030, 2031, and 2033, and of the five boilers that had
10  been shipped, your records showed that Victory had made
11  payment.  Do you see that?
12     A.  Yes.
13     Q.  And on the sixth boiler, it had not shipped yet,
14  correct?
15     A.  Correct.
16     Q.  And therefore, there was no payment due at that
17  time, correct?
18     A.  No.
19     Q.  That's not correct?
20     A.  No.
21     Q.  What's not correct about that?
22     A.  They were supposed to pay us an initial fee, and
23  then a final fee of 40 percent -- wait a minute.  I may have
24  got that wrong.  Yes.  The final 40 percent of the royalty
25  was to be paid upon shipment.
                                                            94
```

```
 1  plus that Boiler hadn't shipped yet, correct?
 2     A.  Correct.
 3     Q.  Turn to Page 7 of 9, which is IKE5303.  The first
 4  full bolded paragraph says, "VEO has taken EPTI's Keystone
 5  sales brochure and modified it for their use."  Do you see
 6  that?
 7     A.  Yes.
 8     Q.  Do you have any knowledge of whether or not the
 9  Keystone sales brochure that Victory Energy was utilizing had
10  been approved by Mark White?
11     A.  No.
12     Q.  On Page 8 of 9, which is IKE5304, the top of the
13  page, Paragraph S, Clause 19, Arbitration, and the last
14  sentence in the bold there you say, "Failing this the
15  agreement should be terminated."  Do you see that?
16     A.  Yes.
17     Q.  So it was your understanding that Erie Power could
18  seek arbitration or termination of the agreement if it didn't
19  like what Victory was doing, correct?
20     A.  Correct.
21     Q.  Erie never did that, correct?
22     A.  No.
23     Q.  That's not correct?
24     A.  No, they did not terminate the agreement.
25     Q.  And they never sought to arbitrate, correct?
                                                            95
```

```
 1     A.  Correct.
 2     Q.  Mr. Fuhrman, I've handed you what we've marked as
 3  Fuhrman Deposition Exhibits 19, 20, 21, and 22.  Exhibit 19
 4  is IKE1735, Exhibit 20 is IKE5126, Exhibit 21 is IKE1461, and
 5  Exhibit 22 is IKE1449.
 6         (Fuhrman Deposition Exhibit Nos. 19, 20, 21, and 22
 7         marked for identification.)
 8     A.  Okay.
 9     Q.  Do you see that?
10     A.  Yes.
11     Q.  For the record, Exhibit 19 is an April 23, 2004
12  letter to Mr. Bob Gdaniec from Mark J. White with a carbon
13  copy to Ted Fuhrman, and that project shows Dallas-Fort Worth
14  Airport Authority.  Do you see that?
15     A.  Yes.
16     Q.  It shows, "One Keystone Model 15M 100 percent full
17  membrane watercooled."  Do you see that?
18     A.  Yes.
19     Q.  You understood that was the project with the 60-inch
20  drum?
21     A.  Yes.
22     Q.  And here it shows Erie receiving a 4 percent royalty
23  on that project?
24     A.  Yes.
25     Q.  Did you, or anyone from Erie Power, object to
                                                            96
```

**Page 97**

     A. No.

     Q. Exhibit 20 is dated April 23, 2004. It's, again, to Mr. Bob Gdaniec from Mark White with a carbon to yourself, Ted Fuhrman. It says, "Re: License Agreement Unit Sale Notification Ware, Incorporated." And the purchaser is Ware, Inc., and it's two Keystone Model 15M 100 percent full membrane watercooled boilers with a 4 percent royalty of $20,666.64 going to Erie Power. Do you see that?

     A. Yes.

     Q. Did you, or anyone at Erie Power, object to Victory Energy proceeding with the sale of those boilers?

     A. I didn't. I don't know if anyone else did.

     Q. Okay. The next document, Exhibit 21 is, again, April 23, 2004, "License agreement Unit Sale Notification for Protherm for Nestle Purina." It's one Keystone Model 15M 100 percent full membrane watercooled, and it's, again, showing an Erie royalty there, and you're carbon copied on that. Do you recall receiving this, by the way, sir?

     A. Yes.

     Q. Did you or anyone at Erie Power object to Victory Energy proceeding with the sale of this 15M 100 percent full membrane watercooled boiler?

     A. I didn't. I don't know if anyone else did.

     Q. And Exhibit 22 is for the Oxy Vinyl project that we

**Page 98**

heard about with the different size boiler, correct? Do you recall the earlier document I showed you regarding Oxy Vinyl, and you indicated that you objected to the whole project proceeding?

     A. I thought that was the Dallas-Forth Worth.

     Q. Fair enough. Doesn't matter. With respect to the Oxy Vinyl job, do you remember receiving this invoice in or around April 23, 2004?

     A. I don't remember receiving it, but --

     Q. Okay. It's for two Keystone 15Ms with superheated steam 100 percent full membrane watercooled?

     A. Correct.

     Q. And it has a 7 percent Erie royalty at $56,098.56?

     A. Yes.

     Q. Did you, or anyone at Erie Power, object to Victory Energy proceeding with the sale of those boilers to Oxy Vinyl?

     A. I didn't. I don't know if anyone else did.

     Q. Did Erie Power consider the technology for its drum internals to be proprietary?

     A. Yes.

     Q. Did you, in particular, consider that to be a closely-guarded proprietary asset?

     A. Yes.

     Q. Did you have a problem with Victory Energy utilizing

**Page 99**

     A. That was part of the license agreement.

     Q. So you didn't have a problem with it?

     A. No.

     Q. Do you recall that in August 2004 Victory Energy had made a request to send a new engineer up to Erie for training?

     A. I don't recall the exact time, but they did that several times.

     Q. Did anyone ever come for training?

     A. No.

     Q. Were you opposed to Victory Energy engineers coming up for training?

     A. No.

     Q. Let me just go through my notes. Mr. Fuhrman, how old are you?

     A. 55.

     Q. Do you like working at CMI EPTI?

     A. Yes.

     Q. Do you plan to continue working there?

     A. Yes.

     Q. Any plans to move out of the Erie area?

     A. No.

     MR. SHEEAN: Those are all the questions I have for you right now, sir.

**Page 100**

     MR. GISLESON: I just have a few questions.

                    CROSS-EXAMINATION

BY MR. GISLESON:

     Q. In Exhibit 17 we looked at an e-mail exchange that you had with Bob Gdaniec in which you expressed your view that, "EPTI needs to insure that if/when we sell this to VEO that we maintain the Keystone trademark." Why was it important to you that EPTI maintain ownership over the Keystone trademark?

     MR. SHEEAN: Objection. Asked and answered. You can answer again.

     A. Because that was a trademark that covered both the M series as well as the O style boilers that we went and manufactured. And it was the trademark of -- in the industry relative to our package boiler line. So it was an asset to the company.

     Q. How long had the Keystone trademark been used in the industry? Approximately.

     A. Since the early 1950s.

     Q. Was the Keystone name well known, to your knowledge?

     A. Yes.

     Q. How do you know the Keystone name was well known in the industry?

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF OKLAHOMA
2

3   INDECK KEYSTONE ENERGY, LLC,  )
    a Delaware limited liability  )
4   company,                      )
                                  )    CIVIL ACTION
5               Plaintiff,        )
                                  )
6   vs.                           )    Case No. 04-CIV-325E
                                  )    Judge Sean J. McLaughlin
7   VICTORY ENERGY OPERATIONS, LLC)
    a Delaware limited liability  )
8   company,                      )    CONFIDENTIAL TESTIMONY
                                  )
9               Defendant.        )

10

              DEPOSITION OF JOHN VISKUP,
11

    a witness called on behalf of the Plaintiff, on the 31st
12  day of January, 2006, at 320 South Boston, Suite 400, in
    the City of Tulsa, County of Tulsa and State of Oklahoma,
13  commencing at 9:30 A.M., before the undersigned, Joni
    Humphries, a Certified Shorthand Reporter in and for the
14  State of Oklahoma.

15  Fee for Original:    $_____
    Paid by Plaintiff.
16

17

18          _____
                 JONI HUMPHRIES, CSR #1236

19

20              DAVIDSON REPORTING
            CERTIFIED SHORTHAND REPORTERS
21             5508 South Lewis Avenue
               Tulsa, Oklahoma 74105
22             Phone: (918) 745-9959

23

24

25


                 DAVIDSON REPORTING



                         1

8

```
 1  A     Since we started the company in 1999.

 2  Q     As of the time that VEO entered the license

 3  agreement, how many watertube boilers had it sold?

 4  A     I don't know.

 5  Q     Approximately?

 6  A     I'm not sure.

 7  Q     Can you estimate in any way?

 8  A     Several I would say.  More than ten.

 9  Q     Who were the manufacturers of those boilers?

10  A     Superior Boiler Works, ourself and Erie Power.

11  Q     Any others?

12  A     Not that I can recall right now.

13  Q     What was the VEO watertube boiler that had been sold

14  prior to the time that VEO entered the license agreement?

15  A     Heat recovery steam generators.

16  Q     Were those heat recovery steam generators, or HRSGs,

17  ones that had been designed by VEO?

18  A     Correct.

19  Q     As of the time that VEO entered the license

20  agreement, who at VEO was designing HRSGs?

21  A     That would be myself, I believe Trent Miller.  That's

22  about it I guess.

23  Q     As of the time that the license agreement was

24  executed by VEO, how many watertube boilers designed by

25  EPTI had it sold?
```

DAVIDSON REPORTING

INDECK.ASC                                                                2/13/2006

9

1   A      Can you restate your question?

2   Q      Sure.  How many EPTI watertube boilers had VEO sold

3   as of the time that it entered the license agreement with

4   EPTI?

5   A      Two.

6   Q      To whom did VEO sell those EPTI boilers?

7   A      Actually they weren't EPTI boilers, they were Aalborg

8   I believe at the time.  They were sold to Heinz -- excuse

9   me, Armstrong Services for the Heinz plant in Muscatine,

10  Iowa.

11  Q      Did anyone from VEO play any role in the design of

12  the two Aalborg boilers that were sold to the Heinz plant?

13  A      What do you mean by design?

14  Q      Have any input into the design of the boilers?

15  A      Yes.

16  Q      Who?

17  A      Myself.

18  Q      Anyone else?

19  A      No.

20  Q      What was the input that you had into the design of

21  the boilers for the Heinz plant?

22  A      As related to the steam capacity, as it related to

23  the internal design of the boiler, and also as it related

24  to the heat transfer aspects as it related to efficiency.

25  Q      Anything else?


DAVIDSON REPORTING

INDECK.ASC                                                    2/13/2006

71

1   inquires, which are not in licensor's range of products,

2   subject to and prior notice to the licensor, licensee will

3   be free to enter into separate alternative agreements.  Do

4   you see that?

5   A     Yes.

6   Q     Did you understand that the products that were being

7   licensed under the agreement were to be industrial

8   watertube package steam generators?

9   A     Yes.

10  Q     And a generator is an entire system, is that correct?

11  A     No, not necessarily.

12  Q     What else is it?

13  A     What else is what, a generator?

14  Q     Right?

15  A     In particular I believe that's referring to the

16  boiler.

17  Q     So the reference to watertube package steam

18  generators reference to a boiler?

19  A     Yes.

20  Q     Then it says products shall include but not be

21  limited to the items set forth in Annex 1.  What did you

22  understand the purpose of Annex 1 to be in the license

23  agreement as it was being negotiated?

24  A     It was just kind of a guideline so to speak, nothing

25  specific.


                    DAVIDSON REPORTING

INDECK.ASC                                                          2/13/2006

                                                                        72

1   Q     Why do you say that?

2   A     Because there was a lot of assumptions for operating

3   capacities and what not.

4   Q     Assumptions by whom?

5   A     I guess at the time it must have been Erie Power.

6   Q     Did anyone ever tell you that Annex 1 was just a

7   guideline?

8   A     I believe so, yeah.

9   Q     Who?

10  A     Mark.

11  Q     When did he tell you that Annex 1 was just a

12  guideline?

13  A     Probably during the discussions of the license

14  agreement.

15  Q     Do you know for a fact that Mark White told you that

16  Annex 1 was just a guideline?

17  A     Well we discussed it, so I guess it would be a fact.

18  Q     Did he use the word guideline to describe Annex 1?

19  A     I believe so.

20  Q     When?

21  A     During the discussions of the license agreement.

22  Q     When during the discussions did he describe it as a

23  guideline?

24  A     I don't know.

25  Q     Do you have any documentation showing that Mark White


                        DAVIDSON REPORTING

INDECK.ASC                                                      2/13/2006

148

1   copy the KPSC software program or use the existing output

2   files to design boilers that were not Keystone boilers?

3   A      No.

4   Q      Did you have any discussions with Mark White prior to

5   the execution of Annex 1 to the license agreement about

6   membrane walls or welded wall technology?

7          MR. SHEEAN:  Can you read that back please?

8          (Whereupon, the Reporter read back the last

9   question.)

10         MR. SHEEAN:  And I'm going to object as vague,

11  simply because I'm not sure that conditionally the annex

12  constitutes execution, but subject to that, he can answer.

13         MR. GISLESON:  I'll rephrase the question.

14  Q      (By Mr. Gisleson)  Did you have any conversations

15  with Mark White between December 20, 2003, when Mark White

16  sent to Shawn Brewer the proposed data table and a draft of

17  the license agreement, and February 3, 2003, when you

18  initialed Annex 1?

19  A      I knew Mark and I had a conversation one time, and I

20  think it was in that time frame, regarding suppliers.

21  As we were getting ready to get geared up to manufacture

22  the boilers, I had asked Mark where, you know, where they

23  went to get their drums drilled, where they went to get

24  membranes, you know, put onto the tubes, you know, what

25  their list of suppliers were, just in a manner of trying to

DAVIDSON REPORTING

INDECK.ASC                                                    2/13/2006

149

1  gear up for that.

2  Q     What did he tell you?

3  A     There's a lady from -- I think it was a lady that was

4  filling me in, somebody from EPI I believe sent us over a

5  vendor list to where we could source some of those

6  materials if needed.

7  Q     Was that the only conversation in which you and Mark

8  White mentioned in any way either welded walls or membrane

9  walls?

10        MR. SHEEAN:  Objection.  You mean during that

11 same time frame?

12 Q     (By Mr. Gisleson)  During that same time frame?

13 A     I don't know.  I mean we might have had some others,

14 but right now that's what comes to mind.

15 Q     During that conversation about suppliers, did you and

16 he discuss whether the membrane walls were within the scope

17 of the license agreement?

18 A     Well, I mean it was, so I don't know if it was

19 necessarily discussed, but it was part of it.  It says it.

20        MR. GISLESON:  Move to strike as non-responsive.

21 Q     (By Mr. Gisleson)  The question was during that

22 conversation with Mark White, did you and he specifically

23 discuss whether the membrane walls were within the scope of

24 license agreement?

25 A     I believe we did.


                    DAVIDSON REPORTING

INDECK.ASC                                                                    2/13/2006

1  Q      You discussed the scope of the license agreement

2  during the call about suppliers?

3  A      We talked about membrane wall construction, I mean

4  relative to where some of those materials were sourced,

5  because we were trying to put together a program, you know,

6  where you could support the manufacturing of it.  So I mean

7  I guess why would we be discussing membrane walls if it

8  wasn't in the license agreement.

9  Q      Did VEO, in fact, source membrane walls from the

10  location identified by EPTI?

11  A      No, it didn't need to.  We were able to get some

12  information where we could sit down and meet with the

13  different suppliers here in Oklahoma to be able to source

14  it closer to home for quality control purposes.

15  Q      Did you and Shawn Brewer have any conversations about

16  membrane wall technology or welded walls for Keystone

17  boilers between the time that you received the initial

18  draft of the license agreement and the time that you

19  initialed Annex 1?

20  A      I don't recall right now.

21  Q      Does Parfab still have copies of manufacturing

22  drawings for the Keystone provided by VEO?

23  A      I believe so, yes.

24  Q      Who was responsible for recovering any drawings

25  provided to Parfab pertaining to the Keystone?

DAVIDSON REPORTING

1   granted that right?

2          MR. GISLESON:  Well move to strike as being

3   argumentative.

4   Q     (By Mr. Gisleson)  The point is simply this, did

5   Chris Petcos or anyone else from Indeck Keystone Energy

6   ever authorize VEO to sell watertube boilers under the

7   Keystone trademark that deviated from the parameters as

8   described in the second paragraph of his e-mail?

9          MR. SHEEAN:  Same objection.

10  A     The only way I can answer that is that the license

11  agreement allowed for us to sell the boilers that we were

12  selling and that's it.  That's all I have to say.

13  Q     (By Mr. Gisleson)  I understand that's your position,

14  but the question is whether anyone from IKE expressly

15  authorized VEO to continue selling boilers that included

16  membrane wall or welded wall technology or other features

17  that were outside the scope of Annex 1 to the license

18  agreement?

19         MR. SHEEAN:  Same objection.

20  A     Same answer.

21  Q     (By Mr. Gisleson)  No one provided that

22  authorization?

23         MR. SHEEAN:  Same objection.

24  A     I did not say that.

25  Q     (By Mr. Gisleson)  Can you identify anyone from IKE


                        DAVIDSON REPORTING

177

1  who authorized VEO to sell boilers that were outside the

2  scope of the boiler set forth in Annex 1 of the license

3  agreement?

4          MR. SHEEAN:  Objection, asked and answered.

5  A    I don't think I have anything else to add to that, my

6  previous answer.

7  Q    (By Mr. Gisleson)  What you're saying is you believe

8  you had the right under the license agreement?

9  A    Yes.

10  Q    But my question is did anyone from IKE state, either

11  verbally or in writing to you, after IKE became the

12  licensor, that VEO was authorized to sell boilers that

13  deviated from the boilers described in Annex 1 to the

14  license agreement?

15          MR. SHEEAN:  Same objection.

16  A    Absolutely, yes.

17  Q    (By Mr. Gisleson)  Who?

18  A    Whoever was in charge of I guess managing the license

19  agreement.

20  Q    At IKE?

21  A    Yes.

22  Q    How?

23  A    Our license agreement, it's in writing, what we're

24  allowed to sell.

25  Q    In the license agreement?


                    DAVIDSON REPORTING

INDECK.ASC                                                      2/13/2006

                                                          178

1   A    Yes.

2   Q    Did you receive anything from IKE other than the

3   license agreement that specifically authorized VEO to sell

4   boilers that differed from the boilers described in Annex 1

5   to the license agreement?

6        MR. SHEEAN:  Objection, asked and answered.  He's

7   already identified the license agreement and he's

8   identified the invoices and the checks that were cashed.

9        MR. GISLESON:  It's been asked, but it hasn't

10  been answered.

11  A    I just have the same answer, the license agreement.

12  So that's it.

13  Q    (By Mr. Gisleson)  The only basis that you have for

14  saying that VEO could sell boilers outside the scope of

15  Annex 1 is what is in the terms of the license agreement

16  itself?

17       MR. SHEEAN:  Objection, asked and answered, and

18  now you're mischaracterizing his prior testimony.  He's

19  already identified specifically the invoices submitted by

20  IKE and the fact that they cashed the checks.

21  Q    (By Mr. Gisleson)  What was in the invoices submitted

22  by IKE that led you to believe that VEO could sell boilers

23  that were outside the parameters in Annex 1 of the license

24  agreement?

25  A    I don't know.


                        DAVIDSON REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC,          :
          Plaintiff                   :
                                      :
          v.                          : Case No. 04-325 Erie
                                      :
VICTORY ENERGY OPERATIONS, LLC,       :
          Defendant                   :


          Deposition of TERRENCE SCOTT PAWLOWSKI, taken

before and by Sondra A. Black, Notary Public in

and for the Commonwealth of Pennsylvania, on Thursday,

November 10, 2005, commencing at 9:03 a.m., at the

offices of Marshall Dennehey Warner Coleman & Goggin,

1001 State Street, Erie, Pennsylvania 16501.



For the Plaintiff:

     John K. Gisleson, Esquire
     Schnader Harrison Segal & Lewis, LLP
     Fifth Avenue Place
     120 Fifth Avenue, Suite 2700
     Pittsburgh, PA 15222

For the Defendant:

     Christopher T. Sheean, Esquire
     Wildman Harrold Allen & Dixon, LLP
     225 West Wacker Drive
     Chicago, IL 60606


          Reported by Sondra A. Black
          Ferguson & Holdnack Reporting, Inc.



EXHIBIT
7
PENGAD 800-631-6989

Page 110

1    A.  Where are you at?
2    Q.  VEO1655 through VEO1662.
3    A.  Yes.
4    Q.  What do those drawings show, as you understand them?
5    A.  The standard M series Keystone boiler.
6    Q.  Do these drawings for the standard M series Keystone
7   boiler show tangent tubes?
8    A.  Yes, they do.
9    Q.  On which pages?
10    A.  Page 1657, 1658, 1659, 1660, 1661, and 1662.
11    Q.  Where on the drawings are the tangent tubes
12   identified?  And what I'll do is give you a highlighter, and
13   if you could highlight on your copy of the deposition
14   exhibit --
15        MR. SHEEAN:  Well, I'm going to object to that.
16        Only because the deposition exhibit was used in Bob
17        Gdaniec's deposition where he didn't highlight on
18        it, so --
19        MR. GISLESON:  We can mark it as another copy.
20        MR. SHEEAN:  I don't have another copy of Gdaniec
21        20 that doesn't have writing all over it.  If you
22        want to use yours, that's fine.
23    Q.  I'd like to show you what's been marked now as
24   Pawlowski 5, which is the Keystone engineering design guide.
25   And if you could mark on the first page where the tangent

Page 111

1   tubes are shown, which is VEO1657.  Where the tangent tubes
2   are on that page.
3        (Pawlowski Deposition Exhibit No. 5 marked for
4        identification.)
5    A.  Every single tangent tube?
6    Q.  Yes.  You can just highlight it in so it's clear
7   where they are.
8    A.  My eyesight's not great so -- they're small.
9    Q.  So you highlighted tubes appearing in the middle
10   drawing at the top of the page as well as at the bottom of
11   the page; is that right?
12    A.  That's correct.
13    Q.  To the extent those drawings appear on subsequent
14   pages, you'd highlight the same aspects?
15    A.  That is correct.
16    Q.  The sheets have a reference in the lower right-hand
17   corner to KDB.  Do you see those initials?
18    A.  That's correct.
19    Q.  What does KDB stand for?
20    A.  That was the engineer standard numbers for the M
21   series.
22    Q.  What's meant by engineering standard numbers?
23    A.  They were a series of drawings and standard pages
24   which were constructed together for the M series.
25    Q.  So that the standard drawings for the M series are

Page 112

1   those bearing the KDB prefix?
2    A.  They should, yes.  If memory serves me right, I
3   think that's all they used throughout the entire standard
4   line.
5    Q.  You were asked questions about the sectional view of
6   the steam drum internals with the vortex cans and the
7   Chevrons that were shown either in a power point presentation
8   or in sales literature.  Do you recall that?
9    A.  Yes.
10    Q.  Are those the only drawings of the drum internals
11   that EPTI or its predecessors had?
12    A.  Those are the only drawings.
13    Q.  I'll rephrase it.  Did EPTI or its predecessors have
14   more detailed drawings --
15    A.  Yes.
16    Q.  -- of the drum internals?
17    A.  Yes.
18    Q.  Were the detailed drawings the ones that were used
19   to design the drum internals?
20        MR. SHEEAN:  Objection.  Lack of foundation.
21    Q.  You can answer.
22    A.  They're the ones used to manufacture the drum -- the
23   units, yes.
24    Q.  Were the sectional views used in the power point
25   presentation you looked at, or in any sales brochures, the

Page 113

1   drawings that were used to actually design and manufacture?
2    A.  There's not enough detail to do that.
3    Q.  So that, in your experience, a third party looking
4   at the sectional views in that power point presentation or in
5   sales literature would not have the ability to design and
6   manufacture the drum internals with those cross sections?
7    A.  Yes.
8        MR. GISLESON:  Those are all the questions I have.
9
10        REDIRECT EXAMINATION
11   BY MR. SHEEAN:
12
13    Q.  Just a couple follow-up questions, sir.  Go back to
14   what we've now marked Pawlowski Deposition Exhibit No. 5.
15    A.  Where's that at?
16    Q.  That's the design guide.  Look at VEO1580.  No. 6,
17   projected radiant heating surface, we talked about that
18   before with respect to the M series standard summary chart
19   that we were looking at.  Do you recall that?
20    A.  Yes.
21    Q.  PRHS.  Do you see down -- it says, "Where AFW equals
22   flat projected area, a front wall minus the burner when a
23   welded front wall is used."  Do you see that?
24    A.  Yes.
25    Q.  And that references the inclusion of a front wall on

29 (Pages 110 to 113)

e9b8da78-37b6-4de3-b36e-10ec1d2eb3d1

Page 114

1  a boiler; is that correct?
2  A. Yes.
3  Q. And then, if you turn to the next page, 1581, it
4  references, "Boilers without superheaters use equation three
5  for B, and where," in the second one, "flat projected area of
6  welded rear wall or flat projected area of tubes for a tube
7  and rear wall." Do you see that?
8  A. That's ARW?
9  Q. Yes, sir.
10  A. Yes.
11  Q. And that's a reference to a welded rear wall,
12  correct?
13  A. Yes. Along with the tube and tile rear wall.
14  Q. Right. It references both, right?
15  A. Yes.
16  Q. You were just discussing with Mr. Gisleson the
17  standard M series Keystone drawings, and you said that they
18  had a prefix of KD; is that right?
19  A. I--
20  MR. GISLESON: KDB.
21  A. Yes.
22  Q. KDB. Look back at Annex 1 that we were looking at a
23  minute ago, which is Fuhrman 24, on Page 23.
24  A. What page do you want me to look at?
25  Q. 23 of the annex. You see that drawing -- and that's

Page 115

1  a standard M series drawing, correct?
2  A. It's pretty small. It's hard for me to focus, but
3  it appears to be.
4  Q. And the bottom right corner says, "KD 3.2." Do you
5  see that?
6  A. I'll take your word for it.
7  Q. Do you have an understanding of why, with respect to
8  this drawing, it would be identified as KD as opposed to KDB?
9  A. No. You'd have to ask someone else that question.
10  Q. Is there any significance to the KD designation?
11  Does it refer to anything --
12  A. I believe the KD stands for Keystone design.
13  Q. We looked earlier today at the sales manual, which
14  was Gdaniec 7, and I want to direct your attention to IKE22.
15  Do you see that?
16  A. Okay.
17  Q. And that is identified as, "Keystone M series
18  optional features, front wall welded tube and membrane with
19  watercooled burner throat." Do you see that?
20  A. At the top, yes.
21  Q. Is this a drawing that would appear, typically, in
22  Zurn Energy, Aalborg, or Erie Power sales materials?
23  A. It might have.
24  Q. Do you see the number at the bottom right? It says,
25  "KD 46."

Page 116

1  A. Yeah.
2  Q. Do you have an understanding that this is another in
3  the series of KD drawings?
4  A. Yes.
5  MR. SHEEAN: That's all I have.
6
7  RECROSS-EXAMINATION
8  BY MR. GISLESON:
9
10  Q. Just finally, looking at the Keystone engineering
11  design guide, which was marked a Pawlowski Exhibit 5, your
12  attention was pointed to 1580 and 1581. First, was there a
13  reference to the M series on either of those two pages?
14  A. No.
15  Q. And second, as to the provisions that were pointed
16  out to you on those pages, do those apply to O style Keystone
17  boilers that are not M series?
18  A. They would -- yes.
19  MR. GISLESON: Those are all the questions I have.
20
21  FURTHER REDIRECT EXAMINATION
22  BY MR. SHEEAN:
23
24  Q. Mr. Pawlowski, do you have any understanding of why
25  Victory Energy would be provided with Keystone engineering

Page 117

1  design guide materials for what you term to be O style
2  boilers that are outside the scope of an M series?
3  A. No.
4  MR. SHEEAN: Those are all the questions I have.
5  MR. GISLESON: The witness will read and sign.
6
7  (Deposition concluded at 1:26 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ferguson & Holdnack Reporting, Inc.
814-452-4556

e9b8da78-37b6-4de3-b36e-10ec1d2eb3d1

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

             Plaintiff

    v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

             Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

### SUPPLEMENTAL AFFIDAVIT OF MARK J. WHITE

I, Mark J. White, being duly sworn on oath, depose and state:

1.    EPTI would frequently modify the design or components of a boiler in order to improve the thermal performance of a boiler based on the information provided by the KPSC software.

2.    VEO never submitted a proposal to a potential customer for a tangent tube Keystone Boiler.

3.    The March 26, 2004 letter was sent in conjunction with a longer letter setting forth EPTI's offer to sell rights to manufacture and sell a portion of the Keystone boiler line, which strongly suggests EPTI was attempting to gain leverage against VEO to exact a higher price.

4.    Through discovery, VEO provided IKE with extensive information regarding the boilers VEO sold during the License Agreement, including design drawings, sales proposals and correspondence.

EXHIBIT

10

PENGAD 800-631-6989

I affirm, under the penalties for perjury, that the foregoing representations are true.

Further affiant sayeth not.

_____
Mark J. White

SUBSCRIBED AND SWORN TO
before me this __11__ day of April, 2006.


_____
Notary Public

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, )
LLC, a Delaware limited )
liability company, ) CONFIDENTIAL
)
Plaintiff, ) CIVIL ACTION
)
vs. ) No. 04-CV-325E
)
VICTORY ENERGY OPERATIONS, ) Judge Sean J. McLaughlin
LLC, a Delaware limited )
liability company, )
)
Defendant. )

The videotape deposition of MARK WHITE taken on
behalf of the Plaintiff before Pamela B. Stinchcomb,
Certified Shorthand Reporter in and for the State of
Oklahoma, on the 1st day of February, 2006, in the
City of Tulsa, State of Oklahoma, pursuant to the
stipulations of the parties.

PAMELA B. STINCHCOMB, CSR #1544
DAVIDSON REPORTING SERVICE
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
(918) 745-9959

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:     MR. JOHN K. GISLESON
                       Attorney at Law
                       Fifth Avenue Place
                       120 Fifth Avenue
                       Suite 2700
                       Pittsburgh, Pennsylvania
                                            15222

FOR THE DEFENDANT:    MR. CHRISTOPHER T. SHEEAN
                      Attorney at Law
                      225 West Wacker Drive
                      Chicago, Illinois     60606

Also appearing:      Chris Petcos
                     John Viskup
                     Martin Swabb

S T I P U L A T I O N S

It is hereby stipulated and agreed by and
between the parties hereto that this deposition is
being taken pursuant to notice and that the same may
be taken at this time and place.

It is further stipulated and agreed that this
deposition may be taken pursuant to the Federal Rules
of Civil Procedure and that the same may be taken at
this time and place.

Page 4

I N D E X

DIRECT EXAMINATION
   by Mr. Gisleson..................... Page 5
REPORTER'S CERTIFICATE................... Page 218
INDEX OF EXHIBITS
EXHIBIT                               PAGE
NUMBER                                IDENTIFIED
PLAINTIFF'S EXHIBITS
Number 1.............................. 5
   (previously marked in Mr. Viskup's deposition)
Number 3.............................. 21
   (previously marked in Mr. Viskup's deposition)
Number 6.............................. 14
Number 7.............................. 27
Number 8.............................. 31
Number 9.............................. 34
Number 10............................. 40
Number 11............................. 42
Number 12............................. 47
Number 13............................. 50
Number 14............................. 67
Number 15............................. 74
Number 16............................. 141
Number 17............................. 142
Number 18............................. 143

Page 4 (cont.)

Number 19............................. 152
Number 20............................. 156

Page 5

INDEX OF EXHIBITS
EXHIBIT                               PAGE
NUMBER                                IDENTIFIED
PLAINTIFF'S EXHIBITS
Number 21............................. 157
Number 22............................. 165
Number 23............................. 167
Number 24............................. 170
Number 25............................. 178

Page 6

```
 1              MARK WHITE
 2   being first duly sworn to tell the truth, the whole
 3   truth, and nothing but the truth, testified as
 4   follows:
 5        DIRECT EXAMINATION
 6   BY MR. GISLESON:
 7 Q. State your name, please.
 8 A. Mark White.
 9 Q. Mr. White, are you here to testify as the
10   authorized corporate designee of Victory Energy
11   Operations concerning certain matters in a deposition
12   notice?
13 A. Yes, I am.
14 Q. I'd like to show you what's been marked as
15   Exhibit 1.  Would you let me know whether you are
16   here to testify as the authorized representative
17   concerning Items 1 through 20?
18 A. If I am here to testify?
19 Q. Yes.
20 A. Yes.
21 Q. Item Number 1 is:  "The duration of,
22   participants in, and subjects of negotiation for the
23   License Agreement, including identification of drafts
24   of the Agreement."  What was the duration of the
25   negotiation of the license agreement between Erie
```

Page 7

```
 1   Power Technologies and Victory Energy Operations?
 2 A. Well, I answer this question both as a
 3   representative as Victory Energy and also an
 4   ex-employee of EPTI.  It's hard to separate the two
 5   in terms of the negotiations because I was at EPTI
 6   during the negotiations and later became an employee
 7   of Victory Energy.
 8 Q. So you understand that the testimony you're
 9   giving is on behalf of Victory?
10 A. I understand that but, once again, it's
11   hard to -- it's a impossible for me to provide
12   testimony and not state that I was involved in the
13   negotiations, for example, at EPTI.  That being the
14   case, the negotiations first began sometime in around
15   December of 2002.  I'm not sure exactly the exact
16   time and date, but it would be around that time
17   frame.
18        Shawn Brewer had given me a call while I
19   was an employee of EPTI, just basically stating they
20   had an interest in forming a license agreement or
21   some type of an agreement with EPTI that would allow
22   them to market and sell "O" style Keystone watertube
23   package boilers.  And the next step was to -- for me,
24   at the time I was a EPTI, to bring that up to
25   management and see if they had interests, and there
```

EXHIBIT
11

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY; Use of the software after 3/3/06 prohibited

Page 62

1 A. The agreement hasn't changed.
2 Q. Did IKE ever provide consent to VEO to make
3    a modification to the design of the Keystone?
4 A. No, because no modification was sent to IKE
5    by VEO.
6 Q. Let's skip ahead for a moment to Item
7    Number 5 since we're to the subject. Item Number 5
8    is the nature and extent of any modifications made by
9    VEO to Keystone boilers. Did VEO make my
10   modifications to the Keystone boiler?
11 A. On two projects. On the Dallas/Ft. Worth
12   airport project and Occidental Petroleum project with
13   Tejas.
14 Q. Did VEO receive EPTI's consent with respect
15   to those modifications?
16 A. Yes.
17 Q. Were there any other projects for which VEO
18   received consent to make modifications?
19 A. Not that I'm aware of.
20 Q. What were the modifications in the DFW
21   project?
22 A. The height of the unit changed and actually
23   Erie Power was ~~xxxxx~~ a purchase order by Victory
24   Energy to make the modifications. The modifications
25   were primarily made by Erie Power to include a

Page 63

1    larger -- the tube diameter in the front wall was --
2    yeah, in the front wall was increased. They
3    performed a circulation study to insure that the
4    boiler that's been designed would, I guess, produce
5    as designed and then wouldn't have any problems with
6    that. And I think, you know, just an overall look at
7    any of the changes that were made.
8          MR. SHEEAN: Let's take a break.
9          (break was taken)
10 A. I need to retract my previous comment
11   relative to did Victory Energy make any modifications
12   to the project. The answer is no. If in the eyes of
13   Erie Power Technologies, the Dallas/Ft. Worth
14   airport, and Occidental Petroleum projects -- and
15   again, in their eyes included modifications, we did
16   receive a consent.
17 Q. (By Mr. Gisleson) Did VEO believe it was
18   making modifications on the DFW project?
19 A. No.
20 Q. Did EPTI consent to the changes that VEO
21   made to the boiler for the DFW project?
22 A. Yes.
23 Q. What were the changes? Was it increase in
24   height and a larger tube diameter?
25 A. I retracted that comment. We said -- I

Page 64

1    said -- I retracted my answer and I said there were
2    no modifications.
3 Q. What were the ways in which the DFW boiler
4    deviated from the standard design of the Keystone
5    boiler?
6 A. It didn't.
7 Q. Did VEO create any modifications to the
8    design of the Keystone that it did not disclose to
9    the licensor?
10 A. No.
11 Q. Under Item Number 6, the nature and extent
12   of any improvements made my VEO to Keystone boilers,
13   did VEO make any improvements to the Keystone boiler
14   design?
15 A. No.
16 Q. Did VEO ever request approval to make
17   improvements to a Keystone boiler?
18 A. No.
19 Q. Has VEO made any improvements to a Keystone
20   boiler that it has not disclosed to the licensor?
21 A. No.
22 Q. Under Item 7, the identification of
23   Keystone boilers sold by VEO during the time that IKE
24   has been the licensor that had designed
25   characteristics that are depicted or referenced in

Page 65

1        Annex 1 to the license agreement, were there any such
2        boilers?
3 A. Well, once again, Annex 1 was a guideline,
4    so in terms of Annex 1, I don't know.
5 Q. Did any of the boilers that were sold by
6    VEO while IKE has been the licensor have design
7    characteristics as shown in the drawings in Annex 1
8    on Pages 23, 24 and 25?
9          MR. SHEEAN: Objection, vague. Can
10   you read that back? I just didn't follow it. Maybe
11   I'll retract my objection if I hear it.
12        (The record was read back by the court
13        reporter as requested.)
14        MR. SHEEAN: I'm objecting as vague.
15   Are you asking if any of the boilers had those
16   characteristics in Annex 1?
17        MR. GISLESON: As -- yeah, as sold by
18   VEO.
19        MR. SHEEAN: Any of the
20   characteristics in there?
21        MR. GISLESON: On Pages 23, 24 and 25.
22        MR. SHEEAN: Okay. I withdraw my
23   objection then. You may answer.
24 A. Yes.
25 Q. (By Mr. Gisleson) Which ones?

Page 66

1 A. Which projects?
2 Q. Yes.
3 A. I would have to go through each and every
4    one of them to determine that.
5 Q. Can you identify any projects for which the
6    boiler had a cross-section as shown on Page 23 of
7    Annex 1?
8          MR. SHEEAN: Objection, vague.
9 A. Define cross-section.
10 Q. (By Mr. Gisleson) Did you identify Page 23
11   as showing a cross-section of the Keystone boiler?
12 A. Yes.
13 Q. Did any of the boilers that were sold by
14   VEO during the time that IKE was a licensor have a
15   cross-section as shown on Page 23 of Annex 1?
16        MR. SHEEAN: Objection, vague. Are
17   you -- are you asking whether or not a boiler matched
18   at every physical detail the drawing on Page 23?
19        MR. GISLESON: Yes.
20 A. It's impossible to tell. There are no
21   transverse pitch, no longitudinal pitch, no tube
22   diameter. The drawing is incomplete so I can't
23   answer your question.
24 Q. (By Mr. Gisleson) Did VEO sell any boilers
25   during the time that IKE has been the licensor that

Page 67

1    had tangent tube furnace and outer walls?
2 A. No.
3 Q. Did VEO sell any boilers during the time
4    that IKE has been the licensor that had a refractory
5    front wall?
6 A. No.
7 Q. Did VEO sell any boilers during the time
8    that IKE was the licensor that did not have a water
9    cooled burner throat?
10 A. I don't believe so.
11 Q. Did all the boilers sold by VEO have water
12   cooled burner throats while IKE was the licensor?
13 A. Yes.
14 Q. I understand that it's VEO's position that
15   Annex 1 is just a guide. Did VEO sell any boilers
16   during the time that IKE was a licensor that followed
17   the guide in Annex 1?
18        MR. SHEEAN: Objection, vague as to
19   the term "followed" and as to the term "guide".
20 A. I don't know. I would have to go back
21   and -- and look through all of the information in the
22   guide and compare it to everything else so -- so I
23   don't know.
24 Q. (By Mr. Gisleson) Going back to Item Number
25   2, which was VEO's interpretation of the license

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Scrunch® www.eScrunchit.com    GC Software, Seattle, Washington

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of this software after 3/3/06 prohibited

**Page 200**

1 A. They may have. I don't recall.
2 Q. Did VEO receive drawings of membrane walls
3     from EPTI?
4 A. Yes.
5 Q. Did VEO utilize the membrane wall drawings
6     that EPTI provided in the design of Keystone boilers?
7 A. Yes, we did.
8 Q. Were those membrane wall drawings created
9     by EPTI prior to the inception of the license
10    agreement?
11         MR. SHEEAN: Objection, foundation.
12 A. They were -- I don't know. I can't speak
13    for when they were created.
14 Q. (By Mr. Gisleson) Did VEO ever receive
15    drawings of water cooled burner throats from EPTI?
16 A. I believe so.
17 Q. Did VEO ever prepare a list of the
18    technical information that it received from EPTI?
19 A. No, not to my knowledge.
20 Q. Was there anyone at VEO who oversaw
21    management of the Keystone technical information
22    received from EPTI?
23 A. I managed, as I mentioned before, the
24    drawings, the workstation and our drafting
25    department, Carl Logan, would have managed any of the

**Page 201**

1     project drawings. The design manuals, I manage -- I
2     manage those. I'm returning all those as I said
3     before.
4 Q. Can you identify any other drawings or
5     technical information provided by EPTI to VEO?
6 A. Not at this time.
7 Q. Item Number 4 is drawings and other designs
8     created by VEO that incorporate in whole or in part
9     drawings, designs and other technical information
10    provided by EPTI to VEO. Per all of the drawings
11    that VEO created from Keystone boilers it sold, did
12    it incorporate Keystone drawings --
13         MR. SHEEAN: Objection.
14 Q. (By Mr. Gisleson) -- that it received from
15    EPTI?
16         MR. SHEEAN: Objection, vague,
17    overbroad.
18 A. Could you better define your question? I
19    don't quite understand.
20 Q. (By Mr. Gisleson) Did VEO create any of its
21    own drawings that did not incorporate information
22    received from EPTI pertaining to Keystone boilers?
23         MR. SHEEAN: Objection, overly broad,
24    vague.
25 A. Well, I'm not -- I'm not real sure what

**Page 202**

1     your -- your question is specifically but I will make
2     an attempt to answer it. You're asking for --
3         MR. SHEEAN: Mark, I want to caution
4     you if you don't understand the question, I'd ask you
5     not to try to answer it.
6 A. I don't know.
7 Q. (By Mr. Gisleson) VEO received the standard
8     drawings for the Keystone "M" series, correct?
9 A. I don't know what was standard and what
10    really -- you know -- well, let me rephrase my
11    question. We received drawings, none of which were
12    marked as standard.
13 Q. What was on the marked up Heinz drawings?
14 A. I don't know.
15 Q. Did VEO use the drawings that it received
16    from EPTI to develop its own drawings for Keystone
17    boilers?
18 A. Like -- I believe I had answered this
19    question. We received a hard copy set of drawings
20    that had to be transferred to an Auto CAD format.
21    That occurred and then those are considered project
22    drawings. So I think the answer is yes, but I had
23    answered that previously.
24 Q. Did all of the project drawings incorporate
25    the Keystone drawings that EPTI provided to VEO?

**Page 203**

1         MR. SHEEAN: Objection. Hopelessly
2     broad and vague.
3 A. I don't know.
4 Q. (By Mr. Gisleson) Can you identify any
5     drawings that VEO created that did not rely on
6     information provided by EPTI?
7         MR. SHEEAN: Same objections.
8 A. I don't know.
9 Q. (By Mr. Gisleson) Does VEO still have
10    copies of all of the project drawings for each of the
11    boilers sold under the license agreement?
12 A. Yes, we do.
13 Q. Is VEO returning those drawings to IKE?
14 A. That's yet to be determined.
15 Q. When will that determination be made?
16 A. I don't know.
17 Q. Item Number 19 is the identification of
18    documents currently in VEO's possession, custody or
19    control that concern, refer or relate to Keystone
20    direct fire -- direct-fired watertube boilers. What
21    documents pertaining to Keystone boilers are still in
22    VEO's possession?
23         MR. SHEEAN: Objection, asked and
24    answered.
25 A. We have the design manual and we have

**Page 204**

1     project related drawings that are in our possession,
2     as well.
3 Q. (By Mr. Gisleson) Anything else?
4 A. Not that I can think of right now. I will,
5     if I may, supplement my answer. The design manuals
6     will be returned as soon as I can get out of these
7     depositions and most likely this week.
8 Q. Does VEO need to retain project drawings
9     for Keystone boilers that are no longer in the
10    warranty period?
11 A. Well, the license agreement does not
12    require Victory to -- to provide those drawings to
13    IKE. So either it requires them to maintain those
14    after the warranty period is expired really isn't
15    relevant.
16 Q. Does Victory maintain an O and M manual for
17    each of the boilers that were sold during the
18    license?
19 A. An O and M manual is developed for each
20    project.
21 Q. What's an E O and M manual?
22 A. I don't know.
23 Q. Does VEO still have copies of sales
24    proposals that it submitted for Keystone boilers?
25         MR. SHEEAN: Objection, vague.

**Page 205**

1 A. I don't know.
2 Q. (By Mr. Gisleson) Does VEO have any
3     Keystone drawings on its computer system?
4         MR. SHEEAN: Objection, asked and
5     answered.
6 A. We do. We have the project drawings which
7     are on Auto CAD. We're also -- keeping in mind we're
8     also still executing projects which we have not
9     delivered yet, so there are still drawings in
10    progress.
11 Q. (By Mr. Gisleson) Item Number 17 is the
12    basis for VEO's belief that virtually every
13    characteristic, component and feature of the Keystone
14    direct-fire watertube boilers is publicly known and
15    in the public domain with the exception of the
16    Keystone mark and KPSC software program used to rate
17    the boilers. Can you identify the basis that VEO has
18    for that belief?
19 A. Well, outside of the mark and the KPS
20    program, yeah, we believe that through the public
21    domain and also through third party, that this
22    information is available in the -- in the
23    marketplace.
24 Q. Why does VEO believe it's available in the
25    marketplace?

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY LLC, )
                      )
           Plaintiff, )
                      )
VS                      )Civil Action No. 04-325 Erie
                      )
VICTORY ENERGY OPERATIONS, )Judge Sean J. McLaughlin
LLC,                 )
                      )
          Defendant )JURY TRIAL DEMANDED

ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN YOUNG KANG

December 13, 2005

Volume 1 of 1

Oral Deposition of STEPHEN YOUNG KANG, produced as a
witness at the instance of MR. CHRISTOPHER T. SHEEAN,
ATTORNEY FOR DEFENDENT VICTORY ENERGY OPERATIONS, LLC,
and duly sworn, was taken in the above-styled and
numbered cause on December 13, 2005, from 1:50 p.m.
to 5:03 p.m., before Lydia P. Battle, CSR, RPR, in and
for the State of Texas, reported by stenographic means,
at the offices of Jones & Young, P.C., 2700 Post Oak
Blvd., Suite 1350, Houston, Harris County, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record attached hereto.



EXHIBIT
12

Page 26

1   then, of course, when I did that, Mark White went to Dan
2   Levstek or Bob Gdaniec of Erie Power to discuss what
3   the -- what the pressures per pound would be or what the
4   technical specification would be.
5       Q   Okay. Reading the definition of "Products" -- I
6   know you're a lawyer -- it says, "'Products' shall mean
7   natural circulation, industrial watertube packaged steam
8   generators with a steam capacity range beginning at
9   29,000 pph up to and including 150,000 pph." Do you see
10  that?
11      A   Yes.
12      Q   The second sentence says, "Products shall
13  include but not be limited to the items set forth in
14  Annex I." Do you see that?
15      A   Yes.
16      Q   Okay. Was there any discussion about the
17  meaning of the term "Products shall include but not be
18  limited to the items set forth Annex I"?
19      A   I do not particularly recall discussion regarding
20  that phrase.
21      Q   Did you have any conversations with anyone at
22  Victory Energy regarding the meaning of the term
23  "Products"?
24      A   No.
25      Q   Okay. Were you present when any discussions

Page 27

1   were held with anyone at Victory Energy regarding the
2   meaning of the term "Products"?
3       A   No.
4       Q   Did you have any conversations with Chairman Kim
5   about the license agreement with Victory Energy?
6       A   Yes.
7       Q   To the best of your recollection, what did you
8   say and what did he say relative to the license agreement?
9       A   After the license agreement was entered into
10  legally, I had told Mr. Kim and DKME board, as I
11  typically report back to them once a month, that Erie
12  Power had licensed a certain boiler line to Victory to
13  sell and then that was the -- basically the scope of the
14  discussion.
15      Q   Did you have any discussions with Chairman Kim
16  prior to the entry of the license agreement regarding the
17  license?
18      A   No.
19      Q   What, if anything, did the members of the board
20  of DKME say when you reported to them about the license
21  agreement?
22      A   DKME asked what the strategy behind the license
23  agreement for Erie Power was, and I explained to them
24  that it was a certain size of boilers that Erie Power
25  felt like probably will not sell competitively, therefore

Page 28

1   we were going to license it so that we could get revenue
2   from royalties.
3       Q   Were you ever present, after the license
4   agreement was signed, where there was a discussion about
5   what products were covered by the license agreement with
6   Victory Energy?
7       A   Yes.
8       Q   How many such conversations were you present for?
9       A   I don't recall the exact number, but there were
10  various discussions internally at Erie Power regarding
11  this license agreement after -- after the fact.
12      Q   Was there any reluctance on the part of the
13  preexisting Erie Power employees with respect to the
14  license agreement?
15      A   Can you clarify like "preexisting", please.
16      Q   Okay. Were any of the engineers at Erie Power
17  opposed to Victory -- opposed to Erie Power entering into
18  the license agreement with Victory Energy?
19      A   Yes.
20      Q   Okay. Which ones?
21      A   I'm trying to think. There are a couple of
22  vocal guys that did not like the license agreement.
23  There was a -- Jerry Naminiski I believe was the one
24  engineer's name, and the other person is Bob Gdaniec.
25      Q   Did Ted Fuhrman ever express any opposition to

Page 29

1   the license agreement to you?
2       A   No, not to me personally. No.
3       Q   Did Chris Petcos ever express any opposition to
4   the license agreement?
5       A   Yes. That's the -- other person.
6       Q   What did -- let's start with Jerry Naminiski.
7   What did Mr. Naminiski say to you about the license
8   agreement?
9       A   He had indicated to me that -- that he felt like
10  Victory was merely trying to get this license agreement
11  so that they could steal Keystone line from Erie Power.
12      Q   And what did you say?
13      A   I said, "What are you basing that on?" and --
14  and he indicated that certain members of Keystone
15  Aftermarket group believed that Victory was asking for
16  data or information that was outside the scope of the
17  license agreement.
18      Q   Were these people that were telling you what was
19  outside the scope of the license agreement lawyers?
20      A   No. No.
21      Q   Did you ever provide for them an interpretation
22  of the license agreement?
23      A   No. I just say, well, let me then go talk to
24  the rest of the people and find out why they're believing
25  that there's some data being exchanged that are outside

8  (Pages 26 to 29)

Page 58

1  license agreement.
2      Q   Do you know who assisted Victory Energy in
3  designing and rating those boilers?
4      A   Who from Erie Power?  No.  I mean -- no.
5      Q   Do you know whether or not Erie Power assisted
6  Victory Energy in designing and rating those boilers?
7      A   No, I do not know.
8      Q   Do you know whether or not anyone at Erie Power
9  ever told Victory Energy "You can't sell the Oxy and
10 Dallas/Fort Worth Airport projects," before those
11 projects were built and closed?
12     A   No, I do not know.
13     Q   Do you know whether or not Erie Power received
14 payment from Victory Energy for the Oxy and Dallas/Fort
15 Worth projects?
16     A   No, I do not know.
17     Q   In fact, were you aware that Erie Power received
18 additional remuneration from Victory Energy for an
19 engineering study that was done for the Oxy project?
20     A   No, I was not aware.
21     Q   Were you aware that Victory Energy paid Erie
22 Power an additional sum of money for studies done for the
23 Dallas/Fort Worth Airport project?
24     A   No, I was not aware.
25     Q   As an attorney, did you go back and look at the

Page 59

1  license agreement to verify whether or not there was any
2  violation of the license agreement consistent with what
3  Mr. Gdaniec was saying here?
4      A   I try not to do that as a president because I
5  did not want to play the attorney role as the company
6  officer.  So -- so I really went to our engineers and --
7  and I would really ask them what -- in the trenches, what
8  was really happening when these boilers were being
9  marketed or -- so I try to really review it from that
10 point of view, rather than in looking at the license
11 agreement.
12     Q   Does Mr. Gdaniec have any legal training, to the
13 best of your knowledge?
14         MR. GISLESON:  Objection to the extent
15 you're implying that it's necessary to have legal
16 training to interpret this license agreement.
17     Q   (BY MR. SHEEAN)  Go ahead.  You can answer, sir.
18     A   No.
19     Q   Did you ever have any counsel, other than what
20 you've already told me about the MacDonald law firm, go
21 back and look at the license agreement to verify whether
22 or not Victory Energy had, in fact, stepped outside the
23 boundaries as identified in the license agreement?
24     A   No.
25     Q   Mr. Gdaniec never says in this two-page document

Page 60

1  that Victory Energy is in breach of the agreement, does he?
2          MR. GISLESON:  Objection.  Mischaracterizing
3  the document.
4          MR. SHEEAN:  I'm asking what Mr. Kang's
5  understanding of the document is.
6      Q   (BY MR. SHEEAN)  You can answer, sir.
7      A   No, he did not have a conclusion on that issue.
8      Q   Did you ever reach a conclusion as to whether or
9  not Victory Energy was in breach of the agreement?
10     A   No.
11     Q   What is your understanding of the "M" series
12 boiler?
13     A   My understanding of the "M" series is more of
14 a -- it was designed before the "O" series, so, therefore,
15 the term "outdated" or "antiquated" were used by our
16 people.
17     Q   Do you have an understanding of why Victory
18 Energy would want to license outdated and antiquated
19 technology?
20     A   I believe Victory wanted to sell those lines
21 because they had a niche market that was different from
22 Erie Power perhaps to certain industries that fit those
23 certain types of boilers that we would not sell or have
24 an access to in the market.
25     Q   How did you develop that understanding?

Page 61

1      A   Because they wouldn't have paid money for it and
2  we figured that they had a -- sort of a different niche
3  market perhaps that they wanted to sell those into versus
4  us.
5      Q   Did anyone from Victory Energy ever tell you
6  that they were interested in licensing antiquated and
7  outdated boilers?
8      A   No.
9      Q   To the best of your knowledge, did any of the
10 boilers that Victory Energy designed, manufactured,
11 marketed and sold under the license agreement fall within
12 the boundaries of what your understanding of an "M"
13 series boiler is?
14     A   No.  I mean, I don't know if they sold "M"
15 series or "O" series.  No, I do not.
16     Q   When you met with Mark -- strike that.  When you
17 met with Victory Energy, along with Chairman Barber, in
18 December of 2002, the stated goal was to increase revenue
19 for Erie Power, correct?
20     A   Yes.
21     Q   And that's why you entered into the license
22 agreement, correct?
23     A   Yes.
24     Q   And wasn't Erie Power interested in doing
25 whatever it could to try and assist Victory Energy in

Page 78

1 conversations. Can you recall any specific conversation
2 with Mr. Petcos, other than the two you've already
3 identified, relative to his belief that the license
4 agreement should be terminated?
5    A  No.
6    Q  When was the -- strike that. How many
7 conversations did you have with Ted Fuhrman wherein he
8 indicated he believed the license agreement between Erie
9 Power and Victory Energy should be terminated?
10   A  A couple of times. And in Ted's case, it wasn't
11 a termination discussion. It was more of a -- Ted's
12 concern that the technology or information being given
13 were outside of the scope of the license agreement was
14 more of his concern.
15   Q  Did you ever authorize anyone at Erie Power to
16 inform Victory Energy that it was not authorized to sell
17 boilers -- any specific boiler under the license
18 agreement?
19   A  No.
20   Q  I asked you before about negotiations between
21 Erie Power and Victory Energy relative to the license
22 agreement.
23   A  Yes.
24   Q  Do you recall that?
25   A  Yes.

Page 79

1    Q  And I believe you indicated that Mark White
2 negotiated the license agreement on behalf of Erie Power,
3 correct?
4    A  Yes, that's correct.
5    Q  Do you know whether or not any other Erie Power
6 representative was involved in communications with
7 Victory Energy regarding the license agreement before it
8 was executed?
9    A  Dan Levstek.
10   Q  How do you know that Dan Levstek was involved?
11   A  Because, at the time, I was still sort of
12 learning the company and Dan Levstek was practically
13 running day-to-day operation in many areas in his
14 involvement with the company, so I had asked him if he
15 could work with Mark White to oversee this license
16 agreement negotiation. So I'm -- I don't have personal
17 knowledge that he was on the phone or actually
18 communicated with Victory, but I'm sure he -- he -- he
19 did when he worked on this with Mark White.
20   Q  You're sure he did but you have no personal
21 knowledge?
22   A  Right, right.
23   Q  Anyone else that you're aware of that communicated
24 with Victory?
25   A  No.

Page 80

1       MR. SHEEAN: Those are all the questions I
2 have at this time.
3          EXAMINATION
4    Q  (BY MR. GISLESON, 3:42 p.m.) Good afternoon.
5    A  Hi.
6    Q  So your undergraduate and major from Carnegie
7 Mellon, you got a bachelor of science in?
8    A  Economics, industrial management.
9    Q  Oh, in industrial management?
10   A  Yes.
11   Q  Do you have any education or training in
12 engineering?
13   A  No.
14   Q  Throughout the time that you were, first, chief
15 financial officer and then president of Erie Power
16 Technologies, were you relying on the engineers with
17 respect to their knowledge and experience with the
18 technology underlying the license agreement with Victory
19 Energy Operations?
20   A  Yes.
21   Q  I want to ask you some questions about your
22 discussions with Mark White prior to the time that the
23 license agreement between Erie Power and VEO was executed.
24 How did Mark White describe to you the technology that
25 was to be licensed to VEO?

Page 81

1    A  He said it was 150 pounds per hour pressure
2 or -- or less size or these were outdated, antiquated
3 models to Erie Power.
4       MR. SHEEAN: I'm going object to the extent
5 it mischaracterizes prior testimony.
6    Q  (BY MR. GISLESON) When you're referring to 50
7 (SIC) pounds, is it -- do you mean 150,000 pounds per hour?
8    A  Yes. I'm sorry. 150 -- 150,000, yes, yes.
9    Q  And Mark White told you that the technology was
10 outdated and antiquated?
11   A  Yes.
12   Q  And that's what Mark White told you prior to the
13 time the license agreement was executed, correct?
14   A  Yes.
15   Q  Did you rely on his description as to the
16 technology in authorizing him to proceed with the
17 negotiations and execution of a license agreement?
18       MR. SHEEAN: Objection. Vague.
19   A  I relied on him and others, other engineers, to
20 look into the technical scope definition for the license
21 agreement.
22   Q  (BY MR. GISLESON) Now, in terms of the
23 technical scope definition for the license agreement, you
24 said that you wanted to have Mark check with the
25 engineers about what those specifications were; is that

21 (Pages 78 to 81)