# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC, a
Delaware limited liability company,

         Plaintiff

    v.

VICTORY ENERGY OPERATIONS, LLC, a
Delaware limited liability company,

         Defendant.

CIVIL ACTION

No. 04-CV-325E

Judge Sean J. McLaughlin

## DEFENDANT VICTORY ENERGY OPERATIONS, LLC'S APPENDIX OF EXHIBITS IN OPPOSITION TO PLAINTIFF INDECK KEYSTONE ENERGY, LLC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON VICTORY ENERGY OPERATIONS, LLC'S COUNTERLCAIMS

| NUMBER | EXHIBIT |
|--------|---------|
| 1 | January 7, 2003 License Agreement (without Annexes) |
| 2 | Deposition of Alan Christian (38, 43, 46-49, 53-54, 92-94) |
| 3 | Deposition of Chris T. Petcos (26-36, 40-44, 45-48, 51-53, 58) |
| 4 | Deposition of John C. Viskup, Jr. (23-25, 151-161) |
| 5 | Deposition of VEO's 30(b)(6) (Viskup) (23-24, 37-42) |
| 6 | Deposition of VEO's 30(b)(6) (White) (176) |
| 7 | Deposition of Mark J. White (72, 174-75, 255-256) |



# LICENSE AGREEMENT

This agreement is made in Erie, Pennsylvania, USA this 7th day of, January 2003 by and between Erie Power Technologies, Inc., 5300 Knowledge Pkwy. Ste. 200, Erie, PA, 16510 a corporation established under the laws of Ohio, U.S.A., (hereinafter, "Licensor") and Victory Energy Operations, LLC, 302 East 5th Avenue, Unite "D", Owasso, OK, 74055, a corporation established under the laws of Delaware, U.S.A. (hereinafter "Licensee") hereinafter referred to as "Party/Parties".

## WITNESSETH

WHEREAS, Licensor has for many years been engaged in researching, designing, engineering and manufacturing certain Products (as defined hereinafter) and has acquired considerable experience therein; and

WHEREAS, Licensee intends to manufacture and sell said Products and wishes to secure access to and use of Licensor Technical Information (as defined herein) for said purpose to the extent permitted herein; and

NOW, THEREFORE, in consideration of the mutual premises set forth herein, IT IS AGREED AS FOLLOWS:

## CLAUSE 1
### Definitions

1.a)    "Products" shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include but not be limited to the items set forth in Annex. 1. If Licensee receives inquires which are not in Licensor's range of Products, subject to and prior notice to Licensor, Licensee will be free to enter into separate alternative agreements.

1.b)    "Technical Information" shall mean any facts, data, know how, formula, procedures, techniques or advice, whether written or oral and regardless of form (including reports, letters, designs, drawings, specifications, training and operational manuals, photographs, tapes, diagrams, patent applications, Software (as defined herein), and any related documentation). Whether owned by Licensor, used by Licensor under license with the right to sublicense, or in the public domain, relating to design, manufacture, testing, operation, and repair of the Products, including but not limited to information set forth in Annex II of this Agreement. "Technical Information" may be patentable or unpatentable, and if patentable, need not be patented. Improvements may also be protected under the copyright, trade secret, or other applicable legal principles.

1.c)    "Technology Disclosure Fee" shall mean payment due to Licensor for the disclosure of the Technical Information and for the supply of the technical assistance under Clause 3 and Clause 4 hereof.

EXHIBIT

___1___



1.d)    "Exclusive Territory" shall mean United States, Canada and Mexico.

1.e)    "Net Selling Price" shall mean the actual selling price of Products, ex-works, excluding field supervision prices, taxes (directly applied to the selling price) and equipment including water treatment systems and associated equipment (i.e. pumps deaerators etc.) continuous blowdown heat recovery systems, spare parts (directly applied to the selling price) freight and insurance charges to destination, FOB charges or costs of parts supplied by Licensor, if any.

1.f)    "Effective Date" shall mean the date identified in the first sentence of this Agreement.

1.g)    "Contract Year" as used herein shall mean each one year period commencing with the Effective Date of this Agreement or anniversary dates.

1.h)    "Improvements" shall mean all modifications, variations, revisions, and enhancements of the Products, or methods or processes for manufacturing the Products, and all Technical Information relating thereto, which either Licensor or Licensee may develop, acquire, or acquire control of and commercially exploit during the term of this Agreement and which Licensor determines, in its reasonable judgment: (1) improve Product Performance and/or manufacturing costs of Products; (2) expand commercial applications of the Products or provide a superior substitute for any Product; or (3) increase marketability and/or commercial acceptance of the Products. "Improvements" may be patentable or unpatentable, and if patentable, need not be patented. Improvements may also be protected under copyright, trade secret, or other applicable legal principles.

1.i)    "Software" shall mean computer programs, in whatever form and including related documentation, owned or licensed by Licensor and used in connection with the design, manufacture, testing operation or repair of Products.

1.j)    "Standard Parts" shall mean parts which are made for other products as well as for the Products covered by this Agreement, and which require no change in design or specification to become parts for the products covered by this Agreement.

1.k)    "Mark" shall mean the trademarks " Erie Power Technologies, Inc. or EPTI" and shall include any related designs, logos, or other descriptive devices customarily used by Licensor in connection with the Mark.

1.l)    "Licensor Confidential Information" shall mean any data or information disclosed hereunder (whether written, oral or graphical) that relates to Licensor's products, technology, research, development, customers or business activities, and which is confidential or proprietary to or a trade secret of Licensor. Licensor Confidential Information shall not include any information, data or material which:


**ERIE POWER TECHNOLOGIES, INC.**

(a) Licensor expressly agrees in writing is free of any non-disclosure obligations; (b) at the time of disclosure to Licensee was known to Licensee (as evidenced by documentation in Licensee's possession) free of any non-disclosure obligations; (c) is independently developed by Licensee (as evidenced by documentation in Licensee's possession); (d) is lawfully received by Licensee, free of any non-disclosure obligations, from a third party having the right to so furnish such Licensor Confidential Information; or (e) is or becomes generally available to the public without any breach of this Agreement or unauthorized disclosure of such Licensor Confidential Information by Licensor

## CLAUSE 2
## Grant of Selling, Manufacturing and Related Rights

2.a)    Selling Rights.  Licensor hereby grants to Licensee:

(i)    The exclusive license to manufacture the Products and to offer, sell, and install the Products so manufactured, and to use Technical Information in connection therewith, within the Exclusive Territory.  Licensee understands and agrees, however that Licensor reserves the right to itself to offer, sell, manufacture, and install the Products in the Exclusive Territory in the following cases:

1.  if explicitly requested by the client(s), or
2.  Licensee's capabilities to meet the requirements by any client are significantly diminished as determined by mutual agreement of the parties.

In these cases, the Parties will also agree on the best practical cooperation and support to be provided by Licensee and Licensee's most reasonable offer/order share.

2.b)    Manufacturing Rights.  Licensor hereby grants to Licensee an exclusive license to manufacture or have manufactured the Products using the Technical Information for installation in the Territory except for what provided in Clause 2.a.i.  Licensee may not manufacture or have manufactured, the Products or any component part thereof, anywhere outside of Territory without the prior written consent of Licensor.

2.c)    Conditions of Grant of Rights.

(i)    Licensee expressly agrees that it will not sell, transfer, sublicense or disclose the Technical Information to any third party except as expressly provided in this Agreement and subject to the prior written consent of Licensor.  The grant of rights pursuant to this Agreement shall not extend to technology (patented or unpatented), manufacturing information, or know-how possessed by Licensor regarding the Products.


ERIE POWER
TECHNOLOGIES, INC.

(ii)  As a condition of the licenses granted herein, Licensee agrees that it will exercise its best efforts to promote the offer, sale, and installation of Products manufactured under the Agreement in the Territory. Whenever Licensee receives any inquiry regarding the purchase of installation of Products outside of Territory, Licensee will promptly notify Licensor, and the parties shall thereafter mutually agree which one of them shall submit a bid in response to such inquiry.

(iii) During the term of this Agreement, Licensee shall not engage in the manufacture of products that are in competition or may compete with the Products licensed under this Agreement without the advance written consent of Licensor except as follows; firetube boilers with a steam capacity up to and including 75,000 pph at various pressures and steam temperatures.

(iv) Nothing in this Agreement shall be construed to establish by expression or implication that either Party to this Agreement is acting as, or is deemed to be, the agent for the other Party.

## CLAUSE 3
## Delivery of Technical Information/Technical Assistance

3.a) Licensor shall furnish Licensee with the Technical Information indicated within Annex II at Licensor's office in Erie, Pennsylvania within sixty (60) days of receipt of the initial payment of the Technical Disclosure Fee. Licensor will provide Licensee access via remote connection to Licensor's computer system so that Licensee may properly rate the Product. The rating system is a Fortran based program, designed to run on UNIX workstations. If Licensee elects to run the program on a Windows based system, an X-Windows emulator is required on Licensee's computer system to properly display the user interface for the program. It is the responsibility of the Licensee to provide the X-Windows emulator.

3.b) Each item of Technical Information furnished by Licensor shall be furnished in a form utilized by Licensor and such information shall be as detailed as Licensor would furnish to its own personnel for use in connection with the Products.

3.c) With the aid of the Licensor-provided Technical Information, Licensee will, in case of an order, make its own workshop drawings of Products, as well as calculations of performance of Products, except for information and output from the Licensor's natural circulation computer program. (Licensor will provide the foregoing assistance as outlined in the Annexes until a reasonable period of training and Software transfer is complete. This assistance will include



reasonable thermal design support, other mechanical and general proposal support from Licensor's offices sufficient for preparation of proposals by Licensee for the Licensee's clients).

3.d)     At the request of Licensee, Licensor will review Licensee's workshop drawings and calculations for compliance with Licensor's design at Licensee's applicable service rate in effect at the time such service is rendered. This support will be modified by Licensor free of charge to Licensee for the first two orders to review for general compliance with Licensor's standard. Licensee will be responsible for making and implementing any alterations of the design of the Products required by codes, rules, or other requirements of the country of manufacture or the country of delivery or because of shop practices within the Licensee's plant(s).

3.e)     Upon Licensee's reasonable request, Licensor shall provide, without any additional payment to Licensor, reasonable technical assistance to Licensee by written or telephone response relating to the application and interpretation of the Technical Information furnished by Licensor under this Agreement.

3.f)     On reasonable request by Licensee, Licensor will give special engineering advice regarding planning, design, manufacturing, installation or operation of Products by Licensee at Licensor's applicable service rate in effect a the time service is rendered.

3.g)     All amounts payable to Licensor under this Clause shall be due in United States Dollars (USDLR) within thirty (30) day after receipt by Licensee of Licensor's invoice. Payments will be by wire transfer or issued by company check.

3.h)     Annex III here to set forth Licensor's contract rates for technical assistance as of the Effective Date, provided however, that rates for technical assistance are subject to prior agreement between the Parties on reasonable escalation throughout the term of this Agreement.


**CLAUSE 4**
**Personnel Support, Training, and Technical Assistance**

4.a)     During the life of this Agreement, at the reasonable requests of Licensee, Licensor will admit to that portion of its facility a reasonable number of Licensee's employees to inspect and become acquainted with Licensor's engineering discipline, working methods, and manufacturing processes relating to the Products. Such visits shall be free of charge to Licensee for up to, one (1) month of training during the first year of this Agreement. Licensor will conduct periodic Licensee meetings during the term of this Agreement to provide additional training and exchange of information. Licensor will provide Licensee with any other Technical Information in respect of the manufacture of Products, in



connection with such visits, on the condition that the regular course of business of Licensor is not interfered with thereby, and provided that all expenses of such employees of Licensee will be borne and paid for by Licensee. All employees of Licensee who participate in on-site training at Licensor will execute acknowledgements that they are aware of a bond by the secrecy provisions of this Agreement and that all information disclosed during on-site training constitutes Technical Information hereunder. Licensee assumes all responsibility for any health, accident, or other liability insurance coverage for all employees and other representatives of Licensee who participate in such on-site visits to Licensor's premises.

4.b)   Licensor will provide personnel support to Licensee by sending a Licensor representative to Licensee's project team as technical presentations of the Products and joint technical meetings between Licensee and its clients as required by Licensee, free of charge to Licensee, for the first two (2) projects, limited to, two (2) day trip and one trip per project. For subsequent Licensor's personnel support, Licensee will pay to Licensor standard per diem rate set forth in Annex III or as may be in effect at the time the support is provided.

4.c)   All amounts payable under this Clause shall be due and payable (USDLR) within thirty (30) days after receipt by Licensee of Licensor invoice.


**CLAUSE 5**
**Secrecy**

5.a)   All of the Technical Information supplied by Licensor under this Agreement shall be for the exclusive use of Licensee (and its employees on a need to know basis) and Licensee agrees that Technical Information shall not be given, sold, disclosed, or otherwise made available in any fashion to any other firm, company, or person (including customers and prospective customers of Licensee) except with the prior written consent of Licensor. Licensee shall not use any of the Technical Information supplied by Licensor under this Agreement for any purpose except as set forth in Clause 2 of this Agreement. In the event that Licensee becomes legally obligated or compelled to disclose any Technical Information, it will provide Licensor with prompt written notice of same and cooperate with Licensor in its efforts to obtain a protective order or other confidential treatment.

5.b)   Notwithstanding the foregoing, no secrecy obligation herein shall apply to Technical Information which:

(i)    At the time of disclosure is generally available to the public;
(ii)   After disclosure by Licensor becomes generally available to the public by publication or otherwise through no fault of Licensee;



     (iii)    Was in Licensee's possession prior to the disclosure hereunder and which was not acquired directly or indirectly from Licensor and which was acquired without being subject to any restriction as to disclosure or use;

     (iv)    Was received by Licensee from a third party imposing no obligation of confidentiality and who did not acquire any such information directly or indirectly from Licensor under an obligation of confidentiality.

5.c)    Licensee requires all of its subcontractors to agree in writing to be bound by the provisions of this Clause 5.

5.d)    The provisions of this Clause 5 shall apply with equal force with respect to improvements with Licensor supplies to Licensee.

5.e)    Licensee may, from time to time, furnish the Licensor with certain Licensee Confidential Information. Licensor will use the same care, but at a minimum reasonable care, to avoid disclosure, publication or dissemination of Licensee Confidential Information as it uses with its own similar confidential information which it does not wish to disclose, publish or disseminate. Licensee Confidential Information shall not be used except as expressly permitted under this Agreement nor disclosed to any persons other than the employees and authorized consultants of Licensor (if any) who have a need to know and who have been informed of the their obligation to maintain its confidentiality prior to such disclosure, and who have entered into written confidentiality agreements restricting their use and disclosure of such information, except for the uses expressly permitted in this Agreement. The disclosure of Licensee Confidential Information does not grant to Licensor any license or rights to any trade secrets or under any patents or copyrights. In the event that Licensor becomes legally obligated or compelled to disclose any Licensee Confidential Information, it will provide Licensee with prompt written notice of same and cooperate with Licensee in its efforts to obtain a protective order or other confidential treatment. Licensor will under no circumstances furnish any portion of the Licensee Confidential Information that it is not legally required to produce and, to the extent that Licensor is required to produce any Licensee Confidential Information, it will use its best efforts to obtain reliable assurances that confidential treatment will be accorded to the Licensee Confidential Information that is disclosed.

**CLAUSE 6**
**Compensation**

In consideration of Licensee rights granted herein, supply of Technical Information, and the supply of technical assistance, Licensee shall pay to Licensor:

6.a)    <u>Technology Disclosure Fee:</u> A lump sum of $50,000 (US) payable per the schedule defined in paragraph 6 (b) below.


ERIE POWER
TECHNOLOGIES, INC.

6.b)    Payment Schedule:  Payment for the Technology Disclosure Fee will be payable as follows:

(i)     $10,000 within thirty (30) days from the Effective Date of this Agreement.

(ii)    $20,000 within twelve (12) months from the Effective Date of this Agreement.

(iii)   A final payment of $20,000 within eighteen (18) months from the Effective Date of this Agreement.

6.c)    Royalties:  On the schedule set forth in Clause 7, Licensee will pay to Licensor, in addition to the Technology Disclosure Fee, a continuing royalty, which shall be computed at 4% of the Net Selling Price, as defined in Clause 1.e hereof, of each Product manufactured and sold by Licensee.

6.d)    The compensation rates herein provided for shall continue for the duration of this Agreement, unless altered in accordance with the terms of Clause 19 hereof.


## CLAUSE 7
## Payments and Accounting

7.a)    The Royalties defined in Clause 6 will be paid in accordance with the following schedule:
1.  Sixty percent (60%) within three (3) months after the receipt of the purchase order or upon initiation of manufacture of the Product by Licensee for this purchase order, whichever occurs sooner.
2.  Forty percent (40%) upon materially complete shipment of the Product under the specific purchase order.

7.b)    A "Semi-Annual" Statement" (as hereafter defined) shall be submitted by Licensee to Licensor for period ending with the end of each half Contract Year for the duration this Agreement, listing Products upon which manufacturing by Licensee has been completed in such period and an addendum listing Products upon which manufacturing is not complete.  The Semi-Annual Statement shall identify for each completed or incomplete Product:

(i)     Date of Order
(ii)    Name of Client
(iii)   Destination
(iv)    Performance Data to include steam capacity and conditions and the number of industrial watertube package steam generators
(v)     Date of completion or scheduled completion of the Products
(vi)    Purchase order price and portion relevant Net Selling Price



   (vii)  The royalty amount payable thereon

7.c)  All amounts, which Licensee owes Licensor under this Clauses 6 and 7, will be paid by Licensee to Licensor in U.S. Dollars.

7.d)  Licensee will advise Licensor of each sale of a Product by Licensee by forwarding to Licensor a copy of each order immediately after said order has been placed with Licensee.

7.f)  Licensee shall, during the term of this Agreement, keep accurate and complete records, books, and files of all Products and orders for Products, including the identifying data required in the Semi-Annual Statement. These records shall be made available for inspection and copying by authorized representatives of Licensor during any normal business day; provided however, that an inspection of Licensee's records shall be made by Licensor only upon and after giving to Licensee at least ten (10) days written notice by Licensor of Licensor's intention to inspect such records.

7.g)  If an audit by Licensor reveals a shortfall in Royalty payments exceeding five (5) percent of Royalties owing then Licensee shall pay any such shortfall, plus interest thereon at the US Federal Reserve Prime Rate plus three percent (3%) and the reasonable cost of the audit.


**CLAUSE 8**
**Modifications to Products by Licensee**

8.a)  Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products. Licensee will submit to Licensor such plans for modifications for prior written approval by Licensor except for the alterations as defined in Clause 3 (e).

8.b)  Licensee shall assume the entire responsibility for any changes in design or material specifications made by Licensee, and shall hold Licensor harmless from any liability thereafter, regardless of any approvals made by Licensor.

8.c)  All technical questions related to proposed modifications of the Products shall be directed to the Licensor's Chief Mechanical Engineer with a copy provided to the Licensor contact identified in Clause 23 – Notices.

8.d)  Any modification by Licensee shall be deemed an Improvement under this Agreement.


**ERIE POWER**
TECHNOLOGIES, INC.

**CLAUSE 9**
**Workmanship**

9.a)    Licensee will at all times use its best efforts to attain high class workmanship in all activities performed by Licensee or its subcontractors relating to Products, so as to protect the reputation of Licensor and the good will of the Mark (as hereinafter defined) regarding such Products.

9.b)    Licensee shall maintain Licensor's standards of materials and workmanship and shall conform, insofar as possible, to Licensor's engineering standards in manufacture of Products, and will regularly consult with Licensor in matters of application or problems relating to the design, manufacture, quotation, sale, installation and operation of Products, and will abide by the recommendations and instructions received from Licensor. The responsibility for the exercise of final judgment in making recommendations to Licensee's customers for proper application of Products shall, however, rest solely with Licensee.

9.c)    Licensor shall have the right, upon reasonable notice to Licensee, to conduct inspections of Licensee's manufacturing facilities and procedures during normal business hours and to inspect randomly-selected Products, manufacturing equipment and processes for Products, and installations of Products. Deficiencies in Products, to the extent these are the result of Licensee's manufacture, use, modification or installation of Products, shall be remedied by Licensee within 30 days of written notice from Licensor of the deficiencies.

**CLAUSE 10**
**Warranty & Representations**

10.a)    Licensor will provide to Licensee Technical Information available to Licensor. Licensor represents that such Technical Information provided by Licensor is accurate and complete.

10.b)    OTHER THAN AS SET FORTH HEREIN, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, AND ASSUMES NO RESPONSIBLITIES WHATEVER WITH RESPECT TO THE MANUFACTURE, USE, SALE, OR OTHER DISPOSITION BY LICENSEE OF PRODUCTS.

**CLAUSE 11**
**Indemnity/Insurance/Limitation of Liability**

11.a)    Indemnity. Licensee and Licensor will indemnify and hold harmless each other from, for, and against all liabilities asserted against, resulting to, imposed on, or



incurred by either Party at any time arising out of claims or allegations that injury to either Party or any third party resulted from the manufacture, marketing, sale, installation, and operation of Products and any Improvements thereto pursuant to this Agreement. If it should be shown that the cause of any liability for any injury resulting from the manufacture, marketing, sale, and installation of Products, then Licensor will use its best efforts to correct any errors or deficiencies in the Technical Information and will contribute to satisfying any liability arising from such defect in the Technical Information in an amount up to but not exceeding the limit set forth in Clause 11 (b) herein. As used in this Agreement, "Indemnify" means to indemnify, reimburse, defend and hold harmless the indemnitee (including its parents, subsidiaries, successors, affiliates, officers, directors, employees, agents, and representatives) from any and all liabilities and injuries; "liabilities" means all demands, claims, actions, causes of action, assessments, losses, damages, obligations, judgments, fines, and costs and expenses (including without limitation settlements, penalties, interest, reasonable attorneys fees, disbursements and expenses, and reasonable consultant fees, disbursements and expenses); and "injury" means bodily injury, death, property damage or economic loss.

11.b)  <u>Limitation of Liability.</u>  Licensor's responsibility for any liabilities for any injury to Licensee or any third party arising from the design, manufacture, marketing, sale, and installation of any Product pursuant to this Agreement shall be limited to the amount of the relevant Royalty for the particular Product, as provided in Clause 6(c). In no event shall Licensor's liability exceed the amount of such royalty for he particular Product. Licensee understands and agrees, however, that in no event shall it be entitled to any indemnity from Licensor with respect to liabilities for injuries arising from the operation by purchasers of installed Products, inasmuch as Licensor and its agents will not be permitted or authorized to operate, service, or repair Products manufactured and sold by Licensee pursuant to this Agreement.

11.c)  <u>Insurance.</u>  Licensee, pursuant to this Agreement, will carry general public liability insurance to include products and completed operations coverage on a claims-made or occurrence basis. This insurance coverage shall be in an amount not less than Two Million U.S. Dollars. Each such insurance policy will name Licensor as additional insured by no later than the date of the first Licensee purchase order. Licensee will furnish a certificate of insurance, or a copy of the policy upon request, evidencing such overage within thirty (30) days of the Licensee's first purchase order and annually thereafter.

11.d)  Licensee may satisfy the requirement in the above paragraph by adding Licensor to its Builders All-Risk insurance policy as an additional insured "for the interests as specified" if such insurance policy meets the identified insurance limits specified above.

**ERIE POWER**
**TECHNOLOGIES, INC.**

11.e)    Licensee may be allowed to self-insure for the required insurance coverage, provided Licensee demonstrates to the satisfaction of Licensor sufficient financial capability to self-insure.

## CLAUSE 12
## Patents

12.a)    To the best of Licensor's knowledge, it has not infringed any patent possessed by any third party.  Accordingly, Licensor makes no warranty or representation, and none implied, that the manufacture, use or sale of Products, by Licensee under this Agreement will be free from infringement of any third party patents.

12.b)    In the event of any legal action for patent infringement by or against Licensee based on the manufacture, use or sale of any Products under this Agreement, Licensor shall, upon request of Licensee, furnish Licensee any information and evidence which is readily available to Licensor and which Licensor deems material to the prosecution or defense of such patent actions.

12.c)    If Licensee desires that a patent be obtained in the Territory for an invention made by Licensor during the term of this Agreement, then Licensor will cooperate with Licensee in obtaining such patent on behalf of Licensor if Licensor desires the patent and if the invention is patentable under applicable patent laws.  The payment of all fees incurred in investigating or obtaining such patents shall be equally shared by Licensor and Licensee; provided however, that any such patent obtained by Licensee for Licensor will be subject to this Agreement.

12.d)    In case a patent of Licensor which is covered by this Agreement shall have lost its importance to Licensor in the Territory, Licensor will consult with its other Licensees not later than 6 months before the date upon which any patent fees or other required patent maintenance action shall fall due.  If all other Licensees agree, Licensor will cease to maintain such patent, whereby Licensee will cease to maintain such patent, whereby Licensee may maintain such patents for its own account in Licensor's name.

12.e)    Licensee will use due diligence to police and enforce any patents obtained by Licensor in the Territory, and will notify Licensor when third parties commit such acts as may infringe such patents.  It will be left to Licensor to decide whether or not such infringements are to be prosecuted and the Parties will mutually agree how to share in the costs of prosecution.



## CLAUSE 13
## Improvements

13.a)  In order to further the mutual interest of both parties, Licensor shall disclose and make available to Licensee and Licensee shall disclose and make available to Licensor, free of any charge, all Improvements developed while this Agreement is in effect. Such disclosure shall be made not earlier than six (6) months after such Improvement have been introduced into commercial production, whether or not such Improvements are patented or subject to patent applications; provided, however, that an Improvements, including new designs and inventions, which are developed by any of Licensor's other Licensees shall not be made available to Licensee and, similarly, any such improvements and developments made by Licensee shall not be made available to any other Licensee of Licensor. However, best efforts will be made to make all improvements available to Licensee unless this is prevented by other license agreement (s) and related legal regulation.

13.b)  Improvements disclosed by either party pursuant to this paragraph shall be subject to the secrecy provisions of Clause 5 herein.

13.c)  Any Improvement shall be owned by the party, which has discovered or made the Improvement. Licensor shall grant to Licensee a royalty-free license to use Improvements developed by Licensor and disclosed pursuant to Clause 13(a) above. Any Improvement licensed from Licensee to Licensor, however, shall be non-exclusive as to Licensor's use or modification of such Improvement, subject only to rights retained by Licensee.


## CLAUSE 14
## Copyrights

14.a)  Licensee understands and agrees that certain items to be provided within the Technical Information, including but not limited to software, drawings, manuals, and promotional and sales materials, are protected under U.S. Copyright law whether or not such items bear copyright notice. Licensee further agrees that Licensor owns all right, title, and interest to any copyrightable materials contained in the Technical Information. Nothing in this Agreement shall constitute or be deemed to be a transfer to Licensee of any ownership rights in any such copyrightable material, and title to all copyrights shall remain exclusively with Licensor. Pursuant to the license granted in Clause 2 of this Agreement, however Licensee shall have the limited right to use internally and copy any program in conjunction with a machine or for archival or backup purposes. Any archival copies made under this paragraph shall be destroyed upon termination of this Agreement for any reason. Licensee may maintain archival copies as required by national or local laws, regulations, and codes.



14b.)   Except as provided above in Clauses 3 (a), 3(d), 3(e) and 14 (a), Licensee may not copy, reproduce, distribute (including sale, lease, or rental), perform, display, or prepare derivative works based upon any copyrightable materials provided to Licensee by Licensor without prior written consent of Licensor.

CLAUSE 15
Trademarks

15.a)   Grant of License.  For the duration of this Agreement, Licensee shall be permitted to use the Mark royalty-free on the Products manufactured by Licensee.  The Mark shall be affixed to a plate appearing on each Product supplied by Licensee upon which there shall be an indication that the Products were supplied by Licensee under license from Licensor.  For the duration of this Agreement, Licensee also shall be permitted to use the Mark in marketing, advertising, and sales activities related to the Product manufactured by Licensee.

15.b)   Use of Trademarks.
Licensee agrees to use the Mark only in the form approved by Licensor.  The design, appearance, placement, application of statutory notice and other uses by Licensee of the mark shall conform to the existing usage and specifications to be provided to Licensee by Licensor.  Upon request by Licensor, Licensee shall promptly provide representative samples of any and all uses by Licensee of the Mark.

   (i)     Licensee acknowledges that the Mark, the property solely of Licensor, is of great commercial value to Licensor, and represents the good will and wide recognition attained by Licensor's high quality Products.  All use of the Mark by Licensee, including any good will arising out of such use, shall be solely to the benefit of Licensor.  Licensee further acknowledges that any misuse or infringement of the Mark, including breach of Licensee's obligations under Clauses 8 and 9 of this Agreement would cause Licensor irreparable harm for which it would have no adequate remedy at law.

   (ii)    All rights to the use of the Mark by Licensee shall terminate immediately with the termination of this Agreement.  Licensee understands and agrees that it will use no mark confusingly similar to the Mark in any way following the termination of this Agreement.  Licensee's obligations under this paragraph shall survive any termination of this Agreement.

15.c)   Registered User Status.  This license to use the Mark on Products and in marketing and sales activities shall be conditioned, where required by applicable law or custom, upon the entry of Licensee into a Registered User Agreement in a form appropriate under the applicable law within the Territory.  The use of the



Mark pursuant to this license shall in no way imply that Licensee is acting as an agent for Licensor or vice versa.

## CLAUSE 16
## Duration of Agreement

16.a)   This Agreement will be in effect for the term of three (3) years from the Effective Date hereof, unless terminated earlier under the terms provided for herein.

16.b)   After the expiration of the initial three (3) year term, this Agreement will be continued from year to year, in accordance with the terms and conditions of this Agreement unless notice is given in writing by one party to the other at least sixty (60) days before the expiration of the original or extended period that the notifying party does not intend to renew or extend this Agreement.

16.c)   In the event Licensee has not received during the first two (2) years a minimum of 5 orders for the Products, Licensor has the right to terminate the Agreement.

16.d)   Any orders resulting from bids submitted by the Parties though a consortium or joint venture or equivalent cooperation agreement will be part of the orders received in the time period as per above Clause 16.c.

## CLAUSE 17
## Obligations After Termination of Agreement

17.a)   After any termination of this Agreement by Licensor in accordance with the provisions of Clause 16 (c) hereof, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement (to the extent that said Technical Information has not meanwhile become publicly known through no fault of Licensee), or to use the Mark. Licensee shall return to Licensor all of the design, drawings, and other physical materials comprising the Technical Information within thirty (30) days after such termination.

17.b)   Any notice of termination, or any termination, of this will not prevent Licensee from completing manufacture and delivering Products which were ordered before the date said notice or to confirm the validity of bids submitted to Clients before the notice of Termination, if so agreed in writing with Licensor in order to prevent any damage to Licensor's Trademark and Licensor's/Licensee's reputation in the Territory; provided, however, that Licensee will have the duty to make the Royalty payment required under Clause 6 of this Agreement, provided further, that Licensee will have the duty to maintain the secrecy of all Technical Information as herein above provided in Clause 5. If the Agreement termination



is for a reason other than breach, Licensor shall provide reasonable support to Licensee required in execution of this work.

## CLAUSE 18
### Assignment

The rights and obligations arising out of this Agreement shall not be assignable by Licensee without the written consent of Licensor.

## CLAUSE 19
### Arbitration

In the event of any dispute, controversy or claim between the parties arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, the parties shall attempt in the first instance to resolve such dispute through friendly consultations between the parties. If such consultations do not result in a resolution of the dispute within thirty (30) days, then the dispute may be referred to the President of each Company and the two of them shall personally confer in an effort to resolve the matter. If the presidents can not resolve the matter, then the dispute may be submitted by either party to binding Arbitration, irrespective of the magnitude thereof, the amount in dispute or whether such dispute would otherwise be considered justifiable for resolution by any court, by giving written notice thereof to the other party. The parties agree to attempt to resolve all dispute arising hereunder promptly equitably and in a good faith manner.

Arbitration shall be conducted in accordance with the American Arbitration Association and interpreted under the laws of the State of Pennsylvania. The place of Arbitration shall be Erie, PA.

## CLAUSE 20
### Law Applicable

This Agreement shall be deemed to have been made in the Commonwealth of Pennsylvania, United States of America, and the parties intend to be governed in the operation, effect, validity, interpretation, performance and discharge of this Agreement by the laws of the Commonwealth of Pennsylvania.

## CLAUSE 21
### Modification

This Agreement shall not be modified except by a supplemental written agreement executed by an authorized representative of both of the parties hereto.



**CLAUSE 22**
**Force Majeure**

22.a)   In the event that either party gives notice that it is delayed in the performance of its obligations under this Agreement by Force Majeure, this Agreement shall be suspended until such party gives notice that the cause of such delay has ceased, and neither Licensor nor Licensee shall have any liability for loss or injury suffered by the other party by reason of said Force Majeure.  Upon cessation of the cause of said delay, this Agreement shall become fully operative under the terms hereinabove set forth.

22.b)   For the purpose of this Agreement, Force Majeure shall include, without limitation, strikes, lockouts, riots, sabotage, acts of war, civil disorder or piracy, retroactive application of laws and regulations in any country covered by this Agreement, destruction of essential equipment by fire, explosion, storm, flood, earthquake and the like, and delay caused by failure of power supplies to either Licensor's or Licensee's facilities and delay caused by transportation facilities and any similar cause of delay beyond the reasonable control of the party liable to perform.

**CLAUSE 23**
**Notices**

23.a)   Any notices, reports, or information required to be given under the terms of this Agreement, by Licensee to Licensor shall, unless otherwise expressly provided for, be addressed to:

Mark J. White
Erie Power Technologies, Inc.
5300 Knowledge Pkwy., Suite 200
Erie, PA  16510
Fax:  814/897-1092

23.b)   Any notices, reports or information required under the terms of this Agreement to be given by Licensor to Licensee shall, unless otherwise expressly provide for, be addressed to:

John C. Viskup, Jr.
Victory Energy Operations, LLC
302 East 5th Avenue – Unit "D"
Owasso, OK  74055
Fax: 918-274-0059



Notice shall be deemed to have been given as of the date postmarked, when in writing and mailed, registered mail herein above specified, but such method of giving notice shall not exclude the use of any other method of giving notice, which does in fact give notice.

## CLAUSE 24
## Integration, Merger and Waiver

24.a)   The terms and provisions contained in this Agreement, are the full Agreement of the parties pertaining to the subject matter of this Agreement, and are fully set forth herein, and no prior understanding or obligation not expressly set forth herein shall be binding upon the parties to this Agreement, and no subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms herein provided and executed with the same formalities as this Agreement.

24.b)   No waiver, expressed or implied, by either party of any breach of obligation by the other party shall operate or be considered as a waiver of any other or subsequent breach.

24.c)   Section headings appearing in this Agreement are inserted for convenience of reference only and shall in no way be construed to be interpretation of the text.

## CLAUSE 25
## No Agency

Nothing in this Agreement shall be construed to establish by expression or implication that either party to this Agreement is acting as, or is deemed to be, the agent for the other party.

## CLAUSE 26
## Severability

In the event that any provision of this Agreement shall be held to be invalid, illegal, or unenforceable in any respect, as a whole or in part, by a court or administrative body of competent jurisdiction, then unless otherwise agreed, this Agreement shall continue in full force and effect except for such provision, which shall be deemed to be excised here from but only with regard to the part held invalid, illegal, or unenforceable. In such event, the parties hereby agree to use their best efforts to agree on substitute provision, which while valid, will achieve as closely as possible the same economic effects as invalid provision(s).



**CLAUSE 27**
**Further Assurances**

Each Party hereto covenants, without the need for additional consideration, that it and its affiliates will take such further actions and execute any further documents as may be reasonably required to fully effectuate the terms, ownership and licenses, conditions and intent hereunder.

**CLAUSE 28**
**Counterparts**

This Agreement may be executed in two or more counterparts, each of which will be considered an original, and all of which together will constitute one and the same instrument.

IN TESTIMONY WHEREOF, witness the signatures of the parties hereto:

**ERIE POWER TECHNOLOGIES, INC.**

By: _____

Title: DIRECTOR, SALES AND MARKETING

Date: 1/10/03

Witnessed By: Terri L Jackson

**VICTORY ENERGY OPERATIONS, LLC**

By: _____

Title: PRESIDENT

Date: 01/09/03

Witnessed By: _____

Page 771

```
 1          UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF PENNSYLVANIA
 3
 4   INDECK KEYSTONE ENERGY LLC )
                                )
 5          Plaintiff,     )
                                )
 6      vs.                )  Civil No. 04-325 Erie
                           )  Judge Sean J. McLaughlin
 7   VICTORY ENERGY OPERATIONS )
     LLC,                    )
 8                          )
            Defendant.   )
 9   _____)
10
11
12
13
14      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
15           DEPOSITION OF ALAN W. CHRISTIAN
16
        Taken on Monday, December 5, 2005
17              at 10:08 a.m.
18      At Hall Prangle & Schoonveld, LLC
         300 South Fourth Street, Suite 1001
19              Las Vegas, Nevada
20
21
22
23
24
25   Reported by:  MICHELLE C. JOHNSON
```

Page 3

```
 1                I N D E X
 2   WITNESS                     PAGE
     ALAN W. CHRISTIAN
 3
        Examination by Mr. Sheean       5
 4
        Examination by Mr. Williams     96
 5
        Further Examination by Mr. Sheean   171
 6
 7           E X H I B I T S
 8   NUMBER                      PAGE
 9   Christian Deposition
10   1    "Amended Notice of Videotaped Deposition  68
          of Alan Christian"
11
12   2    CONFIDENTIAL - Printout of e-mail,    69
          8/8/03 (VEO0936)
13   3    CONFIDENTIAL - Printout of e-mail,    69
          9/5/03 (VEO0941)
14
15   4    CONFIDENTIAL - Printout of e-mail,    69
          6/24/03 (IKE 000154)
16   5    HIGHLY CONFIDENTIAL - Printout of e-mail,  76
          10/4/04 (IKE 07971)
17
18   6    Printout of e-mail, 3/14/05 (IKE 07749)  76
19   7    HIGHLY CONFIDENTIAL - Printout of e-mail  76
          with attachments, 3/17/05 (IKE 07931-65)
20   8    3/24/05 letter to Christian from West   76
21   9    HIGHLY CONFIDENTIAL - Printout of e-mail  76
          with attachments, 5/18/04 (IKE 07980-82)
22
23   10   Indeck Keystone Energy, LLC "Boiler   76
          Design and Manufacturing" brochure
24        (IKE 07437-42)
25   11   CONFIDENTIAL - Various documents     87
          beginning with 11/29/05 "Memorandum" to
          Williams from Christian
```

Page 4

```
 1   PROCEEDINGS                   10:08 A.M.
 2        THE VIDEOGRAPHER:  We are now on the record.
 3   Today is Monday, December 5th, 2005, and the time is
 4   approximately 10:08 a.m.
 5        This begins Tape No. 1 in the videotaped
 6   deposition of Alan Christian.  We're at the Law
 7   Offices of Hall Prangle & Schoonveld, LLC, 300 South
 8   Fourth Street, Las Vegas, Nevada.
 9        This deposition has been ordered by
10   Christopher Sheean, representing the defendant.  We
11   are here in the matter of "Indeck Keystone Energy,
12   LLC, Plaintiff, versus Victory Energy Operations,
13   Defendant."  This case is in the United States
14   District Court, Western District of Pennsylvania.
15   Civil Action No. 04-325 Erie.
16        My name is Tim Hartmanszerbiec, Court Video
17   Specialist, for Certified Legal Videography, Las
18   Vegas, Nevada.  The court reporter is Michelle
19   Johnson, for Cameo Kayser & Associates.
20        Will counsel please identify yourselves and
21   whom you represent for the record, starting with the
22   plaintiff's counsel.
23        MR. WILLIAMS:  My name is Robert Williams.  I
24   represent the plaintiff, Indeck Keystone Energy, LLC.
25        MR. SHEEAN:  My name is Christopher Sheean.
```

Page 5

```
 1   I'm with Wildman, Harrold, Allen & Dixon in Chicago.
 2   And I represent the defendant, Victory Energy
 3   Operations, LLC.
 4        THE VIDEOGRAPHER:  The reporter will
 5   administer the oath.
 6   Whereupon --
 7            ALAN W. CHRISTIAN,
 8   being first duly sworn to tell the truth, the whole
 9   truth, and nothing but the truth, was examined and
10   testified as follows:
11            EXAMINATION
12   BY MR. SHEEAN:
13        Q.  Sir, would you please state your full name
14   for the record.
15        A.  Alan Wayne Christian.
16        Q.  Mr. Christian, where do you reside?
17        A.  In Danville, California.
18        Q.  Can you please give your current address.
19        A.  593 Old Orchard Drive, Danville, California,
20   94526.
21        Q.  Let the record reflect that this is the
22   deposition of Alan Wayne Christian taken pursuant to
23   subpoena and notice, pursuant to the Federal Rules of
24   Civil Procedure and all applicable local rules.
25        Mr. Christian, have you ever had your
```

EXHIBIT
2

Pages 771 to 5)

Page 38

1   Energy?
2       A. Because Indeck Keystone considered it -- in
3   my opinion, Indeck Keystone considered it a conflict
4   to represent both Victory and Indeck Keystone.
5       Q. Whom from -- strike that.
6           Did anyone from Indeck Keystone Energy tell
7   you that it was a conflict of interest for Christian
8   Power to represent both Victory Energy and Indeck
9   Keystone Energy?
10      A. Yes.
11      Q. Who?
12      A. Chris Petcos.
13      Q. Anyone else?
14      A. Well, I'm pretty sure just about anybody at
15  Indeck Keystone would have said that.
16      Q. I don't want you to guess or speculate; I
17  just want you to tell me what you recall. Do you
18  recall any conversations with anyone, other than Chris
19  Petcos, at Indeck Keystone Energy wherein they stated
20  that it would be a conflict of interest for Christian
21  Power to continue to represent Victory Energy and
22  Indeck Keystone Energy?
23      A. Well, Chris was my primary contact, so he was
24  the one carrying the message, I think.
25      Q. Did anyone within Indeck, but outside of

Page 39

1   Indeck Keystone Energy, ever discuss with you the
2   belief that it was a conflict of interest for
3   Christian Power to continue to represent both Victory
4   Energy and Indeck Keystone Energy?
5       A. Well, there were meetings, even at PowerGen,
6   where I'd say a number of Indeck individuals were
7   present when the topic was being discussed.
8       Q. Well, I want to go through --
9           THE VIDEOGRAPHER: Four minutes.
10          MR. SHEEAN: We'll start this process.
11      Q. I want to go through with you the
12  conversations you had leading up to that decision.
13  You told about the first conversation you had with
14  Mr. Petcos over the phone wherein he said you could
15  continue to represent the aftermarket parts, correct?
16      A. Yes, uh-huh.
17      Q. When was the next time you had any
18  conversation with anyone associated with Indeck
19  relating to your continuation of -- as a
20  representative for Victory Energy?
21      A. Well, those conversations went on, I'd say,
22  pretty regularly through the fall and winter of '04,
23  even into early '05.
24      Q. To the best of your recollection, when was
25  the next specific meeting or conversation that you can

Page 40

1   recall with anyone relating to whether or not
2   Christian Power would be allowed to continue to
3   represent both Indeck Keystone Energy and Victory
4   Energy?
5       A. I don't think that position was clearly
6   stated until probably November of '04. And I don't
7   think it was a firm statement even then. But by
8   December of '04, it was.
9           MR. SHEEAN: Okay, I don't want to get cut
10  off, so let's take our break now.
11          THE VIDEOGRAPHER: This is the end of Tape
12  No. 1. We're off the record at 11:05 a.m.
13          (Recess taken.)
14          THE VIDEOGRAPHER: This is the beginning of
15  Tape No. 2. We're on the record at 11:12 a.m.
16          You may proceed.
17  BY MR. SHEEAN:
18      Q. Mr. Christian, before we went off the record,
19  you had mentioned a couple of conversations in the
20  fall of 2004. I believe you testified that in
21  November of 2004, the prospect that it would be a
22  conflict of interest to represent both Victory Energy
23  and Indeck Keystone Energy was first raised, but it
24  wasn't set as a definitive position; is that correct?
25      A. That's correct.

Page 41

1       Q. And then in December of 2004, it was stated
2   as an affirmative position by Indeck Keystone Energy,
3   correct?
4       A. As I recall, I think the first -- we'll call
5   it absolute statement -- happened at PowerGen in a
6   meeting there.
7       Q. The meeting in November of 2004, was that
8   another telephone conference with Chris Petcos?
9       A. Yes, uh-huh.
10      Q. Anyone else on the line in that conversation?
11      A. I don't recall ever having a conference call
12  when there was more than just myself and one other
13  person.
14      Q. And then in December, the meeting that you
15  referenced at PowerGen, that was in person, correct?
16      A. That's correct.
17      Q. And that was in Orlando?
18      A. Yes.
19      Q. Do you recall where the conversation --
20  strike that.
21          You said there were a series of conversations
22  at PowerGen. Is that right?
23      A. Yes, that's correct.
24      Q. Do you recall where the first conversation
25  took place?

Page 42

1  A. Probably just in the booth, the Indeck
2  Keystone booth.
3  Q. And who was present?
4  A. A number of Indeck Keystone employees. The
5  person I was primarily talking with would have been
6  Chris Petcos.
7  Q. Do you recall the names of any of the other
8  individuals who were there?
9  A. No, I don't. I know Jeff was probably there.
10 But other than -- the individuals they brought to the
11 show were all standing in the booth.
12 Q. When you say "Jeff," are you referring to
13 Jeff Coale?
14 A. Yes.
15 Q. Do you know who Jeff Coale works for?
16 A. I believe he works for Marsha Forsythe.
17 Q. And the company that he works for?
18 A. Indeck, I think.
19 Q. Anyone other than Mr. Petcos and Mr. Coale
20 that you can recall who were present during this first
21 conversation?
22 A. I can't recall who was there.
23 Q. Who primarily did the talking on behalf of
24 Indeck at that time?
25 A. Um, well, since I knew Chris the best and the

Page 43

1  longest, he is the one I preferred to hear from,
2  honestly. And Chris was -- for me, at least, Chris
3  was my primary contact.
4  Q. To the best of your recollection, what did
5  Mr. Petcos say relative to your continuing to
6  represent both Victory Energy and Indeck Keystone
7  Energy?
8  A. My primary interest was to investigate the
9  possibility of representing Indeck Keystone for
10 aftermarket parts sales and to continue with Victory.
11 Chris's response ultimately became, "You can't do
12 that."
13 Q. Did he say why?
14 A. Well, they wanted -- Indeck Keystone wanted
15 representation that would -- individuals and companies
16 that would represent all of their products, not just a
17 portion of the product line.
18 Q. To the best of your knowledge, does Indeck
19 Keystone Energy currently offer any water-tube package
20 boilers for sale?
21 A. Yes, they do.
22 Q. Is there any limitation, to the best of your
23 knowledge, on the size capacity for the water-tube
24 package boiler that Indeck Keystone Energy is offering
25 for sale currently?

Page 44

1  A. Um, I believe there is a restriction on what
2  they can offer, yes.
3  Q. What is your understanding of the restriction
4  on what they can offer?
5  A. I believe that, for package boilers, it has
6  to do -- boilers have to be over 150,000 pounds an
7  hour.
8  Q. What is the basis for your understanding that
9  the boilers have to be over 150,000 pounds per hour?
10 A. Well, I believe that's what they've told us.
11 And I am not sure if the contract states that or not,
12 but that's what I've been told.
13 Q. Did you have an understanding of the range of
14 products that Victory Energy was licensed to sell
15 Keystone boilers for as a licensee for Erie Power?
16 A. I am not aware that it's a license from Erie
17 Power that Indeck Keystone has.
18 Q. I asked a bad question. Let me clean it up
19 for you, okay?
20 A. Okay.
21 Q. Did you ever have an understanding of whether
22 or not there was a limitation on the size capacity
23 range for the boilers that Victory Energy was
24 authorized to manufacture and sell from either Erie
25 Power or Indeck Keystone Energy?

Page 45

1  A. Yes, I think there is a specific range in
2  size and description of those boilers.
3  Q. Do you know the upper limit of that size
4  capacity?
5  A. Well, I think it's, for Victory, for their
6  license, is 150,000 pounds an hour nominally.
7  Q. So to the best of your understanding, would
8  it have been a conflict of interest for Christian
9  Power to continue to represent Victory Energy for
10 boilers below 150,000 pounds per hour of steam and
11 Indeck Keystone Energy for boilers above 150,000
12 pounds of power of steam?
13     MR. WILLIAMS: Objection to the form.
14 BY MR. SHEEAN:
15 Q. You can answer.
16 A. Well, my opinion usually doesn't count for
17 much when manufacturers' principals are making
18 decisions. I think it probably would be possible to
19 do that.
20 Q. Did you make that proposal to anyone at
21 Indeck Keystone Energy during your discussions
22 relative to continuing on as a rep for Victory Energy?
23 A. No, I did not make that proposal.
24 Q. Any reason why you didn't make that proposal?
25 A. For me, I didn't think that would be where

1  the cleanest split of product lines would lie.  My
2  feeling was that the cleanest split would be for me to
3  represent the aftermarket existing boiler servicing
4  for Indeck Keystone, balance of boilers for Victory.
5      Q.  Did anyone at Victory Energy ever tell you if
6  they would consider it to be a conflict of interest
7  for you to represent Indeck Keystone Energy on the
8  aftermarket parts and continue to represent Victory
9  for the boilers?
10     A.  To the best of my knowledge, nobody ever said
11  that.
12     Q.  What was your reaction when Mr. Petcos told
13  you at PowerGen that it would not be possible for you
14  to continue representing both Indeck Keystone Energy
15  and Victory Energy?
16     A.  It was a personal reaction.  I was
17  disappointed because it -- it -- it was going to
18  result in me making a pretty tough decision that would
19  affect, possibly affect, the balance of my product
20  lines.
21     Q.  Did you convey to Chris Petcos or anyone at
22  Indeck that you considered this to be a tough
23  decision?
24     A.  Yes, I did.
25     Q.  Do you recall any response to your voicing

1  that -- strike that.
2          Did anyone from Indeck Keystone Energy
3  respond when you told them this was a tough decision?
4      A.  Yeah, they acknowledged it.  They knew that
5  some reps would have a difficult time making a
6  decision.
7      Q.  How did you leave it with Mr. Petcos and
8  Mr. Coale in this first meeting on the floor of the
9  PowerGen conference in Orlando in 2005 -- in 2004?
10     A.  Well, it was an exchange of views, but not a
11  decision, a meeting where any decisions were going to
12  be made.  I don't think at that point they were asking
13  for a deadline for a decision.  I don't recall that.
14     Q.  When was the next -- strike that.
15         You said there were a series of conversations
16  at PowerGen.  When was the next conversation at
17  PowerGen relative to whether or not you could continue
18  as a representative for both Victory Energy and Indeck
19  Keystone Energy?
20     A.  Well, I went by the booth a number of times,
21  but not for a meeting, just to say hello.  But before
22  the PowerGen was over, we did have a group of reps
23  meet with Chris and Jeff off of the floor in a private
24  room.  Off of the display floor, not in a booth.
25     Q.  Was this a preset meeting?

1      A.  What do you mean, "preset"?
2      Q.  When did you first learn that there would be
3  a meeting with Chris Petcos and Jeff Coale off the
4  display floor with a group of representatives?
5      A.  Oh, it was during the show.  It had not been
6  arranged for prior to that.
7      Q.  How many other reps were in this meeting?
8      A.  There were either three or four, including
9  myself.
10     Q.  Do you recall the names of any of those
11  individuals?
12     A.  Tom Patten, Gene Lockaby, Chuck Thacher.  And
13  I'm not sure who the other person was.  It could have
14  been Tommy Bronson, but I don't remember.  I -- I
15  don't remember.
16     Q.  Do you know whether or not any of the other
17  four individuals that you believe may have been at
18  this meeting were at that time Victory Energy
19  representatives?
20     A.  To the best of my knowledge, I think they all
21  were Victory representatives.
22     Q.  And who primarily did the talking at this
23  meeting?  Was it Mr. Petcos?
24     A.  I'd say it was about 50/50 between Chris and
25  Jeff.  I wouldn't say that one or the other conducted

1  the meeting.
2      Q.  How long did the meeting last?
3      A.  Probably an hour.
4      Q.  To the best of your recollection, what did
5  Chris Petcos and Jeff Coale say, and what did the
6  other representatives say who were there, including
7  yourself?
8      A.  Well, I think that was the first point in
9  time where it was obvious that there wasn't going to
10  be any negotiation with Indeck.  We had to decide; we
11  weren't going to be able to carve up portions of the
12  lines from two different companies.  It was pretty
13  clearly stated that we had to make a decision.
14     Q.  What did the reps say, to the best of your
15  knowledge, if you recall?
16     A.  Well, I guess one of the things that we
17  needed to understand was what Indeck Keystone was
18  going to be as a company, what products they were
19  going to pursue, and just who they were going to be.
20  And it's my opinion that nobody really knew at that
21  point.  I think Indeck Keystone was still trying to
22  decide what they were going to do, but that's just my
23  opinion; that wasn't stated.
24     Q.  Anything else that you can recall from that
25  meeting?

1     A. Um, well, we did talk about details in the
2 proposed Representative Agreement. So there were some
3 discussions on the language in the proposed contract.
4     Q. What discussions relative to the language in
5 the proposed contract do you recall?
6     A. Um, I don't recall all of the issues, but
7 some pertain to what the commission schedule was going
8 to be, what the treatment of commissions on rental
9 boilers was going to be, and indemnification.
10     Q. Why was indemnification discussed, if you
11 know?
12     A. Well, it's a -- it's an important point for
13 me, but for most reps. It's frequently a discussion,
14 a topic of discussion. It's frequently excluded, if
15 possible, by manufacturers, and included, if possible,
16 by reps. So it's not unusual that that be discussed.
17     Q. Did you have any concerns, going into the
18 meeting, regarding what you perceived Indeck's
19 position would be regarding the commission schedule?
20     A. Um, yes, I had a concern with the level of
21 commissions and the method for crediting effort, and
22 whether a portion of the commission could be
23 attributed to the home office for their perceived
24 contribution to the sales task.
25     Q. To the best of your knowledge at the time

1 that you went into this meeting with Mr. Coale and
2 Mr. Petcos, did Indeck have any type of a reputation
3 in the industry relative to its treatment of
4 representatives on commissions?
5     A. I don't know if I -- yeah, I think they
6 did -- did have a reputation.
7     Q. What was that reputation, to the best of your
8 knowledge?
9     A. I think, right or wrong, reps had the
10 perception that -- that you had to fight for any
11 commission on a sale. And you needed to be pretty
12 cautious about dealing with Indeck. And I'm not
13 saying that pertained to Indeck of today, but
14 certainly was a reputation from the past.
15     Q. Was Marsha Forsythe at PowerGen in '04?
16     A. I don't recall seeing her. I don't know if
17 she was there.
18     Q. You certainly didn't meet with her?
19     A. I didn't meet with her.
20     Q. Other than the conversation you had the first
21 time you stopped by the booth, with Chris Petcos and
22 Jeff Coale, and this subsequent one-hour meeting
23 between Mr. Petcos, Mr. Coale, yourself, and three
24 other reps, do you recall any other specific meetings
25 during the PowerGen conference relative to whether or

1 not Christian Power Equipment would be allowed to
2 continue as a representative for both Indeck Keystone
3 Energy and Victory Energy?
4     A. These are meetings between myself and an
5 Indeck person, is that what you're saying?
6     Q. Well, let's -- no, I'm not limiting it in
7 that way. Any other meetings whatsoever.
8     A. Well, the reps talked among themselves. But
9 there were no meetings.
10     Q. What other reps did you talk to about that?
11     A. Um, I don't remember specifically all of the
12 reps, but many of them go back at least 20 years, and
13 so I've known quite a number. We were all uncertain
14 where these companies were going, and so we were all
15 talking about it. But we didn't have any specific
16 meetings about it.
17     Q. Anything else that you can recall regarding
18 your discussions with other representatives relative
19 to this topic?
20     A. No, I wouldn't say so.
21     Q. To the best of your knowledge, did all four
22 of the reps besides yourself who were at the meeting
23 with Mr. Coale and Mr. Petcos at PowerGen in 2004
24 terminate their rep agreement with Victory Energy and
25 go over to Indeck Keystone Energy?

1     MR. WILLIAMS: Objection to form, basis.
2     THE WITNESS: You know what, I don't know
3 what all of the reps have done. I know at least one
4 did not go back to Indeck Keystone.
5 BY MR. SHEEAN:
6     Q. Which one was that?
7     A. Tom Patten.
8     Q. Do you know if he's still a Victory Energy
9 rep?
10     A. To my knowledge, he is.
11     Q. How about Gene Lockaby?
12     A. I don't know.
13     Q. How about Chuck Thacher?
14     A. I don't know what any of them did.
15     Q. Okay.
16     A. I should, but I don't know.
17     Q. When was the next time after the PowerGen
18 conference in December 2005 (sic) that you had any
19 conversation with anyone at Indeck relative to your
20 ability to continue on as a rep for Victory Energy?
21     A. I don't recall specific conversations during
22 the balance of December.
23     Q. When was the next date that you do recall?
24     A. I don't recall a specific date, but there
25 were conversations in January. I think there might

13 (Pages 50 to 53)

Page 54

1  have been a revision of the proposed contract that was
2  sent out in -- sometime in the early part of '05.
3      Q. Had you already seen a version of the
4  proposed Representative Agreement prior to this first
5  one going out in early 2005?
6      A. Yes, I had.
7      Q. When did you see that first version?
8      A. You know, I don't remember. I believe that I
9  had it -- I may have had it -- before PowerGen. I
10  don't remember for sure.
11      Q. Did the revisions in the proposed rep
12  agreement that you received from Indeck Keystone take
13  into account any of the concerns that were raised by
14  you or any of the other reps during that meeting at
15  PowerGen?
16      A. Yes, it did. There were modifications.
17      Q. Other than receiving this revised proposed
18  Representative Agreement from Indeck Keystone Energy,
19  when was the next conversation or communication of any
20  kind that you had with anyone at Indeck Keystone
21  Energy regarding your ability to continue as a rep for
22  Victory Energy?
23      A. I don't recall a specific phone call. I know
24  specifically it was a phone call, but I don't remember
25  when that was. I'm going to say in January.

Page 55

1      Q. And who initiated the call that you're
2  referring to?
3      A. I don't remember if I did or Chris Petcos
4  did.
5      Q. It was between you and Mr. Petcos?
6      A. Yeah. Yes.
7      Q. And to the best of your recollection, what
8  did you say and what did he say in this phone
9  conversation?
10      A. Well, in early January, I was still undecided
11  what I was going to do. I told him that.
12      Q. Anything that you can recall from that
13  conversation?
14      A. Nothing specific, no.
15      Q. When was the next conversation, to the best
16  of your recollection, with anyone at Indeck regarding
17  whether you would continue on as a rep for Victory
18  Energy?
19      A. Could you state that again?
20      Q. When was the next conversation, after the one
21  you just identified sometime in 2005 where you
22  indicated you were still undecided, with anyone at
23  Indeck regarding whether you would continue on as a
24  rep for Victory Energy?
25      A. In late January -- and I don't remember the

Page 56

1  specific call. But in late January, I notified, I
2  think both Chris and Jeff, that I was going to cancel
3  my representation with Victory and sign the Indeck
4  Keystone contract.
5      Q. Was there any single -- strike that.
6      Did anything occur in January 2005 that
7  caused you to sway your decision one way or the other?
8      A. Probably the contract modification and an
9  internal evaluation. Having no contact with Victory
10  or with Indeck, but my internal evaluation of the best
11  business decision for Christian Power Equipment, Inc.
12      Q. What, if anything, did Mr. Petcos say when
13  you communicated your decision to him?
14      A. Well, there had been such a long relationship
15  with myself and -- we'll call it the Zurn product
16  line -- all these different company names, he was
17  happy I made that decision.
18      Q. Anything else that you can recall from that
19  conversation?
20      A. No.
21      Q. And what did Mr. Coale say, if anything, that
22  you can recall from that conversation where you
23  informed him that you were going to sign the rep
24  agreement with Indeck Keystone Energy?
25      A. I don't recall anything substantial. I'm

Page 57

1  sure he was pleased that I had chosen to switch to
2  Indeck.
3      Q. Anything else that you can recall from either
4  of those conversations?
5      A. No.
6      Q. When did you actually sign the rep agreement
7  with Indeck Keystone Energy?
8      A. Well, I informed Mark White verbally on
9  January 31. At least that's my -- best I can
10  determine. And the contract was actually executed the
11  11th of March. I don't remember the date that I
12  signed it, but I think that's the date that's on the
13  contract. I sent a letter, an official letter, on
14  March 9th to Victory.
15      Q. What did Mr. White say when you told him that
16  you were going to be cancelling?
17      A. He was disappointed. And it was -- he
18  actually initiated the call -- I remember it
19  distinctly -- because he was calling me to tell me
20  they were cancelling my portion -- a portion of the
21  territory I was going to cover. The Oregon-Washington
22  territory was being taken away and given to a
23  different agency. And in that same phone
24  conversation, I informed him I'd made a decision to
25  cancel the Victory contract.

14 (Pages 54 to 57)

Page 90

1  Q. Is it your recollection that you in fact
2  signed a copy of this letter and put it in the mail to
3  Mark White?
4    A. Yes. I just couldn't find a copy that I had
5  signed.
6    Q. Turning to Exhibit 9 that you were handed
7  prior to the last break. It's got a paper clip on it.
8  And for the record, it's IKE 7980 through IKE 7982.
9  And the first page is an e-mail from Terry Pawlowski
10  to Ron Swabb, with carbon copies to Marty -- to Ron
11  Brown, sorry -- with carbon copies to Marty Swabb,
12  Phil Meehan, and Alan Christian.
13    Do you see that?
14    A. Yes.
15    Q. The Subject is Module D Shipment.
16    Do you see that?
17    A. Yes.
18    Q. And it says, "Ron, This is to inform that the
19  second module, Module D/superheater, shipped this
20  morning, May 18, 2004, at 8:20 a.m. Attached are a
21  few pictures showing its departure from Kentube."
22    Do you see that?
23    A. Yes.
24    Q. Do you recall receiving this e-mail in or
25  around May 2004?

Page 91

1    A. Yes, I do.
2    Q. Were you involved in the Kentube project?
3    A. Yes, I was.
4    Q. What is to Kentube project?
5    A. Kentube is the sub -- the manufacturer. It
6  was subbed out to Kentube. This was a replacement,
7  aftermarket replacement, of a superheater that went
8  into a solid fuel boiler.
9    Q. Why is it called the second module?
10    A. Well, these shipped in -- I think there were
11  two shipments that left Kentube, and I think this was
12  the second shipment.
13    Q. So it's just two different parts of the same
14  superheater, or was there more than a superheater
15  being sold?
16    A. I can't remember if we had two sections of a
17  superheater or the superheater and a part of the
18  evaporator. But they were two bundles of tubes.
19    Q. Who was the customer on this job?
20    A. Um, the plant is Chinese Station. The
21  ownership of that plant is a combination of Covanta
22  and Constellation Energy.
23    Q. And the pictures attached are just pictures
24  of the module being shipped, correct?
25    A. Correct.

Page 92

1    Q. The last exhibit that I have marked is
2  Christian Deposition Exhibit No. 10, which is IKE 7437
3  through IKE 7442.
4    Do you see that?
5    A. Yes.
6    Q. The first page says "Indeck Keystone Energy,
7  LLC, Boiler Design and Manufacturing." The second
8  says "'O' Series."
9    Do you see that?
10    A. Yes.
11    Q. I just want to ask you about the first two
12  pages for starters. Have you seen this document
13  before?
14    A. Yes, I have.
15    Q. Or I should say, have you seen an actual
16  color copy of the brochure that this document appears
17  to be a Xerox copy of?
18    A. That's what I meant to say.
19    Q. Okay. And is this, to the best of your
20  recollection, an accurate copy of the brochure from
21  Indeck Keystone Energy for boilers currently being
22  used?
23    A. This is one -- one example of literature
24  they're using.
25    Q. Is there -- strike that.

Page 93

1    Do you have knowledge of any additional
2  literature that Indeck Keystone Energy is currently
3  using to market and sell Keystone boilers?
4    A. I think there is -- there may be a general
5  overview, two-page flyer. There's a lot of Indeck
6  literature that we might also use to qualify who
7  Indeck is with a company. But specifically aimed at
8  package boilers or Keystone package boilers, I'm not
9  sure there's something else.
10    Q. Looking at the second page that says "'O'
11  Series," do you see under the words "Capacity Range"
12  it says, "The Keystone 'O' Series water-tube steam
13  generator is capable of producing steam up to 500,000
14  pounds (sic) per hour" -- "pounds steam per hour at
15  design pressures up to 2,000 PSIG and superheated
16  steam up to 1,000 degrees Fahrenheit for both
17  shop-assembled and field-erected designs."
18    Do you see that?
19    A. Yes.
20    Q. Is this brochure distributed to customers, to
21  the best of your knowledge?
22    A. I think it could be, yes.
23    Q. Have you ever sent it out to customers?
24    A. I believe I have.
25    Q. Nowhere under the Capacity Range does it

23 (Pages 90 to 93)

Page 94

1  indicate that Indeck Keystone Energy is not selling
2  boilers below 150,000 pounds per hour of steam; is
3  that correct?
4      A. I don't see anywhere where it qualifies that.
5      Q. Are there additional pages to this brochure
6  that are missing that would indicate a limitation on
7  the steam capacity for boilers offered by Indeck
8  Keystone Energy, to the best of your knowledge?
9      A. No.
10      Q. Do you currently have any proposals that are
11  out for consideration right now by customers with any
12  Indeck entity?
13      A. Yes, I do.
14      Q. How many?
15      A. I don't know.
16      Q. More than five?
17      A. Yes.
18      Q. Are any of those proposals, to the best of
19  your knowledge, for water-tube package boilers?
20      A. Yes.
21      Q. Do you know how many of those are out for
22  consideration right now?
23      A. I don't know.
24      Q. Has there been any change in the pricing
25  structure since Indeck Keystone Energy took over the

Page 95

1  assets from CMI/EPTI?
2      A. I can't answer that. I don't have a price
3  sheet either before or after the exchange. Almost
4  everything is custom, so virtually everything is
5  priced on a one-off basis. It's difficult to compare
6  previous. But my knowledge, to my knowledge, there's
7  not any giant change.
8      MR. SHEEAN: I think I'm just about done.
9  I'm just going through my notes to make sure I didn't
10  miss anything.
11      (Pause in the proceedings.)
12  BY MR. SHEEAN:
13      Q. On Exhibit 11, the last item is a check from
14  Victory Energy.
15      A. Yes.
16      Q. Do you recall that?
17      A. Uh-huh.
18      Q. Are you currently owed any more money from
19  Victory?
20      A. Yes, I am.
21      Q. Do you know how much?
22      A. The balance of that job. I don't think that
23  Victory's been paid the balance of their contract yet,
24  but I don't know. So there's a considerable amount of
25  money still owed.

Page 96

1      Q. More than $10,000?
2      A. Yes.
3      Q. I'm talking about money owed to Christian
4  Power. Correct?
5      A. That's correct.
6      Q. More than 20,000?
7      A. No.
8      Q. So somewhere between $10- and 20,000?
9      A. Yes.
10      Q. Do you recall the pricing on that contract?
11      A. It was approximately $700,000.
12      MR. SHEEAN: Those are all the questions I
13  have for now.
14      THE VIDEOGRAPHER: There's about 30 minutes
15  left on this tape.
16      MR. WILLIAMS: Is everybody okay with
17  continuing?
18      MR. SHEEAN: Oh, yeah.
19      MR. WILLIAMS: Okay, then let's go.
20      EXAMINATION
21  BY MR. WILLIAMS:
22      Q. Mr. Christian, my name is Bob Williams. I
23  represent Indeck Keystone Energy in this action.
24  Before I begin, I want to just briefly reiterate some
25  of the instructions that Mr. Sheean gave to you.

Page 97

1      The first is that because the court reporter
2  is taking down my questions and your answers, she can
3  only transcribe what one person is saying at a time.
4  So I'd ask that you finish -- wait until I finish
5  asking my question before you begin giving me your
6  answer. By the same token, I'll wait until you finish
7  your answer before I start to ask my next question.
8      If at any time you don't hear my question or
9  you don't understand it, don't answer it. Tell me you
10  haven't heard it, you haven't understood it, and I'll
11  be glad to repeat it or rephrase it.
12      Do you understand those instructions?
13      A. Yes, I do.
14      Q. Will you comply?
15      A. To the best of my ability.
16      Q. You've been doing a good job so far, so . . .
17      How many employees work for Christian Power
18  Equipment, Inc.?
19      A. Two, besides myself.
20      Q. And who are they?
21      A. Pam Christian, my wife; and Rita Peppin, my
22  inside sales specialist.
23      Q. And you said Ms. Peppin is your inside sales
24  specialist?
25      A. That's correct.