IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF Pennsylvania

INDECK KEYSTONE ENERGY, LLC,      :
                  Plaintiff,       :
                                   :
     v.                            :  Case No. 04-325 Erie
                                   :
VICTORY ENERGY OPERATIONS, LLC,    :
                  Defendant.       :

          Videotape deposition of CHRISTOS PETCOS, taken

before and by Sondra A. Black, Notary Public in

and for the Commonwealth of Pennsylvania, on Wednesday,

November 9, 2005, commencing at 8:08 a.m., at the

offices of Marshall Dennehey Warner Coleman & Goggin,

1001 State Street, Erie, Pennsylvania 16501.


For the Plaintiff:

     John K. Gisleson, Esquire
     Schnader Harrison Segal & Lewis, LLP
     Fifth Avenue Place
     120 Fifth Avenue, Suite 2700
     Pittsburgh, PA 15222

For the Defendant:

     Christopher T. Sheean, Esquire
     Wildman Harrold Allen & Dixon, LLP
     225 West Wacker Drive
     Chicago, IL 60606

          Reported by Sondra A. Black
          Ferguson & Holdnack Reporting, Inc.

**CONFIDENTIAL**

1

---

                    I N D E X

CHRISTOS PETCOS

     Direct Examination by Mr. Sheean...................3
     Cross-Examination by Mr. Gisleson.................196
     Redirect Examination by Mr. Sheean................208
     Recross-Examination by Mr. Gisleson...............215

EXHIBITS

     Petcos Deposition Exhibit No. 1....................139
     Petcos Deposition Exhibit No. 2....................141
     Petcos Deposition Exhibit No. 3....................143
     Petcos Deposition Exhibit No. 4....................148
     Petcos Deposition Exhibit No. 5....................150
     Petcos Deposition Exhibit No. 6....................150
     Petcos Deposition Exhibit No. 7....................158
     Petcos Deposition Exhibit No. 8....................168
     Petcos Deposition Exhibit No. 9....................183
     Petcos Deposition Exhibit No. 10...................188

EXHIBIT

3

PENGAD 800-631-6989

2

---

          My name is Dale Evanoff.  We are in

Erie, Pennsylvania to videotape the deposition of

Chris Petcos.  This is for Indeck Energy versus

Victory Energy Operations.

          Would the attorneys present state their names.

MR. GISLESON:  John Gisleson from Schnader Harrison

Segal & Lewis on behalf of Plaintiff.

MR. SHEEAN:  Christopher Sheean, Wildman Harrold

Allen & Dixon on behalf of Defendant, Victory

Energy Operations.

MR. EVANOFF:  Would the court reporter introduce

herself and then swear the witness.

COURT REPORTER:  Sondra Black, court reporter.


          C H R I S T O S   P E T C O S, first having

been duly sworn, testified as follows:


                  DIRECT EXAMINATION

BY MR. SHEEAN:


     Q.  Sir, could you please state your full name for the

record.

     A.  Yes.  Christos Trofan Petcos.

     Q.  Mr. Petcos, where do you reside?

     A.  816 West Eighth Street, Apartment 2E, Erie,

3

---

Pennsylvania.

     Q.  Let the record reflect that this is the deposition

of Chris Petcos taken pursuant to notice pursuant to the

Federal Rules of Civil Procedure.

          Mr. Petcos, have you had your deposition taken

before?

     A.  No.

     Q.  I know you've been present for a number of the

depositions in this case, but just so that we get a clear

record, I'll run down the rules.  As you know, my name is

Christopher Sheean.  I represent Victory Energy Operations in

the lawsuit that was brought by your company, Indeck Keystone

Energy, in the Federal Court here in Erie, Pennsylvania.  I'm

going to be asking you a series of questions, they're going

to be out loud and verbal.  I need you to respond in the same

way, out loud and verbal, which means please don't respond

with nods of the head, shakes of the head, uh-huh or huh-uh.

Okay?

     A.  Okay.

     Q.  If you don't understand any of my questions, just

let me know and I'll try and rephrase them for you.  But if

you answer one of my questions, I'll assume you understood

it.  Fair enough?

     A.  Fair.

     Q.  If you need to take a break at any time, just let me

4

**Page 25**

1 concept or so.
2    Q.  How is it a different physical configuration --
3 strike that.  How is an HRSG a different physical
4 configuration from a package boiler?
5    A.  Well, an HRSG can be a drum-over-drum or a header
6 style boiler.
7    Q.  What's the difference between a drum-over-drum and a
8 header style HRSG boiler?
9    A.  A drum-over-drum is where the drums maintain the
10 collection of the steam and water, and a header over header
11 HRSG is where you have a drum that collects the steam
12 moisture coming off of the headers.
13    MR. SHEEAN:  Can you read that last answer back
14    please.
15    (Record read back.)
16    Q.  What style of HRSG does Indeck Keystone Energy use?
17 The drum-over-drum or the header style?
18    A.  Both.
19    Q.  Has Indeck Keystone Energy sold any HRSGs that
20 utilize a drum-over-drum configuration?
21    A.  Indeck Keystone Energy, no.
22    Q.  Has Indeck Keystone Energy sold any HRSGs that
23 utilize a header style configuration?
24    A.  No.
25    Q.  Are there any limitations, to your knowledge, on

**Page 26**

1 Indeck Keystone Energy's ability to sell HRSGs?
2    MR. GISLESON:  Objection.  Vague.
3    A.  What do you mean by that?
4    Q.  Indeck Keystone Energy purchased assets from --
5 strike that.  Indeck purchased assets from CMI and formed
6 Indeck Keystone Energy, correct?
7    A.  Correct.
8    Q.  Are you familiar with the purchase agreement entered
9 into between Indeck and CMI relative to that transaction?
10    A.  Certain things, yeah.
11    Q.  Were there any limitations placed in that agreement
12 on Indeck Keystone Energy's ability to manufacture, market,
13 or sell heat recovery steam generators?
14    A.  Yes.
15    Q.  What limitations?
16    A.  For the header over header design, I think 19
17 megawatts and above, just behind combustion turbines, is
18 CMI's product line, and everything below that is Keystone's
19 product line.  And the drum-over-drum HRSG is completely
20 Indeck Energy's technology from small to large.
21    Q.  Has Indeck Keystone Energy marketed any direct-fired
22 O style boilers below 150,000 pounds per hour of steam?
23    A.  No.
24    Q.  Have you been involved in any of the meetings with
25 Indeck Keystone Energy's representatives?

**Page 27**

1    Q.  Has Indeck Keystone Energy instructed its
2 representatives that Indeck Keystone Energy is not marketing
3 boilers below 150,000 pounds per hour of steam?
4    A.  Yes.
5    Q.  And how has Indeck Keystone Energy communicated that
6 limitation to its representatives?
7    A.  What do you mean by that?
8    Q.  Is it in a written form?  Was it verbal?  What's
9 your recollection?
10    A.  I -- I -- we had a sales rep meeting that -- I don't
11 know if all the reps attended, but a lot of them came, and we
12 gave presentations -- verbal presentations to -- to explain
13 the product line.
14    Q.  Who gave the verbal presentation to the sales reps
15 at the sales rep meeting regarding Keystone Indeck Energy's
16 limitation on selling boilers below 150,000 pounds per hour
17 of steam?  And by that I mean package.
18    A.  I did.
19    Q.  Where did that meeting take place?
20    A.  Chicago.
21    Q.  Where in Chicago?
22    A.  It was actually at a hotel, and I don't remember
23 which one.
24    Q.  In the Loop?

**Page 28**

1    A.  What?
2    Q.  In the Loop?  Downtown?
3    A.  No.  It was --
4    Q.  By the airport?
5    A.  Yeah.  Not far from the airport, I think.
6    Q.  When was that meeting held?
7    A.  I think spring of this year.
8    Q.  What month?
9    A.  Good question.  I don't recall, to be honest with
10 you.  April, March maybe.  Maybe.  I'm not sure.
11    Q.  To the best of your recollection, what did you say
12 to the sales reps in your verbal presentation wherein you
13 described Indeck Keystone Energy's limitation on selling
14 direct-fired package style boilers below 150,000 pounds per
15 hour of steam?
16    A.  I said that we have a license agreement with Victory
17 Energy to -- that allows Victory Energy to sell our standard
18 M series package boiler O line with a refractory front wall,
19 tube and tile rear wall, tangent furnace design, and that,
20 with the license agreement in place, we were honoring that
21 and we didn't want to add conflict to Victory's product
22 lines -- not -- not saying that we couldn't design something
23 less than 150, but we chose to market above 150.  And there
24 seemed to be a lot of activity in other areas as well, so we
25 were just focussed on larger boilers as well.

**Page 29**

1    Q. Did you tell the representatives anything else
2 relative to the license agreement with Victory Energy?
3    A. I don't think so, no.
4    Q. Did you explain to the representatives that pursuant
5 to the terms of the license agreement Victory Energy was
6 authorized to make modifications?
7    A. No.
8    Q. Did you explain to the representatives that Victory
9 Energy had the authority under the terms of the contract to
10 make improvements on the design of the Keystone boilers?
11    A. This meeting was with our representatives, not
12 Victory, so we -- I did not get into any details of the
13 license agreement.
14    Q. Did you explain to the representatives -- and I
15 understand they were IKE representatives, but did you explain
16 to those representatives that Victory Energy had been
17 permitted to manufacture and sell membrane wall -- 100
18 percent membrane direct-fired O style boilers under the
19 license agreement with Erie Power from the inception of the
20 agreement through September of 2004?
21    A. No. I didn't talk about it with them, but I
22 wouldn't have because that's not what the agreement says.
23 The agreement is specific in the annex for the M series
24 boiler that does not include membrane wall. So I definitely
25 would not have said that to our representatives.

29

**Page 30**

1    Q. Was this the first meeting with Indeck Keystone
2 Energy's representatives since the inception of Indeck
3 Keystone Energy?
4    A. That we tried to have a complete meeting, yes.
5    Q. Were there any, to use your language, incomplete
6 meetings that you had with Indeck Keystone Energy
7 representatives? And by that I guess -- I think you mean
8 less than all of the representatives were present?
9    A. Correct.
10    Q. Is that true?
11    A. Yes.
12    Q. When did you have a meeting with more than one but
13 less than all of the Indeck Keystone Energy sales
14 representatives?
15    A. Oh, I'm sorry. I -- no, I think that was the first
16 meeting with the Indeck Keystone Energy reps that I've had
17 that was even incomplete. I might have had a couple business
18 trips here and there with some Indeck Keystone Energy reps
19 while I was trying to sell a project, but I didn't have any
20 meetings with Indeck Keystone Energy reps even as a small
21 group, other than maybe one or two individual sales trips
22 with a rep.
23    Q. Did you attend the Power Gen conference in December
24 '04?
25    A. Yes.

30

**Page 31**

1    Q. Did Indeck Keystone Energy have a booth there?
2    A. We shared a booth with -- as Indeck Corporation,
3 yes.
4    Q. Did you attend any meeting of sales reps at the
5 Power Gen conference?
6    A. Not Indeck Keystone sales reps, but I spoke with
7 sales reps of -- of product lines, yes.
8    Q. And when you spoke with sales reps of product lines
9 at the Power Gen conference in December 2004, were any of
10 those representatives also representing Indeck Keystone
11 Energy?
12    A. Could you repeat that again.
13    Q. Sure. You told me a minute ago that you spoke with
14 sales reps of various product lines --
15    A. Right.
16    Q. -- for Indeck at the Key -- at the Power Gen
17 Conference in December 2004. My question is, were any of
18 those reps also representing the Indeck Keystone Energy
19 product line?
20    A. No, I don't think so. Because I don't -- I don't
21 think we signed any reps yet. I think we signed them
22 after -- after Power Gen. We were looking for reps while we
23 were at Power Gen, of course.
24    Q. So is it fair to say you spoke to prospective
25 Keystone Energy reps at the Power Gen conference?

31

**Page 32**

1    A. Yes.
2    Q. How many prospective representatives did you meet
3 with at the Power Gen conference?
4    A. I don't know. Maybe half a dozen.
5    Q. Was that collectively or individual meetings?
6    A. Both.
7    Q. Can you identify any of the reps that you met with
8 at the Power Gen conference in December '04?
9    A. Yeah. Allen Christian, I think, was there; I think
10 Gene Lockaby; I think Tom Patton; Chuck Thatcher. Those are
11 the only names that I can think of right now. There might
12 have been a few more.
13    Q. Allen Christian was with Christian Power, correct?
14    A. Correct.
15    Q. Who was Gene Lockaby with?
16    A. His own company. I forget the name of it. I think
17 it's like Power something -- Power Systems or Power Services.
18 I don't recall what the name of his rep company is.
19    Q. Are they located in Michigan?
20    A. No. He's in North Carolina, I think.
21    Q. How about Tom Patton, what company is he with?
22    A. You know, I know these guys for a long time with
23 their names -- I think Patton & Associates or something. I
24 don't recall the name of his rep company.
25    Q. How about Chuck Thatcher?

32

**Page 33**

```
 1       A. I think the company name is Gulf Coast Heat
 2   Q. And at the time you spoke with Allen Christian, did
 3   you have an understanding that he was currently representing
 4   Victory Energy?
 5       A. I did. For the -- for the M series package boiler
 6   line as far as I was -- my understanding of his relationship.
 7   I don't know the details of what he was repping.
 8   Q. Did you -- strike that. Was anyone else present
 9   when you spoke with Allen Christian at the Power Gen
10   conference in December '04?
11       A. Allen and I get along pretty well, so I probably
12   spoke to him at different times in different groups, but I
13   think that he was present whenever I -- I sat with him for a
14   few minutes with a couple of the other reps.
15   Q. What did you -- strike that. To the best of your
16   recollection, what did you say, and what did Allen say,
17   during your meetings at the Power Gen conference in December
18   04?
19       A. I don't recall specifically, but general terms were
20   we were looking for representatives for Keystone Energy, and
21   he was interested in trying to get us to sign him.
22   Q. Did he indicate any desire to continue in his
23   relationship with Victory Energy?
24       A. I think he -- he might have said that he was -- he's
25   a representative. He wants to rep as many companies as he
```

**Page 34**

```
 1   can because he gets paid by commission. So, of course,
 2   nobody wants to drop their product lines.
 3   Q. Did you tell --
 4       MR. GISLESON: Just make sure you answer the
 5       specific question that's asked.
 6   Q. Did you tell Mr. Christian that he would have to
 7   drop Victory Energy if he was going to take on a rep
 8   agreement with Indeck Keystone Energy?
 9       A. No, I did not.
10   Q. Did anyone that you were with at the Power Gen
11   conference state to Mr. Allen Christian that he would have to
12   drop Victory Energy as a rep in order to represent Indeck
13   Keystone Energy?
14       A. No. I was -- I stated -- we were -- we stated
15   that we wanted our representatives to represent Indeck
16   Corporation, and we didn't want our representatives to rep
17   other competing product lines. I never told him he had to
18   drop anybody.
19   Q. To the best of your knowledge, did you ever tell
20   Allen Christian that he would not be allowed to represent
21   Victory Energy Operations if he wanted to represent Indeck
22   Keystone Energy?
23       A. Not in those specific words, no.
24   Q. Did you use words to the effect that if Allen
25   Christian wanted to represent Indeck Keystone Energy, he
```

**Page 35**

```
 1   would have to drop Victory Energy Operations as a rep?
 2       A. No. I just said that we were looking for new reps,
 3   and we don't want our reps to represent competitors.
 4   Q. Was Jeff Coale at that Power Gen conference?
 5       A. Yes, he was.
 6   Q. Was Jeff Coale present when you met with Allen
 7   Christian at any time during the conference?
 8       A. I'm sorry, what?
 9   Q. Was Jeff Coale present when you met with Allen
10   Christian at any time during the conference?
11       A. Yes.
12   Q. Did Mr. Coale say words to the effect that if Allen
13   Christian wanted to represent Indeck Keystone Energy, he
14   would have to drop Victory Energy Operations as a rep?
15       A. No, he didn't.
16   Q. Did anyone affiliated with the Indeck family of
17   companies tell Allen Christian, in your presence, during the
18   Power Gen conference, that he would have to drop Victory
19   Energy Operations as a rep if he wanted to represent Indeck
20   Keystone Energy?
21       A. No.
22   Q. Who else was present when you had these
23   conversations with Mr. Christian besides Jeff Coale?
24       A. I think it was just -- just us. I don't know if
25   anybody was in that call -- or that conversation.
```

**Page 36**

```
 1       MR. SHEEAN: We're going to take a break to change
 2       tapes.
 3       (Pause in the proceedings.)
 4       MR. EVANOFF: We're back on the video and the
 5       record. It's 9:16 a.m.
 6   Q. Mr. Petcos, before we took a break we were talking
 7   about your meeting with Allen Christian at the Power Gen
 8   conference. Do you recall that?
 9       A. Yes.
10   Q. I just want to make sure I heard your answer right.
11   Was Jeff Coale present during your meetings with Allen
12   Christian?
13       A. I said Jeff Coale was there when we talked with
14   Allen, so, yes, you know.
15   Q. I just wanted to make sure I understood. To the
16   best of your knowledge, was Gene Lockaby a representative for
17   Victory Power when you met with him at the Power Gen
18   conference?
19       A. I think he might have -- I don't recall -- I don't
20   recall exactly, but he might have been.
21       MR. GISLESON: Don't speculate.
22   Q. Did you tell Mr. Lockaby that he would have to drop
23   representation of Victory Energy in order to represent Indeck
24   Keystone Energy?
25       A. No.
```

1    Q. Did you tell Mr. Lockaby that he would have to drop
2  representation of any other package boilers if he wanted to
3  represent Indeck Keystone Energy?
4    A. I -- again, we didn't say that specifically. We --
5  we told all our reps that we were looking at representing
6  that they were not to represent -- we weren't going to accept
7  any representatives that represented competing product lines
8  with the Indeck organization.
9    Q. Did you explain what you considered a competing
10  product line?
11    A. No. That was for our decision.
12    Q. What, in your mind, would compete with the products
13  that Indeck Keystone Energy is currently authorized to sell,
14  to the best of your knowledge?
15    A. The same product lines.
16    Q. How about for package boilers?
17    A. The same product lines that we -- we have.
18    Q. Does a D style boiler compete with an O style
19  boiler, generally speaking, if the size parameters are the
20  same?
21    A. It can.
22    Q. So would you -- strike that. Would, in your mind,
23  Indeck refuse to sign a representative that sold a -- or
24  represented a company that -- that manufactured D style
25  boilers between 50,000 and 200,000 pounds per hour of steam?

37

1    A. Would we what?
2    Q. Would you refuse to sign a rep who was already
3  representing another company that manufactured that size
4  boiler?
5    A. Possibly.
6    Q. What factors would go into your consideration of
7  whether or not to allow that to occur?
8    A. I don't know. A lot. Whether the rep's a good rep,
9  the exact product line -- I don't know the specifics of what
10  you're referring to.
11    Q. Does Indeck Keystone Energy currently have a
12  representative relationship with any company that also
13  represents Nebraska Boiler?
14    A. Does Indeck Keystone Energy have a rep that also
15  reps Nebraska?
16    Q. Yes.
17    A. I don't think so.
18    Q. Does Indeck Keystone Energy have a representative
19  relationship with any company that also represents Babcock &
20  Wilcox?
21    A. I don't think so.
22    Q. How about Rentech?
23    A. I don't think so.
24    Q. How about English?
25    A. I don't think so.

38

1  Patton at the Power Gen conference in December 2004, was
2  Patton & Associates a representative for Victory Energy?
3    A. To the best of my knowledge, I think so.
4    Q. Were you ultimately successful in getting Gene
5  Lockaby to sign a rep agreement with Indeck?
6    MR. GISLESON: Objection to the characterization of
7    getting.
8    A. I think Gene signed a rep agreement with us.
9    Q. Following your meeting with Tom Patton at the Power
10  Gen conference in December 2004, did Patton & Associates sign
11  a rep agreement with Indeck?
12    A. No.
13    Q. Following your meeting with Chuck Thatcher, did Gulf
14  Coast Thermal sign a rep agreement with Indeck?
15    A. Yes.
16    Q. And was Gulf Coast Thermal -- strike that. At the
17  time that you met with Mr. Thatcher at the Power Gen
18  conference in December 2004, was Gulf Cost Thermal a
19  representative for Victory Energy?
20    A. I -- to be honest, I don't know.
21    Q. Can you recall any other prospective representatives
22  that you spoke to at the Power Gen conference, other than
23  those you've already identified?
24    A. No. As I mentioned earlier, I couldn't think of

39

1  any, but I'm sure I talked to maybe a couple. I can't
2  remember. There were a lot of people that I just met for the
3  first time that I didn't know their names.
4    Q. Did you tell anyone at the Power Gen conference in
5  December 2004 that Victory Energy is only licensed to sell
6  old style boilers?
7    A. I don't recall my exact description. I -- my -- my
8  description was that Victory was allowed to sell the M series
9  boiler, which was a refractory front wall, tube and tile rear
10  wall, tangent furnace.
11    Q. Did you ever refer to that type of boiler that you
12  believe Victory Energy was authorized to sell as an old style
13  boiler?
14    A. I don't recall.
15    Q. Are the terms "standard M series boiler" well known
16  and understood in the boiler industry, to your knowledge?
17    A. The standard M series, there are certain clients
18  that recognize that, yes.
19    Q. Would you say that the term "standard M series" is a
20  well-known term in the industry?
21    A. I don't know what you mean by well -- well-known.
22    Q. Would more than half of the prospective customers in
23  the industry understand the term "standard M series boiler"
24  with no further elaboration?
25    MR. GISLESON: Objection. Foundation.

40

**Page 41**

```
1        A. I don't know.
2        Q. When you met with prospective reps at the Power Gen
3   conference in December 2004, in addition to explaining to
4   them your understanding of what Victory Energy was licensed
5   to sell, did you provide a description with regard to Victory
6   Energy's rights to modify or improve the boilers?
7        MR. GISLESON:  Objection.  Asked and answered.
8        A. Wait, could you repeat that again.
9        MR. SHEEAN:  Sure.  And to respond to the
10       objection.  My prior questions related to the
11       meetings in April or May with sales
12       representatives, and now I'm asking him about Power
13       Gen, which I think is a different question.
14       Q. To the best of your knowledge, when you met with
15   representatives at the Power Gen conference and explained to
16   them that Victory Energy was only licensed to sell your
17   understanding of the M series boiler, did you also explain to
18   those representatives that Victory Energy had rights under
19   the agreement to modify and improve the boiler?
20       A. No.  Because, like I mentioned before, we were
21   looking for new reps, and I wasn't talking about Victory,
22   other than they were allowed to sell our M series standard
23   boiler.
24       Q. Did you mention to any of the reps that you met with
25   in December 2004 at the Power Gen conference that Victory
```

**Page 42**

```
1   Energy had sold more than 10 boilers under the license
2   agreement with a 100 percent membrane construction?
3        A. No.  These weren't our reps, and it wasn't my job to
4   discuss any violations of the license agreement.
5        MR. GISLESON:  Please make sure you limit your
6        answer to the question that's asked.
7        Q. You just said it was not your practice to mention
8   violations of the license agreement.  Is it your
9   understanding that Victory Energy violated the license
10  agreement when it sold membrane wall boilers during the time
11  that Erie Power was the licensor?
12       A. I don't know if the term "violation" is -- is the
13  correct term, but my understanding, from talking with
14  representatives from -- did you say EPTI?
15       Q. Yes, sir.
16       A. From talking with EPTI and looking at documentations
17  that were provided to me, that, yes, they -- Victory Energy
18  sold boilers outside of the license agreement.
19       Q. Do you have an understanding of whether or not
20  Victory Energy was authorized by Erie Power to manufacture
21  and sell those boilers that you deem outside the scope of the
22  license agreement?
23       A. I think there were -- an occasion where EPTI might
24  have provided authorization to pursue some work through a
25  paid engineering study.  But other than that, there was no
```

**Page 43**

```
1   formal addendum to the annex or any formal description
2   providing authorization for Victory to do so.
3        Q. I want to jump ahead.  We'll get back to that.  Did
4   you tell anyone at the sales rep meeting in the spring of
5   2005 that Victory Energy was only authorized to sell old
6   style boilers?
7        A. I -- again, we were talking to our representatives,
8   so I told the reps that Victory -- we have a license
9   agreement that we're going to honor for Victory to sell our
10  standard M series boilers.
11       Q. Did you tell them that Victory Energy is only
12  authorized to sell standard M series boilers?
13       A. I don't know what -- what else Victory sells.  I
14  wouldn't -- wouldn't have said that as far as their product
15  line.
16       Q. Did you tell the reps at the sales rep meeting in
17  the spring of 2005 that, based on your understanding of the
18  license agreement, Victory Energy was only authorized to sell
19  standard M series boilers under the terms of the license
20  agreement?
21       MR. GISLESON:  Objection.  Asked and answered.
22       A. Yeah.  I don't understand how that's different from
23  what I've already answered.
24       Q. You can answer.
25       A. I told our representatives that Victory -- we have a
```

**Page 44**

```
1   license agreement with Victory for them to sell and market
2   our standard M series boiler with refractory front wall, tube
3   and tile rear wall, tangent furnace, and outer wall.
4        Q. Did you say anything else relative to the license
5   agreement?
6        A. I don't think I did.
7        Q. How many sales representatives attended the meeting
8   in April or May 2005?
9        A. Good question.  I don't know exactly.
10       Q. Was it more than 20?
11       A. I think it might have been around 20.  Plus or
12  minus.  I don't know exactly.
13       Q. Was Allen Christian there?
14       A. I can't recall if he was there or not.
15       Q. Can you identify any specific representatives who
16  attended the meeting?
17       A. Gene Lockaby was there.  I'm not sure if the Power
18  Process -- I can't remember our rep in Michigan, if he was
19  there.  Chuck Thatcher was there.  And I can't remember who
20  else.
21       Q. What was the name of the Michigan rep?
22       A. I'm drawing a blank right now.
23       Q. How about the company?
24       A. It was Power Process or Power Systems, something
25  like that.  I'm pretty sure he was there.
```

```
 1    Q.  Edward Heidt?
 2    A.  I don't know if it was Ed Heidt that was there.  I
 3  think it was the other -- the other guy that was there.
 4    Q.  Did you meet with anyone from Power Systems at the
 5  Power Gen conference?
 6    A.  I can't remember if they met with us or not.  I
 7  might have talked to them.
 8    Q.  Do you know an individual named Ian Milligan of
 9  Thermal and Hydraulic?
10    A.  Yes.
11    Q.  How do you know Mr. Milligan?
12    A.  He used to be a representative of Erie Power
13  Technologies while I worked there.
14    Q.  Is he currently a rep for Indeck?
15    A.  No, he's not.
16    Q.  Have you met with Mr. Milligan or spoken with him by
17  telephone since you joined Indeck Keystone Energy?
18    A.  Yes.  I spoke to him on the phone.
19    Q.  When did you speak to Mr. Milligan on the phone?
20    A.  I don't know the exact month, but I think it was
21  last fall sometime, of '04.
22    Q.  Did you call him or did he call you?
23    A.  I think I called him.
24    Q.  What was the purpose of the call?
25    A.  If -- I think I called him -- I don't think --
                                                          45
```

```
 1    A.  Currently?
 2    Q.  Yes, sir.
 3    A.  No.  Not to my knowledge.
 4    Q.  What else did you say to Mr. Milligan?
 5    A.  It was -- it was basically me interviewing him as
 6  well.  You know, trying to just find out what basically
 7  the -- what his interest was as well.  But he -- he -- he did
 8  say some concerning things back that I said that -- I said
 9  that we potentially -- I wasn't sure if we were in the
10  lawsuit or we were going to be in the lawsuit, but I might
11  have mentioned that to him.
12    Q.  What did you say about the lawsuit?
13    A.  That there were -- VEO was selling outside of the
14  license agreement, and we were going to honor the agreement
15  for VEO to sell the standard M series boiler, refractory
16  front wall, tube and tile rear wall, tangent furnace, but we
17  weren't going to allow them to sell outside of that license
18  agreement from the Annex 1.  And he mentioned that VEO was
19  selling boilers and they were going to continue selling
20  boilers after the license agreement and above 150.
21    Q.  You said that Mr. Milligan stated Victory Energy was
22  selling boilers.  What do you mean by that?
23    A.  He -- he mentioned that -- he -- I don't recall the
24  exact conversation, but he alluded to VEO selling boilers,
25  and I don't know if he meant they were outside the license
                                                          47
```

```
 1  unless he called for something else, but the conversation, I
 2  was trying -- I was looking for sales reps, so I was -- that
 3  was the intent of the call.
 4    Q.  Was anyone else on the phone?
 5    A.  Not to my knowledge.
 6    Q.  How long did the call last?
 7    A.  Not too long.
 8    Q.  10 minutes?
 9    A.  Five, 10 minutes.
10    Q.  To the best of your recollection, what did you say,
11  and what did he say?
12    A.  I was looking for reps, and I was pretty standard in
13  what I'd been telling reps, that Indeck wants to sign reps to
14  represent Indeck Corporation.  And we were evaluating what
15  their line cards were, and then we were going to make a
16  decision.  But we were not going to sign any reps that
17  represented other boiler manufacturers that would compete
18  against Indeck.
19    Q.  Are there any representatives of Indeck Keystone
20  Energy who also represent Victory Energy at this time, to
21  your knowledge?
22    A.  What's that?
23    Q.  To the best of your knowledge, are there any
24  representatives for Indeck Keystone Energy that also
25  represent Victory Energy?
                                                          46
```

```
 1  agreement or not.  I don't know if he meant they were
 2  proposing them above 150.  But it didn't sound very good in
 3  my opinion.
 4    Q.  Have you ever become aware of an instance where
 5  Victory Energy sold a direct-fired watertube boiler above
 6  150,000 pounds per hour of steam since January 7, 2003?
 7    A.  No.  But we did become aware of them proposing
 8  boilers above that, which they were not allowed to do per the
 9  license agreement.
10    Q.  Has Indeck Keystone Energy suffered any damages as a
11  result of any proposals that Victory Energy made that you
12  deem outside the scope of the license agreement?
13    A.  I believe so.
14    Q.  Identify those damages, please.
15    A.  We're still -- they're under evaluation, but VEO has
16  been providing proposals and -- and sales meetings with
17  clients where they have not been identifying the trademark
18  Keystone under licensee, which is now under -- from Indeck
19  Keystone Energy.  They've been claiming it as their own
20  trademark and technology on both proposals and brochures, and
21  on nameplates of boilers they've built.
22    Q.  Anything else?
23    A.  It's still under evaluation.
24    Q.  Can you identify for me a single dollar of lost
25  sales that Indeck Keystone Energy has suffered as a result of
                                                          48
```

**Page 49**

```
 1   any of the actions of Victory Energy --
 2       A.  It's out there, I can't -- it's under evaluation.
 3       Q.  So the answer is, no, you can't at this time
 4   identify a single dollar of damages?
 5       A.  At this time it's under evaluation.
 6       Q.  Can you identify a single dollar of damages that
 7   Indeck Keystone Energy has suffered at this time?
 8           MR. GISLESON:  Just object to the extent it calls
 9           for a legal conclusion.
10       A.  It's under evaluation with our counsel.
11       Q.  It's a yes or no question, sir.  Can you or can you
12   not identify a single dollar of damages at this time that
13   Indeck Keystone Energy has suffered as a result of the
14   actions of Victory Energy?
15       A.  Every -- all the profits on all the jobs that
16   they've sold that included membrane wall and were outside of
17   the license agreement, just for a start.
18       Q.  You believe Indeck suffered those damages?
19       A.  It's a product that Indeck could have offered, yes.
20       Q.  Can you identify any other damages that you believe
21   Indeck Keystone Energy has suffered as a result of Victory
22   Energy's actions at this time, in dollar amount?
23       A.  No.
24       Q.  And you would agree with me, would you not, that
25   Indeck Keystone Energy would only be entitled to any profits
                                                          49
```

**Page 50**

```
 1   generated from those jobs that you alluded to if, in fact,
 2   those jobs were outside the scope of the license agreement as
 3   determined by a court, correct?
 4       A.  No.
 5       Q.  You don't agree with that?
 6       A.  That -- you're asking me if I agree with Indeck only
 7   being harmed from the profits of those jobs if VEO was
 8   actually outside of the license agreement?
 9       Q.  You would agree with me, would you not, sir, that
10   the profits you were identifying regarding the sales that
11   Victory Energy has made would only go to Indeck Keystone
12   Energy if the projects were, in fact, outside the scope of
13   the license agreement as determined by a court of law.
14       A.  What -- am I saying that that's the only damage, no.
15   I think there is more damage that I can't even justify of our
16   product line and our name of our -- our trademark not -- not
17   being represented as Indeck Keystone Energy's trademark at
18   this time over the last year.
19       Q.  I asked you to identify specific damages, and the
20   only specific damage that you've identified were the profits
21   that Victory Energy has earned on any Keystone boiler sold
22   that you believe were outside the scope of the license
23   agreement.
24           MR. GISLESON:  He identified the other aspects,
25           too.
                                                          50
```

**Page 51**

```
 1   I mean, I had said that complete damages are under
 2   review, and I also discussed the trademark issues and not
 3   advertising our product line and our trademark under the
 4   ownership of Indeck Keystone Energy, which I can't quantify
 5   at this time.
 6       Q.  With respect to the profits that you discussed, I
 7   just want to limit your answer to the profits right now,
 8   okay, would you agree that Indeck Keystone Energy would only
 9   be entitled to profits, if at all, for jobs that a court of
10   law determines were outside the scope of the license
11   agreement; is that correct?
12           MR. GISLESON:  Objection.  Calls for a legal
13           conclusion.
14       A.  I don't know.
15       Q.  What else did you say to Mr. Milligan during that
16   phone conversation?
17       A.  I -- I said, after the license agreement expires we
18   were probably not going to extend it, and VEO would not be
19   selling any Keystone package boilers with our technology.
20   Any O style package boilers with our technology.
21       Q.  Did you tell Mr. Milligan that Victory Energy would
22   not be allowed to sell package boilers after the expiration
23   of the license?
24       A.  No.  I specifically said -- because I -- I was very
25   careful what I said to Ian because of the -- potential
                                                          51
```

**Page 52**

```
 1   lawsuit or the lawsuit that we had.  And Indeck already sells
 2   package -- or not Indeck.  VEO already sells packaged HRSGs,
 3   which are boilers, too, so -- I don't know other products
 4   that they do.
 5       Q.  Did you tell Mr. Milligan that Victory Energy would
 6   not be allowed to sell O style watertube direct-fired package
 7   boilers after the expiration of the license agreement?
 8       A.  No.
 9       Q.  What else did Mr. Milligan say to you, other than
10   what you've already testified?
11       A.  I don't recall anything else.
12       Q.  Did you mention to Mr. Milligan that under the terms
13   of the license agreement Victory Energy was authorized to
14   make modifications?
15       A.  I did not -- I mentioned that Victory Energy was
16   only allowed to sell the standard M series boiler with
17   refractory front wall, tube and tile rear wall, and tangent
18   furnace.
19       Q.  Did you mention to Mr. Milligan that Victory Energy
20   is permitted to make improvements to the Keystone boiler
21   design under the terms of the license agreement?
22       A.  It wasn't for me to tell him that at the time.
23           MR. GISLESON:  Please make sure you answer the
24           question that's asked.  It's easier for the
25           questioning attorney that way.
                                                          52
```

1     A. Okay.

2     Q. Did you mention to Mr. Milligan that Victory Energy

3     had sold several 100 percent membrane wall boilers with the

4     consent of Erie Power under the terms of the license

5     agreement?

6     A. No.

7     Q. Have you ever had -- strike that.  Other than the

8     conversations you discussed with me thus far this morning,

9     have you had any conversations with Allen Christian regarding

10    Victory Energy?

11    A. I don't recall.

12    Q. Other than the conversation you just identified with

13    Ian Milligan, have you had any other conversations with

14    Victory Energy -- strike that.  Other than the conversation

15    you've already identified today regarding Victory Energy with

16    Ian Milligan, have you had any other conversations with

17    Mr. Milligan regarding Victory Energy?

18    A. I don't believe so.

19    Q. Have you discussed the Victory Energy license

20    agreement with any other representatives that you can recall,

21    other than ones you've already testified to today?

22    A. I don't recall.  Maybe.

23    Q. I mean, certainly there were the 20 or so Indeck

24    representatives that you discussed the license agreement with

25    at the sales rep meeting you've already discussed in April or

53

---

1     May of 2005, correct?

2     A. Correct.

3     Q. Have you ever met an individual named Dirk Poppin?

4     A. Dirk Poppin?

5     Q. Yes, sir.

6     A. I don't believe so.

7     Q. Do you know Jim Mitchell?

8     A. Jim Mitchell, I don't believe so.  And if -- if he

9     is one of our new reps, I apologize, but I -- I don't know

10    the names of all of our new reps.

11    Q. To the best of your knowledge, has any IKE

12    representative ever told a current or prospective customer of

13    Victory Energy that Victory Energy is no longer able to sell

14    Keystone boilers of any type?

15    A. No.

16    Q. Have you ever been to the Volcano plant in Montreal,

17    Canada?

18    A. It's Indeck Boiler Corporation, yes.

19    Q. It used to be known as Volcano, correct?

20    A. Correct.

21    Q. How many times have you been to the Indeck Boiler

22    Corp. plant in Montreal?

23    A. Once.

24    Q. When was that?

25    A. I don't remember if it was last fall or early

54

---

1     Q. It's since you joined Indeck Keystone Energy?

2     A. Yes.

3     Q. Was Jeff Coale there when you went there?

4     A. No.

5     Q. What was your purpose for visiting the plant?

6     A. New employee to the corporation, see the

7     manufacturing facility, meet people.

8     Q. Anything else?

9     A. I don't -- I don't recall.

10    Q. Did you meet any prospective customers of Indeck

11    when you were at the plant?

12    A. No.

13    Q. Did you meet anyone from the University of Notre

14    Dame when you were at the plant?

15    A. No.

16    Q. Did you ever become aware of a proposal presented on

17    behalf of Erie Power and Victory Energy to sell a package

18    boiler to the University of Notre Dame?

19    A. Briefly.

20    Q. When did you become aware of that proposal?

21    A. I don't know the details of it.  I just overheard

22    some things.

23    MR. GISLESON:  The question was when.

24    A. Oh, it was before Indeck Key -- Indeck purchased the

55

---

1     assets.

2     Q. You were not involved in any aspect of the

3     negotiations of that site agreement, correct?

4     A. No.

5     Q. That's not correct?

6     A. I was not involved, yeah.

7     Q. Do you have any reason to doubt that Erie Power

8     Technologies authorized Victory Energy to pursue the project

9     at the University of Notre Dame?

10    A. I don't know anything about it.  I mean, I don't

11    know.

12    Q. And, therefore, you have no reason to doubt that

13    there was authorization, correct?

14    A. For that specific project, I don't doubt that.

15    Q. Were you involved in any discussions with Victory

16    Energy related to requests to pursue projects above 150,000

17    pounds per hour of steam?

18    A. I don't believe so, no.

19    Q. Besides the Notre Dame project we just discussed,

20    did you ever become aware of any projects that Victory Energy

21    had approached Erie Power representatives regarding that were

22    above 150,000 pounds per hour of steam?

23    A. Approached Erie Power representatives?

24    Q. That was a horrible question, let me ask it again.

25    Did you ever become aware of any instances, besides Notre

56

```
 1  Dame, ... Energy requested authorization from Erie
 2  Power to pursue projects above 150,000 pounds per hour of
 3  steam?
 4      A.  I think there might have been one -- one other one.
 5  I don't know the details of it, though.
 6      Q.  And I believe you already testified -- and I'm not
 7  trying to tie you up on this, just cover -- make sure I
 8  covered this, but I believe you already testified that you
 9  were not aware of any instance during the time that Erie
10  Power was the licensor of the license agreement where Victory
11  Energy pursued a project above 150,000 pounds per hour of
12  steam without express authorization from Erie Power, correct?
13      A.  Correct.
14      Q.  You indicated that Indeck Keystone Energy has
15  developed sales literature, brochures, correct?
16      A.  Correct.
17      Q.  Were you involved in drafting those materials?
18      A.  Yes.
19      Q.  What products are identified in the sales materials?
20      A.  Package boilers, the O, D, and A style boilers.
21      Q.  Anything else?
22      A.  Our field-erected industrial boilers, and I think
23  our waste gas boilers -- waste gas HRSGs, I think, and
24  after-market parts.
25      Q.  Is there any mention anywhere in the sales materials
                                                              57
```

```
 1  that you were involved in drafting of the Victory Energy
 2  license agreement?
 3      A.  No.
 4      Q.  Is there any mention in the sales materials that you
 5  were involved in drafting that Indeck Keystone Energy was not
 6  currently offering package boilers -- direct-fired package
 7  boilers below 150,000 pounds per hour of steam?
 8      A.  No.
 9      Q.  Is there a mention in the sales materials of the
10  range in terms of size of products that Indeck Keystone
11  Energy would offer for sale regarding direct-fired package
12  boilers?
13      A.  Yeah.  I think on some of them we said up to
14  500,000, and on others we said maybe up to 800,000 pounds per
15  hour of steam flow.
16      Q.  Are you aware of any other companies that sell
17  direct-fired O style watertube package boilers?
18      A.  Yes.
19      Q.  Can you identify those companies for me.
20      A.  Rentech, B&W, Foster Wheeler, Nebraska.
21      Q.  Any others?
22      A.  Alstom Power.
23      Q.  Can you spell that.
24      A.  A-L-S-T-O-M-E -- or S-T-O-M, no E.
25      Q.  Any others?
                                                              58
```

```
 1      A.  I think Aalborg covers the major of them.
 2      Q.  Does Volcano offer an O style?
 3      A.  Yes.
 4      Q.  Actually, Indeck Boiler Corporation now.
 5      A.  Indeck Boiler Corporation, yes.
 6      Q.  And is the O style boiler offered by Indeck Boiler
 7  Corporation a Keystone boiler?
 8      A.  No.
 9      Q.  What are the differences in terms of the design of
10  the Indeck Boiler Corporation's O style boiler and the
11  Keystone O style boiler?
12      A.  I don't know.  I never got into their designs yet.
13      Q.  What are the differences -- differences between the
14  Keystone O style boiler and the Rentech O style boiler?
15      A.  I don't know specifically.
16      Q.  How about the B&W boiler?
17      A.  I don't know.  Their stuff's proprietary, so I
18  wouldn't know.
19      Q.  How about the Foster?
20      A.  Same.
21      Q.  Nebraska?
22      A.  Same.
23      Q.  Have you ever -- strike that.  You're involved in
24  the after-market parts business for Keystone, correct?
25      A.  Correct.
                                                              59
```

```
 1      Q.  Has Erie Power -- strike that.  In your experience
 2  at Zurn, Aalborg, Erie Power, and now Indeck Keystone Energy,
 3  with respect to after-market parts, have you ever sold
 4  after-market parts for O style direct-fired watertube package
 5  boilers, other than those that were Keystone's?
 6      A.  Typically that's not common for us to do.  In the --
 7  I don't think we did this year.  In the past we might have
 8  only if a client had the exact drawing specifications that
 9  just wanted us to bend tubes identical to what they had.  But
10  we -- we -- other than that --
11      Q.  Of the boiler companies that you identified that
12  manufacture O style direct-fired watertube package boilers,
13  do you know whether any of those offered the boilers with a
14  100 percent membrane wall construction?
15      A.  Can you repeat that.
16          MR. SHEEAN:  Can you read that back, please.
17          (Record read back.)
18      A.  I don't know exactly, but I believe so.
19      Q.  Are you aware of any boiler manufacturer currently
20  in business today that offers direct-fired watertube package
21  boilers with only a tangent tube front and rear refractory
22  design?
23      A.  I think a lot of them do.
24      Q.  Okay.  Which companies only offer the tangent tube
25  and the front and rear refractory?
                                                              60
```

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

INDECK KEYSTONE ENERGY, LLC, )
a Delaware limited liability )
company, )
               )
      Plaintiff,       )       CIVIL ACTION
               )
vs.            )       Case No. 04-CIV-325E
               )       Judge Sean J. McLaughlin
VICTORY ENERGY OPERATIONS, LLC) )
a Delaware limited liability )
company, )       CONFIDENTIAL TESTIMONY
               )
      Defendant.       )

DEPOSITION OF JOHN VISKUP,
a witness called on behalf of the Plaintiff, on the 31st
day of January, 2006, at 320 South Boston, Suite 400, in
the City of Tulsa, County of Tulsa and State of Oklahoma,
commencing at 9:30 A.M., before the undersigned, Joni
Humphries, a Certified Shorthand Reporter in and for the
State of Oklahoma.
Fee for Original:        $_____
Paid by Plaintiff.

_____

JONI HUMPHRIES, CSR #1236
DAVIDSON REPORTING
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
Phone: (918) 745-9959

Page 2

1          A P P E A R A N C E S
2  ATTORNEY FOR PLAINTIFF:
3     MR. JOHN K. GISLESON
      Schnader, Harrison, Segal & Lewis
4     Attorneys at Law
      120 Fifth Avenue
5     Suite 2700
      Pittsburgh, Pennsylvania 15222-3001
6
   ATTORNEY FOR DEFENDANT:
7
      MR. CHRISTOPHER T. SHEEAN
8     Wildman, Harrold, Allen & Dixon
      Attorneys at Law
9     225 West Wacker Drive
      Chicago, Illinois 60606-1229
10
         * * * * * * * * * *
11
12  It is stipulated and agreed by and between the parties
13  hereto that this deposition is being taken pursuant to a
14  notice for this time and place.
15  It is further stipulated and agreed by and between
16  the parties hereto that the deposition shall be taken
17  pursuant to the Federal Rules of Civil Procedure.
18
19       * * * * * * * * * *
20
21
22
23
24
25

Sidebar: Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 3

1          CONTENTS
2  WITNESS                          PAGE
3  JOHN VISKUP
4  Direct Examination by Mr. Gisleson        4
   Reporter's Certificate                   216
5
6          E X H I B I T S
7                    Identified    Offered
8  Plaintiff's Exhibit No. 1     66
   Plaintiff's Exhibit No. 2     90
9  Plaintiff's Exhibit No. 3     96
   Plaintiff's Exhibit No. 4     98
10 Plaintiff's Exhibit No. 5     100
   Plaintiff's Exhibit No. 6     101
11 Plaintiff's Exhibit No. 7     113
   Plaintiff's Exhibit No. 8     122
12 Plaintiff's Exhibit No. 9     123
   Plaintiff's Exhibit No. 10    125
13 Plaintiff's Exhibit No. 11    127
   Plaintiff's Exhibit No. 12    130
14 Plaintiff's Exhibit No. 13    136
   Plaintiff's Exhibit No. 14    139
15 Plaintiff's Exhibit No. 15    143
   Plaintiff's Exhibit No. 16    161
16 Plaintiff's Exhibit No. 17    165
   Plaintiff's Exhibit No. 18    165
17 Plaintiff's Exhibit No. 19    171
   Plaintiff's Exhibit No. 20    172
18 Plaintiff's Exhibit No. 21    173
   Plaintiff's Exhibit No. 22    203
19 Plaintiff's Exhibit No. 23    207
   Plaintiff's Exhibit No. 24    208
20 Plaintiff's Exhibit No. 25    210
   Plaintiff's Exhibit No. 26    211
21 Plaintiff's Exhibit No. 27    212
22
23
24
25

Page 4

1          MR. GISLESON: If you could keep track please of
2  the time that we go on and the time that we go off.
3          VIDEOGRAPHER: Running time or watch time?
4          MS. GISLESON: I guess running time.
5          MR. SHEEAN: Well, that is typically what we've
6  done, but this deposition, I understand, there was a
7  misunderstanding with the start time, but the Court
8  Reporter, the Videographer, and the Notice that I received
9  all indicated nine o'clock. Mr. Viskup has somewhere to be
10 at five o'clock, so we intend to finish this deposition by
11 five o'clock.
12         MR. GISLESON: I'll do the best I can.
13              JOHN VISKUP,
14 having been first duly sworn to testify the truth, the
15 whole truth and nothing but the truth, testified as
16 follows:
17              DIRECT EXAMINATION
18 BY MR. GISLESON:
19 Q  State your name please?
20 A  John Viskup.
21 Q  Have you had your deposition taken before?
22 A  Yes, I have.
23 Q  On how many occasions?
24 A  Four or five.
25 Q  Chances are the procedures there will be the same as



EXHIBIT
4
PENGAD 800-631-6989

Scrunch® www.ScrunchIt.com  GC Software,  Seattle, Washington
EVALUATION COPY: Use of the software after 3/0/06 prohibited

Page 23

1  A  Yes.
2  Q  What kind of design assistance did you provide to
3     customers at that time?
4  A  How are you defining design?  That might help me
5     answer your questions.
6  Q  What does design mean to you in terms of a watertube
7     boiler?
8  A  It means a lot of things.  I mean it means laying out
9     a boiler plan.  It could mean designing the package to be
10    the most efficient package you could develop at the time.
11    I mean there's several aspects of the design side.
12 Q  What aspects of the design side were you assisting
13    customers with?
14 A  What I just mentioned before.
15 Q  All of those?
16 A  Yeah.
17 Q  And during that process of assisting in the design,
18    were you reviewing drawings of the boilers?
19 A  Yes.
20 Q  And that included the internal design drawings for
21    the boilers?
22 A  It could have, yes.
23 Q  So front and rear walls, sidewalls, furnace walls?
24 A  Sure.
25 Q  All of those?

Page 24

1  A  Yes.
2  Q  Why did you leave Indeck Power?
3  A  To pursue our own business, Victory Energy
4     Operations.
5  Q  You said our.  Who is our?
6  A  I have a partner, Jim Sponder.
7  Q  Did Jim Sponder work at Indeck Power?
8  A  Yes.
9  Q  What was his position at Indeck Power?
10 A  I don't know.  He was in the controls group.
11 Q  What was the controls group?
12 A  It was a group that was formulated which designed
13    control systems for the operation of package boilers.
14 Q  What's the control system for a package boiler?
15 A  It's the electronics that allows it to operate in a
16    safe manner.
17 Q  What percentage of VEO do you own?
18 A  Fifty.
19 Q  What percentage does he own?
20 A  Fifty.
21 Q  Did you both leave Indeck Power at the same time?
22 A  No.
23 Q  Who left first?
24 A  Jim did.
25 Q  Was he fired?

Page 25

1  A  No.
2  Q  What did he do concerning the development of Victory
3     after he left Indeck Power?
4  A  What do you mean?
5  Q  What did he do after he left Indeck Power as
6     pertaining to a boiler business or the creation of a boiler
7     business?
8        MR. SHEEAN:  Objection, vague.
9  A  I'm not sure what you mean?
10 Q  (By Mr. Gisleson)  Well you said Sponder left first.
11    What did he do after he left?
12 A  He went to work for another company called Moore
13    Process Automation.
14 Q  Were you fired from Indeck Power?
15 A  Yes, I was.
16 Q  When were you fired?
17 A  I don't remember.
18 Q  Approximately?
19 A  1999.
20 Q  Why were you fired from Indeck Power?
21       MR. SHEEAN:  Well John, I'm going to have to
22    object here, and this line of questioning can't go too far
23    just because there's a settlement agreement between Victory
24    and Indeck Power that precludes going into the parameters
25    of the litigation and the settlement.

Page 26

1        MR. GISLESON:  I don't want to go into any of
2     that if there's a confidentiality provision.
3  Q  (By Mr. Gisleson)  What's your understanding as to
4     why you were fired from Indeck Power?
5  A  Well at the time I was terminated I really never got
6     a good understanding.
7  Q  Did you ever develop an understanding as to why you
8     were fired?
9  A  Well we were seeking our own business at the time and
10    that was it.  I guess in their mind it was a conflict.
11 Q  You and Jim Sponder were seeking your own business at
12    the time that you were working for Indeck Power?
13 A  Yes.
14 Q  What was the business that you and Jim Sponder were
15    seeking at the time you were working for Indeck Power?
16 A  We were -- we started out in the operations
17    management of a steam facility.
18 Q  Where was the steam facility?
19 A  In Detroit, Michigan.
20 Q  What was the name of it?
21 A  I think it was Ruge Steel.
22 Q  Did you, in fact, set up a competing company while
23    you were working with Indeck Power?
24       MR. SHEEAN:  Same objection John.  I think we're
25    getting into the underlying cause of the allegations of the

Page 27

1     lawsuit and what ultimately was settled.
2  Q  (By Mr. Gisleson)  What did you do after you were
3     fired from Indeck?
4  A  Worked at Victory Energy.
5  Q  Beginning in 1999?
6  A  Correct.
7  Q  What was VEO's business when you first started it?
8  A  We were operating and maintaining a steam facility.
9  Q  At Ruge?
10 A  Yeah.
11 Q  Anything else?
12 A  Not at that time.
13 Q  When did VEO expand its business beyond operating the
14    steam facility?
15 A  It was later, probably later in that year, the first
16    part of 2000.
17 Q  To what business did VEO expand?
18 A  We started to get into selling equipment.
19 Q  Equipment manufactured by others?
20 A  Yes.
21 Q  As a distributor or seller?  How would you
22    characterize it?
23 A  As a distributor, sort of a sales representative I
24    guess.
25 Q  What equipment?

Page 28

1  A  Boilers.
2  Q  What kinds of boilers?
3  A  Fire tube and watertube.
4  Q  Who were the manufacturers of the watertube boilers
5     that you were selling?
6  A  It would have been Volcano.
7  Q  Any others?
8  A  We sold two of the Keystone boilers.
9  Q  Those are the Heinz boilers?
10 A  Yes.
11 Q  Any others?
12       MR. SHEEAN:  I'm going to object as to time.  I'm
13    not sure where we're talking about right now in terms of
14    the manufacturers of boilers.  For all time or just in
15    2000?
16 Q  (By Mr. Gisleson)  Just in 2000?
17 A  That's about it.
18 Q  At some point did VEO expand into the manufacturing
19    of boilers?
20 A  Yes.
21 Q  When?
22 A  When we first developed our HRSG product line.
23 Q  When was that?
24 A  Late 2000.
25 Q  Who developed the design for the HRSG product?

Scrunch® www.Scrunchit.com   GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 149

1   gear up for that.
2 Q  What did he tell you?
3 A  There's a lady from -- I think it was a lady that was
4   filling me in, somebody from EPI I believe sent us over a
5   vendor list to where we could source some of those
6   materials if needed.
7 Q  Was that the only conversation in which you and Mark
8   White mentioned in any way either welded walls or membrane
9   walls?
10     MR. SHEEAN:  Objection.  You mean during that
11   same time frame?
12 Q  (By Mr. Gisleson)  During that same time frame?
13 A  I don't know.  I mean we might have had some others,
14   but right now that's what comes to mind.
15 Q  During that conversation about suppliers, did you and
16   he discuss whether the membrane walls were within the scope
17   of the license agreement?
18 A  Well, I mean it was, so I don't know if it was
19   necessarily discussed, but it was part of it.  It says it.
20     MR. GISLESON:  Move to strike as non-responsive.
21 Q  (By Mr. Gisleson)  The question was during that
22   conversation with Mark White, did you and he specifically
23   discuss whether the membrane walls were within the scope of
24   license agreement?
25 A  I believe we did.

Page 150

1 Q  You discussed the scope of the license agreement
2   during the call about suppliers?
3 A  We talked about membrane wall construction, I mean
4   relative to where some of those materials were sourced,
5   because we were trying to put together a program, you know,
6   where you could support the manufacturing of it.  So I mean
7   I guess why would we be discussing membrane walls if it
8   wasn't in the license agreement.
9 Q  Did VEO, in fact, source membrane walls from the
10   location identified by EPTI?
11 A  No, it didn't need to.  We were able to get some
12   information where we could sit down and meet with the
13   different suppliers here in Oklahoma to be able to source
14   it closer to home for quality control purposes.
15 Q  Did you and Shawn Brewer have any conversations about
16   membrane wall technology or welded walls for Keystone
17   boilers between the time that you received the initial
18   draft of the license agreement and the time that you
19   initialed Annex 1?
20 A  I don't recall right now.
21 Q  Does Parfab still have copies of manufacturing
22   drawings for the Keystone provided by VEO?
23 A  I believe so, yes.
24 Q  Who was responsible for recovering any drawings
25   provided to Parfab pertaining to the Keystone?

Page 151

1 A  It could have been Trent Miller.  I don't remember.
2 Q  Do you believe that VEO has lost any sales reps
3   because of anything that was said by Indeck Keystone
4   Energy?
5 A  Yes.
6 Q  Who?
7 A  Who what?
8 Q  What sales rep do you believe that VEO lost because
9   of something said by Indeck?
10 A  Christian Power Equipment Company.
11 Q  Any others?
12 A  Process Systems -- Power Process, excuse me.
13 Q  Power Processes?
14 A  Process Systems, Ed Hall's company.
15 Q  Any others?
16 A  Nothing comes to mind right now.
17 Q  Has VEO replaced Christian Power with another sales
18   representative?
19 A  Yes, we have.
20 Q  What's the name of the sales representative?
21 A  Anderson & Associates.
22 Q  Is Anderson & Associates a competent sales
23   representative?
24 A  I believe so, yes.
25 Q  Where are they located?

Page 152

1 A  California.
2 Q  Where in California?
3 A  I don't know the name of the town right now.
4 Q  Northern, middle?
5 A  Yes, northern.
6 Q  Is Anderson covering the same territory as Christian
7   Power?
8 A  Yes.
9 Q  Has Anderson made any sales for VEO?
10 A  No.
11 Q  What was the amount of sales that Christian Power had
12   for VEO?
13 A  I think it was right around a million dollars or
14   more.
15 Q  Did Christian Power tell you personally why it was
16   going to discontinue its relationship with VEO?
17 A  Yes.
18 Q  Who did you speak with?
19 A  Allen Christian.
20 Q  What did he tell you?
21 A  He told me that he was being forced by Chris Petcos
22   to make a decision, if he wanted to keep the after market
23   parts, he was going to have to cancel us and take on Pike.
24 Q  Anything else?
25 A  Just that he was concerned because the after market

Page 153

1   was a big part of his business.  He didn't like the fact
2   that he was being, as he referred to as threatened, but he
3   didn't feel he had a choice at that point.  That was his
4   largest source of income at that particular time he told
5   us.
6 Q  Allen Christian made more money from being a sales
7   rep for Indeck than he did being a sales rep for VEO?
8 A  Well at that particular time the project hadn't come
9   through.  What I mean is it was going through manufacturing
10   and at that present time I don't know.  You know, I mean.
11 Q  Did he tell you he made more money from repping
12   Indeck products than repping VEO products?
13 A  He just referred it as, you know, the after market
14   parts business was kind of his bread and butter out there,
15   and the boiler business hadn't been as good in California
16   at the time.
17 Q  Did he have the right to terminate the VEO sales
18   representative agreement?
19 A  Sure.
20 Q  Did VEO have the right to terminate the sales rep
21   agreement with Christian Power if it wanted to do so?
22 A  Yes.
23 Q  And both Christian Power, as well as VEO, could
24   terminate for any reason they wanted, is that correct?
25 A  Sure.

Page 154

1 Q  Can you identify any damages to VEO experienced by
2   Christian Power discontinuing its association?
3 A  Well, we had spent a considerable amount of time
4   working with Allen trying to develop opportunities within
5   his territory, and you know, whose to know -- you can't
6   look back now and determine what you were going to get
7   since the agreement was canceled albeit because the man was
8   threatened.  So, I don't know what it could have been.
9 Q  Has VEO ever told any of its sales reps that they
10   only could rep VEO boilers and not boilers manufactured by
11   someone else?
12     MR. SHEEAN:  Objection, vague.
13 A  Our sales rep agreement calls for a non-compete.
14   We don't want them to have a competing product line, yes.
15 Q  (By Mr. Gisleson)  Why is that clause in the sales
16   rep agreement for VEO?
17     MR. SHEEAN:  Objection, foundation.
18 A  We don't want the representative -- I mean as an
19   example, representing our boiler product line and a
20   competitor, such as Nebraska Boiler, at the same time, so
21   they can focus their efforts on selling our equipment.
22 Q  (By Mr. Gisleson)  Was that clause also in the sales
23   rep agreement that Christian Power had?
24 A  Yes.
25 Q  Is it correct that under your agreement, Christian

Scrunch® www.Scruncllt.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 155

1   Power could not be a rep for both Indeck and for VEO?
2        MR. SHEEAN:  Objection, vague as to Indeck.
3 A  Not necessarily, because he was working with the
4   after market parts and we didn't stop them from doing that.
5 Q  (By Mr. Gisleson)  Did VEO sell after market parts?
6 A  Yes.
7 Q  Was VEO a competitor of Indeck for after market
8   parts?
9        MR. SHEEAN:  Objection, vague as to Indeck.
10 A  I didn't know Indeck had after market parts.
11 Q  (By Mr. Gisleson)  Which Indeck entity are you
12   referring to?
13 A  Which one are you referring to?
14 Q  Well you're the one that said he wanted to rep
15   Indeck?
16 A  Okay.  I'm talking Indeck Power.
17 Q  Indeck Power?
18 A  Yeah.
19 Q  Do you know whether he represents Indeck Keystone
20   Energy?
21 A  Do I know whether or not?
22 Q  Correct?
23 A  I've never seen a signed agreement, so I can't
24   confirm or deny it.
25 Q  Are you able to quantify in any way any financial

Page 156

1   harm to VEO from Christian Power no longer being a sales
2   rep?
3        MR. SHEEAN:  I'm going to object to the extent
4   this calls for expert testimony, but you can answer if you
5   know.
6 A  Other than what I just previously testified to, no.
7 Q  (By Mr. Gisleson)  When did you speak with Allen
8   Christian about why he was going to terminate his
9   relationship with VEO?
10 A  It was during the Powergen conference.  It would have
11   been about two years ago I guess, or right after IKE had
12   purchased the Keystone technology.  They held a sales
13   meeting and invited a lot of our reps to the meeting and
14   that's when it was discussed they being forced to make
15   a decision as a campaign.
16 Q  Are you aware of any sales reps who chose VEO over
17   Indeck, whether Indeck Power or Indeck Keystone?
18 A  Yeah, sure.
19 Q  Who?
20 A  Ian Milligan, all the reps that are there with us
21   right now that were -- well, I shouldn't say that.
22   Ian Milligan, which was Thermal Hydraulic, Jim Logue, with
23   J.K. Logue.
24 Q  How do you spell Logue's last name?
25 A  L-o-g-u-e.  Tom Patton with M.C. Patton.  I would

Page 157

1   just say right now those are the ones that come to mind,
2   but whoever at the time used to be the old Erie Power reps
3   that we had as our reps.
4 Q  The old EPTI reps went with VEO instead of with an
5   Indeck company?
6 A  Well they were already representing us, so I think
7   your question was did they stay with us or -- you had said
8   who stayed with us.
9 Q  So they all stayed with you?
10 A  Not all of them, no.
11 Q  How long did it take for you to replace Christian
12   Power as a sales rep with Anderson & Associates?
13 A  I want to say somewhere between six and eight months
14   maybe, four to six months, I don't know.
15 Q  Did you have another sales rep who could cover that
16   territory?
17 A  Did we?
18 Q  Yes?
19 A  Not at the time, no.
20 Q  Were any proposals submitted during that time period
21   to that territory by VEO?
22 A  I don't know.
23 Q  Did you have a conversation with Ed Hall about why he
24   stopped his relationship with VEO?
25 A  Yes.

Page 158

1 Q  What did he say?
2 A  Essentially the same thing as Allen Christian, that,
3   you know, he had been contacted by Chris, and Chris being
4   Chris Petcos, and being forced to make a decision, and his
5   call to me was to let me know that he wasn't the owner of
6   the company, so it was kind of out of his hands, and he
7   knew that the decision was going to be made to go with IKE
8   and he apologized.  He said once I own the company the
9   process will change and I said okay.
10 Q  Did he say why the owner wanted to go with IKE
11   instead of VEO?
12 A  He did not.
13 Q  Did he tell you how much business his company
14   received from Indeck rather than VEO?
15 A  Did he tell me how much they did receive?
16 Q  Right?
17 A  I hope they wouldn't have because they were
18   representing us, so they would have been in violation of
19   their agreement.  I don't think they received any.
20 Q  That they weren't receiving any work from Indeck?
21 A  Shouldn't have.
22 Q  So did he say that the owner believed they could make
23   more money by working with Indeck than by staying with VEO?
24        MR. SHEEAN:  Objection, mischaracterizes his
25   testimony, and I think you're confusing the terms Indeck

Page 159

1   again, which is why I objected before.  You can answer the
2   question.
3 A  He didn't say.
4 Q  (By Mr. Gisleson)  Now was this Indeck Keystone or
5   Indeck Power?
6 A  This would have been IKE, Indeck Keystone.  Whoever
7   Chris Petcos works for.
8 Q  Was VEO able to replace Ed Hall and his company?
9 A  Just recently we have, yes.
10 Q  With whom?
11 A  Scott Bowman's company.  I don't remember the name
12   right now.  They're fairly new with us.
13 Q  Can you identify any financial harm caused to VEO
14   from the end of the relationship with Ed Hall and his
15   company?
16 A  There were some missed opportunities that we were in
17   the process to bid that we did not get the chances to bid.
18 Q  Do you know whether there were other bidders for
19   those projects?
20 A  Yes, there was.
21 Q  Do you know if there were multiple bidders for each
22   project?
23 A  I think so, yes.
24 Q  Is there any way to know whether VEO likely would
25   have obtained the contracts?

Page 160

1 A  I would say our success rate has been pretty good, so
2   probably so.
3 Q  What were the projects?
4 A  There was one for Michigan Correctional Facility.
5 Q  What else?
6 A  That's the only one that comes to mind right now.
7 Q  What has VEO's success rate been -- strike that.
8   What was VEO's success rate with Keystone in terms of
9   submitting proposals and getting a contract?
10 A  I would say that the projects that we focused on we
11   had good success.  Our close ratio would probably be higher
12   than 30 percent.
13 Q  Have you ever seen any written analysis showing what
14   the close ratio was?
15 A  Not necessarily.
16 Q  Can you be anymore specific than having a close ratio
17   of higher than 30 percent?
18 A  Well if I personally worked on it I know it was
19   higher.  That's all I can attest to.
20 Q  Are you able to place a specific dollar value or
21   figure on any financial losses associated with losing Ed
22   Hall?
23 A  Not at this time.
24 Q  Do you have any reason to believe that IKE breached
25   the exclusivity in the license agreement?

Scrunch® www.Scrunchl.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 161

1 A   I don't know if they did or not.
2 Q   Has anyone at VEO ever told you that IKE breached an
3       exclusivity provision in the license agreement?
4 A   I don't recall.  I guess the only thing I can add to
5       it is other than negative comments made by IKE and Indeck
6       employees about our company.
7 Q   Anything else?
8 A   That's it.
9 Q   Negative comments to whom?
10 A   Our sales reps, potential customers, namely from Jeff
11      Cole.
12 Q   Do you know for what Indeck company Jeff Cole works?
13 A   At this point I don't know.
14 Q   Can you identify the potential customers to whom
15      comments were made?
16 A   Yes, Notre Dame was one in particular.  It just seems
17      like anytime we would come up to bid against IKE or Indeck
18      there was always a negative comment that was made about our
19      company, you know they're getting ready to lose their
20      license agreement and they won't have the ability to build
21      package boilers.  That was pretty common.
22 Q   Any customers other than Notre Dame that you can
23      identify?
24 A   Not right now.
25 Q   I would like to show you what's been marked as Viskup

Page 162

1       Exhibit 16 and it's a document stamped VEO527 to 531.  Can
2       you take a look at that and let me know if you've seen it
3       before?
4 A   I don't know if I've seen it or not.
5 Q   Pardon me?
6 A   It doesn't look familiar.
7 Q   Did Mark White ever tell you that Bob Gdaniec sent a
8       letter to VEO identifying concerns that EPTI had with VEO's
9       performance under the license agreement?
10 A   I'm sure we discussed it, sure.
11 Q   In the second paragraph on the first page Mr. Gdaniec
12      writes, let me explain our philosophy in general terms for
13      the approach we have taken, which was based on our overall
14      assessment of the past year operating with the current
15      license agreement in place and the desire of VEO to
16      purchase some of the technology.  While things in general
17      have gone well over the past year, we do have concerns with
18      regard to past year's performance that needs to be
19      addressed and resolved.  Attached is an overview of our
20      concerns for your reference.  And do you see on the last
21      two pages a listing of one through several other paragraphs
22      that are not appropriately numbered identifying different
23      concerns that EPTI had?
24 A   I guess I would just question on who is we?
25 Q   EPTI?

Page 163

1 A   I mean that doesn't help me, but I mean -- okay.
2 Q   Had you seen these two pages before at the end of
3       this exhibit?
4 A   I'm sure I have.
5 Q   On the first page there's an EPTI approach recap.
6       Do you recall receiving this letter in the context of the
7       discussions between EPTI and VEO for the potential sale of
8       the Keystone technology?
9 A   Not necessarily.
10 Q   Turning to the second to last page of this exhibit.
11 A   530?
12 Q   Yes.  It says EPTI's concerns regarding VEO's
13      performance under existing agreement.  Number 1, VEO
14      currently licenses only the M-Series product line which has
15      a very specific geometry and characteristics.  In review of
16      some of the VEO recent projects and proposals, it appears
17      that the majority of the projects that VEO is pursuing or
18      has completed has been outside the definition of the
19      license agreement.  Did you have any discussions with Mark
20      White about whether projects were outside the scope of the
21      license agreement at the time that VEO and EPTI were
22      discussing the potential sale of technology?
23 A   I wasn't aware that we may.
24 Q   Did you have a discussion with Mark White as to
25      whether any of the projects were outside the scope of the

Page 164

1       license agreement?
2 A   I'm sure we did.
3 Q   What makes you say that you're sure that you had that
4       discussion?
5 A   Mark and I talk everyday.
6 Q   Do you recall any specific discussion you had after
7       receiving this letter?
8 A   I think I remember one, for instance, where I know
9       Bob had some concerns and I know that I was -- and I
10      remember seeing this document because it was concerning to
11      me that yet EPTI was involved in the design assistance with
12      these particular projects, yet they're concerned about
13      going outside the geometry and characteristics of the
14      M-Series.  I mean it seems to me like that's an oxymoron a
15      little bit.  So there was some concerns on where Bob was
16      coming from because the last time I checked, they cashed
17      the checks of the boilers that we sold and they were
18      involved, so I don't know.  This just seems odd to me.
19 Q   What do you mean by geometry?
20 A   I just was reading it off this number 1 here.
21 Q   What did you understand to be meant by the word
22      geometry?
23 A   I was trying to figure out what he was talking about.
24      So I don't know.
25 Q   Did you read each of the paragraphs in which Mr.

Page 165

1       Gdaniec identified concerns that EPTI had?
2 A   I think I already said yes, yes.
3 Q   Did you have any conversations with Mark White as to
4       whether welded wall or membrane technology was an
5       improvement under the license agreement?
6 A   No.  It was never viewed that way.
7 Q   Did Mark White send any drafts of a response to Mr.
8       Gdaniec's letter?
9 A   He may have.
10 Q   I would like to show you what's been marked as Viskup
11      Exhibit 17.  It's a document stamped VEO1013 to 1016.  Is
12      this an e-mail with attachment that you received from Mark
13      White on or about March 26, 2004?
14 A   Yes.
15 Q   Did you review his proposed response to Bob Gdaniec's
16      letter identifying concerns that EPTI had?
17 A   I don't know if I did or not.
18 Q   Did you authorize Mark White to send a response to
19      the letter in which EPTI identified concerns it had with
20      VEO's performance?
21 A   I don't recall if I did or not.
22 Q   I would like to show you what's been marked as Viskup
23      Exhibit 18.  It's a document stamped VEO632 through 635.
24      If you will, take a look at that and let me know whether
25      you've seen it before?

Page 166

1 A   This is the same letter I think, isn't it?  I don't
2       know, I mean, if I've seen it or not.
3 Q   Do you see how you're shown as a CC on Mr. White's
4       March 30, 2004 e-mail to Bob Gdaniec?
5 A   Yes.
6 Q   It says Bob, the enclosed is in response to your
7       letter dated March 26, 2004.  Please feel free to call me
8       should you have any questions or comment.  Did you have any
9       discussions with Mark White concerning this March 30, 2004
10      letter before he sent it to EPTI?
11 A   I think my comments are the same as I said before.  I
12      think it's the same letter.  It has different dates on it.
13 Q   Do you specifically recall having any conversations
14      with Mark White concerning the substance of his response to
15      EPTI about his concerns with VEO's performance under the
16      license agreement?
17 A   I know we talked about it.  So, I mean, we had
18      several discussions I'm sure.  I just can't recall anything
19      specific right now.
20 Q   On how many occasions did you and Mark White discuss
21      the response that VEO would provide Mr. Gdaniec's March
22      26th letter?
23 A   I don't know if we ever discussed that in particular,
24      the response.  I know we discussed the issues.
25 Q   So you don't know one way or the other then whether

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, )
LLC, a Delaware limited )
liability company, ) CONFIDENTIAL
        )
        Plaintiff,    ) CIVIL ACTION
        )
vs.        ) No. 04-CV-325E
        )
VICTORY ENERGY OPERATIONS, ) Judge Sean J. McLaughlin
LLC, a Delaware limited )
liability company, )
        )
        Defendant.    )

The videotape deposition of JOHN VISKUP taken on
behalf of the Plaintiff before Pamela B. Stinchcomb,
Certified Shorthand Reporter in and for the State of
Oklahoma, on the 1st day of February, 2006, in the
City of Tulsa, State of Oklahoma, pursuant to the
stipulations of the parties.

PAMELA B. STINCHCOMB, CSR #1544
DAVIDSON REPORTING SERVICE
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
(918) 745-9959

Page 3

A P P E A R A N C E S
FOR THE PLAINTIFF:    MR. JOHN K. GISLESON
                Attorney at Law
                Fifth Avenue Place
                120 Fifth Avenue
                Suite 2700
                Pittsburgh, Pennsylvania
                    15222
FOR THE DEFENDANT:    MR. CHRISTOPHER T. SHEEAN
                Attorney at Law
                225 West Wacker Drive
                Chicago, Illinois    60606
Also appearing:        Chris Petcos
                Mark White
                Martin Swabb

S T I P U L A T I O N S
It is hereby stipulated and agreed by and
between the parties hereto that this deposition is
being taken pursuant to notice and that the same may
be taken at this time and place.
It is further stipulated and agreed that this
deposition may be taken pursuant to the Federal Rules
of Civil Procedure and that the same may be taken at
this time and place.

Page 4

I N D E X
DIRECT EXAMINATION
    by Mr. Gisleson..................... Page 4
REPORTER'S CERTIFICATE.................. Page 50
INDEX OF EXHIBITS
EXHIBIT                    PAGE
NUMBER                    IDENTIFIED
PLAINTIFF'S EXHIBITS
Number 1............................. 4
Number 2............................. 25
Number 3............................. 26
Number 4............................. 45
Number 5............................. 47

EXHIBIT
5
PENGAD 800-631-6989

Page 5

1        JOHN VISKUP,
2    being first duly sworn to tell the truth, the whole
3    truth, and nothing but the truth, testified as
4    follows:
5        DIRECT EXAMINATION
6    BY MR. GISLESON:
7 Q. Would you state your name, please.
8 A. John Viskup.
9 Q. Do you understand you're appearing here
10    today as the authorized representative of Defendant
11    Victory Energy Operations, LLC, in this lawsuit?
12 A. Yes.
13    (Plaintiff's Exhibit Number 1 was marked
14    for identification.)
15 Q. (By Mr. Gisleson) I'd like to show you
16    what's been marked as Plaintiff's Exhibit 1, which is
17    a copy of a Notice of Rule 30(b)(6) Deposition Of
18    Corporate Designee Of Defendant. If you can look at
19    that, let me know whether you've seen it before.
20 A. Yes.
21 Q. Are you here today to testify to any of
22    these items listed 1 through 23?
23 A. Yes.
24 Q. Which ones?
25 A. I believe specifically 21, 22, 23.

Page 6

1 Q. Any others?
2 A. No.
3 Q. Item Number 21 is, "The factual basis for
4    VEO's claim that IKE has violated exclusivity under
5    the license agreement," correct?
6 A. Yes.
7 Q. What is VEO's understanding as to any
8    exclusivity obligation under the license agreement
9    that applies to Indeck Keystone Energy?
10 A. We believe under the license agreement, we
11    had exclusive rights to the marketing and the sales
12    thereof of the Keystone boilers within the United
13    States, Canada and Mexico.
14 Q. Which Keystone boilers?
15 A. The ones that have been licensed.
16 Q. Which were the ones that were licensed?
17 A. The ones identified in the license
18    agreement.
19 Q. In Clause 1 as well as in Annex 1?
20 A. Clause 1.
21 Q. Are the license products for which VEO
22    claim as exclusivity those included in Annex 1, as
23    well?
24    MR. SHEEAN: John, I think we're
25    getting into sort of blending back over to topic

Page 7

1    Number 2, which is the interpretation of the license
2    agreement for which we're going to offer Mark White.
3    MR. GISLESON: I understand that. I
4    just want to make sure I understand the scope of the
5    exclusivity claim and the specific boilers that are
6    the subject of the exclusivity claim.
7    MR. SHEEAN: And I think the answer to
8    that is what Mr. Viskup has already testified to and
9    that is the -- those items licensed under the license
10    agreement. If you want to delve into what VEO's
11    interpretation of the license agreement is, you're
12    free to ask Mr. White all about that.
13    MR. GISLESON: Thank you.
14 Q. (By Mr. Gisleson) So what are the boilers
15    for which — well, strike. That does VEO believe
16    that IKE violated exclusivity under the license
17    agreement?
18 A. Yes.
19 Q. How did IKE violate exclusivity under the
20    license agreement?
21 A. There were several announcements made about
22    their ability to sell Keystone boilers in the same
23    marketplace that we had been selling Keystone boilers
24    in, with no mention of Victory Energy, no mention of
25    capacity ranges to which they could sell -- sell the

Scrunch® www.Scrunchit.com  GG Software, Seattle, Washington

EVALUATION COPY; Use of the software after 3/3/06 prohibited

Page 20

1 notify the public that VEO only had an exclusive
2 license for boilers below 150,000 pounds per hour,
3 whereas IKE or its predecessor, EPTI, could sell
4 boilers above 150,000 pounds per hour?
5          MR. SHEEAN: I'm going to object
6 because I think the documents produced in this
7 litigation speak for themselves.
8 Q. (By Mr. Gisleson) You can answer the
9 question.
10 A. Yes.
11 Q. When did you do that?
12 A. Several occasions. If you ask any one of
13 our representatives of what our steam line capacity
14 was, that it would be 150,000 pounds an hour, every
15 single one of our reps would say that.
16          MR. SHEEAN: That let's take a break.
17          (break was taken)
18 A. Okay. I want to supplement to a previous
19 answer here. We know that on several occasions Chris
20 Petcos represented to the industry that IKE was able
21 to sell Keystone boilers -- well, let me step back,
22 that -- that -- or excuse me. That Victory Energy
23 was only allowed to sell boilers that were tangent
24 tube or fractory front and rear wall construction,
25 that anything above that, IKE was allowed to sell

Page 21

1 Keystone boilers above that type of design.
2 And the other thing, too, is regarding the
3 public announcement. We did make a public
4 announcement on our own web site about our steam
5 limitation as far as capacities that Victory Energy
6 could offer as related to the Keystone boiler. And
7 in the very beginning when we first signed the
8 license agreement, there was a -- a public
9 announcement made in writing, drafted originally by
10 EPTI and reviewed back and forth between Mark White,
11 myself and Shawn Brewer. And that notice was sent
12 out to several people about our steam limitation
13 capacities.
14 Q. (By Mr. Gisleson) Anything else?
15 A. No.
16 Q. How long was the public announcement on the
17 web site that VEO's exclusive license was only up to
18 150,000 pounds per hour?
19 A. I believe up until the termination of the
20 agreement.
21 Q. Did VEO ever develop a sales brochure that
22 advised the public that the exclusive license was
23 only up to 150,000 pounds per hour steam flow?
24 A. I believe so.
25 Q. Who developed that brochure?

Page 22

1 A. I'm not sure.
2 Q. VEO believes that its own sales brochure
3 identified that its exclusive license was only up to
4 150,000 pounds per hour steam flow?
5 A. Yes.
6 Q. What was the name of the trade publication
7 that you referenced?
8 A. I don't remember.
9 Q. Who were the customers who expressed
10 confusion to VEO?
11 A. I don't recall right now.
12 Q. Can VEO identify any sales that it lost as
13 a result of any alleged actions by IKE in violation
14 of the exclusivity provision in the license
15 agreement?
16 A. Well, I know we lost opportunities, so
17 don't know of any sales were lost yet, but we lost
18 opportunities to bid.
19 Q. Can you identify any specific opportunities
20 to bid that VEO loss?
21 A. Yes, the one I mentioned in Michigan about
22 the 150,000 pound per hour boiler application.
23 Q. Any others?
24 A. No.
25 Q. As of Michigan boiler, was that Indeck

Page 23

1 Keystone Energy or Indeck Power Equipment?
2 A. Indeck Keystone Energy.
3 Q. Are there any other public announcements
4 you can identify, other than the Marsha Fornyeah
5 e-mail and the trade publication?
6 A. Other than just Chris Petcos, his own
7 announcements at the sales meeting in front of
8 several sales reps and several phone calls that he
9 made to a lot of our existing reps.
10 Q. When was the sales conference that you
11 referenced?
12 A. It was in December, Power Gen.
13 Q. December of 2005?
14 A. No, it was a year before that.
15 Q. December of 2004?
16 A. Right.
17 Q. What exactly did Mr. Petcos say that causes
18 concern to VEO?
19          MR. SHEEAN: Objection, asked and
20 answered.
21 A. He had said that Victory Energy was
22 licensed to sell Keystone boilers of the tangent tube
23 refractory front and rear wall design, that IKE could
24 sell Keystone boilers that differ from that. As an
25 example, "O" series or -- or the new series, whatever

Page 24

1 he was characterizing at that time.
2 Q. (By Mr. Gisleson) Was that the same
3 statement that Mr. Petcos made to VEO in writing
4 prior to the time of Power Gen?
5 A. No.
6 Q. Did IKE through Chris Petcos, at any time
7 prior to December 2004, notify VEO that its license
8 only permitted VEO to sell tangent tube boilers?
9 A. What time frame?
10 Q. Prior to December 2004.
11 A. I don't know.
12 Q. What were the several calls that Chris
13 Petcos allegedly made?
14 A. To our sales reps.
15 Q. To which sales reps?
16 A. Ian Milligan being one of them.
17 Q. What did he say?
18 A. What I had said before about what our
19 limitations were as far as what we could sell. He
20 was trying to get Ian Milligan to cancel our sales
21 agreement with Victory Energy, represent IKE. And
22 one of his lasting comments was, you know, you might
23 as well just cancel your contract with them. We're
24 suing them anyways and they're not going to be able
25 to sell Keystone boilers.

Page 25

1 Q. Did Ian Milligan cancel his contract with
2 VEO?
3 A. No.
4 Q. Is Ian Milligan currently a VEO sales rep?
5 A. Yes, he is.
6 Q. Did Ian Milligan in any way change his
7 sales approach based on the conversation with Chris
8 Petcos, to the best of VEO's knowledge?
9 A. I don't know.
10 Q. What customers expressed concerns to you in
11 phone calls?
12 A. I don't know.
13 Q. Can you remember the specific concerns that
14 were raised?
15 A. I think just the consistent campaign that
16 he was on, trying to make a difference that we were
17 not able to sell Keystone boilers in the marketplace.
18 Q. But what were the concerns raised by the
19 customers with whom VEO spoke?
20 A. Whether or not we were going to be able to
21 sell boilers, you know, again, the mention of the
22 litigation created some serious doubt in people's
23 minds and just caused a stress for us for a period of
24 time there.
25 Q. So the only public announcements that VEO

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 32

1 specifications were for the GE project?
2    MR. SHEEAN: Documents related to that
3 project have been produced in this litigation.
4 A. I believe that the boiler size was about
5 70,000 pounds per hour, 70 to 90,000 an hour, I
6 believe. I believe there's some super heat in that
7 request for proposal.
8 Q. (By Mr. Gisleson) Did VEO advise EPTI that
9 it believed EPTI had breached the exclusivity
10 provision?
11 A. Yes.
12 Q. What was EPTI's response?
13 A. I believe the response was that GE had come
14 to them and they just provided a proposal. I don't
15 think that -- they said -- they didn't act like it
16 bothered them, I guess.
17 Q. Had EPTI previously sold boilers to GE?
18 A. I don't know. I know the license agreement
19 has a clause that they would come to us, we'd work
20 out the best efforts the way to offer the unit for --
21 for offer -- for sale I mean. They did not do that.
22 Q. Is it VEO's understanding that GE
23 explicitly requested a proposal from EPTI?
24 A. No.
25 Q. EPTI told you that GE came to EPTI; is that

Page 33

1 correct?
2 A. They didn't tell us anything. We found out
3 through word of our burner vendors that EPTI had
4 offered a Keystone boiler for sale and we actually
5 had to call them on the carpet, if you will, about
6 the quotation.
7 Q. Does VEO have any reason to believe that
8 EPTI obtained any business as a result of that
9 contact with GE?
10 A. They may have.
11 Q. Does VEO know one way or the another?
12 A. Don't know right now.
13 Q. Can VEO quantify in any way any damages
14 associated with that action by EPTI? And by damage I
15 mean any specific financial losses.
16 A. Sure. I mean, again, you can see the
17 confusion when you have the -- the exclusive licensee
18 not being given the opportunity, a company going
19 behind our back, so to speak, offered a proposal.
20 We're not given an opportunity so, therefore, we lose
21 the chance to quota, we lose the chance to profit
22 from that particular sale, as well as them. So,
23 therefore, I mean, there is damages on those
24 particular boilers. I'm sure we could determine what
25 that would be.

Page 34

1 Q. Can you identify that amount sitting here
2 today?
3 A. I would say it would be somewhere above
4 250,000 to $400,000.
5 Q. As profit?
6 A. Yes.
7 Q. Did VEO contact GE after learning of the
8 proposal by EPTI?
9 A. I believe we did.
10 Q. Who contacted GE?
11 A. I believe Shawn Brewer did.
12 Q. What did VEO say to GE?
13 A. I don't know.
14 Q. Do you know what GE's response was to the
15 contact by VEO?
16 A. I do not.
17 Q. Did VEO submit a proposal to GE?
18 A. I believe we did.
19 Q. Did GE award a contract to VEO?
20 A. No.
21 Q. Why not?
22 A. I don't know. I think they were confused
23 as what was going on. They didn't understand the
24 whole relationship. I believe they were just
25 confused on what the issues were.

Page 35

1 Q. What basis does VEO have to believe that GE
2 was confused as to the relationship?
3 A. I believe that there is a conversation
4 between Shawn Brewer and somebody from the -- the GE
5 site.
6 Q. What were the details of the conversation?
7 A. How I recall it, that the client was
8 concerned why he had two proposals for a Keystone
9 boiler. He didn't understand why we were -- or why
10 they were offering the unit for sale if we were the
11 exclusive licensee. So there was concerns.
12 Q. Any other concerns that you can identify?
13 A. Not right now, no.
14 Q. Had GE made a decision as to the sale of
15 the boiler as of the time of that contact by VEO?
16 A. I don't know.
17 Q. Did VEO correct any concerns or confusion
18 that GE had?
19 A. I think we tried to verbally, yeah.
20 Q. Any other potential breaches by EPTI that
21 you can identify?
22 A. Not at this time.
23 Q. Are there any other alleged breaches of
24 exclusivity that VEO can identify?
25 A. No.

Page 36

1 Q. Turning to Item 22 of the deposition
2 notice, that reads, "The damages allegedly sustained
3 by VEO with respect to each its of counterclaims."
4 VEO is not seeking any money damages with respect to
5 Count 1 declaratory judgment; is that correct?
6 A. No.
7 Q. Say it differently, is VEO seeking money
8 damages under Count 1 for declaratory judgement?
9 A. No.
10 Q. Under Count 2 is VEO seeking money damages
11 for breach of contract?
12 A. No.
13    MR. SHEEAN: Let's take a break.
14    (break was taken)
15 A. I'd like to correct my answer for Count 2.
16 Q. (By Mr. Gisleson) Okay.
17 A. There's two items there, that one being
18 there's a missed opportunity for the Michigan boiler
19 project that we were not able to pursue, and,
20 secondly, written and oral -- or representations by
21 Chris Petcos and IKE in the industry of their ability
22 to sell Keystone boilers below 150,000 pounds per
23 hour.
24 Q. Anything else?
25 A. No.

Page 37

1 Q. Sitting here today, are you able to
2 quantify any financial damages associated with the
3 missed opportunity for the Michigan boiler?
4 A. Not right now, but I'm sure we could review
5 past project and then determine what that amount is
6 for past opportunities.
7 Q. If the Michigan boiler was a D boiler, that
8 would not violate the license agreement exclusivity
9 provision, would it?
10 A. Yes.
11 Q. A D boiler would violate --
12 A. Yes.
13 Q. -- the agreement? How so?
14 A. Because it's below 150,000 pounds her hour
15 and they're offering it "O" type.
16 Q. Who was offering an "O" type?
17 A. IKE.
18 Q. But if the customer wanted "D" type and IKE
19 offered a "D" type boiler, would that violate the
20 exclusivity provision?
21 A. I don't know.
22 Q. Can you identify the amount of any
23 financial damages associated with any statements by
24 Chris Petcos?
25 A. Not at this time.

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 38

1  Q. And Count 2 was for breach of contract
2     based on alleged violations of the exclusivity
3     provision, correct?
4  A. Correct.
5  Q. Is VEO seeking any money damages associated
6     with its claim in Count 3 for intentional
7     interference with contractual relations?
8  A. Yes.
9  Q. What is the amount of financial damages?
10 A. It's undetermined right now.
11 Q. Can VEO identify any specific sales that
12    were lost as a result of the alleged interference
13    with contracts set forth in Count 3?
14 A. We do know that there was a missed
15    opportunity for a -- an alternative fuel boiler that
16    Christian Power put together and missed opportunity
17    by ways of them not representing our company any
18    more, we weren't given that opportunity. It was for
19    a large project that we -- we consider to be in that
20    marketplace in a very competitive way and we weren't
21    given that opportunity that he developed.
22 Q. What was the alternative fuel?
23 A. It was a project and I believe it was for
24    Hereford [sic] ethanol.
25 Q. Was that an HRSG?

Page 39

1  A. Yes.
2  Q. That project did not involve a Keystone
3     boiler, did it?
4  A. I don't know.
5  Q. Can you identify any other potential
6     damages experienced by VEO?
7  A. I know that we sold -- we have an
8     aftermarket parts and sales group at Victory Energy
9     and, of course, since Christian Power is not our rep
10    any longer, we don't have the ability to sell parts
11    in that territory and had he still been the rep, we
12    definitely would have.
13 Q. Can you quantify in any way the lost sales
14    associated with the alleged inability to sell parts
15    in the territory?
16 A. I can't at this point.
17 Q. Can you identify any other alleged
18    financial damages experienced by VEO under Count 3?
19 A. The only other one would be -- give me one
20    second. The only other missed opportunities were
21    through a company called PSI Power Systems in
22    Michigan and the termination of their representative
23    agreement with us did not provide us the ability to
24    offer proposals for a period of time.
25 Q. Can you identify any specific sales that

Page 40

1     were lost as a result of PSI no longer being a sales
2     rep?
3  A. The Michigan project we know.
4  Q. Anything else?
5  A. I believe the Notre Dame project through
6     interference with -- with Indeck and IKE.
7  Q. Anything else?
8  A. No, not right now.
9  Q. As VEO's authorized representative, can you
10    identify a specific amount of money damages
11    associated with Count 3?
12 A. I believe we're going to leave that to
13    expert testimony.
14 Q. Has VEO retained an expert to quantify
15    damages under Count 3?
16 A. I don't believe we have at this point.
17 Q. Has VEO undertaken any attempt at
18    quantifying its money damages under Count 3?
19 A. I think it's an ongoing process right now.
20 Q. Has it undertaken any attempt to the
21    present to quantify money damages under Count 3?
22    MR. SHEEAN: Objection, asked
23    answered.
24 A. I don't have anything else to add to that.
25 Q. (By Mr. Gisleson) Pardon me?

Page 41

1  A. I don't have anything else to add.
2  Q. Can you identify anything that VEO has done
3     in an effort to quantify damages under Count 3?
4     MR. SHEEAN: Objection, asked and
5     answered.
6  A. Other than with our attorney, no.
7  Q. (By Mr. Gisleson) Is VEO seeking any
8     damages under Count 4 of its counterclaim?
9  A. No.
10    MR. SHEEAN: Let's take a break.
11    (break was taken)
12 A. I need to correct one of my last
13    statements. I was looking at Count 5 when you were
14    talking about Count 4. The pages kind of came
15    together but -- so we do, yes.
16 Q. (By Mr. Gisleson) What is the claim in
17    Count 4?
18 A. Count 4 is violation of California business
19    and professional code.
20 Q. What are the money damages that VEO seeks?
21 A. Money damages are anything that's been sold
22    from Christian Power for the termination of his
23    representative agreement with us to present day time.
24 Q. Can you quantify that in any way as you sit
25    here today as VEO's authorized representative?

Page 42

_That's what_

1  A. I know Alan had mentioned to us that it was
2     worth well north of 150, $150,000 a year to them.
3  Q. That Alan Christian's business?
4  A. That would he profited from that, and so
5     profits brought to the company would be in excess of
6     that.
7  Q. Alan Christian told VEO that his profits
8     exceeded $100,000 from his aftermarket parts
9     business?
10 A. Yes. And also during the period of time
11    Alan hasn't been a rep of ours, we have not had
12    opportunities to sell projects in his territory. He
13    was successful for a project with us through, you
14    know, several hours and days of preparation and
15    bidding on the King County project. So there were
16    several projects that probably didn't get opportunity
17    to bid on.
18 Q. Can you identify the projects for which VEO
19    did not have an opportunity to bid?
20 A. There was I know a couple of projects that
21    he was working on with a large engineering firm. His
22    territory name escapes me right now. I can't think
23    of the name of him at the moment. SNC Lavalin,
24    sorry.
25 Q. Any others?

Page 43

1  A. Not that I know of right now.
2  Q. VEO, in fact, submitted a bid to SNC
3     Lavalin, didn't it?
4  A. We had in the past.
5  Q. Was this a new project for SNC Lavalin?
6  A. I'm not sure. I don't remember.
7  Q. Had VEO ever obtained a contract from any
8     of its prior proposals to SNC Lavalin?
9  A. No.
10 Q. So that VEO had no prior experience getting
11    a contract from SNC Lavalin; is that correct?
12 A. Correct.
13 Q. Can VEO quantify its money damages
14    associated with Count 4?
15 A. Not at this time.
16 Q. Alan Christian of CPI had a sales rep
17    agreement that permitted him to terminate at any time
18    for any reason; is that correct?
19 A. CPE?
20 Q. CPE?
21 A. Yes.
22 Q. Are there any other bases for damages that
23    VEO can identify under Count 4?
24 A. Not that I can recall right now.
25 Q. Is VEO seeking damages under Count 5?

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

INDECK KEYSTONE ENERGY, LLC, )
a Delaware limited liability )
company, )
                )   CIVIL ACTION
   Plaintiff, )
                )
vs. )  Case No. 04-CIV-325E
                )   Judge Sean J. McLaughlin
VICTORY ENERGY OPERATIONS, LLC) )
a Delaware limited liability )
company, )  CONFIDENTIAL TESTIMONY
                )
   Defendant. )

DEPOSITION OF JOHN VISKUP,

a witness called on behalf of the Plaintiff, on the 31st
day of January, 2006, at 320 South Boston, Suite 400, in
the City of Tulsa, County of Tulsa and State of Oklahoma,
commencing at 9:30 A.M., before the undersigned, Joni
Humphries, a Certified Shorthand Reporter in and for the
State of Oklahoma.

Fee for Original:   $_____
Paid by Plaintiff.

_____

JONI HUMPHRIES, CSR #1236
DAVIDSON REPORTING
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
Phone: (918) 745-9959

---

Page 2

```
 1        A P P E A R A N C E S
 2   ATTORNEY FOR PLAINTIFF:
 3      MR. JOHN K. GISLESON
           Schnader, Harrison, Segal & Lewis
 4         Attorneys at Law
           120 Fifth Avenue
 5         Suite 2700
           Pittsburgh, Pennsylvania  15222-3001
 6
     ATTORNEY FOR DEFENDANT:
 7
        MR. CHRISTOPHER T. SHEEAN
 8         Wildman, Harrold, Allen & Dixon
           Attorneys at Law
 9         225 West Wacker Drive
           Chicago, Illinois  60606-1229
10
            * * * * * * * * * *
11
12   It is stipulated and agreed by and between the parties
13   hereto that this deposition is being taken pursuant to a
14   notice for this time and place.
15   It is further stipulated and agreed by and between
16   the parties hereto that the deposition shall be taken
17   pursuant to the Federal Rules of Civil Procedure.
18
19          * * * * * * * * * *
20
21
22
23
24
25
```

---

Page 3

```
 1              CONTENTS
 2   WITNESS                              PAGE
 3   JOHN VISKUP
 4   Direct Examination by Mr. Gisleson      4
     Reporter's Certificate                216
 5
 6         E X H I B I T S
 7                       Identified    Offered
 8   Plaintiff's Exhibit No. 1     66
     Plaintiff's Exhibit No. 2     90
 9   Plaintiff's Exhibit No. 3     96
     Plaintiff's Exhibit No. 4     98
10   Plaintiff's Exhibit No. 5    100
     Plaintiff's Exhibit No. 6    101
11   Plaintiff's Exhibit No. 7    113
     Plaintiff's Exhibit No. 8    122
12   Plaintiff's Exhibit No. 9    123
     Plaintiff's Exhibit No. 10   125
13   Plaintiff's Exhibit No. 11   127
     Plaintiff's Exhibit No. 12   130
14   Plaintiff's Exhibit No. 13   136
     Plaintiff's Exhibit No. 14   139
15   Plaintiff's Exhibit No. 15   143
     Plaintiff's Exhibit No. 16   161
16   Plaintiff's Exhibit No. 17   165
     Plaintiff's Exhibit No. 18   165
17   Plaintiff's Exhibit No. 19   171
     Plaintiff's Exhibit No. 20   172
18   Plaintiff's Exhibit No. 21   173
     Plaintiff's Exhibit No. 22   203
19   Plaintiff's Exhibit No. 23   207
     Plaintiff's Exhibit No. 24   208
20   Plaintiff's Exhibit No. 25   210
     Plaintiff's Exhibit No. 26   211
21   Plaintiff's Exhibit No. 27   212
22
23
24
25
```

---

Page 4

```
 1        MR. GISLESON:  If you could keep track please of
 2   the time that we go on and the time that we go off.
 3        VIDEOGRAPHER:  Running time or watch time?
 4        MS. GISLESON:  I guess running time.
 5        MR. SHEEAN:  Well, that is typically what we've
 6   done, but this deposition, I understand, there was a
 7   misunderstanding with the start time, but the Court
 8   Reporter, the Videographer, and the Notice that I received
 9   all indicated nine o'clock.  Mr. Viskup has somewhere to be
10   at five o'clock, so we intend to finish this deposition by
11   five o'clock.
12        MR. GISLESON:  I'll do the best I can.
13               JOHN VISKUP,
14   having been first duly sworn to testify the truth, the
15   whole truth and nothing but the truth, testified as
16   follows:
17             DIRECT EXAMINATION
18   BY MR. GISLESON:
19 Q  State your name please?
20 A  John Viskup.
21 Q  Have you had your deposition taken before?
22 A  Yes, I have.
23 Q  On how many occasions?
24 A  Four or five.
25 Q  Chances are the procedures there will be the same as
```



EXHIBIT

6

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Scrunch® www.Scrunchit.com   GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 173

1  2004?
2 A  I believe he was one of them, yes.
3 Q  Who at VEO was coordinating with its outside counsel
4     on matters pertaining to this license agreement?
5 A  Mark White.
6 Q  Did you have any conversations with Mark White at the
7     end of August, beginning of September of 2004, about
8     assertions by EPTI's outside counsel that VEO was violating
9     the license agreement?
10    MR. SHEEAN:  Mr. Viskup, I'm going to caution you
11    now not to disclose any conversations you may have had or
12    the content of any conversations you may have had with your
13    outside counsel relating to that topic.
14 A  Not necessarily.
15 Q  (By Mr. Gisleson)  What do you mean not necessarily?
16 A  I mean we may have talked about it, but I don't
17    recall right now.
18 Q  I would like to show you what's been marked as Viskup
19    Exhibit 21.  It's a document stamped IKE1098.  Do you see
20    how this is an e-mail exchange between Chris Petcos and
21    Mark White from September 24, 2004?
22 A  Yes.
23 Q  Did Mark White provide a copy of this e-mail exchange
24    to you?
25 A  I don't believe so, no.

Page 174

1 Q  Did Mark White advise you that on or about September
2     24, 2004 Chris Petcos was telling him that IKE is still
3     awaiting a response to a prior letter from him and
4     confirmation that Victory Energy will comply with all of
5     the terms and conditions of the license agreement by
6     marketing the specific M-Series product line, specifically
7     following the product size, dimensional data for the
8     different size ranges, typical cross section of the boiler
9     and overall boiler construction which includes refractory
10    front and rear walls, tangent furnace and outer wall tubes
11    and pressure casing design?
12 A  I believe we discussed it, yes.
13 Q  What did Mark White tell you?
14 A  I think essentially that, you know, regarding this
15    e-mail from Chris and just I think the context of his
16    e-mail I think in general.
17 Q  What did you tell Mark White?
18 A  Again, I think that there -- they, meaning IKE, are
19    misinterpreting the agreement and, you know, to the best of
20    my knowledge, you know, there was no concerns with the way
21    we were operating under the license agreement as told to me
22    and, you know, again, as they would invoice for royalties,
23    they would cash the checks.  You know, some of the concerns
24    as Chris states in here, or requests I guess, were new to
25    me.

Page 175

1 Q  By they cashing the check, you're referring to EPTI?
2 A  No, IKE.
3 Q  Had VEO provided any checks to IKE as of September
4     24, 2004?
5 A  I don't know.
6 Q  Did VEO disclose to IKE in any unit sale
7     notifications that VEO was selling boilers with membrane
8     walls?
9 A  I don't know.  I didn't have the communication, so I
10    couldn't tell you.
11 Q  Did VEO, after receiving the September 24, 2004
12    e-mail from Chris Petcos, sell boilers that included
13    membrane walls or welded walls?
14 A  I'm sure we did.
15 Q  Did VEO, after receiving the September 24, 2004
16    e-mail from Chris Petcos, limit the boilers it sold to Mr.
17    Petcos' description as set forth in that second paragraph
18    of his e-mail to Mark White?
19 A  No.
20 Q  Did Chris Petcos or anyone else from Indeck Keystone
21    Energy ever authorize VEO to sell boilers that were outside
22    the scope of the license agreement as he defined in the
23    second paragraph of his e-mail of September 24, 2004?
24    MR. SHEEAN:  Objection, vague.  You mean other
25    than being the licensor under the license agreement that

Page 176

1     granted that right?
2     MR. GISLESON:  Well move to strike as being
3     argumentative.
4 Q  (By Mr. Gisleson)  The point is simply this, did
5     Chris Petcos or anyone else from Indeck Keystone Energy
6     ever authorize VEO to sell watertube boilers under the
7     Keystone trademark that deviated from the parameters as
8     described in the second paragraph of his e-mail?
9     MR. SHEEAN:  Same objection.
10 A  The only way I can answer that is that the license
11    agreement allowed for us to sell the boilers that we were
12    selling and that's it.  That's all I have to say.
13 Q  (By Mr. Gisleson)  I understand that's your position,
14    but the question is whether anyone from IKE expressly
15    authorized VEO to continue selling boilers that included
16    membrane wall or welded wall technology or other features
17    that were outside the scope of Annex 1 to the license
18    agreement?
19    MR. SHEEAN:  Same objection.
20 A  Same answer.
21 Q  (By Mr. Gisleson)  No one provided that
22    authorization?
23    MR. SHEEAN:  Same objection.
24 A  I did not say that.
25 Q  (By Mr. Gisleson)  Can you identify anyone from IKE

Page 177

1     who authorized VEO to sell boilers that were outside the
2     scope of the boiler set forth in Annex 1 of the license
3     agreement?
4     MR. SHEEAN:  Objection, asked and answered.
5 A  I don't think I have anything else to add to that, my
6     previous answer.
7 Q  (By Mr. Gisleson)  What you're saying is you believe
8     you had the right under the license agreement?
9 A  Yes.
10 Q  But my question is did anyone from IKE state, either
11    verbally or in writing to you, after IKE became the
12    licensor, that VEO was authorized to sell boilers that
13    deviated from the boilers described in Annex 1 to the
14    license agreement?
15    MR. SHEEAN:  Same objection.
16 A  Absolutely, yes.
17 Q  (By Mr. Gisleson)  Who?
18 A  Whoever was in charge of I guess managing the license
19    agreement.
20 Q  At IKE?
21 A  Yes.
22 Q  How?
23 A  Our license agreement, it's in writing, what we're
24    allowed to sell.
25 Q  In the license agreement?

Page 178

1 A  Yes.
2 Q  Did you receive anything from IKE other than the
3     license agreement that specifically authorized VEO to sell
4     boilers that differed from the boilers described in Annex 1
5     to the license agreement?
6     MR. SHEEAN:  Objection, asked and answered.  He's
7     already identified the license agreement and he's
8     identified the invoices and the checks that were cashed.
9     MR. GISLESON:  It's been asked, but it hasn't
10    been answered.
11 A  I just have the same answer, the license agreement.
12    So that's it.
13 Q  (By Mr. Gisleson)  The only basis that you have for
14    saying that VEO could sell boilers outside the scope of
15    Annex 1 is what is in the terms of the license agreement
16    itself?
17    MR. SHEEAN:  Objection, asked and answered, and
18    now you're mischaracterizing his prior testimony.  He's
19    already identified specifically the invoices submitted by
20    IKE and the fact that they cashed the checks.
21 Q  (By Mr. Gisleson)  What was in the invoices submitted
22    by IKE that led you to believe that VEO could sell boilers
23    that were outside the parameters in Annex 1 of the license
24    agreement?
25 A  I don't know.

1             IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2


3

INDECK KEYSTONE ENERGY,      )
4 LLC, a Delaware limited     )
liability company,           )
5                            )
              Plaintiff,      ) CIVIL ACTION
6                            )
vs.                          ) No. 04-CV-325E
7                            )
VICTORY ENERGY OPERATIONS,   ) Judge Sean J. McLaughlin
8 LLC, a Delaware limited     )
liability company,           )
9                            )
              Defendant.      )
10

11

12

13      The videotape deposition of MARK WHITE taken on

14 behalf of the Plaintiff before Pamela B. Stinchcomb,

15 Certified Shorthand Reporter in and for the State of

16 Oklahoma, on the 14th day of October, 2005, in the

17 City of Tulsa, State of Oklahoma, pursuant to the

18 stipulations of the parties.

19

20

21
            PAMELA B. STINCHCOMB, CSR #1544
22          DAVIDSON REPORTING SERVICE
               5508 South Lewis Avenue
23            Tulsa, Oklahoma  74105
                 (918) 745-9959
24

25                                    COPY

EXHIBIT
7

PENGAD 800-631-6989

Scrunch® www.Scruncht.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

**Page 1**

```
 1              MARK WHITE,
 2   being first duly sworn to tell the truth, the whole
 3   truth, and nothing but the truth, testified as
 4   follows:
 5          MR. SHEEAN:  Before we begin the
 6   questioning of Mr. White, my name is Christopher
 7   Sheean.  I'm the attorney for Victory Energy
 8   Operations in this litigation.  Earlier this week
 9   Victory Energy received a set of documents produced
10   by Christian Power pursuant to subpoena from counsel
11   for Indeck Keystone Energy.  Those documents were
12   provided from Victory Energy to Christian Power
13   pursuant to a representative agreement, and Christian
14   Power had an obligation to maintain those documents
15   as confidential.  As such, the parties have agreed to
16   stipulate that those document will be deemed
17   confidential pursuant to the protective order entered
18   in this case in June of 2005.  Thank you.
19          DIRECT EXAMINATION
20   BY MR. GISLESON:
21 Q.  Will you state your name, please.
22 A.  Mark White.
23 Q.  Have you been deposed before?
24 A.  Yes, I have.
25 Q.  On how many occasions?
```

**Page 2**

```
 1 A.  One.
 2 Q.  What did that involve?
 3 A.  It was the case from Stephen Graves against
 4   Victory Energy.
 5 Q.  Can you describe your understanding of that
 6   lawsuit.
 7 A.  It was a lawsuit, from my understanding,
 8   that Mr. Graves had claimed he was owed commissions,
 9   back commissions, back pay and so forth, and it was
10   filed against Victory Energy.
11 Q.  What was the outcome of that lawsuit?
12 A.  It was settled.
13 Q.  Did any of those commissions pertain to the
14   sale of any Keystone watertube boilers?
15 A.  No, sir.
16 Q.  Do you have a copy of your transcript in
17   that lawsuit?
18 A.  Do I?  No.
19 Q.  Chances are the procedure today is going to
20   be the same as the procedure in that lawsuit.  If at
21   any time I ask you a question that you don't
22   understand, will you let me know so that I can
23   rephrase the question?
24 A.  Yes.
25 Q.  If at any time I ask you a question that
```

**Page 3**

```
 1   you don't hear, would you let me so that I can repeat
 2   the question?
 3 A.  Yes.
 4 Q.  Do you agree to only answer those questions
 5   that you have heard and understood?
 6 A.  Yes, sir.
 7 Q.  Please never guess or speculate, okay?
 8 A.  Yes.
 9 Q.  And make sure that all of your responses
10   are verbal, okay?
11 A.  Yes.
12 Q.  How are you currently employed?
13 A.  I'm employed with Victory Energy
14   Operations.
15 Q.  Where is your office located?
16 A.  Collinsville, Oklahoma.
17 Q.  What's the address?
18 A.  I don't recall.
19 Q.  Do you work on site at Victory's location?
20 A.  Yes.  Yes, I do.
21 Q.  What's -- what is the address for Victory
22   Energy Operations?
23 A.  I had mentioned I don't recall.
24 Q.  Where are its headquarters located?
25 A.  Collinsville, Oklahoma.
```

**Page 4**

```
 1 Q.  What is your title with Victory?
 2 A.  Director -- or, excuse me, general manager.
 3 Q.  What are your job responsibilities as
 4   general manager?
 5 A.  I oversee the operations of the company.
 6 Q.  All operations?
 7 A.  Yes, sir.
 8 Q.  Describe the operations.
 9 A.  Operations to include project management
10   functions, engineering functions, manufacturing
11   functions, limited sales and marketing functions,
12   employee personnel functions.
13          MR. SHEEAN:  This would be a good time
14   for me to mention that along with yesterday's
15   deposition, Victory Energy considers and designates
16   the deposition here today as confidential under the
17   protective order.  Sorry.
18 Q.  (By Mr. Gisleson)  Any other job
19   responsibilities?
20 A.  There are various duties, too.  You know,
21   I'm trying be as expansive as I possibly can be, but
22   there are certainly other duties that I may not have
23   referenced.
24 Q.  Have you had all those duties since you
25   joined Victory Energy?
```

**Page 5**

```
 1 A.  Yes, sir.
 2 Q.  When did you join Victory?
 3 A.  I joined Victory in 2003, August of 2003.
 4 Q.  Have you been general manager of Victory,
 5   which I'll sometimes refer to as VEO, continuously
 6   from August of 2003 to the present?
 7 A.  Yes, sir.
 8 Q.  To whom do you report?
 9 A.  John Viskup and Jim Sponder.
10 Q.  What is John Viskup's title with VEO?
11 A.  President.
12 Q.  What is Jim Sponder's title with VEO?
13 A.  Service manager.
14 Q.  Do you have an ownership interest in VEO?
15 A.  I do not.
16 Q.  Is any aspect of your compensation based on
17   commissions?
18 A.  I was on a bonus program for the previous
19   calendar year, which has expired.
20 Q.  Was that bonus in any way related to the
21   sale of Keystone watertube boilers?
22 A.  It was based on the overall sales of the
23   company.
24 Q.  Which would include the Keystone boilers?
25 A.  Yes, sir.
```

**Page 6**

```
 1 Q.  Did you receive a bonus?
 2 A.  Yes, sir.
 3 Q.  Can you allocate any of the bonus to the
 4   sales of Keystone boilers?
 5 A.  Not directly.
 6 Q.  Indirectly?
 7 A.  Indirectly they would have been part of the
 8   overall sales of the company.
 9 Q.  What was the amount of the bonus?
10 A.  It was based on my salary at the time, and
11   I believe it was in the neighborhood of about
12   $20,000, approximately.
13 Q.  Are John Viskup and Jim Sponder the only
14   two owners of VEO?
15 A.  To my knowledge.
16 Q.  Do you know what their respective ownership
17   interests are?
18 A.  I don't.
19 Q.  What's your educational background?
20 A.  I graduated with a Bachelor of Science in
21   1984 from Wayne State College in Wayne, Nebraska.
22 Q.  I'm sorry, what was the name of the
23   college?
24 A.  Wayne State College in Wayne, Nebraska.
25 Q.  Are you an engineer?
```

Page 67

1  license agreement was entered with VEO, that VEO
2  maintain secrecy over the technical information it
3  received from EPTI?
4  A.  It terms of the secrecy, the understanding
5  and the intent of the agreement was to limit design
6  details, such as separation devices, those type of –
7  that type of information, what we would consider
8  proprietary, but not to limit proposal type
9  information. And when selling anything, it would
10  have been entirely impossible for Victory to limit
11  technical information to the extent not providing it
12  to their clients. You couldn't even provide a
13  proposal. It wouldn't have been a practical
14  agreement.
15  Q.  Is there any carve out that you're aware of
16  in the license agreement for that kind of proposal
17  information you just described?
18       MR. SHEEAN:  I'm going to object to
19  the extent it calls for a legal conclusion.
20  A.  I'm not an attorney, but under 2A, under
21  selling rights:  The exclusive license to manufacture
22  the products and to sell – or to offer, sell and
23  install the products so manufactured, and use the
24  technical information connected therewith. I'm not
25  an attorney, but to me that implies that you use the

Page 68

1  information to provide – to sell and market these
2  boilers.
3  Q.  Anything else?
4  A.  Without doing a thorough review of the
5  document, I couldn't say.
6  Q.  On Page VEO670 under Clause 6 for
7  compensation, it refers to a technology disclosure
8  fee of $75,000.  How did you arrive at the $75,000
9  figure?
10  A.  It was discussed with Stephen. There may
11  have been others in the discussion. It was a
12  starting point for the negotiations. I recall it was
13  later reduced to somewhere around $20,000.
14  Q.  Turning to Page VEO671, Clause 8 refers to
15  modifications to products by licensee.  Are you aware
16  of any changes to Clause 8 from this draft based on
17  discussions that you had with John Viskup, Shawn
18  Brewer or anyone else from VEO?
19  A.  No.
20  Q.  Turning to Page VEO672, Clause 9 for
21  workmanship, are you aware of any changes that were
22  made to the language in that clause based on
23  discussions you had with John Viskup, Shawn Brewer or
24  anyone else from VEO?
25  A.  I don't recall.

Page 69

1  Q.  Turn to Page VEO675, Clause 13,
2  improvements.  Are you aware of any changes to the
3  language in that clause based on conversations you
4  had with John Viskup, Shawn Brewer or anyone else
5  from VEO?
6  A.  I'm not aware of any.
7  Q.  Turn to Page VEO676.  Clauses 14 and 15
8  refer to copyright and trademarks respectively.  Are
9  you aware of any changes that were made to the
10  language in those clauses based on conversations you
11  had with John Viskup, Shawn Brewer or anyone else
12  from VEO?
13  A.  I don't recall.
14  Q.  Was it always your expectation that VEO
15  preserve and protect the copyright and trademark
16  rights that EPTI had?
17  A.  Yes.
18  Q.  As of the time that the license agreement
19  was executed with VEO, did you care whether VEO
20  complied with the license agreement?
21  A.  Absolutely.
22  Q.  Why?
23  A.  Why did I care?
24  Q.  Yes.
25  A.  Well, I was an employee of Erie Power

Page 70

1  Technology, and as such, it was my responsibility to
2  administrate this document and implement this
3  document, execute this document in the best interest
4  of Erie Power Technology. In addition to that, you
5  know, this document was drafted in a broad sense to
6  understand that both parties, Erie Power Technology
7  and Victory Energy, would enter into an agreement
8  where we would be successful, where both parties
9  could be successful. You know, limiting
10  documentation, trying to make this very difficult
11  would have defeated the entire point of putting this
12  together.
13  Q.  Do you know who drafted the original
14  Rosetti license agreement?
15  A.  I believe it's Jim Davis.
16  Q.  Did you speak with Jim Davis about what he
17  intended by the different provisions in the Rosetti
18  license?
19  A.  No.
20  Q.  So you don't have any personal knowledge,
21  one way or the other, as to what Jim Davis intended
22  by certain provisions in the license agreement,
23  correct?
24  A.  In the Rosetti agreement?
25  Q.  Yes.

Page 71

1  A.  No.
2       THE WITNESS:  I'd like to take a
3  break.
4       MR. GISLESON:  Yeah, let's take a
5  break.
6  (Break was taken)
7  Q.  (By Mr. Gisleson)  Under Clause 15-B-2 of
8  the December 20, 2002 draft license agreement, it
9  says:  Licensee acknowledges that the mark, the
10  property solely of Licensor, is of great commercial
11  value to Licensor and represents the good will and
12  wide recognition attained by Licensor's high quality
13  of products.  All use of the mark by Licensee,
14  including any good will arising out of such use,
15  shall be solely to the benefit of Licensor.
16  It was your belief, wasn't it, as of the
17  time the license agreement was executed, that the
18  mark owned by Erie Power Technologies, particularly
19  the Keystone trademark, was of great commercial value
20  to EPTI and represented the good will and wide
21  recognition attained by EPTI's high quality products?
22  A.  In terms of the definition, yeah.  You
23  know, it was valuable to Erie Power Technologies.
24  Q.  And it was your expectation, wasn't it,
25  that all use of the Keystone mark by VEO, including

Page 72

1  any good will arising out of such use, shall be
2  solely to the benefit of EPTI, correct?
3  A.  Yes.
4  Q.  Was there any negotiation or change to that
5  language at any time by VEO?
6  A.  Not that I recall.
7  Q.  Under Clause 16, duration of agreement,
8  Subparagraph C, it's in bold highlighting and it
9  says:  In the event Licensee has not received during
10  the first two years a minimum of five orders for the
11  products, Licensor has the right to terminate the
12  agreement.  Do you see that?
13  A.  Yes, sir.
14  Q.  Whose language was that?
15  A.  I don't recall.
16  Q.  Was this the first draft of the license
17  agreement?
18  A.  You know, I don't know who authored this at
19  all of the information. It may have been, it may not
20  have been.
21  Q.  Was this a document that you maintained on
22  the hard drive of your computer at EPTI?
23  A.  You know, I don't know. It could have been
24  maintained on the company directory or it could have
25  been maintained on the hard drive. Once again,

Scruncht® www.Scruncht.com   GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Scrunch® www.Scrunchit.com  GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 169

1   answered and mischaracterizes his prior testimony.
2 A   While I was with EPI [sic], we wanted to
3    take the benefit of the marketing side.
4    (Plaintiff's Exhibit Number 22 was marked for
5    identification.)
6 Q.  (By Mr. Gisleson) I'd like to show you
7    what's been marked as White Exhibit 22.  See on the
8    first page of this exhibit is a December 23rd, 2004
9    e-mail from Bill Crutchfield to Alan C. on the
10   subject of ACCO engineered systems?
11 A   Yes.
12   He writes: "Alan, attached is our proposal
13   for the Central Valley, CA, project and our terms and
14   conditions of sale.  Please feel free to contact me
15   if you have any questions."  In December of 2004, was
16   Christian Power Equipment a sales representative for
17   VEO?
18 A   I believe so.
19 Q.  Is Christian Power Equipment still a sales
20   representative?
21 A   No.
22 Q.  Why not?
23 A   They elected to terminate the agreement.
24 Q.  Did they tell you why?
25 A   I don't recall.  Oh, well, yeah.  They were

Page 170

1    given the option to either continue with Victory or
2    continue with IKE.  And my understanding was Indeck
3    Keystone Energy made the demand of them to be one or the
4    other, but not both.
5 Q.  Was it reasonable, in your view, that IKE
6    require Christian to either work for it or work for
7    VEO, but that it couldn't work for both?
8 A   No.
9 Q.  Do you have any sales representatives who
10   work both for Victory and one of Victory's
11   competitors?
12        MR. SHEEAN:  Objection.
13 A   No.  It goes against -- if they're doing
14   it, they're doing it, you know, against the terms of
15   the agreement, because specifically in our agreement
16   that Victory Energy, they cannot compete with our
17   products.
18 Q.  (By Mr. Gisleson) Is it also correct that
19   under the sales representative agreements in force at
20   VEO that the sales representatives can terminate
21   those agreements for any reason they want so long as
22   they give appropriate notice?
23 A   They can terminate if they desire.
24 Q.  Similarly, VEO can terminate the sales
25   representatives if it chooses to do so for any reason

Page 171

1    it wants so long as it gives appropriate notice,
2    right?
3 A   That's correct.
4 Q.  Do you know how the commissions that
5    Christian Power received from IKE compare to the
6    commissions that it received from VEO?
7 A   No.
8 Q.  Would that make sense to you -- strike
9    that.
10   Is it reasonable to you that a sales
11   representative would prefer to work for a
12   manufacturer for whom it can earn more commissions
13   rather than less commissions?
14        MR. SHEEAN:  Objection, calls for
15   speculation, incomplete hypothetical, lack of
16   foundation.
17 A   The products weren't competing with each
18   other.  IKE doesn't have products that compete with
19   Victory's products in terms of the Keystone because
20   we were the licensee.  Therefore, they had more
21   opportunity to make additional commission money in
22   addition to what they had for IKE by representing
23   both companies.  To me it would make sense to
24   represent both companies, not one or the other.
25 Q.  Did Christian power go to work for IKE or

Page 172

1    for a different Indeck entity?
2 A   I don't know.
3 Q.  Turning to the fourth page, a cover sheet
4    for ACCO Engineered Systems for a 60,000 pound per
5    hour watertube steam boiler dated December 23rd,
6    2004?
7 A   Yes.
8 Q.  Then turning to the next page, under
9    summary proposal and terms, that's a standard format
10   for a VEO proposal, correct?
11 A   There is no standard format.  There is a --
12   maybe a typical format that might be used.
13 Q.  Is this the typical format for proposals?
14 A   Without looking at other proposals, I
15   couldn't be sure.
16 Q.  Looking under Section 1.1, equipment
17   description and pricings, it reads:  "Victory Energy
18   is pleased to offer a 60,000 pph "O" type watertube
19   steam boiler for the ACCO Engineered Systems project
20   Central Valley, California.  A detailed description
21   of the boiler and trim is provided in the following
22   sections.  The boiler will be complete and includes
23   the following."  Number 1 identifies:  "One Victory
24   Energy Operations, LLC, Model 14M, 60,000 pph
25   packaged watertube steam boiler."  Did VEO maintain

Page 173

1    its own line of boilers separate from Keystone
2    boilers?
3 A   No, that's referring to a Keystone.
4 Q.  Do you have any understanding as to why
5    there's no reference to Keystone?
6 A   No.
7 Q.  Turning to Section 3.0, under boiler
8    specifications, general, do you have any
9    understanding as to why there's no reference to this
10   being a Keystone design?
11 A   No.
12 Q.  Looking through this proposal, do you see a
13   referenced anywhere to Keystone?
14 A   Without reading the entire document, I
15   can't be sure.  But on the -- on a cursory review, I
16   would say no.
17        MR. GISLESON:  Let's take a break.
18   (Break was taken)
19   (Plaintiff's Exhibit Number 23 was marked for
20   identification.)
21 Q.  (By Mr. Gisleson) I'd like to show you
22   what's been marked as White Exhibit 23.  It's a
23   two-page document stamped IKE342 to 343.  If you'll
24   take a look at that and let me know when you're
25   finished, please.

Page 174

1 A   Okay.
2 Q.  This is an e-mail exchange from January 21
3    and 22 between you and Bob Gdaniec, correct?
4 A   Yes.
5 Q.  Starting from the bottom on January 21,
6    2003, at 1:37 p.m. concerning a possible new order of
7    50,000 pounds per hour, you write to Mr. Gdaniec:
8    Bob, it would appear that Victory may sell an M12 or
9    13 to Atofina in La Porte this week.  They originally
10   quoted a "D" type and changed to the "O" after the
11   license agreement was signed.  I know that you are
12   quite busy with the Siemens project, but I would like
13   to be somewhat prepared should they secure the
14   order.  Regarding the execution, my thoughts are as
15   follows.
16   And then under drawing and engineering you
17   write:  "The boiler selected is a standard "M" series
18   Keystone.  Therefore, drawing changes should be
19   minimal.  Victory Energy will modify those drawings
20   requiring changes under the guidance of EPTI.  EPTI
21   will review such changes for approval."
22   What was your basis for describing that
23   process?
24 A   On which -- I'm sorry, what -- where were
25   you referring?

Scrunch® www.Scrunchit.com  GC Software,  Seattle, Washington

EVALUATION COPY: Use of the software after 3/3/06 prohibited

Page 175

1 Q. The paragraph for drawing and engineering
2    at the bottom of the first page.
3 A. Well, Victory -- excuse me.  Erie Power
4    Technology was involved.  Steve Bernatowicz was
5    involved in the thermal design of the unit.  There
6    were changes, if I recall, in the fact that the unit
7    included a membrane wall, which I'd talked about
8    previously was part of the license agreement.  And
9    so, therefore, the membrane wall in front and rear
10   would have to have been changed, and those drawings
11   would be changed by Erie Power under the guidance of
12   EPTI.
13 Q. You mean changed by Victory under the
14    guidance of EPTI?
15 A. I'm sorry, yes, by Victory under the
16    guidance of EPTI, correct.
17 Q. Did that, in fact, occur, that Victory
18    modified the drawings under the guidance of EPTI?
19 A. I believe so.  I don't recall entirely.  I
20    believe that was the case.
21 Q. Bob Gdaniec then writes back to you:
22    "Mark, be careful on this one for free.  Dan and I
23    spoke on it today, and he believes that if this is
24    outside of the license agreement (which it is), then
25    we better get paid for it.  I think you need to get

Page 176

1    together with Dan and Stephen and Simon and resolve
2    this matter pretty quickly.  From what I understand,
3    this is way out of the license agreement, welded
4    walls and higher design pressure.
5    At this point, until Dan gives the okay, we
6    are not going to support this one for free.  Bob."
7    Is that correct?
8 A. That's what he wrote, yes.
9 Q. And then you write in response:  "Bob,
10    thank you for your e-mail message.  The welded wall
11    design will be handled by Victory and they will take
12    the responsibility and the liability of the change."
13    What do you mean by Victory taking responsibility and
14    liability of the change?
15 A. In terms of pulling in the welded wall in
16    the membrane, that Victory would be responsible for
17    changing the drawings, doing the manufacturing and so
18    forth.  And if there's liability that was associated
19    with that, they would be -- as in Victory, would be
20    liable for those changes.
21 Q. You then say:  "We will not be required to
22    make such changes.  In regard to the design pressure,
23    the operating pressure of the boiler outlet is 110
24    psig.  I am not sure where you are getting a pressure
25    outside the "M" series.  In general, we need to be

Page 177

1    practical about the agreement.  We need to assist
2    Victory in a positive way to ensure sales are
3    generated and a diversified revenue stream is created
4    for EPTI."  Did I read that correctly?
5 A. Yes.
6 Q. So you didn't tell Bob Gdaniec you're
7    wrong, welded walls are within the scope of the
8    license agreement.  You simply said we need to be
9    practical about the agreement, correct?
10       MR. SHEEAN:  Objection,
11    mischaracterizes the document.  You can answer.
12 A. No.  Bob was wrong.  Bob's interpretation
13    of the agreement was wrong.  Erie designed and
14    engineered this unit and included welded front and
15    rear walls, as they did on the prior job, which was
16    for Broin Corporation, three units, membrane front
17    and rear, membrane inner, membrane outer.  There was
18    no confusion within the corporation.
19 Q. (By Mr. Gieleson) You did not, in
20    responding to Mr. Gdaniec, advise him that he was
21    wrong in describing welded walls as being outside of
22    the license agreement, did you?
23       MR. SHEEAN:  Objection,
24    mischaracterizes the document and it's been asked and
25    answered.  You can answer it again.

Page 178

1 A. The welded wall construction was included
2    prior to the license.  There are times internally to
3    a corporation that you try to be politically
4    correct.  What I was trying to do was be politically
5    correct in getting Bob to understand that this
6    agreement did include this equipment.  And if you
7    wanted to argue and fight about it, you could take it
8    to Stephen Kang, you could take it to others in the
9    superiors, which he did.
10 Q. (By Mr. Gieleson) This e-mail exchange
11    occurred before you finalized Annex.1 of the license
12    agreement, correct?
13 A. What was the date of the annex agreement
14    that was executed?
15 Q. February the 3rd.
16 A. Then it would have -- yes, then it would
17    have -- exchange would have occurred then.
18    (Plaintiff's Exhibit Number 24 was marked for
19    identification.)
20 Q. (By Mr. Gieleson) I'd like to show you
21    White Exhibit 24, which is a document stamped
22    IKE273.  Do you recognize this as an e-mail exchange
23    in which you participated on February 3, 2003?
24 A. Yes.
25 Q. The lower message from Dave Briggs to you,

Page 179

1    copied to Dan Levstek and Bob Gdaniec, subject
2    license agreement response reads:  "Mark, the
3    agreement is for the saturated standard 8M through
4    22M refractory wall design Keystone package
5    boilers."  Did you thereafter write back to Dave
6    Briggs and tell him he's wrong in his interpretation
7    of the license agreement?
8 A. Shawn Brewer had asked what would change in
9    terms of the "M" series Keystone line if -- with a
10    membrane wall, which, again, was part of the license
11    agreement.  I was referring back to Shawn.  Ask Dave
12    Briggs for some assistance ^ * ^ Dave with these
13    drawings that were provided to Victory Energy, what
14    would change?  That information was then transmitted
15    back.
16 Q. Did you write back to Dave Briggs to advise
17    him that he's wrong in his interpretation of the
18    license agreement as being the saturated standard 8M
19    through 22M refractory wall design Keystone package
20    boiler?
21 A. I don't recall, but I wasn't Dave's
22    supervisor.
23 Q. You were being politically correct again?
24 A. I think it was up to David's supervisor to
25    inform him and, so, Bob Gdaniec to be informed by

Page 180

1    Stephen Kang and Dan Levstek of the intention, so --
2    (Plaintiff's Exhibit Number 25 was marked for
3    identification.)
4 Q. (By Mr. Gieleson) I'd like to show you
5    what's been marked as White Exhibit 25.  Do you
6    recognize this as a true and correct copy of an
7    e-mail that you sent to Shawn Brewer on February 10,
8    2003, on the subject of Atofina, utilization of the
9    Heinz boiler?
10 A. Yes.
11 Q. You write:  "Shawn, as you are aware, at
12    present, the Atofina boiler is sized as a 14M special
13    (with water cooled walls)."  What did you mean by 14M
14    special?
15 A. Well, 14M Keystone that would -- the
16    drawings that were provided to Victory included a
17    different wall configuration.  This was my attempt to
18    try to just -- to show they were different, that they
19    show that the water cooled walls included in this as
20    part of the license agreement would make some
21    change.  It would be an alteration.  There is no 14M
22    special.  It's just my interpretation.
23 Q. So what that means is that it's not a
24    standard model?
25       MR. SHEEAN:  Objection to the extent

Scrunch® www.Scrunchit.com    GC Software, Seattle, Washington

EVALUATION COPY: Use of the software after 3/2/06 prohibited

**Page 253**

1  A  Yes.
2  Q.  Do you know approximately when it was
3     created?
4  A  I don't recall, to be honest.
5  Q.  Do you know whether it was created before
6     or after you joined VEO?
7  A  It was before I joined VEO.
8  Q.  Did you provide a Keystone sales brochure
9     to Shawn Brewer or someone else at VEO?
10 A  I believe I provided a brochure to Shawn.
11 Q.  Did Shawn Brewer show you a draft of the
12    Victory brochure for the Keystone "M" series before
13    it was finalized?
14 A  This particular brochure?
15 Q.  Yes.
16 A  Yes, I've seen it.
17 Q.  But did he show you a draft of it before it
18    was finalized?
19 A  No, I saw a final version.
20 Q.  It had already gone to print?
21 A  It appeared it had, yes.
22 Q.  Did you send anything in writing to Shawn
23    Brewer advising him that he could copy wholesale the
24    sales manual for Keystone that Erie or one of its
25    predecessors had prepared?

**Page 254**

1     MR. SHEEAN:  Object to the terms "copy
2     wholesale". You can answer.
3  A  Would you repeat the question.
4  Q.  (By Mr. Gisleson)  Sure.  Did you give
5     written authorization to Shawn Brewer to copy, in
6     material respect, a Keystone sales brochure that was
7     created by EPTI or one of its predecessors?
8  A  I did not give him written authorization,
9     no.
10 Q.  Is it correct that a number of the
11    boilers depicted in photographs in this brochure are
12    outside of the scope of the license agreement?
13 A  Without really knowing the specific steam
14    capacity, pressure and temperature range, I couldn't
15    be certain, to be honest. I think it's the intent of
16    this document to show pictures, not to relate to
17    steam capacities, per se, as it relates to the
18    pictures.
19 Q.  Is this brochure still in use at VEO?
20 A  I don't believe so.
21 Q.  Has it been replaced by another brochure?
22 A  I don't think so.
23 Q.  Are there any brochures that are being
24    distributed by VEO?
25 A  I think at this time, no. I don't think

**Page 255**

1     we're actually utilizing really any brochures that
2     would depict the Keystone.
3  Q.  When did VEO stop issuing brochures for the
4     Keystone?
5  A  I don't recall.
6  Q.  Approximately?
7  A  I don't recall. I couldn't – I don't
8     know.
9  Q.  Why did VEO stop distributing Keystone
10    sales brochures?
11 A  You know, I don't know. I just think it
12    was – and I don't like to speculate. But just,
13    again, I think it's word of mouth, being known more
14    in the industry, not having to really produce much
15    marketing material, so it just stopped.
16 Q.  Did you personally instruct salesmen at VEO
17    to stop distributing Keystone sales manuals?
18 A  No.
19 Q.  Did VEO provide these brochures to its
20    sales representatives since you became general
21    manager?
22 A  I don't know if that to be a fact.
23 Q.  Do you know whether the sales
24    representatives for VEO have copies of any Keystone
25    sales brochures?

**Page 256**

1  A  I don't know.
2  Q.  Is there anyone at VEO who keeps track as
3     to what sales literature is provided to VEO sales
4     representatives?
5  A  There may be. Lee West may be tracking
6     that, I'm not sure.
7  Q.  Anyone else who would have that
8     responsibility?
9  A  No. Lee is the sales manager.
10 Q.  How long has Lee West been sales manager?
11 A  Approximately a year or two.
12 Q.  As sales manager, does he have
13    responsibility for Keystone boilers?
14 A  He has – he has a responsibility for all
15    products.
16    (Plaintiff's Exhibit Number 41 was marked for
17    identification.)
18 Q.  (By Mr. Gisleson) I'd like to show you
19    what's been marked as White Exhibit 41.  It's a
20    document stamped VEO646 to 658.  And the question is
21    do you know who prepared this power point
22    presentation?
23 A  I did.
24 Q.  Did you provide this to VEO?
25 A  Yes.

**Page 257**

1  Q.  Why?
2  A  It was provided as part of the technology
3     transfer to use in the marketing materials in the
4     March 2003 meeting.
5  Q.  Did you expect VEO to make any changes to
6     this presentation?
7  A  You typically would alter the presentation
8     to suit your needs, depending upon the client. There
9     is no canned presentation that I've been involved
10    with that suits all customers and all needs, so,
11    yeah, I would expected that.
12 Q.  Do you know whether this power point
13    presentation's still being used?
14 A  This particular? There are probably
15    aspects of it being used, but not in this – you
16    know, in this sequence and in this configuration.
17 Q.  How are aspects of this being used?
18 A  Without looking at it specifically, I
19    couldn't – I couldn't tell you what – you know, in
20    terms of representing, for example, the Keystone "O"
21    type applications.  It represents the steam flow
22    capacity.  It's simply a bulleted item. It could be
23    brought into a power point presentation and
24    represented to the client.
25 Q.  What was the source of the information in

**Page 258**

1     the presentation?
2  A  What do you mean when you refer to source?
3  Q.  Did you copy this from a presentation that
4     was being used for Keystones generally?
5  A  Well, again, there was no – when I worked
6     for Erie Power Technology, there was no standard
7     presentation material. Every presentation that was
8     done was done in a sense that it was specific for a
9     particular application or particular client. That's
10    just good sales and marketing. So when I developed
11    this, I developed it, to an extent, to be a standard
12    knowing that it would – it would flux, it would
13    fluctuate.
14 Q.  Did you copy this, though, from another
15    presentation you found at EPTI?
16 A  Pieces. You know, there might have been
17    six or seven presentations, and you bring in
18    different aspects, you may create new bullets, bring
19    – import photos. So yes and no.  Probably a
20    variety of different things.
21 Q.  Were some of those presentations for
22    boilers above 150,000 pounds per hour?
23 A  They may have been.
24 Q.  Did EPTI ever prepare summaries of the
25    different products that it designed and sold?