IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


INDECK KEYSTONE ENERGY, LLC,
     Plaintiff


    v.             CIVIL ACTION NO. 04-325 ERIE


VICTORY ENERGY OPERATIONS, LLC,
     Defendant



HEARING ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, May 10, 2006.



APPEARANCES:
     JOHN K. GISLESON, Esquire, appearing on behalf
     of the Plaintiff.


     ROBERT J. WILLIAMS, Esquire, appearing on behalf

of the Plaintiff.

CHRISTOPHER T. SHEEAN, Esquire, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1            P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 9:25 a.m., on

4   Wednesday, May 10, 2006, in Courtroom C.)

5

6            THE COURT:  This is the time that we set for

7   argument on the plaintiff and defendant's cross-motions for

8   partial summary judgment on the main claims.  And we also have

9   for consideration the plaintiff's motion for partial summary

10   judgment with respect to two counterclaims that are asserted by

11   VEO.  Now, let's start off on the cross-motions for summary

12   judgment.  Those were filed contemporaneously, were they not?

13            MR. SHEEAN:  No, your Honor.

14          THE COURT:  Refresh my recollection, the timing of

15   them, if you would?

16          MR. SHEEAN:  Sure, your Honor.  Christopher Sheean

17   on behalf of defendant/counter plaintiff Victory Energy

18   Operations.  We filed our initial motion for partial summary

19   judgment on January 20th.  After an extension of time,

20   plaintiff filed a cross-motion and a response on March 6th.

21          THE COURT:  All right, that refreshes my

22   recollection.  That said, Mr. Sheean, come on up to the podium,

23   we'll start off with you.

24          MR. SHEEAN:  Thank you, your Honor.  Again,

25   Christopher Sheean on behalf of Victory Energy Operations.


                              3


1   Your Honor, as sort of a housekeeping matter but really not,

2   as your Honor will recall, last Friday we had a telephonic

3   hearing to discuss Victory Energy's motion to strike Indeck's

4   supplement.  I have a few facts, I actually typed them up, I

5   would be willing to file them today if your Honor would prefer.

6   But I'd like to read them into the record just so they're a

7   matter of record.

8          THE COURT:  Sure, go ahead.

9          MR. SHEEAN:  And it is all of three pages, so it

10   shouldn't take too long.  Your Honor, I'll identify the

11   paragraph number that I'm responding to before providing the

12   response.  Paragraph number 51, Mark White testified that he

13   disputed Dave Briggs' understanding of the License Agreement.

14   And that Mr. Briggs had no understanding of the agreement and

15   was speculating.

16          Paragraph 99.  Neither Mark White, nor Robert

17   Gdaniec testified that a "special" Keystone boiler was outside

18   the scope of the agreement.  Mr. White attributed no meaning to

19   his use of "special".

20          Paragraph 104.  Trent Miller testified that he did

21   not recall receiving Exhibit 42 and did not recall whether he

22   sent a response.  That's from Mr. Miller's deposition, pages 76

23   to 78.

24          Paragraph 106.  Jay McConaughy testified that he did

25   not see a set of standard Keystone design drawings while he

4

1   worked at VEO.  Mr. McConaughy did not testify that he was

2  unaware of VEO creating any new design for any aspect of the

3  Keystone boiler.  That's Jay McConaughy deposition, pages 120

4  to 121.

5        Paragraph 111.  IKE's Exhibit 47 makes clear that

6  VEO sought to purchase in March of 2004, the O-type

7  ("M-Series") boiler.  Mark White and VEO considered the

8  M-Series and O-type to be synonymous.  Mark White deposition,

9  pages 37 through 38.

10        Paragraph 112.  IKE's Exhibit 47, relying upon the

11  same statement as paragraph 111 in rebutting the evidence or

12  the facts submitted for 111.

13        And that again is repeated for 113.

14        Then for paragraph 114, Mark White of VEO responded

15  to Mr. Gdaniec's letter and rejected his claim that the License

16  Agreement only provided VEO authorization to build and sell

17  tangent tube boilers with refractory front and tube and tile

18  rear walls.  That's from Mark White's deposition, pages 212 to

19  214.

20        Paragraph 139.  VEO admits that it used language

21  from a Zurn brochure in developing its own sales and marketing

22  material, but affirmatively states that VEO was given express

23  permission by Mark White of EPTI to use the materials.  That's

24   from Shawn Brewer's deposition, pages 98 to 103.  Shawn Brewer

25   testified that he changed a lot of the verbiage from the Zurn


5


1   brochure.  Shawn Brewer deposition, page 100.

2        Paragraph 141.  VEO admits that it utilized the Zurn

3   brochure dated 1978 and made revisions to update the

4   information.  Shawn Brewer deposition, pages 199 to 204.

5        VEO submits the same citation in response to

6   paragraph 143.

7        For paragraph 152, IKE fails to offer any competent

8   evidence to authenticate or lay a foundation for the sales

9   proposals identified.

10        Paragraph 153.  IKE has failed to proffer any

11   testimony or other competent evidence to substantiate its

12   claims regarding the sales proposals.  Mr. Viskup testified

13   that he had not previously seen the proposals at issue.

14   Mr. Viskup's testimony was the only testimony cited in support

15   of laying a foundation or authenticating those documents.

16        Paragraph 154 is the identical to paragraph 153, in

17   terms of rebutting the allegations set forth in 153.

18          Paragraph 156.  VEO has failed to proffer any

19   testimony or other competent evidence -- I'm sorry, that's the

20   same -- 156 is the same as 153.

21          Paragraph 157 is the same as 153.

22          THE COURT:  All right.

23          MR. SHEEAN:  I appreciate the court's indulgence in

24   that.  Now, if it please the court, I'd like to address the

25   issues set forth in our motion and response to IKE's motion for


                                    6


1    partial summary judgment on Count I, Victory Energy's

2    counterclaim, as well as Counts II through VI of Indeck

3    Keystone Energy's complaint.

4          Your Honor, Victory Energy submits that the License

5    Agreement is not ambiguous --

6          THE COURT:  That was Counts II through VI?

7          MR. SHEEAN:  That's correct, your Honor.  On its

8    face the agreement clearly indicates the parties intended to

9    have --

10          THE COURT:  I'm going to ask some questions here and

11   I'm going to make sure that each of you get to tell me what you

12  want to tell me, but I think it's more productive for me to do

13  it this way because I have read the file, I'm familiar with the

14  facts.  You spend a lot of time in your brief, and so does Mr.

15  Gisleson, pointing out extrinsic or parole evidence that you

16  think is helpful to your respective positions.  In fact,

17  there's a lot of that in both briefs.  As a narrow legal

18  proposition, isn't it true that, except in the most unusual of

19  cases, if a contract, and I say if, a contract is unambiguous,

20  the interpretation of parole evidence is uniquely the province

21  of the jury?

22         MR. SHEEAN:  That's correct, your Honor.

23         THE COURT:  All right.  Now, your first position or

24  line in the sand is that the contract unambiguously,

25  unambiguously gave you the right to manufacture and sell


                                    7


1   membrane wall technology, is that right?

2          MR. SHEEAN:  Boilers that incorporated membrane

3   walls.

4          THE COURT:  All right.  Tell me why that's so, tell

5   me why the contract is unambiguous, from your perspective?

6          MR. SHEEAN:  Thank you, your Honor.  I'll endeavor

7   to answer that question as briefly as possible.

8          THE COURT:  Let me just say this before you start.

9   Whenever both sides argue vociferously that a contract

10   unambiguously supports their position, it gives me some pause

11   as to its clarity.  But go ahead.

12          MR. SHEEAN:  Well, your Honor, I'll get back to that

13   point at the end of the discussion.  But, first, let's talk

14   about the agreement itself.  The definition of the term

15   products in clause 2(a) specifically states "the term products

16   shall mean natural circulation, industrial watertube package

17   steam generators with a steam capacity range beginning at

18   29,000 pph up to and including 150,000 pph.  Products shall

19   include but not be limited to the items set forth in Annex I."

20   That clause --

21          THE COURT:  But not necessarily be limited I think

22   is the exact verbiage, isn't it?

23          MR. SHEEAN:  No, it's not, your Honor, I just read

24   the exact phrase, I don't mean to correct, your Honor.

25          THE COURT:  That's all right, you can correct me

1   anytime.  So the record is complete, there was an addendum to

2   the agreement that upped the pressure from 150 to 160,000, is

3   that right?

4         MR. SHEEAN:  No, your Honor, there was an addendum

5   to the agreement that upped the pressure from 399 p.s.i. to

6   1,200 p.s.i., and upped the steam temperature from 212 degrees

7   Fahrenheit up to 750 degrees Fahrenheit.

8         THE COURT:  All right, go ahead.

9         MR. SHEEAN:  The parties clearly intended for this

10  agreement to be broad in scope by including that language.  The

11  parties clearly understood that Annex I was meant to be used as

12  a guideline and not meant to be used as the absolute list of

13  what Victory could build or not build.

14         THE COURT:  In March of 2004, there was

15  correspondence from EPTI to VEO, I think maybe March 26th, if

16  memory serves me, on or about March 26th, someplace at the end

17  of March.  Where EPTI writes a letter to VEO and says you have

18  to stop -- I'm paraphrasing it, but fairly read, stop selling

19  M-Series boilers, that's outside the scope of the License

20  Agreement.  That then generates a return letter from VEO.

21  You know what I'm talking about, don't you.  In the return

22  letter from VEO, doesn't the draftsman of that letter

23  specifically recognize that the product that it had been

24  selling, that is the membrane wall technology, was outside the

25  geometry and characteristics of the products sketched in Annex


                                    9


1  I, number one.  But, number two, there was no argument in that

2  letter that the terms of the agreement, the clear terms

3  permitted them to do it.  At that time didn't VEO take the

4  position that they were allowed to do it because they were

5  improving the product within the meaning of the contract -- and

6  hasn't your position now changed?

7        MR. SHEEAN:  Let me address that, your Honor.  First

8  of all, you've taken me out of looking only at the contract and

9  now talking about parole evidence.

10        THE COURT:  I'm going to bring you back to the clear

11  language, but I wanted to ask you about that?

12        MR. SHEEAN:  I believe the letter that you're

13  referencing, the initial letter was March 26, 2004, from Robert

14  Gdaniec.  And in that letter there are assertions made

15  regarding the scope of the License Agreement and Victory's

16  prior sales relating to the License Agreement.

17         THE COURT:  Right.

18         MR. SHEEAN:  One interesting point that has to be

19  noted, your Honor, is that letter was part of a larger letter

20  that was sent negotiating the terms of the sale of the

21  technology at issue, O-type Keystone boilers, along with

22  Victory was negotiating to purchase a perpetual license to use

23  the Keystone name.  So the parties were in negotiations, and we

24  believe this is a clear tactic on the part of EPTI to say oh,

25  you thought you had the ability to sell membrane wall boilers


                              10


1  but you don't.  But hey, we're willing to let you have that for

2  more money.

3         THE COURT:  Different issue, that's getting into

4  your bait and switch argument.  My question is at that point in

5  time -- fairly read, could that letter be read to mean or to

6  suggest that at least at that instant the representative of VEO

7  who drafted it was of the opinion, was of the opinion, that the

8  design characteristics set forth in Annex I represented a

9    different boiler than they had been selling?

10       MR. SHEEAN:  That is a true statement, your Honor.

11       THE COURT:  All right.  Now, for purposes of us

12   moving forward and the decision on the summary judgment motion,

13   my question is this.  Your position is, one, the contract is

14   unambiguous, and unambiguous in the sense it is expansive and

15   gives you the right to sell boilers other than the old-fashion

16   refractory wall boilers; that's your number one position.

17   Your second position is that even if there's an ambiguity in

18   the contract, when you pick around at all this other extrinsic

19   evidence which gives meaning to it, it supports your position

20   that the contract should be construed more broadly, is that

21   right?

22       MR. SHEEAN:  In broad strokes, yes, your Honor.

23       THE COURT:  All right.

24       MR. SHEEAN:  Can I just finish answering the last

25   question for a minute?


11


1        THE COURT:  Yes.

2        MR. SHEEAN:  The March 26th letter, your Honor

3    correctly characterized the response by Victory was yes,

4    membrane walls are outside the scope of Annex I.  And with

5    respect to that, that's true.  But Victory has never taken the

6    position that Annex I is the outer boundary of what Victory

7    Energy was authorized to sell.  Now, Mark White, in response to

8    that letter, on behalf of Victory said okay, well they're

9    improvements, is that a change in position from what Victory is

10   saying now.  Well, it is a change in position from what we're

11   saying now, and the difference is -- it makes no impact on the

12   outcome of this motion and I'll tell you why.  Because Victory

13   Energy takes the position that it was entitled to build boilers

14   beyond the scope of what was in Annex I, and it was provided

15   with the technical information to build those boilers at the

16   outset of the License Agreement.  Erie Power gave it the

17   drawings and the necessary know how to build the membrane wall

18   boilers that it built during that time.  However, even if that

19   weren't the case, the improvements section gives VEO the right

20   to make those changes to improve the boilers, to sell more

21   modern, up-to-date boilers.  The parties clearly understood --

22        THE COURT:  But I thought the language, sometimes I

23   confuse the modification section with the improvement clause,

24   but I thought the improvement clause relates to improvements

25  that occur -- in other words, it would not subsume


12


1  technological advances that existed prior to the contract,

2  would it?

3        MR. SHEEAN:  That's what my adversary would have you

4  believe, but that's not what the contract says, your Honor.  It

5  says technology -- if you'll give me leave, I'll grab the

6  contract for one second.

7        THE COURT:  You can do that, sure.  While you're

8  grabbing it, though, isn't it fair to say that for all intents

9  and purposes, it is not a significant part of your case now

10  that what you folks did was legitimate because it was an

11  improvement or modification; it's in your papers, but that's

12  not the thrust of your position, is it?

13        MR. SHEEAN:  Our position is, as an initial matter,

14  Victory Energy takes the position that there were no

15  improvements or modifications because it was given all of that

16  information from Erie Power at the outset.

17        THE COURT:  Even if it was, alternatively, it was an

18  improvement?

19          MR. SHEEAN:  Yes, if you want to not call a rose a

20    rose, if you want to pretend that that didn't happen, Victory

21    Energy did acquire -- let me read to you the improvement,

22    "improvements shall mean all modifications, variations,

23    revisions and enhancements of the products or methods or

24    processes for manufacturing the products and all technical

25    information relating thereto, which either licensor or licensee


13


1    may develop, acquire or acquire control of and commercially

2    exploit during the term of this agreement."  Well, Victory

3    Energy acquired the know how to incorporate membrane wall

4    boilers, Erie Power gave it to them.

5          THE COURT:  All right, I'm going to be quiet for a

6    minute and let you return to your argument on the clarity of

7    the agreement?

8          MR. SHEEAN:  Well, your Honor, we talked initially

9    about clause 2(a) and including but not limited to language.

10    And, frankly, it flies in the face of standard contract law for

11    Erie, for Indeck Keystone Energy to argue now that that clause

12    must be disregarded.  They cite no case to support that theory

13  or that principle, and I've seen no case that suggests that

14  where the clause doesn't work for one side, the court should

15  throw it out.  It just doesn't stand for that.  With regard

16  to --

17       THE COURT:  Would it be fair to say, as you read the

18  face of the contract, the agreement, I'm not talking about the

19  annex right now, where it talks about -- it says "products

20  shall mean natural circulation, industrial watertube package

21  steam generators with a steam capacity range beginning at

22  29,000 pph up to and including 150,000 pph."  It goes on to say

23  "products shall include but not be limited to the items set

24  forth in Annex I."  Is it your position that the only -- that

25  your ability to sell boiler products under the clear terms of


14


1  the agreement was limited only by pressure range?

2       MR. SHEEAN:  No, your Honor.  I mean the term

3  including but not limited to does have meaning within contract

4  law under the doctrine of ejusdem generis.  The courts looking

5  at this phrase understand that it's of the same time or general

6  character, that's what we're talking about here.

7          THE COURT:  I'm drawing a distinction now between

8    membrane wall technology versus old refractory wall technology

9    and just pressure ranges.  And pressure ranges exist in

10   membrane wall technology or old refractory wall technology.

11   My question is under your clear reading of this agreement, were

12   you circumscribed in any form or fashion as to the type of

13   boiler you could sell or the capacity of the boiler you could

14   sell?

15          MR. SHEEAN:  Well, the capacity, yes, that's the

16   pressure change or I mean the capacity range.

17          THE COURT:  So your view is that the contract

18   restricted you within a certain capacity or pressure range, but

19   save that restriction, you were not restricted from the sale of

20   any other type of boiler, as long as that boiler did not exceed

21   that pressure range, is that right?

22          MR. SHEEAN:  No.

23          THE COURT:  Go ahead, I don't understand what you

24   just told me?

25          MR. SHEEAN:  Well, I mean that is the outer limit,

15

1  yes, your Honor.  But I think it has to be of the same general

2  class or type as the items identified in Annex I.  Those are

3  all old style boilers.  So, for instance, as IKE suggests,

4  Victory could not, without authorization from the licensor,

5  sell a D-style boiler under the License Agreement.  That's not

6  what was contemplated anywhere in the agreement.  But O-style

7  watertube package boilers certainly were.  There was a range of

8  M-Series boilers, and that's what Victory sold.  We're not

9  talking about taking it from an O-style to a D-style or an A or

10  a B, there are a number of different configurations.

11      THE COURT:  Were the design sketches, if you will,

12  on Annex I, and I think it referenced M-Series 8 through 23 or

13  something like that, I'm not exactly sure.  But there were

14  engineering drawings that were prepared by EPTI to give some

15  context.  All of those engineering drawings in Annex I

16  reflected the old series refractory wall, as opposed to the

17  membrane technology, is that right?

18      MR. SHEEAN:  There's only three drawings, your

19  Honor, and the three drawings depict tangent tube boilers.

20      THE COURT:  Okay.  Which is the old series?

21      MR. SHEEAN:  Right.  By the way, your Honor, Annex I

22  also indicates that the boilers would operate at a thousand

23  feet altitude, at an ambient temperature of 80 degrees, and

24  similar restrictions that everyone in this case agrees were not

25  actual limitations.  Those are under the heading of design

16

1  parameters.  But that's not meant to restrict Victory to only

2  sell boilers to companies that will operate them at a thousand

3  feet in elevation where it's 80 degrees year round, that's

4  ludicrous.

5       THE COURT:  That has nothing to do with membrane

6  wall technology, does it?

7       MR. SHEEAN:  No, but it's in Annex I, your Honor.

8  And the point is if, as IKE suggests, Annex I is meant to be

9  this rigid document that can have no variation, then it

10  creates, it renders the document a nullity because it makes no

11  sense.

12       THE COURT:  After the License Agreement was executed

13  with EPTI in February, early February of '03, and then the

14  addendum was executed later in February of '03, shortly

15  thereafter, notwithstanding IKE's interpretation of the

16  contract, you began to sell -- you sold 100-percent membrane

17  wall technology, correct?

18      MR. SHEEAN:  Correct.

19      THE COURT:  But in doing that, doesn't the record --

20  tell me if the record reflects this.  Did you ask and receive

21  permission from EPTI to sell that technology?

22      MR. SHEEAN:  There is not a single statement in the

23  record to support the contention that there was some separate

24  authorization given to Victory Energy to sell membrane wall

25  boilers.  There was no separate request made and there was no


17


1  separate authorization given.  The boilers were -- were

2  identified pursuant to the License Agreement as being sold and

3  identified as a 100-percent membrane.  Erie Power invoiced them

4  pursuant to the terms of the License Agreement at a

5  four-percent royalty.  It was all in line with what the License

6  Agreement said.  And nobody said anything for 15 months --

7      THE COURT:  IKE takes the position that there was

8  never any prospective permission to sell this ad infinitum and

9  I think they take the position in the papers that there was

10    case by case individual approval, does the record support that?

11        MR. SHEEAN:  Absolutely not.

12        THE COURT:  What else, if anything, do you want to

13    tell me about your contention that the contract is clear?

14        MR. SHEEAN:  Well, your Honor, above and beyond what

15    we've been talking about, and that is the meaning of clause

16    2(a), the definition of products in conjunction with Annex I,

17    what we also talked about, your Honor suggested that

18    modifications and improvements aren't really relevant here

19    because Victory takes the position there were no modifications

20    or improvements.  Well, that's not entirely true.  What we've

21    stated in our briefs is we don't believe that membrane wall

22    technology is an improvement or a modification because that was

23    permitted from day one, it was part of the License Agreement,

24    it was provided as drawings on the day they inked the license.

25        THE COURT:  What sense -- cutting through the


18


1    legalese, just putting on your common sense hat, does it make

2    sense to you that the parties would agree on an annex whose

3    design drawings exclude, exclude membrane wall technology, and

4   yet one of the parties takes the position that it's merely a

5   guide and I have a running field beyond that; does that make

6   any sense to you?

7        MR. SHEEAN:  Yes, your Honor, that's what included

8   but not limited to is meant to mean.  I would object to the use

9   of the term running field because I don't think that that's

10  accurate.

11       THE COURT:  You can object if you want.  I guess

12  I'll overrule your objection.  But isn't this really fair to

13  say.  That when all is said and done, in terms of your position

14  as to the clarity of the agreement, that the phrase included

15  but not limited to, that's an important part of your arsenal,

16  isn't it, on this thing?

17       MR. SHEEAN:  It is, your Honor.

18       THE COURT:  All right.  I understand your point on

19  alleged lack of ambiguity.  Now, I want to go searching for

20  extrinsic evidence that is supportive of your position that as

21  to what the parties intent was from the get-go here, why don't

22  you start to tell me about that?

23       MR. SHEEAN:  I really feel like I need to back up

24  for one second to finish the modification and improvement.

25       THE COURT:  Go ahead.

19

1       MR. SHEEAN:  And that is, your Honor, IKE takes the

2   position that it's limited to Annex I and too bad for Victory

3   if they licensed this outdated, antiquated technology that

4   nobody really wanted.  If they couldn't sell it, that's too bad

5   for them, you get the benefit of your bargain, and that's their

6   bargain.  That doesn't fly with what the agreement, read as a

7   whole, as this court must read it, it doesn't fly with an

8   interpretation of the agreement as a whole.  Why would the

9   parties say yes, sell this antiquated technology, and then

10   three pages later say if we come up with any improvements,

11   they're yours.  If you come up with any improvements, we get to

12   use them, too.  And, by the way, you can modify it so long as

13   it doesn't affect the reliability or performance of the boiler.

14   It doesn't make any sense, judge.  You've got to read the

15   agreement as a whole.

16       THE COURT:  I agree you have to read it as a whole.

17   But if the intent, this is more than a rhetorical question, but

18   if the intent from the get-go was to permit you to sell both

19   O-style and M-style boilers, why didn't they say so?

20    MR. SHEEAN:  They're one in the same, judge.

21    THE COURT:  Well, take me to engineering school on

22  this because I thought that among the other differences between

23  O-style and M-style, you're shaking your head before you know

24  what I'm going to ask you, which is a bad thing to do.

25    MR. SHEEAN:  I apologize.


20


1    THE COURT:  I thought the differences, one of the

2  differences between M-style and O-style, was that the M-style

3  boilers used the refractory wall system, whereas the O-style

4  boilers, if you will, utilized what in the '80s or late '80s

5  came to be known as membrane wall technology, is that right?

6    MR. SHEEAN:  No, your Honor.  Victory Energy --

7  let's jump into extrinsic evidence.  Victory Energy purchased

8  two 15M boilers for its client at the Heinz plant in Muscatine,

9  Iowa in 2001, from the predecessor of IKE.  Those boilers were

10  100-percent membrane wall.  They're M-Series boilers.  Victory

11  Energy sold -- I'm sorry, the testimony of Steve Bernatowicz,

12  who worked at Zurn and then at Erie Power, Allborg and then at

13  Erie Power, testified that M-Series boilers can have membrane

14  walls.  Mark White, who worked at Zurn Energy, Allborg, Erie

15  Power and now at Victory Energy, testified that throughout the

16  time he worked there, M-Series boilers can have membrane walls.

17       THE COURT:  It's part of your contention, isn't it,

18  that the term M-Series boiler had no generally-accepted meaning

19  in the industry?

20       MR. SHEEAN:  That's correct.

21       THE COURT:  But it did have an accepted meaning for

22  EPTI, didn't it?

23       MR. SHEEAN:  No, I dispute that.  Because if you

24  talk to Jay McConaughy, who worked there, he said I don't know

25  what an M-Series boiler is.  We have to modify them to meet


21


1  customer specs every time we sell a boiler.  So to say that an

2  M-Series boiler is this tall, that wide, this has tangent tube,

3  doesn't make sense.  Jay McConaughy works at CMI EPTI now, one

4  of the predecessors of the EPTI bankruptcy.

5       THE COURT:  Would it be more accurate, then, by your

6  lights as you look at the record, to focus less on M and O, and

7  more on the fundamental design characteristic of what you're

8    dealing with, that is does it have membrane wall technology or

9    doesn't it?

10    MR. SHEEAN:  In what context, judge, I'm confused by

11    the question, I'm sorry.

12    THE COURT:  Well, you folks took one last -- took a

13    last stab at trying to purchase this whole kit and caboodle

14    from EPTI, didn't you, the Keystone mark for O-Series and

15    M-Series?

16    MR. SHEEAN:  Victory Energy was interested in

17    purchasing the O-style boilers with the Keystone mark up to

18    165,000 pounds per hour.  And the Erie Power representatives

19    came back and began this M versus O dichotomy, and Victory

20    responded back and said well, wait a minute, we want it all.

21    We don't want what you're calling M and what you're calling O,

22    we want it all.

23    THE COURT:  But doesn't the record, couldn't the

24    record be read to reflect in connection with that negotiation,

25    which didn't come to pass, but parties couldn't get together,


22


1    that VEO recognized, in connection with that attempted to

2   purchase, that the M-Series was a subset of the O-Series and

3   distinct?

4         MR. SHEEAN:  No, your Honor, there's no admission of

5   that.  What that letter simply stands for is EPTI came in with

6   a set of nomenclature, M versus O, and you only have M right

7   now, we're only going to sell you M, but we'll license you some

8   more O.  That was nomenclature that began the negotiations.  So

9   Victory simply responded in kind, there was no admission that M

10  is a subset of O.

11        THE COURT:  Keep going now on the extrinsic evidence

12  that clarifies an alleged ambiguity?

13        MR. SHEEAN:  Your Honor, shortly after the agreement

14  was signed by the parties pursuant to Annex II, which provides

15  for the provision of technical information, Victory Energy

16  received from Erie Power drawings of various M-Series Keystone

17  Boilers with membrane walls, depicting 100-percent membrane

18  wall construction, a draft sales manual, showing welded walls

19  and watercooled front and rear walls as an optional feature to

20  the Keystone M-Series boiler.  Power point presentation, this

21  was prepared by the way, your Honor, by Erie Power's sales

22  staff, specifically for Victory Energy, it said right on it

23  draft Victory Energy sales manual.

24         THE COURT:  Okay.

25         MR. SHEEAN:  A power point presentation, put

23

1  together again specifically for Victory Energy, showing welded

2  walls, watercooled front and rear walls as an optional feature

3  for the M-Series Keystone boiler.  The Keystone design guide,

4  which Erie Power utilized in order to design the boiler,

5  identifies welded walls as part of the M-Series Keystone

6  boiler.  The KPSC program, they provided a program to allow

7  Victory Energy to rate the boilers.  In other words, if you

8  changed X and Y, how will that change the heat output, etc.

9         THE COURT:  I didn't mean to interrupt you, maybe

10  I'm just foggy on something.  Should it come as any surprise

11  that the M-Series, that is the M-Series that is identified in

12  the Annex I, 8 through 23, the M-Series by its very nature had

13  the refractory walls rather than the membrane wall technology,

14  didn't it?

15         MR. SHEEAN:  I don't understand your Honor's

16  question.  From what time period?

17          THE COURT:  I don't want to suggest you're moving

18    the peas under the pod around with me because if you are, I can

19    usually pick that up pretty quickly and it bothers me.  So let

20    me come at it this way.  The membrane wall technology that

21    we're talking about here, I want to make sure I have some basic

22    engineering down on that, that is the more advanced technology,

23    that's the more cutting-edge technology, is that right?

24          MR. SHEEAN:  That's correct, your Honor.

25          THE COURT:  Okay.  And the technology that appears


                                24


1    on Annex I, as sketched out by the engineering department of

2    EPTI, would be reflective of the older technology, that is the

3    refractory wall technology, is that right?

4          MR. SHEEHAN:  I'm sorry, can you say that last part

5    again.

6          THE COURT:  Sure, let me get closer to the mike, I

7    apologize.  Would it be fair to say that the technology which

8    is -- the design sketches on Annex I, are exclusively

9    reflective of the older technology, which would be the

10    refractory wall technology?

11          MR. SHEEHAN:  The three drawings contained in

12   Annex I show tangent tube boilers, that's correct.

13          THE COURT:  And if memory serves, on Annex I itself,

14   in addition to drawings, there is also reference to the

15   M-Series, is that right?

16          MR. SHEEAN:  That's correct, your Honor.

17          THE COURT:  Okay.  So my question is, and I'm not

18   asking you to speak for EPTI or IKE, they can speak for

19   themselves, but at least with respect to that document,

20   Annex I, prepared by the EPTI engineers, they were equating

21   M-Series with refractory wall older technology, weren't they?

22          MR. SHEEAN:  I can't speak as to, I have not

23   obtained testimony specific to that point, your Honor, in order

24   to speculate as to the intention of the engineers when they

25   drafted that document.


25


1          THE COURT:  Fair enough, you can't get in their

2   head.  Isn't it true that the record fairly read suggests that

3   EPTI let you folks off the contractual hook and let you sell

4   more expansively because they were in a world of financial

5   trouble?

6       MR. SHEEAN:  No, I don't think that's true, your

7   Honor, I think that's the argument that IKE would like this

8   court to believe.

9       THE COURT:  Tell me why their take on that is wrong?

10      MR. SHEEAN:  Well, as I was just pointing out to

11  your Honor, from the get-go, without any specific request by

12  Victory, other than hey, we'd like to put together a sales

13  manual and some brochures, can you help us out with that, Erie

14  Power provides sales manual, specifically for Victory Energy's

15  use, that show membrane walls as part and parcel of what could

16  be sold.  Why would they do that if this was only being done on

17  a special basis, why would they want Victory to be able to

18  market boilers with membrane walls.  It doesn't make any sense,

19  judge, it just flat out doesn't fly.  If I can for one second I

20  just want to grab something.

21      THE COURT:  Go ahead.

22      MR. SHEEAN:  The testimony adduced in discovery was

23  that Victory Energy was given a sales brochure from Zurn

24  Energy.

25      THE COURT:  I'm sorry, you said who was given it?

1       MR. SHEEAN:  Victory Energy was given a copy of this

2   when they visited Erie in March of 2003, at the outset of the

3   License Agreement.  They said we need to put together some

4   brochures.  And they said here you can use this as your

5   template, as your starting point.  This has a copyright of

6   1979.  It was Exhibit 8, by the way, to IKE's appendix of

7   exhibits -- or Exhibit 9, it's one of those two.

8       THE COURT:  Be that as it may, what is the upshot of

9   the exhibit?

10       MR. SHEEAN:  The upshot is, judge, within this 1979

11   vintage brochure, they show welded or membrane walls as an

12   option available on Keystone boilers, M-Series boilers.

13       THE COURT:  It sounds to me like what you're saying

14   is -- I want to make sure that I understand it, that if your

15   position is and it is in part, that the term M-Series had no

16   clearly understood meaning in the industry, then wouldn't it be

17   true that to the extent the phrase M-Series is used in the

18   annex, then by your lights, there's an inherent ambiguity in

19   the agreement?

20       MR. SHEEAN:  No, your Honor, because specifically

21  the agreement itself says shall include but not be limited to.

22       THE COURT:  I understand that.  Put that phrase

23  aside just for the time being.  Is it your position that the

24  phrase M-Series in the annex, what that means has no

25  generally-accepted definition in the industry because it can be

27

1  refractory or it can be membrane, is that true?

2       MR. SHEEAN:  Let me try and answer it as best I can,

3  your Honor.  Victory Energy has adduced evidence in discovery

4  in this case to show that Keystone M-Series boilers can include

5  both membrane walls and refractory walls.

6       THE COURT:  All right.  If I remember correctly, you

7  cited me to some testimony whereby some engineers said or

8  testified that there is, and I'm paraphrasing but I think it's

9  the accurate upshot of it, that there is no generally-accepted

10  design definition for what M-Series means; didn't you cite me

11  to some testimony, except that EPTI may have had its own view,

12  but out in the broader marketplace we know it can be refractory

13  or we know it can be membrane wall, isn't their testimony to

14  that effect?

15        MR. SHEEAN:  Yes, your Honor.

16        THE COURT:  All right, I'm satisfied with that.  Go

17  ahead.

18        MR. SHEEAN:  With regard to the addendum that your

19  Honor was referencing before, the super heat addendum, as I'll

20  refer to it, which increased the pressure and the steam range

21  in February of 2003.  IKE takes the position that well, that

22  must demonstrate that the parties recognized Annex I was the

23  outer boundary of what VEO could sell under the License

24  Agreement.  And, frankly, I think that just stands logic on its

25  head because the parties understood that VEO requested the

28

1  opportunity to sell super heat boilers with super heaters.  And

2  EPTI came back and said well, you know what, we're going to

3  need an addendum.  Victory said fine, and they did that.

4        THE COURT:  Is there testimony in the record, and if

5  so where is it, if you can get me to the citation, that White

6  discussed with Brewer, in conjunction with the negotiations

7  early on that the agreement -- that the agreement would permit

8  the sale of boilers with membrane walls?

9          MR. SHEEAN:  Sure, your Honor, I'll find that cite

10  for you as soon as I can.

11          THE COURT:  And, also, where in the record is there

12  testimony from White, Viskup and Brewer, that they considered

13  the annex as a mere guideline?

14          MR. SHEEHAN:  John Viskup testified, as much as did

15  Mark White and I'll get you that.

16          THE COURT:  All right.  Go ahead.

17          MR. SHEEAN:  In contrast to the addendum, if Erie

18  Power is starved for cash, as IKE suggests, and is on a per

19  unit basis authorizing Victory Energy to sell boilers with

20  membrane walls, clearly membrane wall boilers were of higher

21  value to the parties, as we've already discussed, they're a

22  more modern, cutting-edge technology, why wouldn't the parties

23  have entered into an addendum to allow membrane walls, to allow

24  a higher royalty, so Erie Power could make more money off that

25  sale.  Again, if this was outside the scope, there are two ways

29

1  they could have dealt with that.  One is an addendum, as they

2  did for super heat.  The other is a side agreement, as they did

3    for at least two opportunities where Victory was authorized to

4    pursue opportunities above 150,000 pounds per hour of steam.

5    The Notre Dame job and the University of Massachusetts job.

6    The parties sat down, entered into a separate side agreement to

7    cover that instance.  No such agreement was ever entered for

8    these specific instances where Victory sold membrane wall

9    boilers while Erie Power was the licensor.

10        THE COURT:  Would it have been true that for a

11    licensor like EPTI, it's more valuable -- it's more valuable

12    technology to it, in terms of licensing it to other people,

13    would have been the newer style technology, would have been the

14    membrane technology?

15        MR. SHEEAN:  Absolutely, your Honor.  When I deposed

16    Stephen Kang, the president of Erie Power, who authorized Mark

17    White to negotiate and enter into the License Agreement, he

18    said the reason why he authorized it was he wanted to maximize

19    the revenue stream for Erie Power, they needed money.  Why

20    would they then enter into this narrowly construed agreement to

21    only allow Victory to sell boilers that were 20 years out of

22    date.

23        THE COURT:  Well -- this is conjecture on your part

24    unless the record speaks to it, but go ahead and try to answer

25    it anyways, would VEO have entered into the License Agreement


30


1    if it only believed that it was being given the license to

2    market old-style boilers?

3         MR. SHEEAN:  And using the definition that IKE

4    attributes to old-style boilers --

5         THE COURT:  Non-membrane wall technology?

6         MR. SHEEAN:  The answer is no.

7         THE COURT:  Couldn't it also be said, though, that

8    EPTI would have been -- that a natural impulse on the part of

9    EPTI would have been not to part with its more productive and

10   lucrative advanced membrane wall technology and let you folks

11   have the scraps?

12        MR. SHEEAN:  That's the counter argument.  What I

13   think you see in reading the testimony in discovery is sort of

14   a dichotomy in the mind set of the sales folks and the people

15   who negotiated and entered into the License Agreement, namely

16   Mark White, with the authorization of Stephen Kang, and the

17   engineers themselves, namely Chris Petcos, Ted Fuhrman and Bob

18   Gdaniec, who said they were opposed to the License Agreement

19   from the outset.  They didn't want to give anything to Victory

20   because they said why should we allow some third party to sell

21   this, we should be selling it.  These are engineers, they

22   hadn't done any marketing studies, they hadn't done any

23   analysis on whether or not Erie Power could have been

24   competitive in that marketplace.

25              THE COURT:  Throughout the entire course of the


                                31


1   License Agreement, both with EPTI and then the successor IKE,

2   who I think became the licensor in September of 2004, is that

3   right?

4              MR. SHEEAN:  September 8th, as I understand it.

5              THE COURT:  And up to present day, did VEO ever sell

6   a boiler that didn't have membrane wall technology?

7              MR. SHEEAN:  No.  We talked a little bit about the

8   idea that IKE has proposed that the standard M-Series Keystone

9   boiler has meaning, and as I've already discussed with your

10   Honor, Jay McConaughy, Steve Bernatowicz and even Bob Gdaniec

11   admitted that had no general meaning in the industry.  And,

12   moreover, Steve Bernatowicz admitted that in his mind that the

13   M-Series boiler was something that had to be adapted in each

14   and every instance in order to sell it to meet a customer's

15   specifications.  One of the implications made by IKE in its

16   briefs is that Victory Energy could have sold tangent tube

17   boilers if it wanted to.  There is testimony in the record that

18   we cite to that that just really is an inaccurate statement.

19   It's akin to saying that if GM wanted to roll out a series of

20   cars that ran on regular gas instead of unleaded gas, they

21   could do that.  That, as your Honor knows, is not accurate

22   because you would have never been able to get it, you would

23   never get it licensed with the state licensing authorities for

24   a new vehicle.  Now, that doesn't mean if you have a '57 T-Bird

25   you can't drive it on the road because it runs on regular gas.


32


1   Certainly cars that are outdated and run on outdated fuel can

2   still run.  They're grandfathered in.  Likewise, tangent tube

3   boilers that are out there in the industry continue to operate.

4   And there are many such boilers in operation throughout the

5   United States.

6        THE COURT:  If I could interrupt you just for one

7  second, something occurred to me, I'm jumping around.  Clause

8  13 of the agreement, which is the improvements clause?

9        MR. SHEEAN:  Yes, your Honor.

10        THE COURT:  Do you have that handy somewhere?

11        MR. SHEEAN:  I do, your Honor.

12        THE COURT:  I had made a note to myself when I was

13  reviewing the file and I want to confirm its accuracy or not.

14  I had been under the impression that the improvements referred

15  to improvements developed while the agreement was in effect, is

16  that an inaccurate reading?

17        MR. SHEEAN:  Well, your Honor, I think it depends on

18  how the court interprets the meaning of the definition of

19  improvements that I read before.  And for that definition you

20  go back to clause 1(h), wherein it says "improvements shall

21  mean modifications, variations, revisions and enhancements of

22  the products or methods or processes for manufacturing the

23  products and all technical information relating thereto which

24  either licensor or licensee may develop, acquire or acquire

25  control of and commercially exploit."

33

1          THE COURT:  From a common sense standpoint, if the

2    membrane wall technology as Keystone -- as it existed with

3    EPTI, predated the agreement, then the continued use of that

4    same technology during the course of the agreement could not be

5    considered an improvement because it was the same product that

6    existed before the agreement was signed, isn't that right?

7          MR. SHEEAN:  Well, your Honor, we take the position

8    that membrane wall technology is not an improvement because it

9    was provided to Victory as part of the License Agreement.  But

10   it doesn't say that if it was in existence, it doesn't count,

11   it doesn't say that.

12         THE COURT:  That doesn't make any sense, that part

13   makes no sense to me.

14         MR. SHEEAN:  Wait a minute.  Your Honor, if I may.

15   Reading this from a common sense standpoint, the implication of

16   this clause is that the parties want to share the technology in

17   order to sell the most efficient, best performing products they

18   can.

19         THE COURT:  Couldn't it mean this -- and I agree

20   with you, I think that's what it means and more generally

21   speaking.  But as I read it, I thought, and I don't want to

22  spend a lot of time on this improvements because I quite

23  frankly don't think it's the heart of this lawsuit.  But I

24  thought what it meant is, for instance, if during the term of

25  the agreement, the licensee sees a better way to build a


                                    34


1   mousetrap and figures out a better way to make this membrane

2   wall technology more efficient, then they go and talk to the

3   licensor and they come up with an agreement and then away they

4   go, isn't that what it means?

5        MR. SHEEAN:  That's an example of how this clause

6   could work in the real world.  But does it mean it's limited to

7   that, no, I don't think it does.  I think, again, if you

8   interpret it to mean only technology that is devised during the

9   time of the license, then, again, it's sort of falls on itself

10  in terms of making sense.

11       THE COURT:  All right, I got your point right.

12       MR. SHEEAN:  And, similarly, if you want to take

13  away improvements and say it's a modification, there is nothing

14  in the definition of modification that says it has to be

15  acquired during the time of the license.

16          THE COURT:  I thought modifications required written

17    approval?

18          MR. SHEEAN:  Unless -- if you look at clause 8(a),

19    and I'll read it into the record, your Honor.  "Licensee will

20    have the right to modify the products; provided, however, that

21    such modifications will not diminish the reliability and the

22    performance of the said products.  Licensee will submit to

23    licensor such plans for modifications for prior written

24    approval by licensor except for the alterations as defined in

25    clause 3(e)."  Clause 3(e) reads "upon licensee's reasonable


                                    35


1    request, licensor shall provide, without any additional payment

2    to licensor, reasonable technical assistance to licensee by

3    written or telephone response relating to the application,

4    interpretation of the technical information furnished by

5    licensor under this agreement."  So it can be by telephone or

6    by writing under 3(e).  Victory Energy clearly made requests to

7    sell membrane wall boilers at the outset, didn't make a

8    request, simply said we sold a boiler, we sold three of them to

9    Braun Industries, this was in the first month of the agreement,

10   they're a 100-percent membrane wall technology.  We need the

11   drawings that we're going to need in order to erect these.  And

12   guess what, they got the drawings.  They didn't get the

13   drawings with the caveat that said these are only for this

14   project.  They got the drawings.

15          THE COURT:  Assuming only for the sake of my

16   question, that the agreement limited to your ability, that you

17   were contractually limited in your ability to sell anything

18   other than old-style boilers.  And that EPTI waived that

19   contractual limitation, and thereafter you engaged in the

20   course of conduct which you did.  What is to prevent, as a

21   legal matter, what would prevent the successor in interest from

22   revoking that conditional privilege?

23          MR. SHEEAN:  Your Honor, the case law cited by IKE,

24   as well as the Pennsylvania statute governing the Uniform

25   Commercial Code, specifically provides that where the party


36


1   reasonably relies upon those -- the acquiescence or the waiver,

2   if you will, that the party acquiescing or waiving will be

3   estopped from attempting to revoke.

4          THE COURT:  Are you really talking about detrimental

5  reliance?

6          MR. SHEEAN:  Yes --

7          THE COURT:  If so, how were you harmed; in fact,

8  weren't you bettered, wasn't your position improved, as opposed

9  to harmed, by virtue of being permitted to sell a broader range

10  of boilers during that period of time?

11          MR. SHEEAN:  We were harmed in two ways, your Honor.

12  We were harmed in terms of the amount of money that was

13  outlayed.  Victory Energy opened up a brand new factory in the

14  summer of 2004 in order to meet its demand to build old-style

15  watertube boilers.  As your Honor has already asked and heard,

16  they were all membrane wall.  Victory Energy developed a

17  national sales force of sales representatives in order to

18  market and sell these boilers.  Victor Energy came up with

19  marketing materials in order to market and sell these boilers.

20  And in terms of how they were harmed -- well, Victory Energy

21  under the License Agreement is not allowed to sell any

22  competing products.  So Victory couldn't sell Keystone

23  old-style watertube package boilers with membrane walls, it

24  couldn't sell any watertube package boilers with membrane

25  walls, it would have been frozen out of the market.


37


1        THE COURT:  All right.  We're going to take about a

2   five-minute recess because my court reporter, these are hard,

3   it's just not regular testimony and there's a lot of

4   engineering terms flying.  When we come back then, I'm going to

5   let you finish on the summary judgment aspect.  And then I'm

6   going to hear from IKE on their response and their motion.  And

7   then lastly, we're going to talk about -- we're going to talk

8   about your summary judgment on your counterclaims.  So we'll be

9   at this for a little bit.

10       MR. SHEEAN:  Judge, I am prepared at this point to

11  move into my argument on the individual counts of IKE's

12  complaint, in terms of the legal aspects of it, I can do that

13  as a rebuttal or I can do it when we come back.

14       THE COURT:  I think it's probably easier for me that

15  I hear his response to your motion and then you'll have an

16  opportunity to rebut anything you want.

17       MR. SHEEAN:  Thank you, your Honor.

18       (Recess from 10:24 a.m.; until 10:34 a.m.)

19        THE COURT:  Is there anything more that you wanted

20   to tell me at least right now on the summary judgment part,

21   recognizing you're going to have an opportunity again?

22        MR. SHEEAN:  Again, I have specific responses to the

23   legal arguments made by IKE with respect to the motions for

24   summary judgment on the claim of trademark infringement and

25   trade secret infringement.


38


1        THE COURT:  We'll get to those in a bit.

2        MR. SHEEAN:  I also just have one short thing I

3   wanted to add.

4        THE COURT:  All right, go ahead

5        MR. SHEEAN:  Thank you, your Honor.  There were a

6   couple of statements made in the reply brief that I felt like I

7   needed to respond to.  One is the argument that the Keystone

8   M-Series boiler is a standardized design.  That VEO was not

9   authorized to make any changes.  It is undisputed that VEO was

10   authorized in the February 27, 2003 addendum to design, build

11   and sell boilers with pressures up to 1,200 p.s.i., as we've

12   discussed, and temperatures up to 750 degrees Fahrenheit.

13   Boilers designed to operate at pressures above 750 p.s.i.

14   require an increased thickness in the drums and tubes in order

15   to meet ASME code requirements.  They just do, you have to make

16   them thicker or they're unsafe.  And Terry Palowski, one of the

17   engineers at Erie Power, testified as such on pages 56 and 57

18   and 93.  And that necessitated a design change.  IKE takes the

19   position that Victory was not authorized to make any design

20   changes.  They had this cookie-cutter set of designs with

21   respect to each of the M-Series boilers and they could make no

22   variation.  Again, there are specific aspects within this

23   agreement that dispute that.

24          Similarly, Bob Gdaniec testified he understood that

25   Victory Energy could sell auxiliary equipment, such as


39


1   economizers.  An economizer increases the efficiency of the

2   boiler.  You can use a smaller boiler to do a bigger job.  The

3   addition of an economizer requires a design change, in terms of

4   where the waterline feeds into the boiler.  That again was

5   admitted by Chris Petcos at his deposition on page 33; and

6   Steve Bernatowicz on page 14 of his deposition.  So, again,

7   there's a recognition by the people on the ground floor, the

8   engineers themselves that well, yeah, even if you limit it to

9   the specific language of Annex I, you had to make design

10  changes.  So that breaks down the argument that there was this

11  standardized set of designs that could not be varied from.

12        IKE alleges that it was not informed by Victory that

13  Victory was selling boilers with membrane wall construction,

14  that's not the case.  When Victory Energy first received notice

15  from IKE that it was the new licensor on or about September 8,

16  2004, Victory Energy responded each and every time, please

17  provide the documentation necessary to verify that in fact IKE

18  is the licensor.  That issue is still open.  When we first came

19  before your Honor for the Rule 16 conference in 2005,

20  ultimately through the initial disclosures, Victory Energy

21  received a copy of the purchase and sale agreement between CMI

22  EPTI and IKE to verify that IKE was the licensor.  Not until

23  that time was VEO in a position where it could share

24  potentially commercially sensitive information with a third

25  party.  Once that information was disclosed in April of 2005,

40

1  VEO has made production in this case of some 10,000 pages of

2  documents at this point.  In those documents there are many,

3  many references to the boilers that Victory Energy sold.  As

4  the testimony and as I've told your Honor today, they were

5  membrane wall.  And IKE knew that, they've known it all along,

6  in the answers to interrogatories and similar discovery

7  responses.  So I think it's disingenuous for IKE to argue that

8  they did not know VEO was selling membrane wall boilers.  And

9  that goes to the point regarding waiver and, frankly, equity.

10  IKE has known all along that Victory was selling membrane wall

11  boilers, that's why they filed the lawsuit.  They cashed every

12  royalty check that's been submitted to them.

13        The final point I wanted to correct, IKE takes the

14  position that Victory Energy was not authorized to design

15  boilers, that the agreement itself was limited to manufacture,

16  market and sell.  And, again, that is not accurate.  Annex II

17  of the License Agreement specifically provides "licensor shall

18  furnish technical data on the products to allow licensee with

19  normal engineering capabilities to design and manufacture the

20  products."  That may seem like a small point, but I think,

21  again, it goes to the larger issue, and that is Victory Energy

22  was not simply given a cookie-cutter set of drawings and said

23  go build antiquated boilers.  They were, under the terms of the

24  agreement, provided with the know-how in order to design

25  modern, up-to-date efficient boilers that they could market and

41

1  sell.

2       THE COURT:  All right.  Thank you, Mr. Sheean.

3  All right, Mr. Gisleson.

4       MR. GISLESON:  May it please the court, John

5  Gisleson from Schnader, Harrison on behalf of plaintiff.

6  I think both parties agree, as the court can tell from the

7  briefing, that the crux of this dispute involves contract

8  interpretation.  To answer the question about ambiguity and why

9  we believe it's not ambiguous, we believe you have to view the

10  contract as a whole giving effect to all terms.  Clause one

11  does say that the products include but are not limited to those

12  set forth in Annex I.  In clause one you have the range 29,000

13  to 150,000 pph.  But it doesn't tell you is it an O-type or

14  D-type, it doesn't tell you is this even a Keystone boiler.

15  When you look at Annex I, it's clear that that embodies the

16  definition of products.  Because in two different places it

17   identifies the word products as being the specific models of

18   Keystone M-Series.

19          THE COURT:  Let me ask you this.

20          MR. GISLESON:  Yes, your Honor.

21          THE COURT:  The phrase "products shall include but

22   not be limited to the items set forth in Annex I."  In your

23   papers, by way of attempting to distance yourself from that

24   language, you tell me that in essence what happened is that

25   language, which had existed in a prior unrelated agreement,


                                    42


1   found its way into this agreement, implicitly by mistake or

2   oversight, but it found its way into the agreement?

3          MR. GISLESON:  Correct.

4          THE COURT:  While that all may be, that's really of

5   no real moment as I look at the face of the agreement, is it?

6          MR. GISLESON:  That's correct, it only comes into

7   play if the court finds that there's an ambiguity with respect

8   to that phrase "includes but not limited to," to explain its

9   origin.

10          THE COURT:  You would be a much happier lawyer,

11  wouldn't you, if that phrase wasn't in that agreement?

12      MR. GISLESON:  That's correct, I would.

13      THE COURT:  All right.  Isn't it true that --

14  well, let me put it this way.  We have two interpretations now

15  as to what the agreement means.  We have, and I use the term

16  loosely, a ton of extrinsic evidence, some of which cuts both

17  ways.  Are you serious when you tell me that I can sit here and

18  read this agreement in the face of all this other information,

19  including that phrase, and declare as a matter of law what it

20  means without being reversed by the circuit in about a

21  nanosecond?

22      MR. GISLESON:  There are a lot of facts in the

23  record and they do include some extrinsic evidence.  I think

24  the reason, though, why we included the facts that we did and

25  why they're so lengthy, is to show that when this record is

43

1  viewed as a whole from every conceivable angle,

2  pre-negotiation, during the negotiation --

3      THE COURT:  And you guys have explored every

4  conceivable angle, believe me.

5          MR. GISLESON:  Yes, we did, your Honor.  But I think

6    however you look at it, a few things become clearer.  Number

7    one is that the licensor has always been consistent in its

8    interpretation of the License Agreement and that consistency

9    derives from Annex I.

10          Number two, I think that February 27, 2003 addendum

11   is absolutely critical.  And that perhaps more than any other

12   piece of evidence demonstrates what the purpose of Annex I was

13   and what the licensed products are.  Because that addendum was

14   entered by the parties less than one month after they finalized

15   Annex I.  If defendant's argument is true, that well Annex I is

16   just items of this general type and all we really care about is

17   includes but not limited to 29,000, 150,000, you don't need the

18   addendum --

19          THE COURT:  Which changed the pressure?

20          MR. GISLESON:  Pressure and temperature, your Honor.

21   Pressure and temperature is only found in Annex I.

22          THE COURT:  If -- playing the same quote unquote

23   game and I don't mean it pejoratively, couldn't it also be said

24   that if VEO truly were not authorized to manufacture and market

25   membrane wall technology, then during the course of the EPTI

44

1  experience, there you would have expected there to have been a

2  written addendum to the agreement that specifically permitted

3  VEO to sell the product, wouldn't one perhaps expect that to

4  have happened?

5      MR. GISLESON:  No, your Honor.  And that ties back

6  to why the engineering department didn't want this technology

7  to be licensed.  But, if so, they wanted to make sure it was

8  clearly defined, which is the undisputed testimony concerning

9  Annex I.  What they did was they permitted on a boiler by

10  boiler basis, the boiler to deviate from Annex I and to have

11  membrane walls because the company was in financial crisis, the

12  technology at that time for the standard M-Series wasn't being

13  used.  They permitted those boilers to be sold.  But if they

14  enter into an addendum, then at that point VEO has an unlimited

15  right prospectively to go forth and sell boilers with membrane

16  walls.  As we indicated, I believe in one of the places in the

17  factual statement and certainly in some of the testimony that

18  was identified by VEO, this market is cyclical.  You have these

19  HRSGs, which we had talked about before, heat recovery steam

20  generators.  Sometimes that market is up and your standard

21  industrial watertube boilers are down.  Other times it's

22  reversed.  I think what EPTI wanted to do was obviously to keep

23  control over that technology and not license it out.  The

24  reason why they had Annex I was to be clear about what that

25  license technology was.  It in turn was modified by the


                              45


1  addendum.

2        THE COURT:  With respect to EPTI's -- let me ask the

3  question this way.  What does the record reflect as to the

4  genesis of VEO, as to the beginning of VEO starting to sell

5  membrane wall technology, what EPTI knew about it and what

6  correspondence or oral communication went back and forth on

7  that point?

8        MR. GISLESON:  Yes, your Honor, it actually happened

9  very early in the agreement.  As early as January 21, 2003,

10  this is Exhibit 18 in our appendix, Mark White, who at the time

11  was the director of sales for EPTI, sent an e-mail to Bob

12  Gdaniec, in which he's already identifying a sale that Victory

13  was prepared to make.  By January 21, 2003, the agreement had

14  been signed, but Annex I had not been finalized yet.  That

15  didn't occur until February 3rd.  In Mr. White's e-mail to Mr.

16  Gdaniec, he states the boiler selected is a standard M-Series.

17  So here we have Mark White using that phrase standard M-Series.

18  Therefore, drawing changes should be minimal.  The next day --

19  it says Victory Energy will modify those drawings requiring

20  changes under the guidance of EPTI.  EPTI will review such

21  changes for approval.  The following day, and this is Exhibit

22  19, Bob Gdaniec, who basically was the chief engineer for EPTI

23  and was the protector of the technology, writes back and says

24  from what I understand, this is way out of the License

25  Agreement, welded walls and higher design pressure.  What's


46


1  important about that, obviously, is that Mr. White is already

2  been told that per the standard M-Series, welded walls are not

3  part of that technology.  And then there's a response back from

4  Mr. White, the welded wall design will be handled by Victory

5  and they will take the responsibility and liability of the

6  change, will not be required to make the change.  Suggesting

7  that it's not going to be an EPTI design change that's being

8    made.  But he doesn't refute the statement by Mr. Gdaniec that

9    it's outside the scope.  He then goes on to say we need to be

10   practical about the agreement, we need to assist Victory Energy

11   in a positive way to insure sales are generated and a

12   diversified revenue stream is created for EPTI.  The next

13   e-mail on that point is February 3rd, which is the same day

14   that the annex is finalized.  And that is an e-mail that Mr.

15   White forwarded on to Victory Energy.  That's Exhibit 35.  In

16   which he writes or he's forwarding an e-mail that writes the

17   agreement is for the saturated standard 8M through 22M

18   refractory wall design, Keystone package boiler.  And the next

19   one that I think is very important is on February 19, 2003,

20   that's Exhibit 40.  And Mr. Levstek writes to Mr. White

21   concerning certain drawings that were going to be forwarded to

22   Victory.  Some drawings had already been forwarded to Victory.

23   A new batch, that included drawings for welded wall, were about

24   to be signed or sent.  And Mr. Levstek writes as these drawings

25   are outside of the basic License Agreement, we should put a

47

1    disclaimer in the transmittal to Victory that they are for use

2  on this specific project only.  So when you look at what's

3  happening inside of EPTI, it's not just the engineering

4  department who are saying M-Series technology is just tangent

5  tube, which we know from the evolution of Annex I, in which

6  Mark White, the author of Annex I, was involved, and it was

7  Mark White, the author of Annex I, who supposedly was having

8  conversations on the side with individuals from Victory --

9       THE COURT:  Does the record reflect -- let me do it

10  this way.  The record reflects clearly that EPTI early on was

11  on actual notice that Victory was selling membrane wall

12  technology, correct?

13       MR. GISLESON:  Correct.

14       THE COURT:  There is nothing in the record, is

15  there, whereby on a project by project basis, by written

16  correspondence or addendum or whatever, EPTI was advising

17  Victory that its right to sell membrane wall technology was job

18  limited; in other words, we're giving you approval job by job

19  by job as you go?

20       MR. GISLESON:  EPTI under the license -- it's not

21  that clear under the documents.  EPTI was collaborating with

22  VEO on the initial designs.  Because VEO didn't have this

23  technology, didn't have this ability to manufacture it and it

24    required EPTI's assistance in that process.

25         THE COURT:  Why did and I guess why and regardless

48

1    of why, why is it relevant -- if EPTI engineers took the time

2    to put together this annex, which apparently reflects

3    exclusively refractory wall technology, why, before you can

4    sneeze, did EPTI permit its licensee to engage in a broad range

5    of sales that by your lights are completely inconsistent with

6    Annex I?

7         MR. GISLESON:  It just goes back to the financial

8    problems the company was having and the diversified revenue

9    stream.  I think they made a decision evidently, that because

10   of the financial condition of the company, they would allow

11   this to continue.  I think what's important is that throughout

12   the time that those sales were being made with EPTI, you had

13   representatives from EPTI sending communications to Victory

14   reiterating what the scope was.  So that it wasn't as though

15   they start selling membrane walls, and then EPTI disappears and

16   says nothing at all for an extended period of time.  The

17   evidence in fact is to the contrary.  And I think that, in

18  particular, is why that March 26th and then March 30th exchange

19  between EPTI and VEO was so important.  Because that really was

20  the culmination of this ongoing dialogue from time to time that

21  the two were having.  It was to such an extent that VEO's chief

22  engineer said you know my biggest frustration is being told

23  that this is not a standard M-Series.  Gdaniec clearly defines

24  in his March 26, 2004 letter what the scope of the agreement

25  is.  His description of the scope is fully consistent with

49

1  Annex I, which is the description of the product as confirmed

2  by the parties in that February 27th addendum.

3       THE COURT:  But isn't there something almost

4  schizophrenic with a situation whereby EPTI -- you've got an

5  agreement that has the annex, which apparently is limited to

6  refractory walls.  Shortly on the heels of the execution of the

7  agreement, EPTI then supplies Victory with engineering

8  drawings, etc., so they can build membrane wall technology.

9  Then periodically during this next 14 or 15 months, as the

10  licensee is selling membrane wall technology, we have people at

11  EPTI saying oh, by the way, you're not really licensed to sell

12  membrane wall technology, we really mean it, you're not

13  licensed to sell membrane wall technology, finally culminating

14  15 months later in the letter in March, whereby they say we

15  want you to know you can't sell membrane wall technology.  What

16  the heck was going on here.  I have read this record and I have

17  never seen a business transaction like this in my entire life?

18      MR. GISLESON:  This certainly is not the poster

19  child for good license agreement administration.  But I think

20  what you have --

21      THE COURT:  Actually it's the poster child for bad

22  license administration.

23      MR. GISLESON:  And I agree with that.  It comes back

24  to the context of what was happening, that you're dealing with

25  a company that is in distress, a company that's in bankruptcy,


50


1  a company that's looking for cash.  And, frankly, that's part

2  of the reason why corporations have provisions in their

3  contracts that says the waiver of one breach is not a waiver of

4  subsequent breaches and that any modification must be in

5  writing.  That's how it protects itself.

6          THE COURT:  What is your response to his position

7   that by virtue of, whether it was grudging or otherwise,

8   acquiescence in this alleged, in the course of conduct which by

9   your lights ran afoul of the material terms of the contract,

10  that you've waived the right now to object to that by virtue of

11  their change in circumstances or conditions?

12          MR. GISLESON:  Absolutely not.  First, we have not

13  brought any claims for any damages sustained by Erie Power,

14  precisely because Erie Power acquiesced during the time it was

15  the licensor.  Our claims are limited solely to the time that

16  IKE had been the licensor.  So for none of the boilers that

17  were sold while EPTI was licensor, is there a claim in our

18  complaint.  Secondly, from our view, we still go back to the

19  License Agreement and Annex I --

20          THE COURT:  Not to interrupt you, but as a legal

21  matter, don't you acquire all the legal baggage, both good and

22  bad, from your predecessor in interest?

23          MR. GISLESON:  We stand in Erie Power's shoes.

24          THE COURT:  So you are, for all intents and

25  purposes, EPTI.  So you're not really telling me that it was

1  EPTI who acquiesced in this and that you shouldn't -- that if

2  the doctrine of waiver would apply, it can't apply because you

3  weren't the people who were doing the acquiescing?

4       MR. GISLESON:  Well, I think, obviously, whatever

5  happened between EPTI and Victory, that is going to be relevant

6  to whether it's interpretation of the agreement or the course

7  of dealings between the parties.  But I think what's important

8  is that EPTI retained the right to revoke its consent, rescind

9  its consent.  Because there never was an addendum that gave

10  Victory a prospective right and it consistently was telling

11  Victory along the way what the scope was.  Which Victory should

12  already know, because they approved of Annex I.  So it was on

13  notice directly from EPTI consistently during that 15-month

14  period what the scope of the License Agreement was.

15       THE COURT:  So are you saying what the record

16  reflects is that there was, for all intents and purposes, an

17  oral modification of the agreement during EPTI's tenure?

18       MR. GISLESON:  That's correct, reflected by conduct.

19  Which is confirmed by the unit sale notifications that we

20  attached.  While EPTI was the licensor, Victory, just like when

21  IKE became licensor, had to identify the boiler units that it

22  was selling and that's what generated an invoice.  When VEO was

23  sending these unit sale notifications to EPTI, it specifically

24  identified in the notice 100-percent membrane wall.  If that

25  was simply part of the agreement, there was no need to identify

52

1  that feature in the unit sale notification.  Once IKE becomes

2  the licensor and they have to make unit sale notifications,

3  they stop making that disclosure.  What's important is that it

4  was always on notice throughout the time that EPTI was the

5  licensor, what EPTI's view of the License Agreement was.  They

6  got the benefit from being able to develop the ability to sell

7  these membrane wall boilers and hold themselves out to the

8  world as having that capability.  EPTI, because they had a

9  contract, had the right to rescind that consent because it was

10  never in an addendum.  The burden, once we rescind, then shifts

11  over to VEO to show how it relied to its detriment.  The fact

12  that it simply sold these membrane wall boilers was not a

13  detriment, that was a benefit.  There is nothing in the record

14  to indicate that they built a factory because they were selling

15   membrane wall boilers, because they had a backlog of orders

16   that they had to fill.  Quite to the contrary.  They also have

17   a HRSG business, the heat recovery steam generator business, as

18   well as fire tube business, which was expressly carved out of

19   the License Agreement and could compete against the watertube

20   boilers.  So they have a significant other business.  And we

21   cite to testimony from Jay McConaughy that their HRSG business

22   was so big, they had to set those products up beneath tents

23   outside of the factory.

24        THE COURT:  Is there testimony, to your

25   recollection, is there testimony in the record from White,


53


1   Viskup and Brewer that they considered the annex as a guide?

2        MR. GISLESON:  They did give that testimony, but in

3   different ways.  They did use the phrase guide and framework.

4   Mark White recalled a conversation with -- let me see if I can

5   find it, they don't recall conversations with each other

6   consistently.  Shawn Brewer didn't recall having a conversation

7   with Mark White on the subject.  Mark White recalled a

8   conversation with Shawn Brewer.

9          THE COURT:  Is there testimony from White or Brewer,

10   leading you up to the agreement, that they had discussed the

11   agreement as containing membrane walls?

12          MR. GISLESON:  They contend that that was always the

13   intent.  John Viskup testified that he had a conversation with

14   Mark White about how do you source the membranes.

15          THE COURT:  Is there testimony in the record,

16   engineering testimony, if you will, whereby folks have gone on

17   record to the effect that there is no standard meaning in the

18   industry as to what M-Series technology means?

19          MR. GISLESON:  There is testimony that in the

20   industry people aren't familiar with M-Series technology.  But

21   the testimony from Mr. Viskup was that he was aware of what the

22   M-Series was and in fact had wanted to license the M-Series

23   since 1999.

24          THE COURT:  Is there testimony in the record in

25   connection with -- is there testimony in the record that Mr.


54


1   Viskup -- let me think, maybe I got the wrong guy -- yeah, I

2   did.  Is there testimony in the record -- was his name Stephen

3    Kang?

4         MR. GISLESON:  Yes.

5         THE COURT:  That on behalf of EPTI had reviewed the

6    License Agreement, and he himself was unable to determine

7    whether membrane walls were included in the definition of

8    products?

9         MR. GISLESON:  I don't recall that.  I know that

10   Mr. Kang emphasized that, although he is an attorney by

11   training, he's not an engineer and he's not a technical person.

12   And that's why he deferred to the engineering department and

13   specifically instructed White to consult with them.  He also

14   testified that he spoke with Mr. White about licensing the

15   technology.  And White told him that the technology was

16   outdated and antiquated, which ties in perfectly to EPTI and

17   IKE's understanding of the M-Series technology that's depicted

18   in Annex I.

19         THE COURT:  Now, just based on the conversation

20   we've had so far, let me stop and ask you this.

21         MR. GISLESON:  Okay.

22         THE COURT:  Is it really your position that on the

23   record that we have been chatting about for the last hour and a

24   half, that there are no material issues of fact?

25          MR. GISLESON:  And I don't want to undermine my


                              55


1   credibility with the answer, but I think it depends on how you

2   view it.  If you're going to consider extrinsic evidence and

3   say that the agreement is ambiguous and, therefore, you let in

4   pre-execution conversations --

5          THE COURT:  Right.

6          MR. GISLESON:  Then I think there could be a dispute

7   of fact.

8          THE COURT:  All right.

9          MR. GISLESON:  If the court says I'm going to

10  interpret this contract based on what's in the contract and

11  what was occurring after the contract was executed, because at

12  that point you're talking about course of performance conduct,

13  not extrinsic evidence, which would be all the pre-execution

14  evidence.

15          THE COURT:  Not to interrupt you, I'm glad you

16  raised course of performance.  Because course of performance

17  evidence can be used -- it's a different creature than parole

18  evidence.  And it can be used to clarify, even the contract

19  that is pretty clear or to confirm a meaning on the part of the

20  court.  But that said, isn't it true that the course of

21  performance evidence in this case cuts both ways?

22        MR. GISLESON:  Not in a material way when you look

23  at the evidence as a whole.  That's why when we're focusing on

24  the contract term while EPTI was the licensor, you have EPTI

25  stating what the scope of the License Agreement is without any


56


1   dispute by VEO.  You have the evidence of express consent.

2   And I can identify that.  But you have that March 26th and 24th

3   language.  What's critical there is you have both of the guys

4   who were involved with signing the License Agreement,

5   responding jointly to EPTI, Bob Gdaniec, who also was involved

6   with developing the annex.  And they're agreeing that membrane

7   technology is outside the scope in geometry.  So the only

8   direct statement that we have during the parties relationship

9   from VEO is that you're right, membrane walls are outside the

10  scope in geometry, and they're basically admitting that the

11  definition of products is Annex I.  And then we move over to

12  the sale negotiations in which Mark White, the same guy who

13    when he was with EPTI drafted the annex and negotiated with

14    John Viskup in demonstrating that VEO knows the difference

15    between the standard M-Series and the rest of the technology,

16    and it refused to buy just the M-Series.

17          THE COURT:  Is VEO selling Keystone membrane wall

18    technology today?

19          MR. GISLESON:  No, but only because the License

20    Agreement expired in January.

21          THE COURT:  This past January?

22          MR. GISLESON:  Correct.  But they did sell membrane

23    wall boilers while IKE was a licensor despite instructions not

24    to do so.

25          THE COURT:  And you were selling membrane wall


57


1    technology at the same time, weren't you?

2          MR. GISLESON:  IKE was just starting in business and

3    was focusing on after-market parts.  I think it may have

4    submitted a proposal, I don't recall exactly, but it was not

5    actively marketing them.  Obviously, because it acquired the

6    technology, here's why the rescission makes so much sense,

7  you've got a new licensor who just paid a lot of money for

8  technology, that of course is going to want to make sure that

9  the licensee conforms to the plain terms, narrow scope of the

10  agreement.

11          THE COURT:  Do you mean since IKE became the

12  licensor, did it manufacture any boilers?

13          MR. GISLESON:  No, your Honor, it did not.

14          THE COURT:  Did EPTI manufacture boilers?

15          MR. GISLESON:  I think that EPTI basically sold all

16  of its assets and that became CMI EPTI, which focused on HRSGs.

17  Part of what happened here, too, is that within a couple of

18  weeks of this License Agreement expiring, VEO rolled out its

19  own line of O-type watertube boilers that we believe is

20  incorporating technology it got from EPTI.

21          THE COURT:  That they knocked off your design?

22          MR. GISLESON:  We're still pursuing discovery on

23  that issue, but that's a concern.  But that's another part of

24  the reason that the engineers at Erie were so concerned about

25  this.

58

file:///A|/INDECK1.TXT

1        THE COURT:  Well, first of all, the viability of

2   these trademark claims, the other claims turn in large measure

3   on the resolution of the license issue.  In other words, if

4   they were licensed to do this, then those other claims

5   disappear, don't they?

6        MR. GISLESON:  That's correct, your Honor.  Except

7   to the narrow extent we'll have proposals that were above

8   150,000 or the reverse passing off claim that we have.  But,

9   otherwise, that is correct.

10       THE COURT:  What else do you want to tell me?

11       MR. GISLESON:  I can identify places in the record

12  where there's consent, evidence of consent.

13       THE COURT:  Consent of what?

14       MR. GISLESON:  The issue of EPTI giving consent on a

15  boiler by boiler basis.

16       THE COURT:  Where would that be?

17       MR. GISLESON:  The first place is in VEO's own

18  brief.  In their response at page two they write "VEO marketed,

19  built and sold boilers with membrane walls for the first 18

20  months of the license with the knowledge and consent of the

21  licensor."  At page five they write "it is undisputed that VEO

22  manufactured and built boilers with EPTI's knowledge and

23  assistance from January 23 until it least March 26, 2004."

24  Exhibit 40, the February 19, 2003, Dan Levstek e-mail.  He was

25  an internal engineer at EPTI.  He sent an e-mail internally,

59

1  including to Mark White, that said the drawings that included

2  membrane wall drawings were "for use on this specific project

3  only."  We have the March 30, 2004 letter that VEO sent to EPTI

4  in response to the March 26th letter, which is Exhibit 34.

5  That says to date no changes have been made without EPTI's

6  knowledge.  We have Bob Gdaniec's testimony, which is in

7  Exhibit 3 of VEO's supplemental appendix.  The question was

8  "But, again, you knew of no instance when Victory Energy had

9  made any improvements or modifications to a fabricated or built

10  boiler without prior authorization from Erie Power, correct?"

11  "Answer:  None that I was aware of."  "Question:  You could not

12  identify a single instance prior to your letter of March 26,

13  2004, where Victory Energy had made a modification without

14  first obtaining consent from Erie Power?"  "Answer:  Correct."

15      THE COURT:  Is the Keystone membrane wall

16  technology -- excuse me, is the IKE Keystone membrane wall

17  technology, isn't that in the public domain?

18       MR. GISLESON:  No, your Honor, it's not.  The

19  concept for membrane walls is in the public domain.  But how

20  each manufacturer develops the design of the membrane wall that

21  it uses, whether it's the thickness, whether it's the spacing,

22  the angles at which the piping and the membrane meet, those

23  different things are specific to each manufacturer and they're

24  not in the public domain.

25       THE COURT:  There is a general technology of


60


1  membrane wall technology, but each manufacturer tweaks it to

2  try to improve it?

3       MR. GISLESON:  Correct.  And I believe that the

4  water-cooled burner may be unique to EPTI, but I would need to

5  confirm that.  Which is now IKE.

6       THE COURT:  What I would suggest we do now, before

7  we then bring Mr. Sheean up again is let's talk about your

8  motion for partial summary judgment on the defendant's two

9  counterclaims that are going forward.  One is the breach of the

10   exclusivity provision of the License Agreement, and the other

11   is the interference with contractual relations based upon

12   EPTI's alleged interference with VEO's sales representatives?

13        MR. GISLESON:  Yes, your Honor.  If it's okay with

14   the court, I'll have Bob Williams address this since he's the

15   individual who wrote the brief.

16        THE COURT:  All right.  Do I take it that you wrote

17   the other brief?

18        MR. GISLESON:  Yes, your Honor.

19        MR. WILLIAMS:  Your Honor, I would submit that the

20   issues have been thoroughly briefed with respect to the motion

21   for partial summary judgment on VEO's counterclaims, at least

22   the two that remain pending before this court.  If it pleases

23   the court, I can give a thumbnail summary of what we've boiled

24   down to or I can simply answer questions that the court may

25   have on those issues.


61


1         THE COURT:  Well, wait until I find what I'm looking

2   for here.  Let's first talk about their interference with

3   contract claim.  And to make it as simple, I really should say

4   no more complicated than it has to be, you would agree with me

5   that the interference claim is pretty much controlled by

6   Restatement of Torts 766.  And the elements of this claim would

7   be that IKE intended to harm VEO's contractual relations with

8   its sales reps.  IKE acted improperly, i.e., was not privileged

9   to act the way that it acted.  IKE intended or otherwise caused

10  VEO sales reps to not perform the contracts.  And VEO suffered

11  pecuniary loss as a result of the alleged interference.  Are

12  those the elements?

13          MR. WILLIAMS:  Your Honor, we would agree that the

14  analysis begins with Section 766 of the Restatement.

15          THE COURT:  Where does it end?

16          MR. WILLIAMS:  Section 768 of the Restatement issues

17  a set of qualifying elements that says but 766 does not count,

18  you don't get anywhere with 766, you cannot state a claim under

19  Section 766, if the competitor's privilege of Section 768 is

20  present.

21          THE COURT:  All right, tell me about that?

22          MR. WILLIAMS:  Your Honor, the competitor's

23  privilege that is set forth at Section 768 of the Restatement

24  provides that if you've got a contract that is terminable at

25  will and one party, a third party comes in and interferes with

62

1   that at-will contract, causing a termination of the at-will

2   contract, there will be no liability for causing that

3   termination.  Provided that the matter involves competition

4   between these actors, that the interfering party did not

5   utilize wrongful means in its interference.  That the

6   interference has not created an unlawful restraint of trade,

7   and that the purpose of the interfering party was to advance

8   its own business interests and competitive interests.

9           THE COURT:  Well, they say here that you, that IKE

10  went to Victory's sales representatives and essentially said to

11  them if you don't resign from Victory, we're not going to let

12  you sell our -- what's the term?

13          MR. WILLIAMS:  After-market parts.

14          THE COURT:  After-market parts.  That's the essence

15  of the claim, as I understand it -- is that as you understand

16  it?

17          MR. WILLIAMS:  That is one of the defenses that VEO

18  has put up to our competitor's privilege.

19          THE COURT:  That's their claim as to what happened,

20  is that wrongful conduct?

21        MR. WILLIAMS:  Absolutely not, your Honor, for a

22  number of reasons.  Number one, that is the gist or the essence

23  of the competitor's privilege, and there is a quotation of a

24  court opinion in our brief, which says the whole point of

25  Section 768 of the Restatement is to allow a party to hurt

63

1  another party.  It is to allow a party to interfere with a

2  contract and cause harm to its competitor without liability.

3        THE COURT:  So the other portion of the Restatement,

4  insofar as it relates to business competition, is intended to

5  envision the reality that in the business world sharper elbows

6  are permitted without running afoul of an interference with

7  contractual claim?

8        MR. WILLIAMS:  Absolutely, your Honor.  The other

9  quotation that is present in our brief is the court saying you

10  know, the essence of the competition privilege is to allow one

11  competitor to induce someone to deal with them and not the

12  other competitors.  And that's exactly what happened here.  IKE

13  came in and said we need sales representatives.  And if I may,

14    your Honor, it's in the record and I could find proof for it,

15    but it's also a matter that the court can take judicial notice

16    of.

17           THE COURT:  Not to interrupt you -- were these sales

18    reps exclusive VEO sales reps, working exclusively for VEO?

19           MR. WILLIAMS:  There is an exclusivity provision in

20    the contract that they had with VEO.  Which is standard in the

21    industry and actually which supports our position.  That

22    everybody in this industry, that you do not allow a sales rep

23    to represent yourself and a competitor simultaneously.  So

24    there was no choice.  The way that this market operates is you

25    represent one company for the competitor, but not both

64

1    simultaneously.

2           THE COURT:  So what was the alleged threat again,

3    I'm going to hear it from Mr. Sheean because they're the people

4    that say they were threatened, but as you understand it, what

5    was the threat that was made?

6           MR. WILLIAMS:  As I understand it, the threat was if

7    you don't terminate your contract with VEO, we will terminate

8   our contract with you.  Or we will not allow you to sell our

9   parts because we deem that to be a conflict.

10        THE COURT:  But they were being permitted to do

11  that, notwithstanding the fact -- as part of this overall

12  contractual arrangement, although they were exclusive VEO sales

13  reps, EPTI was also permitting them to sell these parts, is

14  that right?

15        MR. WILLIAMS:  Not exactly, your Honor.  What I was

16  about to say was that it's a matter that the court could take

17  judicial notice of, that IKE was only organized and created and

18  formed in September of 2004.  So that when all --

19        THE COURT:  These were IKE people who went?

20        MR. WILLIAMS:  Exactly, your Honor.  IKE went out

21  and said hey, folks, we just started this company, we just

22  acquired this technology, we don't have any sales reps now

23  because we were just formed, we're looking to sign sales reps.

24  We're not going to sign with you if you're going to represent

25  our competitor, so make a choice.  There was nothing improper

65

1   about that.  Again, in light of the case law that we've cited,

2    which says --

3          THE COURT:  How could they sign with them anyway.  I

4    mean they couldn't have signed with them; in other words, these

5    sales reps could not have gone to work for IKE unless they

6    terminated their exclusive relationship with VEO, right?

7          MR. WILLIAMS:  That is true.

8          THE COURT:  I guess I don't understand it.  You can

9    stay right there.  Mr. Sheean, so we don't shuffle back and

10   forth, could you explain to me what the threat here was?

11         MR. SHEEAN:  Absolutely, your Honor.  Allan

12   Christian was the representative whom we deposed.  Mr.

13   Christian was the principal of Christian Power Equipment.  He

14   was a representative for Zurn Energy, which became Allborg,

15   which became Erie Power.  When Erie Power entered into the

16   License Agreement, Erie Power said to Victory Energy, here's

17   our list of representatives, why don't you use them to sell

18   Keystone watertube package boilers.  Victory signed as many of

19   those reps as they could to sell these boilers.  They're

20   knowledgeable in the product, they had been years ago.  Allan

21   Christian then became a representative both for Erie Power for

22   after-market parts and other unrelated products and Victory

23  Energy for Keystone watertube package boilers.  That

24  relationship continued from early 2003 until he terminated his

25  license with or his agreement with Victory in 2005.


66


1        THE COURT:  All right.

2        MR. SHEEAN:  And when IKE became the owner of this

3  technology, Erie Power sold after-market parts for IKE while it

4  was still a representative for VEO for a number of months, from

5  September of 2004 until the ultimate termination of VEO in

6  February or March of 2005.  The analysis or the hangup that I

7  think your Honor was having is the competition here is not real

8  because these reps were representing different product lines

9  for different manufacturers.  Christian Power also represents

10  other manufacturers of other product lines.  He represents some

11  seven or eight different manufacturers.

12        THE COURT:  Assume that you're competitors, okay, I

13  know your position is you're not, assume that you are, do you

14  still win?

15        MR. SHEEAN:  If we're competitors, no, I don't think

16  we can prevail.

17          THE COURT:  All right.  What else do you want to

18  tell me -- why are they competitors?

19          MR. WILLIAMS:  Your Honor, they're competitors

20  because they're in the watertube boiler industry.

21          THE COURT:  Meaning IKE and VEO?

22          MR. WILLIAMS:  That is absolutely correct, your

23  Honor.  And by way of argument, what you see, whenever an owner

24  of a project issues a request for proposal that says hey, we

25  need a boiler in the capacity of 150,000 pounds per hour, for

67

1  example --

2          THE COURT:  What was the Restatement of the section

3  that deals with the competitor exception, if you will?

4          MR. WILLIAMS:  Section 768.

5          THE COURT:  All right, what were you saying?

6          MR. WILLIAMS:  They're competitors, your Honor,

7  because, for example, when you are dealing with boilers that

8  are on the cusp of the capacity limit of the License Agreement,

9  you could have a proposal that says hey, look, if instead of

10  two 150,000 pound boilers, which each would have been within

11   the capacity range of the License Agreement, what you see in

12   the industry are boiler manufacturers saying hey, owner,

13   instead of two 150,000 pound boilers, why don't you let us make

14   one 200,000 pound capacity boiler and that will satisfy your

15   needs just as we.  They compete directly for the same boilers,

16   the same parts, the same owners.  And as I point out in our

17   brief and I won't repeat it at length, the cases that construe

18   Section 768 of the Restatement make it clear that the intent of

19   the competition, element of the privilege, is very broad.

20   There are cases where a franchisor and a franchisee have been

21   deemed to be competitors.  There are cases where an original

22   office equipment manager and a company that refurbished other

23   brands of office equipment were deemed competitors.  And that

24   goes to Mr. Sheean's distinction that he's attempting to make,

25   that we didn't compete exactly for the same precise products.


68


1   Well, that doesn't have to be the case, there's no authority

2   for that.

3         THE COURT:  Let's talk about the alleged breach of

4   the exclusivity provision of the License Agreement?

5          MR. WILLIAMS:  Your Honor, before we do that, I did

6   have one point to make on the intentional interference

7   allegation.

8          THE COURT:  Yes.

9          MR. WILLIAMS:  And that is even if we lose on those

10  elements, there is no evidence that Victory sustained any

11  damage as a result of that.  What VEO says, what they point to,

12  to try to defeat the motion, is that Mr. Viskup testified that

13  VEO lost opportunities to submit proposals.

14          THE COURT:  How did that happen, I mean what's the

15  connect, I don't understand that?

16          MR. WILLIAMS:  I think, and I don't mean to speak

17  too much for Mr. Sheean, I think what Victory means there is

18  that if IKE had not caused Mr. Christian, for example, to stop

19  representing VEO, Mr. Christian would have gone to Michigan and

20  said I've got a VEO proposal for you for this project.  That

21  evidence comes by way of testimony from VEO's Mr. Viskup.  And,

22  your Honor, that's a legal conclusion.  What he's asking the

23  court to accept is that but for IKE's alleged interference, VEO

24  would have actually won the Michigan project.  And not only is

25  that a legal conclusion that this court is not required and

1  should not accept, but that's also speculative.

2        THE COURT:  All right.  Now, let's talk about the

3  exclusivity provision of the License Agreement.  Once again,

4  Mr. Sheean can speak for himself on the point.  But are they

5  accusing you of selling products in violation of the

6  exclusivity provision or are they accusing you of marketing

7  products in violation of the exclusivity provision?

8        MR. WILLIAMS:  The latter.  We started out with the

9  former, that it was a sale, accusing us of selling, but then

10  VEO admitted that IKE has not sold any competing boilers.  It

11  seems that their claim has evolved into a breach of a claim

12  that their marketing rights were exclusive.

13        THE COURT:  All right.  Your position is, I know

14  what your position is because I just turned to it.  This is

15  your brief.  You say "thus, it is only the license to

16  manufacture the specified boilers that is exclusive.  The right

17  to use the Keystone name and trademark is not expressly made

18  exclusive by any contract language."  What sense does that

19  make, if they have the exclusive right to manufacture the

20  products and to offer, sell and install the products; isn't

21  offering -- doesn't marketing go hand in hand with offering and

22  selling?

23          MR. WILLIAMS:  I hesitate to go down the contract

24  interpretation road in light of where we've spent the last two

25  hours.  But I think that I have to.  And, your Honor, the

70

1  distinction there lies between what a license is and what a

2  right is.  The exclusivity language of the License Agreement

3  provides that the license will be exclusive.

4          THE COURT:  Didn't they buy, didn't they license the

5  Keystone name and trademark from you -- I know there is a

6  dispute as to what they -- as to what products they licensed it

7  for, but whatever products it was, they licensed the right to

8  use the Keystone name and trademark, right?

9          MR. WILLIAMS:  Yes.  But it was not an exclusive

10  right to use those names and use that for marketing purposes

11  because it's undisputed that above 150,000 pounds per hour,

12  whether or not we're talking membrane wall or tangent tube,

13  above 150,000 pounds per hour the licensor got to continue to

14  market the O-Series, O-style boilers.  So that's why the

15  marketing rights are not exclusive.  You could not take away

16  Erie Power's right to get out there and promote this boiler.

17        THE COURT:  What boiler were you marketing at the

18  same time, by way of marketing brochures and whatnot, at the

19  same time that they were selling membrane wall technology, what

20  toes were you stepping on; in other words, were you

21  marketing -- I'm also confused on this.  You didn't manufacture

22  any boilers, right?

23        MR. WILLIAMS:  IKE has not manufactured any boilers.

24        THE COURT:  Then what was the point in you marketing

25  anything if you couldn't produce it?


71


1        MR. WILLIAMS:  The fact that IKE has not sold any

2  boilers does not mean that IKE cannot produce any boilers.

3        THE COURT:  Are you geared up to actually produce

4  boilers?

5        MR. WILLIAMS:  I believe they are, your Honor.

6        THE COURT:  So getting back to my question.  During

7  the relevant time period here when you were in alleged

8  breach -- is the breach of the exclusivity agreement directed

9   solely at IKE or did it start back with EPTI, as you understand

10  the claim?

11      MR. WILLIAMS:  As I understand it, it is directed

12  solely at IKE.

13      THE COURT:  Okay.  As a factual matter, I'm not

14  saying it's material, but as a factual matter, did IKE market

15  boilers through brochures or whatever marketing mechanism that

16  you used during the contract period?

17      MR. WILLIAMS:  IKE has created a brochure.

18      THE COURT:  All right.  Does that brochure market

19  membrane wall technology or old-style refractory wall

20  technology?

21      MR. WILLIAMS:  Membrane wall technology.

22      THE COURT:  Okay.  So, to a certain extent in part,

23  doesn't the question as to whether you're in breach of the

24  exclusivity provision of the agreement turn on exactly what the

25  agreement is?


72


1       MR. WILLIAMS:  Yes, in part.

2       THE COURT:  Because if the agreement was, for

3    instance, only for O-style, excuse me, only old style, then you

4    could theoretically have marketed membrane wall technology till

5    the cows come home without running afoul of the agreement, is

6    that right?

7         MR. WILLIAMS:  That's true if you reject the reading

8    of the License Agreement that I'm proposing.

9         THE COURT:  Now, getting back to the reading of the

10   License Agreement, why would anyone pay good money to become a

11   licensee with the exclusive right to manufacture, sell and

12   offer product X, if at the same time the licensor retained the

13   co-exclusive right to market to a group of potential customers

14   the very same product, potentially to the detriment of the

15   licensee -- does that make sense?

16        MR. WILLIAMS:  Because of what we have said, your

17   Honor, is that the right to sell and the right to manufacture

18   is exclusive.  It is only the marketing right that is no

19   exclusivity under the License Agreement.

20        THE COURT:  I know you're not geared up to sell yet,

21   but let's assume you were, and I don't know anything about your

22   plant, I don't know if it's tooled and ready to go.  But let's

23   assume you today are actively producing boilers of old style

24  and new style, just hypothetically.  And you licensed the right

25  to VEO to sell, per your rights, the old style.  The exclusive

73

1  right to manufacture and sell.  Aren't you taking away with one

2  hand what you've given with the other, if you nevertheless

3  maintained the right to market that product to the potential

4  economic detriment of the licensee?

5        MR. WILLIAMS:  No, it's free marketing for Victory,

6  your Honor.  In your Honor's, in the court's hypothetical, if

7  IKE, assuming for the sake of this argument in the

8  hypothetical, if IKE put out there a brochure that offered for

9  sale a boiler that VEO was licensed to offer and a customer

10  came to IKE and said we got your brochure, we want this boiler,

11  as long as IKE said to that customer well, we can't make that

12  exact boiler because that's within a License Agreement that

13  exists, call our friends at VEO, they will make that exact

14  boiler for you, there is no harm to VEO.  In fact, again,

15  they've gotten free marketing services because apparently --

16        THE COURT:  How are they harmed by -- this is a

17  softball, I should be asking him, how are they harmed by your

18  marketing the product without your selling the product?

19      MR. WILLIAMS:  And that's exactly the secondary

20  position that we've stated in our brief, your Honor.  Even if

21  there is an exclusive marketing right that's been breached,

22  there is no harm for Victory.  Because there's only two ways

23  harm could occur.  Either IKE's marketing efforts stole a sale

24  from VEO, which VEO admits --

25      THE COURT:  How could they come to you to get


74


1  something you don't produce?

2      MR. WILLIAMS:  Again, not possible, not possible for

3  us to cause harm.  Not possible for IKE to cause harm to VEO.

4      THE COURT:  Why are you marketing to a public if at

5  the end of the day you can't produce what your marketing

6  brochure describes, what's the point?

7      MR. WILLIAMS:  The problem with the court's question

8  is that we've been speaking generally about IKE's marketing

9  material.  The brochure of which VEO complains is a simple

10  passage that says we offer the O-style boiler or the O-style

11  boiler is available with a capacity up to 500,000 pph.  So the

12    details, the factual details, are not that IKE is out there

13    trying to market the specific boilers that had been licensed --

14         THE COURT:  5,000?

15         MR. WILLIAMS:  500,000.

16         THE COURT:  500,000 is a lot higher?

17         MR. WILLIAMS:  Exactly.  So there's no specific,

18    despite what they would argue --

19         THE COURT:  But how do you -- I'm not even sure that

20    this is germane, but I don't understand it.  Why do you say we

21    offer this O-style boiler at this relatively high pressure, if

22    in fact you can't produce that O-style boiler at that

23    relatively high pressure.  What if you get somebody who calls

24    you up and says I read that brochure, that's exactly what we

25    need, what would you say?


                                    75


1         MR. WILLIAMS:  I believe that IKE is capable of

2    producing a 500,000 pounds per hour O-style boiler.

3         THE COURT:  I don't know what the record reflects on

4    this, are you telling me that you stand here today, what IKE

5    really is -- is a fairly recent successor in interest to EPTI,

6   which is trying to but has not yet become, has not yet moved

7   from offeror of products to manufacturer of products, is that

8   what you're telling me?

9           MR. WILLIAMS:  I believe that is correct, your

10  Honor.  I've just been advised that in our hypothetical what

11  IKE would do is outsource the manufacturing.

12          THE COURT:  That was my next question.  In other

13  words, they are offering a product which at present they cannot

14  produce in-house, is that correct?

15          MR. WILLIAMS:  Yes, they own the technology for it,

16  but yes.

17          THE COURT:  All right.  What else do you want to

18  tell me?

19          MR. WILLIAMS:  Just finishing up on the damages,

20  your Honor.  It's clear and it's been admitted that IKE, these

21  alleged breaches of the exclusive marketing right have not

22  resulted in IKE actually selling a boiler.  So there's no

23  possible way there was any damage there.  Again, what VEO turns

24  to is a conclusion in a deposition transcript from Mr. Viskup,

25  which states we lost opportunities to submit proposals to

76

1  owners of projects.  Again, that's just so speculative, and it

2  bears out from the evidence of record regarding the Notre Dame

3  project.  Where the owner said no, there is nothing that

4  anybody did to interfere.

5        THE COURT:  Here's my last question on the

6  exclusivity business.  Recognizing that you are outsourcing or

7  would outsource, does the record reflect that you in fact have

8  outsourced that boiler and it has been produced for you by

9  someone else?

10        MR. WILLIAMS:  My understanding, your Honor, is that

11  IKE had an opportunity to build one boiler that would have been

12  outsourced, but that the company made a business decision,

13  relating to profit, that it did not want to undertake that

14  project.

15        THE COURT:  All right, thank you.  All right, Mr.

16  Sheean.

17        MR. SHEEAN:  Your Honor, I'm not sure in which order

18  you want me to proceed?

19        THE COURT:  I'm going to let you backtrack and pick

20  up those points, among other things you wanted to tell me about

21  before.  But before you do, as long as it's fresh in my mind.

22   On this exclusivity thing, do you concede for purposes of our

23   discussion that they didn't sell any product?

24          MR. SHEEAN:  Yes, your Honor.

25          THE COURT:  So it's accurate for me to say that your


77


1   complaint isn't that they sold it, it's that they marketed it,

2   right?

3          MR. SHEEAN:  Yes, your Honor.

4          THE COURT:  I cannot see for the life of me,

5   although, I can see other things in this case more clearly, I

6   can't see how you could possibly have been damaged by this, no

7   matter how I look at it?

8          MR. SHEEAN:  I understand.  Victory Energy, as the

9   licensee, was authorized to market and sell and manufacture

10   Keystone watertube package boilers below 150,000 pounds per

11   hour of steam.

12          THE COURT:  All right.

13          MR. SHEEAN:  Its potential customers in the

14   marketplace, beginning in September of 2004, are receiving

15   brochures indicating that Keystone watertube package boilers

16  are available from Indeck Keystone Energy from zero to 500,000

17  pounds per hour.  It creates confusion in the marketplace, it

18  diverts potential customers, it damages Victory Energy by

19  taking away that exclusive right to manufacture and sell that

20  product.

21      THE COURT:  But the opportunity to sell even one

22  boiler was not stolen, if you will, by IKE by virtue of giving

23  a ready and willing customer a boiler from them that they

24  otherwise would have purchased from you, in the absence of an

25  actual sale, how are you hurt?

78

1      MR. SHEEAN:  Well, your Honor, I think that is

2  frankly within the province of an expert to testify with regard

3  to how potential customers in the industry would perceive these

4  dichotomist marketing materials, whether or not that would

5  impact on their ability to make a purchase decision.  Victory

6  Energy's percentage, in terms of closing projects that it has

7  an opportunity to bid on.  And as a result, based on the number

8  of sales in the marketplace for a given year, the total number

9  of sales that Victory Energy would have lost out on as a

10  result.

11      THE COURT:  All right.  I'm going to let you run

12  back and pick up where you had wanted to pick up before?

13      MR. SHEEAN:  Well, I wanted to respond first,

14  jumping all the way back to Victory Energy's motion and IKE's

15  cross-motion, I wanted to give your Honor the citations that

16  your Honor asked for a moment ago.

17      THE COURT:  All right.

18      MR. SHEEAN:  With respect to the reference to

19  Annex I being a guideline, Mark White testified as such on page

20  65 of his deposition, taken on February 1, 2006.  Shawn Brewer

21  testified as much on page 40 of his deposition.  John Viskup

22  testified at pages 71 and 72 of his deposition.  Their

23  understanding that the Annex I was a guideline.  Mark White

24  testified at pages 55 and 56, that he had a conversation with

25  Shawn Brewer, wherein Shawn and he discussed Victory Energy


79


1  being able to market and sell and build membrane wall boilers

2  during the time that they were negotiating in terms of the

3  License Agreement.  Likewise, John Viskup testified at pages

4   148 and 150, that he and Mark White had a conversation about

5   where Victory could obtain the necessary raw materials.

6   Namely, the fins that go between the tubes in order to build

7   membrane wall boilers.  And Mr. White provided those names.

8   And Mr. Gisleson makes much out of the concept that while one

9   witness testified that he recalled these conversations and the

10   other didn't, well, these depositions were taken one after the

11   other and Mr. Brewer was first.  Mr. Brewer was asked the

12   general question do you recall any conversation with anyone,

13   and he said he didn't recall.  We have not had the opportunity

14   to rehabilitate him, ask him if he recalls having that

15   conversation with Mr. White.

16        THE COURT:  All right.

17        MR. SHEEAN:  With respect to the reference that John

18   Viskup testified that he was familiar with M-Series boilers.

19   What Mr. Viskup testified to in his deposition was that in a

20   prior employment situation in the 1990's, his company had

21   purchased M-Series boilers from Zurn Energy.  He never said he

22   understood that M-Series boilers or tangent tube, antiquated

23   old-style boilers.  All he said was he heard the term M-Series

24   boilers.  So I think it's disingenuous to argue that Mr. Viskup

25   had the same understanding of M-Series or standard M-Series

80

1   boilers as is being attributed by IKE here today.

2         Finally, with respect to Stephen Kang, I do think

3   this is a very important point, your Honor, and your Honor was

4   asking Mr. Gisleson about this.  Stephen Kang signed the asset

5   purchase agreement between EPTI and CMI EPTI, the company that

6   bought the assets out of bankruptcy.  He signed the asset

7   purchase agreement averring to the fact that, number one, he

8   knew of no instances where any License Agreement was breached

9   by any party, that EPTI was a party of.  He also testified that

10  he knew of no infringements on any of the intellectual property

11  owned by EPTI as of the date of the sale, which was August of

12  2004.

13        THE COURT:  And I take your point on that, I think

14  it might have even been in your papers.  That declaration of

15  course would not necessarily be inconsistent with IKE's

16  position if in fact, as IKE contends, EPTI on a case-by-case

17  basis had permitted the utilization of the technology, correct?

18        MR. SHEEAN:  Actually, it would.  Because you get

19  the March 26th letter, which they claim is the line in the

20  sand, wherein EPTI allegedly revoked its permission.  And we

21  have evidence in the record that we cited to in our papers,

22  that after March of 2004, there were exchanges between

23  Victory's engineers and EPTI's engineers --

24        THE COURT:  So you're saying after that letter went

25  out, there was a representation made that to the best of their

81

1  knowledge, they were not in breach of any agreement?

2        MR. SHEEAN:  As of the time Erie Power ceased to be

3  the licensor.

4        THE COURT:  In Septemer or thereabouts?

5        MR. SHEEAN:  That's correct.  And that same

6  representation was made by CMI EPTI to IKE.  IKE purchased the

7  assets from CMI EPTI, at least on the papers and understanding

8  there were no breaches of any License Agreement and no

9  infringements of any intellectual property.  This is after all

10  of the due intelligence that was done with respect to the

11  assets.

12        THE COURT:  This is neither here nor there, but just

13  as a curiosity to me, who drafted -- I'm not talking about the

14  annex, was a lawyer or was a layman responsible for drafting

15  the License Agreement?

16      MR. SHEEAN:  As I understand it, your Honor, it was

17  a lay person.  I want to turn now, your Honor, unless you have

18  more questions with respect to those motions?

19      THE COURT:  I don't.

20      MR. SHEEAN:  To the counterclaims.  I want to, first

21  of all, apologize to the court because you asked me a question

22  and I was a little caught off guard.  You asked me whether or

23  not if the parties are not competitors, could IKE still be

24  liable.

25      THE COURT:  And you said no?


82


1      MR. SHEEAN:  And I said no.  And that's not correct.

2      THE COURT:  How come?

3      MR. SHEEAN:  I'll start there and then I'll work

4  back to the competition issue.  Comment C of the Restatement,

5  Section 678 states that even where the parties are competitors,

6  that business, the aspect upon which they're allegedly

7   competing, must be legitimately related to the alleged

8   competition in order to qualify as competition or the privilege

9   under Section 678.  This is important, your Honor.  VEO was the

10  licensed manufacturer, marketer, seller of Keystone boilers

11  below 150,000 pounds per hour.  And that's what they were

12  seeking to use these representatives for, was to sell these

13  boilers.  IKE couldn't sell those boilers, it's undisputed,

14  exclusive under the License Agreement, IKE couldn't sell those

15  boilers.  So there is no competition between whether or not

16  Christian Power is selling IKE after-market parts or VEO

17  Keystone boilers.  Similarly, Section 678 in Comment E of the

18  Restatement provides that even if the parties could be

19  considered competitors, if the conduct was improper and

20  actionable because of wrongful means, there can still be

21  liability.  And we submit to your Honor that there were

22  wrongful means used here --

23       THE COURT:  What are they?

24       MR. SHEEAN:  The wrongful means utilized here were

25  the representations made by Chris Petcos of IKE to the

83

1    representatives, that not only would he terminate their

2    contracts, but he represented to them that Victory Energy was

3    not authorized to sell any boilers other than tangent tube,

4    refractory front and rear wall boilers, and that if they wanted

5    to go ahead and continue on with Victory selling these

6    antiquated boilers that nobody would want to buy, go ahead.

7    But if you want to sell membrane wall boilers, you better come

8    on over to IKE.  We submit that that's improper, your Honor.

9    We submit that that conduct in and of itself would nullify the

10   competition privilege as is set forth in Comment E.

11          Now, with respect to whether or not they're

12   competitors, while we sort of hinted around at that, we believe

13   they're not, and they're not because of the different product

14   lines being offered, one above 150, one below.  And the

15   evidence that this would run afoul, allegedly run afoul of

16   exclusivity provisions is vitiated by the mere fact that EPTI

17   and VEO shared these same representatives throughout the time

18   that VEO was the licensee and EPTI was the licensor.

19          THE COURT:  All that having been said, following

20   your argument about the lack of competitive status, etc., the

21   exceptions to it, how are you harmed?

22          MR. SHEEAN:  Your Honor, we're harmed because we

23  lost out on the use of those representatives for several

24  months.  We lost out on the ability to use those

25  representatives to make sales in those districts until we could

84

1  replace them.

2       THE COURT:  How so, how did you lose out on those

3  sales representatives?

4       MR. SHEEHAN:  They terminated their contracts with

5  Victory.  Victory didn't have a ready supply of additional reps

6  that could step in their shoes.  We specifically subpoenaed

7  records from Christian Power requesting the sales that they

8  made of IKE products to their customers.  And those documents

9  we haven't received yet.  IKE has them and they're reviewing

10  them now.

11       THE COURT:  Is there a dispute between the parties

12  as to -- who this guy was that went and talked to the sales

13  reps?

14       MR. SHEEAN:  Chris Petcos.

15       THE COURT:  As to what he exactly said to them?

16       MR. SHEEAN:  I can read to you from his deposition.

17   But what he testified to is that he explained to the

18   representatives that Victory was only allowed to sell tangent

19   tube, refractory front and rear.

20          THE COURT:  All right.

21          MR. SHEEAN:  That's undisputed.

22          THE COURT:  Well, he may have said that to them, all

23   evidence suggests they didn't take that to heart?

24          MR. SHEEAN:  The reps that terminated the agreement?

25          THE COURT:  No, he may have come in and give them


85


1   that speech that you folks are limited to selling the old

2   style, but apparently the record reflects that they blindly

3   went on there way and continued to sell membrane technology,

4   doesn't it?

5          MR. SHEEAN:  The representatives?

6          THE COURT:  Yes.

7          MR. SHEEAN:  No, they terminated their contracts

8   with Victory, that's why we're here on this claim.  Christian

9   Power Equipment is an IKE representative now.  Power Systems,

10   Inc., is an IKE representative now.

11          THE COURT:  Okay.  How many guys terminated?

12          MR. SHEEAN:  To the best of my knowledge, we know of

13  four.  Gene Lacoby is another one.  And I'd have to go back and

14  look at my papers, your Honor.

15          THE COURT:  So, essentially, it is by virtue of -- I

16  guess what you would say was a misrepresentation as to what

17  they could sell, they scared these guys into leaving VEO and

18  coming to join IKE, and since you lost three or four of your

19  experienced sales people, it would suggest that you didn't have

20  the force out there to get the business, so you lost some

21  business?

22          MR. SHEEAN:  We lost some business, your Honor.

23  What business did we lose -- we've contemplated utilizing

24  expert testimony in order to demonstrate the economic impact on

25  Victory.  Can I tell you exactly what specific sales, no.  But


86


1  one of the reasons why is because we haven't gotten the

2  documents yet to verify that.  We think that in terms of

3  damages, your Honor, it would be grossly inequitable to bar

4  Victory's claims now when the parties mutually agreed to

file:///A|/INDECK1.TXT

5  suspend expert discovery until the resolution of these motions.

6  And given the fact that we've been asking for months for these

7  documents from Christian Power that have been in IKE's

8  possession and we haven't gotten those, nor have we gotten the

9  documents from IKE itself with respect to sales made to CMI

10  EPTI customers.  Turning to the breach of exclusivity

11  provision, your Honor, I think your Honor quickly and properly

12  ferreted out the lack of common sense in IKE's argument with

13  respect to what was exclusive as to Victory's rights and what

14  wasn't.  I think it's clear from the agreement and reading it,

15  Victory was an exclusive licensee to manufacture, market and

16  sell Keystone boilers that fall within the definition of

17  products, whatever this court determines that to be.

18      THE COURT:  All right.  How are you harmed by their

19  marketing?

20      MR. SHEEAN:  Your Honor, I think we started with

21  this question, but I will try to answer it again.  We were

22  harmed by their marketing because -- the brochure again is out

23  there in the marketplace, and Victory's customers or potential

24  customers are reading this and saying, wait a minute, I thought

25  Victory was the Keystone manufacturer and seller for boilers

1  below 150,000 pounds per hour, maybe we ought to just go with

2  the Babcock and Wilcox D-style because Victory doesn't know

3  what -- they're not even selling what they said they were

4  selling.

5      THE COURT:  All right.  Did you want to tell me

6  about some of this specific, the unfair trade practices claim?

7      MR. SHEEAN:  Yes, your Honor, thank you for

8  reminding me on that.

9      THE COURT:  You know what, you're going to have an

10  ample opportunity to do that, but we're going to take a break

11  for lunch right now.  I'd like to come back and continue this

12  at ten to 1:00.  All right, we're in recess.

13      (Luncheon recess from 11:55 a.m.; until 1:00 p.m.)

14      THE COURT:  All right, Mr. Sheean.

15      MR. SHEEAN:  Thank you, your Honor.  I just wanted

16  to make a few points with respect to a comment Mr. Gisleson had

17  made regarding the allegation that there was consent for each

18  and every sale that Victory made during the time that EPTI was

19  licensor.  He identified an e-mail between Dan Levstack and

20  Mark White.  That was an internal EPTI communication.  Mr.

21  White was at Erie Power at the time.  So that would not

22  constitute consent one way or the other.  And with respect to

23  the reference to Victory Energy's briefs, there was no

24  admission in the brief of actual express consent.  What the

25  argument specifically stated was that Erie Power was aware of

88

1  and consented to the sales by virtue of their never objecting

2  to the sales.  There was no express, written or verbal, consent

3  given that yes, you can sell a 15M boiler with membrane walls

4  to Brawn Industries, but after this you're going to have to get

5  subsequent consent.  There is nothing in the record to support

6  that.  There was testimony about whether or not Mr. Gdaniec

7  knew of any instance where VEO had manufactured a boiler

8  without express consent as to any modification.  And Mr.

9  Gisleson said the answer that Mr. Gdaniec gave was there was no

10  consent.  Well, Mr. Gdaniec also testified that he knew of no

11  modification.

12          I'd like to move on now to address the issues with

13  respect to Counts II through VI of the complaint.  With regard

14  to trademark infringement, your Honor, I think it's pretty well

15  set out in the briefs, if Victory Energy was authorized to sell

16  the boilers, there's no trademark infringement.  If it wasn't,

17  then your Honor is going to have to take a look at that.  But

18  we believe that the contract clearly authorized Victory to sell

19  those boilers and, therefore, there could not be trademark

20  infringement.

21      THE COURT:  Just as an aside, if you weren't

22  authorized to sell the boilers; in other words, if you were in

23  breach of the License Agreement, plaintiff can only be made

24  whole once, right?  In other words, wouldn't they be entitled

25  to recover from you based on a breach of contract, based on a


89


1  breach of the License Agreement -- any additional damages based

2  on the other counts that they couldn't get on the License

3  Agreement, do you follow me?

4      MR. SHEEAN:  Yes, I agree with your Honor.  That

5  there's no right here to duplicative or redundant damages.

6      THE COURT:  But your point is that a breach of the

7  License Agreement does not necessarily establish a breach of

8  those other federal causes or state causes of action, is that

9  right?

10          MR. SHEEAN:  And I'm getting there, yes, your Honor.

11  One of the arguments that is made with regard to trademark

12  infringement and unfair competition, as well as this idea of

13  revocation of acquiescence or waiver, we touched on a little

14  bitter earlier, I don't want to dwell on it.  But for the

15  reasons that we've enumerated many times already this morning,

16  you cannot revoke that which was granted by contract.  If the

17  court finds Victory Energy was authorized to sell the boilers,

18  then Indeck Keystone Energy is not allowed to come in and say

19  we revoke, that would essentially be akin to a unilateral

20  verbal modification of the contract.  Which clearly is not

21  authorized under the terms of the contract.  And as I've

22  already laid out for your Honor, we do not believe that the

23  revocation would be valid in any case because we believe that

24  we've established that Victory Energy reasonably relied upon

25  any acquiescence given by Erie Power during the time that it

90

1  was licensor.  One of the arguments made by IKE in its brief

2    with respect to this acquiescence claim is the companion claim

3    that well, if this is a waiver, there is no waiver clause in

4    the agreement.  Well, we don't believe that this could be

5    construed as a waiver of the contract.  Because of the specific

6    language regarding modifications and improvements.

7        THE COURT:  What does the no waiver clause say, in

8    essence?

9        MR. SHEEAN:  In essence, it says that no waiver --

10   let me just grab it for one second, okay, your Honor.

11       THE COURT:  All right.

12       MR. SHEEAN:  Clause 24 states in subsection B, "no

13   waiver express or implied by other party of any breach of

14   obligation by the other party shall operate or be considered as

15   a waiver of any other or subsequent breach."

16       THE COURT:  All right.

17       MR. SHEEAN:  One of the important points to remember

18   here, judge, is there is no breach of contract claim being

19   alleged by IKE, they never alleged a breach of contract.  So

20   how this no waiver clause would come into effect I don't

21   understand.  If there is no breach of contract claim, the no

22   waiver is of no effect.

23       THE COURT:  You may be right.  Aren't they accusing

24  you of violating the terms of the License Agreement by selling

25  products that aren't subsumed within it?


91


1        MR. SHEEAN:  There is no claim for violation of the

2  agreement.  Now, does their trademark infringement claim

3  subsume that fact, yes, I think it probably does.

4        THE COURT:  Let me just ask, there's no separate

5  breach of contract claim?

6        MR. GISLESON:  That's correct, there is not.

7        THE COURT:  All right.

8        MR. GISLESON:  But their authorization to use the

9  trademark derives from the contract.

10        THE COURT:  All right, I got it, go ahead.

11        MR. SHEEAN:  Now, one of the theories that is

12  asserted by IKE here is the reverse passing off theory.  I want

13  to nip that in the bud right now.  The reverse passing off

14  occurs where the alleged wrongdoer takes the plaintiff's

15  product and attaches the wrongdoer's own mark to that product.

16  That's not what we have going on here, even if the facts lay

17  out as IKE alleges.  The allegation is that Victory Energy has

18   sold these boilers under Keystone -- using the Keystone

19   technology without calling them Keystone's and calling them

20   Victory Energy.  Well, as the Dastar case points out, if you
                    _____

21   manufactured the products themselves and then you put your mark

22   on it, it's not reverse passing off.  There is no confusion as

23   to the origin of the product, it came from the party putting

24   the mark on it, in this case Victory Energy.  There is nothing

25   in the agreement that required Victory Energy to utilize the


                                92


1    mark in each and every instance.

2          THE COURT:  It's like in the old days in the west,

3    if you branded somebody else's cow, purporting it to be your

4    cow, that might be western reverse passing off.  But what

5    you're saying here is it can't be as a matter of law because

6    they were manufacturing the product, is that right?

7          MR. SHEEAN:  That's correct, your Honor.

8          THE COURT:  As opposed to taking a product of theirs

9    and putting their mark on it?

10         MR. SHEEAN:  Correct.

11    THE COURT:  That's essentially the whole point?

12    MR. SHEEAN:  That's correct, your Honor.

13    THE COURT:  All right.

14    MR. SHEEAN:  And as I just identified, there is no

15    breach of contract claim here for IKE.  One of the other

16    theories is with respect to these sales proposals.  For boilers

17    above 150,000 pounds per hour of steam.  First of all, it's

18    uncontested, Victory Energy never sold any boiler or for that

19    matter manufactured any boiler that was an O-style watertube

20    package boiler during the term of the license that had a steam

21    capacity range above 150,000 pounds per hour.

22    THE COURT:  If you did, would you have been in

23    violation of the agreement?

24    MR. SHEEAN:  Depends on a number of things.  There

25    was a side agreement between Erie Power and Victory to try and

93

1    market a boiler to Notre Dame, and your Honor in reading the

2    briefs got some familiarity with that situation.  That was a

3    side agreement.  In fact, Bob Gdaniec went with Victory Energy

4    to South Bend, Indiana to meet with the director of engineering

5    to try and sell that product.  So in that instance the answer

6    would be no.  But I think we're getting off the course because

7    it didn't happen, and what they're alleging here is that the

8    sale proposals themselves somehow constitute trademark

9    infringement or reverse passing off.  Well, as Mr. Gisleson has

10   already admitted here today, they have no claim for any actions

11   that occurred before they became the licensor.  All of the

12   proposals that they've identified, save one, were dated before

13   September 8, 2004.  The one proposal that they identify is a

14   November, 2004 proposal to Escalon for a boiler at 200,000

15   pounds per hour.  Nowhere in the proposal does it use the

16   Keystone mark.  So there's no trademark infringement, they

17   didn't use the mark.  So here IKE tries to again shoehorn in

18   reverse passing off.  It's not a product or service, it's a

19   sales proposal, and it doesn't use the mark.  And, therefore,

20   they can't recover for anything for that sales proposal.  Now,

21   your Honor drilled down a little bit on this aspect of their

22   claim and that is trade secret misappropriation.  Indeck has

23   fallen woefully short of demonstrating there is a trade secret

24   here.  They've offered no -- they failed to satisfy any of the

25   standards of the Uniform Trade Secrets Act by way of evidence

1  here to demonstrate --

2      THE COURT:  The first and foremost thing, among

3  others that would have to be established, is that the

4  information that -- well, let me restate that.  If allegedly

5  trade secret, confidential or proprietary information is in the

6  public domain, then per force it can't be a trade secret.  Now

7  you contend in your brief, don't you, that the technology for

8  the membrane style walls is readily available and accessible in

9  the public domain, is that right?

10      MR. SHEEAN:  That's correct, your Honor.

11      THE COURT:  Well, my question to you is, is it like

12  saying that the technology for a fighter aircraft is generally

13  accessible in the public domain, but that the specific

14  blueprints that Drummond or any of the other big airplane

15  manufacturers might use to tweak their jets, are not; are the

16  specific plans, is the specific design, let's put it this way,

17  as you folks have come to know it because you've been the

18  beneficiary of the actual plans, can you go on the Internet and

19  look up, can you find their drawings there?

20      MR. SHEEAN:  Are the drawings identified as Keystone

21  membrane wall drawings, no, they're not, your Honor.  But we're

22  not talking about fighter jets here.  There's not that many

23  different ways to skin a cat with respect to membrane walls.

24  This is pretty standard stuff.

25        THE COURT:  Is there anything unique -- first of

95

1  all, context, how many folks are there in the United States

2  that manufacture boilers of the type that IKE would like to and

3  you apparently presently do?

4        MR. SHEEAN:  Well, I asked that question to a number

5  of witnesses, your Honor, we identified at least eight

6  companies that are currently manufacturing O-style watertube

7  package boilers with membrane walls.

8        THE COURT:  Are you telling me that if I went to

9  eight different plants, just hypothetically, where eight

10  different manufacturers had deposited membrane style boilers,

11  all different manufacturers, that in cookie-cutter fashion I

12  could hold up a set of plans and each of those boilers would,

13  for all intents and purposes, be identical?

14        MR. SHEEAN:  Not based on the facts you've just

15   given me, no, your Honor.

16        THE COURT:  All right.  Then would it be fair for me

17   to assume, based upon -- I'm living with this record, does this

18   record inform me one way or the other as to whether it is

19   reasonable for me to conclude that as between manufacturers of

20   membrane-styled boilers, there will be some differences in the

21   ultimate end product?

22        MR. SHEEAN:  That is a true statement, your Honor.

23        THE COURT:  All right.  Well, if that's true and if

24   one can reasonably assume that each manufacturer, for reasons

25   that are unique to its own, but presumably in its perceived


96


1   best interests, tweaks its cookie-cutter design in certain

2   ways, then why couldn't one presume that they would be

3   interested in protecting that design?

4        MR. SHEEAN:  I can't speak to what another party

5   would presume or not presume, your Honor.

6        THE COURT:  Okay.  Taking it to this specific case,

7   then.  If I can reasonably assume that the Keystone M-style

8   boiler is in some form or fashion unique from the membrane wall

9   styled boilers manufactured by competitors, why is it a stretch

10  for me to conclude that however they put their product

11  together, meaning Keystone, is a trade secret?

12       MR. SHEEAN:  Because they haven't demonstrated that

13  without a genuine issue of material fact, your Honor, and they

14  have the burden here of proving that.  When we get to this

15  speculative hypothetical stage, I think we've already passed

16  over the threshold --

17       THE COURT:  I can draw reasonable inferences from

18  the record, but I can't speculate outside the record.  What

19  does the record actually -- actually, you're arguing a

20  negative, you're saying they haven't raised a triable issue

21  because they haven't come forward with evidence that it's

22  proprietary, right?

23       MR. SHEEAN:  That's correct, your Honor.

24       THE COURT:  Have you come forward with any evidence

25  to suggest that it's not proprietary?


97


1       MR. SHEEAN:  Yes, your Honor.  One of the witnesses

2   deposed by Indeck in this case, Jay McConaughy, who is now

3   employed at CMI EPTI, was asked the question is there any

4   aspect of the Keystone boiler that is unique.  And he answered

5   no.  Mr. McConaughy worked at Zurn for a number of years, and

6   then at Zurn Energy, and then at Allborg, and then at Erie

7   Power Technology Inc., and then at Victory Energy.  Now he's

8   with CMI EPTI.  The relevance about his work history is that

9   he's been building Keystone boilers since the early 1980s, he

10  understands the technology.  He also has worked for competitors

11  and he understands their technology.  He's looked on the

12  Internet to see what is available on the Internet.  He opined

13  that there are no unique or protectable, from a uniqueness

14  standpoint, aspects of the Keystone boiler.

15          THE COURT:  All right.

16          MR. SHEEAN:  Just to wrapup, your Honor, I think

17  it's pretty clear from the record, as far as the unfair

18  competition claim, for the reasons that the trademark

19  infringement claim is infirm, the unfair competition claims

20  similarly fail.  They are, for all intents and purposes, a

21  direct overlap of each other for this case, as is evidenced by

22  the briefs.

23          With respect to the unjust enrichment claim, your

24  Honor, one of the basic precepts of equity law here is that if

25  there's a contract between the parties, you can't have an


98


1  unjust enrichment claim.  There's a contract between the

2  parties that govern their behavior and, therefore, it's

3  improper from an equitable standpoint to allow an unjust

4  enrichment claim to stand.  Thank you, your Honor.

5       THE COURT:  Thank you, very much.  All right, Mr.

6  Gisleson.

7       MR. GISLESON:  May it please the court, John

8  Gisleson from Schnader, Harrison.  I think a lot of this goes

9  back to the issue of contract interpretation.  In terms of the

10  trademark issue, the contract does require VEO on every boiler,

11  it says, this is clause 15(a), grant of license, "the mark

12  shall be affixed to a plate appearing on each product supplied

13  by licensee upon which there shall be an indication that the

14  products were sold by licensee under license from licensor."

15  The testimony in this case is that VEO in fact did not place a

16  plate on the boilers to show that they were manufactured under

17  license from licensor, nor did they even put the Keystone name

18   on the boiler.  In fact, what they started to do was simply to

19   paint Victory in big letters so that when someone is walking

20   past the boiler, they say oh, that's a Victory boiler and

21   there's no indication on there that it's a Keystone boiler or

22   that it came from the licensor, from technology that was owned

23   originally by EPTI and then by IKE.  So the trademark claim,

24   the express reverse passing off is based on the fact that they

25   had an obligation under a contract to affix that and they


99


1   didn't do it.  That's what makes this case different than that

2   Dastar case.  Where they took something out of the domain,
     _____

3   reworked it and made it their own, but there was no

4   pre-existing arrangement under which they were required to

5   identify the source.  So that's what makes this case different

6   than the other ones.  I don't have any law that's specifically

7   on point for that provision.  The point is we elected to

8   proceed under a trademark theory, instead of proceeding under a

9   breach of contract theory.  And the reason is that the contract

10   addresses what you can do and the compensation for selling

11   boilers that are defined by Annex I.  So that's the trademark

12  issue.  Are there any other trademark questions that the court

13  has?

14          THE COURT:  No.

15          MR. GISLESON:  In terms of the misappropriation of

16  trade secrets claim, that in the first instance is based on the

17  fact that VEO was given express authorization to sell boilers

18  with membrane wall technology and those designs came from EPTI.

19  March 26th comes, EPTI says no more can you use membrane wall

20  technology, stick to the confines of the License Agreement.

21  VEO disregarded that and continued selling boilers that had

22  membrane wall technology using EPTI's proprietary designs.

23  That is a misappropriation.  So that's the basis of that claim.

24          THE COURT:  There is a difference, isn't there,

25  between a trade secret and proprietary information?


                              100


1           MR. GISLESON:  There is, but it's our position that

2  what they used was a trade secret.

3           THE COURT:  He says you have the burden of coming

4  forward with evidence to raise a triable issue of fact and they

5  say you haven't done it; have you done it?

6          MR. GISLESON:  Yes, we have.

7          THE COURT:  How?

8          MR. GISLESON:  Couple of ways.  One, they entered a

9  License Agreement for this technology.  And then after they've

10  used it for a period of years or about 15 months, they then

11  want to acquire the technology, even though they then have had

12  an opportunity to evaluate the technology.  If it's in the

13  public, go out and see where it's in the public, so they can

14  copy it.  They didn't do it.  The reason is because there is

15  something special about this.  When you look at the exchange of

16  e-mails that went back and forth and the draft agreements

17  between the parties, what becomes clear is they want both the

18  M-Series, as well as all the custom designs, it's those custom

19  designs that go into the Keystone boiler.

20          THE COURT:  Just out of curiosity, assuming that you

21  were successful in this lawsuit, with your claim that they

22  misappropriated your trade secrets.  How do you un-ring that

23  bell now -- they know your product, how does the bell get

24  un-rung?

25          MR. GISLESON:  That's difficult.  One, there's a

1    financial component to it.  But setting that aside, I think

2    what's necessary is the fact that we got to do an audit.  We've

3    got to make sure that they're no longer in possession of the

4    detailed designs, they don't have copies.  We also need to

5    insure that the new boiler they rolled out does not incorporate

6    the technology that they obtained from the licensor or the

7    License Agreement.  It may be difficult, but because in our

8    view the misappropriated evidence, trade secrets, they have an

9    obligation to un-ring that bell.  And if un-ringing the bell

10   requires them to discontinue selling a Voyager boiler, to

11   delete from their software all of their -- or from their

12   network all of their detailed designs that they have in

13   electronic format.  And if it requires a prohibition from the

14   court, an order enjoining them from using this technology in

15   the future, I think that's what we do.  To some extent it

16   becomes an issue of IKE having to police VEO prospectively.

17   But certainly there are steps that can be taken to un-ring the

18   bell.

19        THE COURT:  All right.

20        MR. GISLESON:  But the other thing on

21    misappropriation of trade secrets and why these are trade

22    secrets is that their own brochures that they were publishing

23    about the Keystone technology, identifies the unique designs of

24    technology of manufacturing advances that were made by the

25    licensor for this technology.  So their own materials admit


102


1    that this is something unique.  Plus, we also have an affidavit

2    that we have submitted from Marty Schwab, who was involved for

3    a number of years in development.

4            THE COURT:  Was it Keystone -- who was the

5    originator of membrane wall technology?

6            MR. GISLESON:  I don't know who originated it --

7            THE COURT:  It wasn't Keystone, was it?

8            MR. GISLESON:  I think Erie Boiler Works or Erie

9    City Iron Works, Erie City Boiler Works.

10           THE COURT:  Is that patented, whoever got this horse

11    out of the barn first, it is patented, do you know?

12           MR. GISLESON:  That I don't know.

13           MR. SHEEAN:  We're aware of no patents, your Honor.

14           THE COURT:  Not that it would be definitive, but

15    that could inform one's analysis somewhat, couldn't it, as to

16    the uniqueness of the design?

17          MR. GISLESON:  If there was a patent -- yes, that

18    could, but that's not obviously, as the court's aware, a

19    condition of there being a trade secret.

20          THE COURT:  It's not.  Go ahead.

21          MR. GISLESON:  I think when you look at the fact

22    that they licensed the technology, when you look at the fact

23    that they wanted to acquire the technology, when you look at

24    the fact it was described as being unique, when you look at the

25    fact that they were in fact selling boilers with this

103

1    technology, and then we also have the Marty Schwab affidavit or

2    declaration in our exhibits, I think those things demonstrate

3    that these are trade secrets entitled to protection.  There is

4    a confidentiality clause, there have been other protections

5    that have been taken.

6          THE COURT:  With respect to IKE's contact through --

7    is it Petcos?

8          MR. GISLESON:  Chris Petcos.

9          THE COURT:  His contact with those three or four

10   sales representatives with VEO?

11          MR. GISLESON:  Yes.

12          THE COURT:  As that information tumbled out at

13   deposition or otherwise or affidavit or however it came on the

14   record, is there a dispute as to what was actually said at

15   those meetings?

16          MR. GISLESON:  I don't believe so.  I know that

17   Chris Petcos gave testimony that from my recollection is fairly

18   clear, in which he defined IKE's understanding of the scope of

19   the License Agreement and said that's what they're permitted to

20   sell.  And what he defined, what he described, essentially,

21   tracks what Bob Gdaniec said in the March 26, 2004 letter.

22          THE COURT:  So you're saying there's no dispute as

23   to what was said and what was said, assuming that you are

24   competitors, was not wrongful?

25          MR. GISLESON:  Correct.


104


1          THE COURT:  That's essentially your point?

2          MR. GISLESON:  Correct.

3          THE COURT:  Doesn't a resolution of that issue, if

4   that's the way it sets itself up, if for instance I were to

5   conclude that there is a disputed issue of material fact as to

6   what the contract actually is or says or means, then doesn't

7   that issue of material fact infuse itself into that issue as

8   well?

9          MR. GISLESON:  I don't think so for those claims.

10  Because the contracts that VEO had with its sales

11  representatives were terminable at will by either the

12  representative or by VEO.  And it's the representative who

13  decides whether to stay with VEO, if it chooses to do so, it

14  could pick up the phone and call VEO and say hey, this is what

15  I'm being told, what should I do.

16          THE COURT:  I mean, for instance, one of the

17  components of the statements was you can't, you can only sell

18  the old boilers, you can't sell the new boilers.  If you want

19  to sell the new boilers, you got to come with us if you want to

20  sell those.  If it would turn out that that was contractually

21  incorrect, does that change the picture?

22          MR. GISLESON:  I still don't believe it does.

23  Because the sales rep agreements are terminable at will.

24  Because if you have a licensor of technology expressing a

25  position as to what can be sold under the agreement, he may be

105

1  right, he may be wrong.  But there is no unreasonable force,

2  coercion or improper conduct that is going on.  Particularly,

3  when the sales rep, who has an established relationship with

4  VEO, can go back and ask VEO, I want to see the License

5  Agreement or I want to understand what the scope is.  And when

6  you have the testimony from VEO's own representative saying you

7  don't represent competitors.  So regardless of whether or not

8  Chris Petcos was accurate in his description of the License

9  Agreement, what he was accurate about is that these parties are

10  competitors.  And, in fact, John Viskup of VEO, and this is at

11  paragraph 14 of our statement of facts, specifically said that

12  IKE and VEO are competitors for watertube boilers.  And that

13  was admitted by VEO in response to paragraph 14.  So that even

14  if Petcos was inaccurate in his description, which we don't

15  believe to be the case, because VEO has admitted that they're

16  competitors for this same product and in any case are

17  competitors in other product lines, then a competitor privilege

18  would apply here such that there is no claim for interference.

19          THE COURT:  All right.  Anything else you want to

20    tell me?

21          MR. GISLESON:  No, your Honor, unless there are any

22    specific questions that the court has.

23          THE COURT:  Not off the top of my head.  Thank you.

24    Any last thing you want to tell me?

25          MR. SHEEAN:  Very briefly, your Honor.  Just one or

106

1     two to clarify a couple points made by Mr. Gisleson.  One, with

2     respect to VEO's decision that it wanted to potentially try and

3     acquire the technology in March of 2004.  The key piece of that

4     statement that IKE continues to leave off in their briefs and

5     in their argument is VEO was looking for a perpetual license

6     for the Keystone mark as well.  Was looking for the opportunity

7     to sell the Keystone boilers as Keystone boilers in perpetuity.

8     So to assign a dollar amount and say Victory recognizes this

9     was valuable, why else would it want to buy it.  Well, that

10    trademark has a lot of value as well.  And that in and of

11    itself certainly doesn't demonstrate that these are trade

12    secrets.  With respect to the statements made in advertising, I

13    think your Honor is familiar with the case law that says that

14    statements made in advertising are not admissions of fact and

15    can be construed as puffery and other similar types of

16    language.

17         THE COURT:  It depends on what the statement is.

18         MR. SHEEAN:  I beg your pardon.

19         THE COURT:  I say it depends what the statement is,

20    as an aside.  You're quite right, that depending upon what the

21    statement is or the nature of it, some statements in

22    advertising or marketing brochures are clearly puffery and some

23    statements can be, for instance, expressed warranties that are

24    fully enforceable.  So it all depends.

25         MR. SHEEAN:  Understood.  And, finally, the


                                107


1     reference that Mr. Viskup admitted that IKE and Victory are

2     competitors.  Well, Mr. Viskup's deposition was taken after the

3     expiration of the License Agreement while Victory was in the

4     process of rolling out its new boiler in direct competition

5     with IKE.  So if the question is are they competitors now, you

6     bet, but it doesn't mean they were then.

7          THE COURT:  And proud to be.

8          MR. WILLIAMS:  Your Honor, if I may, I have just a

9   quick couple points.

10         THE COURT:  Come on up.

11         MR. WILLIAMS:  With respect to the interference with

12   the sales representative contract issue, just to add one or two

13   small things.  Their claim is that Victory is not, Victory and

14   Indeck were not competitors because they weren't competing for

15   a specific little subset of the Victory boiler line.

16         THE COURT:  You're preaching to the choir on that

17   point.

18         MR. WILLIAMS:  Okay.  Not only was it admitted in

19   response to the summary judgment motion but there are other

20   affirmative allegations and admissions on the record that based

21   on the case law, they can't just rescind or retract now.  The

22   second thing is that Mr. Sheean indicated that the competitor's

23   privilege does not apply if the alleged interfering party uses

24   wrongful means.

25         THE COURT:  That's true.

108

1          MR. WILLIAMS:  Your Honor, that is what comment E

2    provides.  There is no authority or case law that says what IKE

3    did constitutes wrongful means.

4          THE COURT:  Wrongful means, that is a restatement

5    term of art, what does it mean?

6          MR. WILLIAMS:  Wrongful means means that it has to

7    be independently actionable under some other statute or some

8    other tort.  And there is no authority here to say that what

9    IKE did, which is saying to the sales reps we're not going to

10   do business with you if you do business with Victory, there is

11   no statute or no other claim that that constitutes

12   independently.

13          THE COURT:  Just as a for instance, what happens if

14   he was wrong when he represented his understanding as to the

15   scope of the agreement and what happens if the VEO sales reps

16   acted in response to that, why couldn't that be a negligent

17   misrepresentation, which is a tort?

18          MR. WILLIAMS:  Under that hypothetical, your Honor

19   is correct.  But I would submit to the court that that is a

20   misrepresentation of the record evidence.  Mr. Petcos's

21   testimony, which is cited by VEO, page 28, as well as pages

22  39 and 40, Mr. Petcos only recites the contents of Annex I of

23  the License Agreement.  He does not, as Victory suggests, make

24  an affirmative representation that Victory can't sell, he

25  doesn't go that far.  He says we got a License Agreement with


109


1  Victory, it includes tangent tube, refractory wall O-style

2  boilers and we're honoring it.  The record does not support

3  what is being suggested that it supports.  With respect to the

4  harm issue on the interference --

5      THE COURT:  Right.

6      MR. WILLIAMS:  Mr. Sheean said that whenever the

7  sales reps terminated the contracts with VEO, there could have

8  been projects out there that those sales reps could have

9  brought.  That's speculative.  There's not one scintilla of

10  evidence that a boiler was even made or contracted for in that

11  territory, let alone any evidence that suggests that if that

12  happened, that would have gone to Victory.  Two points with

13  respect to the exclusivity claim.  VEO contends that our

14  interpretation of the exclusive marketing right issue is

15  absurd.  Again, I would direct the court's attention to clause

16    15 of the License Agreement.  Which provides that for the

17    duration of the agreement, licensee shall be permitted to

18    use --

19         THE COURT:  Not to interrupt you, but you're into

20    that portion of the agreement -- were the lawyers involved at

21    any stage in drafting any of these things, or were these all

22    just forms that were moving loosely back and forth between a

23    bunch of lay business people?

24         MR. WILLIAMS:  I honestly cannot answer that, your

25    Honor.


110


1         MR. GISLESON:  There were no attorneys involved on

2    Erie Power's side.

3         THE COURT:  How about on the other side, do you

4    know?

5         MR. SHEEAN:  Your Honor, there's nothing in the

6    record that demonstrates that there was an attorney review that

7    was incorporated as part of the drafts or otherwise.

8         THE COURT:  Off the record.

9         (Discussion held off the record.)

10          MR. WILLIAMS:  But, your Honor, my point with

11  respect to the exclusive marketing claim is that paragraph 15

12  says "licensee shall be permitted to use the mark."  That's a

13  far distance from an exclusive right to use the mark.  It

14  solely provides they shall be permitted to use it.  And on the

15  damages claim for the exclusivity.  Similarly, Mr. Sheean said

16  a customer may have been confused by, I think the term he used

17  was the dichtomist marketing materials by IKE and VEO that

18  seemed to conflict, and as a result that customer may have just

19  gone off and bought a boiler from a competitor, like Nebraska

20  Boiler.  Again, not one scintilla of evidence that any boiler

21  purchaser ever went off and bought a boiler from these

22  company's competitors because it was confused by marketing

23  materials.  And, again, not one scintilla of evidence in the

24  record that even if that had happened, that that purchaser

25  would have awarded the boiler contract to Victory.  Thank you,


111


1  your Honor.

2          THE COURT:  All right.  I'm going to give my court

3  reporter and myself a break, then I'm going to come out and

4    rule on all these motions.

5         (Recess from 1:35 p.m.; until 1:45 p.m.)

6         THE COURT:  All right, this is going to be an order.

7                   ORDER

8         Presently pending before the court are motions for

9    partial summary judgment with respect to Count I, trademark

10   infringement.  Count IV, violation of Unfair Trade Secrets Act.

11   Count V, unfair competition.  And Count VI, unjust enrichment,

12   filed on behalf of the plaintiff.  The defendant, VEO, has also

13   filed a cross-motion for summary judgment on the plaintiff's

14   claims.  And, finally, the plaintiff has filed a motion for

15   partial summary judgment with respect to VEO's counterclaim.

16        The standard for summary judgment is

17   well-established, summary judgment is inappropriate if there

18   are disputed issues of material fact and all reasonable

19   inferences should be drawn in favor of the non-movant.

20        The factual background to this case has been

21   extensively laid out in the parties' briefs, as well as at oral

22   argument here today.  My recitation of facts, therefore, will

23   be somewhat abbreviated.  Fundamentally, the core issue in this

24   case is whether VEO sold boilers which were outside the scope

25   of the License Agreement entered into between EPTI, plaintiff's

112

1   predecessor, and Victory.  I refer to them as Victory, it's

2   easier than VEO.  Both parties claim that a plain reading of

3   the agreement and an annex attached thereto, clearly and

4   unambiguously support their respective positions.  Moreover,

5   both parties point to parole evidence in support of their

6   respective views as to the meaning of the contract.

7          Before turning to the issue as to whether the

8   language of the agreement, insofar as it relates to the scope

9   of the boilers that were licensed to be sold was clear and

10  unambiguous or whether the contract is in fact ambiguous, I

11  briefly supply some additional factual background for context.

12         And I should say parenthetically that the following

13  information can be fairly gleaned from the record.

14         VEO contacted EPTI in or about December of 2002,

15  concerning the possibility of entering into a Licensing

16  Agreement for M-Series boilers.  Mr. Viskup, on behalf of VEO,

17  Viskup exchanged various preliminary drafts with Mark White,

18  then of EPTI.  An agreement was signed on or about January 8,

19  2003, which provided in part:

20          "Products' shall mean natural circulation,

21   industrial watertube package steam generators with a steam

22   capacity range beginning at 29,000 pph up to and including

23   150,000 pph.  Products shall include but not be limited to the

24   items set forth in Annex I" ...  thereafter, the parties signed

25   an annex to the License Agreement which had been prepared by


                                    113


1   EPTI and EPTI's engineering staff.  This annex included a

2   description of products as EPTI's M-Series watertube boilers,

3   to include 8M through 23M, which range up to 150,000 pph.

4   There were also drawings, three separate drawings that

5   comprised the annex, reflecting refractory wall, as opposed to

6   membrane wall technology.  The annex was signed by the

7   respective representative of the parties on February 3, 2003.

8   On February 27, 2003, an addendum was signed under the terms of

9   which the licensor agreed to modify the products described in

10   Annex I, to include higher pressures.

11          Thereafter, the record reflects that with the

12   consent of EPTI, Victory sold Keystone boilers with 100-percent

13   membrane technology for a period of approximately 15 months.

14   On March 26, 2004, a letter was sent from EPTI to Victory,

15   wherein, EPTI informed Victory that it was, in essence, that it

16   was only permitted to market the M-Series boilers.  This in

17   turn generated a response from Victory through White, where he

18   acknowledged that the agreement does provide specific geometry

19   and characteristics of the licensed boilers, but concluded that

20   the feature of the boilers marketed by VEO, while outside the

21   geometry and characteristics of the agreement, were

22   "improvements" within the definition of the agreement.  IKE

23   became licensor on September 8th of 2004.  Since that time

24   defendant has sold, as reflected in the record, approximately

25   11 boilers, all of which include membrane walls.


114


1        Fundamentally, then, the parties disagree as to

2   whether under the terms of the License Agreement, the

3   permissible scope of products was defined by, for instance,

4   pph rating or by fundamental design characteristics, i.e.,

5   membrane technology versus refractory walls.

6        At this point it is appropriate to set forth the

7   legal principles which control the resolution of the parties

8    dispute as to the meaning of a License Agreement.

9          In Pennsylvania, when interpreting a contract, the

10   court's focus is on the intent of the parties as objectively

11   manifested in the language of the agreement.  See

12   Pacitti_v._Macy's, 193 F.3d 766, 773 (3rd Cir. 1999.)

13   "The purpose of contract interpretation is to ascertain and

14   effectuate the objectively manifested intentions of the

15   contracting parties."

16          The court must first make a preliminary

17   determination as to whether the contract's terms are ambiguous;

18   whether a contract is ambiguous is a question of law.  See

19   In_re_Stendardo, 991 F.2d 1089, 1094 (3rd Cir. 1993).  The

20   terms of a contract are ambiguous if they are "capable of more

21   than one reasonable interpretation."  Pacitti, 193 F.3d at 773.

22   See also Mellon_Bank_v._Aetna_Business_Credit,_Inc., 619 F.2d

23   1001, 1011 (3rd Cir. 1980).  "(Defining ambiguity as

24   'intellectual uncertainty' ...  the condition of admitting two

25   or more meanings, of being understood in more than one way, or

1  referring to two or more things at the same time.)"  If the

2  court finds that the contract is clear and unambiguous in that

3  "can be interpreted only one way," then the "court interprets

4  the contract as a matter of law."  Id.  Conversely, if the
                                     —

5  court finds that the contract is ambiguous, then its

6  interpretation is a question of fact.  And the issue is to be

7  resolved by the fact finder after the presentation of extrinsic

8  evidence.  See Hullett, 38 F.3d at 111.
            _____

9       "In determining whether a contract is ambiguous, the

10  court should first examine the language of the document itself;

11  in this regard the court should assume that the intent of the

12  parties to an instrument is embodied in the writing itself.

13  And when the words are clear and unambiguous, the intent is to

14  be discovered only from the express language of the agreement."

15  Pacitti, 193 F.3d at 773.  However, "a court is not always
    _____

16  confined to the four corners of the written document in

17  determining whether ambiguity exists."  Hullett, 38 F.3d at
                                         _____

18  111.  Indeed, it may not be possible to do so "without

19  examining the context in which the agreement arose."  Id.

—

20  Thus, the court may consider "the words of the contract, the

21  alternative meaning suggested by counsel, and the nature of the

22  objective evidence to be offered in support of that meaning."

23  Pacitti, 193 F.3d at 773.

———————

24      Here, then, the court's first task is to make a

25  determination, consistent with the above case law, as to

116

1  whether the terms of the contract are ambiguous.  As previously

2  discussed, plaintiff contends that the License Agreement, as

3  well as the annex attached thereto, clearly restricted Victory

4  from selling anything other than M-Series boilers which do not

5  include membrane wall technology.  Plaintiff points to the

6  language used in the annex, referring to the M-Series boilers,

7  as well as drawings connected with the product line in the

8  annex as giving further definition to the term products in the

9  main text of the License Agreement itself.  Victory, on the

10  other hand, argues that the annex is a mere guide and that

11  under the terms of the agreement, it was not restricted to

12  selling boilers with the older refractory wall technology.

13      Put simply, by examining the content of the annex,

14  one could conclude that the product line was restricted to the

15  M-Series boilers with the older refractory wall technology.

16  As there were no other examples of boiler technology which

17  appeared by definition or otherwise in the annex.  On the other

18  hand, as previously indicated, the following language appeared

19  in the License Agreement itself.  "Products shall include but

20  not be limited to the items set forth in Annex I."  With

21  respect to that particular phrase, the fact as urged by the

22  plaintiff, that that more expansive language may have found its

23  way into this agreement as a mere carryover from a previous

24  unrelated agreement to me is of no moment.  In short, based

25  upon the discussion above and in light of the


117


1  previously-described case law, I find that there is an inherent

2  ambiguity in the agreement.

3      Indeed, parole evidence, which has been marshaled by

4  both sides, seems to highlight the ambiguity.  By way of brief,

5  but not exhaustive summary, there is evidence of record, for

6    instance, of a course of conduct whereby EPTI permitted the

7    sale of membrane technology boilers as previously discussed.

8         There is evidence that in March of 2004, EPTI

9    informed Victory that it could no longer sell membrane wall

10   technology consistent with the License Agreement.

11        There is evidence of record to suggest that there

12   was no written amendment to the License Agreement when EPTI

13   permitted Victory to sell membrane wall boilers.  The only

14   written addendum to the contract which appears in the record

15   involved an agreement to expand the pressure ranges of the

16   boilers.

17        The record reflects that there is testimony from

18   Messrs. White, Viskup and Brewer, that they considered the

19   annex a mere guideline or guide.

20        There is testimony that Mr. White discussed with Mr.

21   Brewer that the agreement was intended to permit membrane wall

22   technology.

23        There is evidence that VEO, in response to EPTI's

24   letter, acknowledged that the boilers that it was selling were

25   outside the scope of the geometry and characteristics of the

118

1  boilers identified in the annex.

2       There is testimony in the record indicating that the

3  term M-Series boilers does not have a commonly understood

4  meaning in the industry outside of EPTI, and that the M-Series

5  boilers were capable and had in the past incorporated membrane

6  walls.

7       There is also testimony that Stephen Kang, on behalf

8  of EPTI, had reviewed the License Agreement and could not

9  himself determine whether membrane walls were included in the

10  definition of products.

11       There is also evidence that VEO, that Victory

12  rather, attempted to purchase from EPTI its Keystone boiler

13  technology.  And a reasonable inference could be drawn from

14  those negotiations that it recognized the O-Series technology

15  as a subset of M-Series technology.

16       That said, it is inappropriate for the court to

17  attempt to resolve the previously-described ambiguity in the

18  contract by resort to the previously-summarized parole

19  evidence, that is a matter properly reserved for the

20  "fact finder" after presentation of the extrinsic evidence.

21  Stenardo at 1094.

_____

22          Consequently, for the reasons set forth above, the

23   plaintiff's and defendant's cross-motions for summary judgment

24   are denied.

25          I now turn to the plaintiff's motion for partial


119


1   summary judgment with respect to Victory's counterclaims.

2   Victory asserts claims for plaintiff's interference with

3   Victory's contracts with salespersons, as well as plaintiff's

4   alleged breach of the License Agreement's exclusivity

5   provision.

6          With respect to the breach of the License Agreement

7   claim, defendant claims that IKE breached it by producing sales

8   and marketing brochures which stated that the Keystone boiler

9   is capable of producing steam up to 500,000 pounds per steam

10   per hour.  With respect to this claim, the defendant seeks

11   damages for loss of market opportunity.  The basis for the

12   defendant's interference with contract claim is that Chris

13   Petcos met with a number of VEO sales representatives and

14   allegedly wrongfully advised them that they were not permitted

15  to sell anything other than the older style boilers.  If they

16  chose to sell membrane style, they would have to leave VEO and

17  go with the plaintiff.  And, furthermore, failing that, would

18  not be permitted to sell plaintiff's after-market parts.

19        In order for VEO to establish that IKE wrongfully

20  interfered with VEO's sales representative agreements, it must

21  prove in part those elements as set forth in Restatement of

22  Torts, Section 766.  One, that IKE intended to harm VEO's

23  contractual relations with its sales reps.  Two, that IKE acted

24  improperly, i.e., was not privileged to act the way it acted.

25  Three, that IKE induced or otherwise caused VEO sales


120


1  representatives to not perform the contracts.  And, four, VEO

2  suffered pecuniary loss resulting from the sales

3  representatives failure to perform their contracts.  As

4  discussed more fully at oral argument, there is a gloss to 766

5  in the context of this case and that is Restatement 768, which

6  relates to the competitive privilege.  First, there is a

7  dispute between the parties as to whether or not they were in

8  fact competitors.  Having carefully considered the record, as

9     well as the rather expansive language in the case law

10    interpreting the term competitor, it is my view that they were

11    competitors as a matter of law.

12          That said, the remaining issue, as set forth more

13    fully in the commentary to Section 768, is whether or not the

14    conduct of the plaintiff's representative was nevertheless

15    wrongful.  In my opinion in part, it is premature to rule on

16    that issue, because I find that there is an issue of fact there

17    as well.  Which turns in part on the resolution of the issue of

18    the proper interpretation of the contract insofar as it either

19    restricts or does not restrict the defendant from selling

20    membrane wall technology.  So the motion for partial summary

21    judgment insofar as -- one other point I should make.  There's

22    also a contention that the damage claim relative to that

23    particular claim is unduly speculative.  My view is that for

24    purposes of summary judgment it may have just narrowly cleared

25    the non-speculative hurdle, but I will re-examine the issue of


121


1     damages more carefully at a later and appropriate date, perhaps

2     by way of appropriate motion at trial.

3          Finally, then, with respect to the exclusivity

4    claim, the essence of -- this boil down to this.  There is a

5    dispute between the parties as to whether the defendant was

6    given the exclusive right to manufacture or the exclusive right

7    to market.  Having read the agreement, it is not a model of

8    clarity.  But even assuming for the sake of discussion that a

9    fair common sense reading would suggest that they were also,

10   meaning Victory, given the right to market, given the exclusive

11   right to market, I find on this record and based on the

12   representation as to damages, a complete lack of sufficient

13   evidence to raise a triable issue on the question of damages,

14   particularly, insofar as the record is clear that no product

15   was actually sold.  So the motion for partial summary judgment

16   insofar as the breach of the exclusivity claim is concerned is

17   granted.

18          Okay.  Refresh my recollection then, where are we on

19   our discovery, what's the coming attractions, what's going on?

20          MR. GISLESON:  The parties have to clean up

21   discovery relating to VEO's new Voyager boiler, which requires

22   a couple of depositions in Tulsa, Oklahoma.  There are some

23   additional documents that IKE needs to provide on the subject

24   of Christian Power, and sales associated with some of those

25   sales representatives on that subject of the court's order.

122

1   And then there is expert reports and expert discovery, to the

2   extent that the parties wish to pursue that.

3          THE COURT:  What's that going to be about, from your

4   standpoint?

5          MR. GISLESON:  I think from IKE's perspective, it

6   may want an expert to assess the design of the new Voyager

7   boiler, to determine whether it incorporates the technology

8   that Victory received from EPTI.  Because if so, that would

9   certainly support a misappropriation of trade secrets claim.

10         THE COURT:  Aren't we going to get back into this

11   same issue again about you don't want them looking at your

12   equipment -- didn't we have this issue come up before, in

13   connection with trying to get the case resolved?

14         MR. GISLESON:  Right.  That was in terms of an

15   audit, they wouldn't agree to an audit.

16         THE COURT:  Let's go off the record.

17         (Discussion held off the record.)

18         THE COURT:  All right, we're back on the record.

19  What kind of expert discovery do you need?

20      MR. SHEEAN:  Judge, we perceive that we will need an

21  expert, essentially for the same issue with respect to the

22  design of the Keystone boiler, whether or not that is in fact

23  within the public domain, as the aspects of it.  That had it

24  been in the public domain for a number of years.  And,

25  likewise, we may need a rebuttal expert if they, if IKE gets an

123

1  expert regarding the Voyager design.  We'll probably need a

2  damages expert as well, for the reasons that we talked about.

3      THE COURT:  Just so I'm clear again, Mr. Gisleson,

4  the reality is if you can show that they breached the License

5  Agreement -- but if you can't show, for instance, that your

6  engineering information was a trade secret, since you don't

7  have an independent contract claim against them, that's merely

8  the predicate for getting on to the trade secret, you could

9  still come away with nothing, is that right?

10      MR. GISLESON:  I'm not sure.  I mean even if it's

11  not a trade secret, in our view, they don't have the right to

12  incorporate the technology.  Because even if it's not a trade

13    secret, it could still be proprietary.  And they can't

14    incorporate that technology into their boiler.

15           THE COURT:  But there's no contract claim?

16           MR. GISLESON:  That's correct, there is no contract

17    claim in this lawsuit.  So it could spawn another lawsuit, but

18    also would form the basis for misappropriation of trade secrets

19    claim.  And they've got a counterclaim in which they're seeking

20    a declaratory judgment that they can continue to sell watertube

21    boilers at the conclusion of the License Agreement, which is

22    what they're doing now.  But if they're selling boilers after

23    the License Agreement that incorporates our technology, I think

24    that's a basis for denying their counterclaim.

25           THE COURT:  All right.  How long is this all going


                                    124


1    to take to get to the end of the discovery -- you can sit down

2    for a second.  Off the record.

3           (Discussion held off the record.)

4           THE COURT:  How much more time -- non-expert

5    discovery is over except for a few loose ends?

6           MR. GISLESON:  Correct.  The only possible

7    scheduling glitch for me is I have to try a $165 million

8    accounting malpractice case against PriceWaterhouse out in

9    Chicago.

10           THE COURT:  When?

11           MR. GISLESON:  The entire month of September.

12           THE COURT:  In federal court?

13           MR. GISLESON:  In State court.  It's a 1997 case

14   that I inherited from my old law firm.

15           THE COURT:  All right.  I want to get some

16   timeframes set here.  Do you have experts in mind?

17           MR. GISLESON:  There are people who historically

18   have been involved with these boilers and are now retired and

19   are no longer working, who we have considered.

20           THE COURT:  Do you have experts in mind?

21           MR. SHEEAN:  We've had preliminary discussions but

22   nothing beyond that, your Honor.

23           THE COURT:  All right.  Well, you got 120 days from

24   today to complete your expert discovery.  In other words, to

25   complete, that's the remaining discovery.

125

1          Plaintiff's pretrial narrative statement with expert

2    report or reports, if there are going to be any, will be due 20

3    days thereafter.

4          Defendant's pretrial statement will be due 20 days

5    after the receipt of the plaintiff's pretrial.  And once we get

6    the pretrial narrative statements in, we'll set this thing down

7    for a pretrial conference.  This will be on my October trial

8    term -- let me think.  Maybe December, I think I won't reach it

9    until December.  Then finally off the record.

10          (Discussion held off the record.)

11          THE COURT:  Let's go back on the record.  The

12    subject just informally came up as to the question of

13    bifurcation on this case.  And I don't have a motion before me,

14    so I haven't thought it through.  But I can tell you, based

15    upon what I know, it would be unlikely in the extreme that I'm

16    going to grant any kind of motion to bifurcate in this case.

17    In my opinion, it would not result in a savings of judicial

18    resources.  Once we start, if we're in for the penny, we're in

19    for the pound, we're going to go right through all the way to

20    damages.  All right, thank you, counsel.

21

22          (Whereupon, at 2:22 p.m., the proceedings were

23   concluded.)

24

25                    - - -


                                126


1              C E R T I F I C A T E
                _ _ _ _ _ _ _ _ _ _ _

2

3

4

5       I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25