**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 04-CV-325 (ERIE) |
| v. | : | |
| | : | Judge Sean J. McLaughlin |
| VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company, | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

**DECLARATION OF ALAN WAYNE CHRISTIAN**

1. I am the President and owner of Christian Power Equipment, Inc. ("CPE").

2. I make this declaration upon personal knowledge and information that has been provided to me in the ordinary course of my duties as an officer of CPE.

3. From February 18, 2003 until March 9, 2005, CPE was an independent sales representative for Victory Energy Operations, LLC ("VEO"). A true and correct copy of the Sales Representative Agreement (the "Representative Agreement") between CPE and VEO is attached hereto as Exhibit "A".

4. VEO retained CPE to market and sell two products: (i) Keystone® Water Tube boilers with steam capacities between 29,000 and 150,000 pounds per hour, and (ii) VEO Heat Recovery Steam Generators ("HRSGs") of all sizes. In fact, those are the only two products identified in the Product Schedule that is attached to the Representative Agreement.

5. CPE did not, nor intend to market or sell any aftermarket or replacement parts for any existing Zurn, Aalborg or Erie Power Technologies boiler (water tube, fire tube HRSG or solid fuel), drum internal, stoker or hopper on behalf of VEO.

6. Consistent with the foregoing, the only products that CPE actually sold for VEO between February 18, 2003 and March 9, 2005 were HRSGs. The HRSGs that CPE sold on behalf of VEO were complete steam generating systems (as opposed to being merely aftermarket or replacement parts for steam generating equipment). CPE did not sell any Keystone® Water Tube boilers for VEO between February 18, 2003 and March 9, 2005.

7. On March 9, 2005, CPE terminated the Representative Agreement, pursuant to the "at-will" termination provision of that agreement. A true and correct copy of that termination letter is attached hereto as Exhibit "B".

8. Before CPE became a representative of VEO for Keystone® Water Tube boilers and HRSGs, CPE previously had been representing certain predecessors of Indeck Keystone Energy, LLC ("IKE")(such as Erie Power Technologies, Inc. ("EPTI"), Aalborg, and Zurn Energy) for the sale of replacement and aftermarket parts for boilers, drum internals, stokers and hoppers that IKE's predecessors had designed and manufactured (collectively, the "Zurn Products").

9. CPE continued to market and sell the Zurn Products on behalf of IKE (and its predecessors) between February 18, 2003 and March 9, 2005, for three reasons in particular. First, CPE's Representative Agreement with IKE's predecessor, EPTI, included the sale of aftermarket and replacement parts. *See* copy of Sales Representative Agreement, attached hereto as Exhibit "C", at ¶ 9. Secondly, equipment owners looking to purchase aftermarket or replacement parts consistently purchase those parts directly from the original equipment

manufacturer, i.e., IKE or its predecessors, especially with respect to the Zurn Products. Thirdly, the VEO Representative Agreement did not specify aftermarket parts sales.

10. For the reasons set forth in paragraph 9, above, if CPE had not voluntarily terminated its Representative Agreement with VEO, it nevertheless would have continued beyond March 9, 2005 to refer customer inquiries for aftermarket and replacement parts to IKE (and not to VEO), especially for the Zurn Products.

11. I have read a copy of the October 18, 2006 Affidavit of Mark J. White, in which Mr. White:

(a) References the potential sales by CPE of fluidized bed coal fired boilers and municipal solid waste boilers for IKE and/or its affiliates (¶¶ 4, and 7);

(b) Asserts that VEO can offer replacement parts for Zurn Travagrate® stokers, by purchasing those parts from Detroit Stoker and re-selling them (¶ 5); and

(c) Asserts that VEO either has sold, or can sell, replacement boiler tubes, hoppers, drum internals and economizer assemblies (¶¶ 6, 8 and 9 – 11).

12. CPE has <u>not</u> sold <u>any</u> boilers or HRSGs through IKE or for IKE from March 9, 2005, to the present.

13. In fact, the only sales that CPE has made or earned commissions on from IKE since March 9, 2005 were aftermarket or replacement parts for the Zurn Products.

14. As set forth in greater detail above, CPE never represented VEO for the marketing or sale of any aftermarket or replacement parts. If VEO had asked CPE at any time before or after March 9, 2005 to expand the scope of the Representative Agreement to include aftermarket

or replacement parts for the Zurn Products, CPE would have rejected that request. In particular, for example, CPE has been invited on several occasions to market and/or sell parts manufactured by Detroit Stoker. CPE always declined those invitations, and has never sold any parts or equipment manufactured by Detroit Stoker.

15. I am also aware that VEO has accused IKE of "intercepting" certain documents that VEO subpoenaed from CPE. Upon receipt of VEO's subpoena, it was actually CPE that contacted IKE and asked if CPE could produce the subpoenaed documents through IKE, because: (i) CPE is a small company and does not have the human resources to handle a large document production, and (ii) the materials requested by VEO contain sensitive price and customer information, which CPE believed IKE had an interest in protecting from unnecessary disclosure to a competitor.

16. I declare under penalty of perjury that the foregoing is true and correct. Executed on October 25, 2006.

Alan Wayne Christian




*Representative Agreement*

This agreement, made this 18th day of February by and between Victory Energy Operations, LLC (hereinafter referred to as "VEO") and Christian Power Equipment (hereinafter referred to as "Representative").

**W I T N E S S E T H:**

WHEREAS, VEO is in the business of selling certain steam generating equipment and services relating thereto (hereinafter referred to as the "Products") and

WHEREAS, VEO desires Representative to represent VEO as more particularly set forth herein; and

WHEREAS, Representative desires to provide such representation,

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the Parties agree as follows:

1. **Territory**

VEO grants to Representative the right to sell the Products during the life of this Agreement in the following territory (hereinafter referred to as "Territory"):

California: Counties North of: San Luis Obispo, Fresno, and Inyo.

Entire States of: Alaska, Idaho, Nevada, Oregon, and Washington

2. **Responsibility for Sales Representation**

(a) Representative agrees to provide sales representation in the Territory. Said representation shall include, but not be limited to, thoroughly canvassing the Territory for potential customers, utilizing all reasonable effort to solicit orders for the Products and properly representing VEO with its customers.

(b) Upon request, Representative shall assist VEO in securing collections, obtaining information on the credit worthiness of potential customers, and helping to resolve trouble jobs.

(c) Representative shall, on a periodic basis, visit the sites where Products are in use within the Territory so as to adequately service existing customers.








3. **Sales Office**
   (a) Representative agrees to maintain in its name, or other approved name, an office in a location approved by VEO.
   (b) Representative's signs or printed matter must designate that it is the representative of VEO in a manner that is approved by VEO.

   (c) Sub-sales Representative offices may be established by the Representative within the Territory, but only with VEO's written approval. Agreements between Representative and his Sub-Representative are personal in nature and nothing therein shall provide for or be construed to provide for liability by VEO in connection with such agreements.

   (d) Representative shall have full responsibility for any and all taxes due on commissions paid, any and all business taxes, and the filing of any required business forms with local, state, or federal authorities.

4. **Sales Expense**
   Representative shall be responsible for all expenses that are incurred in maintaining said office as well as any other expenses that it incurs in providing representation, including, but not limited to, rent, office and traveling expense, postage, telephone, telegraph, etc.

5. **Sales Materials**
   VEO shall furnish catalogs, price lists, order forms and other printed materials, which will inform and assist the Representative in soliciting orders for Products. Said materials shall be treated as confidential and shall remain the property of VEO. Representative shall utilize the materials only with respect to its efforts on behalf of VEO hereunder and shall return all materials to VEO upon request.

6. **Transfer of Information**
   Each party shall promptly forward to the other all inquiries or other information received which relates to potential sales in the Territory.

7. **Direct Contact with Customers**
   (a) Any customer or potential customer in the Territory may communicate directly with VEO concerning any aspect of the Products. VEO shall keep Representative aware of any such communications.

   (b) VEO shall have the right to contact or deal directly with customers or potential customers in the Territory.





(c) VEO may sell to any customer within the Territory who deals directly with VEO. Representative shall receive a commission on every such sale, as herein set forth.

(d) VEO shall have the right to send technical or sales personnel into the Territory to assist in contacting customers, promoting sales, or otherwise performing its contracts. VEO shall keep Representative advised of such activities.

**8. Exclusive Representation**

(a) Representative shall not handle, sell, distribute or otherwise associate itself with any equipment that is similar to or competes in any way with the Products.

(b) Representative shall not handle, sell, or distribute any used equipment without VEO's express written consent.

(c) Representative shall furnish VEO with a complete list of companies and equipment it presently represents and agrees to continually notify VEO of any changes in that representation.

**9. Compensation**

(a) Representative's sole compensation hereunder shall be a commission as set forth in the then effective Commission Schedule. VEO shall have the sole right to modify said Commission Schedule from time to time. The Commission Schedule applicable to a particular project shall be that Commission Schedule in effect upon the date when VEO first issues its proposal upon which the Final Pricing for a particular sale is based. Final Pricing is herein defined as the price that is agreed upon between VEO and its customer at the time of contract formation, prior to any additions or deletions by change order.

(b) Representative's commission shall be based solely upon the portion of the Net Project Value (as defined in the then effective Commission Schedule) which is actually received by VEO. VEO shall not be liable to Representative for commissions on projects that are canceled, except to the extent that commissions are included in the cancellation charges.

(c) VEO shall have the absolute right to determine the sales price for Products.

(d) When two or more Representatives participate in the same sale, the commission for such sale shall be allocated according to the guidelines set forth in the then effective Commission Schedule. VEO shall consult with the Representatives involved prior to such allocation, however, after such consultation, VEO's decision on the allocation of any such commission shall be final.

(e) VEO shall send monthly statements, on or about the fifteenth day of each month, showing the status of Representative's account. Representative shall indicate its approval in the appropriate space and return the required document to VEO. VEO shall tender the pro-rata commission due on or about the






twenty-fifth day of the month following that during which Representative's approval is received. In the event of any overpayment by VEO or erroneous payments for any reasons, commissions paid by VEO to Representative with respect to such sales shall be deducted from the next commission payment. In the event that no further commission payment is due to Representative, Representative shall repay VEO the amount of such overpayment.

10. **Independent Contractor**

(a) Representative shall be an Independent Contractor and not an agent or employee of VEO.

(b) Representative shall have no authority whatsoever to make purchases nor to bind VEO to any contract of any nature. Representative agrees to indemnify and hold harmless VEO from any claims that may arise in any manner from Representative's breach of its obligations under this provision.

(c) Representative's role is to solicit orders that are subject to the sole approval of VEO.

(d) In order to secure uniformity of relations with all Representatives, VEO reserves the right to require conformity with procedures, which may be established from time to time concerning issues such as internal reporting, handling of sales proposals, or other matters dealing with general administration.

(e) The District Sales Representative agrees to abide by all Codes of Fair Practice as well as all local, state, or federal regulations.

(f) VEO agrees to provide "Additional Insured - Vendor" coverage to Representative in accordance with the terms and conditions of the Commercial General Liability Insurance Program.






11. **Complete Agreement**
This Agreement constitutes a final written expression of all of the terms of the agreement between VEO and Representative and is a complete and exclusive statement of these terms. Any modification of these terms must be in writing, signed by VEO.

12. **Cancellation**
(a) This contract is subject to cancellation upon thirty (30) days written notice by either party. Upon cancellation, Representative shall, at its expense, return to VEO all price lists, catalogs, customer lists, orders and correspondence and copies thereof, and any and all other papers relating to the business of VEO whether prepared by VEO or by Representative.

(b) Following the effective date of termination, Representative shall be entitled to commission for orders received up to 90 days after termination, for firm quotations prior to the final day of termination.

(c) Representative agrees that VEO may, at its option, terminate this Agreement in the event that (i) Representative assigns its rights to a third party without VEO's consent, or (ii) Representative undergoes a change in ownership or control.

13. **Applicable Law**
This Agreement shall be enforced and interpreted in accordance with the laws and court decisions of the Commonwealth of VEO.




*Representative Agreement*

Signed in duplication this 18th day of February 2003.

**Company Name**

Date 7/15/03

By [signature]

John C. Viskup, Jr.

Title President

President

**Company Name**

Date 7/11/03

By [signature]

Title Owner



**Commission Schedule**

Effective Date:

This Commission Schedule supersedes all other commission schedules and will be utilized on all quotations as of the above Effective Date.

1. Basis of Commission
   Representative's commission shall be based solely upon the Net Project Value of Products. The Net Project Value is herein defined as the Final Pricing of Products excluding:

   ( Freight and handling charges.

   ( Bonds and letters of credit.

   ( Taxes and duties of any nature, and

   ( Per Diem charges for field or engineering services that are not included in the Final Pricing of Products.

2. Commission Schedule

| Net Project Value | Standard Commission |
|---|---|
| less than $25,000 | 5% |
| $25,001 to $100,000 | $1,250 plus 4.0% of amount over $25,000 |
| $100,001 to 500,000 | $4,250 plus 3.0% of amount over $100,000 |
| $500,000 to $1,000,000 | $16,250 plus 2.0% of amount over $500,000. |
| $1,000,000 to $5,000,000 | $26,250 plus 1.0% of amount over $1,000,000. |
| $5,000,000 to $10,000,000 | $66,250 plus 0.75% of amount over $5,000,000 |
| Over $10,000,000 | $103,750 plus 0.5% of amount over $10,000,000. |






This schedule shall apply for:

0( VEO fabricated and purchased equipment, spare parts, and services including Engineering and Field Services that are offered as part of Final Pricing. No commission shall be paid on Field Services, ordered by a customer following contract formation.

( VEO Field Erection Supervision or Consultation, Field Services, or Engineering, which is proposed on a project basis, separate from an equipment proposal.

3. Commission Adjustments

A. Increase of Contract Scope

In the event the scope of a contract is increased by change order after contract formation, Representative shall also receive a commission on the resulting increase in the Net Project Value. Said commission shall be calculated in accordance with the then effective Commission Schedule beginning at the incremental rate determined from the Net Project Value.

Example:

| | | | | | |
|---|---|---|---|---|---|
| Net Project Value | = | $5,000,000 | Commission | = | $ 66,250 |
| Change Order | = | 50,000 @ 0.75% | Commission Adder | = | 375 |
| | | | Total Commission | | $ 66,625 |

C. Reduction of Contract Scope

In the event the scope of a contract is reduced by change order after contract formation, Representative will receive a reduced commission as a result of a corresponding reduction in the Net Project Value. The amount of commission reduction shall be the difference between the commission due on the Net Project Value prior to the change order and the commission due on the reduced Net Project Value.

**4. Commission Allocations — General Orders for New Equipment**

All commissions shall be allocated in the same manner with amounts determined in accordance with the above Schedule. Commissions shall be specifically allocated using the following guidelines.

**A. Pre-Order Influence: 75%**

This allocation will be divided equitably among the Representatives in accordance with their relative effectiveness on the basis of effort, time, and achievement. Pre-order influence is exerted on:

**i. The User**

a. at local plant/mill level

b. at headquarters level

**ii. Consulting Engineer**

The commission for pre-order influence shall be apportioned as follows:

a. 15% For influence exerted prior to the issuance of the inquiry.

b. 60% For the sales effort expended after receipt by VEO of the inquiry.

**B. Purchase Order: 10%**

10% of the total commission will accrue to the Representative within whose geographic territory the negotiation and award of the contract occurs.





C. **Post-Order Engineering: 5%**
5% of the total commission will accrue to the Representative within whose geographic territory occurs the responsibility of obtaining all details and drawings and other approvals.

In the absence of this responsibility, this percentage shall be added to the amount for pre-order influence, making a total of 80%.

D. **Destination: 10%**
10% of the total commission will accrue to the Representative within whose geographic territory the project equipment is originally installed. This commission credit will be paid after evidence has been submitted to VEO that the Representative has visited the project site during and after start-up and rendered service as to:

- Providing any required assistance regarding delivery and installation of the Products.
- Promoting further use of VEO's equipment.
- Determining spare parts requirements and sales.
- Advising VEO as to key customer contacts.
- Providing VEO with a report as to plant status and customer satisfaction level.

5. **Allocation of Commissions— Aftermarket / Customer Service**

A. **Aftermarket Equipment Sales Commissions**
Commissions shall be allocated as shown below for all orders outside of General Orders consisting of off-the-shelf spare part products sold and for engineered products and Field Service sold. VEO's determination of the allocation shall be final, however, VEO will discuss the allocation when multiple Representatives are involved in a single sale to assure an equitable split of commission among the Representatives.

| | | |
|---|---|---|
| 1. | Annual visits / communication with the customer | 25% of total commission |
| 2. | Inquiry obtained as a result of the visits/communications | 35% of total commission |
| 3. | Pre-order influence | 15% of total commission |
| 4. | Close order | 15% of total commission |
| 5. | Post order follow-up at destination | 10% of total commission |





**B. Field Service**

A sales commission will be paid to VEO's domestic sales Representatives for Field Service orders specifically sold by Representative and contracted by the customer within two months of the written offer. The commission will amount to a flat rate of $150.00 per full-paid contract day. Direct calls for service from the customer to VEO are not eligible for the commission. This incentive will run for calendar year 2003 and will be reviewed at year-end for any modification.

A full-paid contract day is defined as a full day worked (minimum of 8-hours) and is paid at the contract per diem rate. No commission will be paid for less than a full day worked nor for any day worked that is chargeable to VEO such as for warranty, courtesy calls, or part of a negotiated settlement.

**6. Disputes**

VEO's decision as to the allocation of commissions shall be final as detailed in paragraph 9, Compensation, as set forth in the Sales Representation Agreement.






**Product Schedule:**

1. The following products are included within this agreement:

Keystone Water Tube boilers: 8 M – 22M (29,000 PPH – 150,000 PPH)

VEO HRSG's (Heat Recovery Steam Generator) Systems – All sizes

(2)

**Christian Power Equipment, Inc.**
Manufacturer's Representatives
1840 San Miguel Suite 203
Walnut Creek, CA 94596
E-mail: Alan@CPOWER.NET
Phone: 925-943-7444 Fax: 925-943-7463

March 9, 2005

Mark White
Victory Energy Operatons, LLC
10701 East 126th St., North
PO Box 638, Owasso, OK 74055
Collinsville, OK 74021

Subject: Termination of Representation Agreement Dated 7/11/03

Dear Mark,

Per our conversation on February 2, 2005 I have resigned my representation with Victory Energy. I however expect to remain active on the King County Project and Victory should feel free to ask for my assistance anytime.

I have not received any inquiries in the past month but will forward leads that have been generated by my activities should they arise.

I regard Victory highly and hope you continue to find success.

Sincerely,
**CHRISTIAN POWER EQUIPMENT, INC.**

Alan W. Christian
President

EXHIBIT
B

- Significant and effective support and communication with EPTI and the customer to assist/facilitate closure of issues related to other on-going projects

- Significant and effective support and communication with EPTI and the customer to assist/facilitate closure of issues related to the project in question

**4.2 Purchase Order: 10%**

10% of the total commission will accrue to the Representative within whose geographic territory the negotiation and award of the contract occurs.

**4.3 Post–Order Engineering: 5%**

5% of the total commission will accrue to the Representative within whose geographic territory occurs the responsibility of obtaining all details and drawings and other approvals.

In the absence of this responsibility, this percentage shall be added to the amount for pre-order influence, making a total of 80%.

**4.4 Destination: 10%**

Ten percent (10%) of the Commission due on a Project will accrue to the EPTI representative within whose geographic territory the Project is located. However, in order to qualify for the destination allocation, the representative must provide to EPTI written documentation establishing that the representative has visited the Project site during and after start up and has rendered services as to: (1) assistance regarding delivery and installation of the Products; (2) promoting further use of EPTI equipment and services; (3) determining spare parts requirements and sales; (4) advising EPTI as to key customer contacts; and (5) providing EPTI with a report as to plant status and customer satisfaction level.

**5.0 Disputes**

Representative understands and agrees that any determinations made by EPTI with respect to the appointment of Commissions among the Representatives and other EPTI representatives (including, but not limited to, whether a party should be credited with pre-order influence), shall be final and binding upon Representative.





**ERIE POWER TECHNOLOGIES, INC.**
**5300 Knowledge Parkway, Suite 200**
**Erie, PA USA 16510-4660**

This agreement, made this **29th** day of **January, 2003** by and between Erie Power Technologies, Inc. (hereinafter referred to as "EPTI") and **Christian Power Equipment** with offices located at **1840 San Miguel, Suite 203, Walnut Creek, CA, 94596,** (hereinafter referred to as "Representative").

**W I T N E S S E T H:**

WHEREAS, EPTI is in the business of selling certain steam generating equipment and services relating thereto (hereinafter referred to as the "Products") and

WHEREAS, EPTI desires Representative to represent EPTI as more particularly set forth herein; and

WHEREAS, Representative desires to provide such representation,

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein, the Parties agree as follows:

**1.0 Territory**

EPTI grants to Representative the exclusive right to sell the Products during the life of this Agreement in the following territory (hereinafter referred to as "Territory"):

**Alaska (Entire state); California (Counties north of and including Monterey, Kings, Tulare and Inyo); Idaho (Counties north of and including Nez Perce, Lewis and Clearwater); Nevada (Counties of Humboldt, Washoe, Lander, Pershing, Churchill, Storey, Lyon, Ormsby, Douglas, and Mineral); Oregon (Entire state); Washington (Entire state)**

**2.0 Responsibility for Sales Representation**

2.1 Representative's Sales Efforts. Representative shall maintain an active sales program that promotes, recommends, and solicits orders for the Products. Representative shall maintain an adequate and aggressive sales organization to actively market the Products in the Territory and provide advisory and support services for the Products in the Territory. Representatives shall at all times conduct its business so as to assist EPTI in bringing value to our customers, including (but not limited to) the following:

- maintenance of key relationships at all client levels
- early targeting of projects with clients
- monitoring of status and performance of EPTI's on-going projects that may result in duplicate projects order (repeat business)with written communications to ETPI
- monitoring of status and performance of targeted projects with written communication to EPTI



EXHIBIT
C






- written confirmation of all critical issues relevant to success of EPTI in obtaining orders; and
- where possible, provide feedback and guidance on each project relative to EPTI's competitive position, including recommended closure strategy necessary to secure the order.

2.2 Cooperation Between Representative and EPTI. Representative shall as part of its overall sales effort, comply with the following (1) EPTI shall be permitted to train Representative Personnel; (2) EPTI shall be permitted to accompany Representative Personnel on sales calls; (3) Representative shall coordinate and cooperate with EPTI's sales department on all matters relevant to maintaining efficient sales and post-sales services; (4) Representative shall provide EPTI assistance at trade shows, as EPTI may reasonably request; (5) Upon request, Representatives shall assist EPTI in securing collections, obtaining information on the credit worthiness of potential customers, and helping to resolve issues with customer relations, projects, or operating equipment; (6) Representative shall, on at least a semi-annual basis, visit the sites where Products are in use within the Territory so as to adequately service existing customers, and (7) Representative shall furnish to EPTI written communication on Representative's activities (such as, but not limited to customer contacts, market forecasts, customer maintenance budgets, operating status of units, scheduled maintenance outages, advanced notice on major rebuilds and overhauls, this information to be provided to EPTI on a monthly basis. Representatives shall consult with EPTI whenever it discovers changes in the market or other occurrences which affect or might affect the Representative's sales such as (but not limited to), market intelligence on lost orders, competitive pricing, new competitor's products, changes in governmental policies or regulations and so forth.

**3.0 Sales Office**

3.1 Representative agrees to maintain in its name, or other approved name, an office within a suitable location.

3.2 Sub-sales Representative offices may be established by the Representative within the Territory, but only with EPTI's written approval. Agreements between Representative and his Sub-Representative are personal in nature and nothing therein shall provide for or be construed to provide for liability by EPTI in connection with such agreements.

3.3 Representative shall have full responsibility for any and all taxes due on commissions paid, any and all business taxes, and the filing of any required business forms with local, state, or federal authorities.

**4.0 Sales Expense**

Representative shall be responsible for all expenses that are incurred in maintaining said office as well as any other expenses that it incurs in providing representation, including, but not limited to, rent, office and traveling expense, postage, telephone, telegraph, etc. Representative shall obtain at its own expense all necessary licenses and permits to allow representative to conduct business as contemplated herein.

**5.0 Sales Materials and Training**

5.1 Sales and Technical Assistance. EPTI shall: (1) supply Representative with standard sales literature in reasonable quantities when ordered by Representative; and (2) provide technical support and sales assistance as is reasonably required by Representative.

5.2 Training. EPTI may, in its discretion, provide training seminars for Representative and Representative Personnel. Representatives will be responsible and shall pay for any travel expenses (transportation, lodging, and meals) associated therewith, unless otherwise agreed upon by Representative and EPTI in writing.

5.3 Sales Materials. Said materials, including sales literature, CD's, videos, training manuals, etc. shall be treated as confidential and shall remain the property of EPTI. Representative shall utilize the materials only with respect to its efforts on behalf of EPTI hereunder and shall return all materials to EPTI upon request.

**6.0 Transfer of Information**

Each party shall promptly forward to the other all inquiries or other information received which relates to potential sales in the Territory.

**7.0 Direct Contact with Customer**

7.1 Any customer or potential customer in the Territory may communicate directly with EPTI concerning any aspect of the Products. EPTI shall keep Representative aware of any such communications.

7.2 EPTI shall have the right to contact or deal directly with customers or potential customers in the Territory. However, EPTI shall keep the Representative aware of customer communications or meetings

7.3 Limitations with Respect to Certain Customers. The appointment of the Representative as sales representative for EPTI under this Agreement shall not extend to the following customers and any subsidiaries or affiliates of such customers: (1) General Electric Company, (2) Siemens-Westinghouse, and (3) Victory Energy. Representative shall not solicit orders for Products from, or otherwise act in the capacity of an EPTI sales representative with respect to such customers and their subsidiaries and affiliates and shall not be entitled to any Commissions whatsoever with respect to orders placed by such customers, their subsidiaries for their affiliates. EPTI reserves the right to revise or modify the above list, at its discretion.

7.4 EPTI may sell to any customer within the Territory who deals directly with EPTI. Representative shall receive a commission on every such sale, except as stated in 7.3.

7.5 EPTI shall have the right to send technical or sales personnel into the Territory to assist in contacting customers, promoting sales, or otherwise performing its contracts. EPTI shall keep Representative advised of such activities.





**8.0 Exclusive Representation**

8.1 Non Competition. During the term of this Agreement and for a period of three (3) months immediately after termination of this Agreement, Representative and Representative Owners covenant and agree that they will not, directly or indirectly, own, manage, be employed by or engaged by, operate, control, become associated with, and/or act as a sales representative for, any person or firm which, directly or indirectly, manufactures, sells or otherwise promotes the sale or service of equipment which is competitive with the Products. For the three-month period following termination of this Agreement, the provisions of this item shall be limited in geographic scope to the Territory.

8.2 Representative shall not handle, sell, or distribute any used equipment, that may compete with the products or services offered by EPTI, without EPTI's express written consent.

8.3 Representative and Representative Owners will not, at any time during or after the term of this Agreement, directly or indirectly, divulge or otherwise disclose to anyone other than EPTI the names and addresses of customers or potential customers of EPTI, any contents of files maintained by EPTI or by Representative for EPTI, prices and pricing policies of EPTI, procedures and policies of EPTI, or other information which is confidential or proprietary to EPTI.

8.4 Representative shall furnish EPTI with an initial list of companies and equipment it presently represents and agrees to continually notify EPTI of any changes in that representation.

**9.0 Compensation**

9.1 Representative's sole compensation hereunder shall be a commission as set forth in the then effective Commission Schedule. EPTI shall have the sole right to modify said Commission Schedule from time to time. The Commission Schedule applicable to a particular project shall be that Commission Schedule in effect upon the date when EPTI first issues its proposal upon which the Final Pricing for a particular sale is based. Final Pricing is herein defined as the price that is agreed upon between EPTI and its customer at the time of contract formation, prior to any additions or deletions by change order.

9.2 Representative's commission shall be based solely upon the portion of the Net Project Value (as defined in the then effective Commission Schedule) for which payment is actually received by EPTI. EPTI shall not be liable to Representative for commissions on projects that are canceled, except to the extent that commissions are included in the cancellation charges.

9.3 EPTI shall have the absolute right to determine the sales price for Products.





9.4 When two or more Representatives participate in the same sale, the commission for such sale shall be allocated according to the guidelines set forth in the then effective Commission Schedule. EPTI shall consult with the Representatives involved prior to such allocation, however, after such consultation, EPTI's decision on the allocation of any such commission shall be final.

9.5 EPTI shall send monthly statements, on or about the fifteenth day of each month, showing the status of Representative's account. Representative shall indicate its approval in the appropriate space and return the required document to EPTI. EPTI shall tender the pro-rata commission due on or about the twenty-fifth day of the month following that during which Representative's approval is received. In the event of any overpayment by EPTI or erroneous payments for any reasons, commissions paid by EPTI to Representative with respect to such sales shall be deducted from the next commission payment. In the event that no further commission payment is due to Representative, Representative shall repay EPTI the amount of such overpayment.

**10.0 Independent Contractor**

10.1 Representative shall be an Independent Contractor and not an agent or employee of EPTI.

10.2 Representative shall have no authority whatsoever to make purchases nor to bind EPTI to any contract of any nature. Representative agrees to indemnify and hold harmless EPTI from any claims that may arise in any manner from Representative's breach of its obligations under this provision.

10.3 Representative's role is to solicit orders that are subject to the sole approval of EPTI.

10.4 In order to secure uniformity of relations with all Representatives, EPTI reserves the right to require conformity with procedures which may be established from time to time concerning issues such as internal reporting, handling of sales proposals, or other matters dealing with general administration.

10.5 The Representative agrees to abide by all Codes of Fair Practice as well as all local, state, or federal regulations.

10.6 EPTI agrees to provide "Additional Insured" coverage to Representative in accordance with the terms and conditions of the EPTI Commercial General Liability Insurance Program.

**11.0 Complete Agreement**

This Agreement constitutes a final written expression of all of the terms of the agreement between EPTI and Representative and is a complete and exclusive statement of these terms. Any modification of these terms must be in writing, signed by both EPTI and Representative.





**12.0 Termination**

12.1 Without Cause. This Agreement may be terminated without cause by either Representative or EPTI upon thirty (30) days prior written notice to the other party.

12.2 Termination by EPTI Upon Material Breach. EPTI shall have the right to terminate this Agreement for cause immediately if Representative commits a material breach of this Agreement.

12.3 Effect of Termination. Upon termination of this Agreement, the following provisions shall take effect:

(a) All rights granted to Representative under or pursuant to this Agreement shall cease.

(b) Representative shall immediately cease action on behalf of EPTI and shall cease its activities concerning the Products. Representative shall also promptly return all confidential information, sales literature, sales brochures, samples, videos, CD's training manuals, and other materials or facilities furnished by EPTI for the use of Representative. Representative shall also promptly provide to EPTI copies of all files and other documentation relating to customers of EPTI and projects with respect to which the Representative has been involved on EPTI's behalf. EPTI shall have the right to withhold any Commissions which may be due Representative until Representative complies with the provisions of this Section 12.3 (b).

(c) Subject to the requirements, terms, conditions, and limitations of the Commission Schedule, the Representative shall be entitled to receive Commissions following termination for: (1) orders placed prior to termination; and (2) orders for Products received no later than sixty (60) days following termination, provided that the order in question was placed in response to a firm quotation made by EPTI prior to termination. Within seven (7) days, Representative shall submit a list of all firm quotations wherein orders may close in this sixty (60) day period. For purposes of this Section 12.3 (d), budget quotations, estimates, and similar calculations or information shall not be considered in firm quotations.

(d) Any indebtedness of one party to the other shall survive the termination of this Agreement

(e) Representative agrees that EPTI may, at its option, terminate this Agreement in the event that (1) Representative assigns its rights to a third party without EPTI's consent, or (2) Representative undergoes a change in ownership or control.




**13.0 Applicable Law**

This Agreement shall be enforced and interpreted in accordance with the laws and court decisions of the Commonwealth of Pennsylvania.

**14.0 Limitation of Liability**

In no event shall EPTI be liable to Representative for any loss of profits, loss of revenues, indirect damages, special damages or consequential damages arising out of any breach of EPTI's obligations under this Agreement.

Signed in duplication this 5th day of Feb 2003.

**Christian Power Equipment**

Date 2/3/03 By [signature]

Title Owner

**Erie Power Technologies, Inc.**

Date 1/29/03 By [signature] Mark J. White

Title Director, Sales & Marketing






**Effective Date: January 29, 2003**

This Commission Schedule supersedes all other commission schedules and will be utilized on all quotations as of the above Effective Date.

**1. Basis of Commission**

Representative's commission shall be based solely upon the Net Project Value of Products. The Net Project Value is herein defined as the Final Pricing of Products excluding:

- Freight and handling charges
- Bonds and letters of credit
- Taxes and duties of any nature
- Per Diem charges for field or engineering services that are not included in the Final Pricing of Products

**2. Commission Schedule – New Equipment**

| *Net Project Value* | *Standard Commission* |
|---|---|
| Less than $25,000 | 5% |
| $25,001 to $100,000 | $1,250 plus 4% of amount over $25,001 |
| $100,001 to 500,000 | $4,250 plus 3% of amount over $100,001 |
| $500,001 to $1,000,000 | $16,250 plus 2% of amount over $500,001. |
| $1,000,001 to $5,000,000 | $26,250 plus 1% of amount over $1,000,001 |
| $5,000,001 to $10,000,000 | $66,250 plus 0.75% of amount over $5,000,001 |
| Over $10,000,001 | $103,750 plus 0.5% of amount over $10,000,000 |





**2.1. Commission Schedule – Aftermarket Equipment & Services**

| *Net Project Value* | *Standard Commission* |
|---|---|
| $25,000 or Less | 8% |
| $25,001 to $75,000 | $2500 plus 5.0% of amount over $25,001 |
| $75,001 to $150,000 | $5,000 plus 4.0% of amount over $ 75,001 |
| $150,001 to $300,000 | $8,000 plus 3.0% of amount over $150,000. |
| $300,001 to $ 500,001 | $12,500 plus 2.0% of amount over $300,001 |
| $500,001 and Above | Base Comm. As Above, plus 1 % over $500,001 |

This schedule shall apply for:

- EPTI fabricated and purchased equipment, spare parts, and services including engineering and field services that are offered as part of final pricing.

**Exclusion**

- A sales commission will be paid to EPTI's Domestic Sales Representatives for field service orders specifically sold by Representative and contracted by the customer within two months of the written offer. The commission will amount to a flat rate of $50 per full-paid contract day. Direct calls for service from the customer to EPTI are not eligible for the commission. This incentive will run for calendar year 2003 and will be reviewed at year end for any modification.

  A full-paid contract day is defined as a full day worked (minimum of 8 hours) and is paid at the contract per diem rate. No commission will be paid for less than a full day worked nor for any day worked that is chargeable to EPTI such as for warranty, courtesy calls, or part of a negotiated settlement.

**2.2 Allocation of Commissions – Aftermarket/Customer Service A- and Z-Orders**

**2.2.1 Aftermarket Equipment Sales Commissions**

Commissions shall be allocated as shown below for all orders outside of General Orders consisting of off-the-shelf spare part products sold on A-Orders and for engineered products and Field Service sold on Z-Orders. EPTI's determination of the allocation shall be final, however, EPTI will discuss the allocation when multiple Representatives are involved in a single sale to assure an equitable split of commission among the Representatives.

| Activity | % of Total Commission |
|---|---|
| 1. Annual visits/communications with customer | 25% |
| 2. Inquiry obtained as a result of visits/communications | 35% |
| 3. Pre-order influence | 15% |
| 4. Close order | 15% |
| 5. Post order follow-up at destination | 10% |






**3.0 Commission Adjustments**

**3.1 Increase of Contract Scope/New Equipment and Aftermarket Equipment & Service**

In the event the scope of a contract is increased by change order after contract formation, Representative shall also receive a commission on the resulting increase in the Net Project Value. Said commission shall be calculated in accordance with the then effective Commission Schedule beginning at the incremental rate determined from the Net Project Value.

***Example: New Equipment***

| | | | |
|---|---|---|---|
| **Net Project Value** | = $5,000,000 | **Commission** | = $ 66,250 |
| **Change Order** | = 50,000 @ 0.75% | **Commission Adder** | = 375 |
| | | ***Total Commission*** | **$ 66,625** |

**3.2 Reduction of Contract Scope/New Equipment and Aftermarket Equipment & Services**

In the event the scope of a contract is reduced by change order after contract formation Representative will receive a reduced commission as a result of a corresponding reduction in the Net Project Value. The amount of commission reduction shall be the difference between the commission due on the Net Project Value prior to the change order and the commission due on the reduced Net Project Value.

**4.0 Commission Allocations – New Equipment and Aftermarket Equipment & Services**

All commissions shall be allocated in the same manner with amounts determined in accordance with the above Schedule. Commissions shall be specifically allocated using the following guidelines.

**4.1 Pre-Order Influence: 75% (Pre-Inquiry and Post-Inquiry)**

This allocation will be divided equitably among the Representatives in accordance with their relative effectiveness on the basis of effort, time, and achievement. Pre-order influence is exerted on:

Credit for pre-order influence will be allocated equitably among the Representative, other EPTI representatives and in accordance with their relative influence on the purchaser's decision to award the contract in question to EPTI. In general terms, pre-order influence is exerted upon: (1) the ultimate purchaser (both at the headquarters level and the plant level); and (2) the purchaser's consulting engineer and/or other decision makers and influencers having a material role in determining the specifications for a Project and/or the ultimate award of a contract. The determination as to whether a party was, in whole or in part, responsible for an order materializing, shall be made by EPTI based upon a consideration of those facts which EPTI considers to be relevant to the case in question, as reasonably determined by EPTI.






### 4.1.1 Performance Requirements for Competitively Bid Project

In order to qualify for any allocation of credit for pre-order influence with respect to Projects which are bid on a competitive basis, a representative must meet all of the following criteria:

- Maintenance of relationships with key decision makers at all client levels
- Early targeting of projects with client
- As part of the implementation of the agreed upon strategy, continual monitoring of, and regular reporting to EPTI regarding all critical issues relevant to success of EPTI obtaining purchase order award, and where possible, provide feedback and guidance on EPTI's competitive position including recommended closure strategy to secure the order
- Significant and effective support and communication with EPTI and the customer to assist/facilitate closure of issues related to the project in question
  Significant and effective support and communication with EPTI and the customer to assist/facilitate closure of issues related to other on-going projects

### 4.1.2 Performance Requirements For Duplicate Orders (Repeat Business)

In order to qualify for pre-order influence with respect to Projects which are duplicate Project orders (i.e., repeat business from an existing customer which is not bid on a competitive basis), a representative must meet all of the following criteria:

- Maintenance of relationships with key decision makers at all client level
- Early targeting of projects with clients (EPC, developer, utility
- As part of the implementation strategy, continual monitoring of, and regular reporting to EPTI regarding all critical issues relevant to success of EPTI obtaining purchase order award
- Provide significant and meaningful assistance to EPTI in bringing value to customer's requirements for repeat business, and/or otherwise demonstrate substantial influence with respect to key decision-makers, such that the customer decides to deal directly with EPTI rather than bid the project on a competitive basis