# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| INDECK KEYSTONE | : | |
| ENERGY, LLC, a Delaware limited liability | : | |
| company, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 04-CV-325 (ERIE) |
| v. | : | |
| | : | Judge Sean J. McLaughlin |
| VICTORY ENERGY | : | |
| OPERATIONS, LLC, a Delaware limited | : | |
| liability company, | : | |
| | : | |
| Defendant. | : | |

---

## PLAINTIFF'S PRETRIAL STATEMENT

---

Plaintiff Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned

counsel, submits this Pretrial Statement.

## I.    Factual And Legal Contentions

There ultimately are two categories of claims for the jury to decide: (1) whether

Defendant Victory Energy Operations LLC ("VEO") sold boilers outside the scope of a License

Agreement that VEO entered with IKE's predecessor-in-interest Erie Power Technologies, Inc.

("EPTI"); and (2) whether VEO incorporated technology received from EPTI during the term of

the License Agreement into the design of VEO's Voyager boiler line.  Those are independent

claims (*i.e.*, the jury can find either or both for Plaintiff).  The same legal theories apply to both

sets of claims.

A.    **VEO's Sale of Boilers Outside The Scope Of The License Agreement**

VEO contacted EPTI (jointly "the Parties") in December 2002 about VEO's interest in licensing EPTI's Keystone® M-Series line of boilers.  The M-Series is a subset of the overall "O-type" or "O-Series" Keystone® boiler line, utilizes older technology, and has standard geometry (*e.g.,* height, width, and length) and characteristics (*e.g.*, steam flow, gas temperatures, tangent tube furnace and outer walls, refractory front walls, etc.).  Thus, all M-Series boilers are Keystone® boilers, but not all Keystone® boilers are M-Series.  There are different models of the M-Series, each of which has a different "M" designation, such as 9M or 15M.  In seeking authority from EPTI's President (Stephen Kang) to negotiate a license agreement, Mark White (EPTI's Director of Sales and Marketing) advised Kang that the technology to be licensed was "outdated and antiquated."  Kang authorized White to negotiate a license agreement with VEO but to include the Engineering Department in defining the scope of the technology to be licensed.  Neither Kang nor White was an engineer.  White in fact worked with the Engineering Department to define the scope of the license, which was reflected in Annex I to the License Agreement.

1.    **Negotiation of the License Agreement**

John Viskup (President of VEO) and Mark White exchanged drafts of the License Agreement between December 20, 2002 and January 8, 2003.  White prepared the initial draft and used a prior EPTI license agreement for a different product line (heat recovery steam generators) and different licensee as the basis for the agreement.  VEO's changes focused on financial rather than technical terms, and EPTI accepted those changes.  The Agreement was signed by the parties on or about January 8, 2003.

The text of the Agreement defined the licensed "Products" as follows:

PTDATA 303225_1

      **'Products' shall mean natural circulation, industrial watertube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph.  Products shall include but not be limited to the items set forth in Annex 1.**  If Licensee receives inquiries which are not in Licensor's range of Products, subject to and prior notice to Licensor, Licensee will be free to enter into separate agreements."

(License Agreement, Clause 1(a)) (Emphasis added)  There was no negotiation of that definition other than the capacity range, and it does not reference "Keystone®", "M-Series", or O-type boilers.  At the time, EPTI also had "D-type" boiler technology within the capacity range identified in the definition of "Products" but that was not discussed by the Parties and was not licensed to VEO.

      At the time the Parties signed the Agreement, they understood it was still necessary to prepare and agree to the terms of the Annex I referenced in the definition of "Products."  White had sent a "data table" on December 20, 2002 that identified the different sizes of boiler from 3M (9,500 pph steam flow) through 23M (165,000 pph steam flow) and certain operating characteristics (*e.g.*, heat release rate) associated therewith, that showed a proposed "range" of potentially licensed boilers as 8M (29,000) to 17M (100,000).  On January 29, 2003, White sent a draft of Annex I, which incorporated information from the data table, to EPTI's chief engineer (Bob Gdaniec) and others in the Engineering Department, advising that "Annex I is the Product description for the License Agreement."  White's draft Annex I identified the "Description of Products" as EPTI's "M-Series Keystone® water tube boilers to include the 8M, 9M, 10M, 11M, 12M, 13M, 14M, 15M, 16M, 17M, 18M, 19M, 20M, 21M, and 22M," which extended the range to 150,000 pph from the 100,000 pph in the December 20 draft.  White also added to the data in the December 20 draft to include two tables under the heading "Standard M-Series Keystone Summary." (*Id.*)

On January 30, White re-sent his draft Annex I, along with drafts of Annex II (Technology Fee & Transfer of Information) and III (Contract Rates for Technical Assistance), to the Engineering Department, again asking for comments and advising that the "document is complete with all Annex data."

EPTI's Engineering Department advised White, in writing, that Annex I needed to identify the licensed boiler as having (among other features) tangent tube furnace and outer walls (tubes touching each other) and refractory front and rear walls, which are features of the older technology that is part of the Standard M-Series. The Engineering Department prepared drawings showing those features for inclusion in Annex I. White incorporated all of the information from the Engineering Department – including the drawings -- into a revised Annex I, which he sent to VEO on February 3, 2003. EPTI (through Mark White) and VEO (through John Viskup) thereafter initialed each of the pages in Annexes I and II that White had prepared. White and Viskup agree that Annex I is part of the License Agreement.

On February 27, 2003, less than one month after the Agreement was finalized, the Parties entered an "Addendum" that permitted VEO to sell boilers with a higher steam outlet temperature and design pressure, which characteristics are included in Annex I. The Addendum, signed by both White and Viskup, states that "Licensor agrees to **modify the Products described in Annex I of the License Agreement**" for additional compensation. (Emphasis added) The Addendum did not refer to the definition of "Products" in Paragraph 1(a) of the Agreement and thus confirms that Annex I defines the licensed products. The Parties did not negotiate another written addendum or amendment to the Agreement that further modified the Products described in Annex I of the License Agreement.

PTDATA 303225_1

2.    **VEO's Performance While EPTI Was Licensor**

The Parties agreed that EPTI would provide technical assistance to VEO with its manufacturing of boilers at the inception of the Agreement.  For its first boiler, VEO advised EPTI that it wished to sell a boiler that included membrane/welded furnace and outer walls, as well as welded front and rear walls ("full membrane").  "Membrane" or "welded" wall means that there is a metal bar between the tubes such that the tubes are no longer touching.  Membrane walls are a newer technology that was developed after tangent tube technology, although tangent tube boilers remain widely in use.  Membrane walls are not part of the Standard M-Series boiler.  At VEO's request, EPTI gave consent to VEO to sell the non-conforming boilers, and it provided the designs for membrane technology and the other deviations from Annex I to VEO ("non-conforming designs") for that initial project.  EPTI's engineers advised White that it was just for the initial project.  Although EPTI permitted VEO to continue selling non-conforming during the first year, EPTI reiterated to VEO on multiple occasions that the non-conforming designs were outside the scope of the Agreement.  EPTI, though, was in financial distress, so it consented to VEO selling boilers that deviated from Annex I by having (among other features) full membrane walls.

VEO understood that EPTI was giving express consent on each occasion when it utilized the non-conforming designs received from EPTI.  In particular, in a March 30, 2004 letter to EPTI, VEO stated that "[t]o date no changes have been made without EPTIs knowledge."  In that regard, when notifying EPTI of sales, VEO disclosed in writing that it was selling 100% full membrane boilers, which disclosure was unnecessary if that feature was permitted under the License Agreement.  The Parties did not execute a written document that

PTDATA 303225_1

prospectively gave VEO the right to include membrane technology or otherwise deviate from Annex I without the licensor's consent.

In the Summer 2003, White's position with EPTI was eliminated. He then joined VEO as General Manager, and his responsibilities included managing the License Agreement for VEO.

On March 26, 2004 (approximately one year after VEO began selling Keystone® boilers), EPTI formally notified VEO of concerns that it had with VEO's performance under the License Agreement. In particular, EPTI stated the following:

> **VEO currently licenses only the M series product line which has a very specific geometry and characteristics**. …. In review of some of the VEO recent projects and proposals, **it appears that the majority of projects that VEO is pursuing or has completed have been outside the definition of the license agreement.** Of particular concern most recently are the OXY and Dallas Ft. Worth Airport projects which are well outside the bounds of the products defined in the agreement. **VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement. (Annex 1 of the current agreement provides a clear definition of the M-Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design**.)"

VEO – through Mark White in consultation with John Viskup and after two drafts of the letter over six days -- responded as follows:

> **"The Agreement does provide specific geometry and characteristics** but also allows for improvements, refer to Clause 13. **As such, VEO has made improvements** which are necessary to offer/provide a Keystone® boiler that is technically compliant with our customers requirements, is inline with that of our competitors offerings and as we deem necessary to enhance our overall success.
>
> The Oxyvinyls Project includes two (2) 15M Series Keystone® boilers **each of which include membrane furnace and outer walls, watercooled front and rear and an upper drum size of 60" ID. These features are outside the**

PTDATA 303225_1

**geometry and characteristics of the License but are clearly improvements.**"
(Emphasis added)

White's statement that the Agreement "does provide specific geometry and characteristics" referred to Annex 1.  VEO thus admitted that Annex I contained "specific geometry and characteristics" and that "membrane furnace and outer walls, watercooled front and rear walls (which are not identified in Annex I) are "outside the geometry and characteristics of the License."  VEO also admitted that a change in the size of a component (e.g., the upper drum) also was "outside the geometry and characteristics" of Annex I.  VEO did not advise EPTI of any error in its March 30 letter while EPTI was licensor, although in this lawsuit VEO has admitted that it did not make any "improvements" or "modifications" to the boilers under the License Agreement (such that the reference in the March 30 letter to membrane walls as an "improvement" was erroneous).

At that time, EPTI also requested copies of VEO's sales and marketing materials so that EPTI could review VEO's use of the Keystone® trademark and description of the licensed product.  VEO refused to provide that documentation to EPTI.  VEO in fact had copied the sales brochure of an EPTI predecessor (Zurn Industries), stating or implying that it owned the entire Keystone® line and had complete right to all design features associated with Keystone® boilers.

EPTI at the time contacted counsel about its concerns, but EPTI did not pursue litigation because of its bankruptcy and its efforts to sell the assets.  EPTI had its outside counsel send correspondence to VEO advising that VEO must comply with the Agreement.  EPTI did not give consent to VEO to sell boilers that deviated from Annex I after sending the March 26, 2004 letter.

PTDATA 303225_1

### 3.    VEO's Attempt to Purchase The Keystone® Technology from EPTI

In Spring 2004, VEO contacted EPTI about purchasing the Keystone® technology and trademark (or at least obtaining a perpetual license).  White of VEO negotiated with Bob Gdaniec of EPTI, and they both had been involved with creation of Annex I.  VEO offered to pay EPTI $500,000 for the Keystone® technology and the right to the Keystone® name.  The Parties could not, however, reach an agreement because EPTI was willing to sell on the Standard M-Series technology and refused to sell the entirety of the Keystone® technology.

VEO advised EPTI that it would not purchase just the Standard M-Series and that it wanted the complete "O" technology, including customized designs beyond the M-Series.  In a March 24, 2004 email, Mark White of VEO stated that "[i]t has always been the intention of VEO to purchase the 'O' boiler technology **which includes the 'M' Series boilers**.  The purchase of the 'O' Series would enable VEO to be the sole and exclusive owner of the technology up to the capacity range."  (emphasis added)  VEO and White thus confirmed their recognition that the M-Series was a subset of the overall Keystone® technology.   VEO also insisted on a "perpetual license for use of the name 'Keystone,'" demonstrating its recognition of the value of the Keystone® trademark.

EPTI, through Gdaniec, refused to sell the O boiler technology sought by VEO.  The "technology that is available for sale at this time is limited to **just the standard M series boilers which is the basis for the current license agreement**."  (emphasis added)  As an alternative (or in conjunction with a sale of the Standard M-Series), EPTI offered to enter an expansion of the License Agreement that would include features such as membrane walls.  Gdaniec described the "current license" and the proposed "new agreement."  As to the "current license," it "provides VEO the right to market and manufacture the standard M series product

within a defined size and capacity range with an extension to permit addition of superheaters to the standard line."  As to the "new agreement," the

> "extended license option … [would] expand[] availability of the products **to the full O boiler line** and D boiler line within a defined size and capacity range while preserving the original agreement scope and general conditions.   This would give VEO access to a wide range of sizes, pressure and temperature capacity, **the use of welded wall construction** as well as provide access to steam purity equipment **which is not part of the current license agreement scope**. … "[The] purchase option … would give VEO 'ownership' of part of the O boiler product line as well as selected parts of the D boiler line.  This would be specifically the standard M series boiler and the executed D boiler project .…"

(Emphasis added)  Because VEO could not acquire the full O boiler line, the negotiations ended. VEO did not dispute EPTI's description of the scope of the Agreement during the negotiation of the proposed sale and/or extension of the Agreement.

### 3.    VEO's Performance While IKE Was Licensor

IKE became licensor on September 8, 2004 when it acquired the entire Keystone® technology and the trademark during EPTI's bankruptcy.  IKE immediately notified VEO that it must comply with the terms of the Agreement, including that it must confine its sales efforts to the Standard M-Series that included tangent tube boilers as defined in Annex I and reiterated by EPTI at different times.

VEO refused to confine its sales to boilers within the scope of Annex I, and it sold at least 13 non-conforming boilers while IKE was licensor that utilized the designs provided by EPTI on a case-by-case basis and for which consent had been rescinded.  All of those boilers deviated from Annex I and included, among other features, membrane walls – the very features that EPTI and IKE notified VEO that it could not include.  Unlike with EPTI, VEO's Unit Sales Notifications to IKE did not disclose that VEO was selling boilers with membrane walls.  VEO

PTDATA 303225_1

also used the Keystone® trademark in connection with making those sales and submitting various unsuccessful proposals for non-conforming boilers.

VEO's website, sales proposals, and marketing materials utilized the Keystone® trademark throughout the time IKE was licensor.  VEO's proposals and brochures included features (such as membrane walls) that were not included in Annex 1 and were the subject of letters from EPTI and IKE advising VEO of limitations on what VEO could sell.  IKE did not authorize VEO to use the Keystone® name on products outside the scope of the Agreement.

### 4.    Legal Contentions Based On Sale Of Boilers Outside The Scope Of The License Agreement

Based on VEO's sale of boilers outside the scope of the License Agreement, IKE asserted claims for trademark infringement (Count I), trademark dilution (Count II and III), misappropriation of trade secrets under the Uniform Trade Secrets Act (Count IV), unfair competition (Count V), and unjust enrichment (Count VI).  The trademark claims arise because VEO used the Keystone® trademark in connection with the marketing and sale of Keystone® boilers that were outside the scope of the License Agreement and that it therefore had no right to sell.

### a.    Legal Issues Concerning Scope of License Agreement

In issuing its ruling on the parties' respective summary judgment motions on May 10, 2006, the Court found that the License Agreement is ambiguous as to the definition of the licensed product.  In particular, the Agreement was ambiguous as to whether VEO could sell boilers that deviated from the design contained in Annex I.  VEO has argued that the reference in Paragraph 1(a) of the License Agreement that the licensed "Products shall include but not be limited to the items set forth in Annex 1" gave it the right to sell boilers that deviated from

PTDATA 303225_1

Annex I.  As a result, there will be a factual issue for the jury as to what the parties intended to license as of the time the parties entered the Agreement.

There also is a legal issue of whether EPTI and IKE could revoke the prior consent EPTI gave to VEO to sell non-conforming boilers.  A waiver of a contract provision — such as the provision in Annex 1 limiting the License Agreement's scope to Standard M-Series boilers with tangent tube walls — may be revoked as to executory portions of the contract "by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."  13 Pa. C.S. § 2209(e); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 150, cmt. c (same); RESTATEMENT (SECOND) OF CONTRACTS § 150, cmt. e (explaining that, unlike a new interpretation of the contract based on course of performance, contract rights waived through course of performance are "subject to the possibility of reinstatement").  The executory portion of the Agreement was future boiler sales, and both EPTI and IKE gave such notification – in writing – to VEO.  Moreover, EPTI's ability to rescind its limited, case-by-case waiver is supported by Clause 24(b) of the License Agreement, which provides that no waiver of a past breach by either party "shall operate or be considered as a waiver of any other subsequent breach."  VEO thus had no right to expect that past permission to sell boilers beyond the scope would extend to future boiler sales.  Similarly, Clause 24(a) provided that "no subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms contained herein provided and executed with the same formalities as this Agreement."  Yet, there was no written modification (other than the 2/27/03 Addendum) permitting VEO to sell membrane wall boilers or otherwise deviate from Annex 1.  If the Agreement is governed by the UCC, this is fatal to any modification claim as a result of the requirement in the Agreement that

any modification be in writing.  A "signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded."  13 Pa. C.S. § 2209(b).

### b.    <u>Trademark Claims</u>

Trademark infringement occurs when the defendant employed a trademark so similar to that of the plaintiff that the public will mistake the defendant's products for those of the plaintiff.  *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980).  Similarly, "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement."  *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir.1975).  The unauthorized use of a trademark which has the effect of misleading the public to believe that the "user is sponsored or approved by the registrant" may constitute infringement.  *Id.*  To prove trademark infringement, IKE must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by IKE; and (3) VEO's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.  *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (*citing Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir. 1990)).

The first two requirements, validity and legal protectability, are proven where, as here, the mark is federally registered and has become "incontestable" under the Lanham Act, 15 U.S.C. §§ 1058 and 1065.  *Id.* at 194.   IKE owns the Keystone® trademark, which has been registered with the United States Patent and Trademark Office at No. 554,723, and has been continually in use by IKE, EPTI and its predecessors since at least February 12, 1952.

PTDATA 303225_1

As to the third requirement, likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co. v. Summit Motor Products, Inc.*, 30 F.3d 466, 472 (3d Cir. 1991); 15 U.S.C. § 1114(1)(a). The statutory requirement of "confusion" refers to confusion as to the source, origin, or sponsorship of the goods or services associated with the mark. 15 U.S.C. § 1125. Although proof of actual confusion is not necessary, IKE has the burden of proving the likelihood of confusion and not the mere possibility of confusion. *A&H Sportswear v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 201 (3d Cir. 1999). When the trademark owner and the "alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). If the infringing party uses an identical or nearly identical mark on directly competing goods, there is ordinarily a likelihood of confusion. *Id.* at 463 (*citing American Plan Corp. v. State Loan & Finance Corp.*, 365 F.2d 635, 639 (3d Cir. 1966), *cert. denied*, 385 U.S. 1011, (1967)). Likelihood of confusion can be found as a matter of law in trademark infringement action if the defendant intended to derive a benefit from the trademark. *Amstar v. Domino's Pizza*, 615 F.2d 252, 263 (5th Cir. 1980), *cert. denied*, 449 U.S. 889 (1980). Because VEO sought to derive profits through the use of IKE's Mark in connection with the sale of Keystone® boilers outside the scope of the License Agreement -- after EPTI retracted its consent and IKE refused to consent -- there was a likelihood of confusion as a matter of law because VEO used the identical mark on a competing product. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) ("We perceive that there is great likelihood of confusion when an infringer uses the exact trademark [of its former licensor]."); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997) ("proof of

PTDATA 303225_1

continued, unauthorized use of an original trademark by one whose license to use the mark has been terminated is sufficient to establish 'likelihood of confusion'"); *Villanova University v. Villanova Alumni Educ. Found.*, 123 F. Supp.2d 293, 309 (E.D. Pa. 2000) (The unauthorized use of a registered mark by a former licensee has been described as "a fraud of the public, since they are led to think that the ex-licensee is still connected with the licensor.").  In this regard, the likelihood of confusion exists as a *matter of law* if a licensee continues to use marks owned by the licensor after termination of the license."  *Burger King Corp. v. Mason*, 710 F.2d at 1492-93 (emphasis added).

VEO's sales brochures and proposals also amounted to express reverse passing off to the extent they referred to "Victory boilers" and VEO designs in violation of 15 U.S.C. § 1125(a), which prohibits false designations of the origin of goods.  McCarthy on Trademarks § 25:6 ("'Express reverse passing off' occurs when defendant falsely takes credit for another's goods or services.  It can occur, for example, if the defendant removes or obliterates the original trademark without permission and re-brands the item with defendant's own mark.").

### c.     Misappropriation of trade secrets claim

The overall design and assembly of the Keystone® boiler, as well as the customized designs utilized by VEO, are trade secrets because they have economic value and are not in the public domain or readily accessible by proper means.  VEO misappropriated that technology by using it for customized boilers after EPTI and IKE instructed VEO not to do so.  VEO had been given limited authorization to use those designs, and it was improper for VEO to continue its use after permission was rescinded.

PTDATA 303225_1

### d.    Unfair Competition and Unjust Enrichment

Regardless of whether the Keystone® technology is a trade secret, VEO engaged in unfair competition and was unjustly enriched by selling boilers outside the scope after EPTI and IKE instructed it not to do so.  VEO did not independently develop the designs, and IKE did not permit VEO to incorporate the technology into its Voyager boiler.  VEO thus was able to avoid having to expend significant resources to acquire or develop the technology it copied, and it gained a competitive advantage by misappropriating technology that it unsuccessfully sought to purchase and that IKE had to purchase.  If a plaintiff's established business practices, processes, methods, and, ultimately, his capital investment are usurped by a defendant without a license or consent, this is unfair competition.  *Pottstown Daily News Publishing Co. v. Pottstown Broadcasting Co.*, 411 Pa. 383, 394 (1963).

The elements for trademark infringement and unfair competition are identical. *Scott Felzer Co. v. Gehring*, 288 F.Supp.2d 696, 703 (E.D. Pa. 2003); *Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp.2d 567, 580 (E.D. Pa. 2002).  The Third Circuit has previously held that the elements of federal unfair competition and Pennsylvania unfair competition are similar as well.  *Browning King Co. v. Browning King Co.*, 176 F.2d 105 (3d Cir. 1949).  Moreover, a claim of unfair competition inherently encompasses trademark infringement, but also includes a broader ranger of unfair practices which may include the misappropriation of the skill, expenditures and labor of another.  *Murphy Door Bed Co. v. Interior Sleep Systems*, 874 F.2d 95, 102 (2d Cir. 1989).

### B.    VEO's Incorporation of Keystone Technology Into Its Voyager Line Of Boilers

As a result of entering the License Agreement, VEO received proprietary technology for the design, manufacture, and assembly of Keystone® O-type watertube boilers

PTDATA 303225_1

for both the Standard M-Series boiler (the boiler within the scope of the License Agreement) and for customized boilers (technology outside the scope of the License but for which VEO received consent on a case-by-case basis). The License Agreement limited VEO's use of the technology to the duration of the license, and it further contained a secrecy provision that prohibited VEO's disclosure of the technology. The Keystone® drawings supplied by EPTI to VEO, as well as the drawings of Keystone® boilers created by VEO, included legends on them concerning the proprietary nature of the drawings and that they were not to be disclosed to third parties. VEO's right to use the technology expired with the Agreement in January 2006.

In the Spring 2004, VEO attempted to purchase the full range of Keystone® technology for $500,000, but EPTI refused to sell the technology. EPTI was willing to sell only the Standard M-Series technology, but VEO was unwilling to purchase only that limited technology.

As the license period progressed, VEO held itself out to the public as owning the Keystone® technology, and it reduced its references to EPTI and even to the Keystone®. Although VEO's sales proposals initially referenced that it licensed the technology from EPTI, VEO's proposals stopped disclosing that it sold the boilers pursuant to a license. Its proposals then began to refer to the designs as Victory designs and to the boilers as Victory boilers, implying that Victory had developed and owned the boiler technology. In fact, toward the end of the license term, certain proposals had no reference at all to Keystone® and described the boilers such as a "Victory 15M" rather than Keystone® 15M. And Victory failed to include the Keystone® name on the boilers despite a contractual obligation to do so. Those facts demonstrate that VEO was seeking to portray to the marketplace that it owned the boiler designs that had been licensed by EPTI.

PTDATA 303225_1

In September 2004, EPTI sold all of the Keystone® technology to IKE, which therefore became the owner of the technology and replaced EPTI as the licensor for the balance of the License Agreement.  IKE promptly notified VEO that it must confine its activities to the scope of the Agreement as set forth in Annex I, which was the same scope identified by EPTI in its March 26, 2004 correspondence to VEO.  IKE never gave consent to VEO to deviate from the scope of Annex I or to utilize the technology for any purpose other than the sale of licensed boilers.

When VEO learned at or about that time that IKE had acquired the Keystone® technology, VEO promptly began to develop its own line of boilers, which eventually became known as the Voyager.  Although there are A-type and D-type boilers in the marketplace, VEO elected to develop an O-type boiler like the one that is the subject of the License Agreement. The individual responsible for developing the Voyager was Mark White, who had worked for EPTI, had access to all of the Keystone® designs and software in his office and on VEO's network, and who was not an engineer.  Although VEO had a Chief Engineer (Trent Miller) who participated in the design of HRSGs, VEO did not utilize that individual to develop the initial designs for the Voyager.  Rather, Mark White alone performed that function without disclosing that activity to the Chief Engineer.  Miller eventually participated in the design process, as did a draftsman named Carl Logan.  Of course, both Miller and Logan had access to, and in fact utilized, Keystone® designs in manufacturing Keystone® boilers at the same they were working on the Voyager design.  VEO began marketing its untested Voyager boilers within days of expiration of the License Agreement.

VEO is still developing its Voyager designs, which to IKE's knowledge have not been finalized.  However, based on the designs that VEO has provided to IKE in discovery, VEO

has copied – without permission -- significant aspects of the Keystone® design, including the

front wall, rear wall, furnace walls, outer walls, membrane walls, lifting lugs, general notes on

drawings, and assembly sequences.  Comparison of Voyager drawings against Keystone®

drawings (which in many instances have identical text and the same or substantially similar lay-

out) demonstrates that copying has occurred.  IKE has retained an expert (Robert V. Seibel,

P.E.), who was involved with development of the Keystone® and who has determined that

copying occurred to the great benefit of VEO.  IKE also has had one of its engineers (Martin

Swabb, P.E., who also was involved with the development of the Keystone® while employed by

IKE's predecessors) analyze the Voyager designs, and he too has concluded that VEO copied

Keystone® designs.  Both prepared expert reports.

In short, after VEO unsuccessfully sought to buy the Keystone® technology from

EPTI in Spring 2004 and then learned that IKE had successfully purchased that technology, VEO

unilaterally and improperly decided to steal significant aspects of the technology by

incorporating it into the Voyager so that VEO would not have to expend its own resources and

undertake the risk to develop designs and drawings for those features.

Based on VEO's unauthorized incorporation of Keystone® design features into

the Voyager, VEO has engaged in reverse passing off in violation of the Lanham Act (Count I),

misappropriation of trade secrets (Count IV), unfair competition (Count V), and unjust

enrichment (Count VI).  Although VEO has asserted that the design concepts utilized in the

Keystone® are in the public domain, the specific Keystone® designs are not, and IKE and its

predecessors took reasonable measures to protect the designs.[1]  Moreover, even if the designs are

---

[1]    Although VEO has asserted that the Keystone® designs are in the public domain, VEO
has designated the identical designs as being confidential and proprietary, confirming that
they are not publicly known.

PTDATA 303225_1

not trade secrets (which is denied), they are still proprietary, as evidenced by the fact that VEO sought to purchase those designs in the Spring 2004 from EPTI and by the proprietary stamps on the drawings. VEO's use of those designs without permission to develop its own boiler line represents unfair competition and unjust enrichment.

## II.    Damages

IKE seeks an injunction barring VEO from incorporating any Keystone® technology into the Voyager boiler. In addition, IKE seeks the damages described below. IKE cannot yet quantify VEO's profits because VEO failed to produce documents concerning its sales of boilers during the License Agreement while IKE was licensor and concerning its Voyager sales. IKE will timely supplement its damages upon receiving that documentation.

### A.    Trademark Claims: Under the Lanham Act, Plaintiff can recover VEO's profits, Plaintiff's own lost profits, and the costs of the action. (15 U.S.C. §§ 1114, 1117). Plaintiff elects to recover VEO's profits. In proving profits, Plaintiff simply has the burden to prove VEO's revenues; the burden to prove offsetting costs is on VEO. In addition, the Court is empowered to increase damages up to three times the actual damages, and increase "profits" to "such a sum as the court shall find to be just." The Court may include attorneys' fees in "exceptional cases," which, according to the legislative history, include "infringement cases where the acts of infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful,'" S. Rep. No. 93-1400, at 2 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7133 (*cited* in *SecuraComm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 280 (3d Cir. 2000) (other portions of which overruled in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 171 (3d Cir. 2005)). These awards are "subject to the principles of equity." Those standards are met here,

and the Court should both treble damages and award Plaintiff its attorneys' fees. Violations of

Section 43(a) (Section 1125(a)) do not need to be willful to trigger the enhancements of Section

1117(a). *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 171 (3d Cir. 2005) ("This appeal

requires us to decide whether a showing of willful infringement is a prerequisite to an accounting

of a trademark infringer's profits for a violation of section 43(a) of the Lanham Act. We hold

that wilfulness [sic] is an important equitable factor but not a prerequisite to such an award,

noting that our contrary position in *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d

182, 190 (3d Cir. 1999), has been superseded by a 1999 amendment to the Lanham Act.").

Finally, Plaintiff seeks an injunction against VEO's use of the Keystone® technology.

The damages based on VEO's profits are determined by adding together the sales

price of each Keystone® boiler sold while IKE was licensor. Damages will be proven by

stipulation with VEO as to the sales prices of the boilers or by calling a VEO representative to

testify to those amounts, including the purchase orders or invoices, if necessary.

The damages associated with VEO's sale of Voyager boilers is derived by adding

together the sales price of each Voyager boiler sold by VEO. Damages will be proven by

stipulation with VEO as to the sales prices of the boilers or by calling a VEO representative to

testify to those amounts.

IKE also seeks statutory damages of up to $1,000,000 pursuant to 15 U.S.C. §

1117(c) based on VEO's willful use of the Keystone® trademark in proposals for boilers outside

the scope of the License Agreement while IKE was licensor.

PTDATA 303225_1

IKE will submit the amount of its attorneys' fees in the event the Court determines that such an award is proper.

**B.**    **Misappropriation of Trade Secrets:**  Plaintiff seeks to recover the unjust enrichment conferred on VEO from its improper use of licensor's technology and thus VEO's profits for boilers sold while IKE was licensor and for all Voyager boilers.  12 Pa.C.S. § 5304(a). Because VEO's conduct was willful and malicious, Plaintiff also asks that the Court award exemplary damages by doubling the amount awarded by the jury.  12 Pa.C.S. § 5304(b).

The damages associated with VEO's sales outside the License Agreement are derived by adding together the profit realized by VEO on each Keystone® boiler sold while IKE was licensor.  Damages will be proven by stipulation with VEO as to the profits of the boilers or by calling a VEO representative to testify to those profits.  IKE also has an expert who will analyze VEO's profits upon VEO's production of the remaining sales documentation and will give testimony concerning those profits.

The damages associated with VEO's sale of Voyager boilers are derived by adding together the profit realized by VEO on each Voyager boiler sold by VEO.  Damages will be proven by stipulation with VEO as to the profits of the boilers or by calling a VEO representative to testify to those profits.  IKE also has an expert who will analyze VEO profits and will give testimony concerning those profits.

**C.**    **Unfair Competition:**  Plaintiff seeks VEO's profits for all boilers sold while IKE was the licensor and for all Voyager boilers.  The damages are the same as for misappropriation of trade secrets.  Damages will be proven by stipulation with VEO as to the profits of the boilers

PTDATA 303225_1

or by calling a VEO representative to testify to those profits.  IKE also has an expert who has

analyzed VEO profits and will give testimony concerning those profits.

"The trading on another's business reputation by use of deceptive selling practices

or other means is enjoinable on the grounds of unfair competition. If the particular use in

question is reasonably likely to produce confusion in the public mind, equity will restrain the

unfair practice and compel an accounting of the profits gained thereby." *Pennsylvania State

Univ. v. University Orthopedics*, 706 A.2d 863, 871 (Pa. Super. Ct. 1998) (citation omitted).

D. **Unjust Enrichment:**  Plaintiff is entitled to restitution from VEO, which is the

value of the benefit to VEO.  Here, that equates to its profits on non-conforming boilers because

VEO would not have made the boiler sales and earned a profit on those boilers without use of the

technology outside the scope of the license. *Zurich General Acci. & Liability Ins. Co. v. Klein*,

181 Pa. Super. 48, 51 (Pa. Super. Ct. 1956); Restatement, Contracts, § 468(3); Restatement,

Restitution, § 155(1); *West v. Peoples First Nat'l Bank & Trust Co.*, 378 Pa. 275, 286 (Pa. 1954).

 "Unjust enrichment" is an equitable doctrine. *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328

(Pa. Super. 1995), citing *Styler v. Hugo*, 619 A.2d 347 (Pa. Super. 1993).  Pennsylvania courts

have described the elements of unjust enrichment as (1) benefits conferred on defendant by

plaintiff, (2) appreciation of such benefits by defendant, and (3) acceptance and retention of such

benefits under such circumstances that it would be inequitable for defendant to retain the benefit

without payment of value. *Id.*, citing *Wolf v. Wolf*, 514 A.2d 901 (Pa. Super. 1986), overruled on

other grounds, and *Van Buskirk v. Van Buskirk*, 590 A.2d 4 (Pa. 1991); *See also Burgettstown-

Smith v. Langeloth*, 588 A.2d 43 (Pa. Super. 1991).  "Where unjust enrichment is found, the law

implies a contract, referred to as either a *quasi contract* or a contract implied in law, which

requires that the defendant pay to plaintiff the value of the benefit conferred.  In short, the defendant makes restitution to the plaintiff in *quantum meruit*." *Id.* at 328-329, citing *Chesney v. Stevens,* 644 A.2d 1240 (Pa. Super. 1994) and *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 449 (Pa. 1969).  The damages are the same as for misappropriation of trade secrets, unfair competition, and unjust enrichment.  Damages will be proven by stipulation with VEO as to the profits of the boilers or by calling a VEO representative to testify to those profits.  IKE also has an expert who has analyzed VEO profits and will give testimony concerning those profits.

## III.    <u>Witnesses</u>

Plaintiff's potential witnesses for its case-in-chief are identified in Exhibit A. Plaintiff reserves the right to call anyone listed on Defendant's witness list, as well as other witnesses for rebuttal or impeachment.  The expert report of Robert V. Seibel is attached as Exhibit B.  Plaintiff will submit the expert report of its damages expert upon VEO turning over the documents pertaining thereto.

IV.     **Exhibits**

Plaintiff's exhibits are identified on Plaintiff's Exhibit List, which is attached hereto as Exhibit C.  Plaintiff incorporates by reference the exhibits on Defendant's Exhibit List to the extent there is no objection to those exhibits by Plaintiff.

Respectfully submitted,


____/s/____Robert J. Williams_____

John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Gerald F. DeNotto
600 North Buffalo Grove Road, Suite 300
Buffalo Grove, IL 60089
Telephone: 847-520-3212
Facsimile: 847-520-3235

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC


Dated:  December 1, 2006.

PTDATA 303225_1