**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

INDECK KEYSTONE ENERGY LLC,         :
                                    :
   Plaintiff,       :
                                    :
  v.                      :    Civil Action No. 04-325 Erie
                                    :
VICTORY ENERGY OPERATIONS           :    Judge Sean J. McLaughlin
LLC,                                :
                                    :
   Defendant        :
                                    :
                                    :    JURY TRIAL DEMANDED

## DEFENDANT'S PRETRIAL STATEMENT

### Introduction

   Defendant Victory Energy Operations LLC ("VEO"), by its undersigned

counsel, hereby submits its Pretrial Statement.

**I. NARRATIVE STATEMENT OF MATERIAL FACTS RELATED TO
PLAINTIFF'S COMPLAINT**

   The claims in Indeck Keystone Energy LLC's ("IKE") Complaint and

Counts I and VII of Victory Energy Operations LLC's ("VEO") Second Amended

Counterclaim turn on two distinct but related issues: 1) whether the License Agreement

("Agreement") granted to VEO the right to build and sell boilers with membrane walls,

and 2) whether VEO utilized any non-public, proprietary technology in developing and

building its Voyager boilers.

  **A. The License Agreement**

   The Agreement authorized VEO to design, manufacture, market and sell

industrial, natural circulation water tube steam generators with a steam capacity of

between 29,000 and 150,000 pounds per hour of steam.  VEO's authorization included,

but was not limited to, the M Series Keystone boilers generally described in Annex I. The Annex does not state anywhere that M Series boilers must have furnace and outerwalls made of tangent tubes, rather than membrane wall construction. In fact, the only reference to tangent tube walls in the Agreement is in an illustrative drawing on a single page of Annex I. The Agreement authorized VEO to sell Keystone boilers from 29,000 to 150,000 pph, including boilers with membrane walls. The Agreement defines Products broadly enough to allow VEO to sell membrane wall boilers. Moreover, VEO was authorized to modify and improve the boilers. Although VEO contends that membrane walls were not an improvement because they were part of the technology transferred to VEO under the Agreement, in any event membrane walls clearly constitute an enhancement or improvement over the antiquated tangent tube design that IKE claims was the only design permitted under the Agreement.

In addition to being contrary to the plain language of the Agreement, IKE's interpretation is the classic "bait and switch" scenario. The evidence shows that VEO justifiably believed and understood that it was entering into an agreement to allow it to design, build and sell Keystone boilers with membrane walls so that it could compete effectively in the marketplace. Boilers with membrane walls are the standard in the industry.

The License Agreement's language supports VEO's interpretation. The definition of "Products" shows that the parties clearly the Agreement to provide a framework, but not for that framework to be rigid. The parties' primary concern was to delineate the steam capacity range for VEO. The Agreement provides that, "Products shall mean natural circulation, industrial water tube package steam generators with a

steam capacity range beginning at 29,000 pph up to and including 150,000 pph. Products shall include, but not be limited to the items set forth in Annex I." Beyond that, the parties understood that the term "Products" encompassed items of the same general class or type as those described in Annex I. In other words, Annex I was a guideline.

IKE incorrectly argues that Annex I must be the exclusive definition of the term "Products." Such an interpretation, however, ignores the Agreement's plain language, including the clause, "Products shall include but not be limited to the items set forth in Annex I." Recognizing that this provision vitiates its argument, IKE asserts that the Court must ignore the phrase "include but not be limited to" because a similar provision was found in an earlier license EPTI had signed with a third party. IKE does not and cannot cite any legal basis to support its claim that the language should be ignored.

IKE's impossibly narrow interpretation of the Agreement falls under its own weight. IKE asserts that Annex I defines the Products covered under the Agreement. However, Annex I on its face demonstrates VEO was expected to design each boiler to meet a customer's needs. For instance, the thermal performance characteristics for the boilers identified in Annex I are based on a set of assumptions, including that the boiler will operate in a location with an ambient temperature of 80°F at 1000' in elevation. None of the witnesses testified that VEO could only sell a boiler that would operate under those specific conditions. Similarly, VEO was free to design the boilers with appurtenant equipment, such as an economizer, despite the fact that Annex I of the Agreement does not contemplate such equipment. Similarly, the parties knew and understood that VEO

was authorized to design and build boilers with 100% water-cooled walls to meet the specifications of its customers.

IKE argues that VEO's interpretation of the License Agreement is inconsistent with the parties' February 27, 2003 Addendum to extend VEO's license to boilers with higher design pressures and allowable steam output. The Addendum, however, actually supports VEO's interpretation of the Agreement, and not IKE's. The Addendum demonstrates that the parties understood and agreed that higher design pressure and steam output temperatures were above and beyond the scope of what the parties intended in the Agreement, necessitating an amendment. By contrast, although EPTI assisted VEO in designing Keystone boilers with membrane walls from January 2003 until the time it sold its assets in August 2004, no such amendment to the Agreement was ever signed or even discussed between the parties.

The parties' inclusion of provisions for modifications and improvements further demonstrates the parties intended for VEO to sell modern, state of the art boilers under the Agreement. VEO was entitled to make modifications, including the addition of membrane walls. Clause 8a) provides in part:

> Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products. Licensee will submit to Licensor such plans for modifications for prior written approval by Licensor except for the alterations as defined in Clause 3 (e). Upon reasonable request by Licensee, Licensor will give special engineering advice regarding planning, design, manufacturing, installation or operation of Products by Licensee at licensor's applicable service rate in effect at the time service is rendered.

EPTI provided VEO with drawings for welded/membrane walls at VEO's request that VEO utilized in the design of Keystone® boilers.

4

EPTI's assistance in providing the membrane wall drawings and support fall clearly within the confines of Clause 3e), which authorized VEO to modify the Products. VEO made no modifications that diminished any Keystone boiler's reliability or performance. Having provided VEO with the authorization to modify the boilers to include 100% membrane walls, EPTI clearly approved of the reliability and performance of that enhancement. IKE has failed to demonstrate or even allege that VEO's inclusion of membrane walls negatively impacted the boilers' reliability or performance. As such, IKE cannot claim that VEO failed to obtain consent for the alleged modifications it made to the design of the Products. Therefore, even if the term "Products" did not encompass Keystone boilers with membrane walls, VEO was authorized to make modifications, such as adding membrane walls, increasing boiler length, or increasing steam drum diameter, because EPTI supplied those modifications.

Similar to modifications, the Agreement allows VEO to make improvements to the products. VEO does not consider membrane walls to be an improvement because EPTI provided that information to VEO pursuant to the Agreement, and the Agreement defines "improvement" as "all modifications, variations, revisions and enhancements of the Products, or methods or processes for manufacturing the Products, and all Technical Information relating thereto...." If, as IKE argues, membrane walls were not part of the technology transferred to VEO under the Agreement, VEO was still free to use membrane walls as an improvement under the agreement, because VEO was entitled to utilize any "modifications, variations, revisions and enhancements of the Products . . . which either Licensor or Licensee may develop,

acquire, or acquire control of and commercially exploit during the term of this Agreement. . . ." (License Agreement, Clause 1.h).

**B.      The Parties' Course Of Dealing**

VEO marketed, built and sold boilers with membrane walls for the first 18 months of the Agreement with the Licensor's knowledge and consent. When EPTI sold its assets in August 2004, its president represented and acknowledged that he knew of no infringements of any intellectual property and no breaches of any license agreements. Two days after becoming licensor, IKE tried to rewrite the Agreement to lock VEO out of the marketplace. If the Agreement did not permit VEO to sell boilers with membrane walls, VEO would be unable to sell them at all, given the Agreement's provision precluding VEO from offering for sale any competing products. Accordingly, under IKE's tortured version of the facts, VEO licensed worthless technology and paid $50,000 for the right to design, market and sell a commercially unviable product.

**1.      The Pre-Execution Negotiations Between EPTI and VEO Reveal That Both Parties Understood And Agreed VEO Would Build And Sell Keystone Boilers With Membrane Walls And Similar Modern Attributes.**

EPTI and VEO's negotiations reveal that the parties clearly intended to allow VEO to build and sell Keystone boilers with membrane walls and other modern attributes necessary in a competitive market. Mark White, Shawn Brewer and John Viskup, the only individuals who participated in negotiations, testified they understood that Annex I was merely a guideline, a starting point for the parties to use. In addition, during negotiations Mark White and Shawn Brewer discussed that the Agreement would include membrane wall boilers, and John Viskup discussed membrane wall boilers with

Mark White. Mark White agreed and understood that the definition of Products included membrane wall technology.

IKE's Pretrial Statement discusses internal EPTI correspondence between Mark White and various engineers, attempting to show that certain EPTI engineers understood that membrane walls were outside the scope of the License Agreement. But this correspondence is wholly irrelevant to the parties' mutual understanding of the scope of the Agreement. Mark White was the authorized EPTI representative who negotiated the Agreement, and was the designated contact person at EPTI regarding the Agreement with VEO until August 2003. Mark White **never** told any VEO representative that VEO could not design, manufacture, market or sell Keystone Boilers with membrane walls. Moreover, the only instance where an authorized EPTI representative expressed in correspondence that EPTI believed membrane walls were outside the scope of the License, Mark White responded for VEO and explicitly rejected that position.

### 2. The Parties' Course Of Performance Reveals They Understood The Agreement Allowed VEO To Sell Membrane Wall Boilers.

The clearest of course of performance evidence demonstrating the parties' understanding of the Agreement logically occurred closest in time to the Agreement's execution, when the parties' understanding of the Agreement was foremost in their minds. Shortly after executing the Agreement, VEO sold three 15M boilers to Broin Industries for the Iowa Ethanol plant. Each boiler was designed and rated with EPTI's help and assistance and included membrane walls. EPTI invoiced VEO for the three Broin boilers, and VEO paid EPTI the royalty set forth in the Agreement. If these transactions were truly outside the scope of the Agreement, as IKE argues, EPTI would have refused to assist VEO, as EPTI did when VEO requested the opportunity to market

D-Style Keystone boilers.  Alternatively, the parties would have entered into a separate

agreement, as contemplated in Clause 1a), and as the parties did when VEO sought

projects involving boilers above 150,000 pph for the University of Notre Dame and the

University of Massachusetts.  The absence of a separate agreement or addendum, coupled

with the fact that VEO invoiced and was paid for the boilers pursuant to the Agreement,

confirms that EPTI knew and understood VEO was authorized to build membrane wall

boilers under the Agreement.

       In Annex I, the "Description of Products" identified the "M Series

Keystone water tube boilers to include the 8M . . .22M."  There is no evidence to support

the claim that anyone at VEO believed or understood that an M-Series Keystone Boiler

could not include membrane walls.  In fact, EPTI engineers admitted that the term "M-

Series Keystone Boiler" has no clear meaning outside of EPTI.  Moreover, there are

multiple examples both before and during the term of the Agreement where EPTI

engineers referred to M-Series boilers with membrane walls.

       The Agreement required that the Licensor, EPTI, provide VEO with sales

materials and aid VEO in developing its own marketing materials.  Mark White, as the

authorized EPTI representative, supplied a draft Keystone Sales Manual and a related

power point presentation to VEO in March 2003.  These materials show 100% membrane

wall construction (i.e. membrane furnace and convection walls, a water-cooled

membrane rear wall, and a water-cooled burner throat front wall) as an available option

on Keystone M Series Boilers.  Mark White helped VEO develop its own sales brochure

and manual and approved the final version that included diagrams and descriptions of

membrane walls as available features on VEO's Keystone boilers.  Similarly, the

Keystone Design Guide provided to VEO shows welded front and rear walls as an option for M-Series Keystone boilers.

IKE's interpretation of the Agreement is also contradicted by the simple reality of the state of the art in the boiler industry. IKE has grossly mischaracterized the marketability of tangent tube boilers to U.S. customers. Steve Bernatowicz, an EPTI engineer charged with assisting VEO in designing Keystone boilers, testified that by 1990 or 1991, EPTI's predecessor had stopped selling tangent tube boilers, added economizers and added membrane walls to improve emissions and reduce refractory. Mr. Bernatowicz testified further that he did not believe VEO could sell M-Series Keystone boilers without revising the design to meet customer specifications. The boilers would be too large, would waste fuel, and would not be economical.

The March 26, 2004 letter from Robert Gdaniec to Mark White at VEO does not show that EPTI interpreted the Agreement consistent with IKE's current position. First, EPTI sent it 15 months after the parties entered into the Agreement. EPTI allowed those 15 months to pass without any objection and, during that time, assisted VEO in the design and rating of several membrane wall boilers. Most significantly, Mr. Gdaniec testified that he had no knowledge or evidence of any instance where VEO had modified a Keystone Boiler without EPTI's knowledge or consent.

Second, the letter accompanied EPTI's counter-offer regarding the proposed sale to VEO of some or all of the assets licensed to VEO under the Agreement. EPTI was in bankruptcy and desperately trying to drive up the value of its remaining assets in the hopes of staving off liquidation. Furthermore, EPTI's president Stephen Kang reviewed the License Agreement and could not determine whether membrane wall

boilers were included in the definition of Products, but authorized the letter to be sent anyway. Finally, VEO responded to Mr. Gdaniec's letter on March 30, 2004, specifically rejecting EPTI's position that VEO was authorized to build and sell only tangent tube Keystone boilers. EPTI never responded to Mr. White's letter. When asked why he never responded, Mr. Gdaniec stated, "[M]ost of these issues, we just said we'd just let them go by the wayside, and probably didn't follow up after that."

Mr. Gdaniec also testified that EPTI never refused to provide VEO with engineering support on boilers with membrane walls, either before or after he sent the March 26 letter. In addition, EPTI knew and understood that VEO continued to sell boilers with membrane walls after March 26, 2004. For instance, on April 23, 2004, Mark White sent EPTI three Unit Sale Notices, each specifying that VEO had sold a 100% membrane wall boiler. VEO received no objection to those sales from EPTI. Similarly, Mr. Bernatowicz assisted VEO in designing a membrane wall boiler in August 2004.

EPTI's president Stephen Kang admitted that neither he nor Mr. Gdaniec was able to conclude that VEO had breached the Agreement. Similarly, Mr. Kang reaffirmed in the purchase and sale agreement between EPTI and CMI EPTI his acknowledgement that he knew of no breaches of any EPTI license agreement, and no infringements of EPTI's intellectual property. The parties' performance during the course of the Agreement unequivocally demonstrates that EPTI and VEO agreed and understood VEO was authorized to sell Keystone water tube boilers with membrane walls from 29,000 to 150,000 pph.

C.    **VEO's Development Of The Voyager Boiler**

VEO began preliminary analysis for the development of its own O-style water tube package boilers in late 2004. VEO engineers and management have extensive experience in the boiler industry. Mark White and Trent Miller, VEO's Director of Engineering, each worked for several years at Nebraska Boiler Company, designing and selling O-style water tube package boilers. VEO's drafting department has extensive experience in drawing heat exchangers, boilers, heat recovery steam generators, and related equipment. VEO tapped into this knowledge and experience to development its new line of O-style boilers, which it ultimately named the "Voyager" boiler.

While VEO's engineers and outside consultants developed the Voyager, VEO was involved in the instant lawsuit. Cognizant that IKE might raise claims of copying or misappropriating technology, VEO personnel took great pains to avoid using the Keystone design information when developing the Voyager design, even though virtually all of Keystone's design is in the public domain and therefore not a trade secret.

Ignoring VEO's extensive efforts, IKE contends the Voyager boiler misappropriates IKE's trade secrets and otherwise "copies" IKE's design. However, IKE's two engineering experts and VEO's engineering expert all acknowledge there are many distinct differences between the Voyager and the Keystone boiler. VEO retained third party consultants to develop a thermal design program, the structural base for the Voyager, and to perform circulation studies on the Voyager design. Still, IKE claims copying of the Keystone boiler design, despite the fact its design is not patented, Keystone boilers have been sold into the stream of commerce for many years, and

nothing prevents anyone, including VEO, from taking a Keystone boiler apart, analyzing

its design and materials, and creating an exact duplicate to sell in the marketplace.

## II.    LEGAL ANALYSIS OF IKE'S CLAIMS

### A.    IKE Cannot "Revoke" The Parties' Conduct That Demonstrated Their Understanding Of The License Agreement.

Although EPTI granted VEO permission to exceed the scope of the

Agreement, IKE claims it and EPTI revoked that permission.  IKE's argument assumes,

however, that EPTI's conduct in performing under the Agreement constituted a "waiver."

But since this Court already deemed the term "Products" ambiguous, EPTI's conduct

could not have waived a known right.  Rather, EPTI's conduct would have to be deemed

evidence of the initial meaning of the terms of the Agreement.

It is a basic rule of contract construction that "a contract must be

interpreted in light of the meaning which the parties have accorded to it as evidenced by

their course of conduct in its performance."  *Capitol Bus Co. v. Blue Bird Coach Lines,*

*Inc.,* 478 F.2d 556, 560 (3d Cir. 1973).  "Whenever reasonable, the manifestations of

intention of the parties to a promise or agreement are interpreted as consistent with each

other and with any relevant course of performance."  RESTATEMENT (SECOND) OF

CONTRACTS, § 202(5).  By contrast, "where it is unreasonable to interpret the contract in

accordance with the course of performance, the conduct of the parties may be evidence of

an agreed modification or of a waiver by one party."  *Id.* § 202, comm. g.  Here, EPTI

and VEO performed the Agreement for the first 18 months, during which time VEO built

and sold several boilers, all of which were 100% membrane wall units.  Given the

Court's ruling that the term "Products" is ambiguous in the Agreement, it is reasonable to

interpret the Agreement in accordance with VEO and EPTI's course of performance of

designing 100% membrane wall boilers.  Accordingly, EPTI's conduct could not be

construed as a "waiver."

    IKE also ignores that the Agreement permitted VEO to modify and

improve the boilers.  EPTI approved those modifications pursuant to Clause 3e) by

assisting in designing and rating those boilers.  Nothing in the Agreement provides that

the Licensor can withdraw approval of a modification.  For this additional reason, there

was no "waiver" for IKE or EPTI to have revoked.

   **B.**  **VEO Detrimentally Relied Upon EPTI's Conduct In Performing**
     **Under the Agreement.**

    Even if IKE could seek to revoke EPTI's purported waiver (which it

cannot), VEO disputes IKE's contention that the permission granted by EPTI was

revocable.  Pennsylvania's statutory version of the Uniform Commercial Code recognizes

that a party cannot seek to revoke a past permission where doing so would be unjust due

to a material change in reliance on the past permission.  13 Pa. C.S. §2209(e).  Here,

ETPI authorized VEO to manufacture and sell water tube boilers with membrane walls

and similar enhancements until at least March 26, 2004, and EPTI continued to allow and

assist VEO to build Keystone boilers with membrane walls.  At the direction and with the

express permission of EPTI, VEO developed a nationwide force of sales representatives,

brochures and a manual that featured the Keystone, M-Series O-style water tube boiler,

with 100% membrane walls as an available feature.  Moreover, VEO paid technology

disclosure fees and royalty fees to EPTI during the term of the Agreement, based in part

on EPTI's continuing assistance in designing and rating Keystone boilers with membrane

walls.  It would be highly inequitable and work an undue hardship on VEO if it were

found that IKE was entitled to revoke VEO's right to build and sell membrane wall

boilers halfway through the term of the Agreement.

For the same reasons that IKE cannot revoke under Section 2209, IKE

cannot revoke EPTI's acquiescence of VEO's use of the Keystone mark on boilers with

membrane walls.  Where a trademark holder acquiesces in a party's use of a trademark,

the trademark holder may not subsequently seek to revoke that acquiescence if the

permitted user relied upon the acquiescence to its detriment.  *Pappan Enterprises, Inc. v.*

*Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3d Cir. 1998); *Analytic Recruiting, Inc.*

*v. Analytic Resources, LLC*, 156 F. Supp. 2s 499 (E.D. Pa. 2001).

**C.    VEO Did Not Infringe IKE's Marks Because It Manufactured,**
**Marketed and Sold Keystone Boilers Under A Grant of License.**

IKE's trademark infringement claim hinges on a finding that VEO sold

boilers outside the Agreement.  If the Court or jury finds the Agreement authorized VEO

to sell boilers with membrane walls, VEO's conduct could not constitute trademark

infringement.  The Agreement granted to VEO the right to build and sell water tube

package boilers with membrane walls, either under a plain reading of the term Products,

or by virtue of VEO's rights to modify and improve the Products.

IKE also cannot establish likelihood of confusion.  IKE cites three

inapposite cases to try to show likelihood of confusion.  *United States Jaycees v.*

*Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981); *U.S. Structures, Inc. v. J.P.*

*Structures, Inc.*, 130 F.2d 1183, 1190 (6th Cir. 1997); *Villanova University v. Villanova*

*Alumni Educ. Found.*, 123 F. Supp. 2d 293 (E.D. Pa. 2000).  In each case, however, the

license had expired and the former licensee continued to use the licensed mark.  Here, by

contrast, VEO remained a licensee underline throughout the period of time IKE alleges

infringement. Moreover, EPTI had authorized VEO to use the mark for the purpose IKE now claims was outside the scope of the Agreement.

IKE asserts that VEO engaged in "express reverse passing off" when VEO referred to "Victory" boilers and "VEO designs" in its sales proposals and brochures. To prevail on a reverse passing off claim, IKE must show that: (1) the alleged infringer misbranded claimant's goods or services; (2) the goods or services entered interstate commerce; and (3) the misbranding caused a likelihood of confusion such that consumers believe the claimant's product is actually the infringer's. *Daley v. Firetree, Ltd.*, 2006 U.S. LEXIS 4061 (M.D. Pa. 2006). IKE falls woefully short in its proof. As an initial matter, the Agreement authorized VEO to use information provided by EPTI to market and sell the Products. (License Agreement, Clause 2.a)(i), <u>Selling Rights</u>). The Agreement further authorized VEO to sell boilers with membrane walls and similar features. Accordingly, the Agreement permitted VEO to use designs and other material in sales proposals and forecloses any reverse passing off claim. *See Westcode, Inc. v. Daimler Chrysler Rail Systems (North America) Inc.*, 123 F. Supp. 2d 819 (E.D. Pa. 2000) (holding that plaintiff failed to demonstrate a likelihood of success on the merits where plaintiff failed to show that the terms of the contract did not foreclose the reverse passing off claim).

IKE argues that even if VEO was permitted to sell membrane wall boilers under the Agreement, VEO is still liable for reverse passing off. IKE misapprehends this doctrine, and attempts to create a claim for trademark infringement where none exists. Reverse passing off applies only where the infringer has misapplied its own mark to the claimant's goods. *Daley*, 2006 U.S. LEXIS 4062, at *5. Here, IKE does not allege that

VEO applied its own mark to IKE's goods or services. Rather, it alleges that VEO applied the "Victory" name to boilers VEO manufactured. This allegation cannot support a reverse passing off claim. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)(holding that a claim for reverse passing off did not lie where the "goods" in question were created by the alleged wrongdoer). Further, to the extent IKE's claim turns on VEO's use of Keystone drawings or designs with the Keystone reference removed, these materials are not goods or services under the Lanham Act and reverse passing off therefore does not apply.

IKE alleges that even if the Agreement authorized VEO to sell Keystone boilers with membrane walls, VEO is liable for trademark infringement or reverse passing off for submitting proposals to customers for boilers above 150,000 pph. But IKE identifies no competent evidence to show that VEO submitted any proposals above 150,000 pph. Second, even taking into account the unauthenticated proposals IKE identified, IKE has not identified any proposals VEO submitted to prospective customers, using the Keystone mark, for boilers above 150,000 pph, when IKE was Licensor. The lone document identified by IKE for a boiler above 150,000 pph that VEO allegedly submitted during the period that IKE was the licensor was a November 24, 2004 proposal to SNC Lavalin Constructors for a 200,000 pph boiler. However, IKE admits that VEO's proposal did not use the Keystone mark. Accordingly, VEO could not be liable for infringement or reverse passing off.

**D.     IKE's Claims For Trademark Dilution Fail Because IKE Cannot Show The Mark Is Famous, Or Any Actual Blurring or Tarnishment.**

To prevail on its dilution claims, IKE must prove that (1) it owns a "famous" mark; (2) it uses the mark in interstate commerce; (3) VEO began using the

mark after it became famous; and (4) VEO's use lessened the capacity of IKE's mark to

identify and distinguish goods and services through blurring or tarnishing.  15 U.S.C. §

1127; *Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC*, 212 F.3d 157, 163

(3d Cir. 2000).  Because trademark dilution is the "most potent form of trademark

protection" and has the potential of "over-protecting trademarks" by hampering

competition, courts must carefully ensure that plaintiff bears its burden of proof on each

element.  *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 908 (9th Cir. 2002).

> A "critical" limitation on dilution claims is the requirement that the mark

be famous.  *Id.*  To be famous, a mark "must be a household name."  *Id.*  Courts may

consider eight non-exclusive factors:  (1) the degree of inherent or acquired

distinctiveness of the mark; (2) the duration and extent of use of the mark in connection

with the goods or services with which the mark is used; (3) the duration and extent of

advertising and publicity of the mark; (4) the geographical extent of the trading area in

which the mark is used; (5) the channels of trade for the goods or services with which the

mark is used; (6) the degree of recognition of the mark in the trading areas and channels

of trade used by the marks' owner and the person against whom the injunction is sought;

(7) the nature and extent of use of the same or similar marks by third parties; and (8)

whether the mark is registered.[1]  15 U.S.C. § 1125(c)(1).

> IKE cannot establish that its mark was famous.  Other than a few stray

brochures, IKE cannot show the extent of its use of the mark in connection with boilers.

Specifically, there is no evidence regarding the duration and extent of IKE's advertising

of the mark; the geographic extent of the area where IKE used the mark; or any other

evidence establishing that IKE used the mark so widely in trade that it became a household name. *See, e.g.*, *Securemed Corp. v. Standard Security Life Ins. Co.*, No. 05-481, 2006 U.S. Dist. LEXIS 5090, *18 (Feb. 7, 2006) (evidence insufficient to show fame); *SMJ Group, Inc. v. 417 Lafayette Restaurant LLC*, 439 F. Supp. 2d 281, 292 (S.D.N.Y. 2006) (same).

IKE also cannot prove its mark was diluted by blurring or tarnishing. *World Wrestling Federation Entertainment v. Big Dog Holdings*, 280 F. Supp. 2d 413, 441-42 (W.D. Pa. 2003). Blurring occurs when similar marks are used on <u>dissimilar</u> goods. *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 833 (8th Cir. 1999); *24 Hour Fitness USA v. 24/7 Tribeca Fitness*, 447 F. Supp. 2d 266, 288 (S.D.N.Y. 2006). Blurring cannot occur where, as here, VEO allegedly used the mark on the same type of boiler on which IKE would normally use the mark. Likewise, tarnishing occurs only when a mark is improperly associated with an inferior product, which presents a danger that consumers will form unfavorable associations with the mark. *World Wrestling Federation*, 280 F. Supp. 2d at 442 . IKE does not challenge the quality of VEO's boilers and has not adduced any evidence that those boilers were inferior.

### E.     IKE Has Failed To Demonstrate The Existence Of A Valid Trade Secret To Support Its Claim of Trade Secret Misappropriation.

To prevail on a trade secret misappropriation claim, the owner of the alleged trade secret must show the existence of a valid trade secret, that the trade secret was misappropriated by the alleged wrongdoer, and that the use of the trade secret was by improper means. 12 Pa.C.S.A. §§ 5301-5308. "The burden of proof is on the owner to

---

[1]  Section 1125 was amended effective October 6, 2006 to include only four factors to determine whether a mark is famous. The amendment does not apply here because it was enacted several months after this case was filed.

establish the existence of a protectable trade secret by a preponderance of the evidence."

*Camelot Technology, Inc. v. Radioshack Corp.*, 2003 U.S. LEXIS 2517, at *15 (E.D. Pa.

Feb. 14, 2003). Pennsylvania has adopted the definition of "trade secrets" provided in

comment b of the RESTATEMENT OF TORTS § 757 (1939), which states:

> A trade secret may consist of any formula, pattern or device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273, 277 (Pa. 1976) (quoting RESTATEMENT OF

TORTS § 757). The RESTATEMENT cites a number of factors to be considered in

determining whether a trade secret exists:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Restatement of Torts § 757 comment b (1939); *International Election Systems Corp. v. Shoup, 452 F. Supp. 684, 706 (E.D. Pa. 1978),* aff'd, *595 F.2d 1212 (3d Cir. 1979).*

*SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985).*

IKE has not even defined what precise aspects of its O-style water tube

boiler design it considers a trade secret. In its Pretrial Statement, it identifies "significant

aspects of the Keystone design, including the front wall, rear wall, outer walls, membrane

walls, lifting lugs, general notes on drawings, and assembly notes." However, IKE

ignores the well-settled principle of trade secret law that "courts have consistently denied

trade secret protection to information that could be obtained by legitimate means by

competitors." *SI Handling*, 753 F.2d at 1257. "Matters which are fully disclosed by a

marketed product and are susceptible to 'reverse engineering' – i.e. starting with the known product and working backward to divine the process which aided in its manufacture, cannot be protected as trade secrets." *Id.* at 1256 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974)).

Keystone boilers have been sold into the market place for over 40 years. VEO purchased a 100% membrane wall Keystone 15M from EPTI's predecessor, Aalborg Industries, in 2001. As the purchaser, VEO received design drawings and data showing the predicted thermal performance, and had unfettered access to the Keystone boiler. IKE's expert, Robert Seibel, admitted that the assembly sequences, the design of the front and rear walls, the superheater design, the location of the lug support system and the furnace floor tile system, and many other aspects of the Keystone boiler are not proprietary to the Keystone boiler. Martin Swabb, IKE's rebuttal expert, conceded that he did not believe any aspect of the Keystone boiler could properly be deemed proprietary, and that all aspects of the design of the Keystone boiler are discernable and could be reverse-engineered upon inspection of the boiler.

For all of these reasons, the design of the Keystone boiler simply cannot be construed as a trade secret. *United Products Corp. v. Transtech Manufacturing, Inc.*, 2000 Phila. Ct. Comm. Pl. LEXIS 91, at *36 (citing *Van Products Co. v. General Welding & Fabricating Co.*, 213 A. 2d 769, 779-80 (Pa. 1965) ("Certainly, [plaintiff] spent time, effort and money to design these parts. But the products are now in open view and can be copied by any competitor. They are not trade secrets.")).

F.    **IKE's Unfair Competition Claim Fails For The Same Reasons As Its Claims For Trademark Infringement.**

The elements of trademark infringement are identical to those of unfair competition.  *Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 580 (E.D. Pa. 2002).  Thus, IKE's unfair competition claims fail for the same reasons its infringement claims do.

G.    **IKE's Unjust Enrichment Claim Is Barred By The Agreement.**

Unjust enrichment is an equitable doctrine that courts employ in the absence of a contract.  *Aceros Recicilables de Mexico v. ELG Haniel Metals Corp*, 2006 U.S. Dist. LEXIS 10827, at * 2 (W.D. Pa.  2006).  Where a contract exists between the parties, unjust enrichment is not available.  *Alstom Power, Inc. v. RMF Industrial Contracting, Inc.*, 2006 U.S. Dist. LEXIS 8019  at *36 (W.D. Pa. 2006).  Also, unjust enrichment only lies where the defendant received and enjoyed benefits under circumstances where it would be unjust to allow the defendant to retain the benefit without payment of its value.  *See Allegheny General Hospital v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3rd Cir. 2000).

Here, the Agreement governed VEO's rights and obligations regarding the use of the Keystone mark and related technology.  The Agreement bars any unjust enrichment claim.

In addition, IKE's claims are barred by the doctrine of equitable estoppel.  IKE's predecessor in interest, EPTI, acquiesced to VEO's use of the Keystone mark and technology to build and sell O-style water tube package boilers with membrane walls and similar features.  VEO reasonably relied on EPTI's acquiescence.  As such, IKE is

equitably estopped from arguing VEO lacked the right to use the mark and technology to build and sell membrane wall boilers.

## III.    DAMAGES RELATING TO PLAINTIFF'S CLAIMS

VEO will supplement its Pretrial Statement to include a discussion of damages as provided in the Court's December 15, 2006 order.

## IV.    FACTUAL AND LEGAL BACKGROUND RELATING TO VEO'S COUNTERCLAIMS

In addition to the issues arising from IKE's claims against VEO, the jury must also decide the issues raised in VEO's Second Amended Counterclaim against IKE. VEO's counterclaims arise from the License Agreement and unfair and tortious conduct undertaken by IKE and intended to defame VEO and wrongfully interfere with its contractual relationships with its sales representatives. Specifically, the jury must determine whether:

(1)    IKE intentionally interfered with VEO's contractual relations by wrongfully threatening to terminate sales representatives who continued to do business with VEO (Count III);

(2)    IKE disparaged VEO's business reputation and tortiously interfered with VEO's prospective contracts by wrongfully contacting MECS, Inc., a customer of VEO; attempting to convince MECS, Inc. not to purchase a boiler from VEO due to the instant pending lawsuit; and asserting that VEO would be unable to fulfill the order (Counts III and VI); and

(3)    IKE disparaged VEO's business reputation by falsely stating that VEO was not authorized to sell Type O boilers and that VEO lacked the engineering capability (Count VI).[2]

---

[2] VEO's Second Amended Counterclaim also alleged claims of Breach of Contract (Count II), Violation of California & Professional Code § 17200 et seq. (Count IV), and Intentional Interference with Prospective Economic Advantage (Count V). VEO voluntarily dismissed Counts IV and V of its Second Amended Counterclaim on April 7, 2006, and this Court granted plaintiff's motion for partial summary judgment with regard to Count II on May 10, 2006. Therefore, only Counts I, III, VI, and VII need be determined at trial

VEO also seeks a declaratory judgment on Counts I and VII of the Second Amended Counterclaim.  Specifically, VEO seeks a declaration that:

(1)    VEO did not sell any Products using the intellectual property and/or trade secrets of IKE outside of the rights granted under the License Agreement (Count I); and

(2)    VEO is entitled to manufacture natural circulation, industrial water tube package steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors (Count VII).

**A.    Factual Background Related To VEO's Declaratory Judgment Claims**

The facts related to VEO's Declaratory Judgment Claims (Counts I and VII) are discussed in greater detail above and incorporated herein by reference.  In short, the License Agreement granted VEO an exclusive license to build, market and sell natural circulation industrial water tube package steam generators under the Keystone trademark within a given steam capacity range in the U.S., Mexico, and Canada. The Agreement provides that: "'Products' shall mean natural circulation, industrial water tube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph.  Products shall include but no be limited to the items set forth in Annex 1." (License Agreement, Clause 1a).

Although IKE has asserted claims for trademark infringement, misappropriation of trade secrets, unfair competition and unjust enrichment, the fact of the matter is that VEO has never manufactured or sold any products under the Keystone trademark other than as authorized by the Agreement.  Similarly, VEO has never manufactured or sold any products using the technical information provided by IKE or its predecessors other than as authorized by the Agreement. VEO therefore seeks a declaration that all of its sales of boilers using the Keystone trademark were authorized.

VEO similarly seeks a declaration that it is entitled to continue to manufacture, market, and sell natural circulation, industrial water tube package steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors after IKE elected not to renew the contract pursuant to a notice of non-renewal that IKE sent to VEO on October 28, 2005. While the notice was issued pursuant to Clause 16(b) of the Agreement, which simply granted either party the right to terminate the agreement upon sixty days written notice, IKE took the position, after informing VEO of its intention not to renew the Agreement, that "[VEO] must comply with all of its obligations . . . described in Clause 17 and elsewhere in the agreement. In particular, [VEO] shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement, or to use the Mark."

However, Clause 17(a) actually provides that "after any termination of this Agreement by Licensor **in accordance with the provision of Clause 16(c) hereof**, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement . . . or to use the Mark." (Emphasis added.) Clause 16(c), in turn, granted IKE the right to terminate the contract after only two years **only** "in the event Licensee has not received during the first two (2) years a minimum of 5 orders for the Products." VEO received more than 5 orders for the Products during the first two years of the contract. Consequently, IKE's decision not to renew the License Agreement could not have been made pursuant to Clause 16(c) and did not trigger the restrictive terms of Clause 17(a).

Nonetheless, given the language of IKE's notice of non-renewal (as well as other disparaging comments that IKE made to VEO's customers and sales representatives), VEO was concerned that IKE will attempt to foreclose VEO from manufacturing, marketing and selling package steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors. VEO therefore seeks a declaration affirmatively finding that VEO retained these rights after the Agreement expired.

**B.    Factual Background Related To IKE's Tortious Interference With VEO's Contracts With Sales Representatives**

At the December 2004 Power-Gen Conference in Orlando, Florida, IKE's General Manager, Chris Petcos, met with at least four VEO sales representatives including Alan Christian of Christian Power Equipment, Inc., Gene Lockaby of Spectrum Engineering, Inc., Tom Patton of M.C. Patton & Associates and Chuck Thatcher of Gulf Coast Thermal. At the time, each entity had a sales representative contract with VEO.

Mr. Petcos told each representative to terminate its agreement with VEO if it wanted to continue to sell IKE's aftermarket parts. He also misrepresented that the License Agreement authorized VEO to market and sell only refractory front wall, tube and tile rear wall, tangent tube boilers, and not 100% membrane wall boilers. According to Mr. Christian, Mr. Petcos made it clear that "there wasn't going to be any negotiation with [IKE]. We had to decide; we weren't gong to be able to carve up portions of the lines from two different companies. It was pretty clearly stated that we had to make a decision [regarding who we were going to represent]." Mr. Petcos also misrepresented the scope of VEO's exclusive license to the sales representatives.

As a result of Mr. Petcos' false statements, each sales representative cancelled its agreement with VEO and ultimately caused VEO to lose the ability to market its steam generating equipment in the territories serviced by the sales representatives.

**C.    Factual Background Related To IKE's Defamation Of VEO's Business Character**

In addition to the untrue statements made to VEO's sales representatives, IKE also made blatantly defamatory statements to VEO's customers.  Specifically, in August 2004, Jeff Coale, one of IKE's representatives, told Paul Kempf, the Director of Utilities at the University of Notre Dame, that once IKE purchased the Keystone assets, VEO would be prohibited from selling an O-type boiler to the University of Notre Dame.

Mr. Coale made these statements despite the fact that VEO and EPTI had negotiated a Variance Agreement that specifically allowed VEO to sell an O-type boiler under the Keystone name to the University of Notre Dame.  When Mr. Coale made these false statements, VEO was one of two finalists the University of Notre Dame was considering to award a contract to build an O-type boiler.  The Notre Dame contract represented a lucrative opportunity for VEO.  Due in part to IKE's disparaging statements, the Notre Dame contract was not awarded to VEO and VEO suffered damage to its business reputation.

Most recently, IKE disparaged VEO and tortiously interfered with VEO's relationship with its customer, MECS, Inc ("MECS").  VEO and IKE were competing bidders for a project involving the sale of water tube package boilers to MECS for an ethanol plant.  On October 31, 2006, Chris Petcos of IKE contacted Mary Eudy of MECS and asked about the status of the project.  When informed that IKE was not one of the

final bidders, Mr. Petcos stated that if MECS were considering VEO, MECS should know that if VEO's proposal is based on technology from IKE that VEO will not be able to perform on the contract and that IKE currently has a lawsuit against VEO for issues surrounding the misuse of Keystone boiler technology.    Mr. Petcos and other representatives of IKE subsequently met with representatives of MECS and reiterated Mr. Petcos' statements.

As a result of IKE's defamatory and improper comments, VEO was forced to expend significant time and effort attempting to rehabilitate its relationship with MECS.    Moreover, VEO has not been awarded the contract from MECS.    VEO will supplement information on this claim once it has completed discovery of this issue.

## V.    LEGAL ANALYSIS OF VEO'S COUNTERCLAIMS

### A.    Legal Analysis Of The Declaratory Judgment Claims (Counts I & VII)

The factual and legal issues related to these claims are discussed in detail above.

### B.    Legal Analysis Of IKE's Intentional Interference With VEO's Contractual Relations (Count III)

Pennsylvania courts have adopted § 766 of the RESTATEMENT (SECOND) OF TORTS, which sets forth the elements of an intentional interference with existing contractual relations claim. *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1181-83 (Pa. 1978) (citing RESTATEMENT (SECOND) OF TORTS § 766 (1977)). Section 766 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the

contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 (1979).

VEO will prove that IKE wrongfully interfered with VEO's sales representative agreements by showing: (1) IKE intended to harm VEO's contractual relations with its sales representatives; (2) IKE acted improperly, i.e. was not privileged to act the way it acted; (3) IKE induced or otherwise caused VEO's sales representatives not to perform the contracts; and (4) VEO suffered pecuniary loss resulting from the sales representatives' failure to perform.

Pennsylvania courts have also adopted § 768 of the RESTATEMENT regarding the limited circumstances under which a competitor is privileged to interfere with an existing contract. *Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa. 1988). That section provides:

1. One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:

   a. The relation concerns a matter involved in the competition between the actor and the other; and
   b. The actor does not employ wrongful means; and
   c. His action does not create or continue an unlawful restraint of trade; and
   d. His purpose is at least in part to advance his interest in competing with the other.

2. The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

RESTATEMENT (SECOND) OF TORTS § 768 (1979). This section of the RESTATEMENT provides a special application of the factors provided in § 767.

IKE's tortious conduct falls outside the scope of section 768's safe harbor because IKE employed wrongful means in inducing the termination of VEO's contractual agreements with its sales representatives.[3]  According to Comment *e*, if an actor employs improper means, his interference will not be justified as lawful competition. Here, IKE employed wrongful means by strong-arming VEO's sales representatives to terminate their agreements with VEO. Indeed, IKE's representatives threatened that IKE would no longer allow the sales representatives to sell any aftermarket parts or other product lines unless they terminated their agreements with VEO.  When IKE was asked by one of the sales representatives whether the representative could continue to represent both VEO and IKE,  IKE responded "You can't do that."  Similarly, IKE informed some VEO sales representatives that IKE was involved in a lawsuit with VEO arising out of sales of boilers that were purportedly made outside the scope of the License Agreement.

IKE also employed improper means in interfering with VEO's contractual relationships by falsely telling the sales representatives that VEO was only authorized to sell outdated Keystone water tube boilers with tangent tubes and that IKE could sell any other Keystone water tube boiler other than the tangent tube boilers.  In doing so, IKE misrepresented the License Agreement's terms in an effort to convince them that VEO would only be permitted to build and sell outdated boilers with no market appeal, and therefore, opportunities for the sales representatives to sell Keystone boilers built by VEO would be virtually non-existent.  The evidence, therefore, demonstrates that IKE

---

[3] As part of its May 10, 2006, ruling on IKE's Motion for Partial Summary Judgment on VEO's Counterclaims, this Court found that IKE and VEO were competitors as a matter of law.  VEO hereby renews and preserves its objection to this aspect of the Court's ruling on the grounds that the evidence establishes, at a minimum, that a genuine issue of fact exists regarding whether VEO and IKE were in fact competitors where VEO was acting pursuant to and within the scope of the License Agreement.

used unjustifiable, coercive conduct in an attempt to interfere with VEO's sales representative agreements.

Because IKE intentionally and wrongfully interfered with VEO's agreements with its sales representatives, IKE is liable to VEO for damages including lost sales suffered by VEO as a result of IKE's misconduct. The precise calculation of such damages will be disclosed in accordance with this court's December 15, 2006 order. Such damages shall include profits that VEO would have earned on the Herford project, the Michigan boiler opportunity and the Michigan Correctional facility opportunity as well as lost business sales diverted to IKE following the terminations.

**C.    Defamation of Business Reputation (Count VI)**

Under Pennsylvania law, a communication is defamatory if "it tends to harm the individual's reputation so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Tucker v. Fischbein*, 237 F.3d 275, 282 (3rd Cir. 2001) (quoting *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 441, 273 A.2d 899, 904 (1971)). Specifically, the elements of a cause of action for defamation include proof of: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; and (5) an understanding of the reader or listener of an intent by the defendant that the statement refers to the plaintiff. *Miketic v. Baron*, 675 A.2d 324, 327 (1996). Statements imputing business misconduct constitute defamation *per se*. *Synyrgy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999). Where defamation *per se* is proven, the plaintiff need not prove special damages and need only show general damages. *Id.* at 580-81.

In this case, IKE defamed VEO's business reputation by making untrue and defamatory statements to VEO's prospective customers. IKE's false statements satisfy each of the necessary elements of defamation. The comments lowered VEO's reputation it its potential customers' estimation, including the University of Notre Dame, and deterred those customers from dealing with VEO. Moreover, as the disparaging statements imputed business misconduct to VEO, the statements were defamatory *per se*. IKE made these statements directly to VEO's customer, who understood both the defamatory nature of IKE's statements and that IKE intended to refer to VEO.

VEO is consequently entitled to damages including compensation for the loss of the Notre Dame Contract. The precise calculation of such damages will be supported by expert opinion testimony that will be disclosed in accordance with this court's scheduling orders.

VII.    Witnesses

Defendant's potential witnesses for its case are identified in Exhibit A. Defendant reserves the right to call anyone listed on Plaintiff's witness list, as well as other witnesses for rebuttal or impeachment. The expert report of Paul Miller and the rebuttal report of Paul Miller are attached as Exhibits B and C, respectively.

VIII.    Exhibits

Defendant's exhibits are identified on Defendant's Exhibit List, which is attached hereto as Exhibit D. Defendant reserves the right to use the exhibits identified on Plaintiff's Exhibit List.

Dated:  December 21, 2006

Respectfully submitted,

/s/ Christopher T. Sheean
One of the Attorneys for Plaintiff,
VICTORY ENERGY OPERATIONS,
LLC

Christopher T. Sheean
Wildman, Harrold, Allen & Dixon LLP
225 W. Wacker Drive, 28th Floor
Chicago, IL 60606
(312) 201-2997

LOCAL COUNSEL:
G. Jay Habas
Marshall, Dennehey, Warner
Coleman & Goggin
1001 State Street, Suite 1400
Erie, PA  16506
(814) 461-7800
PA  ID No. 55581

Counsel for Victory Energy Operations, LLC