UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>    Defendant. | CIVIL ACTION<br><br>NO. 04-CV-325 (ERIE)<br><br>Judge Sean J. McLaughlin |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS SECOND MOTION
TO COMPEL DISCOVERY RESPONSES FROM DEFENDANT**

  Plaintiff, Indeck Keystone Energy, LLC ("IKE"), by and through its undersigned counsel, submits this reply brief in further support of its Second Motion to Compel Discovery Responses from Defendant, Victory Energy Operations, LLC ("VEO") specifically to address the discoverability of the Proposals and Owner POs, on the one hand, and of Estimates, on the other hand.[1]

<u>Voyager Proposals and Owner POs Are Discoverable.</u>

  VEO admits that it "has entered into contracts with customers to provide 45 Voyager watertube package boilers" but has produced documents for only 5 of those projects because those are the only ones completed. (VEO Memorandum at pp. 2, 7) Because the

---

[1]  Capitalized terms in this Reply Brief shall have the meanings ascribed to them in IKE's Second Motion to Compel.

remaining projects have not been completed, VEO refuses to produce either Proposals or Owner POs, as VEO considers those documents "unnecessary and superfluous to documents already produced regarding the calculation of VEO's profit or loss on the sale of Voyager boilers" and because they supposedly provide a "road map on how to successfully price" boilers.[2] (VEO Memorandum at p.2)

The fundamental flaw in VEO's argument is this: VEO never addresses how IKE can calculate its damages on the remaining 40 boilers without obtaining documents showing (at a minimum) the sales price of those boilers. Put simply, if IKE prevails on its claim that VEO improperly copied detailed designs from the Keystone®, IKE is entitled to damages for all 45 Voyager boilers. IKE has no interest in filing another lawsuit after VEO delivers those other boilers. The proposals and purchase orders enable IKE to determine the sales price for each of the remaining boilers and to develop damages using that information. If VEO does not have documentation showing the anticipated profit for each boiler (that issue is addressed below), IKE will apply a profit percentage associated with the completed boilers to each remaining boiler sale, generating a damages number for the 40 boilers. The Proposals and Owner POs therefore are central to proving damages. Is VEO to keep the profits from those 40 boilers after disgorging profits for the first 5?

In addition, the Proposals describe the boilers that VEO offered for sale and that are the subject of the Owner POs, and they should have more detail about the boilers than the

---

[2] Although VEO refers to its counterclaims as supporting its concern that pricing information would be misused (*id.* at p.2), the counterclaims do not involve any assertion that IKE utilized VEO's confidential information to compete against VEO. Rather, those claims are based on IKE's alleged interference with VEO's contracts with sales representatives by allegedly stating that VEO could only sell boilers with tangent tube walls and that VEO did not have the technical capability to design a certain type of boiler.

2

Owner POs. The Proposals thus will enable IKE to show that VEO utilized certain aspects of the Keystone® design (namely the wall construction and lifting lugs) to achieve Voyager boiler sales. As IKE explained in its Second Motion to Compel, VEO's description of the boiler walls in the proposal for the MECS project copied verbatim the description of the boiler walls from the Keystone® proposals, confirming the role of the Keystone® wall design in the sale of Voyagers. The Proposals also will demonstrate (directly or by inference) that the remaining 40 boilers will utilize the same copied designs as the 5 completed sales based on the descriptions of the boilers in the Proposals. The Proposals therefore will assist in proving that VEO will use the misappropriated designs in future boilers. Finally, the descriptions of the boilers will assist in comparing them to the 5 boilers that were sold for purposes of showing the reasonableness of applying the same profit percentages to the uncompleted boilers that were generated from the completed boilers.

VEO's assertion that IKE's predecessors allegedly used and publicly disseminated the same proposal information before VEO (such that VEO is free to copy that information) does not excuse production. (VEO Memorandum at pp.8-9) Setting aside the fact that VEO does not dispute the copying charge at least as to the proposals,[3] VEO ignores the points raised above as to why that information is necessary. As to "misappropriation of materials," that evidence demonstrates that not only did VEO copy detailed designs of the

---

[3] It is unclear whether VEO disputes copying of the detail design drawings. "Because IKE cannot show any wrongful use by VEO of confidential information not already in the public domain, all that is left of its claim is its assertion that Victory copied portions of design drawings and promotional materials. To the extent that IKE's claim is based solely on its allegation that VEO reproduced or distributed copies of IKE's original material, the claim is preempted by [the] federal Copyright Act." (VEO Memorandum at p.9) The claim is not that VEO "reproduced" the designs and disseminated them; rather, it is that VEO copied designs for use in the Voyager, which represents both misappropriation and unfair competition.

Keystone® for use after the License Agreement ended, it also copied Keystone® marketing materials for use in selling the Voyager. (VEO Memorandum at p.8) VEO came into possession of Keystone® proposals (and of the confidential detailed design drawings) as a result of the License Agreement, and its copying of Keystone® proposals (and detailed design drawings) pursuant to the License Agreement is a far cry from copying documents independently obtained by lawful means from a third party. *See, e.g., Smith v. Dravo Corp.*, 203 F.2d 369, 375 (7th Cir. 1953) ("the mere fact that such lawful acquisition is available does not mean that [defendant] may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis") (applying Pennsylvania law).[4]

    VEO's assertion that the proposals provide a "roadmap to pricing" is equally without merit. (VEO Memorandum at p.2) VEO insisted on an extra, "highly confidential" tier in the Protective Order that restricted disclosure of documents with that designation to only certain individuals at IKE. VEO had no objection to the particular IKE individuals designated to receive highly confidential documents. The concern raised by VEO frequently arises in trade secret litigation, which is why parties enter protective orders enforceable by contempt proceedings. The Protective Order in place in this litigation is a Court order, and there is no basis for VEO to assume that IKE will violate that order.

---

[4] For the same reasons, VEO's suggestion is wrong as a matter of law that the detailed designs of the Keystone® are not protectible because the boiler is sold to the public. (VEO Memorandum at p.9) Put simply, VEO did not create its own design drawings for boiler walls and lifting lugs from a used Keystone® boiler that it bought in the marketplace; rather, VEO copied particular detailed designs from proven Keystone® detailed design drawings that it obtained only by virtue of the confidential relationship created by the License Agreement. Those detail design drawings were not "disseminated publicly without an effort to maintain its confidentiality." (VEO Memorandum at p.9) Rather, those drawings were kept confidential and provided to VEO in trust pursuant to the confidentiality provision in the License Agreement.

4

Ultimately, the issue boils down to this: if VEO is correct that there is no detailed estimate information for the remaining boilers to show anticipated profits, then the proposals and purchase orders must be disclosed so that IKE has a basis to calculate damages based on the profits VEO will earn. While VEO may prefer that an imputed royalty serve as the basis for damages (VEO Memorandum at p.3 n.1), that is an election to be made by Plaintiff, not VEO, and Plaintiff needs the documentation concerning Proposals and Owner POs to determine whether (as expected) VEO's profits will be a greater amount than an imputed royalty (which in any case should be higher than 4%). If VEO cheated, IKE should retain any profits on any boilers.

VEO Effectively Concedes That Some Kind Of Estimate Documentation Exists.

VEO insists that it does not have any estimating information despite the fact that its General Manager (Mark White) testified that VEO created "Price Summary Sheets" that served as VEO's Estimates and that an independent party doing an audit of VEO's operations identified a specific individual as holding the position of "Chief Estimator." (VEO Memorandum at p.6) VEO's efforts to distance itself from these objective facts fail.

First, White clearly testified that a Price Summary Sheet "basically [is] our estimate, how we estimate the project." (VEO Memorandum at p.6) Although VEO now claims that White "misspoke when he referred to the price summary sheets as estimates" (*id.*), White signed an Errata Sheet that did not correct that testimony. (Exhibit 1 hereto) Of course, an estimate is prospective in nature by predicting costs; what the Affidavit of Mark J. White describes is *retrospective* inasmuch as it identifies actual financial information. (Exhibit 4 at ¶ 8)

Importantly, the White Affidavit confirms that VEO in fact develops cost and profit information prior to transmitting a Proposal, consistent with White's deposition testimony:

> "In the course of preparing those bids, the sales engineers consult with VEO's management on a desired or proposed profit margin target. The sales engineers are then responsible for preparing the bid, <u>incorporating in the bid the underlying anticipated costs of the boiler</u> and <u>the desired profit margin</u>. The sales engineers are not required or expected to prepare or maintain a written estimate or record reflecting the breakdown of estimated cost and profit for a given project."

(VEO Memorandum, Exhibit 4 at ¶ 4) (emphasis added) By compiling information on the "underlying anticipated costs" and the "desired profit margin," VEO thus develops an Estimate, just as Mark White testified. Even if there is no "record reflecting the breakdown of estimated cost and profit," the information for "underlying anticipated costs" must be maintained somewhere at VEO so that it is accessible as needed for Proposals. Yet, despite the large number of Proposals it created that led to at least 45 boiler sales, VEO has not produced any records maintained for determining "the underlying anticipated costs" at the inception of a project. At least that documentation must exist.

Secondly, the White Affidavit does not dispute that VEO employs an individual named "Don Jackson" as stated in the Shop Audit. The White Affidavit fails, though, to identify what position Mr. Jackson holds and whether he has any role in developing the "underlying anticipated costs" for boilers for use in the Proposals.

As a compromise, VEO can identify (in addition to producing the Proposals for the 40 pending sales) the anticipated profit for each of those boilers (which information can be designated "highly confidential" if VEO wishes) so that VEO's profits can be calculated.

Finally, the White Affidavit demonstrates precisely why the Proposals and Owner POs for the remaining 40 boilers must be produced. As White confirmed, the Proposal price includes both the "underlying anticipated costs" and the "desired profit margin." That information thus provides a strong basis for determining damages. If (as VEO claims) it does not maintain the detailed back-up substantiating the amount of desired profit, then the only fair

6

and reasonable approach is for the damages to be calculated based on the sales price for the pending boiler sales and the profit margins associated with the completed boiler sales. Otherwise, VEO profits from its poor record keeping practices.

WHEREFORE, Plaintiff, Indeck Keystone Energy, LLC respectfully requests that its Second Motion to Compel Discovery Responses from Defendant be granted.

Respectfully submitted,

/s/   Robert J. Williams
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

Attorneys for Plaintiff and Counterclaim Defendant,
Indeck Keystone Energy, LLC

Dated: March 21, 2007