**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| INDECK KEYSTONE ENERGY LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 04-325 Erie |
| | : | |
| VICTORY ENERGY OPERATIONS LLC, | : | Judge Sean J. McLaughlin |
| | : | |
| Defendant | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |

**DEFENDANT'S AMENDED PRETRIAL STATEMENT**

**Introduction**

Defendant Victory Energy Operations LLC ("VEO"), by its undersigned counsel, hereby submits its Amended Pretrial Statement.

**I.    NARRATIVE STATEMENT OF MATERIAL FACTS RELATED TO PLAINTIFF'S COMPLAINT**

The claims in Indeck Keystone Energy LLC's ("IKE") Complaint and Counts I and VII of Victory Energy Operations LLC's ("VEO") Second Amended Counterclaim turn on two distinct but related issues: 1) whether the License Agreement ("Agreement") granted to VEO the right to build and sell boilers with membrane walls, and 2) whether VEO misappropriated any of IKE's non-public, proprietary technology in developing and building its Voyager boilers.

**A.    The License Agreement**

The Agreement authorized VEO to design, manufacture, market and sell industrial, natural circulation water tube steam generators with a steam capacity between 29,000 and 150,000 pounds per hour of steam.  VEO's authorization included, but was

not limited to, the M Series Keystone boilers generally described in Annex I. The Annex does not state anywhere that M Series boilers must have furnace and outer walls made of tangent tubes rather than membrane wall construction. In fact, the only reference to tangent tube walls in the Agreement is in an illustrative drawing on a single page of Annex I. The parties understood that Agreement authorized VEO to sell Keystone boilers from 29,000 to 150,000 pph, including boilers with membrane walls.

The Agreement defines "Products" broadly enough to allow VEO to sell membrane wall boilers. Moreover, VEO was authorized to "modify" and "improve" the boilers. Although VEO contends that the utilization of membrane walls cannot constitute an "improvement" of the "Products" because membrane wall technology was part of the technology transferred to VEO under the Agreement, membrane walls clearly constitute an enhancement or improvement over the antiquated tangent tube design that IKE claims was the exclusive design permitted under the Agreement.

In addition to being contrary to the plain language of the Agreement, IKE's interpretation of the Agreement represents the classic "bait and switch" scenario. The evidence shows that VEO justifiably believed and understood that it was entering into an agreement to allow it to design, build and sell Keystone boilers with membrane walls so that it could compete effectively in the marketplace. It is undisputed that boilers with membrane walls are the standard in the industry.

The language of the License Agreement clearly supports VEO's interpretation—and not IKE's. The definition of "Products" shows that the parties intended for the Agreement to provide a flexible framework that would set certain boundaries of the scope of the license while simultaneously allowing sufficient flexibility

to permit VEO to produce a product that would meet the marketplace's needs. To that end, the parties defined "Products" by reference to a general class of boilers with a specific steam capacity range.  More specifically, the Agreement provides that, "Products shall mean natural circulation, industrial water tube package steam generators with a steam capacity range beginning at 29,000 pph up to and including 150,000 pph.  Products shall include, but not be limited to the items set forth in Annex I."  Thus, the language of the Agreement reflects the parties' intent to allow VEO to manufacture and sell Products of a broad class of products (i.e. industrial water tube package steam generators of the type generally described in Annex I) with a specific boundaries (i.e., a steam capacity range between 29,000 pph and 150,000 pph)..

IKE incorrectly argues that Annex I must be the exclusive definition of the term "Products."  Such an interpretation, however, ignores the Agreement's plain language, including the clause, "Products shall include <u>but not be limited to</u> the items set forth in Annex I." License Agreement, Clause 1.2 (emphasis added).  Recognizing that this provision vitiates its argument, IKE asserts that the Court must ignore the phrase "include but not be limited to" because a similar provision was found in an earlier license EPTI had signed with a third party.  IKE's argument notwithstanding, there is no basis to ignore this critical language in the Agreement merely because the same language also appears in another agreement that is not the subject of this litigation.  IKE does not and cannot cite any legal authority to support its claim that the language should be ignored.

IKE's impossibly narrow interpretation of the Agreement falls under its own weight.  IKE asserts that Annex I sets forth a complete list of the Products covered under the Agreement.  However, Annex I on its face demonstrates that VEO was

expected to design each boiler to meet a customer's needs. Indeed, because all boilers are designed to customer requirements, it would be impossible for VEO to sell any boilers under the Agreement if it did not provide the flexibility to allow for the production of boilers beyond those that are featured in Annex I.

Moreover, all of the parties to the agreement understood this reality. For instance, the thermal performance characteristics for the boilers identified in Annex I are based on a set of assumptions, including that the boiler will operate in a location with an ambient temperature of 80ºF at 1000' in elevation. None of the witnesses for either party testified that VEO could only sell a boiler that would operate under those specific conditions. Similarly, all of the witnesses acknowledged VEO was free to design the boilers with appurtenant equipment, such as an economizer, despite the fact that Annex I of the Agreement does not contemplate such equipment. The parties knew and understood that VEO was authorized to design and build boilers with 100% membrane walls to meet the specifications of its customers.

IKE also argues that VEO's interpretation of the License Agreement is inconsistent with the parties' February 27, 2003 Addendum to extend VEO's license to boilers with higher design pressures and allowable steam output. The Addendum, however, actually confirms VEO's interpretation of the Agreement, and not IKE's. The Addendum demonstrates that the parties understood and agreed that higher design pressure and steam output temperatures were above and beyond the scope of what the parties intended in the Agreement, necessitating an amendment. By contrast, although EPTI assisted VEO in designing Keystone boilers with membrane walls from January

2003 until the time it sold its assets in August 2004, no such amendment to the Agreement was ever signed or even discussed between the parties.

The parties' specific inclusion of provisions to allow for modifications and improvements further demonstrates that the parties intended for VEO to have the ability to sell modern, state of the art boilers under the Agreement.   Clause 8a) provides in part:

> Licensee will have the right to modify the Products; provided, however, that such modifications will not diminish the reliability and the performance of the said Products.  Licensee will submit to Licensor such plans for modifications for prior written approval by Licensor except for the alterations as defined in Clause 3 (e).  Upon reasonable request by Licensee, Licensor will give special engineering advice regarding planning, design, manufacturing, installation or operation of Products by Licensee at licensor's applicable service rate in effect at the time service is rendered.

VEO was therefore entitled to make modifications to Products under the Agreement, including the addition of membrane walls.  Indeed, EPTI consistently provided VEO with drawings for welded/membrane walls at VEO's request that VEO utilized in the design of Keystone® boilers.  Therefore, given the language in Clause 8a), either membrane wall boilers were included in EPTI's understanding of "Products," or EPTI gave VEO the design information relating to membrane walls without any confidentiality protection.

EPTI's assistance in providing the membrane wall drawings and support fall clearly within the confines of Clause 3e), which authorized VEO to modify the Products so long as the modification did not diminish the Keystone boiler's reliability or performance.  Having provided VEO with the authorization to modify the boilers to include 100% membrane walls, EPTI clearly approved of the reliability and performance of that enhancement.  IKE has failed to demonstrate or even allege that VEO's inclusion of membrane walls negatively impacted the boilers' reliability or performance.  As such,

IKE cannot claim that VEO was not authorized to make the alleged modifications it made

to the design of the Products.  Therefore, even if the term "Products" did not encompass

Keystone boilers with membrane walls, VEO was nonetheless authorized to make

modifications, such as adding membrane walls, increasing boiler length, or increasing

steam drum diameter, because EPTI supplied those modifications.

Similar to modifications, the Agreement allows VEO to make

improvements to the products.  Even if, as IKE argues, boilers with membrane walls were

beyond the scope of the technology transferred to VEO under the Agreement, VEO was

still free to use membrane walls as an improvement under the Agreement because VEO

was entitled to utilize any "modifications, variations, revisions and enhancements of the

Products . . . which either Licensor or Licensee may develop, acquire, or acquire control

of and commercially exploit during the term of this Agreement. . . ."  (License

Agreement, Clause 1.h).

## B.    The Parties' Course Of Dealing

VEO marketed, built and sold boilers with membrane walls for the first 18

months of the Agreement with the Licensor's knowledge and affirmative assistance.

When EPTI sold its assets in August 2004, its president represented and acknowledged

that he knew of no infringements of any intellectual property and no breaches of any

license agreements.  Two days after becoming licensor, IKE nonetheless tried to rewrite

the Agreement to lock VEO out of the marketplace.  If the Agreement did not permit

VEO to sell boilers with membrane walls, VEO would be unable to sell them at all, given

the Agreement's provision precluding VEO from offering for sale any competing

products.  Accordingly, under IKE's tortured interpretation of the Agreement, VEO paid

$50,000 in a technology fee for the right to design, market and sell a commercially

unviable product, while simultaneously agreeing that it would not offer any competing products for sale in the marketplace. The parties' course of dealing demonstrates that this absurd interpretation does not represent the parties' actual intent.

> **1.      The Pre-Execution Negotiations Between EPTI and VEO Reveal That Both Parties Understood And Agreed VEO Would Build And Sell Keystone Boilers With Membrane Walls And Similar Modern Attributes.**

EPTI and VEO's negotiations reveal that the parties clearly intended to allow VEO to build and sell Keystone boilers with membrane walls and other modern attributes necessary in a competitive market. Mark White, Shawn Brewer and John Viskup, the only individuals who participated in negotiations, uniformly testified that they understood that Annex I was merely a guideline, a starting point for the parties to use, and not an exhaustive list of the products and features that were within the scope of the Agreement. In addition, the parties specifically approved the use of membrane wall technology during negotiations. Indeed, Mark White and Shawn Brewer discussed that the Agreement would include membrane wall boilers, and John Viskup discussed membrane wall boilers with Mark White. Mark White agreed and understood that the definition of Products included membrane wall technology.

IKE's Pretrial Statement discusses internal EPTI correspondence between Mark White and various engineers, attempting to show that certain EPTI engineers believed that membrane walls should be outside the scope of the License Agreement. But this correspondence is wholly irrelevant to the parties' mutual understanding of the scope of the Agreement. Mark White was the authorized EPTI representative who negotiated the Agreement, and was the designated contact person at EPTI regarding the Agreement with VEO until August 2003. Mark White **never** told any VEO

representative that VEO could not design, manufacture, market or sell Keystone Boilers with membrane walls. Moreover, the only instance where an authorized EPTI representative expressed in correspondence that EPTI believed membrane walls were outside the scope of the License, Mark White responded for VEO and explicitly rejected that position.

> **2.    The Parties' Course Of Performance Reveals They Understood The Agreement Allowed VEO To Sell Membrane Wall Boilers.**

The clearest course of performance evidence demonstrating the parties' understanding of the Agreement logically occurred closest in time to the Agreement's execution, when the parties' understanding of the Agreement was foremost in their minds. Shortly after executing the Agreement, VEO sold three 15M (M Series) boilers to Broin Industries for its Iowa Ethanol plant. Each boiler was designed and rated with EPTI's help and assistance and included 100% membrane walls. EPTI invoiced VEO for the three Broin boilers, and VEO paid EPTI the royalty set forth in the Agreement.

If these transactions were truly outside the scope of the Agreement, as IKE argues, EPTI would have either (1) refused to assist VEO, as it did when VEO requested the opportunity to market D-Style Keystone boilers, or (2) required a separate agreement or addendum to the Agreement as contemplated in Clause 1a), and as the parties did when VEO sought projects involving boilers above 150,000 pph for the University of Notre Dame and the University of Massachusetts projects. The absence of a separate agreement or addendum, coupled with the fact that EPTI invoiced VEO and VEO paid the royalty on the boilers pursuant to the Agreement without any objection from EPTI, confirms that EPTI knew and understood that VEO was authorized to build membrane wall boilers under the Agreement.

In Annex I, the "Description of Products" identified the "M Series Keystone water tube boilers to include the 8M . . .22M."  There is no evidence to support the claim that anyone at VEO believed or understood that an M-Series Keystone Boiler could not include membrane walls.  In fact, EPTI engineers admitted that people outside of EPTI would have no reason to believe that the term "M-Series Keystone Boiler" should only refer to tangent tube boilers.  Moreover, there are multiple examples both before and during the term of the Agreement where EPTI engineers referred boilers with membrane walls as M-Series boilers.

The Agreement required that the Licensor, EPTI, provide VEO with sales materials and aid VEO in developing its own marketing materials.  Mark White, as the authorized EPTI representative, supplied a draft Keystone Sales Manual and a related power point presentation to VEO in March 2003.  These materials specifically show that 100% membrane wall construction (i.e. membrane furnace and convection walls, a water-cooled membrane rear wall, and a water-cooled burner throat front wall) is an available option on Keystone M Series Boilers.  Mark White helped VEO develop its own sales brochure and manual and approved the final version that included diagrams and descriptions of membrane walls as available features on VEO's Keystone boilers.  Similarly, the Keystone Design Guide that was provided to VEO shows welded front and rear walls as an option for M-Series Keystone boilers.

IKE's interpretation of the Agreement is also contradicted by the simple reality of the state of the art in the boiler industry.  IKE has grossly mischaracterized the marketability of tangent tube boilers to U.S. customers.  Steve Bernatowicz, an EPTI engineer charged with assisting VEO in designing Keystone boilers, testified that by

1990 or 1991, EPTI's predecessor had stopped selling tangent tube boilers in favor of boilers with economizers and membrane walls to improve emissions and reduce refractory. Mr. Bernatowicz testified further that he did not believe VEO could sell M-Series Keystone boilers without revising the design to include these features to meet customer demand because the boilers would be too large, would waste fuel, and would not be economical.

Contrary to IKE's contention, the March 26, 2004 letter from Robert Gdaniec to Mark White at VEO does not show that EPTI interpreted the Agreement consistently with IKE's current position. First, EPTI sent the letter 15 months after the parties entered into the Agreement. EPTI allowed those 15 months to pass without any objection to VEO's use of membrane wall technology while assisting VEO in the design and rating of several membrane wall boilers that were sold pursuant to the Agreement. Most significantly, Mr. Gdaniec testified that he had no knowledge or evidence of any instance where VEO had modified a Keystone Boiler without EPTI's knowledge or assistance.

Second, the letter accompanied EPTI's counter-offer regarding the proposed sale to VEO of some or all of the assets licensed to VEO under the Agreement. At the time, EPTI was in bankruptcy and desperately trying to drive up the value of its remaining assets in the hopes of staving off liquidation. Furthermore, EPTI's president, Stephen Kang, admitted that he authorized the letter to be sent even though he reviewed the License Agreement and could not determine whether the Agreement was limited to tangent tube boilers. Finally, VEO responded to Mr. Gdaniec's letter on March 30, 2004, specifically rejecting EPTI's position that VEO was authorized to build and sell only

tangent tube Keystone boilers, and EPTI never responded to Mr. White's letter. When

asked why he never responded, Mr. Gdaniec stated, "[M]ost of these issues, we just said

we'd just let them go by the wayside, and probably didn't follow up after that."

Mr. Gdaniec also testified that even after he sent the March 26 letter, EPTI

continued to provide VEO with engineering support on boilers with membrane walls. In

addition, EPTI knew and understood that VEO continued to sell boilers with membrane

walls after March 26, 2004. For instance, on April 23, 2004, Mark White sent EPTI three

Unit Sale Notices, each specifying that VEO had sold a 100% membrane wall boiler.

EPTI happily accepted VEO's royalty payment and never objected to those sales.

Similarly, Mr. Bernatowicz assisted VEO in designing a membrane wall boiler in August

2004.

EPTI's president Stephen Kang admitted that neither he nor Mr. Gdaniec

was able to conclude that VEO had breached the Agreement. Similarly, Mr. Kang

reaffirmed in the purchase and sale agreement between EPTI and CMI EPTI his

acknowledgement that he knew of no breaches of any EPTI license agreement, and no

infringements of EPTI's intellectual property. The parties' performance during the

course of the Agreement unequivocally demonstrates that EPTI and VEO agreed and

understood that VEO was authorized to sell Keystone water tube boilers with membrane

walls from 29,000 to 150,000 pph.

### C. VEO's Development Of The Voyager Boiler

VEO began preliminary analysis for the development of its own O-style

water tube package boilers in late 2004. VEO engineers and management have extensive

experience in the boiler industry. Mark White and Trent Miller, VEO's Director of

Engineering, each worked for several years at Nebraska Boiler Company, designing and selling O-style water tube package boilers. VEO's drafting department has extensive experience in drawing heat exchangers, boilers, heat recovery steam generators, and related equipment. VEO tapped into this knowledge and experience to development its new line of O-style boilers, which it ultimately named the "Voyager" boiler.

While VEO's engineers and outside consultants developed the Voyager, VEO was involved in the instant lawsuit. Cognizant that IKE might raise claims of copying or misappropriating technology, VEO personnel took great pains to avoid using the Keystone design information when developing the Voyager design, even though the Keystone design is in the public domain and therefore not protectable as a trade secret.

Ignoring VEO's extensive efforts, IKE contends that the Voyager boiler misappropriates IKE's trade secrets and otherwise "copies" IKE's design. However, IKE's two engineering experts and VEO's engineering expert all acknowledge there are many distinct differences between the Voyager and the Keystone boiler. VEO retained third party consultants to develop a thermal design program, the structural base for the Voyager, and to perform circulation studies on the Voyager design. Still, IKE claims copying of the Keystone boiler design, despite the fact its design is not patented, Keystone boilers have been sold into the stream of commerce for many years, and nothing prevents anyone, including VEO, from taking a Keystone boiler apart, analyzing its design and materials, and creating an exact duplicate to sell in the marketplace.

## II.    Legal Issues To Be Decided By The Court At The Pretrial Conference (Pursuant to L.R. 16.1.4 (E)(3))

A.    Rather than respond to every legal argument raised in Plaintiff's Amended Pretrial Statement, Defendant will provide a legal analysis of the claims

at issue in its trial brief. Defendant submits that the following legal issues relating to liability are appropriate for ruling by the Court at the Pretrial Conference, and will file a motion for ruling on these issues in advance of the Pretrial Conference:

1.  Given that the Court deemed the meaning of the term "Products" in the License Agreement to be ambiguous, the Court should rule that the parties' course of conduct in performing under the Agreement cannot be deemed a "waiver" by EPTI/IKE of its alleged right to limit the scope of the Agreement to tangent tube boilers, and must it be deemed evidence of the respective party's understanding of the Agreement. As such, IKE could not "revoke" any alleged waiver by EPTI.

2.  IKE alleges VEO engaged in "reverse passing off" by selling boilers it manufactured under the license agreement, identified as "Victory" and "Voyager" boilers. VEO cannot be liable for reverse passing off under the Lanham Act or unfair competition for boilers it actually manufactured. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)(holding that a claim for reverse passing off did not lie where the "goods" in question were created by the alleged wrongdoer).

3.  IKE alleges VEO engaged in "reverse passing off" and unfair competition by disseminating proposals and brochures that copied IKE's designs or language from its proposals and brochures. However, IKE cannot recover for reverse passing off for VEO's use of designs or language found in brochures and proposals, as said claims are preempted by the Copyright Act. *Westcode, Inc. v. Daimler Chrysler Rail Systems (North America) Inc.*, 123 F. Supp. 2d 819 (E.D. Pa. 2000).

4.  IKE cannot recover for reverse passing off for VEO's use of designs or language found in brochures and proposals, because reverse passing off applies only to "goods or services" as those terms are defined by the Lanham Act. IKE cannot base a claim of reverse passing off upon VEO's alleged use of its own Victory® or Voyager® mark on drawings or designs of products that are to be manufactured, produced, sold, sponsored, and approved solely by Victory and not IKE

5.  IKE asserts a claim for misappropriation under the Pennsylvania Uniform Trade Secrets Act 12 Pa.C.S.A. §§ 5301 *et seq.* IKE further alleges, and VEO denies, that VEO's misappropriation of trade secrets began with IKE's predecessor-in-interest, EPTI, in January 2003, and continues today. The Pennsylvania Uniform Trade Secrets Act does not apply to this case because the Act specifically excludes "misappropriation occurring prior to the effective date of this act [April 19, 2004], including a continuing misappropriation that began prior to the effective date . . . and which

continues to occur after the effective date . . . ."  12 Pa.C.S.A. § 5301 (2004) (as amended Section 4 of 2004, Feb 19, P.L. 143, No. 14).

6.  IKE claims that VEO copied language from proposals and drawings provided to VEO during the license period by EPTI, and that VEO's use of that information constitutes misappropriation of trade secrets. However, it is undisputed that the documents in question were provided by IKE's predecessors as a matter of course.  IKE claims that even if the drawings in question are not "trade secrets," IKE can still recover for misappropriation of trade secrets.  Pennsylvania courts have long recognized that a party cannot seek recovery for trade secrets misappropriation where the allegedly secret information has been disseminated publicly or disclosed by virtue of the public sale of the product at issue.  *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 267 419 A.2d 769, 779-80(1965)(rejecting the holding of *Smith v. Dravo Corp.*, 203 F.2d 369, 374 (7th Cir. 1953) and stating "the publication and advertising in this case, and the public sale of the air driers destroyed [plaintiff's] right to maintain a cause of action upon a breach of duty not to disclose its "trade secrets.")  Therefore, IKE's trade secret misappropriation claims relating to VEO's copying and dissemination of language and designs cannot stand.

7.  IKE's claims for unjust enrichment and unfair competition for misappropriation of information that does not constitute a trade secret are preempted by the Copyright Act.  *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 201 (2nd Cir. 1983) and *Pytka v. Van Alen*, 1992 U.S. Dist. LEXIS 7956, * 6 (E.D. Pa. 1992).

8.  IKE cannot pursue its claim for unjust enrichment relating to VEO's acts that occurred during the license period, given the existence of the license agreement between the parties that governed the specific conduct at issue.  *Alstom Power, Inc. v. RMF Industrial Contracting, Inc.*, 2006 U.S. Dist. LEXIS 8019 at *36 (W.D. Pa. 2006).  The Agreement governed VEO's rights and obligations regarding the use of the Keystone mark and related technology, and bars any unjust enrichment claim.

9.  Clause 17(a) provides that "[A]fter any termination of the Agreement by Licensor in accordance with Clause 16 (c) hereof, Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under the Agreement . . . or to use the Mark."  Clause 16(c), in turn, granted IKE the right to terminate the Agreement during the first two years if VEO had not received a minimum of 5 orders for the Products.  Because it is undisputed that VEO did receive more than 5 orders for the Products during the first two years of the Agreement, IKE was not entitled to terminate the Agreement pursuant to Clause 16(c). Consequently, the restrictive terms of Clause 17 (a) were not triggered.

**Damages Issues For The Court To Decide At The Pretrial Conference**

VEO submits the following issues are for the Court to decide, if there is a finding of liability requiring an analysis of damages:

1.    Section 35(a) of the Lanham Act grants courts the discretion to, where the facts warrant it, award damages, and costs in a trademark infringement suit. 15 U.S.C. § 1117(a). The Act is clear that any recovery of monetary relief is completely a matter of equity to be determined by the court. Section 35(a) specifically states that the recovery of damages, and costs are "subject to the principles of equity" and that "the court shall assess such profits or cause the same to be assessed at its direction." 15 U.S.C. § 1117(a) (emphasis added). Trial courts enjoy "very wide discretion" when determining an equitable remedy, and courts may base that discretion on a "wide range of considerations." *Nat'l Dryer Mfg. Co. v. Nat'l Drying Mach. Co.*, 136 F. Supp. 886, 887 (E.D. Pa. 1955) (citing *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125 (1947)). The decision on whether to award damages is an issue reserved for the court.

2.    The damage method to be used is likewise an issue for the Court to decide. The Lanham Act affords courts "great latitude" in weighing the equities and determine a just amount of monetary recovery. 87 C.J.S. Trade-Marks, Etc. § 326. In addition, courts are granted broad discretion in actually fashioning and shaping appropriate monetary remedies under the Lanham Act. *Banjo Buddies*, 399 F.3d at 177.

3.    IKE must prove a "willful infringement" in order to recover damages for trademark dilution under either the Lanham Act or the Pennsylvania Trademark Act. The Lanham Act permits recovery for profits, damages, and costs only for "willful violation[s]" of the prohibition against trademark dilution in 15 U.S.C. § 1125(c). 15 U.S.C. § 1117(a). Likewise, the Pennsylvania Trademark Act allows for an injunction for trademark dilution, but no more (absent a showing of willfulness). *See* 54 Pa.C.S.A. § 1124.

## III.    DEFENDANT'S RESPONSE TO PLAINTIFF'S DAMAGES CLAIMS

### A.    The Appropriate Remedy For Any Alleged Infringement Would, At Most, Be A Reasonable Royalty.

In the event that the jury returns a verdict in favor of IKE on its claims, the appropriate remedy in this case would be a reasonable royalty. The Lanham Act affords courts "great latitude" in weighing the equities and determining a just amount of monetary recovery. 87 C.J.S. Trade-Marks, Etc. § 326. In addition, courts are granted

broad discretion in actually fashioning and shaping appropriate monetary remedies under the Lanham Act. *Banjo Buddies,* 399 F.3d at 177.

In analyzing the equities, courts look at six factors: (1) intent to confuse or deceive; (2) diversion of sales; (3) adequacy of other remedies; (4) unreasonable delay by plaintiff in asserting rights; (5) public interest in deterrence; and (6) palming off. *Banjo Buddies*, 399 F.3d at 175. Assuming, without admitting, that this court finds infringement, it is clear that all of the equitable factors weigh in favor of VEO and against an award of monetary relief.

First, there is no evidence that VEO intended to confuse or deceive. To the contrary, VEO entered into a contract with EPTI and worked closely with EPTI in executing on contracts to sell Keystone boilers. Moreover, given this Court's ruling that the definition of "Products" in the License Agreement is ambiguous, it is clear that VEO had a good faith basis for believing its sale of boilers fell within the terms of the License. Second, it is clear that VEO did not divert any sales from IKE. IKE's General Manager testified that IKE never sought to sell a Keystone boiler below 150,000 pph during the term of the License Agreement, and that since the expiration of the License Agreement, IKE has not even offered a Keystone boiler for sale.

Third, a reasonable royalty is a far more appropriate remedy. VEO and EPTI held an arms length negotiation and agreed on a 4% royalty for use of the "technology" at issue. There is no better evidence for what would fairly and adequately compensate IKE for any damages it has suffered. Moreover, evidence recently received by VEO demonstrates that IKE paid far less than $1 million for the Keystone trademark and the technology at issue in this case. Finally, there is no evidence in this case of

willfulness, malice or wrongdoing by VEO that would warrant an award of damages to deter future conduct.

Assuming, again without admitting, that this court determines that the equities weigh in favor of monetary relief, the court should exercise its discretion in fashioning and assessing the most reasonable award: in this case a reasonable royalty. *See A&H Sportswear v. Victoria's Secret Stores*, 967 F. Supp. 1457, 1479 (E.D. Pa. 1997) ("*VS Stores I*") (citing *Sands, Taylor & Wood v. Quaker Oats* (978 F.2d 947 (7th Cir. 1992))(citing *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519-20 (11th Cir. 1990); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1563-65 (11th Cir. 1986); *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 75-76 (5th Cir. 1979)). The pre-existing license agreement dictated the terms of the royalty award. *See id.*

Here, VEO had an ongoing licensing relationship with EPTI and IKE. IKE alleges that VEO manufactured products beyond the authorization of the license. However, IKE (and its predecessor EPTI) has accepted and acquiesced to the terms of the license by continuing to receive and deposit royalty payments from VEO. Furthermore, EPTI showed the plain reasonableness of the license through the acceptance of royalty payments without objection. Through its own actions and course of dealing with VEO, IKE (and previously EPTI) admits that the royalty payments from the license are just and reasonable. Especially given the explicit language of the Lanham Act deeming all monetary relief "compensation and not a penalty[,]" it is evident that most accurate, fair, and equitable measure of monetary compensation is a reasonable royalty. 15 U.S.C. § 1117(a).

**B.     IKE's Requests For Treble Damages, Attorneys Fees and Statutory Damages Are Unfounded.**

While it is true that in "exceptional cases," reasonable attorneys fees may be rewarded to the prevailing party, 15 U.S.C. § 1117(a), those circumstances do not exist here. The Third Circuit has interpreted those exceptional cases to include "culpable conduct on the part of the losing party, such as bad faith, fraud, malice or knowing infringement." *SecuraComm*, 166 F.3d at 190 (*pre-empted by statute on other grounds*) (citing *Ferrero U.S.A. v. Ozark Trading*, 952 F.2d 44 (3d Cir. 1991)); *see also Ferrero*, 952 F.2d at 47-48 (citing numerous cases comparing "exceptional" to cases of malice, fraud and bad faith).

There is no such culpable, bad faith, fraudulent, or malicious conduct here on the part of VEO. Indeed, viewing the facts in the light most favorable to IKE, VEO acted in reliance upon an ambiguous contract. Even assuming VEO did in fact operate beyond the scope of the license agreement, the conduct cannot be deemed to rise to the level of bad faith and malice that was found in exceptional cases. It would be hard to argue that VEO acted in bad faith given the continuing payment by EPTI and IKE consistent with the course of conduct between EPTI and VEO. Similarly, no "exceptional circumstances" exist here that would support IKE's claim for treble or statutory damages.

**C.     IKE Is Not Entitled To Any Damages For Trademark Dilution Under the Lanham Act or Pennsylvania State Law**

The Lanham Act permits recovery for profits, damages, and costs for "willful violation[s]" of the prohibition against trademark dilution in 15 U.S.C. § 1125(c). 15 U.S.C. § 1117(a). Willful intent is necessary to recover under trademark dilution. *Daffy*, 354 F.4d at 240. In *SecuraComm*, the Third Circuit found that willfulness

included an "aura of indifference to plaintiff's rights" or "deliberate and unnecessary" duplication of the trademark that was "calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured." 166 F.3d 182 at 187.

Likewise, the Pennsylvania Trademark Act allows for an injunction for trademark dilution, but no more (absent a showing of willfulness). *See* 54 Pa.C.S.A. § 1124. The statute allows other equitable relief for willful dilution including profits, damages, and attorneys' fees. 54 Pa.C.S.A. § 1125(a). Pennsylvania courts have found willfulness when the dilution came from a "deliberate and premeditated plan to divert from [the plaintiff] business and profits fairly resulting from [plaintiff's] own skill or enterprise . . . ." *Standard Cigar Co. v. Goldsmith*, 58 Pa. Super. 33 (1914). Willfulness can also be inferred from "predatory intent" on the part of the infringer. *Nugget Distributors Co-op. of America, Inc. v. Mr. Nugget, Inc.*, 776 F.Supp. 1012, 1024 (E.D. Pa. 1991).

In this case, VEO exhibited no "predatory intent" and no "aura of indifference to plaintiff's rights." *Id.*; *SecuraComm*, 166 F.3d at 187. Indeed, VEO's actions were the exact opposite: VEO continued to pay royalties for every boiler its sold where it received an invoice from the licensor, demonstrating that (a) VEO had no intent to be a predator, but, in fact, was willing to share in the profits of the manufacture and sale of the boilers; and (b) was not indifferent to the rights of the plaintiff, and actually *respected* those rights by paying a pre-negotiated royalty rate.

### D.    A Reasonable Royalty Is Also The Appropriate Measure Of Damages For Misappropriation Of Trade Secrets.

IKE asserts in its Pretrial Statement that IKE should receive all of VEO's profits on all 45 of the Voyager® boilers VEO has sold, including those that have not yet

been built or shipped. In the unlikely event of a finding that VEO misappropriated IKE's trade secrets in its Voyager® boilers, the most appropriate remedy would be, at most, a reasonable royalty. It is undisputed that the Voyager® has significant differences in design from the Keystone boiler. Accordingly, IKE cannot demonstrate that VEO has duplicated or replicated the Keystone boiler and repackaged it as the Voyager®. Therefore, requiring VEO to disgorge all profits earned on the Voyager® would go far beyond compensating IKE, and amount to an unjustified punishment. Courts have recognized that a reasonable royalty is the most appropriate remedy, particularly where it is proven that a licensee has exceeded the scope of its license. *See University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974) (proper damage award for misappropriation of trade secret was reasonable royalty); *Nucor Corp. v. Tennessee Forging Steel Services, Inc.*, 476 F.2d 386, 392 (8th Cir. 1945); *see also* 11 A.L.R.4th 12 §§ 1, 33[a]. VEO will present evidence that, given VEO and IKE's predecessor deemed 4% a reasonable royalty for use of all of the technology plus the use of the Keystone mark, a reasonable royalty to compensate IKE for VEO's use of a much smaller subset of that information would be substantially less.

   E.    **Any Injunctive Or Monetary Relief Must Be Limited To The Period IKE Can Demonstrate Its Trade Secrets Would Have Remained Confidential.**

   IKE further asserts that VEO should be enjoined from "incorporating any Keystone technology into the Voyager® boiler. IKE fails to recognize, yet again, that any protection would be limited to the "technology" that IKE is able to demonstrate constitutes a trade secret. Moreover, IKE fails to recognize that courts limit both injunctive and monetary relief to the period of time that the misappropriated material would have otherwise remained secret. *General Battery Corp. v. Slaton*, 37 Pa. D &

C.3d 459, 470-72 1984 WL 2578, *6-7 (1984).  "What in reality is protected in cases [involving trade secrets] is not the product or process but the secrecy of it. . . . . We believe commercial morality is preserved by preventing one from wrongfully using secret information for a period of time no longer than that required to discover or reproduce that information by lawful means." *Id.*, citing *ILG Industries v. Scott*, 49 Ill.2d 88, 273 N.E. 2d 393 (1971).  Therefore, to obtain injunctive relief or damages for any alleged misappropriation of trade secrets, IKE must demonstrate that the trade secrets at issue would have remained secret during the period for which IKE seeks damages.

Attorneys' costs and fees may only be awarded for trade secret misappropriation when "overriding considerations" indicate the need to deviate from the general rule that fees and costs are generally born by the parties.  *Greenberg v. Croydon Plastics Co.*, 378 F.Supp. 806, 817-18 (E.D. Pa. 1974).  Fees and costs are generally within the discretion of the court when an opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Id.* (citations omitted).  Fees and costs are necessarily punitive, and require bad faith on the part of the litigant.  *Id.*

## IV.    FACTUAL BACKGROUND RELATING TO VEO'S COUNTERCLAIMS

In addition to the issues arising from IKE's claims against VEO, the jury must also decide the issues raised in VEO's Second Amended Counterclaim against IKE. VEO's counterclaims arise from the License Agreement and  unfair and tortious conduct undertaken by IKE and intended to defame VEO and wrongfully interfere with its contractual relationships with its sales representatives.  Specifically, the jury must determine whether:

(1)    IKE intentionally interfered with VEO's contractual relations by wrongfully threatening to terminate sales representatives who continued to do business with VEO (Count III);

(2)    IKE disparaged VEO's business reputation and tortiously interfered with VEO's prospective contracts by wrongfully contacting MECS, Inc., a customer of VEO; attempting to convince MECS, Inc. not to purchase a boiler from VEO due to the instant pending lawsuit; and asserting that VEO would be unable to fulfill the order (Counts III and VI); and

(3)    IKE disparaged VEO's business reputation by falsely stating to representatives of the University of Notre Dame that VEO was not authorized to sell O Type boilers and that VEO lacked the engineering capability to complete the project (Count VI).[1]

VEO also seeks a declaratory judgment on Counts I and VII of the Second Amended Counterclaim. Specifically, VEO seeks a declaration that:

(1)    VEO did not sell any Products using the intellectual property and/or trade secrets of IKE outside of the rights granted under the License Agreement (Count I); and

(2)    VEO is entitled to manufacture natural circulation, industrial water tube package steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors (Count VII).

**A.    Factual Background Related To VEO's Declaratory Judgment Claims**

The facts related to VEO's Declaratory Judgment Claims (Counts I and VII) are discussed in greater detail above and incorporated herein by reference. In short, the License Agreement granted VEO an exclusive license to build, market and sell natural circulation industrial water tube package steam generators under the Keystone trademark within a given steam capacity range in the U.S., Mexico, and Canada. The Agreement provides that: "'Products' shall mean natural circulation, industrial water tube package steam generators with a steam capacity range beginning at 29,000 pph up to and

---

[1] VEO's Second Amended Counterclaim also alleged claims of Breach of Contract (Count II), Violation of California & Professional Code § 17200 *et seq.* (Count IV), and Intentional Interference with Prospective Economic Advantage (Count V). VEO voluntarily dismissed Counts IV and V of its Second Amended Counterclaim on April 7, 2006, and this Court granted plaintiff's motion for partial summary judgment with regard to Count II on May 10, 2006. Therefore, only Counts I, III, VI, and VII need be determined at trial

including 150,000 pph. Products shall include but no be limited to the items set forth in Annex 1." (License Agreement, Clause 1a).

Although IKE has asserted claims for trademark infringement, misappropriation of trade secrets, unfair competition and unjust enrichment, VEO has never manufactured or sold any products under the Keystone trademark other than as authorized by the Agreement. Similarly, VEO has never manufactured or sold any products using the technical information provided by IKE or its predecessors other than as authorized by the Agreement. VEO therefore seeks a declaration that all of its sales of boilers using the Keystone trademark were authorized.

VEO similarly seeks a declaration that it is entitled to continue to manufacture, market, and sell natural circulation, industrial water tube package steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors after IKE elected not to renew the contract pursuant to a notice of non-renewal that IKE sent to VEO on October 28, 2005. While the notice was issued pursuant to Clause 16(b) of the Agreement, which simply granted either party the right to terminate the agreement upon sixty days written notice, IKE took the position, after informing VEO of its intention not to renew the Agreement, that "[VEO] must comply with all of its obligations . . . described in Clause 17 and elsewhere in the agreement. In particular, [VEO] shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement, or to use the Mark."

However, Clause 17(a) actually provides that "after any termination of this Agreement by Licensor **in accordance with the provision of Clause 16(c) hereof,**

Licensee shall no longer have the right to manufacture the Products, to use the Technical Information supplied to Licensee by Licensor under this Agreement . . . or to use the Mark." (Emphasis added.) Clause 16(c), in turn, granted IKE the right to terminate the contract after only two years **only** "in the event Licensee has not received during the first two (2) years a minimum of 5 orders for the Products." VEO received more than 5 orders for the Products during the first two years of the contract. Consequently, IKE's decision not to renew the License Agreement could not have been made pursuant to Clause 16(c) and did not trigger the restrictive terms of Clause 17(a). As such, VEO was under no contractual obligation to refrain from using or disseminating the Technical Information supplied under the Agreement.

Nonetheless, given the language of IKE's notice of non-renewal (as well as other disparaging comments that IKE made to VEO's customers and sales representatives), VEO is concerned that IKE will attempt to foreclose VEO from manufacturing, marketing and selling package steam generators utilizing technology obtained from the public domain, or developed by VEO employees and independent contractors. VEO therefore seeks a declaration affirmatively finding that VEO retained these rights after the Agreement expired.

    **B.**    **Factual Background Related To IKE's Tortious Interference With VEO's Contracts With Sales Representatives**

At the December 2004 Power-Gen Conference in Orlando, Florida, IKE's General Manager, Chris Petcos, met with at least four VEO sales representatives including Alan Christian of Christian Power Equipment, Inc., Gene Lockaby of Spectrum Engineering, Inc., Tom Patton of M.C. Patton & Associates and Chuck Thatcher of Gulf Coast Thermal. At the time, each entity had a sales representative contract with VEO.

Mr. Petcos instructed each representative to terminate its agreement with VEO if it wanted to continue to sell IKE's aftermarket parts. He also misrepresented that the License Agreement authorized VEO to market and sell only refractory front wall, tube and tile rear wall, tangent tube boilers, and not 100% membrane wall boilers. According to Mr. Christian, Mr. Petcos made it clear that "there wasn't going to be any negotiation with [IKE]. We had to decide; we weren't gong to be able to carve up portions of the lines from two different companies. It was pretty clearly stated that we had to make a decision [regarding who we were going to represent]." Mr. Petcos also misrepresented the scope of VEO's exclusive license to the sales representatives.

As a result of Mr. Petcos' false statements, each sales representative cancelled its agreement with VEO and ultimately caused VEO to lose the ability to market its steam generating equipment in the territories serviced by the sales representatives.

**C.    Factual Background Related To IKE's Defamation Of VEO's Business Character With The University Of Notre Dame**

In addition to the untrue statements made to VEO's sales representatives, IKE also made blatantly defamatory statements to VEO's customers. Specifically, in August 2004, Jeff Coale, one of IKE's representatives, told Paul Kempf, the Director of Utilities at the University of Notre Dame, that once IKE purchased the Keystone assets, VEO would be prohibited from selling an O-type boiler to the University of Notre Dame.

Mr. Coale made these statements despite the fact that VEO and EPTI had negotiated a Variance Agreement that specifically allowed VEO to sell an O-type boiler under the Keystone name to the University of Notre Dame. When Mr. Coale made these false statements, VEO was one of two finalists the University of Notre Dame was

considering to award a contract to build an O-type boiler. The Notre Dame contract represented a lucrative opportunity for VEO. Due in part to IKE's disparaging statements, the Notre Dame contract was not awarded to VEO and VEO suffered damage to its business reputation.

      **D.**      **Factual Background Related To IKE's Defamation And Tortious Interference With MECS, Inc.**

Most recently, IKE disparaged VEO and tortiously interfered with VEO's relationship with its customer, MECS, Inc ("MECS"). VEO and IKE were competing bidders for a project involving the sale of water tube package boilers to MECS for an ethanol plant. On October 31, 2006, Chris Petcos of IKE contacted Mary Eudy of MECS and asked about the status of the project. When informed that IKE was not one of the final bidders, Mr. Petcos stated that if MECS were considering VEO, MECS should know that if VEO's proposal is based on technology licensed from IKE, VEO will not be able to fulfill its contract with MECS. Mr. Petcos further told MECS that IKE currently has a lawsuit against VEO for issues surrounding the misuse of Keystone boiler technology. Mr. Petcos and other representatives of IKE subsequently met with representatives of MECS and reiterated Mr. Petcos' statements.

As a result of IKE's defamatory and improper comments, VEO was forced to expend significant time and effort attempting to rehabilitate its relationship with MECS. Moreover, VEO has not been awarded the contract from MECS. VEO will supplement information on this claim once it has completed discovery of this issue.

**V.**      **VEO's Damages Due On Its Counterclaim**

Because IKE intentionally and wrongfully interfered with VEO's agreements with its sales representatives, IKE is liable to VEO for damages including lost

sales suffered by VEO as a result of IKE's misconduct. Mark White will offer testimony at trial regarding the lost sales. Specifically, VEO's lost sales as a result of IKE's tortious interference with Christian Power, are as follows:

| VEO Lost Profits Analysis for Christian Power | | |
|---|---|---|
| Project | Estimated Sales Price | VEO Lost Profits |
| River Hill Co. (Coal Fired Boiler) | $640,000 | $160,000 |
| EPI Purchase Order 25893 (Coal Fired Boiler) | $2,960,000 | $976,800 |
| Hereford, TX (Coal Fired Boiler & 2 150K PPH Package Boilers) | $6,056,000 | $1,750,800 |
| IKE Inquiry No. 2006-006 (Coal Fired Boiler and Package Boiler) | $2,081 | $1,041 |
| MSW HRSG/Thermal Oxidizer | $950,000 | $237,500 |
| IKE K50-10175 | $250 | $125 |
| IKE Inquiry No. 2005-09 | $9,886 | $4,943 |
| Replacement Economizer | $28,910 | $7,227 |
| IKE Inquiry No. 2005-070 (Boiler Tubes) | $16,286 | $8,143 |
| IKE Inquiry No. 2005-078 (Boiler Tubes) | $20,928 | $10,464 |
| IKE WH5-095 (HRSG w/ SCR & Economizer) | $750,000 | $187,500 |
| IKE Proposal No. K5-085 (Package Boiler) | $1,540,000 | $385,000 |
| TOTAL | | |
| Total Potential Loss | $12,974,341 | $3,729,543 |
| Close/Hit Ratio | 61% | 61% |
| **TOTAL ESTIMATED LOSS** | **$7,914,348** | **$2,275,021** |

VEO is entitled to damages including compensation for the loss of the Notre Dame Contract. Based on the bid VEO submitted, VEO would have sold the boiler to the University of Notre Dame for $1,697,197, for an expected profit of $424,299. John Viskup will offer testimony at trial regarding the lost sale to Notre Dame.

VEO also suffered damages as a result of IKE's disparagement of VEO to MECS and IKE's efforts to tortiously interfere with VEO's sale of a boiler to MECS. Specifically, VEO had to expend time and money traveling to visit MECS and meet with individuals there. Mark White and John Viskup will offer testimony to support VEO's damages that are in excess of $5,000.

**VI.    Witnesses**

   Defendant's potential witnesses for its case are identified in Exhibit A.  Defendant's list of witness deposition designations is attached as Exhibit B.  Defendant reserves the right to call anyone listed on Plaintiff's witness list, as well as other witnesses for rebuttal or impeachment.  The expert report of Paul Miller and the rebuttal report of Paul Miller are attached as Exhibits C and D, respectively.  The expert report of Scott Stringer is attached as Exhibit E.

**VII.    Exhibits**

   Defendant's exhibits are identified on Defendant's Exhibit List, which is attached hereto as Exhibit F.  Defendant reserves the right to use the exhibits identified on Plaintiff's Exhibit List.

Dated:  March 26, 2006

Respectfully submitted,

/s/ Christopher T. Sheean
One of the Attorneys for Plaintiff,
VICTORY ENERGY OPERATIONS, LLC

Christopher T. Sheean
Wildman, Harrold, Allen & Dixon LLP
225 W. Wacker Drive, 28th Floor
Chicago, IL 60606
(312) 201-2997

LOCAL COUNSEL:
G. Jay Habas
Marshall, Dennehey, Warner
Coleman & Goggin
1001 State Street, Suite 1400
Erie, PA  16506
(814) 461-7800
PA  ID No. 55581

Counsel for Victory Energy Operations, LLC