UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company, <br><br> Defendant. | : CIVIL ACTION <br> : <br> : No. 04-CV-325 (ERIE) <br> : <br> : Judge Sean J. McLaughlin |

**PLAINTIFF'S MOTION FOR LEGAL DETERMINATION THAT LICENSOR HAD THE RIGHT TO REVOKE CONSENT TO DEVIATE FROM ANNEX I**

Indeck Keystone Energy LLC ("IKE") hereby moves pursuant to Local Rule 16.1.3.E.3 for a legal determination that IKE and its predecessor licensor Erie Power Technologies Inc. ("EPTI") had the right to revoke consent for Defendant Victory Energy Operations LLC ("VEO") to sell boilers outside the scope of the License Agreement.

1.  EPTI and VEO entered a License Agreement in 2003 for the sale of industrial watertube boilers under the Keystone® trademark. EPTI was to provide Technical Information to VEO that enabled VEO to manufacture and sell the boilers.

2.  EPTI and IKE have at all times believed that the scope of the Agreement is limited to Standard M-Series boilers, which are a subset of the overall Keystone® boiler line.

The Standard M-Series is specifically identified in Annex I to the Agreement, both in text and in a drawing, as having tangent tube walls and other older design features.

3. VEO has asserted in this lawsuit that the Agreement permitted it to sell Keystone® boilers that included more modern designs beyond Annex I, including (without limitation) membrane walls.

4. IKE will present evidence at trial that EPTI provided modern designs outside the scope of the Agreement for a particular project at the inception of the Agreement and that VEO thereafter continued using those designs for the first year of the Agreement with EPTI's consent.

5. Even during the time that EPTI gave express consent to deviate from the Agreement, EPTI on various occasions reiterated to VEO that the scope of the Agreement was the Standard M-Series without any dispute by VEO.

6. EPTI sent VEO a letter dated March 26, 2004, that revoked EPTI's prior consent to sell boilers outside the scope of the Agreement. (Exhibit P-182 at 1861) According to EPTI,

> **VEO currently licenses only the M series product line which has a very specific geometry and characteristics. ....** In review of some of the VEO recent projects and proposals, **it appears that the majority of projects that VEO is pursuing or has completed <u>have been outside the definition of the license agreement</u>. . . . <u>VEO will need to redirect their attention on the sales/marketing and execution of the products that are defined in the license agreement.</u>** (Annex 1 of the current agreement provides a clear definition of the M-Series design with product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design.)

7.   VEO in turn responded that

> [t]he Agreement does provide specific geometry and characteristics but also allows for improvements, refer to Clause 13.  As such, VEO has made improvements which are necessary to offer/provide a Keystone® boiler that is technically compliant with our customers requirements, is inline with that of our competitors offerings and as we deem necessary to enhance our overall success.  The Oxyvinyls Project includes two (2) 15M Series Keystone® boilers each of which include membrane furnace and outer walls, watercooled front and rear and an upper drum size of 60" ID.  These features are outside the geometry and characteristics of the License but are clearly improvements.
> (Exhibit P-191 at 1908) (emphasis added)

8.   White's statement that the Agreement "does provide specific geometry and characteristics" referred to Annex 1 of the Agreement.[1]  VEO thus admitted that Annex I contained "specific geometry and characteristics" and that "membrane furnace and outer walls, watercooled front and rear" are "outside the geometry and characteristics of the License."  Moreover, VEO admitted that a change in the size of the upper drum (which is set forth in Annex I) also was "outside the geometry and characteristics," further confirming that the intent of the Agreement was to sell boilers with the configuration described in Annex I.

9.   The same VEO letter states that "to date no changes have been made [to the Keystone® boilers] without EPTI's knowledge."  (Exhibit P-191 at 1909)

10.  Immediately upon IKE becoming licensor after acquiring the Keystone® technology, IKE advised VEO that VEO may sell only the Standard M-Series boiler.  (Exhibit P-220 at 2159)  "We are still awaiting a response and confirmation that Victory Energy will

---

[1] During this lawsuit, White testified that he was mistaken in describing membrane walls as an "improvement" and testified further that there were no improvements by VEO during the term of the Agreement.

comply with all of the terms and conditions of the license agreement by marketing the specific "M" Series product line. Specifically, following the product size, dimensional data for the different size ranges, typical cross-section of the boiler and overall boiler construction which includes refractory front and rear walls, tangent furnace and outer wall tubes and pressure casing design." (Exhibit P-223 at 2163) IKE never authorized VEO to deviate from the scope of Annex I.

11. Clauses 21 and 24 of the Agreement require a written amendment in order for the Agreement to be modified:

> "The Agreement shall not be modified except by a supplemental written agreement executed by an authorized representative of both of the parties hereto." (Exhibit P-1 at 18, Clause 21)

\* \* \*

> "... [N]o subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms herein provided and executed with the same formalities as this Agreement." (Exhibit P-1 at 20, Clause 24(a))

12. Clause 24(b) addresses waiver and provides as follows:

> "No waiver, expressed or implied, by either party of any breach of obligation by the other party shall operate or be considered as a waiver of any other subsequent breach." (Exhibit P-1 at 20, Clause 24(b))

13. A waiver of a contract provision — such as the limitation in the License Agreement of the licensed product to Standard M-Series boilers with tangent tube walls — may be revoked as to executory portions of the contract "by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver." 13 Pa. C.S.

§ 2209(e); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 150, cmt. c (same); *Cassidy Podell Lynch, Inc. v. Snyder Gen. Corp.*, 944 F.2d 1131, 1147 (3d Cir. 1991) (applying New Jersey's UCC and noting that while the defendant "could have retracted its waiver with respect to future shipments, it could not demand compliance with respect to past shipments"); *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 150, cmt. e (explaining that, unlike a new interpretation of the contract based on course of performance, contract rights waived through course of performance are "subject to the possibility of reinstatement").

14. The executory portion of the Agreement was future boiler sales, and both EPTI and IKE gave notification – in writing – to VEO that VEO no longer had consent to deviate from Annex I.

15. If the Agreement is governed by the UCC, which is a legal issue, the failure to execute a written modification is fatal to any modification claim as a result of the requirement in the Agreement that any modification be in writing. A "signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded." 13 Pa. C.S. § 2209(b).

16. Regardless of whether the UCC applies, "the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence." *Nicolella v. Palmer*, 248 A.2d 20, 23 (Pa. 1968); *see also Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs.*, 685 A.2d 141, 146 (Pa. Super. Ct. 1996). There is a two-step analysis: First, "the parties' conduct [must] clearly show[] the intent to waive the requirement that the amendments be made in writing." *Id.*; *Sonfast Corp. v. York Int'l Corp.*, 875 F. Supp. 1099, 1103 (M.D. Pa. 1995). Second, there must be proof that, after waiving the written modification

5

requirement, the parties agreed to modify the contract; in other words, the same requirements for executing an original contract apply when modifying a contract: "[O]nce a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration." *J.W.S. Delavau v. E. Am. Transp. & Warehousing*, 810 A.2d 672, 681 (Pa. Super. Ct. 2002). Neither requirement is met here.

17. Accordingly, IKE asks for a ruling that if it introduces evidence that EPTI permitted VEO to sell nonconforming boilers on a case-by-case basis (*i.e.*, it waived strict compliance with the scope of the Agreement for particular projects), IKE may argue that as a matter of law, EPTI (and later IKE) had the legal right under the contract to withdraw consent.

Respectfully submitted,

/s/   John K. Gisleson
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
Jennifer A. Callery (Pa. ID. No. 91421)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

*Attorneys for Plaintiff and Counterclaim Defendant, Indeck Keystone Energy, LLC*

Dated: April 24, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Plaintiff's Motion for Legal Determination That Licensor Had the Right to Revoke Consent to Deviate From Annex I** was served upon the following counsel of record by the CM/ECF electronic filing system on the 24th day of April, 2007:

> Christopher T. Sheean, Esquire
> Matthew Garrett, Esquire
> Wildman, Harrold, Allen & Dixon LLP
> 225 West Wacker Drive
> Suite 2800
> Chicago, IL 60606

/s/  John K. Gisleson