your Honor.

THE COURT: All right. I'm going to give my court reporter and myself a break, then I'm going to come out and rule on all these motions.

(Recess from 1:35 p.m.; until 1:45 p.m.)

THE COURT: All right, this is going to be an order.

ORDER

Presently pending before the court are motions for partial summary judgment with respect to Count I, trademark infringement. Count IV, violation of Unfair Trade Secrets Act. Count V, unfair competition. And Count VI, unjust enrichment, filed on behalf of the plaintiff. The defendant, VEO, has also filed a cross-motion for summary judgment on the plaintiff's claims. And, finally, the plaintiff has filed a motion for partial summary judgment with respect to VEO's counterclaim.

The standard for summary judgment is well-established, summary judgment is inappropriate if there are disputed issues of material fact and all reasonable inferences should be drawn in favor of the non-movant.

The factual background to this case has been extensively laid out in the parties' briefs, as well as at oral argument here today. My recitation of facts, therefore, will be somewhat abbreviated. Fundamentally, the core issue in this case is whether VEO sold boilers which were outside the scope of the License Agreement entered into between EPTI, plaintiff's

1  predecessor, and Victory. I refer to them as Victory, it's
2  easier than VEO. Both parties claim that a plain reading of
3  the agreement and an annex attached thereto, clearly and
4  unambiguously support their respective positions. Moreover,
5  both parties point to parole evidence in support of their
6  respective views as to the meaning of the contract.
7       Before turning to the issue as to whether the
8  language of the agreement, insofar as it relates to the scope
9  of the boilers that were licensed to be sold was clear and
10 unambiguous or whether the contract is in fact ambiguous, I
11 briefly supply some additional factual background for context.
12      And I should say parenthetically that the following
13 information can be fairly gleaned from the record.
14      VEO contacted EPTI in or about December of 2002,
15 concerning the possibility of entering into a Licensing
16 Agreement for M-Series boilers. Mr. Viskup, on behalf of VEO,
17 Viskup exchanged various preliminary drafts with Mark White,
18 then of EPTI. An agreement was signed on or about January 8,
19 2003, which provided in part:
20      "Products' shall mean natural circulation,
21 industrial watertube package steam generators with a steam
22 capacity range beginning at 29,000 pph up to and including
23 150,000 pph. Products shall include but not be limited to the
24 items set forth in Annex I" ... thereafter, the parties signed
25 an annex to the License Agreement which had been prepared by

EPTI and EPTI's engineering staff. This annex included a description of products as EPTI's M-Series watertube boilers, to include 8M through 23M, which range up to 150,000 pph. There were also drawings, three separate drawings that comprised the annex, reflecting refractory wall, as opposed to membrane wall technology. The annex was signed by the respective representative of the parties on February 3, 2003. On February 27, 2003, an addendum was signed under the terms of which the licensor agreed to modify the products described in Annex I, to include higher pressures.

Thereafter, the record reflects that with the consent of EPTI, Victory sold Keystone boilers with 100-percent membrane technology for a period of approximately 15 months. On March 26, 2004, a letter was sent from EPTI to Victory, wherein, EPTI informed Victory that it was, in essence, that it was only permitted to market the M-Series boilers. This in turn generated a response from Victory through White, where he acknowledged that the agreement does provide specific geometry and characteristics of the licensed boilers, but concluded that the feature of the boilers marketed by VEO, while outside the geometry and characteristics of the agreement, were "improvements" within the definition of the agreement. IKE became licensor on September 8th of 2004. Since that time defendant has sold, as reflected in the record, approximately 11 boilers, all of which include membrane walls.

   Fundamentally, then, the parties disagree as to whether under the terms of the License Agreement, the permissible scope of products was defined by, for instance, pph rating or by fundamental design characteristics, i.e., membrane technology versus refractory walls.

   At this point it is appropriate to set forth the legal principles which control the resolution of the parties dispute as to the meaning of a License Agreement.

   In Pennsylvania, when interpreting a contract, the court's focus is on the intent of the parties as objectively manifested in the language of the agreement.  See Pacitti v. Macy's, 193 F.3d 766, 773 (3rd Cir. 1999.) "The purpose of contract interpretation is to ascertain and effectuate the objectively manifested intentions of the contracting parties."

   The court must first make a preliminary determination as to whether the contract's terms are ambiguous; whether a contract is ambiguous is a question of law.  See In re Stendardo, 991 F.2d 1089, 1094 (3rd Cir. 1993).  The terms of a contract are ambiguous if they are "capable of more than one reasonable interpretation." Pacitti, 193 F.3d at 773.  See also Mellon Bank v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3rd Cir. 1980).  "(Defining ambiguity as 'intellectual uncertainty' ... the condition of admitting two or more meanings, of being understood in more than one way, or

referring to two or more things at the same time.)"  If the court finds that the contract is clear and unambiguous in that "can be interpreted only one way," then the "court interprets the contract as a matter of law."  Id.  Conversely, if the court finds that the contract is ambiguous, then its interpretation is a question of fact.  And the issue is to be resolved by the fact finder after the presentation of extrinsic evidence.  See Hullett, 38 F.3d at 111.

"In determining whether a contract is ambiguous, the court should first examine the language of the document itself; in this regard the court should assume that the intent of the parties to an instrument is embodied in the writing itself.  And when the words are clear and unambiguous, the intent is to be discovered only from the express language of the agreement."  Pacitti, 193 F.3d at 773.  However, "a court is not always confined to the four corners of the written document in determining whether ambiguity exists."  Hullett, 38 F.3d at 111.  Indeed, it may not be possible to do so "without examining the context in which the agreement arose."  Id.  Thus, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."  Pacitti, 193 F.3d at 773.

Here, then, the court's first task is to make a determination, consistent with the above case law, as to

whether the terms of the contract are ambiguous. As previously discussed, plaintiff contends that the License Agreement, as well as the annex attached thereto, clearly restricted Victory from selling anything other than M-Series boilers which do not include membrane wall technology. Plaintiff points to the language used in the annex, referring to the M-Series boilers, as well as drawings connected with the product line in the annex as giving further definition to the term products in the main text of the License Agreement itself. Victory, on the other hand, argues that the annex is a mere guide and that under the terms of the agreement, it was not restricted to selling boilers with the older refractory wall technology.

Put simply, by examining the content of the annex, one could conclude that the product line was restricted to the M-Series boilers with the older refractory wall technology. As there were no other examples of boiler technology which appeared by definition or otherwise in the annex. On the other hand, as previously indicated, the following language appeared in the License Agreement itself. "Products shall include but not be limited to the items set forth in Annex I." With respect to that particular phrase, the fact as urged by the plaintiff, that that more expansive language may have found its way into this agreement as a mere carryover from a previous unrelated agreement to me is of no moment. In short, based upon the discussion above and in light of the

1  previously-described case law, I find that there is an inherent
2  ambiguity in the agreement.
3       Indeed, parole evidence, which has been marshaled by
4  both sides, seems to highlight the ambiguity.  By way of brief,
5  but not exhaustive summary, there is evidence of record, for
6  instance, of a course of conduct whereby EPTI permitted the
7  sale of membrane technology boilers as previously discussed.
8       There is evidence that in March of 2004, EPTI
9  informed Victory that it could no longer sell membrane wall
10 technology consistent with the License Agreement.
11      There is evidence of record to suggest that there
12 was no written amendment to the License Agreement when EPTI
13 permitted Victory to sell membrane wall boilers.  The only
14 written addendum to the contract which appears in the record
15 involved an agreement to expand the pressure ranges of the
16 boilers.
17      The record reflects that there is testimony from
18 Messrs. White, Viskup and Brewer, that they considered the
19 annex a mere guideline or guide.
20      There is testimony that Mr. White discussed with Mr.
21 Brewer that the agreement was intended to permit membrane wall
22 technology.
23      There is evidence that VEO, in response to EPTI's
24 letter, acknowledged that the boilers that it was selling were
25 outside the scope of the geometry and characteristics of the

1  boilers identified in the annex.
2           There is testimony in the record indicating that the
3  term M-Series boilers does not have a commonly understood
4  meaning in the industry outside of EPTI, and that the M-Series
5  boilers were capable and had in the past incorporated membrane
6  walls.
7           There is also testimony that Stephen Kang, on behalf
8  of EPTI, had reviewed the License Agreement and could not
9  himself determine whether membrane walls were included in the
10 definition of products.
11          There is also evidence that VEO, that Victory
12 rather, attempted to purchase from EPTI its Keystone boiler
13 technology.  And a reasonable inference could be drawn from
14 those negotiations that it recognized the O-Series technology
15 as a subset of M-Series technology.
16          That said, it is inappropriate for the court to
17 attempt to resolve the previously-described ambiguity in the
18 contract by resort to the previously-summarized parole
19 evidence, that is a matter properly reserved for the
20 "fact finder" after presentation of the extrinsic evidence.
21 Stenardo at 1094.
22          Consequently, for the reasons set forth above, the
23 plaintiff's and defendant's cross-motions for summary judgment
24 are denied.
25          I now turn to the plaintiff's motion for partial

1    summary judgment with respect to Victory's counterclaims.
2    Victory asserts claims for plaintiff's interference with
3    Victory's contracts with salespersons, as well as plaintiff's
4    alleged breach of the License Agreement's exclusivity
5    provision.
6              With respect to the breach of the License Agreement
7    claim, defendant claims that IKE breached it by producing sales
8    and marketing brochures which stated that the Keystone boiler
9    is capable of producing steam up to 500,000 pounds per steam
10   per hour. With respect to this claim, the defendant seeks
11   damages for loss of market opportunity. The basis for the
12   defendant's interference with contract claim is that Chris
13   Petcos met with a number of VEO sales representatives and
14   allegedly wrongfully advised them that they were not permitted
15   to sell anything other than the older style boilers. If they
16   chose to sell membrane style, they would have to leave VEO and
17   go with the plaintiff. And, furthermore, failing that, would
18   not be permitted to sell plaintiff's after-market parts.
19             In order for VEO to establish that IKE wrongfully
20   interfered with VEO's sales representative agreements, it must
21   prove in part those elements as set forth in Restatement of
22   Torts, Section 766. One, that IKE intended to harm VEO's
23   contractual relations with its sales reps. Two, that IKE acted
24   improperly, i.e., was not privileged to act the way it acted.
25   Three, that IKE induced or otherwise caused VEO sales

representatives to not perform the contracts. And, four, VEO suffered pecuniary loss resulting from the sales representatives failure to perform their contracts. As discussed more fully at oral argument, there is a gloss to 766 in the context of this case and that is Restatement 768, which relates to the competitive privilege. First, there is a dispute between the parties as to whether or not they were in fact competitors. Having carefully considered the record, as well as the rather expansive language in the case law interpreting the term competitor, it is my view that they were competitors as a matter of law.

That said, the remaining issue, as set forth more fully in the commentary to Section 768, is whether or not the conduct of the plaintiff's representative was nevertheless wrongful. In my opinion in part, it is premature to rule on that issue, because I find that there is an issue of fact there as well. Which turns in part on the resolution of the issue of the proper interpretation of the contract insofar as it either restricts or does not restrict the defendant from selling membrane wall technology. So the motion for partial summary judgment insofar as -- one other point I should make. There's also a contention that the damage claim relative to that particular claim is unduly speculative. My view is that for purposes of summary judgment it may have just narrowly cleared the non-speculative hurdle, but I will re-examine the issue of

1  damages more carefully at a later and appropriate date, perhaps
2  by way of appropriate motion at trial.
3          Finally, then, with respect to the exclusivity
4  claim, the essence of -- this boil down to this.  There is a
5  dispute between the parties as to whether the defendant was
6  given the exclusive right to manufacture or the exclusive right
7  to market.  Having read the agreement, it is not a model of
8  clarity.  But even assuming for the sake of discussion that a
9  fair common sense reading would suggest that they were also,
10 meaning Victory, given the right to market, given the exclusive
11 right to market, I find on this record and based on the
12 representation as to damages, a complete lack of sufficient
13 evidence to raise a triable issue on the question of damages,
14 particularly, insofar as the record is clear that no product
15 was actually sold.  So the motion for partial summary judgment
16 insofar as the breach of the exclusivity claim is concerned is
17 granted.
18         Okay.  Refresh my recollection then, where are we on
19 our discovery, what's the coming attractions, what's going on?
20         MR. GISLESON:  The parties have to clean up
21 discovery relating to VEO's new Voyager boiler, which requires
22 a couple of depositions in Tulsa, Oklahoma.  There are some
23 additional documents that IKE needs to provide on the subject
24 of Christian Power, and sales associated with some of those
25 sales representatives on that subject of the court's order.

1   And then there is expert reports and expert discovery, to the
2   extent that the parties wish to pursue that.
3              THE COURT: What's that going to be about, from your
4   standpoint?
5              MR. GISLESON: I think from IKE's perspective, it
6   may want an expert to assess the design of the new Voyager
7   boiler, to determine whether it incorporates the technology
8   that Victory received from EPTI. Because if so, that would
9   certainly support a misappropriation of trade secrets claim.
10             THE COURT: Aren't we going to get back into this
11  same issue again about you don't want them looking at your
12  equipment -- didn't we have this issue come up before, in
13  connection with trying to get the case resolved?
14             MR. GISLESON: Right. That was in terms of an
15  audit, they wouldn't agree to an audit.
16             THE COURT: Let's go off the record.
17             (Discussion held off the record.)
18             THE COURT: All right, we're back on the record.
19  What kind of expert discovery do you need?
20             MR. SHEEAN: Judge, we perceive that we will need an
21  expert, essentially for the same issue with respect to the
22  design of the Keystone boiler, whether or not that is in fact
23  within the public domain, as the aspects of it. That had it
24  been in the public domain for a number of years. And,
25  likewise, we may need a rebuttal expert if they, if IKE gets an

1    expert regarding the Voyager design.  We'll probably need a
2    damages expert as well, for the reasons that we talked about.
3         THE COURT:  Just so I'm clear again, Mr. Gisleson,
4    the reality is if you can show that they breached the License
5    Agreement -- but if you can't show, for instance, that your
6    engineering information was a trade secret, since you don't
7    have an independent contract claim against them, that's merely
8    the predicate for getting on to the trade secret, you could
9    still come away with nothing, is that right?
10        MR. GISLESON:  I'm not sure.  I mean even if it's
11   not a trade secret, in our view, they don't have the right to
12   incorporate the technology.  Because even if it's not a trade
13   secret, it could still be proprietary.  And they can't
14   incorporate that technology into their boiler.
15        THE COURT:  But there's no contract claim?
16        MR. GISLESON:  That's correct, there is no contract
17   claim in this lawsuit.  So it could spawn another lawsuit, but
18   also would form the basis for misappropriation of trade secrets
19   claim.  And they've got a counterclaim in which they're seeking
20   a declaratory judgment that they can continue to sell watertube
21   boilers at the conclusion of the License Agreement, which is
22   what they're doing now.  But if they're selling boilers after
23   the License Agreement that incorporates our technology, I think
24   that's a basis for denying their counterclaim.
25        THE COURT:  All right.  How long is this all going

1  to take to get to the end of the discovery -- you can sit down
2  for a second.  Off the record.
3             (Discussion held off the record.)
4             THE COURT:  How much more time -- non-expert
5  discovery is over except for a few loose ends?
6             MR. GISLESON:  Correct.  The only possible
7  scheduling glitch for me is I have to try a $165 million
8  accounting malpractice case against PriceWaterhouse out in
9  Chicago.
10            THE COURT:  When?
11            MR. GISLESON:  The entire month of September.
12            THE COURT:  In federal court?
13            MR. GISLESON:  In State court.  It's a 1997 case
14 that I inherited from my old law firm.
15            THE COURT:  All right.  I want to get some
16 timeframes set here.  Do you have experts in mind?
17            MR. GISLESON:  There are people who historically
18 have been involved with these boilers and are now retired and
19 are no longer working, who we have considered.
20            THE COURT:  Do you have experts in mind?
21            MR. SHEEAN:  We've had preliminary discussions but
22 nothing beyond that, your Honor.
23            THE COURT:  All right.  Well, you got 120 days from
24 today to complete your expert discovery.  In other words, to
25 complete, that's the remaining discovery.

1        Plaintiff's pretrial narrative statement with expert
2   report or reports, if there are going to be any, will be due 20
3   days thereafter.
4        Defendant's pretrial statement will be due 20 days
5   after the receipt of the plaintiff's pretrial.  And once we get
6   the pretrial narrative statements in, we'll set this thing down
7   for a pretrial conference.  This will be on my October trial
8   term -- let me think.  Maybe December, I think I won't reach it
9   until December.  Then finally off the record.
10       (Discussion held off the record.)
11       THE COURT:  Let's go back on the record.  The
12  subject just informally came up as to the question of
13  bifurcation on this case.  And I don't have a motion before me,
14  so I haven't thought it through.  But I can tell you, based
15  upon what I know, it would be unlikely in the extreme that I'm
16  going to grant any kind of motion to bifurcate in this case.
17  In my opinion, it would not result in a savings of judicial
18  resources.  Once we start, if we're in for the penny, we're in
19  for the pound, we're going to go right through all the way to
20  damages.  All right, thank you, counsel.
21
22       (Whereupon, at 2:22 p.m., the proceedings were
23  concluded.)
24
25                         - - -

126

## CERTIFICATE

5  I, Ronald J. Bench, certify that the foregoing is a
6  correct transcript from the record of proceedings in the
7  above-entitled matter.

_____

Ronald J. Bench