IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY LLC,   )
                              )
         Plaintiff,           )
                              )
    vs.                       )   Case Number:
                              )   04-325
VICTORY ENERGY OPERATIONS LLC,)
                              )
         Defendant.           )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

The Deposition of PAUL A. KEMPF, P.E.

Date:   Tuesday, November 1, 2005

Time:   1:37 p.m.

Place:  Boveri, Murphy, Rice & LaDue
        400 Plaza Building
        210 South Michigan Street
        South Bend, Indiana

Called as a witness by the Defendant in accordance with the Federal Rules of Civil Procedure and Rules of the United States District Court for the Western District of Pennsylvania, pursuant to Notice.

Before Melody M. Goodrich, CM
Notary Public, Cass County, Michigan

GOODRICH REPORTING
P.O. Box 338
Cassopolis, Michigan 49031-0338
(269) 445-8517

COPY

Page 57

1    conversation about everybody else in the industry.
2        I was -- it was some of the most unprofessional
3    discussions you'll ever have. All you had to do
4    was say, well, what do you think of your
5    competition, and you got an hour dissertation.
6  Q  To the best of your recollection, did Mr. Cole
7    discuss any of Indeck's competitors in that first
8    meeting?
9  A  I'm not sure we had that -- those discussions at
10   that point.
11 Q  Okay. When was the next time that you met with or
12   spoke to Mr. Cole?
13 A  Probably periodically. Off and on he would call,
14   as would everyone else, to follow up on the bidding
15   process and -- and our decision-making.
16 Q  Do you recall any specific follow-up conversation
17   with Mr. Cole from the time that you first met with
18   him, until the time that Indeck was eliminated as a
19   bidder for -- for boiler number 6?
20 A  I don't.
21 Q  Did he visit you at Notre Dame at any point during
22   that period of time, or was it all telephonic?
23 A  Mostly telephone. He may have stopped by one other
24   time. I don't absolutely remember.
25 Q  Do you have any clear recollection, during any of

Page 58

1    those conversations with Mr. Cole, from the first
2    meeting until Indeck was eliminated as a bidder, of
3    any instance where Mr. Cole discussed any of
4    Indeck's competitors?
5  A  Well, we have to define for me what -- the point
6    when they were eliminated as a bidder.
7  Q  And I think that's a fair statement, and I
8    appreciate you helping me out with that.
9        I would say at the time that the bid process
10   was reduced to the three finalists, subject to the
11   possibility of others coming back in if these three
12   didn't work out. Using that as a time reference.
13 A  I'm sure we had some conversation because one of
14   the general -- just a general question we -- again,
15   I don't remember if it was in here or not. Give me
16   a second.
17       Actually, it's probably the kind of question
18   you don't typically write down and send somebody,
19   but on our list of questions that we -- you know,
20   we give you a list of questions for your meeting,
21   and we'd have other questions we were going to see
22   how you handled off-the-cuff.
23       And I know one of the standard questions was,
24   you know, how do you feel like you stack up against
25   your competition. We'd open that door and see who

Page 59

1    walked through it and what they would say.
2        I'm sure we had at least one of those
3    conversations with -- with him, and we had those
4    conversations with everyone at some point prior to
5    the meetings in August.
6  Q  Okay. Do you recall any statements that Mr. Cole
7    made prior to the meetings in August regarding
8    Indeck's competition?
9  A  There was a general mistrust from all of them
10   focused at the English Boiler proposal. Actually,
11   if you were going to buy a boiler based on what the
12   competitors said, you wouldn't buy anybody's boiler
13   because they all told you how none of the other
14   ones were any good.
15 Q  I understand. I understand.
16 A  Made that a difficult process.
17 Q  I understand. But what I'm interested in is rather
18   than a general specific relating to Mr. Cole, do
19   you recall any specific comments that Mr. Cole made
20   regarding Indeck's competition between the first
21   conversation and that third week of July?
22 A  To the best of my recollection, his comments were,
23   again, like most others. The English boiler was a
24   unique design, a patented design that they had and,
25   therefore, it seemed to draw the most fire from

Page 60

1    everybody. If you're going to complain, complain
2    about something you can't provide.
3        But I don't have an absolute memory of what he
4    would have said. I just heard that from everybody.
5  Q  Do you recall any conversations specifically with
6    Mr. Cole after the third week of July, when the
7    university reduced the number of active negotiators
8    that it was dealing with down to three?
9  A  Yes.
10 Q  Okay. How many specific conversations do you
11   recall with Mr. Cole after the third week of July?
12 A  One very specifically in the middle of August, that
13   I took a Record of Conversation from. Subsequent
14   to that, there may have been a couple other phone
15   calls. I don't remember the exact number or dates.
16 Q  And then, I think, you already identified a meeting
17   that you had with Mr. Cole in Montreal?
18 A  Yes, and that was -- I don't remember the exact
19   time, but it was probably in October sometime,
20   October, November.
21 Q  And that's 2004, correct?
22 A  Correct.
23 Q  We're going to go ahead and mark as Deposition
24   Exhibit No. 7 a document that you brought here
25   today with you and have represented to us that you

Page 61

1   located sometime in the last day or two, from your
2   desk.
3       And before we mark it, I'll just identify it as
4   a Record of Conversation on University of Notre
5   Dame Facilities Engineering notepad, dated
6   August 18, '04, time 8:30 a.m., with Jeff Cole.
7  A  Correct. I would just say it was not from my desk.
8     It was from our central files, is where --
9  Q  Fair enough.
10 A  -- where I found it.
11         (Deposition Exhibit 7 marked for
12          identification.)
13 BY MR. SHEEAN:
14 Q  I'm handing you what we've marked as Exhibit 7 and,
15    sir, let me ask you, is that a -- is that an
16    accurate copy of your Record of Conversation you
17    produced to us today?
18 A  Yes, it is.
19 Q  And did you take these notes down contemporaneously
20    with your conversation with Mr. Cole?
21 A  Yes.
22 Q  And is the -- are the notes an accurate reflection
23    of your conversation with Mr. Cole, to the best of
24    your recollection?
25 A  Yes.

Page 62

1  Q  And you kept these notes after you'd made them in
2     August of -- 18th, 2004, in keeping with the
3     standard document retention policy in place at the
4     University of Notre Dame?
5  A  I'm not sure I know what our standard document
6     retention policy is. I would say that I don't
7     frequently write records of conversation, a few
8     times a year.
9         This obviously struck me as a time that I chose
10    to take some notes. I recalled this conversation.
11    I just wasn't aware that I had this written record
12    until two days ago.
13 Q  Okay. Is it fair to say that this document was
14    maintained as a standard business record by the
15    university?
16 A  Yes.
17 Q  Okay. Since it's in your handwriting, I wonder if
18    you'd be so kind as to read the body of the Record
19    of Conversation.
20 A  I'll do my best to read my cryptic, broken,
21    left-handed writing here. It says," Follow-up on
22    boiler, concerned that we are considering an "O"
23    type. Advised that intellectual property at risk.
24    Erie Power rights to be liquidated by end of
25    August. Appears that Indeck is in play for rights

Page 63

1   and Victory is not. If Indeck obtains rights,
2   Victory will no longer be allowed to manufacture
3   boilers based on intellectual property. Questions
4   investment of Victory and English to business.
5   Suggests we be skeptical."
6       I think that's a different thought.
7       "Offers visit and trip to Canada to see their
8   operation," and next thought was, "English issues
9   as well." I believe I was referring to an LA
10  boiler, meaning Los Angeles, "Over-rolled tubes,"
11  obviously, was the problem he was referring to.
12      "Rentech BP, meaning Bridge Petroleum, Cherry
13  Point," and then it said, in parentheses, "locked
14  out."
15 Q  Okay. Thank you. I just want to go through that a
16    little bit. "Concerned that you were considering
17    an "O" type."
18        Did he say anything regarding the "O" type
19    design other than the intellectual property
20    issue -- concerns that follow, to the best of your
21    recollection?
22 A  I don't recall that.
23 Q  Okay. So --
24 A  Unless it was the membrane issue but I -- but I
25    don't recall that being unique.

Page 64

1  Q  Well, to the best of your recollection, did anyone
2     ever tell you that membrane-wall construction was
3     something that was proprietary to Erie Power?
4  A  No.
5  Q  Okay. The next sentence that you read was "Advise
6     that intellectual property at risk. Erie Power
7     rights to be liquidated by end of August."
8         Do you recall specifically what he said in that
9     regard, beyond what's written there and what I just
10    read?
11 A  My gist of it is, is just telling me that -- as we
12    had found out earlier in August, that, you know,
13    Erie Power was in bankruptcy, that it was in the
14    process of being sold. He was saying, you know,
15    hey, by the end of the month we think this is going
16    to be sold, it looks like Indeck may be in a
17    position that they're going to buy it and Victory
18    wasn't really even in the running, is my
19    recollection of the conversation, that they weren't
20    either interested or in a position to be bidding
21    for the rights.
22        And then he went on to intimate that it would
23    seem likely that if Indeck got the rights, there
24    might be difficulty for Victory to produce a boiler
25    of that type.

Page 65

1  Q  Did he say why Victory would no longer be allowed
2     to manufacture this boiler based on intellectual
3     property if Indeck obtained the rights?
4  A  Not beyond just that.
5  Q  Okay. What did you take from -- well, let me --
6     strike that.
7        First of all, you indicated a minute ago it's
8     not your standard practice to take down handwritten
9     notes of telephonic conversations, correct?
10 A  Correct.
11 Q  What -- what prompted you to take these notes in
12    this instance?
13 A  I think at this point we were getting so much bad
14    news about every vendor, that if you called and
15    talked to me, I wrote a note somewhere, and that
16    day I happened to have one of these pads on my
17    desk.
18       I also think it was a little disconcerting to
19    hear some of this information, and if you really
20    look at this, at this point I presume -- I should
21    never presume -- Mr. Cole obviously was aware of
22    who the short list were because he called me and
23    made a comment about each and every one of them,
24    all of them in the negative.
25 Q  And was that public knowledge, to the best of

Page 66

1     your -- to the best of your recollection?
2  A  I think in their industry they all talk to one
3     another.
4  Q  But --
5  A  It wasn't something we publicly released, no.
6  Q  Did you follow up with anyone within the university
7     to inquire about this issue of the intellectual
8     property rights at risk?
9  A  I don't recall that I did.
10 Q  How about anyone with Cummins & Barnard or any of
11    your outside vendors who were helping you with the
12    procurement?
13 A  I also don't recall doing that either.
14 Q  Well, what, if anything, did you do with this
15    information once you had this conversation with
16    Mr. Cole, where he told you that if Indeck obtained
17    the rights, Victory would no longer be allowed to
18    manufacture boilers based on intellectual property?
19 A  We shared it internally. I'm sure we shared it
20    with Cummins & Barnard. Although, there really
21    wasn't anything that I recall asking them to do.
22       At this point in our evaluation, we were
23    leaning towards English and NATCOM, and so if that
24    was going to be the end decision, it really didn't
25    matter to me.

Page 67

1        So I think it was just something we -- plus,
2     I -- a lot of these times I couldn't judge the
3     validity of what everyone was telling me because
4     they were telling me a lot of terrible things.
5        If we had been to a point where we discussed
6     further with Victory a purchase, we would have
7     certainly, in confidence, brought it up with them,
8     but we never got to that point.
9  Q  Were you concerned that if you went forward with
10    Victory, you were going to be getting involved in
11    some sort of a litigation matter?
12 A  I really didn't think about that, from the
13    standpoint that that wasn't our focus at that
14    point, where we were going to go. So I didn't have
15    to think about it.
16 Q  Is it fair to say that Mr. Cole's comment raised
17    doubts in your mind about Victory Energy's
18    relationship with the intellectual property rights?
19 A  I guess what I would say is it was -- it was in
20    conflict with what Victory had told us and that
21    they had a license agreement, that they were -- had
22    shared or were sharing with us at that -- at or
23    around that time.
24       And, again, we didn't get to a point where we
25    were seriously looking at Victory, that then I

Page 68

1     would have asked our general counsel to look at
2     this. It's certainly not an issue I would have not
3     asked for help on.
4  Q  Why, as of August 18, 2004, were you leaning more
5     toward English Boiler than Victory or Rentech?
6  A  Lower costs, higher efficiency, lower emissions.
7     Every -- they basically met the criteria that we
8     were looking for. They were the evaluated most
9     responsive/best bidder, however you want to call
10    that.
11 Q  Did you go back to Victory after the meeting in the
12    first week of August and ask them if they could
13    lower the price or lower the emissions or raise the
14    efficiency of their boiler?
15 A  No. We didn't do that with anyone.
16 Q  Do you know whether or not Victory Energy could
17    have lowered the price or raised the efficiency or
18    lowered the emissions?
19 A  I only can -- no, I don't know that.
20 Q  The next sort of paragraph in your handwritten
21    notes say, "Questions investment of Victory and
22    English to business. Suggests we be skeptical;" do
23    you see that?
24 A  Yes.
25 Q  What did you think Mr. Cole meant by that?

Page 73

1  boilers at the time you made the decision not to
2  select Victory Energy?
3          MR. GISLESON: Objection,
4      misleading, foundation, vague.
5  BY MR. SHEEAN:
6  Q  You can answer.
7  A  Help me with that one.
8          I was aware of the situation as Jeff had laid
9      it out. I did not really go investigate to see if
10     what he was telling me was true or not. And,
11     again, I think, yes, I was aware, but it wasn't
12     part of my decision process.
13 Q  Did you meet with anyone else from Indeck when you
14     were up at the plant in Montreal?
15 A  Basically one other gentleman who was the plant
16     manager. I'd have to dig back to find his name,
17     but he was the guy who ran the facility.
18 Q  And is that actually the Volcano plant in Montreal?
19 A  I believe you are correct.
20 Q  And are those direct-fired package watertube
21     boilers?
22 A  I believe so. They made a variety of things there.
23         MR. SHEEAN: I think I'm done.
24     Let me just go through my notes real
25     quick.

Page 74

1          MR. GISLESON: Want to take a
2      short break so the witness can
3      stretch his legs, perhaps get some
4      water and then, Chris, you can
5      finish up with anything?
6          MR. SHEEAN: That's fine.
7          MR. HOYE: That's a great idea.
8      Thank you.
9          VIDEOGRAPHER: We're off the
10     record. The time is 3:08 p.m.
11     (Short recess taken.)
12         VIDEOGRAPHER: We're back on
13     the record. The time is 3:16 p.m.
14     This is tape number 2 in the
15     deposition of Mr. Kempf.
16         MR. GISLESON: Good --
17         MR. SHEEAN: Mr. Kempf, I just
18     want to say I have no further
19     questions at this time.
20              CROSS-EXAMINATION
21 BY MR. GISLESON:
22 Q  Good afternoon. We looked at Exhibit 1, which
23     included the instructions to bidders, as well as
24     the bid specifications for the boiler number 6
25     project; is that right?

Page 75

1  A  Correct.
2  Q  And if you could pick those up, if you don't mind.
3      Looking at page ND43, which is Section 20,
4      "Invitation For Bids," does this basically set
5      forth the ground rules for how the University of
6      Notre Dame was going to evaluate the bids that were
7      submitted by the different bidders?
8  A  Yes, it does.
9          MR. SHEEAN: What's the page
10     number?
11         MR. GISLESON: ND43.
12         MR. SHEEAN: Thank you.
13 BY MR. GISLESON:
14 Q  Under due date, for April 29, 2004, it says that
15     seven copies of the proposal shall be delivered to
16     you; is that right?
17 A  Yes.
18 Q  How many people were involved in the decision
19     process for the boiler?
20 A  Probably three to four people from our staff and
21     I'm going to say a light number from Cummins &
22     Barnard --
23 Q  As --
24 A  -- had some involvement at some point.
25 Q  As the director of utilities, were you the one who

Page 76

1      was ultimately in charge of the process?
2  A  I presume so, yes.
3  Q  As the director of utilities, ultimately the
4      decision rested with you as to which boiler to
5      select subject to the advice and opinions that you
6      received from the other members of the team?
7  A  That is correct.
8  Q  Did VEO, Victory Energy Operations, have a right to
9      a contract with the university for the watertube
10     package boiler that was being bid as a result of
11     its having submitted a bid to the university?
12 A  No.
13 Q  And is that basically set forth on page ND43, under
14     the paragraph "Right to Reject: The purchaser
15     reserves the right to reject any or all proposals
16     received as a result of this request for proposal
17     or parts thereof or items therein. The purchaser
18     reserves the right to enter into an agreement with
19     whomever it chooses, and the award may be to other
20     than the low bidder"?
21 A  That is correct.
22 Q  Did English obtain the contract for the watertube
23     package boiler --
24 A  Yes.
25 Q  -- on the merits?

Page 77

1  A  Yes.
2  Q  And when you were identifying lower cost, higher
3     efficiency, and lower emissions, English submitted
4     the proposal that was the best in terms of each of
5     those features?
6  A  Yes.
7  Q  Was it your opinion, based on the investigation you
8     did, that the English boiler was in the best
9     interest of the University of Notre Dame?
10 A  Yes.
11 Q  And is that still your opinion?
12 A  Yes.
13 Q  If we look at Exhibit 2, which is the proposal that
14    Victory Energy Operations submitted to the
15    university, did you personally read the proposal
16    cover to cover, page for page?
17 A  I went through all these proposals in fairly decent
18    detail. I won't swear to having read every word.
19 Q  Was the bid that Victory submitted higher in terms
20    of dollars, a higher cost --
21 A  Yes.
22 Q  -- than the English proposal?
23 A  Yes.
24 Q  On page ND212, they have a series of mandatory
25    alternates; do you see that?

Page 78

1  A  I do.
2  Q  Under alternate number 5, it has, "Furnish all
3     welded tube construction in lieu of rolled
4     construction;" do you see that?
5  A  Yes.
6  Q  What's the difference, as you understand it,
7     between all welded tube construction and rolled
8     construction?
9  A  I think that's how the tubes are attached to the
10    drum.
11 Q  Is rolled construction different than all welded
12    tube construction?
13 A  Yes.
14 Q  Were there some bidders who submitted bids that
15    utilized rolled construction instead of an all
16    welded tube construction?
17 A  I believe there may have been.
18 Q  You were asked some questions about welded-wall
19    construction.
20    Were there any bidders who didn't submit a
21    proposal that featured welded-wall construction?
22 A  Talking about membrane construction?
23 Q  Correct.
24 A  I think parts of their boilers may not have been a
25    hundred percent membrane construction.

Page 79

1  Q  Are you familiar with the concept of a tangent-tube
2     construction in watertube boilers?
3  A  I've heard it, but I won't claim to fully
4     understand it.
5  Q  Do you know whether any of the boilers currently in
6     use at the university have a tangent-tube design?
7  A  You know, I'm not certain of that.
8  Q  Are there any of the boilers currently in use at
9     the university that do not have an all-membrane
10    design?
11 A  I actually think all of them are not all-membrane
12    design.
13 Q  And those boilers are still performing adequately
14    for the university?
15 A  Yes.
16 Q  And the university is able to utilize those boilers
17    to generate steam, even though they do not have an
18    all welded wall design?
19 A  Correct.
20 Q  From reviewing this initial proposal that Victory
21    submitted to the university in May 2004, were you
22    able to determine whether Victory owned the
23    technology that was the subject of its proposed
24    Keystone boiler?
25         MR. SHEEAN: Objection, vague.

Page 80

1  A  All I really was aware of is that they had -- as
2     they had told us, that they held a license to use
3     the Erie design.
4  BY MR. GISLESON:
5  Q  When did Victory first tell the university that it
6     held a license to use the Keystone design?
7  A  Without reading the proposal, to see if they said
8     it here, I know for certain it was made aware to us
9     when we had the interview process. I may have
10    known it before then, but I'm not certain.
11 Q  During the interview that occurred in August 2004,
12    did you ask any specific questions as to the role,
13    if any, that Erie Power Technologies would have if
14    Victory was awarded a contract for boiler number 6?
15 A  I believe we asked some questions directly to the
16    gentleman from Erie.
17 Q  Bob Gdaniec?
18 A  Yes.
19 Q  What did Mr. Gdaniec say?
20 A  I think it was basically to explain, my
21    recollection, that Erie had a collection of designs
22    and all the design work it had done for an "O" type
23    design and then what they did was helping the
24    licensees in tailoring, for lack of a better word,
25    the specific design into an "O" design. So they

Page 81

1    were a part of that engineering process.
2        I know he discussed that, you know, they
3    obviously didn't fabricate anything or manufacture
4    anything. That was all stuff that Victory would
5    have done.
6  Q  You said that the "O" design was a well-known,
7    long-term design with a long history. Are you
8    referring to the Keystone?
9  A  Yes.
10 Q  Is one of the boilers that the university currently
11   has a boiler that was manufactured by Erie City
12   Ironworks?
13 A  I believe it is. I think our number 1 boiler is an
14   Erie City "O" -- "O" type boiler.
15 Q  And has that performed well for the university over
16   time?
17 A  Yes, it has.
18 Q  Have you developed an understanding that the
19   Keystone name is well known in the industry for "O"
20   type boilers?
21 A  It was presented to us that way, yes.
22 Q  Presented to you by whom?
23 A  By Victory.
24 Q  Looking at the Victory proposal, at page ND220,
25   which is a page that you looked at with Mr. Sheean,

Page 82

1    this says "O" type boiler specifications and then a
2    general description of the Keystone design.
3        Did you agree, generally speaking, with the
4    description of the benefits that are identified on
5    this page for the Keystone design?
6  A  I generally took the benefits, as people gave them
7    to us, at their word. I wouldn't say I researched
8    them to any great length.
9  Q  Turning to page ND276, which is the first page of a
10   "Victory Energy Keystone Steam-Generating Systems"
11   brochure, do you recall whether you read the
12   brochure that Victory submitted?
13 A  I don't recall reading that. It's -- when I had
14   six or seven of these to read, it's very likely I
15   didn't read that in any great detail.
16 Q  Looking at page ND283, under "Keystone Wall
17   Construction," it says, "Victory Energy's design,
18   engineering, and manufacturing advances offer a
19   complete range of wall construction technology."
20       During the meeting in August 2004 at Notre
21   Dame, did Victory identify any advances that it had
22   developed in the design, engineering, and
23   manufacturing of watertube boilers or
24   wall-construction technology for watertube
25   boilers?

Page 83

1  A  I don't --
2            MR. SHEEAN: Objection, vague.
3  A  I don't specifically recall.
4  BY MR. GISLESON:
5  Q  Turning to page ND292, which is a list of package
6    boilers, selected references, did Victory make any
7    representations to you or, to your knowledge,
8    anyone else associated with this project, as to
9    which of these boilers Victory itself had been
10   involved in the manufacture?
11 A  No, I don't believe so.
12 Q  Was it your belief, from seeing a list of
13   references supplied by Victory, that Victory itself
14   had been involved with the design and manufacture
15   of those boilers?
16           MR. SHEEAN: I'm going to
17           object to the extent it
18           mischaracterizes prior testimony,
19           but you can answer.
20 A  I don't recall at what point but I -- I do recall
21   that at some point there was a realization on my
22   part that possibly they hadn't actually
23   manufactured all of these.
24 BY MR. GISLESON:
25 Q  Did it come as a surprise to you that Victory had

Page 84

1    never designed and manufactured a boiler above a
2    hundred thousand pounds per hour as of the time
3    that it submitted the proposal to the university?
4  A  I wouldn't say it was a surprise, but it was
5    certainly a point of concern.
6  Q  Why was it a point of concern?
7  A  One of our early issues was to try to find a
8    manufacturer that had experience in the boiler we
9    were -- were trying to buy, both in size and type.
10 Q  Had you heard of horror experiences in the industry
11   of a manufacturer who got in over its head?
12           MR. SHEEAN: Objection, vague.
13 A  I don't know that we heard of them in quite that
14   context. We heard a lot of different things but
15   not so much that they got in over their head. I
16   think that was just a concern of our own.
17       In reality, we found out that there was a lot
18   of people that didn't have a lot of experience.
19 BY MR. GISLESON:
20 Q  The university ultimately decided that it wanted a
21   NATCOM burner in the boiler it ultimately selected;
22   is that right?
23 A  Yes.
24 Q  What was it about the NATCOM burner?
25 A  They were able to guarantee lower NOx emissions on

Page 85

1   both natural gas and No. 2 fuel oil firing.
2 Q Did that become a condition, in the university's
3   view, of any successful bidder, that it utilize a
4   NATCOM burner?
5 A We realized that their guarantees were
6   significantly lower than their competition, and we
7   felt that we needed that boiler to achieve the
8   limits that we were having to propose to the state
9   or at least to get ourselves enough margin for our
10  own safety for ongoing operations.
11 Q Was Victory Energy able to provide a package
12  watertube boiler that utilized a NATCOM burner?
13 A They had told us that they could not or would --
14  more specifically, they would not.
15 Q Was that an important factor to you in your
16  decision to go with the English boiler?
17 A It was a factor, that we felt that NATCOM was our
18  best opportunity to meet the compliance needs that
19  we had.
20 Q In the July 21, 2004 letter from Cummins & Barred
21  (sic), to Ed Hull of Power Systems, in which he
22  identified Victory Energy as one of the three
23  boiler manufacturers that had been short-listed,
24  there was a bullet point -- bullet point on there
25  for benefit/shortcomings of all welded tube

Page 86

1   construction.
2       Do you recall any of the three finalists
3   identifying any shortcomings associated with all
4   welded tube construction?
5 A We're moving, again, into an area that I'm not the
6   expert on, but I think we may have started out this
7   process looking at welded tube and eventually
8   ending back up with rolled tube, but I'd have to
9   verify that.
10      So there was some -- my recollection, at least,
11  was there was contention amongst the manufacturers
12  as to what was better.
13 Q It was still an open issue as to which was better,
14  rolled tube versus welded tube?
15 A Correct.
16 Q You were asked questions about whether welded-wall
17  technology is proprietary to a certain
18  manufacturer.
19      Did you ever get into an analysis at any point
20  during this process as to what technology was or
21  was not proprietary to a particular manufacturer?
22 A No.
23 Q Did you ever get to the point where you were
24  looking at detailed design drawings for the kind of
25  wall construction that was to be used, to determine

Page 87

1   whether a particular manufacturer considered its
2   specific design for wall technology to be
3   proprietary?
4 A No.
5       I should correct. The only -- understand
6   proprietary. There was that discussion about the
7   "S" type boiler, but that didn't relate to, you
8   know, membrane-wall construction or the tube, and
9   that was generally accepted by all, that they had a
10  patent. We didn't investigate it.
11 Q Looking at Exhibit 5, which was the July 21, 2004
12  Cummins & Barnard letter, with the meeting minutes
13  attached to it, under the section for Victory
14  Energy Operations, paragraph 3, which is at page
15  ND333, it says, "As 'Victory Energy' they have not
16  manufactured a boiler in the size required for this
17  project, however they can easily scale up their 'O'
18  style design for this project, utilizing a proven
19  Keystone design."
20      Who was speaking from Victory on that point?
21 A I -- I don't recall specifically who would have
22  said that.
23 Q If we look at the previous page under "Victory
24  Energy Discussion," it says, "Introductions were
25  held and John Viskup of Victory provided an

Page 88

1   overview of the company and general discussion of
2   their boiler design."
3       Does that help in any way in identifying who on
4   behalf of Victory stated that although Victory has
5   not manufactured a boiler in the size required for
6   this project, however, they can easily scale up
7   their "O" style design?
8 A I can't say absolutely. I don't recall who said
9   that.
10 Q Do you have an understanding as to what was meant
11  by the statement from the Victory representative
12  that Victory can easily scale up their "O" style
13  design?
14 A I think I do.
15 Q And what's that understanding?
16 A Just that it's -- it's the same as the smaller one,
17  only bigger, and that was --
18 Q They can use their existing technology, to which
19  they have access, to design and manufacture a
20  larger boiler?
21 A Correct.
22 Q Did anyone from Victory during that meeting
23  identify any limitations to their abilities or
24  technology to scale up their existing technology to
25  design and manufacture a 180,000-pound per hour

Page 89

1    watertube boiler?
2  A  I don't recall any.
3  Q  And if we look in the same meeting minutes on
4     paragraph 13, same page, ND333, it reads, "In
5     regards to supplying a NATCOM burner, Victory
6     stated that they cannot do this due to NATCOM's
7     affiliation with Nebraska Boiler;" do you see that?
8  A  I do.
9  Q  And did you understand that to be an unequivocal,
10    unconditional statement by Victory?
11           MR. SHEEAN:  Objection, vague.
12 A  Pretty much. I'd have to clarify that for you a
13    little bit but, yeah, pretty much.
14 BY MR. GISLESON:
15 Q  Did they ever come back thereafter and say, hey, we
16    changed our mind, we'll supply a NATCOM burner?
17 A  I think what happened ongoing is everybody was
18    looking at also the other alternate. We didn't say
19    we wanted a NATCOM burner. We said we wanted
20    certain emission levels.
21    Coen, for example, still had the opportunity to
22    meet that. So I'm sure Victory probably was still
23    working with them.
24 Q  Did they ever come back and to your satisfaction
25    demonstrate that they can exceed the emissions that

Page 90

1     could be developed or obtained through the English
2     boiler?
3  A  No.
4           MR. GISLESON:  Mark this as an
5     exhibit, please.
6           (Deposition Exhibit 8 marked for
7           identification.)
8  BY MR. GISLESON:
9  Q  I'd like to show you what's been marked as
10    Exhibit 8, which is a two-page letter stamped ND355
11    to 356.
12    Do you recognize this as a true and correct
13    copy of an August 20, 2004 letter, that you
14    received from Christopher T. Sheean of the Law Firm
15    Kelley Drye & Warren?
16 A  I do.
17 Q  Did you review the letter when you received it?
18 A  I did.
19 Q  Now, you mentioned before that you had had a
20    conversation with Jeff Cole on August 18, 2004,
21    concerning the license that Victory had; is that
22    correct?
23 A  Yes.
24 Q  So that the letter you received from Mr. Sheean
25    came after the conversation you had with Mr. Cole;

Page 91

1     is that right?
2  A  That is correct.
3  Q  And Mr. Sheean writes, "This firm represents
4     Victory Energy Operations, and we've been asked to
5     comment on the status of Victory Energy's license
6     agreement with Erie Power & Technology,
7     Incorporated. Victory Energy's license should
8     remain in place following the sale of EPTI's assets
9     for two reasons," and then he identifies two
10    reasons in his letter; do you see that?
11 A  I do.
12 Q  Now, after you received this letter, did you do any
13    follow-up investigation or research of any kind on
14    this issue of whether Victory would retain the
15    right to use the Keystone technology if the Erie
16    Power assets were sold?
17 A  I did not.
18 Q  Did this letter satisfy any concerns you may have
19    had at the time?
20 A  It did for the reasons I stated earlier, that we
21    weren't necessarily pursuing a purchase from
22    Victory, but at that point it was something to put
23    in the file, and if we had swung in that direction,
24    I'd have gone back to this issue.
25 Q  From your perspective, there was no need to do any

Page 92

1     further investigation because at the point you had
2     the conversation with Jeff Cole and then you
3     received the letter from Victory's lawyer, the
4     university already planned to award the contract to
5     English Boiler?
6  A  That's a little overreaching. I think we were
7     intending to pursue negotiation with them, and
8     Victory at that point was our back-up plan, for
9     lack of a better term.
10 Q  And it was never necessary to pursue the back-up
11    plan because you reached agreement with English
12    Boiler?
13 A  That's correct.
14 Q  Did you consider English Boiler to have
15    significantly less experience than Victory Energy
16    Operations?
17 A  No.
18 Q  Did you consider English Boiler to offer a product
19    with an inferior history in sales record to the
20    Victory product?
21 A  No.
22 Q  Now, you were shown a Record of Conversation that
23    you had with Jeff Cole on August 18, 2004.
24    Is it correct that during that conversation
25    Mr. Cole discussed with you not just the Victory

Page 93

1  proposal but also the Rentech proposal and the
2  English Boiler proposal?
3  A  That is correct.
4  Q  Based on your experience in dealing with the
5     different manufacturers who were supplying
6     proposals to the university, were they all from
7     time to time commenting on the proposals submitted
8     by their competitors?
9  A  Many of them were.
10 Q  As a result of -- strike that.
11    And was it true that prior to the conversation
12    on August 18, 2004, with Mr. Cole, you had had
13    conversations with other manufacturers in which
14    they expressed their opinions concerning their
15    competitors?
16 A  Yes.
17 Q  As a result of those experiences, was it your
18    belief that you had to form your own independent
19    judgment as to anything you were told by one of the
20    manufacturers submitting a bid?
21 A  It -- that's partially true. It's just that we had
22    to validate their claims and not just take them at
23    their face.
24 Q  Did you take any of the claims that Mr. Cole made
25    during the August 18, 2004 conversation at their

Page 94

1     face?
2  A  Again, they weren't essential to the direction we
3     were currently heading; and if we had headed
4     another direction, I would have certainly taken
5     them with a different level of sincerity.
6  Q  So you had the conversation, you put it in a file,
7     but you moved on and just focused on the English
8     boiler?
9  A  Correct.
10 Q  And I believe you advised counsel for Victory that
11    you don't recall which specific Indeck entity
12    employed Mr. Cole; is that right?
13 A  I don't. I know we have it in our records. I'd
14    have to look it up for you.
15 Q  Do you know during that conversation who first
16    raised the issue of Indeck's acquisition of the
17    Keystone assets, whether it was you or whether it
18    was Mr. Cole?
19 A  It was Mr. Cole. I had no reason to call him. So
20    he called me, and those were the items he wished to
21    discuss.
22 Q  Can you recall anything else that Mr. Cole said to
23    you during that conversation, other than what you
24    wrote down in Exhibit 7?
25 A  No.

Page 95

1  Q  You said that not everyone could meet Notre Dame's
2     desire for a hundred percent membrane construction.
3     Do you recall what alternatives were provided
4     to the membrane construction?
5  A  I'm trying to remember, but it seems like at least
6     one of the bidders had like a front wall refractory
7     design, and they basically downplayed that as not
8     being as big an issue, and we certainly listened
9     and considered that.
10 Q  Any other alternatives that you recall?
11 A  No, I don't.
12 Q  Approximately how many proposals did you receive?
13 A  I believe we received six.
14 Q  From your review of those six proposals, did each
15    of the manufacturers recommend a different design?
16    MR. SHEEAN: Objection, vague.
17 A  Talking about boiler type?
18 BY MR. GISLESON:
19 Q  Correct.
20 A  Mostly "D"s. I think one "O" and the "S."
21 Q  Was it clear to you that there were different
22    alternative approaches that the university could
23    pursue for a boiler?
24 A  Yes. We were aware of that even before we took
25    bids.

Page 96

1  Q  There is no one-size-fits-all in the industry?
2  A  Correct.
3  Q  And I think you said that the boiler that you
4     wanted was not an off-the-shelf item?
5  A  Correct.
6  Q  What did you mean by that?
7  A  That it's a customized product, that you don't
8     order it by a part number and, you know, get -- you
9     know, here's the way it comes and you just decide
10    that's what you want. It's not like buying a
11    furnace at home.
12    MR. GISLESON: Those are the
13    questions I have. Thank you.
14    THE WITNESS: You're welcome.
15    MR. SHEEAN: I just have a
16    couple of quick follow-up questions
17    for you, Mr. Kempf.
18    REDIRECT EXAMINATION
19 BY MR. SHEEAN:
20 Q  You talked about the existing boilers that the
21    university currently has on line and the fact that
22    some of those or many of those are not 100 percent
23    membrane wall, correct?
24 A  Correct.
25 Q  And the fact that those boilers are still in