UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>       Plaintiff,<br><br>   v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>       Defendant. | CIVIL ACTION<br><br>NO. 04-CV-325 (ERIE)<br><br>Judge Sean J. McLaughlin |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION *IN LIMINE* SEEKING TO
BAR REFERENCE TO ROBERT GDANIEC'S LETTER OF
MARCH 26, 2004 AND MARK WHITE'S LETTER OF MARCH 30, 2004**

Plaintiff Indeck Keystone Energy LLC ("IKE") submits this memorandum of law in opposition to Defendant's Motion *in Limine* that seeks to prevent IKE from referencing correspondence between IKE's predecessor-in-interest, Erie Power Technologies, Inc. ("EPTI") and VEO in which those parties specifically addressed the scope of the License Agreement. This Motion is a variation of VEO's Motions *in Limine* Nos. 3, 10, and 11 that seek to exclude various evidence pre-dating IKE's becoming licensor. Of course, IKE stands in EPTI's shoes for purposes of the License Agreement; therefore, conduct prior to September 8, 2004 is relevant. The correspondence is directly relevant to a number of factual issues that are central to Plaintiff's

claims, including the parties' interpretation of the product intended to be licensed under the Agreement. The Motion's attempt to exclude probative, admissible evidence should be denied.

## ARGUMENT

VEO makes the following simplistic argument: because IKE was not the licensor prior to September 8, 2004, "any purported misconduct by VEO that occurred prior to [that date] is irrelevant to any issue to be determined at trial and would be offered for the sole purpose of vilifying VEO." (VEO Motion, p.2, ¶ 8) As with its other Motions *in Limine*, VEO fails to analyze the evidence to explain how it is "irrelevant" or "unfairly prejudicial." (*Id*. at ¶¶ 7-8) Nevertheless, this correspondence – which represents two of the most important exhibits in the case – is relevant and admissible for multiple reasons.

First, the Court has found that the License Agreement is ambiguous as to what the licensed product was intended to be. The course of performance between VEO and EPTI is relevant to interpretation of the Agreement. *Atlantic Richfield Co. v. Razumic,* 390 A.2d 736, 741 n.6 (Pa. 1978) ("course of performance is always relevant in interpreting a writing"); *see also Regscan, Inc. v. Con-Way Transp. Servs.,* 875 A.2d 332, 339 (Pa. Super. Ct. 2005) ("any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement"). Robert Gdaniec, the author of the March 26, 2004 letter, was an EPTI engineer who worked with Mark White in revising Annex I to include specific characteristics of the Standard M-Series. White (who lost his job with EPTI and became VEO's General Manager) wrote VEO's March 30, 2004 letter after sharing two drafts with VEO's President John Viskup. Thus, three individuals involved with creation of the License Agreement

and Annex were involved in a written exchange that specifically and clearly addressed the scope of the Agreement, including the definition of the licensed product.

EPTI sent VEO the March 26, 2004 letter on the subject of "concerns" that EPTI had with VEO's performance of the Agreement during the prior year. That letter specifically stated that VEO was selling boilers outside the geometry and characteristics of the product covered by the Agreement – basically, that VEO breached the Agreement. VEO responded in a letter dated March 30, 2004 that the Agreement does contain specific geometry and characteristics – which referred to Annex I – and that the features identified by EPTI in its March 26 correspondence (including membrane walls) were in fact outside the Agreement. VEO therefore admitted the fundamental point argued by IKE in this lawsuit: Annex I to the Agreement specifically defines the product, and that product does not include membrane walls.[1] VEO made that admission in the context of a claim of breach by the licensor at a time before IKE owned the technology and before there was a lawsuit, making the admission especially probative because VEO was being candid with the original licensor. Moreover, the VEO representatives responsible for the letter were the two people at the center of the discussions during negotiation of the Agreement, making the admission even more probative and relevant to their true understanding of the licensed product.

Second, that correspondence demonstrates that EPTI had previously consented to VEO selling boilers outside the scope of the agreement, but was revoking that consent. It supports the argument that EPTI gave consent on a case-by-case basis and that VEO recognized

---

[1] VEO claimed that membrane walls were "an improvement" it was permitted to make under the Agreement. However, the clause of the Agreement concerning "improvements" provided that VEO only had the right to use improvements "developed during the term" of the Agreement. Membrane walls were developed prior to the time the Agreement was executed and therefore did not fall within the scope of "improvements." VEO has admitted during the lawsuit that there were no "improvements," and White testified that he was mistaken in describing membrane walls as an "improvement."

it was receiving such consent, which refutes VEO's claim that it had unfettered discretion to sell custom boilers.

Third, that correspondence demonstrates that both licensors gave express instruction to VEO to limit sales to the Standard M-Series boiler, but VEO refused. VEO's conduct is relevant to whether it acted willfully in continuing to use the Keystone® trademark for a product outside the scope of the License Agreement.

Fourth, the evidence will demonstrate that EPTI tried to rein in VEO through that correspondence, but VEO refused. VEO then stepped up its improper actions while IKE was licensor, going even farther with its misleading and unfair use of the Keystone® trademark for VEO's benefit, holding itself out as having developed the designs and even as owning those designs. This is directly relevant to the unfair competition and unjust enrichment claims.

Fifth, the correspondence demonstrates that EPTI did not have full knowledge of what VEO was doing, which will counteract VEO's argument that all of its activities were within the scope of the Agreement. For example, VEO has argued that EPTI provided VEO with marketing materials that included non-conforming design features, which VEO argues is evidence of intent as to the meaning of the agreement. Yet when EPTI's March 26 letter sought copies of those materials as used by VEO, VEO refused to provide them, claiming in the March 30 letter that they were proprietary, without stating that EPTI somehow had approved them. In addition, VEO's response to EPTI claimed that it was not marketing "custom boilers" (*i.e.*, boilers other than the Standard M-Series), which was false.

Sixth, the correspondence will counteract VEO's argument as to the significance of EPTI's "representation" in the asset sale agreement for the Keystone® assets that there were no violations of a license agreement.[2] For example, VEO claimed in its March 30 response to EPTI's March 26, 2004 letter that VEO was not selling custom boilers. VEO's proposals show that VEO lied to EPTI, as well as that it failed to disclose what it was marketing.

Seventh, the correspondence shows that there was nothing improper or unfair about IKE's instruction to VEO to stop selling non-conforming boilers given the instruction by EPTI and VEO's admission that membrane walls and other deviations from Annex I were outside the scope of the license.

Finally, the correspondence is impeachment for both Mark White and John Viskup to the extent they claim that the Agreement permitted them to sell boilers that deviated from Annex I.

---

2 That representation did not cover all EPTI employees and was limited to the "actual knowledge" of certain individuals. The representation did not cover, for example, the knowledge or belief of Robert Gdaniec, who wrote the March 26, 2004 letter. In any case, VEO's reliance on that "representation" is a factual issue it can raise that the jury can weigh with the other evidence in the case; it is not a basis for excluding other evidence that is "bad" for VEO.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Indeck Keystone Energy LLC asks the Court to deny Defendant's Motion *in Limine* Seeking to Bar Reference to Robert Gdaniec's Letter of March 26, 2004 and Mark White's Letter of March 30, 2004.

Respectfully submitted,


    /s/   John K. Gisleson
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
Jennifer A. Callery (Pa. ID. No. 91421)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA 15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

*Attorneys for Plaintiff and Counterclaim Defendant, Indeck Keystone Energy, LLC*

Dated: May 2, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion *in Limine* Seeking to Bar Reference to Robert Gdaniec's Letter of March 26, 2004 and Mark White's Letter of March 30, 2004** was served upon the following counsel of record by the CM/ECF electronic filing system on the 2nd day of May, 2007:

> Christopher T. Sheean, Esquire
> Matthew Garrett, Esquire
> Wildman, Harrold, Allen & Dixon LLP
> 225 West Wacker Drive
> Suite 2800
> Chicago, IL 60606

> \_\_/s/\_\_\_John K. Gisleson_____
> John K. Gisleson