UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INDECK KEYSTONE ENERGY, LLC, a Delaware limited liability company,<br><br>      Plaintiff,<br><br>v.<br><br>VICTORY ENERGY OPERATIONS, LLC, a Delaware limited liability company,<br><br>      Defendant. | :<br>:<br>:<br>:<br>:  CIVIL ACTION<br>:<br>:  NO. 04-CV-325 (ERIE)<br>:<br>:  Judge Sean J. McLaughlin<br>:<br>:<br>:<br>:<br>: |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION *IN LIMINE* NO. 6 TO BAR EVIDENCE
RELATING TO UNEXPRESSED INTENT OF CONTRACT TERMS**

Plaintiff Indeck Keystone Energy LLC ("IKE") submits this memorandum of law in opposition to Defendant's Motion *in Limine* No. 6, which seeks to prevent IKE from introducing evidence as to the understanding of employees of IKE's predecessor licensor (Erie Power Technologies, Inc. or "EPTI") as to the interpretation of the License Agreement and, in particular, the product licensed by VEO. VEO's description of that evidence as "unexpressed intent" is wrong, and the Motion should be denied.

## **ARGUMENT**

I.  **The Understanding of EPTI Employees Is Relevant To The Intent Of The Agreement And Other Issues In The Lawsuit.**

VEO makes the following argument: "any belief of an EPTI employee who was not involved in the negotiation of the License Agreement regarding whether or not M-Series boilers could incorporate membrane wall technology and still be considered an M-Series boiler is irrelevant to the interpretation of the License Agreement unless such belief was somehow communicated to VEO prior to the execution of the Agreement." VEO further argues that the evidence "will only mislead and confuse the jury." (VEO motion at p.2, ¶ 5) VEO, however, never identifies the specific evidence it seeks to exclude. Once some of that evidence is identified, the lack of merit to VEO's Motion becomes clear. Mark White ("White") was the EPTI employee who dealt directly with VEO with respect to the creation of the License Agreement. However, he was instructed by EPTI's President (Stephen Kang) to work with the Engineering Department to define the licensed product so that EPTI was adequately protected. White therefore sent a draft of Annex I to the Agreement to the Engineering Department, advising in the cover email that Annex I was "the product description" for the Agreement. (Plaintiff's Exhibit P-55) The Engineering Department then sent an email to White that identifies specific features of the Standard M-Series that were missing from the draft of Annex I. (Plaintiff's Exhibit P-58) White in turn incorporated <u>all</u> of the information identified by the Engineering Department and sent the revised Annex I to VEO. As a result, the understanding of those employees <u>was</u> communicated to VEO through the transmission of the revised Annex I to

2

VEO, and VEO in fact accepted Annex I as edited by those EPTI employees. All of this occurred prior to Annex I being finalized.[1]

The same evidence demonstrates that White is not the sole embodiment of EPTI's understanding of the Agreement. Rather, other EPTI employees were involved in creation of Annex I and communicated with White about the meaning and intent of the Agreement. VEO is wrong to the extent it suggests that White alone can testify as to EPTI's intent.

In addition, EPTI employees communicated with White during and shortly after the creation of the License Agreement and Annex I on the subject of what was and was not within the scope of the license. For example, White was informed that membrane walls are outside the scope of the Agreement. (Exhibit P-64) White did not dispute this, which confirms that EPTI's understanding consistently was that membrane walls were outside the scope of the Agreement.

Further, EPTI employees had communications with VEO employees after the Agreement was finalized in which EPTI advised VEO employees on multiple occasions that the scope of the Agreement was limited to the Standard M-Series. VEO <u>never</u> disputed EPTI's description of the scope of the Agreement. That course of performance evidence is relevant to interpretation of the Agreement given the Court's finding that the Agreement is ambiguous. (5/10/06 Court Op. Transcp. 116:13-117:2) That evidence is further relevant to show that EPTI never gave unconditional permission to VEO to use the custom designs, which had been provided to VEO for a specific project.

---

[1] VEO refers to *Foster v. Colonial Assur. Co.*, 668 A.2d 174 (Pa. Commw. Ct. 1995), to stand for the proposition that only the expressed intent of the parties is applicable when interpreting a contract. However, this reference is misguided due to the fact that the court in that case was looking at a contract that was clear and unambiguous. The Court has previously held that the License Agreement between VEO and IKE is ambiguous. 5/10/06 Court Op. Transcp. 116:13-117:2. Thus, VEO's reliance on the *Foster* case is not applicable to the interpretation of an ambiguous contract, such as the License Agreement.

The evidence from the EPTI employees likewise is relevant to show the information communicated to White while he was employed by EPTI. That is important because he necessarily brought that knowledge with him when he joined VEO, became its General Manager, and became responsible for VEO's performance of the Agreement. In short, he knew that EPTI believed the scope of the Agreement was limited to the Standard M-Series with tangent tube walls. That knowledge is very relevant and significant given White's admission in his March 30, 2004 letter to EPTI that the License Agreement contained specific "geometry and characteristics" and that membrane walls were outside the Agreement. It further is relevant to VEO's intent in proceeding to use the custom designs after IKE instructed VEO to confine its activities to the Standard M-Series, including explaining why VEO concealed its activities from IKE.

Finally, IKE wishes to introduce that evidence to demonstrate that the licensor has always been consistent with respect to its interpretation of the scope of the Agreement. In short, IKE did not create this issue and is acting consistently with what its predecessor licensor believed.

## II. The Rosetti License Agreement Is Admissible To Explain The Origin Of Terms In The VEO Agreement.

VEO makes the additional argument that IKE should be precluded from introducing evidence that White modeled the License Agreement with VEO on another agreement that EPTI entered with an Italian licensee for a different product (a heat recovery steam generator). According to VEO, the "fact that the terms IKE's predecessor chose to express its agreement are the same terms it used in another agreement are of no consequence," and the jury will be misled and confused, while VEO will be unfairly prejudiced. (VEO Motion

at p.3, ¶¶ 11-12) VEO again does not analyze the evidence. Upon inspection, it is clear that the evidence is relevant and probative.

VEO asserts that "where the language in a contract is clear and unambiguous, its interpretation is focused on the terms manifestly expressed rather than upon any silent intent of the parties. Therefore, whether or not IKE intended to be bound by the terms of the contract it drafted, it is bound by those terms." (VEO Motion, p.3, ¶¶ 10-11) However, the Court found exactly the opposite – that the definition of "Products" is ambiguous based on the phrase "includes but not limited to," which is why extrinsic evidence such as the Rosetti Agreement is admissible.

IKE will introduce evidence that White used the Rosetti Agreement as the model for the VEO Agreement, which explains the origin of the phrase "includes but not limited to." (Plaintiff's Exhibit P-24) That phrase was not specifically negotiated by White and VEO, and it does not have any special meaning attributable to it as suggested by VEO. White unthinkingly copied it from another agreement; it was <u>never</u> the subject of negotiation. This is directly relevant to the issue of what the parties intended – if anything – by that phrase.

Such evidence also is relevant cross-examination for White, who is advocating (now that he works for VEO rather than EPTI or IKE) that the parties intended for the Agreement to include membrane walls based on the phrase "includes but not limited to" despite his express inclusion of tangent tube walls in Annex I.

Finally, there is nothing misleading, confusing, or unduly prejudicial about this evidence. It is a simple, straightforward explanation for the origin of the phrase that shows there is no special meaning attributable to it. Furthermore, because it is common that one agreement or document is used as the basis for another, jurors can easily understand the concept.

5

## **CONCLUSION**

For the foregoing reasons, Plaintiff Indeck Keystone Energy LLC asks the Court to deny Defendant's Motion *in Limine* No. 6 to Bar Evidence Relating to Unexpressed Intent of Contract Terms.

Respectfully submitted,

/s/   John K. Gisleson
John K. Gisleson (Pa. ID. No. 62511)
Robert J. Williams (Pa. ID. No. 76139)
Jennifer A. Callery (Pa. ID. No. 91421)
SCHNADER HARRISON SEGAL & LEWIS LLP
Fifth Avenue Place
120 Fifth Avenue, Suite 2700
Pittsburgh, PA  15222-3001
Telephone: 412-577-5200
Facsimile: 412-765-3858

*Attorneys for Plaintiff and Counterclaim Defendant, Indeck Keystone Energy, LLC*

Dated:  May 2, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion *in Limine* No. 6 to Bar Evidence Relating to Unexpressed Intent of Contract Terms** was served upon the following counsel of record by the CM/ECF electronic filing system on the 2nd day of May, 2007:

    Christopher T. Sheean, Esquire
    Matthew Garrett, Esquire
    Wildman, Harrold, Allen & Dixon LLP
    225 West Wacker Drive
    Suite 2800
    Chicago, IL 60606

                                                /s/   John K. Gisleson
                                                John K. Gisleson