IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INDECK KEYSTONE ENERGY, LLC,      )
                  Plaintiff       )
                                  )
            v.                    )   CIVIL ACTION NO. 04-325 ERIE
                                  )
VICTORY ENERGY OPERATIONS, LLC,   )
                  Defendant       )

JURY TRIAL - DAY NO. 1

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, May 8, 2007.

APPEARANCES:
            JOHN K. GISLESON, Esquire, appearing on behalf
            of the Plaintiff.

            ROBERT J. WILLIAMS, Esquire, appearing on behalf
            of the Plaintiff.

            JENNIFER A. CALLERY, Esquire, appearing on
            behalf of the Plaintiff.

            CHRISTOPHER T. SHEEAN, Esquire, appearing on
            behalf of the Defendant.

            BRIAN W. LEWIS, Esquire, appearing on behalf of
            the Defendant.

            MATTHEW M. GARRET, Esquire, appearing on behalf
            of the Defendant.

            Ronald J. Bench, RMR - Official Court Reporter

2

1                          I N D E X

2

3                                                    PAGE

4    PLAINTIFF'S OPENING STATEMENT -                   7

5

6    DEFENDANT'S OPENING STATEMENT -                   50

7

8

9                          - - -

10

11

12      WITNESSES:           DIRECT   CROSS   REDIRECT   RECROSS

13

14   FOR THE PLAINTIFF:

15   Martin Swabb              84       --       --        --

16

17

18

19

20

21                          - - -

22

23

24

25

3

1                          P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 11:38 a.m., on

4    Tuesday, May 8, 2007, in Courtroom C.)

5

6            THE COURT:  Swear the jury, please.

7            DEPUTY CLERK:  Please stand and raise your right

8    hand.

9            (Whereupon, the Jury Panel was sworn.)

10           THE COURT:  Members of the jury, now that you have

11   been sworn, you're going to be given some preliminary

12   instructions to guide you in your participation in this case.

13   It will be your duty to find from the evidence what the facts

14   are.  And you and you alone are the judges of the facts.  You

15   will then have to apply those facts to the law as I give it to

16   you.  And you must follow those instructions, whether you agree

17   with them or not.  Nothing that I may say or do during the

18   course of this trial is intended to indicate or should be taken

19   by you as indicating what your verdict should be.

20           The evidence from which you will find the facts will

21   consist of the testimony of witnesses, documents and other

22   things received into the record as exhibits.  And any facts

23   that the lawyers agree to or stipulate to or that the court may

24   instruct you to find.

25           Now, certain things are not evidence and must not be

4

1  considered by you, I will list them for you now.  Statements,

2  arguments and questions by lawyers are not evidence.

3  Objections to the questions are not evidence.  Lawyers have an

4  obligation to their clients to make objections when they

5  believe that evidence is being offered for an improper purpose

6  under the rules of evidence.  You should not be influenced by

7  the objection or by my ruling on it.  If the objection is

8  sustained, ignore the question.  If it is overruled, treat the

9  answer like you would any other.  If you are instructed that

10 some item of evidence is received for a limited purpose only,

11 you must follow that instruction.  Testimony that I have

12 excluded or told you to disregard is not evidence and must not

13 be considered by you.  Anything that you may have seen or heard

14 outside the courtroom is not evidence and also must be

15 disregarded.  You are to decide this case solely on the

16 evidence that has been presented here in this courtroom.

17           Now, there are two types of evidence, direct and

18 circumstantial.  Direct evidence is direct proof of a fact,

19 such as the testimony of an eyewitness.  Circumstantial

20 evidence is proof of facts from which you may infer or conclude

21 that other facts exist.  I am going to give you further

22 instructions on these, as well as other matters, at the

23 conclusion of the case.  But for present purposes simply bear

24 in mind that both types of evidence exist and you may consider

25 both types of evidence.  It will be up to you to decide which

1    witnesses to believe, which witnesses not to believe and how

2    much of any witness's testimony to accept or reject.  I will

3    also be giving you further instructions at the conclusion of

4    the case concerning the credibility of witnesses.

5            Now, this a civil case.  And that means that the

6    plaintiff has the burden of proving its case by what is called

7    the preponderance of the evidence.  And I should also tell you

8    that it also means that the defendant has the burden of proving

9    its counterclaim by what is known as the preponderance of the

10   evidence.  That means that the plaintiff and the

11   defendant/counter-plaintiff has to produce evidence which

12   considered in light of all the facts leads you to believe that

13   what the plaintiff or the counter-plaintiff on the

14   counterclaims is more likely true than not.  To put it

15   differently, if you were to put the plaintiff's and the

16   defendant's evidence on opposite sides of the scale, the

17   plaintiff would have to make the scales tip so that it's on its

18   side.  If the plaintiff fails to meet their burden, the verdict

19   must be for the defendant.

20           Those of you who may have sat on a criminal case

21   will have heard the term proof beyond a reasonable doubt.  That

22   requirement does not apply to a civil case and so you should

23   put it out of your mind.

24           A few words about your conduct as jurors.  First, I

25   instruct you that during the trial, as I think I mentioned to

6

1   you earlier this morning, you are not to discuss the case with

2   anyone or permit anyone to discuss the case with you.  Until

3   you retire to the jury room at end of this case to deliberate

4   on your verdict, don't talk about it at all.

5          Do not read or listen to anything touching upon the

6   case in any way.  If anyone should try to talk to you about it,

7   let us know.  Do not try to do any research or make any

8   independent investigation about this case on your own.

9          And, finally and importantly, do not form any

10  opinion until all the evidence is in.  That is to say, it's

11  important that you keep an open mind until you start your

12  deliberations at the end of this case.

13         Now, this question comes up frequently, so I'm going

14  to address it right now.  If you wish to take notes in this

15  case, you may.  And my deputy clerk will supply you with note

16  pads and pencils, etc.  The only instruction I would have in

17  that regard is at the conclusion of each day of trial, you

18  should leave your notes in the jury room.

19         The trial is going to begin immediately after

20  lunchtime because I do not want to run into the lunch hour with

21  the opening statements.  Speaking of opening statements, an

22  opening statement is neither evidence nor argument.  It is an

23  outline of what that party intends to prove, which is offered

24  to help you follow the evidence.  After the opening statements,

25  the plaintiff will present its witnesses and the defendant may

1    cross-examine them.  Then the defendant will present its

2    witnesses and the plaintiff may cross-examine them.  After that

3    the attorneys will make what is known as their closing

4    arguments to summarize and to interpret the evidence for you.

5    And then after that I will give you the instructions on the

6    law.  And at that point you will retire to deliberate on your

7    verdict.

8            All right, it is now a quarter to 12, I'm going to

9    ask that you be back here and ready to go for opening

10   statements at 1 o'clock.

11           (Luncheon recess from 11:45 a.m.; until 1:10 p.m.)

12           THE COURT:  Are we ready to go?

13           MR. GISLESON:  Yes, your Honor, we are.

14           THE COURT:  Let's go.

15           MR. GISLESON:  Good afternoon.  My name is John

16   Gisleson, I'm one of the attorneys who represents the

17   plaintiff, Indeck Keystone Energy, in this lawsuit.  As you

18   heard, there are some other attorneys who are also working on

19   this case.  One is Jennifer Callery at the table.  Another is

20   Bob Williams.  Then also sitting at counsel table is Chris

21   Petcos.  Chris, please stand up and say hello.

22           MR. PETCOS:  Good afternoon.

23           MR. GISLESON:  Chris is the general manager of

24   Indeck Keystone Energy, which is the plaintiff in this lawsuit.

25   And you're going to hear from Chris at some point during the

8

1    trial.

2            This trial is about the rules of competition in

3    business.  And the evidence in this case will show that the

4    defendant, Victory Energy Operations, broke the rules and

5    engaged in unfair competition.  We know from our everyday lives

6    what unfair competition is.  It's an athlete who takes steroids

7    to enhance his performance beyond what he could have done on

8    his own.

9            Unfair competition is someone getting confidential

10   information from a corporation, and then using that money or

11   that information to make money, to make a profit.  Unfair

12   competition is plagiarizing.  It's copying.  Getting the

13   benefit of something that someone else did and then claiming it

14   as your own.

15           There are rules of competition in business.  One

16   rule is simple.  If you have a contract, you got to keep your

17   contract and comply with its terms, because that sets forth the

18   rules of the relationship between one party and the other.

19           Another rule.  You don't take someone else's

20   technology.  And if you're given a right to use the technology,

21   then when you use it, you've got to stick within that scope of

22   use and you can't go beyond it.

23           Another rule.  A lot of companies have trademarks.

24   Think of Coca-Cola, which is one of the premiere trademarks.

25   Well, there's a trademark in this case.  And that trademark is

1    Keystone.  Keystone is the name of the boiler, and to Indeck

2    Keystone, to Chris Petcos and the other employees of the

3    company.  Keystone is the company's Coca-Cola, it's an

4    important trademark.

5           Now, in this case there was a contract between the

6    parties.  That contract was a License Agreement.  And if you

7    think about a fishing license, you know it's a right to use or

8    a right to do something, or a hunting license.  Well, the

9    License Agreement is really the right to use technology.  And

10   it's a written contract.  And what it does, it says this is the

11   technology you could use, this is how you can use it, and this

12   is the time period that you can use the technology.

13          What you're going to hear is that the defendant

14   received technology under a License Agreement.  That technology

15   was for a boiler known as the Keystone standard M-Series

16   boiler.  The standard M-Series and the Keystone as a whole,

17   traces its roots right back here to Erie.  In fact, the

18   corporate history, which predates Erie Indeck Keystone Energy,

19   dates back to the mid 1800s, when some guys started a company,

20   and it grew over time.

21          The License Agreement here describes the specific

22   boiler that Victory Energy Operations, VEO, was permitted to

23   sell.  That License Agreement also told them how they could use

24   the Keystone trademark, the company's Coca-Cola.

25          The License Agreement also provides, and you'll see

1    a copy of it at different points during the trial, that VEO was
2    to use this license technology only for the standard M-Series.
3    And that once the License Agreement expired, and it was a
4    three-year license, the defendant had to give all the
5    technology back.  You couldn't keep it for yourself because it
6    was a license, which is a right to use, it wasn't a sale, and
7    it wasn't being given away.
8         In this case the plaintiff, Indeck Keystone Energy,
9    will prove that the defendant broke the rules of competition in
10   two ways.
11        First way.  The defendant sold the Keystone boiler
12   that was beyond the scope of the License Agreement.  As I said,
13   the License Agreement was for the standard M-Series boiler.
14   Standard means standard designs, it's got a specific
15   configuration.  They were selling a broader, more customed
16   boiler under the License Agreement.  A boiler that was beyond
17   the scope of what they could sell.  And then they used the
18   Keystone trademark in selling that boiler that was outside the
19   scope of the contract.
20        Way number two that they broke the rules of
21   competition.  They copied.  What you're going to hear is that
22   the defendant began to develop its own boiler during the term
23   of the License Agreement.  And that its own boiler in a number
24   of respects, not entirely, but in a number of respects copies
25   particular designs from the Keystone boiler that the defendant

1    received in confidence during the term of the License

2    Agreement.

3            Why did they develop their own boiler, why did they

4    copy the design.  Because they met with success.  Because they

5    made money, and they wanted to make more.

6            But why else.  It's because the Keystone, as you're

7    going to hear, is a proven design.  Dates back to the 1950s,

8    and they kept improving it over time, refining it based on

9    actual experience.

10            What you're going to hear is that a proven design

11    for a boiler is important.  Why.  Well, it's like buying a car.

12    You don't want to buy the first model year of a car because

13    they're still working out the kinks.  Customers want to make

14    sure the product is going to last.  And they're going to make

15    sure it can be maintained and efficient to operate.

16            This part of the trial simply focuses on whether VEO

17    broke the rules.  You don't have to worry about damages at this

18    point.  So there are really two questions, as I said.  Number

19    one, did they sell the boiler beyond the scope of the License

20    Agreement.  And, number two, did they copy the designs.

21            As the jurors, as you heard from the judge, you're

22    the judges of the facts.  And in this case, because it involves

23    competition, you're the referees of the rules.  You're the ones

24    who decide whether based on this evidence the defendant broke

25    the rules and engaged in unfair competition.

1       Now, as you can tell from the screen, from the

2    number of computers, the boxes, the binders, there's some

3    technology and there's some documents.  But we have juries

4    because we trust you.  Because we know that jurors, when they

5    apply their common sense to the evidence, they can divine right

6    from wrong, fair from unfair.  If you apply your common sense

7    to the evidence in this case, even though it's somewhat

8    technical, it will take you in the right direction.

9       To give you an example of that.  When you're

10   listening to the testimony of a witness on the stand, compare

11   what the witnesses say here, now that there's a jury, to what

12   they say back at the time before there was a judge, before

13   there was a jury, when it was just one party and the other

14   party head to head.

15       Some background.  What is a Keystone boiler.  Well,

16   let me show you a picture of it, to give you some idea of the

17   scale.  A Keystone boiler is a very large machine that

18   generates steam.  That steam can be used in different

19   applications.  Such as to heat a building.  Or to power a

20   turbine engine.

21       When you look in the left-hand corner up here, you

22   can see, thank you, D.J., -- incidentally, that's D.J. Miller,

23   you'll hear me from time to time talk about D.J., he's the guy

24   that controls the technology, make sure we move forward.

25       When you look at this, this gives you an idea as to

13

1    size.  But also as to shape and the number of tubes.  The
2    Keystone is what's known as an O-type boiler.  It's called an
3    O-type because of the shape of the tubes in here, and the fact
4    that they're concentric circles going out.  What there is, is a
5    lower drum at the bottom, and that lower drum contains the
6    water.  It's sometimes called a mud drum.  The water then moves
7    from the lower drum through all these different tubes.
8             What you're going to hear is there are more than
9    1,500 tubes.  That makes its way through the tubes and
10   eventually gets up to the upper drum, which is also known as
11   the steam drum, where the steam separates.  And then you take
12   the steam, you're able to put it in your application.
13            Each of these different rows of tubes has a
14   different function.  Plus there's also a front wall and a back
15   wall.  The bottom line, you can't have a boiler without walls.
16   It's likes having a house without walls.  You can have a H back
17   system, you're not going to be able to keep heated or cooled
18   because there's nothing to contain it.  And you're not going to
19   have any structural support, either.  Even when you have tubes,
20   there's still a lot more that goes into a boiler.  In fact, as
21   you can tell from the size, it's really a complex jigsaw puzzle
22   in a lot of ways, trying to put all the pieces and parts
23   together.
24            Now, the boiler is also known as a package boiler.
25   Now, what that means is it's shop assembled.  You can build it

1    an integral unit in a plant and then ship it in one piece, so

2    that reduces any work that has to be done at the job site.  And

3    so what this shows is the boiler in different phases of

4    construction.

5             Up here you see it with the walls coming on and some

6    of the structural supports.  More about the walls there.  And

7    here it's being loaded on to a rail car, which is one of the

8    ways it gets shipped.

9             You're going to hear that it's a very competitive

10   market, and there are a number of different manufacturers, as

11   you can imagine.  Boilers have been around for more than a

12   hundred years.  And even though some of the general concepts

13   are known, what you're going to find out is when you get down

14   to the details, when you're trying to match up boiler to

15   boiler, what you find out is that there's some differences.

16            And truth be known, truth be told, the manufacturers

17   don't want to give out their detailed design information

18   because whatever advantage you can get, you want to keep to

19   yourself.  You don't want to share it.

20            You heard the judge mention public domain.  And

21   you're going to hear evidence about whether the Keystone

22   designs are in the public domain.  Whether they're generally

23   available.  But when you hear that evidence, focus on whether

24   the specific designs for this boiler ever entered the public

25   domain, whether they became generally available.  And then

1   consider whether the defendant copied something from the public

2   domain or they copied something from Indeck Keystone.

3           Now, just to give you some history of the company.

4   As I said, it's got an old history, it started in 1840.  Bethel

5   Boyd Vincent and a group of partners founded Presque Isle

6   Foundry in Erie.  The name changed in 1851 to Erie City Iron

7   Works.  Which shows you the close connection which Keystone has

8   to Erie.

9           In 1966 it's purchased by a company called Zurn

10  Industries, renamed it Zurn Energy.  You may see the Zurn name

11  from time to time in this lawsuit.

12          In 1997 the company was purchased by Aalborg

13  Industries, which is a Danish company.  They renamed it

14  Aalborg.  It was sold again in 2002.  And then again in 2004.

15          It was in 2004 that the plaintiff, Indeck Keystone

16  Energy, acquired the technology.  And they did so from a

17  company named Erie Power Technologies, Inc.  What that shows

18  you is the importance of technology.  Because, unfortunately,

19  as we all know, manufacturing in Erie, in the country, has

20  taken a hit.  But the one thing that can endure, the one thing

21  that can keep people employed is the technology.  Because it's

22  got value.  The value is in technology and in people.  And

23  that's why companies like Indeck Keystone Energy seek to

24  protect their technology.

25          I'll just quickly show you the cutout of the inside

1    of a boiler.  That's just another view that shows you the lower

2    drum and the upper drum.  But what it also shows is that from

3    the outside it's all encased, so you can't see what's going on

4    on the interior of the boiler.  As I said, there's more than

5    1,500 tubes, more than a thousand different parts.  And these

6    boilers are sufficiently complex that they cost hundred of

7    thousands of dollars each, and sometimes more than a million

8    dollars each.

9            And you're going to hear from some engineers about

10   how the design was developed and more specifically about how it

11   works.  And they're going to tell you that it's a proven

12   design, proven by the fact that more than 2,000 Keystone

13   boilers have been sold over its history.  Many are still in

14   existence, still working, 20, 30, 40, 50 years later, which is

15   a testament to the quality of design and the fact it's

16   excellent to maintain and to operate over time.

17           Proven design and safety, as I said, are important.

18   These things can explode if they're not properly designed.

19   There are also various safety codes that they must comply with.

20   And then, as I say, customers expect a design to work from an

21   operational perspective, as well as a maintenance perspective

22   and to last.  All those considerations, operation, safety,

23   performance, all that is built into the designs, and those

24   designs ultimately are continued in drawings.

25           And there's going to be a lot of testimony in the

1    case, at least some testimony, about drawings.  And there are

2    different kinds of drawings.  Not all drawings are created

3    equal.  There are some general drawings that are used for

4    marketing purposes.  Basically, to give people a general idea

5    about what the different features or components of a boiler is.

6          But then you have the more detailed designs,

7    including assembly drawings.  And if you think about it, a

8    detailed design is kind of like the recipe.  The recipe for how

9    to put the boiler together.  Because what it does is it tells

10   you the ingredients, all the different pieces and parts.  Then

11   it tells you how many of each, it tells you what order to put

12   them in.  And then it gives you the sequence of how you

13   assemble it once you figured out what the pieces and parts are.

14   Although it may sound easy at first, when you're working with

15   more than 1,500 tubes, when you're working with all these

16   parts, and when each part of the boiler has a specific

17   function, it gets complicated.

18          And even though there are going to be similarities

19   among boilers, there's also going to be differences.  And it's

20   those differences that give you the competitive advantage.  And

21   it's because of those differences that you don't want to share

22   the recipe.  You certainly don't want somebody to steal the

23   recipe.

24          When you look at the designs, the drawings, one of

25   the things you're going to see is a stamp on the drawings, that

1    is going to be true for Indeck's drawings, it's going to be

2    true for Victory's drawings.  Everybody always stamps the

3    drawings confidential or proprietary or not to be used by a

4    third party.  Why is that.  It's because they're important.

5    It is because this is the road map, the recipe that tells you

6    how it is designed and built.

7            And under the law, you have to take reasonable

8    measures to protect it.  It doesn't have to be Fort Knox.  But

9    it has to be reasonable.  So one of the questions for you to

10   decide is were the measures taken over time to protect the

11   technology reasonable.  And that includes such things as

12   confidentiality agreements, and limited distribution of the

13   drawings.  And what you'll see is that there were reasonable

14   measures that were taken here.

15           So how does Indeck Keystone Energy fit into this.

16   As I said, it bought the technology in 2004 from Erie Power

17   Technologies.  At the time it only had 11 employees.  Since

18   then it has grown to 28 employees, all local.  What you're

19   going to hear is that all 28 employees have a connection to the

20   history that I showed you on the board.  To one of the

21   successor companies, and they've worked with the Keystone.

22           Just like the Keystone has been the lifeblood of all

23   those different companies so, too, was the Keystone providing

24   jobs for the Indeck employees.

25           MR. SHEEAN:  Your Honor, I'm going to object, this

1    is argument in terms of provision of jobs.

2             THE COURT:  Overruled.  Go ahead.

3             MR. GISLESON:  Where does VEO fit into this, the

4    defendant.  They entered into a License Agreement with Erie

5    Power Technologies.  That was the company from whom Indeck

6    Keystone acquired the technology.

7             Erie Power Technologies then had some employees,

8    some engineers who went over and began to work for Indeck

9    Keystone.  That License Agreement was entered in January of

10   2003.  And it was for the standard M-Series boiler.

11            You're going to hear a lot about standard M-Series.

12   That is an older technology, that really is the baseline

13   technology for the overall Keystone boiler.  And kind of the

14   hallmark, if you will, you'll hear this a lot during the trial,

15   of the standard M-Series or tangent tubes, which simply means

16   the tubes touch inside the boiler.

17            There was also more current technology, which is

18   called membrane wall technology.  Instead of the tubes

19   touching, there was a bar between the tubes.  So it's slightly

20   different, but it's an important difference, because the

21   membrane is newer, the tangent tube is an older technology.

22            The License Agreement specifically showed only the

23   older technology and had no mention of the newer technology.

24   And that's where the dispute lies under the License Agreement.

25   And that is was the defendant limited to selling boilers that

1    only had tangent tube technology or could they sell boilers

2    that had more modern or custom features, such as membrane wall

3    technology.

4            So how did this License Agreement start.  What

5    you're going to hear is that the president of the defendant, a

6    man named John Viskup, sitting in the front row against the

7    wall, contacted Erie Power.  And he told Erie Power that he

8    wanted to license the M-Series.  So he specifically referenced

9    the M-Series.  He already knew of the Keystone, he knew of the

10   M-Series.  And at that time the defendant didn't have any of

11   his own technology for an O-type watertube boiler.  This was

12   the very first time he was obtaining that technology.

13           He negotiated the License Agreement with a man named

14   Mark White.  Mark White at the time worked for Erie Power

15   Technologies.  And he was their sales and marketing director.

16   As sales and marketing director, Mark White also knew what the

17   technology was, and he had access to all the drawings

18   pertaining to that technology.

19           What Mark White did was he went to the president of

20   the company, because the president of the company had to know

21   about the License Agreement.  And what Mark White told the

22   president of the company was that the technology to be licensed

23   was outdated and antiquated.  And you're going to hear

24   videotaped testimony from the president, who will tell you what

25   Mark White told him.  Because, as I said, the standard M-Series

1    is older technology.

2            The president, though, told Mark White to work with

3    the engineering department.  Because like many of us, the

4    president of the company wasn't particularly technical.  He was

5    relatively new to the company.  But he wanted to make sure that

6    this License Agreement clearly defined what the technology was.

7    And Mark White said yes, I will work with the engineering

8    department to define the technology.

9            And what you're going to hear is from Erie Power

10   engineers, who worked with Mark White, they'll tell you about

11   their communications with Mr. White, many of which were in

12   writing.  And what they will tell you is that the licensed

13   product was the standard M-Series.

14           Let's take a look at the first page of the written

15   contract.  This is the cover letter transmitting it from Mark

16   White at Erie Power to John Viskup.  Next page, please.  And

17   again.

18           This is a cover page of the License Agreement from

19   January of 2003.  Would you please call out products.  Now,

20   what this says is "the products shall mean natural circulation,

21   industrial watertube package steam generators with a steam

22   capacity range beginning at 29,000 pph," which is pounds per

23   hour," up to and including 150,000 pounds per hour.  Products

24   shall include but not be limited to the items set forth in

25   Annex I."

1         And that sentence is one of the key phrases for you

2    as the referees of the rules to decide what its intent was

3    between these parties.

4         It's plaintiff's position that it's Annex I that

5    defines the License Agreement, that defines the licensed

6    product.

7         The defendant, in contrast, believes that because

8    the sentence says "includes but not be limited to," they could

9    sell whatever they wanted, whenever they wanted.  Which of

10   course raises a question for you of what does Annex I say,

11   what's does it mean.

12        What you're going to see that in the course of

13   negotiations "includes but not limited to" was never a subject

14   of negotiation.  In fact, the defendant cared about the

15   financial terms, not the technical terms of the agreement.  And

16   they knew when they signed the License Agreement, that they

17   still had to agree to Annex I.

18        What happens was Mark White, the sales and marketing

19   director for Erie Power, sent a draft of Annex I to the

20   engineering department.  If you can call this out, please.

21        This is one of the most important documents in the

22   case.  And the reason it is, because it's how Mark White

23   describes Annex I.  And what he says is "please review the

24   enclosed Annex I, which is the product description of the

25   License Agreement and provide your comments.  I'd like to

1    finalize this week if possible."  This is an example of what I

2    mean when I say as you listen to the testimony, compare what

3    they say now to what they wrote then.  And he's sending this to

4    Bob Gdaniec, who is the chief engineer at Erie Power

5    responsible for the technology.  Also to Dave Briggs and Ted

6    Fuhrman, both of whom also were with the engineering

7    department.

8          Then he promptly hears back from the engineers

9    because they cared about this.  What do they tell him.  If you

10    call out, please, that portion.

11          Dave Briggs, in the engineering department, writes

12    back to Mr. White and says "I have looked at the Annex as well

13    and the following are my comments as to what should be added."

14    What does he identify.  Tangent furnace wall tubes.  Tangent

15    outer wall tubes.  Units were saturated.  And that the front

16    and wall construction is that of refractory.  No front wall

17    tubes at all.

18          As I said, the tangent tubes are the defining

19    characteristic of the standard M-Series.  Then go back, please.

20    What does he write.  "Thanks."  No dispute, nothing.

21          Now, you can make modifications to a tangent tube

22    boiler to give it the performance characteristics of membrane,

23    it's called seal welding the tangent tubes.  Where you keep

24    them together, but there's a weld you can do that's going to

25    give you the gas sealing that you might want in a boiler.  So

1    that was an option.

2              But what you're going to hear is that the defendant

3    never took advantage of that manufacturing opportunity.   So

4    what was the final Annex I.   What you're going to see is that

5    Mark White, on behalf of Erie Power, then sends back the final

6    Annex I to John Viskup.   Next page, please.   And what they did

7    is they initialed each and every page of the License Agreement.

8    And why did they do that.   Because it shows that they had read

9    it and that they agreed to its terms.

10              If you please call out that portion, including that

11    line, thanks.   What you're going to see is there's a reference

12    to the description of products.   Again, it refers to the

13    M-Series Keystone.   And then below design it says "for the

14    purpose of this agreement, the thermal performance of the above

15    M-Series Keystone boilers products are based on the following

16    design parameters."   And then, again, at the bottom there's a

17    reference to standard M-Series Keystone summary.

18              Standard means that they're standard designs.

19    You'll hear under the evidence that Erie Power in fact provided

20    standard designs to Victory Energy.

21              You'll also see that there was a data table that was

22    included in Annex I.   And the data table included specific

23    information about the boilers.   Such as height, width and

24    length.   Temperatures and operating pressure.   Basically,

25    characteristics in geometry that again define the boiler.

1            But so that there was no dispute about what the

2    licensed product was, Erie Power included a drawing so that

3    everyone would know what the product was.

4            Call that out please, including the title.  Thank

5    you.  As you can see, this starts out with Keystone M-Series

6    standard at the top.  But then in addition to having the

7    drawing, there is a simple test.  Would you call that up,

8    please.

9            It's not as clear as I would like it, but it says

10   "front wall refractory, rear wall tube and tile water cooled,

11   outer walls tangent tube, furnace walls tangent tube."  Go

12   back, please.  Call up the whole thing.  And then even when you

13   look along the side, there is a reference here again to furnace

14   wall tangent tube.  Back, please.  And then also for outer wall

15   tangent tube, right there.  And then it also shows that there's

16   a refractory, which is insulating material in the front of the

17   boiler.

18           So all of that is kind of complex and specific, what

19   it tells you is care went into the creation of Annex I.  And

20   what Mark White did was include all those defining

21   characteristics that were identified to him by the engineering

22   department.

23           Why am I bringing this up.  Because the defendant

24   says that the License Agreement doesn't mean what it says.

25   According to the defendant, it wasn't limited to the standard

1    M-Series, that they could go beyond that.

2           Our position, the License Agreement means what it

3    says.  The defendant's position, it doesn't mean what it says.

4    That's an issue for you as the referees of the rules to decide.

5           What happened was that VEO then begins to market

6    these boilers and it makes a sale.  But it's very first sale

7    wasn't a tangent tube boiler.  It was the more custom designed,

8    a membrane wall boiler.  It goes back to Erie Power and say

9    hey, we got this sale, do you want to do it.  And Erie Power

10   agrees to help Victory with this custom boiler.  That's not a

11   standard M-Series because it has the membrane walls.  And Erie

12   provided them with drawings to show them how to do the custom

13   design of the membrane walls.

14          Why, because Erie Power was in financial distress.

15   It was a sale to help the licensee get started.  But Erie Power

16   was in financial trouble.  Financial trouble that continued, as

17   you'll hear, throughout the course of its relationship with

18   Victory Energy.

19          Providing those designs is important because that

20   explains how they got the designs in the first place and how

21   they're able to access those designs when it came time for them

22   to design their own boiler, the Voyager boiler.

23          But what you'll hear is that even though Erie Power

24   provided those detailed designs for the membrane walls and

25   other custom features, they never amended the License

1    Agreement.  What that meant is they could use the designs on a

2    case-by-case basis if Erie Power gave them permission.  But

3    because there wasn't a written amendment to the contract, they

4    couldn't sell it whenever they wanted.  Erie Power had the

5    right to say no.

6              So what happens.  Erie Power gave Victory Energy an

7    inch.  Victory Energy took a mile.  What you're going to see

8    under the evidence is that Victory Energy didn't market

9    standard M-Series boilers.  As it turns out, they were only

10   marketing custom boilers, custom designed boilers.

11             But what you're also going to hear is that

12   consistently Erie Power was telling Victory Energy, you know,

13   the scope of the agreement is the standard M-Series, what

14   you're doing is not a standard M-Series.  The engineers were

15   concerned.

16             And the evidence is going to show that the chief

17   engineer for VEO said my biggest frustration is being told this

18   boiler is not a standard M-Series.  Which shows you that Erie

19   Power cared about the technology, and they were doing their

20   best to try and reign in VEO.

21             Here's another common sense point during the trial.

22   You're going to see a number of instances in which Erie Power

23   and Indeck said to VEO hey, this is outside the scope or you're

24   limited to a standard M-Series boiler.  See if there are any

25   occasions, even once, when Victory Energy writes back to Erie

1    Power or to Indeck and says no, we can sell whatever we want.
2    We can sell a custom boiler.  See if that ever happens during
3    the course of the trial.
4         You're also going to hear that VEO never even gave a
5    copy of the License Agreement to its chief engineer or to its
6    salespeople so that they could determine for themselves what
7    the scope of the License Agreement was.  They didn't know.
8         But, unfortunately, even though Erie Power permitted
9    VEO to go beyond the scope of the License Agreement, Erie
10   Power's problems didn't get any better.  In fact, they ended up
11   going into bankruptcy.  And there were layoffs that were
12   occurring with the company.
13        One of those people who was laid off was Mark White.
14   That's Mark White sitting over there next to John Viskup.  It
15   was Mark White who entered into the License Agreement with Erie
16   Power.  It was Mark White who permitted VEO to go beyond the
17   scope of the License Agreement to sell these custom boilers.
18   Three days after he lost his job with Erie Power, he called
19   VEO.  He got a job and now he's their general manager.  And he
20   goes from working for the licensor to working for the licensee.
21        And you're going to hear him in this trial testify
22   about what he believes the scope of the License Agreement is.
23   He's going to tell you that VEO could sell whatever they wanted
24   whenever they wanted.  But compare what he says on the stand to
25   what's in the documents, what was written at the time.

1          The engineers, though, were becoming increasingly
2     concerned, including after Mark White left.  Because they knew
3     the technology was how they were going to get out of this
4     bankruptcy.
5          It all came to a head in March of 2004.  One of the
6     engineers, a man named Bob Gdaniec, sent a letter to Mark
7     White, who is now with VEO, that talked about the scope of the
8     License Agreement.  And then tried to get VEO to pull back to
9     the scope of the standard M-Series.
10         This is another really important piece of evidence
11    in the case.  Because what he says in the second paragraph --
12    could you highlight the sentence beginning with while, "while
13    things in general have gone well over the past year, we do have
14    concerns with regard to the past years performance that needs
15    to be addressed and resolved.  Attached is an overview of our
16    concerns for your reference."  Then he goes beyond that and
17    sends a detailed analysis included with this letter.
18         First paragraph, please, number one.  What he says
19    is "VEO currently licenses only the M-Series product line.
20    Which has a very specific geometry and characteristics."  And
21    that refers to Annex I that we looked at.  "In review of some
22    of VEO recent projects and proposals, it appears that the
23    majority of projects that VEO is pursuing or has completed has
24    been outside the definition of the License Agreement.  Of
25    particular concern most recently are the Oxy and Dallas/Fort

1    Worth Airport projects, which are well outside the bounds of

2    the products defined in the agreement.  VEO will need to

3    redirect their attention on the sales and marketing and

4    execution of the products that are defined in the License

5    Agreement."

6              What does that mean.  It means stop.  We let you do

7    it before, but now we're not going to let you do it anymore.

8              But he goes on to say "Annex I of the current

9    agreement provides a clear definition of the M-Series design

10   with product size, dimensional data for the different size

11   ranges, typical cross-section of the boiler and overall boiler

12   construction, which includes refractory front and rear walls,

13   tangent furnace and outer wall tubes and pressure casing

14   design."  And there's the reference again to the tangent wall

15   tubes.

16             At this point it's teed up.  The License Agreement

17   has been in effect for a little over a year.  You have Bob

18   Gdaniec, chief engineer at Erie Power, sending a letter to VEO

19   expressing concerns about his performance.  You would expect a

20   response from VEO.  And what you'll see is that VEO in fact

21   sent a response.  And in that response they specifically

22   addressed, the first two paragraphs, please -- they

23   specifically address the assertion that they were selling

24   boilers outside the scope of the License Agreement.

25             And what this letter says, it was written by Mark

31

1   White, after sending drafts to John Viskup, the two people who
2   were involved directly with the discussions in the License
3   Agreement, it says "the agreement does provide specific
4   geometry and characteristics, but also allows for improvements,
5   refer to clause 13.  As such, VEO has made improvements which
6   are necessary to the offer/provide a Keystone boiler that is
7   technically compliant with customer's requirements in line with
8   that of our competitor's offerings, and as we deem necessary to
9   enhance our overall success."  That first sentence refers to
10  Annex I.
11          But going down here it says the Oxyvana's project
12  includes (2) 515 M-Series Keystone boilers, each of which
13  include membrane furnace and outer walls.  Which is the more
14  custom design I mentioned.  Walter cooled front and rear, and
15  an upper drum size of 60 inches interior diameter.  D.J., could
16  you highlight the next sentence, please.
17          "These features are outside the geometry and
18  characteristics of the license but are clearly improvements."
19  Geometry and characteristics of the license is Annex I.  And
20  there's a clause in the contract that talks about improvements.
21  So what we see is correspondence directly addressing the scope
22  of the License Agreement, and VEO is saying that the membrane
23  walls and certain other changes, including a change to the drum
24  side, are outside the geometry and characteristics of the
25  License Agreement.

1          But why is that important.  Because Victory Energy

2     is now saying that letter doesn't mean what it says.  You're

3     going to hear them say that was a mistake.  The membrane walls

4     in fact are within the scope of the License Agreement.  And

5     you're going to hear that from Mark White and from John Viskup,

6     who will be testifying on that stand.  They're going to say,

7     you know what, even though we called that improvements, they

8     really weren't improvements, they were no improvements, it was

9     always within the scope.  That's another common sense point for

10    you to evaluate as you listen to the evidence.

11         What you're going to hear is that VEO disregarded

12    the letter and they continued selling custom boilers.  They

13    didn't stop, even though Erie Power asked them to do so.  And

14    they continued sending out sales proposals using the Keystone

15    trademark for custom boilers.

16         The License Agreement was then transferred during

17    the bankruptcy to Indeck Keystone Energy.  When Indeck Keystone

18    Energy purchased some of the assets from Erie Power.  At that

19    point some of the engineers from Erie Power, including Chris

20    Petcos, went over to Indeck Keystone, one of the first things

21    they did was to say stop.  They sent a letter that defines what

22    the scope of the License Agreement was, and you'll see the

23    letter, and they used language that tracked what Mr. Gdaniec

24    said in his letter to VEO.  And they sent it to Mark White, who

25    had been a colleague of theirs.  Did Mark White send a response

1    to Mr. Petcos saying you're wrong about the scope of the

2    agreement.  Let's see if we see such a piece of paper in the

3    case.

4            While Indeck Keystone was licensor, what you're

5    going to see is that Victory Energy continued to send out sales

6    proposals with the Keystone trademark for custom boilers.  And

7    they in fact continued to make boiler sales, while Indeck was

8    the licensor, using the Keystone trademark for boilers that

9    were custom.  And even though Victory Energy was disclosing its

10   sale of membrane wall boilers to Erie Power because they were

11   working together on a case-by-case basis, they never made that

12   disclosure to Indeck Keystone.

13           But those sales proposals are important for another

14   reason.  And you're going to see a number of the proposals in

15   this case.  They never refer to the fact that there was a

16   License Agreement.  In fact, what you're going to see is even

17   though these are for a Keystone boiler, they started referring

18   to the boiler as a VE boiler or Victory Energy boiler.

19           Then they started referring to these as being VEO

20   designs, instead of Keystone designs.  Then what you're going

21   to see is that for some proposals they don't even use the

22   Keystone design.  They just call it a Victory Energy boiler or

23   a Victory boiler.

24           When they got a copy of the Keystone brochure from

25   Erie Power, what you're going to see is they simply copied it,

1   and they changed the names in there, I think it was the old

2   Zurn brochure, from Zurn to VEO.  And when it talks about who

3   developed the designs, they just said VEO.  And there was no

4   limitation in there into what the scope of the License

5   Agreement was, basically implied, as you'll see, that they

6   could sell any Keystone boiler that they wanted to.

7           But you know what Erie Power did in the same Gdaniec

8   letter we saw, Erie Power sent a letter to Mark White and said

9   we would like to see the marketing materials, we believe we

10  have the right to do so, to make sure you're marketing the

11  boiler appropriately.  What did Mark White say, who negotiated

12  the License Agreement on behalf of Erie Power.  You're going to

13  hear him testify.  And his statement was no, we're not going to

14  show you the marketing materials, we believe they're

15  proprietary.  So that even though Erie Power was attempting to

16  find out how these boilers were being marketed, VEO said no.

17          Second issue.  Actually before I get to that.  The

18  judge mentioned that there were counterclaims in this case, and

19  there are.  The defendant, VEO, brought claims against Indeck

20  Keystone.  And the claims are based on statements that Indeck

21  allegedly made to customers and sales reps of VEO.  In which,

22  according to VEO, the statements were untrue or were wrong.

23          It's our position, as you'll see from the evidence,

24  that Indeck didn't say anything wrong, didn't say anything

25  untruthful.  What you're also going to see is even the

1    statements that are identified by VEO didn't harm VEO.  Because

2    they didn't get sales.  For example, one of the things it is

3    upset about is sales rep.

4            Indeck Keystone hired some sales who worked for VEO,

5    who had also worked for Erie Power.  Indeck Keystone said look,

6    you can only use, you can either sell the Indeck Keystone

7    products or Victory Energy products, but you can't sell both.

8    Because we don't want sales reps to have divided loyalties.  At

9    that point the sales reps had a decision to make, they could

10   work for Indeck Keystone or they could work for Victory Energy,

11   it was up to them.

12           What you're going to hear from Victory Energy is

13   they didn't want their sales reps working for a competitor,

14   Indeck Keystone was a competitor.  But they didn't like the

15   fact that Indeck made them choose, even though VEO itself made

16   them choose.  But the bottom line is the statements are much

17   ado about nothing.

18           Issue number two is the copying issue.  And that is

19   simply did VEO, based on the confidential design documents in

20   its possession, copy any aspect of the Keystone design into its

21   Voyager boiler.  How did this arise.

22           In September of 2004 something bad, something really

23   bad happened to VEO.  Indeck Keystone bought the technology.

24   Because Indeck Keystone, unlike Erie Power, was not in

25   financial distress.  As soon as Indeck Keystone became

1    licensor, it said stop, no more, standard M-Series only.

2           At that point VEO had a choice to make.  We all make

3    choices in life.  We can choose to play by the rules or we can

4    choose to break the rules.  Playing by the rules here means

5    they could have developed a boiler from scratch on its own.

6    They could have bought the technology or licensed the

7    technology from someone else.  Or you can choose to break the

8    rules.  You can cheat or you can copy.  It's like using

9    confidential inside information to make a profit or taking

10   steroids.

11          In fact, the evidence in this case will show that

12   the defendant wanted to buy the Keystone technology.  That six

13   months before the technology was sold, VEO spoke with the

14   president of Erie Power and wanted to buy the technology.

15   Erie Power said we'll sell you the standard M-Series, that's

16   the subject of the License Agreement, but we're not going to

17   sell custom design, the membrane wall designs.

18          You're going to hear that Victory Energy took the

19   position we don't want to buy just the standard M-Series, we

20   want the custom designs.  The discussions got into a half

21   million or more dollars, but it didn't go anywhere.  Because

22   Erie Power wouldn't budge to sell at that price, and Victory

23   Energy didn't want to buy just the standard M-Series.

24          You'll also hear that they had discussions about

25   expanding the License Agreement to include the membrane walls.

1    Which means had VEO amended the License Agreement and paid more

2    money to Erie Power, they could have been selling membrane wall

3    boilers with consent, with permission.  But VEO didn't go for

4    the License Agreement, instead they went radio silent.

5         So what does VEO do.  Fall of 2004, after Indeck

6    Keystone becomes licensor, they begin to develop their own

7    boiler.  During the time of the License Agreement, they never

8    told Indeck Keystone.  Did VEO choose to play by the rules.

9         Well, you're going to find out that the person from

10   Victory Energy responsible for the design was Mark White.  The

11   same Mark White who negotiated the License Agreement on behalf

12   of Erie Power.  Mark White is not an engineer.  He never

13   designed a boiler from scratch.  But he worked on Keystone

14   boilers under the License Agreement.  He had a paper copy of

15   all the design drawings.  He had all the design drawings on the

16   computer network to which he had access.  And he had a copy of

17   the Keystone design guide.

18        Who worked with Mr. White.  Trent Miller, the chief

19   engineer for Victory Energy.  Mr. Miller had never drafted a

20   boiler from scratch.  But he did work on Keystone projects.  He

21   had his own set of the drawings.  He had access to the drawings

22   on the computer network.  And he had his own copy of the

23   Keystone design guide, that was given under the License

24   Agreement.

25        Who did they work with.  A draftsman name Carl

1    Logan, who was responsible for creating the specific designs on

2    the paper, based on information he received from Mr. Miller, as

3    well as Mr. White.  He had prepared drawings for Keystone

4    boilers.  He had access to all the drawings.  He had access to

5    the computer network that stored the drawings.

6            What you're going to hear is that Mark White tried

7    to do it from scratch.  In fact, he worked on the tube layouts,

8    which is a configuration of tubes drum to drum, from the fall

9    of 2004, until January, 2006.  And he had a choice to make.

10   There's an O-type boiler, an A-type boiler, and a D-type

11   boiler, that basically refers to the configuration of the tubes

12   and the drums.  Choice of three, he chose the O-type.  Choice

13   of fuels, you'll hear he chose the same fuels as with the

14   Keystone.

15           But he used a trial and error to try and develop the

16   tube layout.  But then something happened.  Using trial and

17   error, it took from the fall of 2004 until January of 2006 to

18   get the tube layout to 90 percent.  The rest of the boiler

19   design was 10 percent.  And he had a problem at that point.

20   Because the License Agreement was over, and if they went out of

21   the market to try and develop the design, they could

22   potentially lose sales, lose visibility in the market.

23           So what you're going to hear, though, is that VEO

24   knows it would be unfair to copy drawings because their own

25   witnesses will tell you how important their drawings are to

1    them and how they don't want anyone to copy their drawings.

2            But on January 7, 2006, the License Agreement

3    expired.  And VEO no longer had the right to sell Keystone

4    boilers under the license.  And it only had a boiler design,

5    which was 90 percent complete as the tube layout.  And it

6    needed walls.  A boiler won't work without walls.

7            We will present evidence that Victory Energy copied

8    important design features of the Keystone into the Voyager

9    boiler.

10            What you're going to hear is that Victory started

11   marketing its boiler on January 11th, four days after the

12   License Agreement expired, when the tube layout was only 90

13   percent complete, and the rest of the boiler was only 10

14   percent complete.  And it made its first sale only a couple

15   days thereafter.

16            The first proposal it officially sent out was on

17   January 11th, to a company called Abengoa.  What you can see is

18   it's got the proposal date, January 11th, and the proposal

19   number, which is VE-1925, it's for a 150,000 pounds per hour

20   watertube steam boiler, which is pretty big.

21            And go into the letter, please.  Next two pages.

22   What this shows is it was sent out by John Viskup, the

23   president of VEO.  But this wasn't the first proposal that VEO

24   sent to Abengoa.

25            What you're going to see is that on December 5,

1    2005, only a few weeks before, there was a proposal that went

2    out for two 150,000 pounds per hour watertube steam boilers.

3    Next two pages, please.

4            It's the same proposal number, that VE-1925, that we

5    saw in the Abengoa proposal for the Voyager.  It's also sent

6    out by John Viskup, the president of VEO.

7            Do a side-by-side, please.  When you match up the

8    proposal that Mr. Viskup sent to Abengoa in December for a

9    Keystone, with the one he sent January 11th to Abengoa for a

10   Voyager, what we find is they match up completely.

11           What happened.  The evidence will show that he

12   simply substituted a new proposal to Abengoa after the License

13   Agreement expired, but all the text is the same.

14           As you can see, the proposal number 1925 is the

15   same.  You may continue through, please.  And that it lines up

16   the same way.  Keep going, please.  When you look at the

17   general information about the boiler -- keep going please,

18   thank you.

19           When you match this up, it's the same description of

20   the boiler -- verbatim.  Next paragraph, please.  And now

21   they're talking about the furnace walls tubes of any boiler.

22   What you see is the first wall tube design was also copied as a

23   specific design construction feature.

24           If you could go on to the wall description, please.

25   Call that out, please.  The way that they define and describe

1    the wall construction is identical in the proposal they sent

2    out for the Keystone, as well as for the proposal they sent out

3    for the Voyager.  Why is that.  Because we believe that under

4    the evidence, you will see they copied the wall designs.  And

5    you're going to see the importance of the wall designs, because

6    Victory Energy in its proposals consistently identified the

7    wall construction as an important feature of the boilers.  And

8    you'll see that for every Voyager proposal they sent out, they

9    included the same description of the walls.  So that this

10   important construction feature that we believe was copied, was

11   an important part of every sale they made.

12          How many sales.  They made 43 sales into the

13   millions of dollars of these boilers in just 16 months when

14   their design was only 90 percent complete as to tubes in

15   January, and 10 percent complete as to the rest of the boiler.

16   Is that fair competition.  That's for you to decide as the

17   referees of the rules.

18          You're going to hear from the engineers, they'll

19   tell you about the designs.  Two of those engineers are Marty

20   Swabb and Bob Seibel.  They personally were involved with

21   developing the designs, the designs that under this evidence

22   were copied by the defendant.

23          Even though, and I'm coming to the end, even though

24   there's some technical evidence, ultimately, your common sense

25   will take you in the right direction.  Because at the end of

1    the day, it's almost like Sesame Street, you're matching up two

2    documents, two drawings, to see if they're alike, what's the

3    same and what's not the same.

4            You're going to see some evidence that there are

5    design differences between the Voyager and Keystone.  That's

6    true.  But you shouldn't have identical designs in the two

7    boilers unless it was copied.  Because if you do it the

8    old-fashion way through hard work, like Marty Swabb and Bob

9    Seibel did, the design should be different.  Because we're all

10   different.  You come with different designs with what we do in

11   our day-to-day lives.

12           When VEO's lawyer gets up here, see if he denies

13   that VEO copied.  When VEO's witnesses take the stand, see if

14   they deny copying.  Then compare the testimony as stated to

15   what you see.

16           This is an example of the front wall of the boiler.

17   It's called welded front wall assembly.  You can tell just from

18   looking at the drawings that the layout is the same.  Then what

19   we do is you start to match up different components of the

20   boiler drawings to see whether they match or whether they don't

21   match.  Stop here please, D.J.

22           One of the suggestions we have for you when you're

23   looking at the drawings is to look at the text.  Because

24   although some of the detailed designs can be complicated, if

25   VEO was truly designing the boiler from scratch using its own

1    drawings, its own creativity and hard work, you shouldn't have

2    identical text on their drawing that also appears on the

3    Keystone drawing that predated what they did.  We suggest that

4    you look at the text, as well as the overall layout of the

5    drawings to see whether there was copying.  Next please, D.J.

6            And then you start to match up other features on the

7    drawing, and you start to see identical designs.  Next, please.

8    You see identical spacing, identical tube sizes, identical

9    layouts.  The spacing down here is the same, the tube layout is

10   the same.  Next, please.

11           Same with this.  That design is substantially

12   similar, if not identical, to each other.  An example of a

13   difference, they have a larger lower drum.  Upper drum is the

14   same.  General construction design on the two boilers is the

15   same.  And you'll see that they copied other designs as well.

16           As referees to the rules, you decide if there was

17   copying.  And you're also detectives to spot what drawings have

18   copying on them.

19           At the end of this case, we're going to ask you to

20   find in favor of Indeck Keystone.  Because VEO broke the rules.

21   It sold boilers outside of the scope and it also copied the

22   designs.

23           You'll hear about what the designs are trade secret

24   or in the public domain.  The issue is simply do these designs

25   have a competitive advantage.  And did the owner of the designs

1    take reasonable measures to protect the information in the

2    drawings.  We believe the evidence will support that.  And that

3    these specific drawings were not in the public domain, they

4    were special, which is why VEO sought to buy them.

5         At the end of the day, because VEO copied the

6    designs, it took what would have been an average boiler at best

7    and put it on steroids using confidential information it gained

8    under the License Agreement.  Based on the evidence you will

9    see in the next two weeks, but hopefully much shorter, we're

10   going to ask you to return a verdict for Indeck Keystone on

11   both sets of its claims.  Thank you.

12        THE COURT:  Members of the jury, I'm going to give

13   you a short break before we hear the opening statement from the

14   defense.  I'm going to stay on the bench, I have some matters I

15   want to take up with counsel, you're welcome to go back in the

16   jury room.

17        (Jury dismissed from Courtroom C at 2:10 p.m.)

18        THE COURT:  All right.  Have you folks worked out a

19   stipulation on this damage question that I talked about?

20        MR. GISLESON:  No, not yet.

21        MR. LEWIS:  Your Honor, we would like to renew our

22   motion barring the evidence of lost profits.

23        THE COURT:  Would you come up to the podium, please.

24        MR. LEWIS:  Your Honor, we renew our motion with

25   respect to barring evidence of lost profits.  This jury has now

1    heard a $45 million lost profit figure.  We were going to work

2    out a stipulation and we prepared a stipulation to say that we

3    made profits under the sale of the Keystone and Voyager

4    boilers.  It should not go beyond that.  And it is very clear,

5    based upon the arguments relating to the proposals, that they

6    are again, that they're sneaking back into this case the

7    reverse passing off claim.  So we renew our motion with respect

8    to proposals, also.

9          MR. GISLESON:  I did not say that there was $45

10   million in profits that were made.  I identified that there

11   were more than 40 boilers that were sold.  And I said that the

12   sales were in the millions of dollars.  Which is an accurate

13   statement.  I specifically did not, I wanted to say more than

14   $50 million, but I refrained from doing that.  I did not say

15   anything about damages.  I specifically told them that this

16   part of the trial is not about damages.  The other aspect on

17   the proposals, we don't have a reverse passing off claim, the

18   court ruled on that.  I'm not arguing reverse passing off.  It

19   ties directly into the unfair competition claim.  How they use

20   these proposals to set themselves up for once the License

21   Agreement expired.

22         THE COURT:  What motion are you renewing now, is it

23   the motion I took under advisement relative to the appropriate

24   measure of damages?

25         MR. LEWIS:  Yes, your Honor, part of that motion is

1    we wanted to make sure we were truly having a bifurcated trial

2    on liability, where we weren't mentioning the issue of lost

3    profits.  And not letting them infer the amount of lost profits

4    based on argument.

5              THE COURT:  What relief are you requesting?

6              MR. LEWIS:  Well, we prepared a stipulation.

7              THE COURT:  Hang on a second, he can't get us both

8    down.  I didn't hear him mention profits.  The record will

9    speak for itself.  I heard him mention sales.  And assuming

10   that's correct, are you objecting to a statement made in his

11   opening statement or are you asking again for a ruling from me

12   on the appropriate measure of damages?

13             MR. LEWIS:  I believe I'm asking for an

14   understanding of limiting in connection with the evidence.  Are

15   we going to hear evidence of $45 million in sales and let the

16   jury infer that half of that is lost profits.  I believe that

17   the stipulation that we should have and I prepared it, I don't

18   know whether Mr. Gisleson has had a chance to look at it.

19   "Victory Energy Operations, LLC, earned profits on the sale of

20   Keystone boilers during the time prior to the expiration of the

21   License Agreement.  And Victory Energy Operations, LLC, earned

22   profits on the sale of Voyager boilers after the License

23   Agreement expired."

24             THE COURT:  All right, there you go.  There's the

25   proposed stipulation, is that acceptable?

1      MR. GISLESON:  I need to discuss it with my client.

2  I would like to identify the dollar value of the sales.

3  Because that ties directly into how important and valuable the

4  technology is.

5      THE COURT:  What I'm talking about now is a

6  stipulation, outside the presence of the jury, which they're

7  never going to hear, at least in this liability phase.  Because

8  it's unnecessary.  But I'm talking about a stipulation which

9  may nevertheless be necessary for you prove up all the elements

10  of your case.  So what more do you want beyond what he just

11  said?

12      MR. GISLESON:  The dollar value of total sales under

13  each the Keystone and the Voyager.

14      THE COURT:  Would it be true that during the course

15  of discovery, let me ask it this way.  Is there any dispute, I

16  mean there's a dispute here on just about everything, but is

17  there any dispute about the gross dollar value of the sales

18  that VEO generated?

19      MR. GISLESON:  No.

20      MR. SHEEAN:  When you say the gross dollar sales,

21  judge, are you talking about the total income Victory Energy

22  received on the sale of boilers?

23      THE COURT:  I guess that's what I'm talking about?

24      MR. GISLESON:  I would be happy just to total up the

25  sale price of the boiler, setting aside any after-market parts

1    or anything else they sold.  I just want the sales prices as

2    identified in the purchase orders and proposals, I add those up

3    and I say total sales for 11 Keystones were this, total sales

4    for 43 Voyager boilers were that, that's all I care about.

5              MR. SHEEAN:  Why does that need to be in a

6    stipulation that's not going to be shown to the jury?

7              MR. GISLESON:  I do want to get that into evidence

8    to the jury can hear because -- it's not profits, because it

9    says look, the court gave the jury an instruction on public

10   domain.  And the jury is going to hear, based on their

11   argument, that everything that was copied was in the public

12   domain.  They tried to buy the technology.  And they

13   immediately began selling this Voyager boiler, that includes

14   copied technology.  The dollar value of the sales goes directly

15   to unfair competition, unjust enrichment, because they didn't

16   take time out of the market.  They jumped into it feet first

17   and they did it on the backs of the Keystone technology.  The

18   fact they were able to generate not just so many sales, but so

19   many sales at a high dollar value, is definitely probative to

20   unfairness, to unjust enrichment and to value of these wall

21   designs.

22             MR. LEWIS:  It is highly prejudicial, your Honor.

23   What they're saying is we're a poor bankrupt company and look

24   at these big bad guys who they pointed to all through opening

25   statement, they made nearly $45 or $50 million in gross

1    revenues.  That doesn't have any place in this liability phase.

2    All they have to prove is that it had value, and they prove

3    that by us reading the stipulation that they made profits on.

4    The issue of the amount and the lost profits goes to the issue

5    of damages, if we ever get to that.

6                THE COURT:  I'm hard pressed to see how, in terms of

7    the jury resolving the issues as to whether or not the

8    information was a trade secret, whether or not the information

9    was in the public domain, I'm hard pressed to see whether it

10    would, in resolving those issues, it would make any difference

11    to the jury whether you engaged in sales of $10,000 or $10

12    million.  I just don't see it as relevant.  Now, the bell did

13    get rung a little bit in your opening statement.  Because you

14    already referenced, I think you referenced millions of dollars

15    worth of sales.  That can't conveniently be unrung, and I'm not

16    going to try to unring it.  And I don't think you want me to

17    try to unring it?

18                MR. SHEEAN:  I just don't want it to be mentioned

19    again, judge.

20                THE COURT:  So it won't be.  So getting back to the

21    stipulation that you proposed, read it to me one more time?

22                MR. LEWIS:  "Victory Energy Operations, LLC, earned

23    profits on the sale of Keystone boilers during the time prior

24    to the expiration of the License Agreement.  Victory Energy

25    Operations, LLC, earned profits on the sale of Voyager boilers

1   after the License Agreement expired."

2           THE COURT:  All right.  Mr. Gisleson, recognizing

3   that you would prefer more rather than less, but at least that

4   much is accurate, is it not?

5           MR. GISLESON:  That part is accurate, yes, your

6   Honor.

7           THE COURT:  All right, then that's your stipulation.

8   And that removes the burden that you otherwise were carrying

9   from trying to inject damages into this part of the case.

10          MR. GISLESON:  Thank you for relieving me of that

11  burden.

12          THE COURT:  All right, we're going to take a short

13  recess.

14          (Recess from 2:18 p.m.; until 2:30 p.m., with the

15  Jury present.)

16          THE COURT:  Go ahead.

17          MR. SHEEAN:  Thank you, your Honor.  Good afternoon,

18  ladies and gentlemen.  My name is Christopher Sheean, and with

19  me today in the courtroom are my co-counsel, Mr. Brian Lewis

20  and Mr. Matthew Garret.  We represent the defendant in this

21  case, Victory Energy Operations.  With me in the courtroom

22  today, also, is the president of Victory Energy Operations,

23  Mr. John Viskup.  And the general manager, Mr. Mark White.

24  You will be hearing from them later.

25          Ladies and gentlemen, the facts of this case boil

1    down to one simple theme, competitive revenge.  Indeck does not

2    want to compete fairly with Victory Energy in the marketplace.

3    And they've done everything they can to try and frustrate

4    Victory's ability to compete in the marketplace.

5            The evidence will show that they're not entitled to

6    the relief they're seeking.  And at the end of this case, we're

7    going to ask you to return a verdict in our favor.

8            But I want to address the specific theme here, and

9    that is the statement that you don't take someone else's

10   technology.  That's what you heard a moment ago, you don't take

11   someone else's technology.  Well, I'm glad that's not really

12   what happens in competition in the world.  I'm glad.  Because

13   using your competitor's technology that's available for you and

14   I to inspect in the marketplace, being able to do that is good

15   for competition.  And it encourages competition.  We want

16   companies that are able to take the information that's out

17   there and available in the public domain and make a better

18   mousetrap.

19           We've seen this time and time again with products

20   that we buy.  The first VCR that rolled out into the

21   marketplace, cost $500 to $600.  And within a few years the

22   price of those came down, as competition increased and other

23   companies learned how to make VCRs.  The same thing happened

24   with DVD players.  And latest craze seems to be HDTV's, we see

25   the price of those coming down.  Because there is competition.

1       If a company doesn't have a patent on an innovation
2   and a product, there is nothing that prevents its competitors
3   from going into the marketplace, looking at that product and
4   see if they can make it better and cheaper.  That is good for
5   competition, and that's good for our economy and that's good
6   for consumers.

7       Now, you've heard some pretty serious accusations
8   here, ladies and gentlemen.  Victory Energy didn't steal
9   anything.  Because there wasn't any secret to steal.  Every one
10  of plaintiff's claims is based on information that is available
11  to anyone out there.  And if Victory, anyone else had access to
12  it, it can't be a secret and it can't be a basis for a claim of
13  theft or unfair competition.

14      The case can be divided into two parts.  The License
15  Agreement between the parties, and the claims involving Victory
16  Energy's development of its new boiler, the Voyager boiler.

17      The License Agreement involved the sale of a line of
18  boilers called the Keystone boiler.  You've heard a little bit
19  about the Keystone boilers a little bit already today.
20  Keystone boilers came in to existence and around 1950, you will
21  hear, by a company called Zurn Energy.  Zurn Energy made these
22  boilers until it sold this company to Aalborg Keystone.  And
23  there was a name change to Aalborg Industries.  Then ultimately
24  that company sold the Keystone line to Erie Power Technologies
25  through that british company, DKME.

1          And you will hear in this case that when Erie Power

2    went into bankruptcy, for about two weeks there was a company

3    called CMI EPTI that owned the technology.  Then it turned

4    around and sold it to Indeck Keystone Energy.  And this is the

5    progression of companies that we need to keep in mind when you

6    hear the evidence about what Aalborg Industries and Aalborg

7    Keystone and Aalborg Industries, what they allowed their

8    customers to have and what they allowed their customers to do.

9    Because what happened back then is relevant as to what's out in

10   the public domain today on the Keystone boiler.

11         Now, you will hear evidence that there have been

12   nearly 3,000 Keystone boilers sold just up to 1996.  That means

13   there are over 3,000 Keystone boilers out there for anybody to

14   go up to and inspect.  Anybody can go out there and recondition

15   one of these boilers, buy it used, take it apart, there's no

16   prohibition on that.  Thousands of people have seen these

17   boilers.

18         Now, Erie Power realized in 2002 that it was not

19   able to compete in the marketplace by selling its package

20   boiler line.  Erie Power had two problems.  Number one, it

21   closed its shops here in Erie back in the early '90s.  And it

22   was too expensive to ship smaller package boilers from the

23   factory that it used in Korea.

24         So that, coupled with the fact that Erie Power had

25   targeted a heavily engineered type of product, much more

1    technically advanced than the watertube boiler, so it had a lot

2    of expensive engineers to pay.  So as a result, Erie Power

3    decided they needed to do something to develop a revenue stream

4    with the Keystone boiler.  The decision was made in late 2002

5    to enter into a License Agreement.

6         Erie Power was desperate for cash, it needed to find

7    somebody who was licensed in this technology.  Victory Energy

8    was a willing participant.  The president of Victory Energy,

9    John Viskup, who I introduced a moment ago, was anxious to

10   enter into the watertube package boiler market so that he would

11   gain access to the know-how involving the overall boiler

12   industry, so that he could develop a reputation for Victory

13   Energy as a boiler manufacturer.  And develop customer

14   relationships in the industry so that it could sell boilers

15   down the road.  And the Keystone boiler offered a good

16   opportunity.

17        Mr. Viskup was well aware of the Keystone boilers,

18   he sold them for one of his former employers, he knew about the

19   Keystone boiler.  So he was more than willing to enter into

20   this License Agreement.

21        Now, Victory Energy is a relatively young company,

22   it started only eight years ago.  It's based outside of Tulsa,

23   Oklahoma.  Eight years ago, Mr. Viskup and his partners started

24   this company with only 14 employees, doing supervisory work,

25   running boilers.  Today Victory Energy employs over 300 people

1    in Oklahoma, selling boilers all over the world.  Not just
2    these Keystone watertube boilers, but other types of boilers.
3    And they've developed an extensive distribution system and
4    they've done it on the sweat and hard work of Mr. Viskup and
5    his employees.
6          Victory Energy was anxious to enter into this
7    License Agreement and the price was right.  Erie Power only
8    demanded $50,000, payable over two years, plus a four-percent
9    royalty on all the boilers that were sold.  With Erie Power
10   desperate for cash, it was a good deal for Erie Power as well.
11         What the companies understood, ladies and gentlemen,
12   was if they wanted to be successful in this relationship, they
13   had to give Victory Energy a boiler that they could actually
14   market and sell.  They understood that Victory Energy would
15   have to sell products that would be competitive in the
16   marketplace, that would offer the same sort of features that
17   its competitors offered and the features that its customers
18   wanted and were required to have, in order to meet emissions
19   guarantees on the boilers.
20         You'll hear testimony that in the 1990's the Clean
21   Air Act and other emissions requirements were implemented that
22   required people who run boilers to keep their emissions low,
23   keep the air clean.  In order to do that, certain features were
24   implemented in the boilers.
25         Victory Energy and Erie Power understood that